UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY FRANCHI, Individually and on Behalf of All Others Similarly Situated, | Case No. Case No. 1:20-cv-08585-LJL |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| v. | |
| TURQUOISE HILL RESOURCES LTD., ULF QUELLMANN, BRENDAN LANE, LUKE COLTON, RIO TINTO PLC, RIO TINTO LIMITED, RIO TINTO INTERNATIONAL HOLDINGS LIMITED, JEAN-SÉBASTIEN JACQUES and ARNAUD SOIRAT, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Anthony Franchi ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following against Defendants Turquoise Hill Resources Ltd. ("Turquoise Hill" or the "Company"), the Turquoise Hill Individual Defendants and the Rio Tinto Defendants (defined below), based upon personal knowledge as to Plaintiff and his own acts, and information and belief as to all other matters.

Plaintiff's information and belief concerning matters other than himself is based upon the investigation conducted by and through his attorneys, which included, among other things, a review and analysis of (i) transcripts, press releases, news articles and other public statements issued by or concerning Turquoise Hill or Rio Tinto (defined below); (ii) research reports concerning the Company; (iii) reports filed publicly by Turquoise Hill and Rio Tinto with the United States Securities and Exchange Commission ("SEC"); (iv) Turquoise Hill's and Rio Tinto's corporate websites; (v) filings, wire and press releases published by and regarding Turquoise Hill

and Rio Tinto; and (vi) information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a federal securities action on behalf of a class (the "Class") consisting of all persons other than Defendants who purchased or otherwise acquired the securities of Turquoise Hill from July 17, 2018 to and July 31, 2019, inclusive (the "Class Period"), and who were damaged thereby, subject to certain exclusions addressed in ¶154, below.  Plaintiff seeks to recover compensable damages on behalf of himself and the Class caused by Defendants' violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    Turquoise Hill is an international mining company focused on the operation and development of the Oyu Tolgoi copper-gold mine in Southern Mongolia ("Oyu Tolgoi"), which is the Company's principal and only material resource property.  Turquoise Hill's subsidiary, Oyu Tolgoi LLC, holds a 66% interest in Oyu Tolgoi, and the remainder is held by the Government of Mongolia.

3.    Rio Tinto plc and Rio Tinto Limited are operated and managed together as single economic unit and engage in mining and metals operations in approximately 35 countries. Through their subsidiaries, Rio Tinto owns 50.8% of Turquoise Hill.  A Rio Tinto subsidiary, Rio Tinto International Holdings, Inc. ("Rio Tinto International" or "RTIH"; and collectively with Rio Tinto plc and Rio Tinto Limited, "Rio Tinto"), is also the manager of the Oyu Tolgoi project, including having responsibility for its development and construction.

4.      During the Class Period, Defendants made materially false and misleading statements and omitted to disclose material facts regarding the Company's business and operations.  Specifically, Defendants made false and or misleading statements and/or failed to disclose that: (i) the progress of underground development of Oyu Tolgoi was not proceeding as planned; (ii) there were significant undisclosed underground stability issues that called into question the design of the mine, the projected cost and timing of production; (iii) the Company's publicly disclosed estimates of the cost, date of completion and dates for production from the underground mine were not achievable; (iv) the development capital required for the underground development of Oyu Tolgoi would cost substantially more than a billion dollars over what the Company had represented; and (v) Turquoise Hill would require additional financing and/or equity to complete the project.

5.      On February 26, 2019 after the close of trading, Turquoise Hill shocked the financial markets by disclosing in a press release that, although "the [Oyu Tolgoi] project cost was expected to remain within the $5.3 billion budget," a review had determined that "***there was an increasingly likely risk of a further delay to sustainable first production beyond Q3'21.***"  In the press release, the Company attributed the "likely risk" to productivity delays in completing Shaft 2 and "***challenging ground conditions that have had a direct impact on the project's critical path***."

6.      In response to the news, Turquoise Hill's common stock price closed at $1.83 per share on February 27, 2019, a 12.86% decline from the close at $2.10 per share on February 26, 2019, on a trading volume of over 18 million shares – more than four times greater than the average daily trading volume over the prior year.

7.      Four and a half months later, on July 15, 2019, after the close of trading, Turquoise Hill issued a press release announcing a further delay and that the underground project would cost substantially more than the Company had repeatedly stated during the Class Period.  Sustainable first production from the underground development of Oyu Tolgoi would now be delayed by a further nine to twenty-one months until May 2022 to June 2023, and "the development capital spend for the project may increase by *$1.2 to $1.9 billion* over the $5.3 billion previously disclosed."  Turquoise Hill attributed the change to "[i]mproved rock mass information and geotechnical data modelling," which "confirmed that there are stability risks associated with components of the existing mine design."  Turquoise Hill disclosed that the issues with the mine design were so unsettled that it would take until the second half of 2020 to develop a revised design for the mine.

8.      Following this news, Turquoise Hill's common stock price closed at $0.60 per share, down 43.9% from the prior day's closing price of $1.07 per share, with over 50.2 million shares traded.

9.      On July 31, 2019, after the market close, Turquoise Hill issued a press release and Management Discussion & Analysis ("MD&A") making further disclosures about the status of the project, including that Turquoise Hill took a $600 million impairment charge and a substantial "deferred income tax recognition adjustment" tied to the Oyu Tolgoi project, and that it suffered a loss in the second quarter.  The next day, before the market open, Rio Tinto issued a release concerning in part the project status, including that it had also taken an impairment charge related to the Oyu Tolgoi project, of $800 million.  Following this news, on August 1, 2019, Turquoise Hill's common stock price closed at $0.53 per share, down 8.62% from the prior day's closing price of $0.58 per share, with over 16.6 million shares traded.

4

10.     After the Class Period, on July 2, 2020, Turquoise Hill and Rio Tinto announced that the revised feasibility study for the Oyu Tolgoi project had been completed.  The study recommended a new design for the portion of the mine undergoing development, with the addition of structural pillars and other changes, resulting in a reduction to the estimated mineral reserves for the mine.  Turquoise Hill's press release also warned that the Oyu Tolgoi team was engaged in "re-design studies" for other portions of the underground mine.  Turquoise Hill estimated that there would be an increase in capital costs of $1.5 billion (with a range of $1.3 billion to $1.8 billion), "subject to further studies and any additional scheduling delays or increases in capital costs arising from the impacts of the COVID-19 pandemic."

11.     Also, on September 10, 2020, Turquoise Hill and Rio Tinto announced that they had entered into a non-binding Memorandum of Understanding under which they would seek to "reprofile Oyu Tolgoi's existing debt" and raise an additional $500 million through debt financing, plus up to $3.6 billion in equity – thereby diluting Turquoise Hill's public shareholders.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.   <u>JURISDICTION AND VENUE</u>

13.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

14.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c).  Many of the acts and transactions that constitute the alleged violations of law complained of herein, including the dissemination to the public of untrue statements of material facts occurred in this District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III.   THE PARTIES

### A.   Plaintiff

17.     Plaintiff Anthony Franchi, as set forth in the accompanying Certification, purchased Turquoise Hill securities at artificially inflated prices during the Class Period and was damaged as a result of Defendants' wrongdoing as alleged in this Complaint.

### B.   The Turquoise Hill Defendants

#### 1.   Turquoise Hill

18.     Defendant Turquoise Hill is headquartered in Canada, with the Company's principal executive offices located at Suite 3680 1 Place Ville-Marie, Montreal, Quebec Canada, H3B 3P2.  Turquoise Hill's common stock is traded on the New York Stock Exchange ("NYSE") and was traded on NASDAQ under the ticker symbol "TRQ."  The majority of Turquoise Hill's common stock (50.8%) is owned by Rio Tinto International, together with other affiliates of Rio Tinto plc.

#### 2.   The Turquoise Hill Individual Defendants

19.     Defendant Ulf Quellmann ("Quellmann") has served as the CEO of Turquoise Hill from August 1, 2018 to the present and as a Turquoise Hill director from May 2017 to the present.

Since September 2018, he has served as a member of the Oyu Tolgoi LLC Board of Directors. From 2013 to July 2018, Quellmann was the Vice President, Strategic Projects, Copper and Diamonds at Rio Tinto, which he joined in 2008.  Quellmann signed Turquoise Hill's Form 40-F for the year ended December 31, 2018, and he made a series of false and misleading statements concerning underground development of the Oyu Tolgoi project during investor conferences and calls, as set forth herein.

20.     Defendant Brendan Lane ("Lane") served as Turquoise Hill's Vice President of Operations & Development from February 1, 2016 until his departure in or after March 2019. From 2013 to January 2017, Lane was the Minera Escondida Limiteada and Gasberg Financial Director at Rio Tinto Copper, and he previously had other positions at Rio Tinto.  Lane made a series of false and misleading statements concerning underground development of the Oyu Tolgoi project during investor conferences and calls, as set forth herein.

21.     Defendant Luke Colton ("Colton") has served as Turquoise Hill's Chief Financial Officer ("CFO") from October 9, 2017 to the present.  Colton also served as interim CEO from June 27, 2018 until Quellmann's appointment to the position.  Previously, Colton was an employee of Rio Tinto from 2004 until September 2017.  Colton signed Turquoise Hill Forms 40-F for the year ended December 31, 2018, and he made a series of false and misleading statements concerning underground development of the Oyu Tolgoi project during investor conferences and calls, as set forth herein.

22.     Defendants Quellmann, Lane and Colton are collectively referred to as the "Turquoise Hill Individual Defendants."  Together with Turquoise Hill, they are collectively referred to as the "Turquoise Hill Defendants."

23.     The Turquoise Hill Individual Defendants possessed the power and authority to control the contents of Turquoise Hill's SEC filings, press releases, and other market communications.  The Turquoise Hill Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Turquoise Hill Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made by them were materially false and misleading.  The Turquoise Hill Individual Defendants are liable for the false statements and omissions pleaded herein made by Turquoise Hill and themselves.

3.     **The Rio Tinto Corporate Defendants**

24.     Defendant Rio Tinto plc is incorporated in England and Wales, and its principal executive offices are located at 6 St. James's Square, London, SW1Y 4AD, United Kingdom.  Rio Tinto plc has a sponsored ADR facility.

25.     Defendant Rio Tinto Limited is incorporated in Victoria, Australia, and its principal executive offices are located at Level 7 360 Collins Street, Melbourne, Victoria 3000, Australia.

26.     According to Rio Tinto's web site, "Rio Tinto plc and Rio Tinto Limited established a dual listed companies (DLC) structure in December 1995.  As a result, ***the two companies are managed as a single economic unit***."

27.     During the Class Period, Rio Tinto PLC and Rio Tinto Limited (collectively, "Rio Tinto") filed a joint Form 20-F (annual report) and Forms 6-K (interim reports) with the SEC and made presentations to investors in which they made disclosures concerning the development of Oyu Tolgoi.

8

28.     Defendant Rio Tinto International is incorporated in England and Wales, and its principal executive offices are located at 6 St. James's Square, London, SW1Y 4AD, United Kingdom.  As stated by Turquoise Hill in its Forms 40-F for the years ended December 31, 2017 and December 31, 2018:

> RTIH, a wholly-owned subsidiary of Rio Tinto, together with other Rio Tinto affiliates, owns a majority of the outstanding Common Shares and can exercise its voting power to elect all of the members of the Board of Directors, subject to applicable securities legislation.  RTIH can also exercise its majority voting power to unilaterally pass any ordinary resolution submitted to a vote of the Corporation's shareholders, except for resolutions in respect of which RTIH is an interested party and for which disinterested shareholder approval is required.  In addition, under the HoA, RTIH was appointed as manager of Oyu Tolgoi which provides RTIH with responsibility for the management of Oyu Tolgoi.

> RTIH is also able to exert a significant degree of control over the management, development and operation of Oyu Tolgoi, as well as the Corporation, through a series of governance mechanisms and restrictive covenants established under the Private Placement Agreement, the HoA and other agreements entered into with Rio Tinto.   These include the Technical Committee established under the Private Placement Agreement and the Operating Committee established under the HoA, through which RTIH is able to control decisions respecting the business of Oyu Tolgoi LLC subject to a veto of the Corporation in respect of certain special matters.

### 4.     The Rio Tinto Individual Defendants

29.     Defendant Jean-Sébastien Jacques ("Jacques") has been the Chief Executive of Rio Tinto and a member of its Executive Committee since July 2016, and a member of Rio Tinto's Board of Directors since March 2016.  Prior to becoming Rio Tinto's Chief Executive, Jacques was the head of Rio Tinto's Copper product group from 2013 and the Chief Executive of Rio Tinto's Copper & Coal group from February 2015.  During that time, Jacques had overall responsibility for the Oyu Tolgoi project.   Jacques signed Rio Tinto's 2018 Forms 20-F during the Class Period, and he also made a series of false and misleading statements concerning underground development of the Oyu Tolgoi project during investor conferences and calls, as set forth herein.

30.     Defendant Arnaud Soirat (Soirat) has been the Chief Executive of Rio Tinto's Copper & Diamonds product group, a member of Rio Tinto's Executive Committee since 2016 and a member of the Board of Directors of Oyu Tolgoi LLC since September 2018.  Defendant Soirat made a series of false and misleading statements concerning underground development of the Oyu Tolgoi project, as set forth herein.

31.     Defendants Jacques and Soirat are collectively referred to as the "Rio Tinto Individual Defendants.  Together with Rio Tinto, they are collectively referred to as the "Rio Tinto Defendants."

32.     Defendants Jacques and Soirat possessed the power and authority to control the contents of Rio Tinto's SEC filings, press releases, and other market communications concerning the Oyu Tolgoi project, and as alleged herein, each of them made specific misrepresentations concerning development of the Oyu Tolgoi mine.  These two Defendants were provided with copies of the Rio Tinto's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  These Defendants also had the power and authority to control the contents of Turquoise Hill's SEC filings, press releases, and other market communications concerning the Oyu Tolgoi project, as alleged herein.  Because of their positions with Rio Tinto, and their access to material information available to them but not to the public, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

IV.     **SUBSTANTIVE ALLEGATIONS**

A.      **Background**

1.      **The Oyu Tolgoi Mine**

33.     Turquoise Hill is an international mining company focused on the operation and development of the Oyu Tolgoi copper-gold mine in Southern Mongolia, which is the Company's principal and only material resource property. Oyu Tolgoi is a combined open pit and underground mining project in the Khanbogd sum, or district, in Mongolia, located in the south Gobi Desert. The site was discovered in 2001 and is currently being developed as a joint venture between Turquoise Hill, which has a 66% ownership stake in the mine, and the Mongolian government, which has a 34% stake.

34.     The Oyu Tolgoi mine began construction as of 2010 and shipped its first batch of copper from open pit operations on July 9, 2013. Rio Tinto has estimated that up to 80% of the value of the mine lies in its underground operations because copper grades are roughly three and a half times higher than in the open pit.

35.     The design of the underground mine consists of five shafts for access to the mine and "lateral development" to mine the ore. The 10-meter wide Shaft #2 is to be used for production and ventilation, and the other four shafts are for ventilation only. The underground mine was divided into three "panels," with the highest copper grade ore in "Panel 0," to be mined first, followed by Panels 1 and 2. Another feature of the mine design is the use of "panel block cave development," in which iron ore is extracted largely by using gravity to loosen and gather the ore, rather than through shoring up the mine and blasting. The ore is then gathered in massive "draw bells." Rio Tinto held itself out as a leading expert in bock cave mining, and Turquoise Hill and Rio Tinto represented that this was a more efficient and ultimately less costly method to extract ore from the site.

