**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TURQUOISE HILL RESOURCES LTD. SECURITIES LITIGATION | Case No. 20-CV-08585-LJL |

**THE TRQ DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

PAUL, WEISS, RIFKIND,
　WHARTON & GARRISON LLP
Richard A. Rosen
Robert N. Kravitz
Apeksha S. Vora
1285 Avenue of the Americas
New York, New York  10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990
rrosen@paulweiss.com
rkravitz@paulweiss.com
avora@paulweiss.com

*Attorneys for Defendants Turquoise Hill*
*Resources Ltd., Luke Colton, Brendan Lane,*
*and Ulf Quellmann*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ....................................................................... 4

I.      Defendants .............................................................................. 4

II.     Oyu Tolgoi ............................................................................. 5

III.    The Roles of Turquoise Hill and Rio Tinto ............................. 7

IV.     Turquoise Hill's Public Disclosures ....................................... 9

V.      Turquoise Hill's Risk Factor Disclosures ............................... 11

VI.     Delays and Cost-Increases Resulting from Complications with Shaft 2 and
        Instability in the Rock Mass Around and under the Ore Body ....................... 12

VII.    Plaintiffs' Claims .................................................................. 15

ARGUMENT .......................................................................................... 16

I.      The Complaint Does Not Adequately Allege Scienter in Regard to the Turquoise
        Hill Defendants ...................................................................... 17

        A.      Plaintiffs Do Not Allege That the Turquoise Hill Defendants Had
                Knowledge of Contrary Facts ................................................ 18

        B.      Plaintiffs Do Not Adequately Allege Motive and Opportunity ............ 25

II.     TRQ's Statements concerning the Projected Cost and Timeline for the
        Underground Development Are Forward-Looking Statements Protected by the
        PSLRA Safe Harbor ................................................................ 29

        A.      The Statements Are Identified as Forward-Looking and Accompanied by
                Meaningful Cautionary Language ........................................... 30

        B.      The Amended Complaint Does Not Adequately Allege That the TRQ
                Defendants Made Any Forward-Looking Statements with Actual
                Knowledge That They Were False .......................................... 35

III.    TRQ's Statements regarding the Expected Timeline and Costs and Other Issues
        Were Statements of Opinion That the Complaint Does Not Adequately Allege
        Were False ............................................................................. 36

## TABLE OF CONTENTS
### (Continued)

**Page**

IV.    Certain of the TRQ Statements That Plaintiffs Challenge Are Vague Statements
       of Optimism That Are Not Actionable ........................................................................38

V.     The TRQ Defendants Are Not Liable for Statements Made by the Rio Tinto
       Defendants........................................................................................................................40

CONCLUSION.........................................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Abely* v. *Aeterna Zentaris Inc.*,
  2013 WL 2399869 (S.D.N.Y. May 29, 2013) ............................................................. 24, 26

*Acito* v. *IMCERA Grp.*,
  47 F.3d 47 (2d Cir. 1995) ...................................................................................... 35

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ............................................................ 21, 31

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
  2013 WL 144041 (S.D.N.Y. Jan. 14, 2013) ............................................................ 22, 26

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) .................................................................... passim

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) .................................................................................................. 4

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ........................................................................................ 4

*In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*,
  2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .............................................................. 31

*In re Bank of America AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013) ....................................................................... 25

*In re Barrick Gold Corp. Sec. Litig.*,
  341 F. Supp. 3d 358 (S.D.N.Y. 2018) ............................................................. 29, 30, 32

*In re Barrick Gold Sec. Litig.*
  2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) .................................................. 22–23, 30, 35

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017) .......................................................................... 30

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) .......................................................................... 20

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) ........................................................................ 38

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Chapman* v. *Mueller Water Prods., Inc.*,
    466 F. Supp. 3d 382 (S.D.N.Y. 2020) ...................................................................37

*In re Citigroup Inc. Sec. Litig.*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010) .................................................................20

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004) .................................................................23

*City of Austin Police Dep't Ret. Sys.* v. *Kinross Gold Corp.*,
    957 F. Supp. 2d 277 (S.D.N.Y. 2013) ..........................................................29, 30

*City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008) .................................................................21

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen.*
*Holdings Corp.*,
    2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) .......................................................24

*In re Coty Inc. Sec. Litig.*,
    2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ....................................................25

*Das* v. *Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) .................................................................25

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    2017 WL 4049253 (S.D.N.Y. June 28, 2017) ....................................................28

*In re Dot Hill Sys. Corp. Sec. Litig.*,
    594 F. Supp. 2d 1150 (S.D. Cal. 2008) ...............................................................39

*ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .........................................................................17, 18

*In re EDAP TMS S.A. Sec. Litig.*,
    2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) ...................................................38

*Elec. Workers Pension Fund, Local 103* v. *Six Flags Enter. Corp.*,
    2021 WL 807251 (N.D. Tex. Mar. 3, 2021) .......................................................38

*Elliott Assocs., L.P.* v. *Covance, Inc.*,
    2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ...................................................39

*In re Fed Ex Corp. Sec. Litig*,
    2021 WL 396423 (S.D.N.Y. Feb. 4, 2021) .........................................................39

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*In re Federal-Mogul Corp. Sec. Litig.*,
   166 F. Supp. 2d 559 (E.D. Mich. 2001) ............................................................39

*Foley* v. *Transocean Ltd.*,
   861 F. Supp. 2d 197 (S.D.N.Y. 2012) ..............................................................22

*Fulton Cnty. Emps. Ret. Sys.* v. *MGIC Inv. Corp.*,
   2010 WL 601364 (E.D. Wis. Feb. 18, 2010) ....................................................38

*In re Gen. Elec. Sec. Litig.*,
   2021 WL 357756 (2d Cir. Feb. 3, 2021) ...........................................................26

*Glaser* v. *The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..............................................................20

*In re Gold Resources Corp. Sec. Litig.*,
   776 F.3d 1103 (10th Cir. 2015) ...........................................................22, 23, 32

*Gregory* v. *ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)..............29

*Halperin* v. *eBanker USA.Com, Inc.*,
   295 F.3d 352 (2d Cir. 2002) .............................................................................33

*In re Health Mgmt., Inc., Sec. Litig.*,
   970 F. Supp. 192 (E.D.N.Y. 1997).....................................................................23

*Hou Liu* v. *Intercept Pharm. Inc.*,
   2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ...........................................17, 25

*Iowa Pubs. Emps.' Ret. Sys.* v. *MF Glob., Ltd.*,
   620 F.3d 137 (2d Cir. 2010) .............................................................................30

*Institutional Inv'rs Grp.* v. *Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) .............................................................................31

*Jackson* v. *Abernathy*,
   960 F.3d 94 (2d Cir. 2020) ...............................................................................17

*Koch* v. *Christie's Intern. PLC*,
   699 F.3d 141 (2d Cir. 2012) ...............................................................................4

*Landow* v. *Bartlett*,
   2019 WL 1027994 (D. Nev. Mar. 4, 2019)........................................................38

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Lorenzo* v. *SEC*,
    139 S. Ct. 1094 (2019) ...........................................................................................40

*Maloney* v. *Ollie's Bargain Outlet Holdings, Inc.*,
    2021 WL 517934 (S.D.N.Y. Feb. 10, 2021) ................................................ 28–29

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ...................................................................18

*Martin* v. *Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) ................................................................. passim

*Moshell* v. *Sasol Ltd.*,
    481 F. Supp. 3d 280 (S.D.N.Y. 2020) ...................................................................30

*In re MRU Holdings Sec. Litig.*,
    769 F. Supp. 2d 500 (S.D.N.Y. 2011) ...................................................................26

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) ........................................................25–26, 26

*In re NovaGold Resources Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009) ...................................................................33

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................... 19, 28

*In re Pretium Resources Inc. Sec. Litig.*,
    2020 WL 953609 (S.D.N.Y. Feb. 27, 2020) .......................................................37

*In re Pretium Resources Inc. Sec. Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017) ........................................................21, 40

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004) ...............................................................................38

*Rudani* v. *Ideanomics, Inc.*,
    2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020) ....................................................29

*In re Sanofi-Aventis Sec. Litig.*,
    2009 WL 3094957 (S.D.N.Y. Sept. 25, 2009) ....................................................28

*Schaffer* v. *Horizon*,
    2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ........................................................39

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Shaw* v. *Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) ................................................................................... 39

*Slayton* v. *Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ......................................................................... 26, 35, 40

*In re Synchrony Fin. Sec. Litig.*,
    2021 WL 560204 (2d Cir. Feb. 16, 2021) ............................................................. 38

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................ 17, 22

*Tongue* v. *Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ................................................................................. 37

*Turner* v. *MagicJack VocalTec, Ltd.*,
    2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) .......................................................... 26

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ............................................................... 39

*Wochos* v. *Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .............................................................................. 31

**STATUTES**

15 U.S.C. § 78u-5(c) ...................................................................................................... 29

PSLRA ............................................................................................................... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 1

Defendants Turquoise Hill Resources Ltd. ("Turquoise Hill," "TRQ," or the "Company"), Luke Colton, Brendan Lane, and Ulf Quellmann (together, the "Turquoise Hill Defendants" or "TRQ Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' Consolidated Complaint (the "Amended Complaint") in its entirety and with prejudice under Rule 12(b)(6) of the Federal Rule of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## PRELIMINARY STATEMENT

This is a purported securities fraud class action arising from the underground development of Oyu Tolgoi, a massive copper and gold mine located in a remote region of Mongolia. Turquoise Hill, which is based in Canada, and an entity owned by the Government of Mongolia are co-owners of the company that owns the mine. Rio Tinto, one of the largest mining companies in the world and a majority owner of Turquoise Hill, is the manager of the mine and oversees its operations.

Plaintiffs allege that Turquoise Hill and Rio Tinto misled Turquoise Hill investors by purportedly delaying disclosure of problems and delays in the underground development of the mine that eventually led to a substantial increase in the estimated investment costs and a delay in the estimated date of initial production.

The Turquoise Hill Defendants agree with the Rio Tinto Defendants that the Amended Complaint does not adequately allege a claim against any defendant and therefore incorporate by reference all of the arguments set forth in Points II.B–IV of the Rio Tinto Defendants' motion to dismiss. But the claims against the Turquoise Hill Defendants also suffer from several additional fundamental flaws.

*First*, while Plaintiffs do not adequately allege scienter as to *any* defendant, the Amended Complaint's scienter allegations are especially insufficient as to the Turquoise Hill

Defendants.  The Amended Complaint  contains allegations  purportedly  based on interviews  with former Rio Tinto employees and consultants that certain individuals  at Rio Tinto were apprised of delays and cost overruns in the underground  development  before they were publicly  disclosed. But there is not a single allegation  that anyone at Turquoise Hill  was told  about these issues, or that any of the Turquoise  Hill  Defendants were otherwise aware of them at any relevant time prior to public  disclosure.

In addition,  Turquoise Hill's  disclosures  in relation to the project are based essentially  entirely  on information  regarding  the  mine  provided  to it by the  project  manager. Moreover, the Amended Complaint  does not ascribe any illicit  motives to TRQ.

