USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/1/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE TURQUOISE HILL RESOURCES LTD. SECURITIES LITIGATION

20-cv-8585 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendants Turquoise Hill Resources Ltd. ("Turquoise Hill" or "TH"), Ulf Quellmann, Brandan Lane, and Luke Colton (collectively, the "TRQ Defendants") move for a protective order directing Lead Plaintiff Pentwater Funds ("Pentwater"), until the conclusion of this litigation, from "ceas[ing] all communications with Turquoise Hill concerning Oyu Tolgoi (including by calling or emailing management, Board members, or the Investor Relations department) and . . . prohibit[ing it] from posing questions—or proposing questions for others to ask—on Turquoise Hill's earnings calls and during other presentations to investors or analysts." Dkt. No. 117 at 4.

Familiarity with the Court's earlier opinion in this case is presumed. Dkt. No. 103; *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2021 WL 148752, at *7 (S.D.N.Y. Jan. 15, 2021). Turquoise Hill is an international mining company focused on the operation and development of the Oyu Tolgoi copper-gold mine in Southern Mongolia (the "Oyu Tolgoi mine"). Rio Tinto plc and Rio Tinto Limited own 50.8% of Turquoise Hill through their subsidiaries. Pentwater holds a 9.3% equity stake and has been an active investor in Turquoise Hill.

On October 14, 2020, a lawsuit was filed against the TRQ Defendants, Rio Tinto plc, Rio Tinto Limited, Rio Tinto International Holding, Ltd., Jean-Sébastien Jacques, and Arnaud Soirat

alleging securities fraud claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Dkt. Nos. 1, 4, 7. On January 15, 2021, the Court granted the motion of Pentwater to be appointed Lead Plaintiff under the PSLRA. Dkt. No. 103. Pentwater filed an amended complaint on March 17, 2021, Dkt. No. 110, and Defendants filed a motion to dismiss the amended complaint pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) on May 17, 2021, Dkt. Nos. 111, 114. The PSLRA stay of discovery is in effect. *See* 15 U.S.C. § 78u-4(b)(3)(B).

The TRQ Defendants complain that Pentwater representatives, including the CEO of Pentwater's internal investment advisor, Pentwater Capital Management ("Pentwater Capital"), have contacted individuals in Turquoise Hill's investor relations department and sought answers to a number of questions about the Oyu Tolgoi mine. The CEO of Pentwater Capital, Matthew Halbower ("Halbower"), made at least five attempts by phone and email to gather information about operations at the Oyu Tolgoi mine directly from Turquoise Hill, asking questions such as whether underground work was expected to resume and whether TRQ representatives had negotiated with the government of Mongolia. Dkt. No. 117 at 2-3; *id.*, Ex A. When Turquoise Hill did not respond, Halbower emailed the head of the investor relations department: "I just called and left a voicemail. We have been trying to speak with you for the past week and a half. Can you return my phone calls today or tomorrow?" Dkt. No. 117, Ex. A. The following week, he contacted investor relations again and said: "I keep calling but you are not returning my phone calls. Pentwater is the largest minority investor in TRQ. We would like to ask you some questions about your most recent press releases. When do you plan to return my phone calls." *Id.* Defense counsel asked Pentwater's counsel in this case to request that Pentwater cease

communications with Turquoise Hill. *Id.* In response, Halbower wrote to the Chairman of Turquoise Hill's Board of Directors and the head of its investor relations department:

> Peter and Roy, I just received this email from Paul Weiss. As you know, Pentwater is a substantial investor in TRQ and has been so for over 8 years. We have legitimate questions about two of your recent press releases. I know that you have an investor relations department that speaks with investors about their questions. You appear to be treating Pentwater differently from all your other investors. I hope that is a mistake that you plan to correct shortly. I would appreciate a phone call back so that we can ask our questions just like every other TRQ shareholder does.

Dkt. No. 117, Ex. B.

