**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TURQUOISE HILL RESOURCES LTD. SECURITIES LITIGATION | Case No. 1:20-cv-08585-LJL<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF**
**THE RIO DEFENDANTS' MOTION TO DISMISS**
**THE SECOND AMENDED CONSOLIDATED COMPLAINT**

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND .................................................................................... 3

I.      THE DEVELOPMENT OF THE OYU TOLGOI MINE .................................. 3

II.     THE OCTOBER 2018 RE-FORECAST ............................................................. 5

III.    PLAINTIFFS' CLAIMS ..................................................................................... 5

        A.      The Alleged Misstatements ..................................................................... 6

        B.      Allegations Regarding Scienter ............................................................... 8

        C.      Allegations Regarding Plaintiffs' Losses ................................................ 8

LEGAL STANDARD ............................................................................................... 9

ARGUMENT ............................................................................................................. 9

I.      PLAINTIFFS LACK STANDING TO SUE THE RIO DEFENDANTS ........... 9

II.     PLAINTIFFS FAIL TO ALLEGE MATERIAL MISSTATEMENTS OR
        OMISSIONS ...................................................................................................... 15

        A.      The Rio Defendants Are Not Liable For Statements Made By Turquoise
                Hill ........................................................................................................... 15

        B.      Plaintiffs' "Scheme Liability" Allegations Fail ...................................... 19

        C.      The Alleged Misstatements Are Not Actionable ..................................... 21

                1.      Statements That The Project Was "On Track" And "On Budget"
                        And Would Meet Construction Expectations Are Forward-Looking
                        Statements Protected By The PSLRA's Safe Harbor ..................... 21

                2.      Statements That The Project Was "On Track" And "On Budget"
                        And Would Meet Construction Expectations Are Inactionable
                        Statements Of Opinion .................................................................. 26

                3.      Statements That The Project Was "On Track" Are Immaterial ..... 28

                4.      SOX Certifications And Risk Disclosures Are Inactionable ......... 29

        D.      The Alleged Misstatements Were Not Materially False Or Misleading ... 30

III.    PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED A STRONG
        INFERENCE OF SCIENTER ........................................................................... 34

        A.      Plaintiffs Do Not Allege Any Unique Motive To Defraud The Market ... 34

        B.      The Complaint Contains No Particularized Allegations The Defendants
                Were Aware Their Statements Were False When Made ......................... 35

                1.      Opinions Held By Former Employees Cannot Establish Scienter ... 36

2.      Plaintiffs Fail To Adequately Allege Defendants Read Reports
        Containing Contrary Information Sufficient To Render Their
        Statements False ........................................................................................38

3.      Bowley's Opinion Regarding The Oyu Tolgoi Development Does
        Not Establish Scienter For Jacques Or Soirat...........................................42

4.      The "Importance" of Oyu Tolgoi Does Not Permit An Inference of
        Scienter .....................................................................................................45

IV.     PLAINTIFFS DO NOT ADEQUATELY ALLEGE LOSS CAUSATION ...................45

V.      PLAINTIFFS FAIL TO PLEAD A CLAIM UNDER SECTION 20(A).........................47

CONCLUSION ....................................................................................................................48

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ....................................................*passim*

*In re Alpharma Inc. Sec. Litig.*,
372 F.3d 137 (3d Cir. 2004) ....................................................................................43

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ....................................................................47

*In re: Altisource Portfolio Sols., S.A. Sec. Litig.*,
2015 WL 12001262 (S.D. Fla. Sept. 4, 2015) ..................................................12, 13

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018) ...........................................................*passim*

*Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*,
18 F. Supp. 3d 482 (S.D.N.Y. 2014) ......................................................................47

*In re Australia and New Zealand Banking Group Ltd. Sec. Litig.*,
2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ........................................................23

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017) .....................................................................35

*In re Bank of America AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013) ...............................................................29, 30

*In re Barrick Gold Corp. Sec. Litig.*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018) ...........................................................22, 24, 25

*In re Barrick Gold Sec. Litig.*,
2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) ......................................................23, 25

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015) .......................................................................39

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) .................................................................................................14

*Bondholder Comm. on Behalf of Owners of Quad Cities Reg'l Econ. Dev. Auth. First
Mortg. Revenue Bonds Series 2013A v. Sauk Valley Student Hous., LLC*,
2020 WL 5995617 (D.N.J. Oct. 9, 2020) ................................................................18

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008) .....................................................................33

*Carter-Wallace, Inc. Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000) ......................................................................................41

*Chapman v. Mueller Water Prod., Inc.,*
   466 F. Supp. 3d 382 (S.D.N.Y. 2020) ........................................................37

*Chill v. Gen. Elec. Co.,*
   101 F.3d 263 (2d Cir. 1996) .....................................................................35

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.,*
   957 F. Supp. 2d 277 (S.D.N.Y. 2013) .......................................31, 35, 36, 37

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.,*
   540 F. Supp. 2d 464 (S.D.N.Y. 2008) .......................................................42

*City of Roseville Emp. Ret. Sys. v. Nokia Corp.,*
   2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) .............................................32

*In re Cognizant Tech. Solutions Corp. Sec. Litig.,*
   2020 WL 3026564 (D.N.J. June 5, 2020).................................................20

*Colbert v. Rio Tinto PLC,*
   392 F. Supp. 3d 329 (S.D.N.Y. 2019) .......................................................33

*Colbert v. Rio Tinto PLC,*
   824 Fed. App'x 5 (2d Cir. 2020) ..............................................................28

*In re Coty Inc. Sec. Litig.,*
   2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016).............................................30

*In re Deutsche Telekom AG Sec. Litig.,*
   2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ..............................................48

*DoubleLine Cap. LP v. Odebrecht Finance, Ltd.,*
   323 F. Supp. 3d 393 (S.D.N.Y. 2018) .......................................................47

*Duane & Virginia Lanier Tr. v. SandRidge Mississippian Tr. I,*
   361 F. Supp. 3d 1162 (W.D. Okla. 2019)...................................................12

*Dura Pharm., Inc. v. Broudo,*
   544 U.S. 336 (2005) ...............................................................................45

*In re EDAP TMS S.A. Sec. Litig.,*
   2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) ...........................................28

*Elliott Assocs., L.P. v. Covance, Inc.,*
   2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ...........................................28

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
   308 F. Supp. 2d 249 (S.D.N.Y. 2004) ..................................................32, 37

*Fogel v. Vega,*
   759 F. App'x 18 (2d Cir. 2018)................................................................14

*Fogel v. Wal-Mart de Mexico SAB de CV,*
   2017 WL 751155 (S.D.N.Y. Feb. 27, 2017) .............................................14

*Frankfurt-Trust Inv. Luxemburg AG v. United Tech. Corp.,*
   336 F. Supp. 3d 196 (S.D.N.Y. 2018) .............................................26, 27, 39

*Frederick v. Mechel OAO*,
   475 Fed.Appx. 353 (2d Cir. 2012) ........................................45

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008) ....................................38

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) .....................................40

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ....................................37

*In re Global Crossing, Ltd. Sec. Litig.*,
   2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005) ........................47, 48

*In re Gold Res. Corp. Sec. Litig*,
   776 F.3d 1103 (10th Cir. 2015) .................................35, 36, 37

*Gray v. Wesco Aircraft Holdings, Inc.*,
   454 F. Supp. 3d 366 (S.D.N.Y. 2020) ....................22, 24, 26, 27

*Harbinger Cap. Partners LLC v. Deere & Co.*,
   632 Fed. App'x 653 (2d Cir. 2015) ....................................12, 13

*Hertz Corp. v. Accenture LLP*,
   2019 WL 5537997 (S.D.N.Y. Oct. 25, 2019) ...........................28

*In re Initial Pub. Offering Sec. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005) ....................................46

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020) ...........................................41, 45

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) .................................................*passim*

*Kasilingam v. Tilray*,
   2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021) ......................*passim*

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012) .............................................3

*Kuwait Inv. Office v. Am. Intern. Group, Inc.*,
   128 F. Supp. 3d 792 (S.D.N.Y. 2015) ....................................48

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) .............................................46

*Lefkowitz v. Synacor, Inc.*,
   2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019) ...........................26

*LightSquared Inc. v. Deere & Co.*,
   2015 WL 585655 (S.D.N.Y. Feb. 5, 2015) ................................13

*Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010) ....................................41

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019) .........................................................................................19, 20, 21

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ...................................................................................27

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) .................................................................................43

*Martin v. Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) ................................................................................25, 28, 43

*Menaldi v. Och–Ziff Cap. Mgmt. Group LLC*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017) .................................................................................21

*Menkes v. Stolt-Nielsen S.A.*,
    2005 WL 3050970 (D. Conn. Nov. 10, 2005) ....................................................................43

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
    2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ................................................................12, 20

*In re Micro Focus Int'l Plc Sec. Litig.*,
    2020 WL 5817275 (S.D.N.Y. Sept. 29, 2020) ....................................................................23

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020) .............................................................................19, 20

*In re New Energy Sys. Secs. Litig.*,
    66 F. Supp. 3d 401 (S.D.N.Y. 2014) ...................................................................................46

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009) .................................................................................25

*In re NYSE Specs. Sec. Litig.*,
    405 F. Supp. 2d 281 (S.D.N.Y. 2005) ........................................................................11, 12, 14

*In re NYSE Specs. Sec. Litig.*,
    503 F.3d 89 (2d Cir. 2007) ...............................................................................10, 11, 12, 14

*Oklahoma Police Pension Fund and Ret. Sys. v. Teligent, Inc.*,
    2020 WL 3268531 (S.D.N.Y. June 17, 2020) .....................................................................41

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*,
    575 U.S. 175 (2015) ..............................................................................................................27

*Ontario Pub. Service Emp. Union Pension Trust Fund v. Nortel Networks Corp.*,
    369 F.3d 27 (2d Cir. 2004) ...........................................................................................*passim*

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015) .................................................................................29

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ....................................................................................................19

*In re Pretium Res. Inc. Sec Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017) .................................................................................43

*In re Rockwell Med., Inc. Sec. Litig.*,
    2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018)......................................................45

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011) ...............................................................41

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996)................................................................................39

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016) ...............................................................44

*In re Sanofi-Aventis Sec. Litig.*,
    2009 WL 3094957 (S.D.N.Y. Sept. 25, 2009) ...................................................35

*Schaffer v. Horizon Pharma PLC*,
    2018 WL 481883 (S.D.N.Y. Jan. 18, 2018).......................................................45

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ................................................................................38

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) ...............................................................29

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011) ...............................................................19

*Shemian v. Research In Motion Ltd.*,
    2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013)..............................................37, 41

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) .......................................................................passim

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012) ...............................................................48

*Stoneridge Inv. Partners v. Scientific-Atlanta*,
    552 U.S. 148 (2008) ....................................................................................14, 20

*In re SunEdison, Inc. Sec. Litig.*,
    300 F. Supp. 3d 444 (S.D.N.Y. 2018) ...............................................................22

*Starr v. Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005) ..............................................................................32

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ..............................................................................36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................................passim

*In re Teva Sec. Litig.*,
    512 F. Supp. 3d 321 (D. Conn. 2021) ...............................................................20

*Villare v. Abiomed*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ...................................................23

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
 504 F. Supp. 3d 224 (S.D.N.Y. 2020) ..................................................................17

*Woodward v. Raymond James Financial, Inc.*,
 732 F. Supp. 2d 425 (S.D.N.Y. 2010) ..................................................................39

*Youngers v. Virtus Investment Partners Inc.*,
 195 F. Supp. 3d 499 (S.D.N.Y. 2016) ..................................................................44

## Statutory Authorities

15 U.S.C. § 77o ......................................................................................................47

15 U.S.C. § 78t .......................................................................................................47

15 U.S.C. § 78u-4(b) .........................................................................................9, 34

15 U.S.C. § 78u–5(c)(1) ........................................................................................26

Securities Exchange Act of 1934 § 10(b)........................................................*passim*

Securities Exchange Act of 1934 § 20(a) ...................................................2, 15, 47

## Rules and Regulations

Fed. R. Civ. P. 9(b).................................................................................................19

Fed. R. Civ. P. 12(b)(6) ...........................................................................................1

SEC Rule 10b-5 ...............................................................................................*passim*

Defendants Rio Tinto plc and Rio Tinto Limited (together, "Rio" or "Rio Tinto"), Rio Tinto International Holdings Limited ("RTIH"), Jean-Sébastien Jacques and Arnaud Soirat (jointly with Jacques, the "Rio Individual Defendants" and together with Rio and RTIH, the "Rio Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the claims asserted against them under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") in Plaintiffs' Second Amended Consolidated Complaint (the "Complaint" or "SAC") (ECF No. 127).

