**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

IN RE TURQUOISE HILL RESOURCES LTD.
SECURITIES LITIGATION

Case No. 20-CV-08585-LJL

---

**THE TRQ DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION**
**COMPLAINT**

PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
Gregory F. Laufer
Richard A. Rosen
Robert N. Kravitz
James G. Mandilk
1285 Avenue of the Americas
New York, New York  10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990
glaufer@paulweiss.com
rrosen@paulweiss.com
rkravitz@paulweiss.com
jmandilk@paulweiss.com

*Attorneys for Defendants Turquoise Hill*
*Resources Ltd., Luke Colton, Brendan Lane,*
*and Ulf Quellmann*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 4

I.       Defendants.................................................................................................. 4

II.      Oyu Tolgoi .................................................................................................. 5

III.     The Roles of Turquoise Hill and Rio Tinto................................................ 7

IV.      Turquoise Hill's Public Disclosures .......................................................... 9

V.       Turquoise Hill's Risk Factor Disclosures .................................................11

VI.      Delays and Cost Increases Resulting from Complications  with Shaft 2 and
         Instability in the Rock Mass Around and Under the Ore Body .....................13

VII.     Plaintiffs' Claims ....................................................................................17

ARGUMENT ............................................................................................................18

I.       THE COMPLAINT DOES NOT ADEQUATELY ALLEGE SCIENTER IN
         REGARD TO THE TURQUOISE HILL DEFENDANTS.............................................18

         A.       Plaintiffs Do Not Allege That the Turquoise Hill Defendants Had
                  Knowledge of Contrary Facts ...........................................................20

         B.       Plaintiffs Do Not Adequately Allege Motive and Opportunity ..........................29

II.      TRQ'S STATEMENTS CONCERNING THE PROJECTED COST AND
         TIMELINE FOR THE UNDERGROUND DEVELOPMENT ARE FORWARD-
         LOOKING STATEMENTS PROTECTED BY THE PSLRA SAFE HARBOR ...........33

         A.       The Statements Are Identified as Forward-Looking  and Accompanied by
                  Meaningful Cautionary Language ....................................................34

         B.       Plaintiffs Do Not Adequately Allege That the TRQ Defendants Made Any
                  Forward-Looking  Statements with Actual Knowledge  That They Were
                  False ................................................................................................39

III.     TRQ'S STATEMENTS REGARDING THE EXPECTED TIMELINE AND
         COSTS AND OTHER ISSUES WERE STATEMENTS OF OPINION THAT
         THE COMPLAINT DOES NOT ADEQUATELY ALLEGE WERE FALSE ................40

# TABLE OF CONTENTS
## (Continued)

Page

IV.    CERTAIN OF THE TRQ STATEMENTS THAT PLAINTIFFS CHALLENGE
       ARE VAGUE STATEMENTS OF OPTIMISM THAT ARE NOT
       ACTIONABLE............................................................................................................42

V.     THE TRQ DEFENDANTS ARE NOT LIABLE FOR STATEMENTS MADE
       BY THE RIO TINTO DEFENDANTS ........................................................................43

VI.    PLAINTIFFS' "CONTROL PERSON" CLAIM AGAINST THE TRQ
       INDIVIDUAL DEFENDANTS FAILS TO STATE A CLAIM FOR RELIEF...............44

CONCLUSION.......................................................................................................................44

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Abely* v. *Aeterna Zentaris Inc.*,
    2013 WL 2399869, (S.D.N.Y. May 29, 2013) ............................................................27, 29

*Acito* v. *IMCERA Grp.*,
    47 F.3d 47 (2d Cir. 1995) ....................................................................................................38

*In re Adient*,
    2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ..................................................21, 22, 23, 35

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
    2013 WL 144041 (S.D.N.Y. Jan. 14, 2013)...........................................................24, 30, 31

*In re Aratana Therapeutics Inc. Sec. Litig.*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018) ............................................................21, 30, 34, 38

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)..............................................................................................................4

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ...................................................................................................4

*In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*,
    2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009).....................................................................35

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017) ...............................................................................32

*In re Bank of America AIG Disclosure Sec. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013) ...............................................................................28

*In re Barrick Gold Corp. Sec. Litig.*,
    341 F. Supp. 3d 358 (S.D.N.Y. 2018) ....................................................................33, 34, 36

*In re Barrick Gold Sec. Litig.*,
    2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) ..........................................................26, 34, 39

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017) .................................................................................34

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015) .................................................................................23

*Chapman* v. *Mueller Water Prods., Inc.*,
    466 F. Supp. 3d 382 (S.D.N.Y. 2020) ...............................................................................41

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*In re Citigroup Inc. Sec. Litig.*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010) .................................................................21

*In re Citigroup Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004) .................................................................26

*City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008) .................................................................24

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen.
Holdings Corp.*,
    2021 WL 212337 (S.D.N.Y. Jan. 21, 2021)........................................................28

*In re Coty Inc. Sec. Litig.*,
    2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ...................................................28

*Das* v. *Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ...............................................1, 10, 11, 28

*ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ...............................................................................19

*In re EDAP TMS S.A. Sec. Litig.*,
    2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) ...................................................42

*Elec. Workers Pension Fund, Local 103* v. *Six Flags Enter. Corp.*,
    2021 WL 807251 (N.D. Tex. Mar. 3, 2021) ......................................................42

*Elliott Assocs., L.P.* v. *Covance, Inc.*,
    2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ...................................................42

*In re Fed Ex Corp. Sec. Litig.*,
    2021 WL 396423 (S.D.N.Y. Feb. 4, 2021).........................................................43

*Foley* v. *Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012) ...............................................................25

*In re Gen. Elec. Sec. Litig.*,
    844 Fed. App'x 385 (2d Cir. 2021) ....................................................................30

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ...............................................................21

*In re Gold Resources Corp. Sec. Litig.*,
    776 F.3d 1103 (10th Cir. 2015) ...........................................................24, 26, 36

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Gregory* v. *ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)...............................33

*Halperin* v. *eBanker USA.Com, Inc.*,
  295 F.3d 352 (2d Cir. 2002) ........................................................................37

*In re Health Mgmt., Inc., Sec. Litig.*,
  970 F. Supp. 192 (E.D.N.Y. 1997)................................................................26

*Higginbotham* v. *Baxter Int'l Inc.*,
  495 F.3d 753 (7th Cir. 2007) .......................................................................31

*Horizon Asset Mgmt. Inc.* v. *H & R Block, Inc.*,
  580 F.3d 755 (8th Cir. 2009) .......................................................................31

*Hou Liu* v. *Intercept Pharm. Inc.*,
  2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ...........................................18, 29

*Institutional Inv'rs Grp.* v. *Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ........................................................................35

*Iowa Pub. Emps.' Ret. Sys.* v. *MF Glob., Ltd.*,
  620 F.3d 137 (2d Cir. 2010) ........................................................................33

*Jackson* v. *Abernathy*,
  960 F.3d 94 (2d Cir. 2020) ..........................................................................19

*Kasilingam* v. *Tilray*,
  2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021) ..........................................*passim*

*City of Austin Police Dep't Ret. Sys.* v. *Kinross Gold Corp.*, 957 F. Supp. 2d 277
  (S.D.N.Y. 2013) ........................................................................................34

*Koch* v. *Christie's Intern. PLC*,
  699 F.3d 141 (2d Cir. 2012) ..........................................................................4

*Landow* v. *Bartlett*,
  2019 WL 1027994 (D. Nev. Mar. 4, 2019)......................................................42

*Lipow* v. *Net1 UEPS Techs., Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015) ...........................................................23

*Lorenzo* v. *SEC*,
  139 S. Ct. 1094 (2019).................................................................................43

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006) ................................................................19

*Martin* v. *Quartermain*,
  732 F. App'x 37 (2d Cir. 2018) ...........................................................*passim*

*Moshell* v. *Sasol Ltd.*,
  481 F. Supp. 3d 280 (S.D.N.Y. 2020) .............................................................34

*In re MRU Holdings Sec. Litig.*,
  769 F. Supp. 2d 500 (S.D.N.Y. 2011) .............................................................30

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) .........................................................29, 30

*In re NovaGold Resources Inc. Sec. Litig.*,
  629 F. Supp. 2d 272 (S.D.N.Y. 2009) .............................................................37

*Novak* v. *Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ...........................................................19, 20, 32

*In re Pretium Resources Inc. Sec. Litig.*,
  2020 WL 953609 (S.D.N.Y. Feb. 27, 2020) ....................................................40

*In re Pretium Resources Inc. Sec. Litig.*,
  256 F. Supp. 3d 459 (S.D.N.Y. 2017) .........................................................22, 44

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004) ........................................................................42

*In re Sanofi-Aventis Sec. Litig.*,
  2009 WL 3094957 (S.D.N.Y. Sept. 25, 2009) ................................................32

*Slayton* v. *Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ...................................................................30, 39, 44

*In re Synchrony Fin. Sec. Litig.*,
  2021 WL 560204 (2d Cir. Feb. 16, 2021) .......................................................42

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................18, 24

*Tongue* v. *Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ........................................................................41

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Turner* v. *MagicJack VocalTec, Ltd.*,
    2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) .........................................................................29

*In re Welspun*,
    2019 WL 2174089 (S.D.N.Y. May 20, 2019) .....................................................................31

*Wochos* v. *Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ...........................................................................................35

**Statutes**

Exchange Act ...................................................................................................................17, 38, 44

United States Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-
    4, 78u-5 ........................................................................................................................*passim*

**Other Authorities**

Rule 10b-5 ........................................................................................................................17, 39, 43

Defendants Turquoise Hill Resources Ltd. ("Turquoise Hill," "TRQ," or the "Company"), Luke Colton, Brendan Lane, and Ulf Quellmann (together, the "Turquoise Hill Defendants" or "TRQ Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' Second Amended Consolidated Complaint (the "Complaint") in its entirety and with prejudice under Rule 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## PRELIMINARY STATEMENT

This is a purported securities fraud class action arising from the underground development of Oyu Tolgoi, a massive copper and gold mine located in a remote region of Mongolia. Turquoise Hill, which is based in Canada, and an entity owned by the Government of Mongolia are co-owners of the company that owns the mine. Rio Tinto, one of the largest mining companies in the world and a majority owner of Turquoise Hill, is the project manager of the mine and oversees its operations.

Plaintiffs allege that Rio Tinto and Turquoise Hill misled Turquoise Hill investors by purportedly delaying disclosure of problems and delays in the underground development of the mine that eventually led to a substantial increase in the estimated investment costs and a delay in the estimated date of initial production. The Turquoise Hill Defendants incorporate by reference the Rio Tinto Defendants' arguments in support of dismissal of the Complaint to the extent applicable to the Turquoise Hill Defendants. The claims against the Turquoise Hill Defendants, however, suffer from several fundamental flaws.

*First*, the Complaint does not adequately allege scienter as to the Turquoise Hill Defendants, who had no involvement at all in the operations of the mine during the Class Period. The Complaint contains allegations, purportedly based on interviews with former Rio Tinto employees and consultants, that management officials at *Rio Tinto* were apprised of problems,

delays, and cost overruns in the underground development before they were publicly disclosed. But there is not a single allegation that anyone at *Turquoise Hill* was told about these issues, or that any of the Turquoise Hill Defendants were otherwise aware of them at any relevant time prior to public disclosure. To the contrary, the Complaint alleges that Rio Tinto sought to conceal information about the problems at the mine from its partners, including the Government of Mongolia and Turquoise Hill.

Similarly, the Complaint contains some twenty-five pages of allegations purportedly based on a report prepared for a special committee of the Oyu Tolgoi Board of Directors investigating the delays and cost overruns (the "ICG Report"). But again, none of these allegations suggest that any of the Turquoise Hill Defendants were aware of facts that contradicted the disclosures they made.

