**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE TURQUOISE HILL RESOURCES LTD.
SECURITIES LITIGATION

Case No. 1:20-cv-08585-LJL

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

GLOSSARY ......................................................................................................... xvi

PRELIMINARY STATEMENT ............................................................................... 1

I.  STATEMENT OF FACTS ......................................................................... 6

    A.  Rio Tinto's Control Over Turquoise Hill....................................... 7

    B.  The Oyu Tolgoi Underground Expansion Was Plagued By Delays and Cost Overruns......................................................................... 9

    C.  Defendants Were Warned About Delays and Cost Overruns and Hired An Expert, Now-Turned Whistleblower, to Investigate ................. 12

    D.  Despite Warnings, Defendants Concealed Oyu Tolgoi Delays and Cost Overruns From Investors ................................................... 15

    E.  Defendants Had A Powerful Motive to Hide the Problems at OT ............ 17

    F.  Defendants Concocted A False "Re-Forecast" to Conceal the Oyu Tolgoi Delays and Cost Overruns............................................... 18

    G.  Rio Tinto Retaliated Against Numerous Whistleblowers........................ 20

    H.  Under Pressure from the Whistleblower, Defendants Disclose Oyu Tolgoi Cost Overruns and Delays............................................... 21

ARGUMENT ....................................................................................................... 24

II.  PLAINTIFF HAS STANDING TO ASSERT SECTION 10(B) CLAIMS AGAINST ALL DEFENDANTS ........................................................... 24

    A.  Plaintiff Properly Asserts Section 10(b) Claims Against the Rio Defendants ................................................................................. 25

    B.  Rio Is Liable Under Rule 10b-5(b) as the Maker of TRQ's False Statements ................................................................................. 34

    C.  Rio Is Liable Under Rule 10b-5(a) and (c) for Knowingly Disseminating False Information Through TRQ ...................................... 36

III.  LEAD PLAINTIFF ADEQUATELY ALLEGES FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....................................................... 40

A.     Plaintiff Adequately Alleges Defendants' False and Misleading Statements and Omissions Concerning the Oyu Tolgoi Underground Expansion ..................................................................41

B.     Plaintiff Adequately Alleges, and the ICG Report Confirms, that Defendants Made False and Misleading Statements and Omissions Concerning the Causes of Delays and Cost Overruns at Oyu Tolgoi........46

C.     Plaintiff Adequately Alleges Defendants' Improper Failure to Recognize the Impairment of the Oyu Tolgoi CGU ..................................47

D.     Plaintiff Adequately Alleges False and Misleading SOX Certifications..................................................................................................48

E.     Plaintiff Adequately Alleges False and Misleading Risk Factor Disclosures ..............................................................................................49

F.     Defendants' Falsity and Materiality Arguments Are Meritless ................50

     1.     Defendants' Statements Are Not Inactionable Puffery................. 50

     2.     The PSLRA Safe Harbor Does Not Protect Defendants' False and Misleading Statements and Omissions ........................ 53

         a.     Defendants' Statements Were False When Made............ 53

         b.     Defendants' Boilerplate Disclosures Did Not Trigger The Safe Harbor ............................................................. 56

         c.     Defendants' Statements Were Made With Actual Knowledge They Were False............................................ 57

     3.     Defendants' Statements Are Not Inactionable Statements of Opinion .......................................................................................... 58

     4.     Defendants' Statements Were Material ....................................... 61

IV.     LEAD PLAINTIFF ALLEGES A STRONG INFERENCE OF SCIENTER ...... 62

A.     The Complaint Provides Overwhelming Evidence of Scienter ................62

B.     Defendants' Scienter Arguments Are Meritless ......................................74

V.     LEAD PLAINTIFF ALLEGES LOSS CAUSATION ......................................... 88

VI.     LEAD PLAINTIFF ALLEGES CONTROL CLAIMS UNDER SECTION 20(A)……………………………………………………………………………90

CONCLUSION.................................................................................................. 92

i

## TABLE OF AUTHORITIES

CASES                                                                 Page(s)

*Abramson v. Newlink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020)....................................................................88

*In re Adient plc Sec. Litig.*,
   2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)............................................55, 75, 83

*In re Agnico-Eagle Mines*,
   2013 WL 144041 (S.D.N.Y. Jan. 14, 2013) ...........................................78

*In re Alphabet, Inc. Sec. Litig.*,
   2021 WL 2448223 (9th Cir. June 16, 2021) ..........................................38, 39

*In re Alpharma Inc. Sec. Litig.*,
   372 F.3d 137 (3d Cir. 2004).....................................................................76

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................................65, 91, 92

*In re Altisource Portfolio Solutions, S.A. Sec. Litig.*,
   2015 WL 12001262 (S.D. Fla. Sept. 4, 2015) .......................................30, 31

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010)......................................................73

*In re APAC Teleservice, Inc. Sec. Litig.*,
   1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999) ........................................44

*In re Aqua Metals, Inc. Sec. Litig.*,
   2019 WL 3817849 (N.D. Cal. Aug. 14, 2019) .......................................39

*In re Aratana Therapeutics Inc. Sec. Litig.*,
   315 F. Supp. 3d 737 (S.D.N.Y. 2018)......................................................52, 55, 83

*Ark. Teacher Ret. Sys. v. Bankrate, Inc.*,
   18 F. Supp. 3d 482 (S.D.N.Y. 2014)........................................................92

*In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*,
   2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .......................................56

*Azar v. Yelp, Inc.*,
   2019 WL 285196 (N.D. Cal. Jan. 22, 2019) ..........................................90

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017)..............................................................52, 69

*In re Bank of America*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013)....................................................................50

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
    390 F. Supp. 3d 432 (S.D.N.Y. 2019)....................................................................31

*In re Barrick Gold Sec. Litig.*,
    2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)..........................................................56

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................32, 61

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)..........................................................56, 65, 85

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017)......................................................................56

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015)......................................................................78

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975)..............................................................................................28

*Bondholder Comm. on Behalf of Owners of Quad Cities Reg'l Econ. Dev. Auth.
    First Mortg. Revenue Bonds Series 2013A v. Sauk Valley Student Hous., LLC*,
    2020 WL 5995617 (D.N.J. Oct. 9, 2020)..............................................................36

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
    2021 WL 3675180 (D. Conn. Aug. 19, 2021) ......................................................37

*In re Bristol–Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)....................................................................39

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    56 F. Supp. 3d 549 (S.D.N.Y. 2014)............................................................. *passim*

*In re Carter-Wallace, Inc. Sec. Litig.*,
    220 F.3d 36 (2d Cir. 2000)....................................................................................76

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)............................................................................... *passim*

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
    403 F. Supp. 3d 712 (D. Minn. 2019)....................................................................36

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)........................................................................66

*Chill v. Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996).............................................................................69, 83

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010)......................................................................84

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
701 F. Supp. 2d 506 (S.D.N.Y. 2010)......................................................................73

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013)................................................................ *passim*

*City of Brockton Retirement System v. Shaw Group. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008)......................................................................85

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)..............................................40, 42, 56, 60

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ..........................................................83

*City of Roseville Emp. Ret. Sys. v. Nokia Corp.*,
2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011)............................................................47

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
423 F. Supp. 2d 348 (S.D.N.Y. 2006)......................................................................51

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
2020 WL 3026564 (D.N.J. June 5, 2020) ..............................................36, 37, 39

*Colbert v. Rio Tinto PLC*,
824 Fed. App'x 5 (2d Cir. 2020)............................................................................52

*Collier v. ModusLink Glob. Sols., Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014) ....................................................................71, 72

*CompuDyne Corp. v. Shane*,
453 F. Supp. 2d 807 (S.D.N.Y. 2006)......................................................................90

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010)......................................................................65

*Cotter v. Gwyn*,
2016 WL 4479510 (E.D. La. Aug. 25, 2016) ..........................................................35

iv

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ........................................................................50

*In re Deutsche Telekom AG Sec. Litig.*,
  2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ..........................................................................92

*Dietrich v. Bauer*,
  126 F. Supp. 2d 759 (S.D.N.Y. 2001) ...................................................................................90

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
  323 F. Supp. 3d 393 (S.D.N.Y. 2018) ...................................................................................92

*Drobbin v. Nicolet Instrument Corp.*,
  631 F. Supp. 860 (S.D.N.Y. 1986) ........................................................................................91

*Duane & Virginia Lanier Tr. v. SandRidge Mississippian Tr. I*,
  361 F. Supp. 3d 1162 (W.D. Okla. 2019) .............................................................................30

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ...............................................................................................................88

*In re EDAP TMS S.A. Sec. Litig.*,
  2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) ......................................................................52

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017) ...................................................................................39

*Elliott Assocs., L.P. v. Covance, Inc.*,
  2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) .......................................................................52

*In re EZCorp., Inc. Sec. Litig.*,
  181 F. Supp. 3d 197 (S.D.N.Y. 2016) ...................................................................................65

*In re Fannie Mae 2008 Sec. Litig.*,
  2011 WL 13267340 (S.D.N.Y. Apr. 11, 2011) ......................................................................86

*In re Fannie Mae*,
  891 F. Supp. 2d 458 (S.D.N.Y. 2012) ...................................................................................86

*In re Fed Ex Corp. Sec. Litig*,
  517 F. Supp. 3d 216 (S.D.N.Y. 2021) ...................................................................................52

*In re Flag Telecom Sec. Litig.*,
  308 F. Supp. 2d 249 (S.D.N.Y. 2004) ...................................................................................75

*Fogel v. Wal-Mart de Mexico SAB de CV*,
  2017 WL 751155 (S.D.N.Y. Feb. 27, 2017) ..........................................................................33

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018) .......................................................................61

*Frederick v. Mechel OAO*,
  475 F. App'x 353 (2d Cir. 2012) ...............................................................................73

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................. *passim*

*Ga. Firefighters Pension Fund v. Anadarko Petroleum Corp.*,
  2021 WL 182316 (S.D. Tex. Jan. 19, 2021) .......................................................38, 83

*In re Galena Biopharma, Inc. Securities Litigation*,
  117 F. Supp. 3d 1145 (D. Or. 2015) ....................................................................32, 39

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018) ..................................................................54, 55

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ......................................................................................69

*Garber v. Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008) .......................................................................78

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012) .......................................................................72

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) .......................................................................76

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..................................................................66, 83

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005) .............................................................92

*In re Gold Resource Corp. Securities Litigation*,
  776 F.3d 1103 (10th Cir. 2015) .................................................................................65

*Gray v. Wesco Aircraft Holdings, Inc.*,
  454 F. Supp. 3d 366 (S.D.N.Y. 2020) .......................................................................55

*Gross v. GFI Grp., Inc.*,
  162 F. Supp. 3d 263 (S.D.N.Y. 2016) .......................................................................88

*Gruber v. Gilbertson*,
  2021 WL 2482109 (S.D.N.Y. June 17, 2021) ...........................................................87

*Harbinger Capital Partners LLC v. Deere & Co.*,
 632 F. App'x 653 (2d Cir. 2015) ..............................................................29, 30, 31

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
 422 F. Supp. 3d 821 (S.D.N.Y. 2019)......................................................................51

*In re HealthSouth Corp. Sec. Litig.*,
 257 F.R.D. 260 (N.D. Ala. 2009)............................................................................32

*In re HealthSouth Corp. Sec. Litig.*,
 CV-03-BE-1500-S (N.D. Ala. Feb. 4, 2009) ..........................................................32

*Hering v. Rite Aid Corp.*,
 331 F. Supp. 3d 412 (M.D. Pa. 2013) ......................................................................31

*Hertz Corp. v. Accenture LLP*,
 2019 WL 5537997 (S.D.N.Y. Oct. 25, 2019) ..........................................................52

*In re Hi-Crush Partners L.P. Sec. Litig.*,
 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...............................................90, 91, 92

*Higginbotham* v. *Baxter Int'l Inc.*,
 495 F.3d 7531 (7th Cir. 2007) .................................................................................78

*Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*,
 580 F.3d 755 (8th Cir. 2009) ...................................................................................78

*Hou Liu v. Intercept Pharm. Inc.*,
 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) .........................................................72

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) .........................................................88

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
  Scot. Grp., PLC*,
 783 F.3d 383 (2d Cir. 2015).....................................................................................61

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
 236 F. Supp. 3d 824 (S.D.N.Y. 2017)................................................................54, 59

*In re IMAX Sec. Litig.*,
 587 F. Supp. 2d 471 (S.D.N.Y. 2008).......................................................................73

*Indiana Pu. Ret. Sys. v. SAIC, Inc.*,
 818 F.3d 85 (2d Cir. 2016).......................................................................................78

*In re Initial Pub. Offering Sec. Litig.*,
 399 F. Supp. 2d 261 (S.D.N.Y. 2005).......................................................................90

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009).............................................................................56

*IOP Cast Iron Holdings, LLC v. J.H. Whitney Cap. Partners, LLC*,
  91 F. Supp. 3d 456 (S.D.N.Y. 2015)...............................................25, 33, 34, 90

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)............................................................................65

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011).......................................................................... *passim*

*Kasilingam v. Tilray, Inc.*,
  2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021)...................................................75

*Klein v. Altria*,
  525 F. Supp. 3d 638 (E.D. Va. 2021) ..............................................................39

*Klein v. Altria Group, Inc.*,
  2021 WL 955992 (E.D. Va. Mar. 12, 2021) .....................................................32

*Kuwait Inv. Office v. Am. Int'l Grp., Inc.*,
  128 F. Supp. 3d 792 (S.D.N.Y. 2015)..............................................................90

*Lefkoe v. Jos. A. Bank Clothiers*,
  2008 WL 7275126 (D. Md. May 13, 2008)........................................................85

*Lefkowitz v. Synacor, Inc.*,
  2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019) ...................................................61

*In re Lehman Bros. Sec. & ERISA Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011)..............................................................40

*In re Lernout & Hauspie Sec. Litig.*,
  236 F. Supp. 2d 161 (D. Mass. 2003) ..............................................................39

*LightSquared Inc. v. Deere & Co.*,
  2015 WL 585655 (S.D.N.Y. Feb. 5, 2015)........................................................30

*Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010)..............................................................76

*Lorenzo v. Sec. & Exchange Comm'n*,
  139 S. Ct. 1094 (2019).........................................................................*passim*

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) .........................................................................85

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
 437 F.3d 588 (7th Cir. 2006) .......................................................................51, 76

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
 513 F.3d 702 (7th Cir. 2008) ...............................................................................85

*Manavazian v. Atec Grp., Inc.*,
 160 F. Supp. 2d 468 (E.D.N.Y. 2001) ..................................................................45

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
 501 F. Supp. 2d 452 (S.D.N.Y. 2006)..............................................................76, 87

*Martin v. Quartermain*,
 732 F. App'x 37 (2d Cir. 2018) ...........................................................................60

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011).........................................................................................47, 76

*Menaldi v. Och–Ziff Cap. Mgmt. Grp. LLC*,
 277 F. Supp. 3d 500 (S.D.N.Y. 2017)..................................................................40

*Menkes v. Stolt-Nielsen S.A.*,
 2005 WL 3050970 (D. Conn. Nov. 10, 2005) ......................................................76

*Menora Mivtachim Insurance Ltd. v. International Flavors and Fragrances Inc.*,
 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) .........................................30, 31, 39

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
 761 F.3d 245 (2d Cir. 2014).........................................................................40, 48

*In re Micro Focus Int'l Plc Sec. Litig.*,
 2020 WL 5817275 (S.D.N.Y. Sept. 29, 2020)......................................................55

*In re Mindbody, Inc. Sec. Litig.*,
 489 F. Supp. 3d 188 (S.D.N.Y. 2020)..................................................................38

*Moshell v. Sasol Ltd.*,
 481 F. Supp. 3d 280 (S.D.N.Y. 2020)......................................................42, 54, 78

*In re MRU Holdings Sec. Litig.*,
 769 F. Supp. 2d 500 (S.D.N.Y. 2011)..................................................................87

*In re Mylan N.V. Sec. Litig.*,
 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ......................................................64

*In re N. Telecom Ltd. Sec. Litig.*,
 116 F. Supp. 2d 446 (S.D.N.Y. 2000)..................................................................87

*In re Nat'l Century Fin. Enters., Inc.*,
    846 F. Supp. 2d 828 (S.D. Ohio 2012) ...............................................35

*In re New Energy Systems Securities Litigation*,
    66 F. Supp. 3d 401 (S.D.N.Y. 2014)...................................................90

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ...................................................72, 73

*Nguyen v. New Link Genetics Corp.*,
    297 F. Supp. 3d 472 (S.D.N.Y. 2018)...................................................51

*In re Nortel Networks Corp. Secs. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003)...................................................57

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)...................................................53

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).................................................... *passim*

*In re NYSE Specialists Securities Litigation*,
    503 F.3d 89 (2d Cir. 2007)....................................................28, 29, 30, 31

*Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
    2020 WL 3268531 (S.D.N.Y. June 17, 2020) .......................................76

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)................................................................58, 59

*Ontario Public Services Employees Union Pension Trust Fund
    v. Nortel Networks Corp.*,
    369 F.3d 27 (2d Cir. 2004)...................................................... *passim*

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ....................................................87, 91

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004)........................................................53, 54

*In re Parmalat Sec. Litig.*,
    414 F. Supp. 2d 428 (S.D.N.Y. 2006)...................................................90

*Patel v. L-3 Commc'ns Holdings Inc.*,
    2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)...........................................87

*Patriot Exploration, LLC v. SandRidge Energy, Inc.*,
    951 F. Supp. 2d 331 (D. Conn. 2013)...................................................57

*Pearlstein v. Blackberry Ltd.*,
  2018 WL 1444401 (S.D.N.Y. Mar. 19, 2018) .................................................................58, 59

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)....................................................................................51

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ..........................................................................72

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
  11 F. 4th 90 (2d Cir. 2021) ...................................................................................................39

*In re Pretium Res. Inc. Sec. Litig.*,
  256 F. Supp. 3d 459 (S.D.N.Y. 2017).......................................................................60, 74, 84

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996) ..........................................................................................55

*In re Puda Coal Sec. Inc. Litig.*,
  30 F. Supp. 3d 261 (S.D.N.Y. 2014)......................................................................................35

*Puddu v. 6D Glob. Techs.*,
  2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) .................................................................35, 38

*In re QLT Inc. Sec. Litig.*,
  312 F. Supp. 2d 526 (S.D.N.Y. 2004)..............................................................................42, 55

*In re Refco Sec. Litig.*,
  2011 WL 13261982 (S.D.N.Y. Apr. 11, 2011).......................................................................83

*In re Regeneron Pharms., Inc. Sec. Litig.*,
  2005 WL 225288 (S.D.N.Y. Feb. 1, 2005).............................................................................86

*Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2012).....................................................................................72

*Ret. Sys. v. Berry*,
  616 F. Supp. 2d 987 (N.D. Cal. 2009) ...................................................................................39

*Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d. 395 (S.D.N.Y. 2011).................................................................25, 33, 34, 90

*Rex and Roberta Ling Living Trust u/A Dec. 6, 1990 v. B Comm'ns Ltd.*,
  346 F. Supp. 3d 389 (S.D.N.Y. 2018).....................................................................................87

*In re Rockwell Med., Inc. Sec. Litig.*,
  2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ........................................................................73

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)..................................................................................50, 56

*Rosi v. Aclaris Therapeutics, Inc.*,
  2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) ............................................83, 88, 89

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)...................................................59, 73

*In re Salomon Analyst Metromedia Litig.*,
  544 F.3d 474 (2d Cir. 2008)..............................................................................32

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996)..............................................................................78

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016)................................................................75

*In re Sanofi-Aventis Sec. Litig.*,
  2009 WL 3094957 (S.D.N.Y. Sept. 25, 2009)....................................................69

*Schaffer v. Horizon Pharma PLC*,
  2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ........................................................52

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..............................................................................77

*In re Scot. Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................................49

*SEC v. Kelly*,
  817 F. Supp. 2d 340 (S.D.N.Y. 2011)................................................................38

*SEC v. Monterosso*,
  756 F.3d 1326 (11th Cir. 2014) ......................................................................37

*SEC v. Pentagon Capital Mgmt. PLC*,
  725 F.3d 279 (2d Cir. 2013)............................................................................37

*SEC v. Rio Tinto*
  *plc*, 2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ............................................48

*SEC v. Rio Tinto PLC*,
  2021 WL 1893165 (S.D.N.Y. May 11, 2021) ....................................................39

*SEC v. SeeThruEquity, LLC*,
  2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019)....................................................37

*SEC v. Sequential Brands Grp., Inc.*,
   2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021) .......................................................36

*SEC v. Winemaster*,
   2021 WL 1172773 (N.D. Ill. Mar. 29, 2021) ....................................................37, 38

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000) ...............................................................................31

*Setzer v. Omega Healthcare Invs., Inc.*,
   968 F.3d 204 (2d Cir. 2020) ...............................................................................48

*Shemian v. Research In Motion Ltd.*,
   2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ........................................................65

*Shenk v. Karmazin*,
   867 F. Supp. 2d 379 (S.D.N.Y. 2011) ..................................................................73

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ...................................................58, 61

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010) ......................................................................... *passim*

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010) ..................................................................65

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012) ..................................................................92

*Starr v. Georgeson S'holder, Inc.*,
   412 F.3d 103 (2d Cir. 2005) ...............................................................................47

*STMicroelectronics v. Credit Suisse Grp.*,
   775 F. Supp. 2d 525 (E.D.N.Y. 2011) ..................................................................91

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008) ..................................................................................... *passim*

*In re Synchrony Fin. Sec. Litig.*,
   988 F.3d 157 (2d Cir. 2021) .........................................................................46, 47

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008) ..........................................................63, 64, 77, 87

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
   551 U.S. 308 (2007) ....................................................................................62, 63

*In re Teva Sec. Litig.*,
    512 F. Supp. 3d 321 (D. Conn. 2021) ....................................................38

*Thabault v. Chait*,
    541 F. 3d 512 (3d Cir. 2008)...............................................................88

*In re Tronox, Inc. Sec. Litig.*,
    769 F. Supp. 2d 202 (S.D.N.Y. 2011)..................................................90

*Turner v. MagicJack VocalTec, Ltd.*,
    2014 WL 406917 (S.D.N.Y. Feb. 3, 2014)...........................................87

*U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*,
    2013 WL 791462 (S.D.N.Y. Mar. 5, 2013) ...........................................51

*In re Vale S.A. Sec. Litig.*,
    2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ......................................35

*In re Venator Materials PLC Sec Litig.*,
    2021 WL 2980581 (S.D. Tex. July 7, 2021)...................................43, 92

*Villare, v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021).......................................52

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    195 F. Supp. 3d 528 (S.D.N.Y. 2016)..............................................35, 51

*In re Vivendi Universal, S.A. Sec. Litig.*,
    2004 WL 876050 (S.D.N.Y. Apr. 22, 2004)......................................42, 55

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................40

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    845 F.3d 384 (8th Cir. 2016) ...............................................................39

*Wash. State Inv. Bd. v. Odebrecht SA*,
    461 F. Supp. 3d 46 (S.D.N.Y. 2020).....................................................52

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020)...................................................36

*Wilson v. LSB Indus., Inc.*,
    2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017).........................................55

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .............................................................56

*Woodward v. Raymond James Fin., Inc.*,
  732 F. Supp. 2d 425 (S.D.N.Y. 2010)......................................................................78

*Youngers v. Virtus Investment Partners Inc.*,
  195 F. Supp. 3d 499 (S.D.N.Y. 2016)......................................................................68

*In re Yunji Inc., Sec. Litig.*,
  2021 WL 1439715 (E.D.N.Y. Mar. 31, 2021)........................................................52

*Ziemba v. Cascade Int'l Inc.*,
  256 F.3d 1194 (11th Cir. 2001) ..............................................................................32

**GLOSSARY**

| Term | Description |
|------|-------------|
| 2009 OT Agreements | Agreements between Rio, TRQ, and the Government of Mongolia governing the Oyu Tolgoi project. ¶¶59, 168. |
| 2018 Annual Reports | Turquoise Hill's 2018 Form 40-F and Rio Tinto's 2018 Form 20-F. |
| Bowley, Richard | Mining expert hired in late 2017 by Rio Tinto to examine problems at Oyu Tolgoi. ¶¶97-100. |
| Brinkmann, Grant | Rio Tinto's Senior Area Manager of Shafts. ¶131. |
| Class Period | July 17, 2018 to July 31, 2019. ¶1. |
| Colton, Luke | Defendant; Chief Financial Officer of Turquoise Hill since October 9, 2017. ¶41. |
| Complaint | Second Amended Consolidated Complaint for Violations of the Federal Securities Laws.  ECF No. 127. |
| Copper and Diamonds division | A division of Defendant Rio, which was headed during the Class Period by Defendant Soirat and had responsibility for the Oyu Tolgoi mine. ¶¶48, 97. |
| Dudley, Joanne | TRQ's Chief Operating Officer. ¶225. |
| Duff, Andrew | Rio Tinto's Senior Construction Manager at OT. ¶132. |
| Duffy, Dr. Maurice | Executive Coaching Consultant for Rio Tinto since 2007. ¶113 |
| EPCM | Engineering, procurement and construction management. ¶73. |
| Executive Defendants | The Rio Executive Defendants and TRQ Executive Defendants. ¶¶43, 49. |
| Fagen, Rosemary | Vice President for Human Resources for Rio Tinto's Copper & Diamond group, who reported to Defendant Soirat. ¶119. |
| Field, Greg | Rio's former General Manager-Underground at OT. ¶¶85, 104. |

| Term | Description |
|---|---|
| Former Employee ("FE") 3 | Oyu Tolgoi manager who was given some of Brinkmann's responsibilities after Brinkmann was fired. ¶89, 138. |
| FE 8 | Surface construction manager at the Oyu Tolgoi project from May 2016 to May 2018. ¶136. |
| ICG | The Independent Consulting Group retained by the Oyu Tolgoi Board Special Committee. ¶2. |
| ICG Report | The "Independent Technical Review—Oyu Tolgoi Underground Expansion Project," dated July 31, 2021, prepared for the Oyu Tolgoi Board Special Committee by the ICG, and the Peer Review. ¶2. |
| Peer Review | The memorandum entitled "Investigation into Cost and Schedule Overrun—Peer Review," dated July 28, 2021, prepared for the Oyu Tolgoi Board Special Committee by Allan Moss and John Barber. ¶2. |
| Primary Crusher #1 or PC1 | The first of two primary gyratory crushers at Oyu Tolgoi used to reduce the size of the ore to bring it to the surface. ¶73. |
| Rio Br. | Memorandum of Law in Support of the Rio Defendants' Motion to Dismiss the Second Amended Consolidated Complaint. ECF No. 131. |
| Rio Tinto or Rio | Defendants Rio Tinto plc (a United Kingdom company) and Rio Tinto Ltd. (an Australian company). Rio Tinto has joint head offices in London, United Kingdom and Melbourne, Australia. ¶44. |
| Rio Tinto International Holdings Limited or RTIH | Wholly owned subsidiary of Rio Tinto; incorporated in England and Wales; has principal executive offices at the same London address as Rio. ¶45. |
| Sayed, Arshad | Rio Tinto executive who replaced Kinnell as Copper & Diamonds Chief Development Officer. ¶128. |
| Shaft 2 | The most important shaft for development of the Oyu Tolgoi mine. ¶70. |
| Shaft 5 | A ventilation shaft for the Oyu Tolgoi mine. ¶¶82, 266. |
| Soirat, Arnaud | Defendant; Chief Executive of Rio Tinto's Copper & Diamonds product group from 2016 to December 2020. ¶48. |

| Term | Description |
|---|---|
| Torres, Armando | Oyu Tolgoi LLC's CEO after Kinnell's departure. ¶78. |
| TRQ Br. | The TRQ Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Second Amended Class Action Complaint. ECF No. 133. |
| TRQ Executive Defendants | Defendants Quellmann, Colton, and Lane. ¶43. |
| Turquoise Hill Defendants or TRQ Defendants | Defendants TRQ and the TRQ Executive Defendants. ¶¶36-43. |
| Turquoise Hill or TRQ | Mining company headquartered in Montreal, Canada; a majority-owned subsidiary of Rio Tinto. ¶¶36-39. |

## PRELIMINARY STATEMENT

Defendants' motions to dismiss should be denied.  Plaintiff's Complaint details striking contemporaneous evidence of wrongdoing, including internal company emails and witness accounts, that is more than sufficient to deny a motion under Rule 12(b)(6).  Defendants falsely reassured investors that progress of the underground development at the Oyu Tolgoi mine, Defendant Rio's cornerstone project and Defendant Turquoise Hill's sole business, was "on plan and on budget" and that the deadline for achieving sustainable first production—when the mine would begin generating cash flows—remained intact.  In reality, from before the start of the Class Period, the project was many months behind schedule and hundreds of millions of dollars over budget, including because the construction of a critical mine shaft—Shaft 2—was so defective and unsafe it was considered "criminal" and "illegal" by the OT managers charged with fixing it.

