**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

IN RE TURQUOISE HILL RESOURCES LTD.
SECURITIES LITIGATION

Case No. 20-CV-08585-LJL

**THE TRQ DEFENDANTS' REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS
THE SECOND AMENDED CONSOLIDATED COMPLAINT**

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
Richard A. Rosen
Gregory F. Laufer
Robert N. Kravitz
James G. Mandilk
1285 Avenue of the Americas
New York, New York 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990
rrosen@paulweiss.com
glaufer@paulweiss.com
rkravitz@paulweiss.com
jmandilk@paulweiss.com

*Attorneys for Defendants Turquoise Hill
Resources Ltd., Luke Colton, Brendan Lane,
and Ulf Quellmann*

**TABLE OF CONTENTS**

Page

ARGUMENT ................................................................................................................ 1

I.    The Complaint Does Not Adequately Allege That the TRQ Defendants Acted
      with Scienter ...................................................................................................... 1

      A.    Plaintiff's Opposition Further Highlights the Deficiencies in Plaintiff's
            Scienter Allegations Concerning the TRQ Defendants ......................... 1

      B.    Plaintiff Does Not Adequately Allege Actual Knowledge on the Part of
            the TRQ Defendants .............................................................................. 6

      C.    Plaintiff Does Not Adequately Allege Recklessness ........................... 14

      D.    Plaintiff Does Not Adequately Allege That the TRQ Defendants Had a
            Motive to Commit Fraud ...................................................................... 16

II.   TRQ's Statements Concerning the Projected Cost and Timeline for the
      Underground Development Are Forward-Looking Statements Protected by the
      PSLRA Safe Harbor ........................................................................................ 18

      A.    Plaintiff Does Not Adequately Allege That the TRQ Defendants Had
            Actual Knowledge That Any Forward-Looking Statements Were False ........... 18

      B.    TRQ's Cautionary Statements Were Meaningful ................................ 21

III.  TRQ's Statements Regarding the Expected Timeline and Costs and Other Issues
      Were Statements of Opinion That Plaintiff Does Not Adequately Allege Were
      False ................................................................................................................ 21

IV.   Certain of the TRQ Statements That Plaintiff Is Challenging Are Vague
      Statements of Optimism That Are Not Actionable ......................................... 24

CONCLUSION .......................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdo* v. *Fitzsimmons*,
  2017 WL 6994539 (N.D. Cal. Nov. 3, 2017) ..................................................... 7, 9

*Abely* v. *Aeterna Zentaris, Inc.*,
  2013 WL 2399869 (S.D.N.Y. May 29, 2013) ...................................................... 5

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ....................................................... 9, 24

*In re Aegon N.V. Sec. Litig.*,
  2004 WL 1415973 (S.D.N.Y. June 23, 2004) ..................................................... 14

*Ambac Fin. Grp., Inc. Sec. Litig.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010) ............................................................... 12

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................................................... 25

*Chapman* v. *Mueller Water Prod., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020) (Liman, J.) ............................................. 16

*Chill* v. *General Electric Co.*,
  101 F.3d 263 (2d Cir. 1996) ............................................................................. 15

*Citiline Holdings, Inc.* v. *iStar Fin., Inc.*,
  701 F. Supp. 2d 506 (S.D.N.Y. 2010) ............................................................... 12

*City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013) ............................................................... 19

*City of Pontiac Gen. Emps. Ret. Sys.* v. *Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) ............................................................... 19

*City of Providence* v. *Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ................................................... 15

*City of Westland Police & Fire Ret. Sys.* v. *MetLife, Inc.*,
  129 F. Supp. 3d 48 (S.D.N.Y. 2015) ................................................................. 22

*Cornwell* v. *Credit Suisse Grp.*,
  689 F. Supp. 2d 629 (S.D.N.Y. 2010) ............................................................... 9

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Das* v. *Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ...........................................................................12, 13

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
    2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ................................................................ 13

*In re EZCorp., Inc. Sec. Litig.*,
    181 F. Supp. 3d 197 (S.D.N.Y. 2016) .............................................................................. 9

*Fait* v. *Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011) ........................................................................................... 22

*Fresno Cnty. Ret. Ass'n* v. *comScore*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2012) ............................................................................ 12

*Garber* v. *Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) .............................................................................. 9

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012) ............................................................................ 12

*In re Gold Resources Corp. Sec. Litig.*,
    776 F.3d 1103 (10th Cir. 2015) ...................................................................................... 23

*Gray* v. *Wesco Aircraft Holdings Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020) ............................................................................ 18

*Hart* v. *Internet Wire, Inc.*,
    145 F. Supp. 2d 360 (S.D.N.Y. 2001) ............................................................................ 15

*Hawaii Structural Ironworkers Pension Tr. Fund* v. *AMC Ent. Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019) ............................................................................ 24

*In re HEXCO Corp. Sec. Litig.*,
    2021 WL 878589 (S.D.N.Y. Mar. 8, 2021) .................................................................... 13

*Hou Liu* v. *Intercept Pharm. Inc.*,
    2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) .................................................................. 2

*Inter-Local Pension Fund GCC/IBT* v. *Gen. Elec. Co.*,
    445 F. App'x 368 (2d Cir. 2011) ...................................................................................... 3

*Jackson* v. *Halyard Health, Inc.*,
    2018 WL 1621539 (S.D.N.Y. Mar. 30, 2018) .................................................................. 9

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Kasilingam* v. *Tilray, Inc.*,
2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021) .......................................................... 8, 9, 15

*Kinsey* v. *Cendant Corp.*,
2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005) ................................................................ 15

*Lipow* v. *Net1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015) .............................................................................. 7

*Long Miao* v. *Fanhua, Inc.*,
42 F. Supp. 3d 774 (S.D.N.Y. 2020) .............................................................................. 14

*Maloney* v. *Ollie's Bargain Outlet Holdings, Inc.*,
2021 WL 517934 (S.D.N.Y. 2021) ............................................................................. 9, 13

*In re Marsh & McLennan Cos., Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ............................................................................ 14

*Martin* v. *Quartermain*,
732 F. App'x 37 (2d Cir. 2018) ................................................................................. 22, 23

*Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*,
2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ............................................................... 15

*In re Micro Focus Int'l Plc Sec. Litig.*,
2020 WL 5817275 (S.D.N.Y. Sept. 29, 2020) ............................................................... 24

*Moshell* v. *Sasol Ltd.*,
481 F. Supp. 3d 280 (S.D.N.Y. 2020) ............................................................................ 19

*In re N. Telecom Ltd. Sec. Litig.*,
116 F. Supp. 2d 446 (S.D.N.Y. 2000) ............................................................................ 17

*New Orleans Emps. Ret. Sys.* v. *Celestica*,
455 F. App'x 10 (2d Cir. 2011) ...................................................................................... 12

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000) ........................................................................................... 18

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ........................................................................................................ 21

*In re PetroChina Co. Ltd. Sec. Litig.*,
120 F. Supp. 3d 340 (S.D.N.Y. 2015) ............................................................................ 11

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*In re Pfizer Sec. Litig.*,
   2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) ....................................................... 14

*Pirnik* v. *Fiat Chrysler Automobiles*,
   2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016)....................................................... 12

*In re Pretium Res. Inc. Sec. Litig.*,
   2020 WL 953609 (S.D.N.Y. Feb. 27, 2020)....................................................... 22

*In re QLT Inc. Sec. Litig.*,
   312 F. Supp. 2d 526 (S.D.N.Y. 2004) ............................................................... 19

*In re Refco Securities Litigation*,
   2011 WL 13261982 (S.D.N.Y. Apr. 11, 2011) ............................................... 5, 15

*Rosi* v. *Aclaris Therapeutics, Inc.*,
   2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) (Liman, J.)..........................12, 14, 15

*Rudani* v. *Ideanomics, Inc.*,
   2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020) ................................................... 13

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos*,
   75 F.3d 801 (2d Cir. 1996)................................................................................. 9

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016) ............................................................... 11

