UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

IN RE TURQUOISE HILL RESOURCES LTD.
SECURITIES LITIGATION

------------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____               │
│ DATE FILED: 09/02/2022               │
└─────────────────────────────────────┘
```

20-cv-08585 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiffs the Pentwater Funds bring a putative class action for violations of Sections

10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and

Exchange Commission Rule 10b–5 against Turquoise Hill Resources Ltd. ("Turquoise Hill"),

Rio Tinto plc and Rio Tinto Limited (together, "Rio Tinto" or "Rio"), Rio Tinto International

Holdings Limited ("RTIH"), Jean-Sébastien Jacques ("Jacques"), Arnaud Soirat ("Soirat"), Ulf

Quellmann ("Quellmann"), Luke Colton ("Colton"), and Brendan Lane ("Lane") (collectively,

"Defendants").

Defendants move to dismiss the Second Amended Consolidated Complaint ("SAC" or

the "Complaint").  Dkt. Nos. 129, 132.

## BACKGROUND

The Court accepts as true for purposes of this motion the well-pled allegations of the

SAC as supplemented by the documents incorporated by reference.

### I.    The Relevant Parties

Turquoise Hill is a mineral-exploration and development company headquartered in

Montreal, Quebec, Canada, and a majority-owned subsidiary of Rio Tinto.  Its sole business is

the operation and development of the Oyu Tolgoi copper-gold mine in southern Mongolia, the company's only material mineral-resource property.  Dkt. No. 127 ¶¶ 38, 58.  Its common stock trades on the New York Stock Exchange and the Toronto Stock Exchange (and previously also traded on the Nasdaq) under the ticker symbol "TRQ."  *Id.* ¶ 41.

Quellmann was the Chief Executive Officer ("CEO") of Turquoise Hill from August 1, 2018 until his resignation on March 3, 2021.  Before becoming CEO of Turquoise Hill, Quellmann was Vice President of Strategic Projects, Copper and Diamonds at Rio Tinto from March 2018 to July 2018, and Chief Financial Officer ("CFO"), Coppers and Diamonds at Rio Tinto from August 2016 to February 2018.  *Id.* ¶ 42.  Colton has been the CFO of Turquoise Hill since October 9, 2017 and briefly served as Turquoise Hill's interim CEO after former CEO Jeff Tygesen resigned on May 29, 2018 and before Quellmann assumed that role in August 2018.  *Id.* ¶ 43.  Lane served as Vice President, Operations and Development of Turquoise Hill from February 2016 until his resignation in March 2019.  He was Finance Director of Rio Tinto Copper's Minera Escondida Limitada and Grasberg operation from 2013 to January 2016 and was a Rio Tinto employee while seconded to Turquoise Hill during the alleged class period— here, from July 17, 2018 to July 31, 2019 ("Class Period").  *Id.* ¶ 44.  Quellmann, Colton, and Lane are referred to as the "Turquoise Executive Defendants."  *Id.* ¶ 45.

Rio Tinto, which consists of Rio Tinto plc (a United Kingdom company) and Rio Tinto Limited (an Australian company), is one of the world's largest metals and mining companies.  *Id.* ¶ 46.  RTIH is a wholly owned subsidiary of Rio Tinto and holds a majority interest in the common stock of Turquoise Hill.  *Id.* ¶ 47.  It also is the manager of Oyu Tolgoi and manager of a substantial portion of Turquoise Hill's receivables and liquid asset deposits.  *Id.*

Jacques was the CEO of Rio Tinto from July 2016 until December 2020.  *Id.* ¶ 49.  He became deputy CEO in March 2016 and CEO in July 2016, largely as a result of his work in negotiating with the Mongolian government to restart underground development at Oyu Tolgoi.  *Id.*  Soirat served as the chief executive of Rio Tinto's Copper and Diamonds product group from 2016 to December 2020.  *Id.* ¶ 50.  Jacques and Soirat are sometimes referred to as the "Rio Executive Defendants" and together with the Turquoise Executive Defendants are referred to as the "Executive Defendants."

## II.    The Oyu Tolgoi Mine

The Oyu Tolgoi (the "Mine" or "OT") underground mine in southern Mongolia is expected to be one of the largest copper mines in the world.  *Id.* ¶¶ 3, 57.  The Mine is jointly owned by Turquoise Hill and the Government of Mongolia.  *Id.* ¶ 3.  OT is comprised of an open-pit copper mine and an underground mine.  *Id.* ¶ 5.  The open-pit copper mine has been in operation since 2013.  *Id.*  Drilling of the underground mine began in 2010 but was suspended in 2013 due to ongoing disputes between Rio Tinto and the Government of Mongolia as well as insufficient project financing.  *Id.*  By far the largest amount of copper ore at the site, and 80% of the mine's reserve value, is located in the underground mine.  *Id.*

OT is owned by Oyu Tolgoi LLC, a company 66% of whose equity is owned by Turquoise Hill, while the remainder is held by the Government of Mongolia.  *Id.* ¶¶ 52, 61.  In turn, Rio Tinto owns just over 50% of Turquoise Hill's common stock; manages the OT project under agreements between OT, Rio Tinto, and the Government of Mongolia; and, through RTIH, exercises near-total control over both the project and Turquoise Hill.  *Id.* ¶ 52.  During the Class Period, Quellmann, Lane, Colton and Soirat served on the Board of Directors of OT.  *Id.* ¶ 54.

Rio Tinto has contractual rights with respect to Turquoise Hill's public statements about OT.  In an April 2012 memorandum of agreement, Ivanhoe Mines (the predecessor for Turquoise

Hill) entered into an agreement with Rio Tinto related to public disclosures about OT.  It

provided:

> From the date of this Agreement that any and all public disclosure regarding the
> OT project ("OT Disclosure") must be consistent with the information provided by
> the Rio Tinto Manager (unless Ivanhoe determines that other OT Disclosure must
> be made to comply with Ivanhoe's disclosure obligations under applicable
> Securities Laws) and Ivanhoe covenants and agrees that it will not file or issue any
> OT Disclosure without providing the Rio Tinto Manager with a reasonable
> opportunity to review and comment thereon.

Dkt. No. 127 ¶ 53; Turquoise Hill Resources LTD, General Statement of Acquisition of

Beneficial Ownership - Amendment (Form SC 13D/A) (Apr. 20, 2012).[1]

Turquoise Hill's predecessor, Ivanhoe Mines, began initial work on the Mine as early as

2001, when it completed the first of five planned deep, large-diameter, concrete-lined shafts—

Shaft 1, a 1,385-meter-deep shaft to be used for preliminary exploratory and access work and

services on the underground-mine project.  Dkt. No. 127 ¶¶ 61–62.

In 2007, Ivanhoe Mines commenced work on a much larger shaft—Shaft 2—as part of

the development of the underground mine.  Work on Shaft 2 was conducted in 2007 and again in

2010 to 2013, when the sinking reached a depth of 1,167 meters.  *Id.* ¶ 62.  In August 2013, the

underground work and funding for the project's underground-expansion phase came to a

standstill amid a dispute between OT and the Mongolian government over financing and tax

payments.  *Id.* ¶ 63.

In 2015, Turquoise Hill, Rio Tinto, and the Government of Mongolia signed the 2015

Oyu Tolgoi mine-development and financing plan to begin Phase 2 of the underground

expansion.  *Id.* ¶¶ 6, 64.  The deal included a $4.4 billion financing plan for the project that

---

[1] The Complaint quotes a portion of this agreement.  The full agreement is incorporated by
reference, and, in addition, the Court takes judicial notice of its contents from the SEC filing.
*See In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 203 (S.D.N.Y. 2020).

Jacques personally negotiated with the then Prime Minister of Mongolia. *Id.* ¶ 64. In May 2016, the Government of Mongolia gave OT formal notice to restart second-phase underground construction, and Rio Tinto, Turquoise Hill, and the Government of Mongolia publicly announced the approval of the development of the Mine. *Id.* ¶ 65. Defendants publicly reported that the total development cost for the Mine would be $5.3 billion and that the first production ramp-up would begin in the first quarter of 2021. *Id.* ¶¶ 7, 65, 80 n.6. Defendants refer to that milestone as achieving "sustainable first production," an event that occurs after the "first drawbell" blasting. *Id.* ¶ 7.

In June 2016, Rio selected Jacobs Engineering Group Inc. ("Jacobs") as the principal contractor for the underground expansion at Oyu Tolgoi. *Id.* ¶ 80.

## III.    Development of OT

The planned development of OT involved a mining method called "panel caving." *Id.* ¶¶ 66–67. "Panel caving" involves a process by which mineral ore is undercut, drilled, and blasted in order to break off the ore; the ore then is removed and conveyed to tunnels or shafts that allow the ore to be brought to the surface. *Id.* ¶¶ 67–70. For panel caving to work, the construction of appropriate mine shafts is critical, as it allows for people, equipment, supplies, and mined ore to be moved between the surface and the underground mining area. *Id.* ¶¶ 71, 75.

By the beginning of the Class Period, the Mine's success depended on the construction and completion of primary crusher 1 and two key mine shafts and associated infrastructure, specifically, the Shaft 1 crusher and systems and Shaft 2. *Id.* ¶ 72. Shaft 2 was intended to be the main logistics hub for OT for both personnel and equipment needed to build the remainder of the underground Mine and, once finished, would increase mining expansion and productivity by at least a factor of five. *Id.* ¶¶ 74, 77. The timely development of Shaft 2 was also critical to the

Mine's profitability as it would allow investors to capitalize on the Mine's copper production just as copper prices were expected to rise.  *Id.* ¶ 77.

However, as soon as the work on the underground project resumed in 2016, the project was plagued by delays and cost overruns as a result of engineering, procurement, and construction issues.  *Id.* ¶ 8.  The most significant of these issues concerned Shaft 2.  *Id.*  In particular, during the shutdown of the project, inspections of the Mine revealed potentially catastrophic issues with the work that had been done by a contractor on the steel headframes for Shaft 2.  *Id.* ¶ 81.  Due to the severity of these issues, construction on Shaft 2 was delayed for eight months and required over $30 million in additional costs (which alone accounted for 10% of the Shaft 2 projected budget).  *Id*. ¶¶ 82–83.  According to a former employee, daily, weekly, and monthly progress reports on work related to fixing the headframe problem were provided to senior Oyu Tolgoi executive managers, including one individual who reported to Armando Torres—Oyu Tolgoi's CEO since May 2017; Torres in turn reported to and served on the OT Board of Directors with certain of the Executive Defendants.  *Id*. ¶ 84.

Further delays to Shaft 2 resulted from engineering problems and faulty construction.  *Id.* ¶¶ 88, 93.  In particular, the steel supplied for Shaft 2 was consistently subpar and had structural defects, which required 95% of the steel in Shaft 2 to be "worked on" before being installed.  *Id*. ¶ 85.  According to independent reports prepared for the Oyu Tolgoi Board Special Committee in 2021 ("ICG Report"), steelwork issues contributed significantly to cost overruns at OT.  *Id*.

Because of the extensiveness of the safety and design issues with Shaft 2, a former employee reported that it became clear as of the summer of 2017 that the underground development project was three to nine months behind schedule.  *Id.* ¶¶ 104–105.  And these delays and costs only grew: from the end of 2017 to June 2019, OT's monthly progress reports

were consistently short around 100–200 meters per month. *Id.* ¶¶ 104–106. One employee noted that by May of 2018, Shaft 2 was fourteen months behind its scheduled commissioning deadline. *Id.* ¶ 98.

According to a number of former Rio Tinto employees and Oyu Tolgoi managers, senior leadership at Oyu Tolgoi, Rio Tinto, and Turquoise Hill were acutely aware of the schedule and cost overruns resulting from these faulty construction and steel-quality problems. *Id.* ¶¶ 94, 103. For example, Grant Brinkmann, Rio Tinto's Senior Area Manager of Shafts at OT from June 2015 to May 2018 and the person with direct responsibility for Shaft 2, reported that Rio Tinto senior management was fully aware of the delays and cost overruns, including due to the problems with the Shaft 2 headframe. *Id.* ¶ 94. And another former employee noted that as of October 2018, the former employee was directed to send weekly progress reports to Defendant Jacques, which Jacques demanded as he was concerned about the extent of the delays. *Id.* ¶ 105.

## IV.   Individuals Raise Concerns about OT

Around 2017, two senior Rio Tinto executive hired an experienced mining executive, Richard Bowley, to investigate the problems at OT. *Id.* ¶ 111. The executives were Defendant Soirat and Craig Kinnell, who was the Chief Development Officer of Rio Tinto's Copper and Diamonds division in charge of the Oyu Tolgoi project from December 2014 to July 2018. *Id.* Bowley was told by Kinnell that he was being hired to tell them the truth about how bad the situation was. *Id.* ¶ 112. Bowley had previously worked at OT from 2011 through 2015 as an employee of AMEC Foster Wheeler, which was at the time engaged to develop the underground study, value, and detailed engineering for Phase 2 of the OT underground project.

Bowley had identified one of the key problems with OT to be Jacobs, the primary contractor for engineering, procurement, and construction at the Mine. *Id.* ¶¶ 79–80, 112–113, 115. In a July 3, 2017 exchange, Bowley reported to Kinnell that, as a result of his discussions

7

with senior managers on the ground at OT, "two out of three of your senior guys on the project

have told me Jacobs are failing badly," warning that "[w]e both know that mess will lead straight

to OTs door in the shape of schedule overruns and cost." *Id.* ¶¶ 14, 115.  Kinnell immediately

responded, agreeing that "it is all getting messy Richard and needs intervention to stop it from

getting significantly worse." *Id.*

Kinnell asked Bowley to write a paper discussing the issues at OT and how Bowley

would address them. *Id.* ¶ 116.  In November 2017, Bowley met with Defendant Soirat for an

hour-long interview, during which he discussed his paper.  Following the meeting, Bowley was

hired by Rio as General Manager for Strategic Projects and Chief Advisor for the OT project.[2]

*Id*.

Shortly after he was hired, Bowley confirmed concerns that the underground project

could not be completed for the original budget of $5.3 billion nor achieve sustainable first

production in the first quarter of 2021. *Id.* ¶ 117.  Upon speaking with people on the ground,

Bowley realized that the engineering, construction, and procurement on the project "could hardly

be worse" and that such poor engineering, construction, and procurement would result in delays

and cost overruns. *Id.* ¶ 120.  Throughout the first half of 2018, Bowley reported the "potential

disaster" at OT to various senior executives at Rio, including Defendant Soirat. *Id.* ¶¶ 141–152.

On February 1, 2018, Bowley made a presentation at Rio's London headquarters to Kinnell and

Rosemary Fagen and reviewed the cost overruns, schedule delays, and Shaft 2 problems. *Id.*

¶ 141.  Fagen was the Vice President for Human Resources for Rio Tinto's Copper and

Diamonds group since July 2016 and for Rio Tinto Copper since September 2014, reported

---

[2] Based on the allegations in the Complaint, it is unclear exactly when Bowley was hired.  Dkt. No. 127 ¶ 116.

directly to Soirat, participated in the meeting on behalf of Soirat, and, according to Bowley, reported the substance of the meeting to Soirat. *Id.*

After the February meeting, Bowley followed up with Soirat and Fagen about the need for immediate action to address the cost overruns and delays, and both of them were aware of the problems at OT. *Id.* ¶ 143. Bowley spoke with Soirat for an hour in May 2018 about the problems facing the expansion. *Id.* ¶ 144. And, on July 19, 2018, Bowley wrote to Fagen stating: "12 months behind schedule. $300mill capital over budget. Expect this to rapidly escalate." *Id.* ¶¶ 141–142, 151.

Due to his reports, Bowley was marginalized within Rio Tinto by Soirat, and Bowley's role was reduced, although he continued to report on the cost overruns and delays to Soirat and Fagen, urging them to correct their misstatements to the public. *Id.* ¶¶ 208–214. In May 2018, Soirat instructed Bowley to stop looking into delays and cost overruns at OT. *Id.* ¶ 281. According to Bowley, during their one-on-one meeting in May 2018, Soirat "seemed to be saying that he knew that there was a big problem with the project but he did not want anyone else to know this." *Id.* ¶ 282. In January 2019, Rio Tinto told Bowley that he was being terminated without reason. *Id.* ¶ 221.

In around 2016, Dr. Maurice Duffy, the head of GFI Blackswan ("Blackswan"), which had served as an executive coaching consultant for Rio Tinto since 2007, started to report concerns about unethical behavior and "potential overstatements" at OT. *Id.* ¶ 132–133. Blackswan began performing executive coaching sessions in Mongolia in around 2005. *Id.* ¶ 133. In connection with that work, Duffy said that he began to hear reports and concerns from senior leaders in Mongolia about unethical behavior and "potential overstatements" at OT in around 2016. *Id.* Duffy provided regular reports about this feedback to the head of Rio's human

resources department, who then delivered the reports to the CEO, Executive Committee, and the Board chairman of Rio Tinto.  *Id.*  Duffy stated that he knew that Rio's Executive Committee—which at the time included Soirat and Jacques—was briefed on these reports because the Executive Committee provided feedback on them to Blackswan.  *Id.*

In mid-2017, Duffy was instructed to stop providing these reports, although he did not stop until September 2017 when he was again instructed to stop providing them.  *Id.* ¶ 134.  This instruction concerned Duffy who felt compelled, as a result, to bring his concerns about cost overruns and schedule delays at OT to the attention of Rio Tinto's senior leadership in London in September 2017.  *Id.* ¶ 135.  He did so specifically by raising them with the Head of Human Resources at Rio Tinto in a meeting on September 6, 2017.  *Id.*  During this meeting, Duffy provided the Head of Human Resources with a document containing comments from coaching assessments in 2016 and 2017, which included comments from senior leaders involved with OT stating, among other things: "Soirat knows what's going on and worry [sic] about renegotiation by Mongolia Government," "Delays and cost over-runs are understated in Mongolia," and "I have escalated issues of concern regarding scheduling at OT—no one wants to hear."  *Id.* ¶ 135. The reports also stated that comments from senior leadership at OT made clear that Jacques knew about these problems and was driving the effort to conceal the reality at OT.  *Id.* ¶ 136. The Head of Human Resources told Duffy to drop and disregard these concerns and that Jacques would not appreciate hearing these concerns and he would regret reporting them to him.  *Id.* ¶ 137.  Duffy resigned and terminated his firm's contract with Rio in December 2017 due to concerns about unethical behavior in Mongolia, which he communicated to Rio's senior leadership.  *Id.* ¶ 138.  According to Duffy, Jacques "knew without a doubt" about the problems

at OT by 2017, and it was clear Jacques knew the "wheels were coming off" the project at OT in January 2018 when he traveled to Mongolia. *Id.* ¶ 140.

## V.     Re-Forecast

After May 2018, Rio Tinto and OT began to "manipulate the schedule" to hide the delays by transferring costs and projects related to the major infrastructure of Shaft 2 to secondary phases. *Id.* ¶ 169.  The tasks that were de-scoped were critical infrastructure and had to be completed before Shaft 2 could become active. *Id.* ¶ 170.

Plaintiffs further allege that the Defendants attempted to conceal the cost overruns and delays plaguing the project through a re-forecast in October 2018. *Id.* ¶ 173.  On October 15, 2018, Turquoise Hill announced an underground development "update" and "re-forecast," disclosing a two-quarter delay to sustainable first production, which would push the scheduled date from the end of the first quarter of 2021 to the end of the third quarter. *Id.* ¶ 174.  Rio Tinto made a similar disclosure the following day. *Id.* ¶ 175.  Both companies reiterated that capital costs remained in line with the $5.3 billion budget, and Rio Tinto reiterated that construction of the first draw bell is still expected in mid-2020. *Id.* ¶¶ 174–175.  Plaintiffs allege that this re-forecast minimized the true extent of delays and denied the cost overruns, which were internally understood to be between twelve and eighteen months and hundreds of millions of dollars. *Id.* ¶ 176.  Moreover, Defendants attributed delays to "ground conditions," which was untrue as the true cause of delays was related to construction, engineering, and procurement failures primarily related to Shaft 2. *Id.* ¶ 176.

Bowley stated that Rio Tinto knew that the disclosure was misleading because Bowley had previously told Soirat that the project was twelve to fifteen months behind schedule and at least a half a billion dollars over budget. *Id.* ¶ 180.  Other former employees confirmed that it was widely known and discussed internally that these public statements were false. *Id.* ¶ 182.

The ICG Report, which was later published, confirmed that such reporting was misleading and that it was "inconceivable that Senior Management both on the Project site and in the higher-level committees were not aware of these shortcomings."  *Id.* ¶¶ 184–185.

Bowley repeatedly expressed his concerns about the re-forecast to senior management. *Id.* ¶¶ 214–217.  For example, On October 30, 2018, Bowley wrote the following email to Fagen about the re-forecast:

> **From:** Richard Bowley (OT)
> **Sent:** 30 October 2018 03:08
> **To:** Fagen, Rosemary (RTHQ) <Rosemary.Fagen@riotinto.com>
> **Subject:** Bit more info and thinking for you !
>
> Hi R.
>
> You and me both know the TRQ statement is a little light on the truth. Nine months is already twelve months, and if you don't know commissioning being one of the biggest risks to any project may add a further three to six months. It's easy to state we can still blow first drawbell with limited exposure to schedule slippage, but if the decline and the conveyors are not commissioned, I am not sure how people think we get that ore to the surface ??? The risks are only going to get bigger.
>
> I know in shaft 2 this month the target was 100 sets. Month to date I think its around 3 !!!!!! You do the numbers ?? It's not rocket science, and it's certainly not a Geo issue as TRQ stated, it's purely construction.

*Id.* ¶ 214.  On December 10, 2018, Bowley again wrote to Fagen warning of the severe implications for the business and reminding her of the delays, stating that they could only be ignored for so long "before it will slap us in the face properly along with GOM and other TRQ shareholders . . . sorry to be honest."  *Id.* ¶ 218.  Fagen responded: "Hi Richard I hear you !!!!  I will have a discussion with Arshad [Sayed] and Arnaud [Soirat] – again!"  *Id.* ¶ 219.  As mentioned, Bowley was terminated in January 2019.  *Id.* ¶ 222.

## VI.   Whistleblower

The day after Bowley was terminated in January 2019, Bowley wrote a critical letter to Arshad Sayed, Rio's Copper and Diamonds Chief Development Officer, and Fagen stating that Rio Tinto's compliance was deficient.  *Id.*  Within three days of sending the letter, Bowley

received a phone call from a Rio Tinto compliance manager who said he was coming to Mongolia to investigate. *Id.* Bowley described the investigation as effectively a cover up; the compliance manager completed his investigation in six days and concluded that there were no compliance breaches. *Id.* ¶ 223–224.

After the investigation was closed, Bowley sent a letter about his concerns to Ann Godbehere, a member of Rio Tinto's Board of Directors, on March 27, 2019. *Id.* ¶ 227. On April 2, 2019, Bowley emailed Jacques and Godbehere, telling Jacques how behind schedule the project was. *Id.* ¶ 228. Rio Tinto then engaged the law firm Baker McKenzie to do a compliance review. *Id.* ¶ 229. Plaintiffs allege that rather than complete a proper investigation, Rio Tinto's lawyers at Baker McKenzie pursued Duffy throughout the Class Period seeking to destroy the data his firm had collected from Rio executives. *Id.* ¶ 288.

On May 21, 2019, the *Australian Financial Review* reported that Rio Tinto had retained a law firm to investigate allegations by an unnamed whistleblower about when Rio knew about problems with the underground-mine project. *Id.* ¶ 237. On July 8, 2019, the *Australian Financial Review* published a report suggesting that the problems at OT that Rio had blamed on newly available "geotechnical data" may have been known by Rio for a year. *Id.* ¶ 240. On July 10, 2019, Turquoise Hill disclosed that a Turquoise Hill director had abruptly resigned from the Board. *Id.* ¶ 241.

Five days later, Rio Tinto and Turquoise Hill publicly disclosed a substantial delay for first production of sixteen to thirty months compared to the original feasibility study guidance in 2016 and disclosed that the capital spend for the project would increase by $1.2 billion to $1.9 billion over the $5.3 billion previously disclosed. *Id.* ¶ 242. In response to this news, Turquoise

Hill's common stock price decreased by approximately 43.9% from the prior day's closing price. *Id.* ¶ 244.

## VII.    Defendants' Alleged Misstatements

Plaintiffs allege that Defendants made repeated misstatements concerning the schedule and budget for Oyu Tolgoi during the Class Period, including that it was progressing on schedule and that costs for the project were on budget. *Id.* ¶ 305.  These statements are included below and are detailed in the SAC in paragraphs 306 to 424.

On July 16, 2018, Turquoise Hill issued a press release announcing its second quarter 2018 production and the completion of Shaft 5.  The press release stated that Oyu Tolgoi had "achieved an important underground development milestone with the completed commissioning of Shaft 5" and that "[t]here is expected to be a step-up in underground activities with the increased ventilation capacity from Shaft 5.  The Company continues to expect the first drawbell in mid-2020 and sustainable first production in 2021." *Id.* ¶ 306.  On July 17, 2018, Rio Tinto issued a similar press release, stating that the "major growth projects remain on track with . . . construction of the first drawbell at Oyu Tolgoi Underground anticipated in mid-2020." *Id.* ¶ 307.

On July 31, 2018, Turquoise Hill issued a press release and a Management Discussion and Analysis ("MD&A") announcing its financial and operating results for the second quarter of fiscal year 2018.  It reported a "record-level of equivalent underground development" for the month of June. *Id.* ¶ 313.  The press release stated that Rio Tinto had undertaken a schedule and cost review and had provided Turquoise Hill with a "high-level overview of the review's outcomes."  The review concluded "that there were no material changes in project scope, cost or schedule.  Following analysis of the review's conclusions, Turquoise Hill is in agreement with the findings." *Id.*

In a conference call with investors the following day, August 1, 2018, Lane, Colton and Quellmann each independently stated and confirmed that Oyu Tolgoi was "on target" for "first drawbell in mid-2020 and sustainable first production in 2021." *Id.* ¶ 315.  With respect to funding, Colton stated that Turquoise Hill had at its "disposal" "about $2.6 billion left of project financing [and] about $1.5 billion in TRQ cash" which it would "use . . . to continue to fund the underground" and that there was an "additional $1.6 billion in supplemental debt" that Turquoise Hill would be able to raise before it hit its debt cap.  *Id.* ¶ 321.

On August 1, 2018, Rio Tinto filed a Form 6-K, which included a report on the OT, stating "construction of first drawbell expected in 2020" and "[a]ll material assumptions underpinning that target continue to apply and have not materially changed." *Id.* ¶ 323.  That same day, Rio Tinto held an investor conference call and a presentation for the call noted that the Oyu Tolgoi underground development remained "on track" (in two places) and on budget with "$5.3 billion Oyu Tolgoi underground first drawbell production in 2020." *Id.* ¶ 324.

On August 15, 2018, Soirat appeared on a Mongolian news network, MBN World, and stated that he had recently visited Oyu Tolgoi and met with Mine employees, that Oyu Tolgoi was "37% complete," and that the underground project was "on plan and on budget." *Id.* ¶ 328.

On September 26, 2018, Jacques gave a presentation on behalf of Rio Tinto at the Bernstein Pan European Strategic Decisions Conference in London. *Id.* ¶ 329.  The presentation stated that the "$5.3 billion Oyu Tolgoi underground first drawbell production" would take place in 2020. *Id.*  On October 2, 2018, Soirat gave a presentation at a roadshow held in the United States, stating: "Underground project on budget and schedule"; "$5.3 billon capex projected"; "First drawbell production expected mid-2020"; and "UG [underground] project on time to deliver mid-2020." *Id.* ¶¶ 331–332.

