# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TURQUOISE HILL RESOURCES LTD. SECURITIES LITIGATION | Case No. 1:20-cv-08585-LJL |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

The United States District Court for the Southern District of New York ("Southern District") presents its compliments to the appropriate judicial authority of the United Kingdom for assistance in obtaining evidence to be used at trial in the above-captioned civil proceeding before this Court. This request is made pursuant to Chapter I of the Hague Convention of 18 March 1970 on the Taking of Evidence in Civil or Commercial Matters ("Hague Convention"). The Southern District is a court of law and equity and has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. §§ 15(a) and 26.

The Southern District has determined that it would further the interests of justice and that justice cannot be completely done between the parties without documents in the possession of Mr. Richard Bowley and the testimony, under oath, of Mr. Bowley, who resides within your jurisdiction. This is an action alleging violation of United States securities laws. Mr. Bowley is a former employee of Rio Tinto and is a significant witness concerning Plaintiffs' allegations that Defendants violated securities laws by failing to timely disclose alleged schedule delays and cost overruns at the Oyu Tolgoi mine. The evidence sought by Applicants is necessary for the just and proper disposal of the proceedings and is for use in the trial of this action.

Mr. Bowley's testimony is not available from any source within the jurisdiction of the Southern District, and cannot be obtained by any means other than pursuant to an order of an

appropriate judicial authority of the United Kingdom, compelling the witness to appear for examination. Mr. Bowley, a non-party to this action, resides at 1 Hazeldown Close, River, Dover, Kent, CT17 0NJ.

This request is made with the understanding that, and on the basis that, any order made pursuant to this request: (1) will not require Mr. Bowley to commit any offense; (2) will not require Mr. Bowley to undergo a broader form of inquiry than he would have if the litigation were conducted in the United Kingdom; and (3) will not violate the laws of civil procedure of any United Kingdom court.

The Southern District, therefore, and in conformity with Article 3 of the Hague Convention, respectfully requests that you, in furtherance of justice by proper and usual process of your court, cause Mr. Bowley to produce the documents listed in Exhibit 1 and to appear before an official examiner authorized to administer oaths, and to take testimony, at a precise time to be fixed between counsel for the Applicants and the witness or (if applicable) the appointed Examiner under 34.15, and answer on his oath or affirmation questions and cross-questions, and that you will direct his deposition to be transcribed and recorded by video, and the transcript and video be sent to counsel for the parties in the action, who so request a copy. The Southern District stands ready to provide similar judicial assistance to judicial authorities in the United Kingdom when required.

This Court has reviewed each of the document requests and deposition topics attached to this letter of request in light of the allegations of the Second Amended Complaint, dated September 16, 2021 ("Complaint"), Plaintiffs' claims that this Court sustained in its decision on Defendants' motions to dismiss the Complaint, and Defendants' Answer to the Complaint. This Court has

determined that each of the document requests and deposition topics seeks evidence that is relevant to Plaintiffs' claims and Defendants' defenses for use at the trial of this action.

In particular, the document requests are relevant to the following Complaint paragraphs: No. 1: ¶ 116; No. 2: ¶¶ 144, 199; No. 3: ¶ 119; No. 4: ¶¶ 118, 127, 268; No. 5: ¶ 141; No. 6: ¶¶ 179-83; No. 7: ¶¶ 209-14; No. 8: ¶¶ 221; No. 9: ¶¶ 222-29; No. 10: ¶¶ 14-17, 20, 23, 111-22, 127, 141-52, 166-68, 171, 179-81, 205-20; No. 11: ¶¶ 24, 262; No. 12: ¶ 284; and No. 13: ¶¶ 14, 20-21, 111-22, 126-27, 141-52, 165-71, 179-83, 205-29.

The deposition topics are relevant to the following Complaint paragraphs: No. 1: ¶¶ 14-17, 20, 23, 111-22, 127, 141-52, 166-68, 171, 179-81, 205-20; No. 2: ¶¶ 111-22, 221-29; No. 3: ¶¶ 111-22, 141-52; No. 4: ¶¶ 165-83; No. 5: ¶¶ 111-22, 141-52, 205-29; No. 6: ¶¶ 111-22, 141-52, 205-29; No. 7: ¶¶ 221-29; No. 8: ¶¶ 111-22, 141-52; No. 9: ¶¶ 15, 141, 272; and No. 10: ¶ 286.

THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK THEREFORE MAKES THE FOLLOWING REQUEST:

1.      **Sender**

      The Honorable Lewis J. Liman
      United States District Judge
      United States District Court for the Southern District of New York
      Daniel Patrick Moynihan United States Courthouse
      500 Pearl St.
      Courtroom 15C
      New York, NY 10007-1312
      United States of America

2.      **Central Authority of the Requested State**

      The Senior Master of the King's Bench Division
      The High Court of England and Wales
      For the attention of the Foreign Process Section
      Room E16
      Royal Courts of Justice
      Strand
      LONDON WC2A 2LL
      United Kingdom

**3. Person to whom the executed request is to be returned**

      The Honorable Lewis J. Liman
      United States District Judge
      United States District Court for the Southern District of New York
      Daniel Patrick Moynihan United States Courthouse
      500 Pearl St.
      Courtroom 15C
      New York, NY 10007-1312
      United States of America

      and

      Michael Blatchley
      Bernstein Litowitz Berger & Grossmann LLP
      1251 Avenue of the Americas, 44th Floor
      New York, NY 10020
      United States of America

**4. Specification of the date by which the requesting authority requires receipt of the response to the Request for International Judicial Assistance ("Request for Assistance")**

The requesting authority would greatly appreciate a response to the Request for Assistance within 21 days or as soon thereafter as is practicable.

**5.**

      **a.    Requesting Judicial Authority**

            United States District Court for the Southern District of New York
            Daniel Patrick Moynihan United States Courthouse
            500 Pearl St.
            Courtroom 15C
            New York, NY 10007-1312
            United States of America

      **b.    To the competent authority of**

            United Kingdom

      **c.    Name of the case and any identifying number**

            *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-08585-LJL (S.D.N.Y.)

6.      **Names and addresses of the parties and their representatives**

a.      **Plaintiffs**

The Pentwater Funds, individually and on behalf of all others similar situated.

b.      **Names and addresses of Plaintiffs' representatives**

Michael D. Blatchley
Salvatore J. Graziano
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas, 44th Floor
New York, New York 10020

*Counsel for Lead Plaintiff The Pentwater Funds*

c.      **Defendants**

Rio Tinto PLC, Rio Tinto Limited, Jean-Sébastien Jacques, and Arnaud Soirat

d.      **Names and addresses of Defendants' representatives**

Corey Worcester
Renita Sharma
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor,
New York, New York 10010

*Counsel for Defendants Rio Tinto PLC, Rio Tinto Limited, Jean-Sébastien Jacques, and Arnaud Soirat*

7.

a.      **Nature and purpose of the proceedings:**

The Plaintiffs in this case allege that Defendants Rio Tinto PLC, Rio Tinto Limited, Jean-Sébastien Jacques, and Arnaud Soirat ("Defendants") violated United States Securities laws by failing to timely disclose schedule delays and budget overruns that occurred at the Oyu Tolgoi mine ("Oyu Tolgoi"). Plaintiffs and the other members of the proposed Class are investors in Turquoise Hill Resources Ltd. ("Turquoise Hill"), which was a publicly-traded issuer whose sole business and asset was its ownership interest in the Oyu Tolgoi mine. During the Class Period

(July 17, 2018, through July 31, 2019), Turquoise Hill owned 66% of the Oyu Tolgoi mine, which was almost exclusively operated by Rio Tinto. (The Mongolian Government owned 34% of the mine.) As described below, Plaintiffs allege that they and the other Class members were harmed when the truth concerning the schedule delays and budget overruns at Oyu Tolgoi caused massive declines in the price of Turquoise Hill securities. A copy of the Complaint is attached as Exhibit 3 hereto. The nature of the action is summarized at Complaint ¶¶ 1-27. Plaintiffs seek damages and other relief for injury caused by Defendants' alleged wrongdoing. *Id.* § XIV.

> **b.      Summary of complaint[1]**

Plaintiffs allege that Defendants made a series of misrepresentations to conceal massive cost overruns and delays concerning the most critical aspect of the development of the Oyu Tolgoi underground mine in Mongolia. Complaint ¶ 3. The Oyu Tolgoi mine, which is jointly owned by Defendant Rio Tinto and the Government of Mongolia, and operated almost exclusively by Rio Tinto, is expected to be one of the largest copper mines in the world. *Id.*

Throughout the Class Period, the senior executives of Rio Tinto assured investors that progress on that development was at the time "on plan and on budget" and that the deadline for achieving sustainable first production—when the mine would begin generating cash flows—remained intact. *Id.* ¶ 4. Plaintiffs allege that in reality, from before the start of the Class Period and at the time of Defendants' statements, the underground expansion project was many months behind schedule and hundreds of millions of dollars over budget. *Id.*

---

[1] The following is a high-level overview of the claims that Plaintiffs will press in this case, and is in no way intended to be a comprehensive description of all claims Plaintiffs may raise or argue. Defendants moved to dismiss Plaintiffs' complaint on various legal grounds, including failing to state a claim for relief, and the Court sustained portions of Plaintiffs' claims. This section summarizes Plaintiffs' claims that were sustained by the Court. The Court's Opinion and Order sustaining the Complaint in part and dismissing it in part is attached as Exhibit 4.

For example, Plaintiffs allege that in late 2017, Defendant Soirat and Craig Kinnell, the Chief Development Officer for Rio Tinto's Copper and Diamonds division, hired Richard Bowley, a veteran Oyu Tolgoi contractor, to examine the problems at Oyu Tolgoi and come up with a plan to address them. *Id.* ¶ 14. Bowley was allegedly particularly qualified to develop such a plan, as he had earlier worked at Oyu Tolgoi for years at a construction management firm in Mongolia charged with developing the underground study, value, and engineering for the underground mine, and knew many of the key managers at the project. *Id.* Before he was hired by Rio, Bowley allegedly wrote to Kinnell in a July 3, 2017 email that "two out of three of your senior guys on the project have told me Jacobs [Rio's principal contractor at Oyu Tolgoi] are failing badly," warning that "[w]e both know that mess will lead straight to O[yu] T[olgoi']s door in the shape of schedule overruns and cost." *Id.* Kinnell allegedly immediately responded, agreeing that "it is all getting messy Richard and needs intervention to stop it from getting significantly worse." *Id.*

Plaintiffs allege that after Bowley was hired by Rio Tinto in late 2017, Bowley identified hundreds of millions of dollars in cost overruns, and it was obvious to him the project was months behind schedule. *Id.* ¶ 15. Bowley allegedly detailed the problems at the mine in a presentation to Kinnell and Rosemary Fagen, who was Vice President for Human Resources for Rio Tinto's Copper & Diamond group and, according to Bowley, served as Defendant Soirat's gatekeeper, at Rio Tinto's London headquarters in February 2018. *Id.* In that presentation and in subsequent discussions and emails, Bowley allegedly directly informed Rio's senior management about the actual cost overruns and massive delays at OT. *Id.*

Nevertheless, Defendants continued to tell investors during the Class Period that the project remained on schedule to achieve sustainable first production in the first quarter of 2021 and was on budget at a $5.3 billion total capital cost. *Id.* ¶ 16; *see also* Ex. 4, at 80-83.

Plaintiffs allege that to prevent the truth from being revealed, Defendants manufactured a false "re-forecast" of the Oyu Tolgoi expansion that they reported to investors in October 2018 to enable Defendants to continue concealing the project's true costs. *Id.* ¶ 17. As Bowley allegedly internally reported at the time this statement was made, the "re-forecast" was just a way to "make the current position appear more tenable" and was a "little light on the truth." *Id.*; *see also* Ex. 4, at 88. Defendants also publicly attributed the delays and cost overruns to "ground conditions," and the Court sustained Plaintiffs' claims based on these statements. Ex. 4, at 89.

Plaintiffs also allege that to further prevent the truth from being revealed, Defendants sidelined Bowley, and later terminated him. *Id.* ¶ 20. However, Plaintiffs allege, Bowley continued to urge Rio Tinto executives to address the problems at Oyu Tolgoi, and emphasized in emails to Rio's senior management throughout the fall of 2018 that Rio Tinto's public statements "watered down the truth," were "inconsistent with the truth (a lie)," and "suicidal." *Id.*

In February 2019, after Bowley's internal reports eventually triggered an internal compliance investigation, Defendants began disclosing what was allegedly actually happening at Oyu Tolgoi. *Id.* ¶ 21. Ultimately, Defendants disclosed that the expansion project required an additional $1.2 to $1.9 billion in capital and was 16 to 30 months behind schedule. *Id.* ¶ 22. These disclosures caused substantial declines in the price of Turquoise Hill securities, damaging Plaintiffs and the proposed Class. *Id.* ¶ 4.

After the end of the Class Period, Plaintiffs allege that Bowley reported Defendants' alleged misconduct to securities regulators, including the U.K. Serious Fraud Office and Financial Conduct Authority, the U.S. Securities and Exchange Commission, the Australian Securities and Investments Commission, and the Mongolia Financial Regulatory Commission, and those agencies are investigating the misconduct alleged in this action. *Id.* ¶ 24. In connection with those

investigations, as well as in a separate employment dispute with Rio Tinto before the U.K. Employment Tribunal, Bowley provided a sworn statement in which he attests that Defendants' Class Period statements were "misleading," "completely untrue," and a "lie." *Id.*

Based on Defendants' allegedly knowingly or recklessly false or misleading statements to investors about the Oyu Tolgoi project, Plaintiffs allege that Defendants violated (1) Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and Securities and Exchange Commission Rule 10b-5; and (2) Section 20(a) of the Exchange Act.  *See, e.g.*, *id.* ¶¶ 1-13, 465-525, 583-619.

### c.     Summary of defense[2]

As noted above, Defendants moved to dismiss Plaintiffs' claims on various legal grounds, including failing to state a claim for relief, and the Court sustained some of Plaintiffs' claims and dismissed others.  This section summarizes Defendants' defenses to Plaintiffs' claims that were sustained by the Court.

Generally, Defendants aver that none of the disclosures regarding Oyu Tolgoi were false or misleading when made.  The Oyu Tolgoi mine is a highly complex project, and Defendants' position is that they disclosed any delays or cost overruns promptly after becoming aware of them. Further, Defendants will argue that even if any of the statements concerning the Oyu Tolgoi mine were false or misleading, these alleged false or misleading statements were made innocently, and not with an intent to deceive, because Defendants had no specific motive to defraud investors and that these allegedly false or misleading statements were not made with scienter.

---

[2] The following is a high-level overview of the defenses that Defendants will press in this case, and is in no way intended to be a comprehensive description of all defenses Defendants may raise or argue.

8.

### a.    Evidence to be obtained

This Court respectfully requests that the appropriate judicial authority in the United Kingdom cause the appropriate orders to be issued to direct Mr. Bowley to produce the documents listed in Exhibit 1 and to give oral testimony on the topics enumerated in Exhibit 2, which are to be used at trial in these proceedings.

### b.    Purpose of the evidence or judicial act sought

To prove their claims at trial, Plaintiffs must prove that Defendants made materially false or misleading statements about the Oyu Tolgoi project and that they did so with scienter, i.e., knowingly or recklessly.

Plaintiffs have represented and furnished sufficient evidence to satisfy this Court that Mr. Bowley has personal knowledge of matters material and relevant to the matters at issue in the proceedings.  As described below, the evidence sought by Plaintiffs relates to the matters in question.  Because Mr. Bowley resides outside this Court's subpoena power and therefore cannot be compelled to testify at trial, Plaintiffs seek the production of documents in Mr. Bowley's possession to support their claims at trial regarding Mr. Bowley's work for Rio Tinto, his complaints to Rio Tinto, and the Oyu Tolgoi project's progress and budget, as well as Mr. Bowley's testimony about the same.

Mr. Bowley served as Rio Tinto's General Manager for Strategic Projects and Chief Advisor for Oyu Tolgoi, and he is a significant witness. He is mentioned in the Complaint no fewer than 234 times.  According to the Complaint, Mr. Bowley was brought in to work on the Oyu Tolgoi project to assess "how bad" the schedule delays and cost overruns were, which is a central topic in this lawsuit, and was in an "excellent position" to evaluate the status of the project. Complaint ¶¶ 112, 114. Mr. Bowley allegedly quickly came to the view that the Oyu Tolgoi project

was experiencing schedule delays and cost overruns. *Id.* ¶ 117. He then allegedly repeatedly reported these concerns to colleagues at Rio Tinto, including Rosemary Fagen and Arnaud Soirat. *Id.* ¶¶ 141-52, 208-214.  In addition, Mr. Bowley allegedly was fired for raising his concerns with Oyu Tolgoi's progress, and after he was fired, Mr. Bowley claimed that Rio Tinto's compliance was deficient, which sparked an investigation.  *See id.* ¶¶ 221-22.

Proving these allegations will be an important part of Plaintiffs' claims in this case.  Thus, Plaintiffs need documents concerning the allegations attributed to Mr. Bowley in the Complaint so Plaintiffs can seek to prove, and the jury can assess, the veracity of these allegations at trial.

Plaintiffs cannot obtain the relevant evidence pertaining to Mr. Bowley sought here through pre-trial discovery from Defendants. Even though Mr. Bowley worked for Rio Tinto during some of the relevant period, Plaintiffs believe it is likely that Mr. Bowley used methods of communications that would not be available to Rio Tinto, such as personal email or text messaging. For example, the Complaint cites emails expressing concerns about the status of the Oyu Tolgoi project that were sent to Mr. Bowley's "hotmail" account.  *See, e.g.*, ¶112.  Further, Mr. Bowley was separated from Rio Tinto before the end of the Class Period, meaning that Rio Tinto would not have access to Mr. Bowley's relevant documents after this time. Because Mr. Bowley is likely to have relevant documents and communications that Plaintiffs cannot obtain from Rio Tinto in the underlying proceeding, Plaintiffs must obtain these documents and communications through a Letter of Request.

In addition, because he is not a party to the underlying proceeding, Plaintiffs may obtain Mr. Bowley's oral testimony through a Letter of Request.

**9.      Identity of any person to be examined**

Richard Bowley
1 Hazeldown Close
River, Dover, Kent
CT17 0NJ
United Kingdom

**Name and address of witness's counsel**

Unknown

**10.    Questions to be put to the persons to be examined or statement of the subject-matter about which they are to be examined**

See Exhibit 2.

**11.    Documents or other property to be inspected**

See Exhibit 1.

**12.    Any requirement that the evidence be given on oath or affirmation and any special form to be used**

The examination of the witness identified at Section 9 above will be taken under oath before:  (1) a secretary of embassy, counsel general, consul, vice-consul, or consular agent of the United States of America or any officer authorized to administer oaths under the laws of the United States of America or of the United Kingdom; or (2) before a person appointed by the Court and empowered to administer oaths and take testimony.  This Court will be content if the requested Court appoints a duly qualified and authorized Examiner.

This Court further requests that you, by your proper and usual process, require that the testimony given during the above-described deposition be given under the following oath or affirmation:  "I [deponent] swear that the testimony that I am about to give is the truth, the whole truth and nothing but the truth, so help me God" or "I [deponent] affirm that the testimony that I am about to give is the truth, the whole truth and nothing but the truth."

13. **Special methods or procedure to be followed**

The examination of the individual identified in Section 9 above will be taken under the Federal Rules of Civil Procedure, except to the extent that any such procedure is incompatible with United Kingdom law. The examinations and cross-examinations shall be the same as though the deponent were testifying at trial. The examinations and cross-examinations will be recorded stenographically and by videotape. The examination will be conducted at a time and date to be agreed with by the witness.

This Court respectfully requests that the judicial authority in England permit the examination of Mr. Bowley to be conducted by (i) attorneys for the Plaintiffs or other duly authorized representatives of Plaintiffs, qualified to practice law in United States jurisdictions and/or in England and Wales, nominated by the Plaintiffs, and that Defendants be permitted to cross-examine Mr. Bowley; and (ii) the witness's counsel (if instructed).

14. **Request for notification of the time and place for the execution of the Request and identity and address of any person to be notified**

Michael D. Blatchley
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas, 44th Floor
New York, New York 10020
*Counsel for Lead Plaintiff The Pentwater Funds*

Counsel for Plaintiffs will promptly send notice to counsel for all parties to the action.

15. **Request for attendance or participation of judicial personnel of the requesting authority at the execution of the Letter of Request**

Omitted.

16. **Specification of privilege or duty to refuse to produce documents under law of the State of origin**

Neither this request for international judicial assistance nor the transmission of documents pursuant to the Hague Convention, shall waive, or be deemed or argued to have waived, the

attorney-client privilege, the work product doctrine, or any other privileges, rights, protections, or prohibitions that may apply to that evidence under the laws of the United Kingdom, the United States of America, or the State of New York, including the privilege against self-incrimination under the Fifth Amendment of the U.S. Constitution.

Mr. Bowley's production of documents will not be oppressive. In addition, documents Mr. Bowley produces can be produced under the terms of the protective order in this action and, therefore, given confidential treatment in connection with this litigation.

**17.     The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by**

Plaintiffs.

Date of Request: _____ 3/8/2023

Signature and Seal of the Requesting Authority:

## EXHIBIT 1

## DEFINITIONS

As used in these requests, the words set forth below shall be defined as follows:

1.      "Action" means *In re Turquoise Hill Securities Litigation*, Case No. 1:20-cv-08585-LJL (S.D.N.Y.).

2.      "Document" means paper and electronic documents.

3.      "EPCM" means engineering, procurement, and construction management.

4.      "Rio Tinto" means Rio Tinto plc and Rio Tinto Limited and their affiliates.

5.      "Text Message" shall include text messages transmitted through SMS, MMS, WhatsApp, and social media direct messages.

6.      "You" or "Your" means Richard Bowley.

## INSTRUCTIONS

The following instructions apply to each request set forth herein.

1.      In producing Documents, You are to furnish all Documents in Your possession, custody, or control.  For the avoidance of doubt, the requested Documents do not include any communications on a Rio Tinto-issued email address that are not in Your possession, custody or control but rather seek Documents within Your control (e.g., Your @hotmail.com email address).

2.      Each Document requested shall be produced in its entirety.  If a Document responsive to any Request cannot be produced in full, it shall be produced to the extent possible.

3.      If any responsive Document has been lost, destroyed, removed from, or is no longer in Your possession, custody, or control for any reason, please identify as such in Your response.

## DOCUMENTS REQUESTED

**REQUEST FOR PRODUCTION NO. 1:**

Documents, emails, Text Messages, and notes from communications from October 1, 2017 through November 30, 2017 concerning Your meeting with Arnaud Soirat in November 2017 and hiring by Rio Tinto.

**REQUEST FOR PRODUCTION NO. 2:**

Documents, emails, Text Messages, and notes from communications from May 1, 2018 through June 30, 2018 concerning Your meeting with Arnaud Soirat on May 23, 2018 and instructions from Arnaud Soirat in May 2018 to stop looking into the problems causing cost overruns and delays .

**REQUEST FOR PRODUCTION NO. 3:**

Documents, emails, Text Messages, and notes from communications with Grant Brinkmann from November 1, 2017 through May 31, 2018 concerning the Shaft 2 delays and the status of the Oyu Tolgoi underground development project.

**REQUEST FOR PRODUCTION NO. 4:**

Documents, emails, Text Messages, and notes from communications from November 1, 2017 through December 31, 2018 with Greg Field concerning EPCM problems, cost overruns, or delays at Oyu Tolgoi.

**REQUEST FOR PRODUCTION NO. 5:**

Emails, Text Messages, and notes from communications from January 1, 2018 through February 28, 2018 concerning Your presentation to Rio Tinto concerning the Oyu Tolgoi development on February 1, 2018.

**REQUEST FOR PRODUCTION NO. 6:**

Your communications from September 1, 2016 through November 30, 2018 with Craig Kinnell, and from November 1, 2017 through November 30, 2018 with Greg Field, David Hume, Grant Brinkmann, Rosemary Fagen, Arshad Sayed, concerning EPCM problems, cost overruns, delays, and the "re-forecast" of the schedule at the Oyu Tolgoi underground project.

**REQUEST FOR PRODUCTION NO. 7:**

Documents, emails, Text Messages and notes from communications from October to December 2018 in which You expressed concerns about Rio Tinto's public statements to investors, including Your meeting with Arshad Sayed on October 26, 2018.

**REQUEST FOR PRODUCTION NO. 8:**

Documents, emails, Text Messages and notes from communications from June 1, 2018 to March 15, 2020 concerning the termination of Your employment at Rio Tinto, as well as Documents, emails, Text Messages and notes from communications from January 1, 2022 to December 31, 2022 concerning Rio Tinto's apology to you in 2022.

**REQUEST FOR PRODUCTION NO. 9:**

Documents, emails, Text Messages and notes from January 1, 2019 through May 31, 2019 from communications with Jason Landers, Jason Storey, Stephen Storey, and Ann Godbehere concerning the investigations of Your whistleblowing concerning EPCM problems, schedule delays, and cost overruns at Oyu Tolgoi by Rio Tinto and Baker McKenzie.

**REQUEST FOR PRODUCTION NO. 10:**

Documents, emails, Text Messages, and notes from communications from January 1, 2017 to July 31, 2021 between You and any Rio Tinto employee concerning EPCM problems, cost overruns, and schedule delays at Oyu Tolgoi.

**REQUEST FOR PRODUCTION NO. 11:**

Emails and notes from communications from March 1, 2020 through December 31, 2022 between You and the United States Securities and Exchange Commission, the United Kingdom Serious Fraud Office, the United Kingdom Financial Conduct Authority, the Australia Securities and Investment Commission, or any Mongolian regulatory authority concerning Rio Tinto or Oyu Tolgoi.

**REQUEST FOR PRODUCTION NO. 12:**

The "Project Document Register for O[yu] T[olgoi]" and the "Project Monthly Report Register for O[yu] T[olgoi]" cited in Your Witness Statement to the U.K. Employment Tribunal.

**REQUEST FOR PRODUCTION NO. 13:**

Notes, whether hard copy or electronic, that you took between September 1, 2017 and September 16, 2021 regarding alleged cost overruns or schedule delays at the Oyu Tolgoi underground project.

# EXHIBIT 2

## DEFINITIONS

The same definitions as set out in Exhibit 1 apply.

## DEPOSITION TOPICS

**TOPIC NO. 1:**

The basis for the allegations attributed to you in the Second Amended Complaint in the Action.

**TOPIC NO. 2:**

Your employment at Rio Tinto, including your qualifications, hiring and departure.

**TOPIC NO. 3:**

Your knowledge and assessment of the Oyu Tolgoi underground project, including its budget and schedule, before and during your employment at Rio Tinto.

**TOPIC NO. 4:**

Your assessment of Rio Tinto's public disclosures concerning the progress and budget of the Oyu Tolgoi underground project.

**TOPIC NO. 5:**

Your reporting of problems at Oyu Tolgoi to Rio Tinto employees and directors, including Your presentations to Rio Tinto in November 2017 and February 2018 and Your communications with Craig Kinnell, Greg Field, David Hume, Grant Brinkmann, Rosemary Fagen, Arshad Sayed, Arnaud Soirat, Jean-Sebastien Jacques, Jason Landers, Stephen Storey, and Ann Godbehere.

**TOPIC NO. 6:**

Your communications concerning the Oyu Tolgoi underground project with current or former Rio Tinto, Turquoise Hill, or Oyu Tolgoi employees and any contractor that worked at Oyu Tolgoi.

**TOPIC NO. 7:**

The investigations of Your complaints and whistleblowing to Rio Tinto by Rio Tinto and Baker McKenzie.

**TOPIC NO. 8:**

Your assessment of the quality of the engineering performed at Oyu Tolgoi.

**TOPIC NO. 9:**

Rosemary Fagen's role as a "gatekeeper" for Arnaud Soirat.

**TOPIC NO. 10:**

Your knowledge of the circumstances associated with Greg Field and David Hume leaving Rio Tinto.

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re Turquoise Hill Resources Ltd. Securities Litigation | Civil Action No.  1:20-cv-8585-LJL<br><br>CLASS ACTION<br><br>SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...................................................................................................... 2

II.    JURISDICTION & VENUE ..................................................................................... 13

III.    THE PARTIES ........................................................................................................ 13

    A.    Plaintiffs ..................................................................................................... 13

    B.    The Turquoise Hill Defendants ................................................................. 17

    C.    The Rio Tinto Defendants .......................................................................... 20

    D.    Non-Party Oyu Tolgoi LLC ....................................................................... 23

IV.    DEFENDANTS MISLEAD INVESTORS CONCERNING THEIR MOST
IMPORTANT AND VALUABLE ASSET ............................................................. 26

    A.    Defendants' Negotiation Of Rio And TRQ's Interests In The Oyu Tolgoi
Mine ........................................................................................................... 26

    B.    Defendants Restart Work On The Oyu Tolgoi Underground Expansion ............ 29

    C.    OT Managers Decry The Work On Shaft 2 As Dangerous, Abysmal, And
Necessitating A Rebuild Costing Hundreds Of Millions Of Dollars And
Months Of Delay ....................................................................................... 34

    D.    Numerous Former Oyu Tolgoi Managers Confirm That Defendants'
Publicly Reported Timeline And Budget Were False And Unachievable
Before The Beginning Of The Class Period ............................................... 43

    E.    Before The Start Of The Class Period, Rio Tinto Hires An Expert To
Investigate The Delays And Cost Overruns And Develop A Plan To
Address Them ............................................................................................ 46

    F.    Rio Tinto's Longstanding Executive Consulting Firm Independently
Identifies Problems With Overestimation And Unethical Conduct At OT
And Reports Them To Senior Management ............................................... 54

    G.    Rio Tinto's Expert Informs The Executive Defendants That Oyu Tolgoi Is
In Distress And That Construction Is A Year Behind Schedule And
Hundreds Of Millions Over Budget .......................................................... 58

    H.    Defendants Scapegoat Managers Who Told Them About The Shaft 2
Delays And Cost Overruns ........................................................................ 62

i

I.      At The Beginning Of The Class Period, Defendants Falsely Reaffirm That The Oyu Tolgoi Expansion Remained "On Target," "On Budget," and "On Track" ...................................................................................... 66

J.      Rather Than Disclose The Truth, Rio Tinto Develops "Forecast 2" And Continues To Misrepresent That OT Is "On Time And On Budget" .................. 67

K.      Defendants Were Highly Motivated To Conceal The Problems At OT In The Face Of A Burgeoning Scandal That Jeopardized Rio Tinto and TRQ's Stake In The Mine .................................................................................... 74

L.      Defendants Attempt To Silence A Whistleblower Who Repeatedly Urged Them To Tell Investors The Truth ........................................................................ 82

M.     Rio Tinto Terminates The Whistleblower And Attempts To Cover Up Its Misconduct Through A Whitewash Investigation ................................................. 86

V.    DEFENDANTS ARE FORCED TO DISCLOSE THAT THE OT PROJECT IS MONTHS BEHIND SCHEDULE AND WELL OVER A BILLION DOLLARS OVER BUDGET .................................................................................................... 89

A.      Defendants Are Forced To Issue A Public Disclosure About The Delays And Cost Overruns After Terminating The Whistleblower—But Continue to Mislead Investors ................................................................................................. 89

B.      News Reports Reveal PWG Review Findings, Disclose That Rio Tinto Is Conducting An Internal Investigation Of Its Oyu Tolgoi Disclosures, And Cast Doubt On Defendants' Geotechnical Data Explanation ............................... 91

C.      Defendants Stun Investors By Disclosing That The OT Expansion's Cost Will Increase By $1.2 To $1.9 Billion And The Schedule Will Be Delayed By 16-30 Months ........................................................................................................ 94

VI.   POST-CLASS PERIOD DEVELOPMENTS ................................................................. 101

VII.  ADDITIONAL ALLEGATIONS OF SCIENTER ......................................................... 104

VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...................................................................................................... 122

A.      Defendants Tout The Progress Of The Oyu Tolgoi Underground Project, Concealing $300 Million In Cost-Overruns And A Year-Long Schedule Delay ........................................................................................................................ 122

B.      Defendant Soirat Falsely Reassures Investors That Oyu Tolgoi Is On Budget And On Schedule Two Weeks Before The "Re-Forecast" .................. 133

C.  Defendants Issue A False And Misleading "Reforecast" In Order To Conceal Delays And Reassure Investors That Capital Costs And Schedule Remain In Line ................................................................ 134

D.  Defendants Continue To Reassure Investors That The Project Is On Schedule And On Budget After The False "Re-Forecast" ................................. 138

E.  Throughout The End Of 2018 And The Beginning Of 2019, Defendants Continued To Falsely Claim The Underground Project Was On Budget And On Schedule ............................................................................ 145

F.  Defendants Falsely Attribute Delays To Later Stage "Understanding" Of "Challenging Ground Conditions," While Continuing To Conceal Cost Overruns And Reassuring Investors Concerning Budget And Schedule ........... 147

G.  Defendants Continue To Misrepresent Delays And Fail To Disclose Cost Overruns, Claiming Delays Are "Absolutely Normal" And Based On New Geotechnical Data ................................................................... 152

H.  Defendants Disclose A 16-30 Month Delay In Sustainable First Production And A $1.2-$1.9 Billion Increase In Capital Expenditure ............... 160

I.  Defendants Signed False And Misleading SOX Certifications ......................... 163

J.  Defendants' Risk Factor Disclosures Were False And Misleading .................... 164

IX.  LOSS CAUSATION ............................................................................... 167

X.  CLASS ACTION ALLEGATIONS ................................................................ 170

XI.  INAPPLICABILITY OF STATUTORY SAFE HARBOR .......................................... 171

XII.  PRESUMPTION OF RELIANCE ................................................................. 172

XIII.  CLAIMS FOR RELIEF ........................................................................ 173

COUNT I ............................................................................................. 173

    For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5 (Against Defendants Turquoise Hill, Rio Tinto, RTIH, Jacques, Soirat, Quellmann, Colton, and Lane) ........................................................... 173

COUNT II ............................................................................................ 177

    For Violations Of Section 20(a) Of The Exchange Act (Against Defendants Rio Tinto, RTIH, Jacques, Soirat, Quellmann, Colton, and Lane) ..................................... 177

XIV.  PRAYER FOR RELIEF ......................................................................... 182

XV.    JURY DEMAND ........................................................................................................... 182

1.      Plaintiffs the Pentwater Funds (defined in ¶31 below, collectively, "Lead Plaintiff" or "Plaintiffs"), by their undersigned counsel, bring this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants Turquoise Hill Resources Ltd. ("Turquoise Hill" or "TRQ"), Rio Tinto plc and Rio Tinto Limited (together, "Rio Tinto" or "Rio"), Rio Tinto International Holdings Limited ("RTIH"), Jean-Sébastien Jacques ("Jacques"), Arnaud Soirat ("Soirat"), Ulf Quellmann ("Quellmann"), Luke Colton ("Colton"), and Brendan Lane ("Lane"). Plaintiffs bring these claims on behalf of a class of investors who purchased or otherwise acquired Turquoise Hill securities from July 17, 2018 to July 31, 2019 in domestic transactions or on United States exchanges (as further defined below), inclusive (the "Class Period"), and were damaged thereby.

2.      Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts are based upon the investigation of Plaintiffs and their counsel Bernstein Litowitz Berger & Grossmann LLP ("Lead Counsel"), including (1) review and analysis of documents filed publicly by Defendants Turquoise Hill and Rio Tinto with the SEC; (2) Turquoise Hill and Rio Tinto press releases and other public statements; (3) transcripts of Turquoise Hill and Rio Tinto investor conference calls; (4) research reports by financial analysts and news reports concerning Turquoise Hill and Rio Tinto; (5) Lead Counsel's review and analysis of trading data for Turquoise Hill and related documents; (6) other publicly available sources as described below; (7) consultations with relevant experts and consultants; (8) Plaintiffs' and Lead Counsel's communications with and review of documents from former employees of Turquoise Hill, Rio Tinto and contractors who worked at the Oyu Tolgoi

mine in Mongolia (sometimes referred to herein as "OT"); (9) the "Independent Technical Review—Oyu Tolgoi Underground Expansion Project," dated July 31, 2021, prepared for the Oyu Tolgoi Board Special Committee by the Independent Consulting Group (the "ICG"), and the memorandum entitled "Investigation into Cost and Schedule Overrun—Peer Review," dated July 28, 2021 (the "Peer Review"), prepared for the Oyu Tolgoi Board Special Committee by Allan Moss and John Barber (collectively, the "ICG Report"); and other sources. Plaintiffs' and Lead Counsel's investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

## I. INTRODUCTION

3. This case arises from Defendants' scheme to conceal massive cost overruns and delays concerning the most critical aspect of the sole business of Defendant Turquoise Hill—the development of the Oyu Tolgoi underground mine in Mongolia. The Oyu Tolgoi mine, which is jointly owned by Turquoise Hill and the Government of Mongolia, and operated almost exclusively by Turquoise Hill's controlling shareholder, mining giant Rio Tinto, is expected to be one of the largest copper mines in the world.

4. Throughout the Class Period, the senior executives of Rio Tinto and Turquoise Hill repeatedly assured investors that progress on that development was at the time "on plan and on budget" and that the deadline for achieving sustainable first production—when the mine would begin generating cash flows—remained intact. In reality, from before the start of the Class Period and at the time of Defendants' statements, the underground expansion project was many months behind schedule and hundreds of millions of dollars over budget. Ultimately, Turquoise Hill investors incurred massive losses as Turquoise Hill shares lost well over 70% of their value when

the true extent of the delays and cost overruns at Oyu Tolgoi came to light—and Defendants were ultimately forced to disclose that the Oyu Tolgoi project was $1.2 to $1.9 billion over budget and up to 30 months behind schedule.

5.     While Oyu Tolgoi has operated an open pit copper mine since 2013, by far the largest amount of copper ore at the site—and 80% of the mine's reserve value—is located deep underground and accessible only by underground mining.  Work on drilling the underground mine began in 2010 but was suspended in 2013 due to ongoing disputes between Rio Tinto and the Government of Mongolia concerning the scale of the investment needed, the government's involvement in decision making and other issues, and insufficient project financing.

6.     In 2015, Defendant Jacques, who was then head of Rio Tinto's copper division, negotiated with the Mongolian government for Rio Tinto to resume work on the underground mine.  Defendant Jacques personally signed the 2015 Oyu Tolgoi mine development and financing plan on behalf of Rio to begin "Phase 2" of the underground expansion—a development that was critical to launching Jacques' surprise ascension to CEO of Rio Tinto in July 2016.  The success of the mine was also a key focus for Defendant Jacques during his tenure as CEO at Rio, which touted OT as the "cornerstone" of its copper strategy.  As the *Australian Financial Review* put it in a July 2019 article, "Jacques' fortunes past and present are inextricably linked to successful progress at Oyu Tolgoi," and thus both he and Defendant Soirat—Rio's head of copper during the Class Period—were intimately familiar with the actual progress at OT at all relevant times.

7.     At the time Rio Tinto reinitiated the underground expansion in October 2016, Defendants publicly reported that the total capital development cost for the mine would be $5.3 billion and that the first production ramp-up would commence in the first quarter of 2021.  That milestone, which Defendants referred to as achieving "sustainable first production," occurs after

the "first drawbell" blasting. The first drawbell blasting marks the beginning of large-scale subsurface production mining and necessarily occurs after completion of sufficient development mining—the excavation of shafts and underground tunnels and the related construction work to build both underground and surface infrastructure. Throughout the Class Period, Defendants repeatedly told investors that the underground development was progressing as planned, provided detailed facts concerning that progress and the number of development kilometers completed, and consistently reaffirmed that everything was on budget and schedule to achieve this milestone.

8.      In truth, as soon as work on the underground mine resumed in 2016, the project was plagued with serious delays and cost overruns as a result of deficient engineering, procurement, and construction by Rio Tinto and other Oyu Tolgoi contractors. One of the most consequential of these failings was Rio Tinto's oversight and execution of the work to complete Shaft 2. Shaft 2 was one of five planned mine shafts at OT but by far its most important, as it was to serve as the main logistics hub for the transportation of personnel and equipment needed to build the remaining mine infrastructure, appropriate ventilation to support increased underground activity, and transportation to convey ore to the surface. But rather than ensure this critical shaft was designed and built properly, the work on Shaft 2 was so incompetent and flawed that its construction presented serious safety risks. As described by numerous former Oyu Tolgoi managers, the initial construction work on Shaft 2 was extremely deficient and dangerous. As a result, OT managers were effectively forced to rebuild much of Shaft 2 from scratch—a project that required workers to replace more than 40,000 bolts and approximately 95% of the steel in the shaft's headframe—and predictably caused costs and schedule delays to skyrocket.

9.      At the same time, by no later than 2016, costs on the Oyu Tolgoi underground expansion increased, in part because of procurement practices that the industry veterans in charge

of them believed were contrary to industry standards. Moreover, rather than implement a synchronized integration system to ensure coordinated activities between engineering, construction and procurement functions—an absolute necessity for a project of the size and scope of Oyu Tolgoi—there was no such coordination at OT.

10. By no later than 2017, Defendants Jacques and Soirat recognized that the underground expansion was in severe distress. As recounted by Dr. Maurice Duffy, a former executive coach whose consulting firm, GFI Blackswan, worked as an executive leadership consultant for Rio Tinto for over a decade, problems with the Oyu Tolgoi expansion were identified by Rio Tinto's top management stationed in Mongolia by 2017. Those reports—which were delivered to Rio's Executive Committee, which included Defendants Jacques and Soirat— highlighted that "Oyu Tolgoi construction of the underground development will not achieve its target by 2020," that "delays and cost over-runs are understated in Mongolia," and that Defendants were "misstating critical pathways"—a fact that was known by senior leadership at Oyu Tolgoi, including Craig Kinnell, the Chief Development Officer for Rio Tinto's Copper and Diamonds division, and Defendant Soirat.

11. In fact, the reports that Duffy's firm received about problems at Oyu Tolgoi were so concerning that he felt compelled to resign from Rio Tinto. After seeing repeated complaints of ethical problems and overstatements at Oyu Tolgoi, Duffy set up a meeting with Vera Kirikova, a member of Rio's Executive Committee and the head of human resources who Duffy knew served as an intermediary for Defendant Jacques, on September 6, 2017. During that meeting, Duffy repeated his concerns about the problems he was hearing about Oyu Tolgoi to Kirikova—but was told by Kirikova this was information that Defendant Jacques would not appreciate, and that Duffy would regret reporting it to him. Troubled by this reaction and after reporting "multiple,

unprofessional [and] unethical behaviors" by Rio's most senior executives since Defendant Jacques took over as CEO to Rio's Board and chairman—who "took no action" in response—Duffy cancelled his firm's contract with Rio Tinto, even though it was its most valuable contract at the time.

12.     According to Duffy—whose firm had been hired by Rio to provide executive coaching services for Rio's senior leadership and who provided such coaching to Defendants Jacques and Soirat for a number of years—Defendant Jacques "knew without a doubt" about the problems at Oyu Tolgoi by 2017.  Indeed, Duffy provided detailed reports from coaches and senior leadership at Oyu Tolgoi to Rio's Executive Committee (which included Defendants Jacques and Soirat) identifying these very concerns—i.e., that, by September 2017, "Oyu Tolgoi construction of the underground development will not achieve its target by 2020." Duffy explained that Defendant Jacques was very distrustful of other Rio Tinto executives, surreptitiously tracked their work through other intermediaries at Rio Tinto (including Kirikova), and closely followed the developments in Mongolia.  According to Duffy, when Defendant Jacques made a surprise visit to Oyu Tolgoi in January 2018, it was because by that time, he knew the "wheels were coming off" of the project.

13.     In fact, as would be revealed after the end of the Class Period in 2021, an independent consultant hired by the OT Project Execution Team to assess the ability for the project to meet Defendants' publicly stated timelines concluded, in 2017, using an accepted industry-practice schedule simulation model, that there was only a mere 2% chance the project would be completed on Defendants' publicly disclosed timeline, concluding in a report provided to Defendants that "the base date of the deterministic schedule for firing of the first drawbell was 26 April 2020, which has approximately a 2% chance of being achieved."

14.    At same time Duffy internally reported these serious ethical concerns to senior management, in late 2017, Defendant Soirat and Craig Kinnell, the Chief Development Officer for Rio Tinto's Copper and Diamonds division, hired a veteran Oyu Tolgoi contractor, Richard Bowley, to examine the problems at OT and come up with a plan to address them.  Bowley was extremely qualified to develop such a plan, as he had earlier worked at Oyu Tolgoi for years at a construction management firm in Mongolia charged with developing the underground study, value, and engineering for Phase 2, and knew many of the key managers at the project.  In fact, before he was hired by Rio, Bowley wrote to Kinnell in a July 3, 2017 email that "two out of three of your senior guys on the project have told me Jacobs [Rio's principal contractor at OT] are failing badly," warning that "[w]e both know that mess will lead straight to OTs door in the shape of schedule overruns and cost."  Kinnell immediately responded, agreeing that "it is all getting messy Richard and needs intervention to stop it from getting significantly worse."

15.    Just as Kinnell had previewed, almost immediately after Bowley was hired by Defendant Soirat and Kinnell in late 2017, Bowley identified hundreds of millions of dollars in cost overruns and it was obvious to him the project was months behind schedule.  Consistent with his assignment, Bowley detailed the problems at the mine in a presentation to Kinnell and Rosemary Fagen, who was Vice President for Human Resources for Rio Tinto's Copper & Diamond group and, according to Bowley, served as Defendant Soirat's gatekeeper, at Rio Tinto's London headquarters in February 2018.  In that presentation and in subsequent discussions and emails with Defendant Soirat and other senior Rio executives, Bowley directly informed Rio's senior management about the actual cost overruns and massive delays at OT.  For example, in an email sent on July 19, 2018, at the start of the Class Period, Bowley wrote to Fagen, Defendant Soirat's gatekeeper, to report that the project was a year behind schedule and hundreds of millions

of dollars over budget:

> **From:** Richard Bowley (OT)
> **Sent:** 19 July 2018 05:20
> **To:** Fagen, Rosemary (RTHQ) <Rosemary.Fagen@riotinto.com>
> **Subject:** RE: Call
>
> Latest update.
>
> 12 months behind schedule.
>
> $300mill capital over budget. Expect this to rapidly escalate.

16.     Nevertheless, Defendants continued to tell investors during the Class Period that the project remained on schedule to achieve sustainable first production in the first quarter of 2021 and was on budget at a $5.3 billion total capital cost.  In fact, in October 2018, after being told repeatedly by Bowley in emails forwarded by Fagen that the project was over a year behind schedule and hundreds of millions of dollars over budget, Defendant Soirat falsely told investors at a presentation in New York that the OT expansion was "on budget and schedule"—a statement Bowley later described in a sworn statement as "completely untrue" at the time it was made.

17.     Rather than disclose the truth, as the delays and cost overruns continued to escalate, Defendants manufactured a false "re-forecast" of the OT expansion that they reported to investors in October 2018 to enable Defendants to continue concealing the project's true costs.  As Bowley internally reported at the time this statement was made, the "re-forecast" was just a way to "make the current position appear more tenable"—and, putting it mildly, was a "little light on the truth."  As one OT manager who had direct responsibility for Shaft 2 throughout the Class Period explained, the notion that the OT expansion was behind schedule but still on budget, as Defendants represented in their public October 2018 re-forecast, was not "accurate at all."  Indeed, as would be revealed after the Class Period in the ICG Report, the actual "re-forecast" analysis performed

by an advisory firm, Broadleaf, concluded that there was "0% likelihood" that Defendants' publicly reported schedule of achieving first drawbell and sustainable production milestones in May 2020 and January 2021, respectively, would be achieved and that the publicly disclosed minimal several-month schedule delay was grossly over-optimistic and unachievable. Nevertheless, Defendants' deception worked, as investors were largely mollified that the nine-month delay announced in October 2018 would not impact the overall cost of the project.

18.      Defendants Jacques and Soirat went to such great lengths to conceal the problems at OT because, at the same time the costs and delays at Oyu Tolgoi had spiraled out of control, the Mongolian Government was seeking to renegotiate the terms of the OT agreements.  That effort was in part driven by Mongolia's newly-elected president, who had campaigned on the promise to secure better economic terms for Mongolia under the OT agreements.  By the start of 2018, Swiss and Mongolian prosecutors had initiated criminal investigations into (and later jailed) several former Mongolian officials responsible for the OT agreements, including the former prime minister who personally negotiated the 2015 agreement with Defendant Jacques at his kitchen table in London.  In fact, on March 22, 2018, the Swiss Office of the Attorney General ("OAG") confirmed that Rio was a focus of a criminal bribery investigation into OT, and a Swiss court issued a ruling on March 2, 2018 noting that the OAG's investigation into bribery at OT was supported by the fact that Rio was also the target of a separate bribery inquiry related to its mining assets in Africa.

19.      That same month, in March 2018, the Mongolia Government announced the formation of a Parliamentary Working Group that would examine the project's progress together with the Mongolian National Audit Office and the Independent Authority Against Corruption ("IAAC"), which began conducting onsite inspections of the OT mine just before the beginning of

the Class Period in June 2018.  In light of this burgeoning scandal and the Parliamentary Working Group's review, Rio Tinto senior management—and Defendant Jacques in particular—were highly incentivized to avoid calling attention to problems at the mine.  It was clear doing so would jeopardize Rio's fragile position with the Mongolian government, which would likely try to leverage any mismanagement failures to rescind or renegotiate the 2015 agreement.

20.    Not wanting to expose the truth, Defendants sidelined Bowley, and later terminated him and other senior OT managers who tried to force Defendants to disclose the problems with the OT expansion.  Undeterred and in an effort to do the job he was hired to do, Bowley continued to urge Rio Tinto executives to address the problems at OT, and emphasized in contemporaneous emails to Defendant Soirat's gatekeeper and Rio's Chief Development Officer for OT throughout the fall of 2018 that Rio Tinto's public statements "watered down the truth," were "inconsistent with the truth (a lie)," and "suicidal."

21.    After Bowley's continued internal reports and whistleblowing eventually triggered an internal compliance investigation, Defendants were eventually forced to begin disclosing what was actually happening at OT.  In February 2019, two days after Rio Tinto finished an internal compliance investigation into Bowley's whistleblowing, Defendants began to admit that the OT expansion was in trouble.

22.    Ultimately, Defendants disclosed that the expansion project required an additional $1.2 to $1.9 billion in capital and was 16 to 30 months behind schedule—revelations that caused dramatic declines in the price of Turquoise Hill shares.  Indeed, when Defendants finally revealed the project was between $1.2 billion to $1.9 billion over budget and 16 to 30 months behind schedule, Turquoise Hill shares plunged by nearly 50% in a single day and analysts slashed their ratings, with one explaining the truth was "far worse than our already conservative estimates."

23.    But even then, Defendants refused to come clean, and instead sought to blame the overruns on "unexpected and challenging geotechnical issues" and "complexities in the construction of Shaft 2."  In reality, the problems with Shaft 2 were internally documented, well known, and had been the subject of at least two whistleblower complaints—including from Bowley, who sent numerous emails to Fagen (who communicated his concerns to Defendant Soirat) that Rio Tinto's public statements were false.  And as former OT geotechnical engineers have explained, to the extent the delays could be blamed on geotechnical issues, those issues had been documented and known by senior Rio Tinto executives during the Class Period.

24.    After the end of the Class Period, the expert hired by Rio Tinto to assess and fix the problems at OT (Bowley) and Defendant Jacques' and Soirat's longtime executive coach (Duffy) reported Defendants' misconduct to securities regulators, including the SEC, the Australian Securities and Investments Commission, the U.K. Serious Fraud Office and Financial Conduct Authority, and the Mongolia Financial Regulatory Commission, and those agencies are now investigating the misconduct alleged in this action.  In connection with those investigations, as well as in a separate employment dispute before a U.K. tribunal, Bowley provided a sworn statement in which he attests that Defendants' Class Period statements were "misleading," "completely untrue," and a "lie"—allegations that were confirmed by Lead Counsel's investigation, numerous former OT managers, scores of internal Rio Tinto documents, and by the Independent Consulting Group hired by the OT Special Committee to investigate the cost overruns and delays at OT.

25.    Defendants' fraud was also independently confirmed by Duffy, who reported nearly identical concerns to Rio Tinto senior management about Oyu Tolgoi as Bowley did before and during the Class Period.  Further, once Duffy learned of the internal investigation Rio was

conducting with outside law firm Baker McKenzie into Bowley's whistleblower claims, Duffy urged Rio's Board to reconsider its findings as the investigation "excluded information" reported to Rio by his firm since 2017. But instead of considering that information, Rio's lawyers at Baker McKenzie successfully sought to destroy the data Duffy's firm had collected.

26.     Defendants' fraud has also been confirmed by the ICG Report commissioned by the Oyu Tolgoi Board Special Committee (consisting of two directors appointed by TRQ and two appointed by the Mongolian Government) after the Class Period to investigate the causes of the cost overruns and delays and whether these problems were caused by geotechnical issues, as Defendants publicly stated. At the end of July 2021, the ICG issued its report, which confirmed that the Oyu Tolgoi project was plagued by cost overruns and delays from the start of renewed work in 2016, and that the problems were not caused by geotechnical issues—making clear that Defendants' Class Period statements were false when made. The ICG Report also confirms that the problems were reported internally to senior management at the time, and that Rio deliberately sought to conceal its knowledge and role in the fraud by refusing to provide the ICG with important documents and access to personnel. Indeed, as the ICG Report concludes, the OT project "fell behind schedule from the very beginning, and the project never recovered from these delays," Rio's work in overseeing the development of Shaft 2 and other aspects of the project was characterized by "staggering" and "inconceivable" decisions and misfeasance, and Defendants' public claim that the cost-overruns and delays were the result of unforeseen ground conditions was "*misleading*," "***not supported in the documents reviewed***," and false.

27.     Lead Plaintiff brings this action to recover the damages to Turquoise Hill investors caused by Defendants' misconduct and to seek accountability for the violations of the securities laws alleged herein.

## II.    JURISDICTION & VENUE

28.    The claims asserted in this complaint arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

29.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Turquoise Hill common stock is and was listed and traded on the New York Stock Exchange and was listed and traded on the NASDAQ during the Class Period, and a substantial part of the events or omissions giving rise to the claims in this action took place in this District, including the dissemination of many of the false statements at issue.

30.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III.    THE PARTIES

### A.    Plaintiffs

31.    Plaintiffs consist of the following related private investment funds (collectively referred to as the "Pentwater Funds"), all of which are advised by Pentwater Capital Management LP as investment adviser: PWCM Master Fund Ltd., Pentwater Thanksgiving Fund LP, Pentwater Merger Arbitrage Master Fund Ltd., Oceana Master Fund Ltd., LMA SPC for and on behalf of the MAP 98 Segregated Portfolio, Pentwater Equity Opportunities Master Fund Ltd., and Crown Managed Accounts SPC acting for and on behalf of Crown/PW Segregated Portfolio.

32.    The Pentwater Funds purchased TRQ common stock, as well as options and swaps referencing TRQ common stock and constituting economic long positions in the stock, on U.S.

13

exchanges and in domestic transactions during the Class Period and were damaged thereby, as set forth in the certification filed as ECF No. 110-1.

33.     In addition to their purchases on U.S. exchanges, the Pentwater Funds purchased 70 million TRQ shares on February 19, 2019 pursuant to a "block trade." The Pentwater Funds placed the order for this transaction from Pentwater Capital's Evanston, Illinois office, through a broker from TD Securities (USA) LLC, who is licensed with FINRA, Nasdaq, and 52 U.S. states and territories, under an account agreement with terms that show irrevocable liability attached in the United States.  The Pentwater Funds' account documentation with TD Securities (USA) LLC, which was executed in the United States, includes a "Trading Authorization" that authorizes its designated trader to place orders and provides that "[t]he undersigned hereby agrees to indemnify and hold TD Securities (USA) LLC harmless from and pay you promptly on demand any and all losses arising [from transactions by the authorized trader] or debit due thereon."  The Trading Authorization also provides that "[i]n all such purchases, sales or other transactions, or deliveries of securities or payments of monies, you are authorized to follow the instructions of the above named Agents in every respect concerning our account with you." In addition, the Pentwater Funds paid for the February 19, 2019 trade in U.S. dollars through accounts at Citigroup Global Markets and Credit Suisse Securities (USA) in the United States, with 50 million shares received in the account at Citigroup Global Markets in the United States and 20 million shares in the account at Credit Suisse Securities (USA) in the United States. Thus, the Pentwater Funds incurred irrevocable liability to take and pay for these TRQ shares in the United States, and title to these shares was transferred to the Pentwater Funds in the United States.

34.     Similar to the February 19, 2019 "block trade," the Pentwater Funds purchased 800,000 TRQ shares on September 27, 2018, 1 million TRQ shares on September 28, 2018, 2

million TRQ shares on October 3, 2018 and 2 million TRQ shares on October 5, 2018 from its Evanston, Illinois office through a broker at TD Securities (USA) LLC under the same agreement and Trading Authorization described in ¶33 above. All of these transactions were conducted in U.S. dollars and were paid for and the shares were received in accounts located in the United States. Specifically, the Pentwater Funds paid for and received the shares on September 27, 2018 and October 3, 2018 through an account at Citigroup Global Markets in the United States. The Pentwater Funds paid for and received 700,000 of the shares purchased on September 28, 2018 through an account at UBS Securities LLC in the United States, and purchased and received 300,000 shares through an account at Credit Suisse Securities (USA) LLC in the United States. The Pentwater Funds paid and received for 1.5 million of the shares purchased on October 5, 2018 through an account at UBS Securities LLC in the United States, and purchased and received 500,000 shares through an account at Credit Suisse Securities (USA) LLC. Thus, the Pentwater Funds incurred irrevocable liability to take and pay for these TRQ shares in the United States, and title to these shares was transferred to the Pentwater Funds in the United States.

35. On July 9, 2019, the Pentwater Funds bought a total of 22,150,000 shares of TRQ pursuant to a separate "block trade." Pentwater Capital placed the order from its Evanston, Illinois office. The executing broker was BMO Capital Markets Corp., a U.S. broker-dealer, and the individual broker who agreed to the trade works for BMO Capital Markets in Chicago and is licensed with FINRA, Nasdaq, the NYSE, and 17 US states and territories. The Pentwater Funds paid for the trade in U.S. dollars through accounts at UBS Securities LLC and Credit Suisse Securities (USA) LLC in the United States. The Pentwater Funds received 14,362,500 shares in the account at UBS Securities in the United States and 7,787,500 shares in the account at Credit Suisse Securities (USA) in the United States. Pentwater Capital's account documentation with

BMO Capital Markets provides that transactions can be "executed orally, in writing or through an electronic order facility"; that Pentwater Capital "authorizes [BMO Capital Markets] to execute orders for [Pentwater] as transmitted orally, in writing or through an electronic order facility"; and that Pentwater Capital, "whether placing orders orally, in writing, or through an electronic order facility, will be responsible for accurate and valid placement of orders." In addition, the agreement is governed by New York law, and BMO Capital Markets' address in the agreement is in New Jersey.  In addition, the Pentwater Funds paid for the July 9, 2019 trade in U.S. dollars through accounts at Credit Suisse Securities (USA) and UBS Securities in the United States, with 7,787,500 shares received in the account at Credit Suisse Securities (USA) in the United States and 14,712,500 shares in the account at UBS Securities in the United States.  Thus, the Pentwater Funds incurred irrevocable liability to take and pay for these TRQ shares in the United States, and title to these shares was transferred to the Pentwater Funds in the United States.

36.    The Pentwater Funds also acquired options to acquire TRQ common stock and swaps referencing TRQ common stock. All of the Pentwater Funds' purchases of TRQ common stock and options and swaps referencing TRQ common stock were domestic transactions in the United States.  The Pentwater Funds' transactions in Turquoise Hill stock options and equity swaps reference the U.S. (not Canadian) symbol for Turquoise Hill stock.  The Pentwater Funds placed orders for Turquoise Hill options from the United States with a United States counter-party, which transacted on a United States-based securities exchange, and upon exercise or assignment, acquired Turquoise Hill United States-listed stock.  The swap contracts were entered into by Pentwater Capital on behalf of the Pentwater Funds in the United States pursuant to contracts governed by New York law under which irrevocable liability attached at the time of the placement of the order.  The swaps orders were placed by Pentwater Funds personnel located in the United

States with U.S.-licensed brokers, and U.S. dollar payment was made, title was transferred and irrevocable liability was incurred under the relevant contracts, and the securities were received in accounts located in the United States. With respect to the swaps transactions, Pentwater Capital's placement of telephonic orders to purchase the swaps constituted a binding contract under the terms of the relevant contracts between Pentwater Capital and the swaps counterparty, industry practice, or both.

37.     All of the Pentwater Funds' transactions in Turquoise Hill securities were executed by the Pentwater Funds in reliance on the integrity of the market price of Turquoise Hill securities and the veracity of Defendants' public statements and financial disclosures.

**B.     The Turquoise Hill Defendants**

38.     Defendant Turquoise Hill is a mineral-exploration and development company headquartered in Montreal, Quebec, Canada, and a majority-owned subsidiary of Rio Tinto. Turquoise Hill's sole business is the operation and development of the Oyu Tolgoi copper-gold mine in southern Mongolia, the Company's only material mineral-resource property. Turquoise Hill was previously known for years as Ivanhoe Mines until 2012, when Rio Tinto acquired a majority interest in the company and renamed it Turquoise Hill.

39.     Throughout the Class Period, Rio Tinto owned slightly over 50% of the common stock of Turquoise Hill, with the remainder of its common stock publicly traded and owned by investors like Pentwater. From before the Class Period and to the present, Rio Tinto has exercised near-total control over Turquoise Hill through control over the election of all members of TRQ's Board of Directors and the selection and appointment of TRQ's executive officers, all but one of whom have been employees of Rio Tinto. Further, TRQ has a majority vote policy in which any director who receives more "withheld" or "abstain" votes than "for" votes will be expected to tender his or her resignation—meaning Rio can block any nomination to the Board or force a

17

resignation.  In fact, after the end of the Class Period and after this lawsuit was filed, Rio intervened to bring about the resignation of the sole executive officer who was not a Rio employee during the Class Period—Defendant Quellmann—after he took actions in support of TRQ's minority shareholders that were contrary to Rio's interests.

40.     Further, from before the Class Period to the present, Rio Tinto has also exercised near-total control over the Oyu Tolgoi project through its contractual authority as manager of the project under the agreements between the Mongolian Government, Rio Tinto, and TRQ, as well as through Rio's control over TRQ.  Indeed, Rio lists TRQ as one of its principal subsidiaries and consolidates TRQ's financials in its own financial statements.  During the Class Period, TRQ represented one of Rio's largest operating assets, a substantial portion of the project financing for OT was held on Rio's books, and Rio earned a 2.5% management fee for providing certain guarantees on that project financing.  For example, as of December 31, 2017, TRQ had cash and cash equivalents of over $740 million deposited with Rio, which charged interest at rates equivalent to those offered by financial institutions or short-term corporate debt on those amounts, and in 2017 paid Rio approximately $20.5 million in managements fees for amounts drawn under the project financing facility.

41.     Turquoise Hill's stock trades on the New York Stock Exchange and the Toronto Stock Exchange (and previously also traded on the Nasdaq) under the ticker symbol "TRQ."  In offering documents for its offerings of securities in the United States, Turquoise Hill has appointed an agent for service of process in New York and has stated that it "has been advised by its Canadian counsel, Norton Rose Fulbright Canada LLP, that a judgment of a U.S. court predicated solely upon civil liability under U.S. federal securities laws or the securities or blue sky laws of any state within the United States would probably be enforceable in Canada if the U.S. court in which the

judgment was obtained assumed jurisdiction on the same basis that a court in Canada would assume jurisdiction." As alleged in ¶¶264-378, Turquoise Hill made false and misleading statements about the Oyu Tolgoi project in SEC filings and other statements disseminated in the United States while its shares traded on the NYSE and Nasdaq in the United States.

42.     Defendant Ulf Quellmann ("Quellmann") was the Chief Executive Officer of Turquoise Hill from August 1, 2018 until he was forced to resign by Rio Tinto on March 3, 2021. Before becoming the CEO of Turquoise Hill, Quellmann was Vice President of Strategic Projects, Copper and Diamonds at Rio Tinto from March 2018 to July 2018; the Chief Financial Officer, Copper and Diamonds at Rio Tinto—the division responsible for overseeing OT—from August 2016 to February 2018; and served as Rio's Group Treasurer before then. During his time as CFO of Copper and Diamonds, Defendant Quellmann served as a member of the OT Project Executive Committee—meaning that he had access to and reviewed all relevant documentation concerning the status of the OT underground development prior to joining Turquoise Hill as its CEO. He had been a member of the Board of Turquoise Hill since May 2017. Defendant Quellmann served on the Board of Directors of OT, along with Defendants Soirat, Colton, and Lane throughout the Class Period. Throughout the Class Period, Quellmann made false and misleading statements concerning the Oyu Tolgoi underground development, including statements related to the budget and schedule for completion of the project.

43.     Defendant Luke Colton ("Colton") has been the Chief Financial Officer of Turquoise Hill since October 9, 2017. Defendant Colton also briefly served as Turquoise Hill's interim CEO after Turquoise Hill unexpectedly announced former CEO Jeff Tygesen's resignation on May 29, 2018 and before Defendant Quellmann assumed that role at the beginning of the Class Period. Colton has worked for Rio Tinto since 2004 in a variety of business units, and was

19

employed by Rio Tinto while he was seconded to Turquoise Hill during the Class Period. Defendant Colton served on the Board of Directors of OT, along with Defendants Soirat, Quellmann and Lane throughout the Class Period. Throughout the Class Period, Colton made false and misleading statements concerning the Oyu Tolgoi underground development, including statements related to the budget and schedule for completion of the project.

44.     Defendant Brendan Lane ("Lane") became Turquoise Hill's Vice President, Operations and Development in February 2016 and unexpectedly resigned after the first partial corrective disclosure of the fraud alleged in this action, in March 2019.  He was Finance Director of Rio Tinto Copper's Minera Escondida Limitada and Grasberg operation from 2013 to January 2016, earlier held various commercial roles in Rio Tinto's Copper and Coal divisions, and was a Rio Tinto employee while seconded to Turquoise Hill during the Class Period.  Defendant Lane served on the Board of Directors OT, along with Defendants Soirat, Quellmann, and Colton throughout the Class Period.  Throughout the Class Period, Lane made false and misleading statements concerning the Oyu Tolgoi underground development, including statements related to the budget and schedule for completion of the project.

45.     Defendants Quellmann, Colton, and Lane are sometimes referred to herein as the "Turquoise Executive Defendants."

C.     **The Rio Tinto Defendants**

46.     Defendant Rio Tinto, which consists of Rio Tinto plc (a United Kingdom company) and Rio Tinto Limited (an Australian company), is one of the world's largest metals and mining companies.  Rio Tinto has joint head offices at 6 St. James's Square, London, SW1Y 4AD, United Kingdom and in Melbourne, Australia. Rio Tinto's primary business is the extraction of minerals. As alleged in ¶¶264-378, Rio made false and misleading statements about the Oyu Tolgoi project and TRQ in SEC filings and other statements disseminated in the United States while TRQ's shares

traded over the Nasdaq and the NYSE in the United States.

47.     Defendant Rio Tinto International Holdings Limited ("RTIH"), a wholly-owned subsidiary of Rio Tinto, is incorporated in England and Wales and its principal executive offices are located at the same London address as Rio's at 6 St. James's Square, London, SW1Y 4AD, United Kingdom.  Rio Tinto exercised its control of TRQ and OT through RTIH.  As stated by Turquoise Hill in its Forms 40-F for the years ended December 31, 2017 and December 31, 2018:

> **RTIH, as the holder of a majority of the [TRQ] Common Shares, as manager of Oyu Tolgoi, and as manager of a substantial portion of Turquoise Hill's receivables and liquid asset deposits, has the ability to exert a significant degree of control over [TRQ], Oyu Tolgoi LLC and Oyu Tolgoi.**

> RTIH, a wholly-owned subsidiary of Rio Tinto, together with other Rio Tinto affiliates, owns a majority of the outstanding [TRQ] Common Shares and can exercise its voting power to elect all of the members of the Board of Directors, subject to applicable securities legislation. RTIH can also exercise its majority voting power to unilaterally pass any ordinary resolution submitted to a vote of [TRQ]'s shareholders, except for resolutions in respect of which RTIH is an interested party and for which disinterested shareholder approval is required. In addition, under the HoA [i.e., the December 2010 Heads of Agreement between Turquoise Hill and RTIH], RTIH was appointed as manager of Oyu Tolgoi which provides RTIH with responsibility for the management of Oyu Tolgoi.

> RTIH is also able to exert a significant degree of control over the management, development and operation of Oyu Tolgoi, as well as [TRQ], through a series of governance mechanisms and restrictive covenants established under the Private Placement Agreement, the HoA and other agreements entered into with Rio Tinto. These include the Technical Committee established under the Private Placement Agreement and the Operating Committee established under the HoA, through which RTIH is able to control decisions respecting the business of Oyu Tolgoi LLC subject to a veto of [TRQ] in respect of certain special matters.

48.     Thus, RTIH is a holding company through which Rio holds its interests in OT and other operations and manages those operations.  RTIH has a minimal number of employees, all of whom are Rio employees and act on instructions from Rio.  RTIH acts as Rio's agent in managing Rio's controlling majority interest in TRQ and Rio's controlling interest as manager of the OT

mine.  Through this structure, and as established in a series of agreements, Rio Tinto effectuated its control over OT and Turquoise Hill.  For example, the 2011 Amended and Restated Shareholder Agreement ("ARSHA") provided Rio Tinto with the ability to cause OT to raise funds from Turquoise Hill through the issuance of common equity, and required Turquoise Hill to deposit unused funds for the construction of the Oyu Tolgoi mine onto Rio Tinto's balance sheet. Turquoise Hill and OT's results are consolidated into and reported in Rio Tinto's financial statements, and their operations accounted for approximately $1 billion in gross revenues and $250 million in earnings reported by Rio Tinto every year during the Class Period.  In all, Rio Tinto has directly received more than $1.5 billion in compensation from OT and Turquoise Hill for its work at Oyu Tolgoi and related financings over the past decade.

49.     Defendant Jean-Sébastien Jacques ("Jacques") was the Chief Executive Officer of Rio Tinto from July 2016 to December 2020.  He first joined Rio Tinto in 2011 and was appointed as the head of its copper business in 2013 and as the head of its copper and coal businesses in February 2015. He became deputy CEO in March 2016 and CEO in July 2016, largely as a result of his work in negotiating with the Mongolian government to restart underground development at Oyu Tolgoi. Throughout the Class Period, Jacques made false and misleading statements concerning the Oyu Tolgoi underground development, including statements related to the budget and schedule for completion of the project. In September 2020, after numerous scandals involving Rio's conduct during Jacques' tenure as CEO, including the revelation of the delays and cost overruns at the Oyu Tolgoi project, Rio announced that Jacques would leave Rio by the earlier of March 2021 or the appointment of his successor, and he was replaced and left Rio in December 2020.

50.     Defendant Arnaud Soirat ("Soirat") served as the chief executive of Rio Tinto's

Copper & Diamonds product group from 2016 to December 2020. Before becoming the chief executive of the Copper & Diamonds group, Soirat served as president and chief executive officer of Rio Tinto Aluminum Primary Metal group.  Soirat served on the Board of Directors of OT, along with Defendants Quellmann, Lane and Colton, throughout the Class Period. Throughout the Class Period, Soirat made false and misleading statements concerning the Oyu Tolgoi underground development, including statements related to the budget and schedule for completion of the project. In December 2020, Soirat was appointed as Rio's Chief Operating Officer.

51.     Defendants Jacques and Soirat are sometimes referred to herein as the "Rio Executive Defendants" and, together with the Turquoise Executive Defendants, as the "Executive Defendants."

**D.     Non-Party Oyu Tolgoi LLC**

52.     Oyu Tolgoi LLC (sometimes referred to herein as "OT") is the company that owns the Oyu Tolgoi mine at the center of this action.  Turquoise Hill owns 66% of the equity in OT, while the Government of Mongolia, through an entity called Erdenes Oyu Tolgoi LLC, owns 34%. Rio Tinto owns just over 50% of Turquoise Hill's common stock, manages the Oyu Tolgoi project under agreements between OT, Rio Tinto, and the Government of Mongolia, and exercises near-total control over both the project and Turquoise Hill, including control over Turquoise Hill's public statements about OT.

53.     In fact, Turquoise Hill explicitly agreed with Rio Tinto that "any and all public disclosure regarding the OT project," or "OT Disclosure," would be "consistent with the information provided by the Rio Tinto Manager," RTIH, and that Turquoise Hill would "not file or issue any OT Disclosure without providing the Rio Tinto Manager with a reasonable opportunity to review and comment thereon."  This agreement, which was documented in an April 2012 memorandum of agreement ("2012 MoA"), followed similar agreements providing Rio Tinto

23

with control over Turquoise Hill's public disclosures concerning OT.  For example, Rio Tinto required Turquoise Hill to provide Rio Tinto and its counsel the opportunity to review and comment on drafts of public filings related to some of the initial financing agreements and transactions related to Oyu Tolgoi, including in the Heads of Agreement ("HoA") dated December 8, 2010.  Further, the ARSHA requires Turquoise Hill to comply with confidentiality requirements established by OT's Board of Directors (which is controlled by Rio), and Turquoise Hill acknowledges in its Shareholder Engagement Policy that Turquoise Hill's governance structure is founded and limited by its contractual agreements with Rio Tinto, including the ARSHA.[1]

54.     As set forth above, Rio and RTIH also control decisions concerning OT's business through its Board of Directors—which during the Class Period included as directors Defendants Quellmann, Lane, Colton and Soirat—and the Board's Operating Committee, which sets the resolutions to be voted on at OT Board of Director meetings.  The Operating Committee, which is composed of two Turquoise Hill nominees and two RTIH nominees, determines what resolutions will be considered by the Board by majority vote, with the exception of certain "special matters." One of the RTIH nominees serves as Chairman and holds the deciding vote in the case of a tie.  As a result, Rio had the ability to determine the outcome of all Operating Committee decisions, and thus the agenda OT Board.  Further, as noted above, Rio had the ability to determine the composition of TRQ's Board and management, and through the contractual arrangements described above had control over Turquoise Hill's public disclosures about OT.  As a result of this arrangement, the leadership of OT reported to the Executive Defendants, and Rio was the maker of both its own and Turquoise Hill's false and misleading statements and omissions alleged herein.

---

[1] In September 2014, Rio Tinto and Turquoise Hill entered into a Non-Disclosure Agreement that consolidated pre-existing confidentiality provisions contained in other agreements between Turquoise Hill and Rio Tinto, including the 2012 MoA.

Rio exercised this control throughout the Class Period, and dictated the content of all of Turquoise Hill's public statements concerning OT.

55.     Due to this relationship—*i.e.*, Rio Tinto's near total-control over the operations of Oyu Tolgoi, its controlling stake in Turquoise Hill (whose sole asset and business is OT), and Rio Tinto's control over Turquoise Hill's public disclosures about OT—investors and analysts looked to the public statements and representations of both Turquoise Hill and Rio in assessing investments in Turquoise Hill.  In fact, Turquoise Hill repeatedly noted that much of the information it conveyed about OT was provided by Rio Tinto, so it was natural for investors to consider Rio Tinto and Rio executives' public statements about the project—indeed, Rio was required to report TRQ and OT's results and operations as part of its own financial reporting.  And not surprisingly, as set forth below, Rio Tinto and Turquoise Hill's statements about OT were consistent throughout the Class Period.

56.     Analysts covering Turquoise Hill routinely cited public statements by Rio in their reports about Turquoise Hill.  For example, TD Securities Inc. wrote in a January 22, 2018 report about TRQ that "Rio Tinto, Turquoise Hill's majority shareholder (50.8%), announced plans to further strengthen its presence in Mongolia by establishing a new office in Ulaanbaatar and expanding its national employee numbers to around 80 through the course of 2018," noted that "Rio Tinto CEO J.S. Jacques commented in the announcement that 'Mongolia is one of Rio Tinto's most strategically important markets,'" and that, "[i]n our view, the move by Rio Tinto to increase its investment in Mongolia is a clear sign that the company is committed to the long-term future in Mongolia and should help ease investor concerns over any near-term political risks." Similarly, Canaccord Genuity Capital Markets issued a report about TRQ on February 27, 2019 entitled "OT scope change—context from the RIO call" that reported on Rio's statements about the delays in

the underground expansion project at Oyu Tolgoi.  Thus, the market looked not only to TRQ but also to Rio and its executives for material information about TRQ.

## IV. DEFENDANTS MISLEAD INVESTORS CONCERNING THEIR MOST IMPORTANT AND VALUABLE ASSET

### A. Defendants' Negotiation Of Rio And TRQ's Interests In The Oyu Tolgoi Mine

57.     "Oyu Tolgoi," which means "Turquoise Hill" in Mongolian, is the name of a large copper deposit in Mongolia. A small amount of the copper ore is near the surface and is accessible to surface mining, but most of the ore is deep underground and is accessible only to deep subsurface mining. When fully developed, the Oyu Tolgoi mine will be one of the largest copper mines in the world.[2]

58.     The success of the OT mine was critical to both Turquoise Hill and Rio Tinto.  The OT mine was not only the sole business and asset of TRQ but touted by Rio Tinto as the "cornerstone" of its copper strategy and key to its future.  To explain, while Rio Tinto had historically enjoyed healthy margins from its vast iron ore resources, by 2016, the outlook for iron ore had dampened as the world's largest purchaser—China—was expected to increasingly rely on recycling rather than importing fresh ore.

59.     The demand for Copper, by contrast, was projected to grow dramatically given its increasingly widespread use in electric vehicles, renewable energy systems, and the "electrification of everything"—the phenomenon described by Defendant Soirat and others during the Class Period in which electric technologies were expected to replace combustible carbon-dioxide emitting energy sources like coal.  As Defendant Jacques told investors at a Bloomberg conference in October 2015, "We will see a new metals age, with copper at the center."

---

[2] The ore deposit also includes smaller amounts of gold, but enough gold to make Oyu Tolgoi the fourth largest gold mine in the world when fully developed.

60.     The Executive Defendants—including Defendants Jacques, Soirat, and Quellmann—were intimately involved in the development of Oyu Tolgoi and understood in exacting detail the challenges to bringing the mine to full production, including the construction and development of Shaft 2.  Indeed, in 2015, before the Class Period, Defendant Jacques and Soirat led the negotiations with the Mongolian government to obtain Rio Tinto and Turquoise Hill's rights to mine the deposit and establish the financial and other terms for the underground mine.  At that same time, Defendant Quellmann drafted many of these agreements in his capacity as CFO of the copper division of Rio Tinto.[3]

61.     Rio Tinto's and Turquoise Hill's interests in Oyu Tolgoi were first acquired in 2009, when the Government of Mongolia signed an investment agreement with Rio Tinto and Turquoise Hill (which was then called Ivanhoe Mines) for the development of the then-undeveloped Oyu Tolgoi mine. (Ivanhoe Mines had begun initial work on the mine as early as 2001.)  The agreement gave Mongolia a 34% stake in Oyu Tolgoi LLC, which owns the mine, and Turquoise Hill/Ivanhoe Mines a 66% stake.

62.     That same year, Ivanhoe Mines completed the first of five planned deep, large-diameter concrete-lined shafts—Shaft 1—a 1,385-meter-deep shaft to be used for preliminary exploratory and access work and services on the underground-mine project at Oyu Tolgoi.  Work on a much larger shaft—Shaft 2—commenced by Ivanhoe Mines in 2007 as part of the development of the underground mine.  Work on Shaft 2 was conducted in 2007 and again in 2010-13, when the sinking reached a depth of 1,167 meters.

63.     But progress on the underground expansion at Oyu Tolgoi came to an abrupt halt

---

[3] Defendant Quellmann's recently announced replacement, current TRQ CEO Steeve Thibeault, led those negotiations on behalf of Turquoise Hill as a seconded Rio employee and TRQ's CFO from 2014 to 2017.

in 2013. While the Oyu Tolgoi mine had begun shipping copper concentrate from surface-mining operations to customers by July 2013, the underground work and funding for the project's underground-expansion phase came to a standstill in August 2013 amid a dispute between Oyu Tolgoi LLC and the Mongolian Government over financing and tax payments. At that time, Rio Tinto announced it would lay off as many as 1,700 employees and contractors—about 90% of whom were Mongolian nationals—as it negotiated with the Mongolian government over the scale of the investment needed, the number of Mongolians working on the project, and the government's involvement in decision making and other issues.

64.     In 2015, the then head of Rio Tinto's copper business—who was later the CEO of Rio during the Class Period—Defendant Jean-Sébastien Jacques, resuscitated the development of the mine. Jacques both served as a principal negotiator for the agreement with the Government of Mongolia and, in May 2015, helped orchestrate a financing agreement between Rio Tinto, Turquoise Hill, and the Government of Mongolia that settled their disputes and allowed Rio to resume underground development of the Oyu Tolgoi mine. That deal, signed in Dubai in December 2015, included a $4.4 billion financing plan for the project with 20 international banks and financial institutions that Jacques personally negotiated with then Prime Minister Chimed Saikhanbileg, including at an October 2014 meeting over dinner at Jacques' home in London.

65.     In large part as a result of Defendant Jacques' efforts, the OT underground expansion was reinitiated in 2016. In May 2016, the Government of Mongolia gave Oyu Tolgoi LLC formal notice to restart second-phase underground construction and Rio Tinto, the Government of Mongolia, and Turquoise Hill publicly announced the approval of the $5.3 billion development of the Oyu Tolgoi underground mine. Two months later, in July 2016, Defendant Jacques became the CEO of Rio Tinto, largely on the basis of his success in negotiating with the

Government of Mongolia and the lenders for the Oyu Tolgoi project, which journalists described as his "flagship project" and "claim to fame at Rio."

**B.      Defendants Restart Work On The Oyu Tolgoi Underground Expansion**

66.      The planned development of the underground mine called for five shafts reaching mining levels located approximately 1,300 meters below the surface, as well as 203 total kilometers of lateral tunnels extending from the bottom of the shafts underneath and around the orebody.

67.      These long lateral tunnels are necessary because the underground mine at Oyu Tolgoi was to be developed using a mining method called "panel caving," a version of "block caving."  Cave mining methods—generically referred to as "block caving"—have become the preferred mass underground mining options for large, regularly shaped mineral deposits that are too deep to mine by open pit, and were particularly suitable for mining Oyu Tolgoi.  As noted in the 2016 Technical Report, the "weak, massive nature of the orebody and its location between 700m and 1400m below surface make it well suited both geotechnically and economically to the large-scale caving method of underground mining"—a method that required a large early capital investment but offered a highly productive means of mining the ore with low operating costs after the initial high-cost excavation (or "development" in mining parlance).  As discussed in the 2016 Technical Report, sometimes referred to as "OTFS16," Hugo North, the principal orebody at Oyu Tolgoi, was considered to be "highly suitable for the cave method of mining."[4]

---

[4] OTFS16 at 16.2.2.1, p. 303.  The OTFS16 was a report required by National Instrument 43-101 (Form 43-101) under the Canadian Securities Administrators' Standards of Disclosure for Mineral Projects in Canada.  The report stated that sustainable first production would be achieved in the first quarter of 2021.  The NI 43-101 rules and guidelines aim to protect investors by improving the accuracy and integrity of the scientific and technical information companies provide about their mineral reserves and resources and were developed by Canadian securities regulators following the infamous Bre-X Minerals Ltd. "gold" scandal in the 1990s.

68.     In block caving, the mineral ore is undercut to initiate the collapse or caving process.  The undercut zone is then drilled and blasted progressively, with some of the broken ore drawn off to create a void into which initial caving of the overlying ore can take place.  As additional broken ore is drawn following cave initiation, the cave propagates upward through the ore deposit, or "block," until the overlying rock breaks or caves under its own weight, and surface subsidence eventually occurs.  Broken ore is removed through an extraction level developed below the undercut level and connected to it by drawbells, through which the ore gravitates to drawpoints on the extraction level where the ore is then conveyed to tunnels or shafts to be brought to the surface, as shown below:



69.     A variation of block caving is panel caving, which divides the ore into sections and extracts it in a similar fashion to block caving.  Panel caving allows the extraction of very large orebodies by dividing them into "panels," which are mined progressively.  The fundamental difference between the methods is that block caving produces from the full orebody footprint,

while in panel caving the active caving zone moves across the panel—i.e., while one end is being undercut, the other end is producing.  Once a panel becomes depleted, the adjacent panel is mined in sequence until the orebody is exhausted.  Like the primary benefits of block caving, panel caving can offer low operating costs and lower development costs due to its progressive approach.[5]

70.     Caving techniques are often chosen based on their high production rates that can be achieved at consistently low costs.  Cave mines are also relatively simple to operate and therefore do not require an extensive team of specialists or skilled workers, especially considering that typically only limited further drilling is required once the draw-points are set up.  If the draw-points and handling facilities are correctly implemented for the specific orebody, then cave mining is generally the most cost-effective way of mining subsurface—even if the initial mine development is cost-intensive.

71.     In any block-caving operation, the construction of appropriate shafts is critical.  In an underground mine, a properly constructed shaft is essential for moving people, equipment, supplies, and mined ore up and down between the surface and the underground mining area.  Building a mine shaft requires first drilling and blasting to make the hole, and then inserting concrete "sets" or lining and associated steelwork to make the shaft suitable for moving people and materials up and down. A mine's schedule requires placing a certain number of sets per day to stay on schedule.

72.     By the start of the Class Period, the keys to the success of Oyu Tolgoi's underground expansion—and thus the success and profitability of the mine—were the construction and completion of primary crusher 1 (or "PC1") and two key mine shafts and associated enabling

---

[5] *See, e.g.*, Gideon Chitombo, Importance of geology in cave mining, SEG Newsletter 119, p.1 & 13-21 (2019).

infrastructure—the Shaft 1 crusher and systems and Shaft 2.

73.     As the ICG Report revealed, Rio's failures in mishandling the excavation and construction for PC1—the first of two primary gyratory crushers needed to reduce the size of the ore to bring it to the surface—were stunning and not of the standards expected by experienced underground designers.  Specifically, the ICG discovered that the excavation for PC1 took 23 months, instead of the planned 15 months, as the excavations were not designed large enough to accommodate the needed construction work.  As the ICG Report noted, "Experienced underground designers would have been aware that allowances are required to cover ground support with additional room for construction and erection which apparently was not the case."  Significantly, however, the ICG made clear that the delays caused by this failure—effectively, the failure to dig a big enough hole for one of the "critical path" functions of the underground mine—was ***not*** a "geotechnical" issue, as it was "driven by a design change to the chamber size."  As was only revealed after the end of the Class Period in the ICG Report, "Overall construction and installation work on the crusher alone has now been delayed from the planned 15 months in OTFS16, to a forecast duration of 25 months with a forecast commissioning date of 31 October 2021, which is 23 months later then OTFS16 Planned date."

74.     The undisclosed delays and cost overruns for the underground development were also impacted by Rio's failures in connection with the engineering and construction of the enabling infrastructure for Shaft 1 and Shaft 2.  As confirmed by numerous former OT employees, internal Rio documents, and Defendants themselves, the underground-expansion project depended on Shaft 2 being delivered on time, as Shaft 2 would serve as the main logistics hub for both personnel and equipment.  When completed, Shaft 2 would allow a further 350 people to reach underground work (each time the transport "cages" went up and down), bring construction materials

32

underground, and, equally importantly, enable workers to remove muck (i.e., rock or blasted ore) away from the lateral development of the mine.  Further, Shaft 2 would be able to bring workers and materials up and down the shaft at a speed of up to 59 kilometers per hour.  To illustrate, just in terms of labor, Shaft 2 would increase mining expansion and productivity by at least a factor of five, enabling 350 workers to descend 1.3 kilometers in two minutes, as compared to Shaft 1, which could only transport 60 workers.  Bowley estimated that if Shaft 2 was not delivered on time, the planned underground lateral development goal of 16km per year would be reduced to at best 10 to 11km—a massive decrease in underground development rates.

75.    The ICG Report confirmed the clear impact the delays in completing in Shaft 2 had on the overall timeline for completing the underground expansion, and detailed how only having Shaft 1 operational  contributed to the delays that Defendants eventually disclosed.  Specifically, the ICG Report explained that, as development progressed, Shaft 1's limited size and capacity compared to Shaft 2 " would become the bottleneck until such time as Shaft #2 was commissioned fully."  As the Report explained:

> With over 350 people underground the shift change was taking up to 3 hours thus reducing the effective time at the work face, particularly in the construction areas. At times only 6 hours of effective work per day was achieved. The hoisting capacity of Shaft #1 could barely keep up with 2 mining crews resulting in a build-up of muck underground and restrictions on bringing on more crews. The Shaft #1 cage was not designed for large loads, so the majority had to be slung beneath the cage, which is a time-consuming process….

> Forward planning had shown that in the months before Shaft #2 was commissioned, the Shaft #1 cage would be running close to 95% utilisation which may have been acceptable for a couple of weeks but not for the extended time that Shaft #2 was eventually delayed. The difference when Shaft #2 was commissioned is clearly noticeable with the main cage capable of moving 300 people into the mine in 2.5 minutes and the rock hoisting capacity increasing to 9000tpd, plus the ability to move large pieces of equipment directly in the main cage.

76.    Indeed, after the Class Period, the ICG Report concluded that the delays related to

Shaft 1's "critical facilities" and Shaft 2 was estimated to be on the order of 21.4 months—i.e., the vast majority of the delay that Defendants eventually disclosed.

77.    But even before the Class Period, Defendants made clear that the Shaft 2 was critical to ensuring the underground expansion would be completed on time—and conceded that, by far, the single "most important value driver for Turquoise Hill is to deliver on the underground development timetable and production ramp-up schedule."  That timing was critical to the mine's profitability in light of the fact that the global copper supply was expected to return to a structural deficit by early 2021.  As Defendant Jacques told investors in May 2016, "production from the Oyu Tolgoi will commence at a time when copper markets are expected to face a structural deficit"—enabling Rio Tinto and Turquoise Hill to capitalize on the mine's copper production just as copper prices were rising.  In fact, in the first part of 2021, copper has approached near all-time highs and prices not seen for nearly a decade—i.e., at the very time OT was supposed to have reached first sustainable production under the timeline represented to TRQ investors throughout the Class Period.  As a result of the delays that were concealed from investors throughout the Class Period, TRQ may be unable to capitalize on this market dynamic.

78.    As former Turquoise Hill CEO Jeff Tygesen explained on a November 2017 investor call, Turquoise and Rio were intently focused on "Shaft 2 development including further mass excavation and final sinking before 2018 fit-out" because "Shaft 2 is key to future increases in lateral development."  Tygesen assured investors that the "sinking of Shafts 2 and 5 continue to move deeper" and that TRQ "maintain[ed] our expectation of first draw bell around mid-2020 and first sustainable production in early 2021."

### C.    OT Managers Decry The Work On Shaft 2 As Dangerous, Abysmal, And Necessitating A Rebuild Costing Hundreds Of Millions Of Dollars And Months Of Delay

79.    There are three key steps in building a mine: engineering, procurement, and

construction management, often abbreviated as "EPCM." At a high level, under an EPCM model, engineering personnel tell the procurement personnel what to buy so that the construction personnel can then complete the project. Poor execution of any of these functions can cause and compound problems in subsequent stages, resulting in delays and cost overruns. At Oyu Tolgoi, Rio Tinto's engineering of Shaft 2, procurement of supplies for the shaft, and construction of the shaft were all severely flawed and caused significant delays and cost overruns from the outset of the renewed work on the underground mine in 2016.

80.    In June 2016, Rio selected Jacobs Engineering Group Inc. ("Jacobs") for the principal EPCM contract for the underground expansion at Oyu Tolgoi. The first step in building a shaft for an underground mine is engineering, *i.e.*, designing the shaft and the concrete and steel components to be constructed in the shaft. When work resumed at the Oyu Tolgoi project in 2016, there were numerous engineering and procurement problems that resulted in potentially catastrophic and "criminal" conditions that presented "immediate safety concerns" at Shaft 2 and caused and would continue to contribute to massive delays and cost overruns.[6]

81.    For example, during the shutdown of the underground expansion project from 2013 to 2016, care and maintenance inspections of the steel headframes—the above-ground structures over mine shafts—for Shafts 2 and 5 identified multiple, potentially catastrophic issues with the work that had been done by a Chinese contractor.

---

[6] On October 21, 2016 Turquoise Hill filed the Oyu Tolgoi Technical Report—the report required by National Instrument 43-101 (Form 43-101) under the Canadian Securities Administrators' Standards of Disclosure for Mineral Projects in Canada—which stated that sustainable first production would be achieved in the first quarter of 2021. The NI 43-101 rules and guidelines aim to protect investors by improving the accuracy and integrity of the scientific and technical information companies provide about their mineral reserves and resources and were developed by Canadian securities regulators following the infamous Bre-X Minerals Ltd. "gold" scandal in the 1990s.

82.     Those problems required Defendants to perform a massive amount of work to address safety concerns before construction could even begin.  For example, Former Employee ("FE") 1, a project manager from January 2016 until March 2020 for Red Path Mining, the main contractor responsible for sinking Shafts 2 and 5, was brought in to lead what was called the Shaft 2 Headframe Construction Readiness Program ("CRP").  FE 1 said that during care and maintenance inspections during the underground expansion shutdown from 2013 to 2016, engineers found multiple, potentially catastrophic problems on the Shaft 2 headframe—including structural steel not properly installed, bolts not tightened, bolts missing, extremely poor welds, missing welds, as well as significant steel fabrication issues.  As a result, Rio commissioned the CRP initiative to rehabilitate and fix issues with the Shaft 2 headframe to "get it ready to continue shaft sinking and construction" once the underground project resumed in May 2016.  As FE 1 explained, the problems were so severe and presented such a clear safety risk that all work was stopped on the sinking of Shaft 2 until the CRP team was able to get it fixed.

83.     According to FE 1, the initial Shaft 2 headframe construction would have been considered "illegal" if built in North America and not addressed, and the work required to fix it was extensive.  To illustrate, FE 1 said that the CRP was originally commissioned with a budget of $17 million and a six-month schedule in mid-2016.  However, due to the severity of the issues the CRP team found, those numbers were ultimately raised to over $30 million and eight months— an extraordinary amount.  To put the figure in context, FE 1 explained that the total budget for sinking Shaft 2 was $300 million—meaning that the work required to simply restore the headframe to a functional condition amounted to one-tenth of the total cost of the entire Shaft 2 sinking effort.

84.     As the project manager for the CRP, FE 1 would provide daily, weekly, and monthly progress reports on this work to FE 1's supervisor, who would sign off on them, and those

reports were then provided to senior Oyu Tolgoi executive managers, such as Oyu Tolgoi Phase 2 Project Director Chris Aitchison, who reported to Rio Tinto's Oyu Tolgoi Managing Director Michael Charron and Armando Torres—Oyu Tolgoi's CEO since May 2017 who reported to and served on the OT Board of Directors with Defendants Soirat, Quellmann, and Colton during the Class Period.

85.     Because of the need to fix the headframe, by the summer of 2016, Shaft 2 was delayed by at least eight months—a material delay that had been baked into the schedule two years before the Class Period again.  Moreover, FE 1 explained, the steel supplied for Shaft 2 throughout FE 1's tenure on the project—from January 2016 until March 2020—was consistently subpar, had structural defects and issues with fabrication, including steel parts not being made to specifications, had poor joints, and was otherwise unusable and dangerous.  According to FE 1, "[t]here were constantly issues with the steel we were receiving.  It was almost every time. We put six thousand tons of steel into Shaft 2, and it all had to come out or be modified."  According to FE 1, approximately 95% of the steel in Shaft 2 "had to be worked on" before being installed.

86.     The ICG Report confirms that steelwork issues contributed significantly to cost overruns at Oyu Tolgoi. In its description of a Commodity Cost increase of $351 million, the Report states: "The problem areas were again steelwork, piping and electrical disciplines.  It is a trend that seems to carry throughout this area."

87.     Other former Oyu Tolgoi managers and internal emails corroborate the severity of the construction problems impeding the completion of Shaft 2.  For example, the problems with the headframes reported by FE 1 were confirmed by FE 2, one of Red Path Mining's top managers at Oyu Tolgoi from 2013 to 2019 who was responsible for the sinking of Shafts 2 and 5.  According to FE 2, OT senior management—including Phase 2 Project Director Aitchison and OT CEO

Torres—knew from at least the beginning of the pause in underground construction in 2013 that the Chinese contractors used for the initial work on Shaft 2 and Shaft 5 had cut corners and caused serious safety issues by not properly installing the reinforcing bolts into the rock. FE 2's team found multiple instances where the contractors had simply drilled the holes in the shaft-wall rock, then put a bolt cap on top of the hole and painted over it to make it seem like the bolts were properly reinforced.  As a result, FE 2 reported, there were multiple instances of bolts falling out—a clear safety hazard.

88.     According to FE 2, the initial construction work on Shaft 2 was so deficient it would have been criminal if not addressed.  As FE 2 explained regarding Shaft 2's initial construction, "Shaft 2's headframe construction would've been a criminal investigation in Canada. They could've killed people."  The dangers posed by these construction defects were repeatedly discussed in meetings with senior leadership, including Oyu Tolgoi LLC's CEO Torres.  In order to address the deficiencies, Oyu Tolgoi workers had to ultimately replace significant amounts of steel in the headframes, working underneath the defective steel while slowly replacing it over time. Senior OT leadership knew from at least 2013 that serious work needed to be done to fix the problems with Shaft 2.

89.     The same problems with defective bolts in the Shaft 2 headframe were also present in the Shaft 5 headframe, creating another hazardous condition.  As an email from FE 2 to senior OT and Rio managers on June 1, 2016 explained, "previous deficiencies at Shaft 2 magnified the concern of loose bolts and siding at Shaft 5" after workers identified a nut that had fallen from the Shaft 5 headframe and identified loose and missing bolts that presented "immediate safety concerns."  A proposed plan to fix these issues on the Shaft 5 headframe called for inspecting and replacing 11,480 bolts under a time and materials contract that would take 60 days.  As shown in

that email correspondence and confirmed by numerous witnesses, while Oyu Tolgoi managers had originally decided to fix these problems during the shutdown maintenance when the underground expansion was on pause due to the issues with the Mongolian government, that work only began once Phase 2 restarted in 2016. According to FE 2, the refusal to take any action to address defective bolts on the Shaft 5 headframe introduced eight months of delay on Shaft 5 alone.

90. Indeed, the ICG Report corroborates FE 2's account, explaining that, with respect to Shaft 5:

> There were known legacy issues with the bolts used in the steel headframe that were installed as grade 10.9 instead of grade 8.8. The latter are always used in structures like the headframes which are subject to considerable vibration because they will not come loose. The ICG were unable to answer why this fault had not been rectified during the readiness phase utilising the contractor resources available. A readiness construction support contract was awarded to Redpath including remedial work in Shaft #2 headframe but this scope of work in Shaft #5 was excluded for unknown reasons.

91. This undisclosed eight-month delay was highly material given Shaft 5's role as the underground mine's principal ventilation shaft. Until Shaft 5 and its ventilation systems were completed, temporary ventilation equipment was installed in Shaft 2, which slowed the movement of workers, equipment, and "muck" up and down Shaft 2 and delayed completion of the permanent equipment meant to go in Shaft 2. As the ICG Report explained, the "delay to Shaft #5 had a major impact on Shaft #2" because "two large ducts were installed in Shaft #2 and connected to exhaust fans" in order to compensate for the lack of ventilation that was supposed to have been provided by Shaft 5. These temporary ventilation systems were needed to "kept in place until Shaft #5 and the main exhaust fans were fully commissioned, which then delayed the start of equipping of Shaft #2"—compounding delays on the development of the mine's most critical shaft.

92. And consistent with the accounts of FE 1 and FE 2, the ICG confirmed after the Class Period that problems with the steel bolts in Shaft 2's headframe caused months of delay

when work resumed on the underground project in 2016.  The Report also confirmed that OT senior managers knew of these problems, that the defective bolts "were **known** to exist in the [Shaft 2] headframe including the replacement of a further 25,000 incorrectly specified bolts," and that these deficiencies and others were documented in a May 2015 audit.  And although Redpath was awarded a contract to complete the rectification work by June 2016, "the critical remedial works were not completed in time and permits to commence sinking" of Shaft 2 were delayed as a result.

93.    Beyond delays caused by the need to remedy the faulty Shaft 2 headframe construction, FE 2 explained that further delays to Shaft 2 resulted from numerous engineering problems. For example, FE 2 reported that the engineers that created the designs for the shaft excavation and those that designed the steel to be used to did not ensure that their schematics matched.  To illustrate, FE 2 explained that FE 2 and FE 2's team would carve out Shaft 2 to the parameters provided by Rio Tinto.  But when the steel housing would show up from the Chinese steel manufacturers, even though it was purportedly done to specifications, there would be a six-foot gap between the shaft wall and the steel housing.  When the steel did not match the excavation, it would have to be sent back to be modified to fit, which added months to the project.

94.    Numerous other former Rio Tinto employees and Oyu Tolgoi managers confirmed that the senior leadership at Oyu Tolgoi and the Executive Defendants were acutely aware of the schedule and cost overruns resulting from these faulty construction and steel quality problems. For example, Grant Brinkmann, Rio Tinto's Senior Area Manager of Shafts at Oyu Tolgoi from June 2016 through May 2018 and the senior-most manager with direct responsibility for Shaft 2, reported that Rio Tinto senior management were fully aware of the delays and cost overruns, including due to the problems with the Shaft 2 headframe.

95.    Brinkmann was responsible for $1 billion worth of work at Oyu Tolgoi, with $300

40

million directly accountable to him and another $700 million through Jacobs, the primary EMPCM contractor that Brinkmann managed. Brinkmann reported directly to Greg Field, Rio Tinto's General Manager of Underground at OT, and to Aitchison, Charron, and David Joyce, Rio Tinto's Global Head of Projects, who reported directly to Defendant Jacques.

96.     According to Brinkmann, each of these senior managers—Field, Aitchison, Charron and Joyce—knew about the delays and cost overruns at Shaft 2 before the beginning of the Class Period. For example, Brinkmann explained that Joyce would come to the site for about five days per month and would spend an entire day with Brinkmann during those visits. As a result, Brinkmann said, Joyce "knew things were delayed" by at least the end of 2017. Brinkmann also confirmed that the problems with the headframe could have been—but were not—addressed during the OT shutdown before Phase 2 began in 2016, and that senior Rio Tinto management was well aware of that fact. As Brinkmann explained, Joyce was "100% aware" of the issues during the shutdown because he received the budget proposals that were made to address them.

97.     Brinkmann also confirmed FE 1 and FE 2's accounts of the problems with the Shaft 2 headframe. For example, Brinkmann confirmed that OT had to go through and replace every bolt in the Shaft 2 headframe because they were not the right grade, that a significant portion of the structural steel had to be replaced because it was wrong and defective and compromised the safety of the design, and that the steel quality problems presented such safety concerns that OT was required to redesign how the shafts were roped up because the infrastructure was simply not strong enough.

98.     As Brinkmann explained, building the steel infrastructure for Shaft 2 once it had been sunk was a disaster. The steel and other key components used to line the 1,300 meters in Shaft 2 came in piecemeal and late—by 4-to-5 months—such that only certain sections could be

completed at a time.  The steel was not only late, but defective, and consistently had incorrect fabrication or designs, both of which were Jacobs's responsibility. As Brinkmann explained, "By the time I left [in May 2018], we had only been constructing [the Shaft 2 infrastructure] for six months, and we were already six months behind. We hadn't advanced very far at all….It was a very poor start and just didn't get any better."  Brinkmann estimated that, by May 2018, Shaft 2 was 14 months behind its scheduled commissioning deadline.

99.     Other senior OT managers confirmed Brinkmann's account.  FE 3, a manager in a commercial role who was directly involved in the aspects of construction that led to the delays and budget overages from 2017 to 2020, and was previously involved in the sinking of Shafts 2 and 5, described the situation at Oyu Tolgoi during the Class Period as a "nightmare scenario."

100.     As FE 3 explained, there were constant problems with the steel procured for the site, which frequently had to be re-engineered and refitted on-site, which required OT managers to send investigation teams to the Chinese factories to figure out what was going on—a step that created "huge delays."  FE 3 estimated that up to 25% of the steel for the entire Shaft 2 project had to be "reworked," and explained that a defect rate over 5% would have been unacceptable under industry standards and in any reasonable scenario a contractor with a 25% defect rate would have been terminated without question.  But that did not happen at Oyu Tolgoi, where these issues persisted throughout FE 3's tenure from 2017 to 2020.

101.     The ICG confirmed FE 3's account concerning the problems with the steel procured for OT, noting that delays preventing the start of equipping Shaft 2 in earnest included "multiple rework of fabricated steel; late ordering and delivery of steel; drilling and epoxy grouting for brackets in the lower reaches of the shaft; incorrect sequencing of work and additional works." Tracking FE 2's account, the ICG Report noted one example in which one of Shaft 2's brows had

been redesigned the previous year, but when the steel arrived on site it was based on the original design not the redesign—an error that contributed to a 156-day delay in equipping the lower region of Shaft 2.

### D. Numerous Former Oyu Tolgoi Managers Confirm That Defendants' Publicly Reported Timeline And Budget Were False And Unachievable Before The Beginning Of The Class Period

102.   The engineering and procurement problems at Oyu Tolgoi caused massive delays and cost overruns before the start of the Class Period, as confirmed by numerous former Oyu Tolgoi managers.

103.   For example, FE 2 said that it was clear from when they restarted Phase 2 (in 2016) until Defendants began to publicly announce delays that Shaft 2 was not going be completed on the timeline represented to investors.  FE 2's job was to approve and submit the progress schedules for Shaft 2; FE 2 always provided accurate schedules to superiors; and FE 2 said that there was complete awareness of where the schedule really was by senior leadership of Oyu Tolgoi—from OT CEO Torres to senior management at Rio Tinto, who received progress reports and schedules—and there is no plausible basis for anyone at Rio Tinto to claim they were unaware. As FE 2 put it, "it was just awful.  I've been mining for 40 years and have never seen anything like it."

104.   FE 3 similarly confirmed that the Shaft 2 and 5 projects FE 3 worked on were six to nine months behind schedule by the time FE 3 started at Oyu Tolgoi in August 2017—and that the schedule never had any hope of getting back on track.  As FE 3 explained, "It was well understood by all levels of management that the project was at least nine months delayed, if not more."

105.   Similarly, FE 4, a planning technician at Oyu Tolgoi LLC from July 2017 to February 2020, who was responsible for producing and disseminating short-term progress reports

of the underground lateral expansion project on a weekly and monthly basis, stated that, when FE 4 joined Oyu Tolgoi in July 2017, or a year before the Class Period began, the underground project was 2,000 meters behind schedule—or over three months behind under the project's target of constructing 700 meters per month. The reports FE 4 prepared compared the completion schedule to the actual progress in meters and were sent via email on a monthly basis to a Rio Tinto mining engineer on site, an Oyu Tolgoi LLC technical services manager, Oyu Tolgoi LLC's CEO Torres, to Rio Tinto's Mine Planning Team in Brisbane, and beginning in October 2018, weekly to Defendant Jacques. According to FE 4, Defendant Jacques demanded these reports be sent to him weekly because he was so concerned about the extent of the delays.  To address the delays, FE 4 said the targets were reset in late 2017 to be 110% of what the schedule should have called for "because we were delayed and we were trying to catch up—but that never happened, and it just made us even more delayed."  According to FE 4, the effort to compress the schedule was intended to hide the delays.  The reports prepared by FE 4 and sent to senior Rio management showed that from the end of 2017 until June 2019, OT's actual monthly progress consistently was short around 100-200 meters per month under a schedule calling for the construction of 800 meters per month.

106.    FE 5, a Jacobs Health Safety and Engineering Superintendent, who worked at OT from August 2018 through February 2020, said that, as soon as he arrived, "It was very apparent [the project] was delayed" and that the "targets they were talking about publicly were obviously not going to be met."  FE 5's primary responsibility was the central heating plant ("CHP"), which was critical in ensuring the mine was warmed to a temperature of 22 Celsius (as required by Mongolian mine safety law).  While the CHP was supposed to have been fully online by Christmas 2017, the schedule plans in August 2018 showed that it was least eight months behind, and it was ultimately delayed by almost two years before coming online in September 2019. FE 5 recalled

that when that Rio Tinto first disclosed to investors that there would be some delays to completing Shaft 2 in October 2018 (although it still falsely maintained the project was on budget), "We were all laughing and saying that wasn't the truth. Just CHP was seven months behind schedule and that was critical to get the underground going."

107.     The ICG confirmed FE 3's account that delays in completing the CHP resulted in significant additional delays in deploying mining crews and thus delays in completing the critical underground infrastructure:

> The ICG . . . found that a near-critical path runs through the completion of the enabling infrastructure to support the underground development. The OTFS16 Study and the Underground Development Plan both clearly demonstrated that mining progress was dependent upon the ability to mobilise underground mining crews and their associated equipment. The mobilisation of these crews was dependent upon the increase in ventilation, heating, crushing capacity and hoisting capacity for people, materials and muck. These "enabling" facilities were critical to the mobilisation of underground crews.
>
> ***
>
> Late infrastructure completion limited the number of underground crews that could be deployed, which was critical to getting the lateral and mass excavation completed.

108.     In fact, as the ICG noted, the consequences for failing to timely complete the CHP could easily have been far more catastrophic, explaining that:

> The CHP plant was over 18 months behind schedule missing to winter periods.  The diesel mine air heaters at Shaft #1 were able to provide some heating but were not as effective.  Fortunately, the 2018 winter was mild.  If it had been an average Mongolian winter the shaft could have frozen.

109.     FE 6, who worked in Contracts and Procurement Management for Rio Tinto at OT from October 2016 to May 2017, said that the lack of progress would have been obvious to any of the senior TRQ or Rio Tinto leadership who toured the site.  FE 6 knew about the schedule delays by speaking to others in procurement, including FE 6's supervisor, Sarah Holling, but said the delays were obvious to anyone who saw Shaft 2.

110.    Indeed, the ICG Report concluded that "it became obvious to most people on the ground that the Project was falling further and further behind schedule," with construction and mining teams blaming each other for the delays, which "reached the top of the organization with Senior Executives also trying to apportion blame, unable to agree on how the Project should move forward."

**E.      Before The Start Of The Class Period, Rio Tinto Hires An Expert To Investigate The Delays And Cost Overruns And Develop A Plan To Address Them**

111.    Consistent with the above accounts, by 2017, senior Rio Tinto executives knew that the Oyu Tolgoi underground expansion project was seriously behind schedule and over budget. Accordingly, two senior Rio Tinto executives decided to hire an experienced mining executive— Bowley—to investigate the problems at Oyu Tolgoi.  These two senior Rio executives were (i) Defendant Arnaud Soirat, who had been the CEO of Rio Tinto's Copper and Diamonds division since July 2016, and (ii) Craig Kinnell, a Rio Tinto veteran who was the President and CEO of Oyu Tolgoi LLC from September 2013 to December 2014 and sat on its Board and was the Chief Development Officer of Rio Tinto's Copper and Diamonds division in charge of the Oyu Tolgoi project from December 2014 to July 2018.

112.    Kinnell told Bowley that Bowley was being hired because the project faced difficulties and Kinnell wanted Bowley to tell him the truth about how bad the situation was. Kinnell indicated his view in email exchanges with Bowley over a year before Bowley was hired that the project was in trouble.  For example, in a September 13, 2016 email exchange, Bowley and Kinnell discussed the four weeks on, two weeks off schedule set by Jacobs for its employees, which Bowley highlighted as "costing the business probably hundreds of thousand's, if not millions over the life of the project."  Kinnell responded:  "Don't get me started Richard, it has me so pissed off I am trying to resign from the OT Board – I can only see bad things on the horizon."

Similarly, in an email to Bowley on December 2, 2016, Kinnell said it was "Best not to talk about OT, neither the Project, nor the Operation are near where I want them to be."

113.    FE 3 independently confirmed the four-week on, two-week off schedule when FE 3 joined the project in 2017 and its impact on the project.  FE 3 said the schedule was something FE 3 had never seen before, called it unacceptable, and said the schedule had "inherent daily, weekly, and monthly delays" given the project lost 50% of its expertise for a two-week period every month.

114.    Bowley was in an excellent position to assess the project's status given that he was highly knowledgeable about OT, having previously worked at the OT mine from 2011 through 2015 as an employee of AMEC Foster Wheeler ("AMEC"), which was at the time engaged to develop the underground study, value, and detailed engineering for Phase 2 of the OT underground expansion.  Kinnell had first met Bowley in 2013 when Kinnell was the President and CEO of Oyu Tolgoi, and the two remained in contact after Bowley left Mongolia.[7]

115.    In July 2017, Kinnell agreed with Bowley the OT project was in trouble and needed intervention, including with respect to scheduling work, capital expenditures, problems with the EPCM contractor, Jacobs, and safety issues.  For example, in a July 3, 2017 exchange, Bowley reported to Kinnell that, based on his discussions with senior managers on the ground at OT, "two out of three of your senior guys on the project have told me Jacobs are failing badly" and that the "mess will lead straight to OTs door in the shape of schedule overruns and cost."  Kinnell agreed, responding immediately that "[i]t is all getting messy Richard and needs intervention to stop it

---

[7] Kinnell served as CEO of OT from October 2013 through 2014, followed by Andrew Woodley (November 2014 through September 2016), Stephen Jones (September 2016 through May 2017), and Armando Torres (May 2017 to present).

getting significantly worse."

116.    To address those issues, Kinnell tasked Bowley with writing a paper to address the problems at OT and how Bowley would propose addressing them.   Following an hour-long interview with Defendant Soirat in November 2017, during which Bowley discussed his paper—which noted, among other things, that what was "clear is Jacobs are [sic] failing"—Bowley was hired.   His role was to work in Rio Tinto's Copper & Diamonds division as general manager for strategic projects and chief advisor for the Oyu Tolgoi project.   Notably, just before being hired by Rio Tinto in July 2017, Bowley had been preparing a paper for the Mongolian Government about the risks of Oyu Tolgoi expansion.[8]

117.    Within a few short months, Bowley confirmed concerns about the state of the OT underground expansion, and informed Kinnell, Soirat and other Rio Tinto executives about the truth at OT—that Rio Tinto could neither complete the underground project for $5.3 billion nor achieve sustainable first production in the first quarter of 2021.

118.    Bowley quickly determined that the project had serious delays that were causing cost overruns.   He received information about the delays from multiple project personnel from Rio Tinto's Growth and Innovation ("G&I") division, including two general managers for the project, who knew that the project was seriously behind schedule and told him the project was six months behind schedule within its first year since resuming work in 2016.   Bowley also discussed the delays with Greg Field, who served both as the General Manager-Underground at OT from May

---

[8] Bowley's wife is Mongolian, and Bowley's father-in-law held a senior-level position in the Mongolian Government.   He asked Bowley to draft a paper so that the Mongolian government could independently understand and assess its position in terms of OT.   At around the same time, Bowley was also approached by SailingStone Capital, one of Turquoise Hill's largest shareholders, that was similarly seeking assistance in assessing OT in connection with its investment.

2015 to December 2018 and as the General Manager of Project Execution at Rio Tinto from May 2013 to December 2018, and reviewed monthly reports from Jacobs, the EPCM contractor, that identified problems with the scope of work under its control.[9]

119.    Bowley also confirmed his assessment of the delays with Shaft 2 and how to address them with Brinkmann, the most senior manager of Shaft 2.  Brinkmann knew Bowley well and fully briefed him on the status of the project.  As Brinkmann put it, Bowley was hired to conduct "an audit and a health check looking for potential blowouts….I think London had asked him to come in and do it….Richard knew about all my concerns and had access to all my reports." As a result, Brinkmann said, "Richard was aware of all the stuff that was going on," including the 14 month-or-more forecast delay for Shaft 2, and "he was pushed out for it too."

120.    With access to the those responsible for the underground expansion and their reports, it was immediately clear to Bowley that the engineering could hardly be worse, and he understood that bad engineering—particularly in a large project like Oyu Tolgoi—would inevitably lead to delays and cost overruns.  As Bowley reported, when work on the underground mine resumed in 2016, Rio Tinto put its engineering team for the project in Santiago, Chile, a twelve-hour time-zone difference from the project site.  Moreover, the engineers did not understand Mongolian legal codes so their work had to be rewritten and translated to go through Mongolian permitting procedures.  This caused additional delays and cost overruns.[10]

---

[9] The Oyu Tolgoi project was overseen by both Rio's G&I division, which was headed by Stephen McIntosh, a member of Rio's Executive Committee who reported to Defendant Jacques, and by Rio Tinto's Copper and Diamonds division, headed by Defendant Soirat, who also oversaw the project throughout the Class Period including through his role on the OT Board.

[10] When Bowley first worked on the Oyu Tolgoi project as an AMEC employee from 2011 to 2015, he insisted on moving the engineers from Vancouver, a fifteen-hour time-zone difference, to Shanghai, in the same time zone as Mongolia, and this worked well.

121.     In addition to the steel engineering problems in the Shaft 2 headframe described above, Bowley identified that the concrete sets that were to be placed in Shaft 2 and secured with steel bolts in precast holes in the concrete were misaligned, and the steel work was badly engineered, making it necessary to redo all the steel bolts. This faulty design of the sets led to over 40,000 steel bolts that were installed in Shaft 2 having to be removed and reinstalled, which caused significant delay and added considerable cost.

122.     Consistent with the accounts of FE 1, FE 2, and FE 3, Bowley also investigated and identified substantial procurement problems at OT and found that the wrong types of steel and other supplies for fitting out the shaft were procured, and that those issues alone caused at least three to six months of additional delay.  As Bowley concluded, the procurement problems at the Oyu Tolgoi project resulted in part from Rio Tinto's bringing in people who had no experience in Mongolia or similar countries, where supply chains do not work the same way as in more developed countries, and were compounded by the significant engineering failures described above.

123.     The procurement cost overruns identified and reported by Bowley to Rio Tinto senior management were confirmed by former OT procurement employees.  Their accounts demonstrate that industry-standard procurement practices were disregarded not only as a matter of policy but also precisely because the OT underground expansion project was so far behind schedule.  For example, FE 7, a procurement specialist at Oyu Tolgoi from March 2016 until April 2018, reported that OT's procurement practices were severely deficient and contrary to industry standards, including because only one quote was required for any procurement that was less than $100,000.  As FE 7 explained, "I've been in procurement for many years. I sent emails and said in meetings that this was not the norm in the industry. It will cost the project lots of money because

it was not by the book." Further, when FE 7 raised these concerns in a meeting in the second half of 2016 with Sara Holling, the Manager of Contracts and Procurement at Rio Tinto from 2016 to November 2018, Holling said, "This is a time driven project, not a cost driven project"—a comment that stunned FE 7, who had never heard anything like that in FE 7's 30-year career.

124.    According to FE 7, "It was a disaster. It was a complete joke. I've never seen anything like it in my life." FE 7 confirmed that poor procurement contributed to the project's delays, which were well known internally while FE 7 was there: "Everyone was always talking about the underground delays and overruns. It was a permanent fact. It was a surprise to no one" when Defendants ultimately disclosed the delays and cost overruns. "There was going to be overruns on time and budget. Everyone knew that."

125.    The ICG Report's findings were consistent with these accounts, with the ICG concluding that overruns in steelwork, piping and electrical disciplines characterized a "trend that seems to carry throughout this area." The ICG further reported that procurement issues specifically contributed to the delays in completing Shaft 2, including "multiple rework of fabricated steel; late ordering and delivery of steel; [and] drilling and epoxy grouting for brackets in the lower reaches of the shaft," among other issues.

126.    In addition to engineering and procurement, the construction phase of Shaft 2 also encountered serious problems. During the construction phase of building a shaft, the drilling of the shaft and the construction of the built elements in the shaft have to be done seamlessly and concurrently. But according to Bowley, there was no synchronization of mining and construction at the Oyu Tolgoi project. The shaft was inadequate for moving the necessary people and equipment for both mining and construction up and down, and there were conflicts between the mining personnel and the construction personnel over use of the shaft. These problems caused

additional delays and cost overruns—a fact that was subsequently confirmed by the ICG.

127.    Bowley explained that Field, the General Manager-Underground at OT and General Manager of Project Execution at Rio Tinto until December 2018, identified the lack of synchronization of mining and construction for Shaft 2 as disastrous for the schedule and cost. Field, who was in charge of the underground mining at OT, became so frustrated that he decided to try to meet his lateral development schedule without coordinating with construction—a frustration that resulted in part from construction being managed by Rio Tinto personnel from Australia who did not understand what was needed for the proper construction of Shaft 2.

128.    Indeed, the ICG confirmed this account and Field's decision, noting that the failure to coordinate the work of the mining and construction teams—and the lack of expertise and familiarity with constructing underground mines in conditions like those in Mongolia—greatly contributed to the overall costs and delays, resulting in the project falling significantly behind schedule before the start of the Class Period:

> The underground execution teams (mining and construction) were working in isolation from each other and blaming each other for the overall project failings, leading to an unhealthy culture across the site.
>
> Because of the lack of integration, there was a poor understanding of the critical inter-relationships between the infrastructure and development work. No clear overall critical path was developed and therefore each group was unable to concentrate their teams on the correct activities nor to focus on those critical path items that were falling behind. The end result was a project falling behind schedule within the first six months and continuing to fall further and further behind as time progressed.

129.    According to the ICG, this lack of coordination was compounded by the fact that the managers in charge of the project lacked the necessary qualifications and expertise.  For example, the ICG concluded that the managers from Rio Tinto's Projects organization responsible for the underground development "had no previous experience in construction of underground mines and most of their work had been in the Pilbara region of Australia building iron ore mines

and infrastructure which differs substantially work involved with this Project. Equally very few

of the team had any experience working outside Australia, and certainly not in the cold climate

conditions of Mongolia." Similarly, the quality of resources provided by the primary EPCM

contractor responsible for Shaft 2—Jacobs—was inadequate. As the ICG Report explained:

> One of the major factors in the selection of Jacobs as the EPCM contractor was
> their commitment to provide the "A" Team to the Project. Jacobs failed to deliver
> on this promise with almost 90% of the senior site staff and management in the
> Project and construction group, including the Project Director, being project hires
> with no experience of working for Jacobs or of their systems and certainly no
> experience working together as a team.

130.    As the ICG concluded, these deficiencies were a clear driver of the poor execution

of the underground project:

> One of the key issues noted by the ICG is the Rio Tinto Projects organisation had
> no experience of building an underground block cave mine, let alone with the added
> complexity of doing so in the middle of the Gobi Desert. They had no-one with the
> skills or experience to lead such a complex project and did not know how to
> establish the controls necessary to manage it. The EPCM was also inexperienced
> and none of the senior management involved with this Project had ever been
> involved in the development of a block cave mine.
>
> In addition, neither the Owners team nor the EPCM senior management had
> experience working in Mongolia. This experience was lost in the change-over from
> the study phase to the project execution phase. The team lacked the relevant
> experience of developing block cave mines and working in Mongolia, the two most
> critical features of the project.

131.    Moreover, despite Jacobs' glaring deficiencies, Rio Tinto failed to oversee its work

in an appropriate manner. As the ICG noted, "the failure of the Owner's Team to effectively

manage the EPCM," Jacobs, was inexplicable. Jacobs was responsible for a budget and schedule

of nearly $2 billion—and as such, the "Owner should have been holding the EPCM accountable

for its performance and the ICG expected there would be a considerable amount of written

communication regarding any shortfalls"—but the ICG was unable to locate "*any* substantial

contractual correspondence" between the two parties in the early part of the execution phase (from

mid-2016 through the third quarter 2017).  The ICG called the lack of correspondence "surprising" given that, at the same time, the EPCM was writing contractual letters to the construction contractors on an almost daily basis—suggesting that Defendants "merely continued to pay more and more" for Jacobs' services rather than enforcing contractual rights.

### F.      Rio Tinto's Longstanding Executive Consulting Firm Independently Identifies Problems With Overestimation And Unethical Conduct At OT And Reports Them To Senior Management

132.    At the same time Defendant Soirat and Kinnell hired Bowley to investigate the delays and cost-overruns at OT, Rio Tinto's longtime executive consulting firm began identifying the problems at OT through its work in Mongolia.  That firm, called GFI Blackswan, and its head, Dr. Maurice Duffy, had served as an executive coaching consultant for Rio Tinto since 2007.  Throughout that time, the firm had an excellent relationship with Rio Tinto, and was consistently recognized by Rio, including as recently as 2016, as having "superb supplier status."  As part of his work for Rio for nearly a decade, Duffy coached and provided leadership consulting services to Rio Tinto's senior leadership, including every CEO and every member of the executive committee during that time period, under a £1 million (about $1.8 million) annual contract—Blackswan's largest, representing about 70% of its business.

133.    Blackswan began performing executive coaching services in Mongolia in around 2015, providing those services to around 50 of Rio Tinto's senior management stationed there and in London.  Blackswan had coaches at Rio in Mongolia, including five from Blackswan and 10-12 local people.  In connection with that work, Duffy said that he began to hear reports and concerns from senior leaders in Mongolia about unethical behavior and "potential overstatements" at OT in around 2016.  Further, Duffy's firm had provided monthly and quarterly reports to the head of Rio's human resources department—first to Hugo Bague, and then Kirikova when she took over Bague's role at the beginning of 2017—concerning its work and interactions with senior

54

Rio leaders in Mongolia and the head of human resources delivered those reports to the Executive Committee, CEO and Board chairman on a quarterly basis. The reports were drafted from a database of information Blackswan absorbed through its coaching sessions with senior leadership, pulse surveys, and web portals that requested confidential comments from employees. Blackswan would typically receive thousands of comments, which they would sort in a database, and then pick out the most relevant ones which Duffy thought the Executive Committee needed to know about. Duffy knew that Rio's Executive Committee—which at the time included Defendant Soirat and Defendant Jacques—was briefed on these reports because the Executive Committee provided feedback on them to Blackswan.[11]

134. Duffy was instructed to discontinue providing those reports in mid-2017 after sending Rio his March 2017 report. Tellingly, Duffy was instructed to discontinue this reporting at the same time, as the ICG later concluded, reporting of other critical aspects of the OT development inexplicably stopped. For example, the ICG points out that crew mobilization dates were replaced by the reporting of "value milestones"—which the ICG concluded led to "misleading" reporting—in the first quarter of 2017. At the same time, single-page critical path diagrams that had been provided in monthly reports since August 2016 that the ICG described as helpful and "encouraging" because they "clearly showed the mining crews tied to infrastructure and driving the underground development" ceased in February 2017, and were replaced with "milestone target" reporting that the ICG concluded was "misleading." Nevertheless, Duffy

---

[11] In addition to Defendants Jacques and Soirat, Rio's Executive Committee at the time included Stephen Mcintosh, Growth & Innovation Group Executive; Vera Kirikova, Human Resources Group executive; Bold Baatar, CEO of Energy and Minerals; Alfredo Barrios, CEO of Aluminum; Joanne Farrell, Health Safety & Environment Group executive; Simone Niven, Corporate Relations Group executive; Philip Richards, Group General Counsel Group executive; Chris Salisbury, CEO of Iron Ore; and Simon Trott, chief commercial officer.

continued to produce the reports until he was told to stop them again in September 2017 (although Duffy's firm continued to generate the reports internally until March or April 2018).

135.    The instruction to stop providing his consulting reports to the Executive Committee was so troubling to Duffy that he felt compelled to bring his concerns—including concerns about the cost overruns and schedule delays at OT—to the attention of Rio Tinto's senior leadership in London.   He did so by specifically raising them with the Head of Human Resources, Vera Kirikova, at a meeting on September 6, 2017.   In connection with that meeting, Duffy provided Kirikova with a document containing comments taken from coaching assessments in 2016 and 2017 and used in Executive Committee reporting that included numerous comments from Rio personnel in Mongolia and at headquarters in London concerning the cost overruns, schedule delays, and other misconduct at Oyu Tolgoi.   Those included comments from senior leaders involved with OT confirming the very facts that the ICG later confirmed in its review, and demonstrated that Defendants Jacques and Soirat knew about the cost overruns and delays by no later than September 2017.   These comments included:

- "Schedule over-run in that panel caving and construction drivers not aligned, we are months behind.   Soirat knows what's going on and worry about renegotiation by Mongolia Government."

- "I have escalated issues of concern regarding scheduling at OT – no one wants to hear."

- "The comments in Mongolia about RT leverage of contract by misstating critical pathways is a concern. Here we all know including CK [Craig Kinnell] and Soirat [sic] knowing."

- "To be successful I need more people for crews and more crews underground, Value milestones is a disaster for critical pathways."

- "There needs to be an independent review in Oyu Tolgoi."

- "Delays and cost over-runs are understated in Mongolia."

56

- "At Oyu Tolgoi, construction of the underground development will not achieve its target by 2020."

- "Budgets are being 'flexed' because of engineering, procurement, and construction delays."

- "I am leaving because I do not want to be tarnished by potential disaster that is Oyu Tolgoi."

136. As Duffy explained, the comments received from OT leadership made clear that Defendant Jacques was driving the effort to conceal the reality at OT, with senior OT leaders and coaches noting that "JS [Jacques] brings a unique blend of strategic and operational expertise on overstatements, overbudget, coverups," that "I am concerned by a culture that seems to be shaped around satisfying one ego," that the "control freak at the top [Jacques] is using HR, PR, Operations to watch, monitor and make decisions from China-Mongolia to US-Canada," and that "JS will destroy us all in his grab for power and glory."

137. After Duffy reported the concerns he was hearing about Oyu Tolgoi and the instruction to discontinue the reports his firm was providing from senior leaders in Mongolia, Kirikova told Duffy he would have to drop and disregard those concerns. As Duffy explained, Kirikova was an intermediary for Defendant Jacques, and told Duffy that Defendant Jacques would not appreciate hearing about his concerns, and that Duffy would regret reporting them to him—telling Duffy that "you will regret it" if he continued to report concerns about Rio's conduct in Mongolia. Duffy understood that Kirikova would report what he told her to Defendant Jacques.

138. Uncomfortable with that response, and with other "serious misgivings" after reporting "multiple, unprofessional [and] unethical behaviors" by Rio's most senior executives since Defendant Jacques took over as CEO to Rio's Board and chairman—who "took no action" in response—Duffy resigned and terminated his firm's contract with Rio in December 2017. As Duffy recounted, he explicitly communicated to Rio's senior leadership that concerns about

unethical behavior in Mongolia was a reason he was terminating his contract.

139.    As the executive coach to nearly all of the senior management at Rio Tinto, Duffy had unique and unparalleled access and insight into the senior leaders at Rio, their motivations, and how they operated.  Indeed, Duffy had overseen executive coaching services for Defendants Jacques and Soirat for several years and had intimate knowledge of how they managed Rio.  Duffy recounted how Defendant Jacques told Duffy at his first coaching session that "I don't like coaching because you guys [Blackswan] might find something I don't want you to know" and later told Duffy that he "didn't trust anyone."

140.    According to Duffy, Defendant Jacques "knew without a doubt" about the problems at Oyu Tolgoi by 2017, as Defendant Jacques' role as CEO and career depended upon the project's success.  As Duffy explained, Defendant Jacques was distrustful of other Rio Tinto executives and surreptitiously tracked their work through other intermediaries at Rio Tinto, and closely followed the developments in Mongolia: "He doesn't trust anyone.  There is no way in hell that a flea flew down the mine and he wouldn't know about it."  As Duffy recounted, it was clear Defendant Jacques knew the "wheels were coming off" the project at OT by at least January 2018, when Defendant Jacques personally traveled to Mongolia to meet with the Mongolian prime minister.

**G.    Rio Tinto's Expert Informs The Executive Defendants That Oyu Tolgoi Is In Distress And That Construction Is A Year Behind Schedule And Hundreds Of Millions Over Budget**

141.    Shortly after Duffy independently reported the concerns he was hearing about OT to Rio's senior leadership in London, Bowley provided a separate presentation in London to Rio Tinto's Copper division addressing how bad the problems were at OT and how to fix them. On February 1, 2018, Bowley made that presentation at Rio's London headquarters to Kinnell and Rosemary Fagen and reviewed the cost overruns, schedule delays, and Shaft 2 problems. Fagen, who was the Vice President for Human Resources for Rio Tinto's Copper & Diamonds group since

July 2016 and for Rio Tinto Copper since September 2014, reported directly to Defendant Soirat, participated in the meeting on behalf of Soirat, and, according to Bowley, reported the substance of the meeting to Defendant Soirat.  As Kinnell made clear to Bowley, Fagen served as a gatekeeper and approver of everything that went to Soirat.[12]

142.  In this February 2018 presentation, Bowley proposed to establish a Project Integration and Implementation Group, which his slides stated "offers Rio Tinto Copper & Diamonds a substantial value add option with the ability to save hundreds of millions of dollars in cost and schedule overrun, and ultimately liabilities."  His proposed group would oversee the management of capital project assurance and would include experienced mining executives with experience at major mining companies, and his proposal provided a "road map" to systematically reduce cost overruns and schedule delays and a stakeholder management plan that would ensure transparency.  Bowley proposed several world-leading mining experts to serve in the proposed Project Integration and Implementation Group, including Malcolm Brown and Chris Beaumont, who were later the lead consultants in the ICG retained by the Oyu Tolgoi Board's Special Committee in 2021.  Rio did not establish Bowley's proposed group or hire Brown or Beaumont.

143.  Following the February meeting, Bowley continued to follow up with Defendant Soirat and Fagen about the need for immediate action to address the cost overruns and delays, and both of them were aware of the problems at OT.  For example, a March 6, 2018 email Bowley wrote to Kinnell warned of "potential disaster" unless "we change strategy rather rapidly and someone gets a hold of this" and recounted a conversation that Bowley had with Soirat warning

---

[12] Fagen's role as Defendant Soirat's intermediary was confirmed by Duffy, supported by the clear knowledge she exhibited concerning the matters under Defendant Soirat's purview, and reflected in comments she made in emails like the one she sent to Bowley on July 3, 2018, asking him to call her: "I'm keen to get things happening for you, not that you actually report to me but I've finally been able to pin Arnaud [Soirat] down on a few things."

him of the problems with the underground expansion project.

144.    Bowley spoke with Defendant Soirat for an hour in May 2018 and again discussed the problems facing the expansion. Bowley wrote in an email to Fagen on May 28, 2018, that "what I tried to engrain in him [Soirat] was the factors around strategy, exposure to schedule risk, and how changing path in terms of timing and where we may be in terms of the project, will cause us massive risk, and what that risk looks like to Arnaud [Soirat] and the business."

145.    Bowley continued to make clear to Soirat—including in emails to Fagen, Soirat's intermediary—that the OT project was doomed and could not be completed on the schedule represented to investors, i.e., that sustainable production would be achieved by 2021.

146.    Specifically, Bowley wrote to Fagen about a dispute between Rio Tinto and its EPCM contractor caused by the delays. Jacobs was behind schedule because it was not getting sufficient cage space for moving people and equipment up and down the much smaller Shaft 1 when necessary. Jacobs told Bowley in the third quarter of 2018 that this was making it fall behind schedule, and Jacobs wanted to offset the costs against Rio Tinto, resulting in a dispute between Rio and Jacobs because the schedule delay was becoming obvious and costly. Jacobs' EPCM contract provided for a target cost of $240 million on a reimbursable cost basis for its management of the supply chain, construction companies, procurement, and other functions, but this money was going to run out in December 2018. When this amount was reached after just two years, Rio Tinto panicked, according to Bowley, and Rio considered doing the EPCM work itself—which Bowley considered laughable.  Instead, Rio decided to raise Jacobs' cap by 50% to $360 million—a step approved by the OT Board (which included Defendants Soirat, Quellmann, Lane and Colton).  The increase in Jacobs' contract was also confirmed by Brinkmann, who said that during his tenure, Jacobs's budget tripled from $150 to $450 million with a minimal increase in the scope of its

work.[13]

147.    Bowley reported on these events in email correspondence on July 3, 2018, to Fagen, who reported to Defendant Soirat:

> Budget for the EPCm runs out by Christmas
>
> Entry for EPCm $240mill  / expected exit just on current expectations $360mill
>
> Massively under performing
>
> The kicker !!!
>
> G&I are considering binning Jacobs and "self managing / performing.
>
> A self performing operator trust me is more risk than an under performing engineering group !!
>
> I will get some exact detail on this but senior OT / G&I people told me this last Sunday.

148.    Fagen responded a couple hours later:  "Oh wow and wow!!"

149.    Later that day, Bowley followed up, stating:

> **From:** Richard Bowley (OT)
> **Sent:** 03 July 2018 15:49
> **To:** Fagen, Rosemary (RTHQ) <Rosemary.Fagen@riotinto.com>
> **Subject:** Re: Call
>
> I am not blowing my own trumpet, but this has been coming from day one !!
>
> Opppppps !!
>
> I will firm the details and numbers up.
>
> The realization and magnitude of what is happening is starting to dawn I think on a few.

150.    Fagen responded the same day, acknowledging the problems were well known to Rio: "Oh don't worry, we've known it from the start, just haven't been able to do anything about

---

[13] The ICG Report corroborates Bowley's account of problems with the Jacobs budget, finding that the EPCM contract contributed $346 million to the cost overruns at Oyu Tolgoi.

it.  Arnaud [Soirat] has played a very card [sic] here, which is why you now see 'things' surfacing."

On the same day, Fagen wrote to Arshad Sayed, Rio's Copper & Diamonds Chief Development

Officer, who replaced Kinnell in March 2018: "At the end of the day, Richard [Bowley] is a

resource on the ground in Mongolia and we need him in the tent, not out of it!"

151.    Then, on July 19, 2018, Bowley emailed Fagen:

From: Richard Bowley (OT)
Sent: 19 July 2018 05:20
To: Fagen, Rosemary (RTHQ) <Rosemary.Fagen@riotinto.com>
Subject: RE: Call

Latest update.

12 months behind schedule.

$300mill capital over budget. Expect this to rapidly escalate.

152.    In other words, by the start of the Class Period in July 2018, Defendants had written

confirmation—as stated in contemporaneous emails and a later sworn Witness Statement by the

expert Rio Tinto hired to investigate and fix the scheduling delays and cost overruns at OT—that

the project was 12 months behind schedule and $300 million over budget and that these amounts

were expected to escalate rapidly.

### H.    Defendants Scapegoat Managers Who Told Them About The Shaft 2 Delays And Cost Overruns

153.    In the face of escalating costs and delays, Defendants fired the senior manager of

Shaft 2 in May 2018—a step that not only provides clear evidence that Defendants knew their

public statements about the project were false, but demonstrates their effort to conceal the truth.

According to FE 3, Grant Brinkmann, the senior-most manager of Shaft 2 and Rio Tinto's Area

Manager of Shafts at the Oyu Tolgoi project from June 2016 to mid-2018, was fired in or around

May 2018 as a scapegoat after repeatedly warning senior management about Jacobs' poor

62

performance and steel-quality issues—a description that Brinkmann confirmed was accurate.

154.    As Brinkmann recounted, the "proverbial shit hit the fan and the rest of the senior hierarchy realized" the extent of the delays in April 2018 when Brinkmann was on leave.  During a monthly progress report during the first week of April 2018, one of Brinkmann's direct reports, Andrew Duff, Rio Tinto's Senior Construction Manager at OT, explained and was upfront with Rio's Global Head of Projects, David Joyce, that Shaft 2 was, by that time, at least five months behind schedule.  According to Brinkmann, the five-month delay in April 2018, forecasted out, meant that the commissioning of Shaft 2 was approximately 14 months behind schedule—a fact that was known and reported internally to senior Rio Tinto management.

155.    When Brinkmann returned in mid-April, he was asked to explain the reason for the delays, and he did—but the response from Aitchison and Charron was "to make me the scapegoat." According to Brinkmann, shortly after he returned from April leave, Field told him to get the documentation evidencing his efforts to force Jacobs to get back on track because the delays reported by Duff had been immediately reported to Defendant Jacques and London leadership. Instead of any review, however, several weeks later Brinkmann was called into Aitchison's office on a Monday morning and summarily terminated, told his contract would not be renewed, and that he needed to be out of the country by Friday that week.  Brinkmann was shocked, as he had received excellent personnel reviews and Rio Tinto senior management had openly discussed mentoring him to be advanced into a project director role.  But, as Brinkmann recounted, "all that changed completely with this one conversation" when Aitchison told Brinkmann he was let go.

156.    Given that Brinkmann was one of only a handful of people in the world qualified to run a project like Shaft 2, his critical role at OT was not filled until after the end of the Class Period when Donna Rathbone was hired as Senior Manager of Shafts—which meant there was

effectively no one overseeing Jacobs and the rest of the project during the Class Period, which Brinkmann said was "insane."  Further, Rathbone had no experience overseeing shaft projects and "had never worked in shafts in her life" before Oyu Tolgoi.  According to Brinkmann, "at a minimum they should've had someone acting in that role of oversight and governance.  That's a critical flaw.  They needed someone to be there to oversee and control was going on.  The QA/QC, the design, the work, it was all just allowed to get out of control."  Moreover, by the time Brinkmann was terminated, the schedule was already six months behind which, forecasted out, meant that the commissioning of Shaft 2 was at least 14 months behind schedule.

157.    Brinkmann's termination was an extraordinary event that demonstrates senior management's knowledge of the problems with Shaft 2 given that, according to FE 3, Brinkmann was "the manager of the whole project" and was one of maybe five people in the world who had the expertise and ability to handle a project of this size and complexity.  According to FE 3, Brinkmann had been warning senior management "for a long time" about the problems with Shaft 2, and senior management then turned around and fired Brinkmann "to protect their own asses knowing that there were going to be significant delays."

158.    But Brinkmann was not the only prominent OT manager who was let go at this critical time at the project.  Just like Brinkmann, FE 8, the surface construction manager at the Oyu Tolgoi project from May 2016 to May 2018, was also terminated in May 2018.  FE 8 said that when FE 8 left the project in May 2018, it was $2 billion over budget and at least a year and a half behind schedule.  FE 8 explained that these facts were documented in the cost and schedule reports FE 8 reviewed, and discussed by project control personnel who would brief FE 8 on the costs and schedule.  As FE 8 explained, "We all knew the schedule was overrun. . . . It was well known how far behind we were."  FE 8 repeatedly told senior management about the issues and suggested that

OT needed to slow the project down to fix them and re-examine their contractors, and these problems and the need to address them were communicated verbally as well as in emails.

159.    After raising concerns about cost overruns and delays with FE 8's managers, FE 8 was let go.  While FE 8 had every expectation that his contract would be renewed in May 2018, while on leave in mid-2018, FE 8 was informed via email that the contract was not going to be renewed.  FE 8 said that, just like Brinkmann, "I was thrown under the bus because I kept trying to tell them we should try to sort these things out."

160.    After Brinkmann and FE 8 were terminated, FE 3 was assigned to coordinate with Rio/TRQ, Jacobs, and Red Path on a fully integrated schedule and to get a handle on the major delays—the very measures that Brinkmann had been urging OT to implement "for a long time." As FE 3 put it, "as soon as [Brinkmann] was gone, they asked me to do exactly what Grant had been asking to do for a couple years….They asked me to do exactly what he wanted to get a handle on the delays."

161.    As part of that role, FE 3 ran weekly integration meetings with leadership from all three parties.  These meetings addressed engineering, fabrication, major component delivery, and completion of the fully integrated schedule.  David Joyce, Rio Tinto's Global Head of Projects, who reported to McIntosh, the head of Rio's Projects & Innovation division (who reported to Defendant Jacques), was fully briefed on the meetings, and thus detailed information concerning the true status and causes of the delays would have been reported to Defendant Jacques starting before and continuing throughout the Class Period.  As part of that work, FE 3 identified over 60 actions that were required to "get things back to being remotely on schedule"—but nothing was ever done, and the EPCM leadership from Jacobs stopped attending.  Six months after this steering committee was created, nothing had been done to address the 60 critical actions, and Joyce told

65

FE 3 to cancel the meetings moving forward.

**I.     At The Beginning Of The Class Period, Defendants Falsely Reaffirm That The Oyu Tolgoi Expansion Remained "On Target," "On Budget," and "On Track"**

162.    Despite being told repeatedly that the reported timeline for the OT expansion project completion was unachievable, and that the project was "massively underperforming" and hundreds of millions of dollars over budget, Defendants reassured investors everything remained "on target" at OT.  Specifically, on August 1, 2018, executives at Turquoise Hill and Rio Tinto falsely told investors that OT had "remain[ed] on target for the first drill point blast in mid-2020 and sustainable production in early 2021" and that all material assumptions underpinning their publicly reported production targets "continue to apply and have not materially changed."

163.    In fact, in direct response to analysts' questions probing the reliability of TRQ's statements about the progress at OT and the concern that TRQ was somewhat on the "outside looking in," Defendant Quellmann reassured investors that he and Turquoise Hill had "good visibility" and were "plugged-in" to the "various processes, cost reviews and the like," including with respect to the "the progression of the underground construction."  Specifically, during the Turquoise Hill's second quarter 2018 conference call on August 1, 2018, Defendant Quellmann committed to transparency and touted his and Turquoise's intimate knowledge of the actual facts on the ground at OT: "where I am today, what I see, I think we're in a good place [and] we'll continue to monitor that, we'll make sure that we are set—well set up to provide good visibility to the board and to our shareholders."

164.    Defendants' statements reassured analysts, who commented in reports immediately following the August 1, 2018 conference call that the "underground development seems to be progressing very well," that "all progress metrics continue to indicate that the Hugo North Lift One project is ahead of schedule on budget," that lateral development for the Phase 2 project was

"on track" for the year, and that "OT continues to expect first draw bell in mid-2020 and sustainable first production in 2021" and maintained their positive ratings on Turquoise Hill stock.

### J.    Rather Than Disclose The Truth, Rio Tinto Develops "Forecast 2" And Continues To Misrepresent That OT Is "On Time And On Budget"

165.    As costs and delays continued to mount, Rio Tinto manufactured a false story to conceal the true extent of the problems at OT.  Indeed, the true situation at OT was dire and could not be squared with Defendants' repeated public representations that the underground expansion was "on time and on budget."

166.    Bowley made this fact explicit in an August 31, 2018 email to Fagen that was intended to warn Defendant Soirat to correct Rio Tinto's false statements to the market about the status of the project.  Specifically, Bowley forwarded a link to a news article regarding the development of the London Crossrail transit line, which had recently disclosed that the project would "come in a year late, and in the region of $600mill over budget."  As Bowley pointed out, "the uncanny relationship to the [OT] expansion is we are looking at the same schedule overrun and a very similar capital value," and he noted parallels between Defendants' false public statements about OT and the claims by Crossrail executives, who had similarly repeatedly and wrongly claimed that the Crossrail project was "on time and on budget."

167.    Fagen, who served as Soirat's gatekeeper, immediately agreed, responding "Yes I completely agree and now we're trying to be clever by doing 'forecast 2'!"

168.    As Fagen recognized, "forecast 2" was simply a "clever" way to continue concealing the true extent of the problems concerning the underground expansion.  As Bowley explained in a response email several hours later, forecast 2 was:

> just another re-base line of the schedule that just makes the current position appear more tenable.  All this does is makes us look good, pulls back aspects of schedule that are knackered, and makes people feel a little bit better about their inadequacies to deliver.  The root cause why this happens will remain constant, and will not

change.

169.     After terminating Brinkmann and FE 8 in May 2018, Rio Tinto and OT management were able to manipulate the schedule to hide the delays by transferring costs and projects related to the major infrastructure of Shaft 2 to secondary phases. According to FE 3, this "de-scoping" allowed OT to show an accelerated completion schedule and to then go back and ask for additional funding at a later time.  FE 3 explained, "You would reduce the scope of projects. If Task One has steps 'A' through 'I,' you reduce that to steps 'A' to 'D.' You then make steps 'E' to 'I' a whole new project and push that into a secondary phase.  But that means the costs of those pieces are going to be additional. They're just moved further down the road."

170.     The tasks that were being de-scoped were critical infrastructure and had to be completed before Shaft 2 could become active.  FE 3 said that Shaft 2 had been repeatedly "de-scoped" from the beginning of the Class Period and estimated that, by the second quarter of 2019, 10% of the entire Shaft 2 schedule had been de-scoped in this way—a process that was approved and carried out by OT senior leadership, including Charron, Rio Tinto's Oyu Tolgoi Managing Director, who reports to OT CEO Torres and is close to Defendant Soirat.  It also meant that contractors were essentially being paid twice and their schedules were being duplicated. As FE 3 explained, contractors were being paid for time and materials, even though they had not completed the full scope of the project that was initially budgeted.  He recalled that Dayan (a joint venture with Red Path and Hasu Megawatt that performed underground mining and support services) received an additional $20 million to do the work that was de-scoped from their original project.

171.     Bowley similarly described how Jacobs engaged in this kind of "re-forecast" or "de-scoping" after the EPCM budget was increased to $360 million at the end of 2018.  Because this amount was still not nearly enough money to complete the project, Jacobs cut out key parts of

the execution team, including the commissioning team, to meet Rio's expectation of $360 million. But, as Bowley explained, commissioning is one of the biggest risks in an underground mining project, and inadequate commissioning is likely to result in delays at the back end because of optimization issues and bottlenecks. Thus, in addition to the two-year delay and $1.2-$1.9 billion cost overrun that Rio Tinto disclosed at the end of the Class Period, cutting the commission team will likely result in additional costs and delays at the completion of the project.

172.    Brinkmann later learned that his absence from OT facilitated the manipulation and "de-scoping" of the schedule. In January 2019, when Rio Tinto finally filled Brinkmann's vacancy by hiring Rathbone, one of her first tasks was to prepare a report on the delays to Joyce. To do so, she reached out to Brinkmann to understand them. According to Brinkmann, Rathbone informed him that the paperwork Rathbone had been reviewing to understand the history of the project showed Brinkmann signing off on de-scoping and other trimming changes to the schedule in September 2018, months after he left Rio Tinto and when he was no longer in Mongolia. In other words, Rio Tinto not only used Brinkmann as a scapegoat but falsified schedule changes using his name to make it appear as though he approved them.

173.    The manipulation and "de-scoping" of the schedule, together with the rebranding of the OT expansion with "forecast 2," were intended to further conceal the extraordinary cost overruns and delays plaguing the project. As part of this effort to preempt investor concern about the progress at OT, Defendant Soirat met with investors in New York during the week of October 2, 2018 to discuss the project. During this "road show," Defendant Soirat used a presentation that falsely touted that the OT "underground project [was] **on budget and schedule**," that "First drawbell production [was] **expected mid 2020**," and that the project had maintained "**$5.3 billion development capex projected**"—statements Bowley said were at the time "completely untrue."

174.    Then, after the market closed on October 15, 2018, Turquoise Hill announced an underground development "update" and "re-forecast," disclosing a two-quarter delay to sustainable first production to occur at the end of the third quarter instead of the first quarter of 2021, but not disclosing the hundreds of millions of dollars in cost overruns or the year-long delay that existed at the time:

> Rio Tinto has undertaken a second annual re-forecast of underground development schedule and costs and preliminary results have concluded that capital costs remain in line with the overall $5.3 billion budget and the project remains on schedule to complete in 2022. However, there are certain delays, most notably to the completion of Shaft 2, which includes schedule contingency, that are ultimately expected to result in a revised sustainable production start from the first quarter of 2021 to late in the third quarter 2021.

175.    Similarly, Rio Tinto disclosed before market open on October 16, 2018 that under an "annual re-forecast," sustainable first production could be delayed by two quarters but that "capital costs remain in line with the overall $5.3 billion budget and construction of the first draw bell is still expected in mid-2020."   According to Rio Tinto, the "preliminary re-forecast assessment indicates ground conditions and shaft sinking challenges" that resulted in the revised "ramp-up schedule" and two-quarter delay.

176.    Defendants' reassurances comforted investors because the "re-forecast" included "over four months of schedule contingency" and, more importantly, the critical fact supporting the Turquoise Hill investment thesis was unchanged: "the project is expected to be completed at the $5.3 billion budget estimate disclosed in the 2016 Oyu Tolgoi Feasibility Study and the 2016 Oyu Tolgoi Technical Report."   Indeed, Defendants not only minimized the true extent of the delays and denied the cost overruns—which were internally confirmed to be between 12 and 18 months and hundreds of millions of dollars—but also sought to blame the minimal several-month delay they did disclose on unspecified "ground conditions."   In reality, as Defendants knew, the delays were caused by the abysmal engineering, construction, and procurement management of Shaft 2.

177. For example, during Turquoise Hill's November 2, 2018 third quarter earnings call, Defendants Quellmann and Lane sought to reassure investors about the announced nine-month delay. And to demonstrate Turquoise Hill's command over the situation, Defendant Quellmann highlighted that Turquoise Hill's management and Board had visited OT "just a few weeks ago" and that Defendant Lane was actually participating on the call from Mongolia, conveying a false sense of legitimacy to Defendants' explanations about the delays arising from unspecified "ground conditions." During the call, investors and analysts pressed Defendants about the timing of the Shaft 2 fit-out, the reasons for the delays (if the delay resulted from ground conditions or something else) and what exactly Defendants meant by "ground conditions." In response, Defendants falsely attributed delays to "ground conditions" associated with construction of Shaft 2 and the PC1— claims that the ICG Report concluded were "not substantiated in any way," as the delays were the result of a "major construction oversight, not a 'ground condition worse than expected.'"

178. Defendants' misrepresentations had their intended effect, and analysts were largely unmoved by what was represented to be a minor and manageable issue that did not impact the overall timeline and budget for the project. For example, analysts at RBS noted that "Oyu Tolgoi appears to have been struggling with ground conditions which will see a revised ramp up but is still inline on capex with unchanged $5.3bn cost estimate." UBS analysts similarly attributed the delays primarily to "adverse ground conditions," brushing off the disclosure as "disappointing" and writing that "in the context of the greater OT project the impact to value is minimal." Canaccord analysts concluded that the "9-month delay [was] immaterial to our overall thesis," noting that, beyond the nine-month delay in sustainable production, "other elements appear to be on plan," including Rio's confirmation of "key elements of the project including the $5.3 billion budget, the completion of construction in 2022, and first drawbell in mid-2022."

179.    While analysts were reassured by Defendants' statements, Rio Tinto and Turquoise Hill senior executives internally acknowledged that they were false and were urged internally to correct them.  For example, after Defendants made the first public statement about potential delays in the project on October 15, 2018, Bowley emailed Fagen the next day that Rio had not disclosed "the real truth":

> I see TRQ put out a very watered down statement of the truth regarding the Underground yesterday.  It's a good job the market does not know the real truth, and that Rio knew this was very likely over 12 months ago.  I think GoM [Government of Mongolia] and our other shareholders may want heads.  Arnaud [Soirat] needs to be clever here.  He has consistently put out messages to the market the project was on schedule and budget.  He may take some heat in terms of not seeing what was coming, even though he knew.

180.    As Bowley explained, Rio Tinto knew that the disclosure was misleading because Bowley had previously told Defendant Soirat that the project was 12 to 15 months behind schedule and at least half a billion dollars over budget.  Bowley urged Rio Tinto to disclose these facts then, rather than face more severe criticism when the truth came out later, but Rio Tinto refused to do so.

181.    As Bowley subsequently recounted in his sworn Witness Statement submitted to the U.K. Employment Tribunal:

> Extraordinarily, in October 2018, Arnaud Soirat issued a press release which included a review of the OT project….At page 12 it states that OT is one of the world's highest quality developments with projected capital expenditures of US$5.3bn.  It states emphatically, "Underground project on budget and schedule" with productivity improvement across project and operations and an excellent safety performance.  This was completely untrue and I raised this with Rosemary Fagen on 16 October 2018 in an email entitled "TRQ share price."

182.    Other former employees confirmed that it was widely known and discussed internally that Defendants' public statements were false.  For example, FE 3 said that Defendants' statements in October 2018 that the project was behind schedule but still on budget were not "accurate at all"—and in fact the "de-scoping" and "re-forecasting" of the schedule only added to

the total costs of the project.

183.    As Bowley explained, by "re-forecasting" the schedule, Defendants were able to pull the schedule back "over night" to an "improved" position—a fact that was documented in weekly progress reports generated by Jacobs for work Jacobs was contracted to deliver for the OT underground expansion project.  Specifically, those reports reflected that, before the October 2018 re-forecast, the total overall progress was at least 14% behind the original plan by August 2018— which translated over the life of a four-year project to months of delay and approximately $750 million over budget.  But as Bowley explained, by replacing the original plan with a new "re-forecasted" schedule—"FC2"—the project went from being 14% behind to only 5% behind the original plan "with the flick of a switch."

184.    The ICG Report examined Defendants' attempts to re-forecast the schedule and confirmed that the effect of the re-forecast was to provide "misleading" reporting about the actual progress in the underground development.  As the ICG report concluded:

> Progress was misleadingly reported.  Areas such as the Oyut Camp (which was ahead of schedule) was used to balance the more critical areas such as the shafts that were falling further behind.  Almost all the reporting focused on overall monthly achieved targets against the latest targets.  ***These target dates were changing throughout the first three years (OTFS16 to FC1 to FC2 plus numerous mining plan changes) to better align actual progress against "plan" without altering the final completion dates.  This reporting was misleading***.

185.    At the same time, the ICG concluded that senior management—i.e., Defendants— knew about the delays and cost overruns, and suggested that they fostered a culture of suppressing negative information and deliberately concealed these problems as demonstrated by the "staggering" lack of documentation concerning the actual progress at the mine:

> ***It is inconceivable that Senior Management both on the Project site and in the higher-level committees were not aware of these shortcomings***, as reports were generated on a regular basis by the schedulers who were working in the Project

Controls section and by the relevant area managers. But there was also a culture on site that did not welcome negative albeit actual, reporting:

*"Culturally, it was expressed through several interviews that delays to the schedule were known, but the individuals felt even though they reported these delays, the schedule dates were not allowed to change after FC2."*

The ICG were unable to find detailed reports of the work done by the development crews although it is known that at the lower management levels these reports were being prepared. The only monthly reports made available to the ICG were the very detailed EPCM reports and the Project Executive Summary reports. *Considering that 60% of the value of the Project fell under the control of the Owner, it is staggering that no detailed reports seemed to exist for their scope of responsibility*.

186.     Further, as the ICG Report and Peer Review confirmed, Defendants' statements attempting to blame delays at Oyu Tolgoi on ground conditions were false.  Indeed, the ICG Report and Peer Review forcefully rejected Defendants' ground condition narrative, concluding that "rock mass quality and ground conditions were ***not a significant contributor to the schedule delays and cost overruns***," there was "***no evidence***" that "rock quality in the off the footprint development and mass excavations was significantly different" than forecast, and that "rock quality on the footprint was ***better than anticipated***" and "***better than originally forecast***."  In other words, far from the delays being caused by unforeseen "ground conditions," the actual ground conditions OT managers encountered were in fact better than originally forecast.

**K.     Defendants Were Highly Motivated To Conceal The Problems At OT In The Face Of A Burgeoning Scandal That Jeopardized Rio Tinto and TRQ's Stake In The Mine**

187.     At the same time delays and costs at the OT underground expansion had skyrocketed, several key developments in 2017 and 2018 created a strong motive for Defendants to cover up these problems.  As Defendant Jacques' executive coach explained, the first quarter of 2018 is when the "wheels were coming off the project" at Oyu Tolgoi.

188.     ***First***, beginning in 2017 after Defendant Jacques took over as CEO, financial

regulators began pursuing inquiries into bribery and fraud related to Rio's mining operations in the Republic of Guinea and Mozambique. In July 2017, the U.K. Serious Fraud Office announced an investigation into "suspected corruption" into a $10.5 million payment Rio made to a consultant who had provided "advisory services" in connection with Rio's Simandou iron ore project in Guinea in 2011—a matter that Rio had self-reported to regulators in 2016 and which had already cost two top Rio executives (including one of Defendant Jacques' primary rivals for the CEO spot) their jobs. In a separate action announced on October 17, 2017, the SEC charged Rio and its former CEO and CFO with misleading investors concerning the value of its coal deposits in Mozambique which Rio had purchased for $3.7 billion but sold three years later for $50 million. That same day, Rio disclosed that it had paid a £27,385,400 fine to resolve the FCA's investigation into the same claims—at the time, the largest such penalty the FCA had ever issued. Moreover, as discussed below, by no later than August 2016, Swiss prosecutors had initiated a criminal corruption and money laundering probe into the negotiation of the 2009 OT agreements.

189. **_Second_**, on January 15, 2018, Turquoise Hill announced that OT had received a $155 million tax assessment from the Mongolian Tax Authority based on an audit of the taxes paid by OT from 2013 to 2015. This sizable tax bill was quickly followed by a report by prominent nonprofit watchdog group, the Centre for Research on Multinational Corporations (SOMO), suggesting Rio's true tax debt to Mongolia was far greater, and detailing that the underlying OT agreements unfairly benefited Rio by enabling Rio and TRQ to illegitimately lower the taxes paid to Mongolia by hundreds of millions of dollars.

190. The Mongolian government's efforts to recoup these allegedly unpaid taxes coincided with several other developments suggesting that the government would seek to renegotiate the 2015 agreement—a possibility that seemed increasingly likely after Mongolian

voters had elected politicians that had promised to extract further economic benefits from OT for the Mongolian people in July 2017.  Indeed, newly elected President Battulga Khaltmaa had made the renegotiation of the OT agreements a key campaign platform, telling voters that the "government should hire experts and take control of everything, including Oyu Tolgoi."  And shortly after his election, President Battulga pushed through a law providing him with significant powers to dismiss members of the judiciary, prosecutors, and the head of the country's top anti-corruption body—broad powers that he immediately put to use.[14]

191.    Undoubtedly aware of the ongoing inquiry by the Swiss OAG, the ongoing tax dispute, and the forthcoming release of the SOMO report, on January 22, 2018, Defendant Jacques personally visited Mongolia to meet with the newly-appointed Prime Minister and to publicly convey Rio's commitment to OT.  As part of that effort, Defendant Jacques announced Rio's opening of a new office in the country's capital, Ulaan Baatar, and an expansion of Rio's national employee numbers to around 80 throughout the course of 2018.  As Defendant Jacques said at a press conference that day, "Mongolia is one of Rio Tinto's most strategically important markets and we are here to stay."

192.    The next day, January 23, 2018, Defendants Jacques and Soirat met with Mongolia's Prime Minister Ukhnaagiin Khürelsükh—who had taken over from his predecessor in October 2017—and other government representatives to discuss Oyu Tolgoi and quell the growing concern the Mongolian Government had been expressing about it.  The meeting addressed whether funding costs could be reduced to improve benefits from the Oyu Tolgoi project, the funding and

---

[14] Mongolia has a semi-presidential government, with an elected parliament, a Prime Minister who is chosen by the party (or coalition) with the majority of the seats in parliament and acts as the head of government, as well as a popularly elected president, who acts as the head of state and commander-in-chief.

development of a power solution for OT (an ongoing, hotly debated source of contention between Rio and the government), and OT's strategy to improve private and public investments in neighboring areas. As Prime Minister Khürelsükh said at the beginning of their meeting, "As a partner, the Government of Mongolia aims to increase the benefit of the project; hence, there is a need to reduce the project's financial expenses and loan interest rate"—a clear reference to the terms of the 2015 agreement. For his part, Defendant Jacques underscored the importance of the agreements he had negotiated during the 2013-2015 shut down, expressing readiness to cooperate on "creating long-term sustainable solutions that benefit all stakeholders and the country while staying true to the established investment frameworks."

193. At the same time Defendants Jacques and Soirat were addressing renewed concerns about the OT agreements directly with the leaders of the Mongolian government, the operations at OT had been threatened by a strike by Chinese coal workers at the Mongolia-China border. On January 18, 2018, Turquoise Hill disclosed that this strike had forced OT to declare a *force majeure* event because Chinese coal haulers had blocked the main access road used by OT to ship copper concentrates from the open pit production to customers. In doing so, Turquoise Hill reassured investors about continued progress on the underground expansion, telling investors that "there has been no disruption to goods and services arriving for underground development." Indeed, when the protests first began, Defendant Jacques pointed to his work in negotiating the OT agreements to reassure investors that the situation would be resolved, saying that "each time we would work with the authorities and each time it was resolved. I've no doubt it will be resolved this time."

194. ***Third***, beginning in March 2018, reports surfaced that Swiss and Mongolian government prosecutors had initiated criminal corruption investigations into the key government officials responsible for negotiating the core agreements underlying Rio's, Turquoise Hill's and

the Mongolian government's ownership and economic interest in OT.  In the second week of March, OT received an information request from the Mongolian Independent Anti-Corruption Authority ("IAAC") pertaining to the negotiation of the 2009 Oyu Tolgoi Investment Agreement between the Government of Mongolia, Rio, and Turquoise Hill.  A week later, on March 19, it was reported that Switzerland's highest court upheld the freezing of $1.8 million in Swiss bank accounts as part of the corruption probe by the Swiss Office of the Attorney General ("OAG") into a former Mongolian finance minister who helped clear the way for the Oyu Tolgoi underground development.  The Swiss court wrote the action was warranted in light of the "concrete clues that large amounts of money of questionable origin" that were "typical of money laundering" were in the accounts, and that "[i]t is very suspicious that the minister of a foreign country, immediately after taking a ministerial post, would be the recipient of such a large sum."  And the lower Swiss court that initially approved the asset freeze specifically credited the OAG's investigation in light of the fact that, at the time, Rio was the subject of an ongoing corruption inquiry into its iron ore assets in Africa.  Indeed, on March 22, 2018, *Bloomberg* confirmed that the OAG was in fact investigating whether Rio itself had paid bribes in connection with the development of OT and had opened criminal proceedings against former finance minister Bayartsogt Sangajav, who had signed the 2009 OT agreement.

195.    Commenting on these developments, Mongolia's then Deputy Mining Minister Zagdjav Deleg said in March 2018 that "[i]f there was corruption, the [Mongolian] government's ownership [of OT] could grow from 34 percent to 100 percent," and indicated that the Mongolian government would seek to revisit the terms of its agreement with Rio Tinto and Turquoise Hill.

196.    The next month, the Mongolian government's inquiries intensified, and the IAAC disclosed that it had arrested and jailed several of the top government officials responsible for the

2009 and 2015 agreements—including two former prime ministers: former Prime Minister Saikhanbileg Chimed, who negotiated the 2015 agreement directly with Defendant Jacques; former Prime Minister Bayar Sanj, who was prime minister when the original 2009 investment deal was signed; Bayanjargal Byambasaikhan, the former CEO of the state-owned entity that holds the Government's stake in Oyu Tolgoi LLC; and Ariunsan Baldanjav, the former Director General of the General Department of Taxation.   Former Prime Ministers Bayar Sanj and Chimed Saikhanbileg and former Finance Minister Bayartsogt Sangajav were held in jail for three months until June 2018, and Bayartsogt Sangajav was rearrested in January 2019 and is currently jailed.[15]

197.   At the same time government criminal prosecutions were intensifying, in March 2018, the Mongolian government established a Parliamentary Working Group ("PWG") to investigate the OT project in cooperation with the Mongolian National Audit Office and the IAAC.

198.   In other words, it was clear that Rio Tinto had every reason to be concerned that government officials were closely scrutinizing the OT relationship, and could uncover facts suggesting the Mongolian government had legitimate reasons to question the fairness of the OT agreements.   As a result, Rio and TRQ actively sought to conceal Rio's responsibility for the OT project's cost overruns and delays to minimize the Government's leverage in potential renegotiation of the agreements—fears that were well founded, as that is exactly what happened after the end of the Class Period, as discussed in ¶¶264-65 below.

---

[15] Both Byambasaikhan, the government's chief negotiator of the 2015 agreement, and Davaadorj Ganbold, who served as CEO of Erdenes Oyu Tolgoi LLC and signed the 2015 agreement on its behalf, were given jail sentences in Mongolia on charges relating to their work on OT, while Chimed Saikhanbileg is in exile in the United States to avoid prosecution in his home country. Chimed Saikhanbileg states on his website that "[c]laims by the current government that the Oyu Tolgoi agreements were negotiated illegally are being used for dual purposes—for [current] President Battulga to persecute his political opponents, and to cajole Rio Tinto into signing a 'better' agreement which the current government can take credit for while tarnishing Mongolia's international business reputation in the process."

199.    Indeed, after the Swiss investigation made headlines, Defendant Jacques flatly denied that the Swiss investigation was going to have any impact on OT and falsely claimed that the project was on track, telling a *Bloomberg* reporter on March 25, 2018 that "I went there in January as you know, the project is progressing very, very well."  The next month, Rio fired the key OT managers that had been warning about the cost overruns and delays in the underground expansion—terminating Brinkmann, the lead manager of Shaft 2, and requiring him to leave the country in mid-April.  And in May 2018, just a month after the ominous developments in the Mongolian investigation into possible corruption into the 2009 and 2015 OT investment agreements, Defendant Soirat, the head of Rio's Copper division, came to Bowley's office and told him to stop looking at what he was originally hired to look at—the problems that were causing delays and cost overruns.

200.    While Rio was secretly taking these drastic measures to conceal the project's problems, externally, Defendants continued to positively portray the progress and OT and stressed the importance of honoring the OT agreements with the government of Mongolia.  For example, on May 22, 2018, as three of the former Mongolian government officials responsible for negotiating the OT agreements with Rio sat in jail, Defendant Soirat gave a speech at the Mongolia Economic Forum urging the Mongolian government to honor the OT agreements, telling an audience of government officials and dignitaries that:

> The world is watching how Oyu Tolgoi develops.  It is a test case for future investment in Mongolia which brings with it jobs, new business opportunities and community development…. Protecting agreements and honoring contracts is critical – particularly in mining where time horizons are long and upfront investment is massive.  When agreements and contracts are honored – it gives international investors' confidence the same will be done for them.

201.    Defendant Soirat even obliquely referenced the pending tax dispute, urging that Mongolia "foster dispute resolution mechanism and forums that yield fair and fact-based results."

202. Then, in June 2018—after Rio Tinto senior management had removed or sidelined managers who had been vocal about the project delays—the Parliamentary Working Group began conducting on-site inspections of Oyu Tolgoi. Publicly commenting on one of those inspections, Torres tweeted on June 16, 2018 that "OT is cooperating fully & transparently with Parliamentary Working Group, National Audit Office and IAAC reviews. . . . Today we are #OTProud to host members of PWG at OT site and showcase our development."

203. **Fourth**, at the same time Defendants were taking drastic measures to conceal the truth about OT, they were being urged by Turquoise Hill's then largest shareholders to improve transparency into the mine's progress. For example, on February 1, 2018, SailingStone Capital which at the time owned more than 10% of TRQ's common stock, publicly filed a letter criticizing the corporate governance failures at TRQ and Rio's control over it, pointing to the fact that TRQ's management team consisted of seconded Rio employees (who had until recently received long-term compensation entirely in the form of Rio stock), that TRQ lacked authority to hire employees without Rio's approval, and that "TRQ independent directors and management are solely reliant on Rio Tinto for information." To remedy these problems and improve transparency to TRQ shareholders, SailingStone asked TRQ to conduct "an independent technical report so that we can be certain that existing estimates of capital intensity and the development schedule are reasonable," and to give TRQ's managers employment contracts and further modify their compensation plans to align their interests with TRQ shareholders.

204. TRQ publicly responded to these concerns, promising investors in a March 2018 letter that TRQ's Board was "committed to robust and effective corporate governance" and would "consider sensible enhancements to Turquoise Hill's governance that are consistent with the existing contractual framework." On May 3, 2018, TRQ announced that its Board had met with

Rio and agreed on several steps in response to SailingStone's criticisms—but, importantly, those steps did not include implementing an independent TRQ technical review of the project to increase transparency for TRQ investors into the actual progress at OT.

### L. Defendants Attempt To Silence A Whistleblower Who Repeatedly Urged Them To Tell Investors The Truth

205.    In light of the extraordinary pressure the Mongolian government was placing on Rio to reopen the OT agreements, and the very real possibility Bowley would disclose the truth, Rio sought to silence him.  As Bowley recounted, Defendant Soirat did not act on Bowley's recommendations to address the problems at OT and implement his proposal presented to Kinnell and Fagen in February 2018 because doing so would eliminate Soirat's ability to escape accountability for the disaster at OT.  As Bowley explained, Soirat's career ambitions would be stymied if the disaster at OT fell on him, and thus Bowley's proposal to address it:

> put Arnaud Soirat in a really uncomfortable position. He knew already in Q1 2018 the project was massively underperforming. Craig Kinnell (Chief Development Officer) Copper & Diamonds and my boss at the time, wanted action, and wanted answers. . . . Craig went long term sick in early March 2018, and never returned to Rio Tinto after 33 years with the company.

> At exactly the same time, I was warned by Soirat in my office on the 12th floor of the Monnis Tower [in Ulaanbaatar, Mongolia] that he knew why I had been employed, but he did not want me touching anything to do with Rio Tinto Growth & Innovation or Jacobs. In short, I was warned to keep away.

>                                         ***

> My group was set up to identify exactly what was wrong, and then go and fix it. This would [have] created a situation for Soirat tha[t] would [have] become very difficult as he is also in control of TRQ. By distancing himself from me, he could claim deniability in terms of not knowing.

206.    As a result, Soirat sought to sideline Bowley because, as Bowley put it, "someone did not like the reports I had made."  The fact that Rio Tinto sought to silence Bowley—rather than terminate him and risk Bowley telling others the truth—was documented in internal Rio Tinto

emails. Explaining that Bowley had been approached by an investor seeking information about the state of affairs at OT, Fagen wrote to Sayed in a July 3, 2018 email, "Richard is a resource on the ground in Mongolia and we need him in the tent, not out of it!"

207. Bowley was therefore marginalized within Rio Tinto by Soirat, and his role in addressing the problems at Oyu Tolgoi was significantly reduced. Bowley's office prior to that time was in the senior Oyu Tolgoi executive suite, about four offices from Torres, the CEO of Oyu Tolgoi LLC. As Bowley would later recount in his Witness Statement, Bowley's marginalization but continued employment at Rio was "in order to prevent me from working outside the business and from telling the market the truth."

208. Nevertheless, Bowley continued to report on the cost overruns and delays to Soirat and Fagen as discussed above in ¶¶179-83, urging Sayed, Fagen, and Soirat to correct the misleading statements issued by Rio Tinto concerning OT.

209. On October 26, 2018, Bowley met Sayed at the Shangri-La Hotel and discussed with him the fact that the business was at significant risk in terms of schedule and capital damage relating to the OT expansion. As Bowley recounted in his sworn Witness Statement:

> I clarified what we [Sayed and Bowley] had spoken about in an email the same day, stating that I had discussed with the business nearly 10 months ago what the likely issues were which would present themselves to the business in terms of schedule, slippage, cost escalation and loss of valuation from production. I had told the business it needed to step in and if it did not, the situation would deteriorate further. I clarified that the schedule was currently 12 months behind schedule.

210. Bowley told Sayed that Rio Tinto and Soirat's October 2, 2018 roadshow presentation's representations that the "UG [underground] project is on time to deliver mid-2020" and that "all material assumptions underpinning these production targets continuing to apply and not having changed materially" were not true.

211. As Bowley told Sayed, "in my view this is grossly misleading and conflicts with

what I had reported," and Fagen knew that the presentation "watered down the truth," which "put it mildly" because, in fact "it was inconsistent with the truth (a lie)." As Bowley told Sayed, "The true schedule damage was around 12 months at that time and that will only increase. This was news that RT knew about. Mining had never been the issue. It was construction, an inexperienced team with the EPCM not having sufficient quality."

212. Following Rio Tinto and Turquoise's initial disclosure of the "re-forecast" on October 15, 2018, Bowley again wrote to Sayed, Fagen, and Soirat to point out that Defendants' statements were false and required correcting.

213. For example, on October 29, 2018, Bowley again wrote Sayed repeating his concerns, referring Sayed to the presentation he had earlier given to Kinnell and Fagen in February 2018, and reminding Sayed of the 12 to 18 month overrun and the cost implications. Referencing the nine-month delay Defendants disclosed on October 15, 2018, Bowley told Sayed that "stating this [nine-month reported delay] will have a limited impact on first drawbell again is a suicidal statement."

214. In an email the next day to Fagen, Bowley urged Rio Tinto to act on delays that had been concealed from the market, highlighted the "need to act now," and pointed out that the target number of sets to be installed in Shaft 2 for October was 100 sets—and it was by then October 30, and only 3 sets had been installed:

**From:** Richard Bowley (OT)
**Sent:** 30 October 2018 03:08
**To:** Fagen, Rosemary (RTHQ) <Rosemary.Fagen@riotinto.com>
**Subject:** Bit more info and thinking for you !

Hi R.

You and me both know the TRQ statement is a little light on the truth. Nine months is already twelve months, and if you don't know commissioning being one of the biggest risks to any project may add a further three to six months. It's easy to state we can still blow first drawbell with limited exposure to schedule slippage, but if the decline and the conveyors are not commissioned, I am not sure how people think we get that ore to the surface ??? The risks are only going to get bigger.

I know in shaft 2 this month the target was 100 sets. Month to date I think its around 3 !!!!!! You do the numbers ?? It's not rocket science, and it's certainly not a Geo issue as TRQ stated, it's purely construction.

215.    In the same email to Fagen, Bowley repeated his concern that Rio was inviting damage to its business by failing to honestly and straightforwardly deal with the problems the underground expansion was facing, noting that he had "told Arshad [Sayed] exactly the same as I have stated above Rosemary."

216.    Bowley repeated these concerns in a November 12, 2018 email to Sayed that highlighted the discrepancy between Defendants' public statements and the true facts, specifically identifying Defendants' October 2018 statements as false:

> [T]he October 15th TRQ news release, as I told you this was a very watered down version of what are actually the issues.  Shaft 2 is behind schedule due to construction and procurement issues, and not geo issues as TRQ state.  Our schedule issues are of our own making.
>
> At the present my belief is we will be around 12 months behind schedule, but what no one will talk about and is always one of our biggest risks on any project is commissioning.  Commissioning I believe will add a further 3-6 months of schedule risk, which may entail we finally come in around 18 months behind schedule.

217.    On November 26, 2018, Bowley wrote to Fagen, saying "Don't get confused with pulling schedule back on the Expansion as shaft 1 has a 450 person capacity and we are a country mile behind schedule on shaft 2 which should of [sic] now been accommodating the additional

350 people a day we need underground to meet the staffing histogram for the project…If they do not want to listen Rosemary, honestly the business in [sic] a bad place, and if our stakeholders and GOM [the Government of Mongolia] wake up, next year could be a nightmare for OT and Rio Tinto."  Fagen did not dispute Bowley's assessment and responded the next day, "Thank you Richard very thorough assessment, have you discussed with Arshad [Sayed]?"

218.    On December 10, 2018, Bowley again wrote to Fagen, warning of the severe implications for the business, and reminding her (and thus Defendant Soirat) that the delays had been known for a long time and that Rio Tinto could only ignore the truth for so long "before it will slap us in the face properly along with GOM and other TRQ shareholders….sorry to be honest."

219.    On December 13, 2018, Fagen replied that "Hi Richard I hear you!!!!  I will have a discussion with Arshad [Sayed] and Arnaud [Soirat] – again!"

220.    As Bowley explained in his sworn Witness Statement, the statements in Rio Tinto's 2018 Annual Report that Oyu Tolgoi's "detailed engineering work and overall construction progress is mostly on track" and that the underground development was "proceeding well" were false.  In addition, the statements that Shaft 2 would be delayed by only several months were contrary to "the reports and the warnings I gave to Craig Kinnell, Rosemary Fagan [sic], Arshad Sayed and Arnaud Soirat during the preceding months."

### M.    Rio Tinto Terminates The Whistleblower And Attempts To Cover Up Its Misconduct Through A Whitewash Investigation

221.    In January 2019, Rio Tinto told Bowley—who had repeatedly warned his superiors, including Defendant Soirat, that their statements about OT were false—that he was being terminated without reason.

222.    The next day, Bowley wrote a sharply critical letter to Sayed and Fagen stating that

Rio Tinto's compliance was deficient. Within three days of sending the letter, Bowley received a phone call from a Rio Tinto compliance manager, Jason Landers, who said he was coming to Mongolia to investigate.

223. But as Bowley described in his Witness Statement, that investigation amounted to a coverup. Urging Landers to investigate the concerns he had been raising for months, Bowley provided Landers with a description of his communications with Rio senior management about the true costs and schedule at OT, including email dates and subjects, and identified the monthly reports that would detail the costs and budget problems. While Bowley had been cut off from Rio's IT systems and no longer had access to email, he forwarded to Landers the communications he had from his personal Hotmail account. Those emails included an exchange Bowley had with Kinnell on July 3, 2017—a year before the Class Period began—in which he reported that OT managers had told him "Jacobs are failing badly" and Kinnell confirmed "[i]t is all getting messy Richard and needs intervention to stop it getting significantly worse."

224. In response, Landers told Bowley these emails provided "context" but that he needed more documentation, repeatedly asking Bowley for all the documents and evidence he had—even though that was already available to Landers through his access to Rio's email servers—saying that it was "critical from an integrity perspective that the comments are supported with evidence and can be shown to be more than mere opinion or hearsay" and that he needed "supporting corroboration of accounts instead of simply relying on hearsay."

225. Landers completed his investigation in six days in late January 2019 and concluded—two days before Rio Tinto released its 2018 year-end results in February 2019—that there were no compliance breaches. Specifically, Landers informed Bowley in a phone call on February 25, 2019 that he had not reviewed the documents Bowley cited because the time frame

was impossible because doing so would take six people three months. But without reviewing the documents Bowley told Landers evidenced the fraud, Landers told Bowley his investigation concluded there was "no evidence" supporting Bowley's claims.

226. According to Bowley, that the investigation did not even consider any of the evidence Bowley identified at Rio Tinto shows it was designed to determine what documents Bowley personally had, assess the company's exposure, and provide a rubber stamp to falsely legitimize Defendants' statements to investors—not to uncover the securities law violations Bowley identified. Indeed, two days after closing its investigation, on February 27, 2019, Rio filed its annual report and Turquoise Hill provided an "underground development update" in which Defendants first began to reveal the problems at OT. But rather than tell investors the truth, Defendant Jacques falsely told investors that the OT expansion project had made "good progress," with TRQ and Rio reporting that the project was "proceeding well," "mostly on track," and "on budget." And Defendants blamed the risk of delays that were disclosed on that date on unexpected "challenging ground conditions"—not the cost overruns and delays Bowley had reported to Rio senior management throughout the Class Period and its compliance officer just days before.

227. After Landers closed Rio's investigation concluding there was no evidence of wrongdoing, Bowley sent a letter about his concerns to Ann Godbehere, a member of Rio Tinto's Board of Directors since 2010. Specifically, on March 27, 2019, Bowley wrote to Godbehere to tell her about deficiencies in the company's investigation, that two senior OT managers that Rio spoke to in connection with the investigation called Bowley to say they were not impressed with the process, and that Rio was not a compliant mining company and that the truth would come out.

228. Bowley then emailed Defendant Jacques and Godbehere on April 2, 2019, telling Jacques how behind schedule the project was. Stephen Storey, the global head of Rio Tinto's

Ethics and Integrity section, responded immediately. Storey called Bowley and said Rio's Board wanted to get his evidence. But again, while Storey pressed Bowley for documents, and "further context and detailed information," Bowley observed that Storey selectively ignored parts of his complaints—while again inviting Bowley to forward "any further supporting facts, documents, detail and context which I believed substantiated my claim."

229. Rio Tinto then engaged the law firm Baker McKenzie to do a compliance review, and Storey asked Bowley to help Baker McKenzie. On May 9, 2019, Bowley had a two-hour call with Baker McKenzie and told the partner in charge of the law firm's team that Rio Tinto would give the law firm only selected information so that Baker McKenzie would conclude that there were no compliance violations. On July 16, 2019, Rio Tinto reported that delays at OT were the result of "ground conditions" being more challenging than expected—despite the facts Bowley provided proving the delays were caused by serious construction and procurement issues that had "nothing to do with ground conditions."

## V. DEFENDANTS ARE FORCED TO DISCLOSE THAT THE OT PROJECT IS MONTHS BEHIND SCHEDULE AND WELL OVER A BILLION DOLLARS OVER BUDGET

### A. Defendants Are Forced To Issue A Public Disclosure About The Delays And Cost Overruns After Terminating The Whistleblower—But Continue to Mislead Investors

230. Having been forced to make some disclosure following Bowley's whistleblowing and increasing investor scrutiny into the progress at OT, on February 27, 2019, Turquoise Hill issued a press release stating that sustainable first production was likely to be delayed beyond Q3'21, blaming "ground conditions." Turquoise Hill stated that it had conducted its own review of Rio Tinto's schedule and cost re-forecast and "found that project cost was expected to remain within the $5.3 billion budget but that there was an increasingly likely risk of a further delay to sustainable first production beyond Q3'21." Turquoise blamed that delay on "certain delays to the

completion of Shaft 2, which continued to experience challenges during Q4'18 with structural, mechanical, piping and electrical installation productivity below expectations," as well as "challenging ground conditions" and new, "more detailed geotechnical data than what was previously available." Significantly, according to Turquoise Hill, this purportedly new geotechnical information could require some "potentially significant changes to the design of some future elements of the development, and the development schedule"—which together could result in an "overall schedule delay to sustainable first production beyond the end of Q3'21."

231. That same day, Rio Tinto issued its year-end results, and provided an update on the progress of OT underground expansion, stating that while "underground lateral development has proceeding well," the fitout of Shaft 2 would be "delayed by several months" and that "difficult ground conditions encountered had slowed progress in some areas of underground development."

232. In the Turquoise Hill press release and a Rio Tinto conference call on that same day, Defendants again reassured investors that the underground project remained within budget at $5.3 billion. Thus, the additional disclosure about delays that day did not reveal the full truth about the project's already-existing problems. For example, in response to an analyst's question seeking clarity on "what exactly . . . you [are] experiencing," Defendant Jacques continued to downplay the seriousness of the delays and blamed new "geotech" data as responsible for the revised schedule—omitting any mention of the massive delays and cost overruns and problems that he had been informed of since at least May 2018:

> So where we are in the project today. Remember, 5 years to build the infrastructure, 7 years to ramp it up. We are mining in the ore body as we speak. So the quantum of geotech data that we are accessing, we have access to is very significant. And we need to go through a process of updating the model to make sure that the infrastructure is the right location on the back of the geotech data that we have. This is, absolutely, a normal process.

233. In response to the February 27, 2019 disclosures, TRQ shares dropped nearly 13%,

from $2.10 per share on February 26, 2019 to close at $1.83 per share on February 27, 2019, on heavy trading volume of more than 18 million shares. As the market continued to absorb these disclosures the next day, TRQ shares dropped again by nearly 7%, from $1.83 per share to $1.71 per share on heavy volume of almost 9 million shares.

234.   While noting that the disclosed delay was negative, analysts focused on TRQ's reassurances that the $5.3 billion budget remained on track. For example, Scotiabank wrote in a February 27, 2019 report that "[d]espite this latest delay, TRQ reaffirmed the $5.3B total project budget."

235.   Despite the announced delay, Turquoise Hill continued to reaffirm the $5.3 billion budget for the OT expansion. On March 14, 2019, Turquoise Hill issued a press release stating that the OT project was expected to remain within the $5.3 billion budget. In a conference call the next day, Defendant Colton referenced the $5.3 billion estimated cost for the underground expansion, informing investors that Turquoise Hill had "spent $2.3 billion on our underground expansion, representing just over 40% of the total $5.3 billion estimated cost."

**B.     News Reports Reveal PWG Review Findings, Disclose That Rio Tinto Is Conducting An Internal Investigation Of Its Oyu Tolgoi Disclosures, And Cast Doubt On Defendants' Geotechnical Data Explanation**

236.   After the close of the market on April 4, 2019, news reports revealed that the PWG had submitted a 200-page report recommending that the original 2009 agreement should be revised, and that the 2015 agreement be scrapped entirely—suggesting that the PWG's review uncovered flaws with the underground expansion. The head of the PWG who led the review, Terbishdagva Dendev, indicated the 2015 agreement did not sufficiently benefit Mongolia, a fact that was exacerbated by the actual costs of the project incurred since its signing. In response to this news, TRQ shares declined approximately 4%, falling from $1.76 per share on April 4, 2019 to close at $1.69 per share on April 5, 2019.

237. Then, on May 21, 2019, the *Australian Financial Review* reported that Rio Tinto had retained the law firm Baker McKenzie to investigate allegations by an unnamed whistleblower—named in this Complaint as Bowley—about when Rio knew about problems with the underground-mine project. The article quoted a source as saying that Baker McKenzie was "looking at how Rio had discovered and then communicated the geology challenges, and their potential impact on project cost and schedule." According to the article, "Baker McKenzie is understood to be working for Rio, but Rio declined to comment when asked about the firm's work on the matter." While this report revealed that a Rio Tinto insider's reports were significant enough to warrant the involvement of an outside law firm, little detail was provided about the reports themselves or what they meant for OT. TRQ's stock price declined that day, falling about 3% from the prior day's close on heavy volume.

238. The *Australian Financial Review* provided an update to the Baker McKenzie investigation on June 11, 2019 in connection with a report questioning the Australian Federal Police's failure to join the corruption investigation into the Oyu Tolgoi LLC 2009 investment agreement. Again, however, the article disclosed little detail about the whistleblower, his reports, or any impact to OT. Then, on June 12, 2019, Rio Tinto disclosed new information concerning its tailing dams following an earlier commitment to improve transparency over safety risks following the catastrophic collapse of rival miner Vale's Brumadinho dam in Brazil in January that year. That report demonstrated that the tailings dam at Oyu Tolgoi received a "High A" hazard grade, the second most severe category, reflecting the severe consequences if there were to be a failure of the dam. On June 12, 2019, TRQ shares declined by nearly 6%, closing at $1.15 per share compared to a close of $1.22 per share on June 11, 2019.

239. Then, on July 8, 2019, the *Australian Financial Review* published a report

suggesting that the problems at OT that Rio had sought to blame on newly available "geotechnical data" may have in fact been known by Rio years earlier, by at least 2012. Specifically, the newspaper reported that, in 2012, "alarm bells started to ring for the engineers working underground at Rio Tinto's Oyu Tolgoi mine when they had to abandon attempts to drill a fairly simple borehole for ventilation." As the article reported:

> Rather than carve a discrete tunnel through the rock to surface, the bore collapsed into an ungainly void, unfit for use.
>
> As they conducted a post mortem into the borehole failure, the engineers were mindful the incident could be the proverbial canary in the coal mine for Rio's plan to build a huge network of tunnels more than a kilometre beneath the Mongolian desert as part of a $US5.3 billion expansion.
>
> "We are pretty confident that it is stress-related and or fault-related, or both," wrote Oyu Tolgoi's then manager of Vertical Development and Mass Excavation Scott Ramsay, when discussing the cause of the bore failure.
>
> "If it is stress alone due to depth, then we recognise that we have a much, much greater problem, as you'd be aware, because we have not only internal vent raises, but also vertical ore passes and ore bins and underground crusher stations to excavate at 1300 metres below surface for the success of this mine."

240. In other words, these newly disclosed facts that rock stability concerns had been previously identified by Rio cast doubt on TRQ and Rio's explanations for the delays disclosed in February, and prompted additional concerns by investors about the status of the underground expansion. In response to this news, TRQ shares declined over 6%, falling from $1.16 per share on July 8, 2019 to close at $1.09 per share on July 9, 2019 on extraordinarily high volume.

241. The following day, on July 10, 2019, TRQ disclosed that TRQ director Dr. James Gill had resigned from the Board, ending his term abruptly after five years and without explanation.

### C.  Defendants Stun Investors By Disclosing That The OT Expansion's Cost Will Increase By $1.2 To $1.9 Billion And The Schedule Will Be Delayed By 16-30 Months

242.  Just five days later, and after falsely assuring investors for a year that the underground-mine project remained on budget at $5.3 billion despite repeated internal warnings about massive cost overruns, Defendants belatedly admitted that they had missed not only the schedule but also the budget.  Specifically, on July 15, 2019, Rio Tinto and TRQ disclosed a substantial delay for sustainable first production of 16 to 30 months compared to the original feasibility study guidance in 2016—resulting in sustainable first production now being expected between May 2022 and June 2023—as well as that the capital spend for the project would increase by $1.2 to $1.9 billion over the $5.3 billion previously disclosed.

243.  In a press release issued by Rio that day, McIntosh, who had been repeatedly briefed on the problems with Shaft 2 throughout the Class Period, stated:

> We have made significant progress on a number of key elements in the construction of the underground project during 2019.  However, the ground conditions are more challenging than expected and we are having to review our mine plan and consider a number of options. Delays are not unusual for such a large and complex project but we are very focused as a team on finding the right pathway to deliver this high value project.

244.  In response to this news, Turquoise Hill's common stock price closed at $0.60 per share, down nearly half—*43.9%*—from the prior day's closing price of $1.07 per share, with over 50.2 million shares traded.

245.  Analysts were taken by complete surprise by the extent of the cost overruns, disturbed by Defendants' disclosures, and drastically cut their price targets for TRQ shares.  For example, analysts from Canaccord reported the "significant capex increase at OT" was "far worse than our already conservative estimates," highlighted the need for additional external financing, and cut their price target for TRQ shares nearly in half.  RBC analysts reported that it was "hard

94

to focus on the long term forecast with so many clouds on the horizon," and cut their price target by one-third. TD Securities similarly slashed its price target nearly in half, and increased its risk rating to "Speculative," noting the 30-month delay for first sustainable production and development cost increases. On July 17, CIBC analysts reduced their price target by more than half, and downgraded TRQ to Neutral from Outperformer as a result of the company's announced capex overruns. Similarly, Barclays analysts covering Rio Tinto noted the "major negative surprise" of a 16 to 30 month delay to "commercial production at Oyu Tolgoi underground in Mongolia and a preliminary capex overrun of $1.2-1.9bn vs. the original $5.3bn estimate"—"a much longer delay and bigger capex overrun than we previously estimated (18 month delay and $0.5bn overrun) with negative implications for NPV."

246. On the last day of the Class Period, on July 31, 2019, Turquoise Hill repeated its July 15, 2019 disclosures about the delays and cost overruns and added that new financing would be needed to complete the project (diluting existing stockholders other than Rio), that a definitive estimate review was not expected to be completed until the second half of 2020 (when TRQ's existing funds would run out, forcing it to take financing from Rio on unfavorable, non-market terms), and that it would be required to take a $600 million impairment charge.

247. In response to the July 31, 2019 disclosures, TRQ's stock price fell *8.6%* on August 1, 2019, from a close of $0.58 per share on July 31 to a close of $0.53 on August 1.

248. However, multiple former employees state that geotechnical issues were not the driver of the underground-expansion project's cost overruns and schedule delays. Rather, as Bowley explained, Rio Tinto falsely blamed the delays on geotechnical problems because this type of problem is outside its control, whereas the concealed engineering and procurement problems were within its control. Thus, Bowley said that Rio Tinto lied to investors about the causes of the

delays and cost overruns in an attempt to evade its responsibility for the problems. Bowley also said that Field, the former General Manager-Underground, told him that the purported rock stability issues were "a load of bollocks" and that these issues were addressed in the original mine design, but Rio erroneously removed that element of the design.

249.    FE 2, the Red Path Mining senior manager at Oyu Tolgoi from 2013 to 2019, likewise said that the notion that the geological issues cited by Defendants was the primary driver of the delays was "one hundred percent pure horseshit. . . . It was a management issue and an engineering issue." Red Path was responsible for sinking Shaft 2 and Shaft 5, and FE 2 saw all the progress reports. "The project was being delayed because of engineering and execution. There may have been some pockets of bad ground, but that's expected in any mine." FE 2 said that he "would have been intimately aware of any rock instability" and that it "was just not present."

250.    Indeed, this was the same conclusion reached by analysts at Scotiabank who visited OT and saw first-hand the progress at the mine, and concluded that in light of the evidence "it is now clear to us that the ~15 month delay in completing shaft 2 . . . appears to be the primary driver behind the recently disclosed Phase II development delay and capex overrun" as opposed to any geo-technical issues, which appear to be "manageable."

251.    In addition, Turquoise Hill's own descriptions of the rate of progress in developing the mine undermine the notion that the delays could be blamed on geotechnical problems. For example, TRQ's Chief Operating Officer, Joanne Dudley, explained to investors visiting the mine after the end of the Class Period that the geotechnical problem is only in the ore body and does not cause delay because after the first team puts in the originally planned steel bolts and mesh, a separate team can put in extra steel bolts and stronger steel mesh to keep the ceiling and walls of the tunnels from collapsing for $5,000 per meter, a total of $100 million. Thus, any geotechnical

problems around the orebody account for only a small part of the $1.2-$1.9 billion cost overruns and do not account for the delays.

252.    Indeed, the ICG Report thoroughly repudiated the notion that "ground conditions" could be blamed for the delays and cost over-runs at OT, describing Rio's statements that "poor Footprint ground conditions significantly contributed to design, schedule and cost variances" as a "serious contradiction."  The ICG Report also noted that "isolated 'surprises' in ground conditions were reported in Off-Footprint locations but were not considered significant contributors, as confirmed by the "lack of specific schedule or cost analysts of these changes that would be expected if their impacts caused major variances."  Rather, as the Peer Review concluded:

- We concur with the findings of ICG that rock mass quality and ground conditions *were not a significant contributor to the schedule delays and cost overruns*.

- *No evidence was found that the rock quality in the off the footprint development and mass excavations was significantly different to that forecast in OTFS16*.

- The PC1 crusher was delayed. *No evidence was found that ground conditions were different than anticipated*. It is recognised that additional support was installed. This additional support appears to be associated with an increase in excavation size rather than with poorer conditions.

- *There is evidence that rock quality on the footprint was better than anticipated. Mapping of the extraction level indicated that the rock mass was better than originally forecast*. Except for the haulage level, the split of support categories (Tier 1, Tier 2 etc.) required for the other footprint levels was within 10% of the original OTFS16 forecast. The substantial amount of support installed is noted which is assumed to reflect the design rather than any significant change in conditions. Designs were not reviewed.

253.    In fact, following its review, the ICG estimated that in a "worst case" scenario there would be approximately $90 million in costs attributable to changes in mine design as a result of legitimately new "ground conditions" and an estimated a "best case" of $12 million—a cost range representing an insignificant fraction of the well over $1 billion cost increase Defendants

ultimately disclosed.

254.    Further, and critically, the ICG refuted Defendants' claim that geotechnical issues had any impact on the schedule.  For example, the ICG found that "there is no accounting evidence in the documents that key geotechnical parameter changes affected mass excavations," and therefore "ground support changes due to key geotechnical parameters *did not significantly affect schedule variances*."  Further, Rio failed to quantify any contribution of the mine re-design change to Panel-0—the first panel that is expected to be mined to provide first sustainable production— which Rio claimed contributed to the overall delay.  As the ICG concluded, the fact that Rio failed to provide any quantification of the delay supposedly caused by this Panel-0 redesign, along with its review of other evidence, "*it is unlikely Key Geotechnical Parameters affecting mine design in Panel-0 contributed to the Project schedule delays*."

255.    Rather, the delays have been caused by the problems with Shaft 2, as well as the associated delays and mismanagement in sinking and constructing Shafts 1 and 5.  According to COO Dudley, before Shaft 2, Rio could drill 1.1 kilometers of lateral tunnels per month, and with Shaft 2 complete Rio was supposed to be able to drill 1.8 kilometers of lateral tunnels per month. Before block-caving mining production can start, 50 kilometers of tunnels surrounding the orebody have to be completed, "drawbell" funnels have to be dug, and a primary crusher has to be installed underground.  Thus, the delay and inadequate construction in finishing Shaft 2 and Shaft 1's enabling infrastructure caused a year's delay in completing the 50 kilometers of tunnels.

256.    In addition, to the extent that geotechnical problems caused any of the delays and cost overruns, Rio Tinto was aware of these problems before the Class Period and actively suppressed them during the Class Period.

257.    In fact, several former contractors and geotechnical engineers who worked at Oyu

Tolgoi expressed significant concerns about the feasibility studies originally conducted to develop the mine, which they report identified the geotechnical problems that Defendants sought to blame for the delays, and they stated Rio Tinto could not credibly claim any supposed geotechnical issues were anything "new."   For example, FE 9, a Construction Manager at Fluor (a contractor at OT) who was one of the head construction managers for Phase 1 of the Oyu Tolgoi project from 2013 to 2014, reviewed portions of the non-public feasibility study conducted Rio Tinto and a Canadian engineering firm in advance of Phase 2 in 2012, including the rock stability and makeup sections. He said, "I saw the numbers," and it was clear that the mine presented geotechnical challenges, but those issues were brushed aside because Rio Tinto needed the project to succeed.  FE 9 said, "On a scale of one to ten, with ten being the absolute worst, [the feasibility study] was a nine. People had knowledge of what was coming. The CEOs had to know."  He also said, "If Rio Tinto failed [on the Oyu Tolgoi project] they would lose the company. That's why they did everything to hide it."

258.    Similarly, FE 10, a Rio Tinto Senior Geotechnical Engineer at Oyu Tolgoi from May 2019 through September 2020, who reviewed the 2012 and 2016 feasibility studies—internal documents that are different from the Technical Reports made available to investors—explained that from a geotechnical point of view, the prior feasibility studies did not have the necessary data about the ground conditions, and had no recovery plans in place if something were to happen. Similar to the account provided by Rio Tinto's former manager of Vertical Development and Mass Excavation Scott Ramsay in ¶239 above, FE 10 said that the lack of reliable geotechnical data in the original feasibility studies (in both 2012 and 2016) meant that the OT Mine Planning Team ("MPT") could not rely on the long-term plan to design the lateral tunnels that were excavated. Instead, the MPT had to regularly redesign the short-term plans based on the observed situation—

99

i.e., from the data collected on-site at the time.

259.    Worse, according to FE 10, Rio Tinto did not update the feasibility studies with observations from the MPT's work in developing short-term mining plans and in fact deliberately discouraged Rio geotechnical engineers and the outside consultants Rio hired from obtaining the data needed to properly assess the ground conditions at OT.  In fact, Rio Tinto management required OT geologists like FE 10 to keep the ground condition data they did obtain a secret— precisely because that information showed how difficult and dangerous the mines actually were.

260.    As FE 10 explained, Rio Tinto executives knew from the initial 2012 feasibility study that the ground conditions were challenging but, because of the mismanagement and delays at Shaft 2, no one at Rio Tinto in a leadership role was willing to accept responsibility for any decision that would cause delays or cost money.  As FE 10 recounted: "We all knew that it was a very bad situation, but as a response they always delayed or tried to keep it quiet. They always wanted us to discuss our concerns face to face, never email or in writing."  According to FE 10, Rio Tinto did not want to be charged with knowledge of the ground conditions that existed because addressing them would require Rio to spend significant amounts of money.

261.    Rio Tinto's approach raised serious safety concerns for FE 10, the MPT, and the outside consultants who feared the lack of sufficient geotechnical data heightened the risk of a collapse of the mine.  According to FE 10: "We discussed this with the consultants every day. We were to a point that a failure [collapse] is going to happen with an 80% probability."  Based on FE 10's review of the 2020 feasibility draft, it still did not include a recovery plan despite the high likelihood of a failure.  In all events, Rio management's efforts to bury the geotechnical data its geotechnical engineers had been urging Rio Tinto to incorporate into the OT feasibility studies demonstrates that Rio Tinto's claim that the delays could be blamed on the discovery of previously

unavailable "geotechnical data" were false, and corroborate the accounts of OT managers who said that this was a lie designed to conceal Rio's mismanagement of Shaft 2.

## VI.    POST-CLASS PERIOD DEVELOPMENTS

262.    After the end of the Class Period, in early March 2020, Bowley—the expert hired by Rio Tinto to assess and fix the problems at OT turned whistleblower—reported Defendants' misconduct to securities regulators, including the SEC, the Australian Securities and Investments Commission, the U.K. Serious Fraud Office and Financial Conduct Authority, and the Mongolia Financial Regulatory Commission, and those agencies are now investigating the misconduct alleged in this action.  In connection with a separate employment dispute before a U.K. tribunal, Bowley provided a 62-page sworn statement detailing Defendants' fraud.  As summarized in that document:

> My case, in a nutshell, is as follows:
>
> 4.1    In 2017, Craig Kinnell said that he had concerns about the OT project.
>
> 4.2    He recruited me to address his concerns and to suggest solutions.
>
> 4.3    I reported my concerns and suggested solutions to Craig and Rosemary Fagen in London.
>
> 4.4    Despite repeating those concerns about schedule delay and cost overrun and proposing solutions, Rio Tinto made no disclosure of the true facts to their partners and investors or the market.
>
> 4.5    I was then sidelined but was not released from my contract and the confidentiality obligations that went with it.
>
> 4.6    Not only did RT not disclose the true facts but Arnaud Soirat, Craig Kinnell's boss, told the market that the project was on schedule and on budget, misleading the Government of Mongolia and others.
>
> 4.7    I continued to report my findings and fears over a) non-disclosure and b) misleading the market until my contract was brought to an early end, having continued to be sidelined and left completely unoccupied until then, marooned in Mongolia.

4.8    Being sidelined and then dismissed was the direct result of my whistleblowing reports to the Company.

5.    Having reported the true facts to Rio Tinto, and having seen the misreporting of the facts to the market, I conclude that Rio Tinto is seeking to suppress my reports and, by delay, to enable it to shape the narrative for its later disclosures to stakeholders and the market generally regarding the state of the OT project. It has had every opportunity to take corrective action based upon my reports but has declined to do so. Not only has it suppressed my reports but it has made misleading statements to the market regarding the OT project which I was instructed to investigate and report on in London. There were no major geographical [sic] reasons for the delay in the project although this is what Rio Tinto claimed in order to conceal the true causes.

263.    Around the same time Bowley filed his Witness Statement, on March 20, 2020, Turquoise Hill disclosed that it would require at least an additional $4.5 billion in financing to complete the Oyu Tolgoi underground expansion, and said that this financing was required on top of the $2.2 billion Turquoise Hill had in available liquidity.

264.    In December 2020, the PWG proposed resolutions, which were unanimously passed by the Mongolian Parliament, that the Government should "take comprehensive measures to improve the implementation" of the 2009 agreement, the ARSHA, and the 2015 agreement. In a December 18, 2020 videoconference, members of the PWG, and in particular Minister Luvsannamsrain Oyun-Erdene, raised concerns with Rio's senior executives—including Defendant Soirat and Sayed—that the cost overruns in the OT underground mine and the decline in project benefits had confirmed the necessity to increase the project's benefits to Mongolia and that the Government would, if necessary, terminate the 2015 agreement.

265.    Giving validity to Defendants' concerns about the Mongolian Government citing cost overruns and delays at OT in the parties' negotiations, on February 8, 2021, Mongolia announced it was seeking to cancel the Oyu Tolgoi deal with Rio Tinto and would replace that deal with a new agreement, explaining that the significant cost increases at Oyu Tolgoi eroded the

economic benefits the Mongolian government expected to receive from the mine.

266. On November 30, 2020, the OT Board established a special board committee (the "OT Special Committee") consisting of two representatives of Erdenes Oyu Tolgoi (the entity through which the Mongolia holds its interest in OT) and two representatives of TRQ to investigate the causes of the cost overruns and schedule delays. A group of consultants, referred to as the Independent Consulting Group" or "ICG," was hired to conduct the review on behalf of the OT Special Committee. The ICG was composed of eight highly experienced and qualified mining professionals, one of whom, Sim Lau, had previously worked for TRQ at Oyu Tolgoi as the General Manager of Project Services. As noted in the Report,

> The Purpose of the Review was for the ICG to determine, based on the information from the Definitive Estimate 2020 (DE2020), the reasons and causes that have contributed to the schedule delays and cost overruns when compared to the Baseline Budget and Schedule from the Oyu Tolgoi Feasibility Study 2016 (OTFS16).

> Further elements of the review include a study of the geotechnical data for the mine to determine what is the real impact, if any, of major changes that have occurred post the feasibility study and what the cost and schedule impacts of these changes has been.

267. The ICG submitted its Report to the OT Special Committee on August 3, 2021. The ICG Report detailed the ICG's investigation and findings and concluded that the underground expansion project's delays and cost overruns began as soon as work resumed in 2016 and were caused by engineering, procurement, and construction problems related to Shaft 2 and associated work in completing Shafts 1 and 5—and not by any geotechnical issues. Rather, the ICG concluded that the cost overruns were driven by the management failures identified in Lead Plaintiff's investigation—identifying the "schedule delay increasing substantially the duration of the project [which] directly impacted the indirect costs"; "Grossly underestimating or overly conservative designs for the underground infrastructure in the areas of piping, electrical equipment and associated bulk materials"; "Underestimating of the legacy issues and construction

methodology relating to Shaft #2"; "Design and fabrication errors for Shaft #2"; and "Underestimating the surface infrastructure facilities in particular the central heating plant and camp accommodation facilities."

268.    As detailed in the ICG Report and accompanying Peer Review—a separate check on the ICG's work by two independent consultants with extensive experience in building and operating large block caves—the overruns and delays were caused by mismanagement, not unexpected "ground conditions," as Defendants falsely represented.  Rather, the ICG concluded that Rio's concealed mismanagement of the project was characterized by "staggering" and inexplicable failures that resulted in "misleading" reporting of the actual progress of the underground expansion.

269.    On July 21, 2021, the *Financial Times* confirmed that the UK's Financial Conduct Authority was investigating whether Rio Tinto breached listing rules by making false and misleading statements concerning the value of Oyu Tolgoi in 2018 and 2019—i.e., the Class Period in this case.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

270.    Numerous facts including those detailed above, considered collectively, demonstrate that Defendants knew they were misrepresenting the status of the OT expansion or, at minimum, acted recklessly.

271.    ***First***, Defendants were repeatedly informed in detail about delays and cost overruns at OT and were told that their statements to investors that the project was "on time and on budget" were false.  In fact, the Rio Executive Defendants hired Bowley in 2017 precisely because they knew that progress at OT was far behind schedule and wanted an expert like Bowley to address those issues and propose solutions.  As Kinnell told Bowley in July 2017, "the project was in trouble" and "needed intervention" and the "problem was with scheduling work and potential

capital expenditure."  After Bowley was hired by Defendant Soirat and Kinnell to conduct that intervention in November 2017, Bowley quickly identified the cost overruns and schedule delays and reported them to Kinnell and Fagen, who relayed them to Defendant Soirat, in a meeting in London in February 2018.  At the start of the Class Period, on July 19, 2018, Bowley informed Kinnell and Fagen in writing (who delivered the report to Defendant Soirat) that the project was 12 months behind schedule and $300 to $400 million over budget, which was expected to escalate rapidly, and was "massively underperforming."  The schedule delays and budget overruns were known by Defendant Soirat and Rio Tinto management, as confirmed by Fagen, who responded to Bowley, "Oh don't worry, we've known it from the start, just haven't been able to do anything about it. Arnaud [Soirat] has played a very card [sic] here, which is why you now see 'things' surfacing."

272.   Thereafter, Bowley sent repeated emails and had numerous discussions with Defendant Soirat, Kinnell, and Fagen about the status of the OT expansion, warning them that Defendants' statements to the market that during the Class Period that OT "on time and on budget" were false and required correcting.  For example, after the timeline to complete Shaft 2 was internally delayed from October 2018 to January 2019, Bowley sent emails to Defendant Soirat through his gatekeeper, Fagen, in December 2018 stating that Shaft 2 could not be completed by January 2019 and could be completed by the end of 2019 only with luck.  As Bowley informed Defendants, their representations concerning OT "watered down the truth" and were "inconsistent with the truth (a lie)," and "completely untrue," noting that Defendants' representations in October 2018 concerning the disclosure that the announced nine-month delay would have a limited impact on first drawbell was a "suicidal statement" and concealed the actual 12- to 18-month overrun and associated cost implications that existed.  Defendants' receipt of this information from the expert

they hired to report on OT's schedule and cost overruns—as well as Bowley's repeated urging that Defendants correct their misstatements at the time they were made—is powerful evidence of scienter.

273. ***Second***, during the Class Period, Defendants engaged in a machination designed to stage-manage and conceal the true extent of the delays and cost overruns in the fall of 2018. As Bowley recounted, "Rio Tinto understood that the project was now trending out of control" by August 2018 and that the completion of Shaft 2 set for October 2018 would be delayed until at least the third or fourth quarter of 2019, and was concerned about its own liability for mismanaging it. The true state of the progress on Shaft 2 was also reflected in a report from OT's EPCM contractor, Jacobs, that was sent to Rio's senior management in August 2018, and showed that the project was already falling behind the original plan by approximately 14%. As Bowley explained, this confirmed that, as of August 2018, the project had already been delayed by several months and was in the region of $750 million over budget. In fact, because Jacobs could not meet its $240 million contractual target cost for finishing its ECPM work in 2018, Jacobs asked to raise the target cost to $360 million. The OT Board (which included Defendants Soirat, Quellmann, Colton and Lane) approved that request in December 2018, a development Bowley described as "totally shocking." Thus, Defendants clearly knew the project was behind schedule and exceeding its budget.

274. Moreover, instead of disclosing the true facts about OT, Defendants engaged in a "re-forecast" of the schedule that was designed to continue concealing the true extent of the problems with the underground expansion. As shown in monthly progress reports, Rio's initiative to "re-baseline" or "reforecast" the schedule artificially lowered current delays from 14% to 5%. As Fagen wrote in an email to Bowley on August 31, 2018 responding to his description of

the delays and cost overruns, "Yes I complete [sic] agree and now we're trying to be clever by doing 'forecast 2'!"  As Bowley said to Fagen at the time, "forecast 2" was just a way to "make the current position appear more tenable" and "make[] us look good, pull[] back aspects of schedule that are knackered" but ultimately increased costs.  That is because, as Bowley and FE 3 explained, the "re-forecasting" simply pushed out and defunded critical and necessary tasks, such as commissioning work, that would be required before Shaft 2 would be operational.  For this reason, according to FE 3, Defendants' statements concerning the October 2018 reforecast that the project was a bit behind schedule—but still on budget—were not "accurate at all."  The fact that Defendants engaged in this "clever" maneuver to "reforecast" the schedule in a manner that concealed the true status of the project—and did so by falsifying the schedule changes as being approved by Brinkmann after he had been terminated and left Mongolia months earlier—is highly indicative of fraudulent intent.

275.  ***Third***, Defendants and senior management of Rio and TRQ received and had access to detailed reports documenting the true status of the OT underground expansion.  Those included monthly project reports that detailed the status of various OT expansion projects and compared percentages of progress-per-month and cumulative progress-to-date to the development plan reported to investors, as well as commentary from the assigned Project Director summarizing key issues.  For example, in a December 2018 report prepared by Jacobs, OT's EPCM contractor, which was delivered to Rio's senior management after the October 2018 "re-forecast" that artificially reduced current delays from 14% to 5%, Jacobs noted that "the extent of the work to go is more than reflected in the contractor and master schedule."  The reports FE 4 prepared demonstrating that from the end of 2017 until June 2019, OT's actual monthly progress consistently totaled around 100-200 meters under a schedule calling for the construction of 800

meters per month were sent to OT and Rio senior management every month, and to Defendant Jacques weekly beginning in October 2018.

276.    In addition, monthly and quarterly reports concerning the executive consulting work on behalf of Rio's senior leaders in Mongolia that were provided to Rio's human resources chief, Defendant Jacques and his predecessor, and Rio's Board chairman, identified unethical behavior and "potential overstatements" at OT beginning around 2016.   In fact, soon after Defendant Jacques was promoted to CEO, Duffy's firm was ordered to discontinue providing those regular reports to Rio's top leadership in mid-2017—a development that led Duffy to terminate his firm's long-term consulting engagement with Rio.

277.    Defendant Jacques and senior management at Rio Tinto also received reports through Rio Tinto's Technical Evaluation Group ("TEG"), which was responsible for ensuring technical aspects around any capital expenditure met Rio's requirements and reported directly to Rio's Investment Committee, which was chaired by CEO Jacques.   They also received reports from a Business Evaluation Department ("BED"), which reported to the Evaluation Committee and provided a critique to management about those capital expenditures, which was chaired by Rio's CFO Jakob Stausholm, who reported to Defendant Jacques (and who replaced Jacques as CEO in December 2020).   According to FE 11, a senior project manager from 2007 to 2019 who routinely attended Oyu Tolgoi Board meetings, both the TEG and the BED performed week-long on-site reviews of the Oyu Tolgoi project twice per year, including in August-September 2018, which would have identified and reported the cost overruns and delays and reported them Rio Tinto's top leadership.   The TEG and BED reports were sent and reviewed by Defendants Jacques and Soirat and showed throughout the Class Period that the underground project was behind schedule and over budget.   Tellingly, Rio refused to provide the TEG reports to the ICG during

the ICG's post-Class Period investigation into the project's cost overruns and delays, which supports a strong inference that these reports demonstrate that top Rio management were contemporaneously informed of these problems.

278.    As FE 12, who was Oyu Tolgoi LLC's financial controller from October 2014 to March 2017, explained, Defendant Jacques was fully informed about the project's status: "If the question is did [Defendant Jacques] know the plan's status, then yes, he definitely did. We constantly had reports that went up the chain [to him]."  Given that the Defendants possessed these reports and were responsible for reviewing them, there is a strong inference that they knew what the actual costs and schedule were at the time they made their material misrepresentations.

279.    **Fourth**, Defendants were highly motivated to conceal the problems at OT in light of the Mongolian government's aggressive efforts to renegotiate the OT agreements.  The Executive Defendants were rightly concerned that the government of Mongolia would use the cost overruns that then existed at OT to renegotiate the terms of their partnership—as it did just that after the Class Period when the overruns were revealed—but also that such a corruption inquiry posed an acute risk to them personally.  Indeed, in 2013, the Mongolia government detained (and later jailed) a U.S. citizen who was a well-known member of the expatriate community in Mongolia and the president of SouthGobi Resources—a coal mining company partly owned by Rio and Turquoise Hill—and would not let him leave the country until he was pardoned in February 2015.  In fact, Rio Tinto's silencing of key OT managers coincided with the Mongolian Government's seeking $155 million in tax payments from OT, jailing the former Mongolian government officials involved in negotiating the OT agreements, and initiating inspections into the progress and finances of OT by the Parliamentary Working Group and Mongolian National Audit Office.

280.     These developments posed such a serious threat that Defendant Jacques personally traveled to Mongolia to meet with Defendant Soirat and the Mongolian prime minister about Oyu Tolgoi in January 2018, while Defendant Soirat gave a speech in May 2018 urging government officials to respect the existing OT agreements.  If Rio had promptly and accurately disclosed the problems at Oyu Tolgoi, its negotiating position relative to the Government would have been significantly weakened.  Indeed, following the disclosure of the cost overruns and delays at the end of the Class Period, the Mongolian Government has done just that, demonstrating the Rio Tinto Executives' motives for concealing the problems to avoid disclosure to the Mongolia Government were well founded.  The confluence of these events, and Defendants Jacques' and Soirat's intimate involvement in them, supports a strong inference that they were acting to cover up the truth about Oyu Tolgoi in 2018.

281.     *Fifth*, Defendants attempted to silence Bowley to prevent him from disclosing the truth about OT, terminated him for blowing the whistle on the fraud, and tried to keep his information secret as long as possible.  As Bowley recounted, in May 2018, Defendant Soirat instructed Bowley to stop looking into delays and cost overruns at OT—i.e., the issues Bowley was hired to address—because Bowley continued to report facts that Soirat wanted to keep secret.  To prevent Bowley from continuing to do so, Rio instructed him not to come to work from June 2018 to January 2019, even while Rio kept him on its payroll.

282.     According to Bowley, during their one-on-one meeting in May 2018, Defendant Soirat "seemed to be saying that he knew that there was a big problem with the project but he did not want anyone else to know this."  Although he no longer had any work to do, Bowley was kept on Rio's payroll "due to my knowledge and the desire from senior C&D [Copper & Diamonds] individuals for [the problems at OT] not to become public and to keep me 'in the camp'."  The

sidelining of Bowley in May 2018 coincided with Rio's firing of Brinkmann, the head of Shaft 2, and instruction that he leave the country, as well as the unexpected termination of FE 8, who was vocal about the 18-month delay and approximately $2 billion in cost-overruns the project had incurred by that time.

283.    After Bowley repeatedly emailed Rio Tinto senior management, including Defendant Soirat, about the cost overruns and delays at OT, Rio Tinto terminated Bowley in January 2019 without providing any reason.  The next day, Bowley wrote a letter to Rio Tinto complaining that its compliance was seriously deficient—and Rio Tinto responded with an internal investigation that Bowley called a coverup.  In fact, despite Bowley providing detailed information and citation to the emails documenting Defendants' fraud, Rio never reviewed those documents—claiming doing so would take months—and instead concluded there was "no evidence" to support Bowley's claims before publishing its annual report just two days later.  Bowley then sent a letter about his concerns to Godbehere, a member of Rio Tinto's Board, which prompted Rio Tinto to hire Baker McKenzie, which conducted another investigation whose results have never been publicly released. In his Witness Statement, Bowley wrote: "My impression has been that through conducting two reviews, Rio Tinto has sought only to establish the extent to which I am in a position to prove the facts rather than to establish and investigate the true facts."

284.    Following his termination, Bowley filed a wrongful-discharge case against Rio in the U.K. Employment Tribunal in late 2019.  Bowley's witness statement filed in that proceeding on March 16, 2020, a detailed, 62-page account of the Rio Defendants' knowingly or recklessly false statements about the Oyu Tolgoi underground mine's cost overruns and schedule delays, was

signed under penalty of contempt of court.[16]  Under the U.K. Employment Tribunal's rules, Bowley's Witness Statement would remain nonpublic unless and until a public hearing was held on his claims, at which point the Witness Statement and other evidence in his case would become publicly available.  On the eve of the scheduled public hearing, Rio settled Bowley's wrongful-discharge case to avoid the public hearing and keep his evidence of Rio's knowingly or recklessly false statements to investors about the Oyu Tolgoi mine from becoming public. Bowley's Witness Statement (which has not yet become public) repeatedly states that Rio committed "securities fraud" by misrepresenting the underground mine project's schedule and costs. He states: "Having reported the true facts to Rio Tinto, and having seen the misreporting of the facts to the market, I conclude that Rio Tinto is seeking to suppress my reports and, by delay, to enable it to shape the narrative for its later disclosures to stakeholders and the market generally regarding the state of the OT project."

285.  **Sixth,** Defendants silenced, terminated, forced out and sought to discredit numerous senior OT managers and other witnesses who reported problems at OT to senior management.  Indeed, Bowley was far from alone in internally reporting the problems at OT.  For example, Grant Brinkmann, Rio Tinto's Area Manager of Shafts who was one of a handful of people in the world capable of handling the construction of Shaft 2, was fired in or around May 2018 after warning senior management "for a long time" about the problems with the project.  According to FE 3, Brinkmann was fired because other members of senior management could "protect their own asses knowing that there were going to be significant delays."  And FE 8 was

---

[16] Specifically, Bowley signed the Witness Statement with the affirmation that "I believe that the facts stated in this witness statement are true" which, under English law, is a "statement of truth" that subjects the maker to contempt of court.

terminated in May 2018 at the same time as Brinkmann and was "thrown under the bus because I kept trying to tell them we should try to sort these things out."

286.    Similarly, Field, Rio's former General Manager-Underground at OT, was removed from his position precisely because he was an outspoken critic of Rio Tinto's performance.  Field reported to Charron, a managing director in Rio Tinto's Growth & Innovation Division at OT who is close to Defendant Soirat, and, according to Bowley, Field was removed by Defendant Soirat and McIntosh (who reported directly to Soirat) in 2018 because of his criticisms of Rio's handling of OT.  Further, Field's replacement, David Hume, left the project after just three months because, according to Bowley and Brinkmann, Hume recognized just how serious the project's problems were and feared the liability associated with the project would destroy his career.

287.    In addition, as reported in the *Financial Times* and *Australian Financial Review* in November 2020 and confirmed by Lead Counsel, an executive leadership consultancy firm that had worked with Rio Tinto for more than a decade terminated its multi-year contract in 2017 because of "serious misgivings about unethical behaviour" at Rio under Defendant Jacques' leadership, including in connection with OT.  In a November 2019 email from the consultancy firm to Rio's Board, executives, and lawyers at Baker McKenzie, Duffy highlighted concerns about "potential overstatements" at the Oyu Tolgoi project and said that Baker McKenzie's supposedly independent investigation into OT "excluded information" known by his firm since 2017.

288.    Rather than consider that information, Rio's lawyers at Baker McKenzie pursued Duffy throughout the Class Period seeking to destroy the data his firm had collected from Rio Tinto executives—including data about the cost overruns and delays at OT—and successfully did so after the Class Period.  In response to Duffy's repeated requests to Rio Tinto's Board and

chairman to address the concerns he had identified before the Class Period, they "took no action"—and did not do so during the Class Period in response to multiple repeated requests from Duffy after Duffy terminated his firm's contract with Rio in December 2017.  As Duffy explained in a January 2019 email to Rio Tinto's directors, "We have informed your organization many times since 2017 that we have information that might be pertinent on some legal and ethical grounds." Instead of asking what information Duffy had, Rio actively sought to discredit Duffy be spreading misinformation about his firm's relationship with Rio.  In fact, as reported in the *Australian Financial Review*, around this same time, there was a nighttime break-in at Duffy's home in England that U.K. criminal investigation department officers told Duffy appeared to be an attempt to steal data—as the intruders, who have not been arrested or identified, took no valuables.  After the break-in, Rio Tinto in-house lawyers Stephen Storey and Fiona Lockhart demanded that Blackswan allow an unspecified data management company to access and collect the reports Duffy's firm had documented—a request Duffy rejected.  Duffy stated that Rio never denied responsibility for the break-in and that "it was surprising given their threats against me about retention of the data that they never even asked any questions about whether or not the data was stolen."  Rio's failure to respond to serious concerns about overstatements at Oyu Tolgoi and other unethical conduct—and its ultimately successful effort to destroy Duffy's evidence of that misconduct—strongly supports an inference of fraudulent intent.[17]

289.  ***Seventh***, Defendants professed to know about the mine's actual progress, repeatedly spoke knowledgably about it in detail on conference calls with investors, and personally oversaw the problems causing the delays and cost overruns.  For example, Defendant Soirat said

---

[17] Lead Counsel understands that at least certain of the data collected by Duffy's firm was provided to regulators in the U.K. before Rio was able to destroy the data in Duffy's possession.

in an interview on November 10, 2018 that he spent one week every month at Oyu Tolgoi, spent more time in Mongolia than in London, and called Oyu Tolgoi "very important to me." Similarly, Defendant Jacques personally negotiated the 2015 agreements that resulted in the restart of the underground expansion, which was his "claim to fame" at Rio, and the media has observed that there is "no one at Rio whose standing is more closely connected to the copper business generally and to Oyu Tolgoi particularly than Jacques." And Defendant Jacques personally visited Mongolia in January 2018 to specifically reaffirm that "Mongolia is one of Rio Tinto's most strategically important markets and we are here to stay," and to quell the Mongolian government's attempt to renegotiate the OT agreements.

290.    In addition, Defendants Quellmann, Colton, and Lane, all of whom regularly visited OT, spoke about the underground mine project and its schedule and budget in detail on every investor call during the Class Period.   During these presentations, these Defendants assured investors that they knew about the project's actual status and progress.   For example, in direct response to an analyst's question, Defendant Quellmann said on the first investor call during the Class Period that he and Turquoise Hill's management were "well plugged-in" to the "processes, cost reviews and the like," on the underground construction and had "good visibility as to what's going on." Defendant Colton similarly explained on that call that "we definitely have visibility" into both the "day-to-day" and strategic issues at OT given that Quellmann, Lane, and Colton each had personal responsibility for them and the negotiations with Mongolia, including that Colon was a member of the "joint working committee" and "working group for the shareholder loan," that "Brendan's [Lane] involved in power," and that "Ulf [Quellmann] has been involved throughout [and] will continue to be very involved."

291.    In fact, in announcing the October 2018 "re-forecast," Defendants Quellmann, Lane

and Colton took personal credit for overseeing the work being done with the third-party advisor (Broadleaf) in assessing the nine-month delay and the "independent study" TRQ was conducting, with Defendant Quellmann explaining that "we as the TRQ management team review and work[] with OT and Rio to do that together, and then we avail ourselves at the same time of help and support by third parties, and that's what's going on at the moment." Defendant Quellmann further highlighted Defendant Lane's personal, on-the-ground involvement in Mongolia in stressing TRQ's command over the delays and the "ground conditions" purportedly behind them, explaining that TRQ had a "seat at the table" on the OT Board, a strong relationship with the OT project management team and with Rio, and intimate knowledge of the actual facts at OT:

> First of all, we have a seat at the table, we are on the OT L.L.C. board, so that's really where the first round of review happen and takes place, because the OT board of directors obviously have to sign off on, you know, regular budgets and certainly that includes the underground and then there are number of other committees ….whether it's the operating committee or the technical committee. So those are bodies and mechanisms that we have to obtain information.

> So those are the formal arrangements that are there and that we avail ourselves, and then in addition, I would say we think that we have a very good and a very productive working relationship, both with the project team at OT itself as well as the Rio team that does the project work. And as I said before, that's why Brendan [Lane] is in Mongolia at the moment to go through the data to reports together with the external consultant to do that, so we are well positioned … [], to, as you say, have a seat at the table and to understand review and provide input and ultimately sign off on the underground expansion.

292. In fact, immediately before becoming CEO of TRQ, Defendant Quellmann served as Chief Financial Officer, Copper and Diamonds at Rio Tinto and served on the OT Project Executive Committee—meaning that he had access to and reviewed all relevant documentation concerning the status of the OT underground development before becoming CEO of Turquoise Hill. As set forth herein, that reporting revealed the true extent of the cost overruns and delays which existed before the beginning of the Class Period. Of course, Defendant Quellmann did not

forget the true facts about OT that he learned through his senior management roles at Rio and as a member of the OT Project Executive Committee when he joined TRQ as its CEO—a position he obtained based on this very experience in overseeing the OT underground development.

293. Moreover, since before the Class Period, Turquoise Hill senior management had been actively engaging with TRQ's then-largest minority shareholder, SailingStone, about its criticisms over the lack of transparency about OT. Those concerns were shared by analysts, who reported that they were "disillusioned by the ongoing lack of clarity provided by TRQ management with regard to key elements affecting the true value of the company," that TRQ's disclosures on key regulatory matters "lack clarity," and that there was a lack of "material update regarding the ongoing uncertainty surrounding the timeline and capex for the development of Phase II" after TRQ began disclosing problems with the project in February 2018.

294. In response to SailingStone's and other investor concerns, TRQ management purported to take significant measures to ensure TRQ management was fully aware of the progress at OT and reported on that progress to investors, telling investors in a March 14, 2018 letter "that the Board and senior management of Turquoise Hill fully recognize our responsibility to serve the interests of the company and all of its shareholders" and were "committed to the principles of transparency and good governance." Given that Defendants admitted they knew about the actual progress at OT and committed to investors that they would closely track and report on that progress, there is a strong inference they knew the project was over a year behind schedule and hundreds of millions of dollars over budget when they made their statements. Further, to the extent that the Turquoise Executives Defendants were unaware of the true facts, they were reckless in making statements to the contrary—particularly in light of the fact that OT is Turquoise Hill's sole asset and business—and misrepresented the "visibility" they claimed to have into OT's operations.

295.     **Eighth**, Defendants Jacques and Soirat were personally motivated to conceal the problems at OT.  Defendant Jacques understood that he was under serious threat from Oyu Tolgoi's delays and cost overruns because Jacques' involvement in OT was the basis of his ascension to CEO at Rio Tinto—a fact that Kinnell, OT's previous CEO, explained to Bowley, and was independently confirmed by Defendant Jacques' longtime executive coach.  As Duffy explained, taking credit for Oyu Tolgoi was critical to Defendant Jacques ascension to CEO, and his close connection to that endeavor drove him to conceal its failure.  As Duffy reported, "JS had to have a win to propel him to CEO and it was Mongolia.  It did what he needed to do… but it's just a big fraud."  According to Duffy, Defendant Jacques' control over OT was also confirmed by Alan Davies, the CEO of Rio's Diamond and Minerals division, and Andrew Harding, the former CEO of Rio's Iron Ore division, both of whom "complained that JS was holding OT to himself," and Jacques was able to take "credit" for OT to succeed Sam Walsh as CEO of Rio.  As Defendant Jacques' executive coach explained, Defendant Jacques closely tracked developments in Mongolia and "knew without a doubt" about the problems at OT.  Consistent with Duffy's account, Kinnell told Bowley that he believed that if the truth came out, Defendant Jacques would attempt to blame the problems on Soirat.  In fact, however, Defendant Jacques was forced to resign as CEO in September 2020 and was to leave Rio by March 2021 or when his successor was appointed, and did so in December 2020 when Jakob Stausholm was appointed as Rio's CEO.

296.     Similarly, as Bowley recounted, Defendant Soirat internally sought to distance himself from the project—attempting to force responsibility for it onto the G&I division instead of C&D, which Soirat headed—because Soirat knew that its problems were so severe that being accountable for managing it would risk destroying his career. Bowley said that Soirat knew how bad the problems were throughout 2018 even while he falsely told the market that the project

remained on schedule and on budget, contrary to the undisclosed facts known to him.

297.     **Ninth**, Defendants' scienter can be inferred from the fact that they sought to blame the cost overruns and up to 30-month delay on "geotechnical" problems as opposed to Rio Tinto's malfeasance in managing the project.  As noted above, the initial engineering and construction work on Shaft 2 necessitated OT to effectively rebuild much of the Shaft 2 headframe from scratch and replace over 40,000 bolts.  And, as the ICG concluded, Rio made errors that no "experienced" miner would have made, including by failing to excavate a large enough chamber for PC1.  Rio Tinto did not want these facts to come to light, and blaming the delays and cost overruns on a geotechnical issue provided Rio Tinto with a false reason to deny it knew its statements about the progress at OT were false when made.  Rio Tinto was, Bowley said, desperate to conceal the truth about the cause of the delays and cost overruns.

298.     To the extent that geotechnical problems with instability of the rock in Shaft 2 caused any part of the delays and cost overruns, Rio Tinto was aware of these geotechnical problems by as early as 2012 as a result of the feasibility report completed that year, as reported by FE 9, FE 10, and other Rio Tinto geotechnical engineers as alleged in ¶¶257-61.  In fact, Rio Tinto senior management not only knew about these conditions but actively sought to conceal them by requiring Rio geotechnical engineers to communicate about the rock conditions they studied face-to-face—"never email or in writing"—because they knew "it was a very bad situation."  Defendants' active concealment of the true facts concerning the true geotechnical conditions at OT is additional powerful evidence supporting an inference of scienter.

299.     **Tenth**, the ICG's investigation provides compelling evidence that Defendants knew about the project's delays and cost overruns before and during the Class Period and took measures to conceal the true progress from investors.  For example, the ICG Report notes that it is

"inconceivable that the Senior Management both on the Project site and in the higher-level committees were not aware of these shortcomings, as reports were generated on a regular basis by the schedulers who were working in the Project Controls section and by the relevant area managers."  In fact, the ICG found the lack of contemporaneous documentation concerning the schedule delays and their impact on the critical path "staggering" and inexplicable, and the Peer Reviewers commented that they were "not able to find the reporting and tracking that represents good practice in large underground mining projects."

300.    Other evidence cited in the ICG Report demonstrates that Defendants knew their statements were false when made.  Those facts include the conclusions of Broadleaf's analysis of the 2017 and 2018 "reforecasts" showing that the publicly stated schedules had a 2% and 0% chance of being completed on-time, respectively.  The ICG Report also concluded that, by the fourth quarter of 2018, "the timing of the delay should have been forecasted" as it was "very clear that underground resources (crews 8-13) were not able to deploy."  Thus, Defendants knew or recklessly disregarded that mining crews were not able to deploy on schedule at least two quarters before they disclosed the impact of these problems on the project's schedule and costs.

301.    Moreover, the ICG reported that Rio refused to cooperate fully with the ICG, demonstrating that the Rio Defendants' coverup is continuing.  As the ICG Report noted:

> **Rio Tinto has refused to release the TEG review documents which the ICG believe would have been extremely useful to the Review in that they are prepared by a group of experienced experts who have reviewed the Project several times over the period in question.**
>
> It would also have been highly informative for the ICG team to interview current and former Project staff, EPCM staff and contractors but this was not entertained by Rio Tinto. The ICG were able to hold some technical discussions with the current Project team members, but this was limited to very specific questions which were submitted by the ICG to the team members in advance.

302.    In fact, Rio refused to give the ICG access to the principal contractor for the critical

Shaft 2—a refusal that was all the more suspicious in light of the fact that there was a lack of documentation and monthly reporting from the principal contractor responsible for Shaft 2, a failure the ICG described as "staggering."  As the ICG recounted:

> It was difficult for the ICG to determine how efficiently the [Shaft 2] headframe fit-out progressed as ***for some reason the contractor was not required to produce monthly reports which was staggering on such an important piece of work***.  It would have been extremely helpful for the ICG to speak directly to the main contractor Redpath / Dayan who was involved in all aspects of the shaft sinking / equipping / and headframe fit-out but this was not possible.

303.     Rio also refused to provide the ICG with information about the delay in mobilizing mining crews: ***"No information was provided to verify these dates despite numerous requests."*** The Peer Review faulted Rio's lack of transparency during the ICG review process, and described the lack of contemporaneous documentation concerning the delays impacting the completion of the project as inexplicable.  The Peer Review noted that the "documentation that would be expected in a project of this size and complexity was absent," that the "apparent absence of critical path reporting in the documentation which for a project of this size and complexity is perplexing," and that the reviewers were simply unable to "comprehend the absence of documentation that provides a clear view of the critical paths that are standard in large underground projects."  Further, of the documents the Peer Reviewers did obtain, they undermined Rio's public statements concerning the underground expansion, noting that "many of the statements provided in the Rio Tinto documents are not supported by rigorous analysis or documentation; more specifically that if that documentation exists, it has not been provided."  Indeed, the Peer Review found "several conflicts and inconsistencies in values provided by Rio Tinto, or in project documentation," including in the areas of cost estimates, scheduling, identification of critical path, geotechnical situation, and ground support—i.e., the critical aspects of the underground expansion underlying the fraud alleged in this action.

## VIII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

304.   Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions that were disseminated to investors during investor calls and presentations, in Turquoise Hill and Rio Tinto's SEC filings and press releases, and through other news and media outlets.

305.   Most significantly, Defendants made repeated misstatements concerning the schedule and budget for the Oyu Tolgoi mining operation in Mongolia. Specifically, while Defendants told investors that Oyu Tolgoi was progressing on schedule and that costs for the project were on budget, in truth, the underground construction of Oyu Tolgoi faced significant delays and cost overruns.

### A.   Defendants Tout The Progress Of The Oyu Tolgoi Underground Project, Concealing $300 Million In Cost-Overruns And A Year-Long Schedule Delay

306.   At the beginning of the Class Period, on July 16, 2018, after the market close, Turquoise Hill issued a press release entitled "Turquoise Hill announces second quarter 2018 production and completion of Shaft 5," which it also filed as an exhibit to Form 6-K with the SEC. The press release stated the following about development of the Oyu Tolgoi underground project:

> Oyu Tolgoi has achieved an important underground development milestone with the completed commissioning of Shaft 5, which is 1,178 metres deep and 6.7 metres in diameter. ***There is expected to be a step-up in underground activities with the increased ventilation capacity from Shaft 5. The Company continues to expect the first draw bell in mid-2020 and sustainable first production in 2021.***

307.   Echoing Turquoise Hill's press release concerning the development of the Oyu Tolgoi underground project, on July 17, 2018, Rio Tinto issued its own press release entitled "Rio Tinto releases second quarter production results," which it also filed as an exhibit to Form 6-K with the SEC.  The press release made the following statements about the status of development

of the Oyu Tolgoi underground project:

> **The major growth projects remain on track**, with . . . **construction of the first drawbell at Oyu Tolgoi Underground anticipated in mid-2020.**
>
>      \*    \*    \*
>
> Shaft two equipping and headframe fit-out is in progress, **and the shaft five ventilation system has been fully commissioned and is now operational. Construction of the first drawbell is still expected in mid-2020.**

308. The statements above in ¶¶306-07 that the "major growth projects remain **on track**," that "first drawbell" was "still expected in mid-2020" and that Defendants expected "sustainable first production in 2021" were materially false and misleading because, in truth, the schedule and major growth projects were not "on track" but at least a year behind schedule and hundreds of millions of dollars over budget. In fact, according to FE 8, by the time these statements were made, the Oyu Tolgoi expansion project was $2 billion over budget and at least a year and a half behind schedule—a fact that was confirmed by Bowley, who was hired by Defendant Soirat in 2017 to investigate the state of the expansion because senior Rio Tinto executives were so concerned about cost overruns and delays, and Brinkmann, who reported that Shaft 2 alone was 14 months behind schedule and hundreds of millions of dollars over budget. Further, it was materially false and misleading for Defendants to state that "construction of the first drawbell is still expected in mid-2020" because, in fact, they had no such expectation given that "everyone" involved in the Oyu Tolgoi project knew about the delays, particularly senior Rio and OT managers. The statements in ¶¶306-07 that "[t]here is expected to be a step-up in underground activities with the increased ventilation capacity from Shaft 5" and that "the shaft five ventilation system has been fully commissioned and is now operational" were false and misleading because the CHP heating unit—which was required by Mongolian law to maintain the minimum air temperature for safe underground work by human beings—was supposed to have been fully online

by the end of 2017 but was at least eight months behind schedule as of August 2018, so it was not possible to properly perform Shaft 5's ventilation function.

309.   In fact, as reported by numerous former OT managers, including the former employees identified in ¶¶102-10, 151-52, and 158-60 above, the Oyu Tolgoi expansion project was between 12 and 18 months delayed by the start of the Class Period, a fact that was confirmed in monthly and weekly progress reports sent to senior executives.   For example, FE 5 reported that by August 2018 was "very apparent" to everyone at OT that the "targets [Defendants] were talking about publicly were obviously not going to be met," and FE 8 said the project was $2 billion over budget and at least 18 months behind schedule when FE 8 left in May 2018.

310.   Further, Defendants' statements were also materially false and misleading because they failed to disclose the highly material facts that, among other things, (i) the expert hired by Defendant Soirat to examine the progress at Oyu Tolgoi and "everyone" associated with the project knew it was at least a year behind schedule and extraordinarily over budget; (ii) the headframe for Shaft 2 effectively had to be rebuilt, with the headframe Construction Readiness Program team required to replace approximately 95% of the steel originally installed; (iii) improper engineering and construction required Oyu Tolgoi to remove and replace over 40,000 bolts in Shaft 2, causing months of delay; (iv)  the CHP heating unit was at least eight months behind schedule as of August 2018; (v) as Field reported, and despite urging from senior OT leadership, there was no synchronization between construction and engineering, a fundamental necessity for a project like Oyu Tolgoi; (vi) Rio Tinto had, several months earlier, terminated the senior-most manager responsible for Shaft 2, Brinkmann, as a scapegoat after he had repeatedly warned management about the delays in completing Shaft 2; and (vii) Rio had rejected a proposal from Bowley—the expert Defendant Soirat hired to investigate and address the massive cost overruns and schedule

delays at OT—and sidelined him in an effort to deliberately prevent the delays and cost overruns from becoming known to investors and other stakeholders.

311.    In addition, Defendants' statements were materially false and misleading because they were accompanied by concrete statements of facts concerning progress at OT that were false. First, in representing that OT was on track to meet the 2020 drawbell deadline, Defendants pointed to "shaft two equipping and headframe fit-out" as being "in progress" when, in reality, in July 2018, the Shaft 2 equipping and headframe fit-out were woefully behind schedule because the headframe had to be rebuilt, and the equipping of Shaft 2 had been delayed by a year as a result of the abysmal conditions of the initial Shaft 2 installation.  Second, Defendants supported their statement that the 2020 drawbell deadline was "on track" by stating that the Shaft 5 "ventilation system has been fully commissioned and is now operational" when, in truth, Shaft 5 could not properly perform its ventilation function because the CHP heating system required by Mongolian law was eight months behind schedule and would not be ready until September 2019.

312.    The ICG Report further confirms that Defendants' statements were false and misleading, as the Report, based on internal TRQ and Rio Tinto documents, details significant cost overruns and delays before the Class Period began, including delays and cost overruns attributable to Shaft 2, Shaft 5, and the Primary Crusher #1—including, for example, the facts noted above concerning the delay in installing the CHP and the related impact on the schedule, that nearly all bolts in the Shaft 2 headframe had to replaced, that it was "obvious" to "most people on the ground" that the project was woefully behind schedule, and that, in truth, Defendants' independent consultant had determined in 2017 that there was a mere 2% chance the schedule would be met (and concluded a month later that the probability was actually 0%).

313.    On July 31, 2018, Turquoise Hill issued a press release and an MD&A announcing

the Company's financial and operating results for the second quarter of fiscal year 2018, which it filed as exhibits to Forms 6-K with the SEC. Turquoise Hill reported a "record-level of…underground development" and assured investors that a review of Oyu Tolgoi revealed no material changes to the scope, cost, or schedule:[18]

**Underground development progress**

The main focus of underground development for 2018 continues to be underground lateral development, the fit out of Shaft 2, support infrastructure and the convey-to-surface decline. *The Company continues to expect the first draw bell in mid-2020 and sustainable first production in 2021*.

Underground lateral development was reduced during the first two months of Q2'18 partly due to the commissioning of the new Shaft 5 permanent fans and the resulting ventilation flow transition underground. However, June subsequently achieved a record-level of equivalent underground development with 0.9 kilometres developed. *Progress overall during Q2'18 was 2.4 equivalent kilometres with a total of 12.7 equivalent kilometres of lateral development completed since the re-start of development*. During 2018, underground development is expected to advance approximately 10.0 kilometres.

\* \* \*

*Also during Q218, the Primary Crusher 1 chamber was excavated*. Eventually this chamber will hold the first 4,000 tonne per hour crusher to initially feed the Shaft 2 production system up to 30,000 tonne per day in the first part of underground ramp up.

\* \* \*

During Q4'17, Rio Tinto undertook a schedule and cost review. *Rio Tinto has provided Turquoise Hill with a high-level overview of the review's outcomes, in which Rio Tinto concluded there were no material changes in project scope, cost or schedule. Following analysis of the review's conclusions, Turquoise Hill is in*

---

[18] Each of the MD&As filed by Turquoise Hill during the Class Period was accompanied by a certification signed by Defendants Colton or Quellmann as Turquoise Hill's CEO and Colton as Turquoise Hill's CFO stating that the MD&A and accompanying financial report did "not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made." Defendant Jacques similarly certified that Rio's 2018 annual report did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

*agreement with the findings.*

314.     During an investor conference call the next day, on August 1, 2018, Defendants Lane, Colton, and Quellmann reassured investors about the ground conditions at Oyu Tolgoi and provided a detailed report on numerous aspects of the progress purportedly made on the underground expansion.

315.     In doing so, Defendants Lane, Colton and Quellmann each independently stated and confirmed that the schedule was on track and that Oyu Tolgoi was "on target" for "first drawbell in mid-2020 and sustainable first production in 2021":

Colton:  During the second quarter, underground progress continued and we completed a major milestone, with Shaft 5 ventilation system becoming fully operational. ***Lateral development continued to advance during the quarter, albeit at a slightly slower rate in the first quarter due to the completion of the Shaft 5 ventilation system.***

That said, June development rates were at record levels. Brendan [Lane] will provide more detail on underground development later in the call. ***We do maintain our expectation of first draw bell in mid-2020 and sustainable first production in 2021.***

Lane:    [D]uring the second quarter, a chamber for primary crusher 1 or PC1 completed its primary mass excavation.

* * *

Overall, the main focus areas for the project continue to be critical headings development, Shaft 2 infrastructure work, that also includes an underground ore bin and materials handling development, as well as surface infrastructure like the new mine drive facilities and essential heating plant expansion.

***Finally, we will remain on target for the first drill point blast in mid-2020 and sustainable production in early 2021.***

Quellmann:  We've hit several underground milestones thus far in 2018, including the completion of Shaft 5. And finally, we continue to expect production from the first draw bell mid-2020 and sustainable first production in 2021.

316.     The statements above in ¶¶307, 313-15 that the "major growth projects remain on

track," that "first drawbell" was "anticipated in mid-2020," and that Defendants expected "sustainable first production in 2021" were materially false and misleading because, in truth, the schedule and major growth projects were not "on track" but at least a year behind schedule and hundreds of millions of dollars over budget.  Further, Defendants' statements were materially false and misleading because they omitted the highly material facts set forth in ¶¶81-101 concerning the abysmal construction and engineering work of Shaft 2 and the other major problems with the expansion.

317.  Additionally, Defendants' statements concerning the excavation of the chamber for primary crusher 1 were false and misleading because, as documented in the ICG Report, the excavation was too small for primary crusher 1 and had to be resized due to basic and inexplicable design flaws that would have been obvious to "experienced underground designers."  These design flaws, as well as underground infrastructure issues related to the excavation of the chamber for PC1, contributed significantly to the cost overruns and schedule delays at Oyu Tolgoi, and it was misleading for Defendants to omit these material facts while describing the excavation of the PC1 chamber while maintaining the underground development remained "on track."

318.  Last, these statements were misleading because they were accompanied by additional false statements of fact.  For example, the statement that the slow pace of lateral development during the quarter was a result of the commissioning process related to Shaft 5 was materially false and misleading because the progress during the quarter was, in truth, impacted by the highly material delays identified in ¶¶102-10, 151-52, and 158-60.

319.  Defendants also misrepresented numerous other aspects of the actual progress of the OT underground expansion.  For example, Defendant Lane spoke at length and provided a detailed chronology of the progress purportedly made at Oyu Tolgoi, suggesting that the only

slowdown that had occurred during the quarter resulted from the Shaft 5 ventilation commissioning and, in any event, that slowdown would not prevent OT from reaching its 10-kilometer lateral development target. Moreover, Defendant Lane omitted any mention of a slowdown concerning Shaft 2—which instead was presented as progressing smoothly and without any issue:

> ***Shaft 2 and associated work will continue throughout the year following the completion of shaft stripping and bracket installation in the last quarter. Equipping is well underway with the cable and piping installation initiated during the period.***

> Shaft 2 cages and skips are expected to be delivered on-site late in the third quarter for installation during the fourth quarter.

> *       *       *

> Taking into account the rotating shifts, the daily average project workforce on-site during the quarter was over 4,000. The Shaft 5 ventilation system was fully commissioned during the quarter and is now operational and adding additional air capacity to mine.

> Shaft 5 is now a dedicated exhaust ventilation shaft fitted with 3 surface fans. It has 2 ventilation take-off points, one at the 1,141-meter level and one at the shaft bottom at 1,178 meters.

> ***

> ***Impacts from the [Shaft 5] fan commissioning and the transition of airflows underground were felt during the quarter and resulted in the slowing of lateral development for the period, namely in April and May.*** Consequently, we recorded the first quarterly drop in development since project restart. However, the upward trend is expected to be back in the third quarter with June having a record month and July tracking quite well to date. ***We still expect to meet the target of 2018 of approximately 10 kilometers of development.***

320.    The statements above that Shaft 2 equipping was "well under way with the cable piping installation initiated during the period" were materially false and misleading because, in truth, equipping for Shaft 2 was not "well under way" but instead was facing significant challenges in terms of planning and progress by July 2018, according to internal monthly project reports. In truth, Shaft 2 equipping had been mismanaged by Rio Tinto, including because there was no synchronization between engineering and construction, as Field reported and as corroborated by

129

the ICG Report.  Moreover, it was materially false and misleading for Defendants to state that equipping for Shaft 2 was "well under way" without disclosing that Defendants had several months earlier terminated the senior-most manager responsible for Shaft 2, Brinkmann, as a scapegoat after he had repeatedly warned management about the delays in Shaft 2.

321.    During the August 1, 2018 investor conference call, Defendant Colton downplayed analyst concerns about the financing of Oyu Tolgoi and available capital for completing the expansion:

> So when you think about our funding requirements, and you think about the—what we currently have at our disposal, we've got about $2.6 billion left of project financing.  And we've got about $1.5 billion in TRQ cash. So that gets you to around $4 billion, $4.1 billion just in cash that's available now. We'll obviously use that to continue to fund the underground. If you look at the additional $1.6 billion in supplemental debt that we can raise to before we hit our debt cap at an OT level, that is something that is continued to be looked at and will be progressed as necessary in order to complete the underground expansion.

322.    Turquoise Hill's attempts to reassure investors that it had enough funding to complete the underground expansion because it had $2.6 billion in project financing available as of July 2018 was materially false and misleading because, in truth, the costs and schedule overruns had by that time amounted to hundreds of millions of dollars over the original budget and had materially depleted the funds available for financing the completion of the Oyu Tolgoi project.

323.    On August 1, 2018, Rio Tinto also commented on the Oyu Tolgoi underground project, filing a Form 6-K including its Unaudited Condensed Interim Financial Report for the six-month period ended June 30, 2018.  The Interim Financial Report stated that the development of the Oyu Tolgoi underground project remained on budget and on schedule:

> Oyu Tolgoi underground copper mine development in Mongolia (approved project spend of $5.3 billion): **construction of first drawbell expected in 2020, with average annual production of 560 thousand tonnes between 2025 and 2030.**[9]

---

[9] This production target was disclosed in a release to the market on 6 May 2016.

***All material assumptions underpinning that target continue to apply and have not materially changed.***

324.    On August 1, 2018, Rio Tinto also held an investor conference call to discuss the six-month financial results.  A written presentation for the call listed Defendant Jacques' name on the cover and was posted on Rio Tinto's website.  The slides stated that the Oyu Tolgoi underground development remained "***on track***" (in two places) and on budget with "***$5.3 billion Oyu Tolgoi underground first drawbell production in 2020***."

325.    The statements above in ¶¶323-24 that the "construction of first drawbell [was] expected in 2020, with average annual production of 560 thousand tonnes between 2025 and 2030" and that "all material assumptions underpinning that target continue to apply and have not materially changed" were materially false and misleading because, in reality, Shaft 2 was at least a year behind schedule and hundreds of millions of dollars over budget.  Further, Defendants' statements that "all material assumptions underpinning" the target of 560 thousand tonnes between 2025 and 2030 remained unchanged was materially false and misleading because, in fact, there had been material changes to those assumptions—including the fact that, by July 2018, the schedule was at least a year behind and the budget was hundreds of millions of dollars above the assumptions contained in the 2016 feasibility study.

326.    Similarly, Rio's statements that Oyu Tolgoi remained "on track" and on budget at "$5.3 billion" with "first drawbell production in 2020" were materially false and misleading because, in truth, the schedule and budget were not remotely "on track."  Further, the statements above in ¶¶323-24 were materially false and misleading because they omitted highly material facts, including those set forth in ¶¶81-101 concerning the abysmal construction and engineering work of Shaft 2 and the other major problems with the expansion.

327.    Last, these statements were false and misleading because they were accompanied

by additional false statements of fact. For example, the statement that the slow pace of lateral development during the quarter was a result of the commissioning process related to Shaft 5 was materially false and misleading because the progress during the quarter was, in truth, impacted by the highly material problems identified in ¶¶102-10, 151-52, and 158-60.

328.    On August 15, 2018, Defendant Soirat appeared on MBN World, a Mongolian news network, and discussed the Oyu Tolgoi underground project. During the interview, Defendant Soirat stated that he had recently visited the Oyu Tolgoi mine and met with mine employees, that Oyu Tolgoi was "37% complete," and that the underground project was "***on plan and on budget***."

329.    Similarly, on September 26, 2018, Defendant Jacques gave a presentation on behalf of Rio Tinto at the Bernstein Pan European Strategic Decisions Conference in London. A written presentation for the conference listed Jacques' name on the cover and was posted on Rio Tinto's website. The presentation represented that Oyu Tolgoi would begin production according to the previously announced schedule, stating that the "$5.3 billion Oyu Tolgoi underground first drawbell production" would take place in 2020.

330.    The statements by Defendants Soirat and Jacques in ¶¶328-29 that the underground project was "on plan and on budget" for first drawbell production in 2020 with capital expenditures of $5.3 billion were materially false and misleading because, in truth, the expansion project was a year behind schedule and hundreds of millions of dollars over budget by that time "with this expected to escalate rapidly"—a fact that Bowley had reported to Defendant Soirat's gatekeeper before Soirat made these statements. These statements were also materially false and misleading because they omitted highly material facts concerning the true state of the progress made at OT, as detailed in ¶¶81-152.

**B.     Defendant Soirat Falsely Reassures Investors That Oyu Tolgoi Is On Budget And On Schedule Two Weeks Before The "Re-Forecast"**

331.    On October 2, 2018, two weeks before Defendants would announce a false and misleading "re-forecast" of the Oyu Tolgoi underground development, Defendant Soirat gave a presentation on behalf of Rio Tinto at the Copper & Diamonds roadshow held in the United States. Soirat met with investors, reassuring them that the underground project was on track just before Defendants publicly announced a nine-month sustainable-production delay.  Soirat's presentation included slides that again represented that the project was proceeding on track: "***Underground project on budget and schedule***"; "***$5.3 billon capex projected***"; "***First drawbell production expected mid-2020***"; and "***UG [underground] project on time to deliver mid-2020.***"

332.    The slides stated, as before, "This production target was disclosed in a release to the market on 6 May 2016…. ***All material assumptions underpinning these production targets continue to apply and have not materially changed.***"

333.    The statements above in ¶¶331-32 that the "Underground project [was] on budget and schedule"; that "$5.3 billon capex [was] projected"; that "First drawbell production [was] expected mid-2020"; and that "UG project [was] on time to deliver mid-2020"—and that "All material assumptions underpinning these production targets continue to apply and have not materially changed"—were materially false and misleading.  As Bowley stated in his sworn Witness Statement submitted in the U.K. Employment Tribunal, these statements were "completely untrue," a fact that he raised internally at Rio Tinto just days after they were made. As Bowley recounted, these statements were "completely untrue" because, in reality, the OT expansion was hundreds of millions of dollars over budget and at least a year behind schedule, as Bowley had documented and reported to Soirat.  These statements were also materially false and misleading because they omitted highly material facts concerning the true state of the progress

made at OT, as detailed in ¶¶81-152, including that the lead manager responsible for Shaft 2 had recently been terminated and scapegoated after raising concerns about the delays and trying to address them, that up to 95% of the steel on the headframe of Shaft 2 had to be replaced because it was defective and that, as described above at ¶124, "everyone" at OT knew the schedule was at least a year behind where it should have been.

### C. Defendants Issue A False And Misleading "Reforecast" In Order To Conceal Delays And Reassure Investors That Capital Costs And Schedule Remain In Line

334. On October 15, 2018, Turquoise Hill issued a press release entitled "Turquoise Hill Announces Third Quarter 2018 Production and Provides Underground Development Update," which it filed with the SEC as an exhibit to Form 6-K. Specifically, TRQ disclosed that there would be a two- or three-quarter delay in achieving sustainable production, which it attributed to unspecified delays and "challenging ground conditions" affecting the completion of Shaft 2. At the same time, the Company reassured investors that "*capital costs remain in line*," and "*the project remains on schedule to complete in 2022.*"

335. The October 15 press release included a statement by Defendant Quellmann:

Rio Tinto has undertaken a second annual re-forecast of underground development schedule and costs and *preliminary results have concluded that capital costs remain in line with the overall $5.3 billion budget and the project remains on schedule to complete in 2022.* However, there are certain delays, most notably to the completion of Shaft 2, which includes schedule contingency, that are ultimately expected to result in *a revised sustainable production start from the first quarter of 2021 to late in the third quarter 2021*. We are undertaking a review of the cause and the impact of these delays and will announce the results as soon as possible.

336. The press release also stated that the underground development remained on budget despite the delay:

Rio Tinto, in its role as manager of Oyu Tolgoi and underground construction contractor, has undertaken its second annual schedule and cost re-forecast for the project. *According to this re-forecast, lateral development has progressed well, construction completion schedule remains on track for 2022 and the project is*

*expected to be completed at the $5.3 billion budget estimate disclosed in the 2016 Oyu Tolgoi Feasibility Study and the 2016 Oyu Tolgoi Technical Report.*

\* \* \*

Despite significant progress in the development of the project, Rio Tinto has notified Turquoise Hill, based on preliminary results, of a delay to achievement of sustainable first production, which is now expected to occur by the end of Q3'21 instead of Q1'21.  *This is a result of certain delays including, but not limited to, the completion of Shaft 2, which includes over four months of schedule contingency, and challenging ground conditions.  First draw bell remains on track for mid-2020, partly due to a change in the draw bell sequencing strategy.*

Shaft 2 production capability is a key enabler of increased underground development as well as further construction of critical underground infrastructure such as Primary Crusher One and the material handling systems, that support the start of production ramp-up.  *While the full effect of some critical path impacts, including the Shaft 2 delay, has been partly mitigated, the net effect is sustainable first production has been forecast by Rio Tinto to be delayed by up to nine months, and is now anticipated to occur in late Q3'21.*

337.    Turquoise Hill provided a table on completed lateral development at Oyu Tolgoi for the third quarter of 2018 as follows:

| Year | Total Equivalent Kilometres | Lateral Development (kilometres) | Mass Excavation ('000 metres$^3$) |
|---|---|---|---|
| 2016 | 1.6 | 1.5 | 3.0 |
| Q1'17 | 1.0 | 0.8 | 5.2 |
| Q2'17 | 1.4 | 0.9 | 9.2 |
| Q3'17 | 1.4 | 1.2 | 8.3 |
| Q4'17 | 2.2 | 1.9 | 8.9 |
| 2017 | 6.1 | 4.8 | 31.6 |
| Q1'18 | 2.6 | 2.1 | 11.6 |
| Q2'18 | 2.4 | 2.1 | 8.6 |
| Q3'18 | 3.0 | 2.3 | 17.9 |
| Total | 15.7 | 12.8 | 72.7 |

338.    For its part, Rio Tinto echoed Turquoise Hill's comments on the Oyu Tolgoi underground development on October 16, 2018 in a press release, which it filed with the SEC as an exhibit to Form 6-K:

*Following an annual re-forecast of the Oyu Tolgoi underground development schedule and costs, capital costs remain in line with the overall $5.3 billion*

*budget and construction of the first draw bell is still expected in mid-2020.* The preliminary re-forecast assessment indicates ground conditions and shaft sinking challenges that are ultimately expected to result in a revised ramp-up schedule to sustainable first production.

339. The statements in ¶¶334-38 that the $5.3 billion budget for the underground project was on track and the first drawbell remained on track for "mid-2020" were false and misleading because, in reality, the OT expansion was hundreds of millions of dollars over budget and at least a year behind schedule, as Bowley had documented and reported to Soirat. In fact, rather than achieve 2.3 kilometers in lateral development during the quarter as set forth in the chart above at ¶337, only approximately 1.8 to 2.1 kilometers had been completed, as lateral expansion was at least 100-200 meters behind schedule (under a schedule requiring construction of 800 meters) per month as set forth above at ¶¶105, 275. Turquoise Hill would later admit that the lateral expansion figure it reported for the third quarter of 2018 was false, overstated and had to be revised.

340. These statements were also materially false and misleading because they omitted highly material facts concerning the true state of the progress made at OT as detailed in ¶¶81-152, including that the lead manager responsible for Shaft 2 had recently been terminated and scapegoated after raising concerns about the delays and trying to address them, that up to 95% of the steel on the headframe of Shaft 2 had to be replaced because it was defective, that the initial headframe construction was described as "criminal" and required fixing, and that "everyone" at OT knew the schedule was at least a year behind where it should have been.

341. The statement in ¶334 attributing the delays to "challenging ground conditions" was materially false and misleading because, as alleged in detail in ¶¶102-10, 151-52, and 158-60, and as corroborated by the ICG Report, Bowley and multiple other former employees, the delays were caused by the engineering, procurement, and construction problems in Shaft 2, not by ground conditions. Bowley reported internally and Defendants knew these statements were false and

misleading because the undisclosed true 12- to 18-month delay and associated cost overruns were not driven by geotechnical issues ("ground conditions") but by undisclosed construction and project mismanagement. Moreover, as alleged in detail in ¶¶257-61, multiple former employees have stated that to the extent any part of the delay was caused by ground conditions, Rio Tinto was aware of these ground conditions and deliberately covered them up in order to avoid reporting additional costs and delays in light of the problems with Shaft 2. Further, the ICG Report confirms that "ground conditions" or geotechnical issues were not a significant contributor to the schedule delays and cost overruns at Oyu Tolgoi.

342. Further, the statements in ¶¶334-36 and 338 concerning the re-forecast of the underground project were false and misleading because the re-forecast was a deliberate attempt to obscure the true costs and delays to the underground project. For example, Fagen called the re-forecast a "clever" way to address the 12-month delay and cost overruns that existed in August 2018, and FE 3 said that Defendants' statements in October 2018 that the project was behind schedule but still on budget were not "accurate at all" because Rio and TRQ were only shifting costs to later periods and in a manner that would only increase them. And the ICG Report confirmed that the reforecast led to "misleading" reporting about the underground development's actual progress.

343. In addition, as Bowley told Sayed in an October 29, 2018 email, representing that there would be a "limited impact on first drawbell" was a "suicidal statement" and misleading because, in fact, there was no reasonable expectation that this timeline could be achieved. Last, Defendants' statements concerning the schedule and drawbell timeline were false and misleading because they failed to disclose that Bowley—the expert Defendants hired to investigate and fix the schedule delays and cost overruns—called Defendants' statements about those topics "suicidal,"

misleading and untrue.

### D. Defendants Continue To Reassure Investors That The Project Is On Schedule And On Budget After The False "Re-Forecast"

344. Following the announcement on October 15, 2018 of the OT "re-forecast," Defendants made numerous reassuring statements that the slight adjustment to the substantial-completion schedule did not impact any other major deadlines and that the overall budget for OT remained intact. For example, on November 1, 2018, Turquoise Hill issued a press release, which it filed with the SEC as an exhibit to Form 6-K, announcing the Company's financial results for the third quarter of fiscal year 2018.

345. In the press release, TRQ again reported on Rio Tinto's second annual reforecast of underground-development schedule and costs: "construction completion schedule remains on track for 2022 and the project is expected to be completed at the $5.3 billion budget estimate." TRQ also again noted that "sustainable first production . . . is now expected to occur by the end of Q3'21 instead of Q1'21. This is a result of certain delays including, but not limited to, the completion of Shaft 2, which includes over four months of schedule contingency, and challenging ground conditions." TRQ stated that "[f]irst draw bell remains on track for mid-2020."

346. The statements in ¶345 that the underground project was "expected to be completed at the $5.3 billion budget estimate" and that the completion of Shaft 2 "include[d] over four months of schedule contingency" were false and misleading because, as Bowley had told Soirat, the project at the time was 12 to 18 months behind schedule, not 9 months, and $750 million over budget. Thus, there was no "four month" contingency, which had already been exceeded. Defendants' statements were also materially false and misleading because they omitted highly material facts concerning the true state of the progress made at OT as detailed in ¶¶81-186 and the ICG Report, including that the lead manager responsible for Shaft 2 had been terminated as a scapegoat, that

up to 95% of the steel on the headframe of Shaft 2 had to be replaced because it was defective, and that "everyone" at OT knew the schedule was at least a year behind where it should have been.

347.    During an investor conference call regarding Turquoise Hill's third quarter fiscal year 2018 financial results on November 2, 2018, Defendants addressed the October 2018 "re-forecast" in detail.  As set forth below, in prepared remarks and in response to analyst questions, Defendants reassured investors that there was nothing out of the ordinary about the "re-forecast," which was purportedly entirely typical in mining projects like this one, and that the budget remained the same.  Notably, Defendant Lane, TRQ's COO, participated in the call from Mongolia, and was tasked with answering analyst questions about the "ground conditions" that had been blamed for the recently disclosed delays, providing a false sense of legitimacy to Defendants' "ground conditions" narrative.

348.    For example, Defendant Quellmann stated that the delay was "not atypical in the mining industry":

> If we turn to the underground and how that is progressing, OT is in the midst of a transformation into a true Tier 1 asset.  We have a strong and uniquely-experienced operating partner in Rio Tinto.  We did announce on October 15 that Rio Tinto now projects a 9-month delay for the start of sustainable production from the underground development.  The work delays are of course not desirable, ***developing the OT underground blockade is a very large undertaking and these types of delays are certainly not atypical in the mining industry for projects of this scale and complexity.***  Meanwhile, we're in the midst of a review of the project progress and status[.]

349.    Following these remarks, analysts pushed Defendants for certainty about the delay and its implications.  For example, an analyst from Eight Capital asked about the "nine-month delay in the context of the $5.3 billion budget" and why Defendants were not reporting a larger financial impact given that the extended timeline presumably increased certain costs, like "increased contractor costs and a longer time to keep an elevated workforce."  In fact, Eight Capital asked directly whether "accrual to contingency [is] the reason why we're not seeing more CapEx

or is it largely because these sums are largely immaterial in your view?"

350.     In response, Defendant Quellmann reassured investors that the primary underground expansion milestones remained the same and had actually been "confirmed," so that there would not be associated cost increases for labor (for example) for those tasks.  As Defendant Quellmann put it, "part of the re-forecast and the preliminary conclusions actually confirmed the existing assumptions so costs, as you just referred to, stay the same," including the final completion date, or first drawbell, and that it was only "really the first sustainable production [deadline] which has been pushed out."  Further, Defendant Quellmann noted that any changes in the capital expenditures would depend on future events, as there was a "degree of contingency" in the revised schedule that could be impacted by various "mitigation options" and that "[f]or now, where we are with the information that we've provided, we confirm the $5.3 billion total budget."

351.     Analysts also asked numerous questions seeking clarity on the exact causes behind the delay in order to assess its impact.  For example, a Scotiabank analyst asked for additional color on "exactly sort of what caused the delay in terms of the underground ramp-up" and whether "we should think of this as like a nine-month knock-on delay on the whole plan" or as something that could be recovered "relatively quickly" to get back to the previously disclosed schedule.  Again, Defendant Quellmann provided assurances concerning the work being done to analyze the key drivers of the delay and pointed to the cushion in the new schedule and the future potential "mitigation impacts" that "still can be affected."

352.     Likewise, an analyst from Rossport Investments asked why investors should not be concerned about the delay becoming "something bigger and longer-lasting," where "production is delayed for a long period of time."  In response, Quellmann reassured investors that Turquoise had "one of the best operators in the industry with Rio Tinto as the project manager," that it was

undertaking a review to come up with mitigation options that would "minimize any potential delay from a timing perspective, from a cash flow perspective" and that "[g]iven the size, the complexity of these projects, these things have happened in other projects and that's maybe why you're asking the question and that's why we're putting these safeguards in place to make sure that the concerns that you have is absolutely minimized and doesn't happen."

353.     The statements in ¶¶347-52 that the delays with the underground project were "not atypical" and "happened in other projects," Defendants' statements confirming the $5.3 billion budget, and their assurances that capital expenditures were not materially impacted were materially false and misleading.  In truth, the delays at Oyu Tolgoi were atypical and material because, as described by former OT managers, they resulted from abysmal construction and procurement work, and were like nothing they had ever experienced in their long careers in mining.

354.     Further, rather than being cushioned by any "degree of contingency," in reality, the Oyu Tolgoi expansion project was 12 to 18 months behind schedule, not 9 months, and at least $750 million (and as much as $2 billion) over budget—and thus there was no "contingency" left in the false timeline Defendants provided to investors. The ICG Report further confirms that, by the time Defendants were reassuring investors in November 2018, the project had suffered significant delays to multiple critical path items, including Shaft 2 and the Primary Crusher #1.  In addition, the statements in ¶¶350-52 concerning available "mitigation options" were materially misleading because they failed to disclose that Bowley, in February 2018, proposed a mitigation option to address the cost overruns and delays—but Defendants rejected it and sidelined him to prevent the truth concerning the OT project delays and cost overruns from becoming public.

355.     Analysts also specifically asked about the status of Shaft 2.  For example, a Sefton Life analyst asked about "how Shaft 2 fit-out is going," asked for some "sense of the magnitude"

of the delay (e.g., whether it was due to something that was meant to take a month but took 6 weeks), and asked whether it resulted from the "fit-out" itself or a delay to "sinking the shaft" that had been carried over.  The Sefton Life analyst also asked "how much contingency" was "still left in the $5.3 billion CapEx estimate versus the amount of contingency initially provided for."

356.    Defendants refused to provide specifics and instead reassured investors that the delay in Shaft 2's completion had only been pushed out one quarter—from an expected completion date of the end of 2018 to the first quarter of 2019.  For example, Defendant Lane reassured investors that the delay on Shaft 2, "especially the fit-out was supposed to be complete at the end of – or everything combined by the end of the year, and now it's moved into quarter one as per the re-forecast."  Following Defendant Lane's comment, Defendant Quellmann provided additional reassurance by telling investors that the "key takeaway of the delay" on Shaft 2 was that Defendants' new estimate of an additional nine months incorporated the Shaft 2 delay and did not take into account any "mitigations"—i.e., efforts to "make up" for the lost time resulting from Shaft 2 delay—and that this part of the re-forecast period is "still ahead of us."

357.    In fact, in responding to analysts' questions seeking additional information about the exact "ground conditions" that were unexpected and resulted in delays, Defendant Lane provided two examples—both of which were false and unsubstantiated.  Specifically, Defendant Lane highlighted "ground conditions" encountered with mass excavation around Bin 11, which purportedly impacted the progress of Shaft 2, as well as some of the mass excavations relating to the PC1 chamber:

Rossport:      ….[T]he word ground conditions is a very loose term. So, kind of, what were the ground condition issues that were unexpected so far, where did they cause, was it a weakness in one area that had to be reinforced and now it's done that something that could be specifically identified to kind of of give us comfort that it's not going to be, it's not going to be a chronic issue….

***

Lane:        Yeah, in the last quarter, there has been some mass excavation around Bin
             11, that is part of the Shaft 2 infrastructure. And that has caused that Bin 11
             component to fall behind schedule, but that's now in the past.  So that part
             of the ground conditions has been absorbed.

Rossport:    Could you just repeat that please? What was it?

Lane:        In part, in Bin 11, which is part of Shaft 2.

***

Lane:        That's what I'm trying to say, some of these ground condition problems
             have been – either that happened in the past, and some of those are behind
             us. Some of them are recognized.  And some of the mass excavations is in
             the chamber and so they are being dealt with now for the PC1 chamber. And
             then there's some small amounts in certain areas, elsewhere, but it's, from
             what we've seen so far and this is part of the review that will go on is that
             we will look at everything that's been done so far and take our own view on
             the extent of them – but it doesn't – it's mainly in the footprint mass
             excavations where some of the mechanical equipment is going to be
             installed.

358.    Defendant Quellmann's statements in ¶¶355-56 concerning Shaft 2 and the budget
were materially false and misleading because they omitted the highly material facts concerning the
actual progress of Shaft 2 as detailed in ¶¶81-186, and rather than having some contingency "in
there" in the $5.3 billion budget, in truth, the project was at least $750 million dollars (and as much
as $2 billion) over budget at the time.

359.    Defendant Lane's statements in ¶¶355-57 concerning the purported "ground
conditions" contributing to the schedule delays were materially false and misleading because, in
truth, ground conditions had nothing to do with the delays in completing Shaft 2 or the massive
schedule delays and cost overruns that had been experienced by this time.

360.    In fact, the ICG Report confirmed that Rio's citation to ground conditions
impacting the PC1 were "unsubstantiated" and a false post-hoc explanation for the delay in

143

completing PC1.  The ICG Report explained that a crusher chamber is excavated top down, where the next cut is not started until the excavated cut above is fully supported, and thus, before dropping to the next cut, face mapping would have already been completed and any concerns for structure recognized and appropriate ground support supplied.  Because there was no evidence that this had occurred during the excavation of the PC1 chamber, the ICG Report concluded that any claim that "ground conditions" were responsible for the PC1 delay were false, and that "repairing anything significant enough to affect the excavation schedule seems like a major construction oversight, not a 'ground condition worse than expected.'"

361.    The ICG Report further confirmed that any claims that "ground conditions" impacted mass excavation around Bin 11 were false and "not substantiated in any way" and that the supposed "'surprises' noted in the various Shaft #2 components were common unexpected ground conditions," and that the notion that "unexpected ground" conditions materially impacted Shaft 2 completion "were not evidenced in the documents reviewed."

362.    In a corresponding investor presentation on Turquoise Hill's Third Quarter 2018 Financial Results dated November 2, 2018, the Company made further reassuring statements about the status of underground development.  Among other things, the presentation represented that the "UG development project budget [was] unchanged," that "key risks" were "well understood and managed," and that "Turquoise is Well Positioned to Address Key Challenges," including having sufficient funding to develop the mine.

363.    The statements quoted in ¶362 that the underground project remained on budget, that the key risks were "well understood and managed," and that Turquoise had sufficient funding to deal with "key challenges" were false and misleading because, in truth, the OT expansion project was at least $750 million dollars (and as much as $2 billion) over budget, the key risks were not

"well managed" but out of control, and Turquoise Hill lacked the funding needed to deal with them. These statements were also false and misleading because they failed to disclose that the "re-forecast" disclosed by Turquoise Hill simply transferred costs and projects related to the major infrastructure of Shaft 2 to secondary phases and thus, it was not "true at all" that the budget was not impacted.

364. In fact, rather than "manage" OT's schedule risks, Defendants refused to manage the risks posed to the OT schedule and instead sought to bury the truth about the cost overruns and delays. For example, as reported by FE 3, after the lead manager for Shaft 2, Brinkmann, was scapegoated and terminated in May 2018, OT managers set up weekly integration meetings to address the delays and cost overruns and identified at least 60 critical actions that needed addressing—but those meetings were ultimately canceled and nothing had been done to address the critical actions by the time Defendants made their statements in October 2018. Further, Defendants failed to "manage" key risks at Oyu Tolgoi by rejecting the efforts by Bowley to do just that in February 2018.

**E.     Throughout The End Of 2018 And The Beginning Of 2019, Defendants Continued To Falsely Claim The Underground Project Was On Budget And On Schedule**

365. Following the October 2018 re-forecast, Defendants provided investors with repeated assurances that OT was on budget and on schedule, as that schedule had been purportedly modified in October. For example, on November 12, 2018, at the UBS Australasia Conference in Sydney, Australia, Defendant Jacques presented slides that highlighted Oyu Tolgoi as "the largest and highest quality copper development" in the world, with "$5.3 billion Oyu Tolgoi underground first drawbell production in 2020."

366. And on January 17, 2019, Turquoise Hill gave an investor presentation at the TD Securities Mining Conference. A slide deck accompanying that presentation, which noted that it

included "information received from Rio Tinto," again represented that Turquoise Hill was "Well Positioned to Address Key Challenges," that OT's "UG development project [was] unchanged," that the "Key risks" to the project were "well understood and managed," and that development was proceeding in accordance with the revised schedule:



367. On January 18, 2019, Rio Tinto issued a press release disclosing its third quarter production results, which it also filed as an exhibit on Form 6-K, and which conveyed the same message as Jacques' and Turquoise Hill's two prior investor presentations that the project was meeting the revised schedule:

> Work continues on the critical Shaft Two equipping activities, central heating plant, mine infrastructure, underground materials handling systems and on priority underground development. ***Overall progress continues to track in-line with the re-forecast undertaken in the third quarter of 2018***.

368. The statements quoted in ¶¶365-67 that the underground project remained on budget, that the key risks were "well understood and managed," that Turquoise Hill had sufficient funding to deal with "key challenges," and that "overall progress" was tracking "in-line with the re-forecast" were false and misleading because, in truth, the OT expansion project was at least

$750 million (and as much as $2 billion) over budget, key risks were not "well managed" but had trended out of control and the project was "massively underperforming," Turquoise Hill lacked the funding needed to deal with them, and the "re-forecast" was, in truth, a deliberate effort undertaken to conceal those facts.  The statement that progress was continuing "in-line with the re-forecast" was also misleading for the reasons identified in ¶¶111-71 and ¶¶179-86 because the concrete examples referenced by the statement—e.g., Shaft 2 equipping, central heating plant, and mine infrastructure work—were by then already at least a year behind schedule and falling further behind.

### F.  Defendants Falsely Attribute Delays To Later Stage "Understanding" Of "Challenging Ground Conditions," While Continuing To Conceal Cost Overruns And Reassuring Investors Concerning Budget And Schedule

369.  Beginning on February 27, 2019, Defendants began to disclose facts about the delays at OT but continued misleading investors concerning the implications for the project budget, and falsely blamed delays on unexpected and recently discovered "challenging ground conditions." Specifically, on February 27, 2019, Turquoise Hill issued a press release, which it filed as an exhibit on Form 6-K, entitled "Turquoise Hill Announces 2019 Financial Guidance and Provides Underground Development Update."

370.  In its comments on the underground expansion, Turquoise Hill cited "unexpected" "challenging ground conditions" at OT, which it claimed had resulted in "some potentially significant changes to the design of some future elements of the development, and the development schedule" that would result in an overall schedule delay to sustainable first production beyond the end of Q3'21.  Nevertheless, Turquoise Hill continued to mislead investors, stating that "total lateral development or equivalent development metres have remained on budget."  Further, Turquoise Hill represented that the delays were primarily the result of a review of "more detailed geotechnical data than what was previously available" showing more variability of the rock mass

than previously anticipated, which Turquoise Hill claimed could "require some potentially significant changes" to the mine design and development schedule.

371.    Similarly, that same day, Rio Tinto disclosed a delay in the OT schedule, attributing it to "challenging ground conditions," while reassuring investors OT development was "mostly on track."  Specifically, on February 27, 2019, Rio Tinto issued its 2018 full year results (the "Year-End Results").  The Year-End Results made the following statements about the Oyu Tolgoi project:

> The Oyu Tolgoi underground project continued to progress through 2018 with the construction of critical above and below ground infrastructure to develop Oyu Tolgoi into one of the largest copper mines in the world.
>
> ***Detailed engineering design work and overall construction progress is mostly on track.***  The main focus in 2018 has been underground lateral development, the fit out of shaft 2 (our main production shaft), support infrastructure and the convey-to-surface decline.  Recent achievements include the completion of the overland conveyor connecting shaft 2 to the coarse ore stockpile, significant progress on the second underground crusher and the expansion of the central heating plant.
>
> ***Overall the underground lateral development has been proceeding well, with a total of 19.0km achieved at the end of January 2019 against our second annual reforecast target of 19.8km.***  With the structural, mechanical and electrical fitout of shaft 2, it is now clear that the completion of this technically complex installation and commissioning work will be delayed by several months.  ***Delayed completion of the shaft, which provides additional hoist capacity to accelerate lateral development, will further delay the date we reach sustainable production beyond the 9 month delay indicated in October 2018.***
>
> As announced at that time, difficult ground conditions encountered had slowed progress in some areas of the underground development.   As the lateral development continues, we learn more about the rock mass around and under the orebody and have access to more detailed geotechnical data than was available from surface drilling.  This data reveals there are areas of the mine footprint where the strength of the rock mass is more variable than anticipated in the feasibility study.  This will require some potentially significant changes to the design of some future elements of the development and the development schedule.
>
> Detailed design work is under way as is the work necessary to estimate the impact on cost and schedule from these changes and the delay in commissioning shaft 2.

372.    The same day, Rio Tinto issued a written presentation concerning its 2018 annual results, which it filed as an exhibit on Form 6-K, in which Rio Tinto represented that the Oyu

148

Tolgoi underground project "Progressed well in 2018," as well as its 2018 Annual Report, which it later filed with the SEC as an exhibit to its Form 20-F on March 4, 2019 (the "Annual Report"). The 2018 Annual Report made the same statements about the Oyu Tolgoi project (with immaterial variations) as the Year-End Results.  It also stated that the "Total approved capital cost" of the Oyu Tolgoi project was $5.3 billion and that "By 2027, we expect our Oyu Tolgoi mine in Mongolia to become one of the world's top producers of copper." The Annual Report included a letter by Defendant Jacques, in which he stated:

> The world-class underground copper project at Oyu Tolgoi, in Mongolia, also progressed . . . . ***The detailed engineering design work and overall construction is mostly on track***, but more detailed geotechnical information and difficult ground conditions have required a review of the mine design. This, combined with fit-out and commissioning challenges with the main production shaft, is ultimately expected to result in a further revised ramp-up schedule to sustainable first production (beyond the nine-month delay indicated in October 2018).  Detailed design work is underway to estimate the impact these issues will have on cost and schedule.

373.    The statements in ¶¶370-72 that the underground project was "proceeding well," "mostly on track," and "on budget" were materially false and misleading because, in reality, the project was not remotely on track or proceeding well, and was at least $750 million (and as much as $2 billion) over budget, as reported by multiple former employees and by Bowley.  It was materially false and misleading for Defendants to state that OT was "proceeding well" and "mostly on track" while omitting highly material facts demonstrating the opposite, including those detailed in ¶¶81-186 and 209-20. Furthermore, the ICG Report confirms that "ground conditions" or geotechnical issues were not a significant contributor to the schedule delays and cost overruns at Oyu Tolgoi.

374.    Rio Tinto's 2018 Form 20-F also disclosed that, while there was "a deterioration in some internal and external indicators of value for the Oyu Tolgoi CGU [cash-generating unit]," it

had concluded that no impairment had taken place.  With respect to recent events, the 2018 Form

20-F stated:

> As set out in the Strategic report, in October 2018 we announced our annual reforecast of the development schedule which at that time suggested a nine-month delay in the schedule to sustainable production, primarily caused by delays in completing and equipping the primary production shaft and by some zones of variable rock strength that had been encountered. . . . These updates, together with an estimate of the financial impact of a potential further delay in the commissioning of the primary production shaft, have been reflected in the recoverable amount of the CGU [cash-generating unit] as set out above.
>
> Since then, our mine design teams have continued to work with the more comprehensive geotechnical data that has become available as the underground development continues, and it is clear that potentially significant changes to the design of some future elements of the development, and to the development schedule, will be needed, to allow for zones of particularly variable rock strength which have been encountered in the footprint of the mine.  The detailed design work is under way, as is the work necessary to estimate the impact on cost and schedule that these changes may have.
>
> Given the very early status of this work, no adjustments have at this time been made to the recoverable amount.  The Group will continue to review the CGU for further indicators of impairment as this work progresses.
>
> Recognising the uncertainties noted above, as well as the time remaining through to ramp-up of commercial production, the Group highlights that it does not consider the current headroom to be indicative of an impairment reversal at this time.

375.    The statement in ¶374 that Defendants did "not consider the current headroom to

be indicative of an impairment reversal at this time" was materially false and misleading because

the project was impaired and had been since before the Class Period.  For the same reasons, the

Oyu Tolgoi CGU as represented in Rio's Forms 6-K throughout the Class Period were materially

false and misleading.

376.    Defendant Jacques fielded analyst questions concerning the OT disclosure in an

investor conference call on February 27, 2019, in which he again highlighted the "good progress"

made at Oyu Tolgoi:

> During 2018, we made good progress on our underground project at Oyu

Tolgoi . . . . *As we learn more about the rock mass around and under the ore body, we continue to encounter geotech challenges*. This is a complex project, and we have indicated a further delay to the main production shaft and we will continue to assess the mine plan and design.   So in general, copper is not just well performing, it also has got exciting growth opportunities such as Oyu Tolgoi . . . .

377.     Later, in response to an analyst asking "what exactly are you experiencing" that was causing the OT schedule delay, Jacques amplified his remarks:

So where we are in the project today.  Remember, 5 years to build the infrastructure, 7 years to ramp it up.  We are mining in the ore body as we speak.  So the quantum of geotech data that we are accessing, we have access to is very significant.  And we need to go through a process of updating the model to make sure that the infrastructure is the right location on the back of the geotech data that we have. *This is, absolutely, a normal process.*

378.     In response to an analyst who sought further clarification about the "chance that the $5.3 billion CapEx really moved up significantly," Defendant Jacques again responded by highlighting the supposed geotech issues that he blamed as the driver of the delay:

So there will be—the final cost estimate will be prepared and most of the costs should be prepared this year, so we will have a better sense.  So let's see what comes out of it.  But the second element is really by building the mine, the infrastructure, the drill holes, the extraction drives and so on and so forth.  And that's clearly on the back of the information we have in terms of geotech that we need to look at where do we put the infrastructure?  So where do you put the extraction drives, depending on where the faults are?  Where do you put the air ventilation?  Where do you put the ore passes and so on and so forth in order to make sure that as and when you initiate the cave, then you have the right ground conditions and so on and so forth.  So the work is underway.  *Anyone who's got any block cave technology or experience should know that it happens pretty often*.  So when you have the geotech issue, you have to upgrade the model, and that's what the team is doing.  And what I said sometime during the year, we'll update the market accordingly.

379.     A CLSA analyst similarly asked for more detailed information concerning the "concerns around ground conditions," as well as how much "headroom" was available under the $5.3 billion CapEx budget.  In response, Defendant Jacques deflected the question about the budget and instead solely responded to the analyst's question about the ground conditions:

So one of the key questions that people are looking at is where should we put the infrastructure, we know the extraction drive and where we should initiate the cave,

and the pace at which we move in order to initiate the cave. So work is underway. By the way, the model will be updated on real-time basis, but we should have a pretty good view on where we are this year. I mean it is normal process. We are incorporating the geotech as we speak. And we have a better answer in the coming months, and we'll come back to the market.

380. The statements in ¶¶376-79 attributing the announced schedule delays to the purportedly new "geotechnical" data Defendants obtained were materially misleading because they omitted the highly material fact that a 12- to 18-month delay and at least $750 million (and as much as $2 billion) in cost overruns had been internally documented and were known by Defendant Jacques and other senior Rio executives since the beginning of the Class Period, and these delays and cost overruns were not driven by any geotechnical issues. Additionally, the ICG Report confirms that "ground conditions" or geotechnical issues did not impact the schedule and had a nominal (at best) impact on the cost overruns, and that blaming the delays and costs on "ground conditions" was a false excuse manufactured by Defendants to conceal their own mismanagement of the underground development.

### G. Defendants Continue To Misrepresent Delays And Fail To Disclose Cost Overruns, Claiming Delays Are "Absolutely Normal" And Based On New Geotechnical Data

381. Following the February disclosure, Defendants continued to misrepresent the true cost overruns at OT and their cause. For example, Turquoise Hill continued to reaffirm the $5.3 billion budget for the OT expansion. Specifically, on March 15, 2019, Turquoise Hill issued a press release, which it filed as an exhibit on Form 6-K, and filed an annual report on Form 40-F with the SEC (the "2018 Form 40-F"), announcing the Company's financial and operating results for the fiscal year ended December 31, 2018. That press release stated the OT project was expected to remain within the $5.3 billion budget, but added that there may be additional delays to sustainable first production, identifying three key risks:

Shaft 2 equipping delays were due to lower than expected productivity in steel and

electrical installation as well as increased quality assurance measures. It was likely the completion date would move beyond Q1'19 and impact overall underground development rate increases.

There have been delays to development progress and productivities in key areas. Even though lateral development has experienced consistent overall progress, development of some critical areas, such as the footprint, Primary Crusher 1 (PC1) system, Shaft 2 and Shaft 5, have been impacted by delays and, with the exception of Shaft 5, are critical path items for the project schedule. Small delays in lateral development on the footprint have had a direct impact on the project schedule critical path, even though total lateral development or equivalent development metres have been on budget. Development in the PC1 system (which includes the PC1 chamber and transfers 3, 4 and 5) has, since the time of the Rio Tinto Review data cut-off, fallen significantly behind target rates.

The Company review indicated that in some areas there was a delay to the critical path from scope growth in mass excavation and additional ground support due to unexpectedly adverse geotechnical conditions. Although the ground support quantities and installation times are less, but not materially less than planned in the 2016 Oyu Tolgoi Feasibility Study and ground support quantities are reported as lower than planned, some types of ground support have had reduced installation times.

382.    The press release also quoted Defendant Quellmann:

Underground development continued to progress during 2018 with more than 10 equivalent kilometres completed by year end.  As can occur in a project of this size and complexity, mine manager Rio Tinto has identified challenges with the location of some ore passes on the footprint.  ***We acknowledge Rio Tinto's proactive approach to maintaining the highest level of infrastructure stability by reviewing the location of these ore passes***.  The impact of these changes will be reflected in the definitive estimate review, which is expected to be complete towards the end of the year.

383.    Turquoise Hill updated its table on lateral development advancement at Oyu Tolgoi for Q4'18, and revised results for Q3'18:

| Year | Total Equivalent Kilometres | Lateral Development (kilometres) | Mass Excavation ('000 metres³) |
|---|---|---|---|
| **2016** | **1.6** | **1.5** | **3.0** |
| **Q1'17** | 1.0 | 0.8 | 5.2 |
| **Q2'17** | 1.4 | 0.9 | 9.2 |
| **Q3'17** | 1.4 | 1.2 | 8.3 |
| **Q4'17** | 2.2 | 1.9 | 8.9 |

| 2017 | 6.1 | 4.8 | 31.6 |
|------|-----|-----|------|
| Q1'18 | 2.6 | 2.1 | 11.6 |
| Q2'18 | 2.4 | 2.1 | 8.6 |
| Q3'18 | 3.0 | 2.1* | 23.3* |
| Q4'18 | 2.3 | 1.6 | 16.0 |
| 2018 | 10.3 | 7.9 | 59.5 |
| Total | 18.0 | 14.2 | 94.1 |

*:  Lateral development and mass excavation amounts for Q3'18 have been updated to reflect revised results.

384.    Turquoise Hill further described as a "shortfall" the "2.3 equivalent kilometres of development against a target of 3.0 equivalent kilometres" for the fourth quarter of 2018, blaming the shortfall on challenges including "time constraints during hoist rope maintenance and the introduction of a new underground traffic management plan," as well as a "shift in priorities of resources from lateral development to mass excavation."

385.    The statements in ¶¶381-84 that the OT expansion "continued to progress" and remained on budget were materially false and misleading because they omitted the facts that the project was in fact at least $750 million (and as much as $2 billion) over budget and 12 to 18 months behind schedule—and that these cost overruns and delays did not result from geotechnical issues but had been internally documented and reported to Defendants before the Class Period.  In fact, while Turquoise Hill admitted that its prior representation that there was 2.3 kilometers in lateral development during the third quarter in 2018 was false—and provided a "revised" estimate of 2.1 kilometers—Turquoise Hill continued to misrepresent the actual lateral development expansion progress.  Specifically, it was false and misleading for Turquoise Hill to represent that the underground development progress had only experienced a minor "shortfall" in one quarter by "hoist rope maintenance and the introduction of a new underground traffic management plan" when, in reality, lateral expansion was consistently 100-200 meters behind schedule under a schedule requiring construction of 800 meters per month since late 2017, as set forth above at

154

¶¶105, 275.  Further, the ICG Report confirms that "ground conditions" or geotechnical issues did

not impact the schedule delays and had, at best, a nominal impact on the cost overruns at Oyu

Tolgoi.

386.     Further, Defendants' representations concerning the key risks to the schedule were

materially misleading in that they failed to disclose the highly material facts about the construction

and engineering of Shaft 2, Shaft 5, and the Primary Crusher #1 as alleged in ¶¶81-186 and

discussed in the ICG Report, Defendants' knowledge of those issues since the beginning of the

Class Period, and their efforts to conceal them from investors.

387.     In addition, the 2018 Form 40-F added that, based on the then-"best available

information," the $5.3 billion project cost remained unchanged and no impairment was required:

> Since the completion of its independent review and as announced on February 27,
> 2019, the Company has become aware that Rio Tinto, as manager of the project,
> has advised that as the lateral development continues, there is more detailed data
> than what was previously available. As a consequence, Rio Tinto is studying the
> impact of some potentially significant changes to some future elements of the
> underground design including relocating the ore passes. This, together with the
> delay to Shaft 2 also announced by the Company on February 27, 2019, is
> ultimately expected to result in an overall schedule delay to sustainable first
> production beyond the end of the third quarter of 2021.
>
> Recognizing the uncertainties noted above, the Company acknowledges that a
> further delay to first sustainable production would have an adverse impact upon the
> recoverable amount. The Company has estimated that, based on its best available
> information, any possible additional delay to sustainable first production, whilst
> maintaining a total project cost of $5.3 billion, would reduce the recoverable
> amount by approximately $0.1 billion per each incremental month of delay. ***As
> such, the Company believes that any reasonably possible movement in the
> development schedule would not reduce the recoverable amount to below the
> carrying value of the Oyu Tolgoi cash-generating unit.***

388.     The statements in ¶387 that the underground project was "maintaining a total

project cost of $5.3 billion" and that delays "would not reduce the recoverable amount to below

the carrying value of the Oyu Tolgoi cash-generating unit" were materially false and misleading

because the project was in fact impaired—and OT had been at least $750 million (and as much as

$2 billion) over budget since the beginning of the Class Period.  For the same reasons, the Oyu Tolgoi cash-generating as represented in TRQ's Forms 6-K throughout the Class Period were materially false and misleading.

389.   In discussing these disclosures with investors on a conference call that day, Defendant Quellmann again attributed the schedule delays to a purportedly new "understanding" of the ore body based on additional geotechnical data:

> As announced on February 27, we were recently advised by Rio Tinto as our project manager that as the lateral development continues, *there is more data than was previously available.  And as a consequence, the understanding of the ore body has improved.  As such, the location of some of the underground infrastructure may need to change.*  Essentially, what that means is that we need to revisit the location of some of the ore passes on the footprint contemplated in the 2016 technical report with the benefit of this later stage and understanding.

390.   In addition, Defendant Quellmann responded to a number of analyst questions seeking further information concerning the extent of the delays and ability to mitigate them, including one asking how Defendants were "seeing the trade-off between delaying the sustainable first production versus the ability to ramp-up the underground faster."  In response, Quellmann suggested that the possibility of a delay in completing Shaft 2 only recently became apparent:

> October last year, Rio had conducted its cost and schedule review last year, we advised the markets of that.  That was an announcement at the time of a 9-month delay to sustainable—first sustainable production whilst confirming costs.  We then conducted our own independent review, which we—the results of which are included in our disclosure to the market, which effectively said that we confirmed the cost at the time, *but had identified some higher level of risks to the schedule, but not enough to warrant to change the indication to the market*.  Since then, if we fast forward to February of this year, it became obvious that Shaft 2 was delayed more than expected.

391.   Defendant Quellmann also suggested that Defendants' new understanding of the ore body contributed significantly to the revised schedule, noting it was not "uncommon, not unusual" for new geotechnical data concerning ore-body stability to result in a reexamination of the mine plan in projects like OT.

156

392.    The statements in ¶¶389-91 concerning the timeline for Shaft 2 and the purported impact of the geotechnical data were materially false and misleading because, in truth, the problems with Shaft 2 were known by Defendants from the beginning of the Class Period, were responsible for at least $750 million (and as much as $2 billion) in cost overruns and up to 18 months in delay—and were not the result of the ground conditions referenced by Defendant Quellmann.  Defendants' statements were also materially misleading because they omitted the true facts about Shaft 2 as noted above in ¶81-152.  Furthermore, the ICG Report confirms that "ground conditions" or geotechnical issues were not a significant contributor to the schedule delays and cost overruns at Oyu Tolgoi.

393.    Just like Turquoise Hill, Defendants Rio Tinto and Jacques continued to reassure investors about the progress at OT and dismissed or minimized concerns about that progress as an "absolutely normal" part of mine development.   On April 10, 2019, Rio Tinto held its annual shareholders meeting.  During the meeting, Jacques responded to a shareholder's question about rock stability at the Oyu Tolgoi mine by explaining that the geotechnical issues Rio Tinto purportedly encountered were "absolutely normal in the context of a block cave."

394.    The statements in ¶393 that the delays associated with OT were associated with geotechnical issues and that those issues were "absolutely normal" were materially false and misleading because, in truth, the delays at Oyu Tolgoi were abnormal and unusual and were actually the result of having to address the disastrous and dangerous initial engineering and construction work on Shaft 2, had contributed to at least $750 million (and as much as $2 billion) in cost overruns, and were not driven by the geotechnical issues highlighted by Defendant Jacques.

395.    Turquoise Hill likewise downplayed concerns about the delays by attributing them to geotechnical issues, and told investors that Shaft 2 would be completed by the end of October

2019.  On April 15, 2019, in a press release filed simultaneously with the SEC as an exhibit to a Form 6-K, Turquoise Hill echoed Defendant Jacques' April 10, 2019 statements in announcing first-quarter 2019 production for the Oyu Tolgoi mine and providing an update on underground development.  Specifically, Defendant Quellmann stated that "Rio Tinto, as project manager, has advised that it has completed a review of the fit-out and commissioning issues at Shaft 2 and it now expects Shaft 2 to be completed by the end of October 2019." Turquoise Hill further stated in its report that "more detailed geotechnical information and different ground conditions have required a review of the mine design and the development schedule."

396.    On April 16, 2019, Rio Tinto issued a press release entitled "Rio Tinto releases first quarter production results," which it also filed as an exhibit on Form 6-K.  The press release stated the following about development of the Oyu Tolgoi underground project:

> At the Oyu Tolgoi Underground Project the review of the mine design and the development schedule is continuing.  ***The commissioning of the main production shaft (Shaft 2) is now expected to complete in October 2019.***
>
> *      *      *
>
> Work is underway at the Oyu Tolgoi Underground Project to understand the overall cost and schedule impacts resulting from the review of the mine design and delays with the fit-out and commissioning work on Shaft 2, as announced in February 2019.
>
> Work continues on critical Shaft 2 equipping activities, central heating plant, mine infrastructure, underground materials handling systems and on priority underground development….
>
> ***The mine design work, announced in February, to adjust to more detailed geotechnical information and difficult ground conditions continues.  Also as announced in February, there have been further delays in the technically complex fit-out and commissioning work on the main production and services shaft (Shaft 2).***  It is now anticipated that the commissioning of Shaft 2 will be completed by the end of October 2019.  This further delay in Shaft 2 will impact on the timeline for other activities in the underground development, and the impact of this and of the mine design work referred to above on the overall project schedule and costs will be announced once the necessary work has been completed.

158

397.    The statements in ¶¶395-96 concerning the commissioning of Shaft 2 and the reasons for further delays were materially false and misleading because they failed to disclose the highly material facts that the underground project was behind because of significant engineering, construction, and procurement issues, as detailed in ¶¶81-152. Furthermore, the ICG Report confirms that "ground conditions" or geotechnical issues were not a significant contributor to the schedule delays and cost overruns at Oyu Tolgoi.

398.    On May 15, 2019, Turquoise Hill issued a press release filed with the SEC on Form 6-K announcing the Company's financial and operating results for the first quarter of fiscal year 2019, and reported that "more detailed geotechnical information and different ground conditions have required a review of the mine design and the development schedule" that would be incorporated into the definitive estimate review that Turquoise Hill was conducting.

399.    Turquoise Hill also updated its table on lateral development for Oyu Tolgoi for Q1'19:

| Year | Total Equivalent Kilometres | Lateral Development (kilometres) | Mass Excavation ('000 metres[1]) |
|------|------|------|------|
| 2016 | 1.6 | 1.5 | 3.0 |
| 2017 | 6.1 | 4.8 | 31.7 |
| 2018 | 10.3 | 7.9 | 59.5 |
| Q1'19 | 3.2 | 2.3 | 21.4 |
| Total | 21.2 | 16.6 | 115.5 |

400.    During a conference call the next day, May 16, 2019, Defendant Quellmann claimed that the definitive estimate work "*may include some potentially significant changes to the design of some future elements of the mine design and the development schedule*."

401.    When Defendant Quellmann was asked by a Scotiabank analyst during the May 16, 2019 call whether he could provide any further information on the status of the underground

project, Quellmann avoided providing any further information, claiming he could not do so because of ongoing necessary work to review new rock mass stability data.

402.    The statements in ¶¶398-401 concerning Defendants claims that the underground project's schedule delay was due to a new understanding of ground conditions were false and misleading because, in truth, the project was by that time 16 to 30 months behind schedule, as previously reported by Bowley and multiple former employees.  The figures of lateral development reflected in the chart above in ¶399 were false because, in reality, only approximately 1.8 to 2.1 kilometers had been completed, as lateral expansion was consistently behind schedule by 100-200 meters (under a schedule requiring construction of 800 meters) per month as set forth above at ¶¶105, 275.  Last, Defendants statements concerning the reasons for the underground project schedule delay were false and misleading because the ICG Report, Bowley and multiple former employees confirmed that the underground project was behind because of significant engineering, construction, and procurement issues since the beginning of the Class Period, which had nothing to do with rock stability, and which Defendants failed to disclose. Indeed, the ICG Report confirms that "ground conditions" and geotechnical issues had no impact on the schedule delays and, at best, a nominal impact on costs at OT.

**H.    Defendants Disclose A 16-30 Month Delay In Sustainable First Production And A $1.2-$1.9 Billion Increase In Capital Expenditure**

403.    On July 16, 2019, Turquoise Hill finally disclosed that, as Defendants had known since the beginning of the Class Period, the OT expansion was massively over budget and behind schedule.  Specifically, on that date, Turquoise Hill announced second quarter 2019 production for Oyu Tolgoi and provided an update on underground development, in which TRQ reported that "[i]mproved rock mass information and geotechnical data modelling has confirmed that there are stability risks associated with components of the existing mine design."  In addressing those

stability issues, TRQ disclosed that "preliminary estimates indicate that sustainable first production could be delayed by 16 to 30 months compared to the original feasibility study guidance in 2016," that the "capital spend for the project may increase by $1.2 to $1.9 billion over the $5.3 billion previously disclosed," and that sustainable first production was "now expected between May 2022 and June 2023."

404.    On July 16, 2019, Turquoise Hill held a conference call with investors in which Defendant Quellmann discussed the $1.2 billion to $1.9 billion cost increases and the 9- to 21-month delay until sustainable first production from the extended schedule disclosed in February (i.e., a 16- to 30-month delay from the original plan).  As an explanation for this delay and increased cost, Quellmann stated, "what we found is looking at the geotech conditions, they have been slightly worse than anticipated, requiring heavier ground support in some areas than were anticipated in the original feasibility study."

405.    On the same day, Rio Tinto similarly announced these massive cost overruns and schedule delays in a press release (which was later filed with the SEC on Form 6-K):

> Preliminary information now suggests that, depending on which mine design options are adopted, first sustainable production could be achieved between May 2022 and June 2023, a delay of 16 to 30 months compared to the original feasibility study guidance in 2016. This range includes contingency of up to eight months reflecting the unexpected and challenging geotechnical issues, complexities in the construction of shaft 2 and the detailed work still required to reach a more precise estimate. Preliminary estimates for development capital spend for the Project, depending on the outcome of the work described above, is now $6.5 billion to $7.2 billion, an increase of $1.2 billion to $1.9 billion from the $5.3 billion previously disclosed.

406.    Further, McIntosh, who had been repeatedly briefed on the problems with Shaft 2 throughout the Class Period, stated:

> We have made significant progress on a number of key elements in the construction of the underground project during 2019.  However, the ground conditions are more challenging than expected and we are having to review our mine plan and consider a number of options. Delays are not unusual for such a large and complex project

but we are very focused as a team on finding the right pathway to deliver this high value project.

407.     Following this news, on July 16, 2019, Turquoise Hill's common stock price closed at $0.60 per share, down 43.93% from the prior day's closing price of $1.07 per share, with over 50.2 million shares traded.

408.     Although Defendants had finally begun to disclose critical information about the true scope of the delays and cost overruns at Oyu Tolgoi, the statements in ¶¶403-06 were materially false and misleading because Defendants failed to disclose the true drivers of those costs and delays—*i.e.*, the disastrous engineering, procurement, and construction issues at OT—or that these material issues required Turquoise Hill to record a $600 million impairment.  Further, McIntosh's statement that the delays experienced at OT were "not unusual" was materially misleading because, in truth, they had resulted from the fact that OT had to address abysmal initial engineering and construction work on Shaft 2 that was nothing like the veteran miners responsible for the project had witnessed in their careers. Defendants also falsely blamed the schedule delays on cost overruns and schedule delays when the ICG Report, relying on internal TRQ and Rio Tinto documents, confirmed that "ground conditions" or geotechnical issues did not impact the schedule delays and had, at most, a nominal impact on the cost overruns at Oyu Tolgoi.

409.     Last, on July 31, 2019, Turquoise Hill issued a press release and Management's Discussion and Analysis that were also filed with the SEC on Form 6-K. Turquoise Hill disclosed that the cost overruns and schedule delays at OT required Turquoise Hill to record a $600 million impairment of the "Oyu Tolgoi cash-generating unit and deferred tax asset de-recognition adjustments in the period."

410.     Following this news, on August 1, 2019, Turquoise Hill's common stock price closed at $0.53 per share, down 8.62% from the prior day's closing price of $0.58 per share, with

over 16.6 million shares traded.

**I.    Defendants Signed False And Misleading SOX Certifications**

411.    Turquoise Hill filed the 2018 Form 40-F that contained Sarbanes-Oxley certifications signed by Defendants Quellmann and Colton, stating that the information contained in the 2018 40-F "does not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading" and that "the financial information included in this report[] fairly present in all material respects, the financial condition, results of operations and cash flows of the issuer."

412.    The Rio Tinto 2018 Form 20-F included Sarbanes-Oxley certifications signed by Defendant Jacques certifying that the Form 20-F "does not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading."

413.    The statements quoted in ¶¶411-12 were materially false and misleading because Defendants made untrue statements of material facts and omitted to state material facts necessary to make their statements not misleading throughout the Class Period, including for the reasons stated in ¶¶81-186 above.  Defendants failed to disclose to investors the "catastrophic" undisclosed engineering, construction, and procurement problems at Oyu Tolgoi that caused over a year of delay and over a billion dollars in cost overruns in the construction of the underground project, while simultaneously touting that the project was on track and on budget.  Even when Defendants finally disclosed delays and cost overruns for the project, they continued to mislead investors on the reasons for the delays and cost overruns, failing to disclose that mismanagement of engineering, construction, and procurement were the primary drivers of the delays and cost overruns. The financial statements issued by Turquoise Hill during the Class Period did not fairly

present its financial condition and results of operations because they should have but did not disclose the impairment of the Oyu Tolgoi cash-generating unit.

### J. Defendants' Risk Factor Disclosures Were False And Misleading

414. During the Class Period, Defendants issued risk factor disclosures that failed to adequately address risks regarding the development of the Oyu Tolgoi underground mine and were false and misleading.

415. In its 2017 Annual Report and 2017 Form 40-F (incorporated by reference in its Consolidated Interim Financial Statements for March 31, 2018 and June 30, 2018, both filed during the Class Period on Form 6-K), Turquoise Hill included the following risk factor disclosure:

> **The actual cost of developing Oyu Tolgoi may differ materially from the Company's estimates, and development may involve unexpected problems or delays.**
>
> The Company's estimates regarding the cost of development and operation of Oyu Tolgoi are estimates only and are based on many assumptions and analyses made by the Company's management in light of their experience and perception of historical trends, current conditions and expected future developments, as well as other factors management believes are appropriate in the circumstances. These estimates and the assumptions upon which they are based are subject to a variety of risks and uncertainties and other factors that could cause actual expenditures to differ materially from those estimated. *If these estimates prove incorrect, the total capital expenditures required to complete development of the underground components of Oyu Tolgoi may increase, which may have a material adverse impact on the Corporation, its results of operations, financial condition and share price.*
>
> *In addition to the requirements of the Investment Agreement, there are also a number of uncertainties inherent in the development and construction of any new or existing mine, including Oyu Tolgoi.* These uncertainties include the timing and cost, which can be considerable, of the construction of mining and processing facilities; the availability and cost of skilled labour, the impact of fluctuations in commodity prices, process water, power and transportation, including costs of transport for the supply chain for Oyu Tolgoi, which requires routing approaches which have not been fully tested; the annual usage fees payable to the local province for sand, aggregate and water; the availability and cost of appropriate smelting and refining arrangements; and the need to obtain necessary environmental and other government permits, such permits being on reasonable terms, and the timing of those permits. The cost, timing and complexities of mine

construction and development are increased by the remote location of a property such as Oyu Tolgoi.

*It is common in mining operations and in the development, construction or expansion of existing facilities to experience unexpected problems and delays during such activities, which may cause delays in the commencement or expansion of mineral production or sustainable production. Such delays could have unforeseen impacts on disclosed project economics.*

416.    In its 2018 Annual Report and March 14, 2019 Form 40-F, Turquoise Hill retained

the same disclosures (with the change of "Company" to "Corporation" in the risk factor disclosure)

but added the words, "*ground and rock mass conditions and stability*" to the laundry list of

"uncertainties" in the risk factor disclosure and added the following at the end:

Accordingly, there is no assurance that the current or future development, construction or expansion activities will be successfully completed within cost estimates, on schedule or at all and, if completed, there is no assurance that such activities will result in profitable mining operations.

417.    The 2018 Annual Report and 2018 Form 40-F of Turquoise Hill also stated the

following in a section concerning forward-looking statements:

*With respect to specific forward-looking information concerning the continued operation and development of Oyu Tolgoi,* the Company has based its assumptions and analyses on certain factors which are inherently uncertain. Uncertainties and assumptions include, among others: *the timing and cost of the construction and expansion of mining and processing facilities;* the timing and availability of a long-term domestic power source (or the availability of financing for the Company to construct such a source) for Oyu Tolgoi; the ability to secure and draw down on the supplemental debt under the Oyu Tolgoi project financing facility and the availability of additional financing on terms reasonably acceptable to Oyu Tolgoi LLC, Rio Tinto and the Company to further develop Oyu Tolgoi; the impact of changes in, changes in interpretation to or changes in enforcement of, laws, regulations and government practices in Mongolia; the availability and cost of skilled labour and transportation; the obtaining of (and the terms and timing of obtaining) necessary environmental and other government approvals, consents and permits; delays, and *the costs which would result from delays, in the development of the underground mine (which could significantly exceed the costs projected in the 2016 Oyu Tolgoi Feasibility Study and the 2016 Oyu Tolgoi Technical Report)*; projected copper, gold and silver prices and their market demand; and production estimates and the anticipated yearly production of copper, gold and silver at Oyu Tolgoi.

418.    These statements were repeated in the 2018 Form 40-F, except that Turquoise Hill added the words, "and projected gold, copper and silver grades," to the first two paragraphs above.

419.    Certain of these statements were repeated or incorporated by reference in various Turquoise Hill disclosures during the Class Period.  Among other things: (a) Turquoise Hill's press releases and presentations referred to the risk factors in the most recent Form 40-F; and (b) Turquoise Hill's press releases also included the first two paragraphs quoted in ¶415 above, generally from the most recent Form 40-F; (c) Turquoise Hill's interim Management Discussions and Analyses (MD&As) included the forward-looking statement disclosure (with small modifications) from the most recent Form 40-F; and (d) speakers in Turquoise Hill's conference calls referred to the forward-looking statement disclosures in the accompanying presentation or to the most recent earnings press release and MD&A.

420.    Rio Tinto's 2017 and 2018 annual reports and Forms 20-F included "Forward-looking statements" disclosures:

> This announcement includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All statements other than statements of historical facts included in this announcement, including, without limitation, those regarding Rio Tinto's financial position, business strategy, plans and objectives of management for future operations (***including development plans*** and objectives relating to Rio Tinto's products, production forecasts and reserve and resource positions), are forward-looking statements. The words "intend", "aim", "project", "anticipate", "estimate", "plan", "believes", "expects", "may", "should", "will", "target", "set to" or similar expressions, commonly identify such forward-looking statements.

> Such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements of Rio Tinto, or industry results, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. Such forward-looking statements are based on numerous assumptions regarding Rio Tinto's present and future business strategies and the environment in which Rio Tinto will operate in the future. Among the important factors that could cause Rio Tinto's actual results, performance or achievements to differ materially from those in the forward-looking statements are ***levels of actual production during any period, levels of demand and market prices, the ability to produce and***

*transport products profitably, the impact of foreign currency exchange rates on market prices and operating costs, operational problems, political uncertainty and economic conditions in relevant areas of the world, the actions of competitors, activities by governmental authorities such as changes in taxation or regulation and such other risk factors identified in Rio Tinto's* most recent Annual report and accounts in Australia and the United Kingdom and the most recent Annual report on Form 20-F filed with the United States Securities and Exchange Commission (the "SEC") or Form 6-Ks furnished to, or filed with, the SEC.

421.    In a separate "principal risks and uncertainties" section of the Annual Report, Rio Tinto described the following as a "Strategic Risk":

| The Group's ability to deliver projects successfully may vary. | A delay or overrun in a project schedule could negatively impact the Group's profitability, cash flows, ability to repay project-specific indebtedness, asset carrying values, growth aspirations and relationships with key stakeholders. |
|---|---|

422.    A later section of the Annual Report disclosed that the 2017 trend for this risk was negative and that "An ability to develop projects on time and within budget enhances the Group's license to operate and investor confidence," and that the potential impacts were "Future performance"; "HSE&C"; "Group reputation" and "Solvency." These disclosures were combined in a single table in the 2018 Annual Report.

423.    Rio Tinto's quarterly operations reviews, interim financial reports, and certain other disclosures incorporated by reference the risk factor disclosures in Rio Tinto's most recent Form 20-F and Annual Report.

424.    The statements quoted in ¶¶415-23 were materially false and misleading because they failed to disclose to investors that there were catastrophic undisclosed engineering, construction, and procurement problems at Oyu Tolgoi that caused significant delays and cost overruns in the construction of the underground project at the time they were made.

## IX.    LOSS CAUSATION

425.    During the Class Period, as detailed in this complaint, Defendants made materially

false and misleading statements and omissions, including statements regarding the Oyu Tolgoi project's schedule and budget and undisclosed delays and cost overruns, and engaged in a scheme to deceive the market. This artificially inflated or maintained the price of TRQ common stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and risks concealed by the fraudulent conduct alleged in this complaint materialized and were disclosed to the market starting on February 27, 2019, the price of TRQ common stock fell precipitously, as set forth above in ¶¶230-61.  As a result of their acquisition of TRQ common stock during the Class Period and Defendants' material misstatements and omissions, Plaintiffs and other members of the Class (defined below) suffered economic loss, i.e., damages, under the federal securities laws.

426.    Specifically, the artificial inflation in TRQ's stock price began to be removed when the conditions and risks misstated and omitted by Defendants began to be partially revealed to the market beginning on February 27, 2019.  That day, TRQ and Rio reported that sustainable first production was likely to be delayed beyond the end of third quarter 2021, the date for sustainable first production that it had announced in October 2018 when it disclosed a delay from the previously indicated date of first quarter 2021.  TRQ and Rio also disclosed that they were working to estimate the impact of this further delay on the project's schedule and cost but did not disclose any updated cost estimate.

427.    In response to the February 27, 2019 disclosures, TRQ shares dropped nearly 13% on February 27, 2019, from $2.10 per share to $1.83 per share on heavy trading volume of more than 18 million shares traded. As the market continued to absorb these disclosures the next day, TRQ shares dropped again by nearly 7%, from $1.83 per share to $1.71 per share on heavy volume of almost 9 million shares.

428.    While noting that the disclosed delay was negative, analysts focused on Defendants' reassurances that the budget remained on track. For example, Scotiabank wrote in a February 27, 2019 report that "[d]espite this latest delay, TRQ reaffirmed the $5.3B total project budget."

429.    Defendants' February 27, 2019 disclosures partially corrected Defendants' prior materially misleading statements and omissions concerning the Oyu Tolgoi project. However, the full truth about the project's delays had not been disclosed, Defendants affirmatively denied its cost overruns, and TRQ's stock price remained artificially inflated.

430.    On July 15, 2019, Defendants announced that Oyu Tolgoi's underground extension could be delayed by 16 to 30 months and capital costs could increase by nearly $2 billion. Specifically, Defendants announced that sustainable first production could be delayed by 16 to 30 months to between May 2022 and June 2023 and that the development capital spend for the project could "increase by $1.2 to $1.9 billion over the $5.3 billion previously disclosed."

431.    In response to the July 15, 2019 disclosures, TRQ's stock price fell *43.9%* on July 16, 2019, from a close of $1.07 per share on July 15 to a close of $0.60 on July 16.

432.    On July 31, 2019, Turquoise Hill publicly stated that improved rock mass information and geotechnical data modelling had confirmed that there were stability risks associated with components of the existing mine design; as a result, a number of mine design options were under consideration to complete the project; given the further required technical work, a definitive estimate review was not expected to be delivered until the second half of 2020; and preliminary estimates indicated that sustainable first production could be delayed by 16 to 30 months from the estimates in the 2016 Feasibility Study, and the development capital spend might increase by $1.2 billion to $1.9 billion over the $5.3 billion previously disclosed in the 2016

Feasibility Study, additional financing would be needed to complete the project (diluting existing stockholders), and a definitive estimate review was not expected to be completed until the second half of 2020 (when TRQ's existing funds would run out, forcing it to take financing from Rio on unfavorable, non-market terms).

433.    In response to the July 31, 2019 disclosures, TRQ's stock price fell *8.6%* on August 1, 2019, from a close of $0.58 per share on July 31 to a close of $0.53 on August 1.

434.    The declines in TRQ's stock price were a direct and proximate result of Defendants' scheme being revealed to investors and to the market. The timing and magnitude of TRQ's stock-price declines negate any inference that the economic losses and damages suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or TRQ-specific facts unrelated to Defendants' fraudulent conduct.

## X.    CLASS ACTION ALLEGATIONS

435.    Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the securities of TRQ during the Class Period on an exchange located in the United States or through transactions in which irrevocable liability was incurred or title was transferred in the United States and were damaged thereby (the "Class"). Excluded from the Class are Defendants, directors and officers of TRQ and Rio Tinto, and their families and affiliates.

436.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2018, TRQ had more than 2 billion shares of stock outstanding and a public float (i.e., shares not owned by Rio) of more than 900 million shares owned by many thousands of investors.

437.    There is a well-defined community of interest in the questions of law and fact

involved in this case. Questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members include:

    (a)    whether Defendants violated the Exchange Act;

    (b)    whether Defendants omitted and misrepresented material facts;

    (c)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (d)    whether Defendants knew or recklessly disregarded that their statements and omissions were false and misleading;

    (e)    whether the price of TRQ common stock was artificially inflated;

    (f)    whether Defendants' conduct caused the members of the Class to sustain damages; and

    (g)    the extent of damages sustained by Class members and the appropriate measure of damages.

438.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

439.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class-action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

440.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

441.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint. Many of

the specific statements described in this complaint were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described in this complaint, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Rio or TRQ who knew that the statement was false or misleading when made.

## XII.   PRESUMPTION OF RELIANCE

442.   At all relevant times, the market for TRQ's securities was an efficient market for the following reasons, among others:

(a)   TRQ stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange and Nasdaq, which are both highly efficient and automated markets;

(b)   TRQ filed periodic public reports with the SEC, the New York Stock Exchange, and Nasdaq;

(c)   TRQ regularly publicly communicated with investors via established market-communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     TRQ was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

443.    As a result of the foregoing, the market for TRQ securities promptly digested current information regarding TRQ from all publicly available sources and reflected that information in the price of TRQ securities. Under these circumstances, all purchasers of TRQ securities during the Class Period suffered similar injury through their purchase of TRQ securities at artificially inflated prices, and the presumption of reliance applies.

444.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding TRQ's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Oyu Tolgoi project's schedule and budget, as alleged above, that requirement is satisfied here.

## XIII.   CLAIMS FOR RELIEF

### COUNT I

**For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5**
**(Against Defendants Turquoise Hill, Rio Tinto, RTIH, Jacques, Soirat, Quellmann, Colton, and Lane)**

445.    Plaintiffs repeat and reallege every allegation above as if fully stated in this count.

446.    This count is asserted on behalf of all members of the Class against Defendants

173

Turquoise Hill, Rio Tinto, RTIH, Jacques, Soirat, Quellmann, Colton, and Lane for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

447.　During the Class Period, these Defendants made, disseminated, or approved the false and misleading statements specified above, which Defendants knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

448.　Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases or other acquisitions of Turquoise Hill securities during the Class Period.

449.　Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made untrue or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above materially false and misleading statements intentionally or with reckless disregard for the truth; employed devices and artifices to defraud in connection with the purchase and sale of Turquoise Hill securities; and engaged in acts, practices, and a course of

business that operated as a fraud or deceit, which were intended to, and did, (a) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, the progress of underground development at the Oyu Tolgoi project, the cause of delays to that underground development, the impact of delays on capital expenditures for underground development at Oyu Tolgoi, the schedule for completion of key components of the underground development, and problems with the underground development that Rio Tinto was alerted to well in advance of disclosure of delays and cost overruns; (b) artificially inflate and maintain the market price of Turquoise Hill securities; and (c) cause Plaintiffs and other members of the Class to purchase Turquoise Hill securities at artificially inflated prices and to suffer losses when the true facts became known.

450.    Defendants Rio Tinto, RTIH, Jacques, Soirat, Turquoise Hill, Quellmann, Colton, and Lane are liable for the materially false and misleading statements and omissions made during the Class Period, as alleged above in Section VIII.  As alleged in detail in ¶53, Defendants Rio Tinto and RTIH controlled the contents of all public statements by Turquoise Hill and its executives about Oyu Tolgoi and are thus liable as the maker of the statements by Defendants Turquoise Hill, Quellmann, Colton, and Lane as set forth in ¶¶306-419.  As recounted by a former investor relations and corporate communications employee at Turquoise Hill, any communication disseminated outside of Turquoise Hill concerning Oyu Tolgoi or any communication that could impact Turquoise Hill's stock price was dictated by Rio Tinto, which controlled all of Turquoise Hill's communications and access to information about OT.

451.    Further, Defendants Rio Tinto, RTIH, Jacques, Soirat, Turquoise Hill, Quellmann, Colton, and Lane are liable under SEC Rule 10b-5(a) and SEC Rule 10b-5(c) for engaging in deceptive and manipulative acts in a scheme to defraud investors, including by disseminating the

false statements made by each Defendant, as well as for making the statements set forth in ¶¶304-414.  As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), the Defendants named in this Count not only made materially false and misleading statements and omissions to investors in their public statements but also (i) retaliated against employees and consultants who tried to make Defendants acknowledge the truth about the cost overruns and schedule delays at Oyu Tolgoi, as alleged in ¶¶153-59 and 221-29, (ii) commissioned a sham internal investigation by Baker McKenzie that purported to rebut Bowley's allegations while actually deliberately ignoring evidence that Defendants knew or recklessly disregarded that their public statements about Oyu Tolgoi were false when made, as alleged in ¶¶281-86, and (iii) sought to conceal and destroy evidence of their misconduct by securing the destruction of documents possessed by Duffy and by instructing employees not to document important information, as alleged in ¶¶287-88.

452.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness. The misrepresentations and omissions of material facts alleged in this complaint, which presented a danger of misleading purchasers of Turquoise Hill securities, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

453.    Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Turquoise Hill securities, and the inflation was removed from the prices of their securities when the true facts became known. Plaintiffs and the Class would not have purchased Turquoise Hill securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements and misconduct.

454. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged in this complaint in connection with their purchases of Turquoise Hill securities during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Rio Tinto, RTIH, Jacques, Soirat, Quellmann, Colton, and Lane)

455. Plaintiffs repeat and reallege every allegation above as if fully stated in this count.

456. This Count is asserted on behalf of all members of the Class against Defendants Rio Tinto, RTIH, Jacques, Soirat, Quellmann, Colton, and Lane for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

457. *Defendants Rio and RTIH*: As the majority shareholder of Turquoise Hill and project manager of the Oyu Tolgoi development through its wholly owned subsidiary RTIH, and through its contractual rights to exercise control over Turquoise Hill's operations and public statements, Rio Tinto was a controlling person of TRQ within the meaning of Section 20(a) of the Exchange Act. By reason of its ownership and contractual rights, Rio Tinto had the power and authority to direct the management and activities of TRQ and its employees and to cause TRQ to engage in the wrongful conduct alleged in this complaint. Rio Tinto was able to and did control, directly and indirectly, the content of the public statements made by Turquoise Hill during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged in this complaint. Further, as the Manager of OT, RTIH directly participated as Rio Tinto's agent in the wrongdoing alleged in this Complaint, including the concealment of the project's cost overruns and schedule delays and the provision of false and misleading information for inclusion in TRQ's and Rio's public statements.

458. In its capacity as the majority owner of Turquoise Hill common stock and the

project manager of Oyu Tolgoi, and as more fully described above, Rio Tinto had direct involvement in the day-to-day operations of TRQ, especially with regard to the Oyu Tolgoi project. All but one officer of TRQ were Rio Tinto employees who were seconded to TRQ with the expectation that after working at TRQ for several years, they would move on to work at other Rio Tinto projects elsewhere in the world. Thus, they remained dependent on Rio during their time at TRQ for their compensation (including Rio Tinto incentive compensation while seconded at TRQ), long-term employment, and pensions. Rio Tinto employees worked at and supervised Oyu Tolgoi's underground development, conducted unilateral periodic reviews of the development to assess whether the development was on schedule and on budget, and were directly involved in providing false information or certifying or approving the false statements disseminated by Turquoise Hill during the Class Period. As manager of the project, Rio Tinto had unlimited access to information about the project's status and expenses and exercised complete control over TRQ's access to information about its own sole significant asset. Since 2012, all TRQ employees other than Defendant Quellmann have been Rio Tinto employees and remained as such while seconded to TRQ; Quellmann is a former senior Rio employee and was Rio's lead negotiator for a 2013 short-term bridge loan from Rio to TRQ.  All TRQ Board members are elected to the TRQ Board by Rio Tinto, which has the power to cause their election or to block any competing nominees without any votes from other TRQ stockholders.

459.    As a result of the delays and cost overruns at the Oyu Tolgoi project, Turquoise Hill requires billions of dollars of additional capital to complete the project and achieve commercial production of copper from the underground mine. A Financing Support Agreement between Turquoise Hill and Rio Tinto that was entered into in relation to the $4.4 billion project financing facility obtained by TRQ in 2015 and that remains in effect gives Rio Tinto effective

control over any additional capital raising by TRQ. Thus, Rio has an effective stranglehold over how funds are raised for TRQ to develop its only asset. This gave Rio yet another means of control over TRQ during the Class Period when Defendants became aware of the delays and cost overruns and resulting need for additional capital. Rio Tinto's effort in 2020 to use its control over TRQ to force TRQ to raise capital on unfavorable, non-market terms, to the detriment of TRQ's minority stockholders and advantage of Rio, has been so egregious that TRQ initiated an arbitration proceeding against Rio and obtained a Temporary Restraining Order to force Rio to agree to market-rate financing for TRQ that would be fair to TRQ's minority stockholders. Moreover, after Defendant Quellmann initiated this effort, Rio used its control over TRQ to force his resignation.

460. As a result of the foregoing, Rio Tinto and RTIH were controlling persons of Turquoise Hill within the meaning of Section 20(a) of the Exchange Act.

461. ***Rio Executive Defendants***: By reasons of Defendants Jacques' and Soirat's high-level positions of control and authority as Rio's CEO and the CEO of Rio's copper division, respectively, and, in the case of Jacques, a director of Rio, and, in the case of Soirat, a director of OT, the Rio Executive Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of Rio, RTIH, Turquoise Hill and their employees, and to cause them to engage in the wrongful conduct alleged in this complaint. The Rio Executive Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Rio, RTIH and Turquoise Hill during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein. The Rio Executive Defendants were provided with or had unlimited access to copies of Rio, RTIH and Turquoise Hill's press releases, public filings and other statements alleged by Lead Plaintiff to be misleading before or shortly after these

statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

462.     In their capacities as the most senior corporate officers of Rio and RTIH, and as more fully described above, the Rio Executive Defendants had direct and supervisory involvement in the day-to day operations of Rio, RTIH, and OT and therefore are presumed to have had the power to control of influence the particular transactions giving rise to the securities law violations as alleged herein. Defendant Jacques signed Rio's SEC filings and Sarbanes-Oxley certifications, and Defendants Jacques and Soirat were directly involved in providing false information and certifying or approving the false statements disseminated by Rio, RTIH and Turquoise Hill during the Class Period.

463.     As a result of the foregoing, the Rio Executive Defendants were controlling persons of Rio, RTIH and Turquoise Hill within the meaning of Section 20(a) of the Exchange Act.

464.     ***Turquoise Executive Defendants***:  By reasons of Defendants Quellmann, Colton and Lane's high-level positions of control and authority as Turquoise Hill's CEO, CFO and COO, respectively, in their roles as members of the Board of OT, and, in the case of Quellmann, his role on the Turquoise Hill Board, the Turquoise Executive Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of Turquoise Hill and its employees, and to cause them to engage in the wrongful conduct alleged in this complaint.  The Turquoise Executive Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Turquoise Hill during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.  The Turquoise Executive Defendants were provided with or had unlimited access to copies of Turquoise Hill's press releases, public

filings and other statements alleged by Lead Plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

465. In their capacities as the most senior corporate officers of Turquoise Hill, and as more fully described above, the Turquoise Executive Defendants had direct and supervisory involvement in the day-to day operations of Turquoise Hill and served as members of the OT Board, therefore, are presumed to have had the power to control the particular transactions giving rise to the securities law violations as alleged herein. Defendants Quellmann and Colton signed Turquoise Hill's SEC filings and Sarbanes-Oxley certifications, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by Turquoise Hill during the Class Period.

466. As a result of the foregoing, the Turquoise Executive Defendants were controlling persons of Turquoise Hill within the meaning of Section 20(a) of the Exchange Act.

467. As alleged above, Rio, RTIH, and Turquoise Hill violated Section 10(b) of the Exchange Act by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons of Rio, RTIH and Turquoise Hill, and as a result of their own aforementioned conduct, Rio Tinto, RTIH and the Executive Defendants are liable under Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, Rio, RTIH and/or Turquoise Hill is liable under Section 10(b) and Rule 10b-5, respectively, to Plaintiffs and the other members of the Class who purchased or otherwise acquired Turquoise Hill securities.

468. As a direct and proximate result of Rio Tinto, RTIH, and the Executive Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of Turquoise Hill securities.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    determining that this action is a proper class action under Rule 23 of the Federal

Rules of Civil Procedure;

B.    awarding compensatory damages in favor of Plaintiffs and other Class members

against all Defendants, jointly and severally, for all damages sustained as a result

of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.    awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including attorneys' fees and expert fees; and

D.    awarding any equitable, injunctive, or other further relief that the Court may deem

just and proper.

## XV.   JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  September 16, 2021

*/s/      Salvatore J. Graziano*
Salvatore J. Graziano
**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
Salvatore Graziano
Mark Lebovitch
Michael Blatchley
Jai Chandrasekhar
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
markl@blbglaw.com
michaelb@blbglaw.com
jai@blbglaw.com

*Lead Counsel for Lead Plaintiff the Pentwater*
*Funds and the Class*

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

```
                                                  :
                                                  :
                                                  :
                                                  :
                                                  :
IN RE TURQUOISE HILL RESOURCES LTD.               :
SECURITIES LITIGATION                             :
                                                  :
                                                  :
                                                  :
                                                  :
```

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _09/02/2022_

20-cv-08585 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiffs the Pentwater Funds bring a putative class action for violations of Sections

10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and

Exchange Commission Rule 10b–5 against Turquoise Hill Resources Ltd. ("Turquoise Hill"),

Rio Tinto plc and Rio Tinto Limited (together, "Rio Tinto" or "Rio"), Rio Tinto International

Holdings Limited ("RTIH"), Jean-Sébastien Jacques ("Jacques"), Arnaud Soirat ("Soirat"), Ulf

Quellmann ("Quellmann"), Luke Colton ("Colton"), and Brendan Lane ("Lane") (collectively,

"Defendants").

Defendants move to dismiss the Second Amended Consolidated Complaint ("SAC" or

the "Complaint").  Dkt. Nos. 129, 132.

## BACKGROUND

The Court accepts as true for purposes of this motion the well-pled allegations of the

SAC as supplemented by the documents incorporated by reference.

### I.     The Relevant Parties

Turquoise Hill is a mineral-exploration and development company headquartered in

Montreal, Quebec, Canada, and a majority-owned subsidiary of Rio Tinto.  Its sole business is

the operation and development of the Oyu Tolgoi copper-gold mine in southern Mongolia, the company's only material mineral-resource property. Dkt. No. 127 ¶¶ 38, 58. Its common stock trades on the New York Stock Exchange and the Toronto Stock Exchange (and previously also traded on the Nasdaq) under the ticker symbol "TRQ." *Id.* ¶ 41.

Quellmann was the Chief Executive Officer ("CEO") of Turquoise Hill from August 1, 2018 until his resignation on March 3, 2021. Before becoming CEO of Turquoise Hill, Quellmann was Vice President of Strategic Projects, Copper and Diamonds at Rio Tinto from March 2018 to July 2018, and Chief Financial Officer ("CFO"), Coppers and Diamonds at Rio Tinto from August 2016 to February 2018. *Id.* ¶ 42. Colton has been the CFO of Turquoise Hill since October 9, 2017 and briefly served as Turquoise Hill's interim CEO after former CEO Jeff Tygesen resigned on May 29, 2018 and before Quellmann assumed that role in August 2018. *Id.* ¶ 43. Lane served as Vice President, Operations and Development of Turquoise Hill from February 2016 until his resignation in March 2019. He was Finance Director of Rio Tinto Copper's Minera Escondida Limitada and Grasberg operation from 2013 to January 2016 and was a Rio Tinto employee while seconded to Turquoise Hill during the alleged class period— here, from July 17, 2018 to July 31, 2019 ("Class Period"). *Id.* ¶ 44. Quellmann, Colton, and Lane are referred to as the "Turquoise Executive Defendants." *Id.* ¶ 45.

Rio Tinto, which consists of Rio Tinto plc (a United Kingdom company) and Rio Tinto Limited (an Australian company), is one of the world's largest metals and mining companies. *Id.* ¶ 46. RTIH is a wholly owned subsidiary of Rio Tinto and holds a majority interest in the common stock of Turquoise Hill. *Id.* ¶ 47. It also is the manager of Oyu Tolgoi and manager of a substantial portion of Turquoise Hill's receivables and liquid asset deposits. *Id.*

Jacques was the CEO of Rio Tinto from July 2016 until December 2020. *Id.* ¶ 49. He became deputy CEO in March 2016 and CEO in July 2016, largely as a result of his work in negotiating with the Mongolian government to restart underground development at Oyu Tolgoi. *Id.* Soirat served as the chief executive of Rio Tinto's Copper and Diamonds product group from 2016 to December 2020. *Id.* ¶ 50. Jacques and Soirat are sometimes referred to as the "Rio Executive Defendants" and together with the Turquoise Executive Defendants are referred to as the "Executive Defendants."

## II.     The Oyu Tolgoi Mine

The Oyu Tolgoi (the "Mine" or "OT") underground mine in southern Mongolia is expected to be one of the largest copper mines in the world. *Id.* ¶¶ 3, 57. The Mine is jointly owned by Turquoise Hill and the Government of Mongolia. *Id.* ¶ 3. OT is comprised of an open-pit copper mine and an underground mine. *Id.* ¶ 5. The open-pit copper mine has been in operation since 2013. *Id.* Drilling of the underground mine began in 2010 but was suspended in 2013 due to ongoing disputes between Rio Tinto and the Government of Mongolia as well as insufficient project financing. *Id.* By far the largest amount of copper ore at the site, and 80% of the mine's reserve value, is located in the underground mine. *Id.*

OT is owned by Oyu Tolgoi LLC, a company 66% of whose equity is owned by Turquoise Hill, while the remainder is held by the Government of Mongolia. *Id.* ¶¶ 52, 61. In turn, Rio Tinto owns just over 50% of Turquoise Hill's common stock; manages the OT project under agreements between OT, Rio Tinto, and the Government of Mongolia; and, through RTIH, exercises near-total control over both the project and Turquoise Hill. *Id.* ¶ 52. During the Class Period, Quellmann, Lane, Colton and Soirat served on the Board of Directors of OT. *Id.* ¶ 54.

Rio Tinto has contractual rights with respect to Turquoise Hill's public statements about OT. In an April 2012 memorandum of agreement, Ivanhoe Mines (the predecessor for Turquoise

Hill) entered into an agreement with Rio Tinto related to public disclosures about OT. It

provided:

> From the date of this Agreement that any and all public disclosure regarding the OT project ("OT Disclosure") must be consistent with the information provided by the Rio Tinto Manager (unless Ivanhoe determines that other OT Disclosure must be made to comply with Ivanhoe's disclosure obligations under applicable Securities Laws) and Ivanhoe covenants and agrees that it will not file or issue any OT Disclosure without providing the Rio Tinto Manager with a reasonable opportunity to review and comment thereon.

Dkt. No. 127 ¶ 53; Turquoise Hill Resources LTD, General Statement of Acquisition of

Beneficial Ownership - Amendment (Form SC 13D/A) (Apr. 20, 2012).[1]

Turquoise Hill's predecessor, Ivanhoe Mines, began initial work on the Mine as early as

2001, when it completed the first of five planned deep, large-diameter, concrete-lined shafts—

Shaft 1, a 1,385-meter-deep shaft to be used for preliminary exploratory and access work and

services on the underground-mine project. Dkt. No. 127 ¶¶ 61–62.

In 2007, Ivanhoe Mines commenced work on a much larger shaft—Shaft 2—as part of

the development of the underground mine. Work on Shaft 2 was conducted in 2007 and again in

2010 to 2013, when the sinking reached a depth of 1,167 meters. *Id.* ¶ 62. In August 2013, the

underground work and funding for the project's underground-expansion phase came to a

standstill amid a dispute between OT and the Mongolian government over financing and tax

payments. *Id.* ¶ 63.

In 2015, Turquoise Hill, Rio Tinto, and the Government of Mongolia signed the 2015

Oyu Tolgoi mine-development and financing plan to begin Phase 2 of the underground

expansion. *Id.* ¶¶ 6, 64. The deal included a $4.4 billion financing plan for the project that

---

[1] The Complaint quotes a portion of this agreement. The full agreement is incorporated by reference, and, in addition, the Court takes judicial notice of its contents from the SEC filing. *See In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 203 (S.D.N.Y. 2020).

Jacques personally negotiated with the then Prime Minister of Mongolia.  *Id.* ¶ 64.  In May 2016, the Government of Mongolia gave OT formal notice to restart second-phase underground construction, and Rio Tinto, Turquoise Hill, and the Government of Mongolia publicly announced the approval of the development of the Mine.  *Id.* ¶ 65.  Defendants publicly reported that the total development cost for the Mine would be $5.3 billion and that the first production ramp-up would begin in the first quarter of 2021.  *Id.* ¶¶ 7, 65, 80 n.6.  Defendants refer to that milestone as achieving "sustainable first production," an event that occurs after the "first drawbell" blasting.  *Id.* ¶ 7.

In June 2016, Rio selected Jacobs Engineering Group Inc. ("Jacobs") as the principal contractor for the underground expansion at Oyu Tolgoi.  *Id.* ¶ 80.

## III.    Development of OT

The planned development of OT involved a mining method called "panel caving."  *Id.* ¶¶ 66–67.  "Panel caving" involves a process by which mineral ore is undercut, drilled, and blasted in order to break off the ore; the ore then is removed and conveyed to tunnels or shafts that allow the ore to be brought to the surface.  *Id.*  ¶¶ 67–70.  For panel caving to work, the construction of appropriate mine shafts is critical, as it allows for people, equipment, supplies, and mined ore to be moved between the surface and the underground mining area.  *Id.* ¶¶ 71, 75.

By the beginning of the Class Period, the Mine's success depended on the construction and completion of primary crusher 1 and two key mine shafts and associated infrastructure, specifically, the Shaft 1 crusher and systems and Shaft 2.  *Id.* ¶ 72.  Shaft 2 was intended to be the main logistics hub for OT for both personnel and equipment needed to build the remainder of the underground Mine and, once finished, would increase mining expansion and productivity by at least a factor of five.  *Id.* ¶¶ 74, 77.  The timely development of Shaft 2 was also critical to the

Mine's profitability as it would allow investors to capitalize on the Mine's copper production just as copper prices were expected to rise. *Id.* ¶ 77.

However, as soon as the work on the underground project resumed in 2016, the project was plagued by delays and cost overruns as a result of engineering, procurement, and construction issues. *Id.* ¶ 8. The most significant of these issues concerned Shaft 2. *Id.* In particular, during the shutdown of the project, inspections of the Mine revealed potentially catastrophic issues with the work that had been done by a contractor on the steel headframes for Shaft 2. *Id.* ¶ 81. Due to the severity of these issues, construction on Shaft 2 was delayed for eight months and required over $30 million in additional costs (which alone accounted for 10% of the Shaft 2 projected budget). *Id.* ¶¶ 82–83. According to a former employee, daily, weekly, and monthly progress reports on work related to fixing the headframe problem were provided to senior Oyu Tolgoi executive managers, including one individual who reported to Armando Torres—Oyu Tolgoi's CEO since May 2017; Torres in turn reported to and served on the OT Board of Directors with certain of the Executive Defendants. *Id.* ¶ 84.

Further delays to Shaft 2 resulted from engineering problems and faulty construction. *Id.* ¶¶ 88, 93. In particular, the steel supplied for Shaft 2 was consistently subpar and had structural defects, which required 95% of the steel in Shaft 2 to be "worked on" before being installed. *Id.* ¶ 85. According to independent reports prepared for the Oyu Tolgoi Board Special Committee in 2021 ("ICG Report"), steelwork issues contributed significantly to cost overruns at OT. *Id.*

Because of the extensiveness of the safety and design issues with Shaft 2, a former employee reported that it became clear as of the summer of 2017 that the underground development project was three to nine months behind schedule. *Id.* ¶¶ 104–105. And these delays and costs only grew: from the end of 2017 to June 2019, OT's monthly progress reports

were consistently short around 100–200 meters per month. *Id.* ¶¶ 104–106. One employee noted that by May of 2018, Shaft 2 was fourteen months behind its scheduled commissioning deadline. *Id.* ¶ 98.

According to a number of former Rio Tinto employees and Oyu Tolgoi managers, senior leadership at Oyu Tolgoi, Rio Tinto, and Turquoise Hill were acutely aware of the schedule and cost overruns resulting from these faulty construction and steel-quality problems. *Id.* ¶¶ 94, 103. For example, Grant Brinkmann, Rio Tinto's Senior Area Manager of Shafts at OT from June 2015 to May 2018 and the person with direct responsibility for Shaft 2, reported that Rio Tinto senior management was fully aware of the delays and cost overruns, including due to the problems with the Shaft 2 headframe. *Id.* ¶ 94. And another former employee noted that as of October 2018, the former employee was directed to send weekly progress reports to Defendant Jacques, which Jacques demanded as he was concerned about the extent of the delays. *Id.* ¶ 105.

## IV.    Individuals Raise Concerns about OT

Around 2017, two senior Rio Tinto executive hired an experienced mining executive, Richard Bowley, to investigate the problems at OT. *Id.* ¶ 111. The executives were Defendant Soirat and Craig Kinnell, who was the Chief Development Officer of Rio Tinto's Copper and Diamonds division in charge of the Oyu Tolgoi project from December 2014 to July 2018. *Id.* Bowley was told by Kinnell that he was being hired to tell them the truth about how bad the situation was. *Id.* ¶ 112. Bowley had previously worked at OT from 2011 through 2015 as an employee of AMEC Foster Wheeler, which was at the time engaged to develop the underground study, value, and detailed engineering for Phase 2 of the OT underground project.

Bowley had identified one of the key problems with OT to be Jacobs, the primary contractor for engineering, procurement, and construction at the Mine. *Id.* ¶¶ 79–80, 112–113, 115. In a July 3, 2017 exchange, Bowley reported to Kinnell that, as a result of his discussions

with senior managers on the ground at OT, "two out of three of your senior guys on the project have told me Jacobs are failing badly," warning that "[w]e both know that mess will lead straight to OTs door in the shape of schedule overruns and cost." *Id.* ¶¶ 14, 115. Kinnell immediately responded, agreeing that "it is all getting messy Richard and needs intervention to stop it from getting significantly worse." *Id.*

Kinnell asked Bowley to write a paper discussing the issues at OT and how Bowley would address them. *Id.* ¶ 116. In November 2017, Bowley met with Defendant Soirat for an hour-long interview, during which he discussed his paper. Following the meeting, Bowley was hired by Rio as General Manager for Strategic Projects and Chief Advisor for the OT project.[2] *Id*.

Shortly after he was hired, Bowley confirmed concerns that the underground project could not be completed for the original budget of $5.3 billion nor achieve sustainable first production in the first quarter of 2021. *Id.* ¶ 117. Upon speaking with people on the ground, Bowley realized that the engineering, construction, and procurement on the project "could hardly be worse" and that such poor engineering, construction, and procurement would result in delays and cost overruns. *Id.* ¶ 120. Throughout the first half of 2018, Bowley reported the "potential disaster" at OT to various senior executives at Rio, including Defendant Soirat. *Id.* ¶¶ 141–152. On February 1, 2018, Bowley made a presentation at Rio's London headquarters to Kinnell and Rosemary Fagen and reviewed the cost overruns, schedule delays, and Shaft 2 problems. *Id.* ¶ 141. Fagen was the Vice President for Human Resources for Rio Tinto's Copper and Diamonds group since July 2016 and for Rio Tinto Copper since September 2014, reported

---

[2] Based on the allegations in the Complaint, it is unclear exactly when Bowley was hired. Dkt. No. 127 ¶ 116.

directly to Soirat, participated in the meeting on behalf of Soirat, and, according to Bowley, reported the substance of the meeting to Soirat. *Id.*

After the February meeting, Bowley followed up with Soirat and Fagen about the need for immediate action to address the cost overruns and delays, and both of them were aware of the problems at OT. *Id.* ¶ 143. Bowley spoke with Soirat for an hour in May 2018 about the problems facing the expansion. *Id.* ¶ 144. And, on July 19, 2018, Bowley wrote to Fagen stating: "12 months behind schedule. $300mill capital over budget. Expect this to rapidly escalate." *Id.* ¶¶ 141–142, 151.

Due to his reports, Bowley was marginalized within Rio Tinto by Soirat, and Bowley's role was reduced, although he continued to report on the cost overruns and delays to Soirat and Fagen, urging them to correct their misstatements to the public. *Id.* ¶¶ 208–214. In May 2018, Soirat instructed Bowley to stop looking into delays and cost overruns at OT. *Id.* ¶ 281. According to Bowley, during their one-on-one meeting in May 2018, Soirat "seemed to be saying that he knew that there was a big problem with the project but he did not want anyone else to know this." *Id.* ¶ 282. In January 2019, Rio Tinto told Bowley that he was being terminated without reason. *Id.* ¶ 221.

In around 2016, Dr. Maurice Duffy, the head of GFI Blackswan ("Blackswan"), which had served as an executive coaching consultant for Rio Tinto since 2007, started to report concerns about unethical behavior and "potential overstatements" at OT. *Id.* ¶ 132–133. Blackswan began performing executive coaching sessions in Mongolia in around 2005. *Id.* ¶ 133. In connection with that work, Duffy said that he began to hear reports and concerns from senior leaders in Mongolia about unethical behavior and "potential overstatements" at OT in around 2016. *Id.* Duffy provided regular reports about this feedback to the head of Rio's human

resources department, who then delivered the reports to the CEO, Executive Committee, and the

Board chairman of Rio Tinto. *Id.* Duffy stated that he knew that Rio's Executive Committee—

which at the time included Soirat and Jacques—was briefed on these reports because the

Executive Committee provided feedback on them to Blackswan. *Id.*

In mid-2017, Duffy was instructed to stop providing these reports, although he did not

stop until September 2017 when he was again instructed to stop providing them. *Id.* ¶ 134. This

instruction concerned Duffy who felt compelled, as a result, to bring his concerns about cost

overruns and schedule delays at OT to the attention of Rio Tinto's senior leadership in London in

September 2017. *Id.* ¶ 135. He did so specifically by raising them with the Head of Human

Resources at Rio Tinto in a meeting on September 6, 2017. *Id.* During this meeting, Duffy

provided the Head of Human Resources with a document containing comments from coaching

assessments in 2016 and 2017, which included comments from senior leaders involved with OT

stating, among other things: "Soirat knows what's going on and worry [sic] about renegotiation

by Mongolia Government," "Delays and cost over-runs are understated in Mongolia," and "I

have escalated issues of concern regarding scheduling at OT—no one wants to hear." *Id.* ¶ 135.

The reports also stated that comments from senior leadership at OT made clear that Jacques

knew about these problems and was driving the effort to conceal the reality at OT. *Id.* ¶ 136.

The Head of Human Resources told Duffy to drop and disregard these concerns and that Jacques

would not appreciate hearing these concerns and he would regret reporting them to him. *Id.*

¶ 137. Duffy resigned and terminated his firm's contract with Rio in December 2017 due to

concerns about unethical behavior in Mongolia, which he communicated to Rio's senior

leadership. *Id.* ¶ 138. According to Duffy, Jacques "knew without a doubt" about the problems

at OT by 2017, and it was clear Jacques knew the "wheels were coming off" the project at OT in January 2018 when he traveled to Mongolia. *Id.* ¶ 140.

## V.    Re-Forecast

After May 2018, Rio Tinto and OT began to "manipulate the schedule" to hide the delays by transferring costs and projects related to the major infrastructure of Shaft 2 to secondary phases. *Id.* ¶ 169.  The tasks that were de-scoped were critical infrastructure and had to be completed before Shaft 2 could become active. *Id.* ¶ 170.

Plaintiffs further allege that the Defendants attempted to conceal the cost overruns and delays plaguing the project through a re-forecast in October 2018. *Id.* ¶ 173.  On October 15, 2018, Turquoise Hill announced an underground development "update" and "re-forecast," disclosing a two-quarter delay to sustainable first production, which would push the scheduled date from the end of the first quarter of 2021 to the end of the third quarter. *Id.* ¶ 174.  Rio Tinto made a similar disclosure the following day. *Id.* ¶ 175.  Both companies reiterated that capital costs remained in line with the $5.3 billion budget, and Rio Tinto reiterated that construction of the first draw bell is still expected in mid-2020. *Id.* ¶¶ 174–175.  Plaintiffs allege that this re-forecast minimized the true extent of delays and denied the cost overruns, which were internally understood to be between twelve and eighteen months and hundreds of millions of dollars. *Id.* ¶ 176.  Moreover, Defendants attributed delays to "ground conditions," which was untrue as the true cause of delays was related to construction, engineering, and procurement failures primarily related to Shaft 2. *Id.* ¶ 176.

Bowley stated that Rio Tinto knew that the disclosure was misleading because Bowley had previously told Soirat that the project was twelve to fifteen months behind schedule and at least a half a billion dollars over budget. *Id.* ¶ 180.  Other former employees confirmed that it was widely known and discussed internally that these public statements were false. *Id.* ¶ 182.

11

The ICG Report, which was later published, confirmed that such reporting was misleading and that it was "inconceivable that Senior Management both on the Project site and in the higher-level committees were not aware of these shortcomings." *Id.* ¶¶ 184–185.

Bowley repeatedly expressed his concerns about the re-forecast to senior management. *Id.* ¶¶ 214–217. For example, On October 30, 2018, Bowley wrote the following email to Fagen about the re-forecast:

**From:** Richard Bowley (OT)
**Sent:** 30 October 2018 03:08
**To:** Fagen, Rosemary (RTHQ) <Rosemary.Fagen@riotinto.com>
**Subject:** Bit more info and thinking for you !

Hi R.

You and me both know the TRQ statement is a little light on the truth. Nine months is already twelve months, and if you don't know commissioning being one of the biggest risks to any project may add a further three to six months. It's easy to state we can still blow first drawbell with limited exposure to schedule slippage, but if the decline and the conveyors are not commissioned, I am not sure how people think we get that ore to the surface ??? The risks are only going to get bigger.

I know in shaft 2 this month the target was 100 sets. Month to date I think its around 3 !!!!!! You do the numbers ?? It's not rocket science, and it's certainly not a Geo issue as TRQ stated, it's purely construction.

*Id.* ¶ 214. On December 10, 2018, Bowley again wrote to Fagen warning of the severe implications for the business and reminding her of the delays, stating that they could only be ignored for so long "before it will slap us in the face properly along with GOM and other TRQ shareholders . . . sorry to be honest." *Id.* ¶ 218. Fagen responded: "Hi Richard I hear you !!!! I will have a discussion with Arshad [Sayed] and Arnaud [Soirat] – again!" *Id.* ¶ 219. As mentioned, Bowley was terminated in January 2019. *Id.* ¶ 222.

## VI. Whistleblower

The day after Bowley was terminated in January 2019, Bowley wrote a critical letter to Arshad Sayed, Rio's Copper and Diamonds Chief Development Officer, and Fagen stating that Rio Tinto's compliance was deficient. *Id.* Within three days of sending the letter, Bowley

received a phone call from a Rio Tinto compliance manager who said he was coming to Mongolia to investigate. *Id.* Bowley described the investigation as effectively a cover up; the compliance manager completed his investigation in six days and concluded that there were no compliance breaches. *Id.* ¶ 223–224.

After the investigation was closed, Bowley sent a letter about his concerns to Ann Godbehere, a member of Rio Tinto's Board of Directors, on March 27, 2019. *Id.* ¶ 227. On April 2, 2019, Bowley emailed Jacques and Godbehere, telling Jacques how behind schedule the project was. *Id.* ¶ 228. Rio Tinto then engaged the law firm Baker McKenzie to do a compliance review. *Id.* ¶ 229. Plaintiffs allege that rather than complete a proper investigation, Rio Tinto's lawyers at Baker McKenzie pursued Duffy throughout the Class Period seeking to destroy the data his firm had collected from Rio executives. *Id.* ¶ 288.

On May 21, 2019, the *Australian Financial Review* reported that Rio Tinto had retained a law firm to investigate allegations by an unnamed whistleblower about when Rio knew about problems with the underground-mine project. *Id.* ¶ 237. On July 8, 2019, the *Australian Financial Review* published a report suggesting that the problems at OT that Rio had blamed on newly available "geotechnical data" may have been known by Rio for a year. *Id.* ¶ 240. On July 10, 2019, Turquoise Hill disclosed that a Turquoise Hill director had abruptly resigned from the Board. *Id.* ¶ 241.

Five days later, Rio Tinto and Turquoise Hill publicly disclosed a substantial delay for first production of sixteen to thirty months compared to the original feasibility study guidance in 2016 and disclosed that the capital spend for the project would increase by $1.2 billion to $1.9 billion over the $5.3 billion previously disclosed. *Id.* ¶ 242. In response to this news, Turquoise

Hill's common stock price decreased by approximately 43.9% from the prior day's closing price. *Id.* ¶ 244.

## VII.  Defendants' Alleged Misstatements

Plaintiffs allege that Defendants made repeated misstatements concerning the schedule and budget for Oyu Tolgoi during the Class Period, including that it was progressing on schedule and that costs for the project were on budget.  *Id.* ¶ 305.  These statements are included below and are detailed in the SAC in paragraphs 306 to 424.

On July 16, 2018, Turquoise Hill issued a press release announcing its second quarter 2018 production and the completion of Shaft 5.  The press release stated that Oyu Tolgoi had "achieved an important underground development milestone with the completed commissioning of Shaft 5" and that "[t]here is expected to be a step-up in underground activities with the increased ventilation capacity from Shaft 5.  The Company continues to expect the first drawbell in mid-2020 and sustainable first production in 2021."  *Id.* ¶ 306.  On July 17, 2018, Rio Tinto issued a similar press release, stating that the "major growth projects remain on track with . . . construction of the first drawbell at Oyu Tolgoi Underground anticipated in mid-2020."  *Id.* ¶ 307.

On July 31, 2018, Turquoise Hill issued a press release and a Management Discussion and Analysis ("MD&A") announcing its financial and operating results for the second quarter of fiscal year 2018.  It reported a "record-level of equivalent underground development" for the month of June.  *Id.* ¶ 313.  The press release stated that Rio Tinto had undertaken a schedule and cost review and had provided Turquoise Hill with a "high-level overview of the review's outcomes."  The review concluded "that there were no material changes in project scope, cost or schedule.  Following analysis of the review's conclusions, Turquoise Hill is in agreement with the findings."  *Id.*

In a conference call with investors the following day, August 1, 2018, Lane, Colton and Quellmann each independently stated and confirmed that Oyu Tolgoi was "on target" for "first drawbell in mid-2020 and sustainable first production in 2021." *Id.* ¶ 315. With respect to funding, Colton stated that Turquoise Hill had at its "disposal" "about $2.6 billion left of project financing [and] about $1.5 billion in TRQ cash" which it would "use . . . to continue to fund the underground" and that there was an "additional $1.6 billion in supplemental debt" that Turquoise Hill would be able to raise before it hit its debt cap. *Id.* ¶ 321.

On August 1, 2018, Rio Tinto filed a Form 6-K, which included a report on the OT, stating "construction of first drawbell expected in 2020" and "[a]ll material assumptions underpinning that target continue to apply and have not materially changed." *Id.* ¶ 323. That same day, Rio Tinto held an investor conference call and a presentation for the call noted that the Oyu Tolgoi underground development remained "on track" (in two places) and on budget with "$5.3 billion Oyu Tolgoi underground first drawbell production in 2020." *Id.* ¶ 324.

On August 15, 2018, Soirat appeared on a Mongolian news network, MBN World, and stated that he had recently visited Oyu Tolgoi and met with Mine employees, that Oyu Tolgoi was "37% complete," and that the underground project was "on plan and on budget." *Id.* ¶ 328.

On September 26, 2018, Jacques gave a presentation on behalf of Rio Tinto at the Bernstein Pan European Strategic Decisions Conference in London. *Id.* ¶ 329. The presentation stated that the "$5.3 billion Oyu Tolgoi underground first drawbell production" would take place in 2020. *Id.* On October 2, 2018, Soirat gave a presentation at a roadshow held in the United States, stating: "Underground project on budget and schedule"; "$5.3 billon capex projected"; "First drawbell production expected mid-2020"; and "UG [underground] project on time to deliver mid-2020." *Id.* ¶¶ 331–332.

On October 15, 2018, Turquoise Hill issued a press release announcing its third quarter 2018 production results.  *Id.* ¶ 334.  Turquoise Hill disclosed that there would be a two- or three-quarter delay in achieving sustainable production, which it attributed to unspecified delays (which it called "schedule contingency") and "challenging ground conditions" affecting the completion of Shaft 2.  At the same time, it stated that "[a]ccording to this re-forecast, lateral development has progressed well, construction completion schedule remains on track for 2022 and the project is expected to be completed at the $5.3 billion budget estimate disclosed in the 2016 Oyu Tolgoi Feasibility Study and the 2016 Oyu Tolgoi Technical Report."  *Id.* at ¶¶ 334–336.  A table that accompanied the release reported that Turquoise Hill had achieved 2.3 kilometers in lateral development during the quarter.  *Id.* ¶ 337.

Rio Tinto echoed these comments in an October 16, 2018 press release.  *Id.* ¶ 338.  Rio Tinto stated:

> Following an annual re-forecast of the Oyu Tolgoi underground development schedule and costs, capital costs remain in line with the overall $5.3 billion budget and construction of the first draw bell is still expected in mid-2020.  The preliminary re-forecast assessment indicates ground conditions and shaft sinking challenges that are ultimately expected to result in a revised ramp-up schedule to sustainable first production.

*Id.* ¶ 338.

On November 1, 2018, Turquoise Hill issued a press release announcing its financial results for the third quarter of fiscal year 2018.  *Id.* ¶ 344.  In its press release, it reported on Rio Tinto's second annual re-forecast of the underground-development schedule and costs, stating that "construction completion schedule remains on track for 2022 and the project is expected to be completed at the $5.3 billion budget estimate."  *Id.* ¶ 345.  It continued:  "[S]ustainable first production . . . is now expected to occur by the end of Q3'21 instead of Q1'21 [as] a result of certain delays including, but not limited to, the completion of Shaft 2, which includes over four

months of schedule contingency and challenging ground conditions." *Id.* Finally, Turquoise Hill stated, "[f]irst draw bell remains on track for mid-2020." *Id.*

During an investor call on November 2, 2018 regarding Turquoise Hill's third quarter financial results, Quellmann reassured investors that the delay "was not atypical in the mining industry." *Id.* ¶ 348. In response to questions about why the budget had not increased, Quellmann also stated that "[f]or now, where we are with the information that we've provided, we confirm the $5.3 billion total budget." *Id.* ¶ 350. Defendant Lane reassured investors on the call that "ground condition problems" were a cause of the delay. *Id.* ¶¶ 355–357.

In a corresponding investor presentation on Turquoise Hill's third quarter financial results dated November 2, 2018, the company made further reassuring statements about the status of underground development. Among other things, the presentation represented that the "UG development project budget [was] unchanged," that "key risks" were "well understood and managed," and that "Turquoise is Well Positioned to Address Key Challenges," including having sufficient funding to develop the mine. *Id.* ¶ 362.

Following the October 2018 re-forecast, Defendants continued to provide investors with assurances that OT was on budget and on schedule as that schedule had been modified. *Id.* ¶¶ 365–367.

On November 12, 2018, at the UBS Australasia Conference in Sydney, Australia, Jacques presented slides that described OT as "the largest and highest quality copper development" in the world, with "$5.3 billion Oyu Tolgoi underground first drawbell production in 2020." *Id.* ¶ 365.

On January 17, 2019, Turquoise Hill gave an investor presentation at the TD Securities Mining Conference. The slide deck accompanying the presentation, which noted that it included information from Rio Tinto, stated that Turquoise Hill was "Well Positioned to Address Key

Challenges," that OT's "UG development project [was] unchanged," that the "Key risks" to the project were "well understood and managed," and that development was proceeding in accordance with the revised schedule.  *Id.* ¶ 366.

On January 18, 2019, Rio Tinto issued a press release disclosing its third quarter production results, which stated that: "Overall progress continues to track in-line with the re-forecast undertaken in the third quarter of 2018."  *Id.* ¶ 367.

Beginning on February 27, 2019, Plaintiffs allege that the Defendants began to disclose the truth about the delays at OT, although they continued to mislead investors about the overall project budget and the reason for the delays.  *Id.* ¶ 369.

On February 27, 2019, Turquoise Hill issued a press release stating that sustainable first production was likely to be delayed beyond Q3'21 blaming "ground conditions."  *Id.* ¶ 230.  The company stated that it had conducted its own review of Rio Tinto's schedule and cost reforecast and "found that project cost was expected to remain within the $5.3 billion budget but that there was an increasingly likely risk of a further delay to sustainable first production beyond Q3'21."  *Id.* ¶ 230.  The company stated that the delay was attributable to "certain delays to the completion of Shaft 2, which contained to experience challenges during Q4'18 with structural, mechanical, piping and electrical installation productivity below expectations," as well as "challenging ground conditions" and new "more detailed geotechnical data than what was previously available."  *Id.*  Turquoise Hill stated that the new geotechnical information could require some "potentially significant changes to the design of some future elements of the development, and the development schedule," which together could result in an "overall schedule delay to sustainable first production beyond the end of Q3'21."  *Id.*

That same day, Rio Tinto issued its year-end results and conducted a conference call. In its announcement of year-end results, Rio Tinto stated that while "underground lateral development has proceeding well," the fit out of Shaft 2 would be "delayed by several months" and that "difficult ground conditions encountered had slowed progress in some areas of underground development." *Id.* ¶ 231. On the conference call, Jacques responded to an analyst question regarding "what exactly . . . you [are] experiencing," by stating, among other things, "[t]his is, absolutely, a normal process." *Id.* ¶ 232.

That same day, Rio Tinto issued a written presentation, which represented that the OT underground project "Progressed well in 2018," as well as its 2018 Annual Report. *Id.* ¶ 372. The 2018 Annual Report made the same statements about the Oyu Tolgoi project (with immaterial variations) as the year-end results, stating that the "[t]otal approved capital cost" of the Oyu Tolgoi project was $5.3 billion and that "[b]y 2027, we expect our Oyu Tolgoi mine in Mongolia to become one of the world's top producers of copper." *Id.* The 2018 Annual Report also included a letter by Jacques that stated: "[t]he detailed engineering design work and overall construction is mostly on track." *Id.*

Following the February 27, 2019 disclosures, TRQ shares dropped nearly 13% from $2.10 per share on February 26, 2019 to close at $1.83 per share on February 27, 2019, on trading volume of more than 18 million shares. The next day, TRQ shares dropped again by nearly 7% from $1.83 per share to $1.71 per share on trading volume of almost 9 million shares. *Id.* ¶ 233.

Following the February disclosure, Defendants continued to misrepresent the true extent of cost overruns at OT and their causes. *Id.* ¶ 381. For example, on March 14, 2019, Turquoise Hill issued a press release stating that the OT project was expected to remain within the $5.3

billion budget, but it added that there may be additional delays to sustainable first production.

*Id.* ¶¶ 235, 381.

On or around July 16, 2019, Rio Tinto and Turquoise Hill announced a delay for

sustainable production of sixteen to thirty months compared to the original feasibility study

guidance in 2016, resulting in sustainable first production now being expected between May

2022 and June 2023, and announced that the capital spend for the project would be $1.2 to $1.9

billion more than the $5.3 billion previously disclosed. *Id.* ¶¶ 242, 403.

In a press release issued by Rio Tinto that day, McIntosh stated:

> We have made significant progress on a number of key elements in the construction
> of the underground project during 2019. However, the ground conditions are more
> challenging than expected and we are having to review our mine plan and consider
> a number of options. Delays are not unusual for such a large and complex project
> but we are very focused as a team on finding the right pathway to deliver this high
> value project.

*Id.* ¶ 234.

Following that news, the price of Turquoise Hill common stock dropped from the prior

day's closing price of $1.07 per share to $0.60 per share, with over 50.2 million shares traded.

*Id.* ¶ 244.

On July 31, 2019, Turquoise Hill issued a news release that added that new financing

would be needed to complete the project, that a definitive estimate review was not expected to be

completed until the second half of 2020, and that it would be required to take a $600 million

impairment charge. *Id.* ¶ 246. Turquoise Hill stock price fell 8.6% from a close of $0.58 per

share on July 31, 2019 to a close of $0.53 per share on August 1, 2019. *Id.* ¶ 247.

## VIII.    Post-Class Period Developments

In early March 2020, Bowley reported Defendants' alleged misconduct to securities

regulators, including to the U.S. Securities and Exchange Commission ("SEC"), the Australian

20

Securities and Investments Commission, the U.K. Serious Fraud Office and Financial Conduct Authority, and the Mongolia Financial Regulatory Commission. *Id.* ¶ 262. In connection with a separate employment dispute before the U.K. Employment Tribunal, Bowley provided a 62-page sworn statement in which he stated that he reported his concerns about schedule delay and cost overruns to Kinnell and Fagen but that Rio Tinto withheld the "true facts" from investors and the market and misled the market. *Id.* Bowley stated his belief that Rio Tinto was seeking to suppress his reports and had made misleading statements to the market regarding the OT project. *Id.*

Around the same time, on March 20, 2020, Turquoise Hill disclosed that it would require at least an additional $4.5 billion in financing to complete the Oyu Tolgoi underground expansion and that this financing was required on top of the $2.2 billion Turquoise Hill had in available liquidity. *Id.* ¶ 263.

In December 2020, a Parliamentary Working Group ("PWG"), which Mongolia had established to investigate the OT project, proposed resolutions that the Government should "take comprehensive measures to improve the implementation" of its various agreement related to the OT underground development project. *Id.* ¶ 264. These resolutions were unanimously passed by the Mongolian Parliament. *Id.* In a December 18, 2020 videoconference, members of the PWG, and in particular Minister Luvsannamsrain Oyun-Erdene, raised concerns with Rio's senior executives—including Soirat and Sayed—that the cost overruns in the OT underground Mine and the decline in project benefits had confirmed the necessity to increase the project's benefits to Mongolia and that the Government would, if necessary, terminate the 2015 agreement. *Id.*

On February 8, 2021, Mongolia announced that it was seeking to cancel the OT deal with Rio Tinto and would replace that deal with a new agreement, explaining that the significant cost increases at OT eroded the economic benefits the Mongolian government expected to receive from the mine. *Id.* ¶ 265.

On November 30, 2022, the OT Board established a special committee consisting of two representatives of Mongolia and two representatives of Turquoise Hill to investigate the causes of cost overruns and schedule delays. *Id.* ¶ 266. A group referred to as the Independent Consulting Group—*i.e.*, the group who produced the ICG Report—was hired and was composed of highly experienced and qualified mining professionals. *Id.* The ICG Report was submitted on August 3, 2021 to the special committee and concluded that "the underground expansion project's delays and cost overruns began as soon as work resumed in 2016 and were caused by engineering, procurement, and construction problems related to Shaft 2 and associated work in completing Shafts 1 and 5—and not by any geotechnical issues." *Id.* ¶ 267. The ICG Report also reported that Rio had refused to cooperate fully with the ICG, refusing to release certain documents. *Id.* ¶ 301–303.

## PROCEDURAL HISTORY

The original class complaint in this action was accepted for filing on October 15, 2020, Dkt. No. 1. The Pentwater Funds were appointed as lead plaintiffs on January 15, 2021 and filed a consolidated complaint on March 16, 2021. Dkt. Nos. 103, 109. The operative complaint, the SAC, was filed on September 16, 2021. Dkt. No. 127. Lead plaintiffs bring this action on behalf of a class of investors who purchased or otherwise acquired Turquoise Hill securities during the Class Period in domestic transactions or on United States exchanges. *Id.* ¶ 1.

On October 19, 2021, Defendants Rio Tinto, RTIH, Jacques, and Soirat (collectively the "Rio Defendants") moved to dismiss all claims asserted against them in the Complaint. Dkt.

Nos. 129–31.  Also on October 19, 2021, Defendants Turquoise Hill, Colton, Lane, and

Quellmann (collectively, the "Turquoise Defendants") moved to dismiss all claims asserted

against them in the Complaint.  Dkt. Nos. 132–34.  Plaintiffs filed their memorandum of law in

opposition to the motions to dismiss on November 16, 2021.  Dkt. Nos. 135–36, 144.[3]  The Rio

Defendants and the Turquoise Defendants separately filed reply memoranda in further support of

their motions to dismiss on December 17, 2021.  Dkt. Nos. 137–39.  On August 4, 2022,

Plaintiffs filed a letter to the Court addressing the Second Circuit's decision in *SEC v. Rio Tinto

plc*, -- F.4th --, 2022 WL  2760323 (2d Cir. July 15, 2022).  The Rio Defendants and Turquoise

Defendants each responded to that letter on August 10, 2022, and Plaintiffs filed their reply on

August 11, 2022.  Dkt. Nos. 141–144.

The Court heard oral argument on the motions on August 25, 2022.  Following oral

argument, the Turquoise Defendants wrote a letter to the Court addressing the Turquoise Hill

Board of Directors' obligations with respect to the company's minority shareholders.  Dkt. No.

147.

## LEGAL STANDARDS

I.      **Motion to Dismiss**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true

all factual allegations in the complaint and draw all possible inferences from those allegations in

favor of the plaintiff.  *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).  This

requirement "is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[3] Plaintiffs filed a corrected memorandum of law in opposition to the motions to dismiss on
August 22, 2022 after discovering errors in the citations to certain paragraph numbers in the
SAC.  Dkt. Nos. 144–145.

Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

## II.    Section 10(b) and Rule 10b–5(b)

To plead a claim for damages under Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b–5(b), a plaintiff must satisfy each of the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014); *see Matrixx*, 563 U.S. at 37–38; *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

"'The test for whether a statement or omission is materially misleading' . . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec.*

24

*Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach*, 355 F.3d at 172 n.7).  This test is objective and looks to the understanding of the "ordinary investor."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015).  Moreover, under the federal securities laws, "literal accuracy is not enough.  An issuer must as well desist from misleading investors by saying one thing and holding back another."  *Id.* at 192.  Companies have a duty of disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'"  *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. 240.10b-5(b)).  "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

To be actionable, a misrepresentation or omission also must be material, *i.e.*, a plaintiff must allege facts showing that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).  Thus, "[i]n judging whether an alleged omission was material in light of the information already disclosed to investors, [the court] consider[s] whether there is 'a substantial likelihood that the disclosure of the [omitted material] would have been viewed by the reasonable investor as having significantly altered the total mix of information [already] made available.'"  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

However, Section 10(b) and Rule 10b–5(b) "do not create an affirmative duty to disclose any and all material information."  *Matrixx*, 563 U.S. at 44.  "Materiality alone does not demand

disclosure, nor does the duty to disclose encompass non-material information." *In re ProShares*, 728 F.3d at 102 (quoting *Panther Partners, Inc. v. Ikanos Comm'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008)).

When a claim sounds in fraud, such as claims brought under Section 10(b) and Rule 10b–5, the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) also applies. Under Rule 9(b), a "party must state with particularity the circumstances constituting fraud." A complaint making such allegations must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (internal quotation marks and citation omitted).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes additional requirements on a plaintiff bringing a private securities fraud action. See 15 U.S.C. § 78u-4(b)(1). The "complaint [must] specify each statement alleged to have been misleading, the reasons or reason why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed." *Id.* The plaintiff cannot plead "the materiality of the alleged misstatements or omissions . . . in a conclusory or general fashion." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626 (S.D.N.Y. 2005).

Moreover, under the PSLRA, where the complaint alleges scienter, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. 78u-4(b)(2). Under this heightened pleading standard for scienter, a plaintiff will sufficiently allege scienter and a complaint will survive, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be "taken collectively," and "the court must take into account plausible opposing inferences." *Id.* at 323.

## DISCUSSION

Plaintiffs bring claims for Defendants' false statements and omissions under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and under Rule 10b–5(b) promulgated thereunder, 17 C.F.R, § 240.10b–5(b), against all Defendants. They also bring a claim against all Defendants under Section 10(b) and Rule 10b–5(a) and (c), promulgated thereunder, 17 C.F.R, § 240.10b–5(a) & (c), alleging that Defendants engaged in deceptive and manipulative acts in a scheme to defraud investors, as well as for making false statements and omissions. Finally, Plaintiffs bring a control-person claim against the Executive Defendants, Rio Tinto, and RTIH under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

The Rio Defendants argue that Plaintiffs lack standing to sue them and that the Rio Defendants are not liable under Rule 10b–5(b) for Turquoise Hill's statements. The Rio and Turquoise Defendants both argue that the Complaint does not state a claim under Rule 10b–5(b) because it fails to allege an actionable misstatement or omission and does not sufficiently allege scienter. The Defendants also move to dismiss the scheme liability claims under Rule 10b–5(a) and (c) as well as the control person claims under Section 20(a) of the Exchange Act. Finally, the Rio Defendants argue that the Complaint against them should be dismissed as Plaintiffs do not adequately allege loss causation.

I.      **Standing**

The Rio Defendants assert that Plaintiffs lack standing to sue them because "Plaintiffs' alleged losses stem solely from their purchases of stock in another company—Turquoise Hill." Dkt. No. 131 at 10.

The Supreme Court first addressed what standing is required to bring a private cause of action for damages under Rule 10b–5 in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975).  In that case, the Supreme Court held—in line with the Second Circuit's decision in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952)—that to assert a claim for damages under Rule 10b–5, Plaintiff "must be either a purchaser or seller of securities," as opposed to a holder, *i.e.*, someone who decided not to purchase or sell stock as a result of the misrepresentation.  *Blue Chip Stamps*, 421 U.S. at 749.  The Court noted that such a rule was required as, in the absence of such a rule, the difficulties of proof would be significant.  *Id.* at 742–47.  Without such a rule, the Supreme Court noted that "Plaintiff's proof would not be that he purchased or sold stock, a fact which would be capable of documentary verification in most situations, but instead that he decided not to purchase or sell stock," which would turn almost entirely on "oral testimony."  *Id.* at 746–47.  The Supreme Court thus concluded that standing is limited to the "class of plaintiffs [] who have at least dealt in the security to which the prospectus, representation, or omission relates."  *Id.* at 747.

Since then, the Second Circuit has further elaborated on what standing is required to bring a private cause of action under Rule 10b–5 in two key cases.  In *Ontario Pub. Service Employees Union Pension Trust Fund v. Nortel Networks Corp. ("Nortel")*, the Second Circuit considered whether an individual who owns stock in one company has standing to sue a non-issuer of that stock pursuant to Rule 10b–5 for misstatements made by the non-issuer.  369 F.3d 27 (2d Cir. 2004).  In that case, investors in JDS sued Nortel for material misstatements that

Nortel had made about Nortel's own revenue and earnings, which in turn positively affected JDS's share price. *Id.* at 29. Nortel was JDS's largest customer, accounting for 10–15% of JDS's revenues, and, around the time of the false statements, sold its laser business to Nortel in exchange for Nortel stock. *Id.* The JDS investors claimed that they had standing under *Blue Chip Stamps* because they were "purchasers" of securities affected in some way by the relevant misrepresentations. *Id.* at 32. The Second Circuit disagreed and stated broadly that "[s]tockholders do not have standing to sue under Section 10(b) and Rule 10b–5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." *Id.* at 34.

However, only a few years later, the Second Circuit clarified that *Nortel* should not be read so broadly. In *In re NYSE Specialists Securities Litigation* ("*In re NYSE*"), the Second Circuit addressed whether *Nortel* barred plaintiff's claims against the New York Stock Exchange (the "NYSE") for misrepresentations it made about its integrity and internal operations, upon which plaintiffs relied in trading on the NYSE. 503 F.3d 89 (2d Cir. 2007). The plaintiffs in *In re NYSE* were investors who purchased and/or sold NYSE-listed stock during the relevant class period. *Id.* at 287–88. The Second Circuit stated that, despite language to the contrary, *Nortel* should not be read to hold that "an action under Rule 10b–5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security, or that only statements about a security issuer are actionable." *Id.* at 102. The Second Circuit stated that the Rule 10b–5 claim of the JDS investors in *Nortel* was based on Nortel's "knowingly made falsely optimistic public statements about its own financial prospects," which Plaintiffs claimed resulted in JRS's own purchase price being inflated "[o]n the basis of a business relationship" between JDS and

Nortel. *Id.*.[4]  The court therefore held that *Nortel* stood for the proposition that based on the "particular circumstances of the case" "the connection between Nortel Networks' false statements *about itself* and the plaintiff's purchase of JDS Uniphase stock was too remote to sustain an action under Rule 10b–5." *Id.* at 102 (emphasis added).  The Second Circuit further noted that a contrary reading of *Nortel* "would place beyond the reach of Rule 10b–5 false statements made by underwriters, brokers, bankers, and non-issuer sellers." *Id.*  Accordingly, the Second Circuit rejected a request to dismiss the claims of investors in various companies against the NYSE under *Nortel*.

The Rio Defendants urge this Court to conclude that these cases stand for the proposition that, except "in very limited circumstances," investors do not have standing to bring claims under Rule 10b–5 against a non-issuer company whose stock they did not purchase or sell.  Dkt. No. 131 at 10.  But this gets the relationship between *Nortel* and *In re NYSE* backwards.  *In re NYSE* did not, as the Rio Defendants claim, "carve" out certain narrow exceptions to *Nortel*'s general holding.  *Id.* at 12.  Instead, *In re NYSE* confined the potential reach of *Nortel*'s holding substantially.  The *In re NYSE* court clearly stated that *Nortel* should not be read broadly to hold that "an action under Rule 10b–5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security."  503 F.3d at 102.  Instead, per the *In re NYSE* court,

---

[4] At oral argument, the Rio Defendants noted that JDS sold its laser business to Nortel in exchange for Nortel stock and therefore stood to become a shareholder in Nortel.  Transcript of Oral Argument (Aug. 25, 2022) at 94:9–19.  But those facts are distinguishable from those alleged here, including because, unlike in *Nortel*, Plaintiffs allege that Rio Tinto made statements directly about Turquoise Hill.  Moreover, the *Nortel* court specifically contemplated that standing may exist where there is a "more significant relationship between companies than" the sale of a business unit.  369 F.3d at 34.  It thus is incorrect to state that the *Nortel* court somehow anticipated and decided the issue in this case—whether statements that a majority owner makes about the business of its subsidiary whose business it operates are subject to securities law claims from minority interest holders in the subsidiary.

*Nortel* held that plaintiffs lack standing for a Rule 10b–5 action where the "connection between" the false statements of the non-issuer and "plaintiff's purchase" of stock is "too remote." *Id.* And such a connection is "too remote" where, as in the "particular circumstances of" *Nortel*, plaintiffs' claims are based merely on (i) false statements by a non-issuer of the security about *itself* and (ii) nothing more than a "business relationship" exists between the issuer and non-issuer company. *Id.*

That *Nortel*, as clarified by *In re NYSE*, foreclosed only "remote" claims against non-issuers similar to the claims at issue in *Nortel* and was not intended to broadly bar *all* claims against non-issuers, except in limited circumstances, is consistent with the reasoning of *Nortel* itself. *Id.* In reaching its decision, the *Nortel* court reasoned that to find that plaintiffs had standing would be at "odds with the purchaser-seller requirement in *Blue Chip Stamps* that 'limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates.'" *Nortel*, 369 F.3d at 32 (quoting *Blue Chip Stamps*, 421 U.S. at 747). But while it is certainly true that "remote" claims against a non-issuer related to misstatements the non-issuer made about itself (as was the case in *Nortel*) would be inconsistent with the purchaser-seller requirement, claims against a non-issuer related to misstatements the non-issuer made about the company in which plaintiffs directly dealt would plainly not be inconsistent with this requirement. In the latter types of cases, plaintiffs would still fall within the class "who have at least dealt in the security to which the prospectus, representation, or omission relates.'" *Id.* (quoting *Blue Chip Stamps*, 421 U.S. at 747).

In addition, in reaching its decision, the *Nortel* court reasoned that if plaintiffs were found to have standing, "oral testimony would play a crucial role in proving that plaintiffs relied on Nortel's financial projections when they purchased JDS's securities" and therefore would raise

the same concerns that were present in *Blue Chip Stamps*. *Id.* at 33. But, again, while it is undoubtedly true that oral testimony would "play a crucial role" in proving that plaintiffs relied on a non-issuer's overly optimistic false statements about itself in purchasing securities of an entirely separate company, oral testimony would play a much lesser role in many other claims against non-issuers, such as where a non-issuer and the issuer effectively operate as one company and therefore any statement about one is effectively a statement about the other. *Id.*

Subsequent case law in this Circuit supports that *Nortel*'s holding is much narrower than the Rio Defendants claim and applies to cases with similar facts to those present in *Nortel*—that is, where the non-issuers' misstatements do not directly relate to the issuer and there is no more than a "business relationship" between the two parties. For example, in *Menora Mivtachim Insurance v. International Flavors & Fragrances Inc.*, which the Rio Defendants cite in support of their position, the court repeatedly made clear that it read *Nortel* as extending only to cases in which, as in *Nortel*, the non-issuer made misrepresentations "*about itself*." 2021 WL 1199035, at *30–31 (S.D.N.Y. Mar. 30, 2021) (emphasis added) (summarizing *Nortel*'s holding as "plaintiffs lack standing to bring a lawsuit against [a company] for *self-referential statements* made by a company in which plaintiffs never invested" (emphasis added)). Similarly, in *Harbinger Capital Partners LLC v. Deere & Co.*, the Second Circuit dismissed Plaintiffs' claims against a non-issuer defendant for lack of standing because, as in *Nortel*, the claims against the non-issuer related to fraudulent omissions and misrepresentations that the non-issuer made about *its own design product*. 632 F. App'x 653 (2d Cir. 2015) (summary order). The court stated that "[t]here is no relevant difference between [the plaintiffs in this case] and the plaintiffs in *Nortel Networks*," and therefore "just as in *Nortel Networks*, the connection between *defendants' omissions about the shortcomings of its receivers* and [plaintiffs'] purchase of LightSquared's

32

stock was 'too remote to sustain an action' under § 10(b) and Rule 10b–5."  *Id.* at 656 (emphasis

added) (quoting *In re NYSE*, 503 F.3d at 102).  In *In re Barclays Liquidity Cross & High*

*Frequency Trading Litig.*, the court, after considering *Nortel*'s impact on the standing analysis

for Rule 10b–5 claims against non-issuers, appeared to find that its impact was miniscule and

concluded that "the scope of the Section 10(b) private action has not substantially changed since

the Second Circuit first described it: Section 10(b) and Rule 10b–5 'extend[ ] protection only to

the defrauded purchaser or seller' of securities."  390 F. Supp. 3d 432, 447 (S.D.N.Y. 2019)

(quoting *Birnbaum*, 193 F.2d at 464).

Moreover, the Rio Defendants' reading of *Nortel* proves too much.  If it were true that

investors do not have standing to bring claims under Rule 10b–5 against a non-issuer company

whose stock they did not purchase or sell, except in a few limited circumstances, then the

Supreme Court's key holdings in cases such as *Janus Capital Group, Inc. v. First Derivative*

*Traders*, 564 U.S. 135 (2011) and *Stoneridge Investment Partners, LLC v. Sci.-Atlanta*, 552 U.S.

148 (2008)—both of which are described in greater detail in Sections II and V.A— which

concern when a third-party may be liable under Rule 10b–5 to another company's shareholders,

would largely be nullities.  The Supreme Court, in those cases, could have instead held that

Plaintiffs would not have standing to bring Rule 10b–5 claims against the third parties.

Defendants' argument would also undercut the Supreme Court's statements in *Stoneridge* and

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.* that "the implied right of

action in § 10(b) continues to cover secondary actors who commit primary violations."

*Stoneridge*, 552 U.S. at 166; *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of*

*Denver, N.A.*, 511 U.S. 164, 191 (1994) ("The absence of § 10(b) aiding and abetting liability

does not mean that secondary actors in the securities markets are always free from liability under

the securities Acts.  Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming all of the requirements for primary liability under Rule 10b–5 are met.").

The argument the Second Circuit rejected in *Nortel*—that Section 10(b) reaches any statement that affects in any way the securities of which the plaintiff is a purchaser—admitted of no limiting principle.  The securities of any company are subject to being "negatively impacted" in all manners of speaking by statements made by others about their own business—whether it be statements about the general state of the economy or demand for a particular type of product, or statements about competition in an industry.  Once accepted, the proposition that a statement that one company makes about its own business can subject it to liability for securities fraud by shareholders of a different company could not be easily cabined.  It could subject to potential liability any well-heeled or deep-pocket company for the misfortunes of the shareholders of another no matter how remote the first company was from the shareholders of the second.  *Cf. Blue Chip Stamps*, 421 U.S. at 739 ("There has been widespread recognition that litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general.").  A company which made statements to its own shareholders about its own business or about the economic environment affecting its operations could unwittingly be held liable to shareholders of a potentially limitless number of other companies, each of whom claimed that the statements the company made—though only directed to that company's business— spoke to the business prospects of others.

By the same token, however, the Rio Defendants' reading of *Nortel* also admits of no limiting principle.  It would seem to leave out a number of third-party actors whose false

statements about a company could easily have been relied upon by investors in the issuer and whose conduct would constitute a primary violation of Rule 10b–5.  For example, would a majority shareholder who makes misstatements about the company whose shares she owns in order to drive up its share price and increase the value of her holdings (perhaps because they serve as collateral for other business transactions), be immune from a private securities lawsuit by the persons who relied on those statements?  Could the majority shareholder avoid such a lawsuit if she cleverly avoids a board seat and, from a position of presumed authority, uses a megaphone to make the misstatements rather than a corporate filing?  Similarly, what if a prospective acquiring company makes false statements about a target company in order to drive down the price of that company and to be able to make the acquisition on the cheap, would investors who sold their shares in the company lack standing against the acquirer?  The definition of a security under the Exchange Act includes a note, bond, or debenture.  15 U.S.C. § 78c(a)(10).  Would the Rio Defendants argue that a company that decides—for tax planning or other efficiency reasons—to raise capital for the operations of a wholly owned subsidiary through the issuance of debt by that subsidiary is immune from liability under the Exchange Act for fraudulent misstatements it makes about the subsidiary?  At oral argument, the Rio Defendants admitted that in such a scenario, the investors of the subsidiary could have standing to sue the parent company if the parent company's statements sufficiently related to the issuance of the debt related to that asset.  Transcript of Oral Argument (Aug. 25, 2022) at 10:19–11:19.  But that concession gives up the ghost.  From the perspective of Section 10(b) and Rule 10b–5, equity securities are indistinguishable from debt securities.  *See Nortel*, 369 F.3d at 32 (stating that reference in Section 10(b) to fraud "in connection with the purchase or sale of any security" refers to the type of security and captures all types of securities).  If a parent is not immune from

liability for false statements about the subsidiary when it chooses to finance its operations through the issuance of debt, there is no reason why it should be immune from suit when the financing is in the form of a small minority interest in equity. In either case, the purchasers of a security of the company (the subsidiary) are equally injured as a direct result of a false statement made by the parent about the subsidiary.

In addition, the Rio Defendants apparent position that the *In re NYSE* exception should be read only to apply to third parties who are "directly involved in the marketing and sale of the issued securities," *see* Dkt. No. 131 at 11, would mean that Rule 10b–5 claims against auditors— who are neither directly involved in the marketing or sale of an issued securities—would lack standing. *See, e.g.*, *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004) (concluding that plaintiffs adequately stated a Rule 10b–5 claim against outside auditor); *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152 (D. Mass. 2002) (denying motion to dismiss Rule 10b–5 claim against outside auditor).

For these reasons, the Court rejects the Rio Defendants' expansive reading of *Nortel* and instead reads *Nortel*, as clarified by *In re NYSE*, as standing for the proposition that investors lack standing where the "connection between" the false statements of the non-issuer and "plaintiff's purchase" of stock is "too remote," and such a connection is too remote where, as in that case, the third party makes self-referential public statements and the third party and the issuer are connected only by a "business relationship." *In re NYSE*, 503 F.3d at 102. Accordingly, *Nortel* would not bar a claim against a third party where that third party had substantial connections to the issuer and, more importantly, made statements *directly about the issuer's own securities*.

In light of this understanding of *Nortel*, it is apparent that Plaintiffs have standing for their claims against the Rio Defendants.  Plaintiffs allege a connection between Rio Tinto's misstatements and their purchase of Turquoise Hill stock that is significantly less remote than the connection in *Nortel*.  In fact, the facts alleged here are very similar to the hypothetical this Court asked the Rio Defendants about at oral argument.  Rio Tinto owns a majority interest in Turquoise Hill.  Like the parent company in the hypothetical, Rio Tinto appears to have used its interest in Turquoise Hill to invest in Oyu Tolgoi, and then exercised, through RTIH, near-total control over the management and operations of the Mine.  *See* Dkt. No. 127 ¶ 52 ("Rio Tinto owns just over 50% of Turquoise Hill's common stock, manages the Oyu Tolgoi project under agreements between OT, Rio Tinto, and the Government of Mongolia, and exercises near total control over both the project and Turquoise Hill, including control over Turquoise Hill's public statements about OT.").  And, while the public float of Turquoise Hill appears to be a legacy of a time before Rio Tinto built up its majority ownership, the position it espouses would apply even if the public ownership was a consequence of a decision by Rio Tinto to spin off a portion of the equity.  While, unlike the hypothetical, Rio Tinto would have chosen to finance that investment through the issuance of stock in Turquoise Hill, the consequences are ultimately no different than if it had chosen to finance it by issuing debt at the subsidiary level.  Moreover, unlike *Nortel*, Rio Tinto elected to make statements directly about the operation of Turquoise Hill's Oyu Tolgoi project.  *See, e.g.*, Dkt. No. 127 ¶¶ 324, 328, 331–334.  These misstatements are not "self-referential" and directly concern the company in which Plaintiffs invested: as the SAC states repeatedly, the operation and development of OT was the "sole business" of Turquoise Hill and therefore any statement about OT was necessarily about Turquoise Hill.  *E.g.*, *id.* ¶¶ 3, 38.  They

"relate[]" to the company whose securities Plaintiffs purchased.  *Blue Chip Stamps*, 421 U.S. at 747.  The liability to which it exposed itself is anything but unwitting.

Accordingly, this Court declines to dismiss Plaintiffs' claims against the Rio Defendants for lack of standing.[5]

## II.  Rio Defendants Liability for Statements Made by Turquoise Hill

In the Complaint, Plaintiffs allege that Rio and RTIH were "the maker[s] of both [their] own and Turquoise Hill's false and misleading statements and omissions."  Dkt. No. 127 ¶¶ 54, 450.  On that theory, Rio and RTIH would themselves be primarily liable for those alleged misstatements and omissions; no scienter on the part of Turquoise Hill would be necessary.  The Rio Defendants move to dismiss this theory of liability, claiming that Rio and RTIH are plainly not the "makers" of Turquoise Hill's statements under the Supreme Court's holding in *Janus*, 564 U.S. 135.  Dkt. No. 131 at 15.  Although Plaintiffs do not appear to contest this point with respect to RTIH,[6] Plaintiffs claim that Rio is liable for Turquoise Hill's statements as it exercised "complete control" over Turquoise Hill's public statements regarding the Oyu Tolgoi project.  Dkt. No. 135 at 34.

---

[5] In a footnote, the Rio Defendants claim that "for similar reasons, Plaintiffs cannot satisfy the 'in connection with' requirement of the Exchange Act" and cite to a case stating that the "in connection" requirement is not satisfied where plaintiffs' claims are "against a second company based on alleged misstatements pertaining to the second company's stock."  Dkt. No. 131 at 14 n.14 (citing *Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *12 n.14 (S.D.N.Y. Feb. 27, 2017)).  But, as discussed, the Rio Defendants' alleged misstatements relate to Turquoise Hill, not to themselves, and the Court therefore rejects this argument.

[6] In response to the Rio Defendants' motion to dismiss on this claim, Plaintiffs only argue that Rio is the maker of Turquoise Hill's statements.  Dkt. No. 135 at 54.  Plaintiffs have therefore waived this argument with respect to RTIH, *see In re Kingate Mgmt. Ltd. Litig.*, 746 F. App'x 40, 43 (2d Cir. 2018) (summary order) (finding waiver for failing to raise an argument before the district court in response to a motion to dismiss), and, regardless, this Court finds that Plaintiffs have not sufficiently pled that RTIH is the "maker" of Turquoise Hill's statements, as the Complaint only alleges that Rio Tinto exercised control over Turquoise Hill's public statements about OT.  *See, e.g.*, Dkt. No. 127 ¶ 52.

"Under Rule 10b–5, it is unlawful for 'any person, directly or indirectly . . . [t]o make any untrue statement of a material fact' in connection with the purchase or sale of securities." *Janus*, 564 U.S. at 141 (quoting 17 CFR § 240.10b–5(b)). In other words, a party must have "made" the material misstatements in order to be liable under Rule 10b–5. *Id.*

The Supreme Court's decision in *Janus* is the seminal case on when a party has "made" a statement for purposes of Rule 10b–5(b) liability. *Id.* In that case the Court was asked to determine whether Janus Capital Management LLC ("JCM"), a mutual fund investment advisor, could be held liable for making the false statement included in the prospectuses of Janus Investment Fund, JCM's client mutual fund. *Id.* at 137–41. According to the allegations in the complaint, JCM's parent company Janus Capital Group, Inc ("JCG") had created Janus Investment Fund. *Id.* at 138. And although Janus Investment Fund was a separate legal entity owned entirely by mutual fund investors, all of the officers of Janus Investment Fund were also officers of JCM, and one member of Janus Investment Fund's board of trustees was associated with JCM. *Id.* Plaintiffs also alleged that JCM was "significantly involved in preparing the prospectuses" at issue. *Id.* at 147–48.

Despite these facts, the Supreme Court held that JCM was not the maker of the statements in the Janus Investment Fund prospectuses; Janus Investment Fund was. *Id.* at 146–47. The Court explained that "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. The Court noted that: "Without such authority, it is not 'necessary or inevitable' that any falsehood will be contained in the statement." *Id.* at 144. "And in the ordinary case," according to the Court, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only

by—the party to whom it is attributed." *Id.* at 142–43.  The Court likened this rule to the relationship between a speechwriter and a speaker:  "Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.  And it is the speaker who takes credit—or blame—for what is ultimately said." *Id.* at 143.

In reaching its decision, the Supreme Court clarified what type of conduct does not result in a party becoming the "maker" of a statement.  The Court noted that "entities that contribute 'substantial assistance' to the making of a statement but do not actually make it" cannot be considered the maker of a statement. *Id.* (quoting *Cent. Bank of Denver*, 511 U.S. at 169).  Furthermore, a person who "provides the false or misleading information that another person then puts into the statement" is not the "maker" of the statement. *Id.* at 145.  Finally, the Court noted that a "well-recognized and uniquely close relationship" between Company A and Company B or evidence that Company A exerts "significant influence" over Company B does not make Company A the maker of Company B statements, where Company A and Company B "remain legally separate entities." *Id.* at 145–46.

Here, Plaintiffs argue that, unlike in *Janus*, Rio "had 'ultimate authority' over [Turquoise Hill's] statements, including their 'content and whether and how to communicate [them],' and [Turquoise Hill] told investors of this fact."  Dkt. No. 135 at 34 (quoting *Janus*, 564 U.S. at 142–43).  In support of this contention, Plaintiffs points to the allegation that Rio Tinto exercised complete control over the dissemination of the misleading information to Turquoise Hill and Rio Defendants were Turquoise Hill's controlling majority stockholder and the manager of its sole asset. *Id.* at 34–35.  In addition, Plaintiffs allege that Rio Tinto controlled Turquoise Hill's public statements through a contract requiring that those statements be "consistent with the information provided by the Rio Tinto Manager," RTIH, and that Turquoise Hill would "not file

40

or issue any OT Disclosure without providing the Rio Tinto Manager with a reasonable opportunity to review and comment thereon."  *Id.* at 34.

The Court separates its analysis of this argument into: (1) those statements that Turquoise Hill made that are not explicitly attributed to Rio Tinto[7]; and (2) those statements that Turquoise Hill made to investors, which it explicitly attributed in some form to Rio Tinto (*e.g.*, "Rio Tinto has provided Turquoise Hill with a high-level overview of the review's outcomes, in which Rio Tinto concluded there were no material changes in project scope, cost or schedule."  Dkt. No. 127 ¶ 313).[8]

As to the first category of statements, the Complaint alleges insufficient facts to plead that Rio was the "maker" of Turquoise Hill's statements.  Conclusory allegations of one party's ultimate control over another party's statements generally do not suffice to support that the first party was the "maker" of those statements.  *See, e.g.*, *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) ("Plaintiff's conclusory pleading that each defendant had 'ultimate authority' over the statements is clearly insufficient to adequately plead Gooden made these statements."); *see In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 242 (S.D.N.Y. 2018) ("Plaintiffs' generic and conclusory allegation that Mackay

---

[7] *See, e.g.*, *id.* ¶ 336 ("According to this re-forecast, lateral development has progressed well, construction completion schedule remains on track for 2022."); *id.* ¶ 348 ("The work delays are of course not desirable, developing the OT underground blockade is a very large undertaking and these types of delays are certainly not atypical in the mining industry for projects of this scale and complexity."); *id.* ¶ 362 ("key risks" were "well understood and managed," and "Turquoise is Well Positioned to Address Key Challenges").

[8] *See also, e.g.*, *id.* ¶ 335 ("Rio Tinto has undertaken a second annual re-forecast of underground development schedule and costs and preliminary results have concluded that capital costs remain in line with the overall $5.3 billion budget and the project remains on schedule to complete in 2022."); *id.* ¶ 336 ("Rio Tinto has notified Turquoise Hill, based on preliminary results, of a delay to achievement of sustainable first production which is now expected to occur by the end of Q3'21 instead of Q1'21.").

(and the other individual Defendants) 'did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false in misleading' is not sufficient." (citation omitted)). Thus, Plaintiffs cannot successfully plead that Rio was the "maker" of Turquoise Hill's statements through general allegations that Rio exercises "control over Turquoise Hill's public statements about OT" or that "any communication disseminated outside of Turquoise Hill concerning Oyu Tolgoi or any communication that could impact Turquoise Hill's stock price was dictated by Rio Tinto, which controlled all of Turquoise Hill's communications and access to information about OT."  Dkt. No. 127 ¶¶ 52, 450.

That Rio exercised control over Turquoise Hill's access to relevant information about the Oyu Tolgoi project does not itself make Rio the "maker" of Turquoise Hill's statements.  That argument is foreclosed by *Janus*.  There, the mutual fund investment advisor JCM conducted the business of the investment fund.  It "manage[d] the purchase, sale, redemption, and distribution of the Fund's investments," "prepare[d], modifie[d], and implement[ed] the Janus Fund's long-term strategies," and "carrie[d] out the Fund's daily activities." *Janus*, 564 U.S. at 149 (Breyer, J. dissenting); *see also id.* at 138 (noting that JCM provided the fund with the management and administrative services necessary for its operation).  The Court accepted the analogy that the investment advisor played the role of a "playwright whose lines are delivered by an actor," the fund, *id.* at 145, but held that such facts were insufficient for the advisor to be the maker of the fund's statements.  *Janus* held that a person who "provides the false or misleading information that another person than puts into the statement" is not the maker of the "false public statements," as this is merely an "undisclosed act preceding the decision of an independent entity to make a public statement."  *Id.* at 144–45.

Rio's status as a majority stockholder and manager of Oyu Tolgoi also does not result in Rio being the "maker" of Turquoise Hill's statements. *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 262 (S.D.N.Y. 2020) (finding allegations that defendant "owns a large stake in [other company] and has placed board members" is insufficient). Ownership might confer generally the right of the parent to control a subsidiary by, for example, selecting members of its board of directors and, through the directors, the officers of the corporation. But it does not establish that it had control over those directors and officers, and the statements they made, once they were appointed. As discussed below, *infra* Section VI, courts have held that it is not sufficient for control-person liability for the defendant to have the theoretical ability to control the primary violator. The defendant must possess the practical ability to direct the primary violator and "have 'actual control over the *transaction* in question.'" *In re Alstom SA Sec. Litig.,* 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (quoting *in re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005)). Plaintiffs' theory would have the Court impose on a parent corporation primary liability for the misstatements of its partially owned subsidiary where it is a close question at best whether Congress even intended for it to have secondary liability.

Plaintiffs allege generally that Rio Tinto has an "extraordinarily close relationship" with Turquoise Hill and exercises significant influence over it. Dkt. No. 135 at 6. But Turquoise Hill is a "legally independent entity with its own board of trustees" and is separately listed and traded.[9] *Janus*, 564 U.S. at 147. It enjoys its own corporate form, and there are no allegations

---

[9] These, among other facts, distinguishes this case from *IOP Cast Iron Holdings, LLC v. J.H. Whitney Cap. Partners, LLC*, 91 F. Supp. 3d 456 (S.D.N.Y. 2015) in which the company was effectively solely owned by the defendant and its affiliates, and the defendant formed a majority of the company's board. *Id.* at 473–74.

that "corporate formalities were [not] observed here." *Id.* at 146. Indeed, minority shareholders make up almost 50% of the company. Those facts are legally dispositive. As officers and directors of an independently incorporated company with minority shareholders, the persons in control of Turquoise Hill cannot act solely at the behest of their majority shareholder. They owe legal duties to all of Turquoise Hill's stakeholders and must "act honestly and in good faith with a view to the best interest of the corporation." Canada Business Corporations Act § 122. If they were to have made a false and misleading statement, the excuse "Rio Tinto made us do it" would not suffice. *Cf. McMullin v. Beran*, 765 A.2d 910, 925 (Del. 2000) ("In properly discharging their fiduciary responsibilities, directors of Delaware corporations must exercise due care, good faith and loyalty whenever they communicate with shareholders about the corporation's affairs."); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 70 (Del. Ch. 2015) ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey."). Nor would Rio Tinto's majority ownership relieve Turquoise Hill of its own independent regulatory obligations. *See Janus*, 564 U.S. at 147 (concluding JCM was not the maker of the statements as "[o]nly Janus Investment Fund—not JCM—bears the statutory obligation to file the prospectuses with the SEC"); *IOP Cast Iron Holdings, LLC*, 91 F. Supp. 3d at 474 ("Because federal law determined which entity had a duty to file the prospectus, it would have been anomalous for another provision of securities law, Rule 10b–5, to recognize a different entity as the maker of the statements in the prospectus."). As a New York Stock Exchange listed company, for example, it is subject to its own requirement that its financial reporting be truthful or it risks being delisted. *See* NYSE Listed Company Manual § 802.01 (noting that a company can be suspended or delisted if the Exchange believes that it is advisable to do so in the event of "allegations of financial fraud" "in relation to the company's

financial reporting.").[10]  And the well-pled allegations of the Complaint are inconsistent with the claim that the directors and officers of Turquoise Hill simply abandoned their corporate responsibilities.  Even if they relied on Rio Tinto for the information that they reported to their shareholders, the Complaint alleges that members of Turquoise Hill were sufficiently independent to vote—along with the representatives of the Mongolian government—to form a special committee to investigate the causes of cost overruns and schedule delays.  Dkt No. 127 ¶ 266.

Rio's ability—as a majority stockholder—to influence Turquoise Hill's statements is distinct from showing that Rio, in fact, exerted "ultimate control" over the statements at issue in this case.  *Janus*, 564 U.S. at 143; *see Noto v. 22nd Century Grp., Inc.,* 35 F.4th 95, 104 (2d Cir. 2022) ("The complaint made no sufficient factual allegation that the articles were published by anyone except the authors.  Nor did it sufficiently allege that those authors lacked final control over the articles' contents or did not make the ultimate decision as to what specific information to include.  The complaint also does not contain sufficient factual allegations that defendants collaborated with the authors to such an extent that they controlled the articles' publication.").

Plaintiffs attempt to cure their lack of allegations that Rio had "ultimate" control over the particular statements at issue by pointing to a contract between Rio and Turquoise Hill that (1) required Turquoise Hill's public statements to be "consistent with the information provided by the Rio Tinto Manager," RTIH; and (2) provided that Turquoise Hill would "not file or issue any OT Disclosure without providing the Rio Tinto Manager with a reasonable opportunity to review and comment thereon."  Dkt. No. 135 at 34 (quoting Dkt. No. 127 ¶ 53).  But, again, both of

---

[10] The Court takes judicial notice of the NYSE Listed Company Manual under Rule 201(b) and 201(d) of the Federal Rules of Evidence.  *See, e.g.*, *Gee v. Doe*, 2022 WL 125342, at *2 n.2 (S.D.N.Y. Jan. 13, 2022) (taking judicial notice of Department of Corrections procedures).

these allegations, if taken as true, do not establish Rio Tinto's "ultimate control" over Turquoise Hill's statements under *Janus*.  It is not uncommon for two businesses who engage in a joint venture to attempt to coordinate the statements regarding that joint venture.  The contractual obligation of each party to ensure that its statements are consistent with the statements of the other does not make each such party the "maker" of the statements by the other.  "Ultimate authority" is critical.  Here, although the contract stated that Turquoise Hill's public statements "must be consistent with the information provided by the Rio Tinto Manager," it also provided that this clause was limited where Turquoise Hill "determines that other OT Disclosure must be made to comply with Ivanhoe's disclosure obligations under applicable Securities Laws." Turquoise Hill Resources LTD, General Statement of Acquisition of Beneficial Ownership - Amendment (Form SC 13D/A) (Apr. 20, 2012).  In other words, the contract expressly acknowledged that Turquoise Hill had "ultimate authority" over the content of its own disclosures and that it was not required to make a statement consistent with the information provided by the Rio Tinto manager if making that statement violated the securities laws.  *See Janus*, 564 U.S. at 142 ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content *and whether and how to communicate it.* (emphasis added)).  And with respect to (2), *Janus* rejected the notion that a party who reviews and comments on a statement is transformed into the "maker" of that statement.  *See id.* at 148 (finding JCM did not "make" statements in prospectuses for purposes of Rule 10b–5 even though JCM "was significantly involved in preparing the prospectuses"); *see also Noto*, 35 F.4th at 104 ("[E]ven if Sicignano had provided some input on the content of the articles, the complaint does not support the conclusion that Sicignano had the 'ultimate authority' necessary to brand him the articles' maker.").

For these reasons, Plaintiffs have not sufficiently pled that Rio Tinto was the "maker" of the first category of Turquoise Hill's statements (*i.e.*, those statements that Turquoise Hill made that are not explicitly attributed to Rio Tinto).

As to the second category of statements (*i.e.,* those statements that Turquoise Hill made to investors, which it explicitly attributed in some form to Rio Tinto), Plaintiffs' argument that Rio Tinto is the "maker" of these statements is much more compelling. As the Court stated in *Janus*, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." 564 U.S. at 142–43; *see UA Loc. 13 Pension Fund v. Sealed Air Corp.*, 2021 WL 2209921, at *7 (S.D.N.Y. June 1, 2021). The Court, however, does not decide whether Rio Tinto is liable for these statements under Rule 10b–5(b). As discussed *infra* Section III.A.1, regardless of who the speaker of these statements is, these statements are forward-looking statements accompanied by meaningful cautionary language and are therefore protected under the PSLRA safe harbor.[11]

## III.     The Alleged False and Misleading Statements and Omissions

### A.     Turquoise Hill

The Turquoise Defendants seek to dismiss Plaintiffs' claims related to the following alleged statements as either protected by the PSLRA safe harbor, inactionable statements of opinion, or inactionable puffery:

---

[11] *See, e.g.*, Dkt. No. 127 ¶¶ 313 ("During Q4'17, Rio Tinto undertook a schedule and cost review. Rio Tinto has provided Turquoise Hill with a high-level overview of the review's outcomes, in which Rio Tinto concluded there were no material changes in project scope, cost or schedule."); 335 ("Rio Tinto has undertaken a second annual re-forecast of underground development schedule and costs and preliminary results have concluded that capital costs remain in line with the overall $5.3 billion budget and the project remains on schedule to complete in 2022."); 336 ("Rio Tinto has notified Turquoise Hill, based on preliminary results, of a delay to achievement of sustainable first production which is now expected to occur by the end of Q3'21 instead of Q1'21."); 348 ("We did announce on October 15 that Rio Tinto now projects a 9-month delay of the start of sustainable production from the underground development.").

(1) statements related to the expected timeline for the first draw bell and sustainable first production, as well as statements related to the expected amount of capital expenditures required to complete development of the underground mining project;

(2) statements that delays experienced were "not atypical";

(3) statements that the key risks were "well understood and managed," and that things were "progressing well."

Dkt. No. 133 at 33–43. The Court examines each of the categories of challenged statements in turn.

### 1. Statements related to the expected timeline and expected capital expenditures

According to the allegations in the Complaint, starting at the beginning of the Class Period on July 16, 2018, Turquoise Hill made several statements that the underground development project at the Mine continued to be "on track" and that it continued to "expect the first draw bell in mid-2020 and sustainable first production in 2021."[12] Turquoise Hill also represented at various points throughout the Class Period that there were "no material changes in project . . . cost," that "capital costs remain in line with the overall $5.3 billion budget," and that it "confirm[ed] the $5.3 billion total budget" based on "where we are with the information that we've provided."[13] According to Plaintiffs, these statements were false, as internal reports directedly contradicted these schedules and showed that the OT project was months behind schedule and hundreds of millions of dollars over budget. Dkt. No. 127 ¶¶ 79–161, 165–186, 208–220.

---

[12] *See* Dkt. No. 127 ¶¶ 306–307 (July 16, 2018 Press Release); 313–315 (July 31, 2018 Press Release & MD&A); 315 (Aug. 1, 2018 Conference Call); 334–336 (Oct. 15, 2018 Press Release); 344–345 (Nov. 1, 2018 Press Release).

[13] *See* Dkt. No. 127 ¶¶ 334–336 (Oct. 15, 2018 Press Release); 345 (Nov. 1, 2018 Press Release); 348 (Nov. 2, 2018 Investor Conference Call); 370 (Feb. 26, 2019 Press Release); 381 (Mar. 15, 2019 Press Release); 388 (2018 Form 40-F).

The Turquoise Defendants move to dismiss the Section 10(b) claims related to these statements, arguing that they are forward-looking statements that are protected by the PSLRA safe harbor.  Dkt. No. 133 at 33–40.

Subject to certain limited exceptions, the PSLRA bars private actions for federal securities law violations based on "any forward-looking statement, whether written or oral."  15 U.S.C. § 78u-5(c)(1).  Under the PSLRA, forward-looking statements include:

(A) A statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

"'[A] statement may contain some elements that look forward and others that do not,' and 'forward-looking elements' may be 'severable' from 'non-forward-looking' elements."  *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 385 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (summary order) (quoting *In re Vivendi, S.A. Securities Litig.,* 838 F.3d at 246). Under the PSLRA, a defendant is not liable "with respect to any forward-looking statement, whether written or oral, if and to the extent" that:

49

(A) the forward-looking statement is –

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity, was—

(I) made by or with the approval of an executive officer of that entity, and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c). "The safe harbor is written in the disjunctive." *Wesco Aircraft Holdings*, *Inc.*, 454 F. Supp. 3d at 385 (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). Accordingly, a defendant is not liable for a forward-looking statement if (1) "the forward-looking statement is identified and accompanied by meaningful cautionary language," *or* (2) the forward-looking statement "is immaterial," *or* (3) "the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading." *Slayton*, 604 F.3d at 766. "As long as the plaintiff fails to satisfy one of those elements (*e.g.*, the statement is accompanied by meaningful cautionary language or is immaterial), the presence of one of the other elements (*e.g.*, the statement was known to be false or misleading) will not subject to the defendant to liability." *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 385–86; *see In re Vivendi*, 838 F.3d at 245–46 ("Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies." (internal quotation marks and citation omitted)).

Here, each of Turquoise Hill's public statements about the expected timeline and capital expenditures/budget of the underground expansion project—to the extent they are false—are protected under the PSLRA as forward-looking statements.  Statements about the schedule for the underground mine project, such as that they "expect the first draw bell in mid-2020 and sustainable first production in 2021," plainly qualify as forward-looking statements.  Such statements are, under the PSLRA, "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(B); *see, e.g.*, *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 287 (S.D.N.Y. 2020) (concluding that schedule estimates are forward-looking statements under this provision of the PSLRA); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *8 (S.D.N.Y. Apr. 1, 2015) (same).  Similarly, statements about the expected capital costs/budget of the project are forward-looking statements "containing a projection of . . . capital expenditures . . . or other financial items" under the PSLRA.  15 U.S.C. § 78u-5(i)(1)(A); *see, e.g.*, *Moshell*, 481 F. Supp. 3d at 287 (concluding that capital expenditure estimates to be forward-looking looking statements under this provision of the PSLRA); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *8 (same).

Turquoise Hill's statements that the project was "on track" and "on schedule" and that capital costs remain "in line" with the original budget are similarly forward-looking statements protected by the safe harbor.  Stating that the project is "on track" or capital costs remain "in line" is just another way of affirming the expected timeline or the budget, respectively.  *See Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 387 ("Courts within this Circuit have found that statements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement.").  In other words, such statements are virtually indistinguishable from the future projections of which they are part, as they turn on the

reasonableness of the projections:  If the budgetary and schedule projections are reasonable, then there is no basis to challenge statements that the project is "on track" or costs are "in line" with those projections as false or misleading.  And, if the projections were not reasonable, then these statements are false or misleading.  *See id.* at 387; *see also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) (holding that "the 'on track' and 'position us' portions of the [] statements, when read in context, cannot meaningfully be distinguished from the future projection of which they are a part").  As this Court has stated, "[t]hat is precisely the inquiry that the safe harbor puts off-limits to the courts." *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 387.

Further, while these statements arguably reflect a belief in the attainability of these future schedule and budget projections based on current facts about the progress and costs of the project, this alone is not sufficient to take these statements out from under the shelter of the PSLRA safe harbor.  To find that it did would "rip a large hole in that statute and deprive issuers and makers of such statements of the precise protection the safe harbor was intended to provide." *Id.* at 390.  As this Court explained in *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366:

> [A]ll statements of projections come with the implied statement that they are believed and are based on recent trends in the industry and the market and the performance of the business.  That is inherent in the notion of a projection—it is "the phenomenon of making calculated guess into the future according to past trends."  Black's Law Dictionary Online, "projection" (2d ed.).  The PSLRA says that projections are protected unless they are both (a) actually known to be false and (b) not accompanied by meaningful cautionary language. *Slayton*, 604 F.3d at 766; 15 U.S.C. § 78u-5(c).  To hold that such projections should be excepted from the PSLRA's coverage on the theory that management did not appropriately consider recent trends in the industry or the performance of the business would rip a large hole in that statute and deprive issuers and makers of such statements of the precise protection the safe harbor was intended to provide.

*Id.* at 390.

Moreover, even if severed, the assertions of current fact inherent in these statements are too vague to be actionable separate from the future projections. According to the Second Circuit, "[a] statement may contain some elements that look forward and others that do not," and, where that is true, the "the forward-looking elements and the non-forward-looking are severable." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) (quoting *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010)). "However, when the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection." *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018); *see also In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *19 (S.D.N.Y. Apr. 2, 2020); *Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) ("[T]o the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.'" (citation omitted)).

Here, the statements that the schedule was "on track" and that capital costs were "in line" on their own contain no details about Turquoise Hill's current situation; they are forward-looking. The underground development project was a multi-year project. These statements say very little about Turquoise Hill's current situation apart from the future projections of which they are a part. Accordingly, even if severed, the assertions of current fact are too vague to be actionable apart from the future projects. These statements are therefore forward-looking

statements entitled to the PSLRA safe harbor.[14]  *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *19 ("[S]tatements that the Company was 'on track' to reach the projected margin expansion and related growth are 'too vague to be actionable apart from the future projection.'" (citation omitted)); *see also Avaya, Inc.*, 564 F.3d at 255 ("[T]he 'on track' and 'position us' portions of the January 25, 2005 statements, when read in context, cannot meaningfully be distinguished from the future projection of which they are a part" and are therefore nonactionable).

Because Turquoise Hill's projections about the underground project's budget and schedule are forward-looking statements, the Court next must consider whether the statements are identified as such and accompanied by meaningful cautionary language or were not made with actual knowledge that they were false or misleading.  "A determination of either in the affirmative is sufficient to confer safe harbor protection."  *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *20.

As detailed more fully in the scienter analysis below, *infra* Section IV.A, Plaintiffs do not sufficiently allege that the Turquoise Defendants acted with recklessness, let alone actual knowledge.  *See Slayton*, 604 F.3d at 776 n.9 ("We emphasize that under this prong of the statutory safe harbor, the plaintiffs must show more than recklessness—an objective inquiry— they must show actual subjective knowledge.  Therefore, even if we were to conclude, based on

---

[14] Plaintiff notes that along with these statements, the Turquoise Defendants made other false misrepresentations about current facts, such as that Shaft 5 was "fully operational" during the second quarter of 2018 and that Shaft 2 equipping was "well under way," Dkt. No. 127 ¶¶ 307–308, 319–320, and such statements about current facts are not forward-looking and entitled to protection under the PSLRA.  Dkt. No. 135 at 53–54.  The Turquoise Defendants, however, do not appear to base their motion to dismiss on these statements about the status of the Mine on any grounds other than that Plaintiffs have failed to sufficiently allege that the Turquoise Defendant possessed scienter with respect to them.  Therefore, the Court does not address whether such statements by Turquoise Hill are entitled to the safe harbor.

the alleged facts, that [a certain issue was] 'so obvious that . . . of defendant[s] must have been aware it,' . . . this would not avail the plaintiffs." (citations omitted)).  Plaintiffs cite to various paragraphs in the SAC for the proposition that "Defendants had access to and obtained information that rendered their purported forward-looking statements false when made."  Dkt. No. 135 at 53 (citing Dkt. No. 127 ¶¶ 73–112, 119–130, 143–150, 156–160, 182–194). However, only one of those paragraphs mentions the Turquoise Defendants as opposed to the Rio Defendants.  Dkt. No. 127 ¶ 146.  That paragraph states that the Turquoise Defendants were members of the OT Board that approved a $120 million budget increase for the principal contractor on the underground development project.  *Id.*  However, as discussed *infra* Section IV.A.2, without more, this allegation is insufficient to establish that the Turquoise Defendants knew that the project—which was at that time was budgeted to cost over 44 times the amount of that increase—was seriously delayed or over budget.  *Cf. City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *9 (S.D.N.Y. Jan. 21, 2021) (finding lack of scienter, in part, because "Plaintiffs have not alleged that the CPI scorecard or business review decks included any specific information detailing, for example, an unusually high number of customer complaints or an abnormally low number of claims payments").

These forward-looking statements are also not actionable as they were accompanied by meaningful cautionary language.  "A defendant who publishes a forward-looking statement is protected against liability in a private action under the federal securities laws if that statement is accompanied by 'meaningful cautionary language.'"  *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 392 (quoting *Slayton*, 604 F.3d at 771)).  To be meaningful, the cautionary language need not directly precede or follow the forward-looking statement.  *Id.*; *see Slayton*, 604 F.3d at

768–69 (noting that the cautionary language was several pages away).  The language, however, cannot merely be boilerplate and must contain "important factors that could realistically cause results to differ materially." *Slayton*, 604 F.3d at 773.  In other words, the language must be "extensive and specific," *id.* at 772 (quoting *Avaya*, 564 F.3d at 256), and contain "substantive company-specific warnings." *Id.* (quoting S*outhland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004)).  "As the Conference Report accompanying the PSLRA explains, 'the cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business.'" *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 392 (quoting Conference Report at 43, 1995 U.S.C.C.A.N. at 742).

The statements at issue come from three sources: (i) Turquoise Hill's Forms 40-F; (ii) press releases filed as exhibits to Forms 6-K; and (iii) investor conference calls.

Turquoise Hill's 2017 and 2018 Forms 40-F include extensive and specific warnings concerning the estimated schedule and budget of the OT underground development project.  For example, they refer to several factors that could cause the schedule and budget to differ materially, including: (i) "the availability and cost of skilled labor"; (ii) "round and rock mass conditions and stability"; (iii) "the impact of fluctuations in commodity prices, process water, power and transportation"; (iv) the "annual usage fees payable to the local province for sand, aggregate and water"; and (v) the "need to obtain necessary and other government permits." Dkt. No. 134-15 at ECF p. 49 (2018 Form 40-F); *see* Dkt. No. 134-4 at ECF pp. 49–50 (2017 Form 40-F).  Turquoise Hill also noted that the "cost, timing, and complexities for mine construction and development are increased by the remote location of a property such as Oyu

56

Tolgoi." Dkt. No. 134-15 at ECF p. 49 (2018 Form 40-F). The Forms 40-F further provided:

"It is common in mining operations and in the development, construction, or expansion of

existing facilities to experience unexpected problems and delays during such activities, which

may cause delays in the commencement or expansion of mineral production or sustainable

production." *Id.*; *see* Dkt. No. 134-4 at ECF pp. 49–50 (2017 Form 40-F).

Turquoise Hill's Forms 40-F also contained substantial forward-looking disclosures.

Specifically, those disclosures noted:

> Forward-looking statements and information are made based upon certain assumptions and other important factors that, if untrue, could cause the actual results, performance or achievements of the Corporation to be materially different from future results, performance or achievements expressed or implied by such statements or information. There can be no assurance that such statements or information will prove to be accurate. Such statements and information are based on numerous assumptions regarding present and future business strategies, local and global economic conditions, and the environment in which the Corporation will operate in the future, including the price of copper, gold and silver and projected gold, copper and silver grades, anticipated capital and operating costs, anticipated future production and cash flows, and the status of the Corporation's relationship and interaction with the Government of Mongolia on the continued operation and development of Oyu Tolgoi (as defined in the section entitled "Definitions" in the AIF) and Oyu Tolgoi LLC internal governance.
>
> . . .
>
> With respect to specific forward-looking information concerning the continued operation and development of Oyu Tolgoi, the Corporation has based its assumptions and analyses on certain factors which are inherently uncertain. Uncertainties and assumptions include, among others: the timing and cost of the construction and expansion of mining and processing facilities; the timing and availability of a long-term domestic power source (or the availability of financing for the Corporation to construct such a source) for Oyu Tolgoi; the ability to secure and draw down on the supplemental debt under the Project Finance Facility (as defined in the AIF) and the availability of additional financing on terms reasonably acceptable to Oyu Tolgoi LLC, Rio Tinto plc (together with its affiliates, "Rio Tinto") and the Corporation to further develop Oyu Tolgoi; the impact of changes in, changes in interpretation to or changes in enforcement of, laws, regulations and government practices in Mongolia; the availability and cost of skilled labour and transportation; the obtaining of (and the terms and timing of obtaining) necessary environmental and other government approvals, consents and permits; delays, and the costs which would result from delays, in the development of the underground

57

mine (which could significantly exceed the costs projected in the Statutory Feasibility Study and the 2016 OTTR (as defined in the section entitled "Definitions" in the AIF)); projected copper, gold and silver prices and their market demand; and production estimates and the anticipated yearly production of copper, gold and silver at Oyu Tolgoi.

Dkt. No. 134-15 at ECF p. 4 (2018 Form 40-F); *see* Dkt. No. 134-4 at ECF p. 5 (2017 Form 40-F).

Similar cautionary language is present in the press releases that Turquoise Hill released and publicly filed with the SEC. For example, Turquoise Hill's July 16, 2018 press release provided that "[c]ertain important factors that could cause actual . . . achievements to differ materially from those in the forward-looking statements and information include, among others": (i) "mining operational and development risks"; (ii) "regulatory restrictions (including environmental regulatory restrictions and liability)"; (iii) "events or circumstances (including strikes, blockages or similar events outside of the Company's control) that may affect the Company's ability to deliver its products in a timely manner"; (iv) "the global economic climate"; (v) "loss of key employees"; and (vi) "capital and operating costs, including with respect to the development of additional deposits and processing facilities." The press release also noted that:

> Readers are cautioned not to place undue reliance on forward-looking information or statements. By their nature, forward-looking statements involve numerous assumptions, inherent risks and uncertainties, both general and specific, which contribute to the possibility that the predicted outcomes will not occur. Events or circumstances could cause the Company's actual results to differ materially from those estimated or projected and expressed in, or implied by, these forward-looking statements.

Dkt. No. 134-6 at ECF p. 19 (July 31, 2018 Press Release). The press release also directed readers to the risk factors listed in the Company's Forms 40-F: "Important factors that could cause actual results to differ from these forward-looking statements are

58

included in the 'Risk Factors' section in the Company's Annual Information Form."[15]  *Id.*

After February 2019, Turquoise Hill's press releases also warned that mining operational

and technical risks included "geotechnical risks and ground conditions."  Dkt. No. 134-13

at 3 (Feb. 27, 2019 Press Release); Dkt. No. 134-16 at ECF p. 21 (Mar. 15, 2019 Press

Release).

     Further, on investor conference calls during which the rest of the statements about

OT's estimated budget and schedule were made,[16]  Turquoise Hill would start by

referring listeners to the "forward-looking language included in our press release and

MD&A."  Transcripts of the calls also noted that:

> In the conference calls upon which Event Transcripts are based, companies may
> make projections or other forward-looking statements regarding a variety of items.
> Such forward-looking statements are based upon current expectations and involve
> risks and uncertainties.  Actual results may differ materially from those stated in
> any forward-looking statement based on a number of important factors and risks,
> which are more specifically identified in the companies' most recent SEC filings.
> Although the companies may indicate and believe that the assumptions underlying
> the forward-looking statements are reasonable, any of the assumptions could prove
> inaccurate or incorrect and, therefore, there can be no assurance that the results
> contemplated in the forward-looking statements will be realized.

Dkt. No. 134-7 at 2, 13 (Aug. 1, 2018 Investor Call); Dkt. No. 134-11 at 13 (Nov. 2, 2018

Investor Call) (same).

     As an initial point, cautionary language may be incorporated by reference.  *See In*

*re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 319 (S.D.N.Y. 2020)

("[C]onference calls both contained meaningful cautionary language about the nature of

---

[15] *See also* Dkt. No. 134-8 at 4 (Oct. 15, 2018 Press Release) (similar disclosures); Dkt. No. 134-9 at 19 (Nov. 1, 2018 Press Release) (similar disclosures)

[16] Specifically, on an August 1, 2018 conference call, Turquoise Hill executives stated, among other things, that: we "maintain our expectation of first draw bell in mid-2020 and sustainable first production in 2021." Dkt. No. 127 ¶ 314 (emphasis omitted).  Moreover, on the November 2, 2018 investor conference call, Turquoise Hill executives stated: "where we are with the information that we've provided, we confirm the $5.3 billion total budget."  *Id.* ¶ 348.

the forward-looking statements . . . on the contemporaneously filed press releases, which were incorporated by reference into the conference calls."); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 303 (S.D.N.Y. 2013) (determining that cautionary language incorporated by reference "was more than sufficient to bring it within the protection of the bespeaks caution doctrine"); *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 233 (S.D.N.Y. 2009) (concluding that reference during conference call to risk disclosures in press release sufficient to satisfy PSLRA safe harbor). "Courts in this Circuit routinely find that references to SEC filings that expound more fully on the risks suffice to adequately convey the risks." *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d at 319. Turquoise Hill press releases therefore incorporated by reference the cautionary language in the Forms 40-F and the investor conference calls incorporated by reference the cautionary language in the press releases and, in turn, the cautionary language in the Forms 40-F. *See Kinross Gold Corp.*, 957 F.Supp.2d at 303 ("For similar reasons, Kinross's statements during its February 17, 2011 conference call are protected as forward-looking. At the beginning of the call, Kinross's moderator stated that the speakers would 'be making forward-looking statements during the presentation,' and directed the call participants to the cautionary language in Kinross's February 16, 2011 news release for a discussion of the relevant risks, uncertainties, and assumptions.").

The extensive and specific risk disclosures in the press releases and Forms 40-F constitute meaningful cautionary language adequate to invoke the PSLRA's safe harbor. Turquoise Hill explicitly warned investors that "the timing and cost of the construction" were uncertain, could differ materially from what was estimated based on delays as well

as the costs which would result from delays, and depended on a host of factors, including

the availability and cost of skilled labor, ground conditions, and the timing and cost of the

construction of the Mine.  Turquoise Hill also warned investors that the complexities of

the property were increased by its remote location.  Turquoise Hill therefore specifically

warned investors of the significant uncertainty surrounding the construction timeline and

budget of the underground development project, and a reasonable investor would have

understood that the schedule and capital expenditures projections were subject to change.

*See In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009)

("Given the warnings regarding capital costs, it would be unreasonable to demand that a

cost estimate must hold steady over a multi-year period requiring considerable amounts

of construction of a large mine in a remote location by a company just getting its start in

the mineral production business.").  The risks were also company-specific, with

Turquoise Hill noting, for example, that these risks were increased by the remote location

of OT.  Accordingly, "a reasonable investor could have been misled into thinking that the

risk that materialized and resulted in his loss did not actually exist."  *Halperin v. eBanker*

*USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).

Plaintiffs nonetheless argue that such risk disclosures are insufficient because the

cautionary language was virtually unchanged throughout the Class Period despite

Defendants' knowledge of costs overruns and schedule delays before the Class Period,

which were only expected to rapidly escalate, and the conclusion of Defendants' own

advisor that there was a 0% likelihood that the schedule would be met.  Dkt. No. 135 at

56–57 (citing Dkt. No. 127 ¶¶ 73–131, 134–161, 300, 312).  In support of this argument,

Plaintiffs cite to *Slayton*, in which the Second Circuit held that: "[t]he consistency of the

defendants' [cautionary] language over time" "bolstered their conclusion that the cautionary language at issue was not meaningful and entitled to protection under the PSLRA." 604 F.3d at 773. In *Slayton*, defendants had failed to update their cautionary language in spite of "the new information they received in early May 2001," which the court noted "belie[d] any contention that the cautionary language was 'tailored to the specific future projection.'" *Id.*

The Court rejects Plaintiffs' argument that *Slayton* should be read to allow courts to consider the defendant's knowledge in assessing whether cautionary language is sufficiently meaningful. While the Court in *Slayton* did note that the consistency of the language over time despite new information bolstered the conclusion that such language was not meaningful, the court's decision in that case primarily rested on the fact that the language at issue—a single sentence warning—verged on "mere boilerplate." 604 F.3d at 772–73. In fact, *Slayton* expressly declined to address this issue of whether an "issuer [may] be protected by the meaningful cautionary language prong of the safe harbor even where his cautionary statement omitted a major risk that he knew about at the time he made the statement." *Id.* at 771.

Moreover, such an inquiry would be plainly contrary to the disjunctive nature of the PSLRA safe harbor. As this Court stated in *Wesco Aircraft Holdings*:

> This argument conflates the actual knowledge and meaningful cautionary language prongs of the PSLRA. If the Court were to accept it, an allegation of actual knowledge of falsity would suffice to deprive a forward-looking statement of the protections of safe harbor even if there were meaningful cautionary language otherwise. Such a result would be contrary to the disjunctive nature of the safe harbor elements.

454 F. Supp. 3d at 394. This conclusion is further bolstered by the Conference Report accompanying the PSLRA, which stressed that "[c]ourts should not examine the state of

mind of the person making the statement."  Conference Report at 43, 1995 U.S.C.C.A.N. at 742; *see Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 147 (2d Cir. 2002) ("The conference report is generally the most reliable evidence in legislative history of congressional intent because it represents the final statement of the terms agreed to by both houses.").

However, even if *Slayton* were read as broadly as Plaintiffs request, it still would not apply here.  Unlike in *Slayton*, Plaintiffs do not point to any specific new information that the Turquoise Defendants—as opposed to the Rio Defendants—received that would have alerted them to the need to update their risk disclosures.  As discussed *infra* Section IV.A, the Complaint does not plausibly allege that the Turquoise Defendants were aware of cost overruns and schedule delays outside of what they disclosed to investors.  Further, while the Complaint does allege that Defendants' own advisor "analyzed the 2017 and 2018 'reforecasts' showing that the publicly stated schedules had a 2% and 0% chance of being completed on-time, respectively," Dkt. No. 127 ¶ 300, it does not state when this analysis was completed, whether it was provided to the Turquoise Defendants, and, if so, when that was relative to the disclosures at issue.  Without such facts, it cannot be inferred that the Turquoise Defendants would have been alerted to the facts that Plaintiff alleges required updating.  Accordingly, the Court cannot conclude that the cautionary language was not meaningful on this basis.

For these reasons, Turquoise Hill's statements related to the expected timeline and capital expenditures of the underground development project are protected by the PSLRA

safe harbor for forward-looking statements.  Plaintiffs' Section 10(b) claims with respect
to these statements are therefore dismissed.[17]

### 2.    Statements that the delays were "not atypical"

The SAC also alleges that the Turquoise Defendants' statement after the October 15,
2018 "re-forecast" that "these types of delays are certainly not atypical in the mining industry for
projects of this scale and complexity" was false or misleading.  Dkt. No. 127 ¶¶ 348, 353.  This
statement was made by Quellmann on an investor conference call regarding Turquoise Hill's
third quarter fiscal year 2018 financial results on November 2, 2018.[18]  *Id.*  The SAC alleges that
this statement was false or misleading as "the delays at Oyu Tolgoi were atypical and material
because, as described by former OT managers, they resulted from abysmal construction and
procurement work, and were like nothing they had ever experienced in their long careers in
mining."  *Id*. ¶ 353.  Defendants respond that such statements are "quintessential opinion

---

[17] Plaintiffs also argue that even if certain of these statements are protected by the PSLRA safe
harbor, Defendants are still liable for their omission of material information—*i.e.*, the cost
overruns and delays—in their disclosures.  Dkt. No. 135 at 55.  However, while it is true that
courts "in this circuit have consistently held that neither the PSLRA safe harbor, nor the
bespeaks-caution doctrine protects material omissions," *Wilson v. LSB Indus., Inc.*, 2017 WL
7052046, at *3 (S.D.N.Y. Mar. 2, 2017); *see also In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d
518, 537 (S.D.N.Y. 2021), Plaintiffs may not recharacterize their false-statement claims as
material-omission claims on the basis that the statements were false because they omitted
material contrary information.  Otherwise, the PSLRA would have no force.  Regardless,
Plaintiffs have failed to sufficiently allege that Turquoise Hill acted with scienter.  *See infra*
Section IV.A.

    The Turquoise Defendants also argue that even if these statements were not protected by the
PSLRA safe harbor, these statements are nonetheless protected as vague statements of
corporate optimism or puffery.  Dkt. No. 133 at 50.  Because this Court finds that they are
nonactionable as forward-looking statements entitled to the PSLRA safe harbor, it does not
address this argument.

[18] The full statement was "[t]he work delays are of course not desirable, developing the OT
underground blockade is a very large undertaking and these types of delays are certainly not
atypical in the mining industry for projects of this scale and complexity."  Dkt. No. 127 ¶ 348.

statements" and that Plaintiffs have not adequately alleged that they were false when made.  Dkt. No. 133 at 40–42.

To adequately allege that a statement of opinion is false or misleading, a plaintiff must sufficiently allege that the defendant: (1) "did not hold the belief [defendant] professed"; (2) the "supporting fact[s] [defendant] supplied were untrue"; or (3) "omit[ted] information whose omission ma[d]e[] the statement[s] misleading to a reasonable investor."  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citation omitted); *see also Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (summary order).

Plaintiffs appears to argue that Turquoise Hill's statement that "these types of delays are certainly not atypical" does not qualify as a statement of opinion.  Citing the Supreme Court's opinion in *Omnicare*, 575 U.S. 175, Plaintiffs cursorily state that "[a] statement is an opinion only when it is expressly stated as such."  Dkt. No. 135 at 58.

However, "*Omnicare* may not be construed so simplistically."  *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 755 (S.D.N.Y. 2018).  The Supreme Court's opinion in *Omnicare* addressed when an opinion may be actionable as a false or misleading statement for purposes of securities fraud liability.  575 U.S. 175.  It did not address what qualifies as a statement of opinion as opposed to a statement of fact in the first place.  And, although the examples the Supreme Court gave of opinion statements in *Omnicare* were expressly stated as opinion (*e.g.*, "I think the coffee is hot" or "I believe our marketing practices are lawful"),  the Court decidedly did not hold that a statement must be qualified by a "I think" or "I believe" or "it is my opinion that" to qualify as one of opinion.  *Id.* at 183–84.  To read *Omnicare* in such a way would produce absurd results.  Prototypical opinion statements—such as "I like how things are going"

or "we have a good amount of talent on board"—would, under such a reading of *Omnicare*, all

of a sudden qualify as statements of facts.

Moreover, since the Supreme Court's decision in *Omnicare*, the Second Circuit has held

that productivity estimates—that were not expressly stated as opinions—"were statements of []

opinion, rather than assertions of purported fact." *Martin*, 732 F. App'x at 40 & n.1. The court

noted that "[e]stimates, in particular, constitute a well-established species of opinion" as they

"'will vary depending on the particular methodology and assumptions used,' rendering them

'subjective.'" *Id.* (citing *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011)). In other

words, the court did not interpret *Omnicare* as establishing new law on what an opinion

statement was and instead continued to find that statements are opinions —even if not expressly

identified as such—where they "vary depending on the particular methodology and assumptions

used,' rendering them 'subjective.'" *Id.* (quoting *Fait*, 655 F.3d at 111)

For the same reasons that estimates are well-established species of opinion, the statement

in isolation that delays were "not atypical" is one of opinion. An estimate depends "on the

particular methodology and assumptions used," "rendering [it] 'subjective.'" *Martin*, 732 F.

App'x at 40 n.1 (quoting *Fait*, 655 F.3d at 111); *see Chapman v. Mueller Water Prod., Inc.*, 466

F. Supp. 3d 382, 398 (S.D.N.Y. 2020) ("[A]ccounting estimates that depend on management's

determination or assumptions are 'subjective' opinions and 'not matters of objective fact.'"

(internal quotation marks and citation omitted)); *In re Avon Sec. Litig.*, 2019 WL 6115349, at

*16 (S.D.N.Y. Nov. 18, 2019) ("Actuarial or accounting assumptions 'depend on the particular

methodology and assumptions used' and are not 'objective factual matters.'" (cleaned up)); *In re*

*MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 312–13 (S.D.N.Y. 2013) (applying this

standard and finding that statements about the value of company's deferred tax assets were

statements of opinion). It cannot be decided as a "matter[] of objective fact." *Fait*, 655 F.3d at 110. So too is the statement that the cause of a delay is or is not "atypical." Among other things, it will depend on whether there is a publicly understood general (and not "particular") metric of what is typical, how frequently an event must occur for it to be considered metric, and how broadly the speaker classifies the type of delays. *See In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 233 (S.D.N.Y. 2021); *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 253 (S.D.N.Y. 2015) (holding that statement that proposed merger offers a fair price was an opinion statement, as "[w]hether a particular deal is 'fair' is, after all, not a determinate, verifiable statement like 'this ring is 24–carat gold'"). As counsel for Turquoise Hill admitted at argument, there is no categorical rule that a statement regarding typicality can never be one of fact. Transcript of Oral Argument (Aug. 25, 2022) at 50:21–22. But in the absence of any allegation that there exists an objective metric by which to determine which types of events are typical and which are not, the statement that the delay is not atypical is one of opinion. It depends on management's views on what is typical and what is atypical and will vary on the methodology management uses to determine typicality. Accordingly, the statement that delays are not "atypical," while presumably based on supporting facts, is not itself a statement of fact but instead a statement of opinion. *See Omnicare*, 575 U.S. at 182 ("[A] statement of belief may make an implicit assertion about the belief's 'subject matter.'"); *Bedford*, 308 F. Supp. 3d at 755 ("Whether a statement is a matter of fact is a question of whether the statement sets forth something verifiable.").

To be actionable, therefore, Plaintiffs must sufficiently allege that (1) Turquoise Hill did not hold the belief that such delays were "not atypical," (2) that the facts supplied in support of

the belief were untrue, or (3) Turquoise Hill omitted information which led the statements to be misleading to a reasonable investor.

In their opposition, Plaintiffs do not address which of these factors applies to Turquoise Hill's statement that the delays were "not atypical." Dkt. No. 135 at 58–61. In fact, Plaintiffs' opposition does even respond to Defendants' argument that if this particular statement is an opinion, it is inactionable. *See* Dkt. No. 135 at 58–61 (only addressing why the statement that OT remained on track would be actionable if it were an opinion). The Court therefore will consider this point conceded. *See Sussman Sales Co., Inc. v. VWR Int'l, LLC*, 2021 WL 1165077, at *20 (S.D.N.Y. Mar. 26, 2021) ("Plaintiff does not directly respond to this argument in its opposition briefing, and the Court will consider this point conceded."); *AT & T Corp. v. Syniverse Techs., Inc.*, 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) ("Perhaps recognizing the futility of contesting this issue, AT & T did not even discuss it in its opposition brief. AT & T's silence concedes the point.").

Even if this claim, however, were not conceded, any attempt to oppose it would likely be futile. *See Omnicare*, 575 U.S. at 194 (stating that this "is no small task for an investor"). The Complaint merely notes that the "delays at Oyu Tolgoi were atypical and material because, as described by former OT managers, they resulted from abysmal construction and procurement work, and were like nothing they had ever experienced in their long careers in mining." Dkt. No. 127 ¶ 353. However, this statement does not allege that the Turquoise Defendants *themselves* did not hold the belief that such delays were not atypical, or that the Turquoise Defendants omitted information that they had in their possession that led the statement to be misleading to a reasonable investor. *See Omnicare*, 575 U.S. at 189 (explaining that an opinion may actionable due to an omission if the opinion did not fairly align "with the information in the issuer's

possession at the time"). Regardless of whether other managers had seen such delays in their careers, the managers who made the statements could have believed that the delays were not unprecedented and were typical. Moreover, other than a conclusory remark that the "delays at Oyu Tolgoi were atypical," Dkt. No. 127 ¶ 353 Plaintiffs do not allege any facts indicating that such delays are not typical at complex mining companies or that "any of the facts supplied by Turquoise Hill in support of its estimate that such delays were atypical were objectively false." *Martin*, 732 F. App'x at 41.

Accordingly, Plaintiffs 10(b) claim related to Turquoise Hill's November 2, 2018 statement that the delays were "not atypical" is dismissed.

### 3. Statements that the "key risks were well understood and management," that Turquoise Hill is "well positioned" to address key challenges, and that things were "progressing well"

The SAC also alleges that Turquoise Hill's statements that the "Key risks" were "well understood and managed," that "Turquoise is Well Positioned to Address Key Challenges," and that things were "progressing well" were false and misleading because, at this time, the OT expansion project was severely overbudget, the key risks were out of control, and Turquoise Hill lacked the funding to deal with these issues. *See* Dkt. No. 127 ¶¶ 336, 362–363, 366. Defendants respond that such statements are vague statements of optimism that are not actionable. Dkt. No. 133 at 42–43.

General statements of corporate optimism are non-actionable puffery. Unlike "specific, factual" statements, "vague descriptions [that] offer only generally optimistic opinions" are not actionable under section 10(b) and Rule 10b–5. *In re Synchrony*, 988 F.3d at 170. A speaker engages in puffery when he claims to be "'pretty confident' and 'pretty positive'" about the future, or when he makes "[v]ague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices . . . ." *Id.* Such statements "are 'too

general to cause a reasonable investor to rely upon them' and therefore are 'precisely the type of puffery that this and other circuits have consistently held to be inactionable.'"  *Id.* (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)).

As an initial point, in their opposition, Plaintiffs do not specifically respond to the Turquoise Defendants' argument that the first two statements—*i.e.*, that "key risks" were "well understood and managed" and that "Turquoise is Well Positioned to Address Key Challenges" —are inactionable.  Dkt. No. 135 at 51–52 (only responding to question of whether Defendants' "on track," "on plan," and "progressing well" statements were inactionable puffery).  The Court asked Plaintiffs at oral argument whether they intended to oppose Turquoise Defendants' argument that these statements were not actionable, and Plaintiffs responded that they did not "disagree [as to] some of those peripheral comments."  Transcript of Oral Argument (Aug. 25, 2022) at 86:9–24.  Accordingly, Plaintiff has indicated that they do not oppose the Turquoise Defendants' motion to dismiss as to these two statements.  Plaintiffs have therefore abandoned their Section 10(b) claims with respect to these statements.  *See, e.g.*, *Colbert v. Rio Tinto PLC*, 2019 WL 10960490, at *3 (S.D.N.Y. July 29, 2019) ("It is well established that where a plaintiff does not oppose a defendant's argument with respect to an alleged misstatement, it has abandoned its Section 10(b) claim in connection with th[e] misstatement." (cleaned up)); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 449 (S.D.N.Y. 2018) ("Plaintiffs do not oppose this argument and have, therefore, abandoned their Section 10(b) claim in connection with this misstatement."); *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 328 (S.D.N.Y. 2018) ("[I]n their opposition to Defendants' motions to dismiss, Plaintiffs failed to address Defendant Sullivan's claim that he is not personally involved. 'The

failure to oppose a motion to dismiss a claim is deemed abandonment of the claim.'" (quoting *Johnson v. City of New York*, 2017 WL 2312924, at *18 (S.D.N.Y. May 26, 2017))).  Plaintiffs' Section 10(b) claims with respect to these statements are therefore dismissed.

In their opposition, Plaintiffs do, however, contest Turquoise Hill's argument that its statement that things were "progressing well" was puffery.  Dkt. No. 135 at 50–52.  Plaintiffs argue that such a statement cannot be puffery because it was made in response to analysts' questions and investors' concerns about the Oyu Tolgoi mine's schedules and costs, and they note that whether a representation is puffery depends on the context in which it is made.  Dkt. No. 135 at 51–52.  Further, Plaintiffs argue that even if this statement is puffery, Defendants may still be liable for such an expression of puffery if it is in tension with facts known to a defendant. Dkt. No. 135 at 50–51.

As to the second point, even if Plaintiffs are correct that statements of puffery may be actionable if they contradict facts known to the defendant, Dkt. No. 135 at 50, Plaintiffs do not point to any facts *known* to Turquoise Hill that clearly contradicted its statement that things were progressing well.  As noted *infra* Section IV.A, Plaintiffs do not sufficiently allege that Turquoise Hill was aware of the true state of delays and cost overruns at the Mine.  *See In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *11 (S.D.N.Y. Mar. 30, 2021) ("Critically, Plaintiff points to no data—such as documents, reports, analyses, etc.—suggesting that Defendants' statements regarding DN's integration efforts were false or misleading when made, let alone that Defendants knew of such data but made their representations anyway."). Therefore, assuming that such an exception exists, it does not apply here.

As to Plaintiffs first point, Plaintiffs correctly note that "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*,

71

116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F.Supp.3d 482, 485 (S.D.N.Y.2014); *U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*, 2013 WL 791462, at *7 (S.D.N.Y. Mar. 5, 2013). Specifically, where the context makes it such that "a reasonable investor could rely on them as reflective of the true state of affairs at the Company," courts in this District routinely hold that such statements will not be found to be inactionable puffery. *In re Petrobras Sec. Litig.,* 116 F. Supp. 3d at 381; *see Villare v. Abiomed*, Inc., 2021 WL 4311749, at *15 (S.D.N.Y. Sept. 21, 2021).

Applying that principle, courts have found that statements that generally would be puffery in one context are not puffery in another if made to reassure investors as to "specific risks." *Washington State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020); *see In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 381. For example, in *In re Banco Bradesco S.A. Securities Litigation*, the court found that while certain statements "may be mere puffery when viewed in isolation, context shows they were made in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern, and that therefore 'a reasonable investor could rely on them as reflective of the true state of affairs at the Company.'" 277 F. Supp. 3d at 660 (quoting *Petrobras*, 116 F. Supp. 3d at 381). Similarly, in *Odebrecht S.A.,* the court held that defendant's statements about its "competitive advantage" "were made to reassure investors as to specific risks regarding international competition, and accordingly they cannot be dismissed as 'mere puffery.'" 461 F. Supp. 3d 46, 74; *see Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 532 (S.D.N.Y. 2020) (stating that a code of conduct, while generally inactionable puffery, "could be viewed as

72

material statements of fact" where it is wielded "to reassure investors that nothing was amiss when faced with suspicions of internal malfeasance").

This holding—*i.e.*, that a statement that may be puffery in one context is not puffery where it reassures investors as to specific risks—makes sense. A statement of mere puffery is inactionable because it is "too general to cause a reasonable investor to rely upon [it]." *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 29 (2d Cir. 2019) (summary order). However, where a company makes a statement in direct response to concerns raised by investors about a specific risk, it is fair to read the statement in context. *See In re Vivendi, S.A.*, 838 F.3d at 250 (statements must be read "together and in context"). The statement is no longer the general one that all companies would make about their business or their integrity (and thus insufficient to support the reasonable reliance of an investor on the statement as applied to the particular company); it is a statement about a distinctive risk. A statement that a chief executive officer is "law-abiding," on its own may mean very little. Corporate officers are presumed to be law-abiding; it would be an unusual company that was unwilling to say that about its officers generally. The same statement, given in response to the question whether a particular officer who was then under investigation for violating the law, could take on an entirely different meaning altogether.

Applying this reasoning, Turquoise Hill's statement that "lateral development has progressed well" is not puffery. Dkt. No. 127 ¶ 335. This statement was made in the same press release that Turquoise Hill announced on October 15, 2018 that there would be a two to three quarter delay in achieving sustainable production at OT. *Id.* ¶ 334. Specifically, the press release announced:

> However, there are certain delays, most notably to the completion of Shaft 2, which includes schedule contingency, that are ultimately expected to result in a revised

sustainable production start from the first quarter of 2021 to late in the third quarter 2021.  We are undertaking a review of the cause and the impact of these delays and will announce the results as soon as possible.

. . .

Rio Tinto, in its role as manager of Oyu Tolgoi and underground construction contractor, has undertaken its second annual schedule and cost re-forecast for the project.  According to this re-forecast, *lateral development has progressed well*, construction completion schedule remains on track for 2022 and the project is expected to be completed at the $5.3 billion budget estimate disclosed in the 2016 Oyu Tolgoi Feasibility Study and the 2016 Oyu Tolgoi Technical Report.

Dkt. No. 127 ¶¶ 335–336 (emphasis added).

As in *In re Banco Bradesco S.A. Securities Litigation* and *Odebrecht S.A.*, the statement that "lateral development has progressed well"—viewed in context—was addressed to the particular concern of investors about the announced delay.  Specifically, and in connection with the statements directly surrounding it, Turquoise Hill's statement about "progress" reassured investors that construction related to the underground development was not substantially impaired by any delay, a representation that a "reasonable investor could rely on [] as reflective of the true state of affairs at the Company."  *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 381. Accordingly, it cannot be dismissed as mere puffery.  However, because Plaintiffs fail to allege that Turquoise Hill acted with scienter about the underground development project's delays, *see infra* Section IV.A, Plaintiffs' Rule 10b–5 claim with respect to this statement is nonetheless dismissed.[19]

_____

[19] The Court does not address whether this statement would nonetheless be protected as a statement of opinion as Defendants do not move to dismiss this statement on that basis.

**B.  Rio Tinto**

The Rio Defendants seek to dismiss the following two categories of statements as not actionable either because they are forward-looking statements protected by the PSLRA's safe harbor, are inactionable statements of opinion, or are not material:

(1) Statements that the project was "on track," "on budget," and would meet construction expectations; and

(2) Statements that the OT underground development was the "Highest Quality Copper Development" in the world and "Progress[ing] Well."

Dkt. No. 143 at 21–29 & App. A (Categories I, II, III, IV).  The Rio Defendants also argue that the Sarbanes-Oxley ("SOX") certifications and risk disclosures are inactionable and that none of the alleged misstatements were materially false or misleading.  *Id.* at 29–34.

**1.  Statements that the project was "on track," "on budget," and would meet construction expectations**

The Complaint alleges that, similar to Turquoise Hill, Rio Tinto made several statements through the Class Period that the OT project was "on track," "on schedule," and "on plan" and that "[a]ll material assumptions underpinning these production targets continue to apply and have not materially changed."  Dkt. No. 127 ¶¶ 324–372.  The Complaint also alleges that Rio Tinto represented that the "First drawbell production [was] expected mid-2020," "with average annual production of 560 thousand tonnes between 2025 and 2030," and that "the main production shaft (Shaft 2) is now expected to complete in October 2019."  *Id.* ¶¶ 323, 324, 329, 365, 371–372, 396.  Similarly, Rio Tinto allegedly stated that a "$5.3 billion capex [was] projected" for the project, the project remained "on budget," and "capital costs remain in line with the overall $5.3 billion budget."  *Id.* ¶¶ 324–372.

Rio Tinto moves to dismiss Plaintiffs' claims related to these statements, arguing that they are protected by the PSLRA's statutory safe harbor for forward-looking statements or, alternatively, are statements of opinion or inactionable puffery. Dkt. No. 133 at 21–29.

For the same reasons discussed *supra* Section III.A.1, these are all forward-looking statements under the PSLRA. The vast majority of these statements either concern the projected schedule for or future operations of the Mine and therefore are, under the PSLRA, "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," 15 U.S.C. § 78u-5(i)(1)(B), or concern the expected capital costs/budget of the project and are forward-looking statements "containing a projection of . . . capital expenditures . . . or other financial items" under the PSLRA, 15 U.S.C. § 78u-5(i)(1)(A). *See, e.g.*, *Moshell*, 481 F. Supp. 3d at 287 (finding schedule and capital expenditure estimates to be forward-looking looking statements under these provisions of the PSLRA); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *8 (same).

Moreover, statements that project was "on track" and "on schedule," that capital costs remain "in line," and "[a]ll material assumptions underpinning these production targets continue to apply and have not materially changed" are similarly forward-looking statements under the safe harbor. As explained in Section III.A.1, such statements are virtually indistinguishable from the project projections of which they are part and, even if they implicitly assert a statement of current fact, that assertion is too vague to be actionable separate from the future projection. *See Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 387 ("Courts within this Circuit have found that statements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement."); *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *21 ("[W]hen the present-tense portion of mixed present and future statements does

not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection."); *Gissin*, 739 F. Supp. 2d at 505 ("[T]o the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.'" (quoting *Avaya*, 564 F.3d at 255)).

Because these statements are forward-looking, they are protected under the PSLRA safe harbor if they are accompanied by meaningful cautionary language. *See Wesco Aircraft Holdings*, Inc., 454 F. Supp. 3d at 385–86. Rio Tinto's statements at issue are alleged to have come largely from four sources: (i) Rio Tinto's 2018 Annual Report filed as an exhibit to its Form 20-F filed with the SEC; (ii) press releases filed as exhibits to Forms 6-K filed with the SEC; (iii) presentations associated with earnings calls and other public presentations; and (iv) an interview of Soirat on MBN World.

The first three sources—*i.e.*, Rio Tinto's annual report, press releases filed as Forms 6-K with the SEC, and public presentations—contained specific and extensive cautionary language. *See Slayton*, 604 F.3d at 773. The annual report listed four pages of "principal risks and uncertainties" that could "materially affect Rio Tinto or its ability to meet its strategic objectives." Dkt. No. 130-2 at 6. Those risks included: (i) "The Group's ability to raise sufficient funds for planned expenditure;" (ii) "operational difficulties through the value chain"; (iii) operational failure; (iv) natural disasters; and (v) "[t]he inability to attract or retain key talent [that] will constrain the Group's ability to reach its goals within planned timeframes." *Id.* at 6–9. Moreover, as particularly relevant here, the annual report warned of the "inherent risk and

uncertainty" of "[c]apital project development," stating that the "[a] delay or overrun in a project schedule could negatively impact the Group's profitability, cash flows, ability to repay project-specific indebtedness, asset carrying values, growth aspirations and relationships with key stakeholders." *Id.* at 7.  The cautionary language therefore "convey[ed] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement," *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 392 (quoting Conference Report at 43, 1995 U.S.C.C.A.N. at 742), and directly "relate[d] to the risk that brought about plaintiffs' loss," *Halperin*, 295 F.3d at 359.

Rio Tinto's press releases contained similarly substantive warnings about the risk that results could differ materially from what was projected.  The press releases stated:

> Such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements of Rio Tinto, or industry results, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.  Such forward-looking statements are based on numerous assumptions regarding Rio Tinto's present and future business strategies and the environment in which Rio Tinto will operate in the future.  Among the important factors that could cause Rio Tinto's actual results, performance or achievements to differ materially from those in the forward-looking statements are levels of actual production during any period, levels of demand and market prices, the ability to produce and transport products profitably, the impact of foreign currency exchange rates on market prices and operating costs, operational problems, political uncertainty and economic conditions in relevant areas of the world, the actions of competitors, activities by governmental authorities such as changes in taxation or regulation and *such other risk factors identified in Rio Tinto's most recent Annual Report and Accounts in Australia and the United Kingdom and the most recent Annual Report on Form 20-F filed with the United States Securities and Exchange Commission (the "SEC")* or Form 6-Ks furnished to, or filed with, the SEC. Forward looking statements should, therefore, be construed in light of such risk factors and undue reliance should not be placed on forward-looking statements. These forward-looking statements speak only as of the date of this announcement.

Dkt. No. 130-5 at 7 (emphasis added).  Notably, the press releases warned investors of the potential for performance or achievements "to differ materially from those in the forward-looking statements," including due to "operational problems." *Id.*  And the press releases

78

directed investors to the risk factors identified in the Form 20-F filed with the SEC and therefore incorporated those risk factors by reference. *See Biovail Corp.*, 615 F. Supp. 2d at 233 (concluding that reference during conference call to risk disclosures in press release sufficient to satisfy PSLRA safe harbor); *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d at 319 ("[C]onference calls both contained meaningful cautionary language about the nature of the forward-looking statements . . . on the contemporaneously filed press releases, which were incorporated by reference into the conference calls."); *Kinross Gold Corp.*, 957 F. Supp. 2d at 303 (determining cautionary language incorporated by reference "was more than sufficient to bring it within the protection of the bespeaks caution doctrine").

Finally, Rio Tinto's public presentations also contained meaningful cautionary language warning investors about relying on the forward-looking statements contained therein. Plaintiffs' presentations contained a "forward-looking statements" slide, which specifically warned that "anticipated production or construction dates, costs, outputs and productive lives of assets or similar factors" may vary depending on certain factors:

> Examples of forward-looking statements include those regarding estimated ore reserves, anticipated production or construction dates, costs, outputs and productive lives of assets or similar factors. Forward-looking statements involve known and unknown risks, uncertainties, assumptions and other factors set forth in this presentation. For example, future ore reserves will be based in part on market prices that may vary significantly from current levels. These may materially affect the timing and feasibility of particular developments. Other factors include the ability to produce and transport products profitably, demand for our products, changes to the assumptions regarding the recoverable value of our tangible and intangible assets, the effect of foreign currency exchange rates on market prices and operating costs, and activities by governmental authorities, such as changes in taxation or regulation, and political uncertainty.

> In light of these risks, uncertainties and assumptions, actual results could be materially different from projected future results expressed or implied by these forward-looking statements which speak only as to the date of this presentation. Except as required by applicable regulations or by law, the Rio Tinto Group does not undertake any obligation to publicly update or revise any forward-looking statements, whether as a result of new information or future events. The Group

cannot guarantee that its forward-looking statements will not differ materially from actual results.

Dkt. No. 130-4 at ECF p. 3. This slide contained "meaningful cautionary language that identified with specificity the types of risks that might lead the estimates to be inaccurate" and specifically identified "production or construction dates" and "costs" as forward-looking statements that could "be materially different" from projections. *See In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *8. Such language is sufficient to trigger the safe harbor under the PSLRA.

Yet, while the first, second, and third sources of Rio Tinto's statements were accompanied by meaningful cautionary language, the Rio Defendants do not address whether similar cautionary language accompanied the fourth source of statements—*i.e.*, television interviews. As relevant here, Soirat allegedly stated during an interview on August 15, 2018 on MBN World, a Mongolian news network, that the underground project was "on plan and on budget." Dkt. No. 127 ¶ 328. Defendants "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor." *Slayton*, 604 F.3d at 73. Because the Rio Defendants have not proffered any evidence that meaningful cautionary language accompanied Soirat's statements on MBN World, these forward-looking statements are not entitled to protection under the PSLRA safe harbor on that basis.

This, however, does not end the inquiry. The Rio Defendants also argue that the statements that the project are "on plan and on budget" are entitled to the PSLRA safe harbor because Plaintiffs have not adequately pled that the statements were not honestly believed when they were made. Dkt. No. 131 at 25. In addition, the Rio Defendants argue that these statements are inactionable statements of opinion and puffery and are not alleged to have been materially false or misleading when made. *Id.* at 26–34.

As an initial point, for the reasons discussed in greater detail below, *see infra* Section IV.B, Plaintiffs adequately pled that Soirat, prior to the Class Period, knew that the underground development project was behind schedule and over budget. For example, Plaintiffs allege that approximately one month prior to Soirat's statement on MBN World, Bowley—who Soirat had hired to investigate problems at the Mine—told Soirat's direct report, Fagen, who had acted as his intermediary in the past, that the project was "12 months behind schedule" and "$300 mill capital over budget," numbers that were expected to "rapidly escalate." Dkt. No. 127 ¶ 143. Plaintiffs also allege that in May 2018, Soirat instructed Bowley to stop looking into delays and cost overruns at OT and that Bowley was later fired after continuing to report his concerns to Soirat. *Id.* ¶¶ 143, 281–282. These allegations, along with others, sufficiently raise the inference that Soirat had "actual knowledge" that his statements on MBN World that the project was "on plan and on budget" were false or misleading when made.

That is fatal to the Rio Defendants' arguments that: (i) the statements are entitled to the PSLRA safe harbor under the actual knowledge prong, *see Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 385 (explaining that third prong only applies where plaintiff "fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading" (quoting *Slayton*, 604 F.3d at 766)); and (ii) are inactionable statements of opinion, *see Omnicare*, 575 U.S. at 185–86 (holding that liability for a statement of opinion will follow "if the speaker did not hold the belief she professed").

What is left is whether these statements—*i.e.*, that the underground project was "on plan and on budget"—were inactionable puffery. A statement of puffery is a "statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it." *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *13 (internal quotation marks and citation omitted).

"Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 368 (S.D.N.Y. 2021) (quoting *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 381). Accordingly, while "simple economic projections" are generally not actionable, they may be actionable "if they are worded as guarantees or are supported by specific statements of [then-existing] fact." *Villare*, 2021 WL 4311749, at *13 (quoting *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *22); *see also In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998). The key inquiry in deciding whether a statement constitutes puffery is "the nature of the specific statement and whether it concretely assured investors of anything." *Villare*, 2021 WL 4311749, at *13 (quoting *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016)).

Applying these principles, Soirat's statements that the underground project was "on plan and on budget" were not puffery. According to the allegations in the Complaint, Rio Tinto had publicly announced on numerous prior occasions that the first draw bell would be in mid-2020, first production would be obtained in early 2021, and the total capital development cost for the Mine would be $5.3 billion. *See, e.g.*, Dkt. No. 127 ¶¶ 7, 16, 78. In that context, Soirat's statements that the underground project was on plan and on budget were specific, as they related to those earlier projections and confirmed their ongoing accuracy. These statements implicitly confirmed that the OT underground project was still able to meet its production target in early 2021 and that the underground development project was projected to be at or under budget. A reasonable investor therefore could have relied on these statements in assessing an investment in OT through Turquoise Hill, including as to whether the Mine's copper production was likely to begin "just as copper prices" were expected to "ris[e]." Dkt. No. 127 ¶ 77.

That these statements that the project was "on plan" and "on budget" were made in the context of prior specific statements about what that budget and schedule plan were distinguishes this from *In re EDAP TMS S.A. Securities Litigation*, which the Rio Defendants cite. 2015 WL 5326166, at *9–10 (S.D.N.Y. Sept. 14, 2015). Although there, the court found that statements indicating that the Food and Drug Administration ("FDA") approval process was "on track" and making continued "progress" were inactionable puffery, there were no allegations that the defendants had guaranteed or predicted FDA approval by a certain date. *Id.* at *9–10.[20]

Thus, while the remaining statements discussed above are dismissed as protected by the PSLRA safe harbor, Rio Defendants' request to dismiss Plaintiffs' Rule 10–5 claims with respect to this August 15, 2018 statement is denied.

## 2.   Statements that the OT underground development was the "Highest Quality Copper Development" in the world and "Progress[ing] Well"

In a footnote, the Rio Defendants argue that Plaintiffs' claims related to certain statements that Oyu Tolgoi was the "highest quality copper development" in the world and "progress[ing] well" are inactionable puffery or, in the alternative, statements of opinion that are not alleged to be false when made. Dkt. No. 131 at 28 n.27 (citing Dkt. No. 127 ¶¶ 365, 372).

Plaintiffs, however, do not address these statements in their opposition, nor do they allege that they were false or misleading in their Complaint. Dkt. No. 127 ¶¶ 365–368, 372–373 (mentioning that Rio Tinto made these statements but not specifically alleging that they were false or misleading).[21]  Thus, assuming that Plaintiffs even intended to raise Rule 10b–5(b)

---

[20] Defendants also cite *Elliott Associates, L.P. v. Covance, Inc.*, 2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) in support of this argument; however, in that case there was no allegation that the merger discussions were not "on track" when made. *Id.* at *10.

[21] Although Plaintiff allege that Rio Tinto's statement that the underground project was "proceeding well" was materially false and misleading, this statement was made in Rio Tinto's Year-End Results in 2018, *see* Dkt. No. 127 ¶¶ 371, 373, and is different from Rio Tinto's statement that the underground project "Progressed well in 2018" in its written presentation

claims with respect to any of these statements, those claims do not pass muster under the PSLRA as the Complaint does not "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1).

### 3. SOX certification

The Complaint alleges that the Sarbanes-Oxley ("SOX") certification included in Rio Tinto's 2018 Form 20-F and executed by Jacques was false and misleading. Dkt. No. 127 ¶ 412. The Rio Defendants move to dismiss this claim. Dkt. No. 131 at 29–30.

The SOX certification signed by Jacques represented that: "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Rio Tinto plc, (Form 20-F, Ex. 12.1) (Mar. 4, 2019).[22] This SOX certification "contained an important qualification that the certifying officer's statements are true based on his knowledge." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018) (cleaned up) (quoting *Menaldi v. Och-Ziff Cap. Mgmt. Grp.*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017)). As will be discussed, *infra* Section IV.B, Plaintiffs do not sufficiently allege that Jacques possessed the requisite scienter as to the delays and cost overruns at the Mine, "undermin[ing] the allegations that [he] knew that the SOX certifications were false." *Id.* (quoting *Menaldi*, 277 F. Supp. 3d at 517). Moreover, "[t]he law in this District is clear and uniform that [] SOX certifications do not provide a stand-alone basis for liability." *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505,

___

concerning its 2018 annual results, *see id.* ¶ 372. And Defendants do not appear to move to dismiss Plaintiffs' claim on the basis of the statement that the underground project was "proceeding well." *See* Dkt. No. 131 at 28 n.27 & 131-1 (Appendix A).
[22] The Court takes judicial notice of this SEC filing. *See In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d at 203.

at *21 (S.D.N.Y. Mar. 29, 2021). Therefore, the SOX certification is not actionable. *See Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at * 21; *Chapman*, 466 F. Supp. 3d at 410.

### 4. Risk disclosures

Defendants also move to dismiss Plaintiffs' claims that the risk disclosures contained in Rio's 2017 and 2018 annual reports and Forms 20-F were false and misleading. Dkt. No. 127 ¶¶ 420–424. The key risk disclosure that Plaintiffs point to is Rio's risk disclosure providing that: "A delay or overrun in a project schedule could negatively impact the Group's profitability, cash flows, ability to repay project-specific indebtedness, asset carrying values, growth aspirations and relationship key stakeholders." *Id.* ¶ 421. Plaintiffs allege that such a disclosure was misleading as Rio failed "to disclose to investors that there were catastrophic undisclosed engineering, construction, and procurement problems at Oyu Tolgoi that caused significant delays and cost overruns in the construction of the underground project at the time they were made." *Id.* ¶ 424.

Although Defendants acknowledge that a risk disclosure can itself be a material misrepresentation" "where the company warns only that a risk may impact its business when that risk has already materialized," Dkt. No. 131 at 30 (citing *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *10 (S.D.N.Y. Mar. 29, 2016)), Defendants nonetheless argue that the "Complaint does not adequately allege that the Defendants knew of and attempted to conceal any irreparable delays or cost overruns that had materialized at the time the risk disclosures were issued," *id.* However, as discussed *infra* Section IV.B, Plaintiffs do sufficiently allege that Rio knew of delays or cost overruns shortly before the Class Period and, instead of trying to fix them or disclose them to investors, attempted to silence those who spoke out about them. The Court therefore rejects Defendants' request to dismiss this claim on this basis.

85

5.      **Falsity of the statements**

The Rio Defendants also contend that Plaintiffs do not sufficiently plead that their statements were actually false or misleading when made.  Dkt. No. 131 at 30.  Specifically, the Rio Defendants contend that the Complaint does not sufficiently allege: (i) specific facts regarding the delays and cost overruns; (ii) that their statements regarding the date of the first draw bell were false; (iii) that the October 2018 re-forecast was false; (iv) that construction issues with Shaft 2 were not disclosed to the market in October 2018; and (v) that Defendants falsely attributed delays to ground conditions.  The Rio Defendants also contend that Plaintiffs' attempt to establish falsity in March 2019 based on an impairment charge disclosed on July 31, 2019 is classic pleading-by-hindsight.  *Id.* at 30–34.

First, contrary to the Rio Defendants' contention, Plaintiffs allege sufficient specific facts that demonstrate that, by the beginning of the Class Period, the project was significantly behind schedule and over budget, problems that were only expected to get worse.  Plaintiffs specifically allege that Bowley—who had been hired to investigate problems at the Mine—determined, shortly before the Class Period, that the project was twelve months behind schedule and $300 million over budget, numbers that they should expect "to rapidly escalate."  Dkt. No. 127 ¶ 151. Another former employee who was the surface construction manager at OT allegedly stated that when he left the project in May 2018, it was $2 billion over budget and at least a year and a half behind schedule, facts which were documented in cost and schedule reports.  *Id.* ¶ 158.  Plaintiffs also allege that Defendants' independent consultant determined in 2017 that there was a mere 2% chance that the schedule would be met and a month later a 0% chance, *id.* ¶ 312, and, despite being warned about the delays and cost overruns, Defendants made no effort to get either the budget or schedule back on track, *see id.* ¶¶ 160–161.  Further, Plaintiffs allege that, as per a report from Jacobs (OT's key contractor) to Rio's senior management, the Shaft 2 project—as of

86

August 2018—was behind the original plan by approximately 14%—a fact that confirmed the project was fourteen months behind schedule and was approximately $750 million over budget. *Id.* ¶ 273.

Second, the Rio Defendants correctly state that the SAC does not sufficiently allege that their statements regarding the date of the first draw bell were false. As the Rio Defendants note, while the 2017 Broadleaf analysis stated that the then-schedule for the first draw bell (which was April 26, 2020) had a 2% chance of being completed on time, Defendants only represented during the Class Period that the draw bell was projected for "mid-2020"—a sufficiently broad timeframe that allowed for a completion date after April 26, 2022. Dkt. No. 131 at 31. Moreover, after the 2018 Broadleaf report suggested that there was no chance of a May 2020 first draw bell, Plaintiffs allegedly transferred costs and projects related to the major infrastructure of Shaft 2 to secondary phases, which allowed them to maintain the mid-2020 schedule for the first draw bell. On October 15, 2018, Defendants publicly disclosed what they had done, noting that the projected draw bell date was maintained because OT management had changed the "draw bell sequencing strategy." Dkt. No. 127 ¶¶ 17, 169, 336 ("First draw bell remains on track for mid-2020, partly due to a change in the draw bell sequencing strategy."). These facts do not allege falsity. Instead, these facts support that the Rio Defendants updated their projected schedule for the first draw bell in line with new information and, at one point, changed how they measured the draw bell schedule, which they then disclosed to the market. Although Plaintiffs respond that the re-sequencing was ineffectual and intended to conceal OT's true status, Dkt. No. 135 at 44 n.16, Plaintiffs do not actually claim that the re-sequencing of the draw bell schedule, which was publicly disclosed, was misleading or false. *See id.* (citing Dkt. No. 127 ¶¶ 165–173, 300).

Third, the Court rejects the Rio Defendants' argument that Plaintiffs do not sufficiently allege that the October 2018 re-forecast was fraudulent except in hindsight. Dkt. No. 131 at 31. On October 16, 2018, Rio Tinto announced an underground development "re-forecast," disclosing a two-quarter delay to sustainable first production, but it continued to note that capital costs remain in line with the overall $5.3 billion budget. Dkt. No. ¶ 175. Contrary to Defendants' contention, Plaintiffs do not rely on inferences of fraud by hindsight. As detailed above, Plaintiffs allege sufficient facts that prior to the reforecast the OT project was already recognized to be a year behind schedule and several hundreds of millions of dollars over budget, figures that were only anticipated to get worse. Dkt. No. 127 ¶¶ 151, 158, 160–161, 273, 312. Accordingly, Plaintiffs sufficiently allege that the re-forecast was false or misleading as it did not account for the true extent of the delays and cost overruns at that time.

Fourth, Plaintiffs do not appear to contest the Rio Defendants' argument that they cannot be liable for concealing issues with Shaft 2 after Rio explicitly disclosed in an October 16, 2018 Form 6-K that "shaft sinking challenges" would push back the date of the first sustainable production. Dkt. No. 131 at 32. Plaintiffs have therefore conceded this issue as to any claim based solely on a failure to disclose those issues with Shaft 2 after October 16, 2018. *See VWR Int'l, LLC*, 2021 WL 1165077, at *20 ("Plaintiff does not directly respond to this argument in its opposition briefing, and the Court will consider this point conceded."); *Syniverse Techs., Inc.*, 2014 WL 4412392, at *7 ("Perhaps recognizing the futility of contesting this issue, AT & T did not even discuss it in its opposition brief. AT & T's silence concedes the point.").[23]

_____

[23] The Rio Defendants in a footnote also state that Plaintiffs do not sufficiently allege that Rio's statement in July 2018 that "the shaft five ventilation system has been fully commissioned and is now operational" was false based solely on allegations that the heating unit for OT was not functional. Dkt. No. 131 at 32 n.28 (citing Dkt. No. 127 ¶ 307). The Rio Defendants state: "the fact that the heating unit was not yet functional is a separate issue that does not render Rio's

Fifth, the Rio Defendants' argument that Defendants' statements attributing delays to ground conditions were not false because ground conditions did, in part, account for delays and cost overruns mistakes the allegations in the Complaint. Plaintiffs do not allege that ground conditions had no involvement in the delays. *See, e.g.*, Dkt. No. 127 ¶ 341 ("The ICG Report confirms that 'ground conditions' or geotechnical issues were not a *significant contributor* to the schedule delays and cost overruns at Oyu Tolgoi." (emphasis added)); *id.* ("[T]hese statements were false and misleading because the undisclosed true 12- to 18-month delay and associated cost overruns *were not driven by* geotechnical issues."). Instead, they argue that these statements were false and misleading as they implied that the delays and cost overruns were primarily caused by ground conditions when they were actually primarily caused by engineering, procurement, and constructions problems in Shaft 2. *Id.* "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *See Jinkosolar*, 761 F.3d at 250. The Court therefore denies the request to dismiss the claim based on these statements on this basis.[24]

---

statement about Shaft 5 false or misleading." *Id.* But this argument oversimplifies the alleged relationship between Shaft 5 and the heating unit. The Complaint alleges that "Shaft 5 could not properly perform its ventilation function" (which was Shaft 5's principal function) without the "CHP heating unit." Dkt. No. 127 ¶¶ 91, 311. Accordingly, the Complaint plausibly states if the heating unit were not functional, Shaft 5 would not be operational, and the July 2018 statement was false or misleading.

[24] The Court, however, agrees with the Rio Defendants that Jacques's response on a February 27, 2019 investor conference call to an investor question directly about the "concerns around ground conditions," Dkt. No. 131 at 33 n.29; Dkt. No. 127 ¶ 379, is not actionable as false or misleading. Jacques was asked a specific question, which he answered. "The requirement to be complete and accurate [] does not mean that 'by revealing one fact . . . one must reveal all others that, too, would be interesting . . . but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) (citation omitted); *see Finger v. Pearson PLC*, 2019 WL 10632904, at *11 (S.D.N.Y. Sept. 16, 2019). !

Finally, the Court agrees with Defendants that Plaintiffs' have failed to plead a violation based on a failure to take an impairment charge.  Dkt. No. 131 at 33; *see* Dkt. No. 127 ¶ 374. "Failure to take an impairment charge" may constitute securities fraud "when the need to write-down the asset was so apparent to the defendant before the announcement, that a failure to take an earlier write-down amounts to fraud." *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 268–69 (S.D.N.Y. 2009) (quoting *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) (internal quotation marks and alteration omitted)).  To sufficiently plead a violation due to a failure to take an impairment charge, the complaint must generally show, at a minimum, "the amount by which certain assets should have been written down" and "when the write-down[ ] should have occurred." *Vodafone*, 655 F. Supp. 2d at 269 (citing *Caiafa*, 525 F. Supp. 2d at 410–11 & 411 n.10); *see also In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *23 (finding failure to plead facts with particularity because "[w]hile Plaintiffs allege that Adient should have written down an additional impairment charge for long-lived assets in the second quarter of 2018, when the Company took the impairment charge for goodwill, they nonetheless do not allege 'the amount by which certain assets should have been written down'"); *Caiafa*, 525 F. Supp. 2d at  411 & n.10 (dismissing claim based on failure to take an impairment charge because "the Complaint fails to state the basis for its book-value allegations and fails to specify the amounts by which the ferries and containers were allegedly overvalued").  "When the impairments became so severe as to require specific accounting charges, and whether the requirements of the accounting principles were satisfied, necessarily involved issues of judgment." *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004).  The eventual decision to impair an

asset does not itself provide an actionable basis to claim that the failure to do so earlier was fraudulent.  *See In re Adient plc Sec. Litig.*, 2020 WL 1644018 at *24.

Although Plaintiffs plead generally that the failure to take an impairment was "materially false and misleading because the project was impaired and had been since before the Class Period," Dkt. No. 127 ¶ 375, and allege the amount of the write-down ultimately taken, *id.* ¶ 240, they do not specifically allege when those write downs "should have occurred."  *In re Adient plc Sec. Litig.*, 2020 WL 1644018 (stating that this must be pled at a "minimum").  Moreover, Plaintiffs fail to allege sufficient facts to show that an "earlier impairment charge was so clearly required by accounting principles that the failure to take such a charge was fraudulent."  *See In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *17.  That Plaintiffs would later take an impairment that was disclosed on July 31, 2019 does not change this analysis.  *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." (citation omitted)); *Lopez*, 173 F. Supp. 3d at 40 ("The fact of a later correction, made a short time after an initial statement is made, does not connote that that [sic] the Company's earlier statement about its earnings expectations was false or misleading when made." (citation omitted)).

## IV.   Inference of Scienter

Defendants also contend that Plaintiffs have failed to sufficiently plead scienter.

As mentioned above, to plead scienter sufficiently under the PSLRA, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u–4(b)(2)).  The scienter required under Section 10(b) and Rule 10b–5 to sustain a private civil claim is an "an intent to deceive, manipulate or defraud."  *Kalnit v. Eichler*, 264 F.3d 131, 138

(2d Cir. 2001) (quoting *Ganino*, 228 F.3d at 168). Recklessness may also suffice to plead

scienter for securities fraud in the Second Circuit. *See JP Morgan Chase Co.*, 553 F.3d at 198.

To create a strong inference, the inference of scienter must be "more than merely

plausible or reasonable—it must be cogent and at least as compelling as any opposing inference

of nonfraudulent intent." *Id*. (citation omitted). In assessing whether this inference exists, courts

consider both the inferences urged by plaintiffs as well as any reasonable competing inferences

drawn. *Id.* "Moreover, the facts alleged must support an inference of an intent to defraud the

plaintiffs rather than some other group." *Id.*

"A plaintiff may establish scienter by alleging facts that either (1) show that the

defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute

'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Francisco v.

Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (quoting *JP Morgan Chase Co.*, 553

F.3d at 198). A strong inference of scienter through "motive and opportunity" will only be

raised where plaintiffs allege that defendants "benefitted in some concrete and personal way

from the purported fraud." *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting *Novak v. Kasaks*,

216 F.3d 300, 307–08 (2d Cir. 2000)). "Motives that are common to most corporate officers,

such as the desire for the corporation to appear profitable and the desire to keep stock prices high

to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.*

(quoting *Novak*, 216 F.3d at 307). If plaintiffs do not make this showing of "motive and

opportunity," they may adequately allege scienter through the circumstantial evidence prong

misbehavior "'though the strength of the circumstantial allegations must be correspondingly

greater' if there is no motive." *Id.* (quoting *Kalnit*, 264 F.3d at 142).

## A. Turquoise Defendants

The Turquoise Defendants contend that the Complaint does not raise a strong inference either that they had motive and opportunity to commit the fraud or that they had knowledge of contrary facts about the cost overruns and delays at OT.  Dkt. No. 133 at 20–32.

### 1. Motive and opportunity

With respect to motive and opportunity, the Turquoise Defendants argue that Plaintiffs fail to allege that either Quellmann, Lane, Colton, or Turquoise Hill stood to benefit in any concrete and personal way from the alleged fraud.  Dkt. No. 133 at 37.

Plaintiffs respond that "Defendants were highly motivated to conceal the project's problems from the Mongolian Government in light of the fact that disclosing them would provide the government with leverage to renegotiate the terms of the OT partnership."  Dkt. No. 135 at 68.  Plaintiffs also imply that the Turquoise Defendants were motivated to conceal issues to avoid inquiries by the Mongolian government into the Mine and because of the Turquoise Defendants' "deep personal commitments to the OT project," and that Quellmann was personally motivated to conceal the problems as they posed great risk to him.  *Id.* at 68–69 n.31, 84.  In support of the latter point, Plaintiffs point to allegations in the Complaint that, beginning in March 2018, Swiss and Mongolian government prosecutors initiated a criminal corruption investigation into the Mongolian government officials responsible for negotiating the core agreements related to OT and, in connection with those investigations, arrested and jailed several top government officials.  *Id.*; *see also* Dkt. No. 127 ¶¶ 194–196.

The Complaint does not sufficiently allege that the Turquoise Defendants had motive and opportunity to commit the alleged fraud.  Every corporate executive presumptively has a commitment to the projects in which he or she is engaged that could be characterized generally as personal.  Plaintiffs do not allege that Quellmann, Lane, or Colton had any personal stakes in

the OT project short of those that would be possessed by every other corporate executive. The desire to conceal problems from the Mongolian government to prevent a potential renegotiation of the OT agreement—which would presumably reduce potential profits to Turquoise Hill—ultimately reduces to just a "desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation." *JP Morgan Chase Co.*, 553 F.3d at 198. As the Second Circuit has held, such allegations do not constitute "motive" for purposes of the scienter inquiry for a Rule 10b–5 private cause of action. *Id.*; *see also Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (summary order).

Similarly, the desire to avoid an inquiry by the Mongolian government into the status of the Mine does not separate the motives here from those "that are common to most corporate officers." *JP Morgan Chase Co.*, 553 F.3d at 198. Plaintiffs do not allege that Quellmann, Lane, or Colton personally feared prosecution from the Swiss or Mongolian governments or that their individual conduct was being investigated or how an investigation into the circumstances under which a contract was awarded could create peril with respect to how the project was executed. The motive to avoid governmental inquiry can be ascribed to any company—every corporate executive would prefer that his or her company not be investigated whether the investigation is justified or not. At a minimum, investigations can distract management; few companies invite them. *See In re Sanofi-Aventis Sec. Litig.*, 2009 WL 3094957, at *7 (S.D.N.Y. Sept. 25, 2009) (stating that proffered motive of concealing information to avoid increased scrutiny by regulatory body may be ascribed to any pharmaceutical company). The allegations that the Turquoise Defendants desired to avoid an investigation are therefore "too generalized to demonstrate scienter." *Kalnit*, 264 F.3d at 139.

94

Plaintiffs' allegations that the Turquoise Executive Defendants had "deep personal commitments to the OT project" and that Quellmann was personally motivated to conceal information out of fear of potential criminal action also are not sufficient to satisfy Plaintiff's burden to plead scienter.  In support of their contention that the Turquoise Executive Defendants had "deep personal commitments," Dkt. No. 135 at 84, Plaintiffs cite to paragraph 135 in the SAC, which does not mention Turquoise Hill or the Turquoise Executive Defendants.  Dkt. No. 127 ¶ 135.  The allegation regarding deep personal commitments thus is entirely conclusory.  And with regard to Plaintiffs' allegations about Quellmann, while it may be true that certain senior officials in the Mongolian government were arrested in connection with a corruption investigation, Plaintiffs tellingly do not allege facts that Quellmann was involved in such conduct or that would support a reasonable inference that Quellmann himself feared he would be investigated.[25]

### 2.  Circumstantial evidence of misbehavior or recklessness

The Turquoise Defendants argue that Plaintiffs also fail to sufficiently allege circumstantial evidence of scienter.  Specifically, the Turquoise Defendants contend that the Complaint contains no allegations that the Turquoise Defendants—as opposed to the Rio Defendants—were aware of information that would have indicated to them that the relevant

---

[25] Defendants also allege that the fact that Quellmann bought stock in Turquoise Hill during the relevant period negates scienter as to him and asks the Court to take judicial notice of the SEC form detailing these purchases.  Dkt. No. 133 at 29–30 & n.20.  Plaintiffs respond that this argument ignores that (i) Defendant Quellmann was required under his employment agreement to purchase stock and (ii) Defendant Quellmann "did not have any shares to sell except those he was required to purchase as a result of his sign-on bonus and shareholding requirement."  Dkt. 135 at 87.  Because the Court concludes that Plaintiffs have insufficiently pled motive and opportunity with respect to Quellmann, regardless of his stock purchases, the Court does not need to decide whether the stock purchases alone negate scienter.  *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 477 (S.D.N.Y. 2012) (stock purchases "only address a motive and opportunity theory of scienter, not a recklessness theory." (internal quotation marks and citation omitted)).

statements they planned to make about OT were false. Dkt. No. 133 at 20. The Turquoise

Defendants note that by Plaintiffs' own allegations, Turquoise Hill relied on "Rio Tinto, the

project manager, for information and updates concerning the progress of the underground

development, and—as TRQ specifically informed the markets—essentially all of TRQ's

disclosures consisted of information that the project manager provided." Dkt. No. 133 at 20; *see

also* Dkt. No. 127 ¶¶ 52–55.

Plaintiffs respond that the following allegations in the Complaint raise a strong inference

of the Turquoise Defendants' conscious misbehavior or recklessness: (1) that the OT Board (on

which all of the Turquoise Executive Defendants sat) approved a $120 million budget increase

for Jacobs, the primary contractor for underground expansion at OT, in August 2018; (2)

Quellmann, Colton, and Lane, as part of their duties, regularly visited the Mine; (3) Quellmann's

prior positions at Rio Tinto, including serving as a member of the OT Project Executive from

August 2016 to February 2018, gave him access to information about OT; (4) Quellmann,

Colton, and Lane allegedly stated throughout the Class Period that they were "plugged in" and

had "visibility" into what was going on at OT; and (5) the Turquoise Defendants were high-level

executives at a company whose sole asset was OT and sat on the Board of Directors of OT. Dkt.

No. 135 at 64, 71–72.

"Where a plaintiff seeks to plead scienter by alleging conscious misbehavior or

recklessness, the complaint must 'allege[ ] that defendants . . . had access to non-public

information contradicting their public statements.'" *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F.

Supp. 3d 473, 485 (S.D.N.Y. 2017) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76

(2d Cir. 2001)). "[W]here plaintiffs contend defendants had access to contrary facts, they must

specifically identify the reports or statements containing this information." *445 Freight Div.*

*Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309); *see In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *27 (concluding that scienter was insufficiently pled where plaintiffs "fail to show what 'specific contradictory information' was available to any Defendant at the time they made any alleged false or misleading statement"). As the courts have made clear, contrary facts may also be learned in other ways, including through observation. *See, e.g.*, *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020).

Here, Plaintiffs' Complaint is devoid of allegations of specific "facts, reports, or statements" that the Turquoise Defendants had access to and which contained information contrary to Turquoise Hill's public disclosures. *Pirnik v. Fiat Chrysler Autos., N.V.*, 2017 WL 3278928, at *3 (S.D.N.Y. Aug. 1, 2017) (quoting *Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *14 (S.D.N.Y. Mar. 10, 2017), *aff'd*, 710 F. App'x 471 (2d Cir. 2017)). While Plaintiffs allege that, as OT Board members, the Turquoise Executive Defendants were aware of a large budget increase for OT's primary contractor in August 2018 (at the beginning of the Class Period), Plaintiffs fail to specify exactly "how said information 'contradicted Defendants' public statements,' as is required to show scienter." *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (quoting *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28). And this inference is not clear on the face of the Complaint: A $120 million budget increase for the Mine's primary contractor would not necessarily indicate to members of the Board that the project—*with an over-$5.3 billion budget*—would necessarily incur cost overruns. *Cf. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *9 (finding lack of scienter, in part, because "Plaintiffs have not alleged that the CPI scorecard or business review decks included any specific information detailing, for example, an unusually high number of customer

complaints or an abnormally low number of claims payments.").  Similarly, Plaintiffs'

allegations that Quellmann, Colton, and Lane regularly visited the Mine do not specifically

identify any "contrary facts" that these defendants would have observed or had access to on these

visits or, even for that matter, when those visits occurred.  Such "broad allegations" are

insufficient to demonstrate scienter.  *Maloney*, 518 F. Supp. 3d at 781 ("As for the allegations

that Ollie's executives regularly assessed company inventory, courts have routinely dismissed

similar claims as too vague to support an inference of scienter." (citation omitted)); *see also Gen.*

*Elec. Co.*, 445 F. App'x at 370 (finding "vague and general averments" that executives had

access to "real-time customer and sales information" insufficient to demonstrate scienter);

*Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *12 (S.D.N.Y. Jan. 18, 2018)

(concluding that regular visits by the executives to the pharmacies was insufficient to establish

scienter as "there are no allegations that any of the Individual Defendants ever knew or observed

any of the abuses").  Plaintiffs' allegations that Quellmann's role at Rio Tinto from August 2016

to February 2018 would have given him "access to and reviewed all relevant documentation"

concerning OT—without more—are similarly too general to support an inference of scienter.

Dkt. No. 127 ¶ 42; *see also Gen. Elec. Co.*, 445 F. App'x at 370; *Maloney*, 518 F. Supp. 3d at

781.  Although Plaintiffs allege that certain individuals at Rio Tinto started to be aware of

potential delays and cost overruns at OT prior to February 2018, *see, e.g.*, Dkt. No. 127 ¶ 109–

111, Plaintiffs never allege that these individuals directly reported to or told Quellmann about

these issues or that Quellmann had access to reports or statements detailing these issues.[26]

---

[26]  Plaintiffs also note that the Turquoise Executive Defendants would have had access to
progress reports on Shaft 2 that were provided to OT's CEO; however, Plaintiffs do not plausibly
allege why reports sent to an executive at OT would necessarily have been available to
Turquoise Hill executives.  Dkt. No. 135 at 80.  Accordingly, this allegation does not support a
finding of scienter.

To make up for their lack of allegations that the Turquoise Executive Defendants had access to contrary facts, Plaintiffs argue that the Turquoise Executive Defendants' admissions throughout the Class Period that they were "plugged in" and had "visibility," combined with the significance of the problems at OT, necessarily means that they would have been aware of the contrary facts at issue. Dkt. No. 135 at 72–73. But while such facts undoubtedly weigh in favor of a finding of scienter, courts have repeatedly found that such allegations alone are not sufficient. *See, e.g.*, *Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *11 (holding that scienter not sufficiently alleged where plaintiffs argued that defendants "privy to information about the nature and scope of the CPI program because they were hands-on executives of a company that conducted due diligence and held meetings—before which certain documents were disseminated—regarding the CPI program"); *Maloney*, 518 F. Supp. 3d at 781 (finding allegations "that Ollie's executives were 'tight-knit' and 'hands-on,' and therefore must have been aware 'of the critical inventory and supply chain issues [Ollie's] was experiencing during the Class Period'" were insufficient to show that defendants had access to contrary information).

Instead, Plaintiff must allege "what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue." *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28 (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 581 (S.D.N.Y. 2014)). Allegations of Defendants' specific contrary facts are particularly necessary, here, where the allegations relate to an underground development project being built at a slower rate than scheduled and being overbudget—facts that would not necessarily have been plainly visible to someone vising the Mine—and where Plaintiffs fail to allege that Defendants had a motive and opportunity to

commit securities fraud.[27]  *See Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *11 ("Without

showing motive, their uphill battle to plead a strong inference of scienter becomes that much

steeper.").

The cases Plaintiffs cite are not to the contrary.  For example, in *In re Salix*

*Pharmaceuticals, Ltd.*, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016), while the court noted that

defendants' alleged statements that they had "accurate knowledge of Salix's wholesale inventory

levels" as well as the allegations that the process of discerning Salix's true inventory levels was

straightforward and weighed in favor of scienter, the court also based its decision as to scienter

on plaintiffs' allegations that one of the individual executive defendants had direct access to

internal reports that included accurate data on Salix's wholesale inventory levels.  *Id.* at *14.

Similarly, in *New Orleans Employees Retirement System v. Celestica, Inc.*, 455 F. App'x 10, 13–

14 (2d Cir. 2011) (summary order), the complaint included statements from confidential

witnesses stating that they had provided information about rising inventory levels (which was

contrary to the company's public statements) directly to the executive defendants.  *See In re*

*IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008) (finding allegations of scienter to be

sufficient where plaintiff alleged "existence of extensive documentation indicating the progress

of theater system installations and the IMAX defendants' knowledge of, or access to, those

---

[27] Plaintiffs allege that one former employee who worked at OT from October 2016 to May 2017
said that "lack of progress would have been obvious to any TRQ or Rio Tinto leadership who
toured the site."  Dkt. No. 127 ¶ 109.  However, the Complaint does not allege how the employee
would have been in a position to know what would have been obvious to leadership and does not
explain why the progress of an underground mine would have been obvious to anyone touring
the site.  *See Novak*, 216 F.3d at 314 ("[T]here is no requirement that [sources] be named,
provided they are described in the complaint with sufficient particularity to support the
probability that a person in the position occupied by the source would possess the information
alleged.").  An inference of scienter based on this comment is therefore "less cogent than" the
"nonculpable explanations for the defendant's conduct."  *Tellabs*, 551 U.S. at 314.

documents"); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *18 (S.D.N.Y. Mar. 25, 2013) (detailing "all this information" to which the defendants had access).[28]

The Turquoise Defendants' "high-level positions" also do not cure Plaintiffs' failure to allege the contrary facts to which Defendants had access. *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 & n.11 (S.D.N.Y. 2015). Plaintiffs' argument appears to invoke the "core operations doctrine," which courts in this District have held has been thrown into doubt by the enactment of the PSLRA in 1995. *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.) ("Under the core operations theory, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." (internal quotation marks and citation omitted)). "As a result of these doubts as to the doctrine's continuing import, the core operations inference may be considered as part of a court's holistic assessment of the scienter allegations, but it is not independently sufficient to raise a strong inference of scienter." *Id.* (cleaned up). Therefore,

---

[28] Several of the cases Plaintiffs cite are also distinguishable because the court found that the plaintiffs had adequately plead that the defendants possessed motive and opportunity to commit the fraud. *See, e.g., Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 551 (S.D.N.Y. 2017) (finding sufficient inference of scienter where plaintiffs plausibly alleges that the individual 10(b) defendants "had the motive and opportunity to overstate comScore's revenues"); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (finding that plaintiffs successfully alleged that defendants had a particularized motive to commit the fraud). And *Shenk v. Karmazin*, 867 F. Supp. 2d 379 (S.D.N.Y. 2011) is distinguishable because, in that case, the executive defendants merely had to follow the logical chain of what they already knew in order to recognize the falsity of the company's statements. *Id.* at 387 (finding that the Sirius executive defendants "could have easily uncovered the falsity" of Sirius's statements that the merger would result in lower prices since they knew at that time that the "combined debt of the merged entities" would create a need to raise revenues, requiring them in turn to increase prices).

Plaintiffs' high-level positions in the company and their positions as board members at OT do

not, standing alone, raise a strong inference of scienter in this case.  *See Police & Fire Ret. Sys.*

*of the City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 234 (S.D.N.Y. 2009) ("Courts may

not infer scienter 'solely from the fact that, due to the defendants' board membership or

executive managerial position, they had access to the company's internal documentation as well

as any adverse information.'" (quoting *In re Winstar Commc'ns*, 2006 WL 473885, at *7

(S.D.N.Y. Feb. 27, 2006)).

That the allegations of scienter with respect to the Turquoise Defendants are insufficient

is further bolstered by the "competing inferences rationally drawn from the facts alleged."

*Tellabs*, 551 U.S. at 314 ("[T]o determine whether a complaint's scienter allegations can survive

threshold inspection for sufficiency, a court . . . must engage in a comparative evaluation; it must

consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally

drawn from the facts alleged.").  Contrary to the notion that Turquoise Hill sought to trick

investors, the allegations of the Complaint, as a general matter, create an inference that

Turquoise Hill was largely at the behest of Rio Tinto in what information was provided to it

about OT and that Rio kept secret the reality of OT's cost overruns and schedule delays.

According to the Complaint, Rio, through RTIH, managed and exercised "near-total control"

over the underground development project at OT.  Dkt. No. 127 ¶ 53.

In addition, if the allegations in the Complaint are credited, Rio had no motive or reason

to share information with Turquoise Hill if it was bad news, and if Rio was engaged in a massive

fraud, every reason not to share that information.  The April 2012 agreement required Turquoise

Hill to make statements consistent with the information provided by Rio Tinto.  If Rio Tinto

wanted to control Turquoise Hill's statements, it was in its interest to limit the access to

information of the Turquoise Hill officers and directors.  The only way that Turquoise Hill could make statements contrary to the information provided by Rio Tinto's was if it determined that such statements were required under the applicable Securities Laws.  Turquoise Hill Resources LTD, General Statement of Acquisition of Beneficial Ownership - Amendment (Form SC 13D/A) (Apr. 20, 2012).  Thus, Rio Tinto—if it knew the information it was reporting was different from the "true" information— would have every reason not to share that "true" information with Turquoise Hill.  Not only would doing so expand improvidently the number of persons knowledgeable about the fraud (and able to reveal it to others); it would have given Turquoise Hill both the opportunity and the obligation not to repeat Rio Tinto's false information.  Indeed, the Complaint itself also includes a sworn statement from Bowley in which he states that: "Despite repeating those concerns about schedule delay and cost overrun and proposing solutions, Rio Tinto made no disclosure of the true facts to their *partners* and investors or the market."  *Id.* ¶ 262 (emphasis added).

Plaintiffs also argue that even if they cannot sufficiently plead the scienter of the individual executives, the facts sufficiently allege that Turquoise Hill itself had corporate scienter.  Dkt. No. 135 at 64 n.27.  In support of this argument, Plaintiffs cite to the Second Circuit's decision in *Dynex*.  *Id*.  In *Dynex*, the Second Circuit held that "[t]o prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation."  531 F.3d at 195.  It stated that "[i]n most cases, the most straightforward way to [allege this] will be to plead [scienter] for an individual defendant."  *Id.*  The court continued, however, that exceptions exist—for example, if a company "announced that it had sold one million SUVs in 2006, and the actual number was zero," there "would be a

strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* at 195–96 (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). The Second Circuit has since stated that this exception applies only in "exceedingly rare instances," where a statement is "so 'dramatic.'" *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (quoting *Dynex*, 531 F.3d at 195–96).

While, under this exception, a Plaintiff is excused from proving that a particular identified corporate official knew the statement was false, it is not satisfied by the factual allegations here. The facts here, are not as glaring as those discussed in *Dynex*: the underground development project was underground and, unlike the sales in *Dynex*, was not scheduled to be completed for multiple years. The fact that it was running hundreds of millions of dollars behind budget and months behind schedule thus would not at any particular moment be as apparent as the fact that a company which would be expected to sell nearly 100,000 SUVs in a particular month had sold none. Moreover, it is apparent from the example in *Dynex* that Plaintiff must still plead allegations that *some* corporate official would have "know[n] that the announcement was false." *Dynex*, 531 F.3d at 195; *see also Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017) (noting that the example in *Dynex* "makes clear the requirement of some connection at the corporation between a misstatement and the requisite quantum of knowledge of its falsity (in the example, by requiring someone with the required knowledge to approve the misstatement)"). While this pleading requirement may be relatively easy to meet for so "dramatic an announcement" in most companies, such as General Motors, where the corporate executives are involved in the management of the company and would almost certainly know that millions of SUVs were not being sold, it is less intuitive, here, where

Plaintiffs allege that corporate executives at Turquoise were not responsible for the day-to-day management of the Mine and largely received information about the Mine from Rio. In such a case, it is entirely plausible that the corporate officials would have known only what Rio Tinto was reporting to them. Accordingly, the Complaint does not raise a strong inference that some corporate official at Turquoise Hill would have "know[n] that the announcement was false." *Dynex*, 531 F.3d at 195. This "exceedingly rare" exception thus does not apply. *Abernathy*, 960 F.3d at 99.[29]

For these reasons, Plaintiffs fail to raise a strong inference of scienter on the part of the Turquoise Defendants. Plaintiffs thus cannot state a claim under Section 10(b) or Rule 10b–5, and those claims against the Turquoise Defendants must be dismissed.

### B.      Rio Defendants

The Rio Defendants similarly argue that the Complaint does not allege that the Rio Defendants had a unique motive to defraud the market and contains no particularized allegations that the Rio Defendants knew that their statements were false when made. Dkt. No. 131 at 34–45.

### 1.      Motive and opportunity

The Rio Defendants argue that Plaintiffs fail to allege that that the Rio Executive Defendants possessed any unique motive to defraud the market. Dkt. No. 131 at 34–35. Plaintiffs allege that the Jacques and Soirat were incentivized to defraud the market in order to: (i) avoid a renegotiation of the terms of the OT partnership by the Mongolian government; (ii) to

---

[29] That Quellmann and Colton signed SOX certifications that were purportedly false and misleading, Dkt. No. 127 ¶¶ 411–413, does not change this conclusion. *See Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *10 ("Without adequately alleging Defendants' actual knowledge of the illegal CPI scheme, 'SOX certifications do not support an inference of scienter as to any Defendant.'" (citation omitted)); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018).

avoid potential criminal and civil liability in connection with investigations into OT by the Mongolian government; and (iii) to promote their own careers.  Dkt. No. 127 ¶¶ 194, 279–280, 295–296.

These allegations of motive and opportunity against the Rio Defendants are insufficient for the same reasons that they were insufficient against the Turquoise Defendants.  *See supra* Section IV.A.1.  The desire to maintain the profitability of the investment and to avoid governmental and regulatory scrutiny are neither concrete nor personal to the defendants and are common to all corporate officers.  *See JP Morgan Chase Co.*, 553 F.3d at 198; *see also Kinross Gold Corp.*, 957 F. Supp. 2d at 295 ("[T]he motives of increased compensation and to assure that the company completed its announced initiatives are common to corporate officers."); *In re Sanofi-Aventis Sec. Litig.*, 2009 WL 3094957, at *7 (finding that a desire to avoid regulatory scrutiny was too generalized a motive to establish scienter).  Similarly, every corporate officer is incentivized to maximize a core asset of her company in order to benefit her career.  *See JP Morgan Chase Co.*, 553 F.3d at 201 ("If scienter could be pleaded solely on the basis that defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'").  For these reasons, Plaintiffs have not sufficiently pled the Rio Defendant's scienter through motive and opportunity.

### 2.  Circumstantial evidence of misbehavior or recklessness

The Rio Defendants also claim that the Complaint fails to state particularized facts establishing that Jacques or Soirat were aware that any of their statements were false; therefore, Plaintiffs cannot establish that any of the Rio Defendants acted with scienter.  Dkt. No. 131 at 35–36 & n.31.  Plaintiffs respond that the Complaint includes "overwhelming" evidence that

Jacques and Soirat were aware of contrary facts prior to making their statements.  Dkt. No. 131 at 62–73.  Specifically, Plaintiffs note that the Complaint refers to statements from Rio's former employees and contractors about Soirat's and Jacques's knowledge about issues at the Mine prior to the dates they made the allegedly false statements at issue, as well as various reports that Soirat and/or Jacques received—prior to the statements at issue—on delays and cost overruns at OT.  *Id.*  Plaintiffs also contend that the Complaint's allegations about Defendants' retaliation against whistleblowers supports a strong inference of fraud.  *Id.*

With regard to Soirat, the Complaint contains a number of allegations relevant to scienter: approximately one year prior to the Class Period, Soirat, in conjunction with Kinnell, hired Bowley, a veteran Oyu Tolgoi contractor, to examine the problems at OT; Bowley was told that he was hired to tell them "the truth about how bad the situation was."  Dkt. No. 127 ¶¶ 111–112, 114.  The SAC alleges that, upon being hired, Bowley soon recognized that the problems, particularly concerning the lead contractor on the project as well as engineering problems in the Shaft 2 headframe, would lead to significant schedule and cost overruns without intervention.  *Id.* ¶¶ 115–121.  Accordingly, on February 1, 2018 (months prior to the Class Period), Bowley reported concerns related to "cost overruns, schedule delays, and Shaft 2 problems" to Rio's senior leadership in London, which included Fagen, who reported directly to Defendant Soirat.  Bowley also stated that Fagen "participated in the meeting on behalf of Soirat" and "reported the substance of the meeting to Defendant Soirat."  *Id.* ¶ 142.  Moreover, Bowley allegedly "continued to follow up with Defendant Soirat and Fagen about the need for immediate action to address the cost overruns and delays" and stated that "both of them were aware of the problems at OT."  *Id.* ¶ 143.  Bowley also allegedly discussed "the problems facing the expansion" with Defendant Soirat for an hour in May 2018, *id.* ¶ 143, and he continued to report these problems

to Fagen and Soirat, including writing on July 19, 2018: "Latest update.  12 months behind schedule.  $300mill capital over budget.  Expect this to rapidly escalate," *id.* ¶ 143, as well as repeatedly emailing Fagen about the inaccurate "re-forecast," *see* Dkt. No. ¶¶ 166–167.  The Complaint also includes a screenshot of an email from Fagen to Bowley on July 3, 2018—in response to Bowley's email related to OT stating "[t]he realization and magnitude of what is happening is starting to dawn I think on a few"—in which Fagen stated: "Oh don't worry, we've known it from the start, just haven't been able to do anything about it.  Arnaud [Soirat] has played a very card [sic] here, which is why you now see 'things' surfacing."  *Id.* ¶¶ 149–150.

 Plaintiffs also allege that in May 2018, Soirat instructed Bowley to stop looking into delays and cost overruns at OT and, according to Bowley (who was present at the meeting and presumably in a position to form the lay opinion) Soirat "seemed to be saying that he knew that there was a big problem with the project but he did not want anyone else to know this."  *Id.* ¶¶ 281–282.  Around this time, Rio instructed Bowley to not come to work, even while he was kept on Rio's payroll, and then eventually Bowley was fired in June 2019 without any reason. *Id.* ¶ 282.

The SAC also alleges that Soirat professed in an interview on November 10, 2018 that "he spent one week every month at Oyu Tolgoi."  *Id.* ¶ 289.  Soirat also allegedly sat on the OT Board of Directors throughout the Class Period, *id.* ¶ 50, and he received reports from Rio Tinto's executive coaching consultant prior to March 2017, which included reports and concerns from senior leaders in Mongolia about unethical behavior and "potential overstatements" at OT in 2016.  *Id.* ¶ 133.

These allegations, taken collectively, create a strong inference that Soirat knew facts that contradicted Rio Tinto's statements that the project was "on plan," "on budget," and

"progressing nicely," including at the time that he appeared on MBN World on August 15, 2018.
*See Tellabs*, 551 U.S. at 323 (The inquiry is whether "all of the facts alleged, taken collectively,
give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in
isolation, meets that standard.").  The allegation that Soirat hired Bowley to look into the
problems at OT—over a year before the Class Period—creates a clear inference that Soirat was
aware of the potential existence of problems at OT and valued Bowley's opinions and ability to
properly assess what was going on at OT.  The allegations also support the inference that Soirat
soon learned about that truth—*i.e.*, that the project was months behind schedule and had
significant cost overruns—from Bowley who allegedly reported his concerns over schedule
delays and cost overruns directly to Soirat and, more specifically, to Soirat's direct report, Fagen.
*See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198 (S.D.N.Y. 2010) ("Moreover,
additional direct conversations with Individual Defendants, meetings at which Individual
Defendants were present, and visits by Individual Defendants to EGAM demonstrate their access
to and actual knowledge of facts which contradicted their public statements.").  As alleged, by
July 19, 2018 (only a month before Soirat's interview on MBN World), Soirat told Fagen that the
project was "12 months behind schedule" and $300mill capital over budget."  Dkt. No. 127
¶ 143.

   The inference of fraudulent intent is further supported by allegations that Soirat warned
Bowley to stop looking into the delays in May 2018 and attempted to sideline Bowley, *id.* ¶ 206,
as well as allegations that Bowley was terminated one month after emailing Fagen, again
warning her of the delays, which Fagen responded that she would report to Soirat.  *Id.* ¶¶ 219,
222.  These allegations create a strong inference that Soirat actively attempted to conceal the
truth about the delays and cost overruns.  As courts hold in the employment context, a

whistleblower complaint "closely followed in time by the adverse [employment] action" creates an inference that the complaint was a motivating factor in the adverse employment decision. *See Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). Here, too, Bowley's firing shortly after his concerns were reported to Soirat creates an inference that the firing was made in retaliation for Bowley's whistleblowing. These allegations directly rebut Rio Defendants' argument that the Complaint fails to allege anything more than a disagreement among staff regarding whether the project could reach its budget and scheduling goals. Dkt. No. 131 at 46.

Allegations that Soirat claimed to spend one week every month at Oyu Tolgoi and sat on the Board of Directors further support this inference of scienter. According to the allegations in the Complaint, knowledge of delays and cost overruns at OT were no secret. *See, e.g.*, Dkt. No. 127 ¶ 124 ("Everyone was always talking about the underground delays and overruns. It was a permanent fact. It was a surprise to no one"). As a result, Soirat's significant involvement in overseeing the project—although not alone sufficient to establish scienter—bolsters the inference that Soirat would have been aware of these delays and overruns. *See Maloney*, 518 F. Supp. 3d at 781 ("[E]vidence of a hands-on management style may support an inference of scienter."); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *14 (concluding that Defendants' claims that they had "accurate knowledge of Salix's wholesale inventory levels" supported inference of scienter).

Rio Tinto's arguments to the contrary are not persuasive. First, Rio Tinto argues that the Complaint does not adequately allege scienter as it largely relies on the opinions of former employees that scheduling delays and cost overruns were well known and, thus, Defendants must have been aware of them. Dkt. No. 131 at 36. This argument, however, misstates the allegations of the Complaint. As noted above, while allegations that scheduling delays and cost overruns

were well-known bolster the inference of scienter here, the Complaint contains many allegations—detailed above—that directly connect Soirat to information about the cost overruns and delays at OT inconsistent with his public statement.  Moreover, the relevant inquiry is not whether individual pieces of evidence on their own create a strong inference of scienter, but whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *See Tellabs*, 551 U.S. at 32.

Second, Rio Tinto argues that Plaintiffs cannot adequately allege Soirat's scienter by alleging that, Fagen, his subordinate, had information, without alleging facts supporting the conclusion that the subordinates relayed that information to the Soirat.  Dkt. 131 ¶ 131.  But the rule Rio Tinto asks the Court to adopt is too categorical.[30]  Although a plaintiff must allege facts supporting the inference that the executive in question received the contrary information, such facts need not come from any eyewitness or a fly on the wall.  They can also come in the form of allegations supporting that the information and the context were such that the executive would have had to be informed.  Plaintiffs have alleged such facts.  The allegations support the inference that Fagen would have kept Soirat informed of what she learned about delays and cost overruns at the Mine.  Plaintiffs allege that Soirat was one of the two individuals who hired Bowley to look into the problems at OT.  Dkt. No. 127 ¶¶ 111–112, 114.  Bowley was hired on a matter of importance.  And Bowley made regular—and alarming—reports back.  *Id.* ¶¶ 14, 115, 141-52.  It is natural to infer that Fagen would report what she learned from Bowley about the

---

[30] The cases Rio Tinto cites in support of this proposition do not establish such a blanket rule and all are distinguishable from the facts here.  *See Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *11 (D. Conn. Nov. 10, 2005) (concerning whether allegations of subsidiary company knowledge were sufficient to support conclusion that this information was then relayed to holding company management); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) (finding that subordinates' implication in fraud does not mean supervisors knew of their involvement).

concerning problems back to Soirat.  The allegations of the Complaint make it hard to believe that Fagen could responsibly do otherwise.

Moreover, the SAC directly supports the inference that Fagen frequently reported her conversations about cost overruns and schedules delays at OT back to Soirat.  For example, after Bowley wrote to Fagen on December 10, 2018 stating that Rio Tinto could only ignore the truth for so long "before it will slap us in the face properly along with GOM and other TRQ shareholders," Fagen responded: "Hi Richard I hear you!!!! I will have a discussion with Arshad [Sayed] and Arnaud [Soirat] – *again*!" *Id.* ¶ 219 (emphasis added).  Fagen's use of the word "again" indicates that she had reported similar concerns to Soirat in the past, and that she would have the conversation once more.

Finally, Rio Tinto argues that the fact that Soirat hired Bowley to look into the progress of the OT project once he knew about the delays at OT actually weakens allegations of his scienter.  Dkt. 131 at 44.  This argument gets the allegations in the Complaint backward: Plaintiffs do not principally rely on what Soirat knew *prior* to hiring Bowley in support of their allegations of scienter, but instead rely on what Soirat learned about delays and cost overruns *after* hiring Bowley to investigate, which Soirat is alleged to have then fraudulently concealed from investors.

Accordingly, Plaintiffs have successfully pled scienter as to Soirat and therefore have also pled corporate scienter as to Rio Tinto.  *See Dynex*, 531 F.3d at 195 ("In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant."); *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010).

The Complaint, however, does not raise a strong inference of scienter with respect to Jacques.  The majority of Plaintiffs' allegations relating to Jacques's scienter relate to knowledge that Jacques would have had about the status of the Mine in 2017, *see e.g.*, Dkt. No. 127 ¶¶ 10, 133 (2017 reports received from executive leadership consultant); *id.* ¶¶ 11, 137 (2017 meeting with intermediary for Jacques); *id.* ¶ 278 (statement by former employee, who left position at OT in March 2017, that Jacques was fully informed about the status of the mine).  While these allegations may support that Jacques knew about delays at the Mine in 2017, they do not necessarily support the inference that Jacques knew, at the beginning of the Class Period—*i.e.,* an entire year later—that progress at the underground development was still delayed and had not gotten back on track.  Not only does the SAC not allege that delays in 2017 were so significant that the project had no chance of getting back on track, but it actually supports the opposite inference: the SAC alleges that on February 1, 2018, Bowley made a presentation on cost overruns, schedule delays, and Shaft 2 problems "and how to fix them," indicating that, at that point, these problems were able to be remedied through "immediate action."  *Id.* ¶¶ 141–143; *see Tellabs*, 551 U.S. at 323 ("[T]he court must take into account plausible opposing inferences.").[31]

The SAC also includes allegations that beginning in October 2018, Jacques received weekly progress reports showing that the underground project was three months behind schedule, which he demanded because he was so concerned about the delays, *id.* ¶ 105, and alleges that Bowley emailed Jacques on April 2, 2019 telling Jacques how behind schedule the

---

[31] The Complaint also alleges that: "According to Duffy, when Defendant Jacques made a surprise visit to Oyu Tolgoi in January 2018, it was because by that time, he knew the 'wheels were coming off' of the project."  *Id* ¶ 12.  Not only is this allegation not specific enough as to what Jacques knew about OT to support scienter, but the Complaint also alleges that Duffy resigned and terminated his firm's contract with Rio in December 2017, *id* ¶ 138, and so does not support that Duffy would know the information alleged.

project was, *id.* ¶¶ 228, 277.  But, again neither of these allegations support a strong inference of scienter, as shortly after this information was provided to Jacques, Rio Tinto made updated disclosures, announcing further delays.  *See id.* ¶¶ 174 (October 16, 2018 re-forecast announcing that sustainable first production could be delayed by two quarters); 396 (announcing further delays on April 16, 2019).

The Complaint's allegations that Jacques and Jacques's subordinates received various reports on the status and causes of delays prior to the Class Period also do not raise a strong inference of scienter.  While Plaintiffs allege that Jacques's subordinates were informed of the true status and causes of the delays at the Mine, *id* ¶¶ 96, 161, 277, Plaintiffs do not allege facts supporting an inference that these subordinates would have reported what they learned up to Jacques.  To the contrary, the Complaint supports the allegation that individuals associated with Rio Tinto were advised not to report information about the problems at the Mine to Jacques.  *See id.* ¶ 11 ("During that meeting, Duffy repeated his concerns about the problems he was hearing about Oyu Tolgoi to Kirikova—but was told by Kirikova this was information that Defendant Jacques would not appreciate, and that Duffy would regret reporting it to him.").  In addition, as to the reports that were allegedly sent and reviewed by Jacques, the Complaint fails to allege when Jacques would have received them and whether it was before or after Rio Tinto's alleged false statements.  *See id.* ¶ 277; *see also Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 222 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) (dismissing complaint where "[t]here are no descriptions of when these reports would have been provided to the Executive Defendants").

Finally, as discussed above in relation to the Turquoise Executive Defendants, Jacques's

senior position at Rio Tinto, the significance of the OT asset to Rio Tinto, as well as Plaintiffs'

conclusory that scheduling delays and cost overruns were well-known are insufficient, without

more, to allege that Jacques possessed the requisite scienter. *See, e.g.*, *Maloney*, 518 F. Supp. 3d

at 781; *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14; *Shemian v. Rsch. In*

*Motion Ltd.*, 2013 WL 1285779, at *16 (S.D.N.Y. Mar. 29, 2013) (Sullivan, J.) ("[M]ere

assertions that defendants must have been aware of informants' concerns are insufficient to

establish that defendants were aware of those concerns. Such allegations simply do not establish

reckless disregard or scienter."), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

## V.     Scheme Liability Claims

Plaintiffs allege that the Defendants are liable under Rule 10b–5(a) and Rule 10b–5(c) for

engaging in deceptive and manipulative acts in a scheme to defraud investors.  "To state a claim

for scheme liability, a plaintiff must present facts showing '(1) that the defendant committed a

deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with

scienter, and (4) reliance.'"  *Menaldi*, 277 F. Supp. 3d at 517 (quoting *In re Alstom SA*, 406 F.

Supp. 2d at 474).  On that theory, even a defendant who is not a "maker" under *Janus* could be

liable for a misstatement, and plaintiff would not have to show that the "maker" itself had

scienter.  "Scheme liability claims are subject to the PSLRA pleading standard with respect to

scienter."  *Id.*

### A.     Rio Tinto

Plaintiffs allege that the Rio Defendants are liable under the Supreme Court's decision in

*Lorenzo v. Securities & Exchange Commission*, 139 S. Ct. 1094 (2019), for disseminating false

information through Turquoise Hill and engaging in other deceptive conduct.  Dkt. No. 127

¶ 451; *see* Dkt. No. 135 at 36.  The Rio Defendants contend that scheme liability is not

appropriate in this case as scheme liability claims may not be premised solely on alleged misstatements and omissions by the defendant. The Rio Defendants also contend that Plaintiffs do not allege reliance with respect to their allegedly deceptive conduct. Dkt. No. 131 at 19–21.

The Supreme Court's decision in *Lorenzo* and the Second Circuit's recent decision in *Securities and Exchange Commission v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) answer the question whether the deceptive or manipulative act for purposes of scheme liability may be premised solely on alleged a misstatement or omission. In *Lorenzo*, the Supreme Court addressed whether those who do not strictly "make" statements," but who "disseminate false or misleading statements to potential investors with the intent to defraud, can be found to have violated" Rule 10b–5(a) and 10b–5(c). 139 S. Ct. at 1099. In that case, Francis Lorenzo, a director of investment banking at an SEC-registered brokerage firm, sent emails (at the behest of his boss)[32] to prospective investors that described a potential investment in a company. *Id.* The description contained false statements about the assets of the company and Lorenzo conceded that he possessed the requisite scienter. *Id.* at 1100. The Supreme Court, based on the "natural meaning" of the provisions, found that the dissemination of false statements "directly to investors" with the intent to defraud could sustain a claim under the subsections (a) and (c) of Rule 10b–5. *Id.* at 1101. In reaching its decision, the Court rejected the view that only subsection (b) of Rule 10b–5 regulates conduct involving false or misleading statements and noted that there is "considerable overlap among the subsections of the Rule." *Id.* at 1102.

---

[32] The U.S. Court of Appeals of the District of Columbia Circuit found that Lorenzo's boss was the "maker" of the statements, and the Supreme Court noted that they took the case "on the assumption that Lorenzo was not a 'maker' under subsection (b) of Rule 10b–5." *Lorenzo*, 139 S. Ct. at 1100.

The scope of *Lorenzo* was recently clarified by the Second Circuit in *In Rio Tinto plc*, in which the Court was asked to address on interlocutory appeal whether its decision in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005), which held that "misstatements and omissions—without more—" cannot form the basis for scheme liability, had been abrogated by *Lorenzo*. *Rio Tinto plc*, 41 F.4th at 49. The Second Circuit concluded that *Lorenzo* had not abrogated *Lentell*, stating that "misstatements or omissions were not the sole basis for scheme liability in *Lorenzo*" and "[t]he dissemination of those misstatements was key." *Id.* at 53. Accordingly, the Second Circuit found that the Supreme Court's decision in *Lorenzo* was consistent with its decision in *Lentell*, and therefore *Lentell*'s holding that "misstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections" remains valid. *Id.*

The Second Circuit explicitly left open the question what "extra" facts—beyond the knowing dissemination to the public of a false statement made by another in *Lorenzo*—would be sufficient to state a claim for scheme liability. *Id.* at 54. The court stated: "Whether there are ramifications or inferences from *Lorenzo* that blur the distinctions between the misstatement subsections and the scheme subsections is a matter that awaits further development." *Id.* at 53–54. The court thus raised but did not answer the question "whether corruption of an auditing process" or "allegations that a corporate officer concealed information from auditors" is sufficient for scheme liability. *Id.* at 54. The Second Circuit concluded that "[f]or now, *Lentell* tells us that misstatements and omissions alone are not enough for scheme liability, and *Lorenzo* tells us that dissemination is one example of something extra that makes a violation a scheme." *Id.*

Some guidance regarding the type of "extra" facts that would be necessary to convert a misstatement case into a scheme case, however, can be gleaned from *Lorenzo* itself and the Second Circuit's decision in *Rio Tinto plc*, as well as from the Supreme Court's opinion in *Stoneridge* and the opinions of other courts laying out—prior to *Lorenzo*—the facts that would be necessary to plead a scheme case. First, it seems clear from *Lorenzo* and from *Rio Tinto plc* that the creation of a false statement that is then disseminated by another who is the "maker" is not sufficient to create scheme liability. Where the only fraudulent conduct that is alleged is the making of a false statement to the investing public, a defendant in a private civil action is either liable as a maker under Rule 10b–5(b) or is not liable to investors at all. In *Lorenzo* itself, the Supreme Court specifically addressed whether "applying subsections (a) or (c) of Rule 10b–5 to conduct like [Lorenzo's] would render our decision in *Janus* . . . 'a dead letter,'" and concluded that it would not. *Id.* The Court reaffirmed *Janus*'s holding that "subsection (b) did not (under the circumstances) cover an investment adviser who helped draft misstatements issued by a different entity that controlled the statements' content," distinguishing it on the basis that *Janus* said "nothing about the Rule's application to the dissemination of false or misleading information." *Id.* The Court further "assume[d] that *Janus* would remain relevant (*and preclude liability*) where an individual neither makes nor disseminates false information—provided, of course, that the individual is not involved in some other form of fraud." *Id.* (emphasis added).

The Second Circuit's discussion in *Rio Tinto plc* also signals that a plaintiff cannot use "scheme" allegations under Rules 10b–5(a) and (c) to circumvent the rule of *Janus* that a person who drafts a misstatement that is disseminated to the public by another who has ultimate authority is not liable under Section 10(b). The court made clear that subsections (a) and (b) of Rule 10b–5 should not be interpreted in a manner that would render Rule 10b–5(b) surplusage

and that would permit private plaintiffs to repackage any Rule 10b–5(b) claims as Rule 10b–5(a) or (c) claims and thus avoid the heightened pleading standard in cases involving private plaintiffs. *Rio Tinto plc*, 41 F.4th at 54–55; *see also In re Alstom SA*, 406 F. Supp. 2d at 475. The Second Circuit also stated that the scope of Rule 10b–5(a) and (c) must be interpreted so as not to "muddle primary and secondary liability." *Id.* at 55. "[A]iding and abetting liability is authorized in actions brought by the SEC but not by private parties." *Id.*; *see Cent. Bank of Denver*, 511 U.S. at 180. To respect this congressional decision not to extend aider and abettor liability to private actions, the Second Circuit stated that scheme liability should be interpreted "only 'to state a claim against a defendant for the underlying deceptive devices or frauds themselves, and not as a shortcut to circumvent *Central Bank*'s limitations on liability for a secondary actor's involvement in making misleading statements.'" *Id.* at 55 (quoting *SEC v. Lucent Techs., Inc.*, 610 F. Supp.2d 342, 361 (D.N.J. 2009)). Finally, the Second Court implied that scheme liability should not be read so broadly that it would undermine the continued vitality of *Janus*'s holding regarding who is the "maker" of a misstatement. *Id.* at 54. The Second Circuit noted that: "While *Lorenzo* 'may have carved out of *Janus*' liability for disseminating false statements, it did not go so far as to create primary liability for 'participation in the preparation' of misstatements." *Rio Tinto plc*, 41 F.4th at 54 (quoting *Geoffrey A. Orley Revocable Tr. v. Genovese*, 2020 WL 611506, at *7–8 (S.D.N.Y. Feb. 7, 2020)).

Second, although the creation of a false statement that is then disseminated by another who is the "maker" is not sufficient to create scheme liability, it is equally clear that scheme liability is not limited to those who disseminate to investors false or misleading statements that they have not made; scheme liability is not limited to those facts. As much is made clear by *Lorenzo* and the Supreme Court's earlier decision in *Stoneridge*. In *Lorenzo*, the Supreme Court

held that the capacious words and "expansive language" of "device," "scheme" and "artifice" "capture a wide range of conduct."  139 S. Ct. at 1101–02.  A "device" is that which is formed by design, a "scheme" is a project or plan or program of something to be done, and an "artifice" is an artful stratagem or trick.  *Id.* at 1101 (internal quotation marks and citations omitted).  The conduct alleged in *Lorenzo* was not "borderline" but heartland, but it did not exhaust the reach of the statute.

Some of the type of conduct that can be reached by scheme allegations, even if the conduct also involves a misstatement, is described by *Stoneridge* and its progeny.  In *Stoneridge*, the Court considered first whether two companies that generated sham agreements (respondents in the Supreme Court) that a third company (Charter Communications) then used to make false statements to its investors but who did not make the false statements themselves could be liable under Section 10(b) and Rule 10b–5, and then second whether plaintiffs had alleged reliance sufficient to make the two companies liable in a private action.  Although the Court held that the plaintiffs had not alleged reliance—because the sham contracts made it neither necessary nor inevitable that Charter Communications would mislead its investors, the Court also left no doubt that the two companies could be subject to liability for a scheme violation in an enforcement action by the SEC.  The Court stated that "it would be erroneous " "to suggest there must be a specific oral or written statement before there could be liability under § 10(b) or Rule 10b–5." 552 U.S. at 158.  It explained "that if business operations are used, as alleged here, to affect securities markets, the SEC enforcement power may reach the culpable actors."  *Id.* at 161.  It added that the "enforcement power is not toothless."  *Id.* at 166.  It thus concluded that "[c]onduct itself can be deceptive," rejected the interpretation that manipulation should be

limited to manipulative trading practices, and held that respondents' "course of conduct included both oral and written statements, such as the backdated contracts." *Id.* at 158.

The parameters of scheme liability are further elucidated by the Eighth Circuit's decision in *West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384 (8th Cir. 2016), Judge Kaplan's decision in *In re Parmalat Securities Litigation*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005), and the decision in *In re Lernout & Hauspie Securities Litigation*, 236 F. Supp. 2d 161 (D. Mass. 2003), among other cases. In *Medtronic, Inc.*, the Eighth Circuit held that scheme liability claims could be asserted against Medtronic where it paid physicians (but did not disclose such payments) to publish false statements in medical journals. 845 F.3d at 393. The Eighth Circuit noted that "Appellants allege conduct beyond mere misrepresentations or omissions actionable under Rule 10b–5(b)" as "the act of paying physicians to induce their complicity is the allegation at the heart of the scheme liability claim" and "[p]aying someone else to make a misrepresentation is not itself a misrepresentation." *Id.* Similarly, in *In re Parmalat Securities Litigation*, the court found that defendants were liable for engaging in deceptive transactions (involving the regular factoring and securitization of worthless invoices) with Parmalat which, in turn, allowed Parmalat to publish misleading financial statements. 376 F. Supp. 2d at 504. Judge Kaplan stated: "[t]he transactions in which the defendants engaged were by nature deceptive. They depended on a fiction, namely that the invoices had value." *Id.* And in *In re Lernout & Hauspie Securities Litigation*, the court held that allegations that an issuer's business partners had created shell companies, knowing that the issuer would enter into fraudulent licensing agreements with them in order to inflate its financial results, stated a claim for scheme liability. 236 F. Supp. 2d at 173. The court concluded that the creation or financing

of sham entities was a "manipulative or deceptive device . . . intended to mislead investors" apart

from the material misstatement. *Id.*

The Court need not lay out the precise metes and bounds of "scheme" liability to resolve

this case. The Supreme Court in *Lorenzo* directed that the precise outline for scheme liability

would have to await a form of common law development informed by "[p]urpose, precedent, and

circumstance," 139 S. Ct. at 1101, and the Second Circuit in *Rio Tinto plc* held the "ramifications

or inferences from *Lorenzo*" should be the subject of "further development," 41 F.4th at 53–54.

Both caution against the attempt to elaborate a bright-line test applicable to all facts in all cases

in the future. It is clear in this case that Plaintiffs have not alleged enough for scheme liability.

As an initial point, Plaintiffs cannot establish the Rio Defendants' scheme liability *solely*

on the basis of Turquoise Hill's misstatements or omissions in light of *Rio Tinto plc*. Instead,

Plaintiffs must allege "something extra" in order to bring a scheme liability claim against the Rio

Defendants. *Id.* at 54; *see also Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *11

(S.D.N.Y. Mar. 30, 2021) (Nathan, J.) ("A claim brought under subsection (c) would have to

establish different elements than one brought under subsection (b), including, notably, the

existence of an alleged scheme to defraud."). Plaintiffs argue that this "something extra" comes

from five sources: (1) the Rio Defendants' dissemination of false information through Turquoise

Hill; (2) Rio Defendants' retaliation against employees and consultants who tried to make

Defendants acknowledge the truth about cost overruns and schedule delays; (3) Rio Defendants'

commission of a sham internal investigation by Baker McKenzie that purported to rebut

Bowley's allegations; (4) Rio Defendants' concealment and destruction of evidence of their

misconduct, including by destroying documents and instructing employees not to document

important information; and (5) Rio Defendants' use of nondisclosure agreements to try to conceal the truth about the delays and cost overruns.[33]  Dkt. No. 127 ¶ 451; Dkt. No. 140 at 2.

As to the first source, while Plaintiffs use the term "dissemination" to describe the Rio Defendants' conduct, the Rio Defendants' conduct with respect to Turquoise Hill's statements is distinct from the type of "dissemination" alleged in *Lorenzo*.  In *Lorenzo*, the defendant was alleged to have directly transmitted the false statements to prospective investors, 139 S. Ct. at 1104; here, on the other hand, the Complaint does not allege that anyone but Turquoise Hill itself published or distributed its own allegedly false and misleading statements.  That distinction is dispositive.  The Rio Defendants' alleged conduct therefore is nearly identical to the conduct *Janus* stated would not make someone liable for a misstatement or omission under Rule 10b–5(b): the Rio Defendants, like the nonliable "speechwriter" or "playwright" in *Janus*, are alleged to have drafted the statement that Turquoise Hill, a legally separate entity (*see supra* Section II) with ultimate authority over the statement, decided to publish to its investors.  564 U.S. at 145, 148.  Plaintiffs' theory that this alone is sufficient for scheme liability would "muddle primary and secondary liability" and permit scheme liability to be used "as a shortcut to circumvent *Central Bank*'s limitations on liability for a secondary actor's involvement in making misleading statements."  *Rio Tinto plc*, 41 F.4th at 55.

---

[33] At oral argument, Plaintiffs' counsel also appeared to argue that Defendants' settlement with Bowley related to his wrongful discharge case—which resulted in his witness statement and other evidence in the case not becoming publicly available—could constitute the "something extra" for scheme liability.  Transcript of Oral Argument (Aug. 25, 2022) at 72:20–73:1.  This settlement, however, did not occur until after March 16, 2020, *almost a year after* the end of the Class Period.  Dkt. No. 127 ¶ 284.  It is therefore unclear how this allegation could constitute part of the scheme, or how Plaintiffs could allege that they acted in reliance on it.  Regardless, Plaintiffs do not assert this allegation as a basis for their scheme liability claims in the Complaint, and therefore the Court declines to consider it.  Dkt. No. ¶ 451.

Plaintiffs' allegations do not establish any other "underlying deceptive devices or frauds." *Id.* The Rio Defendants' dissemination of false information through Turquoise Hill, while deceptive by nature, is indistinguishable from Turquoise Hill's alleged misstatement. It would "create primary liability for 'participation in the preparation' of misstatements." *Id.* at 54 (quoting *Genovese*, 2020 WL 611506, at *7–8). Plaintiffs do not allege that the Rio Defendants tricked Turquoise Hill into publishing the information or paid Turquoise Hill to do so. Instead, Plaintiffs argue that the Rio Defendants provided the false statement to Turquoise Hill, who then decided to publish it. The deceptive act is the false statement itself.

The remaining allegations are insufficient to carry Plaintiffs over the line. Plaintiffs allege that the contract pursuant to which Bowley was retained to consult with Rio Tinto contained a confidentiality obligation. Dkt. No. 127 ¶ 262. But it appears that contract was signed *before* Bowley began his work and in order for him to have access to the confidential information from which he generated his reports; if anything, the allegations support that the purpose of the agreement was for Bowley to help uncover the truth about the delays and cost overruns and therefore was not signed in furtherance of the alleged fraud. *Id.* ¶¶ 116–117 (alleging that Bowley reported his concerns after he was hired). Nor do Plaintiffs allege there was anything deceptive in Rio Tinto asking Bowley to honor that agreement. Plaintiffs simply allege that Bowley, in connection with an employment dispute, stated that he was "sidelined but was not released from my contract and the confidentiality obligations that went with it." *Id.* ¶ 262.

Plaintiffs also allege that Defendants "retaliated against employees and consultants who tried to make Defendants acknowledge the truth about the cost overruns and schedule delays" at OT, *id.* ¶ 451, but the paragraphs of the Complaint that they cite to for that proposition establish

only that Rio fired Brinkmann, the senior-most manager of Shaft 2, in or around May 2018 after work was delayed on Shaft 2 and the "proverbial shit hit the fan," *id.* ¶¶ 153–157, and at that same time terminated the employment of the surface construction manager at the OT project, after he raised issues with respect to the contractors working on the project, *id.* ¶¶ 157–159.  But those allegations cannot convert this misstatement case into a scheme case.  Although Brinkmann may have believed that he was being made a scapegoat for Jacobs's poor performance, *id.* ¶ 153, and FE8 may have believed that he was being "thrown under the bus [for] trying to tell them we should try to sort these things out," *id.* ¶ 159, there is no allegation that either was terminated to prevent them from making a public statement or that there was anything deceptive or fraudulent in Rio's conduct.  Plaintiffs do not allege that such acts helped create the appearance that something was different than it was.  It would be a rare fraudulent misstatement case indeed where the "bad news" is sufficiently serious for management to make public misstatements but where some employees were not fired, reassigned, or subject to criticism.  Plaintiffs' theory, if accepted, would make virtually every misstatement case into a scheme case.

Finally, Plaintiffs allege that Defendants "commissioned a sham internal investigation by Baker McKenzie" and sought to secure the destruction of documents possessed by Duffy and instructed employees not to document important information.  *Id.* ¶ 451.  The underlying allegations are remarkably thin.  Baker McKenzie's report allegedly excluded information learned by Duffy and sought to destroy data his firm had collected from Rio Tinto executives. *Id.* ¶¶ 287–288.  But if Rio was seeking to engage in a scheme to defraud, why did it hire Baker McKenzie in the first place and how does an internal investigation reporting to the very persons allegedly engaged in the fraud constitute an "underlying deceptive device or fraud"?  As to the

allegations regarding destruction of documents and the not documenting of information, Plaintiffs point to paragraphs 287 and 288, but those paragraphs report that after there was a nighttime break-in at Duffy's home in England that investigators believed was an attempt to steal data and, after the break-in, Rio Tinto's in-house lawyers demanded that an unspecified data management company "be allowed to access and collect the reports Duffy's firm had documented." *Id.* ¶ 288. The request to collect confidential information when a company believes that it might have been stolen is unexceptional. And there is nothing but speculation and innuendo behind Plaintiffs' suggestion that Rio was somehow behind the night-time break-in.

These facts are therefore distinct from other cases in which courts have found that plaintiff successfully stated a claim for scheme liability because the defendants performed an inherently deceptive act that was distinct from an alleged misstatement: *i.e.*, sham agreements, sham transactions, sham companies, or undisclosed payments to doctors who appeared independent. *See also Sec. & Exch. Comm'n v. GPL Ventures LLC*, 2022 WL 158885, at *10 (S.D.N.Y. Jan. 18, 2022) (finding scheme liability adequately pled where defendants "were the puppetmasters of a scheme to launder their investments for profit").

Moreover, even if Plaintiffs had adequately alleged a scheme based on the other conduct (*e.g.*, retaliating against whistleblowers, destroying evidence), the claim would fail for lack of reliance. The Supreme Court held in *Stoneridge*, "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action," including one premised on scheme liability, as it ensures that "for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists." 552 U.S. at 159; *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 156 (2d Cir. 2010)

("*Stoneridge* stands for the proposition that reliance is the critical element in private actions under Rule 10b–5."). In *Stoneridge*, the Court held that scheme liability claims against two defendants who were suppliers and customers of a company and who entered into agreements with the company that helped the company mislead its auditor and issue misleading financial statements were properly dismissed because even if they alleged a scheme, they did not allege reliance. 552 U.S. at 152–54. The Court stated that "[n]o member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times," and "[p]etitioner, as a result, cannot show reliance upon any of respondents' actions except in an indirect chain that we find too remote for liability." *Id.* at 159. The Court rejected plaintiff's argument that liability was appropriate because "the financial statement Charter released to the public was a natural and expected consequence of respondents' deceptive acts; had respondents not assisted Charter, Charter's auditor would not have been fooled, and the financial statement would have been a more accurate reflection of Charter's financial condition." *Id.* at 160. It noted that "[i]t was Charter, not respondents, that misled its auditor and filed fraudulent financial statements; nothing respondents did made it necessary or inevitable for Charter to record the transactions as it did." *Id.* at 161.

Under *Stoneridge* then, claims under subsections (a) and (c) of Rule 10b–5(a) are properly dismissed for lack of reliance where the undisclosed deceptive or manipulative conduct did not make it "necessary or evitable" that the false statement (upon which Plaintiffs relied) would be made. *See, e.g.*, *Menaldi*, 277 F. Supp. 3d at 518–19; *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2009 WL 1686896, at *4 (S.D.N.Y. June 16, 2009). For example, in *Mayer Brown LLP*, the Second Circuit affirmed the district court's holding that the law firm defendants could not be liable for scheme liability based on allegations that they had participated

127

in drafting the documents to create the fraudulent transactions.  603 F.3d at 160.  Quoting the district court, the Second Circuit stated that: "[a]s was the case in *Stoneridge*, it was Refco, not the Mayer Brown Defendants, that filed fraudulent financial statements; nothing the Mayer Brown Defendants did made it necessary or inevitable for Refco to record the transactions as it did."  *Id.* (quoting *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 316 (S.D.N.Y. 2009)).

Plaintiffs do not allege that any product of Rio's retaliation against whistleblowers, commission of an internal investigation, concealment and destruction of evidence, and use of nondisclosure agreements was made known to or relied upon by investors outside of its tangential relationship to Turquoise Hill's false statements.  And while some of this conduct may have made it easier for Turquoise Hill to continue making misrepresentations, none of it can be said to have made such misstatements "necessary or inevitable."  *See Menaldi*, 277 F. Supp. 3d at 519 ("[T]he New Complaint does not adequately allege that Plaintiffs relied on Cohen's alleged cover-up.").

Therefore, Plaintiffs' scheme liability claims against the Rio Defendants must be dismissed.

### B.      Turquoise Hill

Plaintiffs allege that the Turquoise Defendants are liable under SEC Rule 10b–5(a) and (c) for disseminating the purportedly false statements made by Rio and RTIH.  Dkt. No. 127 ¶ 451.  As discussed *supra* Section IV.A, Plaintiffs have not sufficiently pled scienter with respect to the Turquoise Defendants.  *See Menaldi*, 277 F. Supp. 3d at 517 ("[T]o state a scheme liability claim, a plaintiff must plead facts demonstrating 'a strong inference that the defendant acted with the required state of mind.'" (citation omitted)).  Plaintiffs' scheme liability claims against the Turquoise Defendants therefore fail on this basis.

## VI.    Control Person Claims Under Section 20(a)

Plaintiffs also bring claims of control person liability under Section 20(a) of the Exchange Act against the Turquoise Executive Defendants, Rio Tinto, as well as the Rio Executive Defendants, alleging that each was a controlling person of Turquoise Hill within the meaning of Section 20(a) of the Exchange Act.  Dkt. No. 127 ¶¶ 455–468.

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  The section permits plaintiffs to hold the controller secondarily liable if the person controlled has committed a primary violation.  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *Kraft v. Third Coast Mistream*, 2021 WL 860987, at *26 (S.D.N.Y. Mar. 8, 2021) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)).  "Because fraud is not an essential element of a Section 20(a) claim, Plaintiffs need not plead control in accordance with the particularity required under Rule 9(b)."  *Tecku v. Yieldstreet, Inc.*, 2022 WL 1322231, at *15 (S.D.N.Y. May 3, 2022); *see In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 542 (S.D.N.Y. 2016).

Section 20(a) thus does not permit a parent always to avoid responsibility for its subsidiary's wrongdoing.  "In cases involving parent-subsidiary relationships, courts have regularly based findings of control person liability on allegations of substantial stock ownership

and common principals." *STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525, 536 (E.D.N.Y. 2011) (quoting *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007)).  If the controller has the "power to direct or cause the direction of management and policies through ownership of voting securities, by contract, or in any other way," and if the controller has "actual control over the transaction in question," the controller may be liable for the subsidiary's primary violation assuming culpable participation.  *In re Alstom SA*, 406 F. Supp. 2d at 487 ("[T]he Section 20(a) defendant must not only have actual control over the primary violator, but have 'actual control over the transaction in question.'" (quoting *In re Global Crossing*, 2005 WL 1875445, at *3))

It is admittedly a close question whether Plaintiffs' allegations satisfy the second prong of the test for control person liability.  The Complaint alleges that Rio Tinto has a majority interest in Turquoise Hill and, according to the allegations in the Complaint, has control over the election of all members of Turquoise Hill's Board of Directors and the election and appointment of Turquoise Hill's executive officers, all but one of whom have been employees of Rio Tinto. Dkt. No. 127 ¶ 39.  At the same time, however, Rio Tinto's contract with Turquoise Hill makes clear that Turquoise Hill had the power and the responsibility to reject any statements that Rio Tinto asked it to make if Turquoise Hill believed those statements to be false or misleading. The Court need not reach the question, however, whether Plaintiffs have satisfied prong two, because they have failed prong one.  Plaintiffs fail to allege a primary violation by Turquoise Hill.  Plaintiff thus cannot establish control person liability against the Turquoise Executive Defendants, the Rio Executive Defendants, RTIH, or Rio for Turquoise Hill's misstatements. *See ATSI Commc'ns, Inc.*, 493 F.3d at 108; *In re Alstom SA*, 406 F. Supp. 2d at 486.

Plaintiffs also allege that the Rio Executive Defendants were controlling persons of Rio and RTIH within the meaning of Section 20(a) of the Exchange Act.  Dkt. No. 127 ¶¶ 461–463. The Rio Defendants only move to dismiss this claim on the basis that "[b]ecause Plaintiffs have failed to plead [an underlying violation by Rio and RTIH], the Section 20(a) claim should also be dismissed."  Dkt. No. 131 at 47.  Although Plaintiffs have failed to plead an underlying violation by RTIH,[34] they have successfully pled an underlying violation of Rule 10b–5(b) by Rio.  Thus, while claims under Section 20(a) related to the Rio Executive Defendants' control over RTIH will be dismissed for this reason, *see ATSI Commc'ns, Inc.*, 493 F.3d at 108; *In re Alstom SA*, 406 F. Supp. 2d at 486, Plaintiffs' Section 20(a) claims against the Rio Executive Defendants related to their control over Rio will not.

## VII. Loss Causation

The Rio Defendants also move to dismiss Plaintiffs' claims on the basis that Plaintiffs do not adequately allege loss causation.  Dkt. No. 131 at 45.  Under the PSLRA, "the plaintiff [has] the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C.A. § 78u-4.  "To establish loss causation, Plaintiffs must show that 'the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.'"  *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (quoting *In re Vivendi, S.A. Securities Litigation*, 838 F.3d at 261).  "Plaintiffs must allege not only the but-for causation of their losses but also the proximate causation, or that the fraud 'concealed something from the market that, when disclosed,' would foreseeably and 'negatively affect[ ] the value of the security.'"  *Id.* (quoting *Lentell*., 396 F.3d at 173).  To meet this standard, "a plaintiff can allege either (1) 'the existence of a cause-in-fact on the ground that

---

[34] As discussed *supra* footnote 6, RTIH is not the "maker" of Turquoise Hill's statements and Plaintiffs do not plead that RTIH made any statements of its own.

the market reacted negatively to a corrective disclosure of the fraud' or (2) 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *25 (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233–34 (2d Cir. 2014)).

Plaintiffs adequately allege loss causation through evidence that the market reacted negatively to corrective disclosures of the alleged fraud. The SAC alleges that the Turquoise Hill's stock price dropped in a statistically significant manner when the prior misrepresentations and risks concealed by Defendants' fraudulent conduct were disclosed to the market. Dkt. No. 127 ¶ 425. On February 27, 2019, when the Defendants first disclosed that sustainable first production would be delayed by several months, Turquoise Hill's shares dropped nearly 13% that day and again by nearly 7% on the following day. *Id.* ¶¶ 426–427. Plaintiffs allege that additional information concerning the true extent of the delays and cost-overruns at OT were revealed in April, May, and June and caused further declines in the price of Turquoise Hill shares. For example, the SAC alleges that on July 16, 2019, Defendants revealed what they had long known, which was that the underground expansion would be delayed for over a year and was over a billion dollars over-budget. *Id.* ¶¶ 242–245. These disclosures prompted a near 44% price decline and caused analysts to slash their ratings. *Id.* Such allegations are sufficient to plausibly allege that these stock drops were the result, in part, of Defendants' disclosures about the true extent of delays and cost overruns at the Mine. *See, e.g., DoubleLine*, 323 F. Supp. 3d at 458; *see also In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d at 380 (describing the burden of pleading loss causation as "a low one at the pleading stage"); *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016) (burden to plead loss causation is "not a heavy one," and "when it is unclear whether the plaintiff's losses were caused by the fraud or some other

intervening event, 'the chain of causation is . . . not to be decided on a Rule 12(b)(6) motion to dismiss'" (quoting *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs.*, LLC, 797 F.3d 160, 187 (2d Cir. 2015))).

In response, the Rio Defendants contend that Plaintiffs fail to adequately plead loss causation because the risks they allege "materialized" had been disclosed to the market.  Dkt. No. 131 at 46.  But Plaintiffs allege that Defendants "concealed far more than the possibility" of delay and cost overruns, they allege that Defendants concealed that the delays and cost overruns were no longer a risk but a near certainty, of which Defendants were aware even prior to the Class Period.  *See Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *26 (finding loss causation adequately plead because, while the fact that "ESKATA might not be commercialized successfully was extensively disclosed before the Class Period," "[d]efendants here have also concealed 'far more' than the possibility that ESKATA would not be commercially viable—it concealed the truth about its misleading advertising"); *see In re Braskem S.A. Securities Litigation*, 246 F. Supp. 3d 731 (S.D.N.Y. 2017) (rejecting defendant's claim that the complaint failed to plead loss causation because it did not plead the defendant concealed the relevant risk).

The Rio Defendants also contend that the disclosure of a failure to meet a forecasted schedule and budget alone cannot establish loss causation, as while revisions of budgets and schedules may have a negative on stock prices, they do not imply that defendants concealed a scheme.  Dkt. No. 131 at 46–47 (citing *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261 (S.D.N.Y. 2005)).  This argument, however, mischaracterizes Plaintiffs' allegations. Plaintiffs do not allege that the failure to meet forecasts alone establishes a scheme; instead, they

allege that Defendants knew all along that they would not meet these forecasts and yet continued to publicly affirm their validity to investors.[35]

## CONCLUSION

The Rio Defendants' motion to dismiss is GRANTED in part and DENIED in part as to Defendants Rio Tinto, Soirat, and Jacques. The Rio Defendants' motion to dismiss is GRANTED as to Defendant RTIH. The Turquoise Defendants' motion to dismiss is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 129 and 132.


SO ORDERED.

Dated: September 2, 2022
     New York, New York

                                         LEWIS J. LIMAN
                           United States District Judge

---

[35] The case Defendants cite in support of this argument is distinguishable. In *In re Initial Public Offering Securities Litigation*, the court found that plaintiffs had not adequately alleged that the scheme was ever disclosed to the market and thus did not sufficiently allege loss causation. 399 F. Supp. 2d at 266.