**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE TURQUOISE HILL RESOURCES LTD.
SECURITIES LITIGATION

Case No. 1:20-cv-08585-LJL

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

GLOSSARY ................................................................................................................. vii

PRELIMINARY STATEMENT ................................................................................... 1

I.    FACTUAL AND PROCEDURAL BACKGROUND....................................... 3

    A.    The Court Finds That Lead Plaintiff Adequately Alleges Securities Fraud
    Claims Against Rio in the Second Amended Complaint........................................ 3

    B.    Lead Plaintiff's Third Amended Complaint Adds Allegations to Address
    the Issues Identified by the Court in the SAC....................................................... 6

ARGUMENT ................................................................................................................. 7

II.    THE STANDARDS GOVERNING DEFENDANTS' RULE 12(b)(6) MOTION........... 7

III.    DEFENDANT JACQUES ACTED WITH SCIENTER IN MISREPRESENTING THE
PROGRESS AT OYU TOLGOI ..................................................................... 10

    A.    Lead Plaintiff Alleges Powerful Facts Demonstrating Jacques' Scienter ........... 10

        1.    Jacques Received Reports Contradicting Rio's Public Statements ...........11

        2.    Rio's Stonewalling of the ICG and Retaliation Against Bowley and
        Duffy Support Jacques' Scienter ...............................................................16

        3.    Jacques' Demonstrated and Professed Knowledge About Oyu
        Tolgoi's Progress Supports His Scienter ...................................................16

        4.    Jacques Knowingly and Purposely Concealed the Truth About Oyu
        Tolgoi from Investors to Deceive the Mongolian Government.................17

    B.    Defendants' Scienter Arguments Are Meritless ................................................. 19

IV.    LEAD PLAINTIFF ADEQUATELY ALLEGES RIO'S DRAWBELL RESEQUENCING
STATEMENT WAS FALSE............................................................................. 26

    A.    The PSLRA Safe Harbor Does Not Apply to the Drawbell Resequencing
    Misstatement....................................................................................................... 26

    B.    The False Drawbell Resequencing Statement Was Made by Rio......................... 27

    C.    Defendants' Counterfactual Falsity Arguments Fail ........................................... 28

i

D.      The Complaint Adequately Alleges Scienter for the October 15
        Misstatement ............................................................................................... 29

CONCLUSION........................................................................................................................ 30

# TABLE OF AUTHORITIES

CASES                                                                          Page(s)

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)....................................................23

*In re AppHarvest Sec. Litig.*,
  2023 WL 4866233 (S.D.N.Y. July 31, 2023) ..............................................9, 29

*In re Barrick Gold Corporation Securities Litigation*,
  341 F. Supp. 3d 358 (S.D.N.Y. 2018)........................................................24

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015)..........................................................20

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
  866 F. Supp. 2d 223 (S.D.N.Y. 2012)........................................................16

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)....................................................................29

*Christine Asia Co. v. Ma*,
  718 F. App'x 20 (2d Cir. 2017) ........................................................ *passim*

*City of Pontiac Gen. Emps'. Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)..........................................................8

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't., Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020)........................................................18

*Collier v. ModusLink Glob. Sols., Inc.*,
  9 F. Supp. 3d 61 (D. Mass. 2014) ........................................................16, 17

*Cornwell v. Credit Suisse Grp.*,
  689 F. Supp. 2d 629 (S.D.N.Y. 2010)........................................................16

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  665 F. Supp. 3d 255 (E.D.N.Y. 2023) ......................................................19

*In re Didi Global Inc. Sec. Litig.*,
  2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) ............................................18

*Doe v. NYU*,
  2021 WL 1226384 (S.D.N.Y. Mar. 31, 2021) ....................................... *passim*

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................7, 18, 30

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008)...................................................................20

*In re Garrett Motion Inc. Sec. Litig.*,
    2022 WL 976269 (S.D.N.Y. Mar. 31, 2022) ......................................................7, 25

*Gluck v. Hecla Mining Co.*,
    657 F. Supp. 3d 471 (S.D.N.Y. 2023)...................................................................25

*In re Gold Res. Corp. Sec. Litig.*,
    776 F.3d 1103 (10th Cir. 2015) .............................................................................25

*Gray v. Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020)...................................................................10

*Gray v. Wesco Aircraft Holdings, Inc.*,
    847 F. App'x 35 (2d Cir. 2021) .............................................................................10

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).................................................................................................7

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .........................................................19

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009).....................................................................................8

*In re Insys Therapeutics, Inc. Sec. Litig.*,
    2018 WL 2943746 (S.D.N.Y. June 12, 2018) .......................................................18

*Iowa Pub. Empls' Ret. Sys. v. MF Global, Ltd.*,
    620 F.3d 137 (2d Cir. 2010)...................................................................................29

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020).....................................................................................30

*Jackson v. Nassau Cty.*,
    552 F. Supp. 3d 350 (E.D.N.Y. 2021) ...................................................................10

*Kasilingam v. Tilray, Inc.*,
    2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021)........................................................22

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) .................................................................................10

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    2012 WL 2512280 (S.D.N.Y. June 29, 2012) .......................................................26

*Lynch v. City of New York*,
  952 F.3d 67 (2d Cir. 2020)...........................................................................8, 9, 10

*Madej v. Yale Univ.*,
  2021 WL 148888 (D. Conn. Jan. 15, 2021) ...............................................................10

*Makor Issues & Rights, Ltd. V. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...............................................................................25

*Maloney v. Ollie's Bargain Outlet H'gs, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021)...............................................................20, 23

*In re MF Global Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................25

*Northwest Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
  2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023) .......................................9, 20, 24, 28

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..................................................................................8

*Okla. Firefighters Pension Fund & Ret. Sys. v. Musk*,
  2023 WL 6393865 (S.D.N.Y. Sept. 29, 2023)........................................................25

*Petrie v. Electronic Game Card, Inc.*,
  761 F.3d 959 (9th Cir. 2014) ................................................................................8

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ............................................................17

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Comm.*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010).......................................................................19

*Puddu v. 6D Global Techs., Inc.*,
  742 F. App'x 553 (2d Cir. 2018) ...........................................................................18

*Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012).......................................................................30

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001).....................................................................................15

*SEC v. Ripple Labs, Inc.*,
  2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) ............................................................10

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020) ......................................................8, 18

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010) .......................................................26

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
   551 U.S. 308 (2007) ............................................................... *passim*

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022) ........................................ *passim*

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003) ..................................................7, 26

*In re Wells Fargo & Co. Sec. Litig.*,
   2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) ...........................................26

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) .................................................................22

*Woodward v. Raymond James Fin., Inc.*,
   732 F. Supp. 2d 425 (S.D.N.Y. 2010) ......................................................19

## RULES & OTHER AUTHORITIES

Fed. R. Evid. 201(b) .......................................................................................9

Geary, L., *The Exception to Rule 12(d): Incorporation by Reference of Matters
   Outside the Pleadings*, 89 U. Chi. L.R. 979 (2022) ....................................10

## GLOSSARY

| Term | Description |
|------|-------------|
| Bowley, Richard | Mining expert hired in late 2017 by Rio Tinto to examine cost overruns and delays at Oyu Tolgoi. ¶¶15, 117. |
| Brinkmann, Grant | Rio Tinto's Senior Area Manager of Shafts. ¶97. |
| Class Period | July 17, 2018 to July 31, 2019. ¶1. |
| Complaint and "¶__" | Third Amended Consolidated Complaint for Violations of the Federal Securities Laws (as conformed based on the Court's February 26, 2024 Order (ECF No. 328)), and the paragraphs thereof. ECF No. 329. |
| Duffy, Dr. Maurice | Executive Coaching Consultant for Rio Tinto since 2007. ¶138. |
| GRB or Geotechnical Review Board | Rio's Geotechnical Review Board. ¶196. |
| D. Br. | Memorandum of Law in Support of the Rio Defendants' Motion to Dismiss the Third Amended Consolidated Complaint. ECF No 333. |
| ICG | The Independent Consulting Group retained by the Oyu Tolgoi Board Special Committee. ¶2. |
| Jacques, Jean-Sébastien | Defendant; former Chief Executive Officer of Rio Tinto from July 2016 to December 2020. ¶51 |
| Order | The Court's December 23, 2022 Opinion and Order on Defendants' Motions to Dismiss the SAC (ECF No. 198). *In re Turquoise Hill Sec. Litig.*, 625 F. Supp. 3d 164 (S.D.N.Y. 2022). |
| OT | The Oyu Tolgoi underground expansion project. ¶¶2, 60-68. |
| Rio Tinto or Rio | Defendants Rio Tinto plc (a United Kingdom company) and Rio Tinto Ltd. (an Australian company). ¶48. |
| SAC | Lead Plaintiff's Second Amended Complaint, filed on September 16, 2021. ECF No. 127. |
| Shaft 2 | The most important shaft for development of the Oyu Tolgoi mine. ¶70. |
| Shaft 5 | A ventilation shaft for the Oyu Tolgoi mine. ¶¶85, 90, 94. |
| Soirat, Arnaud | Defendant; Chief Executive of Rio Tinto's Copper & Diamonds product group from 2016 to December 2020. ¶48. |
| TAC or Technical Assurance Committee | Rio's Technical Assurance Committee. ¶196. |

Unless otherwise noted, in the following text all emphasis is added, and all internal citations and quotation marks have been omitted.

