**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| IN RE TURQUOISE HILL RESOURCES LTD. SECURITIES LITIGATION | Case No. 1:20-cv-08585-LJL<br><br>ORAL ARGUMENT REQUESTED |
|---|---|

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT ........................................................................................................... 2

I. THE COURT MAY CONSIDER DOCUMENTS QUOTED AND RELIED ON BY PLAINTIFFS IN THE TAC .............................................................................. 2

II. PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF JACQUES' SCIENTER ............................................................................................... 6

A. The Opposition Confirms Plaintiffs' Failure To Add Motive Allegations .............. 6

B. Plaintiffs Fail To Plead Conscious Misbehavior Or Recklessness .......................... 7

C. Plaintiffs Ignore More Plausible, Non-Fraudulent Inferences ............................... 14

III. PLAINTIFFS' DRAW BELL SEQUENCING ALLEGATIONS FAIL .......................... 14

A. Rio Tinto Cannot Be Liable for the Draw Bell Resequencing Statement ............. 14

B. The PSLRA Safe Harbor Applies ........................................................................ 17

C. Plaintiffs Fail to Adequately Allege Falsity ......................................................... 18

D. Plaintiffs Fail to Adequately Allege Scienter ....................................................... 19

CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008)....................19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)....................3

*In re Barclays PLC Sec. Litig.*,
2024 WL 757385 (S.D.N.Y. Feb. 23, 2024)....................10

*Barrett v. PJT Partners Inc.*,
2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017)....................20

*In re Barrick Gold Corp. Sec. Litig.*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018)....................12

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)....................8

*Bravo v. Established Burger One, LLC*,
2013 WL 5549495 (S.D.N.Y. Oct. 8, 2013)....................16

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012)....................13

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)....................3

*Chapman v. Mueller Water Products, Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)....................10

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*,
2021 WL 212337 (S.D.N.Y. Jan. 21, 2021)....................14

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't., Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)....................6

*Collier v. ModusLink Glob. Sols., Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014)....................13

*Daniels v. Kijakazi*,
2023 WL 3901987 (S.D.N.Y. June 8, 2023)....................4, 9

*DF Ventures, LLC v. Aaron & Gianna, PLC*,
2024 WL 916343 (S.D.N.Y. Mar. 4, 2024) ....................3

*In re Didi Global Inc. Sec. Litig.*,
2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) ....................6

*Dikambi v. City Univ. of New York*,
2022 WL 2292873 (S.D.N.Y. June 24, 2022) ....................17

*Doe v. NYU*,
2021 WL 1226384 (S.D.N.Y. Mar. 31, 2021) ....................4, 18

*Doe v. Yeshiva Univ.*,
2023 WL 8236316 (S.D.N.Y. Nov. 28, 2023)....................4

*Faiaz v. Colgate Univ.*,
64 F. Supp. 3d 336 (N.D.N.Y. 2014)....................3

*Garber v. Legg Mason, Inc.*,
537 F. Supp. 2d 597 (S.D.N.Y. 2008)....................9

*Geiger v. Town of Greece*,
311 F. App'x 413 (2d Cir. 2009) ....................3

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................13

*Gray v. Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020)....................4

*Kleinman v. Elan Corp.*,
706 F.3d 145 (2d Cir. 2013)....................3

*Lehmann v. Ohr Pharm., Inc.*,
830 F. App'x 349 (2d Cir. 2020) ....................19

*Lynch v. City of New York*,
952 F.3d 67 (2d Cir. 2020)....................4

*Moore v. Hadestown Broadway Ltd. Liab. Co.*,
2024 WL 989843 (S.D.N.Y. Mar. 7, 2024) ....................4, 5

*Moraes v. White*,
571 F. Supp. 3d 77 (S.D.N.Y. 2021)....................4

*Northwest Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023) ....................5

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ........................................................................10

*Palm Beach Strategic Income, LP v. Salzman*,
457 F. App'x. 40 (2d Cir. 2012) ........................................................................15

*Pirnik v. Fiat Chrysler Autos., N.V.*,
2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ........................................................................14

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010) ........................................................................13

*In re Pretium Res. Inc. Sec. Litig.*,
2020 WL 953609 (S.D.N.Y. Feb. 27, 2020) ........................................................................11

*Ruderman v. Liberty Mut. Grp., Inc.*,
2022 WL 244086 (2d Cir. Jan. 27, 2022) ........................................................................4

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996) ........................................................................8

*Searle v. Red Creek Cent. Sch. Dist.*,
2023 WL 3398137 (2d Cir. May 12, 2023) ........................................................................4

*Shreiber v. Synacor, Inc.*,
832 F. App'x. 54 (2d Cir. 2020) ........................................................................10

*Siino v. Bd. of Trustees of New York City Teachers' Ret. Sys.*,
2009 WL 734076 (S.D.N.Y. Mar. 13, 2009) ........................................................................17

*Skiadas v. Acer Therapeutics Inc.*,
2020 WL 3268495 (S.D.N.Y. June 16, 2020) ........................................................................6

*Thomas v. Shiloh Indus., Inc.*,
2018 WL 4500867 (S.D.N.Y. Sept. 19, 2018) ........................................................................20

*Villare v. Abiomed, Inc.*,
2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ........................................................................11

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ........................................................................10

**Rules / Statutes**

15 U.S.C. 78u-5(i)(1)(B) ........................................................................18

Fed. R. Civ. P. 9(b) ........................................................................6

Fed. R. Civ. P. 10(c) ....................................................................................................................3

Fed. R. Civ. P. 12(b)(6)....................................................................................................................4

Defendants Rio Tinto plc and Rio Tinto Limited (together, "Rio Tinto"), Jean-Sébastien Jacques and Arnaud Soirat (collectively, "Defendants") respectfully submit this reply memorandum of law in support of their Motion to Dismiss Plaintiffs' Third Amended Complaint (ECF No. 333, "Motion to Dismiss" or "Mot.").

