UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___11/7/24___
```

-------------------------------------------------------------------- X
                                                                     :
IN RE TURQUOISE HILL RESOURCES LTD.                                  :
SECURITIES LITIGATION                                                :          20-cv-8585 (LJL)
                                                                     :
-------------------------------------------------------------------- X          OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendants Rio Tinto plc, Rio Tinto Limited (together with Rio Tinto plc, "Rio Tinto"),

Jean-Sébastien Jacques ("Jacques") and Arnaud Soirat ("Soirat") move, pursuant to Federal Rule

of Civil Procedure 12(b)(6), to dismiss Plaintiffs' Third Amended Complaint ("TAC") in part.

Dkt. No. 332. Specifically, Defendants move to dismiss Plaintiffs' Section 10(b) claim against

Jacques and Plaintiffs' claims based on alleged misstatements regarding the timing of the first

draw bell blast. Dkt. No. 333 at 2.

For the following reasons, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

The Court assumes familiarity with the background of this case, which is set out in the

Court's Opinion and Order on the Second Amended Complaint. *See In re Turquoise Hill Res.*

*Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 182–93 (S.D.N.Y. 2022). The Court focuses here on the

allegations most relevant to the instant motion. The Court accepts as true for purposes of this

motion the well-pled allegations of the TAC.

## I.    The Parties and the Oyu Tolgoi Mine

Rio Tinto is one of the world's largest metals and mining companies. Dkt. No. 330

("TAC") ¶ 48. Jacques was the Chief Executive Officer of Rio Tinto from July 2016 to

December 2020. *Id.* ¶ 51. He was also chairman of Rio Tinto's Investment Committee. *Id.*

¶ 53.  Soirat was the Chief Executive of Rio Tinto's Copper and Diamonds product group from 2016 to December 2020.  *Id.* ¶ 52.

Turquoise Hill Resources Limited ("Turquoise Hill") is a mineral-exploration and development company, the sole business of which is the operation of the Oyu Tolgoi mine (the "Mine").  *Id.* ¶ 40.[1]  The Oyu Tolgoi mine, located in Mongolia, is expected to be one of the largest copper mines in the world.  *Id.* ¶ 3.  The Mine is owned by nonparty Oyu Tolgoi LLC ("OT" or "Oyu Tolgoi"), which is 66% owned by Turquoise Hill and 34% owned by the Government of Mongolia.  *Id.*  Rio Tinto International Holdings Limited ("RTIH"), a wholly-owned subsidiary of Rio Tinto, owns a majority interest in Turquoise Hill.  *Id.* ¶ 49.  The remainder of Turquoise Hill's common stock is publicly traded and owned.  *Id.* ¶ 41.  Plaintiffs are purchasers of Turquoise Hill securities in the period from July 17, 2018 to July 31, 2019 (the "Class Period").

Turquoise Hill's predecessor, Ivanhoe Mines, completed some initial work on the Mine as early as 2001.  *Id.* ¶ 64.  In 2009, the Government of Mongolia signed an investment agreement with Rio Tinto and Ivanhoe Mines to develop the Mine, creating Oyu Tolgoi LLC. *Id.* ¶ 64.  By 2013, work had been completed on Shaft 1, a preliminary exploratory and access shaft, and work had been begun on the much larger Shaft 2.  *Id.* ¶ 65.  However, work halted in 2013 due to a disagreement between Oyu Tolgoi and the Government of Mongolia.  *Id.* ¶ 66. Jacques personally negotiated a new financing agreement between Rio Tinto, Turquoise Hill, and the Government of Mongolia that allowed construction to restart in 2016.  *Id.* ¶¶ 67–68.

In October 2016, Defendants reported that the total cost of the Mine would be $5.3 billion and sustainable first production would commence in the first quarter of 2021.  *Id.* ¶ 7.

---

[1] "Oyu Tolgoi" means "Turquoise Hill" in Mongolian.  *Id.* ¶ 60.

Sustainable first production occurs after the first draw bell blasting, which marks the beginning of large-scale subsurface mining and can only occur after completion of sufficient support infrastructure. *Id.* The first draw bell deadline was in mid-2020. *Id.* ¶¶ 81, 173, 195. At the start of the class period, the keys to the success of the project were the completion of primary crusher 1 and two key mine shafts and associated enabling infrastructure—the Shaft 1 crusher and systems and Shaft 2. *Id.* ¶ 75. Shaft 2 was the main logistics hub for completing the underground expansion of the Mine, and the project depended on it being delivered on time. *Id.* ¶¶ 77–78.

From the beginning of the renewal of work in 2016, the project was plagued by significant engineering, procurement, and construction issues. *Id.* ¶ 82. Before construction even resumed, engineers discovered issues with existing construction that prevented serious safety risks in Shaft 2. *Id.* ¶¶ 84–87, 91. By the summer of 2016, Shaft 2 was already delayed by at least eight months. *Id.* ¶¶ 88, 92. The steel supplied for Shaft 2 was consistently of poor quality, delivered late, and sometimes did not fit the shaft due to engineering errors, leading to further overruns and delays. *Id.* ¶¶ 88, 96, 101, 103, 127–128. Mining and construction were not synchronized, creating conflicts between mining and construction personnel. *Id.* ¶¶ 132–133. The project team lacked experience building this type of mine or working in Mongolia, leading to poor planning and execution. *Id.* ¶¶ 135–137. By May 2018, Shaft 2 was about 14 months behind schedule. *Id.* ¶ 101.

Eventually, in July 2019, Rio Tinto and Turquoise Hill disclosed a delay of 16 to 30 months for sustainable first production and cost overruns of $1.2–1.9 billion, resulting in Turquoise Hill's stock price plummeting about 43%. *Id.* ¶ 267, 269. Plaintiffs allege that

Defendants had prior knowledge of the problems at the Mine and concealed the problems by making false and misleading public statements.

## II.    Rio Tinto's Knowledge and Statements

Starting well before the Class Period, it was clear to Oyu Tolgoi management that the project was significantly delayed. *Id.* ¶¶ 107–16. A number of former Rio Tinto employees and Oyu Tolgoi managers reported that senior leadership at Oyu Tolgoi, Rio Tinto, and Turquoise Hill were acutely aware of the schedule and cost overruns. *Id.* ¶¶ 97–99, 105, 108.

Beginning in 2016, Rio Tinto's executive consulting firm, GFI Blackswan, identified concerns about unethical behavior at the Mine. *Id.* ¶¶ 138–139. The head of Blackswan, Dr. Maurice Duffy, created monthly reports based on confidential comments from employees, which were then delivered quarterly to Rio's Executive Committee, CEO, and Board. *Id.* ¶ 139. In mid-2017 Duffy was instructed to stop providing these reports. *Id.* ¶ 140. In response, he raised concerns with Rio's Head of Human Resources in September 2017 regarding information he had received and reported to the Executive Committee concerning cost overruns, schedule delays, and misconduct at the Mine. *Id.* ¶ 141. These comments included statements that the project was significantly behind, that "no one wants to hear" about it, that management is "misstating" or "understat[ing]" delays and overruns, that "Soirat knows what's going on," and that "[t]here needs to be an independent review." *Id.* ¶ 141. The Head of Human Resources told Duffy to drop his concerns, that Jacques would not appreciate hearing about them, and that Duffy would regret reporting the concerns to Jacques. *Id.* ¶ 143. Duffy resigned in December 2017 due to his concerns that Rio Tinto's Board and chairman had taken no action on his reports of misbehavior. *Id.* ¶ 144.

At some point in 2017, Soirat and Rio Tinto executive Craig Kinnell hired experienced mining executive Richard Bowley to investigate the problems at the Mine. *Id.* ¶¶ 117–118.

Bowley discussed his findings at an interview with Soirat in November 2017, after which he was hired by Rio Tinto as chief advisor for the Oyo Tolgoi project. *Id.* ¶ 122. Bowley quickly confirmed that the project could not meet deadlines due to the issues identified above, and he relayed this information to Kinnell, Soirat, and other Rio Tinto executives. *Id.* ¶ 123–128. On February 1, 2018, Bowley made a presentation to Kinnell and Rosemary Fagen, who reported directly to Soirat and participated in the meeting on his behalf, which discussed the need for immediate action to reduce cost overruns and schedule delays. *Id.* ¶¶ 148–149. Bowley spoke with Soirat for an hour in May 2018 to discuss the "massive risk" posed by the cost and schedule issues, and he continued to follow up with Soirat via Fagen. *Id.* ¶¶ 150–151. However, also in May 2018, Soirat personally told Bowley to stop looking at the problems causing delays and cost overruns. *Id.* ¶ 221. Bowley continued to report on the cost overruns and delays, as well as public statements about them which he believed were false, *id.* ¶¶ 200–203, 232–235, but was marginalized within the company and eventually terminated without cause in January 2019, *id.* ¶ 246.

