**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TURQUOISE HILL RESOURCES LTD. SECURITIES LITIGATION | Case No. 1:20-cv-08585-LJL |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY LEAD PLAINTIFF'S EXPERT JOHN C. BARBER**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF CONTENTS ........................................................................................................ I

PRELIMINARY STATEMENT ........................................................................................... 1

I.    FACTUAL AND PROCEDURAL BACKGROUND ................................................. 4

     A.    Turquoise Hill and Rio Tinto Have Had an Often Adversarial Relationship ........ 4

     B.    Lead Plaintiff Retains Mr. Barber to Provide Technical Consultation
          Concerning Discovery ............................................................................................ 7

     C.    Mr. Barber's Work for AMEC Involved Providing Technical Expertise
          for Feasibility Studies that Have Been Entirely Superseded and Were
          Made Public Years Ago ........................................................................................ 8

     D.    Mr. Barber's Technical Work for TRQ Focused on a Redesign of Panel 0,
          Not on the Underground Construction, Did Not Involve this Litigation,
          and Was Adverse to Rio ........................................................................................ 9

     E.    Mr. Barber's Technical Work as a "Peer Reviewer" of the ICG Report Was
          Adverse to Rio, Did Not Involve Legal Counsel, and the ICG Did Not
          Investigate Whether Rio Committed Fraud ......................................................... 12

          1.    The Scope of Work Defining Barber's Engagement by the ICG Was
               Expressly Adverse to Rio ........................................................................ 13

          2.    The ICG Was Engaged Over Other Expert Candidates Due to its
               Independence from Rio ............................................................................ 14

          3.    Rio Actively Concealed Documents, Prohibited Access to Key
               Personnel and Interfered with the ICG's Independent Investigation ........ 14

     F.    Defendants Seek to Disqualify Mr. Barber .......................................................... 16

ARGUMENT ...................................................................................................................... 17

II.    LEGAL STANDARD ............................................................................................... 17

III.    DEFENDANTS HAVE FAILED TO SHOW THAT RIO TINTO
       HAD AN OBJECTIVELY REASONABLE EXPECTATION OF A
       CONFIDENTIAL RELATIONSHIP WITH MR. BARBER FOR THE
       PURPOSES OF THIS CASE ................................................................................. 19

A.      Mr. Barber's Technical Work at AMEC, Completed in 2014 for Public
        Feasibility Studies that Predated the Start of Underground Development,
        Does Not Give Rise to a Confidential Relationship for Purposes of
        Disqualification ...................................................................................................... 19

B.      The Nature of Mr. Barber's Consulting Role In a Now Terminated
        Engagement with TRQ and His Work for the ICG Precludes Any
        Objective Expectation of Confidentiality ............................................................. 21

C.      Courts Routinely Hold that Information Like the Kind Mr. Barber Obtained
        Is Not Confidential for Disqualification Purposes If It Will be Potentially
        Disclosed to Aan Adversary in Discovery ............................................................ 24

IV.     DEFENDANTS HAVE NOT IDENTIFIED ANY "SPECIFIC AND
        UNAMBIGUOUS DISCLOSURES" AS REQUIRED FOR DISQUALIFICATION .... 25

A.      All of the Information Mr. Barber Obtained Through His Prior Engagements
        Is Discoverable, Highly Technical, or Concededly Irrelevant .............................. 25

B.      Mr. Barber's Technical Work for Rio's Adversaries Is Nothing Like the
        Experts' Involvement in the Deliberative and Litigation Strategy Matters
        in Defendants' Cases ............................................................................................ 29

V.      PUBLIC POLICY CONSIDERATIONS STRONGLY DISFAVOR EXCLUSION
        OF MR. BARBER GIVEN THE HIGHLY SPECIALIZED AND
        WELL-TAILORED NATURE OF HIS EXPERTISE ...................................................... 31

CONCLUSION .................................................................................................................... 34

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allstate Ins. Co. v. Electrolux Home Prods., Inc.*,
   840 F. Supp. 2d 1072 (N.D. Ill. 2012) ................................................................23, 33, 34

*Auto-Kaps LLC v. Clorox Co.*,
   2016 WL 1122037 (E.D.N.Y. Mar. 22, 2016) ..............................................20, 26, 27, 28, 34

*Baghdady v. Baghdady*,
   2007 WL 3432427 (D. Conn. Nov. 15, 2007) ....................................................................26

*Baker Hughes, Inc. v. S&S Chemical, LLC*,
   2015 WL 5547751 (W.D. Mich. 2015)..............................................................................24

*Breitkopf v. Gentile*,
   2014 WL 12843765 (E.D.N.Y. Mar. 24, 2014) ........................................................17, 21, 22

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*,
   2000 WL 42202 (S.D.N.Y. Jan. 19, 2000) ............................................................20, 23, 26, 33

*Capitol Recs., Inc. v. MP3tunes, LLC*,
   2010 WL 11590131 (S.D.N.Y. Apr. 15, 2010)..............................................................18, 26

*Eastman Kodak Co. v. Agfa-Gevaert N.V.*,
   2003 WL 23101783 (W.D.N.Y. Dec. 4, 2003) ........................................................17, 21, 26

*Eastman Kodak Co. v. Kyocera Corp.*,
   2012 WL 4103811 (W.D.N.Y. Sept. 17, 2012) ..............................................................28, 30

*English Feedlot, Inc. v. Norden Labs., Inc.*,
   833 F. Supp. 1498 (D. Colo. 1993)........................................................................18, 25, 31, 34

*Ferring Pharms. Inc. v. Serenity Pharms., LLC*,
   331 F.R.D. 75 (S.D.N.Y. 2019) .........................................................................................34

*Gordon v. Kaleida Health*,
   2013 WL 2250506 (W.D.N.Y. May 21, 2013)..............................................................17, 21

*Grioli v. Delta Int'l Mach. Corp.*,
   395 F. Supp. 2d 11 (E.D.N.Y. 2005) ...................................................................................32

*In re Incretin Mimetics Prods. Liab. Litig.*,
   2015 WL 1499167 (S.D. Cal. Apr. 1, 2015)................................................................23, 29

*Koch Refining Co. v. Boudreau*,
   85 F.3d 1178 (5th Cir. 1996) ..............................................................................................18

*Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*,
    2021 WL 4706162 (S.D.N.Y. Oct. 7, 2021) ...........................................................................18

*Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*,
    2021 WL 5362256 (S.D.N.Y. June 2, 2021) .....................................................17, 19, 20, 28

*Lyman v. Pfizer, Inc.*,
    2011 WL 3843956 (D. Vt. Aug. 30, 2011) ..................................................................... *passim*

*In re Nameda Direct Purchaser Antitrust Litig.*,
    2017 WL 3613663 (S.D.N.Y. Aug 21, 2017) ....................................................23, 24, 29, 34

*In re Namenda Direct Purchaser Antitrust Litig.*,
    2017 WL 3085342 (S.D.N.Y. July 20, 2017) ...................................................22, 28, 32, 33

*In re New York City Policing During Summer 2020 Demonstrations*,
    2022 WL 203191 (S.D.N.Y. Jan. 24, 2022) ......................................................29, 33, 34

*In re New York City Policing During Summer 2020 Demonstrations*,
    2022 WL 656808 (S.D.N.Y. Mar. 4, 2022) .................................................................29, 33

*Palmer v. Ozbek*,
    144 F.R.D. 66 (D. Md. 1992).............................................................................25, 31, 34

*Pellerin v. Honeywell Int'l Inc.*,
    2012 WL 112539 (S.D. Cal. Jan. 12, 2012).................................................................34

*Thompson, I.G., L.L.C. v. Edgetech I.G., Inc.*,
    2012 WL 3870563 (E.D. Mich. 2015) .......................................................................27, 33

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    2014 WL 4711185 (S.D.N.Y. Nov. 7, 2024).............................................................5, 6, 12

*Twin City Fire Ins. Co., Inc. v. Mitsubishi Motors Credit of Am., Inc.*,
    2006 WL 5164249 (C.D. Cal. Nov. 6, 2006)..................................................................18, 26

*United States ex rel. Cherry Hill Convalescent Center, Inc. v. Healthcare Rehab Sys. Inc.*,
    994 F. Supp. 244 (D.N.J. 1997) ...................................................................................18, 22

Lead Plaintiff the Pentwater Funds respectfully submits this memorandum of law in opposition to Defendants' motion to disqualify Plaintiff's consulting expert John C. Barber.

