**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TURQUOISE HILL RESOURCES LTD. SECURITIES LITIGATION | CLASS ACTION<br><br>Case No. 1:20-cv-08585-LJL |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... iii

TABLE OF DEFINED TERMS ............................................................................... vii

I.    PRELIMINARY STATEMENT ........................................................................1

II.   BACKGROUND OF INVESTORS' CLAIMS ..................................................4

III.  ARGUMENT .....................................................................................................9

    A.    The Proposed Class Satisfies Rule 23(a) ..............................................10

        1.    Numerosity Is Established ..........................................................10

        2.    Commonality Is Established .......................................................10

        3.    Typicality Is Established.............................................................11

        4.    Adequacy Is Established .............................................................12

            a.    Pentwater Is Fully Aligned With the Class and Is Not
               Subject to Any Unique Defense....................................12

            b.    Pentwater Has Vigorously Represented the Class and Will
               Continue to Do So.........................................................15

            c.    Pentwater Has Selected Experienced and Qualified Class
               Counsel .........................................................................16

        5.    Ascertainability Is Established...................................................16

    B.    The Proposed Class Satisfies Rule 23(b)(3) .........................................16

        1.    Common Questions of Law and Fact Predominate Over Individual
           Issues..........................................................................................17

            a.    The Fraud-On-The-Market Presumption Applies..........18

            b.    Class Membership Can Be Determined with Common
               Class-Wide Proof, and *Morrison* Does Not Require
               Individualized Inquiries ................................................24

            c.    Damages Will Be Calculated Using a Common
               Methodology That Is Consistent with the Class-Wide
               Theory of Liability........................................................26

2.    A Class Action Is Superior to Other Available Methods for Resolving This Controversy ....................................................................27

C.    Lead Counsel Should Be Appointed Class Counsel ..............................................27

IV.    CONCLUSION..............................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Absolute Activist Master Fund LLC v. Ficeto,*
    677 F.3d 60 (2d Cir. 2012)...........................................................................................14, 24

*In re Allergan PLC Sec. Litig.,*
    2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021)............................................................. *passim*

*In re Alstom SA Sec. Litig.,*
    253 F.R.D. 266 (S.D.N.Y. 2008) .............................................................................10

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)....................................................................................................17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013)...............................................................................................10, 17

*In re Apple Inc. Sec. Litig.,*
    2023 WL 2763952 (N.D. Cal. Mar. 28, 2023).........................................................24

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act ("ERISA") Litig.,*
    281 F.R.D. 134 (S.D.N.Y. 2012) .............................................................................11

*In re Barrick Gold Sec. Litig.,*
    314 F.R.D. 91 (S.D.N.Y. 2016) ............................................................................ *passim*

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988).................................................................................................3, 18

*Cammer v. Bloom,*
    711 F. Supp. 1264 (D.N.J. 1989) ....................................................................19, 20, 21

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.,*
    2017 WL 3608298 (S.D.N.Y. Aug. 22, 2017)..........................................................9

*Erica P. John Fund, Inc. v. Halliburton Co.,*
    563 U.S. 804 (2011).................................................................................................17, 18

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    574 F.3d 29 (2d Cir. 2009).......................................................................................12

*In re Glob. Brokerage, Inc.,*
    2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021) ........................................................19

*Halliburton Co. v. Erica P. John Fund, Inc.,*
    573 U.S. 258 (2014).................................................................................................18

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
    338 F.R.D. 205 (S.D.N.Y. 2021) ...........................................................17

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .............................................19, 21, 22

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) .................................................11, 15

*Martinek v. AmTrust Fin. Servs., Inc.*,
    2022 WL 326320 (S.D.N.Y. Feb. 3, 2022).................................... *passim*

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
    328 F.R.D. 86 (S.D.N.Y. 2018) ...........................................................20

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)............................................................. *passim*

*Pearlstein v. BlackBerry Ltd.*,
    2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) .........................................21

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017)...........................................................24, 26

*Rougier v. Applied Optoelectronics, Inc.*,
    2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ......................................22

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
    571 F. Supp. 2d 1315 (N.D. Ga. 2007) ...............................................24

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
    2023 WL 3569981 (N.D. Cal. May 19, 2023) ......................................26

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2019 WL 3001084 (S.D.N.Y. July 10, 2019) ............................... *passim*

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) .........................................................22

*In re SunEdison, Inc. Sec. Litig.*,
    329 F.R.D. 124 (S.D.N.Y. 2019) .........................................................28

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008)................................................................21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)............................................................................9

*In re Teva Sec. Litig.*,
2021 WL 872156 (D. Conn. Mar. 9, 2021) ...................................................21

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
2021 WL 148752 (S.D.N.Y. Jan. 15, 2021) .................................................14

*In re Turquoise Hill Res. Ltd. Sec Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022).........................................................6

*In re Under Armour Sec. Litig.*,
631 F. Supp. 3d 285 (D. Md. 2022) ...........................................................19

*Villella v. Chem. & Mining Co. of Chile Inc.*,
333 F.R.D. 39 (S.D.N.Y. 2019) .................................................................23

*In re Vivendi Universal, S.A.*,
242 F.R.D. 76 (S.D.N.Y. 2007) .................................................................17

*In re Vivendi Universal, S.A.*,
838 F.3d 223 (2d Cir. 2016).......................................................................17

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017).........................................................................24

*Wilson v. LSB Indus., Inc.*,
2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)........................................18, 22

*Woburn Ret. Sys. v. Salix Pharms., Ltd.*,
2015 WL 1311073 (S.D.N.Y. Mar. 23, 2015) ...........................................15

*Woburn Ret. Sys. v. Salix Pharms., Ltd.*,
2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017) ...........................................16

*In re WorldCom, Inc. Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) ..........................................................12, 17

**STATUTES & RULES**

Securities Exchange Act of 1934:

§ 10(b), 15 U.S.C. §78j(b) .....................................................................4, 6, 17

§ 20(a), 15 U.S.C. §78t(a) ..........................................................................4

Fed. R. Civ. P. Rule 23(a)....................................................................9, 10, 16

Fed. R. Civ. P. Rule 23(b)......................................................................*passim*

Fed. R. Civ. P. Rule 23(g)...................................................................4, 27, 28

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995),
    reprinted in 1995 U.S.C.C.A.N. 730.........................................................................................15