2.      **The 2015 Underground Mining Development Plan and Later Development**

36.     Despite the vast majority of the Oyu Tolgoi project's value being locked underground, in August 2013, disagreements between the Mongolian government and Rio Tinto over the size of the investment required to develop Oyu Tolgoi led to Rio Tinto halting underground expansion of the mine.  The open pit segment of the mine continued to function and produce copper and gold, but underground development of the project was stalled until the mine's stakeholders could agree on how best to proceed.

37.     In May 2015, Turquoise Hill, the Government of Mongolia and Rio Tinto entered into an "Oyu Tolgoi Underground Mine Development Plan" (the "Underground Plan") to provide for a restart of underground development.  Among othering things, the Underground Plan confirmed the (then) $5.1 billion project cost for initial underground construction and development and addressed tax matters, sales royalty calculations and management services payments.  Later, on December 15, 2015, Oyu Tolgoi LLC entered into a $4.4 billion Project Finance Facility with a syndicate of various institutions to fund development of the underground mine, with Oyu Tolgoi limited to an overall debt cap of $6.0 billion to provide for the possibility for an additional $1.6 billion of supplemental debt in the future.  Financing was predicated, in part, on the completion and acceptance of a "statutory feasibility study" to be completed in 2016 (the "Feasibility Study").

38.     On May 5, 2016, Turquoise Hill announced that the Feasibility Study had been completed and that the Company had received a "formal notice to proceed approval" by the boards of Turquoise Hill, Rio Tinto and Oyu Tolgoi LLC.  This was the final requirement to re-start underground development.

39.     The Feasibility Study, among other things, concluded that the cost to complete development of the underground project would be $5.3 billion ($5.1 billion in 2016 real costs),

which was "broadly in line" with an earlier Technical Report issued in 2014.  Construction was to take place over five years, with the first "draw bell" (initial production) towards the end of 2020, sustainable production in early 2021 and a five to seven year ramp up period once production began.

3.    **Defendants  Mislead Investors About the Oyu Tolgoi Project**

*40.*     While development was underway, the Defendants repeatedly represented that the projected cost was unchanged and that the schedule was on track.  For example, in a July 31, 2018 press release, Turquoise Hill stated that "***The Company continues to expect the first draw bell in mid-2020 and sustainable first production in 2021.,***" and Defendant Lane stating during an August 1, 2018 conference call that "***we will remain on target for the first drill point blast in mid-2020 and sustainable production in early 2021***."

*41.*     Similarly, Rio Tinto represented during investor conferences on August 1, 2018 (given by Defendant Jacques) that the Oyu Tolgoi underground project remained "***on track,***" with "***first drawbell production in 2020.***"  An October 2, 2018, a slide presentation given at an investment conference by Defendant Soirat represented that the "***underground project [was] on budget and schedule***" with "***first drawbell production expected mid-2020.***"

**42.**    Turquoise Hill first disclosed a delay in the project on October 15, 2018, when it issued a press release filed on Form 6-K announcing that there would be a nine-month delay in reaching sustainable production and that the Company would undertake its own review of the cost and schedule.  At the same time, the Company reassured investors that "***capital costs remain in line***" and "***the project remains on schedule to complete in 2022***."

43.    These statements were reiterated by Rio Tinto on October 16, 2018, when it issued a press release, filed on Form 6-K, announcing that:

> *Following an annual re-forecast of the Oyu Tolgoi underground development schedule and costs, capital costs remain in line with the overall $5.3 billion budget and construction of the first draw bell is still expected in mid-2020.* The preliminary re-forecast assessment indicates ground conditions and shaft sinking challenges that are ultimately expected to result in a revised ramp-up schedule to sustainable first production.

44.     Two weeks later, during a November 2, 2018 earnings conference call, Defendant Colton sought to reassure investors, stating "*The underground CapEx range for 2018 remains unchanged, as does our total underground CapEx estimate of $5.3 billion.  In terms of timing, the first draw bell remains on track for mid-2020 as well as construction completion for 2022.*" He added that the Company expected to complete its review by near the end of the first quarter of 2019, and that, "[w]hatever the timing, we don't want to comment prematurely before we have the benefit of the fulsome study."  A Rio Tinto investor presentation given by Defendant Jacques on November 12, 2018 stated, "*$5.3 billion Oyu Tolgoi underground first drawbell production in 2020.*"

### 4.   Partial Disclosures, Further Misleading Statements, And The Gradual Emergence Of The Fraud

45.     On February 26, 2019, after the market close, Turquoise Hill shocked investors by stating in a press release that, although the Company's review had determined that "the project cost was expected to remain within the $5.3 billion budget," "*there was an increasingly likely risk of a further delay to sustainable first production beyond Q3'21*."  The press release attributed the delay in part to delays in the completion of Shaft 2, "which continued to experience challenges during Q4'18 with structural, mechanical, piping and electrical installation productivity below expectations."  The press release added:

> In addition to the Shaft 2 challenges, *it was found that increased ground support was required* in some key areas resulting in delays to mass excavations such as Ore Bin 11 and Primary Chamber 1 (PC1) and some areas on the footprint.  *While total lateral development or equivalent development metres have remained on budget,*

*these challenging ground conditions have had a direct impact on the project's critical path.*

46.     The February 26, 2019 press release also disclosed that, due to "challenging ground conditions," which Turquoise Hill had previously referred to only vaguely, a redesign of "***some future elements of the development would be necessary***," resulting in increased costs.   The Company stated:

> Since the completion of the Company's independent review, Turquoise Hill has become aware that Rio Tinto, as project manager, has advised that as the lateral development continues, there is more detailed geotechnical data than what was previously available and, as a consequence, the understanding of the rock mass around and under the ore body has improved.  ***This data reveals there are areas of the mine footprint where the strength of the rock mass is more variable than anticipated.  This will require some potentially significant changes to the design of some future elements of the development, and the development schedule.  This, combined with the delay to Shaft 2, is ultimately expected to result in an overall schedule delay to sustainable first production beyond the end of Q3'21.***
>
> Rio Tinto has advised that detailed schedule and design work has begun and is currently underway, as is the work necessary to estimate the impact on cost and development schedule resulting from this anticipated delay, and any impacts from the re-optimized aspects of the development.  ***As a consequence, the completion of the 2019 definitive estimate review has been delayed due to this expected expanded scope.***

47.     In response to the news, Turquoise Hill's common stock closed at $1.83 per share on February 27, 2019 a 12.86% decline from the close at $2.10 per share on February 26, 2019, on a trading volume of more than 18 million shares, more than four times higher than average daily volume over the prior year.

48.     The next shoe dropped after the market close on July 15, 2019, when Turquoise Hill issued a press release announcing that the "[***t]he development capital spend for the project may increase by $1.2 to $1.9 billion over the $5.3 billion previously disclosed.  This results in sustainable first production now being expected between May 2022 and June 2023***."  The press release attributed the delay and increased cost to "[i]mproved rock mass information and

geotechnical data modelling" which "confirmed that there are stability risks associated with components of the existing mine design. ***Therefore, to address these risks, a number of mine design options are under consideration to complete the project***."

49.    Following this news, Turquoise Hill's common stock price closed at $0.60 per share on July 16, 2019, down 43.9% from the prior day's closing price of $1.07 per share, with over 50.2 million shares traded.

50.    On July 31, 2019, after the market close, Turquoise Hill issued a press release and MD& announcing the Company's financial and operating results for the second quarter of fiscal year 2019.  The press release and MD&A made further disclosures about the project status, including that, due to Oyu Tolgoi, Turquoise Hill took a $600 million impairment charge and a substantial "deferred income tax recognition adjustment" tied to the Oyu Tolgoi project, and that it suffered a loss in the second quarter.  On August 1, 2018, before the market open, Rio Tinto issued a release on its second quarter earnings, in which it also made disclosures about the project status, including that it had also taken an impairment charge related to the Oyu Tolgoi project, of $800 million.  Following this news, on August 1, 2019, Turquoise Hill's common stock price closed at $0.53 per share, down 8.62% from the prior day's closing price of $0.58 per share, with over 16.6 million shares traded.

### 5.    Defendants Ultimately Admit That Their Reassurances to Investors About Project Development Were Unreliable

51.    Neither Turquoise Hill nor Rio Tinto previously warned the Class, as they later acknowledged, that they knew or recklessly disregarded that their repeated cost and schedule estimates for underground development were unreliable and that the project would cost more and take longer than what Defendants were claiming.  Shaft 2 was largely excavated even before the beginning of the Class Period, and in the interim, Rio Tinto dug out many kilometers of lateral

development.  Yet, Defendants first disclosed the existence of severe design issues with the mine, resulting in up to $1.9 billion of additional project costs only at the Class Period end.

6.    **Both The Rio Tinto and Turquoise Hill Defendants Had A Strong Motivation To Conceal The Truth**

52.    The Rio Tinto Defendants – like the Turquoise Hill Defendants – had a strong motivation to make positive statements about the Oyu Tolgoi project to support the price of Turquoise Hill securities and conceal negative information about the development of the project. As to the Turquoise Hill Defendants, a collapse in the price of Turquoise Hill's securities would call into question the viability of the Oyu Tolgoi project, on which Turquoise Hill's securities prices depended.  Rio Tinto, as Turquoise Hill's majority stockholder and the manager of the Oyu Tolgoi project, also stood to see its investment in Turquoise Hill impaired and its position as project manager jeopardized if they disclosed serious technical issues at the mine.

53.    Also, Turquoise Hill and Rio Tinto had a rocky relationship with the Republic of Mongolia, with governmental leaders repeatedly expressing concerns about the economic benefit to Mongolia from the project and Oyu Tolgoi's ultimate profitability and cost.

54.    As a result, the Mongolian government was highly sensitive to delays in underground production and increased development costs both before and during the Class Period, and its representatives repeatedly expressed concerns about the progress of the project and the terms under which the Project was being developed.

55.    This created a strong incentive for Defendants to conceal the truth.  Earlier disclosure of the true facts would only have increased Mongolian government scrutiny of the project and Rio Tinto's role.

56.    The Turquoise Hill and Rio Tinto Defendants also had a strong motive and opportunity to engage in their fraudulent conduct.  Turquoise Hill's ownership interest in the Oyu

Tolgoi mine essentially was its sole asset, and Rio Tinto identified Oyu Tolgoi, in which it also had a substantial interest, as the "largest and highest quality copper development in the world."[1] The importance of the project to both Rio Tinto and Turquoise Hill is amply shown by Rio Tinto's continual disclosures to investors about the status of the Oyu Tolgoi project, as set forth herein.

57.     Indeed, Richard Bowley, the former head of strategic projects for Rio Tinto in Mongolia, brought a lawsuit against Rio Tinto for unfair dismissal, alleging that he warned executives of Rio Tinto of developmental problems at the project beginning in February 2018, and that in January 2019, Rio Tinto asked its attorneys, Baker & McKenzie, to investigate Bowley's allegations.  Rio Tinto then terminated Bowley's employment contract with "immediate effect" in March 2019.

58.     In documents filed with the UK Employment Tribunal, Bowley alleged that he wrote to a Rio Tinto executive in July 2018 warning that the project was a year behind schedule and $300 million over budget, and that costs would escalate rapidly.  Yet, on October 2, 2018, Defendant Soirat told investors that the project "was on budget and on schedule," and on October 15, 2018, Rio Tinto represented that. although there was a schedule delay, the project cost was unchanged.  Later in 2018, Bowley outlined his concerns about the unachievability of the project schedule and budgeted cost to Rio Tinto senior managers and Rio Tinto Board members.  Although Rio Tinto denied the allegations, on September 30, 2020, it settled with Bowley for an undisclosed amount.

## V.     **Materially False and Misleading Statements Issued During the Class Period.**

59.     During the Class Period, Defendants repeatedly represented that underground

---

[1] See Rio Tinto's May 16, 2017 presentation by Defendant Jacques to the 2017 Bank of America Merrill Lynch Global Metals & Mining Conference published on Rio Tinto's website.

development of the Oyu Tolgoi mine was proceeding according to plan and there were no substantial impediments to its completion and beginning commercial production.  Defendants also represented that cost to complete development would be $5.3 billion, with first draw bell in mid-2020 and sustainable production in 2021.  Even after Defendants acknowledged that there would be delays, they continued to minimize the cost and schedule impact of any issues that existed and the severe design and stability problems that had developed at Oyu Tolgoi.

A.     **Misstatements and Omissions Before October 15, 2018**

60.     On or about July 16, 2018, after the ,market close, Turquoise Hill issued a press release entitled "Turquoise Hill announces second quarter 2018 production and completion of Shaft 5," which it also filed as an exhibit to Form 6-K with the SEC.  The press release stated the following about development of the Oyu Tolgoi underground project:

> Oyu Tolgoi has achieved an important underground development milestone with the completed commissioning of Shaft 5, which is 1,178 metres deep and 6.7 metres in diameter. ***There is expected to be a step-up in underground activities with the increased ventilation capacity from Shaft 5. The Company continues to expect the first draw bell in mid-2020 and sustainable first production in 2021.***

61.     On or about July 17, 2018, Rio Tinto issued a press release entitled "Rio Tinto releases second quarter production results," which it also filed as exhibits to Form 6-K with the SEC.  The press release and operations review made the following statements about the status of development of the Oyu Tolgoi underground project:

> ***The major growth projects remain on track, with*** first bauxite shipment from Amrun expected in the first half of 2019 and ***construction of the first drawbell at Oyu Tolgoi Underground anticipated in mid-2020.***
>
> *         *         *
>
> Contractor numbers are approaching their peak, with a project workforce of over 7,500 at the end of June 2018, of which 89 per cent are Mongolian nationals.  ***Shaft two equipping and headframe fit-out is in progress, and the shaft five ventilation system has been fully commissioned and is now operational.  Construction of the first drawbell is still expected in mid-2020.***

62.     On July 31, 2018, Turquoise Hill issued a press release filed on Form 8-K and a MD&A announcing the Company's financial and operating results for the second quarter of fiscal year 2018, which it filed as exhibits Forms 6-K with the SEC.  The press release and MD&A stated in part:[2]

### Underground development progress

The main focus of underground development for 2018 continues to be underground lateral development, the fit out of Shaft 2, support infrastructure and the convey-to-surface decline.  ***The Company continues to expect the first draw bell in mid-2020 and sustainable first production in 2021.***

Underground lateral development was reduced during the first two months of Q2'18 partly due to the commissioning of the new Shaft 5 permanent fans and the resulting ventilation flow transition underground.  However, June subsequently achieved a record-level of equivalent underground development with 0.9 kilometres developed.  ***Progress overall during Q2'18 was 2.4 equivalent kilometres with a total of 12.7 equivalent kilometres of lateral development completed since the re-start of development.***  During 2018, underground development is expected to advance approximately 10.0 kilometres.

*     *     *

During Q4'17, Rio Tinto undertook a schedule and cost review.  ***Rio Tinto has provided Turquoise Hill with a high-level overview of the review's outcomes, in which Rio Tinto concluded there were no material changes in project scope, cost or schedule.  Following analysis of the review's conclusions, Turquoise Hill is in agreement with the findings***.