In addition,  Plaintiffs  do not allege that Turquoise  Hill or any of the Turquoise  Hill individual  defendants  received  any concrete benefit  as a result  of the alleged  fraud.  In fact, Mr. Quellmann  *bought*  Turquoise Hill  stock during  the relevant period, which effectively negates scienter as to him.  And, the Amended Complaint  and the disclosures it cites show that Turquoise Hill  disclosed  delays as soon as Rio Tinto  provided  that information  to it and cautioned investors that costs were being re-evaluated in light  of the delays and other issues—all of which also weighs against any inference of scienter.

***Second***, the bulk  of the Turquoise  Hill  disclosures  that Plaintiffs  claim  were misleading—which  concerned the projected cost and timeline  for the underground  development— are quintessential  forward-looking  statements protected by the PSLRA safe harbor.  As the Second Circuit  and other courts have recognized, mining  is an inherently  and particularly  risky business, and miners  never know exactly what they will  find  deep under the surface until  they get there. Turquoise Hill  made meaningful  cautionary statements about those risks in all of its public  filings, news releases, and analyst calls.  While  the PSLRA safe harbor does not immunize  forward-

looking statements that are made with actual knowledge of their falsity, the Amended Complaint does not adequately allege such knowledge on the part of any Turquoise Hill Defendant, as discussed above in regard to the shortcomings of Plaintiffs' scienter allegations.

*Third*, most of the Turquoise Hill disclosures that Plaintiffs challenge are also statements of opinion, and the Amended Complaint does not adequately allege either subjective or objective falsity in regard to those statements.

*Fourth*, a number of the Turquoise Hill disclosures that Plaintiffs challenge—including statements such as "capital costs remain in line"; the schedule "remains on track"; and "key risks [are] well understood and managed"—are vague statements of optimism, or puffery, that courts have repeatedly ruled are not actionable under the securities laws.

For these and other reasons discussed below, all of the claims asserted against the Turquoise Hill Defendants in the Amended Complaint should be dismissed in their entirety and with prejudice.

## STATEMENT OF FACTS[1]

### I.    Defendants

Turquoise Hill is a mining company headquartered in Canada. (¶ 36.)  Its only material mineral resource property is a 66% equity interest in Oyu Tolgoi LLC ("OT"), the company that owns the Oyu Tolgoi copper and gold mine in southern Mongolia ("Oyu Tolgoi"). (¶¶ 36, 50.)  The Government of Mongolia owns the other 34% of OT, through an entity called Erdenes Oyu Tolgoi LLC. (¶ 50.)

Ulf Quellmann was CEO of Turquoise Hill from August 1, 2018 to March 3, 2021. (¶ 40.)  Luke Colton has been the CFO of Turquoise Hill since October 9, 2017. (¶ 41.)  Brendan Lane was its Vice President of Operations & Development from February 1, 2016 to March 2019. (¶ 42.)

Defendant Rio Tinto, which consists of Rio Tinto plc (a United Kingdom company) and Rio Tinto Limited (an Australian company), is one of the world's largest metals and mining companies. (¶ 44.)  Although Turquoise Hill's shares are publicly traded, Rio Tinto owns 50.8% of the shares through various of its wholly owned subsidiaries. (¶¶ 37, 45.)

Jean-Sebastien Jacques was the CEO of Rio Tinto from July 2016 to December 2020. (¶ 47.)  Arnaud Soirat was the chief executive of Rio Tinto's Copper &

---

[1]    Solely for purposes of this motion to dismiss, the well-pleaded facts alleged in the Amended Complaint are assumed to be true. *See Koch* v. *Christie's Intern. PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  That tenet, however, "is inapplicable to legal conclusions."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  In deciding a motion to dismiss, the Court may consider "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Citations to "¶ __" refer to paragraph numbers in the Amended Complaint and citations to "Ex. __" are exhibits to the Declaration of Richard A. Rosen.

Diamonds product group from 2016 to December 2020, and has been Rio Tinto's COO since February 2021.  (¶ 48.)

## II.    Oyu Tolgoi

Oyu Tolgoi is located in a remote part of the South Gobi Desert about 340 miles south of Ulaanbaatar, Mongolia's capital city.  (¶ 36.)  It is one of the largest known copper and gold deposits in the world.  When fully developed, it is expected to be the world's fourth largest copper mine, with an "average annual production of 560 thousand tonnes between 2025 and 2030."[2]  (¶ 281.)

The original mining operations at Oyu Tolgoi, which began in 2013, were surface operations known as "open pit" mining.  (¶ 5.)  Up to 80% of the value of the mine, however, lies in ore deposits that are deep underground and accessible only through a highly complex underground mining project.  (*Id.*)  After initial attempts to start the underground development stalled, Rio Tinto, Turquoise Hill, and the Government of Mongolia entered into an Underground Mine Development and Financing Plan in May 2015 (the "Underground Plan"), and restarted the project in mid-2016.  (¶¶ 62–63; Ex. 19 (2019 Management's Discussion and Analysis ("MD&A") attached to TRQ Form 6-K, dated May 15, 2019), at 6.)  Turquoise Hill filed the Underground Plan with the SEC as an exhibit to a Form 6-K filing on May 19, 2015.  (Ex. 2 (TRQ Form 6-K dated May 19, 2015 (attaching the Underground Plan)).)

Financing was predicated on the completion of a "feasibility study" as required by the Mongolian government—a comprehensive report that calculated the geological-engineering solutions, legal, operational, economic, social, environmental, and other factors required to

---

[2]    A "tonne" is a metric ton, which is 1,000 kilograms.  Thus, 500,000 tonnes equals about 550,000 U.S. tons.

determine the financial viability of the project. (¶ 62; Ex. 2 (Underground Plan), at 5.) The Feasibility Study was completed in May 2016. (Ex. 4 (2017 Annual Information Form ("AIF") attached to TRQ 2017 Form 40-F), at 15.) It estimated that the cost to complete development of the underground project would be $5.3 billion USD. (¶ 63.) Construction was expected to take place over five years, with sustainable production estimated to begin in early 2021. (¶ 7.) As the publicly disclosed Underground Plan stated, the parties (Rio Tinto, the Government of Mongolia, and Turquoise Hill) expressly acknowledged and agreed that the Feasibility Study contained "estimates only and are not binding, are based on assumptions that are subject to uncertainties and contingencies that may prove not to be correct and actual results may vary from the estimates in the Feasibility Study." (Ex. 2 (Underground Plan), at 5.)

The design of the vast underground mine consists of five vertical shafts for access to the mine, reaching mining levels nearly a mile below the surface, and a network of 203 kilometers of lateral tunnels extending horizontally from the bottom of the shafts underneath and around the ore deposits. (¶ 64; Ex. 12 (Jan. 17, 2019 Investor Presentation), at 4.) Shaft 2 is the main logistics hub for transporting personnel and equipment from the surface to the underground mine infrastructure and conveying ore and other materials to the surface, as well as providing ventilation. (¶¶ 8, 70.) The other four shafts are for ventilation only. (*See id.*)

The mine plan calls for the largest ore body, the Hugo North Lift 1, to be divided into three panels, with the middle panel—Panel 0—to be mined first, followed by Panels 1 and 2, which flank Panel 0. (¶ 68; Ex. 12 (Jan. 17, 2019 Investor Presentation), at 4.) The ore will be mined by a process called "panel block caving," in which the supporting rock below the ore body is undercut, causing the ore to loosen and fall by gravity into massive, Y-shaped "drawbells" that

channel the loosened ore into the underground tunnel for extraction. (¶¶ 66–67; Ex. 12 (Jan. 17, 2019 Investor Presentation), at 4.)

The Government of Mongolia gave OT formal notice to restart second-phase underground construction around mid-2016 (¶ 63; Ex. 4 (2017 AIF attached to TRQ 2017 Form 40-F), at 15), and the work then proceeded. To accommodate the mine's scale and complexity, it is heavily staffed—requiring a workforce of approximately 17,000 in total (employees and contractors) at the end of 2018. (Ex. 15 (2018 MD&A attached to TRQ 2018 Form 40-F), at 6.)

## III.    The Roles of Turquoise Hill and Rio Tinto

Although Turquoise Hill owns 66% of OT, which owns the Oyu Tolgoi mine, it is headquartered in Canada, and during the Class Period it had no physical presence or office in Mongolia, and has no operational employees. (¶ 36; Ex. 26 (Apr. 2, 2020 Pentwater Letter to Shareholders), at vii.)

The company that manages the mine is not Turquoise Hill, but a subsidiary of the Rio Tinto Group that has managed the Oyu Tolgoi project since 2010, including having responsibility for its development and construction. (¶ 45; Ex. 3 (May 6, 2016 Rio Tinto Press Release), at 2.) Thus, Rio Tinto, not Turquoise Hill, has "near total-control over the operations of Oyu Tolgoi." (¶ 53.)[3]

Rio Tinto International's parent company, Rio Tinto, is a highly sophisticated metals and mining company with nearly 150 years of industry experience. (Ex. 5 (2017 Rio Tinto

---

[3] *See also* ¶¶ 37, 38, 45, 46, 50, 51, 52; Ex. 4 (2017 AIF attached to TRQ 2017 Form 40-F), at 34–35 ("RTIH, as the holder of a majority of the Common Shares, and as manager of Oyu Tolgoi, has the ability to exert a significant degree of control over the Corporation, Oyu Tolgoi LLC and Oyu Tolgoi."); Ex. 15 (2018 AIF attached to TRQ 2018 Form 40-F), at 36 (same); ¶ 3 (stating that the Oyu Tolgoi mine is "operated almost exclusively by Turquoise Hill's controlling shareholder, mining giant Rio Tinto").

Annual Report), at 2.)   It is one of the largest mining companies in the world, with over 47,000 employees globally and production presence in almost every continent and nearly 35 countries.  (Ex. 5 (2017 Rio Tinto Annual Report), at 6.)  As a result, Rio Tinto maintains a vast portfolio of businesses in the mineral extraction and refining industries producing a variety of metals and minerals, including cooper, iron ore, bauxite, aluminum, diamonds, gold, and many more.  (Ex. 5 (2017 Rio Tinto Annual Report), 2–3.)

The Amended Complaint repeatedly stresses allegations that, in addition to serving as the project manager, Rio Tinto has "exercised near-total control over the Oyu Tolgoi project through its contractual authority as manager of the project under the agreements between the Mongolian Government, Rio Tinto, and TRQ, as well as through Rio's control over TRQ." (¶ 38; Ex. 15 (2018 AIF attached to TRQ 2018 Form 40-F), at 17–18, 36.)  It is a central theme of the Amended Complaint that, at all relevant times, Rio Tinto controlled the flow of information regarding the mine that TRQ received (and continues to receive), which directly impacted the timing and substance of the disclosures that TRQ made respecting the mine.   In this regard, Plaintiffs allege that Rio Tinto:

- maintains "near-total control" over TRQ's "public statements about" OT (¶ 50);

- "has exercised near-total control" over "the election of all members of TRQ's Board of Directors and the selection and appointment of TRQ's executive officers" (¶ 37);

- can "block any nomination" to TRQ's "Board or force a resignation" (¶ 37);

- requires TRQ to provide it "the opportunity to review and comment on drafts of [certain categories of] public filings" (¶ 51);

- controls, with RTIH, "decisions concerning OT's business through its Board of Directors" and the "Board's Operating Committee" (¶ 52);

- has "the ability to determine the outcome of all Operating Committee decisions, and thus the agenda of the OT Board" (¶ 52);

8

- has approval rights over TRQ's ability "to hire employees" (¶ 177); and

- controls information flow to "TRQ independent directors and management" who "are solely reliant on Rio Tinto for information" (¶ 177 (internal quotations omitted)).