On May 12, 2021, a representative of Pentwater Capital, Aron Morris ("Morris"), remotely attended Turquoise Hill's Annual General Meeting ("AGM"). Prior to attending the meeting, Morris received an email from Turquoise Hill's transfer agent with the link for the AGM, instructions that he could register by inputting information such as his name, email address, and company, and an invitation for him to call if he had any questions. Dkt. No. 118, Ex A. Morris replied to the email from his Pentwater email address, inquiring about the ability to ask questions during the AGM. *Id.* The email bore a signature block with Morris's name that identified him as a representative of Pentwater Capital. The transfer agent reply stated: "We got the OK from Turquoise to give you a Control Number to be able to ask questions tomorrow at their AGM." *Id.* The email provided the control number that would allow Morris to ask questions, and it relayed the message that questions should focus on those that were "related to the business of the meeting." *Id.* The email further stated: "Should you wish to ask questions of a more general nature, TRQ's IR team would be happy to schedule a call with you to answer any such questions." *Id.* In a message later that same day, Morris asked whether Pentwater would be able to log in only with one person based on the control number, and Turquoise Hill responded yes. *Id.*

At the AGM, questions were submitted in writing, not orally, and could be viewed only by Turquoise Hill personnel, not investor participants. A representative of Pentwater submitted a question, identifying himself as "Mike O'Connor from Pentwater, your largest minority shareholder." Dkt. No. 117, Ex. D. The question was directed to future operational events related to the mine. Turquoise Hill did not answer questions submitted by any shareholders at the meeting. Dkt. No. 118, Ex B.

The following day, on May 13, 2021, Turquoise Hill held its first quarter earnings call. Pentwater attended. Turquoise Hill did not recognize or respond to any shareholder questions. Dkt. No. 118, Ex C.

That same day, on May 14, 2014, Pentwater wrote a letter to Turquoise Hill's Board of Directors in which it complained that its questions were again not being answered:

> This week's Annual Meeting and earnings call presented leadership with multiple opportunities to address the critical issues facing the company. Instead, TRQ screened all shareholder questions posed at the Annual Meeting beforehand—and chose not to answer a single one, including a question submitted by Pentwater. Every year shareholders get an opportunity to ask the Board questions, but this year the Board simply silenced its shareholders. Unfortunately, the Board's reticence to answer questions of importance to TRQ shareholders appears to be yet another manifestation of Rio's unchecked control over TRQ, and the lack of any meaningful effort by TRQ's Board of Directors to hear from and protect its minority shareholders. Then, on the earnings all, Pentwater's question was once again not fielded. Even worse, the answers provided to analysts' questions were so opaque and evasive that practically all of the notes published after the call were united in their disappointment in management's lack of transparency. TRQ stock ended the day down over 18% as a result.

Dkt. No. 118, Ex. D.

The communications between Pentwater and Turquoise Hill do not come in a vacuum. Pentwater has been a substantial shareholder in Turquoise Hill for the past eight years and, throughout that period, it has regularly communicated with Turquoise Hill senior management, including its CEO, Chief Operating Officer, and Chief Financial Officer as well as with its

investor relations personnel and members of its board of directors. According to Pentwater, Turquoise Hill affirmatively reached out to Pentwater directly even after Pentwater's appointment as lead plaintiff. Dkt. No. 117, Ex. B.

**DISCUSSION**

The TRQ Defendants ask the Court to enter an order directing Pentwater to cease all communications with Turquoise Hill regarding the Oyu Tolgoi mine—Turquoise Hill's "only material asset." Dkt. No. 117 at 1. For its part, Pentwater has made clear that, absent court order, it intends to continue to pursue its rights as a shareholder to "monitor[] its continuing investment and ask[] questions about the Company's ongoing operations" including by "rais[ing questions in public shareholder forums about the Company's current and future business." Dkt. No. 118 at 4. It also intends to "write public letters to the Company about these matters." *Id.* It notes that these are "important rights for current investors." *Id.* The TRQ Defendants lodge no complaint to Pentwater continuing to make public statements, *see* Dkt. No. 119, and Pentwater has indicated that its needs as a shareholder can be met without engaging in one-on-one questions with Turquoise Hill employees, Dkt. No. 118 at 4.

The request is denied. The Court has the authority, where appropriate, to direct counsel to cease from engaging in conduct that is unethical, such as causing its client to engage in unauthorized communications with the opposing party or in communications with guile or disguise. *See Suggs v. Cap. Cities/ABC Inc.*, 1990 WL 182314, at *1-2 (S.D.N.Y. Apr. 24, 1990) ("The federal courts have the inherent authority to discipline attorneys who appear before them for conduct deemed inconsistent with ethical standards imposed by the court."); *Miano v. AC & R Advert., Inc.*, 148 F.R.D. 68, 74 (S.D.N.Y. 1993) ("Although the restrictions of professional codes are not statutorily mandated, 'federal courts enforce professional responsibility standards

pursuant to their general supervisory authority over members of the bar.'") (quoting *United States v. Hammad*, 858 F.2d 834, 837 (2d Cir. 1988)).