## PRELIMINARY STATEMENT

The Second Amended Complaint is yet another attempt by Plaintiffs to obtain compensation for ordinary business losses. The Complaint describes delays and budget overruns related to the development of the Oyu Tolgoi underground mine in Mongolia, caused by unexpectedly difficult ground conditions and construction challenges experienced by Rio and Turquoise Hill Resources Ltd. ("Turquoise Hill"). Using a 2021 report that appears to have been prepared with hindsight bias regarding the issues experienced at Oyu Tolgoi beginning in 2016, and the unsupported allegations of former employees and consultants, Plaintiffs attempt to fashion a securities fraud claim. But while delays and expenses with the mine's construction may have disappointed investors, they do not constitute securities fraud, and certainly do not give rise to claims against Rio.

While Rio agrees with Turquoise Hill that the Complaint fails to state a claim against any Defendant[1], that failure is particularly acute as to Rio, its former executives, and RTIH because Plaintiffs purport to represent a class of investors who purchased stock in Turquoise Hill, a

---

[1] Plaintiffs have also named as defendants Turquoise Hill Resources Ltd., Ulf Quellmann, Luke Colton, and Brendan Lane (together, the "Turquoise Hill Defendants" and with the Rio Defendants, "Defendants").

separately managed and listed company.  To allow Plaintiffs to pursue a securities action against companies in which they did not invest, simply because Rio Tinto plc indirectly owns a majority of Turquoise Hill's shares, would inappropriately expand the scope of Section 10(b) of the Exchange Act.  Plaintiffs do not have standing to sue the Rio Defendants, and Plaintiffs' claims should be dismissed on this ground alone.

Similarly, the Complaint overreaches when it attempts to hold the Rio Defendants liable for the statements *of Turquoise Hill*.  Plaintiffs' attempt to elide corporate separateness is a transparent effort to access what Plaintiffs perceive to be deeper pockets, and the Supreme Court has already held that such efforts are unavailing.

Even if Plaintiffs did have standing to bring securities fraud claims against the Rio Defendants, the Complaint fails to adequately allege claims under Sections 10(b) or 20(a) of the Exchange Act.  ***First***, Plaintiffs have failed to allege that any of the general statements by the Rio Defendants regarding the development of the mine were materially misleading.  The Complaint relies heavily on general statements of corporate optimism, inactionable projections of future performance, and statements of opinion that cannot give rise to securities claims.  Plaintiffs also fail to plead facts demonstrating that the alleged misstatements were actually false or misleading when made, considering the total mix of information available to the market.  When delays occurred, Rio disclosed them, along with specific information regarding many of the issues that Plaintiffs allege were concealed.

***Second***, the Complaint fails to allege a strong inference that any Rio Defendant intended to deceive investors.  Plaintiffs rely on conclusory allegations that Defendants "would have" been aware that the projected schedule and budget were inaccurate based on alleged comments by former employees, allegations of reports that would have contained information about the mine,

and allegations that the Rio Individual Defendants' subordinates held certain opinions about the mine's progress.  These are the kinds of allegations that courts routinely reject.

**Third**, Plaintiffs have failed to plead loss causation because the alleged corrective disclosures revealed nothing more than the materialization of construction risks that are typical in the industry and had been previously disclosed.  While Turquoise Hill's stock price may have dropped as a result of these disclosures, negative news does not equate to a corrective disclosure.

For each of the foregoing reasons, the Complaint should be dismissed in its entirety.

## FACTUAL BACKGROUND[2]

## I.   THE DEVELOPMENT OF THE OYU TOLGOI MINE

Located in Mongolia, the Oyu Tolgoi mine is an open pit and underground copper and gold mine owned jointly by Turquoise Hill and the Government of Mongolia.  SAC ¶ 3.  Various subsidiaries of Rio Tinto plc[3], including its wholly owned subsidiary RTIH, together own a majority interest in Turquoise Hill.  Turquoise Hill is independently managed[4] and headquartered, and its shares are separately listed on the New York and Toronto Stock Exchanges.

Oyu Tolgoi has been in operation as an open pit copper mine since 2013, but additional construction efforts began in October 2016 to expand the underground operations of the mine.  *Id.* ¶¶ 5-7.  One of the largest and most complex mines in the world, the development plan calls for a

---

[2]    Solely for the purposes of this motion to dismiss, the Rio Defendants take the allegations in the Complaint as true.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  However, this acceptance for the present motion is not an admission of the accuracy of the facts as pleaded in the Complaint.  The Rio Defendants reserve all rights, and intend to vigorously contest those allegations if this litigation progresses.

[3]    Plaintiffs assert that Turquoise Hill is "a majority-owned subsidiary of Rio Tinto" (SAC ¶ 38) despite previously being informed that only Rio Tinto plc has an indirect ownership interest in Turquoise Hill.  ECF No. 115, at 3 n.3.  Rio Tinto Limited has **no** ownership interest in Turquoise Hill.

[4]    Defendant Jean-Sébastien Jacques is Rio Tinto's former CEO, and defendant Arnaud Soirat is the former head of Rio Tinto's Copper & Diamonds group.  Neither Jacques nor Soirat is or was an executive of Turquoise Hill.

process called "panel block caving," which is particularly challenging. *Id.* ¶¶ 67-68. In block caving, the mineral ore is undercut, causing it to collapse, and it is then extracted through tunnels below the undercut level. *Id.* In panel block caving, the ore is divided into "panels" which are mined progressively using the block caving technique described above. *Id.*

When the project was announced, the approved capital expenditure for the underground development was $5.3 billion. *Id.* ¶ 7. The first "drawbell" blasting was projected to occur in mid-2020, and the first sustainable production was forecasted for the first quarter of 2021. *Id.* As the project progressed, Plaintiffs allege that the project encountered certain complications, in particular with certain mine shafts (Shafts 1, 2, and 5) and a crusher ("PC1").[5] *Id.* ¶¶ 8, 72. In particular, Plaintiffs allege that there were engineering, procurement, and construction issues faced in designing and building Shaft 2 and that much of the work that had been performed prior to 2016 had to be corrected once expansion efforts began. *Id.* ¶ 8. Plaintiffs also allege certain unexpected expenses were incurred relating to the construction efforts for Shaft 2 and other parts of the development. *Id.*

Plaintiffs allege that, in response to these issues, Richard Bowley, a former Oyu Tolgoi contractor, was hired to examine the difficulties faced by the underground expansion. *Id.* ¶ 14. Bowley[6] allegedly came to the conclusion that there would be delays and cost overruns associated with the expansion of the underground mine, and Plaintiffs allege Bowley communicated those concerns to others at the company, though they do not allege that Bowley directly told Jacques or Soirat that the projected budget or schedule were unachievable. Similarly, Plaintiffs allege that an

---

[5]    Plaintiffs do not allege that Rio Tinto made any misstatements regarding PC1. *See* SAC ¶¶ 313-14, 317.
[6]    Bowley is not a geotechnical engineer, and the Rio Defendants intend to demonstrate the inaccuracies of his assertions in discovery if this action progresses.

executive coach employed by Rio, Maurice Duffy, believed that the schedule and budget were unachievable.[7] *Id.* ¶ 10.

## II.     THE OCTOBER 2018 RE-FORECAST

On October 15, 2018, both Turquoise Hill and Rio announced a revised forecast for Oyu Tolgoi, disclosing that due to ground conditions and shaft sinking challenges, there would be a revised schedule for the sustainable first production but that capital costs remained in line with the overall $5.3 billion budget, and construction of the first drawbell was still expected in mid-2020. *Id.* ¶¶ 174-75. In February 2019, Turquoise Hill announced that there would be further delays to the projected first sustainable production date. *Id.* ¶ 230. Rio's subsequent Form 6-K also disclosed the impending delays, specifically citing difficulties with Shaft 2 and difficult ground conditions, and informing investors that the extent of the delays and the impact on the project's costs were still being evaluated. *Id.* ¶ 371. In July 2019, Turquoise Hill announced that the delays anticipated in February 2019 would range from 16-30 months and that the capital spend for the project may increase by $1.2-1.9 billion. *Id.* ¶ 404. Later that month, Turquoise Hill disclosed that new financing was needed for Oyu Tolgoi's underground expansion and that Turquoise Hill would be taking a $600 million impairment. *Id.* ¶ 408.

## III.    PLAINTIFFS' CLAIMS

This action was filed on October 14, 2020. ECF No. 1. The Pentwater Funds were appointed Lead Plaintiff on January 15, 2021 (ECF No. 103), and filed a consolidated complaint on March 16, 2021 (ECF No. 9). Defendants moved to dismiss the complaint, but, after initially responding to those motions, Plaintiffs requested and were granted leave to file an amended

---

[7]     Plaintiffs inaccurately assert that Duffy was a coach for both Jacques and Soirat (SAC ¶ 139), but that assertion is false.

complaint to add allegations based on the confidential ICG Report[8] and Peer Review, published in July 2021.  ECF No. 126.

Plaintiffs rely heavily on the ICG Report's purported contention that the project experienced cost overruns and delays, but the 2021 report says little about what the Rio Defendants themselves actually knew at the time of the relevant disclosures from 2016 through 2019, as that was not the purpose of the report.  The ICG Report cites certain older reports from an advisory firm, Broadleaf, but Plaintiffs cannot allege when Rio Defendants would have seen such reports or, moreover, that any of the information contained within the Broadleaf reports was actually contrary to Rio Defendants' public statements at the time.  Plaintiffs' second amendment has not rectified the fatal flaws in the Complaint.  Specifically, the Complaint does not allege that any of the general statements by the Rio Defendants regarding Oyu Tolgoi were materially misleading; does not allege a strong inference that any Rio Defendant intended to deceive investors; and fails to plead loss causation.

## A.     The Alleged Misstatements

Plaintiffs allege that the Rio Defendants must have been aware of the impending delays and the need for increased capital expenditures before these issues were disclosed by Turquoise Hill and Rio in October 2018.  Specifically, because Plaintiffs allege that the Rio Defendants must have been aware of delays, Plaintiffs allege the Rio Defendants made various false or misleading statements regarding the progress of the underground development of Oyu Tolgoi.[9]  The relevant

---

[8]     The ICG Report is confidential, and it is unclear how Plaintiffs received it.  There are certain areas of the ICG Report that Rio fundamentally disagrees with, and Rio was not given an opportunity to provide final input to ensure its accuracy.  If this litigation progresses, Rio intends to provide a fuller picture of the project's development.

[9]     At various points, Plaintiffs misleadingly refer to representations made by "Defendants" when they refer to statements made solely by Turquoise Hill.  For example, Plaintiffs refer repeatedly to statements by "Defendants" on a November 2, 2018 investor conference call

statements made by the Rio Defendants can be grouped into six categories.[10]   For the reasons

below, each of these allegations fail to state a claim:

- *Category I:  Statements that the project was the "highest quality copper development" in the world and "progress[ing] well."*  Statements that Oyu Tolgoi was "expect[ed]" to become "one of the world's top producers of copper" are statements of corporate optimism too general to be actionable, and Plaintiffs also cannot allege these statements were false in the context of the mine's development overall.

  o  *See* Appendix A at 1; SAC ¶¶ 365, 372.

- *Category II: Statements that the project was "on track" or "on schedule."*  Plaintiffs allege statements that the development of Oyu Tolgoi was "on track," "on schedule," or "on plan" were misleading due to certain delays the project was allegedly experiencing.  Such statements of expectations are protected by the PSLRA's safe harbor, are too general to be material and are inactionable statements of opinion.

  o  *See* Appendix A at 1-2; SAC ¶¶ 324, 328, 331-32, 367, 372.

- *Category III: Statements regarding the project's budget.*  Plaintiffs claim that alleged increases in costs rendered statements regarding Oyu Tolgoi's approved capital expenditures misleading.  These statements are also inactionable forward-looking statements and statements of opinion, which Plaintiffs have not adequately alleged were not believed when made.

  o  *See* Appendix A at 2-3; SAC ¶¶ 324, 329, 331-32, 338, 365, 372.

- *Category IV: Statements regarding construction expectations.*  Plaintiffs claim that alleged construction and procurement delays rendered misleading statements regarding construction expectations for Oyu Tolgoi, including projections regarding dates for the first drawbell, sustainable production, and commissioning of Shaft 2.  These types of good faith projections are precisely the type of statements that cannot give rise to a securities fraud claim, particularly when, as here, they were couched with cautionary language, and Plaintiffs have failed to allege an intent to deceive.

  o  *See* Appendix A at 3-6; SAC ¶¶ 323, 324, 329, 338, 365, 371-72, 396, 405-06.