Indeed, the Complaint's detailed introductory section does not even mention the Turquoise Hill Defendants, and there is strikingly little concerning them in the rest of the Complaint, either. Instead, the allegations specifically allege that Rio Tinto exercised sweeping control over the entire project—including that Rio Tinto "dictated the content of all Turquoise Hill's public statements concerning OT" (¶ 54) as well as "any communication that could impact Turquoise Hill's stock price" (¶ 450)—and steps that Rio Tinto allegedly took to prevent dissemination of information concerning difficulties it was facing in the underground development of the mine, (¶ 451), including, by the way, to Turquoise Hill. All of this undercuts, rather than supports, Plaintiffs' scienter allegations in regard to the TRQ Defendants.

The Complaint is also devoid of any plausible allegations that the TRQ Defendants had any motive to mislead TRQ investors. Plaintiffs do not allege that Turquoise Hill or any of the TRQ individual defendants received any concrete benefit as a result of the alleged fraud. In

fact, Mr. Quellmann *bought* Turquoise Hill stock during the relevant period, which effectively negates scienter as to him, and Plaintiffs themselves allege that Rio Tinto forced Mr. Quellmann to resign from his position as CEO of TRQ "after he took actions in support of TRQ's minority shareholders that were contrary to Rio's interests" (¶ 39). The Complaint and the disclosures it cites also show that Turquoise Hill disclosed delays as soon as Rio Tinto provided that information to it and cautioned investors that costs were being re-evaluated in light of the delays and other issues. And two TRQ representatives were on the four-member OT Special Committee that commissioned the investigative reports relied on by Plaintiffs. All of this—including the fact that TRQ itself commissioned the report cited by the Plaintiffs while this lawsuit was pending—weighs against any inference of scienter on the part of the TRQ Defendants.

*Second*, the bulk of the Turquoise Hill disclosures that Plaintiffs claim were misleading—which concerned the projected cost and timeline for the underground development—are quintessential forward-looking statements protected by the PSLRA safe harbor. As the Second Circuit and other courts have recognized, mining is an inherently risky business, and miners never know exactly what they will find deep under the surface until they get there. Turquoise Hill made meaningful cautionary statements about those risks in all of its public filings, news releases, and analyst calls. While the PSLRA safe harbor does not immunize forward-looking statements that are made with actual knowledge of their falsity, the Complaint does not adequately allege such knowledge on the part of any Turquoise Hill Defendant, as discussed above.

*Third*, most of the Turquoise Hill disclosures that Plaintiffs challenge are also statements of opinion, and the Complaint does not adequately allege either subjective or objective falsity in regard to those statements.

***Fourth***, a number of the Turquoise Hill disclosures that Plaintiffs challenge—including statements such as "capital costs remain in line"; the schedule "remains on track"; and "key risks [are] well understood and managed"—are vague statements of optimism, or puffery, that courts have repeatedly ruled are not actionable under the securities laws.

For these and other reasons discussed below, all of the claims asserted against the Turquoise Hill Defendants in the Complaint should be dismissed in their entirety and with prejudice.

## STATEMENT OF FACTS[1]

### I.      Defendants

Turquoise Hill is a mining company headquartered in Canada. (¶ 38.)  Its only material mineral resource property is a 66% equity interest in Oyu Tolgoi LLC ("OT"), the company that owns the Oyu Tolgoi copper and gold mine in southern Mongolia ("Oyu Tolgoi"). (¶¶ 38, 52.)  The Government of Mongolia owns the other 34% of OT, through an entity called Erdenes Oyu Tolgoi LLC. (¶ 52.)

Ulf Quellmann was CEO of Turquoise Hill from August 1, 2018 to March 3, 2021. (¶ 42.)  Luke Colton has been the CFO of Turquoise Hill since October 9, 2017. (¶ 43.)  Brendan

---

[1] Solely for purposes of this motion to dismiss, the well-pleaded facts alleged in the Complaint are assumed to be true. *See Koch* v. *Christie's Intern. PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  That tenet, however, "is inapplicable to legal conclusions."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). In deciding a motion to dismiss, the Court may consider "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  That includes the ICG Report and the Peer Report, which Plaintiffs rely upon and which are integral to the Complaint.  Citations to "¶ __" refer to paragraph numbers in the Complaint and citations to "Ex. __" are exhibits to the Declaration of Gregory F. Laufer dated October 19, 2021.

Lane was its Vice President of Operations & Development from February 1, 2016 through mid-2019. (¶ 44.)

Defendant Rio Tinto, which consists of Rio Tinto plc (a United Kingdom company) and Rio Tinto Limited (an Australian company), is one of the world's largest metals and mining companies. (¶ 46.) Although Turquoise Hill's shares are publicly traded, Rio Tinto, through subsidiaries, owns 50.8% of the shares. (¶¶ 39, 56.)

Jean-Sebastien Jacques was the CEO of Rio Tinto from July 2016 to December 2020. (¶ 49.) Arnaud Soirat was the chief executive of Rio Tinto's Copper & Diamonds product group from 2016 to December 2020, and has been Rio Tinto's COO since February 2021. (¶ 50.)

## II.    Oyu Tolgoi

Oyu Tolgoi is located in a remote part of the South Gobi Desert about 340 miles south of Ulaanbaatar, Mongolia's capital city. (¶ 38.) It is one of the largest known copper and gold deposits in the world. When fully developed, it is expected to be the world's fourth largest copper mine, with an "average annual production of 560 thousand tonnes between 2025 and 2030."[2] (¶323.)

The original mining operations at Oyu Tolgoi, which began in 2013, were surface operations known as "open pit" mining. (¶ 5.) Up to 80% of the value of the mine, however, lies in ore deposits that are deep underground and accessible only through a highly complex underground mining project. (*Id.*) After initial attempts to start the underground development stalled, Rio Tinto, Turquoise Hill, and the Government of Mongolia entered into an Underground

---

[2] A "tonne" is a metric ton, which is 1,000 kilograms. Thus, 500,000 tonnes equals about 550,000 U.S. tons.

Mine Development and Financing Plan in May 2015 (the "Underground Plan"), and restarted the project in mid-2016. (¶¶ 64-65; Ex. 19 (2019 Management's Discussion and Analysis ("MD&A") attached to TRQ Form 6-K, dated May 15, 2019), at 6.) Turquoise Hill filed the Underground Plan with the SEC as an exhibit to a Form 6-K filing on May 19, 2015. (Ex. 2 (TRQ Form 6-K dated May 19, 2015 (attaching the Underground Plan)).)

Financing was predicated on the completion of a "feasibility study" as required by the Mongolian government—a comprehensive report that calculated the geological-engineering solutions, legal, operational, economic, social, environmental, and other factors required to determine the financial viability of the project. (Ex. 2 (Underground Plan), at 5.) The Feasibility Study was completed in May 2016. (Ex. 4 (2017 Annual Information Form ("AIF") attached to TRQ 2017 Form 40-F), at 15.) It estimated that the cost to complete development of the underground project would be $5.3 billion. (¶ 65.) Construction was expected to take place over five years, with sustainable production estimated to begin in early 2021. (¶ 7.) As the publicly disclosed Underground Plan stated—and as one would expect when dealing with a project of this size and scope—the parties (Rio Tinto, the Government of Mongolia, and Turquoise Hill) expressly acknowledged and agreed that the Feasibility Study contained "estimates only [that] are not binding, are based on assumptions that are subject to uncertainties and contingencies that may prove not to be correct, and actual results may vary from the estimates in the Feasibility Study." (Ex. 2 (Underground Plan), at 5.)

The design of the vast underground mine consists of five vertical shafts for access to the mine, reaching mining levels nearly a mile below the surface, and a network of 203 kilometers (~126 miles) of lateral underground tunnels extending horizontally from the bottom of the shafts underneath and around the ore deposits. (¶ 66; Ex. 12 (Jan. 17, 2019 Investor

Presentation), at 4.)  Shaft 2 is the main logistics hub for transporting personnel and equipment from the surface to the underground mine infrastructure and conveying ore and other materials to the surface, as well as providing ventilation.  (¶¶ 8, 72.)  The other four shafts are for ventilation only.  (*See id.*)

The mine plan called for the largest ore body, the Hugo North Lift 1, to be divided into three panels, with the middle panel—Panel 0—to be mined first, followed by Panels 1 and 2, which flank Panel 0.  (¶ 69; Ex. 12 (Jan. 17, 2019 Investor Presentation), at 4.)  The ore was to be mined by a process called "panel block caving," in which the supporting rock below the ore body is undercut, causing the ore to loosen and fall by gravity into massive, Y-shaped "draw bells" that channel the loosened ore into an underground tunnel for extraction.  (¶¶ 68-70; Ex. 12 (Jan. 17, 2019 Investor Presentation), at 4.)

The Government of Mongolia gave OT formal permission to restart second-phase underground construction around mid-2016 (¶ 65; Ex. 4 (2017 AIF attached to TRQ 2017 Form 40-F), at 15), and the work then proceeded.  To accommodate the mine's scale and complexity, it is heavily staffed—requiring a workforce of approximately 17,000 in total (employees and contractors) at the end of 2018.  (Ex. 15 (2018 MD&A attached to TRQ 2018 Form 40-F), at 6.)

## III.    The Roles of Turquoise Hill and Rio Tinto

Although Turquoise Hill owns 66% of OT, which owns the Oyu Tolgoi mine, it does not operate the mine or manage its development.  Turquoise Hill is headquartered in Canada, it had no physical presence or office in Mongolia during the Class Period, and it has no employees in Mongolia assigned to work on operations at Oyu Tolgoi.  (¶ 38; Ex. 26 (Apr. 2, 2020 Pentwater Letter to Shareholders), at vii.)

The company that operates the mine and manages its development and construction is a wholly-owned subsidiary of the Rio Tinto Group that has managed the Oyu Tolgoi project

since 2010.  (¶ 47; Ex. 3 (May 6, 2016 Rio Tinto News Release), at 2.)  Thus, Rio Tinto, not Turquoise Hill, has "near total-control over the operations of Oyu Tolgoi."  (¶ 55.)[3]

Rio Tinto International's parent company, Rio Tinto, is a highly sophisticated metals and mining company with nearly 150 years of industry experience. (Ex. 5 (2017 Rio Tinto Annual Report), at 2.)  It is one of the largest mining companies in the world, with over 47,000 employees globally and production presence in almost every continent and nearly 35 countries. (Ex. 5 (2017 Rio Tinto Annual Report), at 6.)  As a result, Rio Tinto maintains a vast portfolio of businesses in the mineral extraction and refining industries producing a variety of metals and minerals, including cooper, iron ore, bauxite, aluminum, diamonds, gold, and many more. (Ex. 5 (2017 Rio Tinto Annual Report), 2–3.)

The Complaint itself repeatedly alleges that, in addition to serving as the project manager, Rio Tinto has "exercised near-total control over the Oyu Tolgoi project through its contractual authority as manager of the project under the agreements between the Mongolian Government, Rio Tinto, and TRQ, as well as through Rio's control over TRQ." (¶ 40; Ex. 15 (2018 AIF attached to TRQ 2018 Form 40-F), at 17–18, 36.)  The Complaint that, at all relevant times, Rio Tinto controlled the flow of information regarding the mine that TRQ received (and continues to receive), and directly controlled both the timing and content of the disclosures that TRQ made respecting the mine.  In this regard, Plaintiffs allege that Rio Tinto:

---

[3] *See also* ¶¶ 39, 40, 47, 48, 52, 53); Ex. 4 (2017 AIF attached to TRQ 2017 Form 40-F), at 34–35 ("RTIH, as the holder of a majority of the Common Shares, and as manager of Oyu Tolgoi, has the ability to exert a significant degree of control over the Corporation, Oyu Tolgoi LLC and Oyu Tolgoi."); Ex. 15 (2018 AIF attached to TRQ 2018 Form 40-F), at 36 (same); ¶ 3 (stating that the Oyu Tolgoi mine is "operated almost exclusively by Turquoise Hill's controlling shareholder, mining giant Rio Tinto").