The Complaint confirms the severity of the cost overruns and delays through the accounts of numerous sources, such as Richard Bowley—a senior mining executive hired by Rio before the Class Period to investigate and address the cost overruns and delays—who informed Defendants in contemporaneous emails and discussions that their statements were "grossly misleading," "watered down the truth," and "inconsistent with the truth (a lie)."  The delays and overruns were also confirmed by Rio's consulting firm, which informed Defendants in 2017 that "construction of the underground development will not achieve its target by 2020," that "delays and cost over-runs are understated in Mongolia," and that Defendants were "misstating critical pathways."

Ultimately, Turquoise Hill investors incurred massive losses as Turquoise Hill shares lost well over 70% of their value when the true extent of the delays and cost overruns at Oyu Tolgoi came to light—and Defendants were ultimately forced to disclose that the Oyu Tolgoi project was $1.2 billion to $1.9 billion over budget and up to 30 months behind schedule.  These allegations

state a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934.  *See Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000).

In moving to dismiss, Defendants ignore Plaintiff's detailed allegations, offer implausible excuses for their misconduct, and mischaracterize this case as involving unforeseen "ground conditions" to suggest their fraud can be excused because "miners never know exactly what they will find deep under the surface until they get there."  Nothing could be further from the truth.  As the Complaint alleges, Defendants falsely blamed the delays and cost-overruns they ultimately disclosed on "ground conditions" in order to <u>conceal</u> the truth—that they had known about the conditions at Shaft 2 and associated costs and delays required to fix them since before the Class Period.  This fact has now been confirmed by the findings of the independent experts the Oyu Tolgoi Board Special Committee hired after the Class Period to investigate the causes of the delays and cost overruns.  Those experts concluded that the OT project "fell behind schedule from the very beginning, and the project never recovered from these delays"; Rio's work in management of the project was characterized by "staggering" and "inconceivable" decisions and misfeasance; and Defendants' public claim that the cost-overruns and delays were the result of unforeseen ground conditions was "<u>misleading</u>," "<u>not supported in the documents reviewed</u>," and false.  The PSLRA imposes heightened pleading standards, but it does not permit Defendants to run from the facts.

For example, Defendants argue that they made no factual misstatements about the progress at OT and spoke only of future "expectations" that they might not meet.  Based on this mischaracterization, Defendants claim that their statements are non-actionable forward-looking projections, opinions, and immaterial puffery.  But this version of events is contradicted by the Complaint.  As alleged, Defendants repeatedly made false statements about <u>current facts</u>, misrepresenting that the underground development was "on track and on schedule" when it was

already hundreds of millions of dollars over budget and a year behind schedule. Moreover, Defendants misrepresented numerous specific facts about the purported progress at OT to substantiate their "on track" and "on schedule" misstatements. For example, at the beginning of the Class Period, Defendants claimed the underground expansion was "on track" because the most critical component of the project—the "shaft two equipping and headframe fit-out"—was "in progress" when, in truth, the headframe for Shaft 2 had to rebuilt from scratch because it was unsafe and "illegal"—facts that were confirmed in the ICG Report. ¶¶92-93. Similarly, Defendants supported their statement that the OT was "on track" because Shaft 5 was then "operational" when in truth Shaft 5 was not operational and eight months behind schedule. Indeed, Defendants later admitted that the underground lateral expansion meters TRQ reported in its SEC filings were factually false and needed to be corrected. Likewise, numerous former OT managers reported that the true progress could not be squared with Defendants' representations, and that Defendant Jacques and other senior managers knew this because, as the former OT financial controller explained, they received detailed reports showing the actual progress at the mine. ¶278.[1]

Moreover, contemporaneous analyst commentary issued when Defendants made their false statements shows that the market correctly understood them to be representations of present fact with analysts stating, for example, that based on Defendants' statements "all progress metrics continue to indicate [the] project is ahead of schedule and on budget." ¶164. And when analysts directly asked Defendants about the reasons for the delays that began to be reported in the third quarter of 2018, Defendants lied—falsely blaming them on purportedly newly-discovered

---

[1] References to ¶__ refer to the Complaint (ECF No. 127) and all defined terms herein have the same meanings as those ascribed in the Complaint and in the Glossary. All emphasis has been added and internal citations omitted unless otherwise noted. References to "Ex. __" are to the accompanying Declaration of Salvatore J. Graziano.

"geotechnical" conditions—while never once mentioning that up to 95% of the steel on the headframe of Shaft 2 had to be replaced because it was defective and "criminally" unsafe. ¶¶80, 88. The market's surprised reaction after the truth was disclosed confirms that Defendants factually misstated the progress at the mine, with analysts slashing their price targets in half, noting that the delays and cost-overruns were "far worse than our already conservative estimates" (based on Defendants' statements). ¶245. Moreover, analysts who visited the mine after the Class Period concluded that Defendants' "geotechnical" excuses were false, and that "it is now clear to us that the ~15 month delay in completing shaft 2 . . . appears to be the primary driver." ¶¶223-24. All of this was confirmed by the ICG, which repudiated the notion that "ground conditions" were responsible, found "<u>no evidence</u>" that rock quality was significantly different than forecast, described Defendants' "ground conditions" excuse as a "serious contradiction," and concluded that, if anything, "rock quality on the footprint was better than anticipated." ¶186.

Defendants also argue that the Complaint fails to plead facts giving rise to a strong inference of scienter, contending that the Court must conclude, as a matter of law at the pleading stage, that their misconduct was just a "mistake" and that they were caught by surprise by "unforeseen ground conditions." A litany of well-pled facts should preclude any such conclusion as a matter of law and easily gives rise to the requisite strong inference.

Among many other allegations set forth at ¶¶270-303 of the Complaint: (1) Defendants were repeatedly informed in contemporaneous detailed reports, including by Bowley, the expert they hired to investigate the cost overruns and delays, that the project was over a year behind schedule, hundreds of millions of dollars over budget, "massively under performing," and that their representations to the contrary "watered down the truth," were "inconsistent with the truth (a lie)," and "completely untrue"; (2) Defendants developed and publicly reported a "clever" "re-

4

forecast" of the project timeline to create the false impression that it was a bit behind schedule but still on budget—a representation that OT managers described as not "accurate at all"—by falsifying the reports of the senior manager of Shaft 2 who Defendants fired just before the Class Period; and (3) Rio's longtime executive coach, Dr. Maurice Duffy, independently reported nearly identical concerns from OT's senior managers as Bowley did to Rio's Executive Committee (which included Jacques and Soirat) in 2017 that, for example, "Delays and cost over-runs are understated in Mongolia," the "underground development will not achieve its target by 2020," that "we are months behind," that "Soirat knows what's going on," and "we all know." So troubling were these reports that Duffy terminated his firm's Rio contract—his most valuable at the time— after he was told to stop reporting unethical behavior and "potential overstatements" at OT.

The Complaint also recounts how (4) Defendants were highly motivated to conceal the delays and cost-overruns out of fear that the Mongolian government would attempt to renegotiate the OT agreements—a fear that was confirmed by Duffy's Executive Committee reports in 2017 that "Soirat knows what's going on and worry about renegotiation by Mongolian government" and was proven correct when the Mongolian government did just that after the delays and overruns were revealed (¶135); (5) Defendants silenced whistleblowers, including Bowley, and others like Brinkmann (the former head of Shaft 2) and other OT managers, and secured the destruction of Duffy's records after Duffy urged Rio's Board to reconsider Rio's investigation of Bowley's whistleblowing (¶¶205-29, 285-88); (6) Defendants spoke in detail about the current progress at OT during every investor call during the Class Period and the TRQ Executive Defendants professed to have "well plugged-in" "visibility" and had gone "through the data [and] reports" into its status after major investors urged TRQ to improve transparency into OT (¶¶290-91); (7) as Bowley reported, Defendants sought to blame the delays on purportedly newly-discovered

"geotechnical" issues to falsely disclaim they knew the truth about the delays, and then refused to cooperate with and provide critical documents to the ICG; and (8) as the ICG Report confirms, Defendants' "geotechnical" excuse was a lie. ¶186. Given these facts, it is implausible that Defendants' conduct reflected a disagreement over management's "judgment" or that the delays and cost overruns Defendants were eventually forced to disclose somehow took them by surprise.

In the face of this damning evidence, the TRQ Defendants and Rio Defendants cynically blame each other to suggest no one can be held accountable. For example, the Rio Defendants wrongly claim that Plaintiffs lack standing to sue them because they purchased securities issued by TRQ, not Rio—disregarding that the Supreme Court has squarely held that secondary actors like Rio can be held liable when all the elements of a primary violation are adequately alleged, as they are here. Turning SEC policy on its head, Rio contends that holding it accountable here would somehow expand liability while ignoring that the extraordinarily close relationship between Rio and TRQ represents the very kind of relationship giving rise to standing under Second Circuit precedent. Similarly, Rio's arguments against Plaintiffs' scheme liability claims under Rule 10b-5(a) and (c) and *Lorenzo v. Sec. & Exchange Comm'n*, 139 S. Ct. 1094 (2019) again ignore the Complaint, and are without merit. For its part, TRQ attempts to disclaim liability by arguing that Rio was responsible for TRQ's misstatements—further underscoring Rio's liability for them—but ignoring that TRQ told investors it had "well plugged-in" "visibility" into OT, that TRQ Executive Defendants were seconded Rio employees and had previously directly overseen OT, and that they personally approved the cost over-runs.

Accordingly, the motions should be denied in full.

## I.    <u>STATEMENT OF FACTS</u>

This case is about Defendants' false and misleading representations to investors that concealed cost overruns and delays at Oyu Tolgoi—the sole asset and business of Defendant

Turquoise Hill and a critical project for Rio—that were described by the expert Defendants hired to investigate those delays and cost overruns as a "lie," "untrue" and "suicidal." ¶¶211-13.

Oyu Tolgoi is a mine in Mongolia jointly owned by Defendant Turquoise Hill and the government of Mongolia, and is operated almost exclusively by Defendants Rio Tinto plc and Rio Tinto Limited. ¶3. Oyu Tolgoi is primarily a copper ore mine, with most of the ore only accessible to deep subsurface mining. ¶57. Once fully developed, Oyu Tolgoi is projected to be one of the largest copper mines in the world. *Id.* The deep subsurface mining component of the Oyu Tolgoi mine, otherwise referred to as the Oyu Tolgoi underground, involves the construction of five shafts reaching mining levels approximately 1,300 meters below the surface, as well as 203 total kilometers of lateral tunnels surrounding the copper orebody. ¶64. Work on the underground development was underway by 2010, but halted in 2013 due to ongoing disputes between Rio Tinto and the Mongolian government over the financing and other terms of the project. ¶¶62-63. The Oyu Tolgoi underground project resumed after Defendant Jean-Sébastien Jacques orchestrated a financing agreement between Rio Tinto, Turquoise Hill, and the Mongolian government in 2015. ¶¶64-65. Oyu Tolgoi is the sole asset and business of Turquoise Hill, and Rio Tinto touted Oyu Tolgoi as the "cornerstone" of its copper strategy. ¶58.

### A. Rio Tinto's Control Over Turquoise Hill

Throughout the Class Period, Rio Tinto held a majority ownership of Turquoise Hill, and through this share ownership and by contractual agreement (as described below) was able to and did exercise near-total control of Turquoise Hill through the election of all members of TRQ's Board of Directors, the ability to block Board nominations, and the appointment of TRQ's executive officers—all but one of whom, Defendant Quellmann, were seconded employees of Rio Tinto during the Class Period. ¶¶39, 43-44. As for Quellmann, before becoming TRQ's CEO in August 2018, he was Rio's Vice President of Strategic Projects, Copper and Diamonds—the

division responsible for overseeing OT (¶104 n.9)—from March 2018 to July 2018 and was Rio's Chief Financial Officer, Copper and Diamonds from August 2016 to February 2018—and before that served as Rio's Group Treasurer.  ¶42; Ex. C at 16.  During his time as CFO of Copper and Diamonds from 2016 to 2018, Quellmann was a member of the OT Project Executive Committee, meaning that he had access to and reviewed all relevant documents concerning the status of the OT underground development.  ¶42.  In 2015, Quellmann negotiated and drafted many of the key agreements between Rio, TRQ, and the Mongolian Government pertaining to Oyu Tolgoi in his capacity as CFO of Rio's copper division.  ¶60.  In other words, Quellmann was a longtime Rio veteran who was in no way independent from Rio during the Class Period despite formally being employed by TRQ.

Rio Tinto listed TRQ as a principal subsidiary and consolidated TRQ's financials in its own financial statements. ¶40. As TRQ stated in its Forms 40-F for the years ended December 31, 2017 and December 31, 2018 concerning Rio's control over its operations:

> RTIH, as the holder of a majority of the [TRQ] Common Shares, as manager of Oyu Tolgoi, and as manager of a substantial portion of Turquoise Hill's receivables and liquid asset deposits, has the ability to exert a significant degree of control over [TRQ], Oyu Tolgoi LLC and Oyu Tolgoi.

> RTIH, a wholly-owned subsidiary of Rio Tinto, together with other Rio Tinto affiliates, owns a majority of the outstanding [TRQ] Common Shares and can exercise its voting power to elect all of the members of the Board of Directors, subject to applicable securities legislation. RTIH can also exercise its majority voting power to unilaterally pass any ordinary resolution submitted to a vote of [TRQ]'s shareholders, except for resolutions in respect of which RTIH is an interested party and for which disinterested shareholder approval is required. In addition, under the HoA [i.e., the December 2010 Heads of Agreement between Turquoise Hill and RTIH], RTIH was appointed as manager of Oyu Tolgoi which provides RTIH with responsibility for the management of Oyu Tolgoi.

> RTIH is also able to exert a significant degree of control over the management, development and operation of Oyu Tolgoi, as well as [TRQ], through a series of governance mechanisms and restrictive covenants established under the Private Placement Agreement, the HoA and other agreements entered into with Rio Tinto. These include the Technical Committee established under the Private Placement

Agreement and the Operating Committee established under the HoA, through which RTIH is able to control decisions respecting the business of Oyu Tolgoi LLC subject to a veto of [TRQ] in respect of certain special matters.  ¶45.

Importantly, Rio controlled Turquoise Hill's public statements concerning the Oyu Tolgoi mine, requiring all public disclosures to be consistent with information provided by Rio Tinto, and Rio Tinto had a contractual right to review and comment on any Turquoise Hill public disclosures concerning Oyu Tolgoi—and in fact did so, and controlled the content of TRQ's statements.  ¶¶51, 404.  As Turquoise Hill admits, its statements "consisted largely of reports as to what Rio Tinto, the project manager, had advised TRQ."  TRQ Br. at 10-11.

Rio owned its interest in the OT through its majority controlling interest in Turquoise Hill. Turquoise Hill, in turn, owned 66% of OT with the 34% owned by the Mongolian government. ¶52. Rio Tinto, through RTIH, manages the Oyu Tolgoi mine and controls OT through the OT Operating Committee, which determines the agenda of OT Board of Director meetings and the resolutions to be considered by the OT Board. ¶54.

**B.    The Oyu Tolgoi Underground Expansion Was Plagued By Delays and Cost Overruns**

The Oyu Tolgoi underground project involved a mining method called "panel caving," where mineral ore is undercut, drilled, and blasted in order to break off ore and remove it to drawbells, where it is conveyed to tunnels or shafts that allow the ore to be brought to the surface. ¶¶67-70. For such a mining method to be successful, the construction of appropriate mine shafts is critical, as they are necessary for moving people, equipment, supplies, and mined ore from the surface and the underground mining area or *vice versa*. ¶¶71, 75.

By the start of the Class Period, the keys to the success of Oyu Tolgoi's underground expansion—and thus the success and profitability of the mine—were the construction and

completion of primary crusher 1 (or "PC1") and two key mine shafts and associated enabling infrastructure—Shaft 2 and the Shaft 1 crusher and systems.  ¶72.

As Defendants told investors, Shaft 2 was a key to the success of Oyu Tolgoi's underground project, as it would serve as the main logistics hub for the transportation of personnel and equipment needed to build the remaining mine infrastructure, appropriate ventilation to support increased underground activity, and transportation to convey ore to the surface.  ¶77.  The ICG Report confirmed the clear impact the delays in completing in Shaft 2 had on the overall timeline for completing the underground expansion, as workers were required to use Shaft 1 to move equipment and materials, and Shaft 1's limited size and capacity became "the bottleneck until such time as Shaft #2 was commissioned fully."  ¶75.  The ICG Report concluded that the delays related to Shaft 1's "critical facilities" and Shaft 2 was estimated to be on the order of 21.4 months—i.e., the vast majority of the delay that Defendants eventually disclosed.  ¶76.

But rather than ensure this critical shaft was designed and built properly, the work on Shaft 2 was so incompetent and flawed that the managers responsible for it explained that the initial Shaft 2 headframe construction would have been considered "illegal" and "criminal" if built in North America and not addressed—and the work required to fix it was extensive.  ¶¶74-78; 83 (witness describing Shaft 2 construction as "illegal"); 88 (Shaft 2 construction would have resulted in a "criminal investigation in Canada" because it "could've killed people").

For this reason, even before Shaft 2 work resumed, inspections of Oyu Tolgoi revealed catastrophic issues with work done by a Chinese contractor on the steel headframes for Shaft 2 that were so severe, unsafe, and "criminal" that all Shaft 2 work was halted until it could be fixed. ¶¶81-92.  The headframe issues caused Shaft 2 to be delayed for eight months and required over $30 million in additional costs—and thus the amount required to fix just the headframe so that

10

Shaft 2 construction could <u>begin</u> accounted for 10% of the Shaft 2 budget. ¶¶82-83.  Further, the engineers that created the designs for the shaft excavation and those that designed the steel did not sync up their schematics, resulting in a six-foot gap between the shaft wall and the steel housing— a failing that alone added months to the project. ¶93.  Steel reworking was prevalent at Oyu Tolgoi, with steel defect rates of up to 25% throughout the underground construction—a rate that far exceeded industry standards (which were 5% at most) and prevented the construction teams from completing sections of Shaft 2 on time. ¶¶88-90, 100-01.

The ICG Report confirms that steelwork issues contributed significantly to cost overruns at Oyu Tolgoi.  For example, the Report highlighted commodity cost increases of $351 million with the "problem areas again steelwork, piping and electrical disciplines," and confirmed senior managers knew of the need to address the defective bolts in Shaft 2 headframe, as they had been documented in a May 2015 audit.  ¶86; *see also* ¶¶90-92 (citing ICG's confirmation of problems with the steel work for Shaft 5 and Shaft 2).

The work required to address the safety and design problems on Shaft 2 was so extensive that the underground development project was three to nine months behind schedule as of the summer of 2017—a year before the Class Period began—delays and costs that grew consistently after that, and the project became an additional 100 to 200 meters behind schedule each passing month during the Class Period.  ¶¶102-05.  Former employees stated that reports detailing these delays were provided directly to Defendant Jacques and other senior managers, and showed the project was nowhere close to the timeline Defendants reported to investors, and so substantial that workers who had been mining for 40 years had "never seen anything like it."  ¶¶102-10.  In one example illustrating the impact of these delays, the central heating plant for the mine, which is required by law to ensure that underground work can be done safely is kept at a temperature of 22

degrees Celsius and "was critical to get the underground going," was scheduled to have been fully online by Christmas 2017—but did not come online until September 2019. ¶106.

OT's senior leadership, as well as Defendants Jacques, Soirat, Quellmann, Lane and Colton, were keenly aware of these delays, and Defendant Jacques requested weekly lateral development progress reports starting in October 2018. ¶94; *see also* ¶¶78, 81, 84-90. After the end of the Class Period, the ICG concluded that the excavation for PC1 took 23 months, instead of the planned 15, as the excavations were not designed large enough to accommodate the needed construction work—effectively, a failure to dig a big enough hole for one of the "critical path" functions at the mine. As the ICG concluded, this delay was caused by basic design failures, and not the "geotechnical" issues that Defendants falsely blamed for the project's delays. ¶73.

## C.     Defendants Were Warned About Delays and Cost Overruns and Hired An Expert, Now-Turned Whistleblower, to Investigate

Throughout the duration of the Oyu Tolgoi underground project, the Executive Defendants received detailed progress reports and schedules concerning the mine's development, and senior leadership at OT repeatedly discussed construction defects at the mine. ¶¶84, 88, 94-96, 102-110. In response to the problems at the mine, Defendant Arnaud Soirat and Craig Kinnell, the former President and CEO of OT and the Chief Development Officer of Rio's Copper and Diamonds division, hired Richard Bowley to investigate the difficulties Oyu Tolgoi faced. ¶¶97-98. When speaking to Bowley over a year-and-a-half before the Class Period, Kinnell informed Bowley about problems with OT's construction progress, warning Bowley that the problems were so severe that Kinnell was "so pissed off I am trying to resign from the OT Board," that he could "only see bad things on the horizon" and that "neither the Project, nor the Operation are near where I want them to be." ¶112. Bowley was already familiar with Oyu Tolgoi, as he had previously worked at Oyu Tolgoi from 2011 and 2015 as part of the team developing the expansion. ¶114.

Bowley immediately identified the problems with Jacobs Engineering Group Inc. ("Jacobs"), the primary contractor for engineering, procurement, and construction management at the mine, that had been flagged by Kinnell months before. ¶¶79-80, 112-113, 115. After discussing these problems with Defendant Soirat in November 2017, Bowley was hired by Rio as general manager for strategic projects and chief advisor for the Oyu Tolgoi project. ¶116.

Once hired, Bowley quickly confirmed that Oyu Tolgoi could neither be completed for $5.3 billion nor could it achieve sustainable production by the first quarter of 2021. ¶¶103-112. He discussed delays at Oyu Tolgoi with general managers of the underground project, reviewed monthly reports, and consulted with Grant Brinkmann, the most senior manager of Shaft 2. ¶¶103-105. Bowley identified issues ranging from engineers who did not understand Mongolian permitting laws and procedures, to significant issues with steel installed at the mine, to conflicts between mining and construction personnel at the mine—all of which added massive costs and delays to the project. ¶¶120-24, 126-27; *see also* ¶¶125, 128-31 (ICG corroborating these findings).