*Shemian* v. *Research In Motion Ltd.*,
   2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ..................................................... 7

*Shields* v. *Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994)............................................................................. 17

*Silvester* v. *Selene Finance, L.P*,
   2021 WL 861080 (Mar. 8, 2021)....................................................................... 25

*In re Skechers USA, Inc. Sec. Litig.*,
   444 F. Supp. 3d 498 (S.D.N.Y. 2020) ............................................................... 24

*Slayton* v. *Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)............................................................................... 6

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ..................................................... 7

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) .................................................................. 14

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................... 3

*Tongue* v. *Sanofi*,
    816 F.3d 199 (2d Cir. 2016) .................................................................. 21

*In re Venator Materials PLC Sec Litig.*,
    2021 WL 2980581 (S.D. Tex. July 7, 2021) ....................................... 19

*Villare* v. *Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) .................................... 24

*In re Vivendi Universal, S.A. Sec. Litig.*,
    2004 WL 876050 (S.D.N.Y. Apr. 22, 2004) ....................................... 19

*Wash. State Inv. Bd.* v. *Odebrecht SA*,
    461 F. Supp. 3d 46 (S.D.N.Y. 2020) ................................................... 25

*Wilson* v. *LSB Indus., Inc.*,
    2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ...................................... 22

*Woolgar* v. *Kingstone Cos., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020) ............................................13, 22

**Statutes**

15 U.S.C. § 78u–4 ...........................................................................13, 18

## ARGUMENT[1]

### I.    The Complaint Does Not Adequately Allege That the TRQ Defendants Acted with Scienter

Plaintiff alleges that Rio Tinto, the project manager, exercised complete control over Oyu Tolgoi, was TRQ's *sole* source of information about the mine, and actively concealed adverse information.  Plaintiff doubles down on these allegations throughout its opposition brief.  These allegations are flatly inconsistent with a claim that the TRQ Defendants nevertheless somehow knew that their public statements—which accurately disclosed what Rio Tinto was reporting to them—were false or misleading.  And because Plaintiff's opposition fails to rebut our showing that the Complaint does not allege, and the Independent Consulting Group ("ICG") Report on which Plaintiff heavily relies did not find, that the TRQ Defendants received any adverse information about OT development that conflicted with TRQ's disclosures, the Complaint should be dismissed for failure to plead scienter as to the TRQ Defendants.

### A.    Plaintiff's Opposition Further Highlights the Deficiencies in Plaintiff's Scienter Allegations Concerning the TRQ Defendants

Plaintiff's opposition fails to rebut our showing that scienter is not adequately alleged as to the TRQ Defendants, for at least seven reasons.

*First*, both the Complaint and Plaintiff's brief pervasively refer to "Defendants" collectively—lumping the TRQ Defendants together with the Rio Tinto Defendants—even though

---

[1]    Citations to "¶ __" refer to paragraph numbers in the Second Amended Consolidated Complaint (the "Complaint"), ECF No. 127; to "Ex. __" refer to exhibits to the Declaration of Gregory F. Laufer, ECF No. 134 (Exhibits 1–31), or exhibits to the Supplemental Declaration of Gregory F. Laufer filed concurrently herewith (Exhibits 32–34); to "Opp." refer to Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, ECF No. 135; and to "Br." refer to the TRQ Defendants' Motion to Dismiss, ECF No. 133.  Unless otherwise defined herein, capitalized terms have the meanings set forth in the TRQ Defendants' Motion to Dismiss.

the specific factual allegations purportedly supporting those assertions refer only to Rio Tinto. (*Compare*, *e.g.*, Opp. at 60–61 ("Defendants sidelined" whistleblower Bowley, and "engaged in a cover-up to conceal his whistleblowing") *with* ¶¶ 119–30, 173 (not alleging that *the TRQ Defendants* did so).)[2]  This does not satisfy the requirement of pleading scienter "as to *each* individual defendant." *See Hou Liu* v. *Intercept Pharm. Inc.*, 2020 WL 1489831, at *14 (S.D.N.Y. Mar. 26, 2020) (emphasis added).

Plaintiff's response to this point only highlights the problem.  First, Plaintiff responds to only one of the many examples that TRQ identified.  (Opp. at 72 n.32; Br. at 29 n.19.) Moreover, the paragraph that Plaintiff does respond to (¶ 271), proves TRQ's point.  Indeed, in it, Plaintiff alleges that "Defendants" were "repeatedly informed about delays and cost overruns," but then alleges that only certain *Rio Tinto* Defendants, and not *TRQ*, received that information.

*Second*, Plaintiff devotes 18 pages of its 92-page brief to arguing that Rio Tinto, not TRQ, completely controlled the Oyu Tolgoi project and information about the mine, asserting that:

- Rio Tinto exercised "complete control over the mine's operations" as its project manager (Opp. at 25; *see also* Opp. at 91);

- Rio Tinto "exercised complete control over TRQ's access to information about the Oyu Tolgoi project" (Opp. at 34; *see also* Opp. at 25–27, 37, 40 n.10);

- TRQ "had no other source of information about its own mine" other than Rio Tinto (Opp. at 27), which was the "sole source of information about TRQ's business and operations for both TRQ and investors" (Opp. at 24–25);

---

[2]    *Compare also* Opp. at 70 ("Defendants' retaliation against" employees) *with* Opp. at 20 (not arguing that *the TRQ Defendants* did so); Opp. at 5–6 ("Defendants" "refused to cooperate with and provide critical documents to the ICG") *with* ¶¶ 277, 301–03 (failing to allege that *the TRQ Defendants* did so); Opp. at 53 ("Defendants" "had access to and obtained information") *with* ¶¶ 10, 141, 144, 151, 154 (failing to allege that *the TRQ Defendants* did).

- TRQ's public statements "consisted almost entirely of information provided by Rio" Tinto and was identified as coming from Rio Tinto, and even "mirrored" Rio Tinto's statements (Opp. at 24–26); and

- Rio Tinto "controlled Turquoise Hill's public statements concerning the Oyu Tolgoi mine," including "the content of TRQ's statements," through exercising its contractual right to review and comment on TRQ's public disclosures concerning the mine (Opp. at 9, 26).

These allegations render *implausible* Plaintiff's allegations that TRQ—a Canadian-based company controlled by Rio Tinto with no physical presence or office in Mongolia during the Class Period, and no employees in Mongolia assigned to work on operations at Oyu Tolgoi—nevertheless knew about purportedly undisclosed delays and cost overruns, because Plaintiff does not allege that Rio Tinto or anyone else *ever* shared such information with anyone at TRQ.[3]

*Third*, the Complaint fails to identify *any* contemporaneous adverse facts about delays and cost overruns that were conveyed to TRQ that TRQ failed to disclose. Similarly, the ICG Report, on which Plaintiff heavily relies, does not find that TRQ knew, but failed to disclose, any such facts, either. Plaintiff repeatedly refers to whistleblowers and confidential witnesses who allegedly told *Rio Tinto* about problems at the mine, but Plaintiff does not allege that a single one of them—or anyone else—provided such information to anyone at *TRQ*.[4] There is therefore no factual basis to impute knowledge of those adverse facts to the TRQ Defendants. Plaintiff must do more than make unsupported allegations "that defendants 'knew facts or had access to information suggesting that their public statements were not accurate.'" *Inter-Local Pension Fund*

---

[3]  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (inference of scienter must be "more than merely plausible or reasonable" and "at least as compelling as any opposing inference of non-fraudulent intent").

[4]  Plaintiff argues in conclusory fashion that TRQ "takes out of context a phrase in Bowley's" sworn statement to a U.K. tribunal in which Bowley purportedly stated that "Rio Tinto made no disclosure of the true facts to [its] partners and investors or the market." (Opp. at 82.) Plaintiff implies that TRQ was not one of the misled "partners." (*Id.*) But as Plaintiff itself alleges, the TRQ defendants viewed Rio Tinto as an "operating partner" in the mine. (¶ 348.)