On October 15, 2018, Turquoise Hill issued a press release announcing its third quarter 2018 production results.  *Id.* ¶ 334.  Turquoise Hill disclosed that there would be a two- or three-quarter delay in achieving sustainable production, which it attributed to unspecified delays (which it called "schedule contingency") and "challenging ground conditions" affecting the completion of Shaft 2.  At the same time, it stated that "[a]ccording to this re-forecast, lateral development has progressed well, construction completion schedule remains on track for 2022 and the project is expected to be completed at the $5.3 billion budget estimate disclosed in the 2016 Oyu Tolgoi Feasibility Study and the 2016 Oyu Tolgoi Technical Report."  *Id.* at ¶¶ 334–336.  A table that accompanied the release reported that Turquoise Hill had achieved 2.3 kilometers in lateral development during the quarter.  *Id.* ¶ 337.

Rio Tinto echoed these comments in an October 16, 2018 press release.  *Id.* ¶ 338.  Rio Tinto stated:

> Following an annual re-forecast of the Oyu Tolgoi underground development schedule and costs, capital costs remain in line with the overall $5.3 billion budget and construction of the first draw bell is still expected in mid-2020.  The preliminary re-forecast assessment indicates ground conditions and shaft sinking challenges that are ultimately expected to result in a revised ramp-up schedule to sustainable first production.

*Id.* ¶ 338.

On November 1, 2018, Turquoise Hill issued a press release announcing its financial results for the third quarter of fiscal year 2018.  *Id.* ¶ 344.  In its press release, it reported on Rio Tinto's second annual re-forecast of the underground-development schedule and costs, stating that "construction completion schedule remains on track for 2022 and the project is expected to be completed at the $5.3 billion budget estimate."  *Id.* ¶ 345.  It continued:  "[S]ustainable first production . . . is now expected to occur by the end of Q3'21 instead of Q1'21 [as] a result of certain delays including, but not limited to, the completion of Shaft 2, which includes over four

months of schedule contingency and challenging ground conditions." *Id.* Finally, Turquoise Hill stated, "[f]irst draw bell remains on track for mid-2020." *Id.*

During an investor call on November 2, 2018 regarding Turquoise Hill's third quarter financial results, Quellmann reassured investors that the delay "was not atypical in the mining industry." *Id.* ¶ 348. In response to questions about why the budget had not increased, Quellmann also stated that "[f]or now, where we are with the information that we've provided, we confirm the $5.3 billion total budget." *Id.* ¶ 350. Defendant Lane reassured investors on the call that "ground condition problems" were a cause of the delay. *Id.* ¶¶ 355–357.

In a corresponding investor presentation on Turquoise Hill's third quarter financial results dated November 2, 2018, the company made further reassuring statements about the status of underground development. Among other things, the presentation represented that the "UG development project budget [was] unchanged," that "key risks" were "well understood and managed," and that "Turquoise is Well Positioned to Address Key Challenges," including having sufficient funding to develop the mine. *Id.* ¶ 362.

Following the October 2018 re-forecast, Defendants continued to provide investors with assurances that OT was on budget and on schedule as that schedule had been modified. *Id.* ¶¶ 365–367.

On November 12, 2018, at the UBS Australasia Conference in Sydney, Australia, Jacques presented slides that described OT as "the largest and highest quality copper development" in the world, with "$5.3 billion Oyu Tolgoi underground first drawbell production in 2020." *Id.* ¶ 365.

On January 17, 2019, Turquoise Hill gave an investor presentation at the TD Securities Mining Conference. The slide deck accompanying the presentation, which noted that it included information from Rio Tinto, stated that Turquoise Hill was "Well Positioned to Address Key

Challenges," that OT's "UG development project [was] unchanged," that the "Key risks" to the project were "well understood and managed," and that development was proceeding in accordance with the revised schedule.  *Id.* ¶ 366.

On January 18, 2019, Rio Tinto issued a press release disclosing its third quarter production results, which stated that: "Overall progress continues to track in-line with the re-forecast undertaken in the third quarter of 2018."  *Id.* ¶ 367.

Beginning on February 27, 2019, Plaintiffs allege that the Defendants began to disclose the truth about the delays at OT, although they continued to mislead investors about the overall project budget and the reason for the delays.  *Id.* ¶ 369.

On February 27, 2019, Turquoise Hill issued a press release stating that sustainable first production was likely to be delayed beyond Q3'21 blaming "ground conditions."  *Id.* ¶ 230.  The company stated that it had conducted its own review of Rio Tinto's schedule and cost reforecast and "found that project cost was expected to remain within the $5.3 billion budget but that there was an increasingly likely risk of a further delay to sustainable first production beyond Q3'21."  *Id.* ¶ 230.  The company stated that the delay was attributable to "certain delays to the completion of Shaft 2, which contained to experience challenges during Q4'18 with structural, mechanical, piping and electrical installation productivity below expectations," as well as "challenging ground conditions" and new "more detailed geotechnical data than what was previously available."  *Id*.  Turquoise Hill stated that the new geotechnical information could require some "potentially significant changes to the design of some future elements of the development, and the development schedule," which together could result in an "overall schedule delay to sustainable first production beyond the end of Q3'21."  *Id.*

That same day, Rio Tinto issued its year-end results and conducted a conference call. In its announcement of year-end results, Rio Tinto stated that while "underground lateral development has proceeding well," the fit out of Shaft 2 would be "delayed by several months" and that "difficult ground conditions encountered had slowed progress in some areas of underground development." *Id.* ¶ 231. On the conference call, Jacques responded to an analyst question regarding "what exactly . . . you [are] experiencing," by stating, among other things, "[t]his is, absolutely, a normal process." *Id.* ¶ 232.

That same day, Rio Tinto issued a written presentation, which represented that the OT underground project "Progressed well in 2018," as well as its 2018 Annual Report. *Id.* ¶ 372. The 2018 Annual Report made the same statements about the Oyu Tolgoi project (with immaterial variations) as the year-end results, stating that the "[t]otal approved capital cost" of the Oyu Tolgoi project was $5.3 billion and that "[b]y 2027, we expect our Oyu Tolgoi mine in Mongolia to become one of the world's top producers of copper." *Id.* The 2018 Annual Report also included a letter by Jacques that stated: "[t]he detailed engineering design work and overall construction is mostly on track." *Id.*

Following the February 27, 2019 disclosures, TRQ shares dropped nearly 13% from $2.10 per share on February 26, 2019 to close at $1.83 per share on February 27, 2019, on trading volume of more than 18 million shares. The next day, TRQ shares dropped again by nearly 7% from $1.83 per share to $1.71 per share on trading volume of almost 9 million shares. *Id.* ¶ 233.

Following the February disclosure, Defendants continued to misrepresent the true extent of cost overruns at OT and their causes. *Id.* ¶ 381. For example, on March 14, 2019, Turquoise Hill issued a press release stating that the OT project was expected to remain within the $5.3

billion budget, but it added that there may be additional delays to sustainable first production.

*Id.* ¶¶ 235, 381.

On or around July 16, 2019, Rio Tinto and Turquoise Hill announced a delay for

sustainable production of sixteen to thirty months compared to the original feasibility study

guidance in 2016, resulting in sustainable first production now being expected between May

2022 and June 2023, and announced that the capital spend for the project would be $1.2 to $1.9

billion more than the $5.3 billion previously disclosed.  *Id.* ¶¶ 242, 403.

In a press release issued by Rio Tinto that day, McIntosh stated:

> We have made significant progress on a number of key elements in the construction
> of the underground project during 2019.  However, the ground conditions are more
> challenging than expected and we are having to review our mine plan and consider
> a number of options.  Delays are not unusual for such a large and complex project
> but we are very focused as a team on finding the right pathway to deliver this high
> value project.

*Id.* ¶ 234.

Following that news, the price of Turquoise Hill common stock dropped from the prior

day's closing price of $1.07 per share to $0.60 per share, with over 50.2 million shares traded.

*Id.* ¶ 244.

On July 31, 2019, Turquoise Hill issued a news release that added that new financing

would be needed to complete the project, that a definitive estimate review was not expected to be

completed until the second half of 2020, and that it would be required to take a $600 million

impairment charge.  *Id.* ¶ 246.  Turquoise Hill stock price fell 8.6% from a close of $0.58 per

share on July 31, 2019 to a close of $0.53 per share on August 1, 2019.  *Id.*  ¶ 247.

## VIII.   Post-Class Period Developments

In early March 2020, Bowley reported Defendants' alleged misconduct to securities

regulators, including to the U.S. Securities and Exchange Commission ("SEC"), the Australian

20

Securities and Investments Commission, the U.K. Serious Fraud Office and Financial Conduct Authority, and the Mongolia Financial Regulatory Commission.  *Id.* ¶ 262.  In connection with a separate employment dispute before the U.K. Employment Tribunal, Bowley provided a 62-page sworn statement in which he stated that he reported his concerns about schedule delay and cost overruns to Kinnell and Fagen but that Rio Tinto withheld the "true facts" from investors and the market and misled the market.  *Id.*  Bowley stated his belief that Rio Tinto was seeking to suppress his reports and had made misleading statements to the market regarding the OT project. *Id.*

Around the same time, on March 20, 2020, Turquoise Hill disclosed that it would require at least an additional $4.5 billion in financing to complete the Oyu Tolgoi underground expansion and that this financing was required on top of the $2.2 billion Turquoise Hill had in available liquidity.  *Id.* ¶ 263.

In December 2020, a Parliamentary Working Group ("PWG"), which Mongolia had established to investigate the OT project, proposed resolutions that the Government should "take comprehensive measures to improve the implementation" of its various agreement related to the OT underground development project.  *Id.* ¶ 264.  These resolutions were unanimously passed by the Mongolian Parliament.  *Id.*  In a December 18, 2020 videoconference, members of the PWG, and in particular Minister Luvsannamsrain Oyun-Erdene, raised concerns with Rio's senior executives—including Soirat and Sayed—that the cost overruns in the OT underground Mine and the decline in project benefits had confirmed the necessity to increase the project's benefits to Mongolia and that the Government would, if necessary, terminate the 2015 agreement.  *Id.*

On February 8, 2021, Mongolia announced that it was seeking to cancel the OT deal with Rio Tinto and would replace that deal with a new agreement, explaining that the significant cost increases at OT eroded the economic benefits the Mongolian government expected to receive from the mine.  *Id.* ¶ 265.

On November 30, 2022, the OT Board established a special committee consisting of two representatives of Mongolia and two representatives of Turquoise Hill to investigate the causes of cost overruns and schedule delays.  *Id.* ¶ 266.  A group referred to as the Independent Consulting Group—*i.e.*, the group who produced the ICG Report—was hired and was composed of highly experienced and qualified mining professionals.  *Id.*  The ICG Report was submitted on August 3, 2021 to the special committee and concluded that "the underground expansion project's delays and cost overruns began as soon as work resumed in 2016 and were caused by engineering, procurement, and construction problems related to Shaft 2 and associated work in completing Shafts 1 and 5—and not by any geotechnical issues."  *Id.* ¶ 267.  The ICG Report also reported that Rio had refused to cooperate fully with the ICG, refusing to release certain documents.  *Id.* ¶ 301–303.

## PROCEDURAL HISTORY

The original class complaint in this action was accepted for filing on October 15, 2020, Dkt. No. 1.  The Pentwater Funds were appointed as lead plaintiffs on January 15, 2021 and filed a consolidated complaint on March 16, 2021.  Dkt. Nos. 103, 109.  The operative complaint, the SAC, was filed on September 16, 2021.  Dkt. No. 127.  Lead plaintiffs bring this action on behalf of a class of investors who purchased or otherwise acquired Turquoise Hill securities during the Class Period in domestic transactions or on United States exchanges.  *Id.* ¶ 1.

On October 19, 2021, Defendants Rio Tinto, RTIH, Jacques, and Soirat (collectively the "Rio Defendants") moved to dismiss all claims asserted against them in the Complaint.  Dkt.

Nos. 129–31.  Also on October 19, 2021, Defendants Turquoise Hill, Colton, Lane, and

Quellmann (collectively, the "Turquoise Defendants") moved to dismiss all claims asserted

against them in the Complaint.  Dkt. Nos. 132–34.  Plaintiffs filed their memorandum of law in

opposition to the motions to dismiss on November 16, 2021.  Dkt. Nos. 135–36, 144.[3]  The Rio

Defendants and the Turquoise Defendants separately filed reply memoranda in further support of

their motions to dismiss on December 17, 2021.  Dkt. Nos. 137–39.  On August 4, 2022,

Plaintiffs filed a letter to the Court addressing the Second Circuit's decision in *SEC v. Rio Tinto*

*plc*, -- F.4th --, 2022 WL  2760323 (2d Cir. July 15, 2022).  The Rio Defendants and Turquoise

Defendants each responded to that letter on August 10, 2022, and Plaintiffs filed their reply on

August 11, 2022.  Dkt. Nos. 141–144.

The Court heard oral argument on the motions on August 25, 2022.  Following oral

argument, the Turquoise Defendants wrote a letter to the Court addressing the Turquoise Hill

Board of Directors' obligations with respect to the company's minority shareholders.  Dkt. No.

147.

## LEGAL STANDARDS

### I.      Motion to Dismiss

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true

all factual allegations in the complaint and draw all possible inferences from those allegations in

favor of the plaintiff.  *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).  This

requirement "is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[3] Plaintiffs filed a corrected memorandum of law in opposition to the motions to dismiss on
August 22, 2022 after discovering errors in the citations to certain paragraph numbers in the
SAC.  Dkt. Nos. 144–145.

Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

## II.     Section 10(b) and Rule 10b–5(b)

To plead a claim for damages under Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b–5(b), a plaintiff must satisfy each of the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014); *see Matrixx*, 563 U.S. at 37–38; *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

"'The test for whether a statement or omission is materially misleading' . . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec.*

24

*Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach*, 355 F.3d at 172 n.7).  This test is objective and looks to the understanding of the "ordinary investor."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015).  Moreover, under the federal securities laws, "literal accuracy is not enough.  An issuer must as well desist from misleading investors by saying one thing and holding back another."  *Id.* at 192.  Companies have a duty of disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'"  *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. 240.10b-5(b)).  "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

To be actionable, a misrepresentation or omission also must be material, *i.e.*, a plaintiff must allege facts showing that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).  Thus, "[i]n judging whether an alleged omission was material in light of the information already disclosed to investors, [the court] consider[s] whether there is 'a substantial likelihood that the disclosure of the [omitted material] would have been viewed by the reasonable investor as having significantly altered the total mix of information [already] made available.'"  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

However, Section 10(b) and Rule 10b–5(b) "do not create an affirmative duty to disclose any and all material information."  *Matrixx*, 563 U.S. at 44.  "Materiality alone does not demand

disclosure, nor does the duty to disclose encompass non-material information."  *In re ProShares*, 728 F.3d at 102 (quoting *Panther Partners, Inc. v. Ikanos Comm'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008)).

When a claim sounds in fraud, such as claims brought under Section 10(b) and Rule 10b–5, the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) also applies. Under Rule 9(b), a "party must state with particularity the circumstances constituting fraud."  A complaint making such allegations must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Rombach*, 355 F.3d at 170 (internal quotation marks and citation omitted).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes additional requirements on a plaintiff bringing a private securities fraud action.  See 15 U.S.C. § 78u-4(b)(1).  The "complaint [must] specify each statement alleged to have been misleading, the reasons or reason why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed."  *Id.*  The plaintiff cannot plead "the materiality of the alleged misstatements or omissions . . . in a conclusory or general fashion."  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626 (S.D.N.Y. 2005).

Moreover, under the PSLRA, where the complaint alleges scienter, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."  15 U.S.C. 78u-4(b)(2).  Under this heightened pleading standard for scienter, a plaintiff will sufficiently allege scienter and a complaint will survive, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be "taken collectively," and "the court must take into account plausible opposing inferences." *Id.* at 323.

## DISCUSSION

Plaintiffs bring claims for Defendants' false statements and omissions under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and under Rule 10b–5(b) promulgated thereunder, 17 C.F.R, § 240.10b–5(b), against all Defendants.  They also bring a claim against all Defendants under Section 10(b) and Rule 10b–5(a) and (c), promulgated thereunder, 17 C.F.R, § 240.10b–5(a) & (c), alleging that Defendants engaged in deceptive and manipulative acts in a scheme to defraud investors, as well as for making false statements and omissions.  Finally, Plaintiffs bring a control-person claim against the Executive Defendants, Rio Tinto, and RTIH under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

The Rio Defendants argue that Plaintiffs lack standing to sue them and that the Rio Defendants are not liable under Rule 10b–5(b) for Turquoise Hill's statements.  The Rio and Turquoise Defendants both argue that the Complaint does not state a claim under Rule 10b–5(b) because it fails to allege an actionable misstatement or omission and does not sufficiently allege scienter.  The Defendants also move to dismiss the scheme liability claims under Rule 10b–5(a) and (c) as well as the control person claims under Section 20(a) of the Exchange Act.  Finally, the Rio Defendants argue that the Complaint against them should be dismissed as Plaintiffs do not adequately allege loss causation.

I.      **Standing**

The Rio Defendants assert that Plaintiffs lack standing to sue them because "Plaintiffs'
alleged losses stem solely from their purchases of stock in another company—Turquoise Hill."
Dkt. No. 131 at 10.

The Supreme Court first addressed what standing is required to bring a private cause of
action for damages under Rule 10b–5 in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723
(1975).  In that case, the Supreme Court held—in line with the Second Circuit's decision in
*Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952)—that to assert a claim for
damages under Rule 10b–5, Plaintiff "must be either a purchaser or seller of securities," as
opposed to a holder, *i.e.*, someone who decided not to purchase or sell stock as a result of the
misrepresentation.  *Blue Chip Stamps*, 421 U.S. at 749.  The Court noted that such a rule was
required as, in the absence of such a rule, the difficulties of proof would be significant.  *Id.* at
742–47.  Without such a rule, the Supreme Court noted that "Plaintiff's proof would not be that
he purchased or sold stock, a fact which would be capable of documentary verification in most
situations, but instead that he decided not to purchase or sell stock," which would turn almost
entirely on "oral testimony."  *Id.* at 746–47.  The Supreme Court thus concluded that standing is
limited to the "class of plaintiffs [] who have at least dealt in the security to which the
prospectus, representation, or omission relates."  *Id.* at 747.

Since then, the Second Circuit has further elaborated on what standing is required to
bring a private cause of action under Rule 10b–5 in two key cases.  In *Ontario Pub. Service
Employees Union Pension Trust Fund v. Nortel Networks Corp. ("Nortel")*, the Second Circuit
considered whether an individual who owns stock in one company has standing to sue a non-
issuer of that stock pursuant to Rule 10b–5 for misstatements made by the non-issuer.  369 F.3d
27 (2d Cir. 2004).  In that case, investors in JDS sued Nortel for material misstatements that

Nortel had made about Nortel's own revenue and earnings, which in turn positively affected JDS's share price. *Id.* at 29.  Nortel was JDS's largest customer, accounting for 10–15% of JDS's revenues, and, around the time of the false statements, sold its laser business to Nortel in exchange for Nortel stock. *Id.*  The JDS investors claimed that they had standing under *Blue Chip Stamps* because they were "purchasers" of securities affected in some way by the relevant misrepresentations. *Id.* at 32.  The Second Circuit disagreed and stated broadly that "[s]tockholders do not have standing to sue under Section 10(b) and Rule 10b–5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." *Id.* at 34.

However, only a few years later, the Second Circuit clarified that *Nortel* should not be read so broadly.  In *In re NYSE Specialists Securities Litigation* ("*In re NYSE*"), the Second Circuit addressed whether *Nortel* barred plaintiff's claims against the New York Stock Exchange (the "NYSE") for misrepresentations it made about its integrity and internal operations, upon which plaintiffs relied in trading on the NYSE.  503 F.3d 89 (2d Cir. 2007).  The plaintiffs in *In re NYSE* were investors who purchased and/or sold NYSE-listed stock during the relevant class period.  *Id.* at 287–88.  The Second Circuit stated that, despite language to the contrary, *Nortel* should not be read to hold that "an action under Rule 10b–5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security, or that only statements about a security issuer are actionable." *Id.* at 102.  The Second Circuit stated that the Rule 10b–5 claim of the JDS investors in *Nortel* was based on Nortel's "knowingly made falsely optimistic public statements about its own financial prospects," which Plaintiffs claimed resulted in JRS's own purchase price being inflated "[o]n the basis of a business relationship" between JDS and

Nortel. *Id.*.[4]  The court therefore held that *Nortel* stood for the proposition that based on the "particular circumstances of the case" "the connection between Nortel Networks' false statements *about itself* and the plaintiff's purchase of JDS Uniphase stock was too remote to sustain an action under Rule 10b–5." *Id.* at 102 (emphasis added).  The Second Circuit further noted that a contrary reading of *Nortel* "would place beyond the reach of Rule 10b–5 false statements made by underwriters, brokers, bankers, and non-issuer sellers." *Id.*  Accordingly, the Second Circuit rejected a request to dismiss the claims of investors in various companies against the NYSE under *Nortel*.

The Rio Defendants urge this Court to conclude that these cases stand for the proposition that, except "in very limited circumstances," investors do not have standing to bring claims under Rule 10b–5 against a non-issuer company whose stock they did not purchase or sell.  Dkt. No. 131 at 10.  But this gets the relationship between *Nortel* and *In re NYSE* backwards.  *In re NYSE* did not, as the Rio Defendants claim, "carve" out certain narrow exceptions to *Nortel*'s general holding.  *Id.* at 12.  Instead, *In re NYSE* confined the potential reach of *Nortel*'s holding substantially.  The *In re NYSE* court clearly stated that *Nortel* should not be read broadly to hold that "an action under Rule 10b–5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security."  503 F.3d at 102.  Instead, per the *In re NYSE* court,

---

[4] At oral argument, the Rio Defendants noted that JDS sold its laser business to Nortel in exchange for Nortel stock and therefore stood to become a shareholder in Nortel.  Transcript of Oral Argument (Aug. 25, 2022) at 94:9–19.  But those facts are distinguishable from those alleged here, including because, unlike in *Nortel*, Plaintiffs allege that Rio Tinto made statements directly about Turquoise Hill.  Moreover, the *Nortel* court specifically contemplated that standing may exist where there is a "more significant relationship between companies than" the sale of a business unit.  369 F.3d at 34.  It thus is incorrect to state that the *Nortel* court somehow anticipated and decided the issue in this case—whether statements that a majority owner makes about the business of its subsidiary whose business it operates are subject to securities law claims from minority interest holders in the subsidiary.

*Nortel* held that plaintiffs lack standing for a Rule 10b–5 action where the "connection between" the false statements of the non-issuer and "plaintiff's purchase" of stock is "too remote." *Id.* And such a connection is "too remote" where, as in the "particular circumstances of" *Nortel*, plaintiffs' claims are based merely on (i) false statements by a non-issuer of the security about *itself* and (ii) nothing more than a "business relationship" exists between the issuer and non-issuer company.  *Id.*

  That *Nortel*, as clarified by *In re NYSE*, foreclosed only "remote" claims against non-issuers similar to the claims at issue in *Nortel* and was not intended to broadly bar *all* claims against non-issuers, except in limited circumstances, is consistent with the reasoning of *Nortel* itself.  *Id.*  In reaching its decision, the *Nortel* court reasoned that to find that plaintiffs had standing would be at "odds with the purchaser-seller requirement in *Blue Chip Stamps* that 'limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates.'"  *Nortel*, 369 F.3d at 32 (quoting *Blue Chip Stamps*, 421 U.S. at 747).  But while it is certainly true that "remote" claims against a non-issuer related to misstatements the non-issuer made about itself (as was the case in *Nortel*) would be inconsistent with the purchaser-seller requirement, claims against a non-issuer related to misstatements the non-issuer made about the company in which plaintiffs directly dealt would plainly not be inconsistent with this requirement.  In the latter types of cases, plaintiffs would still fall within the class "who have at least dealt in the security to which the prospectus, representation, or omission relates.'"  *Id.* (quoting *Blue Chip Stamps*, 421 U.S. at 747).

  In addition, in reaching its decision, the *Nortel* court reasoned that if plaintiffs were found to have standing, "oral testimony would play a crucial role in proving that plaintiffs relied on Nortel's financial projections when they purchased JDS's securities" and therefore would raise

the same concerns that were present in *Blue Chip Stamps*. *Id.* at 33. But, again, while it is undoubtedly true that oral testimony would "play a crucial role" in proving that plaintiffs relied on a non-issuer's overly optimistic false statements about itself in purchasing securities of an entirely separate company, oral testimony would play a much lesser role in many other claims against non-issuers, such as where a non-issuer and the issuer effectively operate as one company and therefore any statement about one is effectively a statement about the other. *Id.*

Subsequent case law in this Circuit supports that *Nortel*'s holding is much narrower than the Rio Defendants claim and applies to cases with similar facts to those present in *Nortel*—that is, where the non-issuers' misstatements do not directly relate to the issuer and there is no more than a "business relationship" between the two parties. For example, in *Menora Mivtachim Insurance v. International Flavors & Fragrances Inc.*, which the Rio Defendants cite in support of their position, the court repeatedly made clear that it read *Nortel* as extending only to cases in which, as in *Nortel*, the non-issuer made misrepresentations "*about itself*." 2021 WL 1199035, at *30–31 (S.D.N.Y. Mar. 30, 2021) (emphasis added) (summarizing *Nortel*'s holding as "plaintiffs lack standing to bring a lawsuit against [a company] for *self-referential statements* made by a company in which plaintiffs never invested" (emphasis added)). Similarly, in *Harbinger Capital Partners LLC v. Deere & Co.*, the Second Circuit dismissed Plaintiffs' claims against a non-issuer defendant for lack of standing because, as in *Nortel*, the claims against the non-issuer related to fraudulent omissions and misrepresentations that the non-issuer made about *its own design product*. 632 F. App'x 653 (2d Cir. 2015) (summary order). The court stated that "[t]here is no relevant difference between [the plaintiffs in this case] and the plaintiffs in *Nortel Networks*," and therefore "just as in *Nortel Networks*, the connection between *defendants' omissions about the shortcomings of its receivers* and [plaintiffs'] purchase of LightSquared's

stock was 'too remote to sustain an action' under § 10(b) and Rule 10b–5."  *Id.* at 656 (emphasis added) (quoting *In re NYSE*, 503 F.3d at 102).  In *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, the court, after considering *Nortel*'s impact on the standing analysis for Rule 10b–5 claims against non-issuers, appeared to find that its impact was miniscule and concluded that "the scope of the Section 10(b) private action has not substantially changed since the Second Circuit first described it: Section 10(b) and Rule 10b–5 'extend[ ] protection only to the defrauded purchaser or seller' of securities."  390 F. Supp. 3d 432, 447 (S.D.N.Y. 2019) (quoting *Birnbaum*, 193 F.2d at 464).

Moreover, the Rio Defendants' reading of *Nortel* proves too much.  If it were true that investors do not have standing to bring claims under Rule 10b–5 against a non-issuer company whose stock they did not purchase or sell, except in a few limited circumstances, then the Supreme Court's key holdings in cases such as *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) and *Stoneridge Investment Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148 (2008)—both of which are described in greater detail in Sections II and V.A— which concern when a third-party may be liable under Rule 10b–5 to another company's shareholders, would largely be nullities.  The Supreme Court, in those cases, could have instead held that Plaintiffs would not have standing to bring Rule 10b–5 claims against the third parties. Defendants' argument would also undercut the Supreme Court's statements in *Stoneridge* and *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.* that "the implied right of action in § 10(b) continues to cover secondary actors who commit primary violations." *Stoneridge*, 552 U.S. at 166; *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) ("The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under

the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming all of the requirements for primary liability under Rule 10b–5 are met.").