## PRELIMINARY STATEMENT

Defendants' motion to dismiss the new allegations in the Third Amended Complaint—concerning Defendant Jacques' scienter and Defendants' false October 15, 2018 drawbell resequencing strategy statement—should be denied.

The Complaint includes new allegations that, together with the facts previously alleged, amply pleads scienter for Defendant Jacques. Among other things, the Complaint alleges that Defendant Jacques was continually informed of the project's status by Rio's internal experts starting well prior to the beginning of the Class Period in July 2018. Specifically, Jacques knew that the OT development was five months behind schedule in November 2017; was told in May 2018 that the delays had gotten worse, and that the project was 12 months behind (just as whistleblower Bowley informed Defendant Soirat); and that the delays had spiraled out of control by the time the Class Period began. The Complaint also alleges detailed facts concerning Jacques' direct involvement in approving and concealing a $120 million budget-overrun just before the Class Period; his subordinates' reporting of the cost overruns and delays directly to him; his oversight of Rio's efforts to craft the statements it issued to investors to conceal the delays; and his knowledge and motivation to mislead investors due to Rio's fear of retribution from the Government of Mongolia.

In other words, the Complaint alleges the very facts the Court suggested would support a finding of scienter, and which thoroughly refute the innocent inference that Jacques could have somehow believed OT could have "gotten back on track." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 246-47 (S.D.N.Y. 2022).

The Complaint also adequately alleges Defendants' October 15, 2018 statement concerning Rio's supposed "drawbell resequencing" strategy was false when made and is

actionable. Specifically, Defendants told investors that a change in "drawbell resequencing" enabled Rio to meet the publicly-reported first drawbell deadline—a message Rio conveyed to investors as part of the false "reforecast" of the schedule previously sustained by the Court. *Turquoise Hill*, 625 F. Supp. 3d at 231-32. As discovery has now shown, Defendant Jacques oversaw Rio's efforts to issue the false reforecast, and Defendants told investors about the drawbell resequencing strategy precisely because it enabled Rio to retain its public commitment to meet the first drawbell deadline—a key "symbol of progress" that was "super important" to the Government of Mongolia. But as the Complaint now alleges, in truth, the drawbell resequencing strategy was in fact rejected at a meeting of Rio's Geotechnical Review Board ("GRB") and Technical Assurance Committee ("TAC") on October 12 and 13. This fact was known by the senior Rio executives on the TAC (who were responsible for drafting Rio's public disclosures about OT) and, at minimum, recklessly disregarded by Defendants Jacques and Soirat.

Defendants challenge these new allegations on a variety of grounds, all of which fail.

***Allegations Concerning Defendant Jacques' Scienter***. Defendants argue the Complaint still fails to allege Jacques' scienter by improperly "scrutinizing" each of the new allegations in isolation, and ignoring all the other previously alleged facts supporting scienter—in other words, the exact analysis that *Tellabs* forbids. *See Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322-23 (2007) (courts must consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter"). Unable to discount the allegations even in isolation, Defendants then improperly ask the Court to consider several exhibits they wrongly claim undermine scienter. But none of Defendants' discovery documents fall within the narrow universe of materials that the Second Circuit has held can be "incorporated by reference" or "integral" to a complaint on a motion to dismiss, and they are certainly not "judicially noticeable," as Lead

Plaintiff disputes their authenticity, relevance and meaning. *See, e.g.*, *Doe v. NYU*, 2021 WL 1226384, at *8-12 (S.D.N.Y. Mar. 31, 2021). The Court should reject Defendants' "invitation to error" (*id.* at *12) to consider and then wrongly credit these extrinsic documents in their favor on a motion to dismiss. *See, e.g.*, *Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (reversing scienter holding because plaintiff was entitled to all reasonable inferences).

*Allegations Concerning October 15, 2018 Drawbell Resequencing Misstatement*. In seeking dismissal of Defendants' false drawbell resequencing statement, Defendants again improperly raise issues of fact that cannot be resolved on a Rule 12(b)(6) motion. First, Defendants contend the statement is forward-looking and protected by the PSLRA's Safe Harbor—ignoring it was verifiably false at the moment it was made, and thus not protected. Second, Defendants again seek to have the Court consider discovery documents that were not cited—let alone relied upon— in the Complaint, and to interpret them in Defendants' favor in arguing the statement was somehow "true" and not made with scienter. Defendants' improper arguments fail in every respect— Defendants' factual challenges to the October 15 drawbell resequencing statement are wrong, and in any event, cannot be considered on a Rule 12(b)(6) motion. Defendants' motion should be denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Court Finds That Lead Plaintiff Adequately Alleges Securities Fraud Claims Against Rio in the Second Amended Complaint

On September 16, 2021, Lead Plaintiff the Pentwater Funds filed the Second Amended Complaint (ECF No. 127) ("SAC") alleging that Defendants misrepresented and concealed massive delays and cost overruns at the Oyu Tolgoi mine in Mongolia. Specifically, Rio Tinto told investors during the Class Period that the project's underground expansion was both on budget at $5.3 billion and on schedule for first sustainable production in the first quarter of 2021. SAC ¶¶141-52, 162-64.

In truth, the development at OT was months behind schedule and hundreds of millions of dollars over budget by the start of the Class Period on July 17, 2018, and the delays and cost overruns were only expected to "escalate rapidly" during the Class Period. SAC ¶¶141-52. As Rio's hired expert and OT veteran Richard Bowley reported to Defendant Soirat and Rio senior management before and throughout the Class Period, Rio's statements were "inconsistent with the truth (a lie)," "completely untrue," and "grossly misleading." SAC ¶¶209-20. In October 2018, Rio continued to provide false assurances that the project remained within its $5.3 billion capital budget and concealed the scale of the delays by releasing a false and misleading schedule "reforecast," blaming a shorter nine-month delay to sustainable production on purportedly unanticipated "ground conditions." SAC ¶¶165-86.

The truth about OT was revealed through a series of disclosures and, in July 2019, Rio was finally forced to admit that the project was 16 to 30 months behind schedule and $1.2 to $1.9 billion overbudget—disclosures that caused Turquoise Hill shares to collapse by over 70%. SAC ¶¶230-61.