## PRELIMINARY STATEMENT

Even with the benefit of additional pages, the Opposition's attempts to pad and weave together the TAC's[1] allegations to cure the deficiencies Defendants identified in their Motion to Dismiss fail. Plaintiffs' TAC attempts to add allegations sufficient to plead scienter for Jacques and to allege that Rio Tinto should be liable for a purported misstatement made by Turquoise Hill, but as explained herein, Defendants' Motion to Dismiss demonstrated those allegations fall far short of establishing a strong inference that Jacques intended to deceive investors, or that the alleged misstatement was either actionable against Rio Tinto or adequately alleged to be false.

*First*, the Court should reject Plaintiffs' request that the Court ignore the documents Defendants rely on in their Motion to Dismiss—the very same documents that Plaintiffs ***themselves*** quote and rely on in their TAC. Because the handful of documents Defendants cite in their Motion to Dismiss are unquestionably known to Plaintiffs, relied on in the TAC, and integral to their new allegations, the Court may—and should—consider their entirety at this stage rather than the cherry-picked excerpts Plaintiffs selectively quote in the TAC. But even if the Court does not consider the exhibits to Defendants' Motion, the TAC's allegations fall short on their own.

*Second*, despite multiple bites at the apple, Plaintiffs still fail to allege with particularity facts establishing a strong inference of fraudulent intent for Jacques. The Opposition's attempt to repackage already rejected allegations that Jacques was motivated by a desire to avoid scrutiny

[1] Capitalized terms not defined herein have the meanings ascribed to them in Defendants' Motion to Dismiss the Third Amended Complaint. ECF No. 333.

from the Government of Mongolia fails. And although the Opposition lists various reports Plaintiffs allege Jacques would have received, Plaintiffs merely allege that Jacques received estimates of potential future delay from certain individuals or groups within Rio Tinto, not that everyone (or, critically, Jacques) believed further delay was likely to occur. Nor can Plaintiffs show such belief where the reports they rely on indicate that the mine was actually ***ahead of schedule overall***, and the estimates of potential future delays were preliminary.

*Third*, the Opposition's attempt to argue that Rio Tinto is liable for a statement made by Turquoise Hill regarding the draw bell sequencing strategy has already been rejected and fails on its face. This Court denied Plaintiffs leave to amend to add allegations that Rio Tinto was liable for Turquoise Hill's statements, and in any event, the Court has already found that this particular statement was not expressly attributed to Rio Tinto. Even if the statement were properly attributed to Rio Tinto, it is both forward looking and not alleged to be false or made with scienter. Plaintiffs' allegation that a committee within Rio Tinto had rejected the draw bell sequencing strategy does not show falsity or scienter: Plaintiffs nowhere allege that Rio Tinto, Turquoise Hill, or Oyu Tolgoi LLC had decidedly rejected the strategy, and the document relied on by Plaintiffs to allege this new misstatement confirms that Defendants were in fact still being told that strategy was in place.

## ARGUMENT

### I. THE COURT MAY CONSIDER DOCUMENTS QUOTED AND RELIED ON BY PLAINTIFFS IN THE TAC

In an effort to conceal that the TAC misleadingly cherry-picks quotes from documents produced in this action,[2] Plaintiffs ask the Court not to consider the Motion to Dismiss' exhibits—documents that Plaintiffs directly quote and rely on for their new allegations. Opp. 8-10.

[2] Defendants attached as Exhibits 2 and 3 SEC filings quoted and relied upon in the TAC. Plaintiffs do not argue that the Court cannot take judicial notice of and consider these filings.

Courts routinely consider documents on a motion to dismiss where those documents are known to plaintiffs, relied on in the complaint, and integral to the complaint's allegations. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint," the court may consider the documents on a motion to dismiss.) (internal quotation marks omitted); *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013) (on a motion to dismiss, the court may consider "statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit") (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)); *see also Geiger v. Town of Greece*, 311 F. App'x 413, 415-16 (2d Cir. 2009) (quoting from a document incorporates it into the pleading); *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 345 (N.D.N.Y. 2014) (court did not need to decide whether emails were "'instruments' for purposes of Rule 10(c) because [they were] all referenced in, and integral to, the complaint").

Here, Plaintiffs cannot dispute that they were aware of and relied on the few documents attached to Defendants' Motion to Dismiss. Indeed, the entire basis of the TAC was to reference documents Plaintiffs obtained in discovery. ECF No. 306 at 1-2. Exhibits 1, 4, 5, and 6 to Defendants' Motion to Dismiss are reports directly quoted in the TAC and relied on by Plaintiffs as a purported basis for allegations that Jacques' knowledge was inconsistent with his public statements. ¶¶ 174-79 (quoting Ex. 1), ¶ 298 (quoting Ex. 1), ¶ 299 (quoting Exs. 4-6). Exhibit 7 is correspondence quoted in the TAC and relied on by Plaintiffs to allege that the new purported misstatement regarding the draw bell sequencing strategy was false and made with fraudulent intent. ¶ 196 (quoting Ex. 7). *See DF Ventures, LLC v. Aaron & Gianna, PLC*, 2024 WL 916343

at *1 n.1 (S.D.N.Y. Mar. 4, 2024) (Liman, J.) (considering invoice on a Rule 12(b)(6) motion because complaint "makes clear, definite, and substantial reference to" the document).