From July–October 2018, Turquoise Hill and Rio Tinto consistently maintained in public statements that the Oyu Tolgoi project was on schedule and on budget. *Id.* ¶¶ 338, 339, 346–347, 355–356. On August 15, 2018, Soirat appeared on a Mongolian television program and stated that the project was "on plan and on budget," and he gave similar assurances in a presentation on October 2, 2018. *Id.* ¶¶ 360, 363–364. On September 26, 2018, Jacques gave a presentation on behalf of Rio Tinto which stated that the Mine was on schedule and on budget. *Id.* ¶ 361.

On October 15, 2018, Turquoise Hill issued a press release stating that there would be a delay in achieving sustainable production from the first quarter of 2021 to late in the third quarter

of 2021 due to unspecified delays and "challenging ground conditions." *Id.* ¶ 366. The release stated that the project remained on budget. *Id.* ¶¶ 367–368. Rio Tinto issued a press release the next day echoing these comments. *Id.* ¶¶ 193, 370. In January 2019, Rio Tinto issued a press release maintaining that progress was in line with the October 2018 "re-forecast." *Id.* ¶ 399.

On February 27, 2019, Turquoise Hill and Rio Tinto made public statements that the delay to sustainable first production would stretch beyond the end of the third quarter of 2021 and that blamed the delays on challenging ground conditions. *Id.* ¶¶ 401–404. The statements maintained that the project was on budget. *Id.* ¶¶ 402, 404.

On April 16, 2019, Rio Tinto issued a press release stating that "as announced in February, there have been further delays in the technically complex fit-out and commissioning work on the main production and services shaft (Shaft 2)." *Id.* ¶ 426. It stated that Shaft 2 would be completed by the end of October 2019. *Id.* It stated that efforts were being made "to adjust to more detailed geotechnical information and difficult ground conditions." *Id.*

On July 16, 2019, Turquoise Hill disclosed that "preliminary estimates indicate that sustainable first production could be delayed by 16 to 30 months compared to the original feasibility study guidance in 2016," that the "capital spend for the project may increase by $1.2 to $1.9 billion over the $5.3 billion previously disclosed," and that sustainable first production was "now expected between May 2022 and June 2023." *Id.* ¶ 434. Rio Tinto disclosed the same facts in a press release on the same day. *Id.* ¶ 436. Turquoise Hill's stock price dropped 43% on that day. *Id.* ¶ 438.

Plaintiffs allege that Rio Tinto failed to disclose the problems at the Mine in part due to concerns about weakening its negotiating position with the Government of Mongolia. *Id.* ¶ 307. They produce emails and related statements showing internal concern that postponing deadlines

could harm such negotiations.  *Id.* ¶¶ 195, 241–242.  Rio Tinto had a project called "Barracuda" that sought to positively influence the Mongolian government, including by preventing any leaks about mismanagement from becoming public.  *Id.* ¶ 227.

After the class period, in March 2020, Bowley reported Defendants' alleged misconduct to securities regulators.  *Id.* ¶ 287.  Also in March 2020, Turquoise Hill disclosed that it would require at least an additional $4.5 billion in financing to complete the project, on top of the $2.2 billion Turquoise Hill had in available liquidity.  *Id.* ¶ 288.  In February 2021, the Mongolian Government announced it was seeking to cancel the Oyu Tolgoi deal with Rio Tinto and replace it with a new agreement due to the cost increases at the Mine.  *Id.* ¶ 290.  In November 2020, the Oyu Tolgoi board hired a group of experienced mining professionals, referred to as the Independent Consulting Group ("ICG"), to investigate the causes of cost overruns and schedule delays.  *Id.* ¶ 291.

The ICG's report determined that delays and overruns began as soon as work resumed in 2016 and were caused by engineering, procurement, and construction problems, not ground conditions.  *Id.* ¶¶ 292–293.  It described certain management failures as "staggering," and repeatedly noted that "documentation that would be expected in a project of this size and complexity was absent."  *Id.* ¶¶ 334–335.  Rio Tinto refused to provide Technical Evaluation Group reports and other documentation to the ICG despite repeated requests.  *Id.* ¶¶ 333, 335.

## III.    Allegations Regarding the First Draw Bell

The original deadline for the first draw bell, an important construction milestone, was mid-2020.  *Id.* ¶ 199.  In the reforecasting press release on October 15, 2018, Turquoise Hill stated that despite overall delays, "[f]irst draw bell remains on track for mid-2020, partly due to a change in the draw bell sequencing strategy."  *Id.* ¶¶ 195, In a press release the next day, Rio Tinto similarly maintained that "the first draw bell is still expected in mid-2020."  *Id.* ¶¶ 193,

195, 370.  However, Plaintiffs allege that on October 12 and 13, 2018, the Rio Tinto Geotechnical Review Board and Technical Assurance Committee had rejected the "pre-belling concept" because it posed rock stability issues.  *Id.* ¶ 196.  A member of the committee therefore wrote to Oyu Tolgoi officials stating that "the plan is to stay with the original undercutting sequence and design."  *Id.*  An internal email from a member of Rio Tinto's Executive Committee stated that maintaining the first draw bell date was important to the Government of Mongolia.  *Id.* ¶ 195.

## IV.    Allegations Regarding Jacques's Scienter

Several members of Rio Tinto's senior management who reported to Jacques were informed of delays and cost overruns at the Mine prior to the start of the class period.  *Id.* ¶¶ 97–99, 105, 112.  Oyu Tolgoi LLC's financial controller during that period stated that reports went up the chain to Jacques, *id.* ¶ 299, and other managers similarly stated that Jacques or Rio Tinto executives knew about the delays during this period, *id.* ¶¶ 97, 109, 112.

As a member of Rio Tinto's Executive Committee, Jacques reviewed reports from Duffy, which by no later than September 2017 included feedback about cost overruns and delays.  *Id.* ¶¶ 139–141.  Duffy also received comments from Oyu Tolgoi leadership stating that "JS brings a unique blend of strategic and operational expertise on overstatements, overbudget, coverups," "I am concerned by a culture that seems to be shaped around satisfying one ego," that the "control freak at the top is using HR, PR, Operations to watch, monitor and make decisions from China-Mongolia to US-Canada," and that "JS will destroy us all in his grab for power and glory."  *Id.* ¶ 142.  When Duffy was instructed to discontinue the reports he raised his concerns with the Head of Human Resources, whom he understood as an intermediary for Jacques.  *Id.* ¶ 143.  She stated he would regret reporting his concerns to Jacques, and Duffy understood that she would report his concerns to Jacques.  *Id.* ¶ 143.  Duffy, who had overseen executive coaching services for

Jacques for several years, stated that Jacques reported to Duffy that he "didn't trust anyone." *Id.* ¶ 145. According to Duffy, Jacques closely followed developments in Mongolia and would certainly have known about the problems in the Mine by 2017. *Id.* ¶ 146.

Jacques received direct monthly reports from David Joyce,[2] Rio Tinto's Global Head of Projects, which highlighted the Oyo Tolgoi delays and their causes. *Id.* ¶ 299. Grant Brinkmann, the Oyu Tolgoi manager most directly responsible for Shaft 2, stated that Joyce was "100% aware" of issues which the Oyu Tolgoi staff discovered before project work restarted in 2016, because he received budget proposals for efforts to address those issues. *Id.* ¶ 99. Brinkmann also stated that Joyce would come to the site for about five days per month and spend an entire day with Brinkmann during the visits. *Id.* In April 2018, one of Brinkmann's direct reports informed Joyce directly that Shift 2 was five months behind schedule. *Id.* ¶ 163. Brinkmann states that this was reported to Jacques and other Rio Tinto leadership, and their resulting realization of the state of the project led to his firing a few weeks later. *Id.* ¶¶ 163–164.

Joyce specifically reported to Jacques in January 2018 that "Shaft #5 completion will be delayed"; in May 2018 that "steel delivery delays impacted commencement of Shaft #2 stripping" and that "Shaft #2 barrel equipping is about two months behind the FC1 schedule";

---

[2] The TAC redacts Joyce's name as the person who provided such reports to Jacques. Dkt. No. 329 ¶ 299. However, Joyce is openly named in other portions of the report, and the description of the reporting employee in Paragraph 299 makes clear that the reporting employee is Joyce. *Compare id.* (describing the reporting employee as someone who was "told in April 2018 that the project was then at least five months behind schedule and briefed on weekly 'integration meetings' led by FE 3") *with id.* ¶ 163 (employee told Joyce in April 2018 that the project was five months behind schedule) *and id.* ¶ 170 (Joyce was briefed on integration meetings led by FE 3). Moreover, Plaintiff's allegations that Joyce received detailed reports about the project would be meaningless "to those monitoring the federal courts" without an understanding that Plaintiff alleges he passed on that information to Jacques. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). Therefore, the Court does not redact Joyce's name in connection with the allegations in Paragraph 299 of the TAC.

and in September 2018 that another Shaft 2 sinking project was "some 3 months behind FC1" and "Shaft 2 fit out conveyor to surface decline and central heating plaint continue to lag behind FC1." *Id.* ¶ 299.