## PRELIMINARY STATEMENT

In their motion, Defendants seek to disqualify Mr. Barber, a "drastic remedy" that "should be resorted to rarely." ECF No. 354 at 11. However, Defendants have no reasonable expectation of confidentiality with Mr. Barber based on prior engagements for other entities. In reality, in those prior engagements, Mr. Barber only obtained either **technical** or **discoverable** information, which courts uniformly hold is not disqualifying. As explained below, Rio fails to show that any of the information Mr. Barber received represents the kind of "**specific and unambiguous disclosures that if revealed would prejudice**" Rio and provide a basis of disqualification.[1]

Rio's failure to establish the existence of a specific and prejudicial disclosure is fatal to its motion. The nature of Mr. Barber's prior consulting—which involved only technical work—was adverse to Rio or over a decade out-of-date. In fact, rather than "switch sides" as an expert—the primary concern animating the disqualification case law (*see, e.g.*, *Lyman v. Pfizer, Inc*., 2011 WL 3843956, at *4 (D. Vt. Aug. 30, 2011))—Mr. Barber's adverse work was never on Rio's "side."

Specifically, Rio seeks disqualification by contending that Mr. Barber suffers from an "irremediable conflict" due to three prior engagements. Mot. at 1. First, Defendants point to an engagement Mr. Barber had with a contractor for the Oyu Tolgoi mine ("OT") that concluded in 2014—or over ten years ago, a time period Defendants have argued is irrelevant and outside the scope of this case. Mr. Barber's work in that time period concerned two OT feasibility studies that

---

[1] "Rio" or "Rio Tinto" refers to Defendants Rio Tinto plc and Rio Tinto Limited; "Mot." or "Motion" refers to Defendants' motion to disqualify (ECF No. 354); "Ex. __" refers to the Exhibits to the Declaration of Salvatore J. Graziano; and "¶__" refers to the Third Amended Complaint (ECF No. 329). Unless otherwise noted, all emphasis is added and internal citations are omitted.

were made public and entirely superseded before the Class Period began.  Second, Rio contends that Mr. Barber should be disqualified based on two engagements that were adverse to Rio. Specifically, Rio contends Mr. Barber's work (i) for TRQ on the Panel 0 redesign—an engagement TRQ unconditionally terminated in 2023—and (ii) as a "Peer Reviewer" for the Independent Consulting Group ("ICG") commissioned by a special committee of the OT Board to investigate Rio's responsibility for the delays and cost overruns at OT, presents a conflict.

But Rio cannot claim that any "specific and unambiguous" disclosures warranting disqualification occurred in connection with these adversarial or decade-old retentions—and the case law and public policy considerations prohibit such a result.  To start, Defendants do not dispute that Mr. Barber did not consult for Rio in connection with this litigation, did not consult with or advise Rio legal counsel or any attorney for any other party besides Pentwater, and indeed never acted as a consultant *for Rio* in *any* of the engagements at issue.

Rather than establish Mr. Barber received "specific and unambiguous" disclosures while consulting for TRQ or the ICG, the reality is that Rio actively refused to provide any such information that could be considered disqualifying because TRQ and ICG were adverse to Rio. Indeed, Rio preciously guarded any information that could possibly be deemed "prejudicial" for purposes of disqualification in this litigation—and had in fact ████████████████████████ ████████████████████████████████████ the time of Mr. Barber's engagement with TRQ.

Rio's direct adversity and careful ████████████████████████████████ eventually resulted in TRQ initiating an arbitration against Rio, and then backing the OT Board's effort to establish the ICG.  The ICG was hired by a special committee of the Oyu Tolgoi LLC Board specifically formed and tasked with investigating the true causes of the cost overruns and delays at OT.  In fact, the actual record shows that Rio was deliberately ████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████

Rio's motion fails because Rio simply cannot establish that it maintained an expectation of confidentiality with respect to adverse parties it actively sought to conceal information from—as Rio clearly cannot show it disclosed "specific and unambiguous" information to Mr. Barber in his role as a TRQ consultant or ICG Peer Reviewer of the kind contemplated by the disqualification case law.  Mr. Barber has simply not "switched sides."  *Lyman*, 2011 WL 3843956, at *4.

Underscoring that its motion lacks merit, ████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Ex. 1 at ¶¶120; 126. ████████████████████████████████████████████████

let alone try to square them with their argument that the purported information Mr. Barber received while serving as consultant for Rio's adversaries could be disqualifying here.

Last, and despite repeated calls by Lead Plaintiff to do so, Defendants have not and indeed cannot show any harm or prejudice that they will suffer through Mr. Barber's retention—that Mr. Barber is eminently qualified to consult for Lead Plaintiff here does not "prejudice" Defendants.  By contrast, Lead Plaintiff and the class will suffer significant prejudice if Mr. Barber is disqualified, given the dearth of specialized expertise and the effective monopolization of

knowledge that Rio would successfully impose on this field if Defendants request is granted.  As

the record makes clear and ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* at ¶144.

Far from being a "textbook case" for disqualification, the actual record here demonstrates

why Mr. Barber's retention is appropriate, and that Defendants' Motion amounts to an

opportunistic attempt to gain a litigation advantage.  The Motion should be denied.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Turquoise Hill and Rio Tinto Have Had an Often Adversarial Relationship

As the Court recently summarized, Turquoise Hill Resources Limited ("TRQ") is a

mineral-exploration and development company, the sole business of which is the operation of the

Oyu Tolgoi mine.  ¶40.  In this case, Lead Plaintiff alleges that Defendants concealed massive

delays and cost overruns for the underground development at OT—a mine that, when completed,

is expected to be one of the largest copper mines in the world.  Investors' claims are premised on

Defendants' representations throughout the Class Period (from July 2018 through July 2019) that

conveyed to investors that the development of the mine was on schedule and budget.  However,

those representations were in direct conflict with Rio's faulty management of the engineering,

procurement and construction issues that led to the cost overruns and delays that Defendants were

ultimately forced to disclose at the end of the Class Period.  *See, e.g.*, ¶¶107-208.

During the Class Period, OT was owned by nonparty Oyu Tolgoi LLC, which is 66%

owned by TRQ and 34% owned by the Government of Mongolia.  *Id.*  Further, during the Class

Period, Rio held a majority interest in TRQ through one of its wholly owned subsidiaries (¶49),

while the remainder of TRQ's common stock was publicly traded and owned by investors like

Pentwater. ¶41; *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 WL 4711185, at *2-6 (S.D.N.Y. Nov. 7, 2024). However, and as the Court has made clear, TRQ operated as a distinct corporate entity with its own directors and management. *See Turquoise Hill*, 625 F. Supp. 3d 164, 205-06 (S.D.N.Y. 2022). The conflict between TRQ's role and duties to its shareholders as a joint investor in OT with the Government of Mongolia—and Rio, the entity contracted by OT to develop the mine—only intensified as the delays and cost overruns at OT worsened.