## TABLE OF DEFINED TERMS

| Term | Meaning |
|---|---|
| Bernstein Litowitz | Bernstein Litowitz Berger & Grossmann LLP, Court-appointed Lead Counsel. |
| Cain Report or Cain Rep. | The accompanying Expert Report of Matthew D. Cain, Ph.D. (Ex. A). |
| [Proposed] Class | All persons or entities who purchased or otherwise acquired Turquoise Hill securities between July 17, 2018 and July 31, 2019, inclusive (the "Class Period"), in domestic transactions or on U.S. exchanges, and were damaged thereby. Excluded from the Class are Defendants; Rio Tinto International Holdings, Ltd. ("RTIH"); officers and directors of Defendant Rio Tinto, RTIH, and Turquoise Hill; Defendants' immediate family members, legal representatives, heirs, successors or assigns; and any entity in which any Defendant, RTIH, or Turquoise Hill has or had a controlling interest. |
| Class Period | July 17, 2018 through July 31, 2019, inclusive. |
| Complaint or ¶___ | Third Amended Consolidated Complaint for Violations of the Federal Securities Laws, *In re Turquoise Hill Resources Limited Securities Litigation*, No. 1:20-cv-08585-LJL (S.D.N.Y.), filed on February 28, 2024 (ECF No. 329) (the "Complaint"). |
| Ex. ___ | Exhibits to the Declaration of Salvatore J. Graziano in Support of Lead Plaintiff's Motion for Class Certification. |
| Graziano Decl. | Declaration of Salvatore J. Graziano in Support of Lead Plaintiff's Motion for Class Certification. |
| Halbower Decl. | The accompanying Declaration of Matthew Halbower in Support of Lead Plaintiff's Motion for Class Certification. (Ex. C). |
| Lead Plaintiff | Lead Plaintiff consists of the following related private investment funds (collectively referred to as the "Pentwater Funds"), all of which are advised by Pentwater Capital Management LP as investment adviser: PWCM Master Fund Ltd., Pentwater Thanksgiving Fund LP, Pentwater Merger Arbitrage Master Fund Ltd., Oceana Master Fund Ltd., LMA SPC for and on behalf of the MAP 98 Segregated Portfolio, Pentwater Equity Opportunities Master Fund Ltd., and Crown Managed Accounts SPC acting for and on behalf of Crown/PW Segregated Portfolio. |

| Term | Meaning |
|---|---|
| Mitts Report or Mitts Rep. | The accompanying Expert Report of Joshua Mitts, Ph.D. (Ex. B). |
| NYSE | New York Stock Exchange. |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4. |
| Rio Tinto | Rio Tinto plc and Rio Tinto Limited. |
| Turquoise Hill or TRQ | Turquoise Hill Resources Ltd. |

Court-appointed Lead Plaintiff the Pentwater Funds ("Lead Plaintiff" or "Plaintiff") respectfully submits this memorandum of law in support of its motion to (i) certify the action as a class action, (ii) appoint Plaintiff as Class Representative, and (iii) appoint Lead Counsel Bernstein Litowitz as Class Counsel.

## I.    **PRELIMINARY STATEMENT**

This securities class action is ideally suited for class treatment under Rule 23. The action arises from Defendants' false and misleading statements to investors concerning the underground mine development at Turquoise Hill's Oyu Tolgoi copper mine in Mongolia, which Defendants told investors was on schedule and budget when it was actually experiencing serious schedule delays and cost overruns. Defendants' common course of deceptive conduct harmed Plaintiff and the other members of the proposed Class. Common questions concerning Defendants' fraud that can be answered by class-wide proof predominate, and the class mechanism is the superior means of resolving Plaintiff's claims. Lead Plaintiff is a sophisticated institutional investor, exactly whom Congress intended to lead securities class actions.[1]

As the Complaint alleges and the evidence establishes, Defendants made class-wide misrepresentations concerning the progress of the underground development at Oyu Tolgoi. For example, Rio and Defendant Soirat in particular represented that the Oyu Tolgoi underground development was "on plan and on budget" when in reality, and as documented in internal emails, the project was "12 months behind schedule" and "$300 mill capital over budget," and these numbers were expected to "escalate rapidly." ¶161. Then, when Rio first began to report potential delays to the project, it falsely blamed those delays on "ground conditions"—instead of disclosing

---

[1] Unless otherwise noted, all emphasis in quotations is added, and internal citations, punctuation, and subsequent history are omitted.

the truth, that the delays were "not driven by geotechnical issues," but by the undisclosed engineering, procurement, and construction management problems. As documents produced in discovery confirm, Rio internally recognized months before the Class Period that "the consequence of ongoing delays is catastrophic" (Ex. D), and during the Class Period that "overall, ground conditions are as expected" and not the cause of any delay. Ex. E at RT0000339139.

Ultimately, investors were harmed following a series of corrective disclosures in the first half of 2019, when a whistleblower forced Defendants to disclose the truth—that the Oyu Tolgoi underground project was over a year behind schedule and over a billion dollars over budget—disclosures that caused substantial declines in the price of TRQ stock.

Like most securities-fraud class actions, this case is ideally suited for class certification because it arises from common public false or misleading statements and omissions that harmed tens of thousands of investors in a like manner. As courts have repeatedly explained, "securities fraud suit[s]" are "particularly well suited to class treatment." *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *1 (S.D.N.Y. Sept. 8, 2021). The proposed Class here readily satisfies all of Rule 23's requirements.

***First***, numerosity is easily satisfied because there are thousands of Class members. There were more than 900 million shares of TRQ common stock issued and outstanding in the public float during the Class Period.

***Second***, this Action involves many common issues of law and fact, including whether (i) Defendants' statements and omissions concerning the Oyu Tolgoi project's progress were false or misleading; (ii) Defendants made these statements and omissions with scienter; (iii) Defendants' misstatements and omissions caused investors' losses; (iv) Defendants Soirat and Jacques controlled Rio Tinto; and (v) the Class suffered damages, and the amount of damages.

**Third**, the typicality requirement is easily satisfied because Pentwater was harmed by the same alleged false and misleading statements and omissions as other Class members.

**Fourth**, Lead Plaintiff will continue to adequately represent the Class, as it has done to date. Pentwater is a sophisticated institutional investor; its interests in prosecuting this action are squarely aligned with those of the Class; it will fairly and adequately protect the interests of the Class; it is not subject to any unique defense; and its counsel is one of the most experienced securities class-action law firms in the country. Further, as reflected in the accompanying report of Professor Joshua Mitts (Ex. B), Pentwater's investments in TRQ securities were domestic transactions or made on U.S. exchanges, just like those of other Class members.

**Fifth**, the proposed Class is readily ascertainable, as it is defined by objective criteria and definite boundaries establishing the defined class of purchasers of TRQ securities.

**Sixth**, this action readily satisfies Rule 23(b)(3)'s predominance requirement. Common issues of law and fact that are subject to common proof abound—including Defendants' unitary course of conduct, falsity, materiality, scienter, and loss causation. The liability issues here are clearly subject to common evidence showing that Defendants' fraudulent acts affected all Class members. Moreover, class-wide reliance is presumed where, as here, the relevant stock trades on an efficient market. *See Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988). As confirmed in the accompanying expert report of Dr. Matthew Cain (Ex. C), the market for TRQ securities, where its common stock was traded on the NYSE and Nasdaq during the Class Period, is efficient. Further, damages can be calculated based on a class-wide methodology that is consistent with Lead Plaintiff's theory of liability. And, as confirmed in the accompanying report of Professor Mitts, class members' claims are consistent with *Morrison*, which can be readily resolved using common, class-wide proof based on common evidence of domesticity. *See Morrison v. Nat'l Australia Bank*

*Ltd.*, 561 U.S. 247, 267 (2010) ("*Morrison*").