63.     During an investor conference call the next day, on August 1, 2018, Defendant Lane made an oblique reference to the existence of "challenging ground conditions" at the mine, but only concerning the "convey-to surface" system, which he assured had not impacted the schedule.

---

[2] Each of the MD&As filed by Turquoise Hill during the Class Period was accompanied by a certification signed by Colton or Quellmann as Turquoise Hill's CEO and Colton as Turquoise Hill's CFO stating that the MD&A and accompanying interim financial report "do not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading."

Nothing was stated during the conference call to suggest that these "challenging" conditions placed into question the mine design or that they impacted development of the mine more broadly.

64.    Lane continued:

The Shaft 2 production will be only the first step of the underground ramp up before production transitions to the convey-to-surface system around 2022. ***The production of the convey-to-surface system also continued -- the progress of the convey-to-surface system also continued during the quarter.  And although having faced challenging jditions it is expected to be ready for the continued ramp up in 2022.***

Shaft 2 and associated work will continue throughout the year following the completion of shaft stripping and bracket installation in the last quarter.  Equipping is well underway with the cable and piping installation initiated during the period.

Shaft 2 cages and skips are expected to be delivered on-site late in the third quarter for installation during the fourth quarter.

*        *        *

Taking into account the rotating shifts, the daily average project workforce on-site during the quarter was over 4,000.  ***The Shaft 5 ventilation system was fully commissioned during the quarter and is now operational and adding additional air capacity to mine.***

Shaft 5 is now a dedicated exhaust ventilation shaft fitted with 3 surface fans.  It has 2 ventilation take-off points, one at the 1,141 meter level and one at the shaft bottom at 1,178 meters.

The up station connects 2 drives that exhaust the ore handling system.  The lower station contains 2 more exhaust drives that take air from facilities such as the workshops and the mine footprint.

Impacts from the [Shaft 5] fan commissioning and the transition of airflows underground were felt during the quarter and resulted in the slowing of lateral development for the period, namely in April and May.  Consequently, we recorded the first quarterly drop in development since project restart.  ***However, the upward trend is expected to be back in the third quarter with June having a record month and July tracking quite well to date.  We still expect to meet the target of 2018 of approximately 10 kilometers of development.***

*        *        *

Overall, the main focus areas for the project continue to be critical headings development, Shaft 2 infrastructure work, that also includes an underground ore bin

and materials handling development, as well as surface infrastructure like the new mine drive facilities and essential heating plant expansion.

*Finally, we will remain on target for the first drill point blast in mid-2020 and sustainable production in early 2021.*

65.     Defendant Colton stated:

During the second quarter, underground progress continued and *we completed a major milestone, with Shaft 5 ventilation system becoming fully operational*. Lateral development continued to advance during the quarter, albeit at a slightly slower rate in the first quarter due to the completion of the Shaft 5 ventilation system. That said, June development rates were at record levels…. *We do maintain our expectation of first draw bell in mid-2020 and sustainable first production in 2021.*

66.     Defendant Quellmann concluded the Company's prepared remarks, stating:

We've hit several underground milestones thus far in 2018, *including the completion of Shaft 5*. And finally, *we continue to expect production from the first draw bell mid-2020 and sustainable first production in 2021.*

67.     On August 1, 2018, Rio Tinto filed a Form 6-K including its Unaudited Condensed Interim Financial Report for the six-month period ended June 30, 2018.  The Interim Financial Report stated the following about development of the Oyu Tolgoi underground project:

Tolgoi underground copper mine development in Mongolia (approved project spend of \$5.3 billion): *construction of first drawbell expected in 2020, with average annual production of 560 thousand tonnes between 2025 and 2030*[9].

_____

[9] This production target was disclosed in a release to the market on 6 May 2016. *All material assumptions underpinning that target continue to apply and have not materially changed*.

68.     On August 1, 2018, Rio Tinto also held an investor conference call to discuss the six-month financial results.  A written presentation for the call listed Jacques' name on the cover and was posted on Rio Tinto's website.  The slides stated that the Oyu Tolgoi underground development remained "*on track*" (in two places, ones shown below) and was the "*largest and highest quality copper development*," with "*\$5.3 billion Oyu Tolgoi underground first drawbell production in 2020*."





69.     During the August 1, 2018 call, Defendant Jacques stated that "Oyu Tolgoi underground is progressing well," and he reassured investors that Rio Tinto has "been very clear about the sanctity of the agreement" with Mongolia, adding:

Now my personal experience over the last 5 years is lots of emotion, lots of drama, lots of things in the press.  But at the end of the day, it's common sense prevails. *And if I even step further, Rio has been around for 145 years, 146 years and that's what our job is about, is to operate in challenging jurisdiction, to find a way to do it and to unlock value for the short, medium and long term.*  So all in all, Paul, discussion on the way.  I'm sure there will be further announcement, including potentially a power station, in the second half of this year.

70.     On September 26, 2018, Defendant Jacques gave a presentation on behalf of Rio Tinto at the Bernstein Pan European Strategic Decisions Conference in London.  A written presentation for the conference listed Jacques' name on the cover and was posted on Rio Tinto's website.  The presentation represented that Oyu Tolgoi would begin production according to the previously announced schedule, stating that the "$5.3 billion Oyu Tolgoi underground first drawbell production" would take place in 2020.  It also stated that Rio Tinto was "Building the largest and highest quality copper development":



71.     On October 2, 2018 Defendant Soirat gave a presentation on behalf of Rio Tinto at the Coppers & Diamonds roadshow held in the United States.  Soirat's presentation included the

following slides, which again represented that the project was proceeding according to track, stating *"$5.3 billon capex projected"*; "*Underground project on budget and schedule*"; "*First drawbell production expected mid-2020*"; and "*UG project on time to deliver mid-2020*":





72.     The fine print at the bottom of the second slide stated, as before, "This production target was disclosed in a release to the market on 6 May 2016…. ***All material assumptions underpinning these production targets continue to apply and have not materially changed***."

73.     The statements referenced in ¶¶61-73 above were materially false and misleading because they misrepresented and/or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the progress of underground development and of Oyu Tolgoi was not proceeding as planned; (ii) there were significant undisclosed underground stability issues that called into question the design of the mine, the projected cost and timing of production; (iii) the publicly disclosed estimates of the cost, date of completion and dates for production from the underground mine were not achievable; (iv) the "challenging ground conditions" were much more severe than Defendants represented, and in fact made it impossible for Turquoise Hill and Rio Tinto to achieve those estimates; (v) the development capital required for the underground development of Oyu Tolgoi would cost substantially more than a billion dollars over what Turquoise Hill and Rio Tinto had represented; and (v) Turquoise Hill would require additional financing and/or equity to complete the project.

**B.      Misstatements and Omissions On Or After October 15, 2018**

74.     On October 15, 2018, Turquoise Hill issued a press release entitled "Turquoise Hill Announces Third Quarter 2018 Production and Provides Underground Development Update," which it filed as an exhibit to Forms 6-K with the SEC.  The Company disclosed that there would be more than a two-quarter delay in achieving sustainable production, which it attributed to unspecified delays and "challenging ground conditions" affecting the completion of Shaft 2.   At the same time, the Company reassured investors that "***capital costs remain in line,***" and "***the project remains on schedule to complete in 2022***."

75.     The October 15, 2018 press release included a statement by Defendant Quellmann that:

> "Rio Tinto has undertaken a second annual re-forecast of underground development schedule and costs and ***preliminary results have concluded that capital costs remain in line with the overall $5.3 billion budget and the project remains on schedule to complete in 2022.***  However, there are certain delays, most notably to the completion of Shaft 2, which includes schedule contingency, that are ultimately expected to result in ***a revised sustainable production start from the first quarter of 2021 to late in the third quarter 2021***.  We are undertaking a review of the cause and the impact of these delays and will announce the results as soon as possible."

76.     The press release included the following statement on the status of underground development:

> Rio Tinto, in its role as manager of Oyu Tolgoi and underground construction contractor, has undertaken its second annual schedule and cost re-forecast for the project.  ***According to this re-forecast, lateral development has progressed well, construction completion schedule remains on track for 2022 and the project is expected to be completed at the $5.3 billion budget estimate disclosed in the 2016 Oyu Tolgoi Feasibility Study and the 2016 Oyu Tolgoi Technical Report.***  Oyu Tolgoi has committed $2.1 billion to Mongolian vendors and contractors since the restart of project development.  Additionally, several key facilities have been completed, including Shaft 5, various underground infrastructure and a new camp to house 5,500 workers.
>
> Despite significant progress in the development of the project, ***Rio Tinto has notified Turquoise Hill, based on preliminary results, of a delay to achievement of sustainable first production which is now expected to occur by the end of Q3'21 instead of Q1'21.  This is a result of certain delays including, but not limited to, the completion of Shaft 2, which includes over four months of schedule contingency, and challenging ground conditions.  First draw bell remains on track for mid-2020, partly due to a change in the draw bell sequencing strategy.***
>
> Shaft 2 production capability is a key enabler of increased underground development as well as further construction of critical underground infrastructure, such as Primary Crusher One and the material handling systems, that support the start of production ramp-up.  ***While the full effect of some critical path impacts, including the Shaft 2 delay, has been partly mitigated, the net effect is sustainable first production has been forecast by Rio Tinto to be delayed by up to nine months, and is now anticipated to occur in late Q3'21.***

*     *     *

> ***Turquoise Hill has commenced its own review, with the assistance of the Company's independent Qualified Person, of the cost and schedule re-forecast and its impact on the project's critical path as a result of the anticipated delay in sustainable first production.*** The Company will assess the impact of this delay including, among other things, to the Company's cash flows and liquidity during the affected period, any potential increase in funding requirements and the timing of such funding requirements, ***as well as investigate potential mitigation options relating to cash flow and longer-term project funding.*** Turquoise Hill will update the market at the conclusion of that process.

> Rio Tinto and Turquoise Hill will also commence a definitive estimate review in Q4'18. The definitive estimate review is projected to conclude in early Q3'19 and will provide the next cost and schedule review of the project.

77.     These statements were reiterated by Rio Tinto on October 16, 2018, when it issued a press release, which I filed as an exhibit on Form 6-K with the SEC, announcing that:

> ***Following an annual re-forecast of the Oyu Tolgoi underground development schedule and costs, capital costs remain in line with the overall $5.3 billion budget and construction of the first draw bell is still expected in mid-2020.*** The preliminary re-forecast assessment indicates ground conditions and shaft sinking challenges that are ultimately expected to result in a revised ramp-up schedule to sustainable first production.

78.     On November 1, 2018, Turquoise Hill issued a press release filed and MDA, which it filed as exhibits on Forms 6-K with the SEC, announcing the Company's financial and operating results for the third quarter of fiscal year 2018. In the press release, the Company again stated that there would be a delay in sustainable production, ***but that the "construction schedule remains on track for 2022 and the project is expected to be completed at the $5.3 billion budget estimate" twshat jhTurquoise Hill had originally projected***. The press release and MD&A repeated the statements made in Turquoise Hill's October 14, 2018 press release about the reasons for the delay and how the project overall remained on schedule.

79.     During an investor conference call on November 2, 2018, Defendant Quellmann stated the following about the delay:

> If we turn to the underground and how that is progressing, OT is in the midst of a transformation into a true Tier 1 asset. We have a strong and uniquely-experienced

28

operating partner in Rio Tinto. *We did announce on October 15 that Rio Tinto now projects a 9-month delay for the start of sustainable production from the underground development. The work delays are of course not desirable, developing the OT underground blockade is a very large undertaking and these types of delays are certainly not atypical in the mining industry for projects of this scale and complexity.* Meanwhile, we're in the midst of a review of the project progress and status, and Luke will discuss our options and the path forward in greater detail later on.

80.     Defendant Colton then made the following statement about the delay and its impact

to the project:

> *The underground CapEx range for 2018 remains unchanged, as does our total underground CapEx estimate of $5.3 billion. In terms of timing, the first draw bell remains on track for mid-2020 as well as construction completion for 2022.* As you know, on October 15, 2018, we announced that Rio Tinto has informed us of a delay of up to 9 months in achieving sustainable underground production from around the start of Q1 2021 until the end of Q3 2021. This will delay revenue from the underground, and we are evaluating the impact of this on our funding requirements. We may have flexibility elsewhere to mitigate the impact of delaying revenue and minimize the need to source additional funding. *The number of options and scenarios are being studied over the course of the next few months, and these will help us to more fully understand how best to mitigate the impact of the delay. For example, we might be able to accelerate production from the open pit or possibly defer spending on noncritical capital expenditure. The impact of these and other options could have a positive impact and may help to mitigate the negative impact of the delay.* We are pushing ahead with the requisite urgency; however, these are complex matters that require proper analysis. We are still refining the exact date when the study will be concluded, but we think it could be near the end of Q1 2019. Whatever the timing, we don't want to comment prematurely before we have the benefit of fulsome study.

81.     In response to an analyst question about the delay and the project cost, Defendant

Quellmann stated:

> Maybe the way to best answer your question, Ralph, is just to remind everyone, when we provided the update on the underground, and it's in the charts that Luke just went through, you'll see that *a lot of the key data points that were formed, part of the re-forecast and the preliminary conclusions actually confirmed the existing assumptions. So costs, as you just referred to, stay the same. We're referring to the final completion date as well as the first draw bell. It's really the first sustainable production which has been pushed out.* The work that we're doing at the moment to evaluate option really looks at understanding exactly some of the drivers behind that because **some of the delays that are incorporated are ones that already happened. In particular, in relation to Shaft 2. Others are in the**

forecast period.   And in that forecast period -- so they haven't already happened, they're assumed to happen.   *And in that forecast period is a degree of contingency contained as well.*   And that's probably the component, Ralph, where we need to focus in the review, particular as we look into mitigation options, as we look into verifying exactly what the extent of the delay is.   *For now, where we are with the information that we've provided, we confirm the $5.3 billion total budget*, and it really requires us to complete the review before we're in a position to provide a specific revision to that number, if you like -- if that is the case.   And that's as Luke was referring to, a piece of work that's going on at the moment.   It'll be completed early next year.

82.    In response to another analyst question seeking "comfort[] that this doesn't turn into something larger," Quellmann stated:

> Thanks for the question. I mean, I think in some respects, we may have covered some of the aspects that you are highlighting in the presentation. So -- but let me readdress them.   *We believe that we've got one of the best operators in the industry with Rio Tinto as the project manager* of the open pit as well as constructing the underground mine.   They've got a very strong track record, good experience, dedicating a lot of very, very strong people.   And we think we've got one of the best in-class operators to be able to do this for us.   We also think that, across the season plays, the governance mechanisms plays are robust.   *Notwithstanding that, nobody likes to see delays.  We don't like to see delays, you don't like to see delays.  That is why the work that we referred to earlier, the review work is going on, not just to understand the reasons but also to come up with mitigation options so that we can minimize any potential delay from a timing perspective, from a cash flow perspective*, and that work is going on. It's being taken very seriously.   And rest assured, there is a high degree of urgency to complete the work and then report back to the market as soon as we can.   *In the big scheme of things, we think that the controls that are in place are strong.*   Given the size, the complexity of these projects, these things have happened in other projects and that's maybe why you're asking the question and that's why we're putting these safeguards in place to make sure that the concern that you have is absolutely minimized and doesn't happen.   So at this stage,  I think we explained what we're doing and it's then incumbent upon us, I think, to report back to you with rigor and with urgency to provide you and the broader market with the comfort that things are managed well.