## IV.    Turquoise Hill's Public Disclosures

Throughout the relevant time period, Turquoise Hill consistently updated investors on developments at Oyu Tolgoi in quarterly reports, analyst calls, and investor presentations. Given Rio Tinto's role as the on-site project manager and TRQ's lack of presence at the site, TRQ's disclosures largely consisted of summaries of reports that it had received from Rio Tinto, and which were expressly attributed to Rio Tinto. These updates included information about the progress of the underground development, the projected schedule for sustainable production, and the expected overall capital costs, as provided by Rio Tinto. For example, TRQ disclosed:

- "During Q4'17, *Rio Tinto undertook* a schedule and cost review. *Rio Tinto has provided* Turquoise Hill with a high-level overview of the review's outcomes, in which *Rio Tinto concluded* there were no material changes in project scope, cost or schedule." (¶ 272 (July 31, 2018 Press Release, at 3));

- "*Rio Tinto has undertaken* a second annual re-forecast of underground development schedule and costs and preliminary results have concluded that capital costs remain in line with the overall $5.3 billion budget and the project remains on schedule to complete in 2022." (¶ 152 (Oct. 15, 2018 Press Release, at 1));

- "*Rio Tinto has notified* Turquoise Hill, based on preliminary results, of a delay to achievement of sustainable first production which is not expected to occur by the end of Q3'21 instead of Q1'21." (¶ 294 (Oct. 15, 2018 Press Release, at 1));

- "We did announce on October 15 that *Rio Tinto now projects* a 9-month delay of the start of sustainable production from the underground development." (¶ 306 (Nov. 2, 2018 Investor Call, at 3));

- "*Rio Tinto, as project manager, has advised* that as the lateral development continues, there is more detailed geotechnical data than what was previously available and, as a consequence, the understanding of the rock mass around and under the ore body has improved. This data reveals there are areas of the mine footprint where the strength of the rock mass is more variable than anticipated.

This will require some potentially significant changes to the design of some future elements of the development, and the development schedule." (Ex. 13 (Feb. 26, 2019 Press Release), at 2);

- "Since completion of the Company's independent review, **Rio Tinto, as project manager, has advised** Turquoise Hill that delays on the Shaft 2 fit out are expected to result in an overall schedule delay to sustainable first production beyond the end of Q3'21." (Ex. 16 (Mar. 14, 2019 Press Release), at 2);

- "As announced on February 27, **we were recently advised by Rio Tinto** as our project manager that as the lateral development continues, there is more data than was previously available. And as a consequence, the understanding of the ore body has improved. As such, the location of some of the underground infrastructure may need to change." (¶ 343 (Mar. 15, 2019 Investor Call, at 4));

- "**Rio Tinto, as project manager, has advised** that the fit-out and commissioning work on Shaft 2 (the main production and services shaft) is now expected to be completed by the end of October 2019." (Ex. 18 (Apr. 15, 2019 Press Release), at 2);

- "As announced in April 2019, **Rio Tinto, in its role as manager of Oyu Tolgoi, has advised** that the fit-out and commissioning work on Shaft 2 was now expected to be completed by the end of October 2019. **Rio Tinto has advised** that this further delay to the completion of Shaft 2 is expected to contribute to the previously announced overall schedule delay to sustainable first production beyond the end of Q3'21." (Ex. 20 (May 15, 2019 Press Release), at 3); and

- "Improved rock mass information and geotechnical data modelling has confirmed that there are stability risks associated with components of the existing mine design. Therefore, to address these risks, **Rio Tinto, in its role as manager of Oyu Tolgoi, has advised** that it continues to review mine design options for the completion of the underground development of Oyu Tolgoi." (Ex. 25 (July 31, 2019 Press Release), at 2.)

In fact, Plaintiffs emphasize that TRQ entered into a written agreement with Rio Tinto requiring that all of TRQ's public disclosures regarding Oyu Tolgoi be "consistent with the information provided by the Rio Tinto Manager," and that TRQ not file or issue "any OT Disclosure without providing the Rio Tinto Manager with a reasonable opportunity to review and comment thereon." (¶¶ 50–51.)

V.    **Turquoise Hill's Risk Factor Disclosures**

Turquoise Hill's public disclosures have consistently included copious risk disclosures concerning Oyu Tolgoi.  Among other things, TRQ cautioned investors that:

- "[t]he actual cost of developing Oyu Tolgoi may differ materially from the Company's estimates, and development may involve unexpected problems or delays";

- "[i]f these estimates prove incorrect, the total capital expenditures required to complete development of the underground components of Oyu Tolgoi may increase, which may have a material adverse impact on the Corporation, its results of operations, financial condition and share price";

- there are also a number of uncertainties inherent in the development and construction of any new or existing mine, including Oyu Tolgoi.  These uncertainties include the timing and cost, which can be considerable, of the construction of mining and processing facilities. . .";

- "The cost, timing and complexities of mine construction and development are increased by the remote location of a property such as Oyu Tolgoi";

- "It is common in mining operations and in the development, construction or expansion of existing facilities to experience unexpected problems and delays during such activities, which may cause delays in the commencement or expansion of mineral production or sustainable production.  Such delays could have unforeseen impacts on disclosed project economics"; and

- "[T]here is no assurance that the current or future development, construction or expansion activities will be successfully completed within cost estimates, on schedule or at all and, if completed, there is no assurance that such activities will result in profitable mining operations."

(¶¶ 118–19; Ex. 4 (2017 AIF attached to TRQ 2017 Form 40-F), at 35–36; Ex. 15 (2018 AIF attached to TRQ 2018 Form 40-F), at 33.)

Turquoise Hill's disclosures also contained extensive "forward-looking statements" disclosures.  These disclosures cautioned investors that statements using words such as "expect," "may," "plan," "estimate," and similar expressions suggesting future outcomes were forward-looking statements within the meaning of the PSLRA safe-harbor provisions, and that there were a variety of reasons why actual results might differ, including "mining operational and

development risks," "the speculative nature of mineral exploration," and "capital and operating costs, including with respect to the development of additional deposits"; and cautioned that certain factors were "inherently uncertain," including "the timing and cost of the construction and expansion of mining and processing facilities," and "**delays, and the costs which would result from delays, in the development of the underground mine which could significantly exceed the costs projected in the Statutory Feasibility Study and the 2016 OTTR**." (Ex. 4 (TRQ 2017 Form 40-F), at 2–3 (emphasis added); Ex. 15 (TRQ 2018 Form 40-F), at 2 (emphasis added).)

TRQ's news releases also contained similar cautionary statements regarding forward-looking statements, and referred investors to the fuller list of risk factors set forth in its Annual Information Form. (*E.g.*, Ex. 6 (July 31, 2018 Press Release), at 17–18.) From February 2019 forward, TRQ's disclosures also warned that mining operational and technical risks included "geotechnical risks and ground conditions." (Ex. 13 (Feb. 26, 2019 Press Release), at 3.)

These risks captured the precise challenges that led to delays and increased costs at the mine in the relevant period, including difficulties in the completion of Shaft 2 and the discovery of geotechnical conditions—that is, the physical condition and stability of the subsurface rock—that required fundamental changes to the mine plan. TRQ promptly disclosed these conditions to the market as it became aware of them. (*E.g.*, Ex. 8 (Oct. 15, 2018 Press Release), at 1; Ex. 13 (Feb. 26, 2019 Press Release), at 2; Ex. 18 (Apr. 15, 2019 Press Release), at 2.)

## VI. Delays and Cost-Increases Resulting from Complications with Shaft 2 and Instability in the Rock Mass Around and under the Ore Body

Under the original Underground Plan, Rio Tinto and TRQ expected production from the first drawbell in mid-2020 and first sustainable production from the underground development in early 2021, with the total expansion capital for the project expected to be $5.3 billion. (Ex. 5 (Rio Tinto 2017 Annual Report), at 43, 47.) Rio Tinto first began reporting delays

in the development and production schedule in October 2018, resulting from a delay in the completion of Shaft 2 and the discovery of "ground conditions," and "shaft sinking challenges," among other things. (¶ 292.) Rio Tinto forecasted that the net effect of the delays would be to delay sustainable first production by up to nine months, to late Q3'21. (¶ 294.) TRQ reported that it was undertaking its own review of the causes and impact of these delays and would "announce the results as soon as possible." (¶ 293.)

Over the ensuing months, TRQ continued to update investors on the results of its review and on the results of additional updates from Rio Tinto, and repeatedly cautioned it would take time for the analyses to be completed and for the full impact on scheduling and costs to be understood. (¶¶ 292–95, 303–04, 305–06, 308–10, 314, 323–24, 335–36, 341, 343–44, 349, 357–58, 384, 386.) In TRQ's February 26, 2019 Press Release (¶¶ 323–24), the company disclosed that its review, which had been conducted with the assistance of mining consultants OreWin Pty Ltd ("OreWin"), its independent Qualified Person ("QP"),[4] had found that the project cost was expected to remain within the $5.3 billion budget, but that due to continued ground support in some key areas, there was an increasingly likely risk of a further delay to sustainable first production beyond Q3'21. In March 2019, TRQ disclosed that Rio Tinto had advised it that further delays in completing Shaft 2 were expected to contribute to an overall schedule delay to sustainable first production beyond the end of Q3'21, and that Rio Tinto was studying certain modifications

---

[4] *See* Ex. 16 (Mar. 14, 2019 Press Release), at 3. Under Canadian mining regulations, a "Qualified Person" is an individual who (a) is an engineer or geoscientist with a university degree, or equivalent accreditation, in an area of geoscience, or engineering, relating to mineral exploration or mining; (b) has at least five years of experience in mineral exploration, mine development or operation, or mineral project assessment, or any combination of these, that is relevant to his or her professional degree or area of practice; and (c) has experience relevant to the subject matter of the mineral project and the technical report. *See* Ex. 1 (National Instrument 43-101 Standards of Disclosure for Mineral Projects), at (2011) 34 OSCB 7046.

to its mining plan, including "relocating the ore passes on the footprint." (¶ 335; Ex. 16 (Mar. 14, 2019 Press Release) at 2.) TRQ said that the impact of those changes "will be reflected in the definitive estimate review, which is expected to be complete towards the end of the year" (*id.* at 1), and that TRQ would be assessing the impact of any further delay to sustainable first production "on the Company's cash flows, liquidity, and funding requirements." (¶ 341; Ex. 15 (2018 MD&A attached to TRQ 2018 Form 40-F), at 13.)