The court also has "both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *In re WorldCom, Inc. Sec. Litig.*, 2003 WL 22701241, at *7 (S.D.N.Y. Nov. 17, 2003) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)). That authority extends to the policing of "proposed communication [that] 'threaten[s] the proper functioning of the [class action] litigation." 6 William B. Rubenstein, Newberg on Class Actions § 19:5 (5th ed. 2021) (citation omitted). It includes the authority to address "abusive communications . . . that affect class members' decisions regarding whether to participate in the litigation, communications that undermine class members' confidence in class counsel or the court, and communications that contain false or misleading statements about the litigation." *Romano v. SLS Residential Inc.*, 253 F.R.D. 292, 296 (S.D.N.Y. 2008); *see also Tedesco v. Mishkin*, 629 F. Supp. 1474, 1483 (S.D.N.Y. 1986) (describing communications that "created fear and confusion among class members").

However, even in a case governed by the PSLRA, counsel continues to have the right, and may have the duty, to investigate its client's claims. The PSLRA stays only "all discovery and other proceedings" during the pendency of a motion to dismiss. *See* 15 U.S.C. § 78u-4(b)(3)(B). Informal investigation where a party does not use the tools provided by the Federal Rules of Civil Procedure is distinct from discovery and is permitted during the PSLRA stay. *See Am Bank v. City of Menasha*, 627 F.3d 261, 265 (7th Cir. 2010) ("Much of the information gathering that litigants do is not 'discovery' as the term is understood in the law."); *In re Bofl Holding, Inc. Sec. Litig.*, 318 F.R.D. 129, 133 (S.D. Cal. 2016) (holding that informal

investigations, including interviews of confidential witnesses, did not fall within the scope of formal discovery under Fed. R. Civ. P. 26 or for the purposes of the PSLRA); *Redus v. CSPH, INC.*, 2017 WL 2079807, at *6 (N.D. Tex. May 15, 2017) ("[T]he term 'discovery' as it is generally used in Federal Rules of Civil Procedure 26 through 37 does not generally include informally investigating facts and issues by contacting potential witnesses who are free to ignore the communication if they elect to do so, as opposed to formal discovery requests that are expressly governed by a Federal Rule and to which a party is legally required to comply."); *In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127, 1133 (N.D. Cal. 2002) (holding that, even where a court order is sought to permit former employees of defendants to speak voluntarily to plaintiffs' counsel, subsequent interviews of the former employees were not necessarily "discovery"); *In re Tyco Int'l Ltd. Sec. Litig.*, 2001 WL 34075721, at *3 (D.N.H. Jan. 30, 2001) ("Neither logic, tradition, the constitution nor the PSLRA prohibit interviewing prospective witnesses."); *cf.* Fed. R. Civ. P. 11(b)(3) (drawing distinction between "investigation" and "discovery").

The reference in the PSLRA to "other proceedings" is best understood to "include litigation activity relating to discovery." *See Medhekar v. U.S. Dist. Court*, 99 F.3d 325, 328 (9th Cir. 1996) (stating that the term "other proceedings" includes only "litigation activity relating to discovery" and not "all litigation activity in general"). Although "Congress . . . intended that complaints in these securities actions should stand or fall based on the actual knowledge of the plaintiffs" when the action is filed, *In re Petrobras Secs. Litig.*, 2016 WL 3144395, at *3 (S.D.N.Y. May 5, 2006) (quoting *Medhekar*, 99 F.3d at 328), that does not foreclose counsel from discharging her duties to make an "appropriate investigation" on behalf of her client, Fed. R. Civ. P. 11, Advisory Committee Notes on the 1993 Amendment.

The communications here do not implicate the concerns addressed in *Gulf Oil*. They do not threaten the proper functioning of the class action. *See, e.g.*, *Gulf Oil*, 452 U.S. at 100 n.12 (describing the "heightened susceptibilities of nonparty class members to solicitation amounting to barratry," "the increased opportunities of the parties or counsel to 'drum up' participation in the proceeding," and the potential for "[u]napproved communications to class members [to] misrepresent the status or effect of the pending action") (citation omitted).

The communications also do not implicate the rules of professional conduct. The New York Rules of Professional Conduct prohibit a lawyer herself from communicating directly with a party the lawyer knows to be represented by another lawyer or causing another to do so. The relevant rule states:

> In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law.

N.Y.R. Prof. Conduct 4.2(a).