- *Category V: Statements regarding the cause of delays and cost overruns.*  Plaintiffs claim that alleged construction and procurement delays rendered misleading statements attributing delays and cost overruns to "geotech challenges" (SAC ¶ 376) and "difficult ground conditions" (*id.* ¶ 396).  These statements cannot give rise to a securities claim because Plaintiffs admit that the project did experience issues with challenging ground conditions (*id.* ¶¶ 253, 260), and these statements were not rendered false or misleading

---

regarding Turquoise Hill's third quarter fiscal year 2018 financial results.  SAC ¶¶ 347-58.
Plaintiffs do not allege that any Rio Defendant participated in that call (nor did they), and Plaintiffs
make no allegations of statements by Rio Defendants on that call.  *See id.*

[10]   For the convenience of the Court, Defendants have reproduced Plaintiffs' allegations
of misstatements attributable to the Rio Defendants, categorized by group, as Appendix A.

by Defendants' alleged failure to disclose every detail of the construction difficulties being faced.

> o   *See* Appendix A at 6-8; SAC ¶¶ 371, 376-77, 393, 396, 406.

- *Category VI: Sarbanes-Oxley Certifications and risk disclosures.*  Plaintiffs allege that both Rio's risk disclosures and the Sarbanes-Oxley ("SOX") certifications executed by Jacques were inaccurate because they failed to disclose misstatements.   These statements cannot give rise to a securities claim because Plaintiffs have not alleged that the company's financial reports were false or its internal controls were defective or that Rio executives had knowledge of any such defects.

> o   *See* Appendix A at 8-10; SAC ¶¶ 420-22.

### B.      Allegations Regarding Scienter

The Complaint does not allege with particularity that each Rio Defendant knew that each statement attributable to that Defendant was materially false or misleading.  Instead, Plaintiffs attempt to cobble together several categories of vague allegations that, even taken together, do not establish a strong inference of scienter.  *First*, Plaintiffs allege that Jacques and Soirat had an incentive to hide delays and cost overruns to avoid scrutiny so the project would appear successful. SAC ¶¶ 279-80, 295-96.  *Second*, Plaintiffs rely on statements from former employees and contractors that the delays and expenses were "well known."  *Id.* ¶ 124.  *Third*, Plaintiffs allege that Richard Bowley, a former Oyu Tolgoi contractor, expressed concerns about the viability of the schedule and expenses to other employees—but not directly to Jacques or Soirat.  *Id.* ¶¶ 271-72. *Finally*, Plaintiffs make allegations that Defendants had access to certain reports regarding the progress of Oyu Tolgoi's development.  *Id.* ¶¶ 275-78.

### C.      Allegations Regarding Plaintiffs' Losses

Plaintiffs claim Turquoise Hill investors sustained losses when Turquoise Hill disclosed delays and cost increases that varied from the company's original projections.  *First*, Plaintiffs allege Turquoise Hill's stock price fell after a February 27, 2019 announcement that ground conditions and difficulties with Shaft 2 would require a revision of the schedule and an analysis of the budget.  SAC ¶¶ 426-27.  *Second*, Plaintiffs allege that Turquoise Hill's stock price fell after a

July 15, 2019 announcement by Turquoise Hill that, consistent with the company's February 2019 announcement, there would be a 16-30 month delay and the need to increase the budget by $1.2-1.9 billion. *Id.* ¶¶ 430-31. *Third*, Plaintiffs allege that the value of Turquoise Hill stock declined after Turquoise Hill announced that new financing was needed for the project and that the company would take an impairment charge related to the project. *Id.* ¶¶ 432-33. The Complaint attempts to convert negative news into corrective disclosures by claiming that the materialization of the risks of the underground development at Oyu Tolgoi somehow revealed Defendants' fraudulent "scheme," when in reality these disclosures announced that additional time and costs were required to ensure the safety and efficacy of the underground mine.

## LEGAL STANDARD

Securities fraud claims under Section 10(b) are subject to the heightened pleading standards of the PSLRA, which requires that a plaintiff "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Moreover, "the complaint shall, with respect to each act or omission alleged to violate this Act, state with particularity facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). While the Court must accept as true all factual allegations, these are "[e]xacting pleading requirements," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007), which Plaintiffs fail to meet.

## ARGUMENT

## I.    PLAINTIFFS LACK STANDING TO SUE THE RIO DEFENDANTS

As a preliminary matter, Plaintiffs do not have standing to sue Rio, RTIH, or the Rio Individual Defendants because Plaintiffs purport to assert claims on behalf of investors "who purchased or otherwise acquired Turquoise Hill securities" (SAC ¶ 1), ***not Rio securities***. Plaintiffs have not cured the central defect of their original complaint: Because Plaintiffs' alleged

losses stem solely from their purchases of stock in another company—Turquoise Hill—Plaintiffs cannot maintain Exchange Act claims against the Rio Defendants.

Except in very limited circumstances, "[s]tockholders do not have standing to sue under Section 10(b) and Rule 10b–5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." *Ontario Pub. Service Emp. Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004) ("*Nortel*"). In *Nortel*, plaintiffs, who purchased stock in a fiber optics manufacturer, JDS, brought an action against a telecommunications company, Nortel, alleging that Nortel made misstatements that affected JDS's stock price. *See id.* Specifically, plaintiffs alleged that JDS disclosed optimistic projections based on misleading information provided by Nortel, and when the truth came out, the value of both companies' shares dropped. *Id.* at 29.[11] The Second Circuit affirmed the dismissal of plaintiffs' claims, holding that plaintiffs lacked standing to sue Nortel because "instead of purchasing securities of the entity that made the alleged misrepresentations, they purchased securities of a company that had a business relationship with the misrepresenter." *Id.* at 32.[12]

In 2007, the Second Circuit recognized that Rule 10b-5 claims against a non-issuer could lie to redress "false statements made by underwriters, brokers, bankers, and non-issuer sellers." *In re NYSE Specs. Sec. Litig.*, 503 F.3d 89, 102 (2d Cir. 2007). *In re NYSE* concerned claims by

---

[11] This mirrors Plaintiffs' allegations here that Rio's disclosures affected Turquoise Hill's stock price and that Turquoise Hill made false disclosures based on information provided by Rio. *E.g.*, SAC ¶ 55.

[12] While *Nortel* involved two companies with a business relationship, its holding has been extended to companies with closer relationships similar to that between Rio and Turquoise Hill. *See infra* at 13. Further, JDS stood to acquire an interest in Nortel pursuant to the contemplated transaction at issue, creating an even closer connection between the two companies, which the Second Circuit still found did not confer standing. *Nortel*, 369 F.3d at 29.

investors against the New York Stock Exchange ("NYSE") and its Specialist Firms, trading firms that were assigned a particular set of stocks by the NYSE and required to fulfill investors' orders in those stocks "to create a fair, competitive, orderly and efficient market." *In re NYSE Specs. Sec. Litig.*, 405 F. Supp. 2d 281, 330 (S.D.N.Y. 2005), *aff'd in part, vacated in part, remanded,* 503 F.3d 89 (2d Cir. 2007). Plaintiffs asserted that the NYSE and its Specialist Firms conspired to manipulate trading and to evade the regulatory scrutiny that would have prevented such conduct. *Id.* at 298. In relevant part, on behalf of a class of all public investors who purchased and/or sold shares listed on the NYSE, plaintiffs alleged "that statements by NYSE concerning NYSE's duties to its customers were false and misleading in violation of section 10(b)" and that these false and misleading statements had inflated the price of all stocks traded on the NYSE. *Id.* at 304. The district court dismissed that Section 10(b) claim against the NYSE, holding that "[u]nder *Nortel,* Section 10(b) confers no standing on Plaintiffs to challenge statements such as these, *i.e.*, statements by a non-issuer about a non-issuer." *Id.* at 305-06.

The Second Circuit reversed, finding that the district court's categorical interpretation of *Nortel* was overbroad. *In re NYSE*, 503 F.3d at 102. The Court held that the decision in *Nortel* was based upon the finding that the connection between Nortel "and the plaintiff's purchase of JDS Uniphase stock was too remote to sustain an action under Rule 10b–5." *Id.* at 102. The Court contrasted that remote relationship with "false statements made by underwriters, brokers, bankers, and non-issuer sellers," which should not be "beyond the reach of Rule 10b-5." *Id.* Underwriters, brokers, bankers, and non-issuer sellers are all directly involved in the marketing and sale of the issued securities. Based upon its disagreement with the district court's categorical interpretation of *Nortel*, which excluded these entities that were directly involved in the purchase and sale of the issuer's shares, the Court reversed and remanded for further proceedings. *Id.* at 103.

The Second Circuit has subsequently affirmed *Nortel*'s general rule and the limited application of the *In re NYSE* carve-out. In *Harbinger Capital Partners LLC v. Deere & Co.*, the Second Circuit affirmed dismissal of securities claims brought by a plaintiff that had allegedly relied on misstatements and omissions by defendants in purchasing stock in a different company, a wireless provider. 632 Fed. App'x 653, 656 (2d Cir. 2015). Despite the fact that defendants' alleged misstatements and omissions "directly concerned" the wireless provider's product, the Second Circuit held that *Nortel* applied and affirmed dismissal. *Id.*

Subsequent courts have interpreted the *In re NYSE* exception narrowly, to apply to "securities that were either contractually or otherwise linked [to the non-issuer speaker] and entities that were not legally separate and distinct." *See Duane & Virginia Lanier Tr. v. SandRidge Mississippian Tr. I*, 361 F. Supp. 3d 1162, 1170 (W.D. Okla. 2019); *see also Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *32 (S.D.N.Y. Mar. 30, 2021) ("*IFF*") (finding that shareholders of IFF did not have standing to sue executives of company acquired by IFF for misstatements about acquired company, because "plaintiffs never purchased or sold [acquired company] securities, never stood to be contingent direct shareholders in [the acquired company] (as opposed to IFF that became the sole shareholder), and never owned a derivative security linked to the ownership value of [the acquired company]"); *In re: Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 12001262, at *4 (S.D. Fla. Sept. 4, 2015) ("Plaintiffs have not identified any case holding that shareholders of one public company have standing to bring a 10b-5 claim against another public company that neither issued nor sol[d] stock to those shareholders.").

While Plaintiffs allege that the Rio Defendants made statements regarding the operation of Turquoise Hill's Oyu Tolgoi project, the Second Circuit has already rejected assertions of standing

where investors in one company sue another for misstatements directly about the issuer company. In *Harbinger Capital*, the Second Circuit affirmed dismissal of claims against manufacturers of allegedly defective GPS devices, brought by shareholders of a company that had "sought to develop a new wireless broadband communications network" with which those GPS devices would operate. 632 F. App'x at 655. After years of cooperation, the "defendants reneged on their prior contracts, broke their prior promises, and disavowed their prior representations" to the shareholders' company, causing its share price to fall. *LightSquared Inc. v. Deere & Co.*, 2015 WL 585655, at *1 (S.D.N.Y. Feb. 5, 2015), *aff'd sub nom. Harbinger Cap.*, 632 F. App'x 653. The district court dismissed the Rule 10b-5 claim for lack of standing, and the Second Circuit affirmed, finding that plaintiffs could not bring suit even though defendants' alleged misstatements and omissions "directly concerned" the company owned by the plaintiff shareholders and that company's main product. *Harbinger Cap.*, 632 F. App'x at 656. Thus, even Plaintiffs' allegations that the Rio Defendants made statements related to Turquoise Hill's Oyu Tolgoi does not give them standing to sue when Plaintiffs purchased only Turquoise Hill stock.

Nor do Plaintiffs' repeated assertions of the close relationship between the Rio Defendants and Turquoise Hill suffice to confer standing on Plaintiffs to sue a company whose stock they did not purchase. Relying on *Nortel* and *Harbinger*, a court in the Southern District of Florida dismissed securities fraud claims for lack of standing even where the company in which plaintiffs invested, Altisource, and the company alleged to have made misrepresentations, Ocwen, "allegedly operated as one company and were founded and run by [a defendant]." *In re Altisource*, 2015 WL 12001262, at *4. Despite the close relationship between the companies and the fact that Ocwen allegedly "made statements directly to Altisource shareholders about Altisource[,]" the plaintiffs lacked standing, as plaintiffs had "not identified any case holding that shareholders of

one public company have standing to bring a 10b-5 claim against another public company that neither issued nor sol[d] stock to those shareholders." *Id.* Thus, even if Plaintiffs' allegations regarding Rio's control over Turquoise Hill are credited—which they should not be, *see infra* Sections II(A) & V—dismissal is required.[13]

The statements made by Rio do not fit within the narrow exceptions to the general rule that "[s]tockholders do not have standing to sue under Section 10(b) and Rule 10b–5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." *Nortel*, 369 F.3d at 34. The Court should reject Plaintiffs' attempt in this action to significantly broaden the scope of a permissible securities fraud claim. The fact that the private right of action under § 10(b) is judicially created "caution[s] against its expansion." *Stoneridge Inv. Partners v. Scientific-Atlanta*, 552 U.S. 148, 165 (2008). To confer standing to plaintiffs that wish to sue a company in which they did not invest would "expose a new class of defendants to [litigation] risks." *Id.* The Supreme Court has noted the "virtue" of rules that "limit[] the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747 (1975). The Second Circuit's rulings in *Nortel* and *In re NYSE* do just that, and Plaintiffs should not be permitted to evade them here.[14]

---

[13] This is particularly true since even Rio Tinto plc—the only entity alleged to have made misstatements that owns an interest in Turquoise Hill—owns that interest indirectly. SAC ¶ 47.