- "dictated the content of all Turquoise Hill's public statements concerning OT" (¶ 54) as well as "any communication that could impact Turquoise Hill's stock price" (¶ 450);

- maintains "near-total control" over TRQ's "public statements about" OT (¶ 52);

- "has exercised near-total control" over "the election of all members of TRQ's Board of Directors and the selection and appointment of TRQ's executive officers" (¶ 39);

- can "block any nomination" to TRQ's "Board or force a resignation" (¶ 39);

- requires TRQ to provide it "the opportunity to review and comment on drafts of [certain categories of] public filings" (¶ 53);

- controls, with RTIH, "decisions concerning OT's business through its Board of Directors" and the "Board's Operating Committee" (¶ 54);

- has "the ability to determine the outcome of all Operating Committee decisions, and thus the agenda of the OT Board" (¶ 54);

- has approval rights over TRQ's ability "to hire employees" (¶ 203); and

- controls information flow to "TRQ independent directors and management" who "are solely reliant on Rio Tinto for information" (¶ 203 (quotations omitted)).

These allegations and others like them make Rio Tinto's control over information flows—both internal to the project and in terms of disclosure to investors—a central theme of the Complaint, and are totally inconsistent with allegations concerning the TRQ Defendants' scienter.

## IV.    Turquoise Hill's Public Disclosures

Throughout the relevant time period, Turquoise Hill, expressly relying on information received from Rio Tinto, consistently updated investors on developments at Oyu Tolgoi in quarterly reports, analyst calls, and investor presentations. Given Rio Tinto's role as the on-site project manager and TRQ's lack of presence at the site, TRQ's disclosures largely consisted of summaries of reports that it had received from Rio Tinto, and which were transparently attributed to Rio Tinto. These updates included information about the progress of the underground

development, the projected schedule for sustainable production, the expected overall capital costs, and, when delays were reported, the reasons for the delays—all as reported to TRQ by Rio Tinto. For example, TRQ disclosed:

- "During Q4'17, **Rio Tinto undertook** a schedule and cost review. **Rio Tinto has provided** Turquoise Hill with a high-level overview of the review's outcomes, in which **Rio Tinto concluded** there were no material changes in project scope, cost or schedule." (¶ 313 (July 31, 2018 News Release, at 3));

- "**Rio Tinto has undertaken** a second annual re-forecast of underground development schedule and costs and preliminary results have concluded that capital costs remain in line with the overall $5.3 billion budget and the project remains on schedule to complete in 2022." (¶ 335 (Oct. 15, 2018 News Release, at 1));

- "**Rio Tinto has notified** Turquoise Hill, based on preliminary results, of a delay to achievement of sustainable first production which is now expected to occur by the end of Q3'21 instead of Q1'21." (¶ 336 (Oct. 15, 2018 News Release, at 1));

- "We did announce on October 15 that **Rio Tinto now projects** a 9-month delay of the start of sustainable production from the underground development." (¶ 348 (Nov. 2, 2018 Investor Call, at 3));

- "**Rio Tinto, as project manager, has advised** that as the lateral development continues, there is more detailed geotechnical data than what was previously available and, as a consequence, the understanding of the rock mass around and under the ore body has improved. This data reveals there are areas of the mine footprint where the strength of the rock mass is more variable than anticipated. This will require some potentially significant changes to the design of some future elements of the development, and the development schedule." (Ex. 13 (Feb. 26, 2019 News Release), at 2);

- "Since completion of the Company's independent review, **Rio Tinto, as manager of the project, has advised** Turquoise Hill that further delays on the Shaft 2 fit out are expected to contribute to an overall schedule delay to sustainable first production beyond the end of Q3'21." (Ex. 16 (Mar. 14, 2019 News Release), at 4);

- "As announced on February 27, [4] **we were recently advised by Rio Tinto** as our project manager that as the lateral development continues, there is more data

---

[4] The reference to "February 27" in the March 15, 2019 TRQ investor call likely refers to the Rio Tinto news release dated February 27, 2019. TRQ's news release is dated February 26.

than was previously available. And as a consequence, the understanding of the ore body has improved. As such, the location of some of the underground infrastructure may need to change." (¶ 389 (Mar. 15, 2019 Investor Call, at 4));

- "*Rio Tinto, as project manager, has advised* that it has completed a review of the fit-out and commissioning issues at Shaft 2 and it now expects Shaft 2 to be completed by the end of October 2019." (Ex. 18 (Apr. 15, 2019 News Release), at 1);

- "As announced in April 2019, *Rio Tinto, in its role as manager of Oyu Tolgoi, has advised* that the fit-out and commissioning work on Shaft 2 is now expected to be completed by the end of October 2019. *Rio Tinto has advised* that this further delay to the completion of Shaft 2 is expected to contribute to the previously announced overall schedule delay to sustainable first production beyond the end of Q3'21." (Ex. 20 (May 15, 2019 News Release), at 3); and

- "Improved rock mass information and geotechnical data modelling has confirmed that there are stability risks associated with components of the existing mine design. Therefore, to address these risks, *Rio Tinto, in its role as manager of Oyu Tolgoi, has advised* that it continues to review mine design options for the completion of the underground development of Oyu Tolgoi." (Ex. 25 (July 31, 2019 News Release), at 2.)

In fact, Plaintiffs themselves emphasize that TRQ entered into a written agreement with Rio Tinto requiring that all of TRQ's public disclosures regarding Oyu Tolgoi be "consistent with the information provided by the Rio Tinto Manager," and that TRQ not file or issue "any OT Disclosure without providing the Rio Tinto Manager with a reasonable opportunity to review and comment thereon." (¶ 53.)

## V.    Turquoise Hill's Risk Factor Disclosures

The risks inherent in mining are widely known, but Turquoise Hill's public disclosures nevertheless consistently included copious risk disclosures concerning the project. Among other things, TRQ cautioned investors that:

- "The actual cost of developing Oyu Tolgoi may differ materially from the Corporation's estimates, and development may involve unexpected problems or delays";

- "If these estimates prove incorrect, the total capital expenditures required to complete development of the underground components of Oyu Tolgoi may

increase, which may have a material adverse impact on the Corporation, its results of operations, financial condition and share price";

- "[T]here are also a number of uncertainties inherent in the development and construction of any new or existing mine, including Oyu Tolgoi. These uncertainties include the timing and cost, which can be considerable, of the construction of mining and processing facilities. . .";

- "The cost, timing and complexities of mine construction and development are increased by the remote location of a property such as Oyu Tolgoi";

- "It is common in mining operations and in the development, construction or expansion of existing facilities to experience unexpected problems and delays during such activities, which may cause delays in the commencement or expansion of mineral production or sustainable production. Such delays could have unforeseen impacts on disclosed project economics"; and

- "[T]here is no assurance that the current or future development, construction or expansion activities will be successfully completed within cost estimates, on schedule or at all and, if completed, there is no assurance that such activities will result in profitable mining operations."

(¶¶ 415-416; Ex. 4 (2017 AIF attached to TRQ 2017 Form 40-F), at 35-36; Ex. 15 (2018 AIF attached to TRQ 2018 Form 40-F), at 33.)

Turquoise Hill's disclosures also contained extensive "forward-looking statements" disclosures. These disclosures cautioned investors that statements using words such as "expect," "may," "plan," "estimate," and similar expressions suggesting future outcomes were forward-looking statements within the meaning of the PSLRA safe-harbor provisions, and that there were a variety of reasons why actual results might differ, including "mining operational and development risks," "the speculative nature of mineral exploration," and "capital and operating costs, including with respect to the development of additional deposits"; and cautioned that certain factors were "inherently uncertain," including "the timing and cost of the construction and expansion of mining and processing facilities," and "**delays, and the costs which would result from delays, in the development of the underground mine (which could significantly exceed**

the costs projected in the Statutory Feasibility Study and the 2016 OTTR)." (Ex. 4 (TRQ 2017 Form 40-F), at 4 (emphasis added); Ex. 15 (TRQ 2018 Form 40-F), at 2 (emphasis added).)

TRQ's news releases also contained similar cautionary statements regarding forward-looking statements, and referred investors to the fuller list of risk factors set forth in its Annual Information Form. (E.g., Ex. 6 (July 31, 2018 News Release), at 17-18.) From February 2019 forward, TRQ's disclosures also warned that mining operational and technical risks included "geotechnical risks and ground conditions." (Ex. 13 (Feb. 26, 2019 News Release), at 3.)

These risks captured the precise challenges that led to delays and increased costs at the mine in the relevant period, including difficulties in the completion of Shaft 2 and the discovery of geotechnical conditions—that is, the physical condition and stability of the subsurface rock— that required fundamental changes to the mine plan. TRQ promptly disclosed these conditions to the market as it became aware of them. (E.g., Ex. 8 (Oct. 15, 2018 News Release), at 1; Ex. 13 (Feb. 26, 2019 News Release), at 2; Ex. 18 (Apr. 15, 2019 News Release), at 2.)

## VI.   Delays and Cost Increases Resulting from Complications with Shaft 2 and Instability in the Rock Mass Around and Under the Ore Body

Under the original Underground Plan, Rio Tinto and TRQ expected production from the first draw bell in mid-2020 and first sustainable production from the underground development in early 2021, with the total expansion capital for the project expected to be $5.3 billion. (Ex. 5 (Rio Tinto 2017 Annual Report), at 43, 47.) Rio Tinto first began reporting delays in the overall development and production schedule in October 2018, resulting from a delay in the completion of Shaft 2 and the discovery of "ground conditions" and "shaft sinking challenges," among other things. (¶ 334.) Rio Tinto forecasted that the net effect of the delays would be to delay sustainable first production by up to nine months, to late Q3'21. (¶ 336.) TRQ reported that

it was undertaking its own review of the causes and impact of these delays and would "announce the results as soon as possible." (¶ 335.)

Over the ensuing months, TRQ continued to update investors on the results of its review and on the results of additional updates from Rio Tinto, and repeatedly cautioned it would take time for the analyses to be completed and for the full impact on scheduling and costs to be understood. (¶¶ 334-337, 345-47, 350-52, 356-57, 366, 369-70, 381-84, 387, 389-91, 395, 398-401, 403-04, 409, 429-430, 432.) In a February 26, 2019 news release (¶¶ 369-70), TRQ reported that its review, which had been conducted with the assistance of mining consultants OreWin Pty Ltd ("OreWin"), TRQ's independent Qualified Person ("QP") under Canadian law,[5] had found that the project cost was expected to remain within the $5.3 billion budget, but that there was "an increasingly likely risk of a further delay to sustainable first production beyond Q3'21," due to certain delays in the completion of Shaft 2 and the need for increased ground support in some key areas. (¶ 369; Ex. 13 (Feb. 26, 2019 News Release), at 1-2.) It also reported that Rio Tinto, as project manager, had advised that as lateral development continued, there was more detailed geotechnical data that potentially revealed the need for significant changes to the design and development schedule, among other things. (*Id.*) In March 2019, TRQ again disclosed that Rio Tinto had advised it that further delays in completing Shaft 2 were expected to contribute to an overall schedule delay to sustainable first production beyond the end of Q3'21, and that Rio Tinto

---

[5]   *See* Ex. 16 (Mar. 14, 2019 News Release), at 3.   Under Canadian mining regulations, a "Qualified Person" is an individual who (a) is an engineer or geoscientist with a university degree, or equivalent accreditation, in an area of geoscience, or engineering, relating to mineral exploration or mining; (b) has at least five years of experience in mineral exploration, mine development or operation, or mineral project assessment, or any combination of these, that is relevant to his or her professional degree or area of practice; and (c) has experience relevant to the subject matter of the mineral project and the technical report. *See* Ex. 1 (National Instrument 43-101 Standards of Disclosure for Mineral Projects), at (2011) 34 OSCB 7046.

was studying certain modifications to its mining plan, including "relocating the ore passes on the footprint." (¶ 381; Ex. 16 (Mar. 14, 2019 News Release), at 2.) TRQ said that the impact of those changes "will be reflected in the definitive estimate review, which is expected to be complete towards the end of the year" (*id*. at 1), and that TRQ would be assessing the impact of any further delay to sustainable first production "on the Company's cash flows, liquidity, and funding requirements." (¶ 387; Ex. 15 (2018 MD&A attached to TRQ 2018 Form 40-F), at 13.)