Bowley gave a presentation in London to Kinnell and Rosemary Fagen, Vice President for Human Resources for Rio's Copper & Diamonds group and Defendant Soirat's "gatekeeper," on February 1, 2018 addressing the significant problems at Oyu Tolgoi and his proposal to remediate the problems he identified. ¶141-42. Following that meeting, Bowley continued to warn Rio senior management, and specifically Defendant Soirat, of "potential disaster" at Oyu Tolgoi throughout the first half of 2018. ¶¶143-52. Fagen acknowledged the problems Bowley was warning them about in a July 3, 2018 email, stating that "we've known it from the start, just haven't been able to do anything about it." ¶¶146-50. Bowley could hardly have been more direct, emailing Rio senior management at the Class Period on July 19, 2018:

**From:** Richard Bowley (OT)
**Sent:** 19 July 2018 05:20
**To:** Fagen, Rosemary (RTHQ) <Rosemary.Fagen@riotinto.com>
**Subject:** RE: Call

Latest update.

12 months behind schedule.

$300mill capital over budget. Expect this to rapidly escalate.

¶151. Around the same time Bowley began investigating problems at Oyu Tolgoi, Dr. Maurice Duffy, an executive coaching consultant for Rio Tinto since 2007, began reporting concerns about unethical behavior and "potential overstatements" at Oyu Tolgoi from the approximately 50 Rio Tinto OT managers his firm coached in Mongolia and London. ¶¶132-33. Duffy had overseen executive coaching services for Defendants Jacques and Soirat for years, had unique and unparalleled insight into the senior leadership at Rio, and provided regular reports about the feedback from Rio's senior managers at OT to the head of Rio's human resources department, Vera Kirikova, who delivered those reports to Defendant Jacques (and his predecessor) and the Board chairman of Rio Tinto. *Id.*

However, in mid-2017, Duffy was instructed to discontinue providing those reports— which substantiated the same cost overruns and schedule delays at Oyu Tolgoi that Bowley reported to Rio's senior management. ¶¶25, 133, 141. For example, Duffy reported comments by Rio managers at OT that explicitly stated the project was woefully behind schedule, that "There needs to be an independent review in Oyu Tolgoi"; "Budgets are being 'flexed' because of engineering, procurement, and construction delays"; and "I am leaving because I do not want to be tarnished by potential disaster that is Oyu Tolgoi." ¶135. Those reports also identified that Defendant Jacques knew about the problems at OT, reporting feedback that "JS [Jacques] brings a unique blend of strategic and operational expertise on overstatements, overbudget, coverups,"

that the "control freak at the top [Jacques] is using HR, PR, Operations to watch, monitor and make decisions from China-Mongolia to US-Canada," and that "JS will destroy us all in his grab for power and glory." ¶136. At Defendant Jacques' direction, Vera Kirikova, who was a member of Rio's Executive Committee and served as an intermediary for Defendant Jacques, instructed Duffy at a meeting on September 6, 2017 to stop providing the negative feedback he was receiving about OT, and that he would "regret it" if he continued to report concerns about Rio's conduct in Mongolia. *Id.* In response, Duffy terminated his contract with Rio Tinto despite the fact that it consisted of about 70% of his firm's business. ¶¶132, 138. Duffy stated that Defendant Jacques "knew without a doubt" about the problems at Oyu Tolgoi, as Defendant Jacques' role as CEO and career depended its success, and Defendant Jacques specifically visited OT in January 2018 because the "wheels were coming off" the project. ¶¶139-40.

Defendants' knowledge of the project delays and cost overruns was also confirmed by the ICG, which noted that it is "inconceivable that Senior Management both on the Project site and in the higher-level committees were not aware of these shortcomings" given the reporting that they received. ¶¶185-86. In fact, the ICG documented numerous facts demonstrating that senior management actively and deliberately hid the true progress at the mine by noting, for example, the "staggering" lack of documentation for critical path activities, a culture of suppressing the truth "even though delays to the schedule were known," and Rio's refusal to provide the ICG with critical documents—including the Technical Evaluation Group reports that were provided to Defendant Jacques and Soirat during the Class Period. ¶¶277-78, 299-303.

### D.    Despite Warnings, Defendants Concealed Oyu Tolgoi Delays and Cost Overruns From Investors

By the time the Class Period began in July 2018, Defendants knew the OT project was in crisis. Bowley specifically met with Defendant Soirat in May 2018, and discussed with him

"exposure to schedule risk, and how changing path in terms of timing and where we may be in terms of the project, will cause us massive risk, and what that risk looks like to Arnaud [Soirat] and the business." ¶144. These problems were confirmed by other Rio employees, including Andrew Duff, who reported to David Joyce, Rio's Global Head of Projects, in April 2018 that Shaft 2 was at least five months behind schedule and, projected out, commissioning was approximately 14 months behind schedule. ¶154.  The ICG Report states that Broadleaf, a consulting firm retained by TRQ, analyzed the 2017 and 2018 "reforecasts" in 2018 and concluded that the publicly stated schedules had a 2% and 0% chance of being completed on-time, respectively.  ¶300.

But rather than remediating the problems at OT as Bowley suggested, Defendants fired senior managers at OT and falsely assured investors that OT was "on track." ¶¶153-64.  In May 2018, Brinkmann, the senior manager of Shaft 2, was fired, despite the fact that he had been warning Rio senior management "for a long time" about the problems with Shaft 2. ¶¶154-57. FE 8, the surface construction manager at Oyu Tolgoi from May 2016 to May 2018, was also removed from the project around this time after warning his managers about significant cost overruns and delays, which he stated amounted to $2 billion and delays of at least a year and a half by the time he left the project. ¶¶158-59.  After Brinkmann was fired, FE 3, a senior OT manager who took over some of Brinkmann's responsibilities, held weekly integration meetings with the key stakeholders on the underground project and identified over 60 remediation actions to address the delays at Oyu Tolgoi to get things "back to being remotely on schedule"—but no action was taken on any of them, and the meetings were canceled six months after they began. ¶¶160-61.

On July 16 and 17, 2018, at the beginning of the Class Period, Turquoise Hill and Rio Tinto stated in SEC filings that "first drawbell" would be in "mid-2020," while Turquoise Hill stated

sustainable first production would be obtained in 2021 and Rio Tinto stated that the "major growth projects [at OT] remain on track" and that "material assumptions" had "not materially changed." ¶¶306-12, 323. Notwithstanding direct evidence to the contrary (including Bowley's July 19, 2018 email quoted above), Defendants repeated these false and misleading statements and issued statements substantially similar to them on July 31, 2018, August 1, 2018, August 15, 2018, September 26, 2018, and October 2, 2018. ¶¶313-15, 323-24, 328-29, 331-32. Furthermore, the Turquoise Hill Defendants falsely assured investors on August 1, 2018 about specific progress being made at Oyu Tolgoi and that Turquoise Hill had enough funding to complete the underground project. ¶¶319, 321.

## E.    Defendants Had A Powerful Motive to Hide the Problems at OT

Before the beginning of the Class Period, several key developments created a powerful motive for Defendants to cover up problems at Oyu Tolgoi.

First, beginning in 2017, Rio Tinto came under intense regulatory scrutiny, with investigations in the U.S. and the U.K. over its conduct at mines in Guinea and Mozambique. ¶188.

Second, beginning in 2018, the government of Mongolia levied a $150 million tax bill on OT at the same time newly-elected Mongolian government officials who had campaigned on the promise to take control of OT and negotiate better terms for Mongolia were seeking to do just that—with Defendant Jacques and Soirat personally addressing the Mongolian prime minister at an in-person meeting in January 2018 to reassure him of Rio's purported commitment to addressing his concerns. ¶¶189-93.

Third, in March 2018, reports surfaced that Mongolian and Swiss officials were conducting a criminal corruption investigation into the negotiation of the 2009 OT Agreements—a development Mongolia government officials were leveraging to renegotiate the terms of Mongolia's agreement with Rio and TRQ. ¶¶197-98. In fact, the next month, Mongolia jailed

several top government officials responsible for the OT agreements, including the former prime minister of Mongolia who personally negotiated the 2015 agreement with Defendant Jacques and the former prime minister responsible for the 2009 investment deal. ¶170. In addition, that same month, the Mongolian government established a Parliamentary Working Group ("PWG") to investigate Oyu Tolgoi—highlighting the risk that it could uncover more facts demonstrating reasons to question the fairness of the OT agreements. Indeed, recognizing the possibility Mongolia would do just that, the next month, Rio fired the key OT managers that had been warning about the cost overruns and delays in the underground expansion—terminating Brinkmann, the lead manager of Shaft 2 and other OT managers—and Defendant Soirat specifically instructed Bowley stop looking into the problems he was hired to address. ¶¶199-202.

Fourth, at the same time Defendants were facing mounting pressure in Mongolia, TRQ's then-largest shareholders were urging more transparency into the OT project, requesting in February 2018 that TRQ conduct an independent technical review "so that we can be certain that existing estimates of capital intensity and the development schedule are reasonable." ¶¶203-04.

## F.    Defendants Concocted A False "Re-Forecast" to Conceal the Oyu Tolgoi Delays and Cost Overruns

Rather than disclose the truth in the face of this pressure and repeated warnings by Bowley and other OT managers, and Duffy, Defendants engaged in a cover-up and manufactured a false narrative to hide the true extent of the delays and cost overruns that were known at the start of the Class Period. To do so, Defendants announced a "re-forecast" of the OT expansion timeline, disclosing a two-quarter delay to sustainable first production—but assured investors that capital costs remained in line with the $5.3 billion budget, that the re-forecast included a buffer of "over four months of schedule contingency," and that the overall timeline for first draw bell remained intact. ¶¶174-75. These reassurances assuaged the market, as analysts stated the delay to

sustainable production was "immaterial to our overall thesis" and that "other elements appear to be on plan" or "unchanged." ¶177. But Defendants' statements were false when made.

Bowley specifically warned Defendants about their false statements on August 31, 2018, forwarding a news article about the development of a London transit line that had disclosed delays and cost overruns to Fagen, and highlighting "the uncanny relationship" with Defendants' false public statements about OT. ¶166. Fagen agreed, responding "Yes I completely agree and now we're trying to be clever by doing 'forecast 2'!" ¶167. Broadleaf warned TRQ that the reforecast had minimal to no chance of being met, and the ICG confirmed that the effect of Defendants' "re-forecasting" of the schedule was to provide "misleading" reporting of the actual progress at OT. ¶¶184, 300.

On October 16, 2018, when Defendants announced the Oyu Tolgoi "re-forecast," Bowley emailed Fagen stating that it was not the "real truth":

> I see TRQ put out a very watered down statement of the truth regarding the Underground yesterday. It's a good job the market does not know the real truth, and that Rio knew this was very likely over 12 months ago. I think GoM [Government of Mongolia] and our other shareholders may want heads. Arnaud [Soirat] needs to be clever here. He has consistently put out messages to the market the project was on schedule and budget. He may take some heat in terms of not seeing what was coming, even though he knew.

¶179. Bowley and other employees confirmed that Defendants' statements about the Oyu Tolgoi budget were not accurate, and that the "re-forecast" allowed Defendants to pull the schedule back "over night" to an "improved position." ¶¶180-83. Specifically, the "re-forecast" was accomplished by transferring costs and projects related to the major infrastructure of Shaft 2 to later phases—providing the Company with a false basis to claim a closer adherence to the original schedule, while secretly increasing costs and the ultimate length of schedule. As FE 3 explained, the re-forecast involved reducing the scope of various projects such that if "Task One has steps 'A' through 'I,' you reduce that to steps 'A' to 'D.' You then make steps 'E' to 'I' a whole new

project and push that into a secondary phase"—a ploy that added costs but "just moved [them] further down the road." ¶169.  By the second quarter of 2019, 10% of the entire Shaft 2 schedule had been "de-scoped" in this way, and resulted in contractors essentially being paid again for work they were required to perform under their prior contracts. ¶170.  Moreover, as Brinkmann reported, he learned from his replacement, Donna Rathbone, that the "de-scoping" changes to the Shaft 2 schedule had been falsely recorded as having been approved by Brinkmann in September 2018— months after he was terminated from Rio in May 2018.  ¶172.

But rather than disclose that the publicly reported "re-forecast" was actually an effort to fraudulently defer reporting increased expenses and conceal the project's true status—which were internally confirmed to be between 12 and 18 months behind schedule and hundreds of millions of dollars over budget—Defendants sought to falsely blame the purportedly minimal delay they disclosed on unspecified "ground conditions."  In reality, as Defendants knew and the ICG Report confirmed, the delays were caused by the abysmal engineering, construction, and procurement management of Shaft 2 and other critical path projects at OT.  ¶¶173-78.

### G.    Rio Tinto Retaliated Against Numerous Whistleblowers

Throughout 2018, Bowley continued to report delays, as he was hired to do by Rio Tinto, including to Soirat, Fagen, and Arshad Sayed, Rio Tinto's Copper & Diamonds Chief Development Officer after Kinnell left in March 2018. ¶¶179-83, 208-20.  However, Rio Tinto did not act on Bowley's warnings, and instead sought to sideline him due to the threat he would pose to Defendants if he informed others about the problems at Oyu Tolgoi. ¶205.  Specifically, because Rio Tinto "did not like the reports" Bowley had made, Rio marginalized Bowley by continuing to keep him on the Company's payroll but limiting his role in addressing the problems with the underground expansion.  ¶¶206-07.  As Bowley recounted in his sworn Witness Statement and as documented in internal emails, by keeping Bowley on Rio's payroll, Rio was able keep him "in

the tent" as he was prevented "from working outside the business and from telling the market the truth"—including to TRQ investors who had reached out to Bowley directly.  *Id.*

In addition to Bowley, Rio Tinto also retaliated against Brinkmann and FE 8, terminating them after they had repeatedly warned Defendants about delays and overruns at OT, and sought to silence Duffy after he reported the same concerns Bowley did to Rio's Board.  ¶¶285-88.

**H.      Under Pressure from the Whistleblower, Defendants Disclose Oyu Tolgoi Cost Overruns and Delays**

After Bowley's continued internal reports and whistleblowing eventually triggered an internal compliance investigation, Defendants were forced to begin disclosing what was actually happening at OT.  In January 2019, Bowley was terminated by Rio Tinto, and he responded with a sharply critical letter to Sayed and Fagen stating that Rio Tinto's compliance was deficient. ¶¶221-22.  Although Bowley was contacted three days later by a Rio Tinto compliance manager, who told Bowley he was coming to Mongolia to investigate, that investigation lasted only days and did not consider any of the evidence Bowley had identified—and amounted to a coverup. ¶¶222-29.

Indeed, rather than disclose that the Oyu Tolgoi project was a year behind schedule and a billion dollars over budget, Defendants continued to tout the progress of the Oyu Tolgoi project even after Bowley forced Defendants to make some disclosure about the reality at OT.  Within days of Rio' completing its rushed and conclusory investigation of Bowley's claims—and when Rio was due to file its annual report—on February 27, 2019, Defendants disclosed that there would be an additional delay at OT, a disclosure that triggered a 7% decline in TRQ shares.  ¶¶230-33. But even then, Defendants falsely assured investors that the expansion project had made "good progress," was "proceeding well," "mostly on track," and "on budget." ¶371.  While both Rio and TRQ also noted difficulties with Shaft 2, they misleadingly highlighted supposedly difficult

"ground conditions," explaining that the extent of the delays and the impact on the project's costs were still being evaluated. ¶¶230-33-369-73.

On March 27, 2019, Bowley wrote to Ann Godbehere, a member of Rio Tinto's Board of Directors, to tell her that the company's investigation was deficient, that two senior OT managers that Rio spoke to in connection with the investigation called Bowley to say they were not impressed with the process, and that Rio was not a compliant mining company and that the truth would come out. ¶227.  Bowley then emailed Defendant Jacques and Godbehere on April 2, 2019, telling them how behind schedule the project was. ¶228.

Faced with growing pressure from Bowley—triggered by, among other things, Bowley's direct reports to Rio's Board about Defendants' misconduct and the fear that he would disclose the truth to regulators and the public—Turquoise Hill was finally forced disclose that the project was 16-30 months behind schedule and $1.2 to $1.9 billion over-budget, but blamed the delays and cost overruns on newly-discovered "challenging" "ground conditions." ¶¶242-43.  In response to this stunning disclosure, on July 16, 2019, Turquoise Hill stock declined by nearly 44% on extraordinary trading volume. ¶244.   Analysts were stunned, and cut their price targets for Turquoise Hill. ¶245.  Later that month, on July 31, 2019, Turquoise Hill disclosed that new financing was needed for OT underground expansion and that Turquoise Hill would be taking a $600 million impairment charge. ¶246.  TRQ shares fell another 8.6% the following day. ¶247.

Despite disclosing the delays and cost overruns at Oyu Tolgoi, Defendants continued to mislead investors by falsely attributing the problems to challenging ground conditions and geotechnical problems. While Defendants disclosed a total of $1.2 to $1.9 billion in cost overruns and a 16-30 month delay, they did not break out how much of these delays and cost overruns were attributable to newly discovered "geotechnical issues" versus the problems associated with the

"criminal" construction of Shaft 2. As Bowley and multiple other former employees explained, TRQ's Chief Operating Officer Joanne Dudley later admitted, analysts who visited the site after the Class Period concluded, and the ICG Report confirmed, the delays were caused by problems with the development of Shaft 2 and other "staggering" and inexplicable construction and engineering failures. ¶¶185, 248-51. As TRQ's Chief Operating Officer admitted, any geotechnical issues would only account for, at most, less than one-tenth of the cost-overruns (¶251), while analysts who later visited the site concluded "it is now clear to us that the ~15 month delay in completing shaft 2 . . . appears to be the primary driver behind the recently disclosed Phase II development delay and capex overrun" as opposed to any geo-technical issues, which appear to be "manageable." ¶250.

The ICG Report confirmed this fact in even stronger terms, concluding that "[n]o evidence was found that the rock quality in the off the footprint development and mass excavations was significantly different to that forecast in [2016]"; "[n]o evidence was found that ground conditions were different than anticipated"; "rock mass quality and ground conditions were not a significant contributor to the schedule delays and cost overruns"; and even that "[t]here is evidence that rock quality on the footprint was better than anticipated." ¶252; *see also* ¶¶ 253-54.

Further, to the extent geotechnical problems were a factor, several former employees stated that any geotechnical issues were known years before the Class Period and that the feasibility studies performed by Rio were knowingly deficient. ¶¶256-61. In fact, Rio Tinto discouraged its geotechnical engineers and outside consultants from obtaining the necessary geotechnical data to properly assess ground conditions, and required them to keep any data they did collect secret and not to communicate any concerns via email or in writing. ¶¶260-61.

After the end of the Class Period, in early March 2020, Bowley reported Defendants' misconduct to numerous securities regulators, including the SEC, the Australian Securities and Investments Commission, the U.K. Serious Fraud Office and Financial Conduct Authority, and the Mongolia Financial Regulatory Commission, and those agencies are all investigating the misconduct alleged in this action. ¶233. In July 2021, the *Financial Times* confirmed that the U.K. Financial Conduct Authority was investigating Rio's false and misleading statements concerning the value of Oyu Tolgoi during the Class Period. ¶269.

## ARGUMENT

## II. PLAINTIFF HAS STANDING TO ASSERT SECTION 10(B) CLAIMS AGAINST ALL DEFENDANTS

In the face of Lead Plaintiff's detailed factual allegations, the Rio Defendants attempt to escape liability based on Plaintiff's status as a Turquoise Hill investor—and arguing that the relationship between Rio and TRQ is "too remote" to provide standing to assert Section 10(b) and Rule 10b-5(b) claims against the Rio Defendants. This characterization is at odds with the law and the well-pleaded facts.

Lacking sound legal or factual arguments, the Rio Defendants fall back on a policy argument that holding non-issuers liable for their false statements about an issuer would somehow improperly expand the scope of Section 10(b) to innocent third parties. To state this policy argument is to refute it, for the very purpose of the federal securities laws is to ensure that parties who publicly make material statements about publicly traded companies provide accurate information to investors.

This is especially true here, where the relationship between Rio Tinto, TRQ and Plaintiff's investment could hardly be more substantial, intertwined and close: Rio is TRQ's controlling majority stockholder, the contractual manager of TRQ's sole asset, the sole source of information

about TRQ's business and operations for both TRQ and investors, and TRQ's false statements mirrored Rio's own false statements about the Oyu Tolgoi mine, which was a vitally important project for Rio as a whole. The cases relied on by the Rio Defendants, in which investors sought to sue external suppliers or other unaffiliated commercial counterparties of securities issuers for the third parties' statements about their own separate businesses, simply do not apply.

To the contrary, courts routinely hold parent companies like Rio liable under Section 10(b) for making fraudulent statements about a controlled subsidiary like TRQ. *See IOP Cast Iron Holdings, LLC v. J.H. Whitney Cap. Partners, LLC*, 91 F. Supp. 3d 456, 473 (S.D.N.Y. 2015) (sustaining 10b-5(b) claims against parent company that held majority of issuer's stock, appointed its own executives as majority of issuer's board, and controlled transaction in which minority of stock was sold); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 557-60 (S.D.N.Y. 2014) (sustaining 10b-5(b) claims against bank holding company and affiliated broker-dealer for bank's false statements that holding company and affiliate participated in making); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d. 395, 418 (S.D.N.Y. 2011) (sustaining 10b-5(b) claims against parent corporation that "had control over the content of the [issuer subsidiary's] message, the underlying subject matter of the message, and the ultimate decision of whether to communicate the message").

Moreover, the Rio Defendants' argument against the Complaint's scheme-liability claims under Rule 10b-5(a) and (c) fails under controlling Supreme Court precedent.

### A.     Plaintiff Properly Asserts Section 10(b) Claims Against the Rio Defendants

Rio made numerous false statements and omissions about Turquoise Hill and the Oyu Tolgoi mine, which was TRQ's only significant asset. Because Rio exercised complete control over the mine's operations and over information about the project, both as TRQ's majority shareholder and as the contractual manager of the project, both TRQ and its investors depended

on Rio for information about the project and looked not only to TRQ's public statements (which consisted almost entirely of information provided by Rio) but also to Rio's public statements. And Defendant RTIH is liable for the same false statements as Defendant Rio Tinto.

RTIH is a wholly owned subsidiary of Rio, owns a majority of TRQ's common stock, manages both the Oyu Tolgoi project and a significant portion of TRQ's receivables and liquid assets, controls the election of all members of TRQ's board and, according to TRQ's public disclosures, is "able to exert a significant degree of control over the management, development and operation of Oyu Tolgoi, as well as [TRQ], through a series of governance mechanisms and restrictive covenants" under various agreements between TRQ and Rio. ¶47.  In a 2012 contract that remained in effect during the Class Period and was disclosed to investors by TRQ, Turquoise Hill explicitly agreed with Rio Tinto that "any and all public disclosure regarding the OT project," or "OT Disclosure," would be "consistent with the information provided by the Rio Tinto Manager," RTIH, and that Turquoise Hill would "not file or issue any OT Disclosure without providing the Rio Tinto Manager with a reasonable opportunity to review and comment thereon." ¶53.  Rio exercised its contractual control over TRQ's public disclosures. ¶¶457-60.

Rio and RTIH also controlled decisions concerning OT's business through its Board of Directors—which during the Class Period included as directors Defendants Quellmann, Lane, Colton, and Soirat—and the Board's Operating Committee, which sets the resolutions to be voted by the OT Board of Director. ¶54. The Operating Committee, which consists of two Turquoise Hill nominees and two RTIH nominees, determines what resolutions will be considered by the Board by majority vote, with the exception of certain "special matters"; one of the RTIH nominees serves as Chairman and holds the deciding vote in case of a tie.  *Id.*  Likewise, all but one of

Turquoise Hill's executive officers during the Class Period were seconded Rio Tinto employees. ¶¶42-44.  In short, Rio controls the OT Operating Committee and all of its decisions.

Rio's control over TRQ was so extensive that TRQ's SEC filings described it at length as a risk factor for investors in the minority of TRQ's stock that was publicly traded. ¶47. TRQ repeatedly disclosed to investors that it depended on Rio for information about its own business and operations (TRQ Br. at 10-11), and TRQ's public statements were entirely consistent with Rio's public statements about Oyu Tolgoi because TRQ had no other source of information about its own mine. ¶¶304-424.  And TRQ investors and analysts cited and considered Rio's public statements as informing their views about TRQ shares.  ¶55.

Under similar circumstances, where one company makes false statements about another issuer with which it has a substantial relationship, courts have held that the first company can be liable under Section 10(b) and Rule 10b-5(b) to investors in the issuer.  The Supreme Court has repeatedly held that claims for securities fraud may be brought against any person who makes false statements in connection with a purchase of securities, not only against the issuer and the issuer's officers.  In *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), the Supreme Court explicitly held that claims against non-issuers are viable as long as every element of a Rule 10b-5(b) claim is met. *See id.* at 158.  Indeed, that has been the rule for well over 20 years, as the Supreme Court has long recognized plaintiffs can bring Section 10(b) claims against parties other than an issuer that make false statements concerning the issuer—as Rio did here.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) ("Any person or entity, including [but not limited to] a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a

purchaser or seller of securities relies <u>may be liable as a primary violator under 10b-5</u>, assuming <u>all</u> of the requirements for primary liability under Rule 10b-5 are met.").[2]

The principal case that the Rio Defendants cite as supposedly barring Section 10(b) claims by Turquoise Hill investors—*Ontario Public Services Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004) ("*Nortel*")—does not address the circumstances here. As Rio acknowledges, *Nortel* was expressly clarified in relevant part by the Second Circuit in *In re NYSE Specialists Securities Litigation*, 503 F.3d 89 (2d Cir. 2007) which held that, in the "particular circumstances" of *Nortel*, the relationship between the defendant's false statements about itself and its potential acquisition of a business unit of the issuer—and the plaintiff's purchase of the issuer's stock—"was too remote to sustain an action under Rule 10b-5."