*GCC/IBT* v. *Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (citation omitted). Rather, they "must 'specifically identify the reports or statements containing this information'" or other contemporaneous facts tending to show that the defendants knew the statements in question were false. *Id.* (citation omitted).

*Fourth*, Plaintiff repeatedly alleges that Rio Tinto took affirmative steps to conceal delays and cost overruns. (*E.g.*, ¶¶ 135, 173, 180–81, 248; Opp. at 4, 12, 15, 17, 20.) But neither the Complaint nor the ICG Report contains *any* similar allegations regarding the TRQ Defendants or suggests that TRQ knew of Rio Tinto's alleged actions.

*Fifth*, Plaintiff incorrectly argues that the TRQ Defendants must have been privy to adverse undisclosed information because they were directors of Oyu Tolgoi LLC ("OT"), the joint venture with the Mongolian Government that owns the mine. (Opp. at 78–81.) But Plaintiff fails to specifically identify any such information provided to the OT Board. Moreover, the representatives of the Mongolian Government who serve on the Board would have seen all of the same information that the TRQ representatives did. (Br. at 27 n.16.) Plaintiff is therefore forced to speculate that this unidentified adverse information must have been too technical for the Mongolian Government representatives to understand. (Opp. at 82.) But the more plausible inference, consistent with Plaintiff's core theory that Rio Tinto was trying to conceal all adverse information from the Mongolian Government (¶¶ 187–220), is that it would have sought to conceal such information from *all* Board members.

*Sixth*, Plaintiff fails to allege that TRQ was aware of any "red flags" concerning the problems that Plaintiff alleges. The Complaint and opposition brief do not identify a single fact that purportedly put TRQ on notice that the information it was reporting from Rio Tinto, the project manager, was false. And any inference of TRQ's scienter is even more implausible because Rio

Tinto was TRQ's "sole source" of information about the project—as Plaintiff itself acknowledges and argues.[5]  (Opp. at 24–25.)  Notably, Plaintiff fails to address *Abely* v. *Aeterna Zentaris*, *Inc.*, in which the court granted the defendant pharmaceutical company's motion to dismiss securities claims regarding disclosures about the results of a clinical trial, finding that defendant "merely repeat[ed]" findings and presentations from its partner who was responsible for conducting the clinical trials at issue.  2013 WL 2399869, at *19 (S.D.N.Y. May 29, 2013); *see also id.* (noting that "there is no factual allegation that the defendants received information that contradicted the seemingly promising results" or any citations "to any disputes about the validity" of the partner's data "that might have led defendants to challenge" it).[6]

     *Seventh*, there is no allegation that TRQ misreported or concealed *any* information that Rio Tinto provided.  Indeed, Plaintiff acknowledges that TRQ's statements "mirrored" Rio Tinto's.  (Opp. at 25, 42 n.13.)  Moreover, as documents that Plaintiff itself relies upon demonstrate, TRQ promptly disclosed delays when it learned of adverse developments from Rio Tinto; commissioned a review of those developments (*see* Ex. 8 (Oct. 15, 2018 News Release), at 2), including the ICG Report upon which Plaintiff heavily relies; and repeatedly cautioned investors that it would take time for the analysis to be completed and for the full impact on scheduling and costs to be understood (*see* ¶¶ 334–37, 345–52, 356, 369–70, 381–82, 387, 389–90,

---

[5]   As discussed on page 10 below, Plaintiff claims for the first time in its opposition that the independent consulting firm Broadleaf "warned" TRQ of risks of certain delays, yet the Complaint says nothing about Broadleaf conveying this "warning" to anyone at TRQ.  (Opp. at 19.)

[6]   Plaintiff quotes *In re Refco Inc. Securities Litigation*, 2011 WL 13261982, at *6 (S.D.N.Y. Apr. 11, 2011) for the theory that "if your representatives have control over a corporation, it is logical to assume that you will find the skeletons in the closet."  (Opp. at 83.)  But *Recfo* is inapposite here, where TRQ did *not* have control over the mine or relevant information.

395, 403–04, 430, 432)—all of which "weakens rather than strengthens an inference of scienter."

*Slayton* v. *Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010).

    **B.**    **Plaintiff Does Not Adequately Allege Actual Knowledge on the Part of the TRQ Defendants**

        The only specifics that Plaintiff alleges and argues concerning the TRQ Defendants fall well short of raising a strong inference of scienter.

        Despite repeated allegations that the ICG report makes certain findings about Defendants' knowledge of schedule delays and cost overruns (¶¶ 299–300; Opp. at 46), Plaintiff does not cite a single fact or finding from the ICG Report or elsewhere showing that anyone at TRQ either knew of undisclosed information that was inconsistent with TRQ's disclosures or sought to conceal such information from investors.

        Rather than point to specific information or reports purportedly provided to the TRQ Defendants, Plaintiff makes conclusory assertions that they must have been aware of the alleged underground development delays and cost overruns based on the positions they held. (Opp. at 78–81.) For example, Plaintiff argues that by virtue of Quellmann's purported role as a member of the Executive Committee and VP for Strategic Projects, he must have been aware of the ongoing OT underground development delays and cost overruns. (Opp. at 7–8.) Plaintiff also argues that Mr. Quellmann "negotiated and drafted" key agreements between Rio, TRQ, and the Mongolian Government pertaining to Oyu Tolgoi in his capacity as CFO of Rio's copper division (Opp. at 8), with no specific claim that this role allowed him to learn adverse facts, or indeed facts that the Government of Mongolia did not also know. Plaintiff's opposition also asserts that Messrs. Quellmann, Lane, and Colton must have known relevant facts because they were former Rio Tinto employees or had been seconded to TRQ by Rio Tinto (Opp. at 78–81), and by virtue of the TRQ Defendants' senior management roles at TRQ. (¶ 464.) Yet, "Plaintiff must do more

than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions." *Lipow* v. *Netl UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015). "It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter." *In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) (collecting cases).[7] Because Plaintiff fails to allege any information that contradicted TRQ's disclosures that TRQ Defendants learned by virtue of being former Rio employees, secondees, senior management, or on any committees, Plaintiff's conclusory reliance on these positions fails to establish an inference of scienter.

In the same vein, Plaintiff also argues that Messrs. Quellmann, Lane, and Colton must have been privy to the same information that Rio Tinto had, based on their positions as directors of OT. (Opp. at 71.) But, as discussed on page 4 above, the Mongolian Government also had representatives on the OT LLC Board, so if, as Plaintiff alleges, Rio Tinto was hiding information from the Mongolian Government representatives, it would have had to hide it from the TRQ representatives, too.[8] In any event, this is an insufficient basis to impute scienter to a defendant. *Abdo* v. *Fitzsimmons*, 2017 WL 6994539, at *18 (N.D. Cal. Nov. 3, 2017) (allegations

---

[7]  *See also Shemian* v. *Research In Motion Ltd.*, 2013 WL 1285779, at *16 (S.D.N.Y. Mar. 29, 2013) ("[M]ere assertions that defendants *must* have been aware of informants' concerns are insufficient to establish that defendants *were* aware of those concerns. Such allegations simply do not establish reckless disregard or scienter.") (emphasis in original).

[8]  Plaintiff attempts to distinguish the Mongolian Government's ignorance of the true facts from TRQ's knowledge by arguing that the Mongolian Government "lacked the mining expertise and experience possessed by the TRQ Executive Defendants." (Opp. at 82.) However, as noted above, if the nature of the OT development issues were as obvious as Plaintiff alleges, (*see* ¶¶ 106, 110, 146, 452), then no such "expertise" would be required to spot them.

that defendant "frequently" attended Board meetings and must have been aware of materially adverse facts fail to sufficiently plead scienter).