The argument the Second Circuit rejected in *Nortel*—that Section 10(b) reaches any statement that affects in any way the securities of which the plaintiff is a purchaser—admitted of no limiting principle. The securities of any company are subject to being "negatively impacted" in all manners of speaking by statements made by others about their own business—whether it be statements about the general state of the economy or demand for a particular type of product, or statements about competition in an industry. Once accepted, the proposition that a statement that one company makes about its own business can subject it to liability for securities fraud by shareholders of a different company could not be easily cabined. It could subject to potential liability any well-heeled or deep-pocket company for the misfortunes of the shareholders of another no matter how remote the first company was from the shareholders of the second. *Cf. Blue Chip Stamps*, 421 U.S. at 739 ("There has been widespread recognition that litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general."). A company which made statements to its own shareholders about its own business or about the economic environment affecting its operations could unwittingly be held liable to shareholders of a potentially limitless number of other companies, each of whom claimed that the statements the company made—though only directed to that company's business— spoke to the business prospects of others.

By the same token, however, the Rio Defendants' reading of *Nortel* also admits of no limiting principle. It would seem to leave out a number of third-party actors whose false

statements about a company could easily have been relied upon by investors in the issuer and whose conduct would constitute a primary violation of Rule 10b–5.  For example, would a majority shareholder who makes misstatements about the company whose shares she owns in order to drive up its share price and increase the value of her holdings (perhaps because they serve as collateral for other business transactions), be immune from a private securities lawsuit by the persons who relied on those statements?  Could the majority shareholder avoid such a lawsuit if she cleverly avoids a board seat and, from a position of presumed authority, uses a megaphone to make the misstatements rather than a corporate filing?  Similarly, what if a prospective acquiring company makes false statements about a target company in order to drive down the price of that company and to be able to make the acquisition on the cheap, would investors who sold their shares in the company lack standing against the acquirer?  The definition of a security under the Exchange Act includes a note, bond, or debenture.  15 U.S.C. § 78c(a)(10).  Would the Rio Defendants argue that a company that decides—for tax planning or other efficiency reasons—to raise capital for the operations of a wholly owned subsidiary through the issuance of debt by that subsidiary is immune from liability under the Exchange Act for fraudulent misstatements it makes about the subsidiary?  At oral argument, the Rio Defendants admitted that in such a scenario, the investors of the subsidiary could have standing to sue the parent company if the parent company's statements sufficiently related to the issuance of the debt related to that asset.  Transcript of Oral Argument (Aug. 25, 2022) at 10:19–11:19.  But that concession gives up the ghost.  From the perspective of Section 10(b) and Rule 10b–5, equity securities are indistinguishable from debt securities.  *See Nortel*, 369 F.3d at 32 (stating that reference in Section 10(b) to fraud "in connection with the purchase or sale of any security" refers to the type of security and captures all types of securities).  If a parent is not immune from

liability for false statements about the subsidiary when it chooses to finance its operations through the issuance of debt, there is no reason why it should be immune from suit when the financing is in the form of a small minority interest in equity.  In either case, the purchasers of a security of the company (the subsidiary) are equally injured as a direct result of a false statement made by the parent about the subsidiary.

In addition, the Rio Defendants apparent position that the *In re NYSE* exception should be read only to apply to third parties who are "directly involved in the marketing and sale of the issued securities," *see* Dkt. No. 131 at 11, would mean that Rule 10b–5 claims against auditors— who are neither directly involved in the marketing or sale of an issued securities—would lack standing.  *See, e.g.*, *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004) (concluding that plaintiffs adequately stated a Rule 10b–5 claim against outside auditor); *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152 (D. Mass. 2002) (denying motion to dismiss Rule 10b–5 claim against outside auditor).

For these reasons, the Court rejects the Rio Defendants' expansive reading of *Nortel* and instead reads *Nortel*, as clarified by *In re NYSE*, as standing for the proposition that investors lack standing where the "connection between" the false statements of the non-issuer and "plaintiff's purchase" of stock is "too remote," and such a connection is too remote where, as in that case, the third party makes self-referential public statements and the third party and the issuer are connected only by a "business relationship."  *In re NYSE*, 503 F.3d at 102. Accordingly, *Nortel* would not bar a claim against a third party where that third party had substantial connections to the issuer and, more importantly, made statements *directly about the issuer's own securities*.

In light of this understanding of *Nortel*, it is apparent that Plaintiffs have standing for their claims against the Rio Defendants.  Plaintiffs allege a connection between Rio Tinto's misstatements and their purchase of Turquoise Hill stock that is significantly less remote than the connection in *Nortel*.  In fact, the facts alleged here are very similar to the hypothetical this Court asked the Rio Defendants about at oral argument.  Rio Tinto owns a majority interest in Turquoise Hill.  Like the parent company in the hypothetical, Rio Tinto appears to have used its interest in Turquoise Hill to invest in Oyu Tolgoi, and then exercised, through RTIH, near-total control over the management and operations of the Mine.  *See* Dkt. No. 127 ¶ 52 ("Rio Tinto owns just over 50% of Turquoise Hill's common stock, manages the Oyu Tolgoi project under agreements between OT, Rio Tinto, and the Government of Mongolia, and exercises near total control over both the project and Turquoise Hill, including control over Turquoise Hill's public statements about OT.").  And, while the public float of Turquoise Hill appears to be a legacy of a time before Rio Tinto built up its majority ownership, the position it espouses would apply even if the public ownership was a consequence of a decision by Rio Tinto to spin off a portion of the equity.  While, unlike the hypothetical, Rio Tinto would have chosen to finance that investment through the issuance of stock in Turquoise Hill, the consequences are ultimately no different than if it had chosen to finance it by issuing debt at the subsidiary level.  Moreover, unlike *Nortel*, Rio Tinto elected to make statements directly about the operation of Turquoise Hill's Oyu Tolgoi project.  *See, e.g.*, Dkt. No. 127 ¶¶ 324, 328, 331–334.  These misstatements are not "self-referential" and directly concern the company in which Plaintiffs invested: as the SAC states repeatedly, the operation and development of OT was the "sole business" of Turquoise Hill and therefore any statement about OT was necessarily about Turquoise Hill.  *E.g.*, *id.* ¶¶ 3, 38.  They

"relate[]" to the company whose securities Plaintiffs purchased.  *Blue Chip Stamps*, 421 U.S. at 747.  The liability to which it exposed itself is anything but unwitting.

Accordingly, this Court declines to dismiss Plaintiffs' claims against the Rio Defendants for lack of standing.[5]

## II.    Rio Defendants Liability for Statements Made by Turquoise Hill

In the Complaint, Plaintiffs allege that Rio and RTIH were "the maker[s] of both [their] own and Turquoise Hill's false and misleading statements and omissions."  Dkt. No. 127 ¶¶ 54, 450.  On that theory, Rio and RTIH would themselves be primarily liable for those alleged misstatements and omissions; no scienter on the part of Turquoise Hill would be necessary.  The Rio Defendants move to dismiss this theory of liability, claiming that Rio and RTIH are plainly not the "makers" of Turquoise Hill's statements under the Supreme Court's holding in *Janus*, 564 U.S. 135.  Dkt. No. 131 at 15.  Although Plaintiffs do not appear to contest this point with respect to RTIH,[6] Plaintiffs claim that Rio is liable for Turquoise Hill's statements as it exercised "complete control" over Turquoise Hill's public statements regarding the Oyu Tolgoi project.  Dkt. No. 135 at 34.

---

[5] In a footnote, the Rio Defendants claim that "for similar reasons, Plaintiffs cannot satisfy the 'in connection with' requirement of the Exchange Act" and cite to a case stating that the "in connection" requirement is not satisfied where plaintiffs' claims are "against a second company based on alleged misstatements pertaining to the second company's stock."  Dkt. No. 131 at 14 n.14 (citing *Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *12 n.14 (S.D.N.Y. Feb. 27, 2017)).  But, as discussed, the Rio Defendants' alleged misstatements relate to Turquoise Hill, not to themselves, and the Court therefore rejects this argument.

[6] In response to the Rio Defendants' motion to dismiss on this claim, Plaintiffs only argue that Rio is the maker of Turquoise Hill's statements.  Dkt. No. 135 at 54.  Plaintiffs have therefore waived this argument with respect to RTIH, *see In re Kingate Mgmt. Ltd. Litig.*, 746 F. App'x 40, 43 (2d Cir. 2018) (summary order) (finding waiver for failing to raise an argument before the district court in response to a motion to dismiss), and, regardless, this Court finds that Plaintiffs have not sufficiently pled that RTIH is the "maker" of Turquoise Hill's statements, as the Complaint only alleges that Rio Tinto exercised control over Turquoise Hill's public statements about OT.  *See, e.g.*, Dkt. No. 127 ¶ 52.

"Under Rule 10b–5, it is unlawful for 'any person, directly or indirectly . . . [t]o make any untrue statement of a material fact' in connection with the purchase or sale of securities." *Janus*, 564 U.S. at 141 (quoting 17 CFR § 240.10b–5(b)).  In other words, a party must have "made" the material misstatements in order to be liable under Rule 10b–5.  *Id.*

 The Supreme Court's decision in *Janus* is the seminal case on when a party has "made" a statement for purposes of Rule 10b–5(b) liability.  *Id.*  In that case the Court was asked to determine whether Janus Capital Management LLC ("JCM"), a mutual fund investment advisor, could be held liable for making the false statement included in the prospectuses of Janus Investment Fund, JCM's client mutual fund.  *Id.* at 137–41.  According to the allegations in the complaint, JCM's parent company Janus Capital Group, Inc ("JCG") had created Janus Investment Fund.  *Id.* at 138.  And although Janus Investment Fund was a separate legal entity owned entirely by mutual fund investors, all of the officers of Janus Investment Fund were also officers of JCM, and one member of Janus Investment Fund's board of trustees was associated with JCM.  *Id.*  Plaintiffs also alleged that JCM was "significantly involved in preparing the prospectuses" at issue.  *Id.* at 147–48.

Despite these facts, the Supreme Court held that JCM was not the maker of the statements in the Janus Investment Fund prospectuses; Janus Investment Fund was.  *Id.* at 146–47.  The Court explained that "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Id.* at 142.  The Court noted that: "Without such authority, it is not 'necessary or inevitable' that any falsehood will be contained in the statement."  *Id.* at 144.  "And in the ordinary case," according to the Court, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only

by—the party to whom it is attributed." *Id.* at 142–43.  The Court likened this rule to the

relationship between a speechwriter and a speaker:  "Even when a speechwriter drafts a speech,

the content is entirely within the control of the person who delivers it.  And it is the speaker who

takes credit—or blame—for what is ultimately said." *Id.* at 143.

    In reaching its decision, the Supreme Court clarified what type of conduct does not result

in a party becoming the "maker" of a statement.  The Court noted that "entities that contribute

'substantial assistance' to the making of a statement but do not actually make it" cannot be

considered the maker of a statement. *Id.* (quoting *Cent. Bank of Denver*, 511 U.S. at 169).

Furthermore, a person who "provides the false or misleading information that another person

then puts into the statement" is not the "maker" of the statement. *Id.* at 145.  Finally, the Court

noted that a "well-recognized and uniquely close relationship" between Company A and

Company B or evidence that Company A exerts "significant influence" over Company B does

not make Company A the maker of Company B statements, where Company A and Company B

"remain legally separate entities." *Id.* at 145–46.

    Here, Plaintiffs argue that, unlike in *Janus*, Rio "had 'ultimate authority' over [Turquoise

Hill's] statements, including their 'content and whether and how to communicate [them],' and

[Turquoise Hill] told investors of this fact."  Dkt. No. 135 at 34 (quoting *Janus*, 564 U.S. at 142–

43).  In support of this contention, Plaintiffs points to the allegation that Rio Tinto exercised

complete control over the dissemination of the misleading information to Turquoise Hill and Rio

Defendants were Turquoise Hill's controlling majority stockholder and the manager of its sole

asset. *Id.* at 34–35.  In addition, Plaintiffs allege that Rio Tinto controlled Turquoise Hill's

public statements through a contract requiring that those statements be "consistent with the

information provided by the Rio Tinto Manager," RTIH, and that Turquoise Hill would "not file

or issue any OT Disclosure without providing the Rio Tinto Manager with a reasonable

opportunity to review and comment thereon."  *Id.* at 34.

The Court separates its analysis of this argument into: (1) those statements that Turquoise

Hill made that are not explicitly attributed to Rio Tinto[7]; and (2) those statements that Turquoise

Hill made to investors, which it explicitly attributed in some form to Rio Tinto (*e.g.*, "Rio Tinto

has provided Turquoise Hill with a high-level overview of the review's outcomes, in which Rio

Tinto concluded there were no material changes in project scope, cost or schedule."  Dkt. No.

127 ¶ 313).[8]

As to the first category of statements, the Complaint alleges insufficient facts to plead

that Rio was the "maker" of Turquoise Hill's statements.  Conclusory allegations of one party's

ultimate control over another party's statements generally do not suffice to support that the first

party was the "maker" of those statements.  *See, e.g.*, *City of Pontiac Gen. Employees' Ret. Sys.

v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) ("Plaintiff's conclusory

pleading that each defendant had 'ultimate authority' over the statements is clearly insufficient to

adequately plead Gooden made these statements."); *see In re Cannavest Corp. Sec. Litig.*, 307 F.

Supp. 3d 222, 242 (S.D.N.Y. 2018) ("Plaintiffs' generic and conclusory allegation that Mackay

---

[7] *See, e.g.*, *id.* ¶ 336 ("According to this re-forecast, lateral development has progressed well, construction completion schedule remains on track for 2022."); *id.* ¶ 348 ("The work delays are of course not desirable, developing the OT underground blockade is a very large undertaking and these types of delays are certainly not atypical in the mining industry for projects of this scale and complexity."); *id.* ¶ 362 ("key risks" were "well understood and managed," and "Turquoise is Well Positioned to Address Key Challenges").

[8] *See also, e.g.*, *id.* ¶ 335 ("Rio Tinto has undertaken a second annual re-forecast of underground development schedule and costs and preliminary results have concluded that capital costs remain in line with the overall $5.3 billion budget and the project remains on schedule to complete in 2022."); *id.* ¶ 336 ("Rio Tinto has notified Turquoise Hill, based on preliminary results, of a delay to achievement of sustainable first production which is now expected to occur by the end of Q3'21 instead of Q1'21.").

(and the other individual Defendants) 'did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false in misleading' is not sufficient." (citation omitted)). Thus, Plaintiffs cannot successfully plead that Rio was the "maker" of Turquoise Hill's statements through general allegations that Rio exercises "control over Turquoise Hill's public statements about OT" or that "any communication disseminated outside of Turquoise Hill concerning Oyu Tolgoi or any communication that could impact Turquoise Hill's stock price was dictated by Rio Tinto, which controlled all of Turquoise Hill's communications and access to information about OT."  Dkt. No. 127 ¶¶ 52, 450.

That Rio exercised control over Turquoise Hill's access to relevant information about the Oyu Tolgoi project does not itself make Rio the "maker" of Turquoise Hill's statements.  That argument is foreclosed by *Janus*.  There, the mutual fund investment advisor JCM conducted the business of the investment fund.  It "manage[d] the purchase, sale, redemption, and distribution of the Fund's investments," "prepare[d], modifie[d], and implement[ed] the Janus Fund's long-term strategies," and "carrie[d] out the Fund's daily activities."  *Janus*, 564 U.S. at 149 (Breyer, J. dissenting); *see also id.* at 138 (noting that JCM provided the fund with the management and administrative services necessary for its operation).  The Court accepted the analogy that the investment advisor played the role of a "playwright whose lines are delivered by an actor," the fund, *id.* at 145, but held that such facts were insufficient for the advisor to be the maker of the fund's statements.  *Janus* held that a person who "provides the false or misleading information that another person than puts into the statement" is not the maker of the "false public statements," as this is merely an "undisclosed act preceding the decision of an independent entity to make a public statement."  *Id.* at 144–45.

Rio's status as a majority stockholder and manager of Oyu Tolgoi also does not result in Rio being the "maker" of Turquoise Hill's statements.  *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 262 (S.D.N.Y. 2020) (finding allegations that defendant "owns a large stake in [other company] and has placed board members" is insufficient).  Ownership might confer generally the right of the parent to control a subsidiary by, for example, selecting members of its board of directors and, through the directors, the officers of the corporation.  But it does not establish that it had control over those directors and officers, and the statements they made, once they were appointed.  As discussed below, *infra* Section VI, courts have held that it is not sufficient for control-person liability for the defendant to have the theoretical ability to control the primary violator.  The defendant must possess the practical ability to direct the primary violator and "have 'actual control over the *transaction* in question.'"  *In re Alstom SA Sec. Litig.,* 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (quoting *in re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005)).  Plaintiffs' theory would have the Court impose on a parent corporation primary liability for the misstatements of its partially owned subsidiary where it is a close question at best whether Congress even intended for it to have secondary liability.

Plaintiffs allege generally that Rio Tinto has an "extraordinarily close relationship" with Turquoise Hill and exercises significant influence over it.  Dkt. No. 135 at 6.  But Turquoise Hill is a "legally independent entity with its own board of trustees" and is separately listed and traded.[9]  *Janus*, 564 U.S. at 147.  It enjoys its own corporate form, and there are no allegations

---

[9] These, among other facts, distinguishes this case from *IOP Cast Iron Holdings, LLC v. J.H. Whitney Cap. Partners, LLC*, 91 F. Supp. 3d 456 (S.D.N.Y. 2015) in which the company was effectively solely owned by the defendant and its affiliates, and the defendant formed a majority of the company's board.  *Id.* at 473–74.

that "corporate formalities were [not] observed here." *Id.* at 146.  Indeed, minority shareholders

make up almost 50% of the company.  Those facts are legally dispositive.  As officers and

directors of an independently incorporated company with minority shareholders, the persons in

control of Turquoise Hill cannot act solely at the behest of their majority shareholder.  They owe

legal duties to all of Turquoise Hill's stakeholders and must "act honestly and in good faith with

a view to the best interest of the corporation."  Canada Business Corporations Act § 122.  If they

were to have made a false and misleading statement, the excuse "Rio Tinto made us do it" would

not suffice.  *Cf. McMullin v. Beran*, 765 A.2d 910, 925 (Del. 2000) ("In properly discharging

their fiduciary responsibilities, directors of Delaware corporations must exercise due care, good

faith and loyalty whenever they communicate with shareholders about the corporation's

affairs."); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 70 (Del. Ch.

2015) ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the

positive laws it is obliged to obey.").  Nor would Rio Tinto's majority ownership relieve

Turquoise Hill of its own independent regulatory obligations.  *See Janus*, 564 U.S. at 147

(concluding JCM was not the maker of the statements as "[o]nly Janus Investment Fund—not

JCM—bears the statutory obligation to file the prospectuses with the SEC"); *IOP Cast Iron

Holdings, LLC*, 91 F. Supp. 3d at 474 ("Because federal law determined which entity had a duty

to file the prospectus, it would have been anomalous for another provision of securities law, Rule

10b–5, to recognize a different entity as the maker of the statements in the prospectus.").  As a

New York Stock Exchange listed company, for example, it is subject to its own requirement that

its financial reporting be truthful or it risks being delisted.  *See* NYSE Listed Company Manual §

802.01 (noting that a company can be suspended or delisted if the Exchange believes that it is

advisable to do so in the event of "allegations of financial fraud" "in relation to the company's

financial reporting.").[10]  And the well-pled allegations of the Complaint are inconsistent with the claim that the directors and officers of Turquoise Hill simply abandoned their corporate responsibilities.  Even if they relied on Rio Tinto for the information that they reported to their shareholders, the Complaint alleges that members of Turquoise Hill were sufficiently independent to vote—along with the representatives of the Mongolian government—to form a special committee to investigate the causes of cost overruns and schedule delays.  Dkt No. 127 ¶ 266.

Rio's ability—as a majority stockholder—to influence Turquoise Hill's statements is distinct from showing that Rio, in fact, exerted "ultimate control" over the statements at issue in this case. *Janus*, 564 U.S. at 143; *see Noto v. 22nd Century Grp., Inc.,* 35 F.4th 95, 104 (2d Cir. 2022) ("The complaint made no sufficient factual allegation that the articles were published by anyone except the authors.  Nor did it sufficiently allege that those authors lacked final control over the articles' contents or did not make the ultimate decision as to what specific information to include.  The complaint also does not contain sufficient factual allegations that defendants collaborated with the authors to such an extent that they controlled the articles' publication.").

Plaintiffs attempt to cure their lack of allegations that Rio had "ultimate" control over the particular statements at issue by pointing to a contract between Rio and Turquoise Hill that (1) required Turquoise Hill's public statements to be "consistent with the information provided by the Rio Tinto Manager," RTIH; and (2) provided that Turquoise Hill would "not file or issue any OT Disclosure without providing the Rio Tinto Manager with a reasonable opportunity to review and comment thereon."  Dkt. No. 135 at 34 (quoting Dkt. No. 127 ¶ 53).  But, again, both of

---

[10] The Court takes judicial notice of the NYSE Listed Company Manual under Rule 201(b) and 201(d) of the Federal Rules of Evidence.  *See, e.g.*, *Gee v. Doe*, 2022 WL 125342, at *2 n.2 (S.D.N.Y. Jan. 13, 2022) (taking judicial notice of Department of Corrections procedures).

these allegations, if taken as true, do not establish Rio Tinto's "ultimate control" over Turquoise Hill's statements under *Janus*.  It is not uncommon for two businesses who engage in a joint venture to attempt to coordinate the statements regarding that joint venture.  The contractual obligation of each party to ensure that its statements are consistent with the statements of the other does not make each such party the "maker" of the statements by the other.  "Ultimate authority" is critical.  Here, although the contract stated that Turquoise Hill's public statements "must be consistent with the information provided by the Rio Tinto Manager," it also provided that this clause was limited where Turquoise Hill "determines that other OT Disclosure must be made to comply with Ivanhoe's disclosure obligations under applicable Securities Laws." Turquoise Hill Resources LTD, General Statement of Acquisition of Beneficial Ownership - Amendment (Form SC 13D/A) (Apr. 20, 2012).  In other words, the contract expressly acknowledged that Turquoise Hill had "ultimate authority" over the content of its own disclosures and that it was not required to make a statement consistent with the information provided by the Rio Tinto manager if making that statement violated the securities laws.  *See Janus*, 564 U.S. at 142 ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content *and whether and how to communicate it.* (emphasis added)).  And with respect to (2), *Janus* rejected the notion that a party who reviews and comments on a statement is transformed into the "maker" of that statement.  *See id.* at 148 (finding JCM did not "make" statements in prospectuses for purposes of Rule 10b–5 even though JCM "was significantly involved in preparing the prospectuses"); *see also Noto*, 35 F.4th at 104 ("[E]ven if Sicignano had provided some input on the content of the articles, the complaint does not support the conclusion that Sicignano had the 'ultimate authority' necessary to brand him the articles' maker.").

For these reasons, Plaintiffs have not sufficiently pled that Rio Tinto was the "maker" of the first category of Turquoise Hill's statements (*i.e.*, those statements that Turquoise Hill made that are not explicitly attributed to Rio Tinto).

As to the second category of statements (*i.e.,* those statements that Turquoise Hill made to investors, which it explicitly attributed in some form to Rio Tinto), Plaintiffs' argument that Rio Tinto is the "maker" of these statements is much more compelling.  As the Court stated in *Janus*, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed."  564 U.S. at 142–43; *see UA Loc. 13 Pension Fund v. Sealed Air Corp.*, 2021 WL 2209921, at *7 (S.D.N.Y. June 1, 2021).  The Court, however, does not decide whether Rio Tinto is liable for these statements under Rule 10b–5(b).  As discussed *infra* Section III.A.1, regardless of who the speaker of these statements is, these statements are forward-looking statements accompanied by meaningful cautionary language and are therefore protected under the PSLRA safe harbor.[11]

## III.   The Alleged False and Misleading Statements and Omissions

### A.     Turquoise Hill

The Turquoise Defendants seek to dismiss Plaintiffs' claims related to the following alleged statements as either protected by the PSLRA safe harbor, inactionable statements of opinion, or inactionable puffery:

---

[11] *See, e.g.*, Dkt. No. 127 ¶¶ 313 ("During Q4'17, Rio Tinto undertook a schedule and cost review. Rio Tinto has provided Turquoise Hill with a high-level overview of the review's outcomes, in which Rio Tinto concluded there were no material changes in project scope, cost or schedule."); 335 ("Rio Tinto has undertaken a second annual re-forecast of underground development schedule and costs and preliminary results have concluded that capital costs remain in line with the overall $5.3 billion budget and the project remains on schedule to complete in 2022."); 336 ("Rio Tinto has notified Turquoise Hill, based on preliminary results, of a delay to achievement of sustainable first production which is now expected to occur by the end of Q3'21 instead of Q1'21."); 348 ("We did announce on October 15 that Rio Tinto now projects a 9-month delay of the start of sustainable production from the underground development.").

(1) statements related to the expected timeline for the first draw bell and sustainable first production, as well as statements related to the expected amount of capital expenditures required to complete development of the underground mining project;

(2) statements that delays experienced were "not atypical";

(3) statements that the key risks were "well understood and managed," and that things were "progressing well."

Dkt. No. 133 at 33–43.  The Court examines each of the categories of challenged statements in turn.

### 1.     Statements related to the expected timeline and expected capital expenditures

According to the allegations in the Complaint, starting at the beginning of the Class Period on July 16, 2018, Turquoise Hill made several statements that the underground development project at the Mine continued to be "on track" and that it continued to "expect the first draw bell in mid-2020 and sustainable first production in 2021."[12]  Turquoise Hill also represented at various points throughout the Class Period that there were "no material changes in project . . . cost," that "capital costs remain in line with the overall $5.3 billion budget," and that it "confirm[ed] the $5.3 billion total budget" based on "where we are with the information that we've provided."[13]  According to Plaintiffs, these statements were false, as internal reports directly contradicted these schedules and showed that the OT project was months behind schedule and hundreds of millions of dollars over budget.  Dkt. No. 127 ¶¶ 79–161, 165–186, 208–220.

---

[12] See Dkt. No. 127 ¶¶ 306–307 (July 16, 2018 Press Release); 313–315 (July 31, 2018 Press Release & MD&A); 315 (Aug. 1, 2018 Conference Call); 334–336 (Oct. 15, 2018 Press Release); 344–345 (Nov. 1, 2018 Press Release).

[13] See Dkt. No. 127 ¶¶ 334–336 (Oct. 15, 2018 Press Release); 345 (Nov. 1, 2018 Press Release); 348 (Nov. 2, 2018 Investor Conference Call); 370 (Feb. 26, 2019 Press Release); 381 (Mar. 15, 2019 Press Release); 388 (2018 Form 40-F).

The Turquoise Defendants move to dismiss the Section 10(b) claims related to these statements, arguing that they are forward-looking statements that are protected by the PSLRA safe harbor.  Dkt. No. 133 at 33–40.

Subject to certain limited exceptions, the PSLRA bars private actions for federal securities law violations based on "any forward-looking statement, whether written or oral."  15 U.S.C. § 78u-5(c)(1).  Under the PSLRA, forward-looking statements include:

> (A) A statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
>
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
>
> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

"'[A] statement may contain some elements that look forward and others that do not,' and 'forward-looking elements' may be 'severable' from 'non-forward-looking' elements."  *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 385 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (summary order) (quoting *In re Vivendi, S.A. Securities Litig.,* 838 F.3d at 246).  Under the PSLRA, a defendant is not liable "with respect to any forward-looking statement, whether written or oral, if and to the extent" that:

(A) the forward-looking statement is –

    (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

    (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

    (ii) if made by a business entity, was—

        (I) made by or with the approval of an executive officer of that entity, and

        (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c). "The safe harbor is written in the disjunctive." *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 385 (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). Accordingly, a defendant is not liable for a forward-looking statement if (1) "the forward-looking statement is identified and accompanied by meaningful cautionary language," *or* (2) the forward-looking statement "is immaterial," *or* (3) "the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading." *Slayton*, 604 F.3d at 766. "As long as the plaintiff fails to satisfy one of those elements (*e.g.*, the statement is accompanied by meaningful cautionary language or is immaterial), the presence of one of the other elements (*e.g.*, the statement was known to be false or misleading) will not subject to the defendant to liability." *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 385–86; *see In re Vivendi*, 838 F.3d at 245–46 ("Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies." (internal quotation marks and citation omitted)).