Defendants moved to dismiss the SAC. On September 2, 2022, the Court issued an Order granting in part and denying in part Defendants' motions. *See Turquoise Hill*, 625 F. Supp. 3d 164. Specifically, the Court held that Turquoise Hill investors had standing to sue the Rio Defendants for the false statements the Court found were actionable, and that Lead Plaintiff adequately alleged Defendant Soirat's (and thus, Rio's) scienter. *See id*. at 242-46.[1]

However, as relevant to the instant Motion, the Court held that the SAC did not sufficiently plead Defendant Jacques' scienter. Specifically, while the Court noted that Plaintiff alleged Defendant Jacques had been informed of the delays in 2017 (before the Class Period began), the Court credited Defendants' urged inference that the delays were not "so significant that the project

---

[1] The Court also held that both Defendants Soirat and Jacques were adequately alleged as control persons under Section 20(a) of the Exchange Act and that loss causation was adequately alleged. *See id*. at 256-57.

had no chance of getting back on track," and that Bowley's hiring in 2017 and his presentation to Rio senior management in February 2018 suggested they could be "fixed." *Id.* at 246. Further, while the Court found that Plaintiff alleged that Jacques's "subordinates received various reports on the true status and causes of the delays," there were insufficient allegations "supporting an inference that these subordinates would have reported what they learned up to Jacques," and a lack of detail concerning the timing of the reports that Jacques allegedly received. *Id.*[2]

In addition, the Court dismissed several alleged misstatements, including because certain misrepresentations were protected by the PSLRA's Safe Harbor. *See Turquoise Hill*, 625 F. Supp. 3d at 224-33. As relevant to this Motion, the Court held that the falsity of Defendants' statement issued in connection with the false October 2018 "reforecast" (*id.* at 231-32) that the "first draw bell remains on track for mid-2020, partly due to a change in the draw bell sequencing strategy" was not adequately alleged because "Plaintiffs do not actually claim that the re-sequencing of the draw bell schedule, which was publicly disclosed, was misleading or false." *Id.* at 231.

Following the Court's Order sustaining Lead Plaintiff's claims in part, the parties proceeded into discovery, engaging in contested document discovery and ultimately agreeing to substantially complete document productions by October 19, 2023. ECF No. 306 at 5 (describing discovery efforts and outstanding discovery disputes).

The Court's Order outlined the facts required to allege scienter for Defendant Jacques, and documents produced by Defendants in discovery bore on the issues that the Court identified in the

---

[2] In the Order, the Court cited the September 2017 discussion that whistleblower Maurice Duffy had with the head of HR Vera Kirikova, who warned Duffy that Jacques would retaliate against him for reporting concerns about OT, holding that these allegations undermined the inference that Jacques's subordinates would have provided reports to him about OT. *See id.* at 246-47. The Court also held that, although the complaint alleged Defendant Jacques received weekly reports about the progress of the mine beginning in October 2018—and an email about the delays from Bowley on April 2, 2019—those were insufficient because, shortly thereafter, Rio made updated disclosures concerning delays. *See id.* at 246.

SAC, in particular concerning Defendant Jacques's scienter and certain dismissed misstatements.

After informing the Court and Defendants of their intent to do so, on December 15, 2023, Plaintiff moved for leave to amend and file the then-proposed Third Amended Complaint. Briefing ensued on the motion for leave to amend and a related motion for reconsideration by Defendants. On February 26, 2024, the Court issued an Order granting in part Defendants' motion for reconsideration, and granting leave for Lead Plaintiff to file the Third Amended Complaint as set forth in the Reconsideration Order. ECF No. 328. The Third Amended Complaint, as conformed to the Court's Reconsideration Order, was filed on February 28, 2024. ECF No. 329.

**B.**     **Lead Plaintiff's Third Amended Complaint Adds Allegations to Address the Issues Identified by the Court in the SAC**

As noted above, and detailed further below, the Third Amended Complaint adds detailed new factual allegations demonstrating Jacques' direct involvement in the development of the OT project, as well as the internal reports he received from Rio's experts and his subordinates informing him about the project's true conditions and status before and throughout the Class Period. Specifically, the Complaint alleges that Jacques (i) was repeatedly informed of the true status of development at OT, (ii) was directly involved in critical decision making concerning OT at the start of the Class Period, (iii) was told by Rio's internal experts that never in Rio's history had a complex mining project recovered from delays, let alone the kind that OT had experienced in the year before the Class Period, and (iv) personally directed Rio's efforts to conceal the cost overruns and delays from the Government of Mongolia to avoid adverse consequences from OT's critical partner.

In addition, the Complaint now alleges that Defendants' statement that Rio would maintain the first drawbell deadline by implementing a "draw bell sequencing strategy" was actionably false because—as discovery has shown—Rio had secretly internally rejected that very "draw bell sequencing strategy" before the statement was made. ¶195. Specifically, in truth, Rio had rejected

6

the resequencing strategy at an October 12 and 13, 2018 GRB and TAC meeting attended by senior Rio executives responsible for Rio's public disclosures about OT. ¶196. Although Rio had rejected the "resequencing strategy" because it was untenable and unsafe, Rio touted the abandoned "resequencing strategy" days later, on October 15, 2018, so it could falsely claim the first drawbell deadline would be met—a "super important" "symbol[] of progress" that Rio falsely maintained precisely to avoid retribution from the Government of Mongolia. ¶¶195-97.

## **ARGUMENT**

## II.    **THE STANDARDS GOVERNING DEFENDANTS' RULE 12(b)(6) MOTION**

To plead a claim under Section 10(b) and Rule 10b-5(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Turquoise Hill*, 625 F. Supp. 3d at 194-95 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

To plead falsity under Rule 9(b) and the PSLRA, plaintiffs need to plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission," *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003), and a statement to investors "is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).

In determining whether scienter is pleaded, "courts must, as with any motion to dismiss…accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 309 (2007). The test is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. A complaint gives rise to a strong inference of scienter by pleading the defendants "knew facts or had access to information

suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). The inference of scienter "need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" but must be "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. "[A] tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps'. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).; *see also Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020).

On a Rule 12(b)(6) motion, courts "do not resolve factual disputes—even in cases governed by the PSLRA." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 260 n.31 (3d Cir. 2009) ("*Tellabs* instructs us to consider competing *inferences* from the allegations, but we nonetheless assume the truth of the specific facts alleged.") (emphasis in original). Contrary to Defendants' suggestion (D. Br. 6), these pleading standards continue to apply where, as here, the plaintiff files an amended complaint relying on documents produced in discovery. *See, e.g.*, *Petrie v. Electronic Game Card, Inc.*, 761 F.3d 959, 970-71 (9th Cir. 2014) (finding scienter adequately alleged based on combination of prior and new, discovery-based allegations).

While a court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," *Tellabs*, 551 U.S. at 322, courts do not permit the weighing of evidence at the pleading stage. Importantly, the Second Circuit has clarified that the only documents that can be appropriately considered as "incorporated by reference or integral to the complaint" are "written instruments," which are "'legal document[s] that define[] rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020). As the courts analyzing and adopting *Lynch* have held, discovery materials are decidedly not "written instruments" that

can be considered "incorporated by reference or integral to a complaint" on a Rule 12(b)(6) motion. *See, e.g.*, *Doe v. NYU*, 2021 WL 1226384, at *8-12 (S.D.N.Y. Mar. 31, 2021) (analyzing *Lynch* and refusing to consider trial evidence as integral to a complaint or incorporated by reference).

Courts can also consider a certain narrow universe of documents that are subject to judicial notice "whose accuracy cannot be reasonably questioned," Fed. R. Evid. 201(b), such as SEC filings, "although only for their existence and not the truth of the matters contained therein." *In re AppHarvest Sec. Litig.*, 2023 WL 4866233, at *17-18 (S.D.N.Y. July 31, 2023).

Where a party disputes the accuracy, completeness, or relevance of a document, that provides an "independent reason" to not consider the document. *See, e.g.*, *Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, 2023 WL 9102400, at *11 (S.D.N.Y. Dec. 29, 2023) (refusing to consider extrinsic documents that were not "written instruments" for the "independent reason" that it was "not 'clear on the record that no dispute exists regarding' the accuracy of the trading records and plaintiff raised 'disputed issues of fact' concerning the relevance of the records"). In *Northwest Biotherapeutics*, the court rejected an attempt to have the court consider records defendants argued were "integral" to the complaint because they were not "written instruments" and, moreover, plaintiffs "vigorously disagree[d] with Defendants' interpretation" of them. *Id.*at *8. Nor were the records entitled to "judicial notice" because defendants cited the documents in an effort "to establish the truth of key factual assertions made in their motion to dismiss." *Id.* at *8-12 (discussing *Lynch* and *Doe*). Asking a court to evaluate such documents, "to weigh that evidence, and to conclude that the evidence contradicts Plaintiff's allegations" is "an invitation to error"— such materials are "outside of the pleadings" and may be considered only on "a motion for summary judgment." *Nw. Biotherapeutics*, 2023 WL 9102400, at *10-11.[3]

---

[3] As noted in *Doe*, although courts have used broader language to describe what can be considered on a Rule 12(b) motion, the Second Circuit's holding in *Lynch* that only "written instruments" can be considered

The risk for such "error" is heightened in securities fraud actions, and particularly on the subject of scienter. *See, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018). Even when a document can be considered incorporated by reference or judicially noticeable, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* Rather, courts must "continue to draw all reasonable inferences in the [plaintiff's] favor." *SEC v. Ripple Labs, Inc.*, 2022 WL 762966, at *1 n.1 (S.D.N.Y. Mar. 11, 2022); *see also Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (reversing scienter decision that "inappropriately discredited significant allegations" by "failing to treat the complaint in the light most favorable to Plaintiffs, and to draw reasonable inferences in Plaintiffs' favor").