Plaintiffs' argument that only contracts or other "written instruments" may be considered on a motion to dismiss (Opp. 8-10) is contrary to well-settled case law. *See, e.g.*, *Searle v. Red Creek Cent. Sch. Dist.*, 2023 WL 3398137, at *2 (2d Cir. May 12, 2023) ("the FAC relies heavily on both the January 14 Directive and the email communications, and the district court did not err in considering them"); *Doe v. Yeshiva Univ.*, 2023 WL 8236316, at *6 (S.D.N.Y. Nov. 28, 2023) (finding email chains "in plaintiff's possession and of which she had knowledge and are integral to the allegations of the Complaint . . . may be considered by the Court in deciding defendants' motions to dismiss under Rule 12(b)(6)"); *Daniels v. Kijakazi*, 2023 WL 3901987, at *2 (S.D.N.Y. June 8, 2023) (considering correspondence and employee review because they were referenced and relied on in complaint); *Moraes v. White*, 571 F. Supp. 3d 77, 92 (S.D.N.Y. 2021) (considering as "'integral' to the complaint" correspondence that was "quoted in part"); *Ruderman v. Liberty Mut. Grp., Inc.*, 2022 WL 244086, at *1 n.1 (2d Cir. Jan. 27, 2022) (district court did not err in considering correspondence integral to complaint); *Moore v. Hadestown Broadway Ltd. Liab. Co.*, 2024 WL 989843, at *8 (S.D.N.Y. Mar. 7, 2024) ("Plaintiff's citation to [email attached as exhibit to motion to dismiss] as factual support for several of her claims not only incorporates [that email] by reference but makes it integral to her Amended Complaint.").

Plaintiffs primarily rely on *Lynch v. City of New York*, 952 F.3d 67 (2d Cir. 2020), but in that case the Court declined to consider a memo book that was not integral to the claim.[3] Here,

[3] The finding that the documents in question were not integral to the claims distinguishes Plaintiffs' case law (Opp. 9-10) from the documents at issue here. *See Doe v. NYU*, 2021 WL 1226384, at *8-12 (S.D.N.Y. Mar. 31, 2021) (most exhibits to motion to dismiss were not integral to pleading and instead were outside complaint); *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382-84 (S.D.N.Y. 2020) (declining to consider documents where "Plaintiff does not rely on them for his Complaint, nor are they integral to his Complaint").

the documents attached to the Motion to Dismiss are integral to the new allegations in the TAC, as Plaintiffs rely on them to allege scienter against Jacques and to allege the purported falsity of the new alleged statement regarding the draw bell sequencing strategy. ¶¶ 174-79, 196, 298, 299. Critically, Plaintiffs never argue Exhibits 2, 4, 5 or 6 are not integral to the Complaint, and their arguments contesting Exhibit 7 fall flat because each version with the language Plaintiffs quote in the TAC does not support Plaintiffs' allegations when read in full (*see infra* at § III(C)). Further, cases post-dating *Lynch*, like *Searle* and *Yeshiva*, have confirmed that the Court is not limited to considering contracts to the exclusion of other types of documents. *See supra* at 4.

To avoid a "goose-gander" problem, Plaintiffs vaguely argue that the documents they quote in the TAC cannot be considered because they dispute the accuracy or authenticity of the documents, despite their production in this litigation. Opp. 3, 9, 24 n.8, 29. But Plaintiffs make no effort to explain what aspect of the documents they contest or why. In any event, these are not the kind of documents for which such a dispute should preclude consideration. Plaintiffs rely heavily on *Northwest Biotherapeutics, Inc. v. Canaccord Genuity LLC*, 2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023), which involved substantially different facts than those at issue here. There, defendants attempted to attach to their motion to dismiss OTC trading records from a database, which had not been produced in the action, and plaintiff disputed the authenticity of those records. *Id.* at *11 ("For example, Plaintiff claims that despite Defendants' contention that Exhibit 11 shows that the price of NWBO stock went up during the Example Episode on October 12, 2020, in fact the price went down.").[4] Here, Plaintiffs ***directly quote*** from documents Defendants produced to Plaintiffs and pulled from agreed-upon ESI sources, and Plaintiffs fail to

---

[4] *Northwest Biotherapeutics* is further distinguishable because the documents were not reports or communications produced in the action but rather "data tak[ing] the form of spreadsheets comprising thousands of individual bids and offers arrayed over twenty columns whose meaning is unexplained and unclear." 2023 WL 9102400 at *11.

explain how they could dispute their authenticity or accuracy.

The Court should reject Plaintiffs' invitation to don blinders and consider only the misleading portions of documents quoted by Plaintiffs and relied upon in their renewed attempt to allege Jacques' scienter and a new misstatement. However, even if the Court does not consider any of the contested exhibits to the Motion to Dismiss, the TAC's allegations still fail.[5]

## II. PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF JACQUES' SCIENTER

The Opposition cannot morph the TAC's allegations into anything resembling a strong inference of scienter for Jacques, as it cannot remedy the flaws that previously resulted in dismissal of the 10(b) claim against Jacques. MTD Order at 113-15. Plaintiffs have not supplemented their motive allegations with allegations of stock sales or any other cognizable theory of motive, nor have Plaintiffs identified (as the Court found they had for Soirat) contrary information conveyed directly to Jacques that informed him that Rio Tinto's disclosures were false and misleading.

### A. The Opposition Confirms Plaintiffs' Failure To Add Motive Allegations

The Court already held that allegations that Defendants were motivated "to avoid governmental and regulatory scrutiny are neither concrete nor personal to the defendants and are common to all corporate officers." MTD Order at 106; Mot. 7-8.[6] In an attempt to salvage these allegations in the TAC, Plaintiffs argue that while "[e]very corporate executive may be motivated to avoid routine regulatory investigations," "Jacques was uniquely personally motivated to avoid

[5] To the extent the Court is inclined to convert the Motion to Dismiss to one for summary judgment, Defendants respectfully request that the Court not consider the contested exhibits and evaluate the TAC's allegations under the pleading standards of Rule 9(b) and the PSLRA.