In June 2018, Rio Tinto sought the approval of the Oyu Tolgoi board for a $120 million increase to the contract of Jacobs Engineering Group, the principal contractor on the Mine. *Id.* ¶¶ 83, 154. The premise of this increase was that Jacobs' costs had ballooned to $388 million, threatening to exhaust the existing budget. *Id.* ¶ 153. Jacques was involved in the effort to seek this approval because it intersected with an urgent effort he was working on to address a conflict of interest that Mongolian Government delegates on the Oyu Tolgoi board had identified in the award of the contract for sinking Shafts 3 and 4. *Id.* ¶ 154. At a meeting on June 19, 2018, Jacques and others met to consider whether to re-tender the tainted project, as demanded by the Mongolian Government delegates. *Id.* ¶ 154. Rio Tinto leadership decided to avoid the re-tender because it would create 2.5–6 months of delay, and internal calculations showed that every month of additional delay reduced the net present value of the Mine by $100 million. *Id.* Instead, Jacques and other Rio leaders decided to convince the Mongolian Oyu Tolgoi directors that the conflict could be resolved and simultaneously to obtain approval of the Jacobs budget increase. *Id.* ¶ 155.

Jacques was also a member of Rio's Investment Committee ("IC"), which received certain reports about the Oyu Tolgoi project. *Id.* ¶ 10. The IC was advised by the Technical Evaluation Group ("TEG") and Business Evaluation Department ("BED"), which performed week-long on-site reviews of the Oyu Tolgoi project twice per year. *Id.* ¶¶ 10, 297. On November 10, 2017, Rio Tinto's TEG reported to the IC that the project had a five-month delay. *Id.* ¶ 298. In May 2018, the TEG informed the IC that delays had worsened. *Id.* ¶¶ 10, 174. On

October 8, 2018, the TEG informed the IC that the delays totaled nine months, with further slippage expected, and that the delays were severe enough to cause the project to suffer a decline in net present value, creating a $1 billion funding shortfall. *Id.* ¶¶ 10, 174–76. The TEG also explained that once a Rio Tinto project begins to experience schedule slippage, further slippage is to be expected later in the project. *Id.* ¶ 177. It stated that the same was likely to occur here, because "[p]lanned improvements are likely to be offset by unforeseen emerging issues as they were between 2017 and 2018," and any further delay to Shaft 2 "will have a full knock-on effect to several critical path elements." *Id.* ¶ 177. The TEG recommended the IC recognize and report: "[t]he full 12 months schedule risk without mitigation of the improvements or contingency reduction," "[t]hat further slippage is likely during 2019," and "[a] further 3 months schedule contingency which would bring the over-run to a total of 15 months." *Id.* ¶ 178. It additionally stated that cost overruns were nearly certain given the "close relationship between schedule and cost increases." *Id.* ¶ 179. Beginning in October 2018, Jacques demanded that progress reports be sent to him weekly by Oyu Tolgoi staff because he was concerned about the extent of delays. *Id.* ¶ 110.

On April 2, 2019, Bowley emailed Jacques and another employee telling them how behind schedule the project was. *Id.* ¶ 253. The head of Rio Tinto's Ethics and Integrity section responded immediately and pressed Bowley for information. *Id.*

## PROCEDURAL HISTORY

The original complaint in this case was accepted for filing on October 15, 2020. Dkt. No. 7. The complaint sought damages under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 on behalf of all persons who purchased or otherwise acquired the securities of Turquoise Hill from July 17, 2018, to July 31, 2019 (the "Class Period"). *Id.* ¶ 1. Notice to the

proposed class pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") was made by press release that same day.  Dkt. No. 31.

On January 15, 2021, the Court appointed the Pentwater Funds as lead plaintiff.  Dkt. No. 103.  Plaintiffs filed an amended complaint on March 17, 2021, Dkt. No. 110, and a second amended complaint ("SAC") on September 16, 2021, Dkt. No. 127.  Defendants moved to dismiss the SAC.  Dkt. Nos. 129, 132.

On September 2, 2022, the Court dismissed all claims against Turquoise Hill, its executives Luke Colton, Brendan Lane, and Ulf Quellman, and Rio Tinto International Holdings Limited.  Dkt. No. 149; *In re Turquoise Hill*, 625 F. Supp. 3d at 257.  The Court also dismissed certain claims against Rio Tinto, Jacques, and Soirat.  *Id.*  Specifically, the Court held that Plaintiffs had not sufficiently pled Rio Tinto's liability for statements made by Turquoise Hill, *id.* at 203–207, that certain forward-looking statements and a Sarbanes-Oxley certification executed by Jacques were not actionable, *id.* at 224–230, that Plaintiffs had not sufficiently alleged that statements regarding the date of the first draw bell were false, *id.* at 231, that Plaintiffs had not sufficiently pled scienter with respect to Jacques, *id.* at 246–247, and that scheme liability was not applicable, *id.* at 247–255.  However, the Court held that Plaintiffs had sufficiently pled Rio Tinto and Soirat's liability for certain statements, including risk disclosures in Rio Tinto's 2017 and 2018 annual reports, statements by Soirat on Mongolian television, an October 2018 re-forecast, and statements attributing delays to ground conditions.  *Id.* at 230–232, 245.  It also held that control-person claims against Jacques and Soirat under Section 20(a) had been adequately pled.  *Id.* at 256.

An initial pretrial conference was held on January 20, 2023, and a case management plan was entered on February 2, 2023.  Dkt. Nos. 202–03, 205.  Discovery has been ongoing since

that time.  On October 19, 2023, Plaintiffs filed a motion for class certification.  Dkt. No. 286.

However, on November 10, 2023, the parties filed a letter stating that Plaintiff intended to move

for leave to file a Third Amended Complaint, which would contain new allegations regarding

Rio Tinto's statements and Jacques' scienter based on documents produced in discovery.  Dkt.

No. 299.  The motion for class certification was then withdrawn without prejudice to renewal

after a ruling on the Third Amended Complaint, and all other orders and deadlines were stayed

pending resolution of the motion to amend and any subsequent motion to dismiss.  Dkt. Nos.

302, 303.

On December 15, 2023, Plaintiffs moved to file the Third Amended Complaint.  Dkt. No.

305.  The Court granted the motion before Defendants' response was filed, Dkt. No. 314, but

Defendants moved for reconsideration in part on the basis that certain allegations Plaintiff sought

to add in the TAC were not based on recent discovery, but rather on information the Plaintiffs

had possessed for years, Dkt. Nos. 320–21.  The Court granted the motion for reconsideration in

part, denying Plaintiffs leave to include allegations which were unduly delayed under Rule

15(a)(2).  Dkt. No. 325 at 7.[3]

Plaintiffs subsequently filed the TAC on February 28, 2024.  Dkt. No. 329.  The TAC

added new allegations concerning Jacques' scienter.  *See, e.g.*, *id.* ¶¶ 10, 105, 154–155, 163–164,

174–179, 298–300, 303, 425.  It also added allegations regarding the falsity of Defendants'

statements about the timing of the first draw bell.  *Id.* ¶¶ 195–196.

_____

[3] Specifically, Defendants could not introduce allegations seeking to impose liability on Rio
Tinto for statements of Turquoise Hill, allegations with respect to Soirat's statements during the
November 2018 television interview, and allegations that Rio Tinto failed to take a needed
impairment charge.  Dkt. No. 325 at 7.

On March 22, 2024, Defendants moved to dismiss the TAC in part.  Dkt. No. 332.
Specifically, Defendants argued that the allegations regarding Jacques' scienter and the falsity of
Defendants' statements about the timing of the first draw bell were still not sufficient.  Dkt. No.
333.  Defendants supported the motion to dismiss with a declaration of counsel with seven
exhibits, consisting of documents produced in discovery which were quoted in the TAC.  Dkt.
No. 334.  Plaintiffs opposed the motion, Dkt. No. 338, and Defendants replied, Dkt. No. 340.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual
allegations in the complaint and draw all possible inferences from those allegations in favor of
the plaintiff.  *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002),
*cert. denied*, 537 U.S. 1089 (2002).  This requirement "is inapplicable to legal conclusions."
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "[t]hreadbare recitals of the elements of a
cause of action, supported by mere conclusory statements, do not suffice." *Id.*  A complaint must
offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of
action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive
dismissal.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  The ultimate question is
whether "[a] claim has facial plausibility, [i.e.] the plaintiff pleads factual content that allows the
court to draw the reasonable inference that the defendant is liable for the misconduct alleged."
*Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief
will . . . be a context-specific task that requires the reviewing court to draw on its judicial
experience and common sense." *Id.* at 679.  Put another way, the plausibility requirement "calls
for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting
the claim]." *Twombly*, 550 U.S. at 556.