After the end of the Class Period in this case, Rio's adversarial relationship with TRQ became acute. At that time, Rio Tinto abused its control over TRQ's minority investors in several ways after TRQ's senior management took steps to challenge Rio's misconduct that led to the cost overruns and delays at OT. First, in November 2020, TRQ, led by then-CEO Ulf Quellmann, initiated an arbitration to prevent Rio from using its control over TRQ to force TRQ to raise capital on unfavorable, non-market terms to the detriment of TRQ's minority stockholders like Pentwater and other members of the Class. *See* ¶490; ECF No. 157-15 at ¶¶9-13. In February 2021, TRQ announced that it had successfully obtained a Temporary Restraining Order that prevented Rio from forcing TRQ to raise capital on Rio's terms. *Id.*

At the same time, on December 1, 2020, representatives of the Government of Mongolia and TRQ voted, with Rio opposing them both, to have Oyu Tolgoi LLC establish a special board committee mandated to conduct an independent review of the causes of the cost overruns and delays to the Oyu Tolgoi underground development announced at the end of the Class Period. Quellmann commented on the resolution stating, "TRQ fully supports our government partner . . . in securing an independent and objective review of the cost overruns and delays announced last year." ECF No. 157-15 at ¶10. This resolution led to the creation of the ICG.

After Quellmann initiated this effort, Rio used its control over TRQ to force his resignation,

with TRQ noting in a March 2021 press release that Quellmann had been forced out because of "Rio Tinto's view that new leadership at Turquoise Hill was necessary" and that "Rio Tinto would not vote in favour of Mr. Quellmann's election as a director at the Company's upcoming annual and general meeting of shareholders in May 2021." *Id.* at ¶14.

Second, just five weeks after removing Quellmann as CEO, TRQ agreed to drop its pending arbitration against Rio in exchange for a financing package that was disadvantageous to TRQ's minority investors and unfairly benefited Rio. *See id.* at ¶15. Third, in August 2021, the ICG issued its report confirming that Rio's "staggering" failures and mismanagement caused the delays and cost overruns at OT—and that, contrary to Rio's public representations, the delays and cost overruns were ***not*** the result of unforeseen ground conditions. ¶¶291-93. Fourth, in January 2022, Rio caused Turquoise Hill to forgive a $2.4 billion loan owed by the Mongolian Government to TRQ in order to resolve claims arising from Rio's own misconduct as operator of the Oyu Tolgoi mine. As Pentwater previously summarized these developments, "TRQ's minority shareholders were harmed three times—first, by Rio's misconduct; second, by having their interest in TRQ used to pay the Government of Mongolia for Rio's misconduct; and third, by Rio causing TRQ to release Rio from any liability for its misconduct." ECF No. 157-15 at ¶18.

After these developments, where Rio's misconduct and oppressive acts drove down TRQ's stock price, Rio swooped in to buy out the TRQ minority on the cheap, requiring Pentwater to take action to protect its rights. Specifically, in September 2022, and in an effort to comply with the Court's directives and its obligations as Lead Plaintiff, Pentwater filed an application concerning its pursuit of legal action in Canada, and the Court affirmed that Pentwater could "continue to serve as lead plaintiff and a proposed class representative" while pursuing this effort. *Turquoise*

*Hill*, 2022 WL 17884165, at *1 (S.D.N.Y. Dec. 23, 2022).[2]

In connection ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

**B.    Lead Plaintiff Retains Mr. Barber to Provide Technical Consultation Concerning Discovery**

In June 2023, Bernstein Litowitz entered into a retention agreement for Mr. Barber to serve as a consulting expert in this case.   *See* Declaration of John C. Barber filed concurrently (the "Barber Decl.") ¶8.  Specifically, after obtaining advice from independent counsel to ensure compliance with his prior contracts and that he would not breach them by working with Pentwater, Mr. Barber entered into an agreement with Bernstein Litowitz on June 27, 2023.  *See* Barber Decl. ¶¶8-11.  In that agreement, Mr. Barber and Bernstein Litowitz expressly agreed that he would not disclose any confidential information he may have obtained through his prior work with AMEC, TRQ and the ICG:

> We understand that you may have information relevant to the Dispute arising from prior work you have performed for Turquoise Hill, Rio Tinto or its affiliates and you have advised us that certain non-disclosure agreements may restrict your ability to disclose some or all of that information to us ("Prior Information").  Accordingly, we ask that you ensure that you do not share any Prior Information to us at any point during the course of providing the Services unless authorized to do so under the terms of any relevant agreements, by consent of the relevant parties to whom

---

[2] Pentwater informed the Court of its intent to pursue legal action in Canada on December 12, 2022 (ECF No. 196), and provided an update on the status of the arbitration in connection with its motion for class certification on October 29, 2023.  ECF No. 287 at 11-14.

any obligation of confidentiality is owed, or by order of any competent authority.

*See* Barber Decl. Ex. B.  Plaintiffs have not and have no intention to ask Mr. Barber to reveal any confidential information, and none has been revealed since his retention.  Graziano Decl. ¶4; Barber Decl. ¶¶11-13.  To date, Mr. Barber has worked with Plaintiff's counsel for a less than 10 hours (not including time spent addressing Defendants' disqualification efforts), during which time he has reviewed documents produced in this case and provided guidance to Plaintiffs' counsel concerning technical aspects of mine construction, scheduling and planning.  Barber Decl. ¶14.  Mr. Barber has not provided any reports or other written work product to Lead Plaintiff or its counsel.  *Id.*

### C.  Mr. Barber's Work for AMEC Involved Providing Technical Expertise for Feasibility Studies that Have Been Entirely Superseded and Were Made Public Years Ago

Mr. Barber joined AMEC in 2007 and from 2009 to 2017 served as a "Technical Director, Underground Mining."  Including during his tenure at AMEC, Mr. Barber has worked on a wide variety of projects, among many others, consulting on underground construction and mining work in Grasberg, PT Freeport Indonesia, Twin Metals Minnesota, Minnesota, and elsewhere, which provided him with significant experience and expertise in understanding large, complex underground mine construction projects like OT.  Barber Decl. Ex. A.  While at AMEC, Mr. Barber also worked in a technical capacity on the 2012 and 2014 feasibility studies for OT ("OTFS12" and "OTFS14," respectively), which analyzed schedule and cost estimates for a number of features of the mine, and were completed two years before construction of the mine began.  Barber Decl. ¶16.  This work concluded over a decade ago, in February 2014.  *Id.*

Significantly, contrary to Defendants' representation that OT's feasibility studies were "highly confidential," in reality, the documents have been public for years.  Specifically, the over decade-old OT feasibility studies that Mr. Barber worked on during his time at AMEC have been

entirely superseded by subsequent updates to the mine—as documented in a separate feasibility study, OTFS16. Barber Decl. ¶16. OTFS16, which superseded OTFS14, is a public document that TRQ filed with the SEC before the start of the Class Period and was available for inspection on TRQ's website throughout the Class Period (¶70), as is OTFS12, which was published twelve years ago on March 25, 2013. *See* Ex. 3 at -3799.[3] Mr. Barber did not work on OTFS16, which was operative during the Class Period. Barber Decl. ¶16.

Mr. Barber's work on OT at AMEC on the public OTFS14 and the OTFS14 studies obviously did not provide him access to the alleged schedule delays and cost overruns in this case—as the underground project did not recommence until long after they were completed, in 2016. ¶68. Rather, by their nature, these two feasibility studies assessed whether the underground project was economically and technically feasible at the outset, and by definition could not speak to cost overruns or delays for construction that had not yet begun. ¶¶66-68. Moreover, the feasibility studies did not involve any consultation with Rio Tinto's—or any other entity's—legal counsel or Rio's legal strategies in this case, as they focused on purely technical evaluations of the mine years before the Class Period and underground construction began. Barber Decl. ¶15.

**D.    Mr. Barber's Technical Work for TRQ Focused on a Redesign of Panel 0, Not on the Underground Construction, Did Not Involve this Litigation, and Was Adverse to Rio**

After the end of the Class Period, on September 2019, Mr. Barber was approached by Jo-Anne Dudley, who had just joined TRQ as its Chief Operating Officer, to review the revisions of the mining plan for Panel 0 then being considered—the initial portion of ore body to be mined at

---

[3] The technical information from OTFS14 was included in the publicly filed 2014 Oyu Tolgoi Technical Report. Further, while TRQ told investors it would publish OTFS14 (as it had done with OTFS12) and publicly disclosed its contents to analysts, its formal publication was delayed and ultimately superseded by OTFS16.