**Seventh**, a class action is the superior method of resolving this dispute under Rule 23(b)(3) because many thousands of investors suffered damages as a result of Defendants' alleged misconduct; individual actions are unworkable; it is desirable to hear all of these claims in this Court; and there is no difficulty in maintaining this litigation as a class action.

**Finally**, Lead Counsel should be appointed as Class Counsel under Rule 23(g) because they are well qualified to prosecute this action on behalf of Lead Plaintiff and the Class.

Lead Plaintiff respectfully requests that the Court certify the following proposed Class:

> All persons or entities who purchased or otherwise acquired Turquoise Hill securities between July 17, 2018 and July 31, 2019, inclusive (the "Class Period"), in domestic transactions or on U.S. exchanges, and were damaged thereby.[2]

Lead Plaintiff further respectfully requests that the Court appoint Lead Plaintiff as Class Representative and appoint Lead Counsel as Class Counsel.

## II.    <u>BACKGROUND OF INVESTORS' CLAIMS</u>

This is a securities class action brought under Sections 10(b) and 20(a) of the Exchange Act on behalf of all persons or entities who purchased or otherwise acquired Turquoise Hill securities between July 17, 2018 and July 31, 2019, inclusive, in domestic transactions or on U.S. exchanges, and were damaged thereby.

This case arises out of a series of misrepresentations and omissions that concealed massive delays and cost overruns in the underground-development project at Oyu Tolgoi—the mine operated almost exclusively by Turquoise Hill's controlling shareholder, mining giant Rio Tinto.

---

[2] Excluded from the Class are Defendants; Rio Tinto International Holdings, Ltd. ("RTIH"); officers and directors of Defendant Rio Tinto, RTIH, and Turquoise Hill; Defendants' immediate family members, legal representatives, heirs, successors or assigns; and any entity in which any Defendant, RTIH, or Turquoise Hill has or had a controlling interest.

As alleged in the Complaint and confirmed by documents produced in discovery, by the beginning of the Class Period in July 2018, Rio's senior executives knew or recklessly disregarded that the underground-development project was hundreds of millions of dollars over budget and many months behind schedule. For example, before the start of the Class Period, an experienced executive named Richard Bowley—whom Rio hired specifically to investigate the problems at the mine and figure out solutions—identified hundreds of millions of dollars in cost overruns and reported them to senior Rio executives in February 2018. ¶¶115-17. By July 2018, Bowley reported to Rio senior management that the project was $300 million over budget and twelve months behind schedule. ¶¶147-51.

Despite these undisclosed problems, throughout the Class Period, Defendants made repeated false positive statements and omitted to disclose critical information to investors about the Oyu Tolgoi project's progress. For example, on July 17, 2018, at the start of the Class Period, Rio Tinto issued a press release stating that "[s]haft two equipping and headframe fit-out is in progress, and the shaft five ventilation system has been fully commissioned and is now operational." ¶339. On August 1, 2018, Rio filed a Form 6-K including its Interim Financial Report for the six months ending June 30, 2018 (¶355), in which Rio incorporated risk disclosures that did not disclose the delays and cost overruns known at that time (¶¶450-54). On August 15, 2018, Defendant Soirat appeared on Mongolian television and stated that he had recently visited the Oyu Tolgoi mine and met with mine employees, that Oyu Tolgoi was "37% complete," and that the underground project was "on plan and on budget." ¶360. Then, on October 16, 2018, Rio began to disclose a short delay but falsely represented that, following an annual "re-forecast," the project's "capital costs remain in line with the overall $5.3 billion budget and construction of the first draw bell is still expected in mid-2020." ¶370.

In reality, and in direct conflict with Defendants' positive statements, the problems at the mine were severe from the start of the Class Period. The truth was revealed over a series of disclosures starting on February 27, 2019, and only after internal complaints by a whistleblower, Mr. Bowley, forced Rio to disclose the delay at Oyu Tolgoi. ¶¶250-57. However, Rio continued to mislead investors, falsely attributing the reported delays to "difficult ground conditions" (¶¶403-04, 426) before finally disclosing in July 2019 that the project was 16 to 30 months behind schedule and $1.2 to $1.9 billion over budget. ¶¶267-72. In all, the disclosures about the true status of the Oyu Tolgoi project caused TRQ's stock price to lose well over 70% of its value. ¶¶261-266, 269-72.

Pentwater was appointed Lead Plaintiff by the Court in January 2021 and filed the Second Amended Complaint ("SAC") in September 2021. After briefing and oral argument, the Court issued a decision denying in part Defendants' motion to dismiss the SAC, sustaining investors' claims that Rio and Defendant Soirat made false and misleading statements in violation of Section 10(b) of the Exchange Act. *See In re Turquoise Hill Res. Ltd. Sec Litig.*, 625 F. Supp. 3d 164, 224-32 (S.D.N.Y. 2022). The Court also found that Lead Plaintiff adequately alleged Defendant Soirat's scienter, including because he received reports from Bowley and Soirat's direct report, Rosemary Fagen, about the delays and cost overruns. *See id.* at 242-45.

Following the Court's opinion on the motion to dismiss the SAC, Lead Plaintiff vigorously pursued discovery, including serving and responding to discovery requests, engaging in extensive discovery negotiations with Defendants, and moving to compel Defendants to produce additional documents and custodians (ECF No. 274), which was granted in part (ECF No. 279). Lead Plaintiff also obtained over 1,493,000 pages of documents from Defendants and third parties and has produced over 363,000 pages of documents to Defendants. *See* Halbower Decl. at ¶2.

On October 19, 2023, Lead Plaintiff filed its motion for class certification in accordance with the prior scheduling order. On November 10, 2023, Lead Plaintiff advised the Court that it intended to file the TAC based on additional documents Defendants produced in discovery, leading to a stay of discovery and withdrawal (without prejudice) of Lead Plaintiff's class certification motion pending resolution of Defendants' motion to dismiss the TAC. ECF No. 302.

On November 7, 2024, the Court issued a decision granting in part and denying in part Defendants' motion to dismiss the TAC. The Court found that the TAC's new allegations were sufficient to allege a Section 10(b) claim against Defendant Jacques related to Rio's false and/or misleading risk disclosures incorporated into its August 1, 2018 interim financial report noted above. ECF No. 356 at 30-31.