83.    Quellmann then added, "*Yes. Look, I personally have not had any feedback or comment from the team in Mongolia that would suggest undo reasons for concern*…. So I think ultimately, everyone is equally and highly motivated to make sure that this is managed well and that *we are able to deliver this world-class project in a timely fashion and on budget*." Quellmann then asked Lane whether Lane could provide additional comfort, and he responded:

30

Yes, Ulf. In the last quarter, there's been some mass excavation around Bin 11 that is part of the Shaft 2 infrastructure. And so that's – that has caused that Bin 11 component to hold the client on schedule, ***but that's now in the past. So that's been -- that part of the ground conditions has been absorbed***.

84.     After an analyst asked for Lane for clarification and whether an adjustment was being made for ground support, Lane stated:

> ***In part -- in Bin 11, which is part of Shaft 2. But that's -- I guess, what I'm trying to say is some of these ground condition problems have been -- either happened in the past and some of that -- so is behind us.*** Some of them are recognized. And some of the mass excavation is in the chamber and so that's being dealt with now for the PC 1 chamber. And then there is some small amounts in certain areas elsewhere, but it's -- from what we're seeing so far, and this is part of the review that will go on, is we will look at everything that's been done so far and take our own view on the extent of them, but it doesn't – it's mainly in the footprint of mass excavations to where some of the mechanical equipment is going to be installed.
>
> *              *              *
>
> Sure. In some areas, like I said in the chamber, they are changing the ground support to increase the ground support. But that's part of the review that we'll be doing going forward, is looking at that. ***And so that's already been taken into account in terms of the delay that Rio Tinto still hangs about***, but we'll be reviewing that as part of the review.

85.     In connection with the November 2, 2018 conference call, Turquoise Hill made further reassuring statements about the status of underground development in a presentation entitled "Turquoise Hill: A Compelling Value Proposition." Among other things, the presentation stated that "Oyu Tolgoi is a True Tier 1 Asset with a Potential 100 Year Mine Life" and has "***Robust Fundamentals Relative to Comparable Projects***" due to a "Unique Ore Body Size & Grade … Resulting in Low Capital Intensity" compared to other projects. The presentation also represented that the "***Key risks [were] well understood & managed***" and that "Turquoise is Well Positioned to Address Key Challenges," including having sufficient funding to develop the mine:

## Turquoise Hill: A Compelling Value Proposition 4

**TRQ's market valuation is deeply discounted relative to its fundamental strengths**



✓ Unique transformation into a tier 1 asset is well advanced

✓ Robust project fundamentals

✓ Established mine; track record of operational performance

✓ Key risks well understood & managed

✓ Well positioned to benefit from positive outlook for copper prices

✓ Strong management team & deeply experienced operator



## Turquoise Hill is Well Positioned to Address Key Challenges 11

| Risks | Mitigating Factors |
|---|---|
| Path to Market | • Oyu Tolgoi has exported significant volumes since start up<br>  - Cumulatively, nearly 850kt of copper in concentrate sold<br>• Oyu Tolgoi's concentrates known and accepted by smelters |
| Financing & CAPEX Budget | • $4.4B in project financing from 20 global financial institutions<br>• $1.9B spent and $1.2B committed on UG development<br>• UG development project budget unchanged |
| Power Supply | • Stable, established power supply from China<br>• Domestic power supply options under evaluation |
| Fiscal Regime / Government Relations | • Peaceful democracy<br>• Almost daily engagement with Government of Mongolia<br>• Stable open-pit production since 2013; UG construction resumed in 2016 |
| Development Schedule | • Operating partner with extensive block caving experience<br>• First underground sustainable production target: Q3 2021 |
| Local Stakeholder Concerns | • Excellent relationships with nearby communities<br>• Strong local workforce: 19% from South Gobi region |



86.     On November 12, 2018, Defendant Jacques presented at the UBS Australasia Conference in Sydney, Australia.  A written presentation listed Jacques' name on the cover and was posted on Rio Tinto's website.  The presentation included an iteration of the "High-return growth" slide that appeared in earlier Rio Tinto presentations, which stated: "Building the largest and highest quality copper development" and "$*5.3 billion Oyu Tolgoi underground first drawbell production in 2020*":



87.     On January 17, 2019, Turquoise Hill issued a press release announcing its fourth quarter and 2018 operational guidance, which it filed as an Exhibit for Form 6-K with the SEC. The press release stated that "[u]nderground lateral development is expected to advance 15 to 16 kilometers during 2019" but otherwise was silent about how underground development was progressing.

88.     On or about January 17, 2019, Turquoise Hill issued on its website a presentation given at the TD Securities Mining Conference held on January 16 to 17, 2019.  The presentation was captioned "A Leading Copper and Gold Producer, Developing the Next Tier-1 Copper Asset." The presentation included the same "Turquoise Hill is Well Positioned to Address Key

Challenges" slide as the November 2, 2018 presentation.  It added the following slides representing again that the "***Key risks [were] well understood and managed***" and that development was proceeding in accordance with the revised schedule:





89.     On or about January 18, 2019, Rio Tinto issued a press release entitled "Rio Tinto releases third quarter production results," which it also filed as an exhibit on Form 6-K.  The press release stated the following about development of the Oyu Tolgoi underground project:

> Work continues on the critical Shaft Two equipping activities, central heating plant, mine infrastructure, underground materials handling systems and on priority underground development.  ***Overall progress continues to track in-line with the re-forecast undertaken in the third quarter of 2018.***  The project workforce has now reached peak levels of around 9,400, whilst maintaining a high (88 per cent) participation rate of Mongolian nationals.

90.     The statements referenced in ¶¶75-90 above were materially false and misleading because they misrepresented and/or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the progress of underground development and of Oyu Tolgoi was not proceeding as planned; (ii) there were significant undisclosed underground stability issues that called into question the design of the mine, the projected cost and timing of production; (iii) the publicly disclosed estimates of the cost, date of completion and dates for production from the underground mine were not achievable; (iv) the "challenging ground conditions" were much more severe than Defendants represented, and in fact made it impossible for Turquoise Hill and Rio Tinto to achieve those estimates; (v) the development capital required for the underground development of Oyu Tolgoi would cost substantially more than a billion dollars over what Defendants had represented; (vi) Turquoise Hill would require additional financing and/or equity to complete the project; and (vii) the "key risks" had not been "well understood and managed" but had placed the project schedule and cost into severe jeopardy.

**C.      Defendants Continue to Mislead the Market Regarding Underground Mining Despite the Truth Beginning to Emerge**

91.      On February 26, 2019, after the close of the market Turquoise Hill issued a press release, which it filed as an exhibit on Form 6-K, entitled "Turquoise Hill Announces 2019 Financial Guidance and Provides Underground Development Update."  For the first time, the Company disclosed that the "challenging ground conditions" resulted in "*some potentially significant changes to the design of some future elements of the development, and the development schedule*," and that the scope of the planned annual review was being increased to deal with this supposedly "unexpected" impact, which "*is ultimately expected to result in an overall schedule delay to sustainable first production beyond the end of Q3'21.*"  The press release stated in relevant part:

> During the last quarter of 2018, Turquoise Hill carried out its own review of the previously announced Rio Tinto schedule and cost re-forecast for the project (2018 Rio Tinto Review) that had concluded a delay to sustainable first production was expected from Q1'21 to the end of Q3'21.  *The Company's review, with the assistance of the Company's independent Qualified Person (QP) and mining consultants OreWin Pty Ltd (OreWin), found that project cost was expected to remain within the $5.3 billion budget but that there was an increasingly likely risk of a further delay to sustainable first production beyond Q3'21*.

> *This assessment is the result of, but not limited to, certain delays to the completion of Shaft 2, which continued to experience challenges during Q4'18 with structural, mechanical, piping and electrical installation productivity below expectations.*  Current expectations are that the completion of this technically complex installation and commissioning work will now take longer than previously anticipated.  *In addition to the Shaft 2 challenges, it was found that increased ground support was required in some key areas resulting in delays to mass excavations such as Ore Bin 11 and Primary Chamber 1 (PC1) and some areas on the footprint.  While total lateral development or equivalent development metres have remained on budget, these challenging ground conditions have had a direct impact on the project's critical path*.

> **Latest project update**

> Since the completion of the Company's independent review, Turquoise Hill has become aware that Rio Tinto, as project manager, has advised that as the lateral development continues, there is more detailed geotechnical data than what was

previously available and, as a consequence, the understanding of the rock mass around and under the ore body has improved. ***This data reveals there are areas of the mine footprint where the strength of the rock mass is more variable than anticipated. This will require some potentially significant changes to the design of some future elements of the development, and the development schedule. This, combined with the delay to Shaft 2, is ultimately expected to result in an overall schedule delay to sustainable first production beyond the end of Q3'21.***

***Rio Tinto has advised that detailed schedule and design work has begun and is currently underway, as is the work necessary to estimate the impact on cost and development schedule resulting from this anticipated delay***, and any impacts from the re-optimized aspects of the development.  As a consequence, the completion of the 2019 definitive estimate review has been delayed due to this expected expanded scope.

The Company is working with Rio Tinto to understand the issues and in parallel with the definitive estimate review, Turquoise Hill will assess the impact of any further delay to sustainable first production beyond the end of Q3'21 on the Company's cash flows, liquidity and funding requirements, as well as investigate potential mitigation options.

92.      On February 27, 2019, Rio Tinto issued its 2018 full year results in a release entitled "Rio Tinto announces record returns to shareholders of $13.5 billion including final dividend of $3.1 billion and special dividend of $4.0 billion" (the "February 27, 2019 Year-End Results"), which it also filed as an exhibit on Form 6-K.  The Year-End Results made the following statements about the Oyu Tolgoi project:

***The world-class Oyu Tolgoi underground copper mine development in Mongolia has progressed in 2018***, including the signing of the Power Source Framework Agreement.  There are challenges which further impact the forecasted ramp-up to sustainable production at this complex project….

\*     \*     \*

***The Oyu Tolgoi underground project continued to progress through 2018*** with the construction of critical above and below ground infrastructure to develop Oyu Tolgoi into one of the largest copper mines in the world.

***Detailed engineering design work and overall construction progress is mostly on track.***  The main focus in 2018 has been underground lateral development, the fit out of shaft 2 (our main production shaft), support infrastructure and the convey-to-surface decline.  Recent achievements include the completion of the overland

conveyor connecting shaft 2 to the coarse ore stockpile, significant progress on the second underground crusher and the expansion of the central heating plant.

***Overall the underground lateral development has been proceeding well, with a total of 19.0km achieved at the end of January 2019 against our second annual reforecast target of 19.8km.*** With the structural, mechanical and electrical fitout of shaft 2, it is now clear that the completion of this technically complex installation and commissioning work will be delayed by several months. Delayed completion of the shaft, which provides additional hoist capacity to accelerate lateral development, will further delay the date we reach sustainable production beyond the 9 month delay indicated in October 2018.

As announced at that time, difficult ground conditions encountered had slowed progress in some areas of the underground development. As the lateral development continues, we learn more about the rock mass around and under the orebody and have access to more detailed geotechnical data than was available from surface drilling. This data reveals there are areas of the mine footprint where the strength of the rock mass is more variable than anticipated in the feasibility study. This will require some potentially significant changes to the design of some future elements of the development and the development schedule.

Detailed design work is under way as is the work necessary to estimate the impact on cost and schedule from these changes and the delay in commissioning shaft 2.

93.     The same day, Rio Tinto issued a written presentation on its 2018 annual results, which it filed as an exhibit on Form 6-K, in which Rio Tinto represented that the Oyu Tolgoi underground project "***Progressed well in 2018***":



94.     On or about February 27, 2019, Rio Tinto also issued its 2018 Annual Report, which it later filed as an exhibit with the SEC in its March 14, 2019 Form 20-F (the "Rio Tinto 2018 Form 20-F").   The 2018 Annual Report made the same statements about the Oyu Tolgoi project (with immaterial variations) contained in the February 27, 2019 Year-End Results.   It also stated that that the "Total approved capital cost" of the Oyu Tolgoi project was **$5.3 billion** and that, "***By 2027, we expect our Oyu Tolgoi mine in Mongolia to become one of the world's top producers of copper***…"   The 2018 Annual Report included a letter by Defendant Jacques, in which he stated:

> ***The world-class underground copper project at Oyu Tolgoi, in Mongolia***, also progressed, including the signing of the Power Source Framework Agreement.  ***The detailed engineering design work and overall construction is mostly on track***, but more detailed geotechnical information and difficult ground conditions have required a review of the mine design. This, combined with fit-out and commissioning challenges with the main production shaft, is ultimately expected to result in a further revised ramp-up schedule to sustainable first production (beyond the nine-month delay indicated in October 2018).  Detailed design work is underway to estimate the impact these issues will have on cost and schedule.

95.     The Rio Tinto 2018 Form 20-F also disclosed that, whole there was "a deterioration in some internal and external indicators of value for the Oyu Tolgoi CGU," Rio Tinto had concluded that no impairment had taken place.   With respect to recent events, the 2018 Form stated:

> ***As set out in the Strategic report, in October 2018 we announced our annual reforecast of the development schedule which at that time suggested a nine-month delay in the schedule to sustainable production, primarily caused by delays in completing and equipping the primary production shaft and by some zones of variable rock strength that had been encountered.*** In December 2018, we announced the signing of the Power Source Framework Agreement, which sets out an amended timetable for Oyu Tolgoi to meet its obligation to source power domestically. These updates, together with an estimate of the financial impact of a potential further delay in the commissioning of the primary production shaft, have been reflected in the recoverable amount of the CGU as set out above.

Since then, our mine design teams have continued to work with the more comprehensive geotechnical data that has become available as the underground development continues, and it is clear that potentially significant changes to the design of some future elements of the development, and to the development schedule, will be needed, to allow for zones of particularly variable rock strength which have been encountered in the footprint of the mine.  The detailed design work is under way, as is the work necessary to estimate the impact on cost and schedule that these changes may have.

Given the very early status of this work, no adjustments have at this time been made to the recoverable amount.  The Group will continue to review the CGU for further indicators of impairment as this work progresses.

***Recognising the uncertainties noted above, as well as the time remaining through to ramp-up of commercial production, the Group highlights that it does not consider the current headroom to be indicative of an impairment reversal at this time.***

96.     The Rio Tinto 2018 Form 20-F included Sarbanes-Oxley certifications signed by Defendant Jacques certifying that the Form 20-F "does not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading."

97.     During an investors conference call on February 27, 2019, Defendant Jacques made the following statements concerning the Oyu Tolgoi project:

During 2018, we made good progress on our underground project at Oyu Tolgoi, and we closed 2018 by meeting our commitment to agree a power solution for the mine which we are now progressing.  ***As we learn more about the rock mass around and under the ore body, we continue to encounter geotech challenges. This is a complex project, and we have indicated a further delay to the main production shaft and we will continue to assess the mine plan and design.***  So in general, copper is not just well performing, it also has got exciting growth opportunities such as Oyu Tolgoi, Resolution in Arizona and our exploration program.