On March 15, 2019, Mr. Quellmann told analysts that, since Turquoise Hill had completed its own review, Rio Tinto had advised it that more detailed data was now available, and that, as a consequence, "Rio Tinto is studying the impact of some potentially significant changes to some future elements of the underground design including relocating the ore passes." (¶ 341.) Mr. Quellmann further disclosed: "[T]he whole value proposition of this mine is predicated upon stability of the tunnels and excavation . . . . We need to make sure we put the infrastructure into the right place where we have stability. That's what we need to do, that's what we're doing now. And so we now need to go, together with Rio, go through the process of understanding the stability, understanding where fault lines are running, identifying different locations, modeling it and then include that in the definitive estimate." (Ex. 17 (Mar. 15, 2019 Investor Call), at 7.) He added that "the ultimate cost and schedule will only be known by year-end with the completion of the definitive estimate," but that the company expected to be able to provide updates prior to that. (¶¶ 343–45; Ex. 17 (Mar. 15, 2019 Investor Call), at 7.)

In the Company's next earnings call on May 16, 2019, Mr. Quellmann reported that "work continues on the definitive estimate work," and that "[t]his may include some potentially significant changes to the design of some future elements and the mine design and the development schedule." (¶¶ 354–55; Ex. 21 (May 16, 2019 Investor Call), at 3.) Mr. Colton added that, by the

14

end of the year, "key milestones related to the underground development project will be significantly more advanced than today," including completion of the "definitive estimate review," which would include "final estimates for completion, schedule, costs, both CapEx and Opex, grades and the production schedule." (*Id*. at 4.)

On July 15, 2019,[5] TRQ disclosed that improved rock mass information and geotechnical modelling had confirmed that there were stability risks associated with the existing mine design, and that, as a result, a number of mine design options were identified to address those risks. Based on these options, TRQ reported, sustainable first production was now expected to be delayed to between May 2022 and June 2023, and the development capital spend for the project was expected to increase by $1.2 to $1.9 billion. (¶ 216; *see also* Ex. 24 (July 16, 2019 Rio Tinto Press Release), at 2.)

On July 31, 2019, TRQ reported that it was taking a $600-million impairment charge due to the delays and increased cost estimate. (¶ 220.)

## VII.    Plaintiffs' Claims

The original plaintiff commenced this action on October 14, 2020. (ECF No. 1.) The Pentwater Funds were appointed Lead Plaintiff on January 15, 2021, and filed the Amended Complaint on March 16, 2021. (ECF No. 110.) The Amended Complaint asserts claims under Section 10(b) of the Exchange Act and Rule 10b-5 claims against all defendants, and control person claims against Mr. Quellmann, Mr. Lane, Mr. Colton, and the Rio Tinto Defendants under Section 20(a) of the Exchange Act.

---

[5]    The Amended Complaint sometimes incorrectly refers to this press release as dated July 16, 2019 (¶ 357); in fact, it was dated July 15, 2019.

The Amended Complaint alleges—purportedly based on interviews of, and documents provided by, former Rio Tinto employees and consultants, including two purported "whistleblowers"—that the delays and cost-overruns in the underground mining operations occurred earlier than when Rio Tinto and TRQ disclosed them. (¶¶ 222–301.) It also alleges, again purportedly based on these interviews and documents, that the delays and cost-overruns were caused by mismanagement and mistakes, not unforeseen ground conditions and geo-technical issues that a number of disclosures referred to, and that certain Rio Tinto employees were advised of these facts. (*Id.*)

There is not a single allegation, however, that any of these former Rio Tinto employees or consultants ever advised anyone at TRQ about the delays and cost overruns prior to when they were disclosed by TRQ. Nor is there a single allegation that the information that TRQ reported about the progress of the underground development did not accurately reflect the information that Rio Tinto, as project manager, was providing to TRQ. The Amended Complaint further alleges that Rio Tinto was motivated to conceal problems at the mine because it was facing multiple regulatory inquiries. (¶¶ 161–176.) There are no similar allegations about TRQ, and indeed no allegations whatsoever as to the TRQ Defendants' "motive" to mislead investors.

## ARGUMENT

The gist of the Amended Complaint is that defendants knew that the underground development of the mine was significantly delayed and over-budget, but that they delayed disclosing that to Turquoise Hill investors. The Amended Complaint also alleges that, contrary to what defendants disclosed, the delays and cost-overruns were caused by mismanagement and mistakes, not unforeseen ground conditions and geo-technical issues.

Again, the TRQ Defendants wish to emphasize that they do not believe that the Amended Complaint adequately alleges securities fraud against *any* defendant. This brief focuses,

however, on why Plaintiffs' allegations against the Turquoise Hill Defendants are deficient. Specifically: (i) they do not adequately allege scienter on the part of the Turquoise Hill Defendants; (ii) they do not allege "actual knowledge" as required to avoid the PSLRA "safe harbor" for forward-looking statements, which applies to most of the disclosures that Plaintiffs challenge; (iii) they do not allege "subjective falsity," as required to plead the Turquoise Hill Defendants' statements of opinion were false; and (iv) they focus on vague statements of corporate optimism that are not actionable.

## I.    The Complaint Does Not Adequately Allege Scienter in Regard to the Turquoise Hill Defendants

The PSLRA requires plaintiffs to allege facts giving rise to a "strong inference" that defendants acted with an intent "to deceive, manipulate, or defraud." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313–14 (2007) (quoting 15 U.S.C. § 78u–4(b)(2)). That inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Id.* at 309. "Particularized facts supporting an inference of scienter must be pled as to each individual defendant." *Hou Liu* v. *Intercept Pharm. Inc.*, 2020 WL 1489831, at *14 (S.D.N.Y. Mar. 26, 2020). To allege corporate scienter, plaintiffs must plead facts that "give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (internal quotation marks omitted). In order to plead a strong inference of scienter, Plaintiffs must allege "either (1) that defendants had the motive and opportunity to commit fraud" or "(2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

17

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [the company] or its officers 'benefitted in some concrete and personal way from the purported fraud.'" *ECA*, 553 F.3d at 198 (quoting *Novak* v. *Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)). Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud. *Novak*, 216 F.3d at 307–08.

In the absence of allegations of motive and opportunity, "the strength of the circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199 (quoting *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants ... '[1] engaged in deliberately illegal behavior; [2] knew facts or had access to information suggesting that their public statements were not accurate; or [3] failed to check information they had a duty to monitor.'" *ECA*, 553 F.3d at 199.[6] Plaintiffs' allegations do not meet any of these tests.

## A.    Plaintiffs Do Not Allege That the Turquoise Hill Defendants Had Knowledge of Contrary Facts

The Turquoise Hill Defendants join in and incorporate by reference the Rio Tinto Defendants' arguments that the Amended Complaint does not adequately allege scienter. (*See* Rio Tinto Defendants' Mem. at Point III.) But even if the Court were to find that the scienter allegations against the Rio Tinto Defendants are sufficient, they are not sufficient as to the Turquoise Hill Defendants.

---

[6]    *See also In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) ("Second Circuit cases uniformly rely on allegations that [1] specific contradictory information was available to the defendants [2] at the same time they made their misleading statements.").

"Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309 (internal citations omitted). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id*.

Here, Plaintiffs do not identify any such reports or statements containing contrary facts that were provided to anyone at TRQ or that the Turquoise Hill Defendants otherwise had access to. By Plaintiffs' own allegations, TRQ relied on Rio Tinto, the project manager, for information and updates concerning the progress of the underground development, and—as TRQ specifically informed the markets—TRQ's disclosures consisted essentially entirely of information that the project manager provided. (¶ 51.) With no physical presence or office in Mongolia, and no operational employees, TRQ did not have the on-site access to progress at Oyu Tolgoi and is wholly reliant on the project manager in this regard. In its disclosures, TRQ expressly stated that it was relaying the information it had received from Rio Tinto.[7] There is not a single allegation in the Amended Complaint that Rio Tinto provided any material information to

---

[7]    *See* ¶ 306 (Nov. 2, 2018 Investor Call, at 3) ("We did announce on October 15 that **Rio Tinto now projects** a 9-month delay of the start of sustainable production from the underground development"); ¶ 343 (Mar. 15, 2019 Investor Call, at 4) ("As announced on February 27, **we were recently advised by Rio Tinto** as our project manager that as the lateral development continues, there is more data than was previously available. And as a consequence, the understanding of the ore body has improved. As such, the location of some of the underground infrastructure may need to change."); *see also* Ex. 13 (Feb. 26, 2019 Press Release), at 2; ¶ 272 (July 31, 2018 Press Release, at 3.); ¶ 294 (Oct. 15, 2018 Press Release, at 1); ¶ 306 (Nov. 2, 2018 Investor Call, at 3); Ex. 16 (Mar. 14, 2019 Press Release), at 2; Ex. 18 (Apr. 15, 2019 Press Release), at 2; Ex. 20 (May 15, 2019 Press Release), at 3; Ex. 25 (July 31, 2019 Press Release), at 2.

TRQ—or, in particular, to Mr. Colton, Mr. Lane, or Mr. Quellmann—about delays or cost overruns that TRQ either failed to disclose in a timely fashion or disclosed inaccurately.[8]

Moreover, Plaintiffs purport to have interviewed about a dozen former Rio Tinto employees and consultants, including purported whistleblowers Richard Bowley and Maurice Duffy, concerning allegedly undisclosed delays and cost overruns. Plaintiffs allege that these individuals brought information about Oyu Tolgoi to the attention of Rio Tinto executives,[9] but there is not a single allegation that any one of these employees or consultants (or anyone else) ever told anyone at TRQ about those issues. To the contrary, Plaintiffs quote a sworn statement from Bowley to a U.K. tribunal in which Bowley purportedly stated: "Despite [my] reporting [my] concerns about schedule delay and cost overrun and proposing solutions [to two Rio Tinto employees], *Rio Tinto made no disclosure of the true facts to [its] partners and* investors or the market." (¶ 233 at 4.4 (emphasis added).) This failure is fatal to Plaintiffs' claim of scienter against the TRQ Defendants. *See Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011) (where confidential witnesses worked for different company, not defendant-company, and plaintiffs "make no allegation that those sources ever had any contact with anyone at" defendant-company or individual defendants, court found that "the law is abundantly clear that such allegations are insufficient to support scienter").[10]

---

[8]  Plaintiffs' bare allegation that TRQ "had access to detailed reports" (¶ 242) is insufficient and "does not allege the content of the reports, the date of the reports, or whether" anyone at TRQ "ever read the reports." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015).

[9]  *See, e.g.*, ¶ 11 (Sept. 2017 meeting with Duffy and Kirikova); ¶ 119 (Feb. 1, 2018 presentation by Bowley); ¶ 122 (May 2018 Bowley conversation Rio Defendant about schedule risks); ¶ 125 (July 3, 2018 email from Bowley about cost overruns); ¶ 129 (July 19, 2018 email from Bowley concerning costs and expected delays); ¶ 132 (Apr. 2018 communication concerning schedule from Andrew Duff, Rio Tinto's Senior Construction Manager at Oyu Tolgoi, to Rio's Global Head of Projects).

[10]  *See also In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) ("Fatal to plaintiffs' claims, however, is that they do not allege with specificity that any of the confidential

In fact, if the Court were to credit the Amended Complaint's allegations that Rio Tinto took steps to hide the true state of affairs by firing key personnel at the mine who raised concerns about delays, and instructing employees not to report about geotechnical problems in writing (¶¶ 131, 135–37, 173, 176, 231, 252–55, 263)—and the Rio Tinto Defendants persuasively show that the Court should not do so—Plaintiffs cannot consistently also allege that TRQ had access to this purported information and, indeed, the Amended Complaint does not allege that anyone at TRQ had any knowledge of these purported practices or instructions.