"The purpose of the rule [against an attorney's *ex parte* discussion with a represented party] is to protect a party from the superior knowledge and skill of an attorney in securing uncounseled statements and attorney-client confidences." *Miano*, 148 F.R.D. at 90; *see Dodona I, LLC v. Goldman, Sachs & Co.*, 300 F.R.D. 182, 187 (S.D.N.Y. 2014) (allowing counsel to communicate with attorneys for class members and noting that "Rule 4.2 was designed to prevent [a lawyer from] obtaining a tactical advantage by knowingly contacting a represented party without notifying her lawyer") (quoting *Velez v. Novartis Pharm. Corp.*, 2010 WL 339098, at *3 (S.D.N.Y. Jan. 26, 2010)). But that rule does not prohibit a represented party from reaching out directly to another represented party about ongoing business the two have—so long as the communication is not done at the behest or direction of counsel. *See* N.Y.R. Prof.

Conduct 4.2, cmt. 11 ("Persons represented in a matter may communicate directly with each other."); *Rekor Sys., Inc. v. Loughlin*, 2021 WL 2186439, at *1 (S.D.N.Y. May 28, 2021) ("New York Rule of Professional Conduct 4.2[] does not prevent a party to a litigation from reaching out to another party to the litigation to discuss the litigation so long as the communication is not directed or caused by counsel."); *E.E.O.C. v. McDonnell Douglas Corp.*, 948 F. Supp. 54, 55 (E.D. Mo. 1996) ("[T]here is nothing that prohibits one party to a litigation from making direct contact with another party to the same litigation."); *see also* ABA Model Rule 4.2, cmt. 4 ("Parties to a matter may communicate directly with each other.").

There is no evidence that counsel in this case contacted the Defendants or caused Pentwater to do so, either directly or indirectly. The question therefore is whether a lead plaintiff, who is also a shareholder of a corporate defendant, may continue to have communications with the corporation in its capacity as shareholder at the same time it has sued the corporation in its capacity as a representative of a class of persons who bought or sold the corporation's securities. The TRQ Defendants have not pointed the Court to any authority that would prevent such communications. The Court concludes that such communications are not inconsistent with the PSLRA and are permissible so long as they comply with the ethics rules.

The PSLRA embodies a preference that institutional investors serve as lead plaintiffs representing members of a class. Dkt. No. 103 at 11. It establishes a presumption that the person with the "largest financial stake in the recovery sought by the class" serve as lead counsel. 15 U.S.C. § 78u-4(a)(3)(B)(i). The legislative history reflects Congress's intent "that institutional investors will serve as lead plaintiffs." S. Rep. No. 104-98, at 11 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 690; *see also Sofran v. LaBranche & Co., Inc.*, 220 F.R.D. 398, 403 (2004) (recalling "the preference expressed by Congress for having institutional investors as lead

plaintiffs”); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*, 229 F.R.D. 395, 402 (S.D.N.Y. 2004) (noting that the prevention of lawyer-driven litigation “could best be achieved, according to Congress, by encouraging institutional investors to serve as lead plaintiffs”). This provision of the PSLRA was adopted to “(i) encourage the voluntary disclosure of information by corporate issuers; (ii) empower investors so that they may exercise primary control over private securities litigation; and (iii) encourage plaintiffs’ lawyers to pursue valid claims and allow defendants to avoid abusive claims.” *In re Recoton Corp.*, 307 B.R. 751, 757 (Bankr. S.D.N.Y. 2004) (citing *Cendant Capital I v. Forbes*, 260 F.3d 183, 196-97 (3d Cir. 2001)).

The PSLRA thus envisions that institutional investors—who owe duties to safeguard the funds they invest on behalf of others—will serve as lead plaintiffs. There is nothing in the law that suggests that in so serving, institutional investors will be required to forego their current rights and obligations as shareholders. *See In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003) (referencing the ability of institutional investors to “communicate directly with the company in which they are investing to verify or better evaluate its public disclosures” as a benefit of naming such an investor as lead plaintiff).

The New York Rules of Professional Conduct permit party-to-party communications so long as they are not caused by counsel. *See supra*. Thus, there is nothing in the rules or the principles of ethics that precludes Pentwater from continuing to ask questions of Turquoise Hill in public fora and from writing public letters to Turquoise Hill, so long as counsel does not cause Pentwater to communicate directly with Turquoise Hill. The Court is comforted in this conclusion by the fact that the communications are between business persons in public fora. *Cf. Shapero v. Kentucky Bar Ass’n*, 486 U.S. 466, 475 (1988) (addressing direct-mail solicitation of

clients by lawyers: "[i]n assessing the potential for overreaching and undue influence, the mode of communication makes all the difference"). In addition, Turquoise Hill's directors and officers, all sophisticated persons, have shown their ability to protect themselves by refusing to answer questions when they have determined that doing so was in their best interests or the best interests of Turquoise Hill. *See Dodona I*, 300 F.R.D. at 188 (noting that moving party had "not shown that [its adversary] gained any improper tactical advantage over communications with [represented persons] who are presumably sophisticated and familiar with securities litigation"); *cf. S.E.C. v. Ralston Purina Co.*, 346 U.S. 119, 125 (1953) (referencing the ability of knowledgeable parties to "fend for themselves").