[14] Separately, for similar reasons, Plaintiffs cannot satisfy the "in connection with" requirement of the Exchange Act because Rio's statements were not made in connection with the sale or purchase of Turquoise Hill securities. "Though the Second Circuit has broadly construed the phrase 'in connection with,' it has not done so to the extent that 'a shareholder of one company [may] bring a private Section 10(b) or Rule 10b-5 claim against a second company based on alleged misstatements pertaining to the second company's stock.'" *Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *12 n.14 (S.D.N.Y. Feb. 27, 2017), *aff'd sub nom. Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018), and *aff'd sub nom. Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018)

## II.     PLAINTIFFS FAIL TO ALLEGE MATERIAL MISSTATEMENTS OR OMISSIONS

Despite 120 paragraphs of allegations detailing dozens of statements by Turquoise Hill and Rio, Plaintiffs have failed to allege a single material misrepresentation or omission by any Rio Defendant.[15]  *First*, Plaintiffs' audacious allegation that Rio and RTIH should be held responsible as the "maker" of statements made by Turquoise Hill—an independent, separately-listed company in which Rio Tinto plc indirectly holds a majority of shares—is unsupported.  *Second*, none of the statements by Rio identified by Plaintiffs are the kind that give rise to a securities fraud claim, as they are protected by the PSLRA safe harbor as forward-looking, statements of opinion, or immaterial puffery.  *Third*, Plaintiffs do not adequately allege the relevant statements were actually false or misleading when made.

### A.     The Rio Defendants Are Not Liable For Statements Made By Turquoise Hill

Plaintiffs allege that Rio and RTIH were "the maker[s] of both [their] own and Turquoise Hill's false and misleading statements and omissions."[16]  SAC ¶¶ 54, 450.  The Supreme Court has already addressed and rejected this argument, holding that corporations cannot be liable pursuant to Section 10(b) for statements made by subsidiaries.  *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).  This Court should dismiss Plaintiffs' claims against Rio and RTIH to the extent they allege responsibility for Turquoise Hill's statements.  To the extent the Court disagrees and finds that Rio or RTIH can be considered the "maker" of Turquoise Hill's statements, however, Plaintiffs have not adequately alleged that any disclosure made by any

---

(citations omitted).

[15]     Further, Plaintiffs have failed to allege how RTIH, a subsidiary of Rio Tinto plc, could possibly be liable for any alleged misstatements made by Rio Tinto.  ***Plaintiffs do not allege RTIH made any false or misleading statements***, which alone warrants dismissal of RTIH.

[16]     Plaintiffs' control person allegations relevant to their Section 20(a) claim are discussed further below.  *See infra* Section V.

Turquoise Hill Defendant was materially false or misleading.  As such, Plaintiffs have failed to state a claim as to Turquoise Hill's statements, and Rio joins the motion of Turquoise Hill as to those arguments.

In *Janus*, plaintiffs alleged that Janus Capital Management LLC ("JCM"), a mutual fund investment adviser, was liable under Rule 10b-5 for allegedly false statements included in its client mutual funds' prospectuses.  *Id.* at 138.  JCM created the mutual funds and marketed them to investors.  JCM also shared executives with the mutual funds and provided all management and administrative services to the funds.  However, "the two entities maintain[ed] legal independence," and the funds issued their own prospectuses.  *Id.*  After alleged fraud in the mutual funds was revealed, mutual fund investors sued both the funds and JCM, alleging that the funds and JCM had jointly "caused [misleading] mutual fund prospectuses to be issued for Janus mutual funds and made them available to the investing public."  *Id.* at 140.

The Supreme Court held that JCM was not liable, because "JCM did not 'make' any of the statements in the Janus Investment Fund prospectuses; Janus Investment Fund"—a "legally independent entity with its own board of trustees"—did.  *Id.* at 146-47.  Plaintiffs

> suggest[] that both JCM and [the funds] might have 'made' the misleading statements within the meaning of Rule 10b–5 because JCM was significantly involved in preparing the prospectuses.  But this assistance, subject to the ultimate control of Janus Investment Fund, does not mean that JCM 'made' any statements in the prospectuses.  Although JCM, like a speechwriter, may have assisted Janus Investment Fund with crafting what Janus Investment Fund said in the prospectuses, JCM itself did not 'make' those statements for purposes of Rule 10b–5.

*Id.* at 147-48.  The Court held that for the purposes of Rule 10b-5, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it" and "others are not."  *Id.* at 142, 143 n.6.

Setting aside the fact that Plaintiffs have not adequately alleged that any of Turquoise Hill's

disclosures were false or misleading, *Janus* forecloses Plaintiffs' claims that "Rio Tinto and RTIH . . . are [] liable as the maker of the statements by [Turquoise Hill] Defendants." SAC ¶ 450. Plaintiffs rely heavily on allegations that Rio and RTIH exerted influence over Turquoise Hill to argue that Section 10(b) liability should be imposed on those entities for Turquoise Hill's statements. *See*, *e.g.*, *id.* ¶¶ 53, 54, 450. Specifically, Plaintiffs allege that Rio "had the ability to determine the composition of TRQ's Board and management" via RTIH and its other subsidiaries and thus exercised control over Turquoise Hill. *Id.* ¶ 54. However, the Supreme Court in *Janus* rejected a similar argument, holding that a "theory of liability based on a relationship of influence resembles the liability imposed by Congress for control," and that adopting such a theory "would read into Rule 10b-5 a theory of liability similar to—but broader in application than . . . what Congress has already created expressly elsewhere." *See Janus*, 564 U.S. at 146. Specifically, the Supreme Court found such relationships are insufficient even where "all of the officers of [subsidiary] were also officers of [parent]" and parent company "was significantly involved in preparing the prospectuses." *Janus*, 564 U.S. at 147-48. Plaintiffs' allegations do not even rise to the level of those found insufficient in *Janus*, because Plaintiffs do not allege any overlap in the officers of Turquoise Hill and Rio, nor do they allege that Rio was involved in preparing the disclosures at issue. As such, even if Rio did have a "relationship of influence" over Turquoise Hill (which Rio disputes), that would be insufficient to find that Rio "made" Turquoise Hill's statements. *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 262 (S.D.N.Y. 2020) (Ownership of "a large stake in [issuer]" and placing board members "falls short of demonstrating that [non-issuer] has 'ultimate authority' to make statements.").[17]

---

[17]    Plaintiffs also do not articulate how RTIH (a subsidiary of Rio Tinto plc owning only a minority portion of its 51% interest in Turquoise Hill) or Rio Tinto Limited (which owned no interest in Turquoise Hill) could have had ultimate authority over Turquoise Hill's disclosures.

Similarly, the fact that Rio was given the opportunity to review and comment on Turquoise Hill's filings does not turn Rio into the "maker" of Turquoise Hill's statements. An opportunity to review and comment does not equate to "ultimate authority" over whether and how to issue the relevant disclosures. *See Janus* at 142, 143 n.6. Regardless, despite empty allegations that Rio "dictated the content" of Turquoise Hill's filings (SAC ¶¶ 54, 450), Plaintiffs do not allege that Rio actually reviewed or provided a single comment on Turquoise Hill's disclosures. Even if Rio had done so, merely "participating in the drafting" of the alleged misstatements does not create Section 10b-5 liability. *See Janus* at 145.

Finally, Plaintiffs allege that Turquoise Hill "noted that much of the information it conveyed about OT was provided by Rio Tinto." SAC ¶ 55. This allegation is belied by Plaintiffs' own Complaint, which acknowledges that Turquoise Hill was directly involved in overseeing the project. *Id.* ¶ 291. However, even assuming that the information Turquoise Hill relied upon and conveyed was somehow flawed—which it was not—the Supreme Court has rejected liability for "a person who provides the false or misleading information that another person puts into the statement." *Janus*, 564 U.S. at 144-45 (internal quotations omitted).[18] Because Turquoise Hill had ultimate authority over its disclosures and the information contained therein, Turquoise Hill is the "maker" of those statements.

---

[18]   *See also Bondholder Comm. on Behalf of Owners of Quad Cities Reg'l Econ. Dev. Auth. First Mortg. Revenue Bonds Series 2013A v. Sauk Valley Student Hous., LLC*, 2020 WL 5995617, at *5 (D.N.J. Oct. 9, 2020) (entity that provided allegedly false information that was then disclosed to the public by another entity was not the "maker" of the statements). Regardless, as further explained below (*see infra* Section II) and also in Turquoise Hill's motion to dismiss, the information provided by Rio and incorporated into Turquoise Hill's filings was not false or misleading.

### B.    Plaintiffs' "Scheme Liability" Allegations Fail

Because Plaintiffs cannot plead that Rio is the "maker" of Turquoise Hill's statements, they retreat to the allegation that the Rio Defendants are liable for Turquoise Hill's statements pursuant to SEC Rules 10b-5(a) and (c), because Rio Defendants allegedly schemed to disseminate false information through Turquoise Hill and engaged in other "deceptive and manipulative acts."  SAC ¶ 451.  Plaintiffs' allegations fail.

To state a scheme liability claim, a plaintiff must show:  "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020) (citation omitted).  Because scheme claims sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021).

Courts have cautioned that subsections (a) and (c) of Rule 10b–5 should not "be used as a back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b–5."  *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (dismissing scheme liability claim where defendant's conduct was allegedly "deceptive only because of [defendant's] subsequent public misrepresentations" regarding that conduct) (citation omitted).  "Where the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected the plaintiff's attempt to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'"  *Id.*  Here, Plaintiffs allege no purpose or effect beyond "disseminating [] false statements."  SAC ¶ 451.

While scheme liability may be appropriate in some circumstances where the defendant was involved in the dissemination of false information, *see Lorenzo v. SEC*, 139 S.Ct. 1094, 1096

(2019), courts in this Circuit have rejected scheme liability claims in cases like this, even in the wake of *Lorenzo*, where the claims are premised on alleged misstatements and omissions by the defendant. *See In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 336 (D. Conn. 2021) (plaintiffs failed to allege scheme liability claim where "these cases are plainly misstatements and omissions cases"); *In re Mindbody*, 489 F. Supp. 3d at 216 (dismissing scheme liability claim "because it is indistinguishable from the misstatements and omissions alleged under Count I").[19]   As such, Plaintiffs' claim for scheme liability fails because they can point to nothing beyond the alleged "dissemination of misleading information." *In re Mindbody*, 489 F. Supp. 3d at 217.

In addition to the foregoing, Plaintiffs' claim also fails because neither Rio nor Turquoise Hill disseminated false information. *See infra* Section II(C); *see also IFF*, 2021 WL 1199035, at *32 (dismissing scheme liability claims because "a complaint must still adequately plead the predicate misconduct—making a false statement or omission of material fact—to be actionable").

Moreover, even if Rio had provided inaccurate information to Turquoise Hill, under *Janus*, there is no liability for a person who provides the false or misleading information that another person then puts into the statement. *Janus*, 564 U.S. at 144-45; *see also supra* Section II(A).

Critically, Plaintiffs also cannot allege reliance as required to sustain a scheme liability claim. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element" of a scheme liability claim. *Stoneridge*, 552 U.S. at 159. In *Stoneridge*, the Supreme Court rejected a scheme liability claim against entities alleged to have colluded with the issuing company to publish misleading financial statements, holding the entities' "deceptive acts . . . [were] too remote to satisfy the requirement of reliance" and "nothing [the entities] did made it necessary or inevitable"

---

[19]   This distinguishes this case from others where the scheme liability defendants' conduct "extended far beyond the mere dissemination of alleged misstatements." *E.g.*, *In re Cognizant Tech. Solutions Corp. Sec. Litig.*, 2020 WL 3026564, at *16 (D.N.J. June 5, 2020).

that the misstatements would be disseminated by the issuer.  *Id.* at 161  The same outcome is warranted here.  *See Menaldi v. Och–Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 518 (S.D.N.Y. 2017) (rejecting scheme liability claim where plaintiffs did not rely on defendant's alleged misconduct).   Plaintiffs' argument is that Rio provided misleading information to Turquoise Hill—a separate company with its own disclosures, which Plaintiffs acknowledge was directly involved in overseeing Oyu Tolgoi and thus had direct access to information about the project. SAC ¶ 291.  Even crediting Plaintiffs' allegation that Rio provided inaccurate information, Rio did not make it "inevitable" that Turquoise Hill would issue the specific disclosures at issue in this action.