On March 15, 2019, Mr. Quellmann told analysts that, after TRQ had completed its own review, Rio Tinto had advised it that more detailed data was now available, and that, as a consequence, "Rio Tinto is studying the impact of some potentially significant changes to some future elements of the underground design including relocating the ore passes." (¶ 387.) Mr. Quellmann further disclosed: "[T]he whole value proposition of this mine is predicated upon stability of the tunnels and excavation . . . . And so we now need to go, together with Rio, go through the process of understanding the stability, understanding where fault lines are running, identifying different locations, modeling it and then include that in the definitive estimate." (Ex. 17 (Mar. 15, 2019 Investor Call), at 7.) He added that "the ultimate cost and schedule will only be known by year-end with the completion of the definitive estimate," but that the company expected to be able to provide updates prior to that. (¶¶ 389-91; Ex. 17 (Mar. 15, 2019 Investor Call), at 7.)

In the Company's next earnings call on May 16, 2019, Mr. Quellmann reported that "work continues on the definitive estimate work," and that "[t]his may include some potentially significant changes to the design of some future elements of the mine design and the development schedule." (¶¶ 400-01; Ex. 21 (May 16, 2019 Investor Call), at 3.) Mr. Colton added that, by the end of the year, "key milestones related to the underground development project will be

significantly more advanced than today," including completion of the "definitive estimate review," which would include "final estimates for completion, schedule, costs, both CapEx and Opex, grades and the production schedule." (*Id*. at 4.)

On July 15, 2019, TRQ disclosed that improved information about the underlying rock mass and geotechnical modeling had confirmed that there were stability risks associated with the existing mine design, and that, as a result, a number of mine design options were identified to address those risks.[6] Based on these options, TRQ reported, sustainable first production was now expected to be delayed to between May 2022 and June 2023, and the development capital spend for the project was expected to increase by $1.2 to $1.9 billion. (¶ 242; *see also* Ex. 24 (July 16, 2019 Rio Tinto News Release), at 2.)

On July 31, 2019, TRQ reported that it was taking a $600 million impairment charge due to the delays and increased cost estimate. (¶ 246.) A special committee of the Oyu Tolgoi Board of Directors, which consisted of two TRQ representatives and two representatives of the Mongolian Government, commissioned a group of mining experts referred to as the Independent Consulting Group ("ICG") to investigate the delays and cost overruns. (¶¶ 2, 26.) ICG's report (the "ICG Report") (Ex. 29) and a peer review of that report (the "Peer Review") (Ex. 30) were issued in July 2021. (¶¶ 2, 26.) While the ICG Report concluded that geotechnical issues were not the principal cause of the delays (¶¶ 26, 254), it does not show—and Plaintiffs do not allege that it shows—that anyone at TRQ was aware of facts that conflicted with TRQ's disclosures during the relevant time period.

---

[6]   The Complaint sometimes incorrectly refers to this news release as dated July 16, 2019 (¶ 403); in fact, it was dated July 15, 2019. *See* Ex. 22.

## VII.    Plaintiffs' Claims

The original plaintiff commenced this action on October 14, 2020.  (ECF No. 1.) The Pentwater Funds were appointed as Lead Plaintiff on January 15, 2021, and filed a consolidated complaint on March 16, 2021.  (ECF Nos. 103, 109).  After initially responding to Defendants' motions to dismiss that complaint, Plaintiffs requested and were granted leave to file an amended complaint to add allegations based on the ICG Report and Peer Review.  (ECF No. 126.)  They then filed the current Complaint on September 16, 2021.  (ECF No. 127.)  The Complaint asserts claims under Section 10(b) of the Exchange Act and Rule 10b-5 against all defendants, and control person claims against Mr. Quellmann, Mr. Lane, Mr. Colton, and the Rio Tinto Defendants under Section 20(a) of the Exchange Act.

The Complaint alleges—purportedly based on interviews of, and documents provided by, former Rio Tinto employees and consultants, including two purported "whistleblowers"—that the delays and cost overruns in the underground mining operations occurred earlier than when Rio Tinto and TRQ disclosed them. (¶¶ 248-343.)  It also alleges that the delays and cost overruns were caused by mismanagement and mistakes, not unforeseen ground conditions and geotechnical issues that a number of disclosures referred to, and that top executives at Rio Tinto had been advised of these facts but failed to disclose them. (*Id.*)

But, despite Plaintiffs' effort to lump Rio Tinto and TRQ together by repeatedly alleging that "Defendants" knew of these issues (¶¶ 20, 25-26, 153, 226, 271, 281, 285), there is not a single allegation that Rio Tinto employees or consultants ever advised anyone at TRQ about the delays and cost overruns prior to when they were disclosed by TRQ, and there is no allegation that the ICG Report made any such finding.  Nor is there a single allegation that the information that TRQ reported to investors about the progress of the underground development or the reasons

for delays did not accurately reflect the information that Rio Tinto, as project manager, was providing to TRQ.

## ARGUMENT

The gist of the Complaint is that defendants knew that the underground development of the mine was significantly delayed and over budget, but that they delayed disclosing that information, including to Turquoise Hill investors. The Complaint also alleges that, contrary to what defendants disclosed, mismanagement and mistakes, not unforeseen ground conditions and geotechnical issues, were the principal reasons for the delays and cost overruns.

The allegations against Turquoise Hill Defendants, however, are deficient. Specifically, the Complaint: (i) does not adequately allege scienter on the part of the Turquoise Hill Defendants; (ii) does not allege "actual knowledge" as required to avoid the PSLRA "safe harbor" for forward-looking statements, which applies to most of the disclosures that Plaintiffs challenge; (iii) does not allege "subjective falsity," as required to plead the Turquoise Hill Defendants' statements of opinion were false; and (iv) focuses on vague statements of corporate optimism that are not actionable.

## I.    THE COMPLAINT DOES NOT ADEQUATELY ALLEGE SCIENTER IN REGARD TO THE TURQUOISE HILL DEFENDANTS

The PSLRA requires plaintiffs to allege facts giving rise to a "strong inference" that defendants acted with an intent "to deceive, manipulate, or defraud." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007) (quoting 15 U.S.C. § 78u–4(b)(2)). That inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Id.* at 309. "Particularized facts supporting an inference of scienter must be pled as to each individual defendant." *Hou Liu* v. *Intercept Pharm. Inc.*, 2020 WL 1489831, at *14 (S.D.N.Y. Mar. 26, 2020). To allege corporate

scienter, plaintiffs must plead facts that "give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quotations omitted).   In order to plead a strong inference of scienter, Plaintiffs must allege "either (1) that defendants had the motive and opportunity to commit fraud" or "(2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [the company] or its officers 'benefitted in some concrete and personal way from the purported fraud.'"  *ECA*, 553 F.3d at 198 (quoting *Novak* v. *Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).   Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud.  *Novak*, 216 F.3d at 307-08.

In the absence of allegations of motive and opportunity, "the strength of the circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199 (quoting *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).  "At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants [1] benefitted in a concrete and personal way from the purported fraud; [2] engaged in deliberately illegal behavior; [3] knew facts or had access to information suggesting that their public statements were not accurate; or [4] failed to check information they had a duty to monitor.'"  *ECA*, 553 F.3d at 199.[7]  Plaintiffs' allegations do not meet any of these tests.

---

[7]   *See also, In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) ("Second Circuit cases uniformly rely on allegations that [1] specific contradictory

### A.     Plaintiffs Do Not Allege That the Turquoise Hill Defendants Had Knowledge of Contrary Facts

"Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309 (citations omitted). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id*.

Here, Plaintiffs do not identify any such reports or statements containing contrary facts that were provided to anyone at TRQ or that the Turquoise Hill Defendants otherwise had access to.

By Plaintiffs' own allegations, TRQ relied on Rio Tinto, the project manager, for information and updates concerning the progress of the underground development, and—as TRQ specifically informed the markets—essentially all of TRQ's disclosures consisted of information that the project manager provided. (¶ 53.) With no physical presence or office in Mongolia, and no employees in Mongolia assigned to work on operations at Oyu Tolgoi, TRQ does not have first-hand knowledge of, or on-site access to progress at the mine and is wholly reliant on the project manager in this regard. In its disclosures, TRQ expressly stated that it was relaying the information it had received from Rio Tinto.[8] There is not a single allegation in the Complaint that Rio Tinto

---

information was available to the defendants [2] at the same time they made their misleading statements.").

[8]     *See* ¶ 348 (Nov. 2, 2018 Investor Call, at 3) ("We did announce on October 15 that *Rio Tinto now projects* a 9-month delay of the start of sustainable production from the underground development"); ¶ 389 (Mar. 15, 2019 Investor Call, at 4) ("As announced on February 27, *we were recently advised by Rio Tinto* as our project manager that as the lateral development continues, there is more data than was previously available. And as a consequence, the understanding of the ore body has improved. As such, the location of some of the underground infrastructure may need

provided any material information to TRQ—or, in particular, to Mr. Colton, Mr. Lane, or Mr. Quellmann—about delays, cost overruns, or the reasons for such delays and cost overruns, that TRQ either failed to disclose in a timely fashion or disclosed inaccurately.

Moreover, Plaintiffs purport to have interviewed about a dozen former Rio Tinto employees and consultants, including purported whistleblowers Richard Bowley and Maurice Duffy, concerning allegedly undisclosed delays and cost overruns. Plaintiffs allege that these individuals brought information about Oyu Tolgoi to the attention of Rio Tinto executives,[9] but again there is not a single allegation that any one of these employees or consultants (or anyone else) ever told anyone at TRQ about those issues. *See Glaser* v. *The9, Ltd.*, 772 F. Supp. 573, 594 (S.D.N.Y. 2011) (where confidential witnesses worked for different company, not defendant-company, and plaintiffs "make no allegation that those sources ever had any contact with anyone at" defendant-company or individual defendants, court found that "the law is abundantly clear that such allegations are insufficient to support scienter").[10]

---

to change."); *see also* Ex. 13 (Feb. 26, 2019 News Release), at 2; ¶ 313 (July 31, 2018 News Release, at 3.); ¶ 336 (Oct. 15, 2018 News Release, at 1); ¶ 348 (Nov. 2, 2018 Investor Call, at 3); Ex. 16 (Mar. 14, 2019 News Release), at 2; Ex. 18 (Apr. 15, 2019 News Release), at 2; Ex. 20 (May 15, 2019 News Release), at 3; Ex. 25 (July 31, 2019 News Release), at 2.

[9]   *See, e.g.*, ¶ 11 (Sept. 2017 meeting with Duffy and Kirikova); ¶ 141 (Feb. 1, 2018 presentation by Bowley); ¶ 144 (May 2018 Bowley conversation with Rio Defendant about schedule risks); ¶147 (July 3, 2018 email from Bowley about cost overruns); ¶ 151 (July 19, 2018 email from Bowley concerning costs and expected delays); ¶ 154 (Apr. 2018 communication concerning schedule from Andrew Duff, Rio Tinto's Senior Construction Manager at Oyu Tolgoi, to Rio's Global Head of Projects).

[10]   *See also Kasilingam* v. *Tilray*, 2021 WL 4429788, at *10, *12 & n.7 (S.D.N.Y. Sept. 27, 2021) (scienter not adequately alleged where none of the employees claim to have "spoken with or otherwise notified . . . any individual defendant" of their dissenting view, where former employees were not "alleged to have reported directly" to defendants, and where the allegations "fail to establish that [d]efendants were insincere in their [publicly disclosed] belief"); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) ("Fatal to plaintiffs' claims, however, is that they do not allege with specificity that any of the confidential witnesses relied upon in the Complaint presented information to the individual defendants."); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 765 (S.D.N.Y. 2018) (finding Second Amended Complaint could

To the contrary, Plaintiffs quote a sworn statement from Bowley in which he purportedly stated: "Despite [my] reporting [my] concerns about schedule delay and cost overrun and proposing solutions [to two Rio Tinto employees], *Rio Tinto made no disclosure of the true facts to [its] partners* and investors or the market." (¶ 262 at 4.4 (emphasis added).)