In *Nortel*, the court's standing discussion was focused on extending Section 10(b) liability to a remote universe of business counterparties, not controlling corporate affiliates, and cannot reasonably be read to limit an investor's ability to sue a corporate parent that ran and controlled the subsidiary-issuer's business and public statements, as Rio did here. To the contrary, the *Nortel* court based its holding on the concern that allowing claims against business counterparties "would encourage individuals to engage in potentially abusive litigation" because such claims "would rest almost exclusively on oral testimony" which "cannot be adequately evaluated until presented to a jury," and so wanted "to protect companies from having to defend and settle cases that relied heavily on that form of evidence." 369 F.3d at 33 (citing *Blue Chip Stamps v. Manor Drug Stores*,

---

[2] In *Stoneridge*, the Supreme Court held that investors could not bring Section 10(b) claims against customers of the issuer whose transactions were misrepresented in the issuer's financial statements only because (unlike here) the non-issuer defendants' "deceptive acts were not communicated to the public," and "[n]o member of the investing public had knowledge, either actual or presumed, of [defendants'] deceptive acts during the relevant times." *Stoneridge*, 552 U.S. at 159. Here, Rio's deceptive acts—i.e., its false statements about TRQ and Oyu Tolgoi—were communicated to the public by both Rio and TRQ and are the core of the fraud on investors alleged in the Complaint.

421 U.S. 723, 743 (1975)). Here, there is no such concern—Plaintiff purchased TRQ stock whose market price reflected information disseminated by Rio about its majority-owned subsidiary, and the Complaint cites documentary evidence that investors and analysts contemporaneously relied on Rio's statements. ¶55.

*Nortel* is also distinguishable because it involved alleged false statements by an issuer's customer about the customer's own business—not about the issuer—and because the two companies did not "share[] any management structures." *Id.* at 29. Here, by contrast, each of TRQ's senior management (except one) were seconded Rio Tinto employees; Rio is both TRQ's majority, controlling shareholder and the manager of its sole asset; and TRQ's governance structure is expressly limited by the control Rio exerts through OT's governing documents, which give Rio control over OT's board, operations, access to information about OT, and TRQ's public disclosures. Moreover, *Nortel*'s holding was specifically clarified in *NYSE*, in which the Second Circuit rejected as "flawed" a reading of *Nortel* that would bar Section 10(b) claims against all non-issuers. 503 F.3d at 102. In rejecting the reading Rio Defendants urge in their motion, the Second Circuit held such an interpretation was obviously incorrect because it would deprive investors of the ability to sue over "false statements made by underwriters, brokers, bankers, and non-issuer sellers"—a group that has a far more remote and attenuated relationship to investors in an issuer than Rio's relationship here to minority stockholders in its subsidiary.

*Harbinger Capital Partners LLC v. Deere & Co.*, 632 F. App'x 653, 656 (2d Cir. 2015), cited by the Rio Defendants, is equally inapt. In *Harbinger*, a hedge fund sued a private-company's suppliers on an omissions theory for failing to disclose flaws in the products the suppliers sold to the company—but where the defendant-suppliers were not alleged to have made any false statements, let alone about the private company and its business. *See id.*; *see also*

*LightSquared Inc. v. Deere & Co.*, 2015 WL 585655, at *19 (S.D.N.Y. Feb. 5, 2015) (clarifying that the *Harbinger* plaintiff's claims did not involve affirmative misrepresentations but omissions). In *dicta*, the Second Circuit cited the similarities to the fact pattern in *Nortel*, noting the plaintiff purchased the company's securities based on the company's own "'optimistic projections' about the feasibility of its plan given defendant[-suppliers]' alleged failure to disclose their receivers' design issues," which was too "remote" a relationship to give rise to standing under *Nortel* and *NYSE. Harbinger*, 632 F. App'x at 656. In any event, the Second Circuit held the plaintiff had not alleged the defendant-suppliers had any duty to disclose the alleged defects. *Id.* By contrast, here, Rio, a publicly traded company, made numerous public representations directly about TRQ and TRQ's sole asset OT (not just about itself), exercised near total control over TRQ, and had a duty to be complete and truthful once it chose to speak—a point the Rio Defendants do not dispute.

The Rio Defendants also cite *Menora Mivtachim Insurance Ltd. v. International Flavors and Fragrances Inc.*, 2021 WL 1199035, at *30-31 (S.D.N.Y. Mar. 30, 2021) ("*IFF*"), where the court applied *Nortel* to preclude Section 10(b) claims by investors in one company against another company that the first company acquired, where the latter company made allegedly false "self-referential statements," i.e., "misrepresentations . . . about itself." And they cite *In re Altisource Portfolio Solutions, S.A. Sec. Litig.*, 2015 WL 12001262, at *3-4 (S.D. Fla. Sept. 4, 2015), where the court applied *Nortel* to preclude Section 10(b) claims against a company that provided services to an issuer and made false statements about the companies' business relationship, and *Duane & Virginia Lanier Tr. v. SandRidge Mississippian Tr. I*, 361 F. Supp. 3d 1162, 1170 (W.D. Okla. 2019), which involved two separate trusts with related management, but where there was no "connection between Trust I's allegedly false statements about itself and [plaintiffs'] purchases of Trust II units." *Id.* at 1171.

But these cases are entirely distinguishable. Indeed, Rio's statements were indisputably not "self-referential statements" about Rio, but statements explicitly about TRQ and Oyu Tolgoi, TRQ's sole asset. Indeed, unlike in *IFF* or *Altisource*: (i) TRQ is a majority-owned, controlled by Rio; (ii) Rio controls and directly manages every aspect of TRQ's business and access to all information about TRQ's sole significant asset, the Oyu Tolgoi project; (iii) Rio's false statements concerned <u>TRQ and Oyu Tolgoi</u>—not Rio itself, Rio's own separate business or mere services or products supplied by Rio to TRQ—and (iv) Rio controlled the statements made by TRQ.[3]

Contrary to the Rio Defendants' suggestion, consistent with *Stoneridge*, courts have repeatedly sustained primary claims against non-issuers. In *Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000), the Third Circuit held that a corporation's statements about a merger related to securities in a merger target even though the merger never occurred. Similarly, following *Stoneridge*, the court in *Hering v. Rite Aid Corp.*, 331 F. Supp. 412 (M.D. Pa. 2013), sustained claims by Rite Aid investors against Walgreens, where those claims (like those in *Semerenko*) were based on Walgreens' statements about a proposed merger with Rite Aid—that is, statements that were about both companies, like Rio's statements about TRQ. *See id.* at 416-20.

---

[3] Not only is the *IFF* "standing" discussion *dicta* given the plaintiff's "threshold pleading failures" to allege any unlawful conduct or misstatement, but the court appears to presume plaintiffs would have had standing had the executives of the acquired third-party defendant made their statements after the subsidiary was acquired by the issuer—reasoning that shows the court would have found standing in a parent-subsidiary relationship like that between Rio and TRQ here. *See IFF*, 2021 WL 1199035, at *32; *cf. In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 446-47 & n.9 (S.D.N.Y. 2019) (discussing "statutory standing" articulated in *Nortel* and *NYSE* as requiring court to ask "who can sue" under Section 10(b)). Moreover, the court in *IFF* noted that plaintiffs alleged "scheme liability" claims under Rule 10b-5(a) and (c) and *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), and those claims failed only because plaintiffs failed to allege any material false statements. *IFF*, 2021 WL 1199035, at *32. Finally, *Harbinger* and *Altisource* do not address "scheme liability" claims under Rule 10b-5(a) and (c), and thus the cases on which the Rio Defendants rely do not affect Lead Plaintiff's scheme-liability claims discussed below.

Likewise, in *In re Galena Biopharma, Inc. Securities Litigation*, 117 F. Supp. 3d 1145, 1184, 1191 (D. Or. 2015), the court sustained Section 10(b) misrepresentation (and scheme-liability) claims against a non-issuer investor-relations firm (DreamTeam) that agreed to tout Galena's stock by disseminating misleading positive articles on the company. *See id.* at 1184, 1191. The court sustained misrepresentation claims against non-issuer DreamTeam based on its materially misleading articles that were made "in connection with" investors' purchase of Galena stock. *Id.* at 1184. Here, the business relationship between TRQ and Rio is much stronger, deeper, and more longstanding than that between Galena and its unrelated investor-relations firm.

And in *In re HealthSouth Corp. Securities Litigation,* the court sustained claims against UBS—a separate public company that issued analyst reports on, underwrote offerings for, and extended lines of credit to HealthSouth—for UBS's statements and deceptive acts that defrauded HealthSouth investors. Relying on *Stoneridge*, the court held that the complaint adequately alleged "UBS committed a primary violation/deceptive act that was communicated to the public, influenced the stock price, and caused Plaintiffs' losses." *In re HealthSouth Corp. Sec. Litig.*, CV-03-BE-1500-S (N.D. Ala. Feb. 4, 2009) (ECF No. 1533) (Ex. A).[4]

Indeed, a court applying *Stoneridge* and *Nortel* recently sustained Section 10(b) claims against a non-issuer that had a far more "remote" relationship than Rio does with Turquoise Hill. In *Klein v. Altria Group, Inc.*, 2021 WL 955992, at *9-10 (E.D. Va. Mar. 12, 2021), the court

---

[4] *See also HealthSouth*, CV-03-BE-1500-S, Tr. (N.D. Ala. Jan. 27, 2009) (ECF No. 1532), at 116:22-126:20; 124:22-23 ("UBS put words in the mouths of officers of the company") (Ex. B); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 277 (N.D. Ala. 2009) ("[in] *Stoneridge* the Supreme Court made clear that a defendant who participates in a fraudulent scheme faces liability for its deceptive public acts or statements"); *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 481-82 (2d Cir. 2008) ("there is no reason in law or logic to apply a bright-line rule prohibiting the application of the *Basic* presumption in suits against secondary actors" because "there is a private right of action under Section 10(b) against entities other than issuers"); *Ziemba v. Cascade Int'l Inc.*, 256 F.3d 1194, 1205 (11th Cir. 2001) (a "secondary actor" can be primarily liable).

sustained Section 10(b) claims by investors in Altria, a tobacco company, against JUUL, an e-cigarette company in which Altria held a minority, non-controlling stake and with which it conducted joint advertising campaigns, for JUUL's false statements about its marketing to youth. The connections between Rio and TRQ are much stronger than those between Altria and its non-controlled business partner JUUL, and are more than sufficient to support Plaintiff's claims here.

Recognizing their standing arguments fail under the law, Defendants manufacture a policy argument to contend that finding standing in this case would somehow expand the scope of Rule 10b-5(b) liability. Rio Br. at 14. Not so. Indeed, the Rio Defendants get the policy exactly backwards: there could hardly be a more appropriate situation in which investors should be permitted recourse against a non-issuer—as Rio was not only TRQ's controlling shareholder, but also the manager of its only operating asset and the source of all information about its business. As courts in this District have recognized, it is entirely appropriate to hold parent companies liable to minority investors in their subsidiaries when the parents make false statements about their subsidiaries. *See IOP Cast Iron*, 91 F. Supp. 3d at 473; *Barclays*, 56 F. Supp. 3d at 557-60; *EnergySolutions*, 814 F. Supp. 2d. at 418. And Lead Plaintiff's claims against the Rio Defendants do not broaden Rule 10b-5(b)'s reach. To the contrary, Defendants' policy argument stands the Exchange Act on its head, and permitting Rio to evade liability for its misrepresentations about the "cornerstone" of its business here would create a glaring legal loophole.[5]

---

[5] In a footnote, the Rio Defendants assert that Plaintiff's claims do not satisfy Section 10(b)'s "in connection with" requirement, citing *Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *12 n.14 (S.D.N.Y. Feb. 27, 2017). Rio Br. at 14 n.14. This argument fails for two reasons. First, the *Fogel* court misconstrued *Nortel* as relying on the "in connection with" element when, in reality, *Nortel* expressly rejected that reasoning. 369 F.3d at 34. Second, the *Fogel* court itself expressly declined to decide the "in connection with" question. *See* 2017 WL 751155, at *12 n.14. In fact, numerous courts have held that one company's false statements about another company are "in connection with" the latter company's securities. *See IOP Cast Iron*, 91 F. Supp. 3d at 468, 473; *Barclays PLC*, 56 F. Supp. 3d at 559-60; *EnergySolutions*, 814 F. Supp. 2d. at 409, 418.

**B.     Rio Is Liable Under Rule 10b-5(b) as the Maker of TRQ's False Statements**

Lead Plaintiff also alleges that Rio exercised complete control over TRQ's access to information about the Oyu Tolgoi project and over TRQ's public statements.  ¶¶46-56, 457-60. These facts support Rio's liability to TRQ investors not only for the false statements that Rio itself made about the project in its own name, but also for TRQ's false statements, and this liability theory is expressly alleged in the Complaint.  ¶55; *see also* ¶¶457-60.

The Supreme Court has held that a person can be liable for making false statements over which it exercises control.  In *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the Court held that a "maker" a statement for purposes of Section 10(b) and Rule 10b-5(b) is the "person or entity with ultimate authority over the statement, including its content and whether and how to communicate it" and that "in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made" by the party to whom it is attributed.  *Id.* at 142-43.  Here, Rio had "ultimate authority" over TRQ's statements, including their "content and whether and how to communicate [them]," and TRQ told investors Rio this fact.[6]

Most significantly, Rio was not only TRQ's controlling majority stockholder but also controlled TRQ's public statements through a contract requiring that those statements be "consistent with the information provided by the Rio Tinto Manager [Rio Tinto International Holdings]" and that Turquoise Hill "not file or issue any OT Disclosure without providing the Rio Tinto Manager with a reasonable opportunity to review and comment thereon."  ¶53.  Defendant RTIH is a wholly owned and controlled subsidiary of Rio Tinto.  ¶¶47.  And TRQ's public

---

[6] Courts routinely find that there can be more than one "maker" of a statement under *Janus*.  *See IOP Cast Iron*, 91 F. Supp. 3d at 473; *Barclays*, 56 F. Supp. 3d at 557-60; *EnergySolutions*, 814 F. Supp. 2d. at 418.

statements identified Rio as its controlling shareholder, the manager of its sole asset, and the source of all information about its business and operations. ¶¶47-48, 52-56. As recounted by a former investor relations employee at TRQ, any communication disseminated outside TRQ concerning Oyu Tolgoi or any communication that could impact TRQ's stock price was dictated by Rio Tinto, which controlled all of TRQ's communications and access to information about OT. ¶450. These allegations easily satisfy the standard for pleading control over statements under *Janus*, which requires only allegations supporting "the plausible inference that Defendant . . . had 'ultimate authority' over the statements." *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *33 (S.D.N.Y. Mar. 23, 2017); *see also Carpenters v. Barclays*, 56 F. Supp. 3d at 559.

As alleged in the Complaint, Rio actually exercised its contractual control over TRQ's public statements (¶¶53-56, 450), and these allegations satisfy *Janus*. *See, e.g.*, *Puddu v. 6D Glob. Techs.*, 2021 WL 1198566, at *7-9 (S.D.N.Y. Mar. 30, 2021) (allegations that defendant was involved in day-to-day operations of issuer, selected issuer's executives, and reviewed issuer's SEC filings gave rise to claims for statements attributed to issuer under *Janus*); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 540-41 (S.D.N.Y. 2016) (sustaining claims under *Janus* against investment adviser that controlled contents of a fund's prospectus and was named in the prospectus); *Cotter v. Gwyn*, 2016 WL 4479510, at *11 (E.D. La. Aug. 25, 2016) (sustaining claims under *Janus* against hedge fund that calculated false asset values for a separately organized commodity pool and circulated them to investors); *In re Puda Coal Sec. Inc. Litig.*, 30 F. Supp. 3d 261, 267 (S.D.N.Y. 2014) (sustaining claims under *Janus* against underwriters who participated in drafting prospectus, had authority to approve its issuance, and were named on its cover); *In re Nat'l Century Fin. Enters., Inc.*, 846 F. Supp. 2d 828, 861-62 (S.D. Ohio 2012) (sustaining claims under *Janus* against underwriter that participated in drafting offering documents, controlled their

contents, and circulated them to investors); *see also In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 736 (D. Minn. 2019) (*Janus* did not bar claims against executives who would have been involved in drafting, reviewing, or approving statements).[7]

### C.    Rio Is Liable Under Rule 10b-5(a) and (c) for Knowingly Disseminating False Information Through TRQ

Rio is also liable under the Supreme Court's decision in *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094 (2019), for disseminating false information through TRQ and engaging in other deceptive conduct.  In *Lorenzo*, the Court held that persons who disseminate false statements with the intent to defraud—even if they are not the "makers" of the statements—can be held liable for violating subsections (a) and (c) of Rule 10b-5, often referred to as "scheme liability."  The defendant in *Lorenzo* was a broker who sent an email drafted by his boss to investors, knowing that it was false.  The Court held that although the broker was not the "maker" of the statement under *Janus* because he did not control its content, he employed a "scheme" and "artifice to defraud" under Rule 10b-5(a), and he also engaged in a "practice, or course of business" that "operate[d] . . . as a fraud or deceit" under Rule 10b-5(c).  *Id.* at 1100-03.

Notably, courts have held that "under *Lorenzo*, unlike prior precedent, a plaintiff need not necessarily allege deceptive conduct that extends beyond the alleged misstatement itself."  *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *17 (D.N.J. June 5, 2020); *see also SEC v. Sequential Brands Grp., Inc.*, 2021 WL 4482215, at *6 (S.D.N.Y. Sept. 30, 2021)

---

[7] Rio's cases are entirely inapposite and do not concern a majority stockholder that controlled both the issuer and its statements.  *Cf. In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 262 (S.D.N.Y. 2020) (minority shareholder who did not participate in preparing false statements was not maker under *Janus*); *Bondholder Comm. on Behalf of Owners of Quad Cities Reg'l Econ. Dev. Auth. First Mortg. Revenue Bonds Series 2013A v. Sauk Valley Student Hous., LLC,* 2020 WL 5995617, at *5 (D.N.J. Oct. 9, 2020) (property manager that provided information to housing-authority issuer but did not draft offering documents or control statements not maker under *Janus*).

("*Lorenzo* instructs that a plaintiff may make out a scheme liability claim by identifying manipulative or deceptive acts grounded in alleged misrepresentations or omissions."); *Boston Ret. Sys. v. Alexion Pharms., Inc.*, 2021 WL 3675180 (D. Conn. Aug. 19, 2021) (same); *SEC v. SeeThruEquity, LLC*, 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (same); *SEC v. Winemaster*, 2021 WL 1172773, at *23-24 (N.D. Ill. Mar. 29, 2021) (citing *Lorenzo* to reject the argument "that Rule 10b-5(a) and (c) require deceptive acts distinct from an alleged misstatement"). However, deceptive conduct in addition to disseminating false information strengthens a scheme-liability claim, as the *Cognizant* court held in sustaining scheme-liability claims against a defendant who disseminated false public statements that concealed a bribery scheme and who also participated in the bribery. *See Cognizant*, 2020 WL 3026564, at *17-18; *see also Winemaster*, 2021 WL 1172773, at *23-24 (conduct of manager who negotiated contracts and concealed them from auditor gave rise to scheme liability).[8]

Likewise, here, as part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), the Rio Defendants both knowingly disseminated false information about OT's progress and costs using TRQ as a conduit for falsehoods that Rio created using its complete control over TRQ and over information about OT, and engaged in other deceptive conduct.  ¶¶402-05.  In particular, the Rio Defendants (i) retaliated against employees and consultants who tried to make Defendants acknowledge the truth about the cost overruns and schedule delays at Oyu Tolgoi (¶¶153-59, 221-29), (ii) commissioned a sham internal investigation by Baker McKenzie that purported to rebut Bowley's allegations while actually deliberately ignoring evidence that

---

[8] The Rio Defendants wrongly argue that *Janus* precludes their liability for causing TRQ to make false statements as part of a scheme under Rule 10b-5(a) and (c). Rio Br. at 20. *Janus*, however, addresses only Rule 10b-5(b) and has no bearing on scheme liability. *See Janus*, 564 U.S. at 141; *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014) (*Janus* "has no bearing" on Rule 10b-5(a) and (c)); *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013) (same).

Defendants knowingly or recklessly made false public statements about Oyu Tolgoi (¶¶281-86), (iii) used nondisclosure agreements to try to conceal the truth about the delays and cost overruns (¶¶150, 281, 284), (iv) sought to conceal and destroy evidence of their misconduct by securing the destruction of documents possessed by Duffy and by instructing employees not to document important information (¶¶287-88), and (v) used other deceptive means to conceal the problems at Oyu Tolgoi from investors and the Mongolian government (¶¶200-02, 339).

These allegations plead scheme liability under *Lorenzo*. *See Ga. Firefighters Pension Fund v. Anadarko Petroleum Corp.*, 2021 WL 182316, at *4 (S.D. Tex. Jan. 19, 2021) (sustaining scheme-liability claims against company that disseminated false information and retaliated against whistleblowers, used confidentiality agreements to conceal problems in developing oil field, and hid those problems from business partners); *see also Winemaster*, 2021 WL 1172773, at *23-26; *6D Glob. Techs.*, 2021 WL 1198566, at *9-11 (sustaining claims under *Janus* and Rule 10b-5(a) and (c), noting that consistent with "*Lorenzo*, the Court sees no basis to conclude that a plaintiff may not establish, in a scheme liability claim, the existence of a 'manipulative or deceptive act' by pointing to alleged misrepresentations or omissions."); *In re Alphabet, Inc. Sec. Litig.*, 2021 WL 2448223, at *15 (9th Cir. June 16, 2021) ("*Alphabet*") ("*Lorenzo* explained that 'considerable overlap' exists among the subsections of Rule 10b-5 and held that disseminating false statements 'ran afoul of subsections (a) and (c)'" and rejected need to show "conduct other than misstatements"); *6D Glob. Techs.*, 2021 WL 1198566, at *11 (similar). Thus, Rio can be held liable under *Lorenzo*.[9]  Finally, contrary to the Rio Defendants' argument that investors did not

---

[9] The Rio Defendants cite non-controlling decisions to argue scheme liability claims cannot be based *solely* on misrepresentations. Rio Br. at 19-20. *See In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 336 (D. Conn. 2021); *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216-17 (S.D.N.Y. 2020); *SEC v. Kelly*, 817 F. Supp. 2d 340, 343-44 (S.D.N.Y. 2011).  But Defendants' cases are distinguishable because Plaintiff alleges extensive deceptive conduct in addition to false

rely on their false statements or deceptive conduct (Rio Br. at 20-21), reliance here is established

based on the fraud-on-the-market presumption that investors relied on Defendants' statements that

were enabled by Rio's deceptive conduct—the very scheme-liability reliance allegations routinely

upheld by courts.  For example, in *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,

845 F.3d 384, 394 (8th Cir. 2016), the court found reliance satisfied where Medtronic

"manipulat[ed] . . . clinical trials by paying the physician-authors to conceal adverse effects and to

overstate the disadvantages of alternative procedures," and "investors directly relied on the

resulting favorable clinical trials."  Likewise, in *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450,

472 (S.D.N.Y. 2017), the court found reliance where the issuer's executive organized a kickback

and bribery scheme, which "made it 'necessary or inevitable' that falsehoods on the part of

Eletrobras would result."  The same is true here.[10]

---

statements.  Plaintiff also respectfully submits that these decisions are contrary to *Lorenzo*—
indeed, none of them cite it—and to the most recent Circuit authority addressing *Lorenzo* in
*Alphabet*.  *See* 139 S. Ct. at 1100-01.  The Second Circuit declined to address whether these
holdings are valid following *Lorenzo*, *see Plumber & Steamfitters Local 773 Pension Fund v.
Danske Bank A/S*, 11 F. 4th 90, 105 n.6 (2d Cir. 2021), but the question is pending before the
Circuit in a separate case against Rio.  *See SEC v. Rio Tinto PLC*, 2021 WL 1893165, at *2-3
(S.D.N.Y. May 11, 2021).  The Rio Defendants also cite *Menora Mivtachim Ins. Ltd. v. Int'l
Flavors & Fragrances Inc.*, 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021), which correctly
recognized that scheme liability claims can be based on false statements but found that statements
were not adequately alleged.  *See id.* at *32.  Similarly, the *Danske* court held the plaintiff failed
to allege either false statements or deceptive conduct, both of which are alleged here.  *See* 11 F.4th
at 105.