In the end, the only specific adverse information that Plaintiff alleges the TRQ Defendants were aware of by virtue of being OT directors was that Jacobs Engineering, the principal engineering, procurement, and construction management contractor on the underground development project, allegedly sought and obtained Board approval for an increase in its budget from $240 million to $360 million.[9]  (Opp. at 64, 78; ¶ 273.)  But the Mongolian Government designees on the Board were also necessarily aware of this information.  Moreover, Plaintiff does not allege that a cost increase of this nature and magnitude was so out of the ordinary for a project of this size and complexity as to raise a red flag that the problems were much larger, which is presumably why the Complaint does not allege (and could not in good faith allege) that the Mongolian Government-appointed Board members opposed the Jacobs request.  *See Kasilingam v. Tilray, Inc.*, 2021 WL 4429788, at *11 (S.D.N.Y. Sept. 27, 2021) (rejecting "the notion that any information Defendants had . . . a duty to monitor would have cured their ultimately misguided optimism" as "an impermissible retrospective critique") (quotation marks and citation omitted).

Plaintiff also contends that the TRQ Defendants had access to reports and documents and must have known of the development problems.  (Opp. at 8, 53, 71, 80.)  However, as demonstrated in our opening brief (Br. at 20–22), Plaintiff does not specifically identify any documents that allegedly conveyed the relevant adverse information to any TRQ Defendants. "Where scienter is based on a defendant's knowledge of and/or access to certain facts, Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available

---

[9]    Although Plaintiff also alleges that TRQ's knowledge of the problems is demonstrated by the "reforecasting" of the project's schedule (Opp. at 18, 66, 82 n.40), the only communications it cites involve *Rio Tinto's* purported awareness of this issue.  (Opp. at 18–20, 66.)

to the defendants [2] *at the same time* they made their misleading statements." *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *27 (S.D.N.Y. Apr. 2, 2020) (citation omitted) (brackets and emphases in original).[10]   While Plaintiff points to allegations of specific communications, meetings, and reports that allegedly provided adverse information to Rio Tinto individuals, the Complaint notably lacks any similar allegations that specific information was provided to TRQ. (*See, e.g.*, Br. at 21 n.9, noting, among other things, alleged meetings and other communications between Rio Defendants and Bowley concerning costs and expected delays.) Thus, Plaintiff's conclusory allegations that TRQ Defendants had access to relevant information fail.  (*See* Opp. at 7–8, 71, 79 (alleging that Quellmann "had access to and reviewed all relevant documentation" concerning OT); Opp. at 5 (asserting that TRQ Executive Defendants had "gone through the data and reports") (quotation marks, brackets, and citation omitted); ¶ 60 (alleging that Quellmann was

---

[10]   *See also San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) (An "unsupported general claim of the existence of confidential company sales reports that revealed [unfavorable figures] is insufficient to survive a motion to dismiss."); *Kasilingam* v. *Tilray, Inc.*, 2021 WL 4429788, at *9 (S.D.N.Y. Sept. 27, 2021) ("[S]cienter cannot simply be presumed from a defendant's organizational role or professional expertise[.]"); *Maloney* v. *Ollie's Bargain Outlet Holdings, Inc.*, 2021 WL 517934, at *5 (S.D.N.Y. 2021) ("[T]he complaint fails to specify exactly what information was contained in the report or how said information 'contradicted Defendants' public statements,' as is required to show scienter.") (citation omitted); *Jackson* v. *Halyard Health, Inc.*, 2018 WL 1621539, at*8–9 (S.D.N.Y. Mar. 30, 2018) (dismissing complaint where plaintiffs failed to allege defendants "personally received" a damaging report about a subpar product), *aff'd sub nom. Jackson* v. *Abernathy*, 960 F.3d 94 (2d Cir. 2020); *Garber* v. *Legg Mason, Inc.*, 537 F. Supp. 2d 597, 615 (S.D.N.Y. 2008) (plaintiff "needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them"); *Abdo* v. *Fitzsimmons*, 2017 WL 6994539, at *18 (N.D. Cal. Nov. 3, 2017) (finding allegations that defendant was "intimately involved" with the company and attended Board meetings to be too vague to support an inference of scienter).  In authority cited by Plaintiff, (Opp. at 65), there were detailed allegations of specific reports containing adverse information allegedly provided to the defendants in question, unlike here.  *See, e.g.*, *In re EZCorp., Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 209 (S.D.N.Y. 2016); *Cornwell* v. *Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637–38 (S.D.N.Y. 2010).

"intimately involved" with OT.)  The corresponding allegations in the Complaint are similarly conclusory, when they exist at all.  (*See* ¶¶ 42, 60, 163, 290–92.)[11]

Plaintiff also argues that Broadleaf, an independent consulting firm, provided adverse information to TRQ.  For example, Plaintiff asserts that Broadleaf "warned TRQ" of the likelihood of delays.  (Opp. at 19.)  But the Complaint paragraphs Plaintiff cites either do not mention Broadleaf at all or say nothing about TRQ receiving such "warnings" from Broadleaf. (*See* ¶¶ 184, 300; *compare also* Opp. at 66 ("As the ICG Report noted, an independent advisory firm informed Defendants . . . .") *with* ¶ 300 (not showing that *the TRQ Defendants* were informed)).  Plaintiff similarly provides no support for its new claim that TRQ cooperated with and retained Broadleaf.  (*Compare* Opp. at 16 ("Broadleaf, a consulting firm retained by TRQ") *with* ¶ 300 (mentioning nothing of Broadleaf's retainer by TRQ).)[12]  The Complaint provides no

---

[11] Plaintiff's brief frequently misrepresents the contents of the Complaint allegations it cites, including multiple instances in which the cited paragraphs have no connection to the proposition for which they are cited.  For example, at one point Plaintiff took a statement from its complaint and recharacterized it by adding a reference to Quellmann that was nowhere to be found in the Complaint itself: (Opp. at 80–81 ("As the ICG put it, "[i]t is inconceivable that Senior Management both on the Project site and in the higher-level committees [that Defendant Quellmann served on] were not aware.") (quoting ¶ 185) (alterations in opposition brief).  But the Complaint paragraph Plaintiff cites says nothing about either Quellmann or the particular committee on which Plaintiff alleges Quellmann served.

[12] *Compare also* Opp. at 80 ([TRQ Defendants]. . . "touted their work with third-party advisors like Broadleaf") *with* ¶¶ 291, 300 (providing no statements by TRQ that suggest they worked with Broadleaf); Opp. at 82 ("[TRQ] worked with third-party advisors like Broadleaf to ensure they were 'plugged in'") *with* ¶¶ 141, 257 (neither of which even mention Broadleaf or TRQ); Opp. at 64 (TRQ's knowledge was "confirmed by an advisory firm Broadleaf") *with* ¶¶ 291, 300, 312 (not showing that any information from Broadleaf was conveyed to anyone at TRQ); Opp. at 72 (TRQ Defendants, "as Defendant Quellmann put it, worked with advisors like Broadleaf to 'understand, review and provide input and ultimately sign off on the underground expansion'") *with* ¶ 257 (mentioning nothing of Quellmann).  Moreover, Plaintiff misrepresents Quellmann's statements; for example, Plaintiff repeatedly claims that in ¶ 291, Quellmann describes working with Broadleaf, but Quellmann's statement does not mention Broadleaf.  Rather, he describes TRQ's work with the "external consultant" in Mongolia— who, TRQ went on to state, was OreWin Pty Ltd ("Orewin") (Br. at 14); *see* Ex. 13 (Feb. 26,

support for Plaintiff's assertion that Broadleaf provided TRQ with any such information, and the ICG Report does not either.

Plaintiff then claims that Messrs. Quellmann, Lane, and Colton, who were not based in Mongolia, should have known about the problems at Oyu Tolgoi because they allegedly visited the mine regularly.  (Opp. at 81.)  But, as Plaintiff itself alleges, Mongolian Government representatives from the Parliamentary Working Group also conducted on-site inspections at the mine, without learning the adverse conditions that Rio Tinto allegedly concealed.  (Opp. at 69; ¶¶ 19, 202, 279.)  Plaintiff does not allege that any of the TRQ Defendants actually observed a specific problem, or was told about any issue by a Rio Tinto employee (or anyone else for that matter) during any site visit.[13]  Moreover, many of the problems that Plaintiff alleges caused the delays and cost overruns—such as defective steel (¶ 88)—would not have been apparent on a site visit.