Here, each of Turquoise Hill's public statements about the expected timeline and capital expenditures/budget of the underground expansion project—to the extent they are false—are protected under the PSLRA as forward-looking statements.  Statements about the schedule for the underground mine project, such as that they "expect the first draw bell in mid-2020 and sustainable first production in 2021," plainly qualify as forward-looking statements.  Such statements are, under the PSLRA, "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(B); *see, e.g.*, *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 287 (S.D.N.Y. 2020) (concluding that schedule estimates are forward-looking statements under this provision of the PSLRA); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *8 (S.D.N.Y. Apr. 1, 2015) (same).  Similarly, statements about the expected capital costs/budget of the project are forward-looking statements "containing a projection of . . . capital expenditures . . . or other financial items" under the PSLRA.  15 U.S.C. § 78u-5(i)(1)(A); *see, e.g.*, *Moshell*, 481 F. Supp. 3d at 287 (concluding that capital expenditure estimates to be forward-looking looking statements under this provision of the PSLRA); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *8 (same).

Turquoise Hill's statements that the project was "on track" and "on schedule" and that capital costs remain "in line" with the original budget are similarly forward-looking statements protected by the safe harbor.  Stating that the project is "on track" or capital costs remain "in line" is just another way of affirming the expected timeline or the budget, respectively.  *See Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 387 ("Courts within this Circuit have found that statements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement.").  In other words, such statements are virtually indistinguishable from the future projections of which they are part, as they turn on the

reasonableness of the projections:  If the budgetary and schedule projections are reasonable, then

there is no basis to challenge statements that the project is "on track" or costs are "in line" with

those projections as false or misleading.  And, if the projections were not reasonable, then these

statements are false or misleading.  *See id.* at 387; *see also Institutional Invs. Grp. v. Avaya, Inc.*,

564 F.3d 242, 255 (3d Cir. 2009) (holding that "the 'on track' and 'position us' portions of the []

statements, when read in context, cannot meaningfully be distinguished from the future

projection of which they are a part").  As this Court has stated, "[t]hat is precisely the inquiry

that the safe harbor puts off-limits to the courts."  *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d

at 387.

Further, while these statements arguably reflect a belief in the attainability of these future

schedule and budget projections based on current facts about the progress and costs of the

project, this alone is not sufficient to take these statements out from under the shelter of the

PSLRA safe harbor.  To find that it did would "rip a large hole in that statute and deprive issuers

and makers of such statements of the precise protection the safe harbor was intended to provide."

*Id.* at 390.  As this Court explained in *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366:

> [A]ll statements of projections come with the implied statement that they are
> believed and are based on recent trends in the industry and the market and the
> performance of the business.  That is inherent in the notion of a projection—it is
> "the phenomenon of making calculated guess into the future according to past
> trends."  Black's Law Dictionary Online, "projection" (2d ed.).  The PSLRA says
> that projections are protected unless they are both (a) actually known to be false
> and (b) not accompanied by meaningful cautionary language. *Slayton*, 604 F.3d at
> 766; 15 U.S.C. § 78u-5(c).  To hold that such projections should be excepted from
> the PSLRA's coverage on the theory that management did not appropriately
> consider recent trends in the industry or the performance of the business would rip
> a large hole in that statute and deprive issuers and makers of such statements of the
> precise protection the safe harbor was intended to provide.

*Id.* at 390.

Moreover, even if severed, the assertions of current fact inherent in these statements are too vague to be actionable separate from the future projections.  According to the Second Circuit, "[a] statement may contain some elements that look forward and others that do not," and, where that is true, the "the forward-looking elements and the non-forward-looking are severable."  *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) (quoting *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010)).  "However, when the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection."  *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018); *see also In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *19 (S.D.N.Y. Apr. 2, 2020); *Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) ("[T]o the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.'" (citation omitted)).

Here, the statements that the schedule was "on track" and that capital costs were "in line" on their own contain no details about Turquoise Hill's current situation; they are forward-looking.  The underground development project was a multi-year project.  These statements say very little about Turquoise Hill's current situation apart from the future projections of which they are a part.  Accordingly, even if severed, the assertions of current fact are too vague to be actionable apart from the future projects.  These statements are therefore forward-looking

statements entitled to the PSLRA safe harbor.[14]  *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *19 ("[S]tatements that the Company was 'on track' to reach the projected margin expansion and related growth are 'too vague to be actionable apart from the future projection.'" (citation omitted)); *see also Avaya, Inc.*, 564 F.3d at 255 ("[T]he 'on track' and 'position us' portions of the January 25, 2005 statements, when read in context, cannot meaningfully be distinguished from the future projection of which they are a part" and are therefore nonactionable).

Because Turquoise Hill's projections about the underground project's budget and schedule are forward-looking statements, the Court next must consider whether the statements are identified as such and accompanied by meaningful cautionary language or were not made with actual knowledge that they were false or misleading.  "A determination of either in the affirmative is sufficient to confer safe harbor protection."  *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *20.

As detailed more fully in the scienter analysis below, *infra* Section IV.A, Plaintiffs do not sufficiently allege that the Turquoise Defendants acted with recklessness, let alone actual knowledge.  *See Slayton*, 604 F.3d at 776 n.9 ("We emphasize that under this prong of the statutory safe harbor, the plaintiffs must show more than recklessness—an objective inquiry— they must show actual subjective knowledge.  Therefore, even if we were to conclude, based on

---

[14] Plaintiff notes that along with these statements, the Turquoise Defendants made other false misrepresentations about current facts, such as that Shaft 5 was "fully operational" during the second quarter of 2018 and that Shaft 2 equipping was "well under way," Dkt. No. 127 ¶¶ 307– 308, 319–320, and such statements about current facts are not forward-looking and entitled to protection under the PSLRA.  Dkt. No. 135 at 53–54.  The Turquoise Defendants, however, do not appear to base their motion to dismiss on these statements about the status of the Mine on any grounds other than that Plaintiffs have failed to sufficiently allege that the Turquoise Defendant possessed scienter with respect to them.  Therefore, the Court does not address whether such statements by Turquoise Hill are entitled to the safe harbor.

the alleged facts, that [a certain issue was] 'so obvious that . . . of defendant[s] must have been aware it,' . . . this would not avail the plaintiffs." (citations omitted)).  Plaintiffs cite to various paragraphs in the SAC for the proposition that "Defendants had access to and obtained information that rendered their purported forward-looking statements false when made."  Dkt. No. 135 at 53 (citing Dkt. No. 127 ¶¶ 73–112, 119–130, 143–150, 156–160, 182–194).  However, only one of those paragraphs mentions the Turquoise Defendants as opposed to the Rio Defendants.  Dkt. No. 127 ¶ 146.  That paragraph states that the Turquoise Defendants were members of the OT Board that approved a $120 million budget increase for the principal contractor on the underground development project.  *Id.*  However, as discussed *infra* Section IV.A.2, without more, this allegation is insufficient to establish that the Turquoise Defendants knew that the project—which was at that time was budgeted to cost over 44 times the amount of that increase—was seriously delayed or over budget.  *Cf. City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *9 (S.D.N.Y. Jan. 21, 2021) (finding lack of scienter, in part, because "Plaintiffs have not alleged that the CPI scorecard or business review decks included any specific information detailing, for example, an unusually high number of customer complaints or an abnormally low number of claims payments").

These forward-looking statements are also not actionable as they were accompanied by meaningful cautionary language.  "A defendant who publishes a forward-looking statement is protected against liability in a private action under the federal securities laws if that statement is accompanied by 'meaningful cautionary language.'"  *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 392 (quoting *Slayton*, 604 F.3d at 771)).  To be meaningful, the cautionary language need not directly precede or follow the forward-looking statement.  *Id.*; *see Slayton*, 604 F.3d at

55

768–69 (noting that the cautionary language was several pages away).  The language, however, cannot merely be boilerplate and must contain "important factors that could realistically cause results to differ materially."  *Slayton*, 604 F.3d at 773.  In other words, the language must be "extensive and specific," *id.* at 772 (quoting *Avaya*, 564 F.3d at 256), and contain "substantive company-specific warnings."  *Id.* (quoting S*outhland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004)).  "As the Conference Report accompanying the PSLRA explains, 'the cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business.'"  *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 392 (quoting Conference Report at 43, 1995 U.S.C.C.A.N. at 742).

The statements at issue come from three sources: (i) Turquoise Hill's Forms 40-F; (ii) press releases filed as exhibits to Forms 6-K; and (iii) investor conference calls.

Turquoise Hill's 2017 and 2018 Forms 40-F include extensive and specific warnings concerning the estimated schedule and budget of the OT underground development project.  For example, they refer to several factors that could cause the schedule and budget to differ materially, including: (i) "the availability and cost of skilled labor"; (ii) "round and rock mass conditions and stability"; (iii) "the impact of fluctuations in commodity prices, process water, power and transportation"; (iv) the "annual usage fees payable to the local province for sand, aggregate and water"; and (v) the "need to obtain necessary and other government permits."  Dkt. No. 134-15 at ECF p. 49 (2018 Form 40-F); *see* Dkt. No. 134-4 at ECF pp. 49–50 (2017 Form 40-F).  Turquoise Hill also noted that the "cost, timing, and complexities for mine construction and development are increased by the remote location of a property such as Oyu

Tolgoi." Dkt. No. 134-15 at ECF p. 49 (2018 Form 40-F).  The Forms 40-F further provided:

"It is common in mining operations and in the development, construction, or expansion of

existing facilities to experience unexpected problems and delays during such activities, which

may cause delays in the commencement or expansion of mineral production or sustainable

production."  *Id.*; *see* Dkt. No. 134-4 at ECF pp. 49–50 (2017 Form 40-F).

Turquoise Hill's Forms 40-F also contained substantial forward-looking disclosures.

Specifically, those disclosures noted:

> Forward-looking statements and information are made based upon certain
> assumptions and other important factors that, if untrue, could cause the actual
> results, performance or achievements of the Corporation to be materially different
> from future results, performance or achievements expressed or implied by such
> statements or information. There can be no assurance that such statements or
> information will prove to be accurate. Such statements and information are based
> on numerous assumptions regarding present and future business strategies, local
> and global economic conditions, and the environment in which the Corporation will
> operate in the future, including the price of copper, gold and silver and projected
> gold, copper and silver grades, anticipated capital and operating costs, anticipated
> future production and cash flows, and the status of the Corporation's relationship
> and interaction with the Government of Mongolia on the continued operation and
> development of Oyu Tolgoi (as defined in the section entitled "Definitions" in the
> AIF) and Oyu Tolgoi LLC internal governance.
>
> . . .
>
> With respect to specific forward-looking information concerning the continued
> operation and development of Oyu Tolgoi, the Corporation has based its
> assumptions and analyses on certain factors which are inherently uncertain.
> Uncertainties and assumptions include, among others: the timing and cost of the
> construction and expansion of mining and processing facilities; the timing and
> availability of a long-term domestic power source (or the availability of financing
> for the Corporation to construct such a source) for Oyu Tolgoi; the ability to secure
> and draw down on the supplemental debt under the Project Finance Facility (as
> defined in the AIF) and the availability of additional financing on terms reasonably
> acceptable to Oyu Tolgoi LLC, Rio Tinto plc (together with its affiliates, "Rio
> Tinto") and the Corporation to further develop Oyu Tolgoi; the impact of changes
> in, changes in interpretation to or changes in enforcement of, laws, regulations and
> government practices in Mongolia; the availability and cost of skilled labour and
> transportation; the obtaining of (and the terms and timing of obtaining) necessary
> environmental and other government approvals, consents and permits; delays, and
> the costs which would result from delays, in the development of the underground

mine (which could significantly exceed the costs projected in the Statutory
Feasibility Study and the 2016 OTTR (as defined in the section entitled
"Definitions" in the AIF)); projected copper, gold and silver prices and their market
demand; and production estimates and the anticipated yearly production of copper,
gold and silver at Oyu Tolgoi.

Dkt. No. 134-15 at ECF p. 4 (2018 Form 40-F); *see* Dkt. No. 134-4 at ECF p. 5 (2017

Form 40-F).

Similar cautionary language is present in the press releases that Turquoise Hill released

and publicly filed with the SEC.  For example, Turquoise Hill's July 16, 2018 press release

provided that "[c]ertain important factors that could cause actual . . . achievements to differ

materially from those in the forward-looking statements and information include, among others":

(i) "mining operational and development risks"; (ii) "regulatory restrictions (including

environmental regulatory restrictions and liability)"; (iii) "events or circumstances (including

strikes, blockages or similar events outside of the Company's control) that may affect the

Company's ability to deliver its products in a timely manner"; (iv) "the global economic

climate"; (v) "loss of key employees"; and (vi) "capital and operating costs, including with

respect to the development of additional deposits and processing facilities."  The press release

also noted that:

> Readers are cautioned not to place undue reliance on forward-looking information
> or statements.  By their nature, forward-looking statements involve numerous
> assumptions, inherent risks and uncertainties, both general and specific, which
> contribute to the possibility that the predicted outcomes will not occur.  Events or
> circumstances could cause the Company's actual results to differ materially from
> those estimated or projected and expressed in, or implied by, these forward-looking
> statements.

Dkt. No. 134-6 at ECF p. 19 (July 31, 2018 Press Release).  The press release also

directed readers to the risk factors listed in the Company's Forms 40-F: "Important

factors that could cause actual results to differ from these forward-looking statements are

included in the 'Risk Factors' section in the Company's Annual Information Form."[15]  *Id.*
After February 2019, Turquoise Hill's press releases also warned that mining operational
and technical risks included "geotechnical risks and ground conditions."  Dkt. No. 134-13
at 3 (Feb. 27, 2019 Press Release); Dkt. No. 134-16 at ECF p. 21 (Mar. 15, 2019 Press
Release).

Further, on investor conference calls during which the rest of the statements about
OT's estimated budget and schedule were made,[16]  Turquoise Hill would start by
referring listeners to the "forward-looking language included in our press release and
MD&A."  Transcripts of the calls also noted that:

> In the conference calls upon which Event Transcripts are based, companies may
> make projections or other forward-looking statements regarding a variety of items.
> Such forward-looking statements are based upon current expectations and involve
> risks and uncertainties.  Actual results may differ materially from those stated in
> any forward-looking statement based on a number of important factors and risks,
> which are more specifically identified in the companies' most recent SEC filings.
> Although the companies may indicate and believe that the assumptions underlying
> the forward-looking statements are reasonable, any of the assumptions could prove
> inaccurate or incorrect and, therefore, there can be no assurance that the results
> contemplated in the forward-looking statements will be realized.

Dkt. No. 134-7 at 2, 13 (Aug. 1, 2018 Investor Call); Dkt. No. 134-11 at 13 (Nov. 2, 2018
Investor Call) (same).

As an initial point, cautionary language may be incorporated by reference.  *See In
re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 319 (S.D.N.Y. 2020)
("[C]onference calls both contained meaningful cautionary language about the nature of

---

[15] *See also* Dkt. No. 134-8 at 4 (Oct. 15, 2018 Press Release) (similar disclosures); Dkt. No. 134-9 at 19 (Nov. 1, 2018 Press Release) (similar disclosures)

[16] Specifically, on an August 1, 2018 conference call, Turquoise Hill executives stated, among other things, that: we "maintain our expectation of first draw bell in mid-2020 and sustainable first production in 2021." Dkt. No. 127 ¶ 314 (emphasis omitted).  Moreover, on the November 2, 2018 investor conference call, Turquoise Hill executives stated: "where we are with the information that we've provided, we confirm the $5.3 billion total budget."  *Id.* ¶ 348.

the forward-looking statements . . . on the contemporaneously filed press releases, which were incorporated by reference into the conference calls."); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 303 (S.D.N.Y. 2013) (determining that cautionary language incorporated by reference "was more than sufficient to bring it within the protection of the bespeaks caution doctrine"); *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 233 (S.D.N.Y. 2009) (concluding that reference during conference call to risk disclosures in press release sufficient to satisfy PSLRA safe harbor). "Courts in this Circuit routinely find that references to SEC filings that expound more fully on the risks suffice to adequately convey the risks." *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d at 319. Turquoise Hill press releases therefore incorporated by reference the cautionary language in the Forms 40-F and the investor conference calls incorporated by reference the cautionary language in the press releases and, in turn, the cautionary language in the Forms 40-F. *See Kinross Gold Corp.*, 957 F.Supp.2d at 303 ("For similar reasons, Kinross's statements during its February 17, 2011 conference call are protected as forward-looking. At the beginning of the call, Kinross's moderator stated that the speakers would 'be making forward-looking statements during the presentation,' and directed the call participants to the cautionary language in Kinross's February 16, 2011 news release for a discussion of the relevant risks, uncertainties, and assumptions.").

The extensive and specific risk disclosures in the press releases and Forms 40-F constitute meaningful cautionary language adequate to invoke the PSLRA's safe harbor. Turquoise Hill explicitly warned investors that "the timing and cost of the construction" were uncertain, could differ materially from what was estimated based on delays as well

as the costs which would result from delays, and depended on a host of factors, including the availability and cost of skilled labor, ground conditions, and the timing and cost of the construction of the Mine. Turquoise Hill also warned investors that the complexities of the property were increased by its remote location. Turquoise Hill therefore specifically warned investors of the significant uncertainty surrounding the construction timeline and budget of the underground development project, and a reasonable investor would have understood that the schedule and capital expenditures projections were subject to change. *See In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009) ("Given the warnings regarding capital costs, it would be unreasonable to demand that a cost estimate must hold steady over a multi-year period requiring considerable amounts of construction of a large mine in a remote location by a company just getting its start in the mineral production business."). The risks were also company-specific, with Turquoise Hill noting, for example, that these risks were increased by the remote location of OT. Accordingly, "a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).

Plaintiffs nonetheless argue that such risk disclosures are insufficient because the cautionary language was virtually unchanged throughout the Class Period despite Defendants' knowledge of costs overruns and schedule delays before the Class Period, which were only expected to rapidly escalate, and the conclusion of Defendants' own advisor that there was a 0% likelihood that the schedule would be met. Dkt. No. 135 at 56–57 (citing Dkt. No. 127 ¶¶ 73–131, 134–161, 300, 312). In support of this argument, Plaintiffs cite to *Slayton*, in which the Second Circuit held that: "[t]he consistency of the

defendants' [cautionary] language over time" "bolstered their conclusion that the cautionary language at issue was not meaningful and entitled to protection under the PSLRA." 604 F.3d at 773. In *Slayton*, defendants had failed to update their cautionary language in spite of "the new information they received in early May 2001," which the court noted "belie[d] any contention that the cautionary language was 'tailored to the specific future projection.'" *Id.*

The Court rejects Plaintiffs' argument that *Slayton* should be read to allow courts to consider the defendant's knowledge in assessing whether cautionary language is sufficiently meaningful. While the Court in *Slayton* did note that the consistency of the language over time despite new information bolstered the conclusion that such language was not meaningful, the court's decision in that case primarily rested on the fact that the language at issue—a single sentence warning—verged on "mere boilerplate." 604 F.3d at 772–73. In fact, *Slayton* expressly declined to address this issue of whether an "issuer [may] be protected by the meaningful cautionary language prong of the safe harbor even where his cautionary statement omitted a major risk that he knew about at the time he made the statement." *Id.* at 771.

Moreover, such an inquiry would be plainly contrary to the disjunctive nature of the PSLRA safe harbor. As this Court stated in *Wesco Aircraft Holdings*:

> This argument conflates the actual knowledge and meaningful cautionary language prongs of the PSLRA. If the Court were to accept it, an allegation of actual knowledge of falsity would suffice to deprive a forward-looking statement of the protections of safe harbor even if there were meaningful cautionary language otherwise. Such a result would be contrary to the disjunctive nature of the safe harbor elements.

454 F. Supp. 3d at 394. This conclusion is further bolstered by the Conference Report accompanying the PSLRA, which stressed that "[c]ourts should not examine the state of

mind of the person making the statement."  Conference Report at 43, 1995 U.S.C.C.A.N. at 742; *see Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 147 (2d Cir. 2002) ("The conference report is generally the most reliable evidence in legislative history of congressional intent because it represents the final statement of the terms agreed to by both houses.").

However, even if *Slayton* were read as broadly as Plaintiffs request, it still would not apply here.  Unlike in *Slayton*, Plaintiffs do not point to any specific new information that the Turquoise Defendants—as opposed to the Rio Defendants—received that would have alerted them to the need to update their risk disclosures.  As discussed *infra* Section IV.A, the Complaint does not plausibly allege that the Turquoise Defendants were aware of cost overruns and schedule delays outside of what they disclosed to investors.  Further, while the Complaint does allege that Defendants' own advisor "analyzed the 2017 and 2018 'reforecasts' showing that the publicly stated schedules had a 2% and 0% chance of being completed on-time, respectively," Dkt. No. 127 ¶ 300, it does not state when this analysis was completed, whether it was provided to the Turquoise Defendants, and, if so, when that was relative to the disclosures at issue.  Without such facts, it cannot be inferred that the Turquoise Defendants would have been alerted to the facts that Plaintiff alleges required updating.  Accordingly, the Court cannot conclude that the cautionary language was not meaningful on this basis.

For these reasons, Turquoise Hill's statements related to the expected timeline and capital expenditures of the underground development project are protected by the PSLRA

safe harbor for forward-looking statements.  Plaintiffs' Section 10(b) claims with respect

to these statements are therefore dismissed.[17]

### 2.    Statements that the delays were "not atypical"

The SAC also alleges that the Turquoise Defendants' statement after the October 15,

2018 "re-forecast" that "these types of delays are certainly not atypical in the mining industry for

projects of this scale and complexity" was false or misleading.  Dkt. No. 127 ¶¶ 348, 353.  This

statement was made by Quellmann on an investor conference call regarding Turquoise Hill's

third quarter fiscal year 2018 financial results on November 2, 2018.[18]  *Id.*  The SAC alleges that

this statement was false or misleading as "the delays at Oyu Tolgoi were atypical and material

because, as described by former OT managers, they resulted from abysmal construction and

procurement work, and were like nothing they had ever experienced in their long careers in

mining."  *Id*. ¶ 353.  Defendants respond that such statements are "quintessential opinion

---

[17] Plaintiffs also argue that even if certain of these statements are protected by the PSLRA safe harbor, Defendants are still liable for their omission of material information—*i.e.*, the cost overruns and delays—in their disclosures.  Dkt. No. 135 at 55.  However, while it is true that courts "in this circuit have consistently held that neither the PSLRA safe harbor, nor the bespeaks-caution doctrine protects material omissions," *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017); *see also In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 537 (S.D.N.Y. 2021), Plaintiffs may not recharacterize their false-statement claims as material-omission claims on the basis that the statements were false because they omitted material contrary information.  Otherwise, the PSLRA would have no force.  Regardless, Plaintiffs have failed to sufficiently allege that Turquoise Hill acted with scienter.  *See infra* Section IV.A.

The Turquoise Defendants also argue that even if these statements were not protected by the PSLRA safe harbor, these statements are nonetheless protected as vague statements of corporate optimism or puffery.  Dkt. No. 133 at 50.  Because this Court finds that they are nonactionable as forward-looking statements entitled to the PSLRA safe harbor, it does not address this argument.

[18] The full statement was "[t]he work delays are of course not desirable, developing the OT underground blockade is a very large undertaking and these types of delays are certainly not atypical in the mining industry for projects of this scale and complexity."  Dkt. No. 127 ¶ 348.

statements" and that Plaintiffs have not adequately alleged that they were false when made.  Dkt. No. 133 at 40–42.

To adequately allege that a statement of opinion is false or misleading, a plaintiff must sufficiently allege that the defendant: (1) "did not hold the belief [defendant] professed"; (2) the "supporting fact[s] [defendant] supplied were untrue"; or (3) "omit[ted] information whose omission ma[d]e[] the statement[s] misleading to a reasonable investor."  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citation omitted); *see also Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (summary order).

Plaintiffs appears to argue that Turquoise Hill's statement that "these types of delays are certainly not atypical" does not qualify as a statement of opinion.  Citing the Supreme Court's opinion in *Omnicare*, 575 U.S. 175, Plaintiffs cursorily state that "[a] statement is an opinion only when it is expressly stated as such."  Dkt. No. 135 at 58.

However, "*Omnicare* may not be construed so simplistically."  *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 755 (S.D.N.Y. 2018).  The Supreme Court's opinion in *Omnicare* addressed when an opinion may be actionable as a false or misleading statement for purposes of securities fraud liability.  575 U.S. 175.  It did not address what qualifies as a statement of opinion as opposed to a statement of fact in the first place.  And, although the examples the Supreme Court gave of opinion statements in *Omnicare* were expressly stated as opinion (*e.g.*, "I think the coffee is hot" or "I believe our marketing practices are lawful"),  the Court decidedly did not hold that a statement must be qualified by a "I think" or "I believe" or "it is my opinion that" to qualify as one of opinion.  *Id.* at 183–84.  To read *Omnicare* in such a way would produce absurd results.  Prototypical opinion statements—such as "I like how things are going"

or "we have a good amount of talent on board"—would, under such a reading of *Omnicare*, all of a sudden qualify as statements of facts.

Moreover, since the Supreme Court's decision in *Omnicare*, the Second Circuit has held that productivity estimates—that were not expressly stated as opinions—"were statements of [] opinion, rather than assertions of purported fact." *Martin*, 732 F. App'x at 40 & n.1. The court noted that "[e]stimates, in particular, constitute a well-established species of opinion" as they "'will vary depending on the particular methodology and assumptions used,' rendering them 'subjective.'" *Id.* (citing *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011)). In other words, the court did not interpret *Omnicare* as establishing new law on what an opinion statement was and instead continued to find that statements are opinions —even if not expressly identified as such—where they "vary depending on the particular methodology and assumptions used,' rendering them 'subjective.'" *Id.* (quoting *Fait*, 655 F.3d at 111)

For the same reasons that estimates are well-established species of opinion, the statement in isolation that delays were "not atypical" is one of opinion. An estimate depends "on the particular methodology and assumptions used," "rendering [it] 'subjective.'" *Martin*, 732 F. App'x at 40 n.1 (quoting *Fait*, 655 F.3d at 111); *see Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 398 (S.D.N.Y. 2020) ("[A]ccounting estimates that depend on management's determination or assumptions are 'subjective' opinions and 'not matters of objective fact.'" (internal quotation marks and citation omitted)); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019) ("Actuarial or accounting assumptions 'depend on the particular methodology and assumptions used' and are not 'objective factual matters.'" (cleaned up)); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 312–13 (S.D.N.Y. 2013) (applying this standard and finding that statements about the value of company's deferred tax assets were

statements of opinion).  It cannot be decided as a "matter[] of objective fact."  *Fait*, 655 F.3d at

110.  So too is the statement that the cause of a delay is or is not "atypical."  Among other things,

it will depend on whether there is a publicly understood general (and not "particular") metric of

what is typical, how frequently an event must occur for it to be considered metric, and how

broadly the speaker classifies the type of delays.  *See In re Nielsen Holdings PLC Sec. Litig.*, 510

F. Supp. 3d 217, 233 (S.D.N.Y. 2021); *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d

241, 253 (S.D.N.Y. 2015) (holding that statement that proposed merger offers a fair price was an

opinion statement, as "[w]hether a particular deal is 'fair' is, after all, not a determinate,

verifiable statement like 'this ring is 24–carat gold'").  As counsel for Turquoise Hill admitted at

argument, there is no categorical rule that a statement regarding typicality can never be one of

fact.  Transcript of Oral Argument (Aug. 25, 2022) at 50:21–22.  But in the absence of any

allegation that there exists an objective metric by which to determine which types of events are

typical and which are not, the statement that the delay is not atypical is one of opinion.  It

depends on management's views on what is typical and what is atypical and will vary on the

methodology management uses to determine typicality.  Accordingly, the statement that delays

are not "atypical," while presumably based on supporting facts, is not itself a statement of fact

but instead a statement of opinion.  *See Omnicare*, 575 U.S. at 182 ("[A] statement of belief may

make an implicit assertion about the belief's 'subject matter.'"); *Bedford*, 308 F. Supp. 3d at 755

("Whether a statement is a matter of fact is a question of whether the statement sets forth

something verifiable.").