## III. DEFENDANT JACQUES ACTED WITH SCIENTER IN MISREPRESENTING THE PROGRESS AT OYU TOLGOI

### A. Lead Plaintiff Alleges Powerful Facts Demonstrating Jacques' Scienter

The Complaint alleges numerous facts that give rise to the requisite inference that Jacques knowingly made misrepresentations or was at least reckless. And contrary to Defendants' effort to mischaracterize and focus exclusively on the ***new*** allegations in the Complaint—and to wrongly ask the Court to "weigh the evidence" by arguing certain improperly-submitted discovery

---

"integral" or incorporated by reference, is controlling. *Doe*, 2021 WL 1226384, at *11-12. This was "not *dicta*" but "essential to the court's holding," and must be followed. *Id.* at *11-12 & nn.5-6; *see also Madej v. Yale Univ.*, 2021 WL 148888, at *5 (D. Conn. Jan. 15, 2021) (refusing to consider documents relied on in complaint because they were not "written instruments"); *Jackson v. Nassau Cty.*, 552 F. Supp. 3d 350, 367 (E.D.N.Y. 2021) (same); *see also* Geary, L., *The Exception to Rule 12(d): Incorporation by Reference of Matters Outside the Pleadings*, 89 U. Chi. L.R. 979, 1014-16 (2022) (analyzing incorporation by reference and related doctrines, and concluding that when courts "strictly follow the text of 10(c), like the Second Circuit, materials incorporated by reference should be limited to literally written instruments"). This Court's prior rulings are consistent with *Lynch*, and have permitted consideration of SEC filings (as judicially noticeable, but not for their "truth"), "written instruments" as defined by *Lynch*, or documents for which there was no dispute about their consideration. *See, e.g.*, *Gray v. Wesco Aircraft Holdings, Inc*., 454 F. Supp. 3d 366, 382 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).

documents contradict them—the new allegations must be taken as true and considered holistically together with the facts already alleged under *Tellabs*. Taken together, these allegations amply address the Court's concerns about Jacques' scienter on the prior motion to dismiss.

### 1.    Jacques Received Reports Contradicting Rio's Public Statements

The Court's prior Order held that the SAC alleged that Jacques knew about delays and cost overruns in 2017, but did not adequately allege that he knew the delays and overruns continued during the Class Period, and there was a plausible inference that he could have believed things had gotten "back on track." 625 F. Supp. 3d at 246. The Complaint adds new facts about reports received by Jacques during the Class Period that refute this innocent inference. The Court also held on the prior motion to dismiss that the SAC did not adequately allege that Jacques himself received negative information about the mine during the Class Period (*see id.* at 246-47)—but the Complaint now alleges specific reports Jacques received about the status of OT during that time.

For example, the Complaint (¶141) repeats the allegations about reports to Jacques in 2017, which included comments from senior OT managers before the Class Period in 2017 that:

- Schedule over-run in that panel caving and construction drivers not aligned

- [W]e are months behind. . . .

- Delays and cost over-runs are understated in Mongolia.

- At Oyu Tolgoi, construction of the underground development will not achieve its target by 2020.

- I am leaving because I do not want to be tarnished by potential disaster that is Oyu Tolgoi.

As the Complaint again alleges, these warnings were so damning that Duffy was told to stop reporting them to Rio's senior leadership; Duffy found this instruction so troubling that he brought his concerns to Jacques' intermediary, the head of Rio's human resources, and then terminated his firm's Rio contract, specifically informing Rio's leadership that his firm was

quitting because of unethical behavior in Mongolia; and Rio and its lawyers then engaged in a years-long campaign to destroy Duffy's records after he continued to urge Rio's Board to investigate "overstatements" and other unethical conduct at OT. ¶¶138-46. Duffy said that Jacques "knew without a doubt" about the problems at OT by 2017 (¶146) and that Mongolia was "just a big fraud" (¶324), and his firm's reports confirmed these facts. ¶141. Jacques reviewed these comments, which were provided in reports to the Rio Executive Committee that he sat on. ¶139.

The Complaint adds detailed new allegations concerning reports Jacques received about the true state of the mine, which continually informed him that the delays had gotten worse, not better. For example, Jacques closely monitored the progress of the mine as chair of Rio's Investment Committee ("IC") and through the work of the Technical Evaluation Group ("TEG"), which reported to Jacques that there was a five-month delay at OT in November 2017; that in May 2018 the delays had "gotten worse" and stood at 12 months (just as Bowley reported); and that in October 2018, the delays had spiraled out of control to such an extent that the project was impaired, and there was a resulting $1.5 billion project funding shortfall and a 15-month delay, and "'further slippage [was] likely during 2019.'" ¶¶10, 174-79, 298, 300, 425.

In fact, rather than allowing Jacques to hope things could get better, the TEG made clear that "'Rio's history of complex mega projects is that once a project begins to experience schedule slippage that further slippage is experienced later in the project,'" and there was "'no real evidence to indicate why this won't apply to OT u/g, particularly since 2019 will be the highest spend year in the project (on some of the most complex project elements).'" ¶177. The TEG reported:

> [S]ome of the specifics that lead TEG to believe further slippage is likely: Planned improvements are likely to be offset by unforeseen emerging issues as they were between 2017 and 2018, this will be compounded by the 2-month reduction in contingency . . . . Any further delay to the completion of Shaft 2 commissioning (scheduled for March) will have a knock-on effect to several critical path elements through to production start date.

¶177. The TEG also reported that management's asserted project completion percentage was misleading—just as the ICG had found (¶206)—because Rio was neglecting critical-path tasks and padding the reported hours worked with non-critical items:

> The project's critical path is becoming more complex as more tasks are falling onto or becoming close to the critical path leaving less options for rescheduling. The stated project completion of 36% is derived on an earned hours basis. Non-critical items such as the camp construction have been brought forward to maintain progress, but this doesn't necessarily reflect completion of critical path or complex items (such as the conveyor to surface) which will inhibit future spend on other elements.

¶177. Accordingly, the TEG reported that the true schedule delay at that time was fifteen months, rather than the nine months Rio publicly reported days later in October 2018. ¶178.

Moreover, the TEG reported that the costs at the project had also ballooned and would continue to grow because—as the TEG reported and Rio's experience had shown—there was no possible way the capital budget would hold, given the "close relationship between schedule and cost increases" and "in the face of a likely 20% schedule over-run." ¶179. Thus, the TEG reported that as a result of the known delays, the project had a funding shortfall of over $1 billion and a $0.7 billion decline in net present value, and Jacques was informed of this. ¶¶10, 180-81, 298. As Defendants admit, the funding shortfall was caused by the project's delays. D. Br. at 12. Thus, Jacques' knowledge of the funding shortfall demonstrates his knowledge of the delays, which were concealed from investors. ¶181.

Following Jacques' review of the TEG's findings, Jacques and Rio worked to convince TRQ CEO Quellmann to continue concealing the true facts—as TRQ was due to report its results on October 15. While Quellmann eventually relented to Rio's wishes, he internally acknowledged that "TRQ has not been kept properly informed," that Rio's deception "has been done for reasons to protect Rio role as manager and the project team," and that the delays presented a "career defining moment for me right now." ¶180. He pressed Rio for additional information but ultimately

acquiesced in Rio's insistence on misleadingly understating the known delays, falsely attributing them to "ground conditions," and concealing the impaired NPV. Importantly, Jacques oversaw Rio's efforts to convince Quellmann to issue the false October 15 "reforecast." ¶181.