[6] The authority cited by Plaintiffs (Opp. 18) involve more specific motive allegations. *In re Didi Global Inc. Sec. Litig.*, 2024 WL 1119483, at *16-17 (S.D.N.Y. Mar. 14, 2024) ("concrete and personal economic motive" alleged where individual defendants would profit $4.4 and $1.1 billion respectively from successful IPO); *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) ("Defendants admitted in their SEC filings that they needed to raise funds for Acer to remain viable."); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't., Inc.*, 477 F. Supp. 3d 123, 137-38 (S.D.N.Y. 2020) (defendants had motive to hide failure of deal when they had falsely disclosed an agreement in principal to investors, and there was other evidence of actual knowledge and intent to defraud).

the wrath of the Mongolian Government upon the implosion of the crown jewel of his career." Opp. 18. But specifically identifying the government entity at issue or the mining project does not make the motive "concrete nor personal," as this Court has previously found. *See* MTD Order at 106 (rejecting allegations of motive specific to scrutiny by Government of Mongolia).

**B. Plaintiffs Fail To Plead Conscious Misbehavior Or Recklessness**

The Opposition's attempts to inflate the TAC's allegations regarding information allegedly received by Jacques does not cure Plaintiffs' failure to plead a strong inference of scienter. The Opposition confirms that while the new allegations plead that Jacques received reports and information about the mine, Plaintiffs still fail to allege he received information that would have informed him that his statements to investors were false. That is, Plaintiffs do not (because they cannot) plead that the reports he allegedly received informed Jacques that the schedule and budget were definitively out of alignment with Rio Tinto's disclosures. Thus, even if the Court declines to consider the substance of the reports relied on in the TAC, Plaintiffs' allegations fall short.

In any event, the context and content of the reports themselves further underscore Plaintiffs' pleading failures. Rather than establishing that Jacques knew Rio Tinto's disclosures were misleading, the reports establish that any information Jacques received that purportedly cut against Rio Tinto's disclosures was preliminary at best or related to a specific aspect of the mine, which could be made up for, rather than the project as a whole.[7]

1. Project Barracuda

Plaintiffs' attempt to transform their insufficient motive allegations regarding Rio Tinto's relationship with the Government of Mongolia into a theory that Jacques had "direct knowledge"

[7] As Defendants noted (Mot. 10 n.7), every single new scienter allegation relates to the schedule or budget of the mine, not whether any purported delays were caused by ground conditions, meaning Plaintiffs have failed to adequately allege Jacques' scienter as to statements related to ground conditions. Plaintiffs brush this off (Opp. 22 n.6), but none of the paragraphs cited by Plaintiffs reference ground conditions.

of the problems (Opp. 18) at Oyu Tolgoi fails. Plaintiffs argue that an email regarding Project Barracuda indicates Jacques had direct knowledge (Opp. 18), but ***Plaintiffs do not allege Jacques received that email***, which in any event merely reflected that the first draw bell was "important" to the Government of Mongolia. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) ("unsupported general claim of the existence of confidential company sales reports that revealed [unfavorable figures] is insufficient to survive a motion to dismiss"); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) (scienter not adequately alleged where complaint "does not allege . . . whether the Individual Exchange Act Defendants ever read the reports").

2. TEG Reports to Investment Committee

Plaintiffs' new scienter allegations rely heavily on purported reports provided by TEG to the IC, which Plaintiffs allege Jacques would have received. Opp. 12-14. But these allegations fall short of establishing fraudulent intent, as they merely establish that different groups within Rio Tinto had different projections regarding the schedule and budget for the project. Such variation is to be expected on a massive project like Oyu Tolgoi. In any event, the face of the documents provides a much more plausible inference: Jacques believed Rio Tinto's disclosures were accurate, and any preliminary estimates of potential delays were too nascent to be reported.

*First*, the Opposition emphasizes that the TAC "repeats the allegations about reports to Jacques in 2017" including that Jacques received a report from TEG in November 2017 indicating there was a five-month delay. Opp. 11-12. The Court already rejected allegations regarding information allegedly conveyed to Jacques in 2017, indicating he had reason to believe that the project could get back on track before the Class Period. *See* MTD Order at 113 ("Not only does

the SAC not allege that delays in 2017 were so significant that the project had no chance of getting back on track, but it actually supports the opposite inference[.]"); Mot. 11.[8]

*Second*, the Opposition argues that the TAC alleges the delays had "gotten worse" by May of 2018. Opp. 12. But the October 2018 report from TEG indicates that those delays were mitigated through "performance improvements." Mot. Ex. 1 at 2. And critically, absent from the TAC is any allegation of what that projection was based on, or how certain the projected delays were. Mot. 11; *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 615 (S.D.N.Y. 2008) (Plaintiffs must not only "specify the internal reports" but also "how firm the numbers were").

*Third*, although the TAC relies heavily on the October 2018 TEG report (the "October TEG Report"), Plaintiffs urge the Court not to consider the report itself in considering the Motion to Dismiss.[9] Opp. 20-21. But Plaintiffs cannot escape the October TEG Report's clear statement that ***only a nine-month delay had been definitively quantified by Rio Tinto's Growth and Innovation group***, which was precisely what was disclosed days later in the October 2018 reforecast. Mot. Ex. 1 at 1. Plaintiffs argue Defendants "mischaracterize" the document by "contending it was only 'preliminary'" (Opp. 20) but ignore that the face of the document says that TEG itself acknowledges the report was the result of only a "quick" and "light touch" review and that TEG did not have sufficient time or data for a full analysis of the implications to production ramp up. Mot. Ex. 1 at 1. The October TEG Report also says TEG believed the 9-month over-run (which was disclosed) "should be approved into the project control schedule." *Id.*

[8] Indeed, the October 2018 TEG report on which Plaintiffs rely makes clear that the "potential" five-month "risk" was addressed through "project improvements." Mot. Ex. 1 at 2.

[9] For the reasons explained above (*see supra* at § I), the Court may consider this report in connection with Defendants' Motion to Dismiss because Plaintiffs rely heavily on its terms to attempt to allege scienter for Jacques. Defendants also offer this report not for the truth of its contents, but rather for what information Jacques would have had access to, which is the relevant inquiry for scienter. *See Daniels v. Kijakazi*, 2023 WL 3901987, at *2 n.1 (S.D.N.Y. 2023) (considering correspondence and employee review because "the documents are referenced in the complaint, and court may consider them not for the truth of the matters asserted therein, but only for the fact that the statements were made") (quotation and citation omitted).