In considering a Rule 12(b)(6) motion, the court generally reviews only "facts stated on

the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n. 2 (2d Cir. 2016). Incorporation by reference requires "a clear, definite and substantial reference to the documents." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 331 (S.D.N.Y. 2003)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). "[E]ven if a document is 'integral' to the complaint," however, a court may not consider it if a "dispute exists regarding the authenticity or accuracy of the document." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

## DISCUSSION

Defendants argue that the TAC fails to adequately plead Jacques' scienter and that Defendants' statements about the first draw bell are not actionable. Dkt. No. 333. Plaintiffs argue that the TAC adds sufficient allegations on both points to withstand a motion to dismiss. Dkt. No. 338. The parties also dispute the threshold issue of whether documents which have been produced in discovery and used in drafting the TAC may be considered on this motion to dismiss. Dkt. No. 333 at 6; Dkt. No. 338 at 7–10; Dkt. No. 340 at 2–6. The Court first turns to that threshold issue.

## I.    Documents Produced in Discovery

In support of their motion to dismiss, Defendants attach seven exhibits: 1) October 8, 2018, TEG report to the IC; 2) Rio Tinto's October 16, 2018 Form 6-K; 3) Rio Tinto's 2018

Form 20-F; 4) a document labeled "Rio Tinto CEO report for January 2018 Board Meeting"; 5) a document labeled "Rio Tinto CEO report for May 2018 Board Meeting"; 6) a document labeled "Rio Tinto CEO report for September 2018 Board Meeting"; and 7) a November 7, 2018 email chain.  Dkt. Nos. 334-1, 334-2, 334-3, 334-4, 334-5, 334-6, 334-7.   Defendants argue that these documents may be considered on this motion to dismiss because they were "known to plaintiffs, relied on in the complaint, and integral to the complaint's allegations."  Dkt. No. 340 at 3; *see* Dkt. No. 333 at 6.  Defendants contend that such consideration is necessary to prevent Plaintiffs from "cherry-picking" misleading quotes from the documents.  Dkt. No. 340 at 2.  Plaintiffs argue that the discovery documents are not incorporated by reference because they are not "written instruments," that the accuracy, completeness, or relevance of the documents is disputed, and that evaluating the documents against the allegations in the complaint would be improper weighing of the evidence at the pleading stage.  Dkt. No. 338 at 8–10.

On a motion to dismiss, a district court may consider "documents incorporated by reference in the complaint."  *Searle v. Red Creek Cent. Sch. Dist.*, 2023 WL 3398137, at *2 (2d Cir. May 12, 2023) (quoting *DiFolco*, 622 F.3d at 111).  Incorporation by reference requires a reference that is "clear, definite, and substantial," rather than merely "passing."  *Trump v. Vance*, 977 F.3d 198, 210 n.8 (2d Cir. 2020).  Moreover, "[w]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint."  *Searle*, 2023 WL 3398137, at *2 (quoting *Nicosia*, 834 F.3d at 230–31); *see Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  Such reliance requires more than a mention or even limited quotations; the document must "appear to have been necessary to the 'short and plain statement of the claim showing that [a plaintiff is] entitled to relief.'"  *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68

(2d Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2)); *see Wen v. N.Y.C. Reg'l Ctr., LLC*, 695 F. Supp.

3d 517, 533–34 (S.D.N.Y. 2023), *aff'd*, 2024 WL 4180521 (2d Cir. Sept. 13, 2024).

"The purpose of the rule is to prevent complaints from being invulnerable at the motion

to dismiss stage purely 'by clever drafting.'" *Guzman v. Bldg. Serv. 32BJ Pension Fund*, 2023

WL 2526093, at *6 (S.D.N.Y. Mar. 15, 2023) (quoting *Global Network Comm"ns, Inc. v. City of

New York*, 458 F.3d 150, 157 (2d Cir. 2006)). "In most instances where this exception is

recognized, the incorporated material is a contract or other legal document containing obligations

upon which the plaintiff's complaint stands or falls, but which for some reason—usually because

the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was

not attached to the complaint." *Global Network Commc'ns,* 458 F.3d at 157; *see Bongiorno v.

Baquet*, 2021 WL 4311169, at *10 (S.D.N.Y. Sept. 20, 2021) ("A clever plaintiff cannot avoid

the court's review of a communication 'as a whole'. . . by quoting only a portion of the

communication and omitting the remainder."); *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers

Squibb Co*., 28 F.4th 343, 352 n.3 (2d Cir. 2022) ("A document that is integral to the complaint

and partially quoted therein may be incorporated by reference in full."). Importantly, even where

a document is integral to the complaint, for the document to be considered "it must be clear on

the record that no dispute exists regarding the authenticity or accuracy of the document."

*DeFolco*, 622 F.3d at 111 (quoting *Faulkner*, 463 F.3d at 134).

Under this standard, Defendants' Exhibit 1, the TEG report of October 8, 2018, may be

considered. The report is quoted extensively at ¶¶ 174–179 of the TAC, which walk through the

specific conclusions of the report in detail. TAC ¶¶ 174–79. Those paragraphs of the complaint

include six quotations from the report, one of which is two paragraphs long, and the reproduction

of a diagram summarizing project delays. *Id.* This extensive quotation and discussion

constitutes a "clear, definite, and substantial" reference.  *See Geiger v. Town of Greece*, 311 F. App'x 413, 416 (2d Cir. 2009) (incorporation was proper when the amended complaint "quoted extensively" from the document); *Vance*, 977 F.3d at 210 n.8 (incorporation was proper when the complaint "relie[d] heavily" on the document).  Although Plaintiffs do not concede the authenticity of the document, they raise no specific dispute as to its accuracy despite the fact that they possess the authentic document and are therefore in a position to do so.  Dkt. No. 338 at 20. The document may be considered.

Defendants' Exhibits 2 and 3, which are SEC filings, may also be considered.  A court may take judicial notice of such filings, not for their truth but to establish what statements they contain.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 238–39 (S.D.N.Y. 2023); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).  In stating that a court may take judicial notice of such filings in a securities action, the Second Circuit has emphasized the factors relevant to incorporation by reference, namely that SEC documents are central to such actions and their authenticity cannot be questioned.  *See Kramer*, 937 F.2d at 774 ("Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure.").  Plaintiffs do not contest that the Court may consider such filings.  Dkt. No. 338 at 23 n.3.

However, Defendants' Exhibits 4–6 may not be considered.  Exhibits 4–6 are titled as Rio Tinto CEO reports for board meetings in January, May, and September 2018.  Dkt. Nos. 334-4, 334-5, 334-6.  They are described by Defendants as quoted in the TAC at Paragraph 299. Dkt. No. 334 ¶ 5–7.  However, an initial obstacle to consideration of the documents is that

Paragraph 299 of the TAC does not clearly and definitely reference the exhibits provided. Paragraph 299 of the TAC states that "monthly reports" were prepared for Jacques by David Joyce, Rio Tinto's Global Head of Projects, and quotes from such monthly reports in January, May, and September 2018. TAC ¶ 299. Defendants' exhibits are lists of bullet points related to various projects, with no indication that they are reports from Joyce to Jacques. The quotations are contained in the documents, but so is a variety of other information. It requires inference to assume that the exhibits are the documents referenced in the TAC and further to assume that all of the bullet points that are contained in the documents were provided by Joyce to Jacques as part of unified communications constituting the "monthly reports" referenced in the complaint, as opposed to, for example, being compiled by Jacques from various sources. This suggests that even assuming Paragraph 299 refers to these documents, the references are not "clear and definite" enough for the documents to be incorporated. [4]

The references also are not substantial. Paragraph 299 of the TAC quotes one sentence from each of the January and May reports, and two sentences from the September report describing delays. TAC ¶ 299. The quotations are used as examples of the type of information being reported to Jacques. *Id.* Plaintiffs do not reference the documents by name or describe them beyond giving these quotations and the summary description that Joyce's reports "highlighted the delays and their causes." *Id.* The quotations are not extensive, nor does the document "contain[] obligations upon which the plaintiff's complaint stands or falls." *Global Network Commc'ns*, 458 F.3d at 157. Plaintiffs quote particular statements within the

---

[4] Plaintiffs contest the authenticity of the documents, but only superficially. Plaintiffs argue that the Exhibits produced by Defendants "are not the same versions of similar reports in Jacques' custodial files." Dkt. No. 338 at 24 n.8. However, Plaintiffs do not identify any specific differences between the Exhibits and the documents quoted in the TAC, despite being in possession of the documents.

documents, but the reference to the documents themselves is "passing." *Vance*, 977 F.3d at 210 n.8. "[N]ot every document referred to in a complaint may be considered incorporated by reference." *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988).

Defendants suggest that the documents must be considered to prevent Plaintiff from cherry-picking. Dkt. No. 340 at 12. Defendants argue that although the quoted parts of the report mention specific delays, other parts of the report suggest the project was on track overall. *Id.* But the allegation by Plaintiffs that Defendants were provided one form of information does not permit Defendants to attach to a motion to dismiss all other pieces of information that might be considered to contradict or contextualize Plaintiffs' allegations. Such evidence is best considered on a motion for summary judgment, after the author or recipient has been deposed and Plaintiffs have had the opportunity to explore whether the information is, in fact, contradictory. *See Goel*, 820 F.3d at 559. The Second Circuit has cautioned against transforming a Rule 12(b)(6) inquiry into a "summary judgment proceeding . . . featuring a bespoke factual record." *Id.* at 560; *see also Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020) ("[T]he court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side.").[5]

Defendants' Exhibit 7 also may not be considered. Exhibit 7 is a chain of emails dated November 7, 2018, which Defendants state is quoted in the TAC at Paragraph 196. Dkt. No. 334 ¶ 8. However, Paragraph 196 only references a single email by Rio Tinto's Head of Underground Mining, which stated that the "pre-belling concept was rejected by the Technical Assurance Committee and the plan is to stay with the original undercutting sequence and

---

[5] This point is especially apposite here, given that the parties have already completed extensive discovery and will soon be prepared to make summary judgment motions on the full record. *See* Dkt. No. 299.