OT.  At the time of this engagement, TRQ was in an adversarial relationship with Rio, which maintained a "firewall" that prevented TRQ from obtaining documents and information—information that TRQ requested at least in part due to growing concerns from its TRQ's minority shareholders like Pentwater concerning the cost overruns and delays and OT.

Specifically, while Mr. Barber's engagement with TRQ states that he was to provide updates on the status of the project, his work was focused on the proposed redesign for Panel 0. Barber Decl.  ¶17.  That work was highly technical in nature and focused on stability risks associated with the design for mining Panel 0.  Barber Decl. ¶¶17-18.  Notably, the proposed redesign for Panel 0 has nothing to do with the cost overruns and delays experienced in the development of Shaft 2, Shaft 3, Shaft 4, Shaft 5, the PC1, the Central Heating Plant or any other part of the enabling infrastructure or other aspects of the underground construction that led to the delays and cost overruns announced in 2019.  Barber Decl. ¶17.  Indeed, Shaft 2 is located approximately 1.5 kilometers away from Panel 0, and the mine plan redesign plan Panel 0 did not evaluate the facts leading to the delays in the underground construction.  Barber Decl.  ¶17.  Mr. Barber's work for TRQ was technical and did not involve any legal strategy, advice or other strategic issues concerning this or any other litigation.  Barber Decl. ¶18.

Moreover, Mr. Barber's work for TRQ was done at a time when Rio was actively concealing the facts about the causes of the delays and cost overruns *from TRQ* and had established a "firewall" to prevent TRQ from accessing that information—none of which was provided to Mr. Barber.  Immediately preceding Mr. Barber's engagement in the summer of 2019, ███████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Rio continued to actively ███████████████████████████████████████████

throughout Mr. Barber's engagement as TRQ's consultant—and indeed, Rio's refusal to provide

that information ultimately led TRQ and the Oyu Togloi LLC Board to establish a special

committee to investigate the causes of the cost overruns and delays.[4]

In February 2023, TRQ formally terminated its engagement with Mr. Barber, explaining

that as of January 31, 2023, "any agreement or engagement between Vendor and TRQ, including

but not limited to" John Barber's engagement on Panel 0, "shall be terminated and cancelled and

shall have no further force or effect, with no further actions or formalities required on the part of

any of the Parties."  Barber Decl. ¶20, Ex. C.

**E.  Mr. Barber's Technical Work as a "Peer Reviewer" of the ICG Report Was Adverse to Rio, Did Not Involve Legal Counsel, and the ICG Did Not Investigate Whether Rio Committed Fraud**

On November 30, 2020, following public disclosure of the cost overruns and scheduling

delays in this case, the OT Board established a special board committee (the "Committee") to

investigate the causes of the overruns and delays, including to scrutinize whether these problems

were caused by geotechnical issues, as Defendants publicly stated.  ¶¶28, 291. ████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████ This independence from

Rio was also reflected in the Committee's composition, consisting of two representatives of

Erdenes Oyu Tolgoi ("EOT"), the entity through which the Mongolian Government held its

interest in OT, and two TRQ representatives.  ¶291.  The Board Resolution establishing the

---

[4] Rio's actual active management of the information provided to TRQ is consistent with the Court's earlier observation that it appeared TRQ was "largely at the behest of Rio Tinto in what information was provided to it about OT and that Rio kept secret the reality of OT's cost overruns and schedule delays." *Turquoise Hill*, 625 F. Supp. 3d at 240.

Committee specifies that the investigation was created not for Rio's benefit, but rather because "it is in the best interest of Oyu Tolgoi LLC *and its shareholders and investors* that independent review is conducted . . . so that Oyu Tolgoi LLC's operations continue *with the confidence of all of its shareholders*"—not OT's contractor, Rio.  *Id.*

Pursuant to that mandate, it engaged the ICG, a group of highly experienced and qualified mining professionals tasked with carrying out the independent review.  The ICG, in turn, engaged two individuals with specialized experience—one of whom was Mr. Barber—to conduct a "Peer Review" of the ICG's investigation as a separate check on that already independent review.  ¶293.

      **1.**      **The Scope of Work Defining Barber's Engagement by the ICG Was Expressly Adverse to Rio**

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████████████

### 2.    The ICG Was Engaged Over Other Expert Candidates Due to its Independence from Rio

████████████████████████████████████████████████ the Special

Committee encountered significant difficulty in finding any experts to perform it given Rio's

dominance in the industry and the highly specialized nature of this expertise. ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ Ex. 12 at -

7545. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████  ████████████

### 3.    Rio Actively Concealed Documents, Prohibited Access to Key Personnel and Interfered with the ICG's Independent Investigation

Underscoring Rio's adverse relationship with the ICG and Mr. Barber—and refuting the notion that Rio could have made prejudicial "specific and unambiguous disclosures" to Mr. Barber while he was conducting the Peer Review for the ICG—Rio actively concealed documents and access to key personnel from the ICG throughout its investigation. *See* ¶¶333-35.

Rio's contemporaneous documents confirm this. ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ ██████████████████████████

████████████████████████████████████████████████████████

████████████████

In fact, Rio's obstruction was one of the reasons the Special Committee determined to engage an additional "Peer Review"—the work that Mr. Barber performed—as the Special Committee was concerned Rio would attack the report's findings, and such a peer review was a common and accepted means of ensuring the quality of ICG's findings.  Ex. 16 at ██████.[6]

████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[5] Rio's lack of cooperation with the ICG was a matter of public record. ████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████

[6] Defendants selectively quote the ICG Report to suggest that Rio was forthcoming with the review (Mot. at 7), omitting from the quoted passage that Rio refused to provide documents "the ICG believe[d] would have been extremely useful to the Review."  ECF No. 124-1 (ICG Report), at 8.

███████████████████████████████████████████████████

███████████████████████████████████████████ After

the ICG issued its Report in August 2021, ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████

**F.    Defendants Seek to Disqualify Mr. Barber**

Earlier this year, Defendants notified Pentwater of their view that Mr. Barber's retention

by Bernstein Litowitz was improper after that fact was disclosed to Defendants ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

                        ███████████████████████████████

                        ███████████████████████████████

                        ███████████████████████████████

                        ███████████████████████████

Ex. 1 at ¶127. ████████████████████████████████ Defendants raised an objection to Mr. Barber's retention by Bernstein Litowitz in this case. *See* Ex. 20. This initiated a series of meet and confers and correspondence between the parties, wherein Plaintiffs provided information to Defendants concerning Mr. Barber's role and work in the current litigation, and agreed to Defendants' request to cease consulting with Mr. Barber until the dispute over his retention was resolved. *See, e.g.*, Ex. 21; Ex. 22. Finally on July 31, 2024, Defendants told Plaintiffs that an impasse had been reached, and that a motion to disqualify was forthcoming. Over two months later, Defendants filed this motion.

## ARGUMENT

## II.    LEGAL STANDARD

Courts in the Second Circuit follow a two-pronged approach to expert disqualification—a "drastic remedy" that "should be resorted to rarely." *Breitkopf v. Gentile*, 2014 WL 12843765, at *5 (E.D.N.Y. Mar. 24, 2014). Specifically, to disqualify an expert, the moving party must prove that (1) "counsel [held] an ***objectively reasonable belief in the existence of a confidential relationship*** with the challenged expert or consultant" and (2) "during the relationship there was a disclosure of 'confidential or privileged information to the expert that is ***relevant to the current litigation***.'" *Gordon v. Kaleida Health*, 2013 WL 2250506, at *5 (W.D.N.Y. May 21, 2013). This burden is onerous—and the evidence must establish the movant satisfies both prongs.

Under the first prong, the party seeking disqualification bears the burden of showing "that a confidential relationship exists and that the confidentiality has not been waived." *Eastman Kodak Co. v. Agfa-Gevaert N.V.*, 2003 WL 23101783, at * 1 (W.D.N.Y. Dec. 4, 2003). Under the second prong, a movant cannot rely on "mere conclusory or ipse dixit assertions" but rather must identify "***specific and unambiguous disclosures that if revealed would prejudice the party***." *Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, 2021 WL 5362256,

at *4 (S.D.N.Y. June 2, 2021), *report and recommendation adopted* at 2021 WL 4706162 (S.D.N.Y. Oct. 7, 2021) (Liman, J.).