Lead Plaintiff has also vigorously pursued additional discovery from Defendants at its earliest opportunity following the Court's ruling on the TAC. For example, on December 2, 2024, the day discovery resumed, Lead Plaintiff filed two motions to compel additional discovery from Defendants (ECF Nos. 375, 378) and sought dates from Defendants for depositions of 25 key fact witnesses associated with Rio. While discovery is ongoing and Lead Plaintiff continues to vigorously pursue additional critical discovery from Defendants, documents produced by Defendants to date corroborate Lead Plaintiff's allegations and demonstrate that Rio's senior management knew about the cost overruns and delays from before the start of the Class Period. For example, ████████, the mine's General Manager Underground, wrote in an email in January 2018—months before the start of the Class Period—that "the consequence of ongoing delays is catastrophic." Ex. D. That same month, ████████y, then a key member of the Rio Tinto technical team at Oyu Tolgoi, wrote that there was a 6-8 month delay in Shaft 2. Ex. F. Three months before the Class Period, in April 2018, ████████—the former manager of Shaft

2—reported to senior executives that despite mitigation efforts, "there will be reportable delay to the schedule." Ex. G. By January 2019, "all hell [was] breaking lose" with "OT now 15mo late," and "shaft 2 delays now are catastrophic." Ex. H. As alleged in the Complaint, the delays were in part caused by the fact that OT workers had to replace virtually every piece of steel in Shaft 2 (*cf.* Ex. I *with* ¶¶82-85), and a result of the EPCM (engineering, procurement, construction management) contractor's "smelly track record with completing anything on time." Ex. J at RT001035816. And long before any disclosure to investors, these delays were reported directly to Defendant Soirat, who was warned by whistleblower Bowley's direct report in September 2018 that "we need to manage: Potential delay in project and the word spreading out." Ex. K. Documents produced also confirm that ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████ For example, ████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████ Ex. L.

Discovery has also corroborated that Rio's senior management knew of the cost overruns by the start of the Class Period. For example, ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████ Ex. M. Rio's documents further confirm that ████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████ Ex. N.

Discovery has also corroborated the Complaint's allegations and the Independent Consulting Group's conclusion that supposedly unforeseen "ground conditions" were not the cause

of the delays and, in fact, senior leaders at Rio Tinto specifically advised Rio's executives not to make any statements attributing any delays to ground conditions. For example, in October 2018, ███████████, Rio's Head of Underground Mining, wrote that "overall, ground conditions are as expected" and that Rio should not "suggest ground conditions are worse overall (which we don't believe)." Ex. E at RT000339139. Internally, ████████████████████

████████████████████████████████████

████████████████████████████████████

Ex. O. Thus, while Defendants' document production and Plaintiff's review and analysis of the documents are ongoing, Plaintiff has already developed substantial evidence that will prove investors' claims.

Lead Plaintiff now moves for class certification under Rule 23.

## III.    **ARGUMENT**

The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)." *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 313 (2007). "The Second Circuit requires a liberal, rather than restrictive, interpretation of Rule 23," *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2017 WL 3608298, at *2 (S.D.N.Y. Aug. 22, 2017), and courts in this district recognize that "securities fraud suit[s]" are "particularly well suited to class treatment," *Allergan*, 2021 WL 4077942, at *1.

To obtain class certification, parties must satisfy Federal Rule of Civil Procedure 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3). *See In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *7 (S.D.N.Y. July 10, 2019). As the Supreme Court has explained, "Rule 23 grants courts no license to engage in free-ranging merits

inquiries at the certification stage"; the question is whether the Rule 23 requirements are met, not whether Plaintiffs will ultimately prevail. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013). Each Rule 23 requirement is satisfied here.

### A. The Proposed Class Satisfies Rule 23(a)

#### 1. Numerosity Is Established

In the Second Circuit, Rule 23(a)(1)'s numerosity requirement is presumed for classes larger than 40 members and, in securities-fraud class actions, is shown where a large number of shares is outstanding and traded during the relevant period. *See Allergan*, 2021 WL 4077942, at *6; *Signet*, 2019 WL 3001084, at *8. Here, Turquoise Hill common stock traded on the NYSE and Nasdaq, had more than 900 million shares of common stock in its public float during the Class Period (not counting the just over 50% of TRQ's outstanding shares that were owned by Defendant Rio), and had an average of 2.37% of all outstanding shares (including those held by Rio) traded weekly. *See* Cain Rep. ¶28. Accordingly, the numerosity requirement is readily satisfied.

#### 2. Commonality Is Established

Commonality exists when "common issues of law or fact affect all class members." *Signet*, 2019 WL 3001084, at *8. Courts in this District hold that, in securities cases, commonality is satisfied where "plaintiffs allege that class members have been injured by similar material misrepresentations and omissions." *Allergan*, 2021 WL 4077942, at *6; *see also In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 276 (S.D.N.Y. 2008) (same).

The common questions of law and fact in this case are numerous and include: (i) whether Defendants' statements (including that the underground mine project was on budget and on schedule) were materially false and misleading when made; (ii) whether Defendants omitted material information regarding the project's status, including its severe cost overruns and schedule delays; (iii) whether Defendants acted with scienter; (iv) whether TRQ securities' prices were

artificially inflated during the Class Period due to these alleged misstatements and omissions; (v) whether Defendants' misrepresentations and omissions caused Class members to suffer economic losses when the truth was revealed; and (vi) whether Defendants Soirat and Jacques controlled Rio Tinto during the Class Period.

Courts routinely certify classes in securities-fraud cases involving these kinds of common questions. *See Signet*, 2019 WL 3001084, at *8 ("This case—as is typical of most securities fraud putative class actions—raises common questions of law and fact."); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 103 (S.D.N.Y. 2016) (finding commonality satisfied due to class-wide questions of falsity, materiality, and damages).

### 3.    Typicality Is Established

The typicality requirement "is satisfied when each class member's claim arises from the same course of events" and "each class member makes similar legal arguments to prove the defendant's liability." *Barrick Gold*, 314 F.R.D. at 98. The typicality requirement does not require the class members' claims to be identical; rather, the plaintiff must show that the claims are "'so interrelated that the interests of the class members will be fairly and adequately protected in their absence,' and that the claims of the potential class members 'share a common question of law or of fact.'" *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 176 (S.D.N.Y. 2008).

Here, Lead Plaintiff's claims arise from the same alleged course of conduct that gives rise to other Class members' claims, are based on the same legal theory, and will be proven by the same set of operative facts. Thus, the typicality requirement is satisfied. *See In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act ("ERISA") Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012).

Similarly, Pentwater seeks to represent a class of purchasers who acquired TRQ securities traded on U.S. exchanges or in domestic transactions in the United States. Pentwater's domestic

transactions in TRQ securities are typical of those of the proposed Class. *See* Mitts Report at ¶10 (Ex. B).

### 4.    Adequacy Is Established

To satisfy the adequacy requirement, the proposed class representative must "fairly and adequately protect the interests of the class." *Signet*, 2019 WL 3001084, at \*9. The adequacy requirement "seeks to ensure that Plaintiff's interests are not antagonistic to those of the Class and that Plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Id.* "The focus is on uncovering conflicts of interest between named parties and the class they seek to represent. In order to defeat a motion for certification, however, the conflict must be fundamental." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). Lead Plaintiff satisfies each facet of the adequacy inquiry.