98.     Later, in response to an analyst question, Jacques amplified his remarks, stating:

So where we are in the project today.  Remember, 5 years to build the infrastructure, 7 years to ramp it up.  We are mining in the ore body as we speak.  ***So the quantum of geotech data that we are accessing, we have access to is very significan***t.  And we need to go through a process of updating the model to make sure that the infrastructure is the right location on the back of the geotech data that we have.

40

This is, absolutely, a normal process.  It will take a few months to do so.  ***I mean, the good piece of news we know that the cave is going to cave, okay?***  It's always a good starting point in a block cave to know that the cave is going to cave.  So it's going to cave, right?  ***So the question is not to cave too quickly, yes.***  So it will take a few months, and we'll provide you an update by the time we are at the midyear and so on and so forth, right?  So that's where we are.  So we are updating the geotech now, but we thought it was important to inform the market accordingly.

*     *     *

So there will be – the final cost estimate will be prepared and most of the costs should be prepared this year, so we will have a better sense.  So let's see what comes out of it.  But the second element is really by building the mine, the infrastructure, the drill holes, the extraction drives and so on and so forth.  And that's clearly on the back of the information we have in terms of geotech that we need to look at where do we put the infrastructure?  ***So where do you put the extraction drives, depending on where the faults are?***  Where do you put the air ventilation?  Where do you put the ore passes and so on and so forth in order to make sure that as and when you initiate the cave, then you have the right ground conditions and so on and so forth.  So the work is underway.  ***Anyone who's got any block cave technology or experience should know that it happens pretty often***.  So when you have the geotech issue, you have to upgrade the model, and that's what the team is doing.  And what I said sometime during the year, we'll update the market accordingly.  ***But as I said, we have started this, the cave is going to cave.***

*     *     *

So one of the key questions that people are looking at is where should we put the infrastructure, we know the extraction drive and where we should initiate the cave, and the pace at which we move in order to initiate the cave.  So work is underway.  ***By the way, the model will be updated on real-time basis, but we should have a pretty good view on where we are this year.  I mean it is normal process.***  We are incorporating the geotech as we speak.  And we have a better answer in the coming months, and we'll come back to the market.

99.     In response to the news, Turquoise Hill's common stock closed at $1.83 per share on February 27, 2019. a 12.86% decline from the close at $2.10 per share on February 26, 2019, on trading volume of more than 18 million shares that was more than four times higher than the average daily trading volume over the prior year.

100.     On March 14, 2019, Turquoise Hill issued a press release, which it filed as an exhibit on Form 6-K, and filed an annual report on Form 40-F with the SEC (the "2018 Form 40-

41

F"), announcing the Company's financial and operating results for the fiscal year ended December 31, 2018.  The press release and 2018 Form 40-F stated again that the project weas expected to remain within the $5.3 billion budget, but added that there may be additional delays to sustainable first production:

> Significant progress on the Oyu Tolgoi underground project continued through 2018, with the construction of critical above and below-ground infrastructure. Shaft 2-connected underground infrastructure progressed well during Q4'18 with the completion of the lining installation and handover of Ore Bin 11 as well as advancement of the new 6,000-tonne-per-day jaw crusher under construction.

> ***During Q4'18, Turquoise Hill carried out its own review of the previously announced Rio Tinto schedule and cost re-forecast for the project (2018 Rio Tinto Review) that concluded a delay to sustainable first production was expected from Q1'21 to the end of Q3'21.***  The Company's review, with the assistance of Turquoise Hill's independent Qualified Person and mining consultants OreWin Pty Ltd, found that ***project cost was expected to remain within the $5.3 billion budget*** but that it is likely there will be further delays to individual activities and that this will result in additional delays to sustainable first production.

> The Company's independent review found that the following key risks are developing.

> - Shaft 2 equipping delays were due to lower than expected productivity in steel and electrical installation as well as increased quality assurance measures.  It was likely the completion date would move beyond Q1'19 and impact overall underground development rate increases.

> - There have been delays to development progress and productivities in key areas.  Even though lateral development has experienced consistent overall progress, development of some critical areas, such as the footprint, Primary Crusher 1 (PC1) system, Shaft 2 and Shaft 5, have been impacted by delays and, with the exception of Shaft 5, are critical path items for the project schedule.  Small delays in lateral development on the footprint have had a direct impact on the project schedule critical path, even though total lateral development or equivalent development metres have been on budget. Development in the PC1 system (which includes the PC1 chamber and transfers 3, 4 and 5) has, since the time of the Rio Tinto Review data cut-off, fallen significantly behind target rates.

> - The Company review indicated that in some areas there was a delay to the critical path from scope growth in mass excavation and additional ground support due to unexpectedly adverse geotechnical conditions.  Although the ground support quantities and installation times are less, but not materially less

than planned in the 2016 Oyu Tolgoi Feasibility Study and ground support quantities are reported as lower than planned, some types of ground support have had reduced installation times.

Since completion of the Company's independent review, Rio Tinto, as manager of the project, has advised Turquoise Hill that further \delays on the Shaft 2 fit out are expected to contribute to an overall schedule delay to sustainable first production beyond the end of Q3'21.  Additionally, Rio Tinto is studying relocating the ore passes on the footprint and this may modify the initiation sequence within Panel 0.  The study will be incorporated into the definitive estimate review, as will work necessary to estimate any impact on cost and development schedule.

101.    The March 14, 2019 press release and Form 40-F included a "Subsequent events" section which stated the following:

- The Company has completed an independent review of Rio Tinto's second annual schedule and cost re-forecast.

- Since completion of the Company's independent review, Rio Tinto, as project manager, has advised Turquoise Hill that delays on the Shaft 2 fit out are expected to result in an overall schedule delay to sustainable first production beyond the end of Q3'21. Additionally, Rio Tinto is studying relocating the ore passes on the footprint and this may modify the initiation sequence within Panel 0. The study will be incorporated into the definitive estimate.

102.    The 2018 Form 40-F added that, based on the then-"best available information," the $5.3 billion project cost remained unchanged:

Recognizing the uncertainties noted above, the Company acknowledges that a further delay to first sustainable production would have an adverse impact upon the recoverable amount. ***The Company has estimated that, based on its best available information, any possible additional delay to sustainable first production, whilst maintaining a total project cost of $5.3 billion***, would reduce the recoverable amount by approximately $0.1 billion per each incremental month of delay.  A such, the Company believes that any reasonably possible movement in the development schedule would not reduce the recoverable amount to below the carrying value of the Oyu Tolgoi cash-generating unit.

103.    The 2018 Form 40-F also stated that the Company had conducted an impairment analysis on Oyu Tolgoi underground mine and concluded that there was none.  With regard to the underground mine, the 2018 Form 40-F stated:

Since the completion of its independent review and as announced on February 27, 2019, the Company has become aware that Rio Tinto, as manager of the project, has advised that as the lateral development continues, there is more detailed data than what was previously available.  As a consequence, Rio Tinto is studying the impact of some potentially significant changes to some future elements of the underground design including relocating the ore passes. This, together with the delay to Shaft 2 also announced by the Company on February 27, 2019, is ultimately expected to result in an overall schedule delay to sustainable first production beyond the end of the third quarter of 2021.

Recognizing the uncertainties noted above, the Company acknowledges that a further delay to first sustainable production would have an adverse impact upon the recoverable amount.  The Company has estimated that, based on its best available information, any possible additional delay to sustainable first production, whilst maintaining a total project cost of $5.3 billion, would reduce the recoverable amount by approximately $0.1 billion per each incremental month of delay. ***As such, the Company believes that any reasonably possible movement in the development schedule would not reduce the recoverable amount to below the carrying value of the Oyu Tolgoi cash-generating unit.***

104.   The March 14, 2019 press release also quoted Defendant Quellmann stating that:

 **"*Underground development continued to progress during 2018 with more than 10 equivalent kilometres completed by year end*.  As can occur in a project of this size and complexity, mine manager Rio Tinto has identified challenges with the location of some ore passes on the footprint.  *We acknowledge Rio Tinto's proactive approach to maintaining the highest level of infrastructure stability by reviewing the location of these ore passes*.  The impact of these changes will be reflected in the definitive estimate review, which is expected to be complete towards the end of the year.

"***Oyu Tolgoi is a world-class asset*** with a best-in-class workforce. Turquoise Hill is a tremendous opportunity to invest in a copper and gold producer with a direct participation in the world's next Tier 1 copper asset."

105.   The 2018 Form 40-F contained Sarbanes Oxley certifications signed by Defendants Quellmann and Colton, stating that the information contained in the 2018 40-F "does not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading" and that "the information contained in this Report presents, in all material respects, the financial condition and results of operations of the Company."

106.    During an investor conference call on March 15, 2019, Defendant Quellmann made

the following statements about the delay:

> As announced on February 27, we were recently advised by Rio Tinto as our project
> manager that as the lateral development continues, *there is more data than was*
> *previously available.  And as a consequence, the understanding of the ore body*
> *has improved.  As such, the location of some of the underground infrastructure*
> *may need to change.  Essentially, what that means is that we need to revisit the*
> *location of some of the ore passes on the footprint contemplated in the 2016*
> *technical report with the benefit of this later stage and understanding.*
>
> The intention of the 2016 feasibility study was to initiate the cave in panel 0, and
> then move north and south into panels 1 and 2.  The intention is still to start within
> panel 0, but these studies may ultimately result in a modification of the initiation
> sequence within panel 0.  To date, we've identified a number of alternative
> locations for these ore passes, and we're currently working through alternative
> scenarios for the initiation sequence.
>
> *Once we've identified and refined the analysis of the various scenarios, we'll*
> *focus on completing feasibility estimates, which will then, ultimately, form the*
> *basis of the definitive estimate report, which is expected to be finished by year-*
> *end.*

107.    In response to analyst questions, Quellmann acknowledged that the Company in

late 2018 had "confirmed the cost at the time, but had identified some higher level of risks to the

schedule, *but not enough to warrant to change the indication to the market*."  He also stated that

the stability issues "*with tunnels and excavation*" which the Oyu Tolgoi project encountered were

"*not uncommon, not unusual in especially a large and complex mine such as Oyu Tolgoi*" – but

these "not unusual" stability issues were not disclosed earlier in the Class Period.

> ULF QUELLMANN: Look, we'll -- good question, Oscar, thank you for that. So I
> think maybe just take a step back for one second.  So there was a sequence of events,
> I think, which we went through. October last year, Rio had conducted its cost and
> schedule review last year, we advised the markets of that.   *That was an*
> *announcement at the time of a 9-month delay to sustainable -- first sustainable*
> *production whilst confirming cost*s.  We then conducted our own independent
> review, which we -- the results of which are included in our disclosure to the
> market, which effectively said that *we confirmed the cost at the time, but had*
> *identified some higher level of risks to the schedule, but not enough to warrant*
> *to change the indication to the market.*  Since then, if we fast forward to February
> of this year, it became obvious that Shaft 2 was delayed more than expected.

The -- we had expected it to be completed by the end of Q1. It's now clear that it's no longer completed by the end of Q1, but there'll be a delay by several months. And as we briefly described in our presentation, Oscar, and as you know it well, Shaft 2 is absolutely critical.  It's a -- on the critical path because it's critical for us to, obviously, get infrastructure down to the shaft.  So several months of delay, really driven by issues in relation to Shaft 2.  And what that means in terms of cost and schedule will be incorporated in the definitive estimate.  ***Now the definitive estimate was scheduled initially to be completed by midyear, June, July.  We've now said that it'll move to the end of the year.  And that is because in that definitive estimate, we need to make sure we incorporate the findings, the learnings and, ultimately, the action we need to take in terms of the ore pass relocations i.e. the change in caving initiation sequence of panel 0, right?  So that's a piece of work, which needs to be done, which wasn't expected before. And that's why it'll take us to the end of the year now to provide that definitive estimate, if you like.  The one thing I would say, Oscar, in relation to that latter point, so the extra -- the data, but also importantly the learning, understanding I think of the ore body and stability in relation there too.  This is not uncommon, not unusual in especially a large and complex mine such as Oyu Tolgoi.***  You will have seen other people have similar issues.  From our perspective, it is critically important that we identify these issues early.  And then we take mitigating action, if you like.  ***As you well know, the whole value proposition of this mine is predicated upon stability of the tunnels and excavation, right?  We need to make sure we put the infrastructure into the right place where we have stability.  That's what we need to do, that's what we're doing now.  And so we now need to go, together with Rio, go through the process of understanding the stability, understanding where fault lines are running, identifying different locations, modeling it and then include that in the definitive estimate.***  What we will be able to do, Oscar – I know I'm giving you a very long answer for a very short question, but what we will be doing is ultimately schedule and cost will only be known by the year end, but clearly, there are milestones along the way to allow us to provide you and the market with update throughout.  So let me stop there….

*     *     *

ULF QUELLMANN: Yes.  So as I was alluding to in my previous answer, Oscar, so the ultimate cost and schedule will only be known by year-end with the completion of the definitive estimate, but we will be in a position, like Rio, to provide updates on sort of some of the key milestones in that process throughout. And the half year will be one point of that.

108.    On April 10, 2019, Rio Tinto plc held its Annual Shareholders meeting.  During the meeting, Defendant Jacques stated the following in response to a shareholder's question concerning stability at the Oyu Tolgoi mine:

The fourth question is about the ground conditions at Oyu Tolgoi underground.  So where we are in the process of developing the mine is that you need to split Oyu Tolgoi underground into 3 buckets: the infrastructure in terms of shaft, crushers; then you have to see the second bucket is about the mine.  Remember, the block caving mine is you go underneath the block – the ore body, and you draw small rocks from the ore body.  That's the second element.  And the third one is a ramp-up.  If we step back, Oyu Tolgoi is 5 years to build the infrastructure, 7 years to ramp it up.  Where we are in the construction process is we are now in the second phase, which is building really the mine in the ore body.  And as and when we mine, we develop a better understanding of the geotech conditions.

The good piece of news is that the mine will cave.  It will cave, and -- but potentially cave faster than what we expected.  And therefore, our engineers and our experts have to rethink where we put the tunnels, where we put the extraction drives in order to make sure that as and when we initiate the cave, we don't destroy the infrastructure within the mine itself in order to protect the ramp-up.  So the good piece of news is it will cave, which is always a question mark in the context of a block cave.  *The question is to make sure we manage this process very, very carefully.  This is absolutely normal.*

You mentioned the caves of Grasberg.  As and when Freeport did develop the [TMLC] mine, underground mine, they had to go through this process at least 3 times in order to make sure that as and when you have a better understanding of the Geotech issues, where the faults are, so on and so forth, to make sure you build the mine in the best possible way.  Because there is fundamentally a big difference between an open pit and an underground.  In an open pit, when I build the open pit and I find some fault, I can manage in the sense of I can move the roads, I can move the sequencing, and so on and so forth.  When I've built hundreds or tens and tens of kilometers of tunnels, I cannot move them.  They are there, and they are here to stay.  So it's important that as and when we understand better the ore body, we can refine the sequencing on how we are going to develop the mine because otherwise, you may have a bigger problem.  *So what we are going through at this point in time is absolutely normal in the context of a block cave.*

109.    On April 15, 2019, Turquoise Hill issued a press release which it filed as an exhibit on Form 6-K entitled "Turquoise Hill announces first quarter 2019 production and provides underground development update," which it filed on Form 6-K.   The press release quoted Defendant Quellmann stating that:

> "*Rio Tinto, as project manager, has advised that it has completed a review of the fit-out and commissioning issues at Shaft 2 and it now expects Shaft 2 to be completed by the end of October 2019*.  Turquoise Hill will review the cause and impact of this further delay to Shaft 2."