Plaintiffs allege that TRQ Defendants Mr. Quellmann, Mr. Colton, and Mr. Lane each "regularly visited" the mine, and "assured investors that they knew about the project's actual status and progress." (¶ 257.) But those allegations fall well short of identifying specific reports or other information that was provided to the TRQ Defendants on such visits that contradicted the disclosures they made.[11]

Nor does the Amended Complaint allege that the issues that were purportedly causing the delays and cost overruns would have been apparent to the TRQ Defendants who visited

---

witnesses relied upon in the Complaint presented information to the individual defendants."); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 765 (S.D.N.Y. 2018) (finding amended complaint could not "generate a strong inference of scienter" where there were no confidential witness statements "tending to suggest that defendants knowingly deceived shareholders"); *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020) (former employees who "rais[ed] red flags" about their concerns with defendants were insufficient to plead scienter because the allegations did not support that the CWs made statements to individual defendants that provided them with "actual knowledge."); *In re Pretium Resources Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 481 (S.D.N.Y. 2017) (finding scienter allegations insufficient where plaintiffs failed to "identify with specificity the documents or way in which this contrary information was communicated" to defendants).

[11] *See City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008) (allegations that executives were "hands on" and "closely involved" insufficient to plead scienter without identifying "particular, identified internal reports" executives had access to). Moreover, Plaintiffs do not allege that a single confidential witness took the occasion of such visits to provide any negative information about cost overruns or delays at Oyu Tolgoi to Mr. Quellmann, Mr. Colton, or Mr. Lane.

the mine.  In fact, the Amended Complaint  alleges that a Parliamentary  Working Group of the Government of Mongolia also began on-site inspections  of the mine in June 2018 (¶ 176), but does not explain how the TRQ Defendants  would have been in a better position  to know about the purported problems  than the Mongolian  government officials  who were also on-site.

Under Plaintiffs' own theory, the more plausible  inference is that TRQ did not have more knowledge than the Mongolian  government.  *Tellabs*, 551 U.S. at 314 (inference of scienter must be "at least as compelling  as any opposing  inference of non-fraudulent  intent").[12]

For similar reasons, Plaintiffs' allegations  regarding Mr. Quellmann's statements about having "good visibility"  and being "plugged  in . . . to the processes, cost reviews and the like" are insufficient  to satisfy Plaintiffs' obligation  to plead *facts* showing that Mr. Quellmann was actually aware of information  about undisclosed delays or cost overruns.[13]  (¶¶ 141, 257, 259.) Given the allegations  of the Amended Complaint  taken as a whole, it is equally plausible,  if not more plausible,  to infer that Mr. Quellmann mistakenly  believed, in good faith, that he and other TRQ executives had "good visibility."[14]

This case, therefore, is unlike  *In re Barrick Gold Sec. Litig.*, where the complaint contained  detailed allegations  that individual  defendants had access to specific reports and statements that contradicted their public  statements regarding environmental  compliance. *See In*

---

[12]  *See also In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *21 (S.D.N.Y. Jan. 14, 2013) (finding inference of scienter not strong and "less compelling  than plausible  alternative inferences concerning Defendants' intent"); *In re Gold Resources Corp. Sec. Litig.*, 776 F.3d 1103, 1116 (10th Cir. 2015) (finding that complaint  failed to allege a strong inference of scienter in regard to an alleged overbilling  scheme at a gold mine in Mexico owned by a Colorado corporation where "the relevant personnel  [were] separated by nearly 2,000 miles and international  borders").

[13]  The Amended Complaint  mistakenly  attributes the statements about having "good visibility" into the mine and being "plugged  in" to Mr. Quellmann (¶ 141); they were actually made by Mr. Colton.  *See* Ex. 7 (Aug. 1, 2018 Investor Call), at 9, 13.

[14]  *See, e.g.*, *Foley* v. *Transocean Ltd.*, 861 F. Supp. 2d 197, 219 (S.D.N.Y. 2012) (defendant was entitled to rely in good faith on certification  that a rig was in safe condition  prior to a blowout).

22

*re Barrick Gold Sec. Litig.* 2015 WL 1514597, at *11 (S.D.N.Y. Apr. 1, 2015). Nowhere in the Amended Complaint do Plaintiffs allege facts showing that any of the Turquoise Hill Defendants had access to specific adverse information regarding Oyu Tolgoi, beyond a perfunctory reliance on Mr. Quellmann's, Mr. Colton's, and Mr. Lane's "positions of control and authority" (¶¶ 418–19), which is not sufficient.[15]

Moreover, in assessing Plaintiffs' scienter allegations, the Court must keep in mind that the mining business is "inherently risky," *Martin* v. *Quartermain*, 732 F. App'x 37, 42 (2d Cir. 2018); and that "it is not always possible to anticipate what miners will face as they dig deeper." *Gold Resource Corp.*, 776 F.3d at 117. Accordingly, to the extent that Rio, as project manager, reported various setbacks, delays, or increased costs from time to time, these adverse developments cannot in and of themselves be considered "red flags" putting TRQ on notice that the project was in danger of going seriously over budget and off schedule. Thus, Plaintiffs' allegation that the TRQ executives who were asked to approve a relatively small budget increase for the work of a consultant, Jacobs (¶¶ 124, 240), were thereby put on notice of much more fundamental cost overruns or delays misses the mark. It is also notable that the Jacobs budget increase is the only "red flag" with respect to TRQ that the Amended Complaint even purports to identify.[16]

*Abely* v. *Aeterna Zentaris Inc.* is instructive. In *Abely*, the defendant, pharmaceutical company Aeterna Zentaris, and another company (Keryx) agreed to work together

---

[15] *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 382 (S.D.N.Y. 2004) (finding that plaintiff's allegation that defendant's position as CFO was "insufficient to support an inference of scienter"); *In re Health Mgmt., Inc., Sec. Litig.*, 970 F. Supp. 192, 204 (E.D.N.Y. 1997) (citing *Duncan* v. *Pencer*, 1996 WL 19043, at *14 (S.D.N.Y. Jan. 18, 1996)).

[16] *See id.* ("Defendants' explanations of the second quarter production problems are as plausible as plaintiff's inference that defendants intentionally ignored or 'consciously disregarded' problems that should have been anticipated in advance. The risks of the mining business were fully set out for investors in the cautionary statements issued to them.").

on the development of a drug for the treatment of advanced cancer, with Keryx being responsible for conducting the clinical trials. 2013 WL 2399869, at *19 (S.D.N.Y. May 29, 2013). The court granted a motion to dismiss the claims against Aeterna Zentaris and found that the scienter theories regarding Aeterna Zentaris were "close to . . . incoherent," because "[s]everal of defendants' allegedly misleading statements merely repeat[ed] Keryx's findings and presentations" about the results of the clinical trials, which Keryx was responsible for. *Id.*; *see also id.* (noting that "there is no factual allegation that the defendants received information that contradicted the seemingly promising results" or any citations "to any disputes about the validity" of Keryx's data "that might have led defendants to challenge" it). Analogously here, the Amended Complaint itself alleges that Rio Tinto controlled both operations at the mine and the flow of information about progress of the mine, such that TRQ's disclosures concerning the progress of the underground development transparently consisted almost entirely of reports that relayed what Rio Tinto had told TRQ.[17]

Additionally, Plaintiffs' allegations that Mr. Quellmann and Mr. Colton signed Sarbanes-Oxley certifications that were purportedly false and misleading (¶¶ 365–67) are not sufficient to allege scienter, either. SOX certifications "do not constitute a standalone basis for liability." *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021) (internal quotation marks

---

[17] *See* ¶ 306 (Nov. 2, 2018 Investor Call, at 3) ("We did announce on October 15 that **Rio Tinto now projects** a 9-month delay of the start of sustainable production from the underground development"); ¶ 343 (Mar. 15, 2019 Investor Call, at 4) ("As announced on February 27, **we were recently advised by Rio Tinto** as our project manager that as the lateral development continues, there is more data than was previously available. And as a consequence, the understanding of the ore body has improved. As such, the location of some of the underground infrastructure may need to change."); *see also* Ex. 13 (Feb. 26, 2019 Press Release), at 2; ¶ 272 (July 31, 2018 Press Release, at 3); ¶ 294 (Oct. 15, 2018 Press Release, at 1); ¶ 306 (Nov. 2, 2018 Investor Call, at 3); Ex. 16 (Mar. 14, 2019 Press Release), at 2; Ex. 18 (Apr. 15, 2019 Press Release), at 2; Ex. 20 (May 15, 2019 Press Release), at 3; Ex. 25 (July 31, 2019 Press Release), at 2.

omitted).  Absent allegations of actual knowledge, "SOX certifications do not support an inference of scienter."  *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018).[18]

Finally, Plaintiffs tellingly try to make up for the Amended Complaint's lack of allegations of knowledge on the part of the TRQ Defendants by repeatedly referring to "Defendants" generally—thus lumping the TRQ Defendants together with the Rio Tinto Defendants. (*E.g.*, ¶¶ 238–39 (alleging that "Defendants were repeatedly informed" of problems and referring to "Defendants' receipt of" information from experts).[19] This semantic blurring does not satisfy the requirement of pleading scienter as to each individual defendant. *See Hou Liu*, 2020 WL 1489831, at *14.

### B.    Plaintiffs Do Not Adequately Allege Motive and Opportunity

Plaintiffs' motive allegations as to the TRQ Defendants also fail.  Plaintiffs have not alleged that either Mr. Colton, Mr. Lane, or Mr. Quellmann benefited or stood to benefit in any concrete and personal way from the alleged fraud.

For example, Plaintiffs have not alleged that any of the TRQ Individual Defendants sold any of their stock during the relevant period.  "The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders."  *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446,

---

[18] Plaintiffs similarly fail to adequately allege scienter or falsity with regard to Turquoise Hill's Risk Factor Disclosures (¶¶ 368–73).  Plaintiffs do not allege facts showing that the Turquoise Hill Defendants knew that risks they disclosed had already materialized at the time the risk disclosures were issued.  *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *11 (S.D.N.Y. Mar. 29, 2016) (ruling that risk disclosures are misleading only "where the company warns only that a risk may impact its business when that risk has already materialized."); *In re Bank of America AIG Disclosure Sec. Litig.,* 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013) ("[W]here there is a disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk.").

[19] *See also* ¶¶ 240–41 (alleging "Defendants engaged in a machination" to conceal the extent of delays and cost overruns); ¶¶ 242–43 (similar).