The TRQ Defendants invoke the concern expressed by the Court in its prior opinion appointing lead plaintiff about Pentwater wearing two hats, as the largest minority shareholder in Turquoise Hill and as class representative. The Court's concern, however, was markedly different from the concern that Turquoise Hill presents here. The Court's concern was that Pentwater's position as a large minority shareholder and/or Turquoise Hill's motivation to rid itself of a gadfly would put pressure on the two to strike a deal between themselves and to the prejudice of the class.

One circumstance in which such a conflict might arise would be if Pentwater were concerned about the small trading volume in Turquoise Hill stock related to the large size of its position and stuck a deal with the majority holder of Turquoise Hill and its litigation adversary here, Defendant Rio Tinto, to take Pentwater out of its position. The obvious concern is that such a transaction would be done in exchange for Pentwater somehow compromising the interests of the absent class members for whom it is acting as fiduciary. Another circumstance would be if Pentwater, as a current large shareholder, pursued simultaneous non-class foreign

litigation against Turquoise Hill and used its position to compromise the interests of the class in this case in exchange for a favorable resolution of that litigation. Relatedly, Pentwater could pursue and settle a derivative action on behalf of Turquoise Hill, drawing funds into the corporation that would benefit Pentwater derivatively through its large ownership stake, while at the same time—perhaps in exchange for a favorable settlement—compromising the interests of the class of Turquoise Hill shareholders on whose behalf it is acting in this case.

The Court addressed those concerns, first, by having Pentwater confirm that it was not pursuing "any litigation . . . that would conflict with this case," including a previously threatened oppression action in Canada, Dkt. No. 93 ¶ 5(b), and second, by having Pentwater submit a letter committing that it "will not enter into any agreement at all relating to the Pentwater Funds' Turquoise Hill holdings with any Defendant or their affiliates other than [as] a result for the entire Class that is subject to class notice and Court approval," *id.* ¶ 5(d). "In other words, the Pentwater Funds will not enter into any agreement with any Defendant regarding any increase or decrease of the Pentwater Funds' holdings in Turquoise Hill securities other than in connection with a settlement in this case that is subject to notice and Court approval." *Id.* The Court also required Pentwater to "report to the Court any arrangements made with any of the Defendants or their affiliates to purchase Pentwater Funds' shares in Turquoise Hill or to otherwise find purchasers for those shares, during the pendency of this litigation, regardless of whether such arrangement is made in connection with settlement." *Turquoise Hill Resources Ltd. Sec. Litig.*, 2021 WL 148752, at *7. The Court warned that "should the disclosures—whether at the time of settlement or otherwise—or other evidence reveal that lead plaintiff has compromised the interests of the class or has created a non-speculative risk that it will do so, the Court has the option of appointing an alternative lead plaintiff or rejecting a settlement." *Id.*

The concern that Turquoise Hill presents here is very different. It does not seek to protect the interests of the absent class members from a conflict but rather to protect itself either from questions posed to it by a current shareholder, or, accepting Turquoise Hill's argument, from an aggressive prosecution of this case. As the Court previously concluded, Pentwater's large interest in Turquoise Hill does not disable it from prosecuting Turquoise Hill; it enhances its ability to do so. As long as Pentwater's counsel abides by the ethical rules (including those regarding contact with represented parties), the Court will not prohibit Pentwater from acting in the best interests of its investors by asking questions to Turquoise Hill employees, officers, and directors in public and by issuing public letters.[1]

**CONCLUSION**

For the foregoing reasons, the TRQ Defendants' request for relief is denied. The Court thus declines to direct Pentwater to cease seeking to elicit information from Turquoise Hill in its role as a shareholder.

SO ORDERED.

Dated: June 1, 2021
New York, New York

LEWIS J. LIMAN
United States District Judge

[1] Pentwater has stated that it does not intend to persevere in its current line of questioning with Turquoise Hill outside of public fora. Dkt. No. 118 at 4.