Finally, Plaintiffs' failure to allege scienter for the Rio Defendants is fatal to Plaintiffs' scheme liability claim irrespective of the claim's other flaws.  *See Menaldi*, 164 F. Supp. 3d at 577; *see infra* Section III.[20]

## C.   The Alleged Misstatements Are Not Actionable

Even as to those statements made by Rio itself, however, Plaintiffs have failed to state a claim because those statements are forward-looking statements expressing expectations for the Oyu Tolgoi project, statements of opinion that Plaintiffs do not adequately allege were not held when made, or are too general to be considered material by a reasonable investor.

### 1.   Statements That The Project Was "On Track" And "On Budget" And Would Meet Construction Expectations Are Forward-Looking Statements Protected By The PSLRA's Safe Harbor

Plaintiffs' claims against the Rio Defendants largely rest on statements that the Oyu Tolgoi project was "on track" and "on budget" and would meet expectations regarding forecasted dates for the first drawbell, sustainable production, and commissioning of Shaft 2.  *See* App. A,

---

[20]   This further distinguishes *Lorenzo* from the present case; in *Lorenzo*, the defendant did not contest scienter.  *See Lorenzo*, 139 S.Ct. at 1096.

Categories II, III, and IV.  Such statements of expectation are protected by the PSLRA's statutory safe harbor for forward-looking statements.

A forward-looking statement cannot be fraudulent if the statement "is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).  Because "[t]he safe harbor is written in the disjunctive," a forward-looking statement is protected under the safe harbor if any of the three prongs applies.  *Id.*

The statements identified in the Complaint are protected by the first prong of the PSLRA's safe harbor because they are forward-looking statements accompanied by meaningful cautionary language.  Forward-looking statements need not be explicitly labeled as such to be identified.  "[A] statement that 'projects results in the future' is 'plainly forward-looking,'" *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375 (S.D.N.Y. 2018) (quoting *Slayton*, 604 F.3d at 769), and "[a] statement about what the speaker 'expect[s]' is forward-looking." *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 466 (S.D.N.Y. 2018) (quoting *Slayton*, 604 F.3d at 769).  As is relevant here, the PSLRA explicitly includes projections of "capital expenditures" and "future operations" as the types of statements that are forward-looking.  *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 385 (S.D.N.Y. 2020).

Accordingly, Courts routinely hold that statements like the ones that the project was on budget and on schedule, and the first drawbell was expected by a particular date are forward-looking statements subject to protection by the PSLRA safe harbor.  For instance, in *In re Adient plc Sec. Litig.*, plaintiffs brought claims against defendant company for alleged misstatements that its planned margin expansion was "on track," arguing the statements were false because the company was experiencing operational issues and would later announce the margin expansion was

not achievable.  2020 WL 1644018, at *19 (S.D.N.Y. Apr. 2, 2020).  The court dismissed the

claims, holding that "statements about Adient being 'on track' with respect to its projected margin

expansion are 'forward-looking' statements within the meaning of the PSLRA, and not statements

of 'present fact,' as Plaintiffs suggest."[21]  *Id.*; *see also In re Aratana Therapeutics Inc. Sec. Litig.*,

315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) (statement that company was "on track" to have

products reach the market by a particular year was inactionable as a forward-looking statement

and statement of opinion); *Villare v. Abiomed*, 2021 WL 4311749, at *17 (S.D.N.Y. Sept. 21,

2021) ("language stating that a company was presently on track with its projected goals" is

forward-looking).  Similarly, in *In re Micro Focus Int'l Plc Sec. Litig.*, the court held that a

company's announcement that it was "on track to deliver on budget and on timescale as per the

original plan" was a forward-looking statement protected by the PSLRA safe harbor.  2020 WL

5817275, at *13 (S.D.N.Y. Sept. 29, 2020); *see also In re Barrick Gold Sec. Litig.*, 2015 WL

1514597, at *8 (S.D.N.Y. Apr. 1, 2015) (construction estimates and expected schedules were

forward-looking statements).  Statements that the company was "on track" to achieve some goal

"does not serve as a guarantee that the goal will indeed be achieved."  *In re Australia and New*

*Zealand Banking Group Ltd. Sec. Litig.*, 2009 WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009).

    To determine whether these forward-looking statements were accompanied by meaningful

cautionary language, the court must "first identify the allegedly undisclosed risk and then read the

allegedly fraudulent materials—including the cautionary language—to determine if a reasonable

investor could have been misled into thinking that the risk that materialized and resulted in his loss

---

[21]    The Court reasoned that "when the present-tense portion of mixed present and future
statements does not provide specific information about the current situation, but merely says that,
whatever the present situation is, it makes the future projection attainable, the present-tense portion
of the statement is too vague to be actionable apart from the future projection."  *In re Adient*, 2020
WL 1644018, at *19.

did not actually exist." *Barrick Gold*, 341 F. Supp. 3d at 377 (internal quotations omitted).

Plaintiffs rely on three sources of alleged misstatements:  (i) Rio's Forms 6-K and 20-F filed with the SEC, (ii) presentations associated with earnings calls, and (iii) other public presentations.  Each of these disclosures contained meaningful cautionary language.  Rio's press releases included in its Forms 6-K explicitly noted that they may contain "forward-looking statements" specifically regarding "Rio Tinto's production forecast or guidance, financial position, business strategy, plans and objectives of management for future operations (including development plans and objectives relating to Rio Tinto's products and reserve and resource positions) . . . ." Ex. 1 (July 17, 2018 Rio Tinto Form 6-K), at 12.[22]  The press releases specifically cautioned investors regarding "known and unknown risks" that could "cause the actual production, performance or results of Rio Tinto to be materially different from any future production, performance or results expressed or implied."  *Id.*  Further, Rio cautioned that forward-looking statements could be influenced by the risks identified in the company's annual reports and Forms 20-F.  *Id.*  The company's Forms 20-F contained even more specific cautionary language regarding scheduling delays or cost overruns for Rio's various operations.  *See* Ex. 2 (March 4, 2019 Rio Tinto Form 20-F), at 7 ("A delay or overrun in a project schedule could negatively impact the Group's profitability, cash flows, ability to repay project-specific indebtedness, asset carrying values, growth aspirations and relationships with key stakeholders.").  Similarly, Rio's presentations contained a "forward-looking statements" slide that warned that "anticipated production or construction dates, costs, outputs and productive lives of assets or similar factors"

---

[22]   All Exhibits referenced herein are Exhibits to the Declaration of Corey Worcester, filed contemporaneously.  Each of the Exhibits was referenced and relied upon by Plaintiffs in their Complaint, and thus may be considered by this Court in deciding a motion to dismiss. *See Wesco Aircraft*, 454 F. Supp. 3d at 383.

may vary depending on certain risks including the ability to "produce and transport products profitably." *See* Ex. 3 (September 26, 2018 Rio Tinto presentation deck), at 2. The slides shown during Rio's investor conference calls began with similar language. *See* Ex. 4 (August 1, 2018 Rio Tinto investor presentation deck), at 2.

Accordingly, a reasonable investor would have understood that Rio's expected schedule, budget, and target drawbell and sustainable production dates were subject to risks, and because these disclosures "include cautionary language sufficient to prevent a reasonable investor from believing the contrary, that cautionary language is meaningful." *Barrick Gold*, 341 F. Supp. 3d at 377. Courts have so held for language similar to that contained in Rio's filings. *See Martin* v. *Quartermain*, 732 F. App'x 37, 42 (2d Cir. 2018); *see also In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009) ("Given the warnings[,]" it would be "unreasonable" for an investor "to demand that a cost estimate must hold steady over a multi-year period requiring considerable amounts of construction of a large mine in a remote location[.]"). Rio's disclosures about the potential delays and overruns "conveyed substantive warnings referring to some of the very risks that materialized here." *Barrick Gold*, 2015 WL 1514597, at *8.[23] Thus, the statements are not actionable.

The statements identified by Plaintiffs are also inactionable under the third prong of the PSLRA's safe harbor because Plaintiffs have not adequately pleaded that the statements were not honestly believed when they were made. "The safe harbor provision also requires dismissal if the plaintiffs do not prove that the forward-looking statement . . . was . . . made or approved by [an

---

[23] Further, Rio Tinto specifically cautioned investors that it was still evaluating the impact of Shaft 2 to the project's cost and schedule in February 2019. *See* Ex. 5 (February 27, 2019 Rio Tinto Form 6-K), at 23 ("Detailed design work is under way as is the work necessary to estimate the impact on cost and schedule from these changes and the delay in commissioning shaft 2.").

executive officer] with ***actual knowledge*** by that officer that the statement was false or misleading." *Slayton*, 604 F.3d at 773 (quoting 15 U.S.C. § 78u–5(c)(1)(B)).[24]  For the reasons set forth below, *see infra* Section III, Plaintiffs fail to allege a strong inference that any Rio Defendant had actual knowledge that any statement was false when made.

> ### 2.   Statements That The Project Was "On Track" And "On Budget" And Would Meet Construction Expectations Are Inactionable Statements Of Opinion

Similarly, the statements identified in the Complaint regarding the expectations for the schedule, budget, and construction dates for Oyu Tolgoi (*see* App. A, Categories II, III, and IV) are matters of opinion because they "express expectations about the future rather than presently existing, objective facts."  *In re Aratana*, 315 F. Supp. 3d at 758.  Courts routinely hold that statements like those at issue here are statements of opinion.  For instance, in *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, plaintiffs alleged statements that defendant company was "on the right track" and that "operationally . . . things [are] moving along exactly in line with what we thought" were false and misleading due to operational issues the company was experiencing. 336 F. Supp. 3d 196, 227 (S.D.N.Y. 2018).  The court held that such statements were statements of opinion.  *Id.*; *see also Lefkowitz v. Synacor, Inc.*, 2019 WL 4053956, at *7 (S.D.N.Y. Aug. 28, 2019) ("statements about future revenue growth and belief that the Company was 'on track' to achieve its projected revenue goals are statements of opinion"); *In re Aratana*, 315 F. Supp. 3d at 758 (statements that defendant pharmaceutical company was "on track" to have certain products reach the market by 2016 were ruled to be statements of opinion and forward-looking statements).

---

[24]   "[B]ecause the safe harbor specifies an 'actual knowledge' standard for forward-looking statements, 'the scienter requirement for forward-looking statements is stricter than for statements of current fact.  Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity.'" *Wesco Aircraft*, 454 F. Supp. 3d at 381 (quoting *Slayton*, 604 F.3d at 773).

These statements "are inactionable so long as the speaker actually held the belief professed, did not supply an untrue supporting fact, and did not omit information rendering the statement misleading." *Id.* It is not sufficient for Plaintiffs to allege that Defendants' opinion regarding the schedule and budget were "unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events," they must allege that Defendants did not actually hold the opinion stated. *Id.* at 754. "The Supreme Court has emphasized that this standard will not be easy to satisfy." *Wesco Aircraft*, 454 F. Supp. 3d at 400.

For the reasons set forth below, *see infra* Section III, Plaintiffs have failed to do so. At best, Plaintiffs allege that former employees, Bowley, or other individuals believed there were budgeting and scheduling issues.[25]  However, even if they had communicated those beliefs to Soirat or Jacques, Defendants had no obligation to disclose those concerns if they disagreed about their significance.[26]  A statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way" because "[a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement." *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 190 (2015); *Frankfurt-Trust*, 336 F. Supp. 3d at 229-30 ("omitting even significant, directly contradictory information from opinion statements is not misleading").

---

[25]  "Notably, none of the CWs is alleged to be the 'maker' of any of the alleged misstatements, and it is the facts known to, and the intent of, the maker of the statements which is ultimately relevant when the Court considers the falsity of statements of belief or opinion." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014).

[26]  This is particularly relevant when considering the opinions of individuals like Bowley, who were not geotechnical engineers, and thus the opinions of those with more expertise may have been given more weight.  It is also worth noting that Oyu Tolgoi is expected to operate "for the next 100 years."  Ex. 6 (August 1, 2018 conference call transcript), at 5.  Considering the duration of the project, allegations that the project was mere months behind schedule did not obviously throw the project "off track."

Information allegedly omitted from a statement of opinion must be viewed in a broad frame that includes "the customs and practices of the relevant industry." *Quartermain*, 732 Fed. App'x 3 at 41. Mining is "a volatile industry" and investing in a company with mining operations is "inherently risky." *Id.* at 42. "This risk is part of the 'broader frame' of the industry in which these plaintiffs invested when they purchased stock" and "[t]he nature of that risk is enhanced where, as here, the mine is still under development, the physical infrastructure is not fully in place, and the mine's developers do not yet have complete information about its economic viability." *Id.* at 42. Particularly considering the industry, a reasonable investor would not have been misled to believe the completion of the project on schedule and on budget was guaranteed.