In addition, despite relying on allegations based on the ICG Report in the current Complaint, Plaintiffs do not allege that the ICG Report contains any finding that the Turquoise Hill Defendants knew of undisclosed delays and cost overruns. They do not cite a single fact or finding from the ICG Report showing that *anyone* at TRQ either knew undisclosed facts about the delays and cost overruns before or during the Class Period, or that anyone at TRQ took measures to conceal the true facts from investors. In fact, the report never even mentions any TRQ Defendant or any other TRQ employee by name.

Furthermore, the Complaint also alleges facts suggesting that TRQ would not and could not have known such information. Thus, it alleges that senior management at the mine (i.e., within Rio Tinto) had a substantial motives to conceal problems at the mine (¶¶ 139-40, 187, 282, 285-88, 297), that this led to "culture of suppressing negative information" (¶ 185), and that employees were instructed "to discuss our concerns face-to-face, never email or in writing" (¶260). Plaintiffs cannot consistently allege both this purported culture of concealment at the mine and that TRQ knew the information that was allegedly concealed.

---

not "generate a strong inference of scienter" where there were no confidential witness statements "tending to suggest that defendants knowingly deceived shareholders"); *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020) (alleging that former employees "rais[ed] red flags" about their concerns with defendants was insufficient to plead scienter because the allegations did not support that the CWs made statements to individual defendants that provided them with "actual knowledge."); *In re Pretium Resources Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 481 (S.D.N.Y. 2017) (finding scienter allegations insufficient where plaintiffs failed to "identify with specificity the documents or way in which this contrary information was communicated" to defendants).

Moreover, it is well-established that "Plaintiff[s] must do more than allege that . . . Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high level positions," *Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015), and that, "[w]here scienter is based on a defendant's knowledge of and/or access to certain facts, Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements." *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *27 (S.D.N.Y. Apr. 2, 2020) (emphasis in original); *see also Kasilingam* v. *Tilray, Inc.*, 2021 WL 4429788, at *9 (S.D.N.Y. Sept. 27, 2021) ("[S]cienter cannot simply be presumed from a defendant's organizational role or professional expertise").

The Complaint does not meet that standard. For example, Plaintiffs allege that Mr. Quellmann purportedly served on the OT Project Executive Committee and as Chief Financial Officer, Copper and Diamonds, at Rio Tinto before becoming CEO of TRQ on August 1, 2018, and that Mr. Lane and Mr. Colton were also former Rio Tinto employees or had been seconded to TRQ by Rio Tinto. (¶¶ 42, 292, 458.) But these allegations fail to show that any of these TRQ Defendants had actual knowledge of any adverse facts, as Plaintiffs do not identify any specific reports or information that any of them received while they were at Rio Tinto that conflicted with any of TRQ's disclosures, or allege that Rio Tinto disclosed any such information to them after they began working at TRQ. *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) (confidential witness allegations that defendants "would often receive reports" on a business area are not sufficient to allege scienter where the confidential witness did not allege "the content of the reports, the date of the reports, or whether the [defendants] ever read the reports");

*Kasilingam*, 2021 WL 4429788, at *12 (scienter lacking where confidential witnesses never spoke with or notified defendants).

Similarly, Plaintiffs allege that Mr. Quellmann, Mr. Colton, and Mr. Lane "regularly visited" the mine, and "assured investors that they knew about the project's actual status and progress." (¶ 290.) But those allegations fall well short of identifying specific information provided to the TRQ Defendants on such visits.[11]

In fact, Plaintiffs allege that a Parliamentary Working Group of the Government of Mongolia also began on-site inspections of the mine in June 2018, but apparently remained unaware of the delays, cost overruns, and other problems that Plaintiffs allege. (¶¶ 19, 197, 202, 279.) Plaintiffs fail to explain how or why the TRQ Defendants would have been in a better position to know about the purported problems on their visits to the site than the Mongolian government officials. Indeed, Plaintiffs do not allege that Bowley, Duffy, or any of the confidential witnesses they refer to in the Complaint took the occasion of such visits to provide any negative information to Mr. Quellmann, Mr. Colton, or Mr. Lane about cost overruns, delays, or other problems at the mine, or told them that such problems were caused by mismanagement, rather than geotechnical conditions. Under Plaintiffs' own theory, the more plausible inference is that TRQ did not have more knowledge than the Mongolian government. *Tellabs*, 551 U.S. at 314 (inference of scienter must be "at least as compelling as any opposing inference of non-fraudulent intent").[12]

---

[11]  *See City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008) (allegations that executives were "hands on" and "closely involved" insufficient to plead scienter without identifying "particular, identified internal reports" executives had access to).

[12]  *See also In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *21 (S.D.N.Y. Jan. 14, 2013) (finding inference of scienter not strong and "less compelling than plausible alternative inferences concerning Defendants' intent"); *In re Gold Resources Corp. Sec. Litig.*, 776 F.3d 1103, 1116 (10th Cir. 2015) (finding that complaint failed to allege a strong inference of scienter in

Plaintiffs contrast the ICG Report's findings that unexpected ground conditions were not a principal cause of delay with certain of the TRQ Defendants' statements during the relevant period attributing certain delays to weak ground conditions. (¶¶ 315-17 (excavation of chamber for primary crusher 1), ¶¶ 357-61 (excavation around Bin 11).) But nothing in the ICG Report suggests that the TRQ Defendants knew that such statements were allegedly false or misleading, to the extent that they actually were, or that they were not accurately reporting what Rio Tinto had told them. "[B]eing wrong—even embarrassingly so—is not the same as being dishonest," and even where a complaint "strongly suggests that defendants should have been more alert and more skeptical," that is not sufficient "to establish that they were promoting a fraud." *Kasilingam*, 2021 WL 4429788, at *21 (citations omitted.). Even if the TRQ Defendants made misjudgments, or even acted negligently in failing to ascertain the truth, which is not admitted but is specifically denied, that does not suffice "to conjure the *strong* inference [of scienter] required under the PSLRA." *Id.* at *8.

Plaintiffs also allege that Mr. Quellmann and Mr. Colton said they had "good visibility" and were "plugged in . . . to the processes, cost reviews and the like," and that TRQ had a "seat at the table." (¶¶ 163, 290-91, 294.) But these statements are entirely consistent with a good-faith belief that Rio Tinto, the project manager, was providing TRQ with complete and accurate information,[13] and, given the allegations of the Complaint taken as a whole, the more

---

regard to an alleged overbilling scheme at a gold mine in Mexico owned by a Colorado corporation where "the relevant personnel [were] separated by nearly 2,000 miles and international borders").

[13] *See, e.g., Foley* v. *Transocean Ltd.*, 861 F. Supp. 2d 197, 219 (S.D.N.Y. 2012) (defendant was entitled to rely in good faith on certification that a rig was in safe condition prior to a blowout).

compelling inference is that the TRQ Defendants actually believed they had "good visibility," not that they were intentionally misleading investors.[14]

This case, therefore, is unlike *In re Barrick Gold Securities Litigation*, where the complaint contained detailed allegations that individual defendants had access to specific reports and statements that contradicted their public statements regarding environmental compliance. *See In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *11 (S.D.N.Y. Apr. 1, 2015). Nowhere in the Complaint do Plaintiffs allege facts showing that any of the TRQ Defendants had access to specific adverse information regarding Oyu Tolgoi, beyond a perfunctory allusion to Mr. Quellmann's, Mr. Colton's, and Mr. Lane's "positions of control and authority" (¶ 464), which is not sufficient.[15] Moreover, in assessing Plaintiffs' scienter allegations, the Court must keep in mind that the mining business is "inherently risky," *Martin* v. *Quartermain*, 732 F. App'x 37, 42 (2d Cir. 2018); and that "it is not always possible to anticipate what miners will face as they dig deeper." *Gold Resource Corp.*, 776 F.3d at 117.

Accordingly, to the extent that Rio Tinto, as project manager, reported various setbacks, delays, or increased costs from time to time, and that unexpected geotechnical issues were causing delays, these reports cannot in and of themselves be considered "red flags" putting TRQ on notice that the project was in danger of going seriously over budget and off schedule.

---

[14] Similarly, Plaintiffs allege that TRQ mistakenly reported that lateral development of the underground mining project progressed by 2.3 kilometres in Q3 2018. TRQ later admitted this report "was false, overstated, and had to be revised" (¶ 339), and TRQ corrected that number down to 2.1 kilometres in its next quarterly report, noting that the number had been "updated to reflect revised results." (¶ 383.) If anything, the fact that TRQ immediately revised the number based on updated information further negates, rather than supports, scienter.

[15] *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 382 (S.D.N.Y. 2004) (finding that plaintiff's allegation that defendant's position as CFO was "insufficient to support an inference of scienter"); *In re Health Mgmt., Inc., Sec. Litig.*, 970 F. Supp. 192, 204 (E.D.N.Y. 1997) (citing *Duncan* v. *Pencer*, 1996 WL 19043, at *14 (S.D.N.Y. Jan. 18, 1996)).

Here, the only specific adverse information that Plaintiff alleges the TRQ Defendants were aware of by virtue of being OT LLC directors was that Jacobs Engineering Group, Inc., the principal engineering, procurement, and construction management contractor on the underground development project, sought and obtained Board approval for an increase in its budget from $240 million to $360 million. (¶ 273.) But the Mongolian Government designees on the OT Board were necessarily aware of this information as well.[16] Moreover, Plaintiff does not allege that a cost increase of this nature and magnitude was so out of the ordinary, especially in a project of such complexity and scale, as to raise a red flag that the problems were much larger, which is presumably why the Amended Complaint does not allege (and could not in good faith allege) that the Mongolian Government-appointed Board members did not support the Jacobs request. *See Kasilingam*, 2021 WL 4429788, at *11 (rejecting "the notion that any information Defendants had . . . a duty to monitor would have cured their ultimately misguided optimism" as "an impermissible retrospective critique") (quotation marks and citation omitted).

      *Abely* v. *Aeterna Zentaris Inc.* is instructive. In *Abely*, the defendant, pharmaceutical company Aeterna Zentaris, and another company (Keryx) agreed to work together on the development of a drug for the treatment of advanced cancer, with Keryx being responsible for conducting the clinical trials. 2013 WL 2399869, at *19 (S.D.N.Y. May 29, 2013). The court granted a motion to dismiss the claims against Aeterna Zentaris and found that the scienter theories regarding Aeterna Zentaris were "close to . . . incoherent," because "[s]everal of defendants' allegedly misleading statements merely repeat[ed] Keryx's findings and presentations" about the results of the clinical trials, which Keryx was responsible for. *Id.*; *see also id.* (noting that "there

---

[16] *See* Ex. 31 (Amended and Restated Shareholders' Agreement dated June 8, 2011), at 3 ("SHC [the entity owned by the Mongolian Government that is a part-owner of OT LLC] is entitled to nominate three Directors [of OT LLC]").

is no factual allegation that the defendants received information that contradicted the seemingly promising results" or any citations "to any disputes about the validity" of Keryx's data "that might have led defendants to challenge" it). Analogously here, the Complaint itself alleges that Rio Tinto controlled both operations at the mine and the flow of information about progress of the mine— indeed, Plaintiffs emphasize that Rio Tinto "dictated the content of all of Turquoise Hill's public statements concerning OT" (¶¶ 54, 450)—such that TRQ's disclosures concerning the progress of the underground development transparently consisted almost entirely of reports that relayed what Rio Tinto had told TRQ.[17]

Plaintiffs' allegations that Mr. Quellmann and Mr. Colton signed Sarbanes-Oxley certifications that were purportedly false and misleading (¶¶ 411-413) are not sufficient to allege scienter, either. SOX certifications "do not constitute a standalone basis for liability." *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021) (quotation marks omitted). Absent allegations of actual knowledge, "SOX certifications do not support an inference of scienter." *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018).[18]

---

[17] *See* ¶ 348 (Nov. 2, 2018 Investor Call, at 3) ("We did announce on October 15 that ***Rio Tinto now projects*** a 9-month delay of the start of sustainable production from the underground development"); ¶ 389 (Mar. 15, 2019 Investor Call, at 4) ("As announced on February 27, ***we were recently advised by Rio Tinto*** as our project manager that as the lateral development continues, there is more data than was previously available. And as a consequence, the understanding of the ore body has improved. As such, the location of some of the underground infrastructure may need to change."); *see also* Ex. 13 (Feb. 26, 2019 News Release), at 2; ¶ 313 (July 31, 2018 News Release, at 3); ¶ 336 (Oct. 15, 2018 News Release, at 1); ¶ 348 (Nov. 2, 2018 Investor Call, at 3); Ex. 16 (Mar. 14, 2019 News Release), at 2; Ex. 18 (Apr. 15, 2019 News Release), at 2; Ex. 20 (May 15, 2019 News Release), at 3; Ex. 25 (July 31, 2019 News Release), at 2.