[10] *See also Klein v. Altria*, 525 F. Supp. 3d 638, 665 (E.D. Va. 2021) (finding reliance on
defendants' submission of false data to FDA); *Cognizant*, 2020 WL 3026564, at *19 (bribery
scheme that resulted in misstated financials); *In re Aqua Metals, Inc. Sec. Litig.*, 2019 WL
3817849, at *9 (N.D. Cal. Aug. 14, 2019) (organizing of analyst site visits to observe machinery
in operation for five to ten minutes when machinery broke down after an hour); *In re Galena
Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1198 (D. Or. 2015) (hiring of authors to write
false articles, internet postings, and emails about issuer); *N.Y. City Emps.' Ret. Sys. v. Berry*, 616
F. Supp. 2d 987, 997-98 (N.D. Cal. 2009) (falsification of minutes that provided basis for
"misrepresentations about the nature of its options granting processes"); *In re Lernout & Hauspie
Sec. Litig.*, 236 F. Supp. 2d 161, 174 (D. Mass. 2003) (finding reliance on sham transactions under
fraud-on-the-market theory); *In re Bristol–Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 170

## III.   **LEAD PLAINTIFF ADEQUATELY ALLEGES FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

Lead Plaintiff adequately alleges Defendants' false and misleading statements and omissions. "The federal securities laws impose an obligation on speakers to be both accurate and complete." *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 282 (S.D.N.Y. 2011). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).  Under Rule 9(b) and the PSLRA, plaintiffs need specify the alleged fraudulent statements, "identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent" by pleading facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003).

A statement to investors "is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010); *see also City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 366 (S.D.N.Y. 2012) (defendant's statement that he did not "see anything that would

---

(S.D.N.Y. 2008) (executive's negotiation of illegal side agreements as part of settlement and failure to correct company's misstatements about settlement).  *Stoneridge*, where the Court held that investors did not rely on an issuer's unaffiliated third-party supplier's sham contracts with the issuer that were never publicly disclosed, is inapposite.  There, it was the issuer, not the supplier, that "misled its auditor and filed fraudulent financial statements; nothing [the supplier] did made it necessary or inevitable for [the issuer] to record the transactions as it did." 552 U.S. at 161.  By contrast, here, Rio's complete control over information about OT and TRQ's disclosures enabled it to make the false statements "necessary" and "inevitable."  Defendants' reliance on *Menaldi v. Och–Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500 (S.D.N.Y. 2017), is also unavailing.  The court there found a lack of reliance where the misconduct—bribery—occurred many years before the class period, the only deceptive conduct during the class period was an attempt to conceal the past bribery from the SEC and DOJ, and that attempt was never publicly disclosed.  *See id.* at 518-19.  Here, by contrast, Rio retaliated against whistleblowers and engaged in other deceptive conduct during the Class Period that directly enabled Defendants' public statements about the OT project.

cause us to back off" an assumption that a division would meet its profitability projections was false and misleading when defendant knew projections were overstated).

The Complaint alleges five categories of materially false and misleading statements and omissions. <u>First</u>, Defendants made false and misleading statements concerning the development of the Oyu Tolgoi underground project, including that the project was "on track," "on budget," and "on schedule." <u>Second</u>, Defendants falsely blamed the Oyu Tolgoi's delays and cost overruns on geological issues, and failed to disclose the engineering, procurement, and construction problems that began well before the Class Period. <u>Third</u>, Defendants failed to recognize the impairment of the Oyu Tolgoi cash-generating unit ("CGU") despite the Oyu Tolgoi underground project's significant cost overruns and delays. ¶¶374, 387, 403-408. <u>Fourth</u>, Defendants signed false and misleading Sarbanes-Oxley certifications. <u>Fifth</u>, Defendants' risk factor disclosures were false and misleading. The Complaint provides a litany of facts demonstrating that all five categories of these statements were false when made, and these are the very kinds of misstatements routinely held actionable by courts in this Circuit.[11]

### A. Plaintiff Adequately Alleges Defendants' False and Misleading Statements and Omissions Concerning the Oyu Tolgoi Underground Expansion

Throughout the Class Period, Defendants made statements concerning the development of the Oyu Tolgoi underground project, reassuring investors that the project was making good progress, was "on budget" with the stated $5.3 billion capital expenditure, and was "on track" and "on schedule" for first draw bell and first sustainable production.[12] Defendants made these

---

[11] The Turquoise Hill Defendants do not challenge the falsity of the statements Plaintiff alleges in the Complaint, but rather assert that the alleged false statements are "opinions" or otherwise "inactionable." TRQ Br. at 18.

[12] *See, e.g.*, ¶¶306-307, 313-15, 319, 321, 323-24, 328-29, 331-32, 334-338, 344-45, 349-50, 355-56, 362, 365-67, 369-72, 376, 381-84, 387, 399.

statements days apart, with TRQ's statements often quickly followed by Rio. *Compare* ¶306 (TRQ press release on July 16, 2018 claiming that it "continues to expect the first draw bell in mid-2020") *with* ¶307 (Rio press release on July 17, 2018 claiming "major growth projects remain on track, with . . . construction of the first drawbell at Oyu Tolgoi Underground anticipated in mid-2020[]" and "Construction of the first drawbell is still expected in mid-2020.").[13]

These statements were false and misleading. Contemporaneous internal reports, including reports from Bowley, the individual Defendants hired to investigate problems at Oyu Tolgoi, directly contradicted the schedule and cost estimates Defendants disclosed to investors and the truth was that the Oyu Tolgoi project was months behind schedule and hundreds of millions over budget. ¶¶79-161, 165-186, 208-220.

In fact, at the start of the Class Period, Defendants were specifically told by Bowley that the Oyu Tolgoi project was "12 months behind schedule" and "$300mill capital over budget" and that they should "[e]xpect this to rapidly escalate." ¶151. Consequently, Defendants knew they were not "on track," "on budget," or "on schedule." *See, e.g., Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 292 (S.D.N.Y. 2020) (sustaining allegations concerning cost estimates and schedule for construction of large chemicals complex); *Lockheed*, 875 F. Supp. 2d at 366 (statements that division was "doing well, had no performance issues, had a 'solid backlog,' and had a strong 'win rate' driving its performance" were not forward-looking and are actionable); *In re Vivendi Universal, S.A. Sec. Litig.*, 2004 WL 876050, at *7 (S.D.N.Y. Apr. 22, 2004) (statement that company was "'on track' to achieve earnings targets" actionable); *In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 533 (S.D.N.Y. 2004) (rejecting application of safe harbor to statement "we're

---

[13] TRQ's statements that OT was "on track," "on schedule," and "on budget" (¶¶306, 313-15, 319, 321, 334-37, 344-45, 349-50, 355-56, 362, 366-67, 369-70, 381-84, 387, 395, 399) mirrored contemporaneous statements by Rio. ¶¶307, 323-34, 328-29, 331-32, 338, 365, 371-72, 376.

comfortable with the 35% quarter-over-quarter growth"); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 305 (S.D.N.Y. 2013) (statement that company was "on track" to meet a schedule not forward-looking); *In re Venator Materials PLC Sec Litig.*, 2021 WL 2980581, at *9, *20-21 (S.D. Tex. July 7, 2021) (statements that rebuild project was "on pace" and "on schedule" were actionable mixed preset/future statements not protected by safe harbor).[14]

Further, for each of the statements discussed above, Plaintiffs allege specific, concrete, and historical undisclosed facts contradicting Defendants' statements.[15]  For example, on the first day of the Class Period, Defendants claimed that the OT expansion was "on track" and, in support of that statement, cited the purported facts that the "shaft five ventilation system has been fully commissioned and is now operational" and that "shaft two equipping and headframe fit-out is in progress." ¶¶306-07.  This "on track" statement and the accompanying representations that shaft five was operational were false because, at the time they were made, the Shaft 5 heating unit was in fact eight months behind schedule (¶¶89-91), and it was thus false to claim that Shaft 5 was in fact operational.  *See also* ¶¶90-91, 107-08 (ICG confirming costs and delays related to Shaft 5 and heating plant).  This "on track" statement was further false because it was accompanied by the additional concrete misrepresentation that the "shaft two equipping and headframe fit-out" were "in progress" when, in reality, at the time, the Shaft 2 equipping and headframe fit-out had been delayed by at least a year as a result of the abysmal initial Shaft 2 installation. ¶¶79-88, 92-101.

---

[14] Defendants cite *Kinross* for the proposition that development schedule statements can be forward-looking or protected opinions (TRQ Br. at 34 n.33; Rio Br. at 31-32) but there, the court sustained "on track" and other schedule statements with far less specificity and far weaker evidence of falsity than Lead Plaintiff provides here.  *See Kinross*, 957 F. Supp. 2d at 305-07.

[15] *See, e.g.*, ¶¶308-12, 316-18, 320, 325-27, 330, 333, 339-40, 343, 346, 353-54, 358, 363-64, 368, 373, 385, 388, 397, 402, 408.

The same is true for Defendants' representations concerning completed lateral development at OT, which were provided to further support their statements that the project remained "on track" and in line with the $5.3 billion capital cost estimate. ¶¶337, 383, 399. These development metrics were false, as lateral expansion was at least 100-200 meters behind schedule during the Class Period and TRQ was forced to restate the lateral progress metrics it reported (¶¶105, 275), which further renders Defendants' "on track" statements actionable. ¶¶339, 385, 402.

And all of these facts were corroborated by the ICG Report, which found that the OT project "fell behind schedule from the very beginning" and "never recovered from these delays," cited contemporaneous reports by Broadleaf in 2017 and 2018 that found that Defendants' reported timelines had a 2% and 0% chances of being timely completed, and confirmed the delay related to Shaft 1's "critical facilities" and Shaft 2 was estimated to be on the order of 21.4 months—i.e., the vast majority of the delay that Defendants eventually disclosed. ¶76; *see also* ¶¶92, 101, 125. Courts in this District routinely sustain similar mixed statements addressing past, present, and future performance. *See, e.g.*, *In re APAC Teleservice, Inc. Sec. Litig.*, 1999 WL 1052004, at *8 (S.D.N.Y. Nov. 19, 1999) ("Linking future success to present and past performance does not render statements immune[.]").[16]

---

[16] The Rio Defendants wrongly contend their public claim that the mid-2020 deadline for first drawbell remained "on track" following the Broadleaf reports was accurate by pointing to single self-serving phrase that this milestone could have been achievable because OT management had changed the "draw bell sequencing strategy." Rio Br. at 30-31. But this incorrect counterfactual narrative contradicts the Complaint, the ICG Report, and witness accounts making clear that any supposed "re-sequencing" was ineffectual and intended to legitimatize the false October 2018 "re-forecast"—which was a deliberate and "clever" story designed to conceal OT's true status that was "not accurate at all." ¶¶165-73, 300. Indeed, Bowley directly informed Defendants that the notion that the projected drawbell date would hold was a "suicidal statement" and false—as Defendants eventually were forced to disclose and the ICG Report confirmed. ¶¶213, 242.

In addition to providing historical misstatements about the development of the Oyu Tolgoi mine, Defendants also provided specific false responses to analyst questions concerning the drivers and status of cost-overruns and delays.  *E.g.*, ¶¶349-52, 376-79. For example, in October 2018, when Defendants announced a nine-month delay to first sustainable production, analysts directly asked whether the delay would impact the $5.3 billion capital expenditure budget. ¶349. Defendant Quellmann falsely reassured analysts and the market that the primary underground expansion milestones and cost assumptions had been "confirmed."  ¶350.  Similarly, in February 2019, Defendant Jacques responded to analysts asking about delays and their impact on the OT budget by falsely stating that the delays were "normal," when they were not, and that Defendants were preparing a cost estimate, when they had been previously told of the true costs. ¶¶376-80.

Specifically, these statements were false because Defendants had received internal reports and warnings from Bowley, Duffy, and numerous other employees and contractors from the beginning of the Class Period that Oyu Tolgoi was at least 12 months behind schedule and hundreds of millions of dollars over budget.  ¶¶102-10, 117-31, 135-61.  In fact, rather than "normal" for the mining industry, in reality the conditions at OT were a "nightmare scenario" ¶99, unlike anything the OT managers had experienced in their careers (¶103) and would have been "criminal" in the United States.  *E.g.*, ¶83, 88.

Defendants' misrepresentations to analysts are also actionable because they misrepresented existing facts, including by assuring investors that the budget had been "confirmed" and stating that the process surrounding the announced delays was "normal."  *See Novak*, 216 F.3d at 314-15 (holding statements actionable that inventory situation was "in good shape" or "under control" while defendants allegedly knew that the contrary was true); *Manavazian v. Atec Grp., Inc.*, 160 F. Supp. 2d 468, 481-82 (E.D.N.Y. 2001) (holding positive statements about business actionable

when defendants knew core business was crumbling).  Additionally, statements that the OT budget and underground expansion milestones, such as first drawbell and first sustainable production, had been "confirmed" is a "'concrete' description and a 'factual representation'" that is actionable.  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 168 (2d Cir. 2021).

### B.    Plaintiff Adequately Alleges, and the ICG Report Confirms, that Defendants Made False and Misleading Statements and Omissions Concerning the Causes of Delays and Cost Overruns at Oyu Tolgoi

Even when Defendants finally began disclosing the disastrous delays and cost overruns at Oyu Tolgoi, they falsely assured investors that they were "not atypical," claimed the Shaft 2 schedule included four months of contingency, and falsely blamed them on newly discovered "geotechnical" data and "ground conditions."[17]  These statements were categorically false.

The falsity of Defendants' statements blaming delays and cost overruns on "ground conditions" and "geotechnical" difficulties has now been confirmed by TRQ's own independent experts, who concluded unequivocally—with the benefit of a comprehensive review of contemporaneous internal company documents—that there was "no evidence" to support them. Specifically, the ICG found that "rock mass quality and ground conditions were not a significant contributor to the schedule delays and cost overruns," there was "no evidence" that "rock quality in the off the footprint development and mass excavations was significantly  different" than forecast, and that rock quality was in fact "better than anticipated" and "better than originally forecast"—findings that must be accepted as true, and are fatal to Defendants' arguments. ¶186.

Defendants' attempts to reassure investors about the delays are particularly egregious because they had known about them since at least 2017 and hired an expert, Bowley, to investigate and address them. ¶¶111-31.  As Bowley and numerous other witnesses confirmed, Defendants'

---

[17] *E.g.*, ¶¶334-36, 338, 347-52, 355-57, 370-72, 376-79, 381-82, 389-91, 393-98, 400-06.

statements that the delays were "typical" were untrue, as Oyu Tolgoi suffered from engineer, procurement, and construction problems that were entirely atypical, highly material, and like nothing the managers charged with addressing them had ever encountered. ¶¶102-10, 117-31, 135-61, 179-86, 208-20.  Further, the contingencies that Defendants assured investors were in place were false, as the delays and cost overruns far exceeded what Defendants disclosed. *See id*. Defendants had a duty to disclose information necessary "'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (discussing failure to disclose adverse information while claiming "very strong momentum").  Defendants did not do so here, where their statements omitted "catastrophic" problems at Oyu Tolgoi, including defective steel design, faulty headframe construction, and the lack of synchronization of mining and construction—facts that were later corroborated by TRQ's own experts in the ICG Report.  ¶¶102-110, 117-31, 135-161.[18]

### C.    Plaintiff Adequately Alleges Defendants' Improper Failure to Recognize the Impairment of the Oyu Tolgoi CGU

On July 31, 2019, Turquoise Hill announced a $600 million impairment of the "Oyu Tolgoi cash-generating unit and deferred tax asset de-recognition adjustments in the period." ¶409. TRQ's impairment charge was a result of the $1.2 to $1.9 billion increase in capital expenditure for Oyu Tolgoi, which reduced Oyu Tolgoi's carrying value by $600 million.  Defendants had previously assured the market that no impairment would be necessary, ¶¶374, 387, 404-08, despite the fact that the Oyu Tolgoi project was at least 12 months behind schedule and $300 million over capital

---

[18] Rio's cases are inapposite, and do not remotely resemble the facts here. *Cf. Starr v. Georgeson S'holder, Inc.,* 412 F.3d 103, 110 (2d Cir. 2005) (dismissing claim based on alleged nondisclosure of availability of free exchange services where services were in fact described in detail); *City of Roseville Emp. Ret. Sys. v. Nokia Corp.*, 2011 WL 7158548, at *9 (S.D.N.Y. Sept. 6, 2011) (defendant disclosed problems with software and risk of delays and no facts alleged showed software release dates would not be met "even in light of the alleged software problems").

budget <u>at the beginning of the Class Period.</u>   ¶¶102-110, 117-31, 135-161, 179-86, 208-20. Defendants knew that Oyu Tolgoi would require significantly more capital expenditure than the disclosed $5.3 billion budget and that the carrying value of Oyu Tolgoi would therefore be reduced. Knowing this, Defendants were "duty-bound" to inform the market about the deflated value. *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 (2d Cir. 2020).[19]

The Rio Defendants argue that the Complaint's allegations concerning the impairment fail because it is "classic pleading-by-hindsight." Rio Br. at 33.[20]   They are wrong. The Complaint contains a multitude of factual allegations concerning the true costs that were known to Defendants throughout the Class Period. *E.g.*, ¶¶102-10, 117-31, 135-61, 179-86, 208-20. Because Defendants put the impairment issue at play in assuring the market that no impairment was necessary, they were duty-bound to disclose the fact that the costs to develop OT were far higher than the $5.3 billion Defendants told investors. *See Setzer*, 968 F.3d at 214 (reversing dismissal and holding defendants were "duty-bound" to disclose information about overvalued asset); *Jinkosolar*, 761 F.3d at 250 ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

### D.  <u>Plaintiff Adequately Alleges False and Misleading SOX Certifications</u>

In their 2018 annual filings with the SEC, Defendants signed Sarbanes-Oxley certifications affirming that Defendants' 2018 Annual Reports did not "contain any untrue statements of a material fact" and Defendants Turquoise Hill, Quellmann, and Colton falsely asserted that the financial information in TRQ's Form 40-F "fairly present[ed] in all material respects, the financial

---

[19] This would not be the first case sustaining allegations that Rio improperly valued a mining asset. *SEC v. Rio Tinto plc*, 2019 WL 1244933, at *9 (S.D.N.Y. Mar. 18, 2019) (sustaining impairment allegations where valuation did not "fairly align" with internally known facts).

[20] Despite disclosing the impairment, the TRQ Defendants do not argue that these allegations are "pleading-by-hindsight," nor do they challenge the falsity of the impairment statements.

condition, results of operations and cash flows of the issuer." ¶¶411-13.  These statements were false when made because Defendants made false statements in the 2018 Annual Reports concerning the progress of the Oyu Tolgoi underground development and failed to disclose to investors the months of delays and over a billion dollars of cost overruns, and—as the ICG Report confirms—the true causes of those delays and cost overruns: "catastrophic" engineering, construction, and procurement problems and the "criminal" construction of the Shaft 2 headframe, and omitted the fact of the impairment of the OT CGU.  ¶¶411-13. Furthermore, as the ICG Report confirms, the OT expansion was plagued by overruns and delays by 2016, well before Defendants signed the SOX certifications. *See, e.g.*, ¶¶73-76.

The Complaint pleads facts sufficient to show that Defendants knew that their statements in the 2018 Annual Reports were false and misleading, including because Defendants received weekly and monthly progress reports concerning the development of the mine and were specifically told by employees, including Bowley, that Oyu Tolgoi suffered from significant problems causing months of delay and hundreds of millions of dollars in cost overruns at the time the 2018 Annual Reports were filed. *See* ¶¶73-131, 141-52, 165-86, 208-220. Defendants' knowledge of these problems renders their Sarbanes-Oxley certifications false.  *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 391-92 (S.D.N.Y. 2007).

### E.    Plaintiff Adequately Alleges False and Misleading Risk Factor Disclosures

Defendants included certain risk factor disclosures concerning the development of the Oyu Tolgoi underground project in their SEC filings. ¶¶415-23.  These risk factor disclosures were false and misleading when made because the risks already had manifested—indeed, as the ICG concluded, the OT expansion "fell behind schedule from the very beginning, and the project never recovered from these delays."  Indeed, at the time Defendants made their risk disclosures, the OT expansion suffered from "catastrophic," "staggering," and "inconceivable" undisclosed

49

engineering, construction, and procurement problems that caused massive delays and cost overruns at least a year before the Class Period began.  ¶¶73-131, 134-61, 165-86, 208-20, 424.  Defendants' generic disclosures of risks related to the "timing and cost" of mine construction "will not insulate Defendants from liability where the risk allegedly disclosed has already occurred." *Freudenberg*, 712 F. Supp. 2d at 193; *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired"). And as Defendants acknowledge, risk disclosures are misleading "when that risk has already materialized." *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *11 (S.D.N.Y. Mar. 29, 2016).

Here, Lead Plaintiff alleges that Defendants knew of significant delays and cost overruns at Oyu Tolgoi that <u>already</u> had occurred—and they had detailed information about those problems months before the Class Period began—but rather than inform investors, disclosed that cost overruns and delays were only future, potential risks that could one day materialize.[21]

### F.    <u>Defendants' Falsity and Materiality Arguments Are Meritless</u>

Defendants argue that all of the alleged false and misleading statements are inactionable as either (i) puffery; (i) protected by the PSLRA safe harbor for forward-looking statements; (iii) statements of opinion; or (iv) immaterial. These arguments fail.

### 1.    Defendants' Statements Are Not Inactionable Puffery

Defendants contend that their "on track," "on plan," and "progressing well" statements are "inactionable puffery." Rio Br. at 28-29; TRQ Br. at 42-43.  Although "[e]xpressions of puffery and corporate optimism do not give rise to securities violations," even "Pollyannaish statements

---

[21] The Rio Defendants' cited case is inapposite.  In *In re Bank of America*, 980 F. Supp. 2d 564 (S.D.N.Y. 2013), the defendant made timely and extensive disclosures about the allegedly concealed litigation risk (*id.* at 580), whereas here, Defendants purported to warn investors about possible risks related to the development of Oyu Tolgoi well after the risks had materialized.

couched as rosy corporate-speak may be actionable if they contradict facts known to a defendant." *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019) (finding actionable statements that integration was making "great progress") (citing *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018)); *In re Virtus*, 195 F. Supp. 3d at 537 (citing *Novak*, 216 F.3d at 315); *see also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (false statements about integrity, taken together, were actionable and not puffery); *Freudenberg*, 712 F. Supp. 2d at 190 ("'Quality' in this context is not an amorphous concept. Defendants denied that [the business] had become more risky—even though it is alleged that the risks had increased."); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 359 (S.D.N.Y. 2006) (that segment remained a "sound business" and a "growth proposition" not puffery).

Whether a representation is puffery depends "on the context in which it is made." *In Petrobras*, 116 F. Supp. 3d at 381; *see also Novak*, 216 F.3d at 315 (finding general statements that inventory was "in good shape" and "under control" actionable where defendants knew the contrary was true); *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, 2013 WL 791462, at *7 (S.D.N.Y. Mar. 5, 2013) (whether statement constitutes puffing "must be viewed within the context of the totality of circumstances"). And management's responses to analysts' questions are typically not puffery because they are directly responsive to what investors consider material. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597-98 (7th Cir. 2006) (response to questions from analysts "went well beyond puffery: it was a direct response to an analyst's inquiry"), *vacated in part on other grounds*, 551 U.S. 308 (2007).

This is fatal to Defendants' puffery arguments concerning their "on track," "on plan," and "progressing well" statements, which were made in response to analysts' questions and investors'

concerns about the Oyu Tolgoi mine's schedule and costs. ¶¶274, 282, 289, 294, 303, 325-26; *see Wash. State Inv. Bd. v. Odebrecht SA*, 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020) ("These statements were made to reassure investors as to specific risks regarding international competition, and accordingly they cannot be dismissed as 'mere puffery.'"); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017) (statements about company's "integrity" were not puffery because they were "made in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern, and . . . therefore a reasonable investor could rely on them"). Moreover, Defendants' statements about the project being "on track" also were accompanied with concrete factual misrepresentations, such as that "Shaft two equipping and headframe fit-out is in progress, and the shaft five ventilation system has been fully commissioned and is now operational" (¶307), which was false (¶311).[22]

---

[22] If anything, Defendants' puffery cases confirm that their statements are actionable. TRQ Br. at 42-43; Rio Br. at 28-29; *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *14 (S.D.N.Y. Sept. 21, 2021) (unlike specific progress statements here, statements not accompanied by "sufficient specificity to offer any guarantee of some concrete fact or outcome"); *In re Yunji Inc., Sec. Litig.*, 2021 WL 1439715, at *8-9 (E.D.N.Y. Mar. 31, 2021) (unlike here, statements about "high quality" products could not be judged on any objective criteria); *In re Fed Ex Corp. Sec. Litig*, 517 F. Supp. 3d 216, 236 (S.D.N.Y. 2021) (soft integration statements not actionable, including because prior public disclosures concerning information allegedly concealed about cyberattack were extensive such that no "would mistakenly conclude…a cyberattack had helped"); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757-59 (S.D.N.Y. 2018) (statements about "progress" toward commercialization not actionable where specific steps, like hiring of sales force, were not challenged and challenged manufacturing statements were not false); *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018) (statements about "unique" business model and sales results); *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *9-10 (S.D.N.Y. Sept. 14, 2015) (positive spin on prospects for FDA approval); *Elliott Assocs., L.P. v. Covance, Inc.*, 2000 WL 1752848, at *10 (S.D.N.Y. Nov. 28, 2000) (no allegations merger was not, in fact, "on track"); *cf. Hertz Corp. v. Accenture LLP*, 2019 WL 5537997, at *5 (S.D.N.Y. Oct. 25, 2019) (not a securities case, no allegations that defendant knew that it did not have "the best talent in the world"); *Colbert v. Rio Tinto PLC*, 824 Fed. App'x 5, 10 (2d Cir. 2020) (not misleading to say coal production was "ramping up" when it was in fact increasing).