Plaintiff's reliance on Messrs. Quellmann and Colton's signatures on Sarbanes-Oxley certifications as evidence of scienter (Opp. at 48–49) also fails.  As an initial matter, as in *In re Sanofi Securities Litigation*, Plaintiff fails to allege "any facts pertaining to [TRQ's] internal structure for financial reporting, much less than [TRQ] lacked internal controls."  155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016); *see also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359–60 (S.D.N.Y. 2015) (same).  To the extent that Plaintiff is relying on the broader certification that the financial reports do not contain any untrue statement of material fact (¶ 411), those

---

2019 News Release), at 1 (TRQ stating it was working with OreWin alongside its Qualified Person during the Company's review of the Rio re-forecast).

[13]  Plaintiff refers to an alleged hindsight statement by TRQ's chief operating office, Jo-Anne Dudley, "after the end of the Class Period" (¶ 251), that problems in the construction of Shaft 2 were a major cause of delays and cost-overruns (Opp. at 22–23), but this allegation says nothing about the TRQ Defendants' knowledge *during* the Class Period.

statements are qualified with the phrase "[b]ased on my knowledge," and thus Plaintiff must demonstrate Quellmann's, Colton's, and Lane's awareness of the falsity of the statement, which Plaintiff here fails to do. *Sanofi*, 155 F. Supp. 3d at 402. Courts have thus repeatedly held that, absent allegations of actual knowledge, "SOX certifications do not support an inference of scienter." *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018).[14] Plaintiff similarly fails to adequately allege scienter or falsity with regard to TRQ's Risk Factor Disclosures because, contrary to what it asserts in its brief, the Complaint does not allege any facts showing that *TRQ* knew that "significant delays and cost overruns . . . <u>already</u> had occurred[.]" (Opp. at 50 (emphasis by Plaintiff).)

Plaintiff further points to statements by certain TRQ Defendants that they were "plugged in" and had "good visibility" to the various processes at the mine.[15] (Opp. at 72; ¶ 163.) But such statements are entirely consistent with a good-faith belief that the information Rio Tinto was supplying to TRQ was both accurate and complete.[16] And indeed, contrary to Plaintiff's

---

[14] *See also Rosi* v. *Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *21 (S.D.N.Y. Mar. 29, 2021) (Liman, J.) ("The law in this District is clear and uniform that such SOX certifications do not provide a stand-alone basis for liability. Either the SEC filings contain materially misleading statements (in which case those statements can form the basis for liability) or they do not contain such statements. An allegation that the certification is false and misleading adds nothing.").

[15] Regardless of which TRQ Defendant made the statements, the statements do not prove actual knowledge of undisclosed delay or cost overrun issues.

[16] The cases cited by Plaintiff (Opp. at 72–73) do not support its position. *See New Orleans Emps. Ret. Sys.* v. *Celestica, Inc.*, 455 F. App'x 10, 13–14 (2d Cir. 2011) (confidential witnesses alleged defendants personally participated in meetings where adverse facts were discussed); *Fresno Cnty. Emps. Ret. Ass'n* v. *comScore, Inc.*, 268 F. Supp. 3d 526, 551 (S.D.N.Y. 2017) (defendant's audit committee admitted restatement was attributable to accounting misconduct); *Pirnik* v. *Fiat Chrysler Automobiles, N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (defendants admitted awareness of deficient automobile recalls that contradicted public statements); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395–96 (S.D.N.Y. 2012) (regular, detailed financial reports of loan portfolio supported finding that defendant knew of exposure to subprime loans); *Citiline Holdings, Inc.* v. *iStar Fin.*, *Inc.*, 701 F. Supp. 2d 506, 511, 516 (S.D.N.Y. 2010) (defendants represented they monitored

argument otherwise (in a single conclusory footnote (Opp. at 81 n.39)), the inference that TRQ mistakenly believed it had visibility into the mine's progress is the more plausible one in light of Rio Tinto's alleged complete control over TRQ's access to information about OT (¶¶ 40, 54, 55, 450), and Rio Tinto's alleged efforts to suppress such information (¶¶ 139–40, 187, 282, 285–88, 297).

Mr. Lane's resignation during the Class Period (Opp. at 79) does not support an inference of scienter either.  "Terminations or resignations of corporate executives are insufficient alone to establish an inference of scienter," *Woolgar* v. *Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 240 (S.D.N.Y. 2020), because "there are any number of reasons that an executive might resign, most of which are not related to fraud."  *Das*, 332 F. Supp. 3d at 815; *see also In re HEXCO Corp. Sec. Litig.*, 2021 WL 878589, at *21 (S.D.N.Y. Mar. 8, 2021) ("'Abrupt' resignations amidst bad financial news . . . are not surprising.") (citation omitted).

Plaintiff's reliance on the "core operations" theory (Opp. at 73) also falls short.  As an initial matter, "the core operations doctrine may no longer be good law after the enactment of the PSLRA." *Maloney* v. *Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021).  And, in any event, "that an allegedly fraudulent statement concerned 'core operations,' standing alone, is insufficient to support strong circumstantial evidence of scienter. The 'core operations' doctrine only bolsters the strength of the inference of scienter when plaintiffs have already adequately alleged facts indicating that defendants might have known their statements were false." *Rudani* v. *Ideanomics, Inc.*, 2020 WL 5770356, at *8 (S.D.N.Y. Sept. 25, 2020)

---

commercial loan portfolio "on a nearly real-time basis," but two weeks later took $135 million impairment and admitted substantial increase in nonperforming loans); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 268 (S.D.N.Y. 2010) (defendants' "own statements detail[ed] the regular reports by which they would have learned of the allegedly drastic deterioration of their CDO portfolio").

(quotation marks and citation omitted); *see also In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021) ("'[T]he core operations theory'—at best—'constitutes supplemental support for alleging scienter but does not independently establish scienter.'"). Plaintiff has alleged no other basis for inferring scienter on the part of the TRQ Defendants, so this "core operations" allegation fails.

Finally, in tacit recognition that its scienter allegations in regard to the TRQ Defendants fail, Plaintiff argues that the Rio Tinto Defendants' alleged scienter can be imputed to TRQ because Rio Tinto controlled and was responsible for TRQ's statements. (Opp. at 87 n.43.) None of the cases that Plaintiff cites support this illogical argument, and they do nothing to disturb the well-established rule that a "corporation can act only through its employees and agents." *In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2012). To impute Rio Tinto's scienter to TRQ, when no individual at Rio Tinto was under the control of TRQ nor alleged to be the agent of TRQ, would undermine the core requirement of individual scienter and principles of corporate separateness. "A corporate defendant's scienter is necessarily derived from *its* employees," *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) (emphasis added), not from employees of other companies.

C.    **Plaintiff Does Not Adequately Allege Recklessness**

Plaintiff's fallback theory that the TRQ Defendants were reckless in not knowing of the allegedly undisclosed delays and cost overruns (Opp. at 83) also fails because the Complaint does not identify a single "red flag" that should have put the TRQ Defendants on notice of such problems. *See Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (finding plaintiff failed to allege recklessness because it failed to "specifically identify the reports or statements" showing the falsity of defendants' public statements, let alone to demonstrate that "such statements would have come to light in a reasonable

investigation" by the defendants); *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 806 (S.D.N.Y. 2020) (finding that "[a]bsent concrete allegations as to [defendants'] knowledge of the alleged [adverse information]," plaintiffs failed to allege recklessness); *see also In re Aegon N.V. Sec. Litig*, 2004 WL 1415973, at *16–17 (S.D.N.Y. June 23, 2004); *Kinsey* v. *Cendant Corp.*, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005).[17]

   None of the conduct ascribed to the TRQ Defendants was "highly unreasonable" or "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rosi* v. *Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *22 (S.D.N.Y. Mar. 29, 2021) (Liman, J.) (quoting *Novak* v. *Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).  In particular, given Plaintiff's own allegations that (i) Rio Tinto, not TRQ, was the project manager; (ii) whistleblowers reported problems to Rio Tinto, not to TRQ; and (iii) Rio Tinto, not TRQ, controlled all information coming