　　　　　To be actionable, therefore, Plaintiffs must sufficiently allege that (1) Turquoise Hill did

not hold the belief that such delays were "not atypical," (2) that the facts supplied in support of

the belief were untrue, or (3) Turquoise Hill omitted information which led the statements to be

misleading to a reasonable investor.

In their opposition, Plaintiffs do not address which of these factors applies to Turquoise

Hill's statement that the delays were "not atypical."  Dkt. No. 135 at 58–61.  In fact, Plaintiffs'

opposition does even respond to Defendants' argument that if this particular statement is an

opinion, it is inactionable.  *See* Dkt. No. 135 at 58–61 (only addressing why the statement that

OT remained on track would be actionable if it were an opinion).  The Court therefore will

consider this point conceded.  *See Sussman Sales Co., Inc. v. VWR Int'l, LLC*, 2021 WL

1165077, at *20 (S.D.N.Y. Mar. 26, 2021) ("Plaintiff does not directly respond to this argument

in its opposition briefing, and the Court will consider this point conceded."); *AT & T Corp. v.

Syniverse Techs., Inc.*, 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) ("Perhaps recognizing

the futility of contesting this issue, AT & T did not even discuss it in its opposition brief.  AT &

T's silence concedes the point.").

Even if this claim, however, were not conceded, any attempt to oppose it would likely be

futile.  *See Omnicare*, 575 U.S. at 194 (stating that this "is no small task for an investor").  The

Complaint merely notes that the "delays at Oyu Tolgoi were atypical and material because, as

described by former OT managers, they resulted from abysmal construction and procurement

work, and were like nothing they had ever experienced in their long careers in mining."  Dkt. No.

127 ¶ 353.  However, this statement does not allege that the Turquoise Defendants *themselves*

did not hold the belief that such delays were not atypical, or that the Turquoise Defendants

omitted information that they had in their possession that led the statement to be misleading to a

reasonable investor.  *See Omnicare*, 575 U.S. at 189 (explaining that an opinion may actionable

due to an omission if the opinion did not fairly align "with the information in the issuer's

possession at the time").  Regardless of whether other managers had seen such delays in their careers, the managers who made the statements could have believed that the delays were not unprecedented and were typical.  Moreover, other than a conclusory remark that the "delays at Oyu Tolgoi were atypical," Dkt. No. 127 ¶ 353 Plaintiffs do not allege any facts indicating that such delays are not typical at complex mining companies or that "any of the facts supplied by" Turquoise Hill in support of its estimate that such delays were atypical were objectively false. *Martin*, 732 F. App'x at 41.

Accordingly, Plaintiffs 10(b) claim related to Turquoise Hill's November 2, 2018 statement that the delays were "not atypical" is dismissed.

### 3. Statements that the "key risks were well understood and management," that Turquoise Hill is "well positioned" to address key challenges, and that things were "progressing well"

The SAC also alleges that Turquoise Hill's statements that the "Key risks" were "well understood and managed," that "Turquoise is Well Positioned to Address Key Challenges," and that things were "progressing well" were false and misleading because, at this time, the OT expansion project was severely overbudget, the key risks were out of control, and Turquoise Hill lacked the funding to deal with these issues.  *See* Dkt. No. 127 ¶¶ 336, 362–363, 366. Defendants respond that such statements are vague statements of optimism that are not actionable.  Dkt. No. 133 at 42–43.

General statements of corporate optimism are non-actionable puffery.  Unlike "specific, factual" statements, "vague descriptions [that] offer only generally optimistic opinions" are not actionable under section 10(b) and Rule 10b–5.  *In re Synchrony*, 988 F.3d at 170.  A speaker engages in puffery when he claims to be "'pretty confident' and 'pretty positive'" about the future, or when he makes "[v]ague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices . . . ."  *Id.*  Such statements "are 'too

general to cause a reasonable investor to rely upon them' and therefore are 'precisely the type of puffery that this and other circuits have consistently held to be inactionable.'" *Id.* (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)).

As an initial point, in their opposition, Plaintiffs do not specifically respond to the Turquoise Defendants' argument that the first two statements—*i.e.*, that "key risks" were "well understood and managed" and that "Turquoise is Well Positioned to Address Key Challenges" —are inactionable. Dkt. No. 135 at 51–52 (only responding to question of whether Defendants' "on track," "on plan," and "progressing well" statements were inactionable puffery). The Court asked Plaintiffs at oral argument whether they intended to oppose Turquoise Defendants' argument that these statements were not actionable, and Plaintiffs responded that they did not "disagree [as to] some of those peripheral comments." Transcript of Oral Argument (Aug. 25, 2022) at 86:9–24. Accordingly, Plaintiff has indicated that they do not oppose the Turquoise Defendants' motion to dismiss as to these two statements. Plaintiffs have therefore abandoned their Section 10(b) claims with respect to these statements. *See, e.g.*, *Colbert v. Rio Tinto PLC*, 2019 WL 10960490, at *3 (S.D.N.Y. July 29, 2019) ("It is well established that where a plaintiff does not oppose a defendant's argument with respect to an alleged misstatement, it has abandoned its Section 10(b) claim in connection with th[e] misstatement." (cleaned up)); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 449 (S.D.N.Y. 2018) ("Plaintiffs do not oppose this argument and have, therefore, abandoned their Section 10(b) claim in connection with this misstatement."); *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 328 (S.D.N.Y. 2018) ("[I]n their opposition to Defendants' motions to dismiss, Plaintiffs failed to address Defendant Sullivan's claim that he is not personally involved. 'The

failure to oppose a motion to dismiss a claim is deemed abandonment of the claim.'" (quoting *Johnson v. City of New York*, 2017 WL 2312924, at *18 (S.D.N.Y. May 26, 2017))).  Plaintiffs' Section 10(b) claims with respect to these statements are therefore dismissed.

In their opposition, Plaintiffs do, however, contest Turquoise Hill's argument that its statement that things were "progressing well" was puffery.  Dkt. No. 135 at 50–52.  Plaintiffs argue that such a statement cannot be puffery because it was made in response to analysts' questions and investors' concerns about the Oyu Tolgoi mine's schedules and costs, and they note that whether a representation is puffery depends on the context in which it is made.  Dkt. No. 135 at 51–52.  Further, Plaintiffs argue that even if this statement is puffery, Defendants may still be liable for such an expression of puffery if it is in tension with facts known to a defendant. Dkt. No. 135 at 50–51.

As to the second point, even if Plaintiffs are correct that statements of puffery may be actionable if they contradict facts known to the defendant, Dkt. No. 135 at 50, Plaintiffs do not point to any facts *known* to Turquoise Hill that clearly contradicted its statement that things were progressing well.  As noted *infra* Section IV.A, Plaintiffs do not sufficiently allege that Turquoise Hill was aware of the true state of delays and cost overruns at the Mine.  *See In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *11 (S.D.N.Y. Mar. 30, 2021) ("Critically, Plaintiff points to no data—such as documents, reports, analyses, etc.—suggesting that Defendants' statements regarding DN's integration efforts were false or misleading when made, let alone that Defendants knew of such data but made their representations anyway."). Therefore, assuming that such an exception exists, it does not apply here.

As to Plaintiffs first point, Plaintiffs correctly note that "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*,

116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F.Supp.3d 482, 485 (S.D.N.Y.2014); *U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*, 2013 WL 791462, at *7 (S.D.N.Y. Mar. 5, 2013). Specifically, where the context makes it such that "a reasonable investor could rely on them as reflective of the true state of affairs at the Company," courts in this District routinely hold that such statements will not be found to be inactionable puffery. *In re Petrobras Sec. Litig.,* 116 F. Supp. 3d at 381; *see Villare v. Abiomed*, Inc., 2021 WL 4311749, at *15 (S.D.N.Y. Sept. 21, 2021).

Applying that principle, courts have found that statements that generally would be puffery in one context are not puffery in another if made to reassure investors as to "specific risks." *Washington State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020); *see In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 381. For example, in *In re Banco Bradesco S.A. Securities Litigation*, the court found that while certain statements "may be mere puffery when viewed in isolation, context shows they were made in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern, and that therefore 'a reasonable investor could rely on them as reflective of the true state of affairs at the Company.'" 277 F. Supp. 3d at 660 (quoting *Petrobras*, 116 F. Supp. 3d at 381). Similarly, in *Odebrecht S.A.,* the court held that defendant's statements about its "competitive advantage" "were made to reassure investors as to specific risks regarding international competition, and accordingly they cannot be dismissed as 'mere puffery.'" 461 F. Supp. 3d 46, 74; *see Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 532 (S.D.N.Y. 2020) (stating that a code of conduct, while generally inactionable puffery, "could be viewed as

material statements of fact" where it is wielded "to reassure investors that nothing was amiss when faced with suspicions of internal malfeasance").

This holding—*i.e.*, that a statement that may be puffery in one context is not puffery where it reassures investors as to specific risks—makes sense. A statement of mere puffery is inactionable because it is "too general to cause a reasonable investor to rely upon [it]." *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 29 (2d Cir. 2019) (summary order). However, where a company makes a statement in direct response to concerns raised by investors about a specific risk, it is fair to read the statement in context. *See In re Vivendi, S.A.*, 838 F.3d at 250 (statements must be read "together and in context"). The statement is no longer the general one that all companies would make about their business or their integrity (and thus insufficient to support the reasonable reliance of an investor on the statement as applied to the particular company); it is a statement about a distinctive risk. A statement that a chief executive officer is "law-abiding," on its own may mean very little. Corporate officers are presumed to be law-abiding; it would be an unusual company that was unwilling to say that about its officers generally. The same statement, given in response to the question whether a particular officer who was then under investigation for violating the law, could take on an entirely different meaning altogether.

Applying this reasoning, Turquoise Hill's statement that "lateral development has progressed well" is not puffery. Dkt. No. 127 ¶ 335. This statement was made in the same press release that Turquoise Hill announced on October 15, 2018 that there would be a two to three quarter delay in achieving sustainable production at OT. *Id.* ¶ 334. Specifically, the press release announced:

> However, there are certain delays, most notably to the completion of Shaft 2, which includes schedule contingency, that are ultimately expected to result in a revised

sustainable production start from the first quarter of 2021 to late in the third quarter 2021.  We are undertaking a review of the cause and the impact of these delays and will announce the results as soon as possible.

. . .

Rio Tinto, in its role as manager of Oyu Tolgoi and underground construction contractor, has undertaken its second annual schedule and cost re-forecast for the project.  According to this re-forecast, *lateral development has progressed well*, construction completion schedule remains on track for 2022 and the project is expected to be completed at the $5.3 billion budget estimate disclosed in the 2016 Oyu Tolgoi Feasibility Study and the 2016 Oyu Tolgoi Technical Report.

Dkt. No. 127 ¶¶ 335–336 (emphasis added).

As in *In re Banco Bradesco S.A. Securities Litigation* and *Odebrecht S.A.*, the statement that "lateral development has progressed well"—viewed in context—was addressed to the particular concern of investors about the announced delay.  Specifically, and in connection with the statements directly surrounding it, Turquoise Hill's statement about "progress" reassured investors that construction related to the underground development was not substantially impaired by any delay, a representation that a "reasonable investor could rely on [] as reflective of the true state of affairs at the Company."  *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 381.  Accordingly, it cannot be dismissed as mere puffery.  However, because Plaintiffs fail to allege that Turquoise Hill acted with scienter about the underground development project's delays, *see infra* Section IV.A, Plaintiffs' Rule 10b–5 claim with respect to this statement is nonetheless dismissed.[19]

_____

[19] The Court does not address whether this statement would nonetheless be protected as a statement of opinion as Defendants do not move to dismiss this statement on that basis.

**B.    Rio Tinto**

The Rio Defendants seek to dismiss the following two categories of statements as not actionable either because they are forward-looking statements protected by the PSLRA's safe harbor, are inactionable statements of opinion, or are not material:

(1) Statements that the project was "on track," "on budget," and would meet construction expectations; and

(2) Statements that the OT underground development was the "Highest Quality Copper Development" in the world and "Progress[ing] Well."

Dkt. No. 143 at 21–29 & App. A (Categories I, II, III, IV).  The Rio Defendants also argue that the Sarbanes-Oxley ("SOX") certifications and risk disclosures are inactionable and that none of the alleged misstatements were materially false or misleading.  *Id.* at 29–34.

**1.    Statements that the project was "on track," "on budget," and would meet construction expectations**

The Complaint alleges that, similar to Turquoise Hill, Rio Tinto made several statements through the Class Period that the OT project was "on track," "on schedule," and "on plan" and that "[a]ll material assumptions underpinning these production targets continue to apply and have not materially changed."  Dkt. No. 127 ¶¶ 324–372.  The Complaint also alleges that Rio Tinto represented that the "First drawbell production [was] expected mid-2020," "with average annual production of 560 thousand tonnes between 2025 and 2030," and that "the main production shaft (Shaft 2) is now expected to complete in October 2019."  *Id.* ¶¶ 323, 324, 329, 365, 371–372, 396.  Similarly, Rio Tinto allegedly stated that a "$5.3 billion capex [was] projected" for the project, the project remained "on budget," and "capital costs remain in line with the overall $5.3 billion budget."  *Id.* ¶¶ 324–372.

Rio Tinto moves to dismiss Plaintiffs' claims related to these statements, arguing that they are protected by the PSLRA's statutory safe harbor for forward-looking statements or, alternatively, are statements of opinion or inactionable puffery.  Dkt. No. 133 at 21–29.

For the same reasons discussed *supra* Section III.A.1, these are all forward-looking statements under the PSLRA.  The vast majority of these statements either concern the projected schedule for or future operations of the Mine and therefore are, under the PSLRA, "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," 15 U.S.C. § 78u-5(i)(1)(B), or concern the expected capital costs/budget of the project and are forward-looking statements "containing a projection of . . . capital expenditures . . . or other financial items" under the PSLRA, 15 U.S.C. § 78u-5(i)(1)(A).  *See, e.g.*, *Moshell*, 481 F. Supp. 3d at 287 (finding schedule and capital expenditure estimates to be forward-looking looking statements under these provisions of the PSLRA); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *8 (same).

Moreover, statements that project was "on track" and "on schedule," that capital costs remain "in line," and "[a]ll material assumptions underpinning these production targets continue to apply and have not materially changed" are similarly forward-looking statements under the safe harbor.  As explained in Section III.A.1, such statements are virtually indistinguishable from the project projections of which they are part and, even if they implicitly assert a statement of current fact, that assertion is too vague to be actionable separate from the future projection.  *See Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 387 ("Courts within this Circuit have found that statements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement."); *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *21 ("[W]hen the present-tense portion of mixed present and future statements does

not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection."); *Gissin*, 739 F. Supp. 2d at 505 ("[T]o the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.'" (quoting *Avaya*, 564 F.3d at 255)).

Because these statements are forward-looking, they are protected under the PSLRA safe harbor if they are accompanied by meaningful cautionary language.  *See Wesco Aircraft Holdings*, Inc., 454 F. Supp. 3d at 385–86.  Rio Tinto's statements at issue are alleged to have come largely from four sources: (i) Rio Tinto's 2018 Annual Report filed as an exhibit to its Form 20-F filed with the SEC; (ii) press releases filed as exhibits to Forms 6-K filed with the SEC; (iii) presentations associated with earnings calls and other public presentations; and (iv) an interview of Soirat on MBN World.

The first three sources—*i.e.*, Rio Tinto's annual report, press releases filed as Forms 6-K with the SEC, and public presentations—contained specific and extensive cautionary language. *See Slayton*, 604 F.3d at 773.  The annual report listed four pages of "principal risks and uncertainties" that could "materially affect Rio Tinto or its ability to meet its strategic objectives."  Dkt. No. 130-2 at 6.  Those risks included: (i) "The Group's ability to raise sufficient funds for planned expenditure;" (ii) "operational difficulties through the value chain"; (iii) operational failure; (iv) natural disasters; and (v) "[t]he inability to attract or retain key talent [that] will constrain the Group's ability to reach its goals within planned timeframes." *Id.* at 6–9. Moreover, as particularly relevant here, the annual report warned of the "inherent risk and

uncertainty" of "[c]apital project development," stating that the "[a] delay or overrun in a project schedule could negatively impact the Group's profitability, cash flows, ability to repay project-specific indebtedness, asset carrying values, growth aspirations and relationships with key stakeholders." *Id.* at 7. The cautionary language therefore "convey[ed] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement," *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 392 (quoting Conference Report at 43, 1995 U.S.C.C.A.N. at 742), and directly "relate[d] to the risk that brought about plaintiffs' loss," *Halperin*, 295 F.3d at 359.

Rio Tinto's press releases contained similarly substantive warnings about the risk that results could differ materially from what was projected. The press releases stated:

> Such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements of Rio Tinto, or industry results, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. Such forward-looking statements are based on numerous assumptions regarding Rio Tinto's present and future business strategies and the environment in which Rio Tinto will operate in the future. Among the important factors that could cause Rio Tinto's actual results, performance or achievements to differ materially from those in the forward-looking statements are levels of actual production during any period, levels of demand and market prices, the ability to produce and transport products profitably, the impact of foreign currency exchange rates on market prices and operating costs, operational problems, political uncertainty and economic conditions in relevant areas of the world, the actions of competitors, activities by governmental authorities such as changes in taxation or regulation and *such other risk factors identified in Rio Tinto's most recent Annual Report and Accounts in Australia and the United Kingdom and the most recent Annual Report on Form 20-F filed with the United States Securities and Exchange Commission (the "SEC") or* Form 6-Ks furnished to, or filed with, the SEC. Forward looking statements should, therefore, be construed in light of such risk factors and undue reliance should not be placed on forward-looking statements. These forward-looking statements speak only as of the date of this announcement.

Dkt. No. 130-5 at 7 (emphasis added). Notably, the press releases warned investors of the potential for performance or achievements "to differ materially from those in the forward-looking statements," including due to "operational problems." *Id.* And the press releases

directed investors to the risk factors identified in the Form 20-F filed with the SEC and therefore

incorporated those risk factors by reference.  *See Biovail Corp.*, 615 F. Supp. 2d at 233

(concluding that reference during conference call to risk disclosures in press release sufficient to

satisfy PSLRA safe harbor); *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d at 319

("[C]onference calls both contained meaningful cautionary language about the nature of the

forward-looking statements . . . on the contemporaneously filed press releases, which were

incorporated by reference into the conference calls."); *Kinross Gold Corp.*, 957 F. Supp. 2d at

303 (determining cautionary language incorporated by reference "was more than sufficient to

bring it within the protection of the bespeaks caution doctrine").

   Finally, Rio Tinto's public presentations also contained meaningful cautionary language

warning investors about relying on the forward-looking statements contained therein.  Plaintiffs'

presentations contained a "forward-looking statements" slide, which specifically warned that

"anticipated production or construction dates, costs, outputs and productive lives of assets or

similar factors" may vary depending on certain factors:

> Examples of forward-looking statements include those regarding estimated ore
> reserves, anticipated production or construction dates, costs, outputs and productive
> lives of assets or similar factors.  Forward-looking statements involve known and
> unknown risks, uncertainties, assumptions and other factors set forth in this
> presentation.  For example, future ore reserves will be based in part on market
> prices that may vary significantly from current levels.  These may materially affect
> the timing and feasibility of particular developments.  Other factors include the
> ability to produce and transport products profitably, demand for our products,
> changes to the assumptions regarding the recoverable value of our tangible and
> intangible assets, the effect of foreign currency exchange rates on market prices and
> operating costs, and activities by governmental authorities, such as changes in
> taxation or regulation, and political uncertainty.
>
> In light of these risks, uncertainties and assumptions, actual results could be
> materially different from projected future results expressed or implied by these
> forward-looking statements which speak only as to the date of this presentation.
> Except as required by applicable regulations or by law, the Rio Tinto Group does
> not undertake any obligation to publicly update or revise any forward-looking
> statements, whether as a result of new information or future events. The Group

cannot guarantee that its forward-looking statements will not differ materially from actual results.

Dkt. No. 130-4 at ECF p. 3.  This slide contained "meaningful cautionary language that identified with specificity the types of risks that might lead the estimates to be inaccurate" and specifically identified "production or construction dates" and "costs" as forward-looking statements that could "be materially different" from projections.  *See In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *8.  Such language is sufficient to trigger the safe harbor under the PSLRA.

Yet, while the first, second, and third sources of Rio Tinto's statements were accompanied by meaningful cautionary language, the Rio Defendants do not address whether similar cautionary language accompanied the fourth source of statements—*i.e.*, television interviews.  As relevant here, Soirat allegedly stated during an interview on August 15, 2018 on MBN World, a Mongolian news network, that the underground project was "on plan and on budget."  Dkt. No. 127 ¶ 328.  Defendants "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor."  *Slayton*, 604 F.3d at 73.  Because the Rio Defendants have not proffered any evidence that meaningful cautionary language accompanied Soirat's statements on MBN World, these forward-looking statements are not entitled to protection under the PSLRA safe harbor on that basis.

This, however, does not end the inquiry.  The Rio Defendants also argue that the statements that the project are "on plan and on budget" are entitled to the PSLRA safe harbor because Plaintiffs have not adequately pled that the statements were not honestly believed when they were made.  Dkt. No. 131 at 25.  In addition, the Rio Defendants argue that these statements are inactionable statements of opinion and puffery and are not alleged to have been materially false or misleading when made.  *Id.* at 26–34.

As an initial point, for the reasons discussed in greater detail below, *see infra* Section IV.B, Plaintiffs adequately pled that Soirat, prior to the Class Period, knew that the underground development project was behind schedule and over budget.  For example, Plaintiffs allege that approximately one month prior to Soirat's statement on MBN World, Bowley—who Soirat had hired to investigate problems at the Mine—told Soirat's direct report, Fagen, who had acted as his intermediary in the past, that the project was "12 months behind schedule" and "$300 mill capital over budget," numbers that were expected to "rapidly escalate."  Dkt. No. 127 ¶ 143. Plaintiffs also allege that in May 2018, Soirat instructed Bowley to stop looking into delays and cost overruns at OT and that Bowley was later fired after continuing to report his concerns to Soirat.  *Id.* ¶¶ 143, 281–282.  These allegations, along with others, sufficiently raise the inference that Soirat had "actual knowledge" that his statements on MBN World that the project was "on plan and on budget" were false or misleading when made.

That is fatal to the Rio Defendants' arguments that: (i) the statements are entitled to the PSLRA safe harbor under the actual knowledge prong, *see Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 385 (explaining that third prong only applies where plaintiff "fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading" (quoting *Slayton*, 604 F.3d at 766)); and (ii) are inactionable statements of opinion, *see Omnicare*, 575 U.S. at 185–86 (holding that liability for a statement of opinion will follow "if the speaker did not hold the belief she professed").

What is left is whether these statements—*i.e.*, that the underground project was "on plan and on budget"—were inactionable puffery.  A statement of puffery is a "statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it."  *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *13 (internal quotation marks and citation omitted).

"Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 368 (S.D.N.Y. 2021) (quoting *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 381). Accordingly, while "simple economic projections" are generally not actionable, they may be actionable "if they are worded as guarantees or are supported by specific statements of [then-existing] fact." *Villare*, 2021 WL 4311749, at *13 (quoting *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *22); *see also In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998). The key inquiry in deciding whether a statement constitutes puffery is "the nature of the specific statement and whether it concretely assured investors of anything." *Villare*, 2021 WL 4311749, at *13 (quoting *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016)).

Applying these principles, Soirat's statements that the underground project was "on plan and on budget" were not puffery. According to the allegations in the Complaint, Rio Tinto had publicly announced on numerous prior occasions that the first draw bell would be in mid-2020, first production would be obtained in early 2021, and the total capital development cost for the Mine would be $5.3 billion. *See, e.g.*, Dkt. No. 127 ¶¶ 7, 16, 78. In that context, Soirat's statements that the underground project was on plan and on budget were specific, as they related to those earlier projections and confirmed their ongoing accuracy. These statements implicitly confirmed that the OT underground project was still able to meet its production target in early 2021 and that the underground development project was projected to be at or under budget. A reasonable investor therefore could have relied on these statements in assessing an investment in OT through Turquoise Hill, including as to whether the Mine's copper production was likely to begin "just as copper prices" were expected to "ris[e]." Dkt. No. 127 ¶ 77.

That these statements that the project was "on plan" and "on budget" were made in the context of prior specific statements about what that budget and schedule plan were distinguishes this from *In re EDAP TMS S.A. Securities Litigation*, which the Rio Defendants cite. 2015 WL 5326166, at *9–10 (S.D.N.Y. Sept. 14, 2015). Although there, the court found that statements indicating that the Food and Drug Administration ("FDA") approval process was "on track" and making continued "progress" were inactionable puffery, there were no allegations that the defendants had guaranteed or predicted FDA approval by a certain date. *Id.* at *9–10.[20]

Thus, while the remaining statements discussed above are dismissed as protected by the PSLRA safe harbor, Rio Defendants' request to dismiss Plaintiffs' Rule 10–5 claims with respect to this August 15, 2018 statement is denied.

### 2. Statements that the OT underground development was the "Highest Quality Copper Development" in the world and "Progress[ing] Well"

In a footnote, the Rio Defendants argue that Plaintiffs' claims related to certain statements that Oyu Tolgoi was the "highest quality copper development" in the world and "progress[ing] well" are inactionable puffery or, in the alternative, statements of opinion that are not alleged to be false when made. Dkt. No. 131 at 28 n.27 (citing Dkt. No. 127 ¶¶ 365, 372).

Plaintiffs, however, do not address these statements in their opposition, nor do they allege that they were false or misleading in their Complaint. Dkt. No. 127 ¶¶ 365–368, 372–373 (mentioning that Rio Tinto made these statements but not specifically alleging that they were false or misleading).[21] Thus, assuming that Plaintiffs even intended to raise Rule 10b–5(b)

---

[20] Defendants also cite *Elliott Associates, L.P. v. Covance, Inc.*, 2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) in support of this argument; however, in that case there was no allegation that the merger discussions were not "on track" when made. *Id.* at *10.

[21] Although Plaintiff allege that Rio Tinto's statement that the underground project was "proceeding well" was materially false and misleading, this statement was made in Rio Tinto's Year-End Results in 2018, *see* Dkt. No. 127 ¶¶ 371, 373, and is different from Rio Tinto's statement that the underground project "Progressed well in 2018" in its written presentation

claims with respect to any of these statements, those claims do not pass muster under the PSLRA as the Complaint does not "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1).

### 3.     SOX certification

The Complaint alleges that the Sarbanes-Oxley ("SOX") certification included in Rio Tinto's 2018 Form 20-F and executed by Jacques was false and misleading.  Dkt. No. 127 ¶ 412. The Rio Defendants move to dismiss this claim.  Dkt. No. 131 at 29–30.

The SOX certification signed by Jacques represented that: "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Rio Tinto plc, (Form 20-F, Ex. 12.1) (Mar. 4, 2019).[22]  This SOX certification "contained an important qualification that the certifying officer's statements are true based on his knowledge." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018) (cleaned up) (quoting *Menaldi v. Och-Ziff Cap. Mgmt. Grp.*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017)).  As will be discussed, *infra* Section IV.B, Plaintiffs do not sufficiently allege that Jacques possessed the requisite scienter as to the delays and cost overruns at the Mine, "undermin[ing] the allegations that [he] knew that the SOX certifications were false."  *Id.* (quoting *Menaldi*, 277 F. Supp. 3d at 517). Moreover, "[t]he law in this District is clear and uniform that [] SOX certifications do not provide a stand-alone basis for liability."  *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505,

---

concerning its 2018 annual results, *see id.* ¶ 372.  And Defendants do not appear to move to dismiss Plaintiffs' claim on the basis of the statement that the underground project was "proceeding well."  *See* Dkt. No. 131 at 28 n.27 & 131-1 (Appendix A).