The Complaint further newly alleges that Defendant Jacques knew of these delays and cost-overruns due to his direct involvement in addressing them at OT—including through his work with Defendant Soirat in obtaining the OT Board's approval of an over $120 million contract expansion for OT's key contractor responsible for the underground construction in June 2018, just before the start of the Class Period. This development crystalized to Defendants that the project was in jeopardy because, as a result of the delays at the time, there was "no time contingency left" in the schedule (contrary to what Rio publicly represented), and Rio's internal analysis showed that each one-month delay translated into a $100 million hit to NPV. ¶¶154, 377-78. The Complaint further newly alleges Jacques' scienter based on his direct involvement in the efforts to avoid publicly reporting the cost overruns and delays at OT, including by quelling the Mongolian OT Board members' simultaneous attempt to publicly retender the contract for Shafts 3 and 4 sinking—a public retendering that would have risked revealing the true status of the mine. ¶¶154-55, 303.

The Complaint also alleges that Jacques received direct reports about the delays before and throughout the Class Period by his subordinates—the Rio senior managers who "were informed of the true status and causes of the delays at the Mine," but who the Court previously held were not adequately alleged to have reported what they learned to Jacques. *Turquoise Hill*, 625 F. Supp. 3d at 246. As newly alleged, these subordinates included ███████ who was "100% aware" of the problems with Shaft 2 and Rio's efforts to address them in 2017, as he approved the budgets (¶99); who was told in April 2018 that Shaft 2 was then five months behind schedule, which meant that the "commissioning of Shaft 2 was approximately 14 months behind schedule" (¶163); who

was involved in the termination and scapegoating of Grant Brinkmann, the manager of Shaft 2, in April 2018, and was "fully briefed on the meetings" established after Brinkmann's termination in a futile effort to "get things back remotely on schedule" (¶163-65, 170); and who himself decried the lack of progress in April and May 2018 and was "extremely disappointed and frustrated" about the delays and Rio's "inability to deliver" (¶105). ███ relayed OT's status in reports provided directly to Jacques. ¶¶105, 163-64, 299.

Thus, in response to the Order's conclusion that "Plaintiffs do not allege facts supporting an inference that these subordinates would have reported what they learned up to Jacques," *Turquoise Hill*, 625 F. Supp. 3d at 246, the Complaint includes allegations that do just that—citing reports that ███ provided directly to Defendant Jacques conveying just how far behind schedule the project actually was. For example, ███ reported to Jacques that, in January 2018, "Shaft #5 completion will be delayed beyond FC1 milestone" and that, in May 2018, "steel delivery delays impacted commencement of Shaft #2 stripping" and "Shaft #2 barrel equipping is about two months behind the FC1 [Forecast 1] schedule [secretly adopted in November 2017]." ¶299. These were all critical path items that required completion before other major tasks could begin—and revealed that, just months after Rio secretly "descoped" the schedule and implemented FC1, the key tasks to "get things back to being remotely on schedule" were already months behind the secretly altered FC1 deadlines. ¶¶169-70, 177, 183-90, 206. As the head of Rio's copper division for over a decade and the architect of OT, Jacques understood exactly what those delays meant for schedule and cost—Shaft 2 was necessary for moving workers, equipment, and mined material between the surface and the underground, and workers could not work underground without ventilation from Shaft 5, paralyzing progress. ¶¶67-68, 75-80; *see, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) (scienter pleaded where complaint alleged "who prepared

the . . . reports, how frequently the reports were prepared, and who reviewed them," and gave "additional indications as to the nature of the reports"); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010) (recklessness alleged where "executives reviewed specific reports that should have alerted them to the problems").

### 2.    Rio's Stonewalling of the ICG and Retaliation Against Bowley and Duffy Support Jacques' Scienter

As previously alleged, Rio refused to cooperate with the independent investigation conducted by the ICG, refused to provide the ICG with the critical TEG reports reviewed by Jacques during the Class Period, and refused to let the investigators speak with key project staff. ¶¶331-35. Rio's retaliation against Bowley and Duffy and active concealment of documents and other information evidencing the fraud from investigators supports a strong inference of Jacques' scienter. *See, e.g.*, *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 234 (S.D.N.Y. 2012) (retaliation against whistleblowers supported strong inference); *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 72 (D. Mass. 2014) (scienter pleaded were former employee was terminated shortly after raising concerns). Defendants ignore these allegations, but they must be considered under *Tellabs*.

### 3.    Jacques' Demonstrated and Professed Knowledge About Oyu Tolgoi's Progress Supports His Scienter

The Complaint also alleges how Jacques professed to know about the mine's actual progress, repeatedly spoke knowledgeably about it in detail in investor conferences, and personally oversaw the problems causing the delays and cost overruns. ¶221 (Jacques telling investors in response to concerns about government investigation involving OT, "I went there in January as you know, and the project is progressing very, very well"); ¶251 (telling investors OT was "proceeding well," "mostly on track," and "on budget"); ¶¶257, 423 (describing OT in detail). Jacques personally negotiated the 2015 agreements that resulted in the restart of the underground

expansion, which was his "claim to fame" at Rio, and the media has observed that there is "no one at Rio whose standing is more closely connected . . . to Oyu Tolgoi particularly than Jacques." ¶318. Jacques visited Mongolia in January 2018 because the "wheels were falling off" the project, and to quell the Mongolian government's attempt to renegotiate the OT agreements. *Id.* And as Duffy recounted, Jacques' close connection to OT drove him to conceal its failure—a fact documented in internal reports noting, for example, that "JS [Jacques] brings a unique blend of strategic and operational expertise on overstatements, overbudget, coverups." ¶¶136, 295. These repeated assurances and facts showing Jacques was "aware of nonpublic facts contradicting [his] public representations" support scienter. *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (citing executive's statements and "self-acclaimed" knowledge about issues on investor conference calls in finding scienter).

Again, Defendants ignore these allegations, but they must be considered under *Tellabs*.

### 4.    Jacques Knowingly and Purposely Concealed the Truth About Oyu Tolgoi from Investors to Deceive the Mongolian Government

The Complaint details that Jacques was personally involved in efforts to conceal OT's problems from investors and the Mongolian Government because disclosing them would provide the government with leverage to renegotiate the terms of the OT partnership—just as it did after the Class Period—and posed a great risk to Jacques personally. ¶¶209-24. Rio's silencing of key OT managers in spring 2018 coincided with the Mongolian Government's seeking tax payments from OT, jailing the former Mongolian government officials who negotiated the OT agreements with Jacques, and initiating inspections into OT's progress and finances by the Parliamentary Working Group and Mongolian National Audit Office—timing that highlights this motivation to conceal the truth about OT, and that Jacques in fact acted on that motivation. ¶¶211-24.

The Complaint adds new allegations that Rio sought to prevent any "leaks," about the cost overruns and delays through a project code-named "Barracuda." Both Jacques and Soirat participated in the decision to launch this project, and the Complaint cites emails showing that Rio misrepresentations concerned facts that were "super important to the government." ¶¶21, 195, 227-30, 310. These communications reflect Jacques' direct knowledge of the problems at OT and his desire to conceal them. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198 (S.D.N.Y. 2010) ("direct conversations" with and "meetings" attended by defendants demonstrate "access to and actual knowledge of facts which contradicted their public statements").

The allegations further reflect that Jacques had a unique, personal motivation to conceal the truth and actively participated in doing so. Every corporate executive may be motivated to avoid routine regulatory investigations, but Jacques was uniquely personally motivated to avoid the wrath of the Mongolian Government upon the implosion of the crown jewel of his career. *See, e.g., In re Didi Global Inc. Sec. Litig.*, 2024 WL 1119483, at *16-17 (S.D.N.Y. Mar. 14, 2024) (noting "*specific* economic motives alleged . . . are not so general that they could be imputed to any company or its officers" in finding motive and opportunity) (emphasis in original); *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) (motive where defendant had "different incentives from a generic corporate insider"); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't., Inc.*, 477 F. Supp. 3d 123, 137-38 (S.D.N.Y. 2020) (motive to falsely dampen "impact" of "troubling" news "perfectly plausibly supports an inference of scienter"). The totality of these allegations supports recklessness under Second Circuit law. *See Puddu v. 6D Global Techs., Inc.*, 742 F. App'x 553, 556 (2d Cir. 2018) (allegations implying defendants "intentionally concealed" shareholder's control of company supported recklessness).[4]

---

[4] *See also In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018) (even weak motive allegations support scienter when accompanied by allegations of "circumstantial

The Complaint's additional factual allegations concerning Jacques' scienter, taken together with the facts previously alleged in the SAC, amply support a strong inference of scienter under *Tellabs'* holistic analysis and the Second Circuit's motive and opportunity and conscious misbehavior or recklessness test. *See Turquoise Hill*, 625 F. Supp. 3d at 235.