Plaintiffs' argument that Jacques should have known this disclosure of a nine-month delay was misleading because of a "quick" review projecting the potential for future delay[10] is misplaced.

*Finally*, even if the Court does not consider the content of the October TEG Report on which the TAC relies, the allegations regarding each report still fall short of alleging a strong inference that Jacques intended to deceive the market. Mot. 10-11. At most, Plaintiffs' allegations that TEG was projecting potential future delays merely constitute facts "cutting the other way." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015) ("An opinion statement [] is not misleading simply because the issuer knows, but fails to disclose, some fact cutting the other way."). Plaintiffs complain that the Court did not previously rule that this particular statement regarding the first draw bell and sequencing strategy was a statement of opinion.[11] Opp. 21. But well-established case law has established that "expectations and projections for the future" are "quintessential opinion statements." *Shreiber v. Synacor, Inc.*, 832 F. App'x. 54, 57 (2d Cir. 2020). Such statements are not made with scienter just because the speaker knows of information cutting the other way. *Chapman v. Mueller Water Products, Inc.*, 466 F. Supp. 3d 382, 404 (S.D.N.Y. 2020) (Liman, J.) (quoting *Omnicare*, 575 U.S. at 189); *see also Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) (defendant told by employee that projections were "impossible to achieve" insufficient where no facts alleged to establish CEO ever accepted or adopted those views).[12]

---

[10] Plaintiffs also ignore that while the TEG Report observes there may be future slippage, that is consistent with Rio Tinto's disclosures. Mot. 9-10.

[11] However, the Court previously acknowledged that estimates and projections are generally statements of opinion. MTD Order at 66.

[12] Plaintiffs attempt to distinguish *Wochos* by arguing that Jacques worked closely with Soirat, for whom the Court previously found scienter adequately alleged. Opp. 22. But Plaintiffs do not explain how Soirat's knowledge is relevant to the analysis of Jacques's scienter, nor can Plaintiffs plead scienter through proximity to another Defendant. *In re Barclays PLC Sec. Litig.*, 2024 WL 757385, at *16 (S.D.N.Y. Feb. 23, 2024) ("where there are multiple defendants, a plaintiff must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible") (quotations omitted).

In a complex project like Oyu Tolgoi, it was inevitable that different employees and groups within Rio Tinto would have different experiences, opinions, and projections. *See In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609, at *5 (S.D.N.Y. Feb. 27, 2020) ("access to countervailing information" is insufficient, and "[i]nsofar as increased tunneling and waste rock excavation weighed against a cheerful view of the mine plan's overall viability, Plaintiffs have not plausibly alleged that it pushed the scale's needle so far as to render continued faith in the plan unreasonable"); *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *23 (S.D.N.Y. Sept. 21, 2021) ("subjective assessments" of other employees cannot establish scienter because they do not establish "the mental states of [defendants]"). The fact that TEG projected ***potential*** delays greater than what Rio Tinto's Growth and Innovation Group projected (which was consistent with what was disclosed to investors) does not mean Jacques adopted TEG's projections and therefore intended to mislead the market.

3. Reports from [REDACTED].

Although Plaintiffs place great emphasis on reports provided by [REDACTED] to Jacques, these allegations that those reports reflected delays to certain aspects of the project cannot create a strong inference that Jacques knew the mine as a whole would be delayed or overbudget. Mot. 13-14; *see* ¶ 299 (reports indicated delays to Shaft #2 stripping and equipping, Bin 11 sinking, and Shaft #5 completion). Plaintiffs attempt to bridge this gap by arguing that ***the TAC*** (rather than any Rio Tinto document) alleges that the project as a whole was behind schedule (Opp. 23), but absent from the TAC is any allegation that [REDACTED] ***told Jacques*** that the entire project was delayed. In any event, at most, these reports merely contain facts "cutting the other way" from Defendants' disclosures, which is not sufficient to plead scienter. *See supra* at 10.

Further, the reports themselves show Jacques was told the project was ***ahead*** of schedule. Mot. 13-14; Mot. Exs. 4-6.[13] Plaintiffs complain that these metrics provided to Jacques were inaccurate (Opp. 8), but that is irrelevant to the Court's scienter analysis, which centers on what information Jacques had and what he was told, regardless of the truth of that information. Further, in January 2018, while there was a delay to Shaft 5 completion, Jacques was informed that "mitigation plans" were being prepared, which undermines Plaintiffs' scienter allegations. Mot. Ex. 4. *See In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 378-79 (S.D.N.Y. 2018) (inference of scienter undermined by focus on catching up behind target production).

4. Extension of Jacobs Contract

Plaintiffs' Opposition insists that Jacques should have known about delays because he was involved in securing a contract extension for Rio Tinto's contractor, Jacobs. Opp. 14. But Plaintiffs ignore Defendants' argument that the TAC fails to draw the connection between discussion in a June 2018 meeting that onboarding a new contractor would cause delays and Plaintiffs' allegation that Jacques should have known the project was already behind schedule. Mot. 14. Plaintiffs argue Jacques should have known as much because at the time there was "no time contingency left" in the schedule (Opp. 14), but absent from the TAC is any allegation that Jacques was told there was no contingency left. Further, no contingency left for future delays does not necessarily equate to being behind schedule. *See Maloney*, 518 F. Supp. 3d at 781 ("the complaint fails to specify exactly what information was contained in the report or how said information 'contradicted Defendants' public statements,' as is required to show scienter") (citation omitted).

[13] Plaintiffs claim Exhibits 4-6 are not the same versions of similar reports in Jacques' custodial files, but Plaintiffs do not (because they cannot) argue that the relevant portions cited in Defendants' Motion to Dismiss showing the project as a whole was ahead of schedule are not in every single version, including the version in Jacques' custodial file. Minor differences between versions are irrelevant when the relevant portions of the reports are the same across all versions.