design." TAC ¶ 196. Defendants seek for the Court to consider an entire chain of emails, the rest of which were not referenced in the TAC and constitute other employees' disagreements with the original email, in support of a conclusion that the original email is not accurate. Dkt. No. 334-7; Dkt. No. 333 at 15. This is an "invitation to error." *Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 368 (E.D.N.Y. 2021). The other emails, which were not referenced in the complaint or integral to the allegations therein, are simply extrinsic evidence in support of Defendants' position, which cannot be credited on a motion to dismiss. *See Global Network Comm'ns*, 458 F.3d at 156; *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 306 (2d Cir. 2021) ("[A] court may not resolve the motion [to dismiss] by weighing the plausibility of competing allegations or by considering evidence extrinsic to the non-movant's pleading."). Although Defendants state that Exhibit 7 is "the email chain cited to by Plaintiffs," Dkt. No. 333 at 15, Defendants do not provide authority for the proposition that other emails sent on the same chain as a referenced email constitute the same "document." A defendant's side of the story is not "integral" to or "incorporated by reference" in a plaintiff's complaint merely because it was sent in response to an email setting out plaintiff's side of the story. If Plaintiffs' side of the story is incomplete, the proper time to consider opposing evidence is after discovery and on a motion for summary judgment.[6]

      Plaintiffs argue that none of the documents may be considered, apart from SEC filings of which judicial notice may be taken, because they are not "written instruments." Dkt. No. 338 at

---

[6] The original email itself is specifically identified, is quoted at some length, and is central to Plaintiffs' renewed argument that Defendants are liable for false statements regarding the timing of the first draw bell. *See* Dkt. No. 338 at 28. This could support consideration of the original email on a motion to dismiss. However, given that Defendants do not appear to seek consideration of the original email in isolation, the Court will not consider that email divorced from the rest of Defendants' exhibit.

8.  Plaintiffs rely on *Lynch v. City of N.Y.*, which defined a "written instrument" under Federal Rule of Civil Procedure 10(c) as a "legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate."  952 F.3d at 79 (quoting Black's Law Dictionary (10th ed. 2014)); *see also Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015).  Plaintiffs suggest that *Lynch* stands for the proposition that only such written instruments may be incorporated by reference into a complaint.  Dkt. No. 338 at 8.  However, Plaintiffs' reading of *Lynch* is overbroad.

*Lynch* held that a plaintiff who failed to attach a document to his complaint could not rely on that document in opposition to a motion to dismiss.  *See* 952 F.3d at 79.  The Second Circuit cited for that conclusion its prior decision in *Smith*, in which the court acknowledged that it had previously permitted consideration of documents other than written instruments in support of a motion to dismiss so long as the plaintiff possessed or knew about them and relied upon them in bringing suit, but held that permitting a plaintiff to rely upon documents other than a written instrument in opposition to a motion to dismiss "would do considerable damage to Rule 8(a)'s notice requirement."  794 F.3d 249, 255.  *Lynch* thus did not make new law.  A plaintiff cannot rely in opposition to a motion to dismiss on language that is neither contained in a paragraph of the complaint consistent with Federal Rule of Civil Procedure 10(b) nor a written instrument that is an exhibit to the complaint under Federal Rule of Civil Procedure 10(c).  "Defendant is entitled to know the allegations against it, and to have those allegations framed in separate paragraphs, 'with sufficient clarity to allow the defendant to frame a responsive pleading.'"  *Ahmad v. Experian Info. Sols., Inc.*, 2023 WL 8650192, at *5 (S.D.N.Y. Dec. 14, 2023) (quoting *Jackson v. Warning*, 2016 WL 7228866, at *4 (D. Md. Dec. 13, 2016)).  A doctrine that would permit an otherwise facially insufficient complaint to survive based on a document appended for

the first time in opposition to a motion to dismiss would "promote litigation by ambush—the pleader would require its opponent to go through the work of filing a motion to dismiss only to have its adversary surprise it, by springing upon it a document which the pleader possessed and of whose contents only it had knowledge." *Wade Park Land Holdings, LLC v. Kalikow*, 2023 WL 2614243, at *10 (S.D.N.Y. Mar. 23, 2023), *aff'd sub nom. In re Wade Park Land Holdings, LLC*, 2024 WL 3024648 (2d Cir. June 17, 2024).

But the same does not apply to a defendant. "A plaintiff cannot avoid dismissal by citing only to a portion of a document upon which it relies and which is integral to its complaint, but also prevent a defendant from challenging the reliance upon that document on a motion to dismiss by the experience of simply not attaching the document to the complaint." *Id.* at *10. That principle applies not only to written instruments, but also equally to other documents, such as emails and transcripts, that are integral to the complaint and that form the "very basis" upon which the plaintiff's claim rests. *Searle*, 2023 WL 3398137, at *1–2 (incorporating emails crucial to plaintiff's First Amendment claim); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co*., 2024 WL 4315128, at *2 (2d Cir. Sept. 27, 2024) (incorporating a call transcript); *Leroy v. Delta Air Lines,* 2022 WL 12144507, at *1 & n.2–3 (2d Cir. Oct. 27, 2022) (incorporating a contemporaneous written report that was "central" to plaintiff's allegations); *Norales v. Acevedo*, 2022 WL 17958450, at *1–2 (2d Cir. Dec. 27, 2022) (incorporating surveillance video, a proffer agreement, and trial testimony that were referred to in complaint and were integral to its allegations); *Sutton v. Stony Brook Univ*., 2022 WL 4479509, at *2–3 & n.2 (2d Cir. Sept. 27, 2022) (incorporating various texts, emails and letters to which the complaint "repeatedly makes extended references"); *see also Ruderman v. Liberty Mut. Grp., Inc*., 2022 WL 244086, at *1 n.1

(2d Cir. Jan. 27, 2022) (summary order) (incorporating "correspondence between Ruderman and Defendants-Appellees regarding her benefits status").[7]

The October 8, 2018, TEG report to the IC and Rio Tinto's SEC filings may be considered on the motion to dismiss. The other documents may not be considered.

## II.    Jacques' Scienter

After the Court's decision on the SAC, Plaintiffs' surviving 10(b) claims are based on the following statements by Rio Tinto: 1) risk disclosures contained in Rio's 2017 and 2018 annual reports and Form 20-F; 2) the October 16, 2018, re-forecast; 3) statements attributing delays to ground conditions; 4) a July 2018 statement that the Shaft 5 ventilation system was fully operational; and 5) statements by Soirat in an interview on Mongolian television.[8]  *See In re Turquoise Hill*, 625 F. Supp. 3d at 230–32 & n.23.  In addition, the TAC attempts to revive Plaintiffs' claims based on statements about the timing of the first draw bell blast.  TAC ¶¶ 195–199.  The issue is whether, for any of these statements, a strong inference exists based on the

---

[7] Plaintiffs cite to *Doe v. N.Y.U.*, 2021 WL 1226384 (S.D.N.Y. Mar. 31, 2021), for the proposition that *Lynch* must be read broadly.  Dkt. No. 338 at 9.  However, that case simply assumed without analysis that the logic which would preclude a plaintiff from relying in opposition to a motion to dismiss on a document the plaintiff eschewed quoting in his complaint would also preclude a defendant from bringing to the court's attention the entirety of a document the plaintiff quoted or characterized in part in its complaint.  The court also based its decision on the mistaken premise that the Second Circuit had never previously authorized the consideration of a document as incorporated by reference that was not a written instrument. *See id.* at *11 n.6.  That premise was incorrect at the time of *Doe*, *see L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 426 (2d Cir. 2011) (incorporating emails discussing contract negotiations), and continues to be incorrect, *see Searle*, 2023 WL 3398137, at *1–2; *see also Ruderman*, 2022 WL 244086, at *1 n.1.

[8] The analysis here focuses on the first three categories of statements, as well as Rio Tinto's statements about the first draw bell blast.  Plaintiffs do not appear to argue that Jacques had scienter with respect to the July 2018 statement about Shaft 5.  *See* Dkt. No. 338 at 22 n.6 (disputing Defendant's claim that they added no scienter allegations regarding ground conditions, but not Defendants' claim that they added no scienter allegations regarding the Shaft 5 ventilation system).  Plaintiffs also do not argue that Jacques is responsible for Soirat's statements on Mongolian television.