Critically, the kind of prejudicial "specific and unambiguous disclosures" warranting disqualification do not concern technical or other factual information that would be disclosed in discovery. Indeed, courts across the country have held that information disclosed to an expert that would be produced in discovery simply does not qualify because parties cannot have a reasonable expectation of confidentiality with respect to information that will be produced to an adversary. *See Capitol Recs., Inc. v. MP3tunes, LLC*, 2010 WL 11590131, *1 (S.D.N.Y. Apr. 15, 2010) (holding that **"technical information" is not "confidential information" for purposes of disqualification**, nor is any information that would be disclosed in discovery); *see also Twin City Fire Ins. Co., Inc. v. Mitsubishi Motors Credit of Am., Inc.*, 2006 WL 5164249, at *4 (C.D. Cal. Nov. 6, 2006) ("Only the disclosure of confidential information that the opposing party would be unable to obtain through discovery should form a basis for disqualification of an expert witness."); *English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F. Supp. 1498, 1503 (D. Colo. 1993) ("Since these communication[s] were discoverable, it would be objectively unreasonable for [defendant] to expect that the information it provided [the challenged expert] would be kept confidential").

Rather, the kind of "confidential information" courts are concerned with include "discussion of the [retaining party's] strategies in the litigation, the kinds of expert [the party] expected to retain, [the party's] views of the strengths and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses.'" *United States ex rel. Cherry Hill Convalescent Center, Inc. v. Healthcare Rehab Sys. Inc.*, 994 F. Supp. 244, 250 (D.N.J. 1997) (quoting *Koch Refining Co. v. Boudreau*, 85 F.3d 1178, 1182 (5th Cir. 1996)). Simply put, "purely technical information is not confidential." *Koch*, 85 F.3d at 1182.

Last, even when a movant satisfies both prongs, courts weigh public policy considerations in determining whether disqualification is appropriate, and are reluctant to disqualify experts who possess specialized and hard-to-replace expertise. *See, e.g.*, *City of New York*, 2021 WL 5362256, at *4 (noting courts in the Second Circuit consider such policy considerations); *Lyman*, 2011 WL 3843956, at *4 (refusing to disqualify "preeminent" expert as contrary to public policy).

## III. DEFENDANTS HAVE FAILED TO SHOW THAT RIO TINTO HAD AN OBJECTIVELY REASONABLE EXPECTATION OF A CONFIDENTIAL RELATIONSHIP WITH MR. BARBER FOR THE PURPOSES OF THIS CASE

Defendants have failed to show that Rio Tinto had an objectively reasonable expectation of a confidential relationship with Mr. Barber for the purposes of this case based on his prior engagements with AMEC, TRQ and in connection with the ICG.  Mr. Barber's engagement with AMEC concluded in 2014 before the Class Period began, involving a time period and information Defendants have previously and successfully argued is not relevant to the case.  His engagements with TRQ and the ICG were adverse to Rio, and the record shows Rio actively concealed information from TRQ and the ICG—refuting the notion that Rio had an objectively reasonable expectation of "confidentiality" with Mr. Barber for purposes of his disqualification here.

### A. Mr. Barber's Technical Work at AMEC, Completed in 2014 for Public Feasibility Studies that Predated the Start of Underground Development, Does Not Give Rise to a Confidential Relationship for Purposes of Disqualification

Defendants' argument that Mr. Barber's work for AMEC over a decade ago requires disqualification is wrong, as it can plainly not support an "objectively reasonable" confidential relationship under the case law.  By Defendants' own admission, Mr. Barber concluded all AMEC OT work by 2014, which renders any information he obtained far too out of date to be confidential in the current litigation, and courts have repeatedly held that expert work conducted years in the past cannot be the basis of disqualification.

Importantly, any information Mr. Barber obtained through his engagement at AMEC also pre-dates the time period Defendants argue is relevant to the issues in the case.  In their motion, Defendants highlight Mr. Barber's work on OT feasibility studies from 2010 until February 2014—but that is a phase of the project that Defendants have repeatedly and successfully argued is "irrelevant" to the current litigation.  *See* Ex. 23 at 7 (contending information from before January 1, 2018 is "irrelevant").  Indeed, the relevance of information predating 2018 was litigated in a discovery motion before the Court, which ruled the time period "beginning in or around January 2018" was appropriate for document discovery.  ECF No. 279 at 1-2.  Moreover, as discussed above, contrary to Defendants' argument, the studies that Mr. Barber worked on have been made public and, in fact, were superseded by a subsequent feasibility study—OTFS16— which TRQ filed with the SEC before the Class Period and was publicly available throughout the Class Period.  Mr. Barber has abided by the terms of his confidentiality agreement with AMEC (Barber Decl. ¶16), and there is no basis to conclude that Rio could have an "objectively reasonable expectation of confidentiality" arising out of Mr. Barber's "purely technical" decade-old work on now-public, superseded and obsolete feasibility studies for OT.  *See, e.g.*, *City of New York*, 2021 WL 5362256, at *6 (that expert's work concluded a year before litigation began and analysis was submitted to regulatory agency showed it was not "confidential"); *Lyman*, 2011 WL 3843956, at *3 (refusing to disqualify expert where disclosure involved supposedly "confidential information" that would have been "four years out of date").[7]

---

[7] None of Defendants' cases suggests a ten-year gap, let alone work concerning superseded and obsolete information outside of the time period at issue in the case, support an "objectively reasonable expectation confidentiality." *See, e.g.*, *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 2000 WL 42202, at *4 (S.D.N.Y. Jan. 19, 2000) (one-year gap for consulting work conducted in connection with submission of patent to PTO in patent case); *Auto-Kaps LLC v. Clorox Co.*, 2016 WL 1122037, at *2 (E.D.N.Y. Mar. 22, 2016) (four-year gap for consulting work in connection with design of accused infringing product in patent case).

B.      **The Nature of Mr. Barber's Consulting Role In a Now Terminated Engagement with TRQ and His Work for the ICG Precludes Any Objective Expectation of Confidentiality**

Mr. Barber's technical work for TRQ and the ICG also did not create a "confidential relationship" of the kind recognized by courts, as those engagements could not give rise to any objectively reasonable expectation of confidentiality for Rio in this case.

While Defendants claim that Mr. Barber's non-disclosure agreements with TRQ and ICG are dispositive, in reality, the existence of an agreement is merely one factor among many considered by courts—which routinely find a lack of any "confidential relationship" despite the existence of a confidentiality agreement. *See Breitkopf*, 2014 WL 12843765, at *5 (finding no reasonable expectation of confidentiality where no "confidential strategies, legal theories, or opinions regarding the case" were discussed, emphasizing a confidentiality agreement was not dispositive); *Gordon*, 2013 WL 2250506, at *16 (no reasonable expectation of confidentiality despite two confidentiality agreements as expert's work did not involve access to "work product" or "assessments of the strengths and weaknesses of Plaintiffs' claims or Defendants' defense").

That is particularly true in this case, given that Mr. Barber's engagements with TRQ and ICG were either explicitly or de facto adverse to Rio's interests.  To start, TRQ terminated its relationship with Mr. Barber in 2023, and informed him his obligations under that engagement "shall be terminated and cancelled and shall have no further force or effect." ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████ This alone should dispose of Rio's argument that disqualification can arise from Mr. Barber's work for TRQ—as he explicitly and concededly has no confidentiality obligations with respect to TRQ (let alone Rio) in connection with that work.  *See Eastman Kodak*, 2003 WL

23101783, at *1 (requiring movant show "a confidential relationship exists and that the confidentiality has not been waived"); *In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 3085342, at *4 (S.D.N.Y. July 20, 2017) (holding it was "unreasonable to expect that any confidential information gleaned as a result of that relationship 'would be maintained in confidence'" after confidentiality provisions expired).