### a.    Pentwater Is Fully Aligned With the Class and Is Not Subject to Any Unique Defense

Lead Plaintiff Pentwater satisfies the adequacy requirement because it "suffer[ed] the same injury as the class members" as a result of Defendants' material misrepresentations and omissions, and thus "possess[es] the same interest" in obtaining the best possible recovery as other Class members. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003). Like all Class members, Lead Plaintiff purchased Turquoise Hill securities during the Class Period and was harmed by the same fraudulent conduct. No conflicts exist between Lead Plaintiff and the Class and, as demonstrated in the accompanying Declaration of Matthew Halbower, Pentwater's CEO, Pentwater has provided excellent representation to the Class and is committed to obtaining the best possible recovery for the Class. *See* Halbower Decl. ¶¶3-6.

As the Court is aware, following the announcement by Rio and TRQ that Rio would acquire the remaining shares of TRQ that it did not already own in a plan of arrangement that threatened

- 12 -

to extinguish investors' claims, Pentwater acted to protect the interests of the Class. Specifically, consistent with its fiduciary duty to protect the Class's interests, through its advocacy in connection with the plan to acquire TRQ under Canadian law, Pentwater acted to ensure that both the U.S. claims sustained by the Court (and similar opt-out claims), as well as potential claims under Canadian law claims (e.g., for oppression) arising out of different and new misconduct by Rio after the Class Period in this case, would be preserved. ECF Nos. 157-2, 157-3. Pentwater also immediately reported its potential pursuit of Canadian claims to the Court. ECF No. 156. In doing so, Pentwater also sought to further protect the Class by requesting permission to add Mr. Murphy, an individual investor who no longer owned any TRQ securities and was thus not impacted by the proposed plan of arrangement, as an additional named plaintiff. *Id*. Pentwater subsequently informed the Court of its agreement to pursue the Canadian law claims against Rio arising out Rio's oppressive conduct through arbitration. ECF No. 189.

In the Court's order denying Pentwater's motion to add Mr. Murphy as a named plaintiff, the Court noted that any conflict of interest presented by Pentwater's pursuit of Canadian claims was "still largely speculative," that pursuing any Canadian claims did not pose any "limited fund" problem because Rio could fund a judgment in this case and in any Canadian action, and that there was "no clear incentive for Pentwater to trade a lesser settlement in this action in order to get a better one in its non-class actions." ECF No. 198, at 12-13. The Court's observations have proven correct, and Pentwater has continued to fulfill its fiduciary duties and serve as an excellent advocate for the Class while pursuing the arbitration.

In any event, to the extent any "speculative" conflict may have existed previously, it has been extinguished. As the parties reported to the Court on November 19, 2024, the Canadian arbitration has concluded (ECF No. 362) and no longer presents any arguable concerns as to

- 13 -

Pentwater's adequacy. Pentwater's prosecution of this case to date further proves Pentwater's adequacy. Pentwater is also an adequate Class Representative because it does not face any unique defenses that would become an undue focus of the litigation. As was addressed at the Lead Plaintiff stage, Pentwater's role as an institutional investor that actively engaged with TRQ management demonstrates its sophistication as a committed and motivated advocate. Indeed, the Court pointed out that, if anything, those discussions reflect that Pentwater is the very kind of institutional investor Congress intended to serve as Lead Plaintiff in enacting the PSLRA, as such institutions "frequently have conversations with company management about publicly available information in the interests of their investors"—they do not detract from Pentwater's adequacy to represent the Class. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2021 WL 148752, at *10 (S.D.N.Y. Jan. 15, 2021).

As noted above, Pentwater's investments in TRQ during the Class Period are also entirely typical of the Class, and none pose any unique defense that Defendants could not raise as to virtually every member of the Class. Specifically, as the Court recognized in appointing Pentwater as Lead Plaintiff, Pentwater made several purchases of TRQ during the Class Period through block trades, for which Pentwater took legal title to the securities in the United States and incurred irrevocable liability in this country—purchases that the Court held were "adequately alleged as a 'domestic transaction.'" *Turquoise Hill*, 2021 WL 148752, at *8-9 (applying *Morrison*, 561 U.S. at 267, and *Absolute Activist Master Fund LLC v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012)). As discussed further below and in the accompanying report of Professor Joshua Mitts, a Ph.D. in financial economics and the David J. Greenwald Professor of Law at Columbia University, any *Morrison* challenges that Defendants may raise are not unique to Pentwater (Mitts Rep. at ¶66). Pentwater's and other Class members' claims are consistent with *Morrison*, which can be readily

- 14 -

resolved using common, class-wide proof based on common evidence of domesticity. Mitts Rep. at ¶¶40-48, 67-71.

### b. Pentwater Has Vigorously Represented the Class and Will Continue to Do So

Lead Plaintiff Pentwater has vigorously prosecuted this action on behalf of the Class and will continue doing so. Lead Plaintiff fully understands its duties and responsibilities as Class Representative and its commitments to the Court and has amply demonstrated its adequacy to lead this case. *See* Halbower Decl. at ¶¶2-6. Among other things, Pentwater has demonstrated its adequacy to represent the Class by retaining and overseeing experienced counsel, filing three detailed amended complaints, attending Court hearings, successfully opposing in part Defendants' motions to dismiss, propounding and responding to discovery requests, engaging in extensive negotiations concerning discovery, successfully opposing Defendants' motion for leave to file an interlocutory appeal of the Court's decision denying their motion to dismiss in part, litigating motions to compel, and filing this motion for class certification. *Id.* at ¶3. Lead Plaintiff will continue to actively participate in and supervise the litigation through trial. *Id.* ¶6. Thus, Lead Plaintiff more than fulfills the adequacy requirement. *See Lapin*, 254 F.R.D. at 176.

Moreover, as the Court recognized in appointing Pentwater as Lead Plaintiff, Pentwater is an experienced institutional investor—precisely the type of plaintiff favored by Congress to lead securities class actions under the PSLRA—that has achieved remarkable success for investors in other cases, including in the *Salix* securities class action prosecuted in this District. *See Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2015 WL 1311073, at *4 (S.D.N.Y. Mar. 23, 2015) ("[M]any courts have demonstrated a clear preference for institutional investors to be appointed as lead plaintiffs."); H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess., at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733 ("Institutional investors and other class members with large amounts at

stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake."); *Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017) (Pentwater funds recovering $210 million for investor class as Lead Plaintiff).

### c. Pentwater Has Selected Experienced and Qualified Class Counsel

Proposed Class Counsel Bernstein Litowitz (which has been serving as Lead Counsel throughout the case) has extensive experience and success in prosecuting securities litigation and, indeed, is one of the preeminent law firms in the country representing investors in securities class actions. *See* Graziano Decl. at ¶¶3-4. Lead Counsel has a proven track record of success in complex cases such as this one and has successfully prosecuted high-profile securities-fraud class actions across the country, including in this District, recovering billions of dollars on behalf of injured investors. *See id.* ¶3. Consistent with its track record, Lead Counsel has vigorously prosecuted the Class's claims to date and will continue to do so. *See id.* ¶4.