110.    The press release also stated:

Rio Tinto, as project manager, has advised that the fit-out and commissioning work on Shaft 2 (the main production and services shaft) is now expected to be completed by the end of October 2019.  As previously announced, more detailed geotechnical information and different ground conditions have required a review of the mine design and the development schedule.  The impact of these changes, including the further delay to Shaft 2, will be included in the definitive estimate review, which is expected to be completed towards the end of the year.  In parallel, Turquoise Hill will incorporate the impact of any further delay to sustainable first production beyond the end of Q3'21 in Turquoise Hill's cash flows, liquidity and financing projections.  Turquoise Hill will also explore potential mitigation options.

111.    On April 16, 2019, Rio Tinto issued a press release entitled "Rio Tinto releases first quarter production results," which it also filed as an exhibit on Form 6-K.  The press release stated the following about development of the Oyu Tolgoi underground project:

At the Oyu Tolgoi Underground Project the review of the mine design and the development schedule is continuing.  ***The commissioning of the main production shaft (Shaft 2) is now expected to complete in October 2019.***

\*       \*       \*

Work is underway at the Oyu Tolgoi Underground Project to understand the overall cost and schedule impacts resulting from the review of the mine design and delays with the fit-out and commissioning work on Shaft 2, as announced in February 2019.

Work continues on critical Shaft 2 equipping activities, central heating plant, mine infrastructure, underground materials handling systems and on priority underground development. Pre sinking works for Shaft 3 and Shaft 4 have commenced.

***The mine design work, announced in February, to adjust to more detailed geotechnical information and difficult ground conditions continues.  Also as announced in February, there have been further delays in the technically complex fit-out and commissioning work on the main production and services shaft (Shaft 2).***  It is now anticipated that the commissioning of Shaft 2 will be completed by the end of October 2019.  This further delay in Shaft 2 will impact on the timeline for other activities in the underground development, and the impact of this and of the mine design work referred to above on the overall project schedule and costs will be announced once the necessary work has been completed.

112.    On May 15, 2019, Turquoise Hill issued a press release and MD&A which it filed
as exhibits on Forms 6-K with the SEC announcing the Company's financial and operating results
for the first quarter of fiscal year 2019.  In the press release and MD&A, the Company stated in
relevant part:

### Underground development progress

As announced in April 2019, Rio Tinto, in its role as manager of Oyu Tolgoi, has
advised that the fit-out and commissioning work on Shaft 2 is now expected to be
completed by the end of October 2019.  Rio Tinto has advised that this further delay
to the completion of Shaft 2 is expected to contribute to the previously announced
overall schedule delay to sustainable first production beyond the end of Q3'21.

*Rio Tinto has also advised that more detailed geotechnical information and
different ground conditions have required a review of the mine design and the
development schedule.  This includes potentially relocating the ore passes on the
footprint and this may modify the initiation sequence within Panel 0. Rio Tinto
has advised that the impact of these changes, including the further delay to Shaft
2, will be included in the definitive estimate review, which is expected to be
completed towards the end of the year.*

113.    During a conference call the next day on May 16, 2019, Defendant Quellmann
made the following statements about the status of the project:

Going forward into the remainder of the year, we are focused on completing the fit
out and commissioning work on Shaft 2, which is expected to be completed by the
end of October this year.    Once commissioned, Shaft 2, which is our primary
service and personnel shaft, will enable Oyu Tolgoi to accelerate underground
lateral development and achieve increased productivity rates more in line with
expectations.

Additionally, work continues on the definitive estimate work.  This may include
some potentially significant changes to the design of some future elements of the
mine design and the development schedule.  While we still expect to commence the
cave initiation within Panel 0, the highest grade area of the underground, *[key]
priorities for the team are confirming the location of the ore passes to ensure
stability over the long life of mine an ore body the size of Oyu Tolgoi supports.
Finally, work also continues on making any necessary adjustments to the
initiation sequence of the [block cave] to preserve the attractive economics of the
mine.*  We expect to provide an update along with our half-year results followed by
the definitive estimate review, which is expected to be completed by year-end.

114.     When Defendant Quellmann was asked by an analyst during the call whether he could provide any further information on the status of the underground project, Quellmann stated that there was no further information available, stating, for example:

I think what we are attempting to do is really to recognize that, obviously, a lot of work is going on to complete the definitive estimate. ***We talked on our last call a little bit about the work that's required around the review of the mine plan as a result of some of the difference in [rock mass stability], and as a result of that, the definitive estimate is now only available towards the end of the year.*** That's a long way away from now, but that's really the time when final costs and schedule will be known. ***And I think we just recognize that we ought to be in a position to give the market an interim update before year-end; the next logical point for us to do that is the half year***. What format and what extent exactly that takes, Orest, we still have to work out. We want to be as helpful as possible to the markets, but at the same time, ***we need to see where we are at that point in time to see what we can meaningfully provide you with***. But it's really a reflection of the fact that we want to be in a position to provide the market with visibility as opposed to having you wait until the full year before we can tell you anything really.

115.     Defendant Quellmann also stated that:

***We are progressing with both the underground*** as well as power, ***[and] both of those are key strategic value drivers for us.*** You all know that Oyu Tolgoi is a large and complex project, so we will encounter challenges along the way. But the key thing is that we recognize when we have challenges and that we are putting really the best people and the best resources against it to make sure that we resolve them. Rio Tinto is, as an operator, as a manager, is recognized as one of the world's best mining companies.

116.     The statements referenced in ¶¶92-116 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the stability issues were much more severe than represented and called into question the design of the mine, the projected cost and timing of production; (ii) the publicly disclosed estimates of the cost, date of completion and dates for production from the underground mine were not achievable; (iii) the "challenging ground conditions" were much more severe than Defendants represented, and in fact made it

impossible for Turquoise Hill and Rio Tinto to achieve those estimates; (iv) the development capital required for the underground development of Oyu Tolgoi would cost substantially more than a billion dollars over what Turquoise Hill and Rio Tinto had represented; and (v) Turquoise Hill would require additional financing and/or equity to complete the project.

### D.   Defendants' Risk Factor Disclosures Were False and Misleading

117.   During the Class Period, Defendants issued risk factor disclosures that purported to address risks regarding the development of the Oyu Tolgoi underground mine.

118.   For example, in its 2017 Form 10-K (incorporated by reference various Turquoise Hill disclosures during the Class Period, as noted below), Turquoise Hill included the following risk factor disclosure:

> **The actual cost of developing Oyu Tolgoi may differ materially from the Company's estimates, and development may involve unexpected problems or delays.**
>
> The Company's estimates regarding the cost of development and operation of Oyu Tolgoi are estimates only and are based on many assumptions and analyses made by the Company's management in light of their experience and perception of historical trends, current conditions and expected future developments, as well as other factors management believes are appropriate in the circumstances.  These estimates and the assumptions upon which they are based are subject to a variety of risks and uncertainties and other factors that could cause actual expenditures to differ materially from those estimated.  ***If these estimates prove incorrect, the total capital expenditures required to complete development of the underground components of Oyu Tolgoi may increase, which may have a material adverse impact on the Corporation, its results of operations, financial condition and share price.***
>
> ***In addition to the requirements of the Investment Agreement, there are also a number of uncertainties inherent in the development and construction of any new or existing mine, including Oyu Tolgoi.***  These uncertainties include the timing and cost, which can be considerable, of the construction of mining and processing facilities; the availability and cost of skilled labour, the impact of fluctuations in commodity prices, process water, power and transportation, including costs of transport for the supply chain for Oyu Tolgoi, which requires routing approaches which have not been fully tested; the annual usage fees payable to the local province for sand, aggregate and water; the availability and cost of appropriate smelting and refining arrangements; and the need to obtain necessary

environmental and other government permits, such permits being on reasonable terms, and the timing of those permits.  The cost, timing and complexities of mine construction and development are increased by the remote location of a property such as Oyu Tolgoi.

***It is common in mining operations and in the development, construction or expansion of existing facilities to experience unexpected problems and delays during such activities, which may cause delays in the commencement or expansion of mineral production or sustainable production.  Such delays could have unforeseen impacts on disclosed project economics.***

119.    In its 2018 Form 40-F, Turquoise Hill retained the same risk factor disclosure (with the change of "Company" to "Corporation") but added the words, "***ground and rock mass conditions and instability***" to the laundry list of "uncertainties."  Turquoise Hill also added the following at the end:

Accordingly, there is no assurance that the current or future development, construction or expansion activities will be successfully completed within cost estimates, on schedule or at all and, if completed, there is no assurance that such activities will result in profitable mining operations.

120.    The Turquoise Hill 2017 Form 40-F also stated the following in in a section concerning forward-looking statements:

Forward-looking statements and information are made based upon certain assumptions and other important factors that, if untrue, could cause the actual results, performance or achievements of the Corporation to be materially different from future results, performance or achievements expressed or implied by such statements or information.  There can be no assurance that such statements or information will prove to be accurate.  Such statements and information are based on numerous assumptions regarding present and future business strategies, local and global economic conditions, and the environment in which the Corporation will operate in the future, including the price of copper, gold and silver, anticipated capital and operating costs, anticipated future production and cash flows, and the status of the Corporation's relationship and interaction with the Government of Mongolia on the continued operation and development of Oyu Tolgoi (as defined in the section entitled "Definitions" in the AIF) and Oyu Tolgoi LLC internal governance.

Certain important factors that could cause actual results, performance or achievements to differ materially from those in the forward-looking statements and information include, among others: copper, gold and silver price volatility; discrepancies between actual and estimated production, mineral reserves and

resources and metallurgical recoveries; development plans for processing resources; matters relating to proposed exploration or expansion; *mining operational and development risks*; litigation risks; regulatory restrictions (including environmental regulatory restrictions and liability); Oyu Tolgoi LLC's ability to deliver a domestic power source for the Oyu Tolgoi project within the required contractual time frame; communications with local stakeholders and community relations; activities, actions or assessments, including tax assessments, by governmental authorities; events or circumstances (including strikes, blockages or similar events outside of the Corporation's control) that may affect the Corporation's ability to deliver its products in a timely manner; currency fluctuations; the speculative nature of mineral exploration; the global economic climate; dilution; share price volatility; competition; loss of key employees; cyber security incidents; additional funding requirements, including in respect of the development or construction of a long-term domestic power supply for the Oyu Tolgoi project; capital and operating costs, including with respect to the development of additional deposits and processing facilities; and defective title to mineral claims or property. Although the Corporation has attempted to identify important factors that could cause actual actions, events or results to differ materially from those described in forward-looking statements and information, there may be other factors that cause actions, events or results not to be as anticipated, estimated or intended. All such forward-looking statements and information are based on certain assumptions and analyses made by the Corporation's management in light of their experience and perception of historical trends, current conditions and expected future developments, as well as other factors management believes are appropriate in the circumstances. These statements, however, are subject to a variety of risks and uncertainties and other factors that could cause actual events or results to differ materially from those projected in the forward-looking statements or information.

*With respect to specific forward-looking information concerning the continued operation and development of Oyu Tolgoi,* the Company has based its assumptions and analyses on certain factors which are inherently uncertain. Uncertainties and assumptions include, among others: *the timing and cost of the construction and expansion of mining and processing facilities;* the timing and availability of a long-term domestic power source (or the availability of financing for the Company to construct such a source) for Oyu Tolgoi; the ability to secure and draw down on the supplemental debt under the Oyu Tolgoi project financing facility and the availability of additional financing on terms reasonably acceptable to Oyu Tolgoi LLC, Rio Tinto and the Company to further develop Oyu Tolgoi; the impact of changes in, changes in interpretation to or changes in enforcement of, laws, regulations and government practices in Mongolia; the availability and cost of skilled labour and transportation; the obtaining of (and the terms and timing of obtaining) necessary environmental and other government approvals, consents and permits; delays, and *the costs which would result from delays, in the development of the underground mine (which could significantly exceed the costs projected in the 2016 Oyu Tolgoi Feasibility Study and the 2016 Oyu Tolgoi Technical Report)*; projected copper, gold and silver prices and their market demand; and

production estimates and the anticipated yearly production of copper, gold and silver at Oyu Tolgoi.

The cost, timing and complexities of mine construction and development are increased by the remote location of a property such as Oyu Tolgoi.  It is common in mining operations and in the development or expansion of existing facilities to experience unexpected problems and delays during development, construction and mine start-up.  Additionally, although Oyu Tolgoi has achieved commercial production, there is no assurance that future development activities will result in profitable mining operations.

121.    These statements were repeated in the 2018 Form 20-F, except that Turquoise Hill added the words, "and projected gold, copper and silver grades," to the first paragraph above.

122.    Certain of these statements were repeated or incorporated by reference in various Turquoise Hill disclosures during the Class Period.  Among other things: (a) Turquoise Hill's press releases and presentations referred to the risk factors in the most recent Form 20-F; (b) Turquoise Hill's press releases typically included the first two paragraphs quoted in ¶129 above, generally from the most recent Form 20-F; (c) Turquoise Hill's interim MD&As included the forward-looking statement disclosure (with small modifications) from the most recent Form 20-F; and (d) speakers in Turquoise Hill's conference calls referred to the forward-looking statement disclosures in the accompanying presentation or in the most recent earnings press release and MD&A.

123.    Rio Tinto's 2017 and 2018 Annual report and Forms 20-F included "Forward-looking statements" disclosures which stated:

This announcement includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  All statements other than statements of historical facts included in this announcement, including, without limitation, those regarding Rio Tinto's financial position, business strategy, plans and objectives of management for future operations (***including development plans*** and objectives relating to Rio Tinto's products, production forecasts and reserve and resource positions), are forward-looking statements. The words "intend", "aim", "project", "anticipate", "estimate", "plan", "believes", "expects", "may", "should", "will", "target", "set to" or similar expressions, commonly identify such forward-looking statements.

Such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements of Rio Tinto, or industry results, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.  Such forward-looking statements are based on numerous assumptions regarding Rio Tinto's present and future business strategies and the environment in which Rio Tinto will operate in the future.  Among the important factors that could cause Rio Tinto's actual results, performance or achievements to differ materially from those in the forward-looking statements are levels of actual production during any period, levels of demand and market prices, the ability to produce and transport products profitably, the impact of foreign currency exchange rates on market prices and operating costs, operational problems, political uncertainty and economic conditions in relevant areas of the world, the actions of competitors, activities by governmental authorities such as changes in taxation or regulation and such other risk factors identified in Rio Tinto's most recent Annual report and accounts in Australia and the United Kingdom and the most recent Annual report on Form 20-F filed with the United States Securities and Exchange Commission (the "SEC") or Form 6-Ks furnished to, or filed with, the SEC…

124.   In a separate "principal risks and uncertainties" section of its 2017 Annual Report, Rio Tinto included the following as a "Strategic risk," Rio Tinto described the following as a "Strategic Risk":

| The Group's ability to deliver projects successfully may vary. | A delay or overrun in a project schedule could negatively impact the Group's profitability, cash flows, ability to repay project-specific indebtedness, asset carrying values, growth aspirations and relationships with key stakeholders. |
|---|---|

A later section of the Annual Report disclosed that the 2017 trend for this risk was negative and that the potential impacts were "Future performance"; "HSE&C" [Health, Safety, Environment and Communities]; "Group reputation" and "Solvency."  These disclosures were combined in a single table in the 2018 Annual Report.