25

462 (S.D.N.Y. 2000).  To the contrary, Mr. Quellmann *purchased* TRQ stock during the relevant period,[20] which is inconsistent with any allegation of scienter.  *See Turner* v. *MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) ("The Complaint does not address why MacInnes and Vento would have purchased Borislow's shares if, as the Plaintiffs allege, the individual Defendants were conspiring to artificially inflate the Company's stock price.").[21]

In addition, when defendants order an investigation as soon as they learn of potential delays, that also "weakens rather than strengthens an inference of scienter." *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (internal quotations and citations omitted).[22]

As the Amended Complaint itself alleges, TRQ did exactly that.  After disclosing in October 2018 that Rio Tinto had advised it that the timetable for sustainable first production had been delayed, TRQ commenced its own review of the scheduling issues with the assistance of a "Qualified Person."[23]  TRQ then consistently updated investors about the results of its review

[20]  Ex. 28 (Quellmann Form 55-102F2 (July 1, 2018–Aug. 31, 2019)); *see Abely*, 2013 WL 2399869, at *22 (taking judicial notice of Canadian equivalent of SEC Form 4 on motion to dismiss).

[21]  *See also In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) (purchase and retention of the shares is "inconsistent with the allegation that [defendants] harbored information that the Company's financial health was in grave jeopardy") (internal quotation omitted); *Telecom*, 116 F. Supp. 2d at 462 (where individual defendants had "held or increased their holdings" in the company, court found "absence of stock sales by insiders" to be "inconsistent with an intent to defraud shareholders").

[22]  *See also In re Gen. Elec. Sec. Litig.*, 2021 WL 357756, at *3 (2d Cir. Feb. 3, 2021) (scienter allegation was not more plausible than non-culpable inference where defendant "revised its assessment of the issue" when confronted with problems and "disclosed the financial consequences with reasonable promptness"); *Aratana*, 315 F. Supp. 3d at 766 (finding that plaintiffs failed to raise a strong inference of scienter where, upon "encountering setbacks," defendants "timely updated the market"); *Agnico-Eagle Mines*, 2013 WL 144041, at *21 (finding no strong inference of scienter where defendants undertook an investigation into potential issues related to rock mass stability issues in underground mining operations).

[23]  *See* Ex. 8 (Oct. 15, 2018 Press Release), at 2.

and the occurrence of additional delays as reported by Rio Tinto.[24]  Four months later, in February 2019, TRQ (along with Rio Tinto) disclosed that "there was an increasingly likely risk of a further delay to sustainable production beyond Q3'21,"[25] and, in March 2019, gave a detailed description of the "key risks" that were "developing."[26]  Subsequently, TRQ updated the market about a definitive estimate review it had commenced with Rio Tinto in addition to its own independent review to better understand the impact of the delays and any additional updates to Shaft 2 commissioning.[27]

Similarly, Plaintiffs allege that TRQ mistakenly reported that lateral development of the underground mining project progressed by 2.3 kilometres in Q3 2018, which TRQ later admitted "was false, overstated, and had to be revised." (¶ 297.)  But, in fact, TRQ corrected that number down to 2.1 kilometres in its next quarterly report, noting that the number had been "updated to reflect revised results." (¶ 337.)  If anything, the fact that TRQ immediately revised the number based on updated information further negates, rather than supports, scienter, as discussed in *Slayton and* the other cases cited above.

Plaintiffs' allegation that "Defendants" were "highly motivated" to conceal the problems at Oyu Tolgoi because the Mongolian government initiated inquiries into Rio Tinto's operations and made efforts to recoup allegedly unpaid taxes (¶¶ 161–78) fails to raise a strong inference of scienter for several reasons.

---

[24]  *See* Ex. 9 (Nov. 1, 2018 Press Release), at 4; Ex. 13 (Feb. 26, 2019 Press Release), at 2; Ex. 17 (Mar. 15, 2019 Investor Call), at 7; Ex. 18 (Apr. 15, 2019 Press Release), at 1; Ex. 20 (May 15, 2019 Press Release), at 3–4, 11; Ex. 22 (July 15, 2019 Press Release), at 2; Ex. 25 (July 31, 2019 Press Release), at 4.

[25]  *See* ¶¶ 204–05; Ex. 13 (Feb. 26, 2019 Press Release), at 1; *see also* Ex. 14 (Rio Tinto 2018 Annual Report), at 45.

[26]  *See* ¶ 204; Ex. 15 (2018 MD&A attached to TRQ 2018 Form 40-F), at 7.

[27]  *See* Ex. 18 (Apr. 15, 2019 Press Release), at 2; Ex. 20 (May 15, 2019 Press Release), at 11; Ex. 22 (July 15, 2019 Press Release), at 2; Ex. 25 (July 31, 2019 Press Release), at 1–2, 4, 9.

*First*, Plaintiffs' allegations focus exclusively on Rio Tinto, not TRQ. Plaintiffs allege that the Rio Tinto Defendants were motivated to hide the operational problems and delays at Oyu Tolgoi from the Government of Mongolia because Rio Tinto was already facing multiple regulatory inquiries (¶¶ 162–76) and purportedly took various steps to this end (¶¶ 84, 173, 181, 248, 252–53, 263).

Leaving aside the inadequacy of these allegations, as discussed in the brief of the Rio Tinto Defendants, the Amended Complaint makes no allegations of this kind about the TRQ Defendants, and does not allege that TRQ knew that Rio Tinto was purportedly engaging in such conduct. Accordingly, the Amended Complaint raises no inference, much less a strong inference, that any of the TRQ Defendants were among the circle of people who were purportedly privy to the real facts.

*Second*—and even if the alleged "motive" applied to TRQ employees—, maintaining good relations with a governmental partner is the type of motive generally possessed by most corporate directors and officers; it is not the type of concrete and *personal* benefit required to raise a strong inference of scienter. *See Novak*, 216 F.3d at 307–08.[28]

*Third*, Plaintiffs do not explain how delaying disclosure of delays and cost overruns at Oyu Tolgoi served to improve either TRQ's or Rio Tinto's relationship with the Government of Mongolia.[29]

---

[28] *See also In re Sanofi-Aventis Sec. Litig.*, 2009 WL 3094957, at *7 (S.D.N.Y. Sept. 25, 2009) (the desire to avoid governmental and regulatory scrutiny is too generalized a motive); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *8 (S.D.N.Y. June 28, 2017) (finding that plaintiff's allegations concerning other lawsuits and government investigations in which defendant was involved "provides no evidence of scienter").

[29] Lastly, Plaintiffs' allegation that the Oyu Tolgoi mine was essentially TRQ's "sole asset" (¶ 259) is not sufficient to raise a strong inference of scienter, either. This is apparently an attempt to rely on the "core operations" doctrine. As an initial matter, "the core operations doctrine may no longer be good law after the enactment of the PSLRA." *Maloney* v. *Ollie's Bargain Outlet Holdings,*

## II.    TRQ's Statements concerning the Projected Cost and Timeline for the Underground Development Are Forward-Looking Statements Protected by the PSLRA Safe Harbor

Under the PSLRA's safe-harbor provision, 15 U.S.C. § 78u-5(c), "'a defendant is not liable if . . . the forward-looking statement is identified and accompanied by meaningful cautionary language . . . or the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading.'" *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 374–75 (S.D.N.Y. 2018) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245–46 (2d Cir. 2016)).[30]

Nearly all of the statements that Plaintiffs challenge concern the expected timeline for the first draw bell and sustainable first production, and the expected amount of capital expenditures required to complete development of the underground mining project. (*E.g.*, ¶ 266 ("The Company continues to expect the first draw bell in mid-2020 and sustainable first production in 2021."); ¶ 267 ("The major growth projects remain on track, with construction of the first drawbell at Oyu Tolgoi Underground anticipated in mid-2020.")).[31]

---

*Inc.*, 2021 WL 517934, at *6 (S.D.N.Y. Feb. 10, 2021). And, in any event, "that an allegedly fraudulent statement concerned 'core operations,' standing alone, is insufficient to support strong circumstantial evidence of scienter. The 'core operations' doctrine only bolsters the strength of the inference of scienter when plaintiffs have already adequately alleged facts indicating that defendants might have known their statements were false." *Rudani* v. *Ideanomics, Inc.*, 2020 WL 5770356, at *8 (S.D.N.Y. Sept. 25, 2020) (internal citation and quotation marks omitted). Plaintiffs have alleged no other basis for inferring scienter on the part of the TRQ Defendants, so this "core operations" allegation fails. To the extent that Plaintiffs rely on *City of Austin Police Dep't Ret. Sys.* v. *Kinross Gold Corp.*, 957 F. Supp. 2d 277 (S.D.N.Y. 2013), that case is distinguishable. Unlike in *Kinross*, Plaintiffs here allege no facts to show any recklessness on the part of Rio Tinto in not foreseeing the need for such capital expenditures earlier than it did, much less on the part of TRQ, which was not the project manager.

[30]  *See also Gregory* v. *ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 397 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).

[31]  *See also* ¶ 274 ("We remain on target for the first drill point blast in mid-2020 and sustainable production in early 2021"); ¶ 292 ("[T]he project remains on schedule to complete in 2022"); ¶ 293 ("Rio Tinto has undertaken a second annual re-forecast . . . and preliminary results have concluded

These statements are not actionable because they are protected by the PSLRA safe harbor for forward-looking statements accompanied by meaningful cautionary language, and Plaintiffs do not adequately allege that they were false.[32]

### A.    The Statements Are Identified as Forward-Looking and Accompanied by Meaningful Cautionary Language

Statements "need not be specifically labeled as forward-looking or segregated into a separate section to qualify for safe-harbor protection." *Barrick*, 341 F. Supp. 3d at 375. Rather, the "use of linguistic cues like 'we expect' or 'we believe,' when companied with an explanatory description of the company's intention to thereby designate a statement as forward-looking" is "generally . . . sufficient to put the reader on notice that the company is making a forward-looking statement." *Barrick*, 341 F. Supp. 3d at 375 (quoting *Slayton*, 604 F.3d at 769).

In particular, courts have held that statements regarding mining development schedules and "construction estimate[s]" are forward-looking statements protected by the PSLRA. *See, e.g.*, *Barrick Gold*, 2015 WL 1514597, at *8 (finding that because company's "construction estimate was clearly identified as just that—an estimate—and the schedule was set out as 'expected,'" the statements "plainly qualify as forward-looking statements").[33]

---

that capital costs remain in line with the overall $5.3 billion budget and the project remains on schedule to complete in 2022.").

[32]    The statements similarly fail under the judicially created counterpart to the PSLRA—the "bespeaks-caution" doctrine. Under this doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys.* v. *MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010).

[33]    *See also Kinross*, 957 F. Supp. 2d at 302 (finding statements regarding development schedule of gold mining operation in West Africa were forward-looking statements); *Moshell* v. *Sasol Ltd.*, 481 F. Supp. 3d 280, 288 (S.D.N.Y. 2020) (energy company's "statement[s] containing a projection of . . . capital expenditures" and "statement[s] of the plans and objectives of management for future operations" were forward-looking); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 84 (S.D.N.Y. 2017) (statements regarding projected performance of company's joint venture with Brazilian mining company were forward-looking); *Aratana*, 315 F. Supp. 3d at

The same can be said for statements about the project remaining "on track" and "on schedule."[34] Here, such statements concerned the estimated time for the first draw bell, sustainable first production, and completion of the project (*e.g.*, ¶¶ 292–94), which, as discussed above, constitute forward-looking statements.[35] All of the TRQ statements that Plaintiffs are challenging regarding underground development and production timelines and expected capital costs are clearly identified as forward-looking by the use of words like "expects,"[36] and TRQ's disclosures expressly state that all such statements are forward-looking statements.[37]

---

758–59 (finding that statements regarding company's "expectations" regarding the timeline for commercial release of pharmaceuticals were forward-looking statements).