### 3.   Statements That The Project Was "On Track" Are Immaterial

Finally, the statements repeatedly cited in the Complaint that the project was "on track" or "on plan" (*see* App. A, Category II) are also inactionable for the additional reason that they are too general to be material to any reasonable investor.[27] These statements are the kind of "inactionable puffery" that cannot give rise to securities violations. *In re EDAP*, 2015 WL 5326166, at *9-10 S.D.N.Y. Sept. 14, 2015) (statements indicating "that the [FDA approval] process was 'on track' and making continued 'progress,'" or "declar[ing defendants'] belief that they were 'moving through the approval process in a timely manner,'" "constitute inactionable puffery"). "If

---

[27] The Complaint also contains certain statements that Oyu Tolgoi was the "highest quality copper development" in the world and "progress[ing] well." These statements are similarly too general to be material to any reasonable investor. SAC ¶¶ 365, 372; *see* App. A, Category I. Courts consider "an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it" to be inactionable "puffery." *In re Adient*, 2020 WL 1644018, at *21; *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *9-10 (S.D.N.Y. Sept. 14, 2015) (statement that company was "making continued progress" is inactionable puffery); *Hertz Corp. v. Accenture LLP*, 2019 WL 5537997, at *5 (S.D.N.Y. Oct. 25, 2019) (representation that company had "the best talent in the world" is "quintessential" example of puffery). These statements are also statements of opinion, *see supra* Section II(C)(2), and Plaintiffs do not allege that the mine was not making good progress despite its setbacks. *See Colbert v. Rio Tinto PLC*, 824 Fed. App'x 5, 10 (2d Cir. 2020).

something is 'on track' it is reasonable to assume that it could go 'off track[,]'" and reasonable investors would not rely on these general sweeping statements.  *See Elliott Assocs., L.P. v. Covance, Inc.*, 2000 WL 1752848, at *10 (S.D.N.Y. Nov. 28, 2000).

<div align="center">

4.    <u>SOX Certifications And Risk Disclosures Are Inactionable</u>

</div>

Finally, Plaintiffs allege that the Sarbanes-Oxley ("SOX") certifications executed by Jacques and Rio's risk disclosures were inaccurate.  SAC ¶¶ 412, 420-22.  SOX certifications are not actionable unless the executive has knowledge that the company's financial reports are false or its internal controls are defective.  *See, e.g.*, *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015), *aff'd* (2d Cir. Mar. 21, 2016).  *First*, as discussed above, nothing in Rio's financial reports was false or misleading.  *Second*, the Complaint is devoid of any particularized allegations that Rio's internal controls were deficient.  *Third*, even if Plaintiffs adequately pled that Rio's financial statements contained false or misleading statements, the Complaint fails to allege Jacques had knowledge they were false.  *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 391 (S.D.N.Y. 2007) ("[F]or these certifications to be materially false . . . defendants must also have had knowledge of that falsity.").

Plaintiffs' argument that Rio's risk disclosures were false and misleading (SAC ¶¶ 420-24) also fails.  As explained above, Rio's filings contained robust disclosures regarding the risks associated with its operations, including specific disclosures regarding potential construction delays and overruns, which could impact expenditures.  *See supra* Section II(C)(1).  While Plaintiffs may argue that these disclosures did not explicitly disclose the potential delays and expenses associated with construction, procurement, and engineering issues at Oyu Tolgoi, "where there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk."  *In re Bank of America AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013).

<div align="center">

29

</div>

Risk disclosures are only misleading "where the company warns only that a risk may impact its business when that risk has already materialized." *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *11 (S.D.N.Y. Mar. 29, 2016). The Complaint does not adequately allege that Defendants knew of and attempted to conceal any irreparable delays or cost overruns that had materialized at the time the risk disclosures were issued. *See infra* Section III. Rather, Rio disclosed the issues with Shaft 2 as they developed. *See In re Bank of America,* 980 F. Supp. 2d at 579 ("the risk disclosures could not have misled a reasonable investor into thinking that risks like the AIG suit did not exist in light of information communicated to the market about BoA's exposure to MBS litigation generally and to the AIG specifically"); *see infra* Section II(D).

### D. The Alleged Misstatements Were Not Materially False Or Misleading

Regardless of whether the statements identified by Plaintiffs are legally actionable, Plaintiffs have failed to plead that any statement was actually false or misleading. Plaintiffs make much of the ICG Report's comments regarding the project, which were prepared in 2021. Plaintiffs' argument that because the project took longer and cost more than expected, the initial projections were misleading is a fraud-by-hindsight approach that adds nothing to the analysis of whether the relevant disclosures were accurate at the time they were made. *See In re Aratana*, 315 F. Supp. 3d at 761. Plaintiffs still fail to allege sufficient specific facts regarding the delays and cost overruns, including when such alleged delays would have made the first drawbell and sustainable production projections inaccurate or the budget unachievable. Further, the statements identified by Plaintiffs make clear that Rio explicitly disclosed the construction issues with Shaft 2 and that such issues were causing delays. In light of such disclosures, no statement identified by Plaintiffs is materially false or misleading.

Referencing the ICG Report and a 2017 Broadleaf report, the Complaint alleges that in late 2017, there was a slim chance of the first drawbell occurring by April 26, 2020. SAC ¶¶ 13, 300.

However, Plaintiffs do not allege that any Defendant ever publicly referenced that April 2020 date after the 2017 Broadleaf report.  Rather, Defendants' statements postdating that Broadleaf report stated only that the first drawbell was projected for "mid-2020," and the re-forecast disclosed that the projected date was maintained because Oyu Tolgoi management had changed the "draw bell sequencing strategy."  *Id.* ¶ 336.  The Complaint is devoid of any allegation that, after that sequencing alteration, the first drawbell could not have occurred in mid-2020 or was not actually expected to.  Plaintiffs allege that an August 2018 Broadleaf report suggested that there was no chance of a May 2020 first drawbell or a January 2021 sustainable production (*id.* ¶ 17), but just as before, Plaintiffs ignore that the mid-2020 first drawbell date was maintained by re-sequencing, and Defendants announced that the sustainable production date would be delayed shortly after the August 2018 broadleaf report in the October 2018 re-forecast.  When there were delays, Rio reported them.

Plaintiffs also criticize Defendants' October 2018 re-forecast, alleging that though it disclosed the project's delays, it did not go far enough.  While Plaintiffs allege the re-forecast was inconsistent with the delays and costs ultimately incurred, "[t]o permit [plaintiff's] claim to go forward based on [defendant's] later abandonment of the schedule would effectively permit plaintiffs to allege 'fraud by hindsight.'  That, plaintiffs may not do."  *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) ("[D]evelopment schedules, especially aggressive ones, change over time and in response to a variety of factors."); *In re Aratana*, 315 F. Supp. 3d at 761 ("Plaintiffs instead appear to argue that defendants' serial revisions of the commercialization timeline demonstrate their culpable knowledge.  But that contention amounts to claiming 'fraud by hindsight,'. . . .  As a matter of law, that dog won't hunt.").  Plaintiffs allege that Fagen believed the re-forecast was inaccurate (SAC ¶ 274), but such

allegations do not equate to a strong inference that ***Defendants*** shared that belief. *See infra* Section III(B)(1); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 270 (S.D.N.Y. 2004). The far more compelling inference is that Defendants believed in good faith that they could achieve sustainable production on the revised timeline, and "upon encountering setbacks and changes . . . timely updated the market." *In re Aratana,* 315 F. Sup. 3d at 766.

Further, Rio explicitly disclosed in its October 16, 2018 Form 6-K that the project was experiencing "ground conditions ***and shaft sinking challenges***" that would push back the date of the first sustainable production. SAC ¶ 175 (emphasis added). These are the exact challenges and delays Plaintiffs allege Defendants concealed. Thus, reasonable investors would not have been misled by any of the disclosures identified by Plaintiffs, since the construction issues with Shaft 2 were disclosed to the market. *See Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005) (dismissing plaintiff's claim because in light of the "total mix" of available information, the plaintiff could not have reasonably been misled by defendant's alleged omission); *City of Roseville Emp. Ret. Sys. v. Nokia Corp.*, 2011 WL 7158548, at *9 (S.D.N.Y. Sept. 6, 2011) ("Nokia admitted to experiencing delays in April 2008 in response to a direct question. Plaintiff's factual allegations do not demonstrate that the explanation offered by Nokia—namely, that the problem was not 'out of the ordinary' and that they had control of the release schedules—was inconsistent with some existing fact. The fact that Nokia did not provide any specific details about the delays is not determinative.").[28]

---

[28] Plaintiffs also allege that Rio's statement in July 2018 that "the shaft five ventilation system has been fully commissioned and is now operational" was false. SAC ¶ 307. Plaintiffs argue that this statement was false because the heating unit for Oyu Tolgoi was not functional, which was required for work in the mine. *Id.* ¶ 308. However, Plaintiffs do not contest that Shaft 5 was itself in fact fully commissioned and operational. The fact that the heating unit was not yet functional is a separate issue that does not render Rio's statement about Shaft 5 false or misleading.

Plaintiffs also cite statements by Defendants regarding ground conditions and geotechnical issues, alleging Defendants falsely attributed delays to such conditions. SAC ¶ 341. However, Plaintiffs admit that such difficult conditions were present. *Id.* ¶ 260 (noting that it was well known that "the ground conditions were challenging"). In fact, Plaintiffs acknowledge (citing the ICG Report) that "legitimately new 'ground conditions'" could have accounted for as much as "$90 million in costs attributable to changes in mine design," even if the Complaint alleges such ground conditions were not the primary driver of delays. *Id.* ¶ 253. This, combined with the fact that Defendants did disclose the construction problems with Shaft 2, demonstrates that such statements were not materially false or misleading. It is not the case that every time Defendants spoke about the difficult ground conditions they were also required to provide details about every construction problem, since Defendants' statements about ground conditions were not rendered false by the fact that the project was also experiencing construction difficulties. *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 159-60 (S.D.N.Y. 2008) (Disclosure requirements do not mean that "by revealing one fact . . . one must reveal all others that, too, would be interesting.").[29]

Finally, Plaintiffs' attempt to establish falsity in March 2019 based on an impairment charge disclosed on July 31, 2019 (SAC ¶¶ 374, 409) is classic pleading-by-hindsight. In order to sufficiently plead a violation based on a failure to take an impairment charge, the complaint must typically show, at a minimum, "the amount by which certain assets should have been written down" and "when the write-down[ ] should have occurred." *In re Adient*, 2020 WL 1644018, at *23. This is because Plaintiffs must "plead with particularity facts to show that failure to take an

---

[29] Plaintiffs' allegation that during a February 27, 2019 investor conference call Jacques "deflected" a question about the budget "and instead solely responded to the analyst's question about the ground conditions" (SAC ¶ 379) also is not actionable. *See Colbert v. Rio Tinto PLC*, 392 F. Supp. 3d 329, 339 (S.D.N.Y. 2019) (choosing to discuss one topic in an answer when asked about another did not mislead investors as to the topic inquired about).

earlier impairment charge was so clearly required by accounting principles that the failure to take such a charge was fraudulent." *Id.* at *24. Plaintiffs' barebones allegations that "the project was impaired and had been since before the Class Period" (SAC ¶ 375) fall short, and the fact that Turquoise Hill "ultimately would take an impairment charge" "does not in itself provide an actionable basis to claim that the failure to do so earlier was fraudulent." *In re Adient*, 2020 WL 1644018, at *24; *Kasilingam v. Tilray*, 2021 WL 4429788, at *11 (S.D.N.Y. Sept. 27, 2021) ("Plaintiffs argue that [defendant's] eventual decision to impair the ABG Agreement due to regulatory uncertainty exposed its prior optimism as fraudulent. But this is nothing more than an impermissible 'retrospective critique.'").

## III. PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED A STRONG INFERENCE OF SCIENTER

Plaintiffs' Section 10(b) claim fails for the added reason that despite its length, the Complaint is devoid of any particularized allegations that any Defendant acted with scienter. *See* 15 U.S.C. § 78u-4(b)(2)(A).[30] Plaintiffs must allege facts supporting an inference of an "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319. The inference "must be more than merely 'reasonable' or 'permissible'—it must be . . . cogent and at least as compelling as any opposing inference." *Id.* at 324. Plaintiffs' conclusory allegations do not meet this standard.