[18] Plaintiffs similarly fail to adequately allege scienter or falsity with regard to Turquoise Hill's Risk Factor Disclosures (¶¶ 414-19). Plaintiffs do not allege facts showing that the Turquoise Hill Defendants knew that risks they disclosed had already materialized at the time the risk disclosures were issued. *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *11 (S.D.N.Y. Mar. 29, 2016) (ruling that risk disclosures are misleading only "where the company warns only that a risk may

Tellingly, Plaintiffs try to make up for the Complaint's lack of allegations of knowledge on the part of the TRQ Defendants by repeatedly referring to "Defendants" generally— thus lumping the TRQ Defendants together with the Rio Tinto Defendants. (*E.g.*, ¶ 271 (alleging that "Defendants were repeatedly informed" of problems and referring to "Defendants' receipt of" information from experts).[19] This semantic blurring does not satisfy the requirement of pleading scienter as to each individual defendant. *See Hou Liu*, 2020 WL 1489831, at *14. And, because Plaintiffs fail to plead scienter with respect to any individual TRQ defendant, they also fail to allege that TRQ acted with corporate scienter. *See Kasilingam*, 2021 WL 4429788, at *13.

## B.     Plaintiffs Do Not Adequately Allege Motive and Opportunity

Plaintiffs' motive allegations as to the TRQ Defendants also fail. Plaintiffs have not alleged that either Mr. Colton, Mr. Lane, Mr. Quellmann, or TRQ itself benefited or stood to benefit in any concrete and personal way from the alleged fraud.

For example, Plaintiffs have not alleged that any of the TRQ Individual Defendants sold any of their stock during the relevant period. "The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders." *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000); *see also Kasilingam*, 2021 WL 4429788, at *7 ("Crucially, Plaintiffs do not allege that [defendants] sold any of their own stock during the relevant period.") To the contrary,

---

impact its business when that risk has already materialized."); *In re Bank of America AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013) ("[W]here there is a disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk.").

[19]   *See also* ¶ 273 (alleging "Defendants engaged in a machination" to conceal the extent of delays and cost overruns); ¶¶ 275-78 (similar).

Mr. Quellmann *purchased* TRQ stock during the relevant period,[20] which is inconsistent with any allegation of scienter. *See Turner* v. *MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) ("The Complaint does not address why MacInnes and Vento would have purchased Borislow's shares if, as the Plaintiffs allege, the individual Defendants were conspiring to artificially inflate the Company's stock price.").[21] In addition, Plaintiffs themselves allege that Rio Tinto forced Mr. Quellmann to resign as TRQ's CEO because he "took actions in support of TRQ's minority shareholders that were contrary to Rio's interests" (¶¶ 39, 42), which further undercuts Plaintiffs' theory that Mr. Quellmann was working with Rio Tinto to conceal information.

In addition, when defendants order an investigation as soon as they learn of potential delays, that also "weakens rather than strengthens an inference of scienter." *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (quotation marks and citations omitted).[22] As the Complaint itself alleges, TRQ did exactly that. After disclosing in October 2018 that Rio Tinto

---

[20] Ex. 28 (Quellmann Form 55-102F2 (July 1, 2018–Aug. 31, 2019)); *see Abely*, 2013 WL 2399869, at *22 (taking judicial notice of Canadian equivalent of SEC Form 4 on motion to dismiss).

[21] *See also In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) (purchase and retention of the shares is "inconsistent with the allegation that [defendants] harbored information that the Company's financial health was in grave jeopardy") (quotation omitted); *Telecom*, 116 F. Supp. 2d at 462 (where individual defendants had "held or increased their holdings" in the company, court found "absence of stock sales by insiders" to be "inconsistent with an intent to defraud shareholders").

[22] *See also In re Gen. Elec. Sec. Litig.*, 844 Fed. App'x 385, 389 (2d Cir. 2021) (scienter allegation was not more plausible than non-culpable inference where defendant "revised its assessment of the issue" when confronted with problems and "disclosed the financial consequences with reasonable promptness"); *Aratana*, 315 F. Supp. 3d at 766 (finding that plaintiffs failed to raise a strong inference of scienter where, upon "encountering setbacks," defendants "timely updated the market"); *Agnico-Eagle Mines*, 2013 WL 144041, at *21 (finding no strong inference of scienter where defendants undertook an investigation into potential issues related to rock mass stability issues in underground mining operations).

had advised it that the timetable for sustainable first production had been delayed, TRQ commenced its own review of the scheduling issues with the assistance of a "Qualified Person."[23] TRQ then consistently updated investors about the results of its review and the occurrence of additional delays as reported by Rio Tinto.[24]  Four months later, in February 2019, TRQ (along with Rio Tinto) disclosed that "there was an increasingly likely risk of a further delay to sustainable production beyond Q3'21,"[25] and, in March 2019, gave a detailed description of the "key risks" that were "developing."[26]   Subsequently, TRQ updated the market about a definitive estimate review that Rio Tinto had commenced in addition to TRQ's own independent review to better understand the impact of the delays and any additional updates to Shaft 2 commissioning.[27]

Similarly, as Plaintiffs concede, two TRQ representatives are on the four-member OT Special Committee that approved an investigation into the causes of the cost overruns and delays to the Oyu Tolgoi underground development, the results of which investigation Plaintiffs rely on (¶ 266). This further undercuts any inference of scienter. *See, e.g., In re Welspun,* 2019 WL 2174089, at *15 (S.D.N.Y. May 20, 2019) (finding defendants' own investigation into alleged fraud suggest a prudent course of action inconsistent with scienter); *In re Agnico-Eagle Mines,* 2013 WL 144041, at *21 (S.D.N.Y. Jan. 14, 2013) (finding no strong inference of scienter where

---

[23]   *See* Ex. 8 (Oct. 15, 2018 News Release), at 2.

[24]   *See* Ex. 9 (Nov. 1, 2018 News Release), at 4; Ex. 13 (Feb. 26, 2019 News Release), at 2; Ex. 17 (Mar. 15, 2019 Investor Call), at 7; Ex. 18 (Apr. 15, 2019 News Release), at 1; Ex. 20 (May 15, 2019 News Release), at 3-4, 11; Ex. 22 (July 15, 2019 News Release), at 2; Ex. 25 (July 31, 2019 News Release), at 4.

[25]   *See* ¶¶ 230-31; Ex. 13 (Feb. 26, 2019 News Release), at 1; *see also* Ex. 14 (Rio Tinto 2018 Annual Report), at 45.

[26]   *See* ¶ 230; Ex. 15 (2018 MD&A attached to TRQ 2018 Form 40-F), at 7.

[27]   *See* Ex. 18 (Apr. 15, 2019 News Release), at 2; Ex. 20 (May 15, 2019 News Release), at 11; Ex. 22 (July 15, 2019 News Release), at 2; Ex. 25 (July 31, 2019 News Release), at 1-2, 4, 9.

defendants undertook an investigation into potential issues related to rock mass stability issues in underground mining operations).[28]

Plaintiffs allege that "Defendants" were "highly motivated" to conceal the problems at Oyu Tolgoi because the Mongolian government initiated inquiries into Rio Tinto's operations and made efforts to recoup allegedly unpaid taxes (¶¶ 187-204). These allegations fail to raise a strong inference of scienter for several reasons.

*First*, once again, Plaintiffs' allegations focus on Rio Tinto, not TRQ. Plaintiffs allege that the Rio Tinto Defendants were motivated to hide operational problems and delays at Oyu Tolgoi from the Government of Mongolia because Rio Tinto was already facing regulatory inquiries (¶¶ 188-202) and purportedly took various steps to this end (¶¶ 94, 199, 207, 281, 285-86, 298). The Complaint makes no allegations of this kind about the TRQ Defendants, and does not allege that TRQ knew that Rio Tinto was purportedly engaging in such conduct. Accordingly, the Complaint raises no inference, much less a strong inference, that any of the TRQ Defendants were among the circle of people who were purportedly privy to the "real" facts.

*Second*—and even if the alleged "motive" applied to TRQ employees—maintaining good relations with a governmental partner is the type of motive generally possessed by most corporate directors and officers; it is not the type of concrete and *personal* benefit required to raise a strong inference of scienter. *See Novak*, 216 F.3d at 307-08.[29]

---

[28] *See also Horizon Asset Mgmt. Inc.* v. *H & R Block, Inc.*, 580 F.3d 755, 763 (8th Cir. 2009) (defendants' internal investigation into accounting errors was a "prudent course of action" that weakens rather than strengthens scienter); *Higginbotham* v. *Baxter Int'l Inc.*, 495 F.3d 753, 760-61 (7th Cir.2007) ("Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention. . . .").

[29] *See also In re Sanofi-Aventis Sec. Litig.*, 2009 WL 3094957, at *7 (S.D.N.Y. Sept. 25, 2009) (the desire to avoid governmental and regulatory scrutiny is too generalized a motive); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 665 (S.D.N.Y. 2017) (finding insufficient motive "to avoid potential criminal liability [and] prosecution").

## II.    TRQ'S STATEMENTS CONCERNING THE PROJECTED COST AND TIMELINE FOR THE UNDERGROUND DEVELOPMENT ARE FORWARD-LOOKING STATEMENTS PROTECTED BY THE PSLRA SAFE HARBOR

Under the PSLRA's safe-harbor provision, 15 U.S.C. § 78u-5(c), "'a defendant is not liable if . . . the forward-looking statement is identified and accompanied by meaningful cautionary language . . . or . . . the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading.'" *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 374-75 (S.D.N.Y. 2018) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245-46 (2d Cir. 2016)).[30]

The bulk of the statements that Plaintiffs challenge as being false and misleading concern the expected timeline for the first draw bell and sustainable first production, and the expected amount of capital expenditures required to complete development of the underground mining project. (*E.g.*, ¶ 306 ("The Company continues to expect the first draw bell in mid-2020 and sustainable first production in 2021."); ¶ 307 ("The major growth projects remain on track, with construction of the first draw bell at Oyu Tolgoi Underground anticipated in mid-2020.")).[31]

These statements are not actionable because they are protected by the PSLRA safe harbor for forward-looking statements accompanied by meaningful cautionary language, and Plaintiffs do not adequately allege that they were false.[32]

---

[30]  *See also Gregory* v. *ProNai Therapeutics Inc.*, 297 F. Supp. 372, 397 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).

[31]  *See also* ¶ 315 ("We will remain on target for the first drill point blast in mid-2020 and sustainable production in early 2021"); ¶ 334 ("[T]he project remains on schedule to complete in 2022"); ¶ 335 ("Rio Tinto has undertaken a second annual re-forecast . . . and preliminary results have concluded that capital costs remain in line with the overall $5.3 billion budget and the project remains on schedule to complete in 2022.").