2.    **The PSLRA Safe Harbor Does Not Protect Defendants' False and Misleading Statements and Omissions**

a.    **Defendants' Statements Were False When Made**

Defendants "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor." *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010). As alleged, Defendants had access to and obtained information that rendered their purported forward-looking statements false when made. *See* ¶¶73-112, 119-30, 143-50, 156-60, 182-94. Here, the false statements at issue concerned contemporaneous facts and disclosures that were contradicted by facts known to Defendants when they spoke. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("Historical or present fact—knowledge within the grasp of the offeror—is a different matter. Such facts exist and are known; they are not unforeseen or contingent."); *Novak*, 216 F.3d at 315 ("[D]efendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true.").

Moreover, having spoken about the progress of the underground project, even if couched in terms of estimates, Defendants had a duty to speak truthfully. *See In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009) ("Having chosen to speak out publicly regarding the Project's cost estimates, NovaGold was under a duty to 'speak truthfully about material issues,' and to correct misleading statements, regardless of whether or not they were 'forecasts.'").

Throughout the Class Period, Defendants' representations described current and historical facts about the status of the mine. For example, in addition to the Shaft 5 and headframe problems discussed *supra*, Defendant Lane claimed on August 1, 2018 that "shaft stripping and bracket installation" had been completed the previous quarter. ¶319. Similarly, Defendants made repeated statements of current and historical facts throughout the Class Period claiming, for example, that Shaft 5 was "fully operational" during the second quarter of 2018 (when it was not) (¶¶307-08),

that Shaft 2 equipping was "well under way" at that time (when it was not) (¶¶319-20), and that OT had made 2.3 kilometers of lateral expansion during the quarter (when it had not). ¶¶337, 339, 383-85. These statements of current and historical fact, made in connection with assurances that OT was "on schedule," are not forward-looking. *See Daum*, 355 F.3d at 96-97 (2d Cir. 2004) ("the misrepresentation of present or historical facts cannot be cured by cautionary language").

And here, Lead Plaintiff also adequately alleges that Defendants had "actual knowledge" that OT was <u>not</u> "on track," which renders any forward-looking statement actionable and exempt from the PSLRA's safe harbor protection. *See, e.g.*, *Moshell,* 481 F. Supp. 3d at 285 (finding actionable statements that construction of a chemical manufacturing plant was "on track" based on allegations of scienter that, collectively, gave rise to inference that certain individuals knew progress was, in fact, not "on track"); *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 833 (S.D.N.Y. 2017) (statements projecting a 2014 launch date for video game actionable when defendants were aware of delays affecting the launch date).

*Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282 (S.D.N.Y. 2018), is instructive. There, the defendant loan broker knew a recent merger caused productivity declines because of different business models and acceptance of more risky loans. *Id.* at 287. Defendants concealed these problems, while touting the new company's projected earnings per share, and the "great opportunity we have to ramp up originations at OneMain, including secured lending," *Id.* at 291. The court held these statements actionable as "statements of present fact." *Id.* at 295. As is the case here, the complaint there included accounts from former employees detailing that these estimates—and reassurances about previous guidance—were false when made as the individual defendants "participated in numerous meetings and conference calls during which the negative effects of integration-related activities were discussed." *Id.* at 300. In addition, former employees

"identified specific reports that were circulated during the Class Period . . . detailing decreases in productivity," which "'would have gone to any executive in charge of the Legacy OneMain branches,' which presumably would have included the Individual Defendants." *Id.* at 301.[23]

In any event, Defendants are liable for their omission of material information in their disclosures that squarely fall outside the safe harbor provision. Courts "in this circuit have consistently held that neither the PSLRA safe harbor, nor the bespeaks caution doctrine protects material omissions." *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017). "Bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). The Grand Canyon in this case were the cost overruns and delays the Oyu Tolgoi project incurred well before the start of the Class Period but were never disclosed to investors. *See, e.g.*, ¶¶73-131, 134-61, 165-86, 208-20.[24]

---

[23] Defendants' reliance on *In re Adient plc Sec. Litig.*, 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) is misplaced. Rio Br. at 22-23; TRQ Br. at 34 n.35. In *Adient*, investors were allegedly misled by statements concerning Adient's projected margin expansion in light of operational problems with the company's metals business—which represented just one component of the margin expansion effort. The court noted that defendants did not make any statements about "metals" being on track—just that the overall projected margin expansion was "on track"— plaintiffs conceded improvements in other areas had benefitted margin expansion, and no specific "present condition" statements were false. *Id.* at *13-15. Here, by contrast, Defendants not only touted the progress at OT but provided numerous specific false representations purporting to substantiate how OT remained "on track." *See, e.g.*, ¶¶307 (falsely claiming Shaft 5 was "now operational"); 319; 347-52, 381-84.

[24] Defendants' other cases (Rio Br. at 22-23; TRQ Br. at 34-35) similarly support Lead Plaintiff. *Cf. Vivendi*, 2004 WL 876050, at *7 (statement that company was "'on track' to achieve earnings targets" actionable); *QLT*, 312 F. Supp. 2d at 533 (rejecting application of safe harbor to statement "we're comfortable with the 35% quarter-over-quarter growth"); *Kinross*, 957 F. Supp. 2d at 305 (statement that company was "on track" to meet schedule not forward-looking) *with In re Micro Focus Int'l Plc Sec. Litig.*, 2020 WL 5817275, at *13 (S.D.N.Y. Sept. 29, 2020) (plaintiff did not plead facts contradicting progress statements); *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 390 (S.D.N.Y. 2020) (plaintiff did not challenge any present or historical facts); *Aratana,*

###### b.    Defendants' Boilerplate Disclosures Did Not Trigger The Safe Harbor

"To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772; *see Lockheed*, 875 F. Supp. 2d at 365 (disclosure of a "'non-exclusive list of fifteen specific risks factors'" were "largely generalized boilerplate, not 'meaningful' cautionary language that speaks to the substantive information that plaintiff alleges the defendants misrepresented."). "To be 'meaningful,' a 'cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'" *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011).  In addition, '[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173.

Defendants' disclosures fail to meet these standards.  First, Defendants admit that their cautionary language was virtually unchanged throughout the Class Period.  Rio Br. at 24-25; TRQ Br. at 13, 36-38.  But, as the Complaint clearly alleges, the schedule delays and cost overruns at OT were known by Defendants before the start of the Class Period, only "expect[ed] to rapidly escalate," and Defendants' own advisors concluded there was a "0% likelihood" the schedule

---

315 F. Supp. 3d at 758-59  (statements related to anticipated FDA approval not actionable where alleged false "embedded assertions of fact" were fully disclosed); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 84 (S.D.N.Y. 2017) (statements based on "accurate historical data"); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *2, *8 (S.D.N.Y. Apr. 1, 2015) (cost and schedule estimates unaccompanied by any present false statements addressing estimates' reasonableness); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) ("on track" statement contained no false "factual assertion" about why it was achievable); *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009) (statement that division was "on track to deliver a turnaround" not actionable where plaintiff did "not even explain how" expectations were false); *Institutional Invs. Grp. v. Avaya, Inc*., 564 F.3d 242, 255-56 (3d Cir. 2009) (no allegations that "on track" statement was false and current assertions of fact were "too vague to be actionable").

would be met. ¶¶73-131, 134-161, 300, 312.  The failure to modify this language is itself evidence that it is impermissibly boilerplate.  *See Slayton*, 604 F.3d at 773 (consistency of language despite new information received "belies any contention that the cautionary language was 'tailored to the specific future projection'"). Similarly, the failure to account for past events reveals that the cautionary language is not meaningful and not designed to warn investors of the risks. *See id.* at 770 ("cautionary language that is misleading in light of historical fact cannot be meaningful").

For example, Defendants' language notes the "actual cost of developing Oyu Tolgoi may differ materially from the Company's estimates, and development may involve unexpected problems or delays" and that "[a] delay or overrun in a project schedule could negatively impact the Group's profitability, cash flows, ability to repay project-specific indebtedness, asset carrying values, growth aspirations and relationships with key stakeholders." ¶¶415, 421. But these were not risks that "may" happen or "could" impact values—those risks had already materialized at the time Defendants purported to warn about their possibility. ¶¶73-131, 134-61, 165-86.  Nor can the TRQ Defendants take refuge in their false statements attributing the announced delays to "ground conditions" (Rio Br. at 33; TRQ Br. at 13) or their risk disclosures, which were false for the precise reason that they failed to disclose the true facts at OT. ¶¶73-131, 134-61, 165-86, 208-20.

### c.    Defendants' Statements Were Made With Actual Knowledge They Were False

Finally, to the extent any of Defendants' statements actually were forward-looking, the safe harbor protection does not apply because they were made with actual knowledge that they were false and misleading. 15 U.S.C. § 78u-5(c).  There is no safe harbor protection when a complaint alleges that defendants "had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality." *In re Nortel Networks Corp. Secs. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003); *Patriot Exploration, LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d

331, 357 (D. Conn. 2013) (the safe harbor does not apply where projections for future profitability were based on historical data that defendants "knew, or should have known, understated the expenses"). Each of the Defendants knew that the statements about the capital budget and schedule for Oyu Tolgoi were false and that massive delays and cost overruns that had already occurred.

### 3.    Defendants' Statements Are Not Inactionable Statements of Opinion

Defendants' statements are not protected opinions.  As the Supreme Court held in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 186 (2015), opinions must be expressly stated as such and are actionable where: (1) "the speaker did not hold the belief she professed"; (2) "the supporting fact[s] she supplied were untrue"; or (3) the speaker omits information that was "necessary to make the statements therein not misleading." *Id.* at 179-87.  To the extent Defendants' statements can be considered opinions, the Complaint adequately alleges they are actionable on all three bases. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *14 (S.D.N.Y. Nov. 26, 2018) (*Omnicare* satisfied where plaintiffs alleged known weaknesses in defendants' business practices through "robust factual matter, reports of confidential former employees, and other corroborative information and third-party accounts"); *Pearlstein v. Blackberry Ltd.*, 2018 WL 1444401, at *3 (S.D.N.Y. Mar. 19, 2018) (*Omnicare* satisfied where statements "contradicted data that defendant[s] had received" and "had access to" but failed to "disclose the adverse[] data could plausibly be misleading to a reasonable investor").

As an initial matter, Defendants' statements are not opinions. A statement is an opinion only when it is expressly stated as such, and here the vast majority of statements contained no such qualifying language whatsoever. *See Omnicare*, 575 U.S. at 183-85.  Even if certain statements could be considered opinions, however, they are actionable here because they omitted material facts.  Here, Defendants assured investors that the Oyu Tolgoi project was on schedule and under budget while omitting that the expert they hired to investigate the delays and cost overruns had

concluded the project was a year behind schedule and hundreds of millions of dollars over budget by the time the Class Period began. ¶¶73-131, 134-61, 165-86, 208-20.  Indeed, among other evidence alleged, the mining executive that Defendants hired to address the schedule and budget told Defendants their statements were false and "a lie" and perfectly tracks the example of a misleading opinion in *Omnicare* itself. ¶¶11-22; 141-52; 165-68, 179-83, 205-20; *see Omnicare*, 575 U.S. 188-89 (if an "issuer made the statement in the face of its lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain"); *see also Pearlstein*, 2018 WL 1444401, at *3 (opinions actionable where public statements "contradicted data" defendants had access to and "fail[ure] to disclose the adverse[] data could plausibly be misleading to a reasonable investor"); *iDreamSky*, 236 F. Supp. 3d at 833 (failure to disclose then-known delays of launch was "precisely the type of omission that, even if included in the context of an opinion, would be misleading to a reasonable investor").

Further, Defendants made additional statements to support their purported "opinions" that were themselves untrue, which is also fatal to their argument. *See, e.g.*, *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *12 n.10 (S.D.N.Y. Apr. 22, 2016) (opinions actionable when "predicated upon untrue supporting statements of fact regarding current inventory levels").  Here, Defendants supported their statements that OT was "on track" by falsely claiming, for example, that Shaft 5 was "fully operational" (when it was not) (¶¶307-08), that Shaft 2 equipping was "well under way" (when internal reports showed it was not) (¶319-20), providing false and overstated metric progress figures for the lateral underground development (¶¶337, 383, 399), and that the nine-month delay disclosed in October 2018 was "immaterial," would have no impact on the budget, and was "not atypical" (when in truth the delays were highly material, ruined the budget, atypical, and like nothing OT managers had ever experienced in their careers).  ¶¶347-52.  These false

supporting statements rendered any supposed "opinion" that OT remained "on track" actionable. ¶¶73-31, 134-61, 165-86.

In this regard, Defendants' cited cases, if anything, support Lead Plaintiff. For example, in *Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018) ("*Martin*") (TRQ Br. at 40), the defendant goldmining company hired a testing company to issue a report after conducting a sampling program of an undeveloped site that another consultant had concluded showed promising initial estimates but recommended be sampled before undertaking full-scale mining.[25] The court held that statements about the potential of the mine were protected opinions in part because the testing company never completed its analysis or issued a final report, and highlighted the fact that the defendant disclosed the testing company's negative opinion two weeks after the company resigned. *Id.* at 39-40. To start, there are obvious differences between statements concerning the "inherently risky" and difficult task of estimating the quality and quantity of a recently discovered underground mineral clearly couched as "subjective" "estimates" that may "prove to be inaccurate" (as in *Martin*, 732 F. App'x at 42)—and the definitive statements concerning the then-current status of OT here, where Defendants assured investors that "all material assumptions underpinning the target continue to apply and have not materially changed." ¶¶323, 332. Moreover, in stark contrast to the facts in *Martin*, Bowley provided a "final report" that OT was "massively under performing," "12 months behind schedule," and "$300mill capital over budget" at the <u>start</u> of the Class Period, and continued to internally report his findings to Defendants throughout the Class Period. ¶¶119-30. And instead of disclosing the true facts, Defendants sidelined Bowley, engaged in a cover-up to conceal his whistleblowing, and then lied about the

---

[25] The District Court's decision in this case, *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459 (S.D.N.Y. 2017), similarly supports Plaintiff. *See* TRQ Br. at 22 n.10; Rio Br. at 43.

reasons for the delays and cost-overruns Defendants eventually disclosed as resulting from "ground conditions"—a conclusion Defendants' own independent experts concluded was based on "no evidence" and false. *See, e.g.*, ¶¶195-203.[26]

Lead Plaintiff also adequately alleges Defendants actually <u>knew</u> the Oyu Tolgoi project was not on track, particularly given that the expert they hired to investigate the cost overruns and delays (Bowley) concluded it was, told them their statements were false, and Defendants only corrected them after Bowley blew the whistle. *See, e.g.*, *Signet*, 2018 WL 6167889, at *14.

### 4.    Defendants' Statements Were Material

The materiality inquiry is "fact-specific" and "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). "On a motion to dismiss, a complaint may not be properly dismissed unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015). The Rio Defendants argue that their "on track" statements are immaterial, yet they fail to grapple with the fact that analysts specifically asked Defendants throughout the Class Period about the schedule and budget—questioning, for example, about "what a nine-month delay means in the context of the $5.3 million budget," requesting a "sense of the magnitude" of the delay, and asking "what

---

[26] Similarly, in *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 230 (S.D.N.Y. 2018), the allegations about the purportedly omitted facts were too "scant in detail and scope" and described at such "a high level" to be actionable whereas here, the Complaint cites contemporaneous internal emails and reports that demonstrate in detail how and why Defendants' statements "watered down the truth," were "inconsistent with the truth (a lie)," and "suicidal." And in *Lefkowitz v. Synacor, Inc.*, 2019 WL 4053956, at *7-8 (S.D.N.Y. Aug. 28, 2019), unlike here, plaintiffs did not challenge any "supporting facts" cited in support of the opinions, and the allegedly omitted facts (e.g., AT&T's control over the contract) were, in fact, disclosed.

exactly are you experiencing." *See, e.g.*, ¶¶349-52, 377-79. This belies any notion that Defendants' "on track" statements were "obviously unimportant" to Turquoise Hill investors. Moreover, Oyu Tolgoi was TRQ's <u>sole asset</u> and Rio touted the mine as the "cornerstone" of the company's copper strategy. Given the mine's importance, Defendants' argument that their repeated statements about it were "obviously unimportant" to investors is meritless.

## IV.    LEAD PLAINTIFF ALLEGES A STRONG INFERENCE OF SCIENTER

In determining whether scienter is pleaded, "courts must, as with any motion to dismiss . . . accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 309 (2007). The test is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. A complaint gives rise to a strong inference of scienter by pleading that the defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311. Significantly, the inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. The Complaint alleges numerous facts that give rise to the requisite inference that Defendants' knowingly made their misrepresentations or were at least reckless.

### A.    The Complaint Provides Overwhelming Evidence of Scienter

<u>First</u>, Defendants were repeatedly informed in detail about delays and cost overruns at OT and were told that their statements to investors that the project was "on time and on budget" were false. The Rio Defendants hired Bowley in 2017 precisely because they knew that progress at OT was far behind schedule and wanted an expert to address those issues and propose solutions. ¶271. As Kinnell told Bowley in July 2017, "the project was in trouble" and "needed intervention," and the "problem was with scheduling work and potential capital expenditure." *Id.* Bowley was hired

by Defendant Soirat and Kinnell in November 2017 and quickly identified the cost overruns and schedule delays. *Id.* He reported them to Kinnell and Fagen, who relayed them to Soirat, in a meeting in London in February 2018. *Id.* At the start of the Class Period, on July 19, 2018, Bowley wrote to Kinnell and Fagen (who delivered the report to Soirat) that the project was 12 months behind schedule and $300 to $400 million over budget, which was expected to escalate rapidly, and was "massively underperforming." *Id.* Fagen confirmed that the schedule delays and budget overruns were known by Soirat and other Rio Tinto management by responding to Bowley, "Oh <u>don't worry, we've known it from the start, just haven't been able to do anything about it</u>. Arnaud [Soirat] has played a very card [sic] here, which is why you now see 'things' surfacing." *Id.*

Bowley continued to warn Defendant Soirat, Kinnell, and Fagen about the cost overruns and delays until he was terminated. For example, Bowley informed Defendants that their representations concerning OT "watered down the truth" and were "inconsistent with the truth (a lie)," and "completely untrue," noting that Defendants' representations in October 2018 that the announced nine-month delay would have a limited impact on first drawbell was a "suicidal statement" and concealed the actual 12- to 18-month delay and associated cost implications. ¶239.

These facts about Bowley's reports to top Rio management alone—which are confirmed by the emails and sworn statement by Bowley cited in the Complaint—demonstrate a strong inference of the Rio Defendants' scienter. *See Freudenberg*, 712 F. Supp. 2d at 198 ("[D]irect conversations with Individual Defendants [and] meetings at which Individual Defendants were present . . . demonstrate their access to and actual knowledge of facts which contradicted their public statements."). But there is much more.[27]

---

[27] The Rio Defendants miscite *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008), as requiring plaintiffs to plead individual executives' scienter in order to plead corporate scienter. Rio Br. 36 n.31. In fact, *Dynex* held that

For example, Defendants' EPCM contractor, Jacobs, warned the Rio and TRQ Defendants about the cost overruns and delays in summer 2018.  As Bowley recounted, "Rio Tinto understood that the project was now trending out of control" by August 2018 and that the completion of Shaft 2 set for October 2018 would be delayed until at least the third or fourth quarter of 2019, and was concerned about its own liability for mismanaging it. ¶273.  The true state of Shaft 2's progress was reflected in a report from Jacobs to Rio's senior management in August 2018, which showed that the project was already behind the original plan by approximately 14%—a fact that confirmed the project was 14 months behind schedule and was about $750 million over budget. *Id.*  In fact, because Jacobs could not meet its $240 million contractual target cost, Jacobs asked the OT Board—which included Defendants Soirat, Quellmann, Colton and Lane—to raise the budget to $360 million, a development Bowley described as "totally shocking." *Id.* Thus, both the Rio Defendants and the TRQ Defendants knew that the project was behind schedule and over budget. And, as explained in the ICG Report, the TRQ and Rio Defendants' knowledge of the schedule delays were confirmed by an advisory firm Broadleaf, which concluded there was "0% likelihood" that Defendants' publicly reported schedule would hold at the very same time Defendants reassured investors it would.  ¶¶291, 300, 312.

The detailed factual allegations summarized above, based on both former employees' statements, contemporaneous documents, and the ICG Report, represent extraordinary evidence at the pleading stage—and Lead Plaintiff is not required to plead evidence to overcome a Rule 12(b)(6) motion. *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018) (scienter where risk was "so obvious that the defendant must have been aware of it");

---

corporate scienter may be established without pleading individuals' scienter where the false statements are such that senior management must have been aware of them. *See id.*  In any event, the Complaint here satisfies both prongs of *Dynex*.

*Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) (allegations of widespread internal knowledge of problems supported scienter); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 505 (S.D.N.Y. 2005) (same).

Here, Lead Plaintiff cites not only <u>unnamed</u> former employees—who were in a position to know the information they provided about undisclosed problems that were reported to top management—but also Bowley, Kinnell, Brinkmann, Duffy (discussed further below), and other senior-level <u>named</u> sources for the Complaint's allegations that Defendants were informed of facts contradicting their public statements.  Thus, this case is much stronger than numerous others sustained based on unnamed former employees' statements.  *See Novak*, 216 F.3d at 314-15 (plaintiffs may rely on unnamed sources "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"); *In re EZCorp., Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 209 (S.D.N.Y. 2016) (relying on former employees' whose accounts created a "collective picture" of fraud); *In re Bear Stearns*, 763 F. Supp. 2d at 503 n.13 (approving use of former employee statements); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 555 n.5 (S.D.N.Y. 2010) (crediting former employees' statements).[28]

---

[28] The detailed allegations from multiple sources demonstrating Defendants' knowledge here distinguish this case from *In re Gold Resource Corp. Securities Litigation*, 776 F.3d 1103, 1117 (10th Cir. 2015) (Rio Br. at 35; TRQ Br. at 24 n.12), where the court held that the production problem's "obvious[ness], and the company's small size" did not suffice. In that case, plaintiffs cited no former employees or internal documents, as Lead Plaintiff does here. Likewise, this case is distinguishable from *Kinross*, 957 F. Supp. 2d at 304 (Rio Br. at 36), where none of the cited former employees "claim[ed] to have spoken with or otherwise notified Kinross, or any Individual Defendant" of the true facts; *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, at *15-16 (S.D.N.Y. Mar. 29, 2013) (Rio Br. at 37), where the cited former employees "never mentioned the Individual Defendants nor tied them personally to knowledge of the delays"; and *Jackson v. Abernathy*, 960 F.3d 94, 96 (2d Cir. 2020) (Rio Br. at 41 n.35), where the complaint provided "no connective tissue" between the employees who knew of problems and the alleged misstatements. In fact, here, the Complaint alleges in detail that Defendants "harbored a secret, but undisclosed,

Second, Defendants provided a false "re-forecast" of the OT schedule specifically to conceal the true extent of the underground expansion's problems. As shown in monthly progress reports, Rio's initiative to "re-baseline" or "reforecast" the schedule artificially lowered current delays from 14% to 5%. ¶241. As Fagen wrote to Bowley in August 2018, responding to his description of the delays and cost overruns, "Yes I complete [sic] agree and now we're trying to be clever by doing 'forecast 2'!" *Id.* As Bowley said to Fagen at the time, "forecast 2" was just a way to "make the current position appear more tenable" and "pull[] back aspects of schedule that are knackered," but it ultimately increased costs. *Id.* That is because, as Bowley and FE 3 explained and the ICG confirmed, the "re-forecasting" simply delayed and defunded tasks, such as commissioning work, that would be required. *Id.* For this reason, FE 3 said that Defendants' statements in October 2018 that the project was a bit behind schedule—but still on budget—were not "accurate at all." *Id.* Defendants' "clever" maneuver to "reforecast" the schedule in a way that concealed the project's true status—and falsification of the schedule changes as being approved by Brinkmann when he had been terminated months earlier—strongly supports their fraudulent intent. *Id.* As the ICG Report noted, an independent advisory firm informed Defendants at the time of their statements that the "re-forecast" had a 0% chance of being completed on time and

---

actual schedule" for the project. 957 F. Supp. 2d at 304. Moreover, the *Kinross* court actually sustained claims based on defendants' reaffirming the schedule after incurring an undisclosed nine-month delay and cost overruns, holding that these facts, "by their nature, would have been sufficiently consequential"—which is precisely the case here. *Id.* at 307. Defendants' characterization of the Complaint as alleging "conclusory statements that defendants 'were aware' of certain information" or "'would have' or 'should have'" known the truth ignores the specific accounts and emails cited therein, which are far cry from the "rumors" or "conjectures" in Defendants' cases. Rio Br. at 37 (quoting *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) (scienter not alleged based on vague online rumors) and *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 399-400 (S.D.N.Y. 2020) (former employees neither held positions where they would have known about accounting nor reported directly or indirectly to defendants)).

that, by the time of publicly announced October "re-forecast," the timing of the delay was known because it was "very clear that underground resources (crews 8-13) were not able to deploy." ¶300.

Third, after receiving repeated reports starting in 2017 about "unethical conduct" and "potential overstatements" concerning Oyu Tolgoi from Duffy—which went to Rio's Executive Committee (which included Defendants Jacques and Soirat)—the Rio Defendants silenced Duffy and later successfully had those reports destroyed. ¶¶254-55. Those reports included the comments from senior OT managers before the Class Period in 2017 that:

- Schedule over-run in that panel caving and construction drivers not aligned, we are months behind. Soirat knows what's going on and worry about renegotiation by Mongolia Government.