---

[17]  In *Rosi* v. *Aclaris Therapeutics, Inc.*, 2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) (Liman, J.), though plaintiff couched her argument in terms of recklessness, the court found that she had alleged scienter only because senior executives *knew* about serious undisclosed issues; for example, the complaint alleged that a confidential witness "personally attended meetings with" senior executives at the company "that were held due to concerns about [certain] misleading claims." *Id.* at *22.  Likewise, the court in *City of Providence* v. *Aeropostale, Inc.*, 2013 WL 1197755, at *17–18 (S.D.N.Y. Mar. 25, 2013) relied on more than just "data available to Defendants," Plaintiff's repeated phrase.  The court ruled that the defendants acted "either recklessly or consciously—more likely the latter" because the complaint alleged not only that the "[d]efendants had access to" pertinent data that "contained detailed information regarding . . . performance metrics on a 'real time basis'" and "made it clear that Aeropostale was not reaching its sales goals," but also that they "reviewed[] and discussed" that data, including at weekly Executive Committee meetings. *Id.*  Here, by contrast, Plaintiff repeatedly alleges that Rio Tinto controlled TRQ's access to "detailed information . . . on a 'real time basis'" that only would have "made it clear that [OT] was not reaching its . . . goals" if disclosed to TRQ. *See id.*  Likewise, because Plaintiff itself alleges that Rio Tinto, not TRQ, controlled all aspects of the mine, and that Rio Tinto also controlled all information available to TRQ, Plaintiff cannot rely on the theory that "if your representatives have control over a corporation, it is logical to assume that you will find the skeletons in the closet." *See In re Refco Inc. Sec. Litig.*, 2011 WL 13261982, at *6 (S.D.N.Y. Apr. 11, 2011).

from the mine, "even an egregious failure to gather information will not establish 10b–5 liability as long as the defendants did not deliberately shut their eyes to the facts." *Hart* v. *Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368–60 (S.D.N.Y. 2001) (quotation marks omitted); *see also Kasilingam*, 2021 WL 4429788, at *21 ("[B]eing wrong—even embarrassingly so—is not the same as being dishonest[.]").[18]

**D.    Plaintiff Does Not Adequately Allege That the TRQ Defendants Had a Motive to Commit Fraud**

We showed in our opening papers that Mr. Quellmann purchased TRQ stock during the alleged Class Period, which negates an inference of scienter. (Br. at 30.) Plaintiff argues that Mr. Quellmann's stock purchases should be disregarded as a factor negating scienter because his employment agreement with TRQ required him to increase his shareholdings and compensated him for doing so.[19] (Opp. at 85–87.) But Mr. Quellmann also purchased shares with money from his own pocket in November 2018 (Ex. 32 (Quellmann SEDI Report), at 2), while the first bonus he received to be used toward the purchase of TRQ stock was not until August 2019. (Opp. at 86; Graziano Decl., Ex. C at 42.) And whether TRQ gave him a bonus to make the purchases or not, it was contrary to his own financial interest to artificially inflate the stock price at the time he was making such purchases. In addition, Plaintiff's focus on common shares in evaluating

---

[18] Fraud cannot be inferred merely because defendants "might have been more curious or concerned" about the matters in question. *Chill* v. *General Electric Co.*, 101 F.3d 263, 270 (2d Cir. 1996); *see also Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *26 (S.D.N.Y. Mar. 30, 2021) ("[A]llegations that a defendant would have learned the truth if it had performed sufficient due diligence have been repeatedly rejected as insufficient to allege scienter.") (quotation marks, brackets, and citation omitted).

[19] Plaintiff's argument that the Court must disregard stock transactions by the TRQ Defendants (Opp. at 85–86) is inconsistent with settled case law; courts routinely look at such evidence in assessing the sufficiency of scienter allegations. *See*, *e.g.*, *Chapman* v. *Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (Liman, J.) (considering evidence related to stock purchases and sales in evaluating scienter).

Mr. Quellmann's compliance with TRQ's stock ownership requirements ignores that grants of Performance Share Units and Restricted Share Units to Mr. Quellmann also "count" towards the contractual requirements. (Ex. 32 (Quellmann SEDI Report), at 2; Graziano Decl., Ex. C at 41–42.) And although Plaintiff argues that Mr. Quellmann spent "less than half the amount of his first sign-on bonus" on stock and was "less than 10% of the way towards [his] shareholding target" by the end of the Class Period (Opp. at 86–87), the first figure fails to take into consideration income tax and the second is irrelevant because Plaintiffs point to no provision imposing intermediate purchase quotas.

We also showed that Messrs. Colton and Lane did not sell TRQ stock during the Class Period, which also negates scienter. (Br. at 29.) Plaintiff incorrectly argues that, because they had no stock to sell, the Court should disregard that, too. (Opp. at 85–87.) Courts routinely rule that the absence of stock sales by a defendant is inconsistent with an intent to defraud shareholders without inquiring whether the defendant had shares to sell,[20] because it is only by selling shares at artificially inflated prices that an insider can personally benefit from committing fraud.[21]

Plaintiff also contends that Defendants were motivated to conceal problems from the Mongolian Government to avoid giving the government leverage to renegotiate the terms of the OT partnership. (Opp. at 84, 86.) But this theory makes no sense, because the delays and cost overruns would eventually become known. "It is hard to see what benefits accrue from a short

---

[20]  *See, e.g.*, *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) ("The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders").

[21]  Plaintiff also incorrectly asserts that Messrs. Colton and Lane failed to acquire shares as contractually required. (Opp. at 87.) However, Colton and Lane received stock in the form of Performance and Restricted Share Units, which fulfilled their stock ownership requirements. (Ex. 33 (Colton SEDI Report), at 2; Ex. 34 (Lane SEDI Report), at 2.)

respite from an inevitable day of reckoning." *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).[22] Finally, Plaintiff's allegation that the TRQ Defendants had "deep personal commitments" to the OT project and therefore were motivated to conceal development delays (Opp. at 84) is insufficient because it is a motive any executive would have. *See Novak*, 216 F. 3d at 307–08 (motives generally possessed by most corporate directors and officers do not suffice). Moreover, Plaintiff's cited support for the "deep personal commitment" (¶ 135) does not mention the TRQ Defendants, but rather describes an alleged meeting between Duffy and Rio Tinto executives.

## II.    TRQ's Statements Concerning the Projected Cost and Timeline for the Underground Development Are Forward-Looking Statements Protected by the PSLRA Safe Harbor

### A.    Plaintiff Does Not Adequately Allege That the TRQ Defendants Had Actual Knowledge That Any Forward-Looking Statements Were False

Plaintiff does not dispute that TRQ's predictions concerning the timeline for the first draw bell and sustainable production and the amount of capital expenditures required to complete development of the underground mining project—the main statements Plaintiff alleges were false—are forward-looking under the PSLRA.  Instead, Plaintiff principally argues that the safe harbor does not apply because Defendants had "actual knowledge" of falsity. (Opp. at 54,

---

[22] Plaintiff tries to diminish the import of TRQ's own investigation into Rio's re-forecast, and of TRQ's commissioning of the ICG Report, by alleging that Defendants "ignore[d] the results" of the investigation and "retaliate[d] against the investigator." (Opp. at 77.)  However, TRQ is not alleged to have retaliated against anyone or to have had any knowledge of or involvement in Rio Tinto's alleged "retaliation" against Bowley, Duffy, or Brinkmann. With respect to the allegation that TRQ "ignore[d] the results" of its own investigation, TRQ disclosed the status of its own investigation throughout the Class Period and the key risks it had uncovered, such as the delays and causes of delays surrounding Shaft 2 equipping, lateral development in the footprint, and the Primary Crusher system.  (Br. at 9–11 (citing Ex. 16 (Mar. 14, 2019 News Release), at 3–4; Ex. 13 (Feb. 26, 2019 News Release), at 1–2)).  Moreover, TRQ's investigation was conducted with the assistance of OreWin—independent mining experts who served as "Qualified Persons" under Canadian law—not Bowley.