[22] The Court takes judicial notice of this SEC filing.  *See In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d at 203.

at *21 (S.D.N.Y. Mar. 29, 2021).  Therefore, the SOX certification is not actionable.  *See Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at * 21; *Chapman*, 466 F. Supp. 3d at 410.

### 4.    Risk disclosures

Defendants also move to dismiss Plaintiffs' claims that the risk disclosures contained in Rio's 2017 and 2018 annual reports and Forms 20-F were false and misleading.  Dkt. No. 127 ¶¶ 420–424.  The key risk disclosure that Plaintiffs point to is Rio's risk disclosure providing that: "A delay or overrun in a project schedule could negatively impact the Group's profitability, cash flows, ability to repay project-specific indebtedness, asset carrying values, growth aspirations and relationship key stakeholders."  *Id.* ¶ 421.  Plaintiffs allege that such a disclosure was misleading as Rio failed "to disclose to investors that there were catastrophic undisclosed engineering, construction, and procurement problems at Oyu Tolgoi that caused significant delays and cost overruns in the construction of the underground project at the time they were made."  *Id.* ¶ 424.

Although Defendants acknowledge that a risk disclosure can itself be a material misrepresentation" "where the company warns only that a risk may impact its business when that risk has already materialized," Dkt. No. 131 at 30 (citing *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *10 (S.D.N.Y. Mar. 29, 2016)), Defendants nonetheless argue that the "Complaint does not adequately allege that the Defendants knew of and attempted to conceal any irreparable delays or cost overruns that had materialized at the time the risk disclosures were issued," *id.* However, as discussed *infra* Section IV.B, Plaintiffs do sufficiently allege that Rio knew of delays or cost overruns shortly before the Class Period and, instead of trying to fix them or disclose them to investors, attempted to silence those who spoke out about them.  The Court therefore rejects Defendants' request to dismiss this claim on this basis.

5.        **Falsity of the statements**

The Rio Defendants also contend that Plaintiffs do not sufficiently plead that their statements were actually false or misleading when made.  Dkt. No. 131 at 30.  Specifically, the Rio Defendants contend that the Complaint does not sufficiently allege: (i) specific facts regarding the delays and cost overruns; (ii) that their statements regarding the date of the first draw bell were false; (iii) that the October 2018 re-forecast was false; (iv) that construction issues with Shaft 2 were not disclosed to the market in October 2018; and (v) that Defendants falsely attributed delays to ground conditions.  The Rio Defendants also contend that Plaintiffs' attempt to establish falsity in March 2019 based on an impairment charge disclosed on July 31, 2019 is classic pleading-by-hindsight.  *Id.* at 30–34.

First, contrary to the Rio Defendants' contention, Plaintiffs allege sufficient specific facts that demonstrate that, by the beginning of the Class Period, the project was significantly behind schedule and over budget, problems that were only expected to get worse.  Plaintiffs specifically allege that Bowley—who had been hired to investigate problems at the Mine—determined, shortly before the Class Period, that the project was twelve months behind schedule and $300 million over budget, numbers that they should expect "to rapidly escalate."  Dkt. No. 127 ¶ 151.  Another former employee who was the surface construction manager at OT allegedly stated that when he left the project in May 2018, it was $2 billion over budget and at least a year and a half behind schedule, facts which were documented in cost and schedule reports.  *Id.* ¶ 158.  Plaintiffs also allege that Defendants' independent consultant determined in 2017 that there was a mere 2% chance that the schedule would be met and a month later a 0% chance, *id.* ¶ 312, and, despite being warned about the delays and cost overruns, Defendants made no effort to get either the budget or schedule back on track, *see id.* ¶¶ 160–161.  Further, Plaintiffs allege that, as per a report from Jacobs (OT's key contractor) to Rio's senior management, the Shaft 2 project—as of

August 2018—was behind the original plan by approximately 14%—a fact that confirmed the
project was fourteen months behind schedule and was approximately $750 million over budget.
*Id.* ¶ 273.

Second, the Rio Defendants correctly state that the SAC does not sufficiently allege that
their statements regarding the date of the first draw bell were false.  As the Rio Defendants note,
while the 2017 Broadleaf analysis stated that the then-schedule for the first draw bell (which was
April 26, 2020) had a 2% chance of being completed on time, Defendants only represented
during the Class Period that the draw bell was projected for "mid-2020"—a sufficiently broad
timeframe that allowed for a completion date after April 26, 2022.  Dkt. No. 131 at 31.
Moreover, after the 2018 Broadleaf report suggested that there was no chance of a May 2020
first draw bell, Plaintiffs allegedly transferred costs and projects related to the major
infrastructure of Shaft 2 to secondary phases, which allowed them to maintain the mid-2020
schedule for the first draw bell.  On October 15, 2018, Defendants publicly disclosed what they
had done, noting that the projected draw bell date was maintained because OT management had
changed the "draw bell sequencing strategy."  Dkt. No. 127 ¶¶ 17, 169, 336 ("First draw bell
remains on track for mid-2020, partly due to a change in the draw bell sequencing strategy.").
These facts do not allege falsity.  Instead, these facts support that the Rio Defendants updated
their projected schedule for the first draw bell in line with new information and, at one point,
changed how they measured the draw bell schedule, which they then disclosed to the market.
Although Plaintiffs respond that the re-sequencing was ineffectual and intended to conceal OT's
true status, Dkt. No. 135 at 44 n.16, Plaintiffs do not actually claim that the re-sequencing of the
draw bell schedule, which was publicly disclosed, was misleading or false.  *See id.* (citing Dkt.
No. 127 ¶¶ 165–173, 300).

Third, the Court rejects the Rio Defendants' argument that Plaintiffs do not sufficiently allege that the October 2018 re-forecast was fraudulent except in hindsight.  Dkt. No. 131 at 31.  On October 16, 2018, Rio Tinto announced an underground development "re-forecast," disclosing a two-quarter delay to sustainable first production, but it continued to note that capital costs remain in line with the overall $5.3 billion budget.  Dkt. No. ¶ 175.  Contrary to Defendants' contention, Plaintiffs do not rely on inferences of fraud by hindsight.  As detailed above, Plaintiffs allege sufficient facts that prior to the reforecast the OT project was already recognized to be a year behind schedule and several hundreds of millions of dollars over budget, figures that were only anticipated to get worse.  Dkt. No. 127 ¶¶ 151, 158, 160–161, 273, 312.  Accordingly, Plaintiffs sufficiently allege that the re-forecast was false or misleading as it did not account for the true extent of the delays and cost overruns at that time.

Fourth, Plaintiffs do not appear to contest the Rio Defendants' argument that they cannot be liable for concealing issues with Shaft 2 after Rio explicitly disclosed in an October 16, 2018 Form 6-K that "shaft sinking challenges" would push back the date of the first sustainable production.  Dkt. No. 131 at 32.  Plaintiffs have therefore conceded this issue as to any claim based solely on a failure to disclose those issues with Shaft 2 after October 16, 2018.  *See VWR Int'l, LLC*, 2021 WL 1165077, at *20 ("Plaintiff does not directly respond to this argument in its opposition briefing, and the Court will consider this point conceded."); *Syniverse Techs., Inc.*, 2014 WL 4412392, at *7 ("Perhaps recognizing the futility of contesting this issue, AT & T did not even discuss it in its opposition brief.  AT & T's silence concedes the point.").[23]

---

[23] The Rio Defendants in a footnote also state that Plaintiffs do not sufficiently allege that Rio's statement in July 2018 that "the shaft five ventilation system has been fully commissioned and is now operational" was false based solely on allegations that the heating unit for OT was not functional.  Dkt. No. 131 at 32 n.28 (citing Dkt. No. 127 ¶ 307).  The Rio Defendants state: "the fact that the heating unit was not yet functional is a separate issue that does not render Rio's

Fifth, the Rio Defendants' argument that Defendants' statements attributing delays to ground conditions were not false because ground conditions did, in part, account for delays and cost overruns mistakes the allegations in the Complaint.  Plaintiffs do not allege that ground conditions had no involvement in the delays.  *See, e.g.*, Dkt. No. 127 ¶ 341 ("The ICG Report confirms that 'ground conditions' or geotechnical issues were not a *significant contributor* to the schedule delays and cost overruns at Oyu Tolgoi." (emphasis added)); *id.* ("[T]hese statements were false and misleading because the undisclosed true 12- to 18-month delay and associated cost overruns *were not driven by* geotechnical issues.").  Instead, they argue that these statements were false and misleading as they implied that the delays and cost overruns were primarily caused by ground conditions when they were actually primarily caused by engineering, procurement, and constructions problems in Shaft 2.  *Id.*  "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *See Jinkosolar*, 761 F.3d at 250.  The Court therefore denies the request to dismiss the claim based on these statements on this basis.[24]

_____

statement about Shaft 5 false or misleading."  *Id.*  But this argument oversimplifies the alleged relationship between Shaft 5 and the heating unit.  The Complaint alleges that "Shaft 5 could not properly perform its ventilation function" (which was Shaft 5's principal function) without the "CHP heating unit."  Dkt. No. 127 ¶¶ 91, 311.  Accordingly, the Complaint plausibly states if the heating unit were not functional, Shaft 5 would not be operational, and the July 2018 statement was false or misleading.

[24] The Court, however, agrees with the Rio Defendants that Jacques's response on a February 27, 2019 investor conference call to an investor question directly about the "concerns around ground conditions," Dkt. No. 131 at 33 n.29; Dkt. No. 127 ¶ 379, is not actionable as false or misleading.  Jacques was asked a specific question, which he answered.  "The requirement to be complete and accurate [] does not mean that 'by revealing one fact . . . one must reveal all others that, too, would be interesting . . . but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead."  *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) (citation omitted); *see Finger v. Pearson PLC*, 2019 WL 10632904, at *11 (S.D.N.Y. Sept. 16, 2019). !

Finally, the Court agrees with Defendants that Plaintiffs' have failed to plead a violation based on a failure to take an impairment charge.  Dkt. No. 131 at 33; *see* Dkt. No. 127 ¶ 374. "Failure to take an impairment charge" may constitute securities fraud "when the need to write-down the asset was so apparent to the defendant before the announcement, that a failure to take an earlier write-down amounts to fraud." *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 268–69 (S.D.N.Y. 2009) (quoting *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) (internal quotation marks and alteration omitted)).  To sufficiently plead a violation due to a failure to take an impairment charge, the complaint must generally show, at a minimum, "the amount by which certain assets should have been written down" and "when the write-down[ ] should have occurred." *Vodafone*, 655 F. Supp. 2d at 269 (citing *Caiafa*, 525 F. Supp. 2d at 410–11 & 411 n.10); *see also In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *23 (finding failure to plead facts with particularity because "[w]hile Plaintiffs allege that Adient should have written down an additional impairment charge for long-lived assets in the second quarter of 2018, when the Company took the impairment charge for goodwill, they nonetheless do not allege 'the amount by which certain assets should have been written down'"); *Caiafa*, 525 F. Supp. 2d at  411 & n.10 (dismissing claim based on failure to take an impairment charge because "the Complaint fails to state the basis for its book-value allegations and fails to specify the amounts by which the ferries and containers were allegedly overvalued").  "When the impairments became so severe as to require specific accounting charges, and whether the requirements of the accounting principles were satisfied, necessarily involved issues of judgment." *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004).  The eventual decision to impair an

asset does not itself provide an actionable basis to claim that the failure to do so earlier was fraudulent. *See In re Adient plc Sec. Litig.*, 2020 WL 1644018 at *24.

Although Plaintiffs plead generally that the failure to take an impairment was "materially false and misleading because the project was impaired and had been since before the Class Period," Dkt. No. 127 ¶ 375, and allege the amount of the write-down ultimately taken, *id.* ¶ 240, they do not specifically allege when those write downs "should have occurred." *In re Adient plc Sec. Litig.*, 2020 WL 1644018 (stating that this must be pled at a "minimum"). Moreover, Plaintiffs fail to allege sufficient facts to show that an "earlier impairment charge was so clearly required by accounting principles that the failure to take such a charge was fraudulent." *See In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *17. That Plaintiffs would later take an impairment that was disclosed on July 31, 2019 does not change this analysis. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." (citation omitted)); *Lopez*, 173 F. Supp. 3d at 40 ("The fact of a later correction, made a short time after an initial statement is made, does not connote that that [sic] the Company's earlier statement about its earnings expectations was false or misleading when made." (citation omitted)).

## IV.   Inference of Scienter

Defendants also contend that Plaintiffs have failed to sufficiently plead scienter.

As mentioned above, to plead scienter sufficiently under the PSLRA, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u–4(b)(2)). The scienter required under Section 10(b) and Rule 10b–5 to sustain a private civil claim is an "an intent to deceive, manipulate or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138

(2d Cir. 2001) (quoting *Ganino*, 228 F.3d at 168).  Recklessness may also suffice to plead

scienter for securities fraud in the Second Circuit.  *See JP Morgan Chase Co.*, 553 F.3d at 198.

To create a strong inference, the inference of scienter must be "more than merely

plausible or reasonable—it must be cogent and at least as compelling as any opposing inference

of nonfraudulent intent."  *Id*. (citation omitted).  In assessing whether this inference exists, courts

consider both the inferences urged by plaintiffs as well as any reasonable competing inferences

drawn.  *Id.*  "Moreover, the facts alleged must support an inference of an intent to defraud the

plaintiffs rather than some other group."  *Id.*

"A plaintiff may establish scienter by alleging facts that either (1) show that the

defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute

'strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Francisco v.*

*Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (quoting *JP Morgan Chase Co.*, 553

F.3d at 198).  A strong inference of scienter through "motive and opportunity" will only be

raised where plaintiffs allege that defendants "benefitted in some concrete and personal way

from the purported fraud."  *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting *Novak v. Kasaks*,

216 F.3d 300, 307–08 (2d Cir. 2000)).  "Motives that are common to most corporate officers,

such as the desire for the corporation to appear profitable and the desire to keep stock prices high

to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *Id.*

(quoting *Novak*, 216 F.3d at 307).  If plaintiffs do not make this showing of "motive and

opportunity," they may adequately allege scienter through the circumstantial evidence prong

misbehavior "'though the strength of the circumstantial allegations must be correspondingly

greater' if there is no motive."  *Id.* (quoting *Kalnit*, 264 F.3d at 142).

### A.      Turquoise Defendants

The Turquoise Defendants contend that the Complaint does not raise a strong inference either that they had motive and opportunity to commit the fraud or that they had knowledge of contrary facts about the cost overruns and delays at OT.  Dkt. No. 133 at 20–32.

#### 1.      Motive and opportunity

With respect to motive and opportunity, the Turquoise Defendants argue that Plaintiffs fail to allege that either Quellmann, Lane, Colton, or Turquoise Hill stood to benefit in any concrete and personal way from the alleged fraud.  Dkt. No. 133 at 37.

Plaintiffs respond that "Defendants were highly motivated to conceal the project's problems from the Mongolian Government in light of the fact that disclosing them would provide the government with leverage to renegotiate the terms of the OT partnership."  Dkt. No. 135 at 68.  Plaintiffs also imply that the Turquoise Defendants were motivated to conceal issues to avoid inquiries by the Mongolian government into the Mine and because of the Turquoise Defendants' "deep personal commitments to the OT project," and that Quellmann was personally motivated to conceal the problems as they posed great risk to him.  *Id.* at 68–69 n.31, 84.  In support of the latter point, Plaintiffs point to allegations in the Complaint that, beginning in March 2018, Swiss and Mongolian government prosecutors initiated a criminal corruption investigation into the Mongolian government officials responsible for negotiating the core agreements related to OT and, in connection with those investigations, arrested and jailed several top government officials.  *Id.*; *see also* Dkt. No. 127 ¶¶ 194–196.

The Complaint does not sufficiently allege that the Turquoise Defendants had motive and opportunity to commit the alleged fraud.  Every corporate executive presumptively has a commitment to the projects in which he or she is engaged that could be characterized generally as personal.  Plaintiffs do not allege that Quellmann, Lane, or Colton had any personal stakes in

93

the OT project short of those that would be possessed by every other corporate executive.  The desire to conceal problems from the Mongolian government to prevent a potential renegotiation of the OT agreement—which would presumably reduce potential profits to Turquoise Hill— ultimately reduces to just a "desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation." *JP Morgan Chase Co.*, 553 F.3d at 198.  As the Second Circuit has held, such allegations do not constitute "motive" for purposes of the scienter inquiry for a Rule 10b–5 private cause of action.  *Id.*; *see also Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (summary order).

Similarly, the desire to avoid an inquiry by the Mongolian government into the status of the Mine does not separate the motives here from those "that are common to most corporate officers." *JP Morgan Chase Co.*, 553 F.3d at 198.  Plaintiffs do not allege that Quellmann, Lane, or Colton personally feared prosecution from the Swiss or Mongolian governments or that their individual conduct was being investigated or how an investigation into the circumstances under which a contract was awarded could create peril with respect to how the project was executed. The motive to avoid governmental inquiry can be ascribed to any company—every corporate executive would prefer that his or her company not be investigated whether the investigation is justified or not.  At a minimum, investigations can distract management; few companies invite them.  *See In re Sanofi-Aventis Sec. Litig.*, 2009 WL 3094957, at *7 (S.D.N.Y. Sept. 25, 2009) (stating that proffered motive of concealing information to avoid increased scrutiny by regulatory body may be ascribed to any pharmaceutical company).  The allegations that the Turquoise Defendants desired to avoid an investigation are therefore "too generalized to demonstrate scienter." *Kalnit*, 264 F.3d at 139.

Plaintiffs' allegations that the Turquoise Executive Defendants had "deep personal commitments to the OT project" and that Quellmann was personally motivated to conceal information out of fear of potential criminal action also are not sufficient to satisfy Plaintiff's burden to plead scienter.  In support of their contention that the Turquoise Executive Defendants had "deep personal commitments," Dkt. No. 135 at 84, Plaintiffs cite to paragraph 135 in the SAC, which does not mention Turquoise Hill or the Turquoise Executive Defendants.  Dkt. No. 127 ¶ 135.  The allegation regarding deep personal commitments thus is entirely conclusory. And with regard to Plaintiffs' allegations about Quellmann, while it may be true that certain senior officials in the Mongolian government were arrested in connection with a corruption investigation, Plaintiffs tellingly do not allege facts that Quellmann was involved in such conduct or that would support a reasonable inference that Quellmann himself feared he would be investigated.[25]

## 2.    Circumstantial evidence of misbehavior or recklessness

The Turquoise Defendants argue that Plaintiffs also fail to sufficiently allege circumstantial evidence of scienter.  Specifically, the Turquoise Defendants contend that the Complaint contains no allegations that the Turquoise Defendants—as opposed to the Rio Defendants—were aware of information that would have indicated to them that the relevant

---

[25] Defendants also allege that the fact that Quellmann bought stock in Turquoise Hill during the relevant period negates scienter as to him and asks the Court to take judicial notice of the SEC form detailing these purchases.  Dkt. No. 133 at 29–30 & n.20.  Plaintiffs respond that this argument ignores that (i) Defendant Quellmann was required under his employment agreement to purchase stock and (ii) Defendant Quellmann "did not have any shares to sell except those he was required to purchase as a result of his sign-on bonus and shareholding requirement."  Dkt. 135 at 87.  Because the Court concludes that Plaintiffs have insufficiently pled motive and opportunity with respect to Quellmann, regardless of his stock purchases, the Court does not need to decide whether the stock purchases alone negate scienter.  *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 477 (S.D.N.Y. 2012) (stock purchases "only address a motive and opportunity theory of scienter, not a recklessness theory." (internal quotation marks and citation omitted)).

statements they planned to make about OT were false.  Dkt. No. 133 at 20.  The Turquoise

Defendants note that by Plaintiffs' own allegations, Turquoise Hill relied on "Rio Tinto, the

project manager, for information and updates concerning the progress of the underground

development, and—as TRQ specifically informed the markets—essentially all of TRQ's

disclosures consisted of information that the project manager provided."  Dkt. No. 133 at 20; *see*

*also* Dkt. No. 127 ¶¶ 52–55.

        Plaintiffs respond that the following allegations in the Complaint raise a strong inference

of the Turquoise Defendants' conscious misbehavior or recklessness: (1) that the OT Board (on

which all of the Turquoise Executive Defendants sat) approved a $120 million budget increase

for Jacobs, the primary contractor for underground expansion at OT, in August 2018; (2)

Quellmann, Colton, and Lane, as part of their duties, regularly visited the Mine; (3) Quellmann's

prior positions at Rio Tinto, including serving as a member of the OT Project Executive from

August 2016 to February 2018, gave him access to information about OT; (4) Quellmann,

Colton, and Lane allegedly stated throughout the Class Period that they were "plugged in" and

had "visibility" into what was going on at OT; and (5) the Turquoise Defendants were high-level

executives at a company whose sole asset was OT and sat on the Board of Directors of OT.  Dkt.

No. 135 at 64, 71–72.

        "Where a plaintiff seeks to plead scienter by alleging conscious misbehavior or

recklessness, the complaint must 'allege[ ] that defendants . . . had access to non-public

information contradicting their public statements.'"  *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F.

Supp. 3d 473, 485 (S.D.N.Y. 2017) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76

(2d Cir. 2001)).  "[W]here plaintiffs contend defendants had access to contrary facts, they must

specifically identify the reports or statements containing this information."  *445 Freight Div.*

*Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309); *see In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *27 (concluding that scienter was insufficiently pled where plaintiffs "fail to show what 'specific contradictory information' was available to any Defendant at the time they made any alleged false or misleading statement"). As the courts have made clear, contrary facts may also be learned in other ways, including through observation.  *See, e.g.*, *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020).

Here, Plaintiffs' Complaint is devoid of allegations of specific "facts, reports, or statements" that the Turquoise Defendants had access to and which contained information contrary to Turquoise Hill's public disclosures.  *Pirnik v. Fiat Chrysler Autos., N.V.*, 2017 WL 3278928, at *3 (S.D.N.Y. Aug. 1, 2017) (quoting *Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *14 (S.D.N.Y. Mar. 10, 2017), *aff'd*, 710 F. App'x 471 (2d Cir. 2017)).  While Plaintiffs allege that, as OT Board members, the Turquoise Executive Defendants were aware of a large budget increase for OT's primary contractor in August 2018 (at the beginning of the Class Period), Plaintiffs fail to specify exactly "how said information 'contradicted Defendants' public statements,' as is required to show scienter."  *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (quoting *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28).  And this inference is not clear on the face of the Complaint:  A $120 million budget increase for the Mine's primary contractor would not necessarily indicate to members of the Board that the project—*with an over-$5.3 billion budget*—would necessarily incur cost overruns.  *Cf. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *9 (finding lack of scienter, in part, because "Plaintiffs have not alleged that the CPI scorecard or business review decks included any specific information detailing, for example, an unusually high number of customer

complaints or an abnormally low number of claims payments.").  Similarly, Plaintiffs'

allegations that Quellmann, Colton, and Lane regularly visited the Mine do not specifically

identify any "contrary facts" that these defendants would have observed or had access to on these

visits or, even for that matter, when those visits occurred.  Such "broad allegations" are

insufficient to demonstrate scienter.  *Maloney*, 518 F. Supp. 3d at 781 ("As for the allegations

that Ollie's executives regularly assessed company inventory, courts have routinely dismissed

similar claims as too vague to support an inference of scienter." (citation omitted)); *see also Gen.*

*Elec. Co.*, 445 F. App'x at 370 (finding "vague and general averments" that executives had

access to "real-time customer and sales information" insufficient to demonstrate scienter);

*Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *12 (S.D.N.Y. Jan. 18, 2018)

(concluding that regular visits by the executives to the pharmacies was insufficient to establish

scienter as "there are no allegations that any of the Individual Defendants ever knew or observed

any of the abuses").  Plaintiffs' allegations that Quellmann's role at Rio Tinto from August 2016

to February 2018 would have given him "access to and reviewed all relevant documentation"

concerning OT—without more—are similarly too general to support an inference of scienter.

Dkt. No. 127 ¶ 42; *see also Gen. Elec. Co.*, 445 F. App'x at 370; *Maloney*, 518 F. Supp. 3d at

781.  Although Plaintiffs allege that certain individuals at Rio Tinto started to be aware of

potential delays and cost overruns at OT prior to February 2018, *see, e.g.*, Dkt. No. 127 ¶ 109–

111, Plaintiffs never allege that these individuals directly reported to or told Quellmann about

these issues or that Quellmann had access to reports or statements detailing these issues.[26]

---

[26]  Plaintiffs also note that the Turquoise Executive Defendants would have had access to
progress reports on Shaft 2 that were provided to OT's CEO; however, Plaintiffs do not plausibly
allege why reports sent to an executive at OT would necessarily have been available to
Turquoise Hill executives.  Dkt. No. 135 at 80.  Accordingly, this allegation does not support a
finding of scienter.

To make up for their lack of allegations that the Turquoise Executive Defendants had access to contrary facts, Plaintiffs argue that the Turquoise Executive Defendants' admissions throughout the Class Period that they were "plugged in" and had "visibility," combined with the significance of the problems at OT, necessarily means that they would have been aware of the contrary facts at issue.  Dkt. No. 135 at 72–73.  But while such facts undoubtedly weigh in favor of a finding of scienter, courts have repeatedly found that such allegations alone are not sufficient.  *See, e.g.*, *Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *11 (holding that scienter not sufficiently alleged where plaintiffs argued that defendants "privy to information about the nature and scope of the CPI program because they were hands-on executives of a company that conducted due diligence and held meetings—before which certain documents were disseminated—regarding the CPI program"); *Maloney*, 518 F. Supp. 3d at 781 (finding allegations "that Ollie's executives were 'tight-knit' and 'hands-on,' and therefore must have been aware 'of the critical inventory and supply chain issues [Ollie's] was experiencing during the Class Period'" were insufficient to show that defendants had access to contrary information).

Instead, Plaintiff must allege "what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue."  *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28 (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 581 (S.D.N.Y. 2014)).  Allegations of Defendants' specific contrary facts are particularly necessary, here, where the allegations relate to an underground development project being built at a slower rate than scheduled and being overbudget—facts that would not necessarily have been plainly visible to someone vising the Mine—and where Plaintiffs fail to allege that Defendants had a motive and opportunity to

commit securities fraud.[27]  *See Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *11 ("Without showing motive, their uphill battle to plead a strong inference of scienter becomes that much steeper.").

The cases Plaintiffs cite are not to the contrary.  For example, in *In re Salix Pharmaceuticals, Ltd.*, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016), while the court noted that defendants' alleged statements that they had "accurate knowledge of Salix's wholesale inventory levels" as well as the allegations that the process of discerning Salix's true inventory levels was straightforward and weighed in favor of scienter, the court also based its decision as to scienter on plaintiffs' allegations that one of the individual executive defendants had direct access to internal reports that included accurate data on Salix's wholesale inventory levels.  *Id.* at *14.  Similarly, in *New Orleans Employees Retirement System v. Celestica, Inc.*, 455 F. App'x 10, 13–14 (2d Cir. 2011) (summary order), the complaint included statements from confidential witnesses stating that they had provided information about rising inventory levels (which was contrary to the company's public statements) directly to the executive defendants.  *See In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008) (finding allegations of scienter to be sufficient where plaintiff alleged "existence of extensive documentation indicating the progress of theater system installations and the IMAX defendants' knowledge of, or access to, those

---

[27] Plaintiffs allege that one former employee who worked at OT from October 2016 to May 2017 said that "lack of progress would have been obvious to any TRQ or Rio Tinto leadership who toured the site."  Dkt. No. 127 ¶ 109.  However, the Complaint does not allege how the employee would have been in a position to know what would have been obvious to leadership and does not explain why the progress of an underground mine would have been obvious to anyone touring the site.  *See Novak*, 216 F.3d at 314 ("[T]here is no requirement that [sources] be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.").  An inference of scienter based on this comment is therefore "less cogent than" the "nonculpable explanations for the defendant's conduct."  *Tellabs*, 551 U.S. at 314.