## B. Defendants' Scienter Arguments Are Meritless

Faced with the new allegations against Jacques, which when considered with the prior allegations create a strong and compelling inference of scienter, Defendants fail to support an innocent inference that is *stronger* than the Complaint's inference, as is their burden under *Tellabs*.

First, Defendants' argue that "general allegations" of Jacques "'closely monitor[ing]' the progress of the mine and received 'reports' during the Class Period due to his position on the IC" are insufficient (D. Br. at 8). This ignores the detailed allegations summarized above about the facts reported by the TEG, ▇▇▇, and others to the IC, including Jacques, demonstrating that the mine was far behind Rio's public schedule and far over budget during the Class Period.

If anything, the cases Defendants cite underscore why scienter *is* sufficiently alleged here, as the specific, detailed reports Jacques received that contradicted Rio's public statements are absolutely nothing like the "conclusory," unspecified, unconnected, or nonexistent "reports" in Defendants' cases. *See* D. Br. at 8-13; *cf. Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Comm.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (complaint "makes no reference to internal CIBC documents or confidential sources"); *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010) (unspecified "internal reports" without

---

evidence of recklessness and misconduct that strongly buttress the motive alleged"); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *25 (S.D.N.Y. Dec. 2, 2013) (allegations that defendants "recklessly (or even intentionally) concealed the repudiation with knowledge that this omission posed a high danger of misleading investors" was "easily sufficient"); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 294 (E.D.N.Y. 2023) (inference of recklessness raised where defendants received emails and "acquiesced" to certain conduct related to anti-competitive practices were "assess[ed] holistically").

allegations of their "content" or "connection" to misstatements); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) (no allegation concerning the "content of the reports, the date of the reports, or whether . . . Defendants ever read the reports"); *Maloney v. Ollie's Bargain Outlet H'gs, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) ("complaint fails to specify exactly what information was contained in the report or how said information 'contradicted Defendants' public statements'"); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 618 (S.D.N.Y. 2008) ("Plaintiffs identify no internal reports of which defendants were aware and failed to disclose, and do not indicate specific data used by defendants").

Recognizing that the Complaint's allegations concerning the TEG alone doom their motion, Defendants improperly ask the Court to consider an exhibit purporting to be the TEG report in the Complaint, and then mischaracterize that document by contending it was only "preliminary" and that the schedule delays it identified were not framed as "certain or based on concrete problems." D. Br. at 9. Setting aside that Defendants' attempt to cite this document to contradict the allegations in the Complaint is patently improper (*see, e.g.*, *Nw. Biotherapeutics*, 2023 WL 9102400, at *10-12), Defendants are wrong about the TEG. The TEG was the formal body set up by Rio to do the very kind of schedule and cost review it performed here (¶¶10, 53), was comprised "a group of experienced experts" who regularly reviewed the project before and during the Class Period (¶333), and provided the very expertise and judgment Defendants cannot wish away on a Rule 12(b)(6) motion. Rather, the reality and only reasonable inference from the facts alleged is that any "hedging" language by the TEG cuts against Jacques—as the TEG was concerned the delays and cost overruns were even worse. *See* ¶177.[5]

---

[5] Defendants do not contend the TEG report included as Defendants' Ex. 1 is a "written instrument" or subject to judicial notice (it clearly is neither) and, on that basis alone, the document cannot be considered. D. Br. at 9-10; *Doe*, 2021 WL 1226384, at *10; *Nw. Biotherapeutics*, 2023 WL 9102400, at *10-12.

Indeed, Defendants' urged inferences are contradicted by the TEG report, which confirms that there was a five-month delay in November 2017, that the delay had grown to "12 months" by May 2018, that there was a 15-month delay by October 2018, that the problems, delays and cost overruns were only getting worse, and that Rio's "planned improvements" amounted to wishful thinking disproven by Rio's experience to-date. ¶177 ("the project's critical path is becoming more complex as more tasks are falling onto or becoming close to critical path"; "non-critical items . . . have been brought forward to maintain progress . . . which will inhibit future spend on other elements"; "planned improvements are likely to be offset by unforeseen emerging issues as they were between 2017 and 2018"). Indeed, Defendants' argument that the Complaint "lacks detail" because it does not allege "how long the purported delay was" in May 2018 (D. Br. at 11) is simply untrue—the Complaint alleges the TEG concluded there was a 12-month delay by that time, precisely as Bowley reported to Soirat and as Plaintiff amply alleges. ¶¶160-61, 175 (identified delays put schedule "at least 12 months behind the original OT schedule" as of May 2018).

Defendants next attempt to bolster their improper argument that a document the Court cannot consider contradicts the Complaint by incorrectly claiming that the only statements the Court previously sustained "relating to the mine's schedule and budget are statements of opinion reflecting future expectations for the complex project." D. Br. at 10. This is wrong. The Court never ruled these statements were opinions, *Turquoise Hill*, 625 F. Supp. 3d at 228; it in fact sustained Rio's false risk disclosure and reforecast statements, *see id.* at 224-32, which included actionable "embedded statements of fact" that are not opinions; and, in any event, the Complaint actually pleads extensive new facts concerning Jacques' scienter as to Shaft 5 and Rio's false

21

"underground conditions" narrative. *See, e.g.*, ¶¶175-82 (Jacques overseeing false "ground conditions" statement); ¶299 (delays to Shaft 5); ¶328 (allegations of ground conditions "story").[6]

In any event, Jacques' involvement in suppressing the adverse facts reported by the TEG distinguishes the Complaint from Defendants' opinion cases—*Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021), which concerned whether the CEO agreed with two employees who said a target was impossible, and *Kasilingam v. Tilray, Inc.*, 2021 WL 4429788, at *12 (S.D.N.Y. Sept. 27, 2021), where plaintiff alleged only an "unsupported, generic allegation" that an employee objected to an accounting decision for unspecified reasons. D. Br. at 10-11. Of course, *Tesla* and *Tilray* are also inapposite because the Court here has already sustained allegations that Defendant Soirat, who worked with Jacques to address the OT delays and keep them a secret (¶¶154-55, 227-28), had "actual knowledge" of them. *See Turquoise Hill*, 625 F. Supp. 3d at 228.

Defendants' argument that the TEG report undermines scienter concerning Defendants' statements about the budget is similarly without merit. D. Br. at 10. The TEG confirmed that never in Rio's complex project history had a delay not led to a cost overrun, that there were already confirmed cost overruns based on expenditures for the "restart, additional ground support and associated expenses," and that it would not be remotely credible for the budget to hold "in the face of a likely 20% schedule over-run." ¶179. The funding shortfall highlighted the severity of these problems, including because "2019 will be the highest spend year in the project" and past spending on non-critical items "brought forward to maintain progress" had "inhibit[ed] future spend." ¶177.

---

[6] Defendants' footnote argument (D. Br. at 10 n.7) that there are no additional allegations concerning Jacques' scienter for Rio's false ground conditions narrative is perplexing given the new allegations (*e.g.*, ¶¶174-82), and seems to rest on an incorrect interpretation of the Court's prior decision, which held Defendants' ground conditions statements "were false and misleading as they implied that the delays and cost overruns were primarily caused by ground conditions when they were actually primarily caused by engineering, procurement, and constructions problems." *Turquoise Hill*, 625 F. Supp. 3d at 232.