5. Rio Tinto's Alleged "Stonewalling" and "Retaliation"

In an attempt to supplement their weak allegations as to Jacques' actual knowledge or intent to deceive investors, Plaintiffs fall back on allegations that Rio Tinto, not Jacques specifically, "refused to cooperate with the independent investigation conducted by the ICG" and "retaliat[ed] against Bowley and Duffy." Opp. 16. These allegations are not only inadequately pled but also do not add to the scienter calculus, as they say nothing about what specific contrary information Jacques had that would have made him aware his statements were false. The Court previously found that Bowley's firing shortly after he allegedly directly reported information to Soirat supported an inference of scienter (MTD Order at 110), but the TAC does not allege any information was reported directly from Bowley to Jacques or that Duffy reported any information directly to Jacques shortly before his termination. Without identifying specific actions by Jacques or linking the purported "retaliation" to any specific information conveyed to Jacques, this argument does not add to the scienter analysis. *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) ("plaintiffs must specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements") (quotations omitted).[14]

6. Jacques's "Professed Knowledge"

Plaintiffs make a last-ditch attempt to allege scienter by arguing that the fact that Jacques spoke about the schedule and budget means he must have been aware of the alleged delays. Opp. 16-17.[15] But if misstatements themselves could suffice to allege fraudulent intent, scienter would

---

[14] Plaintiffs' authorities on this point do not compel a different finding. *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 234 (S.D.N.Y. 2012) (evaluating claim under negligence standard, not heightened standard for pleading scienter, and drawing no connection between intent and alleged retaliation); *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 72 (D. Mass. 2014) (defendants alleged to have spoken to confidential witness directly in retaliation).

[15] Plaintiffs' allegations that Jacques' scienter can be inferred from the fact that he visited the mine is similarly baseless, as Plaintiffs do not allege what Jacques saw (or did not see) that should have alerted him to delays and budget overruns. *Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) ("Plaintiffs should, but do not, provide specific instances in which [defendant] received information that was contrary to [his] public declarations.").

be a foregone conclusion in every securities case premised on misstatements. *See, e.g.*, *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021) ("simply alleging that executive defendants are 'closely involved' in running their business is not enough to show that they had access to contrary information"), *aff'd sub nom. Town of Davie Police Officers Ret. Sys. v. City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan*, 2021 WL 5142702 (2d Cir. Nov. 5, 2021).[16]

### C. Plaintiffs Ignore More Plausible, Non-Fraudulent Inferences

Considering all the allegations in the TAC, it is still more plausible that Jacques did not know Rio Tinto's disclosures were false or misleading and believed the projections the company was providing to investors were accurate. *See Tellabs*, 551 U.S. at 310. Although the TAC identifies purported reports received by Jacques, not a single one is adequately alleged to have informed him that the Oyu Tolgoi project as a whole was inevitably behind schedule or over budget. Further, when such developments became clear, they were disclosed.

## III. PLAINTIFFS' DRAW BELL SEQUENCING ALLEGATIONS FAIL

Plaintiffs' Opposition concedes that Plaintiffs are not claiming Turquoise Hill's statement regarding the change in draw bell sequencing strategy rendered ***Rio Tinto's*** statements false, but rather that ***Rio Tinto is responsible for Turquoise Hill's*** statement. Opp. 26-28. But this sleight of hand is foreclosed by this Court's prior orders—and, even if it were not, it is not adequately alleged to be actionable and misleading. Mot. 16-19.

### A. Rio Tinto Cannot Be Liable for the Draw Bell Resequencing Statement

Plaintiffs' improperly renewed attempt to hold Rio Tinto liable for Turquoise Hill's

---

[16] Plaintiffs' authority (Opp. 17) is distinguishable because defendants in that case had admitted to installing a direct chain of information to top executives, making them aware of information contrary to their public statements. *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016).

statement regarding the plans and projections for the first draw bell is foreclosed by both the Court's MTD Order and more recent order regarding the scope of the TAC.

*First*, ***this Court already rejected Plaintiffs' attempt to add allegations attributing the draw bell sequencing statement to Rio Tinto***. ECF No. 325 (the "Amendment Order") at 7 (denying leave to add new "allegations that seek to impose liability on Rio Tinto for statements of Turquoise Hill"). Plaintiffs' assertion that the Court's Amendment Order "omitt[ed]" Turquoise Hill's October 15 drawbell sequencing statement from those statements as to which it denied leave to amend (Opp. 28) is false. The Amendment Order specifically identified the paragraph of the proposed TAC including Turquoise Hill's draw bell sequencing statement as a new allegation for which it was denying leave to amend. ECF No. 325 at 7 (denying leave to amend as to ¶ 379 of the proposed TAC, among other allegations seeking to hold Rio Tinto liable for Turquoise Hill statements); ECF No. 318-5 at ¶ 379 ("First draw bell remains on track for mid-2020, partly due to a change in the draw bell sequencing strategy."). Plaintiffs' argument (Opp. 28 n.12) that discovery was "necessary" to assert this new misstatement is merely a misplaced objection to the Court's Amendment Order, which already found Plaintiffs had the facts necessary to allege attribution long ago. ECF No. 325 at 7. The Court should reject Plaintiffs' brazen attempt to include theories of liability in the TAC that the Court has already ordered them to omit.[17] *See, e.g.*, *Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x. 40, 43 (2d Cir. 2012) ("District courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave for a limited purpose and the plaintiff filed an amended complaint exceeding the

[17] Defendants have certainly not "concede[d]" these allegations were properly added to the TAC. Opp. 28. Defendants previously argued that this alleged misstatement was made by Turquoise Hill, not Rio Tinto (Mot. 18), and operated under the good faith assumption that the draw bell sequencing allegations were included for the purpose of demonstrating falsity of *Rio Tinto's own statements*—rather than having been added, in brazen violation of this Court's prior order, to seek to hold Rio Tinto liable for Turquoise Hill's alleged misstatements.

scope of the permission granted."); *Bravo v. Established Burger One, LLC*, 2013 WL 5549495, at *5 (S.D.N.Y. Oct. 8, 2013) (noting that "[t]he power to dismiss claims that exceed a leave to amend stems from the Court's inherent authority" to enforce its orders and dismissing claims that "exceeded the scope" of the Court's leave to amend).