allegations of the TAC that Jacques made the statement with recklessness or "intent to deceive, manipulate or defraud." *In re Turquoise Hill*, 625 F. Supp. 3d at 234 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001)).

Plaintiffs contend that the new allegations in the TAC show that "Jacques (i) was repeatedly informed of the true status of development at OT, (ii) was directly involved in critical decision making concerning OT at the start of the Class Period, (iii) was told by Rio Tinto's internal experts that never in Rio Tinto's history had a complex mining project recovered from delays, let alone the kind that OT had experienced in the year before the Class Period, and (iv) personally directed Rio Tinto's efforts to conceal the cost overruns and delays from the Government of Mongolia to avoid adverse consequences from OT's critical partner." Dkt. No. 338 at 6. Defendants state that "[a]lthough Plaintiffs add allegations regarding various reports Jacques would have received, Plaintiffs still cannot identify a single report Jacques received that would have informed him that his statements to investors were false." Dkt. No. 333 at 8.

"A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)). If Plaintiffs do not show "motive and opportunity," "the strength of the circumstantial allegations must be correspondingly greater." *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). "[T]o qualify as a 'strong inference,' the inference of scienter must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *JP Morgan Chase*, 553 F.3d at 198

(quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 324 (2007)).  Therefore, "[i]n determining whether this inference can be reasonably drawn, courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged." *JP Morgan Chase*, 553 F.3d at 198.

A strong inference of scienter may arise from allegations that the defendant "engaged in deliberately illegal behavior," "knew facts or had access to information suggesting that their public statements were not accurate," or "failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).  The inquiry is highly fact-specific, but complaints "typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."  *Id.* at 308.  The relevant inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 323.

### A.      Motive and Opportunity

As stated in the Court's previous decision, allegations that executives desired to improve corporate performance and avoid governmental and regulatory scrutiny are not the type of "particularized showing" of motive and opportunity that supports a claim of fraud.  *JP Morgan Chase*, 553 F.3d at 201; *see In re Turquoise Hill*, 625 F. Supp. 3d at 235–236, 242.  The TAC adds new allegations that Rio established a project called "Barracuda" aimed at influencing the Government of Mongolia, TAC ¶¶ 21, 227–228, 307, and that Rio was otherwise concerned to avoid scrutiny by the Government of Mongolia, *id.* ¶¶ 195, 307–308.  But these allegations are of the same type that was rejected in the Court's previous decision, demonstrating a desire to avoid government scrutiny which is common to most businesses.  *See In re Turquoise Hill*, 625 F. Supp. 3d at 235 ("The motive to avoid governmental inquiry can be ascribed to any company.").

26

Plaintiffs' assertion that "Jacques was uniquely personally motivated to avoid the wrath of the Mongolian Government upon the implosion of the crown jewel of his career" is unavailing.  Dkt. No. 338 at 18.  Without underestimating the strength of many executives' desires for career success, this is not the type of "concrete" and particularized benefit, generally involving ill-gotten financial gain, that suffices to show fraud via motive and opportunity.  *Novak*, 216 F.3d at 307–08; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011) ("[I]nsider trading is considered a classic example of a "concrete and personal" benefit that suffices to plead motive to commit securities fraud."); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *7 (S.D.N.Y. May 1, 2024) (motive and opportunity was satisfied when fraud allegedly was aimed at securing specific bonuses totaling several million dollars).

### B.    Circumstantial Evidence of Misbehavior or Recklessness

To show scienter via conscious misbehavior or recklessness, "the complaint must 'allege[] that defendants . . . had access to non-public information contradicting their public statements.'"  *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 485 (S.D.N.Y. 2017) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)).  "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309).  "As the courts have made clear, contrary facts may also be learned in other ways, including through observation."  *In re Turquoise Hill*, 625 F. Supp. 3d at 237 (citing *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *3, *9 (S.D.N.Y. Sept. 30, 2020)); *see also AppHarvest*, 684 F. Supp. 3d at 243–244.

### 1.    Prior to October 2018

The first category of non-public information identified by Plaintiffs consists of reports about cost overruns and delays that Jacques received via executive leadership coach Duffy in 2017.  Dkt. No. 338 at 11.  These were already described in the SAC.  *See In Re Turquoise Hill*, 625 F. Supp. 3d at 246.  They include statements passed on from Oyu Tolgoi employees by Duffy in reports delivered to the Executive Committee and a meeting Duffy had with the Head of Human Resources, whom Duffy understood to be reporting to Jacques, in September 2017.  TAC ¶¶ 139–143.  The reports by Duffy suggested significant delays and mismanagement on the project, contradicting Rio Tinto's public statements that the project was on track and on budget. *Id.* ¶ 141.  However, as stated in the Court's previous opinion, "they do not necessarily support the inference that Jacques knew, at the beginning of the Class Period—*i.e.*, an entire year later— that progress at the underground development was still delayed and had not gotten back on track."  *In re Turquoise Hill*, 625 F. Supp. 3d at 246.  The SAC did not contain sufficient allegations to support the reasonable inference that Jacques would have known in July 2018, at the start of the class period, that the Oyu Tolgoi project was delayed.  *Id.*

The TAC adds allegations which, when combined with the information allegedly received by Duffy in 2017, support a strong inference that Jacques knew at the start of the class period that the project was still delayed.  The TAC alleges that in November 2017, shortly after Duffy's last reports, Rio's TEG informed the IC of a five-month delay to the schedule.  TAC ¶ 174.  It additionally alleges that in May 2018, just prior to the class period, the TEG informed the IC that the delays had not improved but had gotten worse, with up to twelve months of schedule "risk."  TAC ¶ 174; Dkt. No. 334-1.[9]  In addition, the TAC alleges in some detail that David

---

[9] Paragraph 175 of the TAC describes the May 2018 update "[a]s detailed in reports prepared

Joyce, who reported directly to Jacques, was well-informed about problems with the Mine in early 2018 and reported in January and May 2018 that at least that some specific components of the mine were behind schedule.  TAC ¶¶ 99, 163–164, 299.  Finally, the TAC alleges that in June 2018, Jacques participated in meetings which led to approval of a budget increase for the primary contractor on the mine, the premise of which was a significant increase in the contractor's costs over budget.  TAC ¶¶ 153–155.[10]

Given these reports, especially the TEG report, the "opposing inference" that Jacques believed the problems existing before the class period were remedied by the time of the class period is no longer as plausible.  *In re Turquoise Hill*, 625 F. Supp. 3d at 246 (quoting *Tellabs*, 551 U.S. at 323).  The complaint alleges that specific and highly concerning internal statements were transmitted to Jacques in 2017, along with a TEG report stating the project was months behind.  It is plausible that Jacques believed at that point the delays would be remedied, but if the TAC's allegations are credited that he was informed of continued delays in May 2018, it is more difficult to credit from the pleadings that he would have believed that there was no delay or overrun in July 2018 when the Class Period began.  Although reports of individual delays or

---

discussed at the October 8, 2018, IC meeting."  TAC ¶ 175.  Therefore, the Court understands the allegations regarding the May 2018 IC meeting to be based on the October 8, 2018, TEG report, and refers to that document when considering the May 2018 allegations.

[10] Plaintiffs suggests that Jacques' scienter is also shown by a related effort to avoid "a public retendering [of the contract for Shafts 3 and 4 sinking] that would have risked revealing the true status of the mine."  Dkt. No. 338 at 14.  However, the inference that Rio Tinto avoided retendering that contract due to fears of public disclosure is not supported by the cited paragraphs.  TAC ¶¶ 154–155.  The relevant paragraphs state that "Rio [Tinto] internally calculated the impact of re-tendering the contract, and concluded doing so would push out sustainable production by months because, at that time, there was 'no time contingency left,' that 'any delay is delay to first ore,' and that every month of additional delay translated into a $100 million hit to OT NPV (net present value)," *id.* ¶ 154, and therefore convinced the Mongolian Oyu Tolgoi directors that "the costs resulting from the delay were too severe," *id.* ¶ 155.  This supports that Rio Tinto retendered the contract to avoid future costs and delay, which does not show scienter of present misconduct.

budget overruns could arguably be consistent with a belief that the project was overall on schedule, they would be more difficult to ignore in the context of Duffy's 2017 reports and TEG reports suggesting global project delays. Plaintiffs have adequately alleged that Jacques had access to specific, non-public information showing that delays existed at the start of the Class Period. Whether those allegations can be proven by fact will have to await summary judgment.