Moreover, even if it were not terminated, Mr. Barber's retention by TRQ did not involve the kind of consultation of the nature recognized by courts as giving rise to an expectation of confidentiality in a lawsuit like this—such as consulting with Rio on its "litigation strategy," Rio's "views of the strengths and weaknesses of each side," or Rio's "anticipated defenses." *United States ex rel. Cherry Hill Convalescent Center, Inc.*, 994 F. Supp. at 250. █████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████

---

[8] Defendants are also wrong that Rio Tinto "foot[ing] the bill" by investing in OT and paying Mr. Barber's invoices supports a confidential relationship. Mot. at 16. To the contrary, Mr. Barber's engagement was **with TRQ,** he owed obligations **to TRQ,** and he reported to JoAnn Dudley, the person Rio sought to conceal information from through an actively managed "firewall." ECF No. 347-15 at 1; ████████████ Moreover, if Rio's investment in OT was relevant, Pentwater—which similarly invested hundreds of millions of dollars in OT through its ownership in TRQ—would be entitled to claim the same "confidential relationship" Rio does. In any event, even Defendants' cases make clear that payment of invoices are not enough, and are clearly insufficient here. *See Breitkopf*, 2014 WL 12843765, at *5 ("payment of a fee" was factor outweighed by others in finding that expert's retention was proper).

Mr. Barber's work for ICG is even further afield, as Mr. Barber's relationship was directly and explicitly adverse to Rio from the outset. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

Defendants' argument that Mr. Barber now somehow has a conflict due to his work in providing a second-level review of the findings of an already-independent group that conducted a review that Rio was "excluded from" because of its "clear conflict of interest" turns disqualification case law on its head, and should be rejected. *See Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, 840 F. Supp. 2d 1072, 1084 (N.D. Ill. 2012) (refusing to disqualify expert based on previous engagement that was adverse to movant on the grounds that the expert did not "switch sides" as is required to "justify the extreme sanction of expert disqualification").[9]

---

[9] The alignment between the challenged experts and the movants in Defendants' cases illustrate that Mr. Barber has not "switched sides." In *Bristol Myers*, the court found a confidential relationship where a drug manufacturer disclosed to an expert its "judgments to what degree, and in what areas" the drug at-issue would be used and when submitting the patent application in a lawsuit challenging the patent. *Bristol Myers*, 2000 WL 42202, at *4. Similarly, in *In re Incretin Mimetics Products Liability Litigation*, the expert was disqualified because he was involved in consulting directly for the defendant in connection with the regulatory strategy challenged in the case. 2015 WL 1499167, at *7. And in *In re Nameda Direct Purchaser Antitrust Litig.*, the

Defendants' argument that it does not matter that Mr. Barber's agreements were with Rio's affiliates (TRQ and the OT LLC Special Committee)—as opposed to Rio directly—misses the point entirely. As Defendants' own cases make clear, the problem for disqualification purposes is not TRQ's and the ICG's status as affiliates, but that Rio's relationship with them at the time refutes the notion that Rio could have a "reasonably objective expectation of confidentiality."[10]

### C. Courts Routinely Hold that Information Like the Kind Mr. Barber Obtained Is Not Confidential for Disqualification Purposes If It Will be Potentially Disclosed to Aan Adversary in Discovery

Even if the adversarial nature of Mr. Barber's relationship with Rio through its engagements with TRQ and the ICG—or the fact that the decade-old technical work he performed for AMEC has been made public—were not enough, all of the technical information that Rio permitted Mr. Barber access to was or should have been produced in discovery in this case.

Indeed, Defendants agreed at the outset of discovery that all documents produced to the ICG—and even those that Rio actively withheld from the ICG at the time Mr. Barber was employed to conduct the Peer Review—would be produced in this case. Ex. 25 at 3. And as further discussed below, for the documents related to Mr. Barber's work at TRQ and AMEC, all of the documents Mr. Barber received would have been produced in this case—*if they were actually relevant*, as Defendants apparently agree. *See* Mot. at 19-20 (arguing that the documents

---

disqualified expert was the highest ranking regulatory executive at the defendant's co-conspirator during the conspiracy. 2017 WL 3613663, at *4-5 (S.D.N.Y. Aug 21, 2017).

[10] Defendants' cases make this very point. For example, in *Baker Hughes, Inc. v. S&S Chemical, LLC*, the court found the defendant S&S had a confidential relationship with an expert (even though a "close call") despite the fact that he was retained by the plaintiff, Baker Hughes. 2015 WL 5547751, at *2 (W.D. Mich. 2015). But the court did so precisely because S&S provided confidential information to the expert pursuant to a confidentiality agreement under the misunderstanding about that expert's actual role—when in fact the expert was hired by the plaintiff to collect information for purposes for bringing the suit. In any event, the court denied disqualification because, like here, only "purely technical" information—and no "attorney work product or litigation strategy"—was provided. *Id.* at *3.

Mr. Barber received would have been produced but were not because they were not "proportional" discovery in this case). And as Defendants do not dispute, as Mr. Barber already testified and has submitted here, ██████████████████████████ Mr. Barber did not receive any "privileged" material and "did not have any discussions or communications with legal counsel for any of the involved parties." Ex. 1 at ¶120; Barber Decl. ¶15. As courts have repeatedly held, the kind of "technical information" Mr. Barber possesses cannot give rise to an "objectively reasonable" expectation of confidentiality for disqualification purposes. *See, e.g.*, *English Feedlot*, 833 F. Supp. at 1503 ("Since these communication[s] were discoverable, it would be objectively unreasonable for [defendant] to expect that the information it provided [the challenged expert] would be kept confidential."); *Palmer v. Ozbek*, 144 F.R.D. 66, 68 (D. Md. 1992) (similar).

## IV. DEFENDANTS HAVE NOT IDENTIFIED ANY "SPECIFIC AND UNAMBIGUOUS DISCLOSURES" AS REQUIRED FOR DISQUALIFICATION

As a threshold matter, as noted above, Mr. Barber has not disclosed any confidential information to Plaintiff. But even if Defendants could show that Mr. Barber's prior engagements with AMEC, Turquoise Hill and the ICG can be the basis of an objectively reasonable expectation of confidentiality in the current litigation (they cannot), Defendants also fail to identify *any* "specific and unambiguous disclosures" at risk through Plaintiffs' retention, as is required to disqualify Mr. Barber. The case law is clear that discoverable and technical information—the only information that Defendants contend Mr. Barber possesses through his prior engagements—is not considered "confidential" for the purposes of disqualification.

### A. All of the Information Mr. Barber Obtained Through His Prior Engagements Is Discoverable, Highly Technical, or Concededly Irrelevant

All of the information Mr. Barber obtained through each of his prior engagements is discoverable, highly technical, or concededly irrelevant, and thus not the kind of confidential information that warrants disqualification.