### 5. Ascertainability Is Established

In addition to Rule 23(a)'s requirements, the Second Circuit "also recognizes an implicit 'ascertainability' requirement, which commands that the proposed class be 'defined using objective criteria that establish a membership with definite boundaries.'" *Martinek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *3 (S.D.N.Y. Feb. 3, 2022). This requirement is readily met in securities class actions like this one, where class "membership is based on objective, definite criteria—namely the dates of shareholders' acquisition of [defendant's] common stock." *Barrick Gold*, 314 F.R.D. at 104; *see also Signet*, 2019 WL 3001084, at *9 (class definition "clearly delineates the Class's boundaries").

### B. The Proposed Class Satisfies Rule 23(b)(3)

In addition to satisfying Rule 23(a), the proposed Class also satisfies Rule 23(b)(3), which

requires that (i) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (ii) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Allergan*, 2021 WL 4077942, at *5. This inquiry tests whether the class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

### 1.    Common Questions of Law and Fact Predominate Over Individual Issues

The Supreme Court has recognized that "[p]redominance is a test readily met" in securities-fraud cases like this one. *Id.* at 625; *see also WorldCom*, 219 F.R.D. at 288 (same); *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 90 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (same). Numerous common questions of law and fact predominate over any individual questions here.

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*"). To establish a violation of Section 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen*, 568 U.S. at 460-61.

The Supreme Court has held that issues of "falsity," "materiality," and "loss causation" are all common questions of law and fact and, accordingly, support class certification. *Id.* at 461-62, 474-75; *see also Halliburton I*, 563 U.S. at 811-12; *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 215 (S.D.N.Y. 2021). Additionally, the

element of "reliance" also raises "common questions" in this case and supports class certification because a presumption of reliance is warranted under the *Basic* fraud-on-the-market theory. *See Martinek*, 2022 WL 326320, *8-18 (finding predominance satisfied).

### a.    The Fraud-On-The-Market Presumption Applies

As in most securities class actions involving securities traded on a national exchange, the "fraud-on-the-market" presumption of reliance applies here. *See Basic*, 485 U.S. at 224. That presumption is based on the well-founded principle, adopted by the Supreme Court, that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*"). When this "fraud-on-the-market" presumption applies, investors do not need to demonstrate individual reliance. *Halliburton I*, 563 U.S. at 811; *see also Barrick Gold*, 314 F.R.D. at 101 (presumption "obviate[s] the need to prove reliance on an individual basis").

In this case, all of the relevant factors demonstrate that the market for Turquoise Hill securities was efficient. First, courts consider whether the security at issue trades on a major national exchange—and here, TRQ common stock actively traded on the NYSE and Nasdaq, a presumptively efficient market. *See Halliburton II*, 573 U.S. at 268 ("[T]he market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *15 (S.D.N.Y. Aug. 13, 2018) (finding NYSE "presumptively efficient").

Next, courts consider the five so-called "*Cammer* factors": (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration Form S-3; and (5) stock price reaction to unexpected, material disclosures. *See*

*Allergan*, 2021 WL 4077942, at *9-10 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989)). Finally, courts often consider the so-called "*Krogman* factors," which include: (1) the company's market capitalization; (2) the float for the company's stock; and (3) the bid-ask spread for stock sales. *See Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001).

Here, Dr. Cain—a well-recognized economist and expert on issues of market efficiency—conducted a thorough analysis of the market for TRQ securities.[3] Dr. Cain determined that each of the *Cammer* and *Krogman* factors supports a finding of market efficiency, and his analysis demonstrates without question that TRQ common stock traded in an open, well-developed, and efficient market during the Class Period, and that the market for options and swaps referencing TRQ common stock was similarly efficient.

**High Weekly Trading Volume (*Cammer* Factor 1)**: Courts hold that weekly turnover—measured by average weekly trading—of greater than 1% justifies a "substantial presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1286. Here, an average of 2.37% of Turquoise Hill's shares outstanding (including those held by Rio)—i.e., approximately 4.78 million shares, of which 2.78 million were traded on U.S. exchanges—traded each week. Cain Rep. ¶29. Thus, TRQ's weekly trading volume justifies a "substantial presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1286; *In re Glob. Brokerage, Inc.*, 2021 WL 1160056, at *12 (S.D.N.Y. Mar. 18, 2021) (holding that an "average weekly trading volume of 1% justifies a 'substantial presumption'" of efficiency).

---

[3] Dr. Cain is a Ph.D. in Finance and a Senior Fellow at the Berkeley Center for Law and Business at the University of California-Berkeley. He has served as a testifying expert in securities class actions and has published scholarly articles on many issues in financial economics, and his expert reports, which have included the topics of market efficiency, have been cited with approval by courts. *See* Cain Rep. ¶¶1-6; *see, e.g.*, *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 311-12 (D. Md. 2022).

**Significant Analyst Coverage (*Cammer* Factor 2)**: Courts hold that analyst coverage supports market efficiency because when a company's financial disclosures are "closely reviewed by investment professionals" who "make buy/sell recommendations to client investors," the market price fluctuations reflect the financial disclosures "as interpreted by the securities analysts." *Cammer*, 711 F. Supp. at 1286. Here, securities analysts employed by at least ten firms—including TD Securities, RBC Capital Markets, and Credit Suisse—published 91 analyst reports on Turquoise Hill securities during the Class Period, further demonstrating efficiency. Cain Rep. ¶31; *see also Cammer*, 711 F. Supp. at 1284, n.30 (finding 15 reports sufficient); *see also Allergan*, 2021 WL 4077942, at *10 (finding 29 analysts sufficient).

**Substantial Market Maker/Arbitrage Activity (*Cammer* Factor 3)**: Courts find that the existence of market makers supports market efficiency. Numerous market makers ensure that investors "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87; *see also Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (same). During the Class Period, Turquoise Hill had at least 80 market makers and brokers providing similar activity over the Class Period in the United States. In addition, short interest in TRQ common stock ranged from 1.0 to 1.5 million shares. Cain Rep. ¶¶38-39 & Ex. 10. This supports the conclusion that investors were able to, and did, "react swiftly" to public information by trading in TRQ stock, driving price changes. *Cammer*, 711 F. Supp. at 1286-87; *Martinek*, 2022 WL 326320, *12.