125.   Rio Tinto's quarterly operations reviews, interim financial reports and certain other disclosures incorporated by reference the risk factor disclosures in Rio Tinto's most recent Form 20-F and Annual Report.

126.    The risk factor disclosures by Turquoise Hill and Rio Tinto were false and misleading because they failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the progress of underground development and of Oyu Tolgoi was not proceeding as planned; (ii) there were significant undisclosed underground stability issues that called into question the design of the mine, the projected cost and timing of production; (iii) the publicly disclosed estimates of the cost, date of completion and dates for production from the underground mine were not achievable; (iv) the "challenging ground conditions" were much more severe than Defendants represented, and in fact made it impossible for Turquoise Hill and Rio Tinto to achieve those estimates; (v) the development capital required for the underground development of Oyu Tolgoi would cost substantially more than a billion dollars over what Defendants had represented; (vi) Turquoise Hill would require additional financing and/or equity to complete the project; and (vii) the "key risks" had not been "well understood and managed" but had placed the project schedule and cost into severe jeopardy.

E.    **The Truth Further Emerges**

127.    On July 15, 2019, after the market close, Turquoise Hill issued a press release entitled "Turquoise Hill Announces Second Quarter 2019 Production Results and Provides Underground Development Update," which it filed as an Exhibit on Form 6-K with the SEC.  The press release disclosed that, as a result of stability risks associated with the underground mine design, "*[t]he development capital spend for the project may increase by $1.2 to $1.9 billion over the $5.3 billion previously disclosed. This results in sustainable first production now being expected between May 2022 and June 2023.*"  The press release stated in relevant part:

**Underground Development Update**

Turquoise Hill, in conjunction with Rio Tinto, continues to review mine design options for the completion of the underground development of the Oyu Tolgoi mine and assess the impact on overall cost and schedule for the underground development.  As previously disclosed in connection with Turquoise Hill's project development update on February 26, 2019, this review will result in a revised development plan reflecting appropriate risk reduction efforts.

*Improved rock mass information and geotechnical data modelling has confirmed that there are stability risks associated with components of the existing mine design.*  Therefore, to address these risks, a number of mine design options are under consideration to complete the project.  These options include assessment of the impact of the mid-access drives, location of the on-footprint components of the ore handling system, the sequence of crossing the panel boundaries during mining operations, and an option that alters the panel boundary approach and would leave temporary pillars in ore that would then be recovered later in the mine life, sub-blocking the previously planned three panels into five panels.

*A number of options are being evaluated to determine the final design of "Panel 0," and this work is anticipated to continue into early 2020.  Given the further technical work that is needed, the definitive estimate review is now expected to be delivered in the second half of 2020, reflecting the preferred mine design approach.*

*All options under consideration present a clear pathway to sustainable first production, albeit with different cost and schedule implications.  To date, these have been defined to a level of accuracy associated with a conceptual study or order of magnitude study; therefore, significantly more work is required to complete the final assessment.*

*Based on these options, preliminary estimates indicate that sustainable first production could be delayed by 16 to 30 months compared to the original feasibility study guidance in 2016.*  This range includes contingency of up to eight months reflecting the unexpected and challenging geotechnical issues, complexities in the construction of Shaft 2, and reflects the detailed work still required to reach a more precise estimate.  *The development capital spend for the project may increase by $1.2 to $1.9 billion over the $5.3 billion previously disclosed.  This results in sustainable first production now being expected between May 2022 and June 2023.*  These ranges incorporate a range of productivity assumptions, with optimization work at site and technical review guiding the final inputs into the definitive estimate review.  Although further work is necessary to reach definitive conclusions, Turquoise Hill is assessing the carrying value of its investment in the Project and will announce any changes, along with any adjustments to deferred tax, in its Q2 results at the end of July 2019.

In addition to working closely with Rio Tinto, Turquoise Hill has engaged independent third-party consultants to provide the company with insights into the

planning and estimate process currently underway, as well as progress of key construction work at the mine site.

Current information indicates that Oyu Tolgoi mineral reserves will not be materially impacted by the Hugo North mine design options being considered; however, ongoing reviews will be considered as the work progresses.

**The company will continue to focus on minimizing the impact to the project schedule and cost as it works through the detailed analysis and testing of each mine design option, and work continues concurrently to finalize the critical underground infrastructure and shaft construction.**

Turquoise Hill will evaluate the impact of the estimated delays to sustainable first production as well as increases in underground capital expenditure on its cash flows, liquidity and financing projections, and will update the market in conjunction with the progression of the definitive estimate review.

128.    On July 16, 2019, before the market open, Rio Tinto issued a press release, which

it filed as an exhibit on Form 6-K with the SEC, substantively repeating these disclosures. The

press release stated in part:

As previously advised, enhanced geotechnical information and data modelling suggests that there may be some stability risks identified with the approved mine design and so a **number of other mine design options are also under consideration to complete the Project. Studies to date indicate that these options may result in some of the critical underground infrastructure, such as the mid-access drive and the ore handling system, being relocated or removed. Options relating to the sequence of crossing the panel boundaries during mining operations are also being analysed.**

\*       \*       \*

**Preliminary information now suggests that, depending on which mine design options are adopted, first sustainable production could be achieved between May 2022 and June 2023, a delay of 16 to 30 months compared to the original feasibility study guidance in 2016.** This range includes contingency of up to eight months reflecting the unexpected and challenging geotechnical issues, complexities in the construction of shaft 2 and the detailed work still required to reach a more precise estimate.

**Preliminary estimates for development capital spend for the Project, depending on the outcome of the work described above, is now $6.5 billion to $7.2 billion, an increase of $1.2 billion to $1.9 billion from the $5.3 billion previously disclosed.**

\*       \*       \*

58

Stephen McIntosh, Group executive, Growth & Innovation said "We have made significant progress on a number of key elements in the construction of the underground project during 2019. However, the ground conditions are more challenging than expected and we are having to review our mine plan and consider a number of options. Delays are not unusual for such a large and complex project but we are very focused as a team on finding the right pathway to deliver this high value project."

129. During an investor conference call on July 16, 2019, Defendant Quellmann made

the following statement about the delay:

If we move on to the underground project. *Everyone on the call will know that it is one of the most technically complex underground mine constructions in the world in one of the most remote locations. We did flag last year that given challenging ground conditions, delays in commissioning some of the critical underground infrastructures, such as Shaft 2, there would be a further delay in sustainable first production and likely impacts to costs. We then further signaled this in our February update earlier this year.*

*Our team continues to explore a number of mine design options to complete the project based on the new geotech data and information as well as the ground conditions we have encountered. As a result, we can only provide a range of potential impacts on schedule and cost.* We plan to move to a definitive estimate stage by the second half of next year, which is when we'll have a more accurate readout.

*Project budget we forecast indicates capital costs are now $1.2 billion to $1.9 billion over the FS [sic] '16 estimate of $5.3 billion. Sustainable first production is now forecast to occur between May 2022 and June 2023, a 9- to 21-month delay compared with what we indicated this last February when we have signaled that sustainable first production would be beyond October 2021.* It's also worth noting that we do have up to 8 months of schedule contingency in this estimate.

We remain committed to finding pathways to reduce the impacts to schedule and cost. Teams will continue to work hard on this over the coming months. The work continues to move forward on the critical underground infrastructure and shaft construction.

So in summary, the purpose of this morning's call is really to highlight and explain that: *A, since the discovery of the geotechnical issues, the team has continued to develop a mine design that would best retain the economics of the ore body; b, at this point in time, we still have not determined the final design, but we've developed a number of alternatives; c, the ranges of CapEx and schedule we've just provided encapsulate these options we continue to develop; and d, going forward, we'll work -- we'll continue to work towards progressing the work on the definitive estimate.* And as we do so, we will of course update the markets. It's

no question that OT remains a long-life, low-cost, Tier 1 ore body that will generate attractive returns for its shareholders.

130.    Joanne Dudley, the Company's Chief Operating Officer, added the following:

JO-ANNE DUDLEY: Okay. So in ground conditions that we have from -- at the Oyu Tolgoi, *as you go north from ore body, it was well known that there would be fractured and faulted ground conditions.* And however, difficult to get a lot of data from surface drilling. And so there's been some additional drilling done. And of course, we're getting more experience as the development continues through the ore body.

*Some of what's driven the current challenges has been just things like having to put heavier ground support in, not so much that it wasn't anticipated that, that ground support would be required. But there has been more of that heavier ground support that's required than was anticipated.*

*And I think you would probably say that around the world, in similar conditions to what you would see if you go north, that there -- there may be similar experience in the -- when you get to the ore body, you'll always find some differences because you're actually accessing the rock, you're not relying on drill holes that are 60 millimeters in diameter drilled from 1,300 meters above to make assessments. You're really there in the rock.*

131.    Following this news, on July 16, 2019, Turquoise Hill's common stock price closed at $0.60 per share, down 43.9% from the prior day's closing price of $1.07 per share, with over 50.2 million shares traded.

132.    On July 31, 2019, after the close of the market, Turquoise Hill issued a press release and MD&A, which it filed as an exhibits on Forms 6-K, announcing the Company's financial and operating results for the second quarter of fiscal year 2019.

133.    The press release and MD&A stated in part:

*"We continue to review mine design modifications with Rio Tinto and are assessing the potential impact on the cost and schedule of the underground project.* Critically, all underground development to date has not been impacted at all by pending changes to our mine design, and all infrastructure developed to date remains usable and in the appropriate locations for all of the mine design options under review. *Supported by our current liquidity of $3 billion we continue to drive forward with the underground development of the Oyu Tolgoi mine whilst we are reviewing a variety of funding options."*

\*      \*      \*

- *Improved rock mass information and geotechnical data modelling has confirmed that there are stability risks associated with components of the existing mine design. Therefore, to address these risks, Rio Tinto, in its role as manager of Oyu Tolgoi, has advised that it continues to review mine design options for the completion of the underground development of Oyu Tolgoi.* These options include assessment of the impact of the mid-access drives, location of the on-footprint components of the ore handling system, the sequence of crossing the panel boundaries during mining operations, and an option that alters the panel boundary approach and would leave temporary pillars in ore that would then be recovered later in the mine life, sub-blocking the previously planned three panels into five or more panels.

- *Given the further technical work that is needed, the definitive estimate review is now expected to be delivered in the second half of 2020, reflecting the preferred mine design approach.*

- *Preliminary estimates indicate that sustainable first production could be delayed by 16 to 30 months compared with the Q1'21 estimate in the original feasibility study guidance in 2016, and the development capital spend for the project may increase by $1.2 billion to $1.9 billion over the $5.3 billion previously disclosed.*

- *The Company received an automatic notice from the New York Stock Exchange (the "NYSE") on July 31, 2019 that the Company is no longer in compliance with the NYSE's continued listing standards* because the average closing price of the Company's common shares has fallen below US$1.00 per share over a consecutive 30 trading-day period. The Company will notify the NYSE that it intends to pursue measures to cure the share price non-compliance. Further details can be found below, under Corporate Activities.

\*      \*      \*

*Turquoise Hill, in conjunction with Rio Tinto, in its role as manager of Oyu Tolgoi and underground construction contractor, continues to review mine design options for the completion of the underground development of the Oyu Tolgoi mine and assess the impact on overall cost and schedule for the underground development.* As previously disclosed in connection with Turquoise Hill's project development update on February 26, 2019, this review will result in a revised development plan reflecting appropriate risk reduction efforts.

\*      \*      \*

*Improved rock mass information and geotechnical data modelling has confirmed that there are stability risks associated with components of the existing mine design. Therefore, to address these risks, a number of mine design options are under consideration to complete the project.* These options include assessment of

the impact of the mid-access drives, location of the on-footprint components of the ore handling system, the sequence of crossing the panel boundaries during mining operations, and an option that alters the panel boundary approach and would leave temporary pillars in ore that would then be recovered later in the mine life, sub-blocking the previously planned three panels into five or more panels.

*A number of options are being evaluated to determine the final design of "Panel 0," and this work is anticipated to continue into early 2020. Following a period of additional data collection and model updates, two phases of geotechnical modelling work are planned to inform staged mine design updates. The geotechnical modelling is expected to continue into early 2020 with final design decisions to be made at this time*. A period of detailed design, schedule and cost estimation will follow resulting in the delivery of a final definitive estimate in the second half of 2020, reflecting the preferred mine design approach.

All options under consideration present a clear pathway to sustainable first production, albeit with different cost and schedule implications. *To date, these have been defined to a level of accuracy associated with a conceptual study or order of magnitude study; therefore, significantly more work is required to complete the final assessment*. All infrastructure developed to date remains usable and in appropriate locations with no material expenditure as of June 30, 2019 that is not required for first or ongoing production.

Based on these options, preliminary estimates indicate that sustainable first production could be delayed by 16 to 30 months compared to the original feasibility study guidance in 2016. This range includes contingency of up to eight months[2] reflecting the unexpected and challenging geotechnical issues, complexities in the commissioning of Shaft 2, and reflects the detailed work still required to reach a more precise estimate. *The development capital spend for the project may increase by \$1.2 to \$1.9 billion, inclusive of contingency, over the \$5.3 billion previously disclosed. This results in sustainable first production now being expected between May 2022 and June 2023. The first drawbell is now expected between October 2021 and September 2022, and is delayed by 16 to 30 months. The range of project durations under consideration are largely driving the differences in capital costs estimated to complete the project and the increase includes the Shaft 2 delay related costs.* These ranges incorporate a range of productivity assumptions, and a new program of productivity work is underway at site to optimize performance as well as ongoing technical review to guide the final inputs into the definitive estimate.

---

[2] *As described above, the level of accuracy of these estimates is preliminary in nature and subject to a range of variables. The confidence level of these estimates is at a level associated with a Conceptual or Order of Magnitude Study, and further work is required between now and the second half of 2020 to refine the mine design options and study them to a level of confidence and accuracy associated with Feasibility Study quality estimates.* The estimate of up to 8 months

contingency is the result of the use of simulation techniques to assign an appropriate level of contingency to the deterministic schedule.

In addition to working closely with Rio Tinto, Turquoise Hill has engaged independent third-party consultants to provide the company with insights into the planning and estimate process currently underway, as well as progress of key construction work at the mine site.

134.    The press release and MD&A further disclosed that, as a result of the previously announced delays, Turquoise Hill took a $600 million impairment charge and a $400 million "difference in deferred asset recognition" tied to the Oyu Tolgoi project, and suffered a loss in the second quarter.  The press release and MD&A stated:

> *Loss in Q2'19 was $736.7 million compared with income of $204.4 million in Q2'18. The principal reason for this change is the impairment charge of $0.6 billion recorded in Q2'19. The other reason is the $0.4 billion difference in deferred tax asset recognition in Q2'19 when compared to Q2'18. Both items were impacted by the Company's update on the Oyu Tolgoi underground project* which was affected by a range of possible further delays to sustainable first production now expected between May 2022 and June 2023, compared with the previous estimate of Q1'21. Additionally, both items were also affected by a projected increase in underground development capital ranging between $1.2 billion and $1.9 billion above the $5.3 billion previously disclosed. These adjustments increased the loss in Q2'19 when compared to Q2'18 and were partly offset by the $41.0 million increase in sales revenue in Q2'19 versus Q2'18 driven primarily by the increased gold revenue in the period arising from the higher gold production, partly offset by the impact of lower copper prices.