[34] As discussed below in Sections D and E, these statement are also not actionable because they are statements of opinion and vague statements of optimism.

[35] *See, e.g.*, *Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) (holding that company's statement that it was "on track" to achieve goal of producing 5,000 vehicles per week was forward-looking statement, and noting that "[t]he statutory safe harbor would cease to exist if it could be defeated simply by showing that a statement has the sort of features that are inherent in *any* forward-looking statement"); *see also Adient*, 2020 WL 1644018, at *8 (finding statements regarding metals business being "on track" to be forward-looking statements); *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009) (finding that a "press release stating that the Institutional Division 'is on track to deliver a turnaround at an underlying level, with excellent revenue growth'" is "forward-looking"); *Institutional Inv'rs Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 255–56 (3d Cir. 2009) (finding company's statement that it was "on track" to meet a future projection was forward-looking.).

[36] *See, e.g.*, ¶ 266 ("The Company continues *to expect* the first draw bell in mid-2020 and sustainable first production in 2021") (July 31, 2018 Press Release, at 2); ¶ 294 ("[S]ustainable first production, which is now *expected* to occur by the end of Q3'21 . . . .") (October 15, 2018 Press Release, at 1); ¶ 303 ("[C]onstruction completion schedule remains on track for 2022 and the project *is expected* to be completed at the $5.3 billion budget estimate. . .") (Nov. 1, 2018 Press Release, at 4); ¶ 204 ("[P]roject cost *was expected* to remain within the $5.3 billion budget.") (Feb. 26, 2019 Press Release, at 1); Ex. 20 (May 15, 2019 Press Release), at 3 ("Rio Tinto, in its role as manager of Oyu Tolgoi, has advised that the fit-out and commissioning work on Shaft 2 is now *expected* to be completed by the end of October 2019"); Ex. 22 (July 15, 2019 Press Release), at 2 ("This results in sustainable first production now *being expected* between May 2022 and June 2023.").

[37] *See, e.g.*, Ex. 4 (TRQ 2017 Form 40-F), at 2 ("Certain statements made herein, including statements relating to matters that are not historical facts and statements of the Company's beliefs, intentions and expectations about developments, results and events which will or may occur in the future, constitute 'forward-looking information' within the meaning of applicable Canadian securities legislation and 'forward-looking statements' within the meaning of the 'safe harbor'

TRQ's statements regarding the underground development timelines and expected capital costs were also accompanied by meaningful cautionary language.

"To determine whether cautionary language is meaningful, courts must first identify the allegedly undisclosed risk and then read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." *Barrick*, 341 F. Supp. 3d at 377 (internal quotation marks omitted).

As an initial matter, TRQ's disclosures and cautionary language must be considered in the context of an investment in a mining operation, which is an "inherently risky" business. *See Martin*, 732 F. App'x at 42 (noting that statements at issue must be considered "in the context of an investment in a gold mine," which is "inherently risky").[38]

Moreover, as discussed above, TRQ's 40-Fs and press releases contained abundant disclosures that unexpected problems and delays could occur that would materially impact the schedule and projected costs of the project, and specifically cautioned about factors that were

provisions of the United States Private Securities Litigation Reform Act of 1995"); Ex. 6 (July 31, 2018 Press Release), at 17 (same); Ex. 8 (Oct. 15, 2018 Press Release), at 3–4 (same); Ex. 9 (Nov. 1, 2018 Press Release), at 18–19 (same); Ex. 13 (Feb. 26, 2019 Press Release), at 2 (same); Ex. 18 (Apr. 15, 2019 Press Release), at 3 (same); Ex. 22 (July 15, 2019 Press Release), at 4 (same); Ex. 25 (July 31, 2019 Press Release), at 20 (same); *see also* Ex. 10 (Nov. 2, 2018 Investor Presentation), at 2 ("This presentation includes certain 'forward-looking information' within the meaning of applicable Canadian securities legislation and 'forward-looking statements' within the meaning of the 'safe harbor' provisions of the United States Private Securities Litigation Reform Act of 1995"); Ex. 12 (Jan. 17, 2019 Investor Presentation), at 2 (same); Ex. 7 (Aug. 1, 2018 Investor Call), at 13 ("In the conference calls upon which Event Briefs are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties."); Ex. 11 (Nov. 2, 2018 Investor Call), at 13 (same); Ex. 17 (Mar. 15, 2019 Investor Call), at 13 (same); Ex. 21 (May 16, 2019 Investor Call), at 9 (same); Ex. 23 (July 16, 2019 Investor Call), at 15 (same).
[38] *See also In re Gold Resource Corp. Sec. Litig.*, 776 F.3d 1103, 117 (10th Cir. 2015) (noting that the "mining business" is "one in which it is not always possible to anticipate what miners will face as they dig deeper.").

"inherently uncertain," including "delays, and the costs which would result from delays, in the development of the underground mine," "which could significantly exceed the costs projected in the Statutory Feasibility Study and the 2016 OTTR." (Ex. 4 (TRQ 2017 Form 40-F), at 3; Ex. 15 (TRQ 2018 Form 40-F), at 2.)[39]

Similarly, TRQ's October 15, 2018 and November 1, 2018 press releases and other disclosures warned investors that the "cost, timing and complexities of mine construction and development are increased by the remote location" of the Oyu Tolgoi mine and that it "is common in new mining operations to experience unexpected problems and delays during development, construction and mine start-up." (Ex. 8 (Oct. 15, 2018 Press Release), at 4; Ex. 9 (Nov. 1, 2018 Press Release), at 19.) In *In re NovaGold Resources Inc. Securities Litigation,* 629 F. Supp. 2d 272 (S.D.N.Y. 2009), Judge Cote found this precise language meaningfully cautionary to "address[] the 'relevant risk directly,' a risk of rising capital costs." *Id.* at 294–95.

Each of TRQ's press releases also contained language specifically advising investors that forward-looking statements include "information regarding . . . the development options under consideration for the design" of the mine "and the related cost and schedule implications," as well as "capital and operating cost estimates," and that there was no assurance such statements would prove accurate. (Ex. 22 (July 15, 2019 Press Release), at 4); *see also Halperin* v. *eBanker USA.Com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).[40]

---

[39]  *See, e.g.*, Ex. 8 (Oct. 15, 2018 Press Release), at 4; Ex. 9 (Nov. 1, 2018 Press Release), at 19; Ex. 13 (Feb. 26, 2019 Press Release), at 3; Ex. 22 (July 15, 2019 Press Release), at 4; Ex. 16 (Mar. 14, 2019 Press Release), at 20; Ex. 18 (Apr. 15, 2019 Press Release), at 3; Ex. 25 (July 31, 2019 Press Release), at 20; *see also* Ex. 19 (2019 MD&A attached to TRQ Form 6-K, dated May 15, 2019), at 23; Ex. 4 (2017 AIF attached to TRQ 2017 Form 40-F), at 4.

[40]  *See also NovaGold*, 629 F. Supp. 2d at 294 ("Given the warnings regarding capital costs," it would be "unreasonable" for an investor "to demand that a cost estimate must hold steady over a multi-year period requiring considerable amounts of construction of a large mine in a remote

TRQ's press releases also contained cautionary language warning that "there can be no assurance" that its forward-looking statements "will prove to be accurate," and that they were "based on certain assumptions and analyses made by the Company's management in light of their experience and perception of historical trends, current conditions and expected future developments, as well as other factors management believes are appropriate in the circumstances"[41] —which is nearly identical to cautionary language the Second Circuit found meaningful in *Martin*, 732 F. App'x at 42.

In addition, TRQ repeatedly cautioned investors during the relevant time period that Rio Tinto and TRQ were continuing to review the reasons for the disclosed delays and their impact on the projected capital costs and timeline for the underground development, and that the results of those reviews had not yet been completed. (*See, e.g.*, Ex. 13 (Feb. 26, 2019 Press Release), at 2 ("The Company is working with Rio Tinto to understand the issues and in parallel with the definitive estimate review, Turquoise Hill will assess the impact of any further delay to sustainable first production beyond the end of Q3'21 on the Company's cash flows, liquidity and funding requirements, as well as investigate potential mitigation options.")[42]

---

location[.]" As such, a reasonable investor could not "have been misled into thinking that the risk" of increased capital costs "did not actually exist[.]" *Id.*

[41] *E.g.*, Ex. 8 (Oct. 15, 2018 Press Release), at 4; Ex. 9 (Nov. 1, 2018 Press Release), at 19; Ex. 13 (Feb. 26, 2019 Press Release), at 2–3; Ex. 16 (Mar. 14, 2019 Press Release), at 20; Ex. 20 (May 15, 2019 Press Release), at 18; Ex. 25 (July 31, 2019 Press Release), at 20.

[42] *See also* ¶ 349 (quoting Ex. 18 (Apr. 15, 2019 Press Release), at 2 ("[M]ore detailed geotechnical information and different ground conditions have required a review of the mine design and the development schedule. The impact of these changes, including the further delay to Shaft 2, will be included in the definitive estimate review, which is expected to be completed towards the end of the year.")); ¶ 354 (quoting Ex. 21 (May 16, 2019 Investor Call), at 3 ("[W]ork continues on the definitive estimate work. This may include some potentially significant changes to the design of some future elements of the mine design and the development schedule. . . We expect to provide an update along with our half-year results followed by the definitive estimate review, which is expected to be completed by year-end.")); ¶ 303 (Nov. 1, 2018 Press Release).

As in *Aratana Therapeutics Inc. Sec. Litig.*, given these disclosures concerning the potential risk, "the mere fact that the risk materialized cannot support a claim under the Exchange Act." 315 F. Supp. 3d at 760.[43]

### B. The Amended Complaint Does Not Adequately Allege That the TRQ Defendants Made Any Forward-Looking Statements with Actual Knowledge That They Were False

In addition, the Amended Complaint does not adequately allege that the TRQ Defendants' forward-looking statements were made with actual knowledge of falsity. This standard is more demanding than the scienter requirement for Rule 10b-5 claims, which can be satisfied by recklessness. *See Slayton*, 604 F.3d at 773; *Barrick*, 2015 WL 1514597, at \*9 (where statements were "protected under the PSLRA safe harbor, plaintiffs must allege actual knowledge—recklessness will not suffice"). The Amended Complaint falls well short of meeting this test. As discussed above in regard to scienter, the Amended Complaint does not allege a single fact showing that anyone at TRQ had actual knowledge that any of the Company's statements regarding the expected costs and timeline for the underground mine were false.

To the extent that Plaintiffs allege actual knowledge on the part of the TRQ Defendants, the allegations are entirely conclusory and, as discussed earlier, improperly lump the TRQ and Rio Tinto Defendants together without specifying any information purportedly known by the TRQ Defendants. (*See, e.g.*, ¶¶ 238–39 (alleging "Defendants were repeatedly informed" of problems and "Defendants' receipt of" information from experts is "powerful evidence of scienter" but listing only knowledge attributable to Rio Tinto Defendants).[44]

---

[43] *See also Acito* v. *IMCERA Grp.*, 47 F.3d 47, 53 (2d Cir. 1995) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud.").