### A. Plaintiffs Do Not Allege Any Unique Motive To Defraud The Market

Plaintiffs attempt to plead scienter by alleging that the Rio Individual Defendants were incentivized to defraud the market: (i) to avoid renegotiating the terms of the agreements with Mongolian government, co-owner of Oyu Tolgoi mine (SAC ¶¶ 279-80); (ii) to avoid liability in ongoing investigations (*id.* ¶ 194), and (iii) for the sake of Jacques' and Soirat's careers (*id.* ¶¶ 295-

[30] The Rio Tinto Defendants agree with Turquoise Hill that the Complaint has not adequately alleged scienter for any Turquoise Hill Defendant.

34

96).  However, motives that "are neither concrete nor personal to the defendants" are routinely rejected.  *See Kinross Gold*, 957 F. Supp. 2d at 295 (the desire "to assure that the company completed its announced initiatives are common to corporate officers"); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (the "motive to maintain the appearance of corporate profitability, or of the success of an investment" does not establish scienter); *In re Sanofi-Aventis Sec. Litig.*, 2009 WL 3094957, at *7 (S.D.N.Y. Sept. 25, 2009) (the desire to avoid governmental and regulatory scrutiny is too generalized a motive); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 665 (S.D.N.Y. 2017) (finding insufficient motive "to avoid potential criminal liability [and] prosecution").  And the Complaint is devoid of any other allegations, such as suspicious stock sales, that would demonstrate that Jacques or Soirat personally and directly profited from the alleged misstatements.

## B.    The Complaint Contains No Particularized Allegations The Defendants Were Aware Their Statements Were False When Made

Plaintiffs' claims also fail because they have not alleged particularized facts establishing that Jacques or Soirat were aware that any of their statements to investors were false.  When evaluating scienter, courts must consider "plausible opposing inferences."  *Tellabs*, 551 U.S. at 311.  In the context of mining, this includes the fact that "it is not always possible to anticipate what miners will face as they dig deeper."  *In re Gold Res. Corp. Sec. Litig*, 776 F.3d 1103, 1117 (10th Cir. 2015) ("Defendants' explanations of the second quarter production problems are as plausible as plaintiff's inference that defendants intentionally ignored or 'consciously disregarded' problems that should have been anticipated in advance.").

While Plaintiffs allege that Oyu Tolgoi was ultimately not able to stay on its original schedule or budget, "being wrong—even embarrassingly so—is not the same as being dishonest." *Kasilingam*, 2021 WL 4429788, at *11.  The essence of Plaintiffs' claims is that because the

original schedule and budget were ultimately not adhered to, Defendants should have known they were incorrect from the start.  "This is the definition of fraud by hindsight: [m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."  *Id.* (quotations and citations omitted).  Allegations that Defendants "should have been more alert and more skeptical" are insufficient to allege fraudulent intent.  *Id.*

Absent from the Complaint is any allegation that Jacques or Soirat knew that the projected first drawbell or first sustainable production projections were unattainable, that the project definitively could not be completed within budget, or that any other statements were misleading but continued making public disclosures to the contrary.  Absent such allegations, Plaintiffs' claims fail.[31]

### 1.   Opinions Held By Former Employees Cannot Establish Scienter

The Complaint is replete with conclusory assertions, largely attributable to certain former employees or contractors, that scheduling delays and cost overruns were well known, and thus Defendants must have been aware of them.  *See*, *e.g.*, SAC ¶ 124 ("There was going to be overruns on time and budget.  Everyone knew that."), ¶ 140 (Jacques "knew without a doubt" about the problems), ¶ 158 ("We all knew the schedule was overrun…It was well known how far behind we were."); ¶ 452 (Defendants "should have been aware" of the issues).  These allegations are insufficient, as not a single former employee alleges that they directly communicated to Jacques or Soirat information that would have rendered their statements false.  *See Kinross Gold*, 957 F. Supp. 2d at 304 (scienter inadequately alleged where plaintiff relied "heavily on former employees

---

[31]   Because Plaintiffs have not adequately pleaded that any Individual Defendant intended to defraud the market, Plaintiffs also cannot allege corporate scienter.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (corporate scienter requires "facts [which] create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter").

who opine[d] that the development schedule announced for [the mine] was impossible to meet" where "none of these former employees claims to have spoken with or otherwise notified [defendant company], or any Individual Defendant, of that opinion"); *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, at *16 (S.D.N.Y. Mar. 29, 2013) ("[M]ere assertions that defendants *must* have been aware of informants' concerns are insufficient to establish that defendants were aware of those concerns.  Such allegations simply do not establish reckless disregard or scienter.").

The mere fact that former employees claim to have been aware that the project was experiencing delays and significant costs "does not establish that [Rio Tinto] or the individual defendants had similar foresight."  *In re Flag Telecom*, 308 F. Supp. 2d at 270.  Although former employees may "offer their thoughts and opinions as to various [operational] issues . . . they do not establish what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue."  *In re Adient*, 2020 WL 1644018, at *28.  "[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011).  Reliance on rumors and conjectures are insufficient to establish scienter.  *See Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 399 (S.D.N.Y. 2020).

Regardless, even accepting Plaintiffs' allegations as true, the Complaint "still fails to suggest anything more sinister than a disagreement among staff" regarding whether the project could reach its budget and scheduling goals.  *Kasilingam*, 2021 WL 4429788, at *12.  "[D]ifferences of opinion, even stark differences, between employees do not reveal scienter."  *Kinross Gold*, 957 F. Supp. 2d at 299.

2.     Plaintiffs Fail To Adequately Allege Defendants Read Reports Containing
Contrary Information Sufficient To Render Their Statements False

Plaintiffs reference various reports that they claim would have made Defendants aware of scheduling and budget issues (SAC ¶¶ 275-78).  Specifically, Plaintiffs allege:  (i) Rio "senior management" had access to monthly reports detailing the status of the Oyu Tolgoi project (*id.* ¶ 275); (ii) starting in October 2018, Jacques received weekly reports showing development progress falling 100-200 meters short each month on a schedule calling for the completion of 800 meters per month (*id.* ¶ 275); (iii) Jacques received Technical Evaluation Group ("TEG") and Business Evaluation Department ("BED") reports (*id.* ¶ 277); (iv) Rio's executive committee received consulting reports compiling employee comments (*id.* ¶ 133); and (v) Jacques and Soirat at some point received a report stating that an April 2020 first drawbell date was unlikely (*id.* ¶ 13). None of these allegations establish a strong inference that Jacques or Soirat knew the project's timeline and budget were unachievable and intended to mislead the market.  In fact, ***Plaintiffs fail to allege a single report containing any specific information regarding the project's expenditures***.

While Plaintiffs refer to various reports in the Complaint, their allegations fall short of what is necessary to allege a strong inference of scienter.  Because Plaintiffs allege that Defendants had access to information that rendered their public statements false, Plaintiffs must "specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them."  *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 615 (S.D.N.Y. 2008) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)).

Regarding the TEG/BED reports and monthly progress reports, Plaintiffs' general allegations that these documents *would* have contained contrary information are lacking in the details necessary for these allegations to contribute to the scienter analysis.  Specifically, the

Complaint is devoid of allegations regarding (i) what specific cost overruns or delays were reflected in the reports and when, or (ii) how that information related to forecasts. Even if Plaintiffs had alleged the contents of the reports, Plaintiffs do not allege when or how often the Rio Defendants received such reports. Such vague allegations are insufficient as a matter of law. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) ("unsupported general claim of the existence of confidential company sales reports that revealed [unfavorable figures] is insufficient to survive a motion to dismiss"). Because the Complaint "does not allege the content of the reports, the date of the reports, or whether the Individual Exchange Act Defendants ever read the reports[,]" these allegations fail. *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015); *Woodward v. Raymond James Financial, Inc.*, 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010) (plaintiffs must specify "the content of those reports or the connection between those reports and the misstatements at issue in this case").

While Plaintiffs allege that Defendants would have received certain Broadleaf reports that suggested that originally projected dates were unrealistic, this does not establish scienter. *First*, as explained above (*see supra* Section II(D)), Defendants' disclosures were consistent with the Broadleaf reports. *Second*, the Complaint does not allege **when** Defendants allegedly received the reports, asserting in a conclusory fashion only that the 2017 report was "provided to Defendants" (SAC ¶ 13). Without an allegation of when Defendants received the reports, Plaintiffs cannot establish Defendants knew any of their statements were misleading at the time they were made. *Frankfurt-Trust Inv. Luxemburg AG v. United Tech. Corp.*, 336 F. Supp. 3d 196, 222 (S.D.N.Y. 2018) (dismissing complaint where "[t]here are no descriptions of when these reports would have been provided to the Executive Defendants").

The Complaint alleges that Rio's Executive Committee received reports that essentially

compiled employee comment cards, which Plaintiffs allege should have made Jacques and Soirat aware that there were schedule and budget issues. SAC ¶¶ 10, 135. Not only is the Complaint devoid of any allegations as to when Jacques or Soirat reviewed these comments, *Frankfurt-Trust*, 336 F. Supp. 3d at 222, but the mere fact that some employees had negative opinions about the progress of the project does not equate to knowledge that it could not be completed on time or on budget. *See supra* Section III(B)(1); *see also Kasilingam*, 2021 WL 4429788, at *12 (disagreement among employees does not equate to fraud). Regardless, because Plaintiffs admit these reports compiling employee comments stopped in 2017 (SAC ¶ 134), the more plausible inference is that Defendants believed they had addressed any issues with the Project via the 2018 re-forecast.[32]

Plaintiffs also allege that in October 2018, Jacques had access to reports showing development progress falling short by 100-200 meters per month. SAC ¶ 275. However, access to these reports does not equate to knowledge that the statements identified in the Complaint were false.[33] *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 378 (E.D.N.Y. 2013). The more compelling inference is that—assuming he read the reports—Jacques believed the slower development rate (which is only alleged to have been 100-200 meters behind schedule each month[34]) could be addressed, and the projected timeline and budget were attainable, particularly because Plaintiffs do not allege these reports contained ***any*** information regarding the project's

---

[32]   Plaintiffs assert that Maurice Duffy provided certain of these comments in a report to Rio's Head of Human Resources. SAC ¶ 141. Without allegations that they were ever passed on to the Rio Individual Defendants, such allegations fail. *See infra* Section II(B)(3).

[33]   At most, these allegations demonstrate that Jacques first received reports of a slower-than-planned development rate in October 2018, the very same month the company announced a re-forecast accounting for these delays.

[34]   In the context of a multi-decade operation, allegations of scienter based on the fact that the project was falling short by 100-200 meters per month are not "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

expenditures. *See Oklahoma Police Pension Fund and Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *12 (S.D.N.Y. June 17, 2020) (defendants' receipt of letter detailing compliance failures does not equate to fraudulent intent related to statements regarding compliance because "the violations were correctable, at least with sufficient dedicated resources and time"); *Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 40-42 (2d Cir. 2000) (scienter not adequately alleged where defendants were aware of facts contradicting their public statements but considered the information to be statistically insignificant, though it later turned out to be significant). Defendants did not "act recklessly simply by making optimistic projections that ultimately fail[ed] to materialize." *Russo v. Bruce*, 777 F. Supp. 2d 505, 521 (S.D.N.Y. 2011).

Because Plaintiffs cannot specifically identify contrary information contained in a report at a particular time, the Complaint repeatedly relies on allegations that information regarding the schedule and budget of the project "would have" been communicated to Rio Defendants. *E.g.*, SAC ¶ 161 ("detailed information concerning the true status and causes of the delays ***would have*** been reported to Defendant Jacques starting before and continuing throughout the Class Period") (emphasis added).[35]  "[B]land assertions that they 'would have received' such information offer nothing concrete and are not allegations of fact." *Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010) (plaintiffs must "identify

---

[35]  Similarly, Plaintiffs' reliance on the ICG Report's comment that it would be "inconceivable that Senior Management both on the Project site and in the higher-level committees" (SAC ¶¶ 185, 299) is legally insufficient. *See Shemian*, 2013 WL 1285779, at *16 ("[M]ere assertions that defendants *must* have been aware of informants' concerns are insufficient to establish that defendants were aware of those concerns. Such allegations simply do not establish reckless disregard or scienter."). Further, "senior management" on the "Project site and in the higher-level committees" says nothing about what Jacques or Soirat knew as senior Rio executives. *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) ("general allegations of warnings made to unidentified senior executives" were inadequately particularized).

the names and contents of these documents, or recount specific meetings at which the Individual Defendants actually received contradictory information"). Thus, "assertions that certain information was the 'sort of measurement' or 'would have been' reviewed by the Individual Defendants are too speculative to give rise to a strong inference of scienter." *Id.* at 462 (rejecting allegations that "do not establish what specific contradictory information the Individual Defendants received or when they received it").[36]

Even taken together, these allegations do not raise a strong inference that Jacques or Soirat had formed the view that the project had fallen inevitably behind or over budget but continued to make statements to the contrary. The ICG Report actually suggests a more plausible inference that even if the project had fallen inevitably behind, detailed information was not relayed far enough up the chain for Jacques or Soirat at Rio to have had definitive information contrary to their statements. *See* SAC ¶ 299 (there was a "lack of contemporaneous documentation concerning the schedule delays and their impact on the critical path" and "reporting and tracking" were lacking).