[32]  The statements similarly fail under the judicially created counterpart to the PSLRA—the "bespeaks-caution" doctrine. Under this doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have

A.     **The Statements Are Identified as Forward-Looking and Accompanied by Meaningful Cautionary Language**

Statements "need not be specifically labeled as forward-looking or segregated into a separate section to qualify for safe-harbor protection." *Barrick*, 341 F. Supp. 3d at 375. Rather, the "use of linguistic cues like 'we expect' or 'we believe,' when companied with an explanatory description of the company's intention to thereby designate a statement as forward-looking" is "generally . . . sufficient to put the reader on notice that the company is making a forward-looking statement." *Id.* (quoting *Slayton*, 604 F.3d at 769).

In particular, courts have held that statements regarding mining development schedules and "construction estimate[s]" are forward-looking statements protected by the PSLRA. *See, e.g.*, *Barrick Gold*, 2015 WL 1514597, at *8 (finding that because company's "construction estimate was clearly identified as just that—an estimate—and the schedule was set out as 'expected,'" the statements "plainly qualify as forward-looking statements").[33]

The same can be said for statements about the project remaining "on track" and "on schedule." [34]   Here, such statements concerned the estimated time for the first draw bell,

---

found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys.* v. *MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010).

[33]   *See also City of Austin Police Dep't Ret. Sys.* v. *Kinross Gold Corp.*, 957 F. Supp. 2d 277, 302 (S.D.N.Y. 2013) (finding statements regarding development schedule of goldmining operation in West Africa were forward-looking statements); *Moshell* v. *Sasol Ltd.*, 481 F. Supp. 3d 280, 288 (S.D.N.Y. 2020) (energy company's "statement[s] containing a projection of . . . capital expenditures" and "statement[s] of the plans and objectives of management for future operations" were forward-looking); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 84 (S.D.N.Y. 2017) (statements regarding projected performance of company's joint venture with Brazilian mining company were forward-looking); *Aratana*, 315 F. Supp. 3d at 758-59 (finding that statements regarding company's "expectations" regarding the timeline for commercial release of pharmaceuticals were forward-looking statements).

[34]   As discussed below in Sections D and E, these statement are also not actionable because they are statements of opinion and vague statements of optimism.

sustainable first production, and completion of the project (*e.g.*, ¶¶ 334-36), which, as discussed above, constitute forward-looking statements.[35] All of the TRQ statements that Plaintiffs are challenging regarding the projected capital costs, and the timeline for the underground development, and the start of production are clearly identified as forward-looking by the use of words like "expects,"[36] and TRQ's disclosures expressly state that all such statements are forward-looking statements.[37]

---

[35]    *See, e.g., Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) (holding that company's statement that it was "on track" to achieve goal of producing 5,000 vehicles per week was forward-looking statement, and noting that "[t]he statutory safe harbor would cease to exist if it could be defeated simply by showing that a statement has the sort of features that are inherent in *any* forward-looking statement"); *see also Adient*, 2020 WL 1644018, at *8 (finding statements regarding metals business being "on track" to be forward-looking statements); *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009) (finding that a "press release stating that the Institutional Division 'is on track to deliver a turnaround at an underlying level, with excellent revenue growth'" is "forward-looking"); *Institutional Inv'rs Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 255-56 (3d Cir. 2009) (finding company's statement that it was "on track" to meet a future projection was forward-looking.).

[36]    *See, e.g.,* (¶ 313)  ("The Company continues *to expect* the first draw bell in mid-2020 and sustainable first production in 2021"); ¶ 336 ("[S]ustainable first production, which is now *expected* to occur by the end of Q3'21 . . . .") (October 15, 2018 News Release, at 1); ¶ 345 ("[C]onstruction completion schedule remains on track for 2022 and the project *is expected* to be completed at the $5.3 billion budget estimate. . .") (Nov. 1, 2018 News Release, at 4); ¶ 230 ("[P]roject cost *was expected* to remain within the $5.3 billion budget.") (Feb. 26, 2019 News Release, at 1); Ex. 20 (May 15, 2019 News Release), at 3 ("Rio Tinto, in its role as manager of Oyu Tolgoi, has advised that the fit-out and commissioning work on Shaft 2 is now *expected* to be completed by the end of October 2019"); Ex. 22 (July 15, 2019 News Release), at 2 ("This results in sustainable first production now *being expected* between May 2022 and June 2023.").

[37]    *See, e.g.,* Ex. 4 (TRQ 2017 Form 40-F), at 2 ("Certain statements made herein, including statements relating to matters that are not historical facts and statements of the Company's beliefs, intentions and expectations about developments, results and events which will or may occur in the future, constitute 'forward-looking information' within the meaning of applicable Canadian securities legislation and 'forward-looking statements' within the meaning of the 'safe harbor' provisions of the United States Private Securities Litigation Reform Act of 1995"); Ex. 6 (July 31, 2018 News Release), at 17 (same); Ex. 8 (Oct. 15, 2018 News Release), at 3–4 (same); Ex. 9 (Nov. 1, 2018 News Release), at 18–19 (same); Ex. 13 (Feb. 26, 2019 News Release), at 2 (same); Ex. 18 (Apr. 15, 2019 News Release), at 3 (same); Ex. 22 (July 15, 2019 News Release), at 4 (same); Ex. 25 (July 31, 2019 News Release), at 20 (same); *see also* Ex. 10 (Nov. 2, 2018 Investor Presentation), at 2 ("This presentation includes certain 'forward-looking information' within the meaning of applicable Canadian securities legislation and 'forward-looking statements' within the

TRQ's statements regarding the underground development timelines and expected capital costs were also accompanied by meaningful cautionary language.

"To determine whether cautionary language is meaningful, courts must first identify the allegedly undisclosed risk and then read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." *Barrick*, 341 F. Supp. 3d at 377 (quotation marks omitted).

As an initial matter, TRQ's disclosures and cautionary language must be considered in the context of an investment in a mining operation, which is an "inherently risky" business. *See Martin*, 732 F. App'x at 42 (noting that statements at issue must be considered "in the context of an investment in a gold mine," which is "inherently risky").[38]

Moreover, as discussed above, TRQ's 40-Fs and news releases contained abundant disclosures that unexpected problems and delays could occur that would materially impact the schedule and projected costs of the project, and specifically cautioned about factors that were "inherently uncertain," including "delays, and the costs which would result from delays, in the development of the underground mine," "which could significantly exceed the costs projected in

---

meaning of the 'safe harbor' provisions of the United States Private Securities Litigation Reform Act of 1995"); Ex. 12 (Jan. 17, 2019 Investor Presentation), at 2 (same); Ex. 7 (Aug. 1, 2018 Investor Call), at 13 ("In the conference calls upon which Event Briefs are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties."); Ex. 11 (Nov. 2, 2018 Investor Call), at 13 (same); Ex. 17 (Mar. 15, 2019 Investor Call), at 13 (same); Ex. 21 (May 16, 2019 Investor Call), at 9 (same); Ex. 23 (July 16, 2019 Investor Call), at 15 (same).

[38]  *See also In re Gold Resource Corp. Sec. Litig.*, 776 F.3d 1103, 117 (10th Cir. 2015) (noting that the "mining business" is "one in which it is not always possible to anticipate what miners will face as they dig deeper.").

the Statutory Feasibility Study and the 2016 OTTR." (Ex. 4 (TRQ 2017 Form 40-F), at 3; Ex. 15 (TRQ 2018 Form 40-F), at 2.)[39]

Similarly, TRQ's October 15, 2018 and November 1, 2018 news releases and other disclosures warned investors that the "cost, timing and complexities of mine construction and development are increased by the remote location" of the Oyu Tolgoi mine and that it "is common in mining operations and in the development or expansion of existing facilities to experience unexpected problems and delays during development, construction and mine start-up." (Ex. 8 (Oct. 15, 2018 News Release), at 4; Ex. 9 (Nov. 1, 2018 News Release), at 19.) In *In re NovaGold Resources Inc. Securities Litigation*, 629 F. Supp. 2d 272 (S.D.N.Y. 2009), Judge Cote found substantially identical language meaningfully cautionary to "address[] the 'relevant risk directly,' a risk of rising capital costs." *Id.* at 294-95.

Each of TRQ's news releases also contained language specifically advising investors that forward-looking statements include "information regarding . . . the development options under consideration for the design" of the mine "and the related cost and schedule implications," as well as "capital and operating cost estimates," and that there was no assurance such statements would prove accurate. (Ex. 22 (July 15, 2019 News Release), at 4); *see also Halperin* v. *eBanker USA.Com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).[40]

---

[39]   *See, e.g.*, Ex. 8 (Oct. 15, 2018 News Release), at 4; Ex. 9 (Nov. 1, 2018 News Release), at 19; Ex. 13 (Feb. 26, 2019 News Release), at 3; Ex. 22 (July 15, 2019 News Release), at 4; Ex. 16 (Mar. 14, 2019 News Release), at 20; Ex. 18 (Apr. 15, 2019 News Release), at 3; Ex. 25 (July 31, 2019 News Release), at 20; *see also* Ex. 19 (2019 MD&A attached to TRQ Form 6-K, dated May 15, 2019), at 23; Ex. 4 (2017 AIF attached to TRQ 2017 Form 40-F), at 4.

[40]   *See also NovaGold*, 629 F. Supp. 2d at 294 ("Given the warnings regarding capital costs," it would be "unreasonable" for an investor "to demand that a cost estimate must hold steady over a multi-year period requiring considerable amounts of construction of a large mine in a remote location[.]" ).

TRQ's news releases also contained cautionary language warning that "there can be no assurance" that its forward-looking statements "will prove to be accurate," and that they were "based on certain assumptions and analyses made by the Company's management in light of their experience and perception of historical trends, current conditions and expected future developments, as well as other factors management believes are appropriate in the circumstances"[41]—which is nearly identical to cautionary language the Second Circuit found meaningful in *Martin*, 732 F. App'x at 42.

In addition, TRQ repeatedly cautioned investors during the relevant time period that Rio Tinto and TRQ were continuing to review the reasons for the disclosed delays and their impact on the projected capital costs and timeline for the underground development, and that the results of those reviews had not yet been completed. *See, e.g.*, Ex. 13 (Feb. 26, 2019 News Release), at 2 ("The Company is working with Rio Tinto to understand the issues and in parallel with the definitive estimate review, Turquoise Hill will assess the impact of any further delay to sustainable first production beyond the end of Q3'21 on the Company's cash flows, liquidity and funding requirements, as well as investigate potential mitigation options.").[42]

---

[41] *E.g.*, Ex. 8 (Oct. 15, 2018 News Release), at 4; Ex. 9 (Nov. 1, 2018 News Release), at 19; Ex. 13 (Feb. 26, 2019 News Release), at 2-3; Ex. 16 (Mar. 14, 2019 News Release), at 20; Ex. 20 (May 15, 2019 News Release), at 18; Ex. 25 (July 31, 2019 News Release), at 20.

[42] *See also* Ex. 18 (Apr. 15, 2019 News Release), at 2 ("[M]ore detailed geotechnical information and different ground conditions have required a review of the mine design and the development schedule. The impact of these changes, including the further delay to Shaft 2, will be included in the definitive estimate review, which is expected to be completed towards the end of the year."); ¶ 395 (quoting same); Ex. 21 (May 16, 2019 Investor Call), at 3 ("[W]ork continues on the definitive estimate work. This may include some potentially significant changes to the design of some future elements of the mine design and the development schedule . . . We expect to provide an update along with our half-year results followed by the definitive estimate review, which is expected to be completed by year-end.")); ¶ 400 (quoting same); ¶ 345 (quoting Nov. 1, 2018 News Release).