- The comments in Mongolia about RT leverage of contract by misstating critical pathways is a concern. Here we all know including CK [Craig Kinnell] and Soriat [sic] knowing.

- Delays and cost over-runs are understated in Mongolia.

- At Oyu Tolgoi, construction of the underground development will not achieve its target by 2020.

- I am leaving because I do not want to be tarnished by potential disaster that is Oyu Tolgoi.

¶135.

Defendants' attempt to dismiss these alarming warnings to Rio's senior leadership about the "disaster" at OT as immaterial "employee comment cards" is improper, finds no support in the Complaint, and is contrary to reality. Rio Br. at 39-40. In fact, so damning were these warnings that Defendant Jacques instructed Duffy to stop reporting them to Rio's senior leadership; Duffy found this instruction so troubling that he brought his concerns to Jacques' intermediary, the head of Rio's human resources, and then terminated his firm's Rio contract (his most valuable at the time) in September 2017, specifically informing Rio's senior leadership that his firm was quitting because of unethical behavior in Mongolia; and Rio and its lawyers then engaged in a years' long

campaign to destroy the records Duffy had collected after Duffy continued to urge Rio's Board to investigate "overstatements" and other unethical conduct at OT.  ¶¶113-16, 137-38, 287-88.[29] Moreover, as documented in the ICG Report, the instruction to stop reporting negative information about OT in 2017 occurred at the same time that other critical path reporting at OT was replaced by updates on "milestones"—which the ICG concluded led to "misleading" reporting.  ¶134. Duffy said that Jacques "knew without a doubt" about the problems at OT by 2017 (¶¶140) and that Mongolia was "just a big fraud" (¶295), and his firm's reports confirmed these facts. ¶135. These events leave no room to entertain Defendants' totally implausible suggestion that Defendants Jacques and Soirat failed to read the OT managers' comments, "disagreed" with their conclusions, or somehow believed they had addressed any issues at OT in connection with the false October 2018 re-forecast.  Rio Br. 27, 40.[30]

Fourth, while Lead Plaintiff need not allege motive, Defendants here were highly motivated to conceal the project's problems from the Mongolian Government in light of the fact that disclosing them would provide the government with leverage to renegotiate the terms of the OT partnership—just as it did after the Class Period—and posed a great risk to the Rio Executive Defendants personally. ¶246.  In fact, comments from OT senior managers collected by Duffy documented in 2017 that "Soirat knows what's going on" about being "months behind" schedule and hid those facts because he was "worr[ied] about renegotiation by Mongolia Government"— powerful contemporaneous evidence of this motive.  ¶135.  Rio's silencing of key OT managers

---

[29] Rio cites *Youngers v. Virtus Investment Partners Inc.,* 195 F. Supp. 3d 499, 517 (S.D.N.Y. 2016), but the court there found scienter where the defendant ordered the destruction of incriminating documents, as Rio did here.

[30] To the contrary, the Complaint makes clear that Defendants Jacques and Soirat reviewed these comments, which were provided in reports to the Rio Executive Committee that they sat on (¶133) and through Rio's human resources head Vera Kirikova (¶137), and that Defendants' October 2018 re-forecast was a false narrative, "completely untrue," and not "accurate at all."  ¶¶181-82.

in spring 2018 coincided with the Mongolian Government's seeking $155 million in tax payments from OT, jailing the former Mongolian government officials who negotiated the OT agreements, and initiating inspections into OT's progress and finances by the Parliamentary Working Group and Mongolian National Audit Office—timing that highlights this motivation to conceal the truth about OT, and that Defendants in fact acted on that motivation. *Id.*[31]

Fifth, Defendants retaliated against multiple whistleblowers who warned them about the cost overruns and delays. Defendants attempted to silence Bowley to prevent him from disclosing the truth about OT, terminated him for blowing the whistle, and tried to keep his information secret as long as possible. ¶¶281-84. As Bowley recounted, in May 2018, Defendant Soirat instructed Bowley to stop looking into delays and cost overruns at OT because Bowley continued to report facts that Soirat wanted to keep secret. ¶282. To prevent Bowley from continuing to do so, Rio instructed him not to come to work from June 2018 to January 2019, even while Rio kept him on

---

[31] Because the Complaint adequately alleges conscious or reckless misbehavior, Defendants' motive to commit fraud further bolsters the already strong inference of scienter but is not necessary. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000) (when presented with allegations showing "conscious or reckless misbehavior, [a court] need not also consider" motive). The Rio Defendants cite *Kinross* for the proposition that motives that "are neither concrete nor personal to the defendants" do not support scienter. Rio Br. at 35. But Defendants' specific motive to conceal the cost overruns and delays from the Mongolian Government was both concrete and personal to Defendants Jacques, Soirat and Quellmann—indeed, their negotiating counterparties on the OT agreements had been jailed by the Mongolian government—evident in internal company documents, and totally unlike the *Kinross* defendants' generic desire to earn more compensation and complete a bond offering. ¶¶279-80. Similarly, *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 268 (2d Cir. 1996), involved allegations that GE was motivated to achieve profitability at a separately managed subsidiary where one trader's fraud went undetected—a far cry from this case, where Rio directly managed OT and the fraud concerned the critical underground expansion. In *In re Sanofi-Aventis Sec. Litig.*, 2009 WL 3094957, at *7 (S.D.N.Y. Sept. 25, 2009), plaintiffs alleged only that the pharmaceutical company wanted to conceal adverse test results from regulators other than the FDA, a general motive that "may be ascribed to any pharmaceutical company awaiting approval from multiple authorities." And the statement in *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 665 (S.D.N.Y. 2017), that a desire to avoid personal liability would apply "in every case" does not address Defendants' concrete motive here.

its payroll. *Id.* According to Bowley, during a meeting in May 2018, Soirat "seemed to be saying that he knew that there was a big problem with the project but he did not want anyone else to know this"—and Bowley was kept on Rio's payroll "due to my knowledge and the desire from senior C&D [Copper & Diamonds] individuals for [the problems at OT] not to become public." ¶282.

The sidelining of Bowley in May 2018 coincided with Rio's firing of Brinkmann, the head of Shaft 2, as well as the unexpected termination of FE 8, who was vocal about the 18-month delay and approximately $2 billion in cost-overruns the project FE 8 said had incurred by then. ¶285. Field, Rio's former General Manager-Underground at OT, was also removed from his position by Soirat in 2018 because he was openly critical of Rio's performance, and Field's replacement left after just three months because he did not want to ruin his career by working on a failing project. ¶¶286. Rio ultimately terminated Bowley in January 2019, then rehired him after he complained about compliance violations, and conducted two internal reviews that disregarded his documented allegations that top management knew about the cost overruns and delays while making false public statements about the project's status. ¶283. When Bowley was definitively terminated, he filed a wrongful-termination action in which his sworn statement provided details about the fraud alleged in this action; Rio then settled with him on the eve of a hearing—at which his statement would have been made public—to continue to conceal the truth. ¶251. And Rio refused to cooperate with the independent investigation conducted by the ICG, refused to provide the ICG with the critical TEG reports reviewed by the Rio Executive Defendants during the Class Period, and refused to let the investigators speak with key project staff. Defendants' retaliation against Bowley, Brinkmann, FE 8, and Duffy, and active concealment of the documents and other information evidencing the fraud from investigators supports a strong inference of scienter. *See,*

*e.g.*, *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 72 (D. Mass. 2014) (scienter pleaded were former employee cited in complaint was terminated shortly after raising concerns).

Sixth, Oyu Tolgoi was TRQ's sole asset and one of Rio's most important projects, and both the Rio Defendants and the TRQ Defendants professed to know about the mine's actual progress, repeatedly spoke knowledgably about it in detail in investor conferences, and personally oversaw the problems causing the delays and cost overruns. For example, Defendant Soirat said in November 2018 that he spent one week every month at Oyu Tolgoi and called Oyu Tolgoi "very important to me." ¶289. Similarly, Defendant Jacques personally negotiated the 2015 agreements that resulted in the restart of the underground expansion, which was his "claim to fame" at Rio, and the media has observed that there is "no one at Rio whose standing is more closely connected . . . to Oyu Tolgoi particularly than Jacques." *Id.* Jacques visited Mongolia in January 2018 to reaffirm that "Mongolia is one of Rio Tinto's most strategically important markets and we are here to stay," and to quell the Mongolian government's attempt to renegotiate the OT agreements. *Id.*; *see also* ¶¶295-96 (discussing Jacques' and Soirat's motives to conceal the mine's problems). And as Duffy recounted, Jacques' close connection to OT drove him to conceal its failure—a fact documented in internal reports noting, for example, that "JS [Jacques] brings a unique blend of strategic and operational expertise on overstatements, overbudget, coverups." ¶¶136, 295.

For their part, the TRQ Defendants had equal or, in the case of Defendant Quellmann— who received detailed reporting as a member of the OT Project Executive Committee just before becoming TRQ's CEO—even greater access to information about OT, and voted on the OT Board, where the problems were discussed. Defendants Quellmann, Colton, and Lane all regularly visited OT and spoke about the underground mine project and its schedule and budget in detail on every

investor call during the Class Period and, as Defendant Quellmann put it, worked with advisors like Broadleaf to "understand, review and provide input and ultimately sign off on the underground expansion" (¶257) and voted to approve Jacob's requested budget increase in response to the delays and cost overruns.  ¶240.  And, as Defendant Quellmann said in response to an analyst's question, he and Turquoise Hill's management were "well plugged-in" to the "processes, cost reviews and the like" on the underground construction and had "good visibility as to what's going on." *Id.*  Colton similarly explained that "we definitely have visibility" into both the "day-to-day" and strategic issues at OT given that he, Quellmann and Lane each had personal responsibility for them and the negotiations with Mongolia. *Id.*  The TRQ Defendants also responded to investor concerns about the mine's progress by assuring investors that they were well informed about the mine's status. ¶¶290-92.[32]

In light of Defendants' own representations, Defendants either spoke on these subjects with knowledge or failed to investigate the true facts underlying their statements.  *See, e.g.*, *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 & n.3 (2d Cir. 2011) (scienter pleaded where subject of fraud was "a subject about which investors and analysts often inquired"); *Fresno Cnty. Empls.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2012) (that revenue was "a subject about which investors and analysts often inquired . . . reinforces the inference of scienter"); *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (defendant's statement that he was "tak[ing] a harder look" supported scienter).[33]

---

[32] The TRQ Defendants incorrectly assert that Plaintiff engages in "semantic blurring" by lumping Defendants together for scienter purposes. TRQ Br. at 29 (citing ¶271 and *Hou Liu v. Intercept Pharm. Inc.*, 2020 WL 1489831, at *14 (S.D.N.Y. Mar. 26, 2020)). But paragraph 271 discusses specific reports directly and indirectly to Defendants Soirat, while other paragraphs address the TRQ Defendants' scienter in detail.  *E.g.*, ¶¶42-44, 84, 146, 275, 290-92, 299-300.

[33] *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) (highly "improbable" that defendant who purported to be familiar with company "would not inquire into

The mine's vital importance to Rio and TRQ also supports a strong inference of scienter. *See Salix*, 2016 WL 1629341, at *16 (scienter pleaded where fraud involved company's core operations); *Shenk v. Karmazin*, 867 F. Supp. 2d 379, 387 (S.D.N.Y. 2011) (defendants made "statements that contradicted reasonably available data and that concerned major transactions or touched upon the heart of their companies' businesses"); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 481 (S.D.N.Y. 2008) ("defendants undoubtedly appreciated that theater system revenue was of singular importance to the financial well-being and market perception of the Company").[34]

<u>Seventh</u>, Defendants' attempt to blame the mine's delays and cost overrun on geotechnical problems, not Rio's disastrous oversight of OT and the "criminal" conditions of Shaft 2, demonstrates their scienter.  As Bowley and other witnesses recounted, Defendants' attempt to blame the delays and cost overruns on purportedly newly discovered "geo-technical issues" was a "load of bollocks" specifically designed to conceal Rio's culpability for them—a fact that was confirmed by the ICG, and confirms scienter.  ¶¶248-49.  As the ICG Report conclusively stated, "rock mass quality and ground conditions were not a significant contributor to the schedule

---

whether his company was exposed to the subprime consumer borrower"); *Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (scienter pleaded where defendants "told the investing public that they monitored the value of their portfolio"); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 268-69 (S.D.N.Y. 2010) ("Either Ambac conducted the surveillance it claimed, and . . . Defendants knew of these negative trends but did not disclose them, or Ambac misrepresented its surveillance process" and thus "statements about Ambac's surveillance of 'very current' information . . . supports the inference that [he] acted recklessly.").

[34] The Rio Defendants attempt to cast doubt on the continued viability of the core-operations doctrine, citing *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (Rio Br. at 45).  But the Second Circuit has expressly reserved the question whether core-operations allegations alone suffice under the PSLRA. *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356 n.5 (2d Cir. 2012).  Moreover, the Circuit has noted approvingly that core-operations allegations comport with *Novak*, *see id.* at 356, and has suggested that they remain viable *at least* as support for scienter along with other allegations. *Celestica*, 445 F. App'x at 14 n.3.  *Rockwell* fails to cite *Celestica* but still acknowledges that core-operations allegations may support scienter with other allegations.  *See* 2018 WL 1725553, at *15.

delays and cost overruns." ¶252, *see also* ¶¶253-55. And to the extent that the geotechnical problems are real, Rio knew about them before the start of the Class Period and sought to conceal their existence by instructing engineers not to document their findings in emails. ¶¶256-61.

### B.      Defendants' Scienter Arguments Are Meritless

In light of this overwhelming evidence demonstrating that Oyu Tolgoi's cost overruns and delays that were repeatedly reported to top Rio and TRQ management—and deliberately concealed by a series of false statements that senior OT managers contemporaneously described in internal emails as "untrue" and "a lie"—Defendants' scienter arguments can be swiftly rejected.

<u>First</u>, Bowley's internal reports about the cost overruns and delays were not mere "opinions," "rumors," or "conjectures," as Defendants would have it, but rather facts reported to senior management by an experienced mining expert with previous experience at Oyu Tolgoi, who had been hired by Defendant Soirat to investigate and report on the project's problems nearly a year before the Class Period began and precisely because the former CEO of OT recognized that the OT expansion project was "failing badly" and only getting worse. ¶115. Bowley reported detailed facts demonstrating that the project was already many months behind schedule and hundreds of millions of dollars over budget; these were concrete facts about current conditions, not opinions. ¶¶115-52. Similarly, Jacobs reported that the project was behind schedule and over budget and successfully demanded a 50% increase in the 2018 EPCM cost target—a fact, not an opinion. ¶¶146-52, 273. And Defendants only finally revealed the cost delays and cost overruns after Bowley forced their hand. ¶¶221-35. Thus, Defendants' reliance on *In re Pretium Resources Inc. Securities Litigation*, 256 F. Supp. 3d 459, 481 (S.D.N.Y. 2017), where a consultant merely

disagreed with a company's forecasts of future results and the defendant disclosed the disagreement a few short months after investigating it, is entirely unavailing.[35]

In attempting to minimize their scienter, Defendants ignore the Complaint. For example, the Rio Defendants wrongly assert that Bowley did not report his concerns to Defendants Jacques and Soirat. Rio Br. 4, 8, 42-44. In reality, he reported them to Fagen and Kinnell, who reported them to Soirat, to Soirat directly in May 2018, to Jacques, and to Rio's Board. ¶¶141-52, 179, 208-20, 271-72. Defendants further contend that the Complaint does not allege what Bowley told Soirat at their May 2018 meeting (Rio Br. at 43), but it actually alleges that Bowley believed that Soirat was aware of the mine's problems and wanted to conceal them, and he swore in his witness statement in his wrongful-termination action that he informed Soirat and Jacques about them. ¶¶152, 181, 205-20, 281-84.

The same is true of Duffy's reports to Defendants Jacques, Soirat and the Rio Executive Committee from OT senior managers in 2017 that made clear that "construction of the underground development will not achieve its target by 2020" and that "Delays and cost over-runs

---

[35] Defendants' other cases are also inapposite. In *In re Flag Telecom Sec. Litig.*, 308 F. Supp. 2d 249, 270 (S.D.N.Y. 2004), one manager only "anticipated" a project delay a year before it was announced, and the plaintiff failed to plead any facts about the extent of the delay or how the "market reacted to the news of the delay." Here, Shaft 2 had already incurred months of delays and massive cost overruns at the start of the Class Period, and the Complaint alleges in precise detail the extent of the delays and cost-overruns throughout the Class Period—and alleges that when the truth about the extent of the delays and cost-overruns were revealed, TRQ stock lost 70% of its value. These facts also distinguish this case from courts' dismissal of scienter allegations based on former employees' mere "opinions" in *Kinross*, 957 F. Supp. 2d at 299 (former employees thought due diligence was "inadequate" but did not say so to company or individual defendants), *In re Adient*, 2020 WL 1644018, at *28 (former employees said that problems were "common knowledge" but identified no specific facts reported to senior management), *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 406 (S.D.N.Y. 2016) (no specific information conveyed by whistleblower), and *Kasilingam v. Tilray, Inc.*, 2021 WL 4429788, at *13 (S.D.N.Y. Sept. 27, 2021) (no facts alleged suggesting defendants were "presented with information indicating" inventory values were inflated and "misguided optimism" motive allegations were insufficient).

are understated in Mongolia." ¶135. Duffy's reporting was specifically intended to provide candid feedback to Rio's senior leadership about what was actually happening at OT—and that reporting relayed the true facts concerning the "overstatements, overbudget, coverups" at OT before the beginning of the Class Period that were later confirmed by the ICG.  ¶¶133-35, 184-86.

While *Tellabs* permits court to consider competing plausible inferences, Defendants are not entitled to re-write the Complaint.  Moreover, Defendants' suggested inference that they failed to read their email or other critical company reporting (Rio Br. at 42-43) is implausible and cannot defeat the plausible inference that they <u>did</u> read email sent by Bowley directly to them or forwarded to them by Fagen, Duffy's reports to the Executive Committee, and the TEG reports that Rio later refused to provide the ICG.  ¶277.  Nor are Defendants Soirat and Jacques entitled to the implausible inference that they simply had a difference of opinion with Bowley in light of the concrete nature of his reports and attempts to silence him.[36]

Defendants rely on *Kinross Gold*, where scienter was inadequately alleged because plaintiff relied "heavily on former employees who opine[d] that the development schedule

---

[36] Of course, none of Rio's cases (Rio Br. 40-41) support the notion that Defendants are entitled to the inference that they ignored their email or the reports they demanded they receive concerning the crisis at the company's most cornerstone project.  ¶105.  *Cf. In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 378 (E.D.N.Y. 2013) (no allegation that undisclosed adverse information was reported to senior executives); *Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *11 (D. Conn. Nov. 10, 2005) (same); *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 150 (3d Cir. 2004) (same); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) (same); *Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *12 (S.D.N.Y. June 17, 2020) ("a review of the issues described [in a letter concerning compliance issues] suggests the violations were correctable"); *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 40-42 (2d Cir. 2000) (defendants reasonably believed problems were "statistically insignificant," the standard later abrogated by *Matrixx*). Rio argues that FE 3's statement that information about cost overruns and delays "would have" been reported to Defendant Jacques is insufficient under *Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010), but the information was reported to the Global Head of Projects, who reported to the head of Projects & Innovation, who reported to Jacques. ¶161.

announced for [the mine] was impossible to meet" but where "none of these former employees claims to have spoken with or otherwise notified [defendant company], or any Individual Defendant, of that opinion." 957 F. Supp. 2d at 304. *Kinross Gold* actually supports Lead Plaintiff because Bowley <u>did</u> notify Rio, Jacques, and Soirat both directly and through their intermediaries that the project was over budget and behind schedule. And as discussed above, the Jacobs' cost increase was approved by the OT Board, on which Soirat, Quellmann, Colton and Lane served.

<u>Second</u>, Defendants' argument that the Complaint does not allege specific reports about cost overruns and delays ignores the Complaint's detailed allegations. As discussed above, the Executive Defendants received detailed progress reports and schedules concerning the mine's development showing that it was months behind schedule and hundreds of millions of dollars over budget. ¶¶275-78. Thus, the Complaint "specifically identif[ies] the reports or statements containing [the undisclosed adverse] information." *Teamsters Loc.*, 531 F.3d at 196; *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) (scienter adequately alleged by identifying who prepared and received internal reports quantifying product returns). Defendant Soirat's awareness of these reported problems is demonstrated by his and Kinnell's decision to hire Bowley to investigate the difficulties Oyu Tolgoi faced. ¶¶97-98. Defendants' claim that the Complaint fails allege any report containing specific information regarding the project's expenditures is clearly false (*see, e.g.*, ¶¶15, 83-110, 122-26, 146-61, 166-71, 183-85), and the Complaint explains and the ICG confirms how the schedule delays directly impacted costs.

Nor can Defendants claim innocence by citing Bowley's investigation or the ICG. While Defendants cite *Slayton* for the proposition that ordering an investigation weighs against scienter (Rio Br. at 44; TRQ Br. at 30), in that case, defendants instructed the investigation to use conservative assumptions and did not ignore the results or retaliate against the investigator. *See*

77

604 F.3d at 777.  Moreover, rather than "update[] investors" on any investigation (TRQ Br. at 30-31), Defendants approved an increase in the EPCM budget for 2018 and issued a misleading "reforecasting" of the project's schedule, which pushed back necessary work and expenses to create a false appearance of progress.  ¶¶147-51.  And the TRQ Defendants' assertion that risks were only "developing" in March 2019 (TRQ Br. at 31) fails because the Complaint alleges in detail that the cost overruns and delays had already occurred a year earlier before the start of the Class Period.[37]  Thus, the cases cited by Defendants in which plaintiffs referred vaguely to internal reports without specifying their content, and thus failed to allege that top management were aware of undisclosed problems, are not on-point.[38]

Third, the TRQ Executive Defendants were all Rio veterans who were personally involved in managing the mine, knew or recklessly disregarded that it was months behind schedule and

---

[37] Defendants cannot credibly claim the fact that TRQ supported the initiation of ICG investigation absolves of them—indeed, ordering an internal investigation is the typical response to instances of corporate fraud—particularly in light of the scienter facts here.  See, e.g., Sasol, 481 F. Supp. 3d at 290-91; Indiana Pu. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 96-97 (2d Cir. 2016).  Defendants' other cases stand for the unremarkable proposition that a company is entitled to conduct a good-faith investigation and promptly report its results, and do not remotely condone the over year-long cover-up alleged in this case.  Cf. In re Agnico-Eagle Mines, 2013 WL 144041, at *21 (S.D.N.Y. Jan. 14, 2013) (ongoing investigations did not uncover risks but defendant "immediately" disclosed problems and shut down mine following receipt of expert advice); Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 760-61 (7th Cir. 2007) (company promptly investigated alleged accounting misconduct and announced results in two months); Horizon Asset Mgmt. Inc. v. H & R Block, Inc., 580 F.3d 755, 763 (8th Cir. 2009) (unlike here, defendants warned investors of accounting weaknesses and then issued restatement as soon as management became aware of problems).

[38] Rio Br. at 38-39 (citing San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812 (2d Cir. 1996) (an "unsupported general claim of the existence of confidential company sales reports" is insufficient); In re BioScrip, Inc. Sec. Litig., 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) (former employees did not state undisclosed problems were reported to senior management); Woodward v. Raymond James Fin., Inc., 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010) (allegations about internal reports did not "specify[] the content of those reports or the connection between those reports and the misstatements at issue in this case"); Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 618 (S.D.N.Y. 2008) ("Plaintiffs identify no internal reports of which defendants were aware and failed to disclose").

hundreds of millions of dollars over budget, and told investors that they knew about the mine's status—but falsely represented that the project was on schedule and on budget. As noted above, Defendant Quellmann, TRQ's CEO during the Class Period, was the former Rio Copper and Diamonds division CFO who negotiated the key agreements governing Oyu Tolgoi on behalf of Rio in 2015 and immediately before becoming TRQ's CEO served on the OT Project Executive Committee, a role in which he reviewed all relevant documentation concerning the status of the OT expansion. ¶¶42, 60, 163, 290-92. Similarly, Defendant Colton, TRQ's CFO during the Class Period, worked for Rio since 2004 in a variety of business units and was employed by Rio Tinto while he was seconded to Turquoise Hill during the Class Period. ¶43. And Defendant Lane, TRQ's VP, Operations and Development during the Class Period, was Finance Director in Rio Tinto's Copper division from 2013 to January 2016, earlier held various commercial roles in Rio Tinto's Copper and Coal divisions, and was a Rio Tinto employee while seconded to Turquoise Hill during the Class Period. ¶44. Lane unexpectedly resigned after the first partial corrective disclosure of the fraud alleged in this action, in March 2019, which supports the inference of his scienter. *Id.* Quellmann, Colton, and Lane's longtime, close relations with Rio and roles as senior managers at OT make their argument that they knew none of the true facts about OT that was reported to Rio implausible.