57.)  This argument fails because, as shown above, the Complaint alleges no facts showing that the TRQ Defendants had actual contemporaneous knowledge their predictions were false.

The law is clear that the safe harbor "specifies an 'actual knowledge' standard for forward-looking statements," and liability therefore "'attaches only upon proof of knowing falsity.'"  *Gray* v. *Wesco Aircraft Holdings Inc.*, 454 F. Supp. 3d 366, 381 (S.D.N.Y. 2020) (quoting *Slayton*, 604 F.3d at 773).  Although Plaintiff's opposition brief repeatedly refers to information that was purportedly provided to personnel at *Rio Tinto*, there are no allegations that such information was shared with anyone at TRQ, and Plaintiff expressly alleges that Rio Tinto tightly controlled all such information and took steps to prevent its dissemination.  Plaintiff's allegations therefore do not give rise to any inference, let alone a strong one, that the TRQ Defendants had actual knowledge that their projections were unachievable.  The cases that Plaintiff relies on in which actual knowledge *was* adequately alleged (*see* Opp. at 54–55, 57–58) are therefore inapplicable.

Plaintiff further argues that certain details that were disclosed about the progress of the underground development were statements of existing fact and not forward-looking.  (Opp. at 53.)  But the Complaint does not adequately allege that these statements were false, much less that the TRQ Defendants had actual knowledge of their purported falsity.  Thus, Plaintiff refers to a statement by Mr. Lane that "shaft stripping and bracket installation" had been completed in the previous quarter, (*id.* (citing ¶ 319)), but fails to identify facts showing that statement was not true, or that Mr. Lane knew it was not true.[23]  Plaintiff also manufactures a purportedly false statement

---

[23]  The cases that Plaintiff cites on this point (Opp. at 42–43) are all distinguishable because, unlike here, there were adequate allegations of falsity and actual knowledge of falsity in those cases.  *See Moshell* v. *Sasol Ltd.*, 481 F. Supp. 3d 280, 285–86 (S.D.N.Y. 2020) ("on track" statements were made in conjunction with adequate pleading that defendants were made aware that progress was not on track, unlike here); *City of Pontiac Gen. Emps. Ret. Sys.* v. *Lockheed*

about Shaft 2 by cropping the actual quotation. (Opp. at 53–54.) The Complaint provides the full statement at issue: "Equipping is well underway *with the cable and piping installation initiated during the period.*" (¶ 319 (emphasis omitted).) There is no allegation that cable and piping installation were not initiated during that period, or that any of the TRQ Defendants knew that it had not been initiated.[24]

---

*Martin Corp.*, 875 F. Supp. 2d 359, 366 (S.D.N.Y. 2012) (unlike here, plaintiffs adequately pled falsity of the "highly specific" actionable statements about future growth); *In re Vivendi Universal, S.A. Sec. Litig.*, 2004 WL 876050, at *7 (S.D.N.Y. Apr. 22, 2004) (finding plaintiffs had "pled sufficient facts to create a strong inference that defendants did not reasonably believe their own ['on track'] statements at the time they were made"); *In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 533 (S.D.N.Y. 2004) (defendants, unlike here, provided no cautionary language on analyst call as to their being "comfortable" with the growth rate); *City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*, 957 F. Supp. 2d 277, 305 (S.D.N.Y. 2013) (plaintiffs alleged sufficient facts to show that defendants "had to appreciate" a delay in production and construction was likely); *In re Venator Materials PLC Sec Litig.*, 2021 WL 2980581, at *20 (S.D. Tex. July 7, 2021) (plaintiffs sufficiently pled defendants' knowledge that rebuild was not "on pace").

[24] Similarly, with respect to the statement that the Shaft 5 ventilation system was "fully operational" during the second quarter of 2018, Rio Tinto, the project manager, stated that the Shaft 5 ventilation system was "fully commissioned and is now operational" on July 17, 2018 (¶ 311), and Plaintiff alleges no facts to the contrary. Rather, Plaintiff alleges that another issue—a delay in the central heating plant ("CHP")—was impeding progress. (*Id*.) But, in the same earnings call, Mr. Lane made clear that work on the CHP was continuing. *See* Ex. 7 (Aug. 1, 2018 Investor Call), at 6 ("Overall, the main focus areas for the project continue to be critical [headings] development . . . [including] essential heating plant expansion."). And TRQ continued to update investors about the status of the CHP. *See, e.g.*, Ex. 18 (Apr. 15, 2019 News Release), at 1 ("Work continues on critical Shaft 2 equipping activities, central heating plant, mine infrastructure, underground materials handling systems and on priority underground development."); Ex. 20 (May 15, 2019 News Release), at 3 ("[T]he Central Heating Plant expansion has now moved into the commissioning phase [.]"). Plaintiff also alleges that a statement that OT had made 2.3 kilometers of lateral development during that quarter was false. (Opp. at 54.) But the disclosure in TRQ's Q3 2018 earnings release indicating 2.3 kilometers of lateral development in that quarter (¶ 337) was immediately updated and reduced in the following quarter to 2.1 kilometers "to reflect revised results" (¶ 383.) There is no allegation that any of the TRQ Defendants knew the initial figure was inaccurate when it was disclosed, and Plaintiff does not allege any responsive stock price reaction when the number was revised.

**B.    TRQ's Cautionary Statements Were Meaningful**

As we demonstrated in our opening brief, TRQ's forward-looking statements with respect to this highly complex mining project were also accompanied by meaningful cautionary language.  (Br. at 13, 33–39.)  Plaintiff incorrectly asserts that the risk disclosures did not change during the Class Period.  (Opp. at 56.)  In fact, from February 2019 forward, after Rio Tinto reported that it was encountering geotechnical conditions, TRQ's disclosures added a warning that the mining operational and technical risks that underground development at Oyu Tolgoi face included "geotechnical risks and ground conditions." (Br. at 13 (citing Ex. 13 (Feb. 26, 2019 News Release), at 3).)  In addition, as discussed above (at p. 5–6), after Rio Tinto first reported delays that would push back the date for sustainable production, TRQ announced that it was undertaking its own review of the causes and impact of those delays, and repeatedly cautioned that it would take time for that analysis to be completed and for the full impact on scheduling and costs to be understood.[25]

**III.    TRQ's Statements Regarding the Expected Timeline and Costs and Other Issues Were Statements of Opinion That Plaintiff Does Not Adequately Allege Were False**

We demonstrated in our opening brief that most of the statements that Plaintiff challenges are also statements of opinion that Plaintiff does not adequately allege to be false.  (Br.

---

[25] Plaintiff argues that TRQ's warnings failed to account for "past events" that rendered the warnings not meaningful, because the risks had purportedly "already materialized." (Opp. at 57.)  But, as previously discussed, those paragraphs refer to information allegedly communicated to personnel at *Rio Tinto*, not TRQ.  There are no factual allegations purporting to show that anyone at TRQ knew that such risks had "already materialized."  Plaintiff's argument that the TRQ Defendants cannot "take refuge" in statements attributing the announced delays to "ground conditions" because they purportedly "failed to disclose the true facts at OT" also fails. (Opp. at 57.)  In support of this argument, Plaintiff cites to paragraphs 73–-131, 134–161, and 165–86 of the Amended Complaint, which do not refer to information communicated to personnel at TRQ.  Thus, Plaintiff has not adequately alleged that anyone at TRQ knowingly misstated the reasons for delays or knowingly failed to disclose risks that had purportedly "already materialized."

at 40–41.)  Plaintiff does not dispute that the Complaint contains *no* allegations that any of the TRQ Defendants subjectively believed that any of their statements were untrue.  *See Tongue* v. *Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (statement of opinion can be false if "the speaker d[oes] not hold the belief . . . professed").