documents"); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *18 (S.D.N.Y. Mar. 25, 2013) (detailing "all this information" to which the defendants had access).[28]

The Turquoise Defendants' "high-level positions" also do not cure Plaintiffs' failure to allege the contrary facts to which Defendants had access. *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 & n.11 (S.D.N.Y. 2015). Plaintiffs' argument appears to invoke the "core operations doctrine," which courts in this District have held has been thrown into doubt by the enactment of the PSLRA in 1995. *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.) ("Under the core operations theory, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." (internal quotation marks and citation omitted)). "As a result of these doubts as to the doctrine's continuing import, the core operations inference may be considered as part of a court's holistic assessment of the scienter allegations, but it is not independently sufficient to raise a strong inference of scienter." *Id.* (cleaned up). Therefore,

---

[28] Several of the cases Plaintiffs cite are also distinguishable because the court found that the plaintiffs had adequately plead that the defendants possessed motive and opportunity to commit the fraud. *See, e.g.*, *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 551 (S.D.N.Y. 2017) (finding sufficient inference of scienter where plaintiffs plausibly alleges that the individual 10(b) defendants "had the motive and opportunity to overstate comScore's revenues"); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (finding that plaintiffs successfully alleged that defendants had a particularized motive to commit the fraud). And *Shenk v. Karmazin*, 867 F. Supp. 2d 379 (S.D.N.Y. 2011) is distinguishable because, in that case, the executive defendants merely had to follow the logical chain of what they already knew in order to recognize the falsity of the company's statements. *Id.* at 387 (finding that the Sirius executive defendants "could have easily uncovered the falsity" of Sirius's statements that the merger would result in lower prices since they knew at that time that the "combined debt of the merged entities" would create a need to raise revenues, requiring them in turn to increase prices).

Plaintiffs' high-level positions in the company and their positions as board members at OT do not, standing alone, raise a strong inference of scienter in this case. *See Police & Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 234 (S.D.N.Y. 2009) ("Courts may not infer scienter 'solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information.'" (quoting *In re Winstar Commc'ns*, 2006 WL 473885, at \*7 (S.D.N.Y. Feb. 27, 2006)).

That the allegations of scienter with respect to the Turquoise Defendants are insufficient is further bolstered by the "competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314 ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court . . . must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged.").  Contrary to the notion that Turquoise Hill sought to trick investors, the allegations of the Complaint, as a general matter, create an inference that Turquoise Hill was largely at the behest of Rio Tinto in what information was provided to it about OT and that Rio kept secret the reality of OT's cost overruns and schedule delays. According to the Complaint, Rio, through RTIH, managed and exercised "near-total control" over the underground development project at OT.  Dkt. No. 127 ¶ 53.

In addition, if the allegations in the Complaint are credited, Rio had no motive or reason to share information with Turquoise Hill if it was bad news, and if Rio was engaged in a massive fraud, every reason not to share that information.  The April 2012 agreement required Turquoise Hill to make statements consistent with the information provided by Rio Tinto.  If Rio Tinto wanted to control Turquoise Hill's statements, it was in its interest to limit the access to

information of the Turquoise Hill officers and directors.  The only way that Turquoise Hill could make statements contrary to the information provided by Rio Tinto's was if it determined that such statements were required under the applicable Securities Laws.  Turquoise Hill Resources LTD, General Statement of Acquisition of Beneficial Ownership - Amendment (Form SC 13D/A) (Apr. 20, 2012).  Thus, Rio Tinto—if it knew the information it was reporting was different from the "true" information— would have every reason not to share that "true" information with Turquoise Hill.  Not only would doing so expand improvidently the number of persons knowledgeable about the fraud (and able to reveal it to others); it would have given Turquoise Hill both the opportunity and the obligation not to repeat Rio Tinto's false information.  Indeed, the Complaint itself also includes a sworn statement from Bowley in which he states that: "Despite repeating those concerns about schedule delay and cost overrun and proposing solutions, Rio Tinto made no disclosure of the true facts to their *partners* and investors or the market."  *Id.* ¶ 262 (emphasis added).

Plaintiffs also argue that even if they cannot sufficiently plead the scienter of the individual executives, the facts sufficiently allege that Turquoise Hill itself had corporate scienter.  Dkt. No. 135 at 64 n.27.  In support of this argument, Plaintiffs cite to the Second Circuit's decision in *Dynex*.  *Id*.  In *Dynex*, the Second Circuit held that "[t]o prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation."  531 F.3d at 195.  It stated that "[i]n most cases, the most straightforward way to [allege this] will be to plead [scienter] for an individual defendant."  *Id.*  The court continued, however, that exceptions exist—for example, if a company "announced that it had sold one million SUVs in 2006, and the actual number was zero," there "would be a

strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* at 195–96 (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).  The Second Circuit has since stated that this exception applies only in "exceedingly rare instances," where a statement is "so 'dramatic.'" *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (quoting *Dynex*, 531 F.3d at 195–96).

While, under this exception, a Plaintiff is excused from proving that a particular identified corporate official knew the statement was false, it is not satisfied by the factual allegations here.  The facts here, are not as glaring as those discussed in *Dynex*:  the underground development project was underground and, unlike the sales in *Dynex*, was not scheduled to be completed for multiple years.  The fact that it was running hundreds of millions of dollars behind budget and months behind schedule thus would not at any particular moment be as apparent as the fact that a company which would be expected to sell nearly 100,000 SUVs in a particular month had sold none.  Moreover, it is apparent from the example in *Dynex* that Plaintiff must still plead allegations that *some* corporate official would have "know[n] that the announcement was false." *Dynex*, 531 F.3d at 195; *see also Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017) (noting that the example in *Dynex* "makes clear the requirement of some connection at the corporation between a misstatement and the requisite quantum of knowledge of its falsity (in the example, by requiring someone with the required knowledge to approve the misstatement)").  While this pleading requirement may be relatively easy to meet for so "dramatic an announcement" in most companies, such as General Motors, where the corporate executives are involved in the management of the company and would almost certainly know that millions of SUVs were not being sold, it is less intuitive, here, where

Plaintiffs allege that corporate executives at Turquoise were not responsible for the day-to-day management of the Mine and largely received information about the Mine from Rio.  In such a case, it is entirely plausible that the corporate officials would have known only what Rio Tinto was reporting to them.   Accordingly, the Complaint does not raise a strong inference that some corporate official at Turquoise Hill would have "know[n] that the announcement was false." *Dynex*, 531 F.3d at 195.  This "exceedingly rare" exception thus does not apply.  *Abernathy*, 960 F.3d at 99.[29]

For these reasons, Plaintiffs fail to raise a strong inference of scienter on the part of the Turquoise Defendants.  Plaintiffs thus cannot state a claim under Section 10(b) or Rule 10b–5, and those claims against the Turquoise Defendants must be dismissed.

### B.      Rio Defendants

The Rio Defendants similarly argue that the Complaint does not allege that the Rio Defendants had a unique motive to defraud the market and contains no particularized allegations that the Rio Defendants knew that their statements were false when made.  Dkt. No. 131 at 34–45.

### 1.      Motive and opportunity

The Rio Defendants argue that Plaintiffs fail to allege that that the Rio Executive Defendants possessed any unique motive to defraud the market.  Dkt. No. 131 at 34–35. Plaintiffs allege that the Jacques and Soirat were incentivized to defraud the market in order to: (i) avoid a renegotiation of the terms of the OT partnership by the Mongolian government; (ii) to

---

[29] That Quellmann and Colton signed SOX certifications that were purportedly false and misleading, Dkt. No. 127 ¶¶ 411–413, does not change this conclusion.  *See Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *10 ("Without adequately alleging Defendants' actual knowledge of the illegal CPI scheme, 'SOX certifications do not support an inference of scienter as to any Defendant.'" (citation omitted)); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018).

avoid potential criminal and civil liability in connection with investigations into OT by the Mongolian government; and (iii) to promote their own careers.  Dkt. No. 127 ¶¶ 194, 279–280, 295–296.

These allegations of motive and opportunity against the Rio Defendants are insufficient for the same reasons that they were insufficient against the Turquoise Defendants.  *See supra* Section IV.A.1.  The desire to maintain the profitability of the investment and to avoid governmental and regulatory scrutiny are neither concrete nor personal to the defendants and are common to all corporate officers.  *See JP Morgan Chase Co.*, 553 F.3d at 198; *see also Kinross Gold Corp.*, 957 F. Supp. 2d at 295 ("[T]he motives of increased compensation and to assure that the company completed its announced initiatives are common to corporate officers."); *In re Sanofi-Aventis Sec. Litig.*, 2009 WL 3094957, at *7 (finding that a desire to avoid regulatory scrutiny was too generalized a motive to establish scienter).  Similarly, every corporate officer is incentivized to maximize a core asset of her company in order to benefit her career.  *See JP Morgan Chase Co.*, 553 F.3d at 201 ("If scienter could be pleaded solely on the basis that defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'").  For these reasons, Plaintiffs have not sufficiently pled the Rio Defendant's scienter through motive and opportunity.

### 2.        Circumstantial evidence of misbehavior or recklessness

The Rio Defendants also claim that the Complaint fails to state particularized facts establishing that Jacques or Soirat were aware that any of their statements were false; therefore, Plaintiffs cannot establish that any of the Rio Defendants acted with scienter.  Dkt. No. 131 at 35–36 & n.31.  Plaintiffs respond that the Complaint includes "overwhelming" evidence that

Jacques and Soirat were aware of contrary facts prior to making their statements.  Dkt. No. 131
at 62–73.  Specifically, Plaintiffs note that the Complaint refers to statements from Rio's former
employees and contractors about Soirat's and Jacques's knowledge about issues at the Mine
prior to the dates they made the allegedly false statements at issue, as well as various reports that
Soirat and/or Jacques received—prior to the statements at issue—on delays and cost overruns at
OT.  *Id.*  Plaintiffs also contend that the Complaint's allegations about Defendants' retaliation
against whistleblowers supports a strong inference of fraud.  *Id.*

      With regard to Soirat, the Complaint contains a number of allegations relevant to
scienter: approximately one year prior to the Class Period, Soirat, in conjunction with Kinnell,
hired Bowley, a veteran Oyu Tolgoi contractor, to examine the problems at OT; Bowley was told
that he was hired to tell them "the truth about how bad the situation was."  Dkt. No. 127 ¶¶ 111–
112, 114.  The SAC alleges that, upon being hired, Bowley soon recognized that the problems,
particularly concerning the lead contractor on the project as well as engineering problems in the
Shaft 2 headframe, would lead to significant schedule and cost overruns without intervention.
*Id.* ¶¶ 115–121.  Accordingly, on February 1, 2018 (months prior to the Class Period), Bowley
reported concerns related to "cost overruns, schedule delays, and Shaft 2 problems" to Rio's
senior leadership in London, which included Fagen, who reported directly to Defendant Soirat.
Bowley also stated that Fagen "participated in the meeting on behalf of Soirat" and "reported the
substance of the meeting to Defendant Soirat."  *Id.* ¶ 142.  Moreover, Bowley allegedly
"continued to follow up with Defendant Soirat and Fagen about the need for immediate action to
address the cost overruns and delays" and stated that "both of them were aware of the problems
at OT."  *Id.* ¶ 143.  Bowley also allegedly discussed "the problems facing the expansion" with
Defendant Soirat for an hour in May 2018, *id.* ¶ 143, and he continued to report these problems

to Fagen and Soirat, including writing on July 19, 2018: "Latest update.  12 months behind schedule.  $300mill capital over budget.  Expect this to rapidly escalate," *id.* ¶ 143, as well as repeatedly emailing Fagen about the inaccurate "re-forecast," *see* Dkt. No. ¶¶ 166–167.  The Complaint also includes a screenshot of an email from Fagen to Bowley on July 3, 2018—in response to Bowley's email related to OT stating "[t]he realization and magnitude of what is happening is starting to dawn I think on a few"—in which Fagen stated: "Oh don't worry, we've known it from the start, just haven't been able to do anything about it.  Arnaud [Soirat] has played a very card [sic] here, which is why you now see 'things' surfacing."  *Id.* ¶¶ 149–150.

 Plaintiffs also allege that in May 2018, Soirat instructed Bowley to stop looking into delays and cost overruns at OT and, according to Bowley (who was present at the meeting and presumably in a position to form the lay opinion) Soirat "seemed to be saying that he knew that there was a big problem with the project but he did not want anyone else to know this."  *Id.* ¶¶ 281–282.  Around this time, Rio instructed Bowley to not come to work, even while he was kept on Rio's payroll, and then eventually Bowley was fired in June 2019 without any reason. *Id.* ¶ 282.

The SAC also alleges that Soirat professed in an interview on November 10, 2018 that "he spent one week every month at Oyu Tolgoi."  *Id.* ¶ 289.  Soirat also allegedly sat on the OT Board of Directors throughout the Class Period, *id.* ¶ 50, and he received reports from Rio Tinto's executive coaching consultant prior to March 2017, which included reports and concerns from senior leaders in Mongolia about unethical behavior and "potential overstatements" at OT in 2016.  *Id.* ¶ 133.

These allegations, taken collectively, create a strong inference that Soirat knew facts that contradicted Rio Tinto's statements that the project was "on plan," "on budget," and

"progressing nicely," including at the time that he appeared on MBN World on August 15, 2018. *See Tellabs*, 551 U.S. at 323 (The inquiry is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). The allegation that Soirat hired Bowley to look into the problems at OT—over a year before the Class Period—creates a clear inference that Soirat was aware of the potential existence of problems at OT and valued Bowley's opinions and ability to properly assess what was going on at OT. The allegations also support the inference that Soirat soon learned about that truth—*i.e.*, that the project was months behind schedule and had significant cost overruns—from Bowley who allegedly reported his concerns over schedule delays and cost overruns directly to Soirat and, more specifically, to Soirat's direct report, Fagen. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198 (S.D.N.Y. 2010) ("Moreover, additional direct conversations with Individual Defendants, meetings at which Individual Defendants were present, and visits by Individual Defendants to EGAM demonstrate their access to and actual knowledge of facts which contradicted their public statements."). As alleged, by July 19, 2018 (only a month before Soirat's interview on MBN World), Soirat told Fagen that the project was "12 months behind schedule" and $300mill capital over budget." Dkt. No. 127 ¶ 143.

The inference of fraudulent intent is further supported by allegations that Soirat warned Bowley to stop looking into the delays in May 2018 and attempted to sideline Bowley, *id.* ¶ 206, as well as allegations that Bowley was terminated one month after emailing Fagen, again warning her of the delays, which Fagen responded that she would report to Soirat. *Id.* ¶¶ 219, 222. These allegations create a strong inference that Soirat actively attempted to conceal the truth about the delays and cost overruns. As courts hold in the employment context, a

Case 1:20-cv-08585-LJL   Document 149   Filed 09/02/22   Page 110 of 134

whistleblower complaint "closely followed in time by the adverse [employment] action" creates an inference that the complaint was a motivating factor in the adverse employment decision. *See Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). Here, too, Bowley's firing shortly after his concerns were reported to Soirat creates an inference that the firing was made in retaliation for Bowley's whistleblowing. These allegations directly rebut Rio Defendants' argument that the Complaint fails to allege anything more than a disagreement among staff regarding whether the project could reach its budget and scheduling goals. Dkt. No. 131 at 46.

Allegations that Soirat claimed to spend one week every month at Oyu Tolgoi and sat on the Board of Directors further support this inference of scienter. According to the allegations in the Complaint, knowledge of delays and cost overruns at OT were no secret. *See, e.g.*, Dkt. No. 127 ¶ 124 ("Everyone was always talking about the underground delays and overruns. It was a permanent fact. It was a surprise to no one"). As a result, Soirat's significant involvement in overseeing the project—although not alone sufficient to establish scienter—bolsters the inference that Soirat would have been aware of these delays and overruns. *See Maloney*, 518 F. Supp. 3d at 781 ("[E]vidence of a hands-on management style may support an inference of scienter."); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *14 (concluding that Defendants' claims that they had "accurate knowledge of Salix's wholesale inventory levels" supported inference of scienter).

Rio Tinto's arguments to the contrary are not persuasive. First, Rio Tinto argues that the Complaint does not adequately allege scienter as it largely relies on the opinions of former employees that scheduling delays and cost overruns were well known and, thus, Defendants must have been aware of them. Dkt. No. 131 at 36. This argument, however, misstates the allegations of the Complaint. As noted above, while allegations that scheduling delays and cost overruns

were well-known bolster the inference of scienter here, the Complaint contains many allegations—detailed above—that directly connect Soirat to information about the cost overruns and delays at OT inconsistent with his public statement.  Moreover, the relevant inquiry is not whether individual pieces of evidence on their own create a strong inference of scienter, but whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *See Tellabs*, 551 U.S. at 32.

Second, Rio Tinto argues that Plaintiffs cannot adequately allege Soirat's scienter by alleging that, Fagen, his subordinate, had information, without alleging facts supporting the conclusion that the subordinates relayed that information to the Soirat.  Dkt. 131 ¶ 131.  But the rule Rio Tinto asks the Court to adopt is too categorical.[30]  Although a plaintiff must allege facts supporting the inference that the executive in question received the contrary information, such facts need not come from any eyewitness or a fly on the wall.  They can also come in the form of allegations supporting that the information and the context were such that the executive would have had to be informed.  Plaintiffs have alleged such facts.  The allegations support the inference that Fagen would have kept Soirat informed of what she learned about delays and cost overruns at the Mine.  Plaintiffs allege that Soirat was one of the two individuals who hired Bowley to look into the problems at OT.  Dkt. No. 127 ¶¶ 111–112, 114.  Bowley was hired on a matter of importance.  And Bowley made regular—and alarming—reports back.  *Id.* ¶¶ 14, 115, 141-52.  It is natural to infer that Fagen would report what she learned from Bowley about the

---

[30] The cases Rio Tinto cites in support of this proposition do not establish such a blanket rule and all are distinguishable from the facts here.  *See Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *11 (D. Conn. Nov. 10, 2005) (concerning whether allegations of subsidiary company knowledge were sufficient to support conclusion that this information was then relayed to holding company management); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) (finding that subordinates' implication in fraud does not mean supervisors knew of their involvement).

concerning problems back to Soirat.  The allegations of the Complaint make it hard to believe that Fagen could responsibly do otherwise.

Moreover, the SAC directly supports the inference that Fagen frequently reported her conversations about cost overruns and schedules delays at OT back to Soirat.  For example, after Bowley wrote to Fagen on December 10, 2018 stating that Rio Tinto could only ignore the truth for so long "before it will slap us in the face properly along with GOM and other TRQ shareholders," Fagen responded: "Hi Richard I hear you!!!! I will have a discussion with Arshad [Sayed] and Arnaud [Soirat] – *again*!" *Id.* ¶ 219 (emphasis added).  Fagen's use of the word "again" indicates that she had reported similar concerns to Soirat in the past, and that she would have the conversation once more.

Finally, Rio Tinto argues that the fact that Soirat hired Bowley to look into the progress of the OT project once he knew about the delays at OT actually weakens allegations of his scienter.  Dkt. 131 at 44.  This argument gets the allegations in the Complaint backward: Plaintiffs do not principally rely on what Soirat knew *prior* to hiring Bowley in support of their allegations of scienter, but instead rely on what Soirat learned about delays and cost overruns *after* hiring Bowley to investigate, which Soirat is alleged to have then fraudulently concealed from investors.

Accordingly, Plaintiffs have successfully pled scienter as to Soirat and therefore have also pled corporate scienter as to Rio Tinto.  *See Dynex*, 531 F.3d at 195 ("In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant."); *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010).

The Complaint, however, does not raise a strong inference of scienter with respect to Jacques.  The majority of Plaintiffs' allegations relating to Jacques's scienter relate to knowledge that Jacques would have had about the status of the Mine in 2017, *see e.g.*, Dkt. No. 127 ¶¶ 10, 133 (2017 reports received from executive leadership consultant); *id.* ¶¶ 11, 137 (2017 meeting with intermediary for Jacques); *id.* ¶ 278 (statement by former employee, who left position at OT in March 2017, that Jacques was fully informed about the status of the mine).  While these allegations may support that Jacques knew about delays at the Mine in 2017, they do not necessarily support the inference that Jacques knew, at the beginning of the Class Period—*i.e.,* an entire year later—that progress at the underground development was still delayed and had not gotten back on track.  Not only does the SAC not allege that delays in 2017 were so significant that the project had no chance of getting back on track, but it actually supports the opposite inference: the SAC alleges that on February 1, 2018, Bowley made a presentation on cost overruns, schedule delays, and Shaft 2 problems "and how to fix them," indicating that, at that point, these problems were able to be remedied through "immediate action."  *Id.* ¶¶ 141–143; *see Tellabs*, 551 U.S. at 323 ("[T]he court must take into account plausible opposing inferences.").[31]

The SAC also includes allegations that beginning in October 2018, Jacques received weekly progress reports showing that the underground project was three months behind schedule, which he demanded because he was so concerned about the delays, *id.* ¶ 105, and alleges that Bowley emailed Jacques on April 2, 2019 telling Jacques how behind schedule the

---

[31] The Complaint also alleges that: "According to Duffy, when Defendant Jacques made a surprise visit to Oyu Tolgoi in January 2018, it was because by that time, he knew the 'wheels were coming off' of the project."  *Id* ¶ 12.  Not only is this allegation not specific enough as to what Jacques knew about OT to support scienter, but the Complaint also alleges that Duffy resigned and terminated his firm's contract with Rio in December 2017, *id* ¶ 138, and so does not support that Duffy would know the information alleged.

project was, *id.* ¶¶ 228, 277.  But, again neither of these allegations support a strong inference of scienter, as shortly after this information was provided to Jacques, Rio Tinto made updated disclosures, announcing further delays.  *See id.* ¶¶ 174 (October 16, 2018 re-forecast announcing that sustainable first production could be delayed by two quarters); 396 (announcing further delays on April 16, 2019).

The Complaint's allegations that Jacques and Jacques's subordinates received various reports on the status and causes of delays prior to the Class Period also do not raise a strong inference of scienter.  While Plaintiffs allege that Jacques's subordinates were informed of the true status and causes of the delays at the Mine, *id* ¶¶ 96, 161, 277, Plaintiffs do not allege facts supporting an inference that these subordinates would have reported what they learned up to Jacques.  To the contrary, the Complaint supports the allegation that individuals associated with Rio Tinto were advised not to report information about the problems at the Mine to Jacques.  *See id.* ¶ 11 ("During that meeting, Duffy repeated his concerns about the problems he was hearing about Oyu Tolgoi to Kirikova—but was told by Kirikova this was information that Defendant Jacques would not appreciate, and that Duffy would regret reporting it to him.").  In addition, as to the reports that were allegedly sent and reviewed by Jacques, the Complaint fails to allege when Jacques would have received them and whether it was before or after Rio Tinto's alleged false statements.  *See id.* ¶ 277; *see also Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 222 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) (dismissing complaint where "[t]here are no descriptions of when these reports would have been provided to the Executive Defendants").

Finally, as discussed above in relation to the Turquoise Executive Defendants, Jacques's senior position at Rio Tinto, the significance of the OT asset to Rio Tinto, as well as Plaintiffs' conclusory that scheduling delays and cost overruns were well-known are insufficient, without more, to allege that Jacques possessed the requisite scienter. *See, e.g.*, *Maloney*, 518 F. Supp. 3d at 781; *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14; *Shemian v. Rsch. In Motion Ltd.*, 2013 WL 1285779, at *16 (S.D.N.Y. Mar. 29, 2013) (Sullivan, J.) ("[M]ere assertions that defendants must have been aware of informants' concerns are insufficient to establish that defendants were aware of those concerns. Such allegations simply do not establish reckless disregard or scienter."), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

## V.    Scheme Liability Claims

Plaintiffs allege that the Defendants are liable under Rule 10b–5(a) and Rule 10b–5(c) for engaging in deceptive and manipulative acts in a scheme to defraud investors.  "To state a claim for scheme liability, a plaintiff must present facts showing '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'"  *Menaldi*, 277 F. Supp. 3d at 517 (quoting *In re Alstom SA*, 406 F. Supp. 2d at 474).  On that theory, even a defendant who is not a "maker" under *Janus* could be liable for a misstatement, and plaintiff would not have to show that the "maker" itself had scienter.  "Scheme liability claims are subject to the PSLRA pleading standard with respect to scienter."  *Id.*

### A.    Rio Tinto

Plaintiffs allege that the Rio Defendants are liable under the Supreme Court's decision in *Lorenzo v. Securities & Exchange Commission*, 139 S. Ct. 1094 (2019), for disseminating false information through Turquoise Hill and engaging in other deceptive conduct.  Dkt. No. 127 ¶ 451; *see* Dkt. No. 135 at 36.  The Rio Defendants contend that scheme liability is not

appropriate in this case as scheme liability claims may not be premised solely on alleged misstatements and omissions by the defendant.  The Rio Defendants also contend that Plaintiffs do not allege reliance with respect to their allegedly deceptive conduct.  Dkt. No. 131 at 19–21.

The Supreme Court's decision in *Lorenzo* and the Second Circuit's recent decision in *Securities and Exchange Commission v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) answer the question whether the deceptive or manipulative act for purposes of scheme liability may be premised solely on alleged a misstatement or omission.  In *Lorenzo*, the Supreme Court addressed whether those who do not strictly "make" statements," but who "disseminate false or misleading statements to potential investors with the intent to defraud, can be found to have violated" Rule 10b–5(a) and 10b–5(c).  139 S. Ct. at 1099.  In that case, Francis Lorenzo, a director of investment banking at an SEC-registered brokerage firm, sent emails (at the behest of his boss)[32] to prospective investors that described a potential investment in a company.  *Id.*  The description contained false statements about the assets of the company and Lorenzo conceded that he possessed the requisite scienter.  *Id.* at 1100.  The Supreme Court, based on the "natural meaning" of the provisions, found that the dissemination of false statements "directly to investors" with the intent to defraud could sustain a claim under the subsections (a) and (c) of Rule 10b–5.  *Id.* at 1101.  In reaching its decision, the Court rejected the view that only subsection (b) of Rule 10b–5 regulates conduct involving false or misleading statements and noted that there is "considerable overlap among the subsections of the Rule."  *Id.* at 1102.

---

[32] The U.S. Court of Appeals of the District of Columbia Circuit found that Lorenzo's boss was the "maker" of the statements, and the Supreme Court noted that they took the case "on the assumption that Lorenzo was not a 'maker' under subsection (b) of Rule 10b–5."  *Lorenzo*, 139 S. Ct. at 1100.