Defendants' counterfactual argument is wrong, is contradicted by the Complaint, and cannot be credited. *See Doe*, 2021 WL 1226384, at *8-12; *Ma*, 718 F. App'x at 23.[7]

Defendants next argue that reports to Jacques from ██████ who reported directly to Jacques, showing delays in Shafts 2 and 5 and problems with Shaft 2 steel, did not state that "the mine as a whole was behind schedule." D. Br. at 13. This assertion is wrong and contrary to the Complaint, which alleges the opposite. Again, Defendants do not claim these emails are "written instruments" or subject to judicial notice (nor could they), and they cannot be considered. In any event, in reality, the reports ████ provided to Jacques confirmed what was happening at OT—as ████ "knew things were delayed" in 2017, was "100% aware" of the problems with Shaft 2, and ████ himself in April and May 2018 expressed how "disappointed," "extremely disappointed," and "frustrated" he was about the delays he observed. ¶¶99-100, 105-06. Defendants' argument also ignores that Shafts 2 and 5 were both critical-path elements of the underground project because Shaft 2 was necessary for moving workers, equipment, and material between the surface and the underground working areas, and Shaft 5 was necessary for ventilation—until it was complete, ventilation ducts had to go through Shaft 2, further impeding work underground. ¶¶93-106. Thus, ████ reports informed Jacques that delays in critical elements of the project were blocking the start of subsequent essential underground components.

Defendants go even further to counterfactually claim the reports show that "construction was overall ahead of schedule" and that "mitigation plans" were being prepared at the time of one

---

[7] Defendants cite an SEC filing (Ex. 3, which is subject to judicial notice but cannot be considered for its "truth") to argue Rio belatedly disclosed the funding shortfall five months later in February—but again, that only undercuts an innocent inference. *See, e.g.*, ¶¶255-60 (February corrective disclosure triggered by whistleblowing). In any event, because the shortfall was caused by the delays and made Jacques aware of them, Defendants' cases (alleging "reports" but no facts about what they said) are inapposite. *See Maloney*, 518 F. Supp. 3d at 781; *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020).

of the reports. D. Br. at 14. But the Complaint alleges the opposite, and the TEG's finding that Rio padded the reported hours worked—which were provided in order to "maintain progress" but did not "reflect completion of critical path or complex items"—refutes Defendants' implausible and demonstrably incorrect claim that construction was ahead of schedule. ¶177. Rather, as the Complaint alleges, the progress at OT was so woefully behind schedule that Rio secretly conducted a "reforecast" of the schedule in November 2017—which was reported to Defendant Jacques— and the internal reports to Jacques against that secret "re-forecasted" FC1 schedule do not remotely suggest Jacques remained ignorant of the truth. *See, e.g.*, ¶¶183-89, 208, 306 (describing "re-forecast" and the "misleading" nature of the FC1 progress reporting).

Indeed, Defendants' argument highlights exactly why the Federal Rules and Second Circuit case law narrowly circumscribe the documents properly considered on a motion to dismiss, and how they can be considered if at all. Here, Defendants' arguments inappropriately rely on progress "metrics" in discovery documents that Plaintiff specifically alleges—based on the TEG's statement and other allegations in the Complaint (¶¶177, 183-89, 208, 306)—were false and misleading. Defendants use these metrics in an attempt to rebut the well-pleaded allegation that Jacques was told that the project was much further behind schedule than he was telling investors. The Court cannot consider Exhibits 4-6, cannot credit as "truthful" statements the Complaint alleges were misleading, and must draw all factual inferences in Plaintiff's favor. *See Ma*, 718 F. App'x at 23; *Nw. Biotherapeutics*, 2023 WL 9102400, at *8-11.[8]

---

[8] The reports are not "written instruments," and are not subject to judicial notice because Plaintiff disputes the authenticity and veracity of Exhibits 4-6. Among other things, Exhibits 4-6 are not the same versions of similar reports in Jacques' custodial files, which differ in meaningful respects from those reflected in Exhibits 4-6. *See, e.g., Nw. Biotherapeutics*, 2023 WL 9102400, at *8-11. In any event, the differences between the facts here—where never in Rio's history had a project gotten back on track—and Defendants' case, *In re Barrick Gold Corporation Securities Litigation*, 341 F. Supp. 3d 358, 379 (S.D.N.Y. 2018)— where the company had previously and repeatedly "caught up" to meet production targets—underscore why scienter is adequately alleged.

Defendants also argue that Jacques would have had no motive "to conceal issues with the mine that would inevitably come to light" (D. Br. at 16), but this argument runs afoul of the rule that no motive allegations are required where recklessness or deliberate wrongdoing is alleged. *See Turquoise Hill*, 625 F. Supp. 3d at 235. What's more, it is not uncommon to conceal bad news in the hope that later developments will make it unnecessary ever to reveal the truth:

> The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (Posner, J.).

Last, Defendants' urged "innocent" inference is not only contradicted by the Complaint but also requires numerous leaps of logic—requiring the Court to infer that Jacques was in the dark about the true status of the OT despite his intimate involvement in his career-defining project, the direct reports he received demonstrating it was failing, his oversight of Rio's efforts to prevent "leaks" and the "word from spreading out" about the delays, and his personal involvement in the false statements that were made precisely because they were "important" to the Mongolian Government. That inference is implausible, and should be rejected. *See, e.g., Okla. Firefighters Pension Fund & Ret. Sys. v. Musk*, 2023 WL 6393865, at *15-16 (S.D.N.Y. Sept. 29, 2023) (rejecting opposing inference); *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320-21 (S.D.N.Y. 2013) (innocent inference of "genuine belief" was issue for fact finder).[9]

---

[9] Defendants' cases crediting an innocent inference only underscore the strength of the allegations concerning Jacques, as those cases do not involve any facts like those here. *Cf. In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1116-17 (10th Cir. 2015) (alleging no internal reports, relying solely on supposedly "obvious nature" of problems and core operations); *Gluck v. Hecla Mining Co.*, 657 F. Supp. 3d 471, 486-87 (S.D.N.Y. 2023) (alleging no facts showing statements were false or defendants were aware of problems before disclosing them); *In re Garrett Motion Inc. Sec. Litig.*, 2022 WL 976269, at *13 (S.D.N.Y. Mar. 31, 2022) (illogically alleging defendants were motivated by compensation packages to conceal company's inevitable failure where compensation would not vest before company collapsed).

Defendants' innocent inference is contrary to the facts, and at best a matter for the jury.

## IV.    LEAD PLAINTIFF ADEQUATELY ALLEGES RIO'S DRAWBELL RESEQUENCING STATEMENT WAS FALSE

In the earlier Order, the Court held that Defendants' statements concerning the date of the first drawbell as reported on October 15, 2018 were not false because "Plaintiffs do not actually claim that the resequencing of the drawbell schedule, which was publicly disclosed, was misleading or false." *Turquoise Hill*, 625 F. Supp. 3d at 231. Again ignoring the standards on a Rule 12(b) motion, Defendants make a series of arguments, all of which fail.

### A.    The PSLRA Safe Harbor Does Not Apply to the Drawbell Resequencing Misstatement

First, Defendants argue that "the Court has already determined" that the PSLRA Safe Harbor applies. D. Br. at 17. Defendants are wrong. In its prior decision, the Court held only that the portion of the statement asserting the drawbell schedule "remained on track for mid-2020" was forward-looking. *Turquoise Hill*, 625 F. Supp. 3d at 224-25. But the Complaint now alleges that a separate portion of the statement—that the drawbell deadline would hold because Rio implemented "a change in the draw bell sequencing strategy"—was false because, in truth, that "strategy had been abandoned," pushing the deadline out eight months. ¶196. That is a misrepresentation of presently existing fact, as the sequencing strategy was not in place and had been rejected—and the "misleading nature of the statement could be verified the moment it was made." *Vivendi*, 765 F. Supp. 2d at 569-70; *see also In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2012 WL 2512280, at *9 n.141 (S.D.N.Y. June 29, 2012) (misstatement is "only partially forward-looking and not protected"); *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *18 (S.D.N.Y. Sept. 30, 2021); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010).

Thus, neither the Safe Harbor nor any "actual knowledge" requirement applies. D. Br. at 15, 17.[10]

## B. The False Drawbell Resequencing Statement Was Made by Rio

Next, Defendants argue that, even with the Complaint's new falsity allegations, the October 15 drawbell resequencing misstatement cannot support a claim against Rio because it "was made by Turquoise Hill, not Rio." D. Br. at 18. Not so.