*Second*, even if the new allegation as framed in the Opposition did not violate the Amendment Order, the Court's MTD Order already found that Turquoise Hill's statement was not "expressly attributed" to Rio Tinto. The MTD Order is clear that Rio Tinto could only even potentially be liable for statements "expressly attributed" to Rio Tinto. MTD Order at 41. The MTD Order meticulously analyzed Turquoise Hill's October 15, 2018 press release (which contained the draw bell sequencing statement), concluding that only the specific sentences attributed to Rio Tinto could even theoretically give rise to liability. MTD Order at 41 n.7 & n.8.[18] There is nothing in the draw bell sequencing statement attributing that information to Rio Tinto. ¶ 368.

In an attempt to avoid the application of this ruling to the new improper allegation, Plaintiffs misleadingly paste together quotes from the press release to make it appear that the draw bell sequencing statement was attributed to Rio Tinto when it was not. *See* Opp. 27 ("Rio Tinto has notified Turquoise Hill **[that]** First draw bell remains on track for mid-2020, partly due to a change in the draw bell sequencing strategy.") (emphasis added). Plaintiffs' "[that]" omits two full sentences separating the paragraph's only mention of Rio Tinto and the sole mention of "draw bell sequencing" in the press release:

[18] That press release stated: "Rio Tinto, in its role as manager of Oyu Tolgoi and underground construction contractor, has undertaken its second annual schedule and cost re-forecast for the project. According to this re-forecast, lateral development has progressed well, construction completion schedule remains on track for 2022." ¶ 368. The Court correctly found that while the first sentence (stating Rio had undertaken a re-forecast) was explicitly attributed to Rio Tinto, the second sentence (Turquoise Hill's summary of the re-forecast, which lacked any attribution to Rio Tinto) was not. MTD Order at 41 n.7 & n.8.

> Rio Tinto has notified Turquoise Hill, ***based on preliminary results, of a delay to achievement of sustainable first production which is now expected to occur by the end of Q3'21 instead of Q1'21. This is a result of certain delays including, but not limited to, the completion of Shaft 2, which includes over four months of schedule contingency, and challenging ground conditions.*** First draw bell remains on track for mid 2020, partly due to a change in the draw bell sequencing strategy."

¶ 368 (emphasis added to language omitted from Opposition). Plaintiffs' omission cannot change the fact that the draw bell sequencing strategy statement was not explicitly attributed to Rio Tinto for the same reasons that this Court found other Turquoise Hill statements were not: there is no indication it is Rio Tinto's statement, rather than Turquoise Hill's. MTD Order at 41 & n. 7.

### B. The PSLRA Safe Harbor Applies

Even if Turquoise Hill's draw bell sequencing statement were expressly attributed to Rio Tinto—and it was not—this Court already determined that statements regarding the projection for the first draw bell are forward-looking statements protected by the PSLRA Safe Harbor. Mot. 17; MTD Order at 48-64 (Turquoise Hill's projections related to first draw bell were forward-looking and protected by PSLRA safe harbor); *see also id.* at 75-83 (holding that Rio Tinto's projections related to the first draw bell were forward-looking and protected by the PSLRA safe harbor). Those alleged misstatements include the drawbell sequencing statement, which Plaintiffs in fact emphasized in the SAC. *See* ECF No. 127 at ¶ 327. There is thus no need for the Court to indulge Plaintiffs' attempts (Opp. 26) to re-litigate this issue.[19]

Even if the Court reevaluated its prior holding as to this particular statement, statements regarding the expected sequence and timeline for the first draw bell—projected for years in the

[19] Such attempts are essentially a disguised reconsideration motion and are without merit. *See Dikambi v. City Univ. of New York*, 2022 WL 2292873, at *3 (S.D.N.Y. June 24, 2022) (characterizing attempts to "relitigate the Court's prior findings" in motion to dismiss briefing as a "disguised reconsideration motion"); *Siino v. Bd. of Trustees of New York City Teachers' Ret. Sys.*, 2009 WL 734076, at *1 (S.D.N.Y. Mar. 13, 2009) (plaintiff's attempt to "relitigate defendants' motion to dismiss" without "identif[ying] a single controlling decision that the Court overlooked" through reconsideration motion was "improper").

future—are the kinds of "statement[s] of the plans . . . of management for future operations" routinely held to be forward-looking. MTD Order at 51 (quoting 15 U.S.C. 78u-5(i)(1)(B)); *see also In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *19 (S.D.N.Y. Apr. 2, 2020) (present-tense portion of mixed present and future statement is "too vague to be actionable apart from the future projection" when it merely says that "it makes the future projection attainable") (citation omitted).

### C. Plaintiffs Fail to Adequately Allege Falsity

Even if the PSLRA Safe Harbor did not apply, Plaintiffs still fail to adequately allege that Turquoise Hill's statement regarding the timing of the first draw bell being partly due to a change in sequencing strategy was false at the time it was made.

*First*, the email chain Plaintiffs quote in the TAC is appropriate to consider (*see supra* at § I)[20] and confirms that Rio Tinto had not definitively abandoned the strategy. Mot. 18-19. The email chain confirms that only the Technical Assurance Committee had rejected the strategy, that it was otherwise understood at Rio Tinto that the strategy was still in place, and that Soirat, Jacques, and others were being told that the strategy was still in place and there was "ongoing work" around it. Mot. Ex. 7. This does not establish that Rio Tinto had abandoned the strategy.