Plaintiffs' allegations are sufficient to support Plaintiffs' 10(b) claim against Jacques related to the risk disclosures contained in the 2017 Annual Report. Such disclosures state, *inter alia*, that "[a] delay or overrun in a project schedule could negatively impact the Group's profitability, cash flows, ability to repay project-specific indebtedness, asset carrying values, growth aspirations and relationship key stakeholders." TAC ¶ 452. Although it is not clear when the 2017 Annual Report was originally filed, the risk disclosures in the report were incorporated by reference into "Rio Tinto's quarterly operations reviews and interim financial reports." *Id.* ¶ 454. One such interim financial report was filed on August 1, 2018. *Id.* ¶ 355. The allegations described above support a strong inference that at that time, Jacques "knew of delays or cost overruns" that had not been disclosed and that could affect Rio Tinto's financial results, and failed to disclose to investors that this risk had already materialized. *In re Turquoise Hill*, 625 F. Supp. 3d at 230.[11]

---

[11] The Court here considers only whether Jacques had the relevant scienter for these risk disclosures, not any additional arguments regarding whether the risk disclosures are generally actionable. In the previous motion to dismiss, Defendants "acknowledge[d] that a risk disclosure can itself be a material misrepresentation" "where the company warns only that a risk may impact its business when that risk has already materialized." *In re Turquoise Hill*, 625 F. Supp. 3d at 230 (quoting Dkt. No. 131 at 30 (citing *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *10 (S.D.N.Y. Mar. 29, 2016))). Defendants argued only that the complaint did not adequately allege that Defendants knew of and attempted to conceal delays and overruns that had materialized at the time the disclosures were issued. *In re Turquoise Hill*, 625 F. Supp. 3d at 230. The Court did not consider any other arguments that might support dismissal of the risk disclosure statements at a later stage in the litigation.

### 2.    October 2018 and Beyond

The remainder of the alleged false statements remaining in the case concern the October 2018 reforecast and subsequent developments. The Court's previous opinion held that allegations that Jacques received weekly progress reports beginning in October 2018 and that Jacques received an email from Bowley on April 2, 2019, did not adequately support scienter, because "shortly after this information was provided to Jacques, Rio Tinto made updated disclosures, announcing further delays." *Id.* at 246. The TAC adds one main set of allegations related to Jacques' knowledge in the period beginning in October 2018: allegations regarding the October 8, 2018, TEG report. TAC ¶¶ 174–179. These allegations do not, alone or combined with the previous allegations, support a strong inference that Jacques knew that any of Rio Tinto's statements in or after October 2018 were false. They are more consistent with the opposing inference that Jacques believed the delay announced in the reforecast was accurate.

The TEG report comments on a forecasted schedule overrun provided by Rio Tinto Copper & Diamonds (RTCD) and Growth and Innovation (G&I), the Rio Tinto divisions responsible for the Oyu Tolgoi project.[12] Dkt. No. 334-1; TAC ¶ 124 n.10. It states that RTCD and G&I quantified this risk "through the May 2018 FC2 process" and that "[s]chedule risks associated with the 2017 FC1 reforecast were reported to the IC in May and November 2018." Dkt. No. 334-1. RTCD and G&I opine that the forecast schedule overrun will "delay commencement of the production ramp up by 9 months," but that this will not "have a material impact on the project's cost estimate." *Id.*

TEG states that it has done a "quick 'light touch' review" of RTCD and G&I's projection, focusing on the schedule overrun. *Id.* The TEG recommends based on this review

---

[12] Defendant Soirat is the head of RTCD. TAC ¶ 124 n.10

that an additional 6 months be added to the projected 9 months, for 15 months total.  *Id.*  It first

describes the history of the issues, noting that in November 2017 there were 5 months of

schedule risk, but G&I believed that improvements could cut this back to three months delay and

"a decision was made to move to a higher-risk schedule . . . through assumed further unidentified

improvements."  *Id.*  Then, in May 2018, G&I identified a range of issues "which negatively

impact the production start date by 12 months."  *Id.*  Since that time, two months have been

saved through improvements and a "reduction in contingency" has been applied, leading to

G&I's estimate of 9 months.  *Id.*

TEG suggests that G&I's estimate of 9 months is a minimum, and that "Rio Tinto's

history of complex mega projects is that once a project begins to experience schedule slippage

that further slippage is expected later in the project."  *Id.*  TEG gives a number of specific

reasons this would be the case, for example that "it has proved more difficult than anticipated to

achieve development rates in the faulted ground prevalent in the initial mining area," an obstacle

which "can be expected to continue."  *Id.*  TEG recommends recognizing: 1) "[t]he full 12

months schedule risk without mitigation of the improvements or contingency reduction; 2) "that

further slippage is likely during 2019; and 3) "a further 3 months schedule contingency which

would bring the over-run to a total of 15 months."  *Id.*

As to cost, TEG suggests that even though TRCD and G&I are forecasting that the

budget will not change, typically schedule overruns and costs go together.  Therefore, it would

be "surprising if the capital budget is held in the fact of a likely 20% schedule over-run."  *Id.*

The TEG report does not detail the reasons for the delays, but states that there have been

"difficulties experienced with ground conditions" and that "the ground conditions experienced so

far . . . have significant implication for the underground construction project" and need to be further assessed. *Id.*

This report does not show Jacques' scienter that the October 2018 reforecast was false. The reforecast stated that first sustainable production would be pushed from the first quarter of 2021 to late in the third quarter of 2021, with no change in the budget or date of the first draw bell. TAC ¶¶ 193, 370. This is consistent with the report provided by RTCD and G&I, which stated that forecast schedule overrun will "delay commencement of the production ramp up by 9 months," but that this will not "have a material impact on the project's cost estimate." Dkt. No. 334-1. The reforecast statements blaming the delay on "ground conditions" are also consistent with the reforecast attributing the delay to that cause. *Id.*; TAC ¶¶ 193, 370. The report does not say anything about the first draw bell, and therefore does not show that it could not be kept in place.

Plaintiffs focus on the TEG's analysis, which strongly suggests that RTCD and G&I are being overly optimistic. TAC ¶¶ 174–179. Thus, Plaintiffs state that Jacques knew that "management's asserted completion percentage was misleading," "the true schedule delay at the time was fifteen months," and "there was no possible way the capital budget would hold." Dkt. No. 338 at 13.[13] However, "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994). It is not enough

---

[13] Plaintiffs also suggest that a comment by the TEG that the project had a funding shortfall of over $1 billion and a $0.7 billion decline in net present value, TAC ¶ 10, shows Jacques' "knowledge of the delays," Dkt. No. 338 at 13. However, it is not clear why that number would provide Jacques with knowledge that the delays would be greater than the two- to three-quarter delay stated in the reforecast.

to show for a securities fraud plaintiff to show that the speaker had access to some facts "cutting

the other way," or that some individuals in the organization disagreed with the speaker's course

of action.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175,

189–90 (2015); *see Rosi v. Aclaris Therapeutics, Inc*., 2021 WL 1177505, at *23–24 (S.D.N.Y.

Mar. 29, 2021).  The plaintiff must show "that the speaker's opinion did not 'fairly align[]' with

all the information that was then available."  *In re Pretium Res. Inc. Sec. Litig.*, 2020 WL

953609, at *5 (S.D.N.Y. Feb. 27, 2020) (quoting *Omnicare*, 575 U.S. at 189); *see City of Austin

Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013) (plaintiff must

make "a non-conclusory allegation that the defendant did not truly believe [the statements] at the

time they were made").

The TEG report supports that Rio Tinto's reforecast provided the most optimistic

possible timetable for Oyu Tolgoi's progress.  However, this timetable was consistent with the

projection of the two Rio Tinto divisions with the greatest responsibility for the project, and

Jacques was not required to credit the views of the less optimistic TEG.  *See New England

Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 2023 WL 11965444 (2d Cir. Aug.

23, 2023) (when "reasonable alternative views exist" a speaker "can choose among them without

running afoul of the federal securities provisions").  The TAC does not support a strong

inference that Jacques knew the timetable provided by G&I was false based on the information

available to him.  It may well be that the reforecast did not fairly align with the actual facts, and

that other employees at Rio Tinto knew that the RTCD and G&I projection was not reasonable

even in the most optimistic view.  *See In re Turquoise* Hill, 625 F. Supp. 3d at 231.  However,

the TAC does not allege that Jacques possessed the full factual narrative available to employees

on the ground or even to Soirat.  The well-pleaded allegations show that Jacques was aware of

some amount of delay prior to October 2018, and then in October 2018 received competing forecasts that the delay was either nine months or twelve to fifteen months. This is insufficient to support a strong inference that he knew Rio Tinto's announcement of a nine-month delay was false.[14]

For largely the same reasons, the TAC does not support Jacques' liability for other statements after October 2018. Plaintiffs allege that Jacques learned some additional information in this period, specifically that he received weekly progress reports from Oyu Tolgoi staff because he was concerned about the extent of delays, TAC ¶ 110, and that he received an email from Bowley on April 2, 2019, telling him how far behind the project was, *id.* ¶ 253. However, these allegations do not discuss the content of the reports or show that Jacques learned information that would have made him aware that Rio Tinto's reforecast and subsequent delay updates were insufficient. Therefore, the failure of Plaintiffs' argument that Jacques knew the reforecast was inaccurate when it was made is also fatal to their arguments that he knew it was inaccurate at later dates.