As Mr. Barber has attested, all the information he obtained from his prior engagements was of a technical nature. Barber Decl. ¶¶16-19, 20-23. Courts have consistently distinguished between information that is confidential and can be the basis of disqualification, and other nonconfidential types of information, including information that can be obtained through discovery and technical information, which cannot be. *See Capitol Recs.*, 2010 WL 11590131, *1 (holding that "technical information" is not "confidential information" for purposes of disqualification, nor is any information that would be disclosed in discovery); *Lyman*, 2011 WL 3843956, *3-4 (holding that scientific information was not "confidential" for the purposes of disqualification); *Baghdady v. Baghdady*, 2007 WL 3432427, *3 (D. Conn. Nov. 15, 2007) (technical information not "confidential"); *Twin City Fire*, 2006 WL 5164249, at *4 ("Only the disclosure of confidential information that the opposing party would be unable to obtain through discovery should form a basis for disqualification of an expert witness."). Defendants misstate the law in arguing otherwise (Mot. at 18)—as Rio's cases make clear that courts are concerned with protecting not technical but ***strategic*** information of the kind approaching attorney work product.[11]

Defendants have not, because they cannot, show that Mr. Barber possesses any prejudicial confidential information of the kind contemplated by disqualification case law. For example, Defendants claim that Barber was exposed to TEG review sessions of OTFS12 and OTFS14 while consulting for AMEC. Mot. at 3-4. Rio has said both of these studies are not relevant to this

---

[11] Rio's cases involve strategic information obtained from competitors about the conduct challenged in the suit. *See Auto-Kaps*, 2016 WL 1122037, at *4 (expert received "confidential information ***relating to [the defendant]'s strategy regarding its intellectual property***"); *Bristol-Myers Squibb*, 2000 WL 42202 (expert received "confidential information ***relating to Bristol's clinical trial strategy***"); *Eastman Kodak*, 2003 WL 23101783, at *2-3 (expert "was a senior scientist … for eighteen years ***who was an active member of a closed group of researchers charged with developing, creating and testing [technologies at issue]***"). Pentwater and the class are not competitors of Rio, and Mr. Barber was not involved in any strategy challenged here.

case—and indeed, they have been superseded by OTFS16, which was publicly available on TRQ and Rio's website throughout the Class Period.[12]  But even setting that aside, Rio does not explain how a single decade-old document in the list it provides somehow constitutes an "unambiguous" prejudicial disclosure to Mr. Barber.  Mot. at 3; ECF No. 347-4.

Nor have Defendants specifically identified, as required, any unambiguous and prejudicial confidential disclosure through Mr. Barber's engagement with TRQ.  For example, Defendants claim that Mr. Barber attended "meetings" with Rio and OT mine planning personnel in October 2019 and in March, April and May 2020—but do not identify what was "confidential" about them. Similarly, Defendants argue that Mr. Barber purportedly received confidential documents including the Panel 0 PFS Design Review Study, a complete PFS report, and a final draft of OTFS20. Mot. at 14.  But this work was highly technical in nature, prospective in nature, and post-dates the Class Period.   Barber Decl. ¶¶17-18.   Defendants do not explain what about this information was "confidential" or how it is relevant to the case.[13]

In fact, the OTFS20 is a public document and Mr. Barber's work on Panel 0 has nothing to do with the cost-overruns and delays at OT, which instead were caused by Rio's mismanagement of the underground construction.  Beyond submitting "scheduling" emails for meetings and stating (without citing) that Mr. Barber received "numerous confidential documents," Defendants have

---

[12] Contrary to Rio's claim, OTFS12 was made public in 2013 by Turquoise Hill before it was superseded by OTFS16.  *See* Ex. 3 at -3691.

[13] Again, Defendants' inapposite trade theft cases involve experts who "switched sides" after obtaining competitively sensitive ***strategic*** information from prior engagements concerning the strategy that gave rise to the claims in the case.  *See Auto-Kaps*, 2016 WL 1122037, at *4 (prior engagement "directly related to the technology at issue in the accused product" and "exposed [expert] to confidential information relating to [defendant]'s strategy regarding its intellectual property"); *Thompson*, 2012 WL 3870563, at *6 (expert was "named inventor" of product who "helped develop, trademark, and patent the technology" and, as "high-level [] executive" of defendant, possessed information from "management meetings that were not open to the public.").

not identified *any* confidential information—much less in "specific and unambiguous" terms that Mr. Barber received that would be at risk of prejudicial disclosure through this engagement. Tellingly, Defendants have not attached *any* of these documents they allude to in their in motion, and instead rely on precisely the sort of "conclusory or ipse dixit assertions" rejected by courts. *City of New York*, 2021 WL 5362256, at *4.[14]

Defendants have similarly not identified any confidential information at risk of disclosure that Mr. Barber obtained through his engagement with the ICG.  Indeed, it is impossible for Defendants to contend that Mr. Barber had access to confidential information for disqualification purposes because Defendants agreed to produce the ICG documents in discovery here. For example, Defendants claim that Mr. Barber had access to "over five thousand confidential documents" as a member of the ICG review team—but those documents were produced (or should have been produced) in this case. Mot. at 14; ¶¶333-35.  Far from showing a "specific and unambiguous risk of confidential disclosure" of information Mr. Barber obtained through his engagement with the ICG, these facts confirm that Mr. Barber's work was "purely technical" and involved review of discovery documents that are plainly insufficient to support disqualification.

---

[14] Indeed, the evidentiary record of such prejudicial communications in Defendants' cases and the dearth of specifics here are striking, and underscore the lack of any "confidential" disclosure here. *Cf., e.g.*, *Auto-Kaps*, 2016 WL 1122037, at *2 (finding review of sealed materials including communications between expert and defendant "certainly" revealed confidential information was exchanged); *Eastman Kodak*, 2012 WL 4103811, at *3, 10 (W.D.N.Y. Sept. 17, 2012) (refusing to disqualify because *in camera* review did not reveal "confidential" disclosures); *In re Namenda*, 2017 WL 3085342, at *6 ("vague generalities" that "did not 'show conclusively that any confidential information was actually disclosed'" were insufficient and distinguishing case where *in camera* review revealed "conclusive" specifics).

**B.     Mr. Barber's Technical Work for Rio's Adversaries Is Nothing Like the Experts' Involvement in the Deliberative and Litigation Strategy Matters in Defendants' Cases**

Mr. Barber's work for AMEC, TRQ and the ICG was dramatically and categorically different than the work done by the experts in the cases cited by Defendants, which further underscores that he did not obtain the sort of confidential information Defendants must show he did to support the drastic remedy of disqualification.  In Mr. Barber's engagements with AMEC, Turquoise Hill and the ICG, he provided technical analyses and did not engage in the kind of deliberative strategies as the experts in Defendants' cases. *See In re New York City Policing During Summer 2020 Demonstrations*, 2022 WL 203191, at *4-7 (S.D.N.Y. Jan. 24, 2022), *report and recommendation adopted at* 2022 WL 656808 (S.D.N.Y. Mar. 4, 2022) (disqualifying expert who communicated with attorneys and provided comments on attorney work product at "every step of the analysis" which was at the "heart of the expert disqualification analysis"); *In re Nameda Direct Purchaser Antitrust Litig.*, 2017 WL 3613663, at *4-5 (S.D.N.Y. Aug 21, 2017) (disqualifying former highest ranking regulatory executive at defendant's co-conspirator during the period of the conspiracy); *In re Incretin Mimetics Prods. Liab. Litig.*, 2015 WL 1499167, at *1, *6 (S.D. Cal. Apr. 1, 2015) (disqualifying expert who was the "key player in key moments" during at-issue drug's development and regulatory approval process in case concerning drug's development).

Unlike the experts in Defendants' cases, Mr. Barber did not communicate with Rio's attorneys, review any attorney work product, potentially participate in a conspiracy with Rio, nor was he a "key play in key moments" while Rio was misrepresenting the status of OT during the Class Period.  To the contrary, Mr. Barber's work for AMEC preceded the underground development at issue in this case; his work for TRQ post-dated the Class Period and focused on Panel 0—not delays and cost-overruns in the underground construction during the Class Period—

and Rio was "*excluded* from the independent review process" conducted by the ICG and could not possibly have disclosed any "confidential" information to Mr. Barber in connection with that work.

Fundamentally, Defendants have not shown any risk of harm or prejudice through Mr. Barber's current engagement.  This was not an instance where Rio confided in Mr. Barber as a litigation advisor, let alone unwittingly provided him with information going to Rio's liability in this case or its possible defenses due to a misplaced sense of trust in his loyalty or confidence. *See Eastman Kodak Co. v. Kyocera Corp.*, 2012 WL 4103811, at *10 (W.D.N.Y. Sept. 17, 2012).