**S-3 Registration Eligibility (*Cammer* Factor 4)**: Courts find that a corporation's eligibility to use SEC Form S-3 "is an important factor weighing in favor" of efficiency, as it reflects the SEC's belief that the market operates efficiently for eligible companies, i.e., all public information "has already been disseminated and accounted for by the market place." *Cammer*, 711

F. Supp. at 1284-85; *see also In re Teva Sec. Litig.*, 2021 WL 872156, at *8 (D. Conn. Mar. 9, 2021) (same). Since Turquoise Hill was a Canadian company listed on a U.S. exchange, it was subject to Form F-10 registration, which is the equivalent of the Form S-3 registration that applies to domestic companies. TRQ was eligible for F-10 registration throughout the Class Period, which supports market efficiency. *See* Cain Rep. ¶42; *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *16 (S.D.N.Y. Jan. 26, 2021).

**Reaction of Stock to New Company-Specific Information (*Cammer* Factor 5)**: "[O]ne of the most convincing ways to demonstrate [market] efficiency [is] to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1291. An event study that "correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008). Here, the event study by Dr. Cain provides compelling evidence of this causal relationship by examining Turquoise Hill's common-stock-price reactions following "news dates"—dates with earnings or guidance announcements—as compared to all other dates in the Class Period, which strongly indicate that TRQ common stock traded in an efficient market. Cain Rep. ¶¶48-60; *Martinek*, 2022 WL 326320, at *17-18.

**Market Capitalization (*Krogman* Factor 1)**: Higher market capitalization also indicates market efficiency because "there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. Turquoise Hill's market capitalization at the start of the Class Period was almost $6 billion, and throughout the Class Period it averaged approximately $3.5 billion. Cain Rep. ¶62. This supports a finding of market efficiency. *Id.*; *see*

*also Martinek*, 2022 WL 326320, at *13 (average market capitalization of $2.71 billion).

**Small Bid-Ask Spread (*Krogman* Factor 2)**: "A narrow bid-ask spread is indicative of higher trading volume and courts consider it as a factor for determining market efficiency." *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *13 (S.D. Tex. Nov. 13, 2019); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 317 (S.D.N.Y. 2016) ("The markets for companies with higher market capitalizations and shares with a smaller bid-ask spread are more likely to be efficient."). During the Class Period, the daily bid-ask spread for Turquoise Hill stock averaged only 0.57% on the U.S. exchanges and 0.63% on the TSX, which Dr. Cain explains "indicat[es] that investors could trade Turquoise Hill's Common Stock at very low relative cost" and "supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period." Cain Rep. ¶¶64-65; *see also Martinek*, 2022 WL 326320, at *14.

**Large Public Float (*Krogman* Factor 3)**: Courts also consider the size of an issuer's float (i.e., shares outstanding not held by insiders) in assessing efficiency. "[A] large public float . . . may indicate market efficiency '[b]ecause insiders may have private information that is not yet reflected in stock prices, [so] the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security.'" *Wilson*, 2018 WL 3913115, at *15. Over the Class Period, on average, insiders including Rio Tinto held just over 50% of TRQ's shares outstanding—while TRQ insiders held virtually 0% of the common stock—meaning just under 50% of the float was public during the Class Period. Further, approximately 80% of TRQ's public float was held by institutions (other than Rio), with about 100 million shares available for trading in the public float, which satisfies *Krogman* Factor 2. Cain Rep. ¶67.

***Institutional Ownership:*** As explained by Dr. Cain, a high level of institutional ownership of a company's stock supports the conclusion that the stock trades in an efficient market. Here, at

least 333 institutional investors held TRQ stock at some point during the Class Period, and institutional ownership (including Rio Tinto's stake) fluctuated on a quarterly basis throughout the Class Period, from a minimum of 74.2% of shares outstanding on September 30, 2018 to a maximum of 85.9% of shares outstanding on June 30, 2019, which supports that conclusion. Cain Rep. ¶69 & Ex. 10.

*Absence of Autocorrelation*: In addition to the factors above, courts sometimes consider whether a security's price exhibits autocorrelation, which is when a security's historical price changes can predict future price changes. *See Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54-55 (S.D.N.Y. 2019). Statistically significant autocorrelation "can be an indicator of market inefficiency." *Id.* at 55. There was no persistent and systemic autocorrelation for Turquoise Hill, further supporting a finding of market efficiency. Cain Rep. ¶¶71-72.

*Options Trading:* Dr. Cain also explains that "options written on company stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as indicated by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies." Cain Rep. ¶73. Here, there were significant numbers of options outstanding on TRQ stock throughout the Class Period, which supports market efficiency. *Id.*

Moreover, the options and swaps themselves are similarly efficient. As Dr. Cain opines, "options prices quickly reflect value-relevant information that is also reflected in common stock prices," and "because options pricing is dependent on the stock price, the artificial inflation caused by any misrepresentations and omissions that affects the stock price would translate into the value of derivative instruments such as call and put Options on Turquoise Hill Common Stock." Cain Rep. ¶83. Likewise, he opines that "because equity swaps pricing is dependent on the stock price, the Swaps traded in an efficient market because their pricing and returns are dictated by the pricing

and returns of the Common Stock." Cain Rep. ¶78.

In sum, the market for Turquoise Hill securities—including TRQ common stock and options and swaps referencing TRQ common stock—was efficient throughout the Class Period based on overwhelming evidence concerning each of the factors discussed above, as well as under "a holistic analysis based on the totality of the evidence presented," as articulated by the Second Circuit. *In re Petrobras Sec.,* 862 F.3d 250, 277 (2d Cir. 2017); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1329 (N.D. Ga. 2007) (holding options investors entitled to presumption of reliance "upon proof of market efficiency of the underlying stock"); *In re Apple Inc. Sec. Litig.*, 2023 WL 2763952, at *1 (N.D. Cal. Mar. 28, 2023) (certifying options, noting expert's opinion that options efficiency is "essentially settled"). As a result, Lead Plaintiff is entitled to the "fraud-on-the-market" presumption of reliance.

### b. Class Membership Can Be Determined with Common Class-Wide Proof, and *Morrison* Does Not Require Individualized Inquiries

Turquoise Hill stock was listed during the Class Period on the NYSE, the Nasdaq, and the Toronto Stock Exchange ("TSX"). As explained in detail in Professor Mitts' report, investors' purchases of TRQ stock can readily be identified as domestic transactions satisfying *Morrison* and *Absolute Activist* using Class-wide proof.

As Professor Mitts demonstrates, based on publicly available data and discovery that has already been produced in this case, the vast majority—over 91%—of class members' purchases of TRQ stock were inherently domestic, as they occurred on a U.S. exchange (satisfying *Morrison*'s first prong) or in domestic transactions where there was no delivery of shares from Canada to the United States (confirming a "domestic transaction" under *Morrison*'s second prong). Mitts Rep. ¶¶10, 30-39. Further, as Professor Mitts explains, class membership and whether any other

purchase of TRQ stock during the Class Period can readily be determined as "domestic" under *Morrison* based on common, class-wide proof.