135.    The MD&A also disclosed that Turquoise Hill had taken a "deferred tax de-recognition adjustment" of $252.8 million in the quarter, which was "was primarily due to updated operating assumptions in mine planning during the period, resulting primarily from timing of sustainable first production noted above as well as the revised estimates of underground development capital."

136.    Also, on August 1, 2019, before the close of the market, Rio Tinto issued an "Interim Results 2019" release filed on Form 6-K announcing Rio Tinto's financial and operating results for the second quarter of fiscal year 2019.  The release reiterated many of the points raised

ibn the July 31, 2019 Turquoise Hill press release. In the August 1, 2018 release, Rio Tinto also disclosed that:

> Following our update on the Oyu Tolgoi underground project on 16 July 2019, we completed an impairment assessment and concluded that *the changes to project cost and schedule led to an impairment charge, net of tax and non-controlling interests, of $0.8 billion.* The impairment is reflected in net earnings of $4.1 billion.

137.    Following this news, on August 1, 2019, Turquoise Hill's common stock price closed at $0.53 per share, down 8.62% from the prior day's closing price of $0.58 per share, with over 16.6 million shares traded.

## VI.    Developments After the Class Period

138.    On July 2 and 3, 2020, Turquoise Hill and Rio Tinto announced that the revised feasibility study for the Oyu Tolgoi project had been completed.  The study recommended a new block cave design for the portion of the mine undergoing development, with the addition of structural pillars and other changes, resulting in a reduction to the estimated mineral reserves for the mine.  Turquoise Hill estimated that there would be an increase in capital costs of $1.5 billion (with a range of $1.3 billion to $1.8 billion), "subject to further studies and any additional scheduling delays or increases in capital costs arising from the impacts of the COVID-19 pandemic."

139.    Later, on September 10, 2020, Turquoise Hill and Rio Tinto announced that they had entered into a non-binding Memorandum of Understanding under which they would seek to "reprofile Oyu Tolgoi's existing debt" and raise an additional $500 million through debt financing. In its press release, Turquoise Hill warned that:

> If the Re-profiling is achieved and, SSD in the amount of US$500 million is raised but no other debt or hybrid financing option is successfully completed, *Turquoise Hill estimates that it would need to raise additional equity of at least US$ 1.7 billion* (based on the facts, circumstances and the market environment which formed the basis for the assumptions underlying Turquoise Hill's most recent public disclosures).  *If the Re-profiling is not achieved and no additional debt*

*(including SSD) or hybrid financing is completed, Turquoise Hill expects that it would need to raise additional equity of at least US$3.6 billion (based on the same assumptions*.

## VII.   LOSS CAUSATION

140.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  Defendants' actions artificially inflated the price of Turquoise Hill securities and operated as a fraud or deceit on the Class (as defined below).   Later, when the truth concealed by Defendants' prior misrepresentations and omissions were partially disclosed to the market after the market close on February 26, 2019, July 15, 2019 and July 31, 2019, the price of Turquoise Hill securities fell precipitously the next day.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VIII.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

141.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  For example, many of the statements relate to the current or historical status of Oyu Tolgoi, including that the project was progressing well and on schedule, or that prior challenges have been resolved.  To the extent that any of these statements might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not

accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

142.   Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Turquoise Hill or Rio Tinto who knew that the statement was materially false or misleading when made.

## IX.   **THE PRESUMPTION OF RELIANCE**

143.   Plaintiff is also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a)   Turquoise Hill's common stock was actively traded in an efficient market on the New York Stock Exchange and NASDAQ, highly efficient and liquid markets.

(b)   Turquoise Hill's common stock traded at high weekly volumes.

(c)   As a registered issuer, Turquoise Hill filed periodic public reports with the SEC.

(d)   Turquoise Hill was eligible to file registration statements with the SEC on Form F-10.

(e)   Turquoise Hill regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

(f)   The market reacted promptly to public information disseminated by Turquoise Hill.

(g)    Turquoise Hill securities were covered by securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace.

(h)    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Turquoise Hill securities.

(i)    Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiff and other members of the Class purchased or acquired Turquoise Hill securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

(j)    Accordingly, Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Turquoise Hill securities and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

144.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X.    CLASS ACTION ALLEGATIONS

145.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Turquoise Hill securities during the Class Period, and who were damaged thereby. Excluded from the Class are: Defendants; members of the immediate family of any Individual Defendant; the officers and directors of Turquoise Hill or the Rio Tinto Defendants during the Class Period; any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or

entity.

146.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Turquoise Hill common stock was actively traded on NASDAQ and the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Turquoise Hill or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

147.    The disposition of the claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2018, Turquoise Hill had 2,012,314,469 shares of common stock outstanding, which were owned publicly by at least hundreds of persons and entities.

148.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendants' acts as alleged herein.

- Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, management and financial condition of Turquoise Hill.

- Whether Defendants acted with scienter in engaging in the acts and conducts alleged herein.

- Whether the Individual Defendants and/or the Rio Tinto Defendants were control persons for purposes of §20(a) of the Exchange Act.

- Whether the prices of Turquoise Hill securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein.

- Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

149.   Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

150.   Plaintiff will adequately protect the interests of the Class and have retained competent counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

151.   A class action is superior to other available method for the fair and efficient adjudication of this controversy.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against the Turquoise Hill Defendants)

152.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

153.   Plaintiff asserts this Count pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against the Turquoise Hill Defendants.

154.   During the Class Period, the Turquoise Hill Defendants disseminated or approved the false statements issued by Turquoise Hill set forth above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

155.   The Turquoise Hill Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

(i)   employed devices, schemes and artifices to defraud;

(ii)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(iii)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Turquoise Hill securities during the Class Period.

156.    By virtue of their positions at Turquoise Hill as senior executives, the Turquoise Hill Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, these Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them.  These acts and omissions were committed willfully or with reckless disregard for the truth. In addition, each of the Turquoise Hill Individual Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

157.    The Turquoise Hill Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Turquoise Hill personnel to members of the investing public, including Plaintiff and the Class.

158.    As a result of the foregoing, the market price of Turquoise Hill securities was artificially inflated during the Class Period.  In ignorance of the falsity of the Turquoise Hill Defendants' statements, Plaintiff and the other members of the Class relied on the statements

described above and/or the integrity of the market price of Turquoise Hill securities during the Class Period in purchasing Turquoise Hill securities at prices that were artificially inflated as a result of the Turquoise Hill Defendants' false and misleading statements.

159. Had Plaintiff and the other members of the Class been aware that the market price of Turquoise Hill securities had been artificially and falsely inflated by the Turquoise Hill Defendants' false and misleading statements and by the material adverse information which the Turquoise Hill Defendants did not disclose, they would not have purchased Turquoise Hill's securities at the artificially inflated prices that they did, or at all.

160. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

161. By reason of the foregoing, the Turquoise Hill Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Turquoise Hill securities during the Class Period.

## <u>COUNT II</u>

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against the Rio Tinto Defendants)**

162. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

163. Plaintiff asserts this Count pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against the Rio Tinto Defendants.

164. During the Class Period, the Rio Tinto Defendants disseminated or approved the false statements issued by Rio Tinto set forth above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

165.     Rio Tinto, Jacques and Soirat violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

> (i)     employed devices, schemes and artifices to defraud;
>
> (ii)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (iii)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Turquoise Hill securities during the Class Period.

166.     By virtue of their positions at Rio Tinto as senior executives, Jacques and Soirat had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, these Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  These acts and omissions were committed willfully or with reckless disregard for the truth.  In addition, each of the Rio Tinto Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

167.     The Rio Tinto Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they

failed to ascertain and disclose the true facts in the statements made by them or other Rio Tinto personnel to members of the investing public, including Plaintiff and the Class.

168.    As a result of the foregoing, the market price of Turquoise Hill securities was artificially inflated during the Class Period.  In ignorance of the falsity of Turquoise Hill's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Turquoise Hill securities during the Class Period in purchasing Turquoise Hill securities at prices that were artificially inflated as a result of the Rio Tinto Defendants' false and misleading statements.

169.    Had Plaintiff and the other members of the Class been aware that the market price of Turquoise Hill securities had been artificially and falsely inflated by these Defendants' misleading statements and by the material adverse information which the Rio Tinto Defendants did not disclose, they would not have purchased Turquoise Hill's securities at the artificially inflated prices that they did, or at all.

170.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

171.    By reason of the foregoing, the Rio Tinto Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Turquoise Hill securities during the Class Period.

## COUNT III

**For Violation of Section 20(a) of the Exchange Act**
**(Against the Turquoise Hill Individual Defendants)**

172.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

173.    Plaintiff asserts this Count pursuant to Section 20(a) of the Exchange Act against the Turquoise Hill Individual Defendants.

174.    During the Class Period, the Turquoise Hill Individual Defendants participated in the operation and management of Turquoise Hill, and conducted and participated, directly and indirectly, in the conduct of Turquoise Hill's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the status of Oyu Tolgoi mining project.

175.    As officers and/or directors of a publicly owned company, the Turquoise Hill Individual Defendants had a duty to disseminate accurate and truthful information with respect to Turquoise Hill's financial condition and results of operations, and to correct promptly any public statements issued by Turquoise Hill which had become materially false or misleading.

176.    Because of their positions of control and authority as senior officers, the Turquoise Hill Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Turquoise Hill disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Turquoise Hill Individual Defendants exercised their power and authority to cause Turquoise Hill to engage in the wrongful acts complained of herein. The Turquoise Hill Individual Defendants therefore were "controlling persons" of Turquoise Hill within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Turquoise Hill securities.

177.    Turquoise Hill violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged herein, and as a direct and proximate result of those violations, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

178.     The Turquoise Hill Individual Defendants were culpable participants in Turquoise Hill's violations of Section 10(b) and Rule 10b-5 alleged above.

179.     By reason of their control of Turquoise Hill, the Turquoise Hill Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for Turquoise Hill's violations of Section 10(b) and Rule 10b-5, to the same extent as Turquoise Hill.

## COUNT IV

### For Violation of Section 20(a) of the Exchange Act
### (Against Jacques and Soirat as Control Persons of Rio Tinto)

180.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

181.     Plaintiff asserts this Count pursuant to Section 20(a) of the Exchange Act against Jacques and Soirat.

182.     During the Class Period, Jacques and Soirat participated in the operation and management of the Rio Tinto, and conducted and participated, directly and indirectly, in the conduct of Rio Tinto business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the status of Oyu Tolgoi mining project.

183.     As officers and/or directors of a publicly owned company, Jacques and Soirat had a duty to disseminate accurate and truthful information with respect to Rio Tinto's financial condition and results of operations, and to correct promptly any public statements issued by Rio Tinto which had become materially false or misleading.   This duty extended to statements made by Rio Tinto concerning Turquoise Hill and the Oyu Tolgoi mining project, which Rio Tino managed and in which it had a substantial ownership interest.

184.     Because of their positions of control and authority as senior officers, Jacques and Soirat were able to, and did, control the contents of the various reports, press releases and public

filings which Rio Tinto disseminated in the marketplace during the Class Period. Throughout the Class Period, Jacques and Soirat exercised their power and authority to cause Rio Tinto to engage in the wrongful acts complained of herein. Jacques and Soirat therefore, were "controlling persons" of Rio Tinto within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Turquoise Hill securities.

185.    Rio Tinto violated Sections 10(b) and 20(a), and Rule 10b-5, by its acts and omissions as alleged herein, and as a direct and proximate result of those violations, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Turquoise Hill securities during the Class Period.

186.    Jacques and Soirat were culpable participants in Rio Tinto's violations of Sections 10(b) and 20(a), and Rule 10b-5, alleged herein.

187.    By reason of their control of Rio Tinto, Jacques and Soirat are liable pursuant to Section 20(a) of the Exchange Act for Rio Tinto's violations of Sections 10(b) and 20(a), and Rule 10b-5, to the same extent as Rio Tinto.

## COUNT V

### For Violation of Section 20(a) Of the Exchange Act
### (Against the Rio Tinto Defendants as Control Persons of Turquoise Hill)

188.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

189.    Plaintiff asserts this Count pursuant to Section 20(a) of the Exchange Act against the Rio Tinto Defendants.

190.    During the Class Period, the Rio Tinto Defendants were directly or indirectly the majority shareholders of Turquoise Hill, and they conducted and participated, directly and

indirectly, in the conduct of Turquoise Hill's business affairs. Rio Tinto's subsidiary, Rio Tinto International, was the project manager for Oyu Tolgoi, and the Rio Tinto Defendants were able to exercise control over Turquoise Hill and Oyu Tolgoi, including though a series of governance mechanisms and restrictive covenants entered into with Turquoise Hill, as Turquoise Hill has acknowledged in its Form 40-F filings. Because of their control over Turquoise Hill, the Rio Tinto Defendants knew the adverse non-public information regarding the status of Oyu Tolgoi mining project.

191.    Because of their positions of control and authority over Turquoise Hill, the Rio Tinto Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Turquoise Hill disseminated in the marketplace during the Class Period. Throughout the Class Period, the Rio Tinto Defendants exercised their power and authority to cause Turquoise Hill to engage in the wrongful acts complained of herein. The Rio Tinto Defendants therefore, were "controlling persons" of Turquoise Hill within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Turquoise Hill securities.

192.    Turquoise Hill violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged herein, and as a direct and proximate result of those violations, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

193.    The Rio Tinto Defendants were culpable participants in Timber Hill's violations of Section 10(b) and Rule 10b-5 alleged above.

194.    By reason of their control of Turquoise Hill, the Rio Tinto Defendants are liable pursuant to Section 20(a) of the Exchange Act for Turquoise Hill's violations of Section 10(b) and

Rule 10b-5, to the same extent as Turquoise Hill.

## XI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demand judgment against Defendants as follows:

A.   Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## XII.   **JURY TRIAL DEMAND**

195.   Plaintiff hereby demands a trial by jury

Dated:  October 14, 2020

**HACH ROSE SCHIRRIPA & CHEVERIE LLP**

/s/ Frank Schirripa
Frank R. Schirripa
Kurt Hunciker
Seth M. Pavsner

112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone:      (212) 213-8311
Facsimile:      (212) 779-0057
E-mails:        fschirripa@hrsclaw.com
                khunciker@hrsclaw.com
                spavsner@hrsclaw.com

*Attorneys for Plaintiff*

## CERTIFICATION

I, Anthony Franchi, ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1.        Plaintiff has reviewed the complaint and authorizes its filing.

2.        Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.        Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary.  I understand that is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.        Plaintiff's purchase and sale transaction(s) in the **Turquoise Hill Resources Ltd. (NYSE: TRQ)** security that is the subject of this action during the Class Period is/are as follows:

PURCHASERS                                                            SALES

| Buy Date | Shares | Price per Share | | Sell Date | Shares | Price per Share |
|---|---|---|---|---|---|---|
| 2/5/19 | 100 | 1.6767 | | | | |
| | | | | | | |
| | | | | | | |

**(Please list additional purchase and sale information on a separate sheet of paper, if necessary)**

5.        Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.        During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below_____.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ 14th _____ day of October, 2020.

*Anthony Franchi*
Anthony Franchi (Oct 14, 2020 09:43 EDT)

Anthony Franchi