[44] *See also* ¶¶ 240–41 (alleging "Defendants engaged in a machination" to conceal the extent of delays and cost overruns, but describing only knowledge attributable to Rio Tinto Defendants); ¶¶ 42–43 (similar).

Also, as discussed, TRQ's statements consisted largely of reports as to what Rio Tinto, the project manager, had advised TRQ, and Plaintiffs do not allege that TRQ misreported anything that Rio Tinto told it or that Rio Tinto provided TRQ with any information that conflicted with the information that TRQ disclosed. To the contrary, Plaintiffs themselves have stated that Rio Tinto has "near complete operational control over [Oyu Tolgoi]," was not "provid[ing] to [TRQ] a definitive estimate of cost overruns and required mine design changes," and otherwise had excluded TRQ from key decisions. (*See* Ex. 26 (Apr. 2, 2020 Pentwater Letter to Shareholders), at vii–viii, ix, x.) And even as recently as January 29, 2021, Plaintiffs issued a press release denouncing Rio Tinto for systematically restricting TRQ's ability to have communication with the Government of Mongolia and "overriding" TRQ's "rights and fiduciary obligations" related to Oyu Tolgoi. (Ex. 27 (Pentwater Press Release dated Jan. 29, 2021), at 1 n.1.)

Finally, Plaintiffs' allegations concerning purported warnings of developmental problems, scheduling delays, and cost overruns by former Rio Tinto consultant Richard Bowley and other former Rio Tinto employees do not show that *TRQ* or any of *its* employees had actual knowledge of any such issues. There is no allegation that Mr. Bowley or anyone else conveyed the information to Mr. Quellmann, Mr. Colton, Mr. Lane, or anyone else at TRQ.

## III. TRQ's Statements regarding the Expected Timeline and Costs and Other Issues Were Statements of Opinion That the Complaint Does Not Adequately Allege Were False

Plaintiffs' claims concerning TRQ statements about the expected costs and timeline for the underground development, that the delays being experienced were "not atypical," and that the key risks were "well understood and well managed," also fail because these are "quintessential opinion statements," *Martin*, 732 F. App'x at 40 n.1 ("Estimates, in particular, constitute a well-established species of opinion because they will vary depending on the particular methodology

and assumptions used") (internal citations omitted),[45] and Plaintiffs have not adequately alleged that they were false.

To adequately allege that a statement of opinion is false, a plaintiff must show that the defendant: (1) "did not hold the belief [defendant] professed"; (2) the "supporting fact[s] [defendant] supplied were untrue"; or (3) the defendant "omit[ted] information whose omission ma[d]e[] the statement[s] misleading to a reasonable investor." *Tongue* v. *Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)).[46] None of that is alleged here.

As an initial matter, nowhere do Plaintiffs allege "subjective falsity"—*i.e.*, that TRQ did not believe the estimates or projections it received from Rio Tinto. Nor do Plaintiffs allege that Rio Tinto—the on-site manager and entity closest to the progress and development of the Oyu Tolgoi mine—ever disputed or contradicted TRQ's statements regarding the progress of the development of the mine. Nor do Plaintiffs allege any facts showing that any of TRQ's statements were "objectively false" at the time they were made. Rather, as in *Martin*, Plaintiffs at best allege "merely that [TRQ] should have drawn different conclusions" from the facts. 732 F. App'x at 41. But, "[a]llegations of that sort do not give rise to a claim of objective falsity." *Id.* (citing *Tongue*, 816 F.3d at 214). Finally, Plaintiffs do not allege that TRQ failed to disclose any information that rendered its statements misleading to a reasonable investor.

---

[45] *See also In re Pretium Resources Inc. Sec. Litig.*, 2020 WL 953609, at *4 (S.D.N.Y. Feb. 27, 2020) (ruling that statements that "give commentary or updates on, or tacitly express confidence in, aspect of [the defendant's] mine plan, which provided estimates and projections for developing and administering the mine" were statements of opinion).

[46] S*ee also Chapman* v. *Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 398 (S.D.N.Y. 2020) (Liman, J.).

IV.    **Certain of the TRQ Statements That Plaintiffs Challenge Are Vague Statements of Optimism That Are Not Actionable**

Plaintiffs' claims regarding certain of TRQ's statements that Plaintiffs are challenging also fail because the statements are vague statements of corporate optimism, or puffery, that are not actionable.  *See Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("expressions of puffery and corporate optimism do not give rise to securities violations").[47]

Thus, for example, Plaintiffs focus on statements such as: "capital costs remain in line" and "the project remains on schedule to complete in 2022" (¶¶ 292, 293); "lateral development has progressed well, construction completion schedule remains on track for 2022" (¶ 294); "Key risks well understood and managed" (¶¶ 316, 317, 320, 322).

In case after case, courts have held nearly identical statements to be inactionable statements of optimism, or puffery.  *See, e.g.*, *Elec. Workers Pension Fund, Local 103* v. *Six Flags Enter. Corp.*, 2021 WL 807251, at *23 (N.D. Tex. Mar. 3, 2021) (statement that "the "parks **are progressing** nicely" falls "squarely in the category of corporate optimism or puffery that is insufficient to state a PSLRA claim") (emphasis added); *Landow* v. *Bartlett*, 2019 WL 1027994, *4 (D. Nev. Mar. 4, 2019) ("Statements that an investment is . . . '**well managed**' are not actionable . . .") (emphasis added).[48]

---

[47]    *See also In re Synchrony Fin. Sec. Litig.*, 2021 WL 560204, at *8 (2d Cir. Feb. 16, 2021) ("Vague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices are too general to cause a reasonable investor to rely upon them and therefore are precisely the type of puffery that this and other circuits have consistently held to be inactionable.") (internal quotation marks omitted).

[48]    *See also In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *9–10 (S.D.N.Y. Sept. 14, 2015) (statements "indicat[ing] that the [FDA approval] process was '**on track**' and making continued '**progress**' were inactionable puffery) (emphasis added); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 757 (S.D. Tex. 2012) ("[G]eneral '**progress**' is simply too illusory a metric from the start. Such statements, therefore, are not actionable.") (emphasis added); *Fulton Cnty. Emps. Ret. Sys.* v. *MGIC Inv. Corp.*, 2010 WL 601364, at *6 (E.D. Wis. Feb. 18, 2010) (statement that a company's portfolios were "*well managed*" was "so vague, no reasonable investor would

Moreover, only one statement in the Amended Complaint attributed to the TRQ Defendants says anything about things "progressing well." That was an October 15, 2018 press release in which TRQ stated: "Rio Tinto, in its role as manager of Oyu Tolgoi and underground construction contractor, has undertaken its second annual schedule and cost re-forecast for the project. According to this re-forecast, lateral development has progressed well . . . ." (¶ 294.) Plaintiffs allege no facts to show that TRQ misreported Rio Tinto's re-forecast or that the re-forecast did not show that lateral development had "progressed well" up to that point.[49] Nor does the Amended Complaint allege that TRQ had disbelieved what Rio was reporting. Moreover, in the same release, TRQ stated that it had been notified by Rio Tinto that there had been delays in the completion of Shaft 2 and delays resulting from "challenging ground conditions" (¶ 292); so, if those are the facts Plaintiffs are relying on to show falsity, TRQ disclosed them.

---

have considered it important in deciding whether to buy or sell [defendant's] stock") (emphasis added); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1158 (S.D. Cal. 2008) (statement that integration of technology was "*on schedule* and continuing smoothly" was "puffery") (emphasis added); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1167–68 (C.D. Cal. 2007) (finding non-actionable puffery a statement that the company was "*on track* to deliver improved financial performance in the fall, *in line* with our turnaround plan") (emphasis added); *In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (statement that company was "*on target*" to achieve projected synergies and cost savings was "mere puffery") (emphasis added); *Elliott Assocs., L.P.* v. *Covance, Inc.*, 2000 WL 1752848, at *10 (S.D.N.Y. Nov. 28, 2000) ("If something is '*on track*' it is reasonable to assume that it could go 'off track.' Thus, the challenged statements are vague expressions of opinion which are not sufficiently concrete or specific to impose a duty to update.") (emphasis added); *Shaw* v. *Digital Equip. Corp.*, 82 F.3d 1194, 1219 (1st Cir. 1996) (statement that a company was "basically *on track*" was "properly deemed immaterial as a matter of law") (emphasis added); *Schaffer* v. *Horizon*, 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018) (finding statement that company was "*on track*" was "too general to cause a reasonable investor to rely on them," and was indeed a "textbook case[]" of corporate puffery or optimism) (emphasis added); *Aratana*, 315 F. Supp. 3d at 758 (statements that company had "*made remarkable progress* towards our stated goal of advancing our expanding pipeline towards commercialization" and was "proud" to be "*on track* to have these products reach the market were non-actionable puffery) (emphasis added).

[49]  *In re Fed Ex Corp. Sec. Litig*, 2021 WL 396423, at *14 (S.D.N.Y. Feb. 4, 2021) (statement that "we are progressing well on the integration, and customers are beginning to see the value" is inactionable puffery).

V.    **The TRQ Defendants Are Not Liable for Statements Made by the Rio Tinto Defendants**

Plaintiffs allege that the TRQ Defendants are liable under SEC Rule 10b-5(a) and SEC Rule 10b-5(c) for disseminating the purportedly false statements made by Rio and RTIH. (¶ 404.)  This argument fails, too.  The Supreme Court ruled in *Lorenzo* v. *SEC*, 139 S. Ct. 1094 (2019), that a person who disseminates false or misleading information *with an intent to defraud* can violate sections (a) and (c) of Rule 10b-5, even if the person was not the "maker" of the untrue statements.  But, in *Lorenzo*, the defendant admittedly knew that the statements he disseminated in emails were false, and he did not contest that he sent emails with an intent to defraud the recipients.  *Id.* at 1101.  Here, in contrast, as discussed above, Plaintiffs have not alleged facts showing that any of the TRQ Defendants knew that the Rio Tinto statements that they disseminated were false and misleading, or that they disseminated them with fraudulent intent.[50]

## CONCLUSION

For the reasons discussed above, all of the claims asserted against the Turquoise Hill Defendants should be dismissed in their entirety, with prejudice.

---

[50]  Finally, Plaintiffs' "Control Person" claims fail to state a claim for relief.  Where a complaint fails to state a predicate claim for liability under Section 10(b), control-person claims under Section 20(a) also fail.  *See Slayton*, 604 F.3d at 778; *Pretium*, 256 F. Supp. 3d at 482.  Here, because Plaintiffs have not adequately alleged an underlying claim against Turquoise Hill, their control-person claims against Mr. Quellmann, Mr. Colton, and Mr. Lane also fail and should be dismissed.

Dated: New York, New York
       May 17, 2021

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

*/s/ Richard A. Rosen*
Richard A. Rosen
Robert N. Kravitz
Apeksha S. Vora
1285 Avenue of the Americas
New York, New York  10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990
rrosen@paulweiss.com
rkravitz@paulweiss.com
avora@paulweiss.com

*Attorneys for Defendants Turquoise Hill*
*Resources Ltd., Luke Colton, Brendan Lane, and*
*Ulf Quellmann*

41