3.      Bowley's Opinion Regarding The Oyu Tolgoi Development Does Not Establish Scienter For Jacques Or Soirat

Plaintiffs rely heavily on Bowley's beliefs regarding Oyu Tolgoi to establish scienter, arguing that his opinions must have been passed up the chain to Soirat, who in turn must have agreed with, but concealed, Bowley's views. These allegations do not pass muster.

*First*, the Complaint is devoid of a single allegation that Bowley directly communicated his alleged opinion regarding the impossibility of the schedule and budget to either Soirat or Jacques. Instead, the Complaint alleges only that Bowley "reported them to Kinnell and Fagen"

---

[36]   Similarly, Plaintiffs' allegations that the project was important to Soirat and Jacques and that they were "closely connected" to the project (SAC ¶¶ 289-92) fall far short of establishing fraudulent intent. *See City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008) (allegations that executives were "hands on" and "closely involved" insufficient to plead scienter).

and "sent emails to Defendant Soirat ***through his gatekeeper***, Fagen."  SAC ¶¶ 271-72 (emphasis

added).  Plaintiffs cannot adequately allege scienter by alleging that the Rio Defendants'

subordinates had information, without alleging facts supporting the conclusion that those

subordinates relayed that information to the Rio Defendants.  *See Menkes v. Stolt-Nielsen S.A.*,

2005 WL 3050970, at *11 (D. Conn. Nov. 10, 2005) ("[P]laintiffs do not allege any facts

supporting the conclusion that Cooperman relayed this information to SNSA management."); *In

re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 150 (3d Cir. 2004) ("allegations that Williams,

[defendant's] subordinate, knew of the irregularities occurring in Brazil provide an insufficient

basis upon which to impute knowledge to [defendant]"); *In re Marsh & McLennan Cos., Inc. Sec.

Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) ("arguing that specific high level employees

must have known what was taking place" because subordinates were implicated "is insufficient to

give rise to the strong inference of scienter").

The closest the Complaint comes to alleging a direct communication regarding the progress

of the project is the allegation that "Bowley spoke with Defendant Soirat for an hour in May 2018"

regarding "problems facing the expansion."  SAC ¶ 144.  Because Plaintiffs do not allege the

specifics of what was discussed, this allegation fails.  *See supra* Sections III(B)(1)-(2).  Moreover,

that Bowley and Soirat may have had differences of opinions regarding the projections for Oyu

Tolgoi cannot establish scienter.  In *In re Pretium Resources Inc. Securities Litigation*, plaintiffs

sought to allege scienter based on allegations of a mining company consultant, who collected data

that led him to believe company forecasts were misleading.  The court rejected this as a basis for

scienter because plaintiffs failed to "identify with specificity the documents or way in which this

contrary information was communicated" to defendants, and because a "difference of opinion" did

not equate to an intent to defraud.  256 F. Supp. 3d 459, 481 (S.D.N.Y. 2017), *aff'd sub nom.*

*Martin v. Quartermain* 732 F. App'x 37 (2d Cir. 2018).  Similarly, in *In re Adient*, plaintiffs alleged that former employees believed defendant's statements were misleading and "rais[ed] the flags." 2020 WL 1644018, at *28.  The court held that these allegations were insufficient to plead scienter because "none of the allegations in the [complaint] support Plaintiffs' argument that the CWs made statements to [individual defendants] that provided them with 'actual knowledge' that their statements were false or misleading."  *Id.*  General allegations that Bowley had a conversation with Soirat cannot establish scienter.

*Second*, for the same reason, Plaintiffs cannot rely on Bowley's alleged termination—or the termination of any other employee—to establish scienter because the Complaint fails to allege with particularity what information was communicated to Defendants in advance of the alleged terminations.  *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 406 (S.D.N.Y. 2016) (allegations that defendants knew of underlying issue due to whistleblower investigations insufficient where specific information conveyed to defendants is not alleged).[37]

*Third*, while Plaintiffs allege that Bowley was hired to look into the progress of the Oyu Tolgoi project because Rio "knew that progress at OT was far behind schedule" (SAC ¶ 271), the fact that Soirat supported this review *weakens* allegations of scienter.  *See Slayton*, 604 F.3d at 777 ("Ordering an investigation as soon as they learned that the investment-grade CDOs might be deteriorating, and directing Berman and Yowan to use conservative assumptions, was 'a prudent

---

[37]  Plaintiffs unsupported allegations that Rio attempted to destroy data collected by Maurice Duffy (SAC ¶ 288) are insufficient to allege scienter.  *See Youngers v. Virtus Investment Partners Inc.*, 195 F. Supp. 3d 499, 517 (S.D.N.Y. 2016) (destruction of documents insufficient to allege scienter without specifically alleging individual defendants were involved).  Moreover, Plaintiffs' offensive and baseless suggestion that the company may have had a role in a break-in at Duffy's home warrants no response, but such a vague and unsupported allegation certainly cannot create a strong inference of scienter absent more specific allegations.

course of action that weakens rather than strengthens an inference of scienter.'").[38]

4. The "Importance" of Oyu Tolgoi Does Not Permit An Inference of Scienter

While Plaintiffs allege that Oyu Tolgoi was "key" to Rio's future (SAC ¶ 58), such vague allegations are likewise insufficient to establish a strong inference of scienter. *First*, the Second Circuit has questioned whether the core operations doctrine has survived the PSLRA. *See In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (citing *Frederick v. Mechel OAO*, 475 Fed.Appx. 353, 356 (2d Cir. 2012)). "[E]ven if the doctrine is still valid, it would provide little help to Plaintiffs here" because core operations allegations "constitute supplementary but not independently sufficient means to plead scienter." *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *12 (S.D.N.Y. Jan. 18, 2018) (citations and quotations omitted). *Second*, even assuming the core operations can add to the scienter assessment, the Second Circuit has already determined that a "naked assertion" that a product is "key" is insufficient. *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020). Where, as here, "there are no particularized allegations whatsoever in the [Complaint] regarding what specific portion of [Rio Tinto]'s business depended on [Oyu Tolgoi] . . . Plaintiffs cannot rely on the core operations doctrine to raise an inference of scienter." *In re Rockwell* , 2018 WL 1725553, at *14.

## IV. PLAINTIFFS DO NOT ADEQUATELY ALLEGE LOSS CAUSATION

Plaintiffs' claims also fail because they have failed to plead loss causation, the "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The Complaint alleges that announcements of delays and increased

---

[38] Even if the allegations made by Plaintiffs and Bowley are credited, Bowley is only alleged to have raised concerns in February, May, and July 2018. SAC ¶¶ 15, 144. Plaintiffs admit that Rio Tinto undertook a review and disclosed delays to sustainable first production mere months later, on October 16, 2018. *Id.* ¶¶ 17, 174. For this additional reason, Bowley's allegations do not eliminate "plausible opposing inferences" regarding scienter. *See Tellabs*, 551 U.S. at 319.

costs associated with the Oyu Tolgoi project were corrective disclosures which revealed that "risks concealed by the fraudulent conduct [had] materialized."  SAC ¶ 425-26. However, Plaintiffs' allegations fail because the risks they allege "materialized" had been disclosed to the market.

A "misstatement or omission 'is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor.'"  *In re New Energy Sys. Secs. Litig.*, 66 F. Supp. 3d 401, 405-06 (S.D.N.Y. 2014) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)) (emphasis in original).  Rio's disclosures appropriately disclosed the risks associated with the schedule and cost estimates for the Oyu Tolgoi project.  *See supra* Sections II(C)(1) & II(C)(4). As such, Plaintiffs cannot allege that such risk was "concealed."  *See Lentell*, 396 F.3d at 175 (loss causation not alleged where defendant had not "concealed or misstated any risks associated with an investment in 24/7 Media or Interliant, some of which presumably caused plaintiffs' loss").

Moreover, the "corrective disclosures" identified by Plaintiffs were statements announcing that Oyu Tolgoi would be delayed beyond its forecasted schedule and budget.  *See* SAC ¶ 430.  To allow Plaintiffs to assert a securities fraud claim based on announcements that a company had not performed as well as expected would "effectively convert the securities laws into an insurance policy for investors."  *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) ("If downturns in stock prices based on such mundane events as failures to meet forecasts and downward revisions of forecasts were legally sufficient to constitute disclosures of securities fraud, then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure caused their losses.").  While the revisions of the budget and schedule may have had a negative effect on stock prices, these disclosures "do[] not imply that defendants concealed a scheme" and thus do not

constitute corrective disclosures.  *See id.* at 266.

## V.    PLAINTIFFS FAIL TO PLEAD A CLAIM UNDER SECTION 20(A)

To plead a control person claim under Section 20(a) of the Exchange Act, Plaintiffs must adequately plead a violation of Section 10(b).  Because Plaintiffs have failed to plead such a violation, the Section 20(a) claim should also be dismissed.  *See* 15 U.S.C. § 77o; 15 U.S.C. § 78t.

Further, Plaintiffs' attempt to allege that the Rio Defendants are liable as control persons of Turquoise Hill based on the relationship between the companies is contrary to well-established law.  Conclusory allegations that a parent company had control over the conduct and statements of its subsidiary are routinely dismissed.  *See*, *e.g.*, *DoubleLine Cap. LP v. Odebrecht Finance, Ltd.*, 323 F. Supp. 3d 393, 461 (S.D.N.Y. 2018).  Similarly deficient are the allegations that Rio Tinto plc, through various subsidiaries, indirectly held a majority of shares and influenced the election of Turquoise Hill board members.  *See In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *13 (S.D.N.Y. Aug. 8, 2005) (the ability to appoint directors to the board does not constitute control by the company appointing that director); *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 486 (S.D.N.Y. 2014) (majority shareholder status and ability to appoint board members does not establish control person status).[39]

Plaintiffs also fail to adequately allege the "culpable participation" required in addition to control person status.  *See Global Crossing*, 2005 WL 2990646, at *8.  The Complaint's empty assertion that Rio "dictated" the content of Turquoise Hill's filings is supported only by general allegations that the Rio Defendants "were provided with or had unlimited access to copies of . . .

---

[39]    Nor are RTIH (which held only a minority interest in Turquoise Hill) and Rio Tinto Limited (which held no ownership interest) liable as "control persons."  *See In re Alstom SA*, 406 F. Supp. 2d 433, 492 (S.D.N.Y. 2005) ("Minority stock ownership and the ability to appoint a minority of the board do not create power to direct management and policies, and thus do not constitute sufficient control under Section 20(a).").

Turquoise Hill's press releases, public filings and other statements . . . before or shortly after these statements were issued and had the ability to prevent the issuance of the statements."  SAC ¶ 461. Such allegations do not establish that the Rio Defendants exercised **_actual control_** over the alleged misstatements at issue.  *See In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (finding insufficient allegations that defendants were "provided with or had unlimited access to copies of the complained of statements prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected"); *see also Global Crossing*, 2005 WL 2990646, at *9 (same).  "[T]hese allegations are unavailing because they focus exclusively on [Rio Tinto's] 'control person status' rather than [Rio Tinto's] exercise of 'actual control over the matters at issue.'"  *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166 (S.D.N.Y. 2012).  Without allegations that Rio Defendants "signed, drafted, approved, or confirmed a misleading statement," the Rio Defendants cannot be liable as control persons for statements made by Turquoise Hill.  *See id.*[40]

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Dated:  October 19, 2021

*/s/ Corey Worcester*
Corey Worcester
Renita Sharma
Jomaire Crawford

---

[40]   This is particularly true for Defendants Jacques and Soirat, executives of Rio Tinto, not Turquoise Hill.   "Where, as here, the defendants have no role in the business structure of the speaking entity and are instead officers of a separate entity, and there is no allegation that corporate formalities have not been observed, generalized allegations that the defendants had as much authority over the speaking entity's statements as its own officers are insufficient to state plausibly a claim that the separate entity's officers 'made' the speaker's statements."  *Kuwait Inv. Office v. Am. Intern. Group, Inc.*, 128 F. Supp. 3d 792, 810-11 (S.D.N.Y. 2015).

Jesse Bernstein
Leigha Empson
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
New York, NY 10010
Tel:  212-849-7000
Fax: 212-849-7100

*Counsel for Defendants Rio Tinto plc, Rio Tinto Limited, Rio Tinto International Holdings Limited, Jean-Sébastien Jacques and Arnaud Soirat*