As in *Aratana Therapeutics Inc. Sec. Litig.*, given these disclosures concerning the potential risk, "the mere fact that the risk materialized cannot support a claim under the Exchange Act." 315 F. Supp. 3d at 760.[43]

**B.    Plaintiffs Do Not Adequately Allege That the TRQ Defendants Made Any Forward-Looking Statements with Actual Knowledge That They Were False**

In addition, the Complaint does not adequately allege that the TRQ Defendants' forward-looking statements were made with actual knowledge of falsity. This standard is more demanding than the scienter requirement for Rule 10b-5 claims, which can be satisfied by recklessness. *See Slayton*, 604 F.3d at 773; *Barrick*, 2015 WL 1514597, at *9 (where statements were "protected under the PSLRA safe harbor, plaintiffs must allege actual knowledge— recklessness will not suffice"). The Complaint falls well short of meeting the "actual knowledge" standard. As discussed above in regard to scienter, the Complaint does not allege a single fact showing that anyone at TRQ had actual knowledge that any of the Company's statements regarding the expected costs and timeline for the underground mine were false.

To the extent that Plaintiffs allege actual knowledge on the part of the TRQ Defendants, the allegations are entirely conclusory and, as discussed earlier, improperly lump the TRQ and Rio Tinto Defendants together without specifying any information purportedly known by the TRQ Defendants. (*See, e.g.*, ¶¶ 271-72 (alleging "Defendants were repeatedly informed" of problems and "Defendants' receipt of" information from experts is "powerful evidence of scienter" but listing only knowledge attributable to Rio Tinto Defendants).[44]

---

[43]    *See also Acito* v. *IMCERA Grp.*, 47 F.3d 47, 53 (2d Cir. 1995) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud.").

[44]    *See also* ¶ 273 (alleging "Defendants engaged in a machination" to conceal the extent of delays and cost overruns, but describing only knowledge attributable to Rio Tinto Defendants).

Also, Plaintiffs do not allege that TRQ misreported anything that Rio Tinto told it or that Rio Tinto provided TRQ with any information that conflicted with the information that TRQ disclosed. To the contrary, Plaintiffs themselves have stated that Rio Tinto "dictated" any "communication disseminated outside Turquoise Hill concerning Oyu Tolgoi or any communication that could impact Turquoise Hill's stock price" (¶¶ 54, 450), has "near complete operational control over [Oyu Tolgoi]," was not "provid[ing] to [TRQ] a definitive estimate of cost overruns and required mine design changes," and has otherwise excluded TRQ from key decisions. (*See* Ex. 26 (Apr. 2, 2020 Pentwater Letter to Shareholders), at vii–viii, ix, x.) And even as recently as January 29, 2021, Plaintiffs issued a news release denouncing Rio Tinto for systematically restricting TRQ's ability to have communication with the Government of Mongolia and "overriding" TRQ's "right[s] and fiduciary obligations" related to Oyu Tolgoi. (Ex. 27 (Pentwater News Release dated Jan. 29, 2021), at 1 n.1.)

Finally, Plaintiffs allege that former Rio Tinto consultant Richard Bowley and other former Rio Tinto employees warned of problems, but these allegations do not show that TRQ or any of its employees had actual knowledge of any such issues. There is no allegation that Mr. Bowley or anyone else conveyed that information to Mr. Quellmann, Mr. Colton, Mr. Lane, or anyone else at TRQ, nor did the ICG Report make any such finding.

## III.   TRQ'S STATEMENTS REGARDING THE EXPECTED TIMELINE AND COSTS AND OTHER ISSUES WERE STATEMENTS OF OPINION THAT THE COMPLAINT DOES NOT ADEQUATELY ALLEGE WERE FALSE

Plaintiffs' claims concerning TRQ's statements about the expected costs and timeline for the underground development, that the delays being experienced were "not atypical," (¶ 348) and that the key risks were "well understood and managed," (¶ 362) also fail because these are "quintessential opinion statements," *Martin*, 732 F. App'x at 40 n.1 ("Estimates, in particular, constitute a well-established species of opinion" because they "will vary depending on the

particular methodology and assumptions used") (citations omitted),[45] and Plaintiffs have not adequately alleged that they were false.

To adequately allege that a statement of opinion is false, a plaintiff must show that the defendant: (1) "did not hold the belief [defendant] professed"; (2) the "supporting fact[s] [defendant] supplied were untrue"; or (3) "omit[ted] information whose omission ma[d]e[] the statement[s] misleading to a reasonable investor." *Tongue* v. *Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)).[46] None of that is alleged here.

As an initial matter, nowhere do Plaintiffs allege "subjective falsity"—*i.e.*, that TRQ did not believe the estimates or projections it received from Rio Tinto. Nor do Plaintiffs allege that Rio Tinto—the on-site manager and entity closest to the progress and development of the Oyu Tolgoi mine—ever disputed or contradicted TRQ's statements regarding the progress of the development of the mine. Nor do Plaintiffs allege any facts showing that any of TRQ's statements were "objectively false" at the time they were made. Rather, as in *Martin*, Plaintiffs at best allege "merely that [TRQ] should have drawn different conclusions" from the facts. 732 F. App'x at 41. But, "[a]llegations of that sort do not give rise to a claim of objective falsity." *Id.* (citing *Tongue*, 816 F.3d at 214). Finally, Plaintiffs do not allege that TRQ failed to disclose any information that rendered its statements misleading to a reasonable investor.

---

[45]  *See also In re Pretium Resources Inc. Sec. Litig.*, 2020 WL 953609, at *4 (S.D.N.Y. Feb. 27, 2020) (ruling that statements that "give commentary or updates on, or tacitly express confidence in, aspects of [the defendant's] mine plan, which provided estimates and projections for developing and administering the mine" were statements of opinion).

[46]  S*ee also Chapman* v. *Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 398 (S.D.N.Y. 2020) (Liman, J.).

## IV.    CERTAIN OF THE TRQ STATEMENTS THAT PLAINTIFFS CHALLENGE ARE VAGUE STATEMENTS OF OPTIMISM THAT ARE NOT ACTIONABLE

Plaintiffs' claims regarding certain of TRQ's statements that Plaintiffs are challenging also fail because the statements are vague statements of corporate optimism, or puffery, that are not actionable.   *See Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations.").[47]

Thus, for example, Plaintiffs focus on statements such as "capital costs remain in line" and "the project remains on schedule to complete in 2022" (¶¶ 334-35); "lateral development has progressed well, construction completion schedule remains on track for 2022" (¶ 336); "Key risks . . . well understood and managed" (¶¶ 362, 363, 366, 368).

In case after case, courts have held nearly identical statements to be inactionable statements of optimism, or puffery.  *See, e.g.*, *Elec. Workers Pension Fund, Local 103* v. *Six Flags Enter. Corp.*, 2021 WL 807251, at *23 (N.D. Tex. Mar. 3, 2021) (finding that statement that the "parks **are progressing** nicely" falls "squarely in the category of corporate optimism or puffery that is insufficient to state a PSLRA claim") (emphasis added); *Landow* v. *Bartlett*, 2019 WL 1027994, *4 (D. Nev. Mar. 4, 2019) ("Statements that an investment is . . . '**well managed**' are not actionable . . . .") (emphasis added).[48]

---

[47]    *See also In re Synchrony Fin. Sec. Litig.*, 2021 WL 560204, at *8 (2d Cir. Feb. 16, 2021) ("Vague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices are too general to cause a reasonable investor to rely upon them and therefore are precisely the type of puffery that this and other circuits have consistently held to be inactionable.") (quotation marks omitted).

[48]    *See also In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *9-10 (S.D.N.Y. Sept. 14, 2015) (finding statements "indicat[ing] that the [FDA approval] process was '**on track**' and making continued '***progress***' to be inactionable puffery) (emphasis added); *Elliott Assocs., L.P.* v. *Covance, Inc.*, 2000 WL 1752848, at *10 (S.D.N.Y. Nov. 28, 2000) ("If something is '**on track**' it is reasonable to assume that it could go 'off track.' Thus, the challenged statements are vague expressions of opinion which are not sufficiently concrete or specific to impose a duty to update.") (emphasis added).

Moreover, only one statement in the Complaint attributed to the TRQ Defendants says anything about things "progressing well." That was an October 15, 2018 news release in which TRQ stated: "Rio Tinto, in its role as manager of Oyu Tolgoi and underground construction contractor, has undertaken its second annual schedule and cost re-forecast for the project. According to this re-forecast, lateral development has progressed well . . . ." (¶ 336.) Plaintiffs allege no facts to show that TRQ misreported Rio Tinto's re-forecast or that the re-forecast did not show that lateral development had "progressed well" up to that point.[49] Nor does the Complaint allege that TRQ had disbelieved what Rio was reporting. Moreover, in the same release, TRQ stated that it had been notified by Rio Tinto that there had been delays in the completion of Shaft 2 and delays resulting from "challenging ground conditions" (¶ 334); so, if those are the facts Plaintiffs are relying on to show falsity, TRQ disclosed them.

## V.    THE TRQ DEFENDANTS ARE NOT LIABLE FOR STATEMENTS MADE BY THE RIO TINTO DEFENDANTS

Plaintiffs allege that the TRQ Defendants are liable under SEC Rule 10b-5(a) and SEC Rule 10b-5(c) for disseminating the purportedly false statements made by Rio and RTIH. (¶ 451.) This argument fails, too. The Supreme Court ruled in *Lorenzo* v. *SEC*, 139 S. Ct. 1094 (2019), that a person who disseminates false or misleading information *with an intent to defraud* can violate sections (a) and (c) of Rule 10b-5, even if the person was not the "maker" of the untrue statements. But, in *Lorenzo*, the defendant admittedly knew that the statements he disseminated in emails were false, and he did not contest that he sent emails with an intent to defraud the recipients. *Id.* at 1101. Here, in contrast, as discussed above, Plaintiffs have not alleged facts

---

[49]    *In re Fed Ex Corp. Sec. Litig*, 2021 WL 396423, at *14 (S.D.N.Y. Feb. 4, 2021) (finding statement that "we are progressing well on the integration, and customers are beginning to see the value" to be inactionable puffery).

showing that any of the TRQ Defendants knew that the Rio Tinto statements that they disseminated were false and misleading, or that they disseminated them with fraudulent intent.

## VI. PLAINTIFFS' "CONTROL PERSON" CLAIM AGAINST THE TRQ INDIVIDUAL DEFENDANTS FAILS TO STATE A CLAIM FOR RELIEF

Finally, Plaintiffs' Section 20(a) "control person" against the TRQ Individual Defendants also fails to state a claim for relief. First, it fails because Plaintiffs have not adequately alleged an underlying claim against Turquoise Hill. *See Slayton*, 604 F.3d at 778; *Pretium*, 256 F. Supp. 3d at 482. Second, Plaintiffs' assertions that the TRQ Individual Defendants influenced and controlled the "content and dissemination" of their public statements (¶ 464) directly contradict Plaintiffs' assertions that Rio Tinto overtly "dictated" Turquoise Hill's communications and access to information about OT (¶¶ 54, 450).

## CONCLUSION

The Complaint is Plaintiffs' second amended complaint, and was filed after Plaintiffs saw and responded to the TRQ Defendants' motion to dismiss their prior complaint and after Plaintiffs had the benefit of reviewing the ICG Report. There is no reason to believe that Plaintiffs can cure its deficiencies in yet another amended pleading. All of the claims asserted against the Turquoise Hill Defendants should therefore be dismissed with prejudice and without leave to replead.

Dated: New York, New York
       October 19, 2021

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

*/s/ Gregory F. Laufer*
Gregory F. Laufer
Richard A. Rosen
Robert N. Kravitz
James G. Mandilk
1285 Avenue of the Americas
New York, New York  10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990
glaufer@paulweiss.com
rrosen@paulweiss.com
rkravitz@paulweiss.com
jmandilk@paulweiss.com

*Attorneys for Defendants Turquoise Hill*
*Resources Ltd., Luke Colton, Brendan Lane, and*
*Ulf Quellmann*