Moreover, these three Defendants all served on the Oyu Tolgoi LLC Board along with Defendant Soirat, Kinnell, and Armando Torres, Oyu Tolgoi's CEO. ¶¶42-44 (Quellmann, Colton, Lane, and Soirat), 84 (Torres), 111-12 (Kinnell). Thus, it is implausible that they were not informed of the many adverse facts contradicting their public statements that were reported to their fellow Board members Kinnell (who was so dismayed by the problems that he was trying to leave the Board from the start of the Class Period), Soirat, and the numerous senior OT managers

identified in the Complaint who reported directly to them and to the OT Board. For example, it defies common sense to suggest that Lane and Colton, who served on the OT Board since March 2017 and April 2018, respectively, would have been unaware of the concerns about OT that Kinnell frankly shared with Bowley in September 2016 that the state of the project "has me so pissed off I am trying to resign from the OT Board – I can only see bad things on the horizon," or that they would have been a secret to Quellmann, who in 2016 served as Rio's group treasurer responsible for OT's financing, and oversaw OT as a member of the OT Project Executive Committee from August 2016 through February 2018. *See, e.g.*, ¶¶42, 112, 271-72. Defendants Quellmann, Lane, and Colton had access to the reports on Shaft 2's actual progress provided to Torres (who worked down the hall from Bowley) and other senior leadership at OT, touted their work with third-party advisors like Broadleaf that informed them that there was a "0%" chance the schedule would be met (¶¶291, 300), and it defies credulity to suggest that the TRQ Executive Defendants did not review those reports after they told investors that they, in fact, had "good visibility" into the "various process, cost reviews, and the like" on the underground construction. ¶¶103-05, 109-10, 290-92. And as members of Oyu Tolgoi's Board, the TRQ Defendants approved Jacobs' "shocking" request for a cost-target increase that was necessitated by the project's being months behind schedule and hundreds of millions of dollars over budget. ¶¶125, 273. These Defendants' suggested inference—that they were simply mistaken and unaware of the true state of affairs at their company's sole operating asset despite the detailed reports to their fellow Board members, senior OT leadership and Rio's senior management—is implausible. As

the ICG put it, "[i]t is inconceivable that Senior Management both on the Project site and in the higher-level committees [that Defendant Quellmann served on] were not aware." ¶185.[39]

Defendants Quellmann, Colton, and Lane also all regularly visited the mine and assured investors that they knew about the project's actual status and progress and were personally involved in managing the mine project and relations with the Mongolian Government. ¶290-92. In response to concerns raised by SailingStone, one of TRQ's largest minority investors, and other investors, TRQ also purported to take significant measures to ensure TRQ management was fully aware of the progress at OT and reported on that progress to investors, telling investors in a March 14, 2018 letter "that the Board and senior management of Turquoise Hill fully recognize our responsibility to serve the interests of the company and all of its shareholders" and were "committed to the principles of transparency and good governance."  ¶¶293-94.  After reassuring investors that they had "well-plugged in" "visibility" into OT (¶163), the TRQ Executive Defendants are hardly permitted the implausible inference that they were unaware that the senior-most manager of Shaft 2—the admittedly "most important value driver for Turquoise Hill" (¶¶77, 153-57)—had been terminated, did not inquire about the reasons for his termination, that this critical role was vacant during the Class Period, or that the project was more than a billion dollars over budget.  Indeed, in connection with the first alleged corrective disclosure in the case, Turquoise Hill stated that the increased risk of a "further delay to sustainable first production" was based on the review that <u>TRQ itself conducted</u> into the schedule and cost re-forecast.  ¶230.

---

[39] The Court should reject TRQ's argument (TRQ Br. at 25-26) that Quellmann, Colton and Lane's admissions that they had excellent "visibility" into OT simply reflected a mistaken good faith belief about that visibility—particularly when Defendants gave specific examples of what that visibility entailed (¶¶290-93)—as the Complaint does not permit this implausible inference.

Unable to counter these facts, TRQ contends that the Complaint somehow suggests their innocence. Nothing could be further from the truth. First, TRQ takes out of context a phrase in Bowley's Witness Statement that "Rio Tinto made no disclosure of the true facts to [its] partners and investors or the market" to suggest that TRQ was one of the misled "partners"—as opposed to the Government of Mongolia and TRQ investor SailingStone (both of which approached Bowley for information on OT) and the financial institutions that funded the underground expansion—and seeks dismissal by contending that no one "told anyone at TRQ about these issues." TRQ Br. at 21-22. In addition to further supporting Rio's scienter, such an argument ignores that TRQ itself conducted the cost review and that the TRQ Executive Defendants told investors they had clear "visibility" into the "day-to-day" management of the expansion, personally reviewed the "processes, cost reviews, and the like," and worked with third-party advisors like Broadleaf to ensure they were "plugged in." ¶¶141, 257.

Second, TRQ suggests that, despite their close connections to Rio and review of the reports about OT, that they were just as ignorant but the true facts as the Mongolian Government. TRQ Br. at 24. Setting aside the litany of facts demonstrating the TRQ Executive Defendants' knowledge that dooms this theory, the Mongolian Government's working group clearly lacked the mining expertise and experience possessed by the TRQ Executive Defendants—this was the very reason the Government tried to hire Bowley and ultimately commissioned the ICG Report.[40]

---

[40] Nor does the fact that Defendants were ultimately forced to disclose the truth in the face of Bowley's whistleblowing suggest innocence. The TRQ Defendants suggest that even though TRQ admittedly falsely overstated the project's lateral development, their scienter is undermined because they revised that number downward the following quarter. TRQ Br. at 26 n.14. But this ignores that these false lateral progress statement was made in connection with Defendants' false "re-forecast" of the OT schedule, at a time Defendants were desperately trying to conceal the extent of the cost overruns and delays (¶¶334-43), and the subsequent downward revision of the lateral development figure came on March 15, 2019—after Bowley had reported his concerns to Rio's compliance department (¶221-22) and after he had forced Defendants to make a disclosure about

At best, the TRQ Defendants recklessly failed to discover information that was available to them and contradicted their public statements about the project.  As the Second Circuit has held, allegations of recklessness are "sufficient where plaintiffs allege[] facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud"—a standard readily met by the facts here.  *Novak*, 216 F.3d at 308; *see also Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *22 (S.D.N.Y. Mar. 29, 2021) (Liman, J.) ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *17-18 (S.D.N.Y. Mar. 25, 2013) (in view of "data available to Defendants, and the ongoing nature of the problem as the weeks and months passed with no visible improvement…in a business segment that accounted for 70% of the company's revenue—it is difficult to infer that Defendants really and reasonably thought the company's problem would not persist").

In accordance with these principles, a majority stockholder was found to have scienter with respect to its subsidiary's fraud based on several warnings that the parent "deliberately failed to investigate"; "[b]ut most important is the reasonable inference that if your representatives have control over a corporation, it is logical to assume that you will find the skeletons in the closet." *In re Refco Sec. Litig.*, 2011 WL 13261982, at *6 (S.D.N.Y. Apr. 11, 2011). The same applies here.[41]

---

the delays.  ¶¶208-35.  And in any event, despite revising the lateral expansion metrics downward, Defendants continued to misrepresent the actual progress at OT.  *E.g.*, ¶384-402.  *Cf. Anadarko*, 2021 WL 182316, at *9 (whistleblower allegations support scienter).

[41] TRQ's cited cases (TRQ Br. at 21-22), which did not include anything like the reports to and admissions by the TRQ Executive Defendants here, are inapposite. *See, e.g., Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011) (no scienter for failed contract where defendants lacked any connection to contract counterparty); *Aratana*, 315 F. Supp. 3d at 765 (complaint lacked any "concrete allegations . . . regarding defendants' knowledge, apart from the information defendants themselves disclosed"); *In re Adient*, 2020 WL 1644018, at *28 (no allegations of contradictory

Fourth, Defendants contend that their motivation to conceal the mine's problems in light of TRQ's and Rio's strained relationship with the Mongolian Government does not support scienter. Rio Br. 34-35. This is wrong. To the contrary, Defendants' motive to conceal the problems at OT in light of the Mongolian Government's aggressive moves to investigate the project and renegotiate the governing contracts was concrete and acutely personal to Defendants Jacques, Soirat and Quellmann—who had staked their careers on the mine's success, were personally involved in the negotiations that the Mongolian government sought to revisit, and risked personal prosecution for their involvement in OT. ¶¶60, 279-80. Indeed, this very motivation was documented in contemporaneous reports provided to Rio's Executive Committee before the Class Period, which noted that "Soirat knows what's going on and worry about renegotiation by Mongolia Government." ¶135. Defendants' silencing of Bowley and termination of Brinkmann and FE 8 in the spring 2018, at the same time that the government was stepping up its pressure through multiple investigations and tax penalties, further corroborates Defendants' motive. And here, Defendants received emails from the expert they hired to investigate OT that told them their statements to investors were "untrue," "a lie," and "watered down the truth."

The TRQ Defendants' assertion that "maintaining good relations with a governmental partner is the type of motive generally possessed by most corporate directors and officers" (TRQ Br. at 32) likewise fails because, as noted above, Defendant Quellmann and the other TRQ Defendants had deep personal commitments to the OT project, and this precise motive was shared by Rio's management and documented in contemporaneous reports. ¶135.

---

reports that went to defendants); *Pretium*, 256 F. Supp. 3d at 481 (no scienter where consultant merely disagreed with a company's estimates and defendant swiftly disclosed disagreement after investigating it); *cf. In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) (scienter alleged where, like here, executive was in meetings about CDO risks).

Moreover, Defendants were motivated to delay the day of reckoning as long as possible, as in numerous cases where courts have rejected the argument that the inevitability of the truth coming out eventually negated scienter. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (Posner, J.) ("The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble."); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 252-53 (5th Cir. 2009) ("defendants acted with scienter in concealing their knowledge that US Unwired's [undisclosed practices] would inevitably be severely harmful or disastrous economically for the company."); *In re Bear Stearns*, 763 F. Supp. 2d at 487 ("the depth of the subprime crisis and the current recognition that negative developments were not given sufficient credence by the market may well indicate an intent to continue dancing as long as the music is playing even knowing that the ball may be over"); *Lefkoe v. Jos. A. Bank Clothiers*, 2008 WL 7275126, at *8 (D. Md. May 13, 2008) (rejecting argument that "the fact that disclosure of the financial results . . . was 'imminent and inevitable' negates an inference of scienter"). Defendants' cited cases discounting motives that "are neither concrete nor personal" offered nothing like the concrete and personal facts here, and are entirely inapposite. Rio Br. at 35 (quoting *Kinross Gold*, 957 F. Supp. 2d at 295 and similar cases).[42]

<u>Fifth</u>, recognizing they have no credible argument based on the Complaint, the TRQ Defendants improperly seek dismissal by making up their own facts, suggesting that Defendant Quellmann's TRQ stock purchases undermine an inference of scienter. TRQ Br. at 29-30. To start,

---

[42] Defendants Jacques and Soirat's personal involvement in overseeing the mine and negotiating with the Mongolian Government distinguish this case from the vague allegations in *City of Brockton Retirement System v. Shaw Group. Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008), that executives were "hands on" and "closely involved." Rio Br. at 34 n.25.

"there is no *per se* rule that stock purchases negate any inference of scienter, including an inference based on recklessness." *In re Fannie Mae 2008 Sec. Litig.*, 2011 WL 13267340, at *3 (S.D.N.Y. Apr. 11, 2011) (scienter pleaded for executives who bought stock on market). Indeed, Defendant Quellmann's purchases are irrelevant to Lead Plaintiff's strong evidence that Quellmann acted knowingly or recklessly as such purchases "only address a 'motive and opportunity' theory of scienter, not a recklessness theory." *In re Fannie Mae*, 891 F. Supp. 2d 458, 477 n.13 (S.D.N.Y. 2012) (citing *In re Regeneron Pharms., Inc. Sec. Litig.*, 2005 WL 225288, at *22-24 (S.D.N.Y. Feb. 1, 2005)). And Quellmann's acquisition is also irrelevant to Lead Plaintiff's evidence that the TRQ Defendants were motivated to conceal the project's problems in an effort to stave off the Mongolian Government's efforts to renegotiate the project's governing contracts. ¶¶187-202.

In any event, Defendant Quellmann omits that under his employment agreement with TRQ he was <u>required</u> to purchase TRQ stock—and <u>required</u> by company policy to increase his TRQ shareholdings to more than 10 times the amount he held during the Class Period—and that, if anything, his small stock purchases during the Class Period enhance the inference of scienter. Specifically, under his employment agreement, Defendant Quellmann received a sign-on bonus of C$690,000, to be provided in three equal installments of C$230,000 at 12, 24, and 36 months following his appointment as CEO in August 2018, "to be used towards the purchase of Common Shares." Ex. C at 29, 42. Further, following prompting from investors, in March 2017, TRQ established Executive Shareholding Guidelines requiring that Defendant Quellmann hold 3.5 times his base salary, or C$1,610,000, in TRQ common stock by August 2023. *Id.* at 41-2. But rather than use his sign-on bonus installment to fulfill his obligations under the shareholding requirement, Defendant Quellmann only purchased C$112,125 in TRQ common stock—or less than half the amount of his first sign-on bonus installment—leaving him less than 10% of the way toward this

shareholding target by the end of the Class Period. TRQ Ex. 28. The fact that Quellmann purchased so few shares during the Class Period in light of these requirements suggests he <u>knew</u> TRQ's stock price was overvalued—a fact that weighs in favor, not against, scienter.

The TRQ Defendants' stock-purchase argument also ignores that Defendant Quellmann did not have any shares to sell except those he was required to purchase as a result of his sign-on bonus and shareholding requirement. As courts have repeatedly held, the fact that Defendant Quellmann did not pay a single penny out of his own pocket to increase his holdings does nothing to cut against the strong inference of scienter here. *See, e.g.*, *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (rejecting defendants' attempt to negate scienter by asking court to consider holdings of vested options and shares gained by exercising options that were about to expire). Further, while the TRQ Defendants do not make any "stock purchase" arguments as to Colton and Luke, they too lacked any meaningful TRQ stock to sell, had similar shareholding requirements as Defendant Quellmann to increase their holdings, yet failed purchase any TRQ stock during the Class Period—a fact that further supports their scienter. *See* Ex. C.[43]

---

[43] Defendants' cited cases, in which plaintiffs failed to establish either knowing or reckless misconduct, do not support any innocent inference here. *See Turner v. MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000). Moreover, *In re Northern Telecom Ltd.* "misstates the standard" by confusing "the motive and opportunity prong" with "conscious misbehavior"—the precise error Defendants would like this Court to make here. *Gruber v. Gilbertson*, 2021 WL 2482109, at *13 n.3 (S.D.N.Y. June 17, 2021). In any event, TRQ's scienter is also established by Rio, Jacques and Soirat's scienter—which can be imputed to TRQ given Rio's control over TRQ and the extensive allegations that Rio, Jacques and Soirat were "responsible" for TRQ's false statements. *See Teamsters Loc.*, 531 F.3d at 196-97 (scienter can be established through scienter of someone "responsible for the statements"); *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *15 & n.38 (S.D.N.Y. Apr. 21, 2016) (subsidiary employee "responsible" for parent's accounting misstatements); *In re Marsh & McLennan Cos., Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) (imputing scienter of subsidiary to parent when allegations showed parent was familiar with subsidiary's operations and conduct); *Rex and Roberta Ling Living Trust u/A Dec. 6, 1990 v. B Comm'ns Ltd.*, 346 F. Supp. 3d 389, 410-11 (S.D.N.Y. 2018) (controlling shareholder's scienter imputed to issuer); *see*

## V.    LEAD PLAINTIFF ALLEGES LOSS CAUSATION

Loss causation is a fact-intensive question governed by Rule 8(a)'s notice pleading standards. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) ("*Dura*"). As the Second Circuit has explained, "plaintiffs sufficiently plead loss causation when they allege that their share's 'price fell significantly after the truth became known' through an express, corrective disclosure or 'through events constructively disclosing the fraud' like the 'materialization of [the] risk' concealed." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179-80 (2d Cir. 2020). And courts have made clear that the burden of alleging loss causation is a "low one at the pleading stage" and "not meant to place a great burden on plaintiffs." *Aclaris Therapeutics*, 2021 WL 1177505, at *25-26 (Liman, J.); *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at *12 (S.D.N.Y. Mar. 27, 2013); *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016) (burden to plead loss causation is "not a heavy one").

Here, the Complaint alleges that Turquoise Hill's stock price declined in a statistically significant manner when the facts concealed by Defendants since the beginning of the Class Period—*i.e.*, that progress at OT was over woefully behind schedule and massively over budget—were revealed to the market in a series of disclosures. For example, the Complaint alleges that the truth about the delays and cost overruns at OT began to be revealed on February 27, 2019 when Rio and TRQ first disclosed that sustainable first production would likely be delayed by several months—after being forced to make this disclosure by Bowley just two days after Rio purportedly completed its internal investigation into his whistleblowing. ¶¶230-35, 221-29.

---

*also Thabault v. Chait*, 541 F. 3d 512, 527 (3d Cir. 2008) ("acts of a controlling shareholder" typically "are ... imputed" to the company).

The Complaint further alleges that Defendants additional information concerning the true extent of the delays and cost-overruns at OT were revealed in April, May, and June, when news reports were published revealing the government of Mongolia had issued a 200-page report critical of the OT expansion, that Rio was conducting an internal investigation into Bowley's whistleblowing, and that Rio's attempt to blame the underground delay on rock stability issues may have been false—each of which caused substantial declines in the price of TRQ shares. ¶¶236-41.  And the Complaint alleges that Rio and TRQ's disclosure on July 15, 2019 revealing what Defendants had long known—that the underground expansion would be delayed for over a year and was over a billion dollars over-budget—prompted a near 44% price decline and caused analysts to slash their ratings on TRQ.  ¶¶242-45; *see also* 425-34 (alleging price declines in response to disclosures).  These allegations easily surpass *Dura*'s requirement to provide "defendant[s] with 'some indication of the loss and the causal connection that the plaintiff has in mind'" and satisfy the standards for pleading loss causation in this Circuit.  *See Aclaris Therapeutics*, 2021 WL 1177505, at *25-26.

In response, Defendants first contend that Lead Plaintiff fails to plead loss causation because investors were aware of a general risk of potential delays and cost overruns, and thus the risk that actually materialized was not "concealed."  Rio Br. 46.  But Defendants' misstatements concealed "far more" than a general risk of delay—in fact, Lead Plaintiff alleges this risk had previously materialized, and the cost overruns and delays were known by the Defendants from the start of the Class Period.  *See Aclaris Therapeutics*, 2021 WL 1177505, at *25-26.  Second, Defendants mischaracterize the Complaint and wrongly contend a disclosure of a mere "failures to meet forecasts" cannot establish loss causation.  Rio Br. 46.  Not so.  Setting aside Defendants' mischaracterization of the corrective disclosures, courts routinely find loss causation pleaded when

the failure to meet a forecast (or the reasons behind the failure) were concealed—as is the case

here. *See, e.g.*, *Azar v. Yelp, Inc.*, 2019 WL 285196, at *4-5 (N.D. Cal. Jan. 22, 2019).[44]

## VI.    LEAD PLAINTIFF ALLEGES CONTROL CLAIMS UNDER SECTION 20(A)

Section 20(a) requires: (1) a predicate violation of the Exchange Act; (2) control of the

primary violator; and (3) culpable participation. *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013

WL 6233561, at *27 (S.D.N.Y. Dec. 2, 2013).    In the Second Circuit, "the control person

provisions are broadly construed as they were meant to expand the scope of liability under the

securities laws" and whether "a person is a 'controlling person' is a fact-intensive inquiry, and

generally should not be resolved on a motion to dismiss." *In re Tronox, Inc. Sec. Litig.*, 769 F.

Supp. 2d 202, 207-08, 220 (S.D.N.Y. 2011); *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807,

829 (S.D.N.Y. 2006). Allegations of control "need not be pleaded with particularity," *In re*

*Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006), and actual control requires "only

the ability to direct the actions of the controlled person, and not the active exercise thereof."

*Dietrich v. Bauer*, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001).  As discussed, the Complaint alleges

a predicate violation.  The Complaint also easily alleges control and culpable participation.[45]

Here, the Rio Defendants' primary argument is that Plaintiff's allegations about their

control over TRQ are "conclusory" (Rio Br. at 47)—but Rio ignores that Plaintiff alleges far more

---

[44] In Defendants' case *In re New Energy Systems Securities Litigation*, 66 F. Supp. 3d 401, 406 (S.D.N.Y. 2014), unlike here, the relevant "truth" was revealed months before the alleged corrective disclosure that caused the stock decline.  And in *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005), there was no loss causation because there were no disclosures at all revealing defendants' alleged scheme to manipulate earnings forecasts.

[45] The TRQ Executive Defendants argument against control liability based on the purported absence of an underlying violation (TRQ Br. at 44) fails for the reasons discussed above. Their perfunctory argument that Plaintiff's allegation that they controlled TRQ's statements is contradicted by the allegation that the Rio Defendants controlled TRQ's statements (TRQ Br. at 44) also fails because more than one person can control a statement. *See IOP Cast Iron*, 91 F. Supp. 3d at 473; *Barclays*, 56 F. Supp. 3d at 557-60; *EnergySolutions*, 814 F. Supp. 2d. at 418.

detail about Rio's control over TRQ than those routinely upheld by courts. *See In re Oxford*, 187 F.R.D. at 143 (defendants' involvement in "day-to-day operations" gave the power to control the activities comprising underlying violation). This is not "conclusory": TRQ's SEC filings describe Rio's control in detail. *See, e.g.*, ¶¶457-60 (describing Rio's "ability to exert a significant degree of control over [TRQ], Oyu Tolgoi LLC and Oyu Tolgoi"); *see, e.g.*, *STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525, 536 (E.D.N.Y. 2011) ("In cases involving parent-subsidiary relationships, courts have regularly based findings of control person liability on allegations of substantial stock ownership and common principals."); *Hi-Crush*, 2013 WL 6233561, at *27 (finding control where SEC filings make "clear that Hi-Crush GP completely controls Hi-Crush" and individual defendants "acted within the scope of their employment as officers of Hi-Crush GP when they managed the daily affairs of Hi-Crush"); *Drobbin v. Nicolet Instrument Corp.*, 631 F. Supp. 860, 885 (S.D.N.Y. 1986) (control alleged where stockholder had power to name majority of board). And contrary to Defendants' assertion in a footnote (Rio Br. at 48 n.40), the Complaint also contains detailed allegations about Defendants' Jacques and Soirat's personal involvement, negotiating the key related agreements with the Mongolian Government, and responding to the cost overruns and delays. The Complaint also alleges RTIH's role as TRQ's controlling stockholder and contractual manager, as well as the roles of both Rio Tinto Limited and Rio Tinto PLC, which operate as a single global enterprise. ¶¶53-56.[46] Defendants' cited cases support—not contradict—the control evident from these facts and Defendants' own disclosures.[47]

---

[46] Because RTIH and the Rio controlled TRQ as majority stockholders with power to determine all TRQ Board elections and executive appointments, Defendants' case, *Alstom*, 406 F. Supp. 2d at 492, which involved a minority stockholder with minority board representation, is inapposite.

[47] In Defendants' cases (Rio Br. at 47-48), unlike here, mere corporate status, as opposed to actual control, was alleged. *Cf. DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 460 (S.D.N.Y. 2018) (mere status as parent is insufficient, but "control that [parent] actually exerts over [subsidiary]'s operations and, in particular, its preparation of its financial disclosures"

Lead Plaintiff also alleges Rio's culpable participation.  While "[d]isagreement exists within the Second Circuit . . . as to precisely what conduct" culpable participation entails, *Alstom*, 406 F. Supp. 2d at 490, even if a scienter-level pleading were required, this is easily satisfied here. While Rio contends that Plaintiff did not allege Rio "exercised actual control over the alleged misstatements," this conclusory assertion contradicts the Complaint (*see, e.g.*, ¶¶53-60 (alleging actual control)), is rebutted by Rio's day-to-day management of OT—TRQ's sole asset—and is contrary to commonsense given the uniformity between Rio's and TRQ's statements.  *See also, e.g.*, *Hi-Crush*, 2013 WL 6233561, at *27 (finding culpable participation where individual defendants "acted within the scope of their employment as officers of Hi-Crush GP when they managed the daily affairs of Hi-Crush"); *Venator*, 2021 WL 2980581, at *28-29 (finding control where defendant could appoint board members, hire executives and cause stock offering).

## CONCLUSION

For the reasons discussed above, the Pentwater Funds respectfully request that the Court deny Defendants' motions to dismiss in their entirety.

Dated: November 16, 2021                          Respectfully submitted,

                                                  */s/ Salvatore J. Graziano*
                                                  Salvatore J. Graziano
                                                  Mark Lebovitch
                                                  Michael D. Blatchley

---

suffices); *In re Glob. Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *13 (S.D.N.Y. Aug. 8, 2005) (defendants' "status as minority shareholders of [issuer] is insufficient"); *Ark. Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 486 (S.D.N.Y. 2014) ("no particularized facts suggesting that [defendants] had control over the alleged misrepresentations"); *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (rejecting conclusory control allegations); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166 (S.D.N.Y. 2012) (same). *Kuwait Inv. Office v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 810-11 (S.D.N.Y. 2015), where officers of a separate entity "ha[d] no role in the business structure of the speaking entity" is off-point because Soirat served on the OT Board and Jacques personally negotiated OT's key contracts with the Mongolian Government and lenders.

Jai Chandrasekhar
Ryan Dykhouse
**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
markl@blbglaw.com
michaelb@blbglaw.com
jai@blbglaw.com
ryandykhouse@blbglaw.com

*Counsel for Lead Plaintiff the Pentwater*
*Funds and Lead Counsel for the Class*