   Instead, Plaintiff first argues, purportedly relying on *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015), that Defendants' statements "are not opinions" because a "statement is an opinion only when it is expressly stated as such[.]"  (Opp. at 58.)  *Omnicare* does not impose such a requirement.  Quoting dictionary definitions, it states that a fact is "a thing done or existing" or "an actual happening," while an opinion is "a belief, a view, or a sentiment which the mind forms of persons or things."  *Id.* at 183.  It does not say that an opinion must be "expressly stated as such."

   Thus, consistent with pre-*Omnicare* cases,[26] courts after *Omnicare* have continued to rule that projections about the future "are quintessential opinion statements."  *Martin* v. *Quartermain*, 732 F. App'x 37, 44 n.1 (2d Cir. 2018).  "Estimates, in particular, constitute a well-established species of opinion."  *Id.*[27]  Courts have ruled that mining estimates and projections in particular are statements of opinion, not fact.  *See Martin*, 732 F. App'x at 40 (holding that mining

---

[26] *See*, *e.g.*, *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 108–11 (2d Cir. 2011) (statements concerning estimates that vary depending on the particular methodology and assumptions used . . . are subjective ones rather than "objective factual matters").

[27] *See also Wilson* v. *LSB Indus., Inc.*, 2017 WL 7052046, at *1 (S.D.N.Y. Mar. 2, 2017) (finding that cost and schedule estimates are statements of opinion, because they "express [defendant's] expectations for the future rather than presently existing objective facts" and "necessarily require judgment"); *Woolgar*, 477 F. Supp. 3d at 224 (finding estimates inactionable where complaint was "devoid of allegations demonstrating—or even plausibly suggesting—that Defendants did not honestly believe their opinions regarding" the estimates, "or that they believed those estimates to be false"); *City of Westland Police & Fire Ret. Sys.* v. *MetLife, Inc.*, 129 F. Supp. 3d 48, 68 (S.D.N.Y. 2015) (statements that "necessarily require judgment" are "statements of opinion or belief, not of fact").

company's estimate of the amount of gold a mine could produce "were statements of [the company's] opinion, rather than assertions of purported fact"); *In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609, at *4 (S.D.N.Y. Feb. 27, 2020) (holding that statements that "give commentary or updates on, or tacitly express confidence in, aspects of [the defendant's] mine plan, which provided estimates and projections for developing and administering the mine" were "statements of opinion" and therefore subject to the *Omnicare* standard). In addition, as in *Martin and Pretium*, the timeline and cost projections here were expressly identified as being "estimates only" and "based on assumptions that are subject to uncertainties and contingencies that may prove not to be correct." (Ex. 2 (TRQ Form 6-K dated May 19, 2015 (attaching the Underground Plan), at 5.)

Plaintiff then argues that, even if these statements were opinion statements, they "omitted material facts." (Opp. at 58.) But again, Plaintiff supports this argument by referring to information that Bowley and others allegedly conveyed to certain personnel *at Rio Tinto*, none of which is alleged to have been conveyed to anyone at TRQ.

Plaintiff argues that Defendants "made additional statements to support their purported 'opinions' that were themselves untrue." (Opp. at 59.) But these "supporting statements" were themselves either statements of opinion that are not adequately alleged to be false (for example, that the delays being experienced were "not atypical in the mining industry," particularly "for projects of this scale and complexity" (¶ 348)), or statements of fact also not sufficiently alleged to have been false. (*See* discussion above at pp. 18–19, 21.)

Plaintiff's argument that the Second Circuit's opinion in *Martin* supports Plaintiff's position on this issue (Opp. at 60–61) is difficult to fathom. Plaintiff argues that there are "obvious differences" between the estimates of the quality and quantity of recently discovered underground minerals at issue in *Martin* and the projected timeline and costs of the vast underground

development at issue here.  (Opp. at 60.)  But Plaintiff does not and cannot identify what those "obvious differences" are, since the estimates in both cases are based on initial sampling and expert analysis in an industry that is recognized as being "inherently risky," *Martin*, 732 F. App'x at 42, and in which it is well known that it "is not always possible to anticipate what miners will face as they dig deeper."  *In re Gold Resources Corp. Sec. Litig.*, 776 F.3d 1103, 1117 (10th Cir. 2015).  Plaintiff also argues that here, unlike in *Martin*, Bowley provided a "final report" showing the project was "massively underperforming."  (Opp. at 60.)  But again, there is no allegation at all that Bowley or anyone else ever communicated his "report"—or any of his purported conclusions—to anyone at TRQ.

## IV.    Certain of the TRQ Statements That Plaintiff Is Challenging Are Vague Statements of Optimism That Are Not Actionable

Plaintiff also fails to rebut our showing that certain of the statements by the TRQ Defendants are vague statements of optimism, or "puffery," that are not actionable.  (Br. at 42–43.)

Plaintiff's reliance on *Hawaii Structural Ironworkers Pension Tr. Fund* v. *AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821 (S.D.N.Y. 2019) (Opp. at 51) is misplaced because the court did not find that a company's statement that its integration was making "great progress" was actionable.  To the contrary, the court ruled that phrases like "quick," "very smooth," and "great progress" are so "vague and ill-suited to concrete measurement that they constitute puffery." *Id.* at 846.  Plaintiff further suggests that vague statements of optimism are actionable when they are made in response to analyst questions on earnings calls.  (Opp. at 51–52.)  There is no such rule.  Courts in this District have found similar statements made in response to analysts' questions to be inactionable puffery.[28]

_____

[28]   *See*, *e.g.*, *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 515 (S.D.N.Y. 2020); *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *17 (S.D.N.Y. Apr. 2, 2020); *In re Micro Focus Int'l Plc Sec. Litig.*, 2020 WL 5817275, at *13, 15 (S.D.N.Y. Sept. 29, 2020) (claiming

Plaintiff tries to distinguish *Villare* v. *Abiomed, Inc.*, 2021 WL 4311749, at *14-15 (S.D.N.Y. Sept. 21, 2021), on the grounds that here, unlike in *Villare*, the TRQ Defendants' statements supposedly offered "sufficient specificity to offer a[] guarantee of some concrete fact or outcome." But the Complaint here does not and cannot allege that the TRQ Defendants' statements ever provided a concrete outcome or guarantee regarding underground development at the mine.[29]

## CONCLUSION[30]

The Complaint against the Turquoise Hill Defendants should be dismissed, with prejudice.

Dated: New York, New York             Respectfully submitted,
      December 17, 2021

                                           PAUL, WEISS, RIFKIND,
                                             WHARTON & GARRISON LLP

                                         By: */s/ Gregory F. Laufer*
                                         Richard A. Rosen
                                         Gregory F. Laufer
                                         Robert N. Kravitz
                                         James G. Mandilk
                                         1285 Avenue of the Americas
                                         New York, New York  10019-6064

---

company was "on track" and "making steady" or "solid progress" was inactionable puffery; statements about being "on track" to deliver on budget was inactionable as forward-looking).

[29] The statements cited in Plaintiff's other puffery cases are also distinguishable from TRQ's. (Opp. at 52). *See Wash. State Inv. Bd.* v. *Odebrecht SA*, 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020) (statements that omitted information about Defendants' involvement in bribery scheme found to be actionable); In *re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 659–660 (S.D.N.Y. 2017) (actionable statements about Company's integrity included materially false statements of fact about Company's anti-corruption policy).

[30] We also demonstrated in our opening brief that the TRQ Defendants are not liable for statements made by the Rio Tinto Defendants. (Br. at 43.) Plaintiff does not respond to this issue and thus concedes it. *See Silvester* v. *Selene Finance, L.P*, 2021 WL 861080, at *8 (Mar. 8, 2021).

Tel:  (212) 373-3000
Fax:  (212) 757-3990
rrosen@paulweiss.com
glaufer@paulweiss.com
rkravitz@paulweiss.com
jmandilk@paulweiss.com

*Attorneys for Defendants Turquoise Hill
Resources Ltd., Luke Colton, Brendan Lane, and
Ulf Quellmann*