The scope of *Lorenzo* was recently clarified by the Second Circuit in *In Rio Tinto plc*, in which the Court was asked to address on interlocutory appeal whether its decision in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005), which held that "misstatements and omissions—without more—" cannot form the basis for scheme liability, had been abrogated by *Lorenzo*. *Rio Tinto plc*, 41 F.4th at 49. The Second Circuit concluded that *Lorenzo* had not abrogated *Lentell*, stating that "misstatements or omissions were not the sole basis for scheme liability in *Lorenzo*" and "[t]he dissemination of those misstatements was key." *Id.* at 53. Accordingly, the Second Circuit found that the Supreme Court's decision in *Lorenzo* was consistent with its decision in *Lentell*, and therefore *Lentell*'s holding that "misstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections" remains valid. *Id.*

The Second Circuit explicitly left open the question what "extra" facts—beyond the knowing dissemination to the public of a false statement made by another in *Lorenzo*—would be sufficient to state a claim for scheme liability. *Id.* at 54. The court stated: "Whether there are ramifications or inferences from *Lorenzo* that blur the distinctions between the misstatement subsections and the scheme subsections is a matter that awaits further development." *Id.* at 53–54. The court thus raised but did not answer the question "whether corruption of an auditing process" or "allegations that a corporate officer concealed information from auditors" is sufficient for scheme liability. *Id.* at 54. The Second Circuit concluded that "[f]or now, *Lentell* tells us that misstatements and omissions alone are not enough for scheme liability, and *Lorenzo* tells us that dissemination is one example of something extra that makes a violation a scheme." *Id.*

Some guidance regarding the type of "extra" facts that would be necessary to convert a misstatement case into a scheme case, however, can be gleaned from *Lorenzo* itself and the Second Circuit's decision in *Rio Tinto plc*, as well as from the Supreme Court's opinion in *Stoneridge* and the opinions of other courts laying out—prior to *Lorenzo*—the facts that would be necessary to plead a scheme case.  First, it seems clear from *Lorenzo* and from *Rio Tinto plc* that the creation of a false statement that is then disseminated by another who is the "maker" is not sufficient to create scheme liability.  Where the only fraudulent conduct that is alleged is the making of a false statement to the investing public, a defendant in a private civil action is either liable as a maker under Rule 10b–5(b) or is not liable to investors at all.  In *Lorenzo* itself, the Supreme Court specifically addressed whether "applying subsections (a) or (c) of Rule 10b–5 to conduct like [Lorenzo's] would render our decision in *Janus* . . . 'a dead letter,'" and concluded that it would not.  *Id*.  The Court reaffirmed *Janus*'s holding that "subsection (b) did not (under the circumstances) cover an investment adviser who helped draft misstatements issued by a different entity that controlled the statements' content," distinguishing it on the basis that *Janus* said "nothing about the Rule's application to the dissemination of false or misleading information."  *Id*.  The Court further "assume[d] that *Janus* would remain relevant (a*nd preclude liability*) where an individual neither makes nor disseminates false information—provided, of course, that the individual is not involved in some other form of fraud."  *Id.*  (emphasis added).

The Second Circuit's discussion in *Rio Tinto plc* also signals that a plaintiff cannot use "scheme" allegations under Rules 10b–5(a) and (c) to circumvent the rule of *Janus* that a person who drafts a misstatement that is disseminated to the public by another who has ultimate authority is not liable under Section 10(b).  The court made clear that subsections (a) and (b) of Rule 10b–5 should not be interpreted in a manner that would render Rule 10b–5(b) surplusage

and that would permit private plaintiffs to repackage any Rule 10b–5(b) claims as Rule 10b–5(a) or (c) claims and thus avoid the heightened pleading standard in cases involving private plaintiffs. *Rio Tinto plc*, 41 F.4th at 54–55; *see also In re Alstom SA*, 406 F. Supp. 2d at 475. The Second Circuit also stated that the scope of Rule 10b–5(a) and (c) must be interpreted so as not to "muddle primary and secondary liability." *Id.* at 55. "[A]iding and abetting liability is authorized in actions brought by the SEC but not by private parties." *Id.*; *see Cent. Bank of Denver*, 511 U.S. at 180. To respect this congressional decision not to extend aider and abettor liability to private actions, the Second Circuit stated that scheme liability should be interpreted "only 'to state a claim against a defendant for the underlying deceptive devices or frauds themselves, and not as a shortcut to circumvent *Central Bank*'s limitations on liability for a secondary actor's involvement in making misleading statements.'" *Id.* at 55 (quoting *SEC v. Lucent Techs., Inc.*, 610 F. Supp.2d 342, 361 (D.N.J. 2009)). Finally, the Second Court implied that scheme liability should not be read so broadly that it would undermine the continued vitality of *Janus*'s holding regarding who is the "maker" of a misstatement. *Id.* at 54. The Second Circuit noted that: "While *Lorenzo* 'may have carved out of *Janus*' liability for disseminating false statements, it did not go so far as to create primary liability for 'participation in the preparation' of misstatements." *Rio Tinto plc*, 41 F.4th at 54 (quoting *Geoffrey A. Orley Revocable Tr. v. Genovese*, 2020 WL 611506, at *7–8 (S.D.N.Y. Feb. 7, 2020)).

Second, although the creation of a false statement that is then disseminated by another who is the "maker" is not sufficient to create scheme liability, it is equally clear that scheme liability is not limited to those who disseminate to investors false or misleading statements that they have not made; scheme liability is not limited to those facts. As much is made clear by *Lorenzo* and the Supreme Court's earlier decision in *Stoneridge*. In *Lorenzo*, the Supreme Court

held that the capacious words and "expansive language" of "device," "scheme" and "artifice" "capture a wide range of conduct." 139 S. Ct. at 1101–02. A "device" is that which is formed by design, a "scheme" is a project or plan or program of something to be done, and an "artifice" is an artful stratagem or trick. *Id.* at 1101 (internal quotation marks and citations omitted). The conduct alleged in *Lorenzo* was not "borderline" but heartland, but it did not exhaust the reach of the statute.

Some of the type of conduct that can be reached by scheme allegations, even if the conduct also involves a misstatement, is described by *Stoneridge* and its progeny. In *Stoneridge*, the Court considered first whether two companies that generated sham agreements (respondents in the Supreme Court) that a third company (Charter Communications) then used to make false statements to its investors but who did not make the false statements themselves could be liable under Section 10(b) and Rule 10b–5, and then second whether plaintiffs had alleged reliance sufficient to make the two companies liable in a private action. Although the Court held that the plaintiffs had not alleged reliance—because the sham contracts made it neither necessary nor inevitable that Charter Communications would mislead its investors, the Court also left no doubt that the two companies could be subject to liability for a scheme violation in an enforcement action by the SEC. The Court stated that "it would be erroneous" "to suggest there must be a specific oral or written statement before there could be liability under § 10(b) or Rule 10b–5." 552 U.S. at 158. It explained "that if business operations are used, as alleged here, to affect securities markets, the SEC enforcement power may reach the culpable actors." *Id.* at 161. It added that the "enforcement power is not toothless." *Id.* at 166. It thus concluded that "[c]onduct itself can be deceptive," rejected the interpretation that manipulation should be

limited to manipulative trading practices, and held that respondents' "course of conduct included both oral and written statements, such as the backdated contracts." *Id.* at 158.

The parameters of scheme liability are further elucidated by the Eighth Circuit's decision in *West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384 (8th Cir. 2016), Judge Kaplan's decision in *In re Parmalat Securities Litigation*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005), and the decision in *In re Lernout & Hauspie Securities Litigation*, 236 F. Supp. 2d 161 (D. Mass. 2003), among other cases. In *Medtronic, Inc.*, the Eighth Circuit held that scheme liability claims could be asserted against Medtronic where it paid physicians (but did not disclose such payments) to publish false statements in medical journals. 845 F.3d at 393. The Eighth Circuit noted that "Appellants allege conduct beyond mere misrepresentations or omissions actionable under Rule 10b–5(b)" as "the act of paying physicians to induce their complicity is the allegation at the heart of the scheme liability claim" and "[p]aying someone else to make a misrepresentation is not itself a misrepresentation." *Id.* Similarly, in *In re Parmalat Securities Litigation*, the court found that defendants were liable for engaging in deceptive transactions (involving the regular factoring and securitization of worthless invoices) with Parmalat which, in turn, allowed Parmalat to publish misleading financial statements. 376 F. Supp. 2d at 504. Judge Kaplan stated: "[t]he transactions in which the defendants engaged were by nature deceptive. They depended on a fiction, namely that the invoices had value." *Id.* And in *In re Lernout & Hauspie Securities Litigation*, the court held that allegations that an issuer's business partners had created shell companies, knowing that the issuer would enter into fraudulent licensing agreements with them in order to inflate its financial results, stated a claim for scheme liability. 236 F. Supp. 2d at 173. The court concluded that the creation or financing

of sham entities was a "manipulative or deceptive device . . . intended to mislead investors" apart from the material misstatement. *Id.*

The Court need not lay out the precise metes and bounds of "scheme" liability to resolve this case. The Supreme Court in *Lorenzo* directed that the precise outline for scheme liability would have to await a form of common law development informed by "[p]urpose, precedent, and circumstance," 139 S. Ct. at 1101, and the Second Circuit in *Rio Tinto plc* held the "ramifications or inferences from *Lorenzo*" should be the subject of "further development," 41 F.4th at 53–54. Both caution against the attempt to elaborate a bright-line test applicable to all facts in all cases in the future. It is clear in this case that Plaintiffs have not alleged enough for scheme liability.

As an initial point, Plaintiffs cannot establish the Rio Defendants' scheme liability *solely* on the basis of Turquoise Hill's misstatements or omissions in light of *Rio Tinto plc*. Instead, Plaintiffs must allege "something extra" in order to bring a scheme liability claim against the Rio Defendants. *Id.* at 54; *see also Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *11 (S.D.N.Y. Mar. 30, 2021) (Nathan, J.) ("A claim brought under subsection (c) would have to establish different elements than one brought under subsection (b), including, notably, the existence of an alleged scheme to defraud."). Plaintiffs argue that this "something extra" comes from five sources: (1) the Rio Defendants' dissemination of false information through Turquoise Hill; (2) Rio Defendants' retaliation against employees and consultants who tried to make Defendants acknowledge the truth about cost overruns and schedule delays; (3) Rio Defendants' commission of a sham internal investigation by Baker McKenzie that purported to rebut Bowley's allegations; (4) Rio Defendants' concealment and destruction of evidence of their misconduct, including by destroying documents and instructing employees not to document

important information; and (5) Rio Defendants' use of nondisclosure agreements to try to conceal the truth about the delays and cost overruns.[33]  Dkt. No. 127 ¶ 451; Dkt. No. 140 at 2.

As to the first source, while Plaintiffs use the term "dissemination" to describe the Rio Defendants' conduct, the Rio Defendants' conduct with respect to Turquoise Hill's statements is distinct from the type of "dissemination" alleged in *Lorenzo*.  In *Lorenzo*, the defendant was alleged to have directly transmitted the false statements to prospective investors, 139 S. Ct. at 1104; here, on the other hand, the Complaint does not allege that anyone but Turquoise Hill itself published or distributed its own allegedly false and misleading statements.  That distinction is dispositive.  The Rio Defendants' alleged conduct therefore is nearly identical to the conduct *Janus* stated would not make someone liable for a misstatement or omission under Rule 10b–5(b): the Rio Defendants, like the nonliable "speechwriter" or "playwright" in *Janus*, are alleged to have drafted the statement that Turquoise Hill, a legally separate entity (*see supra* Section II) with ultimate authority over the statement, decided to publish to its investors.  564 U.S. at 145, 148.  Plaintiffs' theory that this alone is sufficient for scheme liability would "muddle primary and secondary liability" and permit scheme liability to be used "as a shortcut to circumvent *Central Bank*'s limitations on liability for a secondary actor's involvement in making misleading statements."  *Rio Tinto plc*, 41 F.4th at 55.

---

[33] At oral argument, Plaintiffs' counsel also appeared to argue that Defendants' settlement with Bowley related to his wrongful discharge case—which resulted in his witness statement and other evidence in the case not becoming publicly available—could constitute the "something extra" for scheme liability.  Transcript of Oral Argument (Aug. 25, 2022) at 72:20–73:1.  This settlement, however, did not occur until after March 16, 2020, *almost a year after* the end of the Class Period.  Dkt. No. 127 ¶ 284.  It is therefore unclear how this allegation could constitute part of the scheme, or how Plaintiffs could allege that they acted in reliance on it.  Regardless, Plaintiffs do not assert this allegation as a basis for their scheme liability claims in the Complaint, and therefore the Court declines to consider it.  Dkt. No. ¶ 451.

Plaintiffs' allegations do not establish any other "underlying deceptive devices or frauds." *Id.* The Rio Defendants' dissemination of false information through Turquoise Hill, while deceptive by nature, is indistinguishable from Turquoise Hill's alleged misstatement. It would "create primary liability for 'participation in the preparation' of misstatements." *Id.* at 54 (quoting *Genovese*, 2020 WL 611506, at *7–8). Plaintiffs do not allege that the Rio Defendants tricked Turquoise Hill into publishing the information or paid Turquoise Hill to do so. Instead, Plaintiffs argue that the Rio Defendants provided the false statement to Turquoise Hill, who then decided to publish it. The deceptive act is the false statement itself.

The remaining allegations are insufficient to carry Plaintiffs over the line. Plaintiffs allege that the contract pursuant to which Bowley was retained to consult with Rio Tinto contained a confidentiality obligation. Dkt. No. 127 ¶ 262. But it appears that contract was signed *before* Bowley began his work and in order for him to have access to the confidential information from which he generated his reports; if anything, the allegations support that the purpose of the agreement was for Bowley to help uncover the truth about the delays and cost overruns and therefore was not signed in furtherance of the alleged fraud. *Id.* ¶¶ 116–117 (alleging that Bowley reported his concerns after he was hired). Nor do Plaintiffs allege there was anything deceptive in Rio Tinto asking Bowley to honor that agreement. Plaintiffs simply allege that Bowley, in connection with an employment dispute, stated that he was "sidelined but was not released from my contract and the confidentiality obligations that went with it." *Id.* ¶ 262.

Plaintiffs also allege that Defendants "retaliated against employees and consultants who tried to make Defendants acknowledge the truth about the cost overruns and schedule delays" at OT, *id.* ¶ 451, but the paragraphs of the Complaint that they cite to for that proposition establish

only that Rio fired Brinkmann, the senior-most manager of Shaft 2, in or around May 2018 after work was delayed on Shaft 2 and the "proverbial shit hit the fan," *id.* ¶¶ 153–157, and at that same time terminated the employment of the surface construction manager at the OT project, after he raised issues with respect to the contractors working on the project, *id.* ¶¶ 157–159. But those allegations cannot convert this misstatement case into a scheme case. Although Brinkmann may have believed that he was being made a scapegoat for Jacobs's poor performance, *id.* ¶ 153, and FE8 may have believed that he was being "thrown under the bus [for] trying to tell them we should try to sort these things out," *id.* ¶ 159, there is no allegation that either was terminated to prevent them from making a public statement or that there was anything deceptive or fraudulent in Rio's conduct. Plaintiffs do not allege that such acts helped create the appearance that something was different than it was. It would be a rare fraudulent misstatement case indeed where the "bad news" is sufficiently serious for management to make public misstatements but where some employees were not fired, reassigned, or subject to criticism. Plaintiffs' theory, if accepted, would make virtually every misstatement case into a scheme case.

Finally, Plaintiffs allege that Defendants "commissioned a sham internal investigation by Baker McKenzie" and sought to secure the destruction of documents possessed by Duffy and instructed employees not to document important information. *Id.* ¶ 451. The underlying allegations are remarkably thin. Baker McKenzie's report allegedly excluded information learned by Duffy and sought to destroy data his firm had collected from Rio Tinto executives. *Id.* ¶¶ 287–288. But if Rio was seeking to engage in a scheme to defraud, why did it hire Baker McKenzie in the first place and how does an internal investigation reporting to the very persons allegedly engaged in the fraud constitute an "underlying deceptive device or fraud"? As to the

allegations regarding destruction of documents and the not documenting of information, Plaintiffs point to paragraphs 287 and 288, but those paragraphs report that after there was a nighttime break-in at Duffy's home in England that investigators believed was an attempt to steal data and, after the break-in, Rio Tinto's in-house lawyers demanded that an unspecified data management company "be allowed to access and collect the reports Duffy's firm had documented." *Id.* ¶ 288.  The request to collect confidential information when a company believes that it might have been stolen is unexceptional.  And there is nothing but speculation and innuendo behind Plaintiffs' suggestion that Rio was somehow behind the night-time break-in.

These facts are therefore distinct from other cases in which courts have found that plaintiff successfully stated a claim for scheme liability because the defendants performed an inherently deceptive act that was distinct from an alleged misstatement: *i.e.*, sham agreements, sham transactions, sham companies, or undisclosed payments to doctors who appeared independent.  *See also Sec. & Exch. Comm'n v. GPL Ventures LLC*, 2022 WL 158885, at *10 (S.D.N.Y. Jan. 18, 2022) (finding scheme liability adequately pled where defendants "were the puppetmasters of a scheme to launder their investments for profit").

Moreover, even if Plaintiffs had adequately alleged a scheme based on the other conduct (*e.g.*, retaliating against whistleblowers, destroying evidence), the claim would fail for lack of reliance.  The Supreme Court held in *Stoneridge*, "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action," including one premised on scheme liability, as it ensures that "for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists."  552 U.S. at 159; *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 156 (2d Cir. 2010)

("*Stoneridge* stands for the proposition that reliance is the critical element in private actions under Rule 10b–5."). In *Stoneridge*, the Court held that scheme liability claims against two defendants who were suppliers and customers of a company and who entered into agreements with the company that helped the company mislead its auditor and issue misleading financial statements were properly dismissed because even if they alleged a scheme, they did not allege reliance. 552 U.S. at 152–54. The Court stated that "[n]o member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times," and "[p]etitioner, as a result, cannot show reliance upon any of respondents' actions except in an indirect chain that we find too remote for liability." *Id.* at 159. The Court rejected plaintiff's argument that liability was appropriate because "the financial statement Charter released to the public was a natural and expected consequence of respondents' deceptive acts; had respondents not assisted Charter, Charter's auditor would not have been fooled, and the financial statement would have been a more accurate reflection of Charter's financial condition." *Id.* at 160. It noted that "[i]t was Charter, not respondents, that misled its auditor and filed fraudulent financial statements; nothing respondents did made it necessary or inevitable for Charter to record the transactions as it did." *Id.* at 161.

Under *Stoneridge* then, claims under subsections (a) and (c) of Rule 10b–5(a) are properly dismissed for lack of reliance where the undisclosed deceptive or manipulative conduct did not make it "necessary or evitable" that the false statement (upon which Plaintiffs relied) would be made. *See, e.g.*, *Menaldi*, 277 F. Supp. 3d at 518–19; *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2009 WL 1686896, at *4 (S.D.N.Y. June 16, 2009). For example, in *Mayer Brown LLP*, the Second Circuit affirmed the district court's holding that the law firm defendants could not be liable for scheme liability based on allegations that they had participated

in drafting the documents to create the fraudulent transactions.  603 F.3d at 160.  Quoting the district court, the Second Circuit stated that: "[a]s was the case in *Stoneridge*, it was Refco, not the Mayer Brown Defendants, that filed fraudulent financial statements; nothing the Mayer Brown Defendants did made it necessary or inevitable for Refco to record the transactions as it did." *Id.* (quoting *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 316 (S.D.N.Y. 2009)).

Plaintiffs do not allege that any product of Rio's retaliation against whistleblowers, commission of an internal investigation, concealment and destruction of evidence, and use of nondisclosure agreements was made known to or relied upon by investors outside of its tangential relationship to Turquoise Hill's false statements.  And while some of this conduct may have made it easier for Turquoise Hill to continue making misrepresentations, none of it can be said to have made such misstatements "necessary or inevitable."  *See Menaldi*, 277 F. Supp. 3d at 519 ("[T]he New Complaint does not adequately allege that Plaintiffs relied on Cohen's alleged cover-up.").

Therefore, Plaintiffs' scheme liability claims against the Rio Defendants must be dismissed.

### B.      Turquoise Hill

Plaintiffs allege that the Turquoise Defendants are liable under SEC Rule 10b–5(a) and (c) for disseminating the purportedly false statements made by Rio and RTIH.  Dkt. No. 127 ¶ 451.  As discussed *supra* Section IV.A, Plaintiffs have not sufficiently pled scienter with respect to the Turquoise Defendants.  *See Menaldi*, 277 F. Supp. 3d at 517 ("[T]o state a scheme liability claim, a plaintiff must plead facts demonstrating 'a strong inference that the defendant acted with the required state of mind.'" (citation omitted)).  Plaintiffs' scheme liability claims against the Turquoise Defendants therefore fail on this basis.

## VI.   Control Person Claims Under Section 20(a)

Plaintiffs also bring claims of control person liability under Section 20(a) of the Exchange Act against the Turquoise Executive Defendants, Rio Tinto, as well as the Rio Executive Defendants, alleging that each was a controlling person of Turquoise Hill within the meaning of Section 20(a) of the Exchange Act.  Dkt. No. 127 ¶¶ 455–468.

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  The section permits plaintiffs to hold the controller secondarily liable if the person controlled has committed a primary violation.  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *Kraft v. Third Coast Mistream*, 2021 WL 860987, at *26 (S.D.N.Y. Mar. 8, 2021) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)).  "Because fraud is not an essential element of a Section 20(a) claim, Plaintiffs need not plead control in accordance with the particularity required under Rule 9(b)."  *Tecku v. Yieldstreet, Inc.*, 2022 WL 1322231, at *15 (S.D.N.Y. May 3, 2022); *see In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 542 (S.D.N.Y. 2016).

Section 20(a) thus does not permit a parent always to avoid responsibility for its subsidiary's wrongdoing.  "In cases involving parent-subsidiary relationships, courts have regularly based findings of control person liability on allegations of substantial stock ownership

and common principals." *STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525, 536 (E.D.N.Y. 2011) (quoting *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007)).  If the controller has the "power to direct or cause the direction of management and policies through ownership of voting securities, by contract, or in any other way," and if the controller has "actual control over the transaction in question," the controller may be liable for the subsidiary's primary violation assuming culpable participation.  *In re Alstom SA*, 406 F. Supp. 2d at 487 ("[T]he Section 20(a) defendant must not only have actual control over the primary violator, but have 'actual control over the transaction in question.'" (quoting *In re Global Crossing*, 2005 WL 1875445, at *3))

It is admittedly a close question whether Plaintiffs' allegations satisfy the second prong of the test for control person liability.  The Complaint alleges that Rio Tinto has a majority interest in Turquoise Hill and, according to the allegations in the Complaint, has control over the election of all members of Turquoise Hill's Board of Directors and the election and appointment of Turquoise Hill's executive officers, all but one of whom have been employees of Rio Tinto. Dkt. No. 127 ¶ 39.  At the same time, however, Rio Tinto's contract with Turquoise Hill makes clear that Turquoise Hill had the power and the responsibility to reject any statements that Rio Tinto asked it to make if Turquoise Hill believed those statements to be false or misleading. The Court need not reach the question, however, whether Plaintiffs have satisfied prong two, because they have failed prong one.  Plaintiffs fail to allege a primary violation by Turquoise Hill.  Plaintiff thus cannot establish control person liability against the Turquoise Executive Defendants, the Rio Executive Defendants, RTIH, or Rio for Turquoise Hill's misstatements. *See ATSI Commc'ns, Inc.*, 493 F.3d at 108; *In re Alstom SA*, 406 F. Supp. 2d at 486.

Plaintiffs also allege that the Rio Executive Defendants were controlling persons of Rio and RTIH within the meaning of Section 20(a) of the Exchange Act.  Dkt. No. 127 ¶¶ 461–463.  The Rio Defendants only move to dismiss this claim on the basis that "[b]ecause Plaintiffs have failed to plead [an underlying violation by Rio and RTIH], the Section 20(a) claim should also be dismissed."  Dkt. No. 131 at 47.  Although Plaintiffs have failed to plead an underlying violation by RTIH,[34] they have successfully pled an underlying violation of Rule 10b–5(b) by Rio.  Thus, while claims under Section 20(a) related to the Rio Executive Defendants' control over RTIH will be dismissed for this reason, *see ATSI Commc'ns, Inc.*, 493 F.3d at 108; *In re Alstom SA*, 406 F. Supp. 2d at 486, Plaintiffs' Section 20(a) claims against the Rio Executive Defendants related to their control over Rio will not.

## VII.   Loss Causation

The Rio Defendants also move to dismiss Plaintiffs' claims on the basis that Plaintiffs do not adequately allege loss causation.  Dkt. No. 131 at 45.  Under the PSLRA, "the plaintiff [has] the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C.A. § 78u-4.  "To establish loss causation, Plaintiffs must show that 'the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.'"  *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (quoting *In re Vivendi, S.A. Securities Litigation*, 838 F.3d at 261).  "Plaintiffs must allege not only the but-for causation of their losses but also the proximate causation, or that the fraud 'concealed something from the market that, when disclosed,' would foreseeably and 'negatively affect[ ] the value of the security.'"  *Id.* (quoting *Lentell*., 396 F.3d at 173).  To meet this standard, "a plaintiff can allege either (1) 'the existence of a cause-in-fact on the ground that

---

[34] As discussed *supra* footnote 6, RTIH is not the "maker" of Turquoise Hill's statements and Plaintiffs do not plead that RTIH made any statements of its own.

the market reacted negatively to a corrective disclosure of the fraud' or (2) 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *25 (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233–34 (2d Cir. 2014)).

Plaintiffs adequately allege loss causation through evidence that the market reacted negatively to corrective disclosures of the alleged fraud.  The SAC alleges that the Turquoise Hill's stock price dropped in a statistically significant manner when the prior misrepresentations and risks concealed by Defendants' fraudulent conduct were disclosed to the market.  Dkt. No. 127 ¶ 425.  On February 27, 2019, when the Defendants first disclosed that sustainable first production would be delayed by several months, Turquoise Hill's shares dropped nearly 13% that day and again by nearly 7% on the following day.  *Id.* ¶¶ 426–427.  Plaintiffs allege that additional information concerning the true extent of the delays and cost-overruns at OT were revealed in April, May, and June and caused further declines in the price of Turquoise Hill shares.  For example, the SAC alleges that on July 16, 2019, Defendants revealed what they had long known, which was that the underground expansion would be delayed for over a year and was over a billion dollars over-budget.  *Id.* ¶¶ 242–245.  These disclosures prompted a near 44% price decline and caused analysts to slash their ratings.  *Id.*  Such allegations are sufficient to plausibly allege that these stock drops were the result, in part, of Defendants' disclosures about the true extent of delays and cost overruns at the Mine.  *See, e.g., DoubleLine*, 323 F. Supp. 3d at 458; *see also In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d at 380 (describing the burden of pleading loss causation as "a low one at the pleading stage"); *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016) (burden to plead loss causation is "not a heavy one," and "when it is unclear whether the plaintiff's losses were caused by the fraud or some other

intervening event, 'the chain of causation is . . . not to be decided on a Rule 12(b)(6) motion to dismiss'" (quoting *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs.*, LLC, 797 F.3d 160, 187 (2d Cir. 2015))).

In response, the Rio Defendants contend that Plaintiffs fail to adequately plead loss causation because the risks they allege "materialized" had been disclosed to the market. Dkt. No. 131 at 46. But Plaintiffs allege that Defendants "concealed far more than the possibility" of delay and cost overruns, they allege that Defendants concealed that the delays and cost overruns were no longer a risk but a near certainty, of which Defendants were aware even prior to the Class Period. *See Aclaris Therapeutics, Inc*., 2021 WL 1177505, at *26 (finding loss causation adequately plead because, while the fact that "ESKATA might not be commercialized successfully was extensively disclosed before the Class Period," "[d]efendants here have also concealed 'far more' than the possibility that ESKATA would not be commercially viable—it concealed the truth about its misleading advertising"); *see In re Braskem S.A. Securities Litigation*, 246 F. Supp. 3d 731 (S.D.N.Y. 2017) (rejecting defendant's claim that the complaint failed to plead loss causation because it did not plead the defendant concealed the relevant risk).

The Rio Defendants also contend that the disclosure of a failure to meet a forecasted schedule and budget alone cannot establish loss causation, as while revisions of budgets and schedules may have a negative on stock prices, they do not imply that defendants concealed a scheme. Dkt. No. 131 at 46–47 (citing *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261 (S.D.N.Y. 2005)). This argument, however, mischaracterizes Plaintiffs' allegations. Plaintiffs do not allege that the failure to meet forecasts alone establishes a scheme; instead, they

allege that Defendants knew all along that they would not meet these forecasts and yet continued to publicly affirm their validity to investors.[35]

## CONCLUSION

The Rio Defendants' motion to dismiss is GRANTED in part and DENIED in part as to Defendants Rio Tinto, Soirat, and Jacques. The Rio Defendants' motion to dismiss is GRANTED as to Defendant RTIH. The Turquoise Defendants' motion to dismiss is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 129 and 132.

SO ORDERED.

Dated: September 2, 2022
New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[35] The case Defendants cite in support of this argument is distinguishable. In *In re Initial Public Offering Securities Litigation*, the court found that plaintiffs had not adequately alleged that the scheme was ever disclosed to the market and thus did not sufficiently allege loss causation. 399 F. Supp. 2d at 266.