In the earlier Order, the Court found that "statements that Turquoise Hill made to investors, *which it explicitly attributed in some form to Rio*," can support a claim.[11] Here, the press release containing the misstatement at issue was "a disclosure that TRQ explicitly attributed to Rio when announcing the re-forecast on October 15." ¶¶195, 368 ("Rio Tinto, in its role as manager of Oyu Tolgoi . . . has undertaken its second annual schedule and cost re-forecast . . . Rio Tinto has notified Turquoise Hill [that] First draw bell remains on track for mid-2020, partly due to a change in the draw bell sequencing strategy."). Moreover, the Complaint amply alleges the statement was in fact "made" by Rio, as it was the very statement Rio convinced Quellmann to issue because Rio knew it was "super important to the government" (¶195) and was described internally by Rio's executives as "our" statement. ¶181 (reporting to Jacques that Quellmann "will align his wording on first drawbell to ours"). And although the Court denied leave to amend as to certain statements

---

[10] Indeed, this is the very kind of "severable" misstatement the Court suggested would be actionable (*Turquoise Hill*, 625 F. Supp. 3d at 211 n.14) and Defendants did not previously argue this portion was forward-looking—but rather relied heavily on the supposedly factually true "strategy" to claim Rio's drawbell "projections" were plausible. ECF No. 137 at 23-24.

[11] In the earlier Order, the Court held that certain statements explicitly attributed to Rio were inactionable, but only because they were forward-looking. *See Turquoise Hill*, 625 F. Supp. 3d at 207-08 & n.11. As explained above, the alleged drawbell resequencing misstatement is not forward-looking.

issued by Turquoise Hill (ECF No. 325 at 7-11), the October 15 misstatement was not one of them, *see id.* at 8 (omitting October 15 statement), as Defendants concede by moving to dismiss it now.[12]

### C.    Defendants' Counterfactual Falsity Arguments Fail

Defendants last attack the October 15 drawbell resequencing misstatement (D. Br. at 18) by improperly introducing a discovery document that was not cited in the Complaint to dispute the Complaint's allegation that "Rio had already concluded that the change in the draw bell sequencing strategy had been abandoned." ¶196. This improper tack should be rejected as well.

The allegation that "Rio had already concluded that the change in the draw bell sequencing strategy had been abandoned" is supported by specific averments of fact—namely, that Rio's technical committees had rejected it. ¶196. Rio's head of Underground Mining, ███████████, who sat on the TAC (together with TAC chair ███████████ who served on the IC with Jacques), reported this directly to Rio's senior leadership in connection with the October 15 reforecast—and reacted with disbelief when he saw what Rio actually disclosed to investors, exclaiming with clear sarcasm, "Whatever works!" ¶¶53, 196, 203-04, 274. These are well-pled factual allegations; the Court must accept them as true and draw all reasonable inferences in Plaintiff's favor. *See Nw. Biotherapeutics*, 2023 WL 9102400, at *7; *Ma*, 718 F. App'x at 23.

Defendants' attempt to manufacture a counterfactual argument that the strategy was still "under consideration" based on the email they offer as Exhibit 7 fails for multiple reasons. First, Defendants do not contend Exhibit 7 is a "written instrument" that is "incorporated by reference" or "integral" to the Complaint—nor could they—and it cannot be considered for this reason. *Nw. Biotherapeutics, Inc.*, 2023 WL 9102400, at *7. Moreover, Defendants are wrong that Exhibit 7

---

[12] Indeed, Plaintiff lacked an adequate basis to allege Rio abandoned the strategy prior to receiving discovery showing that this was the case, and thus would not be precluded under the Order's reasoning from asserting this statement now because discovery was clearly "necessary to bring" the claim. *Id.* at 11.

was even referenced in the Complaint—indeed, it is dated *after* the discovery documents on which Plaintiff relied. Because Exhibit 7 is not referenced in the Complaint, it is obviously not "integral" to it, and Defendants do not (and cannot) argue it is judicially noticeable. Second, even if Exhibit 7 could be considered, which it cannot be, Plaintiff disputes its authenticity, accuracy, and relevance, and thus the Court cannot credit Defendants' arguments based on it over the Complaint's allegations. *See Ma*, 718 F. App'x at 23.[13]

Plaintiff has alleged facts that, when accepted as true, plead the falsity of the misstatement that the first draw bell "remained on track for mid-2020, partly due to a change in the draw bell sequencing strategy" (¶195)—a statement that is clearly alleged as false in light of the fact that Defendants had abandoned the draw bell sequencing strategy before the statement was made. *See, e.g.*, *Iowa Pub. Empls' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 143-44 (2d Cir. 2010); *In re AppHarvest Sec. Litig.*, 2023 WL 4866233, at *17. (S.D.N.Y. July 31, 2023).[14]

### D.    The Complaint Adequately Alleges Scienter for the October 15 Misstatement

Defendants then argue that the Complaint does not show that the Rio Defendants knew that the October 15 misstatement regarding the first drawbell date was false. D. Br. at 15. This argument fails because the Complaint makes clear the resequencing strategy was rejected days *before* the October 15 misstatement—and ▬▬▬▬▬▬ (as well as the other members of the TAC's) actual knowledge of this fact is alone sufficient to allege scienter, as ▬▬▬ was a senior corporate

---

[13] For example, a version of the email quoted in ¶196 submitted in support of Plaintiffs' previous motion for class certification (ECF No. 292-5) does not contain the text Defendants ask the Court to consider. *See* D. Br. at 18. The hearsay statements about the purported knowledge of participants discussed in the email will be the subject of discovery, and are at best a matter for summary judgment or trial. *See Chambers v. Time Warner, Inc*., 282 F.3d 147, 154-55 (2d Cir. 2002) (consideration of extrinsic documents requires court to convert motion into one for summary judgment and provide full opportunity for discovery).

[14] Defendants also wrongly cite Ex. 7 to argue that, because it was dated in November, it cannot support the falsity in October. D. Br. at 18. But Defendants are wrong, as the Complaint alleges the decision to abandon the strategy was made on October 12 and 13, 2018 (¶196), and the fact that there is a later-dated email referencing that previous decision supports, rather than undermines, that it was rejected earlier.

officer responsible for drafting Rio's public disclosures about the drawbell strategy. *See, e.g.*, ¶¶196, 274, 327-28 (describing ███████ position, role, and involvement in the misstatement); ¶53 (describing TAC member's role on IC); *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (scienter of non-speaking corporate officers involved "may also be imputed to the corporation"); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372-73 (S.D.N.Y. 2012) (knowledge of non-speaking executives established corporate scienter).

Moreover, as noted above, Defendants' statements about the resequencing strategy were false statements of present fact, and thus the Safe Harbor's "actual knowledge" requirement does not apply. As the Court previously held with respect to Defendant Soirat, given the Executive Defendants' involvement in issuing the false October 15 "re-forecast"—which depended upon the rejected resequencing strategy—the Complaint adequately alleges recklessness. *Turquoise Hill*, 625 F. Supp. 3d at 242-46. Indeed, in light of the reports by the TEG and Defendants' intense focus on maintaining the drawbell deadline as a "super important" "symbol" for the government, a message Jacques was involved in overseeing (¶181), they clearly had a duty to inquire whether the basis of the deadline had been rejected—and it is inconceivable and contrary to the reasonable inferences from the alleged facts that they did not know it was. *See, e.g.*, ¶¶174-96, 203-04, 296-318, 324-25; *Turquoise Hill*, 625 F. Supp. 3d at 242-43 (finding allegations that reports of delays, Bowley's firing, and involvement at OT support actual knowledge and recklessness); *Freudenberg*, 712 F. Supp. 2d at 198-201.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Dated: April 22, 2024                    Respectfully submitted,

                                         **BERNSTEIN LITOWITZ BERGER**
                                         **& GROSSMANN LLP**

                                         */s/ Salvatore J. Graziano*

                                         Salvatore J. Graziano
                                         James A. Harrod
                                         Michael D. Blatchley
                                         Jai K. Chandrasekhar
                                         Alexander Noble
                                         1251 Avenue of the Americas, 44th Floor
                                         New York, NY 10020
                                         Telephone: (212) 554-1400
                                         Facsimile: (212) 554-1444
                                         salvatore@blbglaw.com
                                         michaelb@blbglaw.com
                                         jim.harrod@blbglaw.com
                                         jai@blbglaw.com
                                         alexander.noble@blbglaw.com

                                         *Lead Counsel for Lead Plaintiff and the Class*