*Second*, even if the Court does not consider the email relied upon by Plaintiffs for this allegation, Plaintiffs fail to allege that the Technical Assurance Committee's purported rejection of the strategy meant Rio Tinto (or Oyu Tolgoi LLC) had adopted the Committee's recommendation. Mot. 18. Plaintiffs fail to make *any* allegations regarding the authority or power of the Technical Assurance Committee—let alone particularized allegations that the Technical Assurance Committee had the power to conclusively abandon the drawbell sequencing strategy,

[20] Plaintiffs' assertion (Opp. 29 n.13) that another version of the email chain "does not contain the text Defendants ask the Court to consider" does not amount to a dispute with its authenticity or accuracy. Rather, it solely reflects Plaintiffs' opportunistic choice to attach an earlier-in-time version of the email thread that did not contain information that "would undermine the legitimacy of the[ir] claim." *Doe*, 2021 WL 1226384, at *10.

rather than its consideration of drawbell sequencing merely representing continued "evaluat[ion] of the best technical approach" and attempts to "reach[] alignment" within Rio Tinto (Mot. 18).[21]

### D. Plaintiffs Fail to Adequately Allege Scienter

Even if Plaintiffs could establish falsity, they still do not adequately allege scienter for Jacques, Soirat, or any individual whose scienter could be imputed to Rio Tinto.

*First*, the TAC does not make a single allegation that the Technical Assurance Committee's purported rejection of the sequencing strategy was ever communicated to Jacques or Soirat. *See* MTD Order at 96 (quoting *445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008)). Nor could they, as the email chain relied on by Plaintiffs shows they were told ***the opposite***. Mot. Ex. 7. Plaintiffs instead contend that Jacques and Soirat were reckless in not inquiring whether the strategy had been rejected. Opp. 30. But recklessness requires "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Lehmann v. Ohr Pharm., Inc.*, 830 F. App'x 349, 352 (2d Cir. 2020) (citation omitted). And Plaintiffs do not explain why it was reckless for Jacques and Soirat—who were being told the strategy was in place (Mot. Ex. 7), and who, as Plaintiffs allege, just received a formal presentation on October 8, 2018 regarding the re-forecast that confirmed the draw bell strategy (¶¶ 53, 174-75, 181; Opp. 30)—to not so inquire in the one- or two-day window between the Technical Assurance Committee's October 12 or 13 meeting and the October 15 statement by Turquoise Hill.[22]

---

[21] The Technical Assurance Committee is mentioned in just four paragraphs of the complaint, without any allegations regarding its authority. *See* ¶¶ 53,196, 274, 327.

[22] Plaintiffs' case law (Opp. 30) is inapposite. In *Freudenberg v. E-Trade Fin. Corp. Plan*, a defendant was alleged to have been present at an "early December 2006 meeting where [another defendant] discussed present and future losses, but nonetheless, made contradictory assurances to investors on December 14, 2006." 712 F. Supp. 2d at 199-200. Here, by contrast, Plaintiffs fail to allege Defendants Jacques or Soirat even had access to information that the drawbell sequencing allegation was abandoned—let alone that they had attended a meeting communicating as much—prior to the Oct. 15, 2018 disclosure.

*Second*, Plaintiffs' argument (Opp. 30) that [REDACTED] alleged knowledge that a committee had rejected the draw bell sequencing strategy is sufficient to impute scienter to Rio Tinto is misplaced. Plaintiffs allege [REDACTED] was Rio Tinto's Head of Underground Mining. ¶ 196. Plaintiffs thus fail to plead scienter because [REDACTED] was not even on the executive leadership team of a product group within Rio Tinto (*e.g.*, Copper & Diamonds, *see* ¶ 15)—let alone a senior executive of Rio Tinto whose knowledge could be considered knowledge of the corporation. Nor do Plaintiffs plead as much. "[T]he fact that an employee is not part of senior management weighs strongly against imputation." *Thomas v. Shiloh Indus., Inc.*, 2018 WL 4500867, at *4 (S.D.N.Y. Sept. 19, 2018); *Barrett v. PJT Partners Inc.*, 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017) (similar).[23]

Moreover, Plaintiffs' new contention that [REDACTED] knowledge can be imputed to Rio Tinto because he was "responsible for drafting Rio Tinto's public disclosures about the drawbell strategy" (Opp. 30) not only has no basis in the TAC but is irrelevant to whether [REDACTED] had a role in ***Turquoise Hill's*** disclosure at issue. *Barrett*, 2017 WL 3995606, at *7 (finding no scienter in part because the complaint did not allege that the employee at issue was involved in crafting internal controls or public disclosures).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss in part the new claims in Plaintiffs' TAC.

[23] Plaintiffs' case law (Opp. 30) is not to the contrary. *Jackson v. Abernathy* did not find that *any* non-speaking "officer[] or director['s]" scienter may "be imputed to the corporation," as Plaintiffs suggest, but rather that only the scienter of those "officers or directors *who were involved in the dissemination of the fraud*" could be imputed to the corporation. 960 F.3d 94, 98. (2d Cir. 2020) (emphasis added). Plaintiffs do not allege [REDACTED] was involved in "dissemination of the fraud." In fact, the TAC confirms the opposite: Plaintiffs allege [REDACTED] attempted to "raise concern[s]" regarding draw bell sequencing—thus "belie[ng] any inference of fraudulent intent" on his part. *Id.* at 99. Here, as in *Jackson*, Plaintiffs fail to allege that [REDACTED] informed any management-level employees that the draw bell sequencing strategy had been rejected prior to the October 15, 2018 disclosure. *Id.*

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Dated: May 13, 2024

*<u>/s/ Corey Worcester</u>*

Corey Worcester
Renita Sharma
Jesse Bernstein
Hope Skibitsky
Leigha Empson
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
New York, NY 10010
Tel: 212-849-7000
Fax: 212-849-7100

*Counsel for Defendants Rio Tinto plc, Rio Tinto Limited, Jean-Sébastien Jacques and Arnaud Soirat*