Specifically, the risk disclosures in Rio Tinto's 2018 Annual Report, which was released in late February 2019 and incorporated into Rio Tinto's Form 20-F in early March, TAC ¶ 404,

---

[14] Plaintiffs also state that Jacques' scienter can be inferred from Rio Tinto's later refusal to cooperate with the independent investigation ordered by the ICG. Dkt. No. 338 at 16. Attempts to cover up misconduct may add support to an inference of scienter, at least if other circumstantial evidence of fraud is present. *See Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 234–35 (S.D.N.Y. 2012); *Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*, 2022 WL 837114, at *23 (S.D.N.Y. Mar. 21, 2022). However, the ICG investigation was commissioned only after the class period and "to investigate the causes of the cost overruns and delays and whether these problems were caused by geotechnical issues." TAC ¶ 28. It was not commissioned to investigate whether Rio Tinto committed fraud in its public statements. Accordingly, Rio Tinto's general refusal to cooperate with the investigation provides very weak support, if any, for the inference that Jacques specifically knew between October 2018 and July 2019 that the nine-month delay reported in the reforecast was an underestimate.

35

were essentially the same as those in the 2017 report, *id.* ¶¶ 451–454.  However, at this point

delays had already been disclosed in line with the reforecast and an additional delay

announcement which accompanied the 2018 Annual Report.  *Id.* ¶¶ 402–404.  The allegation that

Jacques received weekly progress reports of negative but unspecified content is not sufficient to

support a strong inference that by February–March 2019 he would have realized the delay was

greater than Rio Tinto was publicly reporting.  Similarly, given that the TEG report blamed the

delays on ground conditions and there are no clear allegations that Jacques would have later

learned information to disprove this, Plaintiffs have not shown Jacques' scienter for statements

blaming delays on ground conditions.

The motion to dismiss is granted as to Plaintiffs' 10(b) claims against Jacques for

statements in and after October 2018, and is denied as to the claims based on risk disclosures

issued before that time.

### III.   First Draw Bell Statements

Plaintiffs add new allegations to the TAC suggesting that Defendants' statements on

October 15, 2018, that the first draw bell would take place in "mid-2020" "partly due to a change

in the draw bell sequencing strategy" were misleading or false.  TAC ¶¶ 195–196.  Defendant

argues that the statements are protected by the PSLRA safe harbor, are not made by Rio Tinto,

and are not false.  Dkt. No. 333 at 17–18.  Defendants also argue in their reply brief that adding

these allegations was contrary to the Court's order which granted Plaintiffs leave to amend in

part and denied it in part.  Dkt. No. 340 at 15; *see* Dkt. No. 325.  Plaintiffs argue that the

statement was "made" by Rio Tinto in that it was made by Turquoise Hill and attributed to Rio

Tinto, and that the amendment was permissible under the Court's order.  Dkt. No. 338 at 27.

Rio Tinto is not liable for the cited statement because it was not made by Rio Tinto.[15] The statement Plaintiffs argue is false is the statement on October 15, 2018, that "[f]irst draw bell remains on track for mid-2020, partly due to a change in the draw bell sequencing strategy." Dkt. No. 338 at 27; TAC ¶¶ 192, 196, 368.  That statement comes from a press release by Turquoise Hill, not Rio Tinto.  TAC ¶ 368.  As was thoroughly analyzed in the Court's previous decision, Turquoise Hill had "'ultimate authority' over the content of its own disclosures," and the fact that Rio Tinto influenced the disclosures or provided relevant information does not make Rio Tinto the "maker" of the statements. *In re Turquoise Hill*, 625 F. Supp. 3d at 206–07 (quoting *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)); *see Janus*, 546 U.S. at 143 ("Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.").  Assuming that Rio Tinto told Turquoise Hill that first draw bell remains on track for mid-2020 due to a change in the draw bell sequencing strategy,

---

[15] The Court considers the claim on the merits and does not understand it to be barred by the order denying leave to amend.  It is true that the Court's opinion and order of February 26, 2024, denied Plaintiffs leave to include "allegations that seek to impose liability on Rio Tinto for statements of Turquoise Hill," a holding which facially appears to bar the allegations here.  Dkt. No. 325 at 7.  However, in context this holding was directed at allegations which sought to add language from public statements that might suggest Turquoise Hill's statements would be attributed to Rio Tinto, not allegations of new facts showing Turquoise Hill's statements attributed to Rio Tinto were false.  In briefing on the motion to amend, Defendants never challenged the addition of allegations regarding the first draw bell or cited the relevant paragraphs of the complaint, despite Plaintiffs noting that such had been conceded. *See* Dkt. No. 323 at 9, 12 (stating that Defendants do not challenge the addition of such statements); Dkt. No. 324 (not addressing this point).  Defendants instead urged the Court to deny Plaintiffs' attempts to add language in Turquoise Hill disclosures "which has been public since long before Plaintiffs' first complaint was filed . . . that Plaintiffs argue attributes additional information to Rio Tinto."  Dkt. No. 320 at 6.  The Court's holding, which was based on the reasoning that "Plaintiffs identify no new information supporting those allegations that was not available to them" by prior deadlines for amendment, must be read accordingly.  Dkt. No. 325 at 8.  It is also notable that the Court's holding specifically cited a number of paragraphs as to which leave was denied, but did not reference the paragraphs here.  Dkt. No. 325 at 7.  Given that Defendants never argued that leave to add these allegations should be denied, and the Court's order did not clearly intend to deny leave to add these allegations, they are properly considered on the merits.

resulting in Turquoise Hill repeating that information, that does not make Rio Tinto the maker of the statement in Turquoise Hill's press release. Turquoise Hill was not required to, and should not have, "ma[de] a statement consistent with the information provided by the Rio Tinto manager if making that statement violated the securities laws." *In re Turquoise Hill*, 625 F. Supp. 3d at 207.

Plaintiffs argue that Rio Tinto was the maker of the statement because the statement was explicitly attributed to Rio Tinto. Dkt. No. 338 at 27. The Court did suggest in its previous order that Rio Tinto might be liable for statements which Turquoise Hill "explicitly attributed in some form to Rio Tinto." *In re Turquoise Hill*, 625 F. Supp. 3d at 208. But this is not such a statement. The relevant paragraph of the press release states:

> Despite significant progress in the development of the project, Rio Tinto has notified Turquoise Hill, based on preliminary results, of a delay to achievement of sustainable first production, which is now expected to occur by the end of Q3'21 instead of Q1'21. This is a result of certain delays including, but not limited to, the completion of Shaft 2, which includes over four months of schedule contingency, and challenging ground conditions. First draw bell remains on track for mid-2020, partly due to a change in the draw bell sequencing strategy.

TAC ¶ 368. The first sentence of this paragraph is explicitly attributed to Rio Tinto. It is clear that Rio Tinto, and *not* Turquoise Hill, notified Turquoise Hill of a delay. However, the Court's previous order rejected the idea that statements are "explicitly attributed" to Rio Tinto merely because they are based on information from Rio Tinto or in close proximity to statements explicitly attributed to Rio Tinto. *See In re Turquoise Hill*, 625 F. Supp. 3d at 204 n.7 (statement that "[a]ccording to this re-forecast [by Rio Tinto], lateral development has progressed well, construction completion schedule remains on track for 2022" was made by Turquoise Hill). The second and third sentences in the paragraph are not statements that are made "by—and only by— [Rio Tinto]." *Id.* at 208 (quoting *Janus*, 564 U.S. at 142–43). They are statements made by Turquoise Hill.

Turquoise Hill's ultimate authority over the statement is especially relevant here, where Plaintiffs' claim depends on a slight variation in wording in a heavily negotiated statement. In Rio Tinto's press release the next day, Rio Tinto stated that "construction of the first draw bell is still expected in mid-2020." TAC ¶ 370. Though Rio Tinto is clearly the maker of that statement, Plaintiffs do not cite to it because their claim depends on the specific language in Turquoise Hill's press release stating that the first draw bell remains on track "partly due to a change in the draw bell sequencing strategy." *Id.* ¶ 368; *see* Dkt. No. 338 at 26 (arguing that even though the Court held that the statement that the draw bell schedule "remained on track for mid-2020" was forward-looking, the Complaint now alleges that "a separate portion of the statement," that Rio "implemented 'a change in the draw bell sequencing strategy,' was false"). This language is only contained in Turquoise Hill's press release. The TAC emphasizes that the press release involved negotiation around wording between Rio Tinto and Turquoise Hill. TAC ¶¶ 178–182. It cannot simply be assumed that explanations included in Turquoise Hill's press release, and not Rio Tinto's, are attributable to Rio Tinto.

## CONCLUSION

The motion to dismiss is GRANTED IN PART and DENIED IN PART. The motion to dismiss is granted as to Plaintiffs' 10(b) claims against Jacques arising in and after October 2018 and as to Plaintiffs' claims that Rio Tinto made a false statement about the first draw bell blast. The motion to dismiss is denied as to the 10(b) claims against Jacques for risk disclosures before October 2018.

The Clerk of Court is respectfully directed to close Dkt. No. 332.

SO ORDERED.

Dated: November 7, 2024
      New York, New York                          _____
                                        LEWIS J. LIMAN
                             United States District Judge