As underscored by the months-long delay in filing the current motion, Mr. Barber's engagement does not impose any risk of harm to Defendants, and his disqualification will only prejudice Lead Plaintiff, the Class, and the Court.[15]

[15] ████████████████████████████████████████████

## V. PUBLIC POLICY CONSIDERATIONS STRONGLY DISFAVOR EXCLUSION OF MR. BARBER GIVEN THE HIGHLY SPECIALIZED AND WELL-TAILORED NATURE OF HIS EXPERTISE

Beyond Defendants' failure to show that Rio has a reasonable expectation of a confidential relationship with Mr. Barber for this case or any confidential information at risk of disclosure through his engagement with Plaintiff, public policy also strongly weighs against disqualification here. Courts have repeatedly made clear that the "drastic remedy" of disqualification is disfavored when the expertise involves "well-tailored" and "specialized knowledge." *See Palmer*, 144 F.R.D. at 67 ("Courts are generally reluctant to disqualify expert witnesses, especially those . . . who possess useful specialized knowledge."); *English Feedlot*, 833 F. Supp. at 1505 (expert's well-tailored qualifications weighed against disqualification); *Lyman*, 2011 WL 3843956, at *4 (qualifications of "well-credentialed" expert weighed against disqualification).

Here, Mr. Barber's disqualification would undermine the integrity of the current proceedings, provide Defendants with an unfair advantage, and deprive Plaintiff and the Court of important and helpful expertise. To start, Defendants concede that "it may be difficult" for Plaintiffs to find an expert like Mr. Barber—and indeed, discovery in this case confirms this. As discovery has shown, ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████ This weighs heavily against disqualification, and underscores Defendants' motives for seeking it after their unsuccessful ████████████████

The Court should also decline disqualification because doing so could encourage major corporations with dominance in specialized fields (like underground block cave mining construction) to impose a monopoly over technical knowledge. Under Defendants' view of the law, any prior engagement with a Rio-related entity could be potentially disqualifying, and discourage plaintiffs from speaking to even fact witnesses who were paid by any entities associated with Rio. In contrast to the prejudice to Lead Plaintiff, Defendants' only identified public policy consideration is the illusory risk of disclosure of confidential information that he does not possess—a clearly insufficient basis to order the drastic remedy of disqualification.

None of Defendants arguments to the contrary have merit. *First*, Defendants argue that public policy weighs against his engagement because, according to Defendants, Mr. Barber "is not a testifying expert." Mot. at 21. But Defendants are mistaken. Although Mr. Barber was retained to consult for Plaintiffs, his retention agreement contemplates that he may testify in this action— just as Mr. Barber was expressly permitted to do in the Canadian arbitration. *See* Barber Ex. B. Thus, the cases recognizing a public interest in experts who provide testimony are squarely applicable. *See* Mot. 22 (citing *Namenda*, 2017 WL 3085342, at *4) (quoting *Grioli v. Delta Int'l Mach. Corp.*, 395 F. Supp. 2d 11, 15 (E.D.N.Y. 2005)). Moreover, even if Mr. Barber's engagement were so limited, Defendants fail to cite anything suggesting this distinction diminishes any of the public policy considerations supporting his engagement.[16]

---

[16] Neither *Namenda* nor *Grioli* state that an expert ***must*** play a testifying role, and the concern about an expert's "livelihood" are equally applicable to testifying and consulting experts alike.

**Second**, Defendants argue that there is no public policy interest arising from the exceptional difficulties Plaintiff faces in locating any expert with experience comparable to Mr. Barber's. Mot. at 22. Defendants again are wrong, and misstate the law. Mot. at 22. To start, Defendants ignore cases recognizing that disqualification is disfavored where experts, like Mr. Barber, possess specialized and hard-to-replace expertise. *See, e.g.*, *Lyman*, 2011 WL 3843956, at *4. The record is clear, and Defendants do not even attempt to dispute, that Mr. Barber is a "world-renowned" expert with exceedingly specialized and rare experience—distinguishing the authority on which Defendants rely.[17]

**Third**, Defendants argue that there is a strong public interest in prohibiting Mr. Barber's engagement because, they claim, Mr. Barber cannot "compartmentalize" the supposedly confidential information he obtained from his prior engagements. Mot. 20-21. This argument fails for two reasons. First, as Defendants correctly note, Mr. Barber has advised Plaintiffs based on documents that Defendants have provided in discovery in this case, not any supposedly "confidential" information Mr. Barber obtained from prior engagements. Mot. 20. Contrary to Defendants' assertions, courts have allowed this procedure. *See, e.g.*, *Allstate*, 840 F. Supp. 2d at 1084. Second, even if it were impermissible, as explained above, Mr. Barber possesses no confidential information for disqualification purposes—rendering Defendants' cases inapposite.[18]

---

[17] For example, in *Bristol-Myers*, the evidence was the opposite and there were "other experts in the treatment of ovarian cancer available to testify as independent experts." 2000 WL 42202, at *5. *Thompson, I.G., L.L.C. v. Edgetech I.G., Inc.* involved extreme facts and a clear-cut case of disqualification where the "named inventor" switched sides in a patent dispute, but nevertheless reaffirmed the policy "interest in securing an expert." 2012 WL 3870563, at *7 (E.D. Mich. Sept. 6, 2012). And in *In re New York City Policing*, the expert provided comments on attorney work-product at "every step of the analysis"—which is not remotely comparable to Mr. Barber's work for Rio's adversaries. 2022 WL 656808 (S.D.N.Y. Mar. 4, 2022) (Mot. 21 at n.17).

[18] For example, in *Namenda*, the court held that it was "impossible" for the former highest ranking regulatory executive at defendant's co-conspirator during the period of the conspiracy to

In sum, Defendants fail to show that public policy considerations weigh in favor of disqualification and, as the Canadian arbitrator already concluded, in fact, public policy weighs strongly the other way. *See English Feedlot*, 833 F. Supp. at 1505; *Palmer*, 144 F.R.D. at 67; *Lyman*, 2011 WL 3843956, at *4.[19]

## CONCLUSION

For the reasons discussed above, Lead Plaintiff the Pentwater Funds' respectfully request that the Court deny Defendants' motion to disqualify Mr. Barber.

Dated: November 20, 2024                 Respectfully submitted,


                                         */s/ Salvatore J. Graziano*
                                         Salvatore J. Graziano
                                         Michael D. Blatchley
                                         James A. Harrod
                                         Alexander Noble
                                         **BERNSTEIN LITOWITZ BERGER**
                                         **& GROSSMANN LLP**
                                         1251 Avenue of the Americas
                                         New York, New York 10020
                                         Telephone: (212) 554-1400
                                         Facsimile: (212) 554-1444
                                         salvatore@blbglaw.com
                                         michaelb@blbglaw.com
                                         jim.harrod@blbglaw.com

---

"prevent[] her twenty-three years of experience at [the company] from bearing" on her opinions. 2017 WL 3613663, at *4 (S.D.N.Y. Aug. 21, 2017). Defendants' other cases are similar. *Cf. Pellerin v. Honeywell Int'l Inc.*, 2012 WL 112539, at *1 (S.D. Cal. Jan. 12, 2012) (disqualifying 20-year long "former employee of the division of the defendant responsible" for product, where relevant experts were abundant, and because expert was hired "***because of*** relationship"); *New York City Policing*, 2022 WL 203191, at *4-7 (disqualifying expert who commented on attorney work product at "every step of the analysis"); *Auto-Kaps*, 2016 WL 1122037, at *4 (expert who consulted for two years "regarding the evolving design of the accused product" in patent case).

[19] The "drastic remedy" of disqualification should also be denied given that less draconian remedies are available. *See, e.g.*, *Ferring Pharms. Inc. v. Serenity Pharms., LLC*, 331 F.R.D. 75, 78 (S.D.N.Y. 2019). Pentwater and Mr. Barber have already expressly agreed to refrain disclosing any confidential information Mr. Barber allegedly possesses (Barber Ex. B, and the Court can further protect against any risk through further Court order. *See, e.g.*, *Allstate*, 840 F. Supp. 2d at 1084 (denying disqualification and ordering this outcome).

alexander.noble@blbglaw.com

*Lead Counsel for Lead Plaintiff and the Class*