Specifically, purchases of Turquoise Hill's dual-listed common stock by members of the Class can be divided into three groups. First, there are class members who purchased their shares on a U.S. exchange, who clearly engaged in domestic transactions under the first prong of *Morrison*, i.e., "transactions in securities listed on domestic exchanges." Mitts Rep. ¶30. Second, class members who purchased shares of Turquoise Hill securities using a U.S. broker-dealer from a seller who is also a U.S. broker-dealer engaged in domestic transactions, as there is no non-U.S. counterparty to the transaction and irrevocable liability for the purchase arose in the United States, which also satisfies *Morrison*. Mitts Rep. ¶31. Third, class members can purchase Turquoise Hill securities with a U.S. broker-dealer that purchases from a Canadian seller, in which case the transaction results in a transfer of legal title in the United States. As explained in detail by Professor Mitts, and as confirmed by DTC and settlement and clearing data, the overwhelming majority of Turquoise Hill's dual-listed common stock traded during the Class Period did not involve the delivery of shares from Canada—and were thus conducted in "domestic transactions" because the transfer of title occurred in the United States, and irrevocable liability for the purchase of those securities was also incurred in the United States. Mitts Rep. ¶¶40-48.

Importantly, Professor Mitts' analysis makes clear that clearing and settlement data, when considered in the context of the applicable rules and policies for securities transactions, provide common, class-wide evidence of domestic title transfer and irrevocable liability. Moreover, this information makes it readily possible to identify and use Class-wide, common evidence to confirm those transactions in TRQ securities that satisfy *Morrison* while excluding those that do not. Mitts Rep. ¶¶67-71. In other words, any potential extraterritoriality defense poses no obstacle to

predominance in this case. *Cf. Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2023 WL 3569981, at *3-8 (N.D. Cal. May 19, 2023) (citing Professor Mitts' report in certifying class over *Morrison* challenge to typicality and predominance).[4]

**c.     Damages Will Be Calculated Using a Common Methodology That Is Consistent with the Class-Wide Theory of Liability**

Courts in this Circuit and elsewhere routinely find that determining damages is subject to a common methodology in securities cases because damages can be calculated on a class-wide basis using an event study that measures investors' out-of-pocket damages. *See Allergan*, 2021 WL 4077942, at *15 ("there is no reason why an event study—the generally accepted method for measuring damages in a securities fraud class action—cannot work in this case"); *Signet*, 2019 WL 3001084, at *20 (accepting damages model using event study).

As Dr. Cain explains, a common methodology may be used to determine damages caused by Defendants' misrepresentations and omissions using the standard event study and "out-of-pocket" methodology. Cain Rep. ¶¶85-89. Here, damages will be measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale—the same methodology that is employed in nearly every securities-fraud class action and has been widely endorsed by courts in this District and throughout the Second Circuit. *See, e.g.*, *Allergan*, 2021 WL 4077942, at *15; *Barrick Gold*, 314 F.R.D. at 103; Cain Rep. ¶¶85-89. Dr. Cain further explains that the same common methodology can be used to calculate damages

---

[4] Notably, unlike in *Petrobras*, Plaintiff's analysis for establishing domesticity is not based simply on the fact that those transactions may have been recorded in the DTC's book-entry system. *Cf. Petrobras*, 862 F.3d at 272 n.24 (rejecting proposition that a "securities transaction is 'domestic'" simply because it "settles through the DTC"). Rather, Professor Mitts' analysis makes clear that clearing and settlement data, when considered in the context of the applicable rules and practices for securities transactions, clearly evidence domestic title transfer and irrevocable liability and can be used to determine domesticity on a class-wide basis. Mitts Rep. ¶¶40-48.

for Class members who purchased swaps or options on TRQ common stock. Cain Rep. ¶¶90-92.

Accordingly, common questions of law or fact predominate, and the first prong of Rule 23(b)(3) is satisfied.

### 2.    A Class Action Is Superior to Other Available Methods for Resolving This Controversy

Rule 23(b)(3) also asks whether class resolution will be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Courts have long recognized that class actions are a desirable means for resolving claims based on securities laws," and find superiority is easily established. *Allergan*, 2021 WL 4077942, at *17.

All of the factors courts consider in assessing superiority are satisfied here. *First*, the number of Class members—in the thousands—is far too large, and the typical claim is generally too small, for each individual Class member to have an interest in maintaining a separate action. *Second*, Lead Plaintiff is aware of no other action that seeks recovery under the federal securities laws for damages caused by Defendants' alleged fraud. *Third*, the geographical dispersion of the Class members makes it desirable to litigate Lead Plaintiff's claims in this forum. *Finally*, there are no management difficulties that would preclude this Action from being maintained as a class action. *See id.* at *16.

### C.    Lead Counsel Should Be Appointed Class Counsel

Lead Plaintiff also respectfully requests that the Court appoint Lead Counsel as Class Counsel. In appointing Class Counsel, Rule 23(g) provides that the Court consider: (i) the work counsel has done; (ii) counsel's experience in handling, among other things, class actions and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Lead Counsel amply satisfies the Rule 23(g) criteria. Under Lead Plaintiff's supervision

and direction, Lead Counsel has vigorously prosecuted this case, including by, among other things: analyzing, researching and investigating the securities law claims here; drafting two detailed complaints; successfully opposing Defendants' motions to dismiss in large part; successfully opposing Defendants' motion for an interlocutory appeal of the denial of their motion to dismiss; conducting ongoing fact discovery; retaining and consulting with experts in economics, damages, and mining operations; and assembling a dedicated and highly skilled team to prosecute the Action. *See* Graziano Decl. ¶4. Lead Counsel has significant experience prosecuting complex securities class actions, deep knowledge of the applicable securities laws, and an exemplary record of success. *See* Ex. P. Indeed, Bernstein Litowitz has helped recover billions of dollars for investors in courts in this District, and is well equipped to prosecute investors' claims in this case.[5]

## IV.    <u>CONCLUSION</u>

Lead Plaintiff requests entry of an Order certifying this Action as a class action under Federal Rule of Civil Procedure 23, appointing Lead Plaintiff as the Class Representative, and appointing Bernstein Litowitz as Class Counsel.

Dated: December 23, 2024                Respectfully submitted,

                                        **BERNSTEIN LITOWITZ BERGER
                                          & GROSSMANN LLP**

                                        <u>*/s/ Salvatore J. Graziano*</u>
                                        Salvatore J. Graziano
                                        James A. Harrod
                                        Michael D. Blatchley
                                        Alexander M. Noble
                                        1251 Avenue of the Americas, 44th Floor
                                        New York, NY 10020
                                        Telephone: (212) 554-1400

---

[5] *See, e.g.*, *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 147 (S.D.N.Y. 2019) ("In light of Bernstein Litowitz's substantial resources and experience in litigating securities class actions, and the conduct of the litigation to date, the Court concludes that Bernstein Litowitz satisfies Rule 23(g).").

Facsimile: (212) 554-1444
salvatore@blblaw.com
jim.harrod@blblgaw.com
michaelb@blblaw.com
alexander.noble@blblaw.com

*Lead Counsel for Lead Plaintiff and the Class*