UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/04/2025
```

-------------------------------------------------------------------  X
                               :
                               :
                               :

IN RE TURQUOISE HILL RESOURCES LTD.      :
SECURITIES LITIGATION                :         20-cv-8585 (LJL)
                               :
                               :       OPINION AND ORDER
                               :
-------------------------------------------------------------------  X

LEWIS J. LIMAN, United States District Judge:

Defendants Rio Tinto plc, Rio Tinto Limited (together with Rio Tinto plc, "Rio Tinto"), Jean-Sébastien Jacques ("Jacques"), and Arnaud Soirat ("Soirat," and with Rio Tinto and Jacques, "Defendants") move to disqualify Lead Plaintiff's expert John C. Barber ("Barber"). Dkt. No. 345.

For the following reasons, the motion to disqualify is denied.

## BACKGROUND

The case is brought by purchasers of the securities of Turquoise Hill Resources Ltd. ("Turquoise Hill") during the period from July 17, 2018, to July 31, 2019. Dkt. No. 329 ("TAC") ¶ 1. The Plaintiffs allege that Defendants violated Sections 10(b) and 20(a) the of Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), by making false and misleading statements to investors regarding the Oyu Tolgoi mine (the "Mine"), a copper mine in Mongolia operated by Rio Tinto via its subsidiary Turquoise Hill. TAC ¶¶ 1, 3. By order of January 15, 2021, Pentwater Funds ("Pentwater," or "Lead Plaintiff") was appointed Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(a)(3)(B). Dkt. No. 103.

Lead Plaintiff's allegations are recounted in full in prior opinions. *See In re Turquoise Hill Res. Ltd.*, 2024 WL 4711185, at *1–6 (S.D.N.Y. Nov. 7, 2024); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 182–93 (S.D.N.Y. 2022). The Court focuses here only on background relevant to this motion and the facts introduced on the motion to disqualify.

## I.     Relevant Background

The Oyu Tolgoi mine is expected to be one of the largest copper mines in the world. TAC ¶ 3. The Mine is owned by Oyu Tolgoi LLC ("OT LLC"), which is in turn 66% owned by Turquoise Hill and 34% owned by the government of Mongolia. *Id.* ¶ 55. Turquoise Hill's sole business is the operation and development of Oyu Tolgoi. *Id.* ¶ 40. Rio Tinto acquired a majority interest in Turquoise Hill in 2012 via a wholly-owned subsidiary, Rio Tinto International Holdings ("RTIH"). *Id.* ¶¶ 40–41, 49–50. The remainder of Turquoise Hill's common stock is publicly traded. *Id.* ¶ 41. Rio Tinto controls the election of all members of Turquoise Hill's Board of Directors and the selection and appointment of its executive officers. *Id.* ¶¶ 40–41, 49–50.

Turquoise Hill's predecessor began initial work on the Mine as early as 2001. *Id.* ¶ 64. By 2013, work had been completed on Shaft 1, a preliminary exploration and access shaft, and work had begun on Shaft 2, which was the main hub for completing the underground expansion of the Mine. *Id.* ¶¶ 65, 77–78. However, work was paused between 2013 and 2016 due to a dispute between OT LLC and the government of Mongolia. *Id.* ¶ 66. Work began again in 2016 after Rio Tinto negotiated a new financing agreement with the government of Mongolia. *Id.* ¶¶ 67–68.

Construction of Oyu Tolgoi between 2016 and 2019 was plagued by engineering, procurement, and construction issues. *Id.* ¶ 82. Construction during this period was focused on the completion of Shaft 2. *Id.* ¶¶ 77–78. The part of Shaft 2 left over from the earlier

construction posed safety risks, the steel supplied to build the shaft was of poor quality and often did not fit, and different parts of the project were not synchronized, leading to conflicts between personnel.  *Id.* ¶¶ 84–133.  Employees and consultants raised concerns over delays, overruns, and unethical behavior at the mine.  *Id.* ¶¶ 122, 138–39

Until October 2018, Rio Tinto and Turquoise Hill consistently maintained that the project was on time and on budget.  *Id.* ¶¶ 338, 339, 346–347, 355–356.  In October 2018, Turquoise Hill and Rio Tinto announced a "reforecast" of the project timeline with a delay of approximately six months, stating that the project remained on budget.  *Id.* ¶¶ 367–68, 370.  In July 2019, Rio Tinto and Turquoise Hill disclosed a delay of 16 to 30 months in the construction of Oyu Tolgoi and cost overruns of $1.2–1.9 billion, resulting in Turquoise Hill's stock price decreasing by about 43%.  *Id.* ¶¶ 267–68.

Lead Plaintiff purchased Turquoise Hill stock in late 2018 and early 2019 and suffered losses when the stock price declined.  *Id.* ¶¶ 34–38.  It seeks to represent a class comprised of investors who purchased or otherwise acquired Turquoise Hill securities from July 17, 2018, to the date of the alleged corrective disclosure on July 31, 2019, in domestic transactions or on United States exchanges.  *Id.* ¶ 1.

## II.    Barber's Involvement with Oyu Tolgoi

Barber has experience with Oyu Tolgoi in three distinct roles.

### A.    AMEC Consultancy

In June 2010, OT LLC commissioned AMEC Foster Wheeler ("AMEC") as the Engineering, Procurement, and Construction Manager ("EPCM") responsible for carrying out the feasibility study for Hugo North Lift 1 at Oyu Tolgoi.  Subsequently, AMEC prepared 2012 and 2014 feasibility studies covering all aspects of the Oyu Tolgoi project.  From 2007 to 2017, Barber held the position of "Technical Director, Underground Mining" at AMEC.  Dkt. No. 347-

3.  In this role, he was involved with preparation of the 2012 and 2014 feasibility studies.  *See* Dkt. No. 365 ¶ 16; Dkt. Nos. 347-3, 347-11, 347-12, 347-13, 347-14.  This work concluded in February 2014.  Dkt. No. 365 ¶ 16.

AMEC's work was governed by a 2010 EPCM Agreement and a 2012 Master Services Agreement ("MSA") with OT LLC.  Dkt. Nos. 347-5–347-10.  Both contained confidentiality provisions.  Dkt. No. 347-7 § 40; Dkt. No. 347-10 § 37.  The 2010 EPCM agreement states:

> The Service Provider undertakes and agrees:
>
> a)  To hold in strict confidence all Confidential Information[1] and not to disclose, permit or cause the Confidential Information to be disclosed to any person other than any of its Personnel who require the Confidential Information for the purpose of providing the Services, and
>
> b)  Not to make use of the Confidential Information (including duplicating, reproducing, distributing, disseminating or directly or indirectly deriving information from the Confidential Information), except, and solely to the extent necessary, for the performance of the Services,
>
> Unless the Service Provider has obtained the prior written consent of the Company to do so (which consent may be withheld by the Company in its discretion, or given on such terms as it sees fit).

Dkt. No. 347-7 § 40.1.  The Company is defined as OT LLC and the Service Provider is defined as AMEC Americas Ltd.  Dkt. No. 347-5 at 2.[2]  The Service Provider acknowledges that the confidentiality provision "is for the benefit of not only the Company, but also any member of the Oyu Tolgoi Companies that has any interest in any Confidential Information."  Dkt. No. 347-7 § 40.4.  "Oyu Tolgoi Companies" is defined to include any entity related to OT LLC.  *Id.* § 1.1. The confidentiality provision states that it will "survive the termination of the contract."  *Id.* § 40.8.

---

[1] Confidential Information is defined as "the Contract and any information (in whatever form) or Documentation of a confidential nature. . . .which relates to the business, affairs or activities of the Company . . . ."  Dkt. No. 347-7 § 1.1.

[2] ECF pagination.

The 2012 MSA has similar language, except that it does not apply to information "after it becomes generally available to the public" or when disclosure is necessary to comply with applicable law or court order.  Dkt. No. 347-10 § 37.2.  This confidentiality provision states that it will be effective "during the term of this contract and seven (7) years following the termination of this Contract."  *Id.* § 37.8.  The term of the contract is stated as "sixty months from the Commencement Date unless otherwise terminated or extended."  Dkt. No. 347-8 at 2.

### B.     Turquoise Hill Consultancy

Butler had no involvement with Oyu Tolgoi between 2014 and 2019.  In September 2019, he was retained by Turquoise Hill pursuant to a Consultancy Agreement and Confidentiality Agreement.  Dkt. Nos. 347-15, 347-16.

The Consultancy Agreement states that Barber's scope of work included "support[ing] the Oyu Tolgoi project by attending and actively participating in project review meetings."  Dkt. No. 347-15 Sch. A.  Pursuant to this agreement, Barber participated in non-public meetings concerning the project's status and technical issues impacting the project.  Dkt. No. 365 ¶ 18. Barber declares that his consulting work "was focused on evaluating a proposed redesign for Panel 0, the primary ore body to be mined at OT."  Dkt. No. 365 ¶ 17.  He states that his work evaluating proposed future designs for Panel 0 did not include any retrospective analysis of overruns and delays which had been reported on Shaft 2 and related infrastructure.  *Id.*  He states that "Shaft 2 is located approximately 1.5 kilometers away from Panel 0, and the mine plan redesign for Panel 0 would have no impact on the construction of Shaft 2 or associated infrastructure."  *Id.*  Although the duration of Barber's work under this contract is not clear, he was still "providing some technical support" to Turquoise Hill through at least June 2021.  Dkt. No. 365-5.

The 2019 Consultancy Agreement also provides:

6.1 The Consultant acknowledges that all information disclosed by or on behalf of the Client to the Consultant during the term of this Agreement (or prior to the execution hereof or following the termination or expiration of this Agreement) and any rights related thereto, are and shall remain the exclusive and absolute property of the Client.

6.2 Accordingly, the Consultant agrees to respect the confidentiality of such information and to use it solely in respect to the terms and conditions set forth in the Confidentiality Agreement signed on September 17, 2019 between the Consultant and the Client.

Dkt. No. 347-15.

The Confidentiality Agreement contains Barber's acknowledgement that, in reviewing the Oyu Tolgoi mine process, Barber "will have access to confidential information concerning Turquoise Hill, its subsidiaries, shareholders and their affiliates and related parties which is to remain confidential pursuant to the terms of the Agreement."  Dkt. No. 347-16.  Barber further acknowledges that the Confidential Information "is secret, confidential and valuable to Turquoise Hill's Group," undertakes to "treat the Confidential Information as proprietary to Turquoise Hill and members of Turquoise Hill's Group," and agrees to "keep the Confidential Information secret and confidential, and without Turquoise Hill's prior written consent, [not to] disclose or grant any third party access to any Confidential Information . . . "  *Id.* §§ 2.1, 2.2.  "Turquoise Hill's Group" is a defined term which includes Rio Tinto.  *Id.* § 1.5.

In February 2023, Turquoise Hill formally terminated its engagement with Barber.  Dkt. No. 368-20 at 20.[3]  The letter from Turquoise Hill to Barber states:

[F]urther to the acquisition by Rio Tinto, Plc of Turquoise Hill and as of January 31, 2023, any agreement or engagement between the Vendor [JC Barber LLC] and TRQ [Turquoise Hill], including but not limited to the Agreement[4] shall be

---

[3] ECF pagination.
[4] The "Agreement" is defined as the "Services Agreement dated as of September 17, 2019." Dkt. No. 368-20 at 20.  This appears to refer to Barber's Consultancy Agreement with Turquoise Hill, which is dated September 17, 2019, and states that it sets forth the conditions of "the provision by the Consultant to the Client of certain services."  Dkt. No. 347-15.

terminated and cancelled and shall have no further force or effect, with no further actions or formalities required on the part of any of the Parties.

*Id*.

### C. ICG Peer Review

Finally, in July 2021, Barber was engaged as a peer reviewer to review the work of the Independent Consulting Group ("ICG"), which was retained by a special committee of the OT LLC Board to report on the causes of the delays and cost overruns at Oyu Tolgoi. The special board committee was composed of two representatives of the government of Mongolia and two representatives of Turquoise Hill. Dkt. No. 368-9. It was established in November 2020 due to concerns about the reported issues at Oyu Tolgoi. *Id.* The special committee was given a mandate to conduct an "independent review" of the project using "an independent and reputable firm of experts." *Id.* The special committee hired the ICG, which was composed of eight mining experts. TAC ¶¶ 291–92. The ICG engaged two additional specialists, one of whom was Barber, to review the ICG's report before it was released. Barber and the other peer reviewer sent a report to the OT LLC special committee on July 28, 2021. Dkt. No. 368-18 at 18. To facilitate their review, the peer reviewers had "access to ICG's database of project information." *Id.* at 2. The reviewers also conducted meetings with the ICG team. *Id.*

The ICG was independent from Rio Tinto. TAC ¶¶ 291–92. Rio Tinto provided a large volume of documents to the ICG, although not all of them were relevant. Dkt. No. 124-1 at 8. The ICG report criticized Rio Tinto for providing uncooperative responses to certain requests, refusing to release Technical Evaluation Group ("TEG") review documents, refusing to provide explanations. and refusing to allow the ICG team to interview current and former project staff. *Id.* The Mongolian government representatives on the OT LLC special committee sent a letter on June 16, 2021, asking Rio Tinto to stop "interfering" with the independent review process and

asking Rio Tinto to promptly comply with requests for information from the ICG.  Dkt. No. 368-16.

In his capacity as a peer reviewer, Barber signed a One Way Confidentiality Agreement with OT LLC.  Dkt. No. 347-19.  Barber agreed to "hold all Confidential Information in strict confidence and [not to] disclose any of it to any person except in accordance with this Agreement or otherwise as permitted or directed in writing by the Discloser."  *Id.* § 3.1.  The Discloser is defined as OT LLC.  *Id.* at 3.  The agreement stated that Barber was obligated not to "make any use of the Confidential Information or any part of it to the competitive disadvantage of the Discloser or any member of the Rio Tinto Group."  *Id.* § 3.1(d).  The "Rio Tinto Group" is defined as Rio Tinto and any business entity which it controls, which controls it, or which is under common control.  *Id.* § 1.1.  The agreement provides that the confidential provisions are for the benefit not only of the Discloser "but also any members of the Rio Tinto Group that have any interest in any Confidential Information."  *Id.* § 8.  The confidentiality obligations continue until "all the Confidential Information becomes generally available to the public" or "the Discloser notifies the Recipient that the Confidential Information is no longer to be treated as Confidential Information."  *Id.* § 2.2.  The agreement also does not prevent the Recipient from disclosing the information if it "becomes available to the Recipient from a third party legally entitled to possess the information and provide it to the Recipient, if the use or disclosure accords with the right or permission legally granted to the Recipient by that third person."  *Id.* § 3.2.

### III.    Barber's Retention by Lead Plaintiff

On June 27, 2023, Barber signed an agreement with counsel for Lead Plaintiff to provide consulting services to it in connection with this litigation.  Dkt No. 368 ¶ 3; Dkt. No. 347-20.  The scope of Barber's work is defined as "(1) consulting with counsel on issues related to the Litigation including providing your opinion on a confidential basis; (2) if requested, preparing a

report outlining opinions you have formed concerning matters related to the Litigation; (c) attending in-person, or virtually, to testify in the Litigation; and (d) preparation in advance of the giving of testimony as a witness." *Id.* The agreement contains the following provision:

> We understand that you may have information relevant to the Dispute arising from prior work you have performed for Turquoise Hill, Rio Tinto or its affiliates and you have advised us that certain non-disclosure agreements may restrict your ability to disclose some or all of that information to us ("Prior Information"). Accordingly, we ask that you ensure that you do not share any Prior Information with us at any point during the course of providing the Services, unless authorized to do so under the terms of any relevant agreements, by consent of the relevant parties to whom any obligation of confidentiality is owed, or by order of any competent authority. Any information furnished to you in connection with the Services, whether or not it may have been available to you previously, does not constitute Prior Information.

Dkt. No. 347-20.

To date, Barber has worked fewer than 10 hours for Lead Plaintiff. *Id.* ¶ 14. He states that he has not disclosed any confidential information and has only made reference to information which has been produced in litigation or is publicly available. *Id.* ¶¶ 12–13. On May 1, 2024, Barber paused his work for Lead Plaintiff pending resolution of his alleged conflict. Dkt. No. 368 ¶ 5.

## DISCUSSION

### I.     Legal Standard

"The Court has the inherent power to disqualify an expert witness when such relief is warranted." *Rodriguez v. Pataki*, 293 F. Supp. 2d 305, 311 (S.D.N.Y.), *aff'd*, 293 F. Supp. 2d 315 (S.D.N.Y. 2003) (citation omitted); *accord Capitol Records, Inc. v. MP3tunes, LLC*, 2010 WL 11590131, at *1 (S.D.N.Y. Apr. 15, 2010); *Rouviere v. DePuy Orthopaedics, Inc.*, 496 F. Supp. 3d 811, 813 (S.D.N.Y. 2020); *Paul ex rel. Paul v. Rawlings Sporting Goods Co*., 123 F.R.D. 271, 277–82 (S.D. Ohio 1988); *see generally* Nina A. Vershuta, Note, *New Rules of War in the Battle of the Experts Amending the Expert Witness Disqualification Test for Conflicts of*

*Interest*, 81 Brook. L. Rev. 733, 742–63 (2016) (surveying relevant case law).  "Disqualification is designed to protect the integrity of the judicial process by ensuring that experts do not use, even unwittingly, confidential information that they learned from a party in the course of an earlier engagement against that party in a later lawsuit."  *Eastman Kodak Co. v. Kyocera Corp.*, 2012 WL 4103811, at *8 (W.D.N.Y. Sept. 17, 2012) (citation omitted); *Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc*., 2024 WL 5135692, at *5 (S.D.N.Y. Dec. 17, 2024).  "Disqualification is a drastic remedy, however, and should be resorted to rarely."  *Kyocera Corp.*, 2012 WL 4103811, at *8.

"In determining whether disqualification is appropriate based on a prior relationship between an expert and the party moving for disqualification, the court should consider whether (1) the movant had a prior confidential relationship with the expert; and (2) the movant had disclosed to the expert confidential or privileged information."  *Kyocera Corp.*, 2012 WL 4103811, at *8 (collecting cases); *see also Rodriguez*, 293 F. Supp. 2d at 311.  If these two threshold elements are satisfied, courts also consider whether there is a "relationship between the information received and the issues in the litigation," such that there is a risk that the confidential information will be disclosed by the expert in the litigation.  *In re New York City Policing During Summer 2020 Demonstrations*, 2022 WL 656808, at *7 (S.D.N.Y. Mar. 4, 2022) (quoting *Auto-Kaps, LLC v. Clorox Co.*, 2016 WL 1122037, at *3 (E.D.N.Y. Mar. 22, 2016)); *see Gordon v. Kaleida Health*, 2013 WL 2250506, at *5 (W.D.N.Y. May 21, 2013) (describing this element as whether the information is "relevant to the current litigation"[5] (citation omitted)).

---

[5] Although this formulation is common, the term "relevant" can be misleading.  The relevance courts have considered here is not relevance in an evidentiary sense.  Evidentiary relevance is an "extremely broad concept," and includes for example evidence which is entirely cumulative or has some minimal probative value towards proving a fact not in dispute.  *Eur. v. Equinox*

Finally, courts consider whether the information remains confidential, as opposed to being publicly available or already disclosed in the litigation. *See Twin City Fire Ins. Co. v. Mitsubishi Motors Credit of Am., Inc*., 2006 WL 5164249, at *4 (C.D. Cal. Nov. 6, 2006); *Edwards Vacuum LLC v. Hoffman Instrumentation Supply, Inc*., 2020 WL 7360682, at *10 (D. Or. Dec. 15, 2020); *Sarl v. Sprint Nextel Corp*., 2013 WL 501783, at *6 (D. Kan. Feb. 8, 2013).

Each of these four elements—confidential relationship, disclosure of information, relationship of the information to the litigation, and continued confidentiality—is necessary for disqualification to be warranted. The purpose of disqualification is "to prevent the 'risk of prejudice from possible disclosure'" of confidential information by an expert witness "and the 'fundamental unfairness' that would arise as a result." *Auto-Kaps*, 2016 WL 1122037, at *3 (quoting *Gordon*, 2013 WL 2250506, at *6). Therefore, the touchstone of the analysis is the risk of a breach of confidentiality. *See Gordon*, 2013 WL 2250506, at *13; *Kyocera Corp.*, 2012 WL 4103811, at *8. Absent any of the elements above, the risk of such a breach is minimal or nonexistent and cannot justify the "drastic remedy" of disqualification. *Kyocera Corp.*, 2012

---

*Holdings, Inc*., 592 F. Supp. 3d 167, 176 (S.D.N.Y. 2022) (quoting *Cruz v. G-Star Inc*., 2019 WL 4805765, at *11 (S.D.N.Y. Sept. 30, 2019)); *see* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). The case law does not support the disqualification of an expert who possesses confidential information which is merely of some tangential relevance to an undisputed issue. *See Gordon*, 2013 WL 2250506, at *13 (framing the issue as whether there is "actual or highly likely disclosure" (internal citation omitted)); *Auto-Kaps*, 2016 WL 1122037, at *3 (considering whether there is a "substantial relationship between the information [the expert] received and the issues in this litigation"); *Pellerin v. Honeywell Int'l Inc*., 2012 WL 112539, at *3 (S.D. Cal. Jan. 12, 2012) (considering whether there is a "substantial risk [the expert] may inadvertently use confidential information he is contractually barred from disclosing"). And confidential attorney work product and trial strategy, which ordinarily are not relevant evidence, unquestionably are the type of confidential information that requires disqualification. *See Twin City Fire Ins. Co. v. Mitsubishi Motors Credit of Am., Inc*., 2006 WL 5164249, at *3 (C.D. Cal. Nov. 6, 2006); *Mayer v. Dell*, 139 F.R.D. 1, 4 (D.D.C. 1991). The issue is not evidentiary relevance but whether the information has a sufficient relationship to the litigation to create a likelihood of disclosure.

WL 4103811, at *8.  If there was no confidential relationship or the expert received no

information, the motion fails at the threshold.  If the expert had a relationship with the party and

received confidential information, but the information is not related to the litigation, there is no

reason for the expert to disclose it and disqualification also is not required.  *See, e.g.*, *Bone Care*

*Int'l, LLC v. Pentech Pharms., Inc.*, 2009 WL 249386, at *3 (N.D. Ill. Feb. 2, 2009) (holding that

retention for litigation on one patent did not bar an expert from testifying against the company

regarding a different and unrelated patent); *City of Springfield v. Rexnord Corp.*, 111 F. Supp. 2d

71, 74–76 (D. Mass. 2000).  If the expert received information of great importance to the

litigation, but it was not confidential or has already been disclosed, the expert cannot breach

confidentiality by revealing it.  *See Edwards Vacuum*, 2020 WL 7360682 at *10; *Stencel v.*

*Fairchild Corp.*, 174 F. Supp. 2d 1080, 1084 (C.D. Cal. 2001) ("Those documents cannot be

confidential information, since, as Defendant rightfully points out, they are public record.").  In

situations where the only information that remains confidential is not relevant, there is no

necessary taint to the proceedings and no reason to disqualify the expert.  To do so would only

impede the factfinding function of litigation.  *See Eng. Feedlot, Inc. v. Norden Lab'ys, Inc.*, 833

F. Supp. 1498, 1505 (D. Colo. 1993) (noting that "[c]ourts are generally reluctant to disqualify

expert witnesses" because they "possess useful specialized knowledge") (quoting *Palmer v.*

*Ozbek*, 144 F.R.D. 66, 67 (D. Md. 1992))).

On the other hand, when all four elements are present, improper use of the confidential

information is nearly inevitable.  An expert who actually possesses confidential information

related to a litigation cannot be expected to provide opinions and advice without consideration of

the confidential information.  *See Topps Co. v. Productos Stani Sociedad Anomina Indus. y*

*Com.*, 2001 WL 406193, *2 (S.D.N.Y. Apr. 20, 2001) ("[I]t is assumed that an individual who

has received confidential information cannot be expected to forget such information when serving as an expert in litigation."); *Auto-Kaps*, 2016 WL 1122037, at *4 ("An expert cannot build a Chinese wall in his own mind, despite his best efforts to do so."); *Eastman Kodak Co. v. Agfa-Gevaert N.V.*, 2003 WL 23101783, at *5 (W.D.N.Y. Dec. 4, 2003); *Pellerin*, 2012 WL 112539, at *3; *cf. PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) ("[A] plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets.").  Therefore, "[t]he moving party must not wait for the expert to disclose confidential information before challenging an adverse party's use of the expert; at the point the information is disclosed, the moving party would have already been unfairly prejudiced in the litigation."  *Auto-Kaps*, 2016 WL 1122037, at *3.  If the moving party shows that it has actually provided the expert with confidential information that is sufficiently related to the litigation that the expert's retention will inevitably lead to a breach of confidentiality, the opposing party may not protest that the expert has not used or will not use the information.  *Id.*

"[T]he movant bears the burden of establishing the elements supporting its motion for disqualification."  *Auto-Kaps*, 2016 WL 1122037, at *4; *see Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, 2021 WL 5362256, at *4 (S.D.N.Y. June 2, 2021), *report and recommendation adopted*, 2021 WL 4706162 (S.D.N.Y. Oct. 7, 2021).  In keeping with the policy considerations favoring the use of expert witnesses and the drastic nature of disqualification, that burden is not light.  To meet it, the movant must provide "specific and unambiguous evidence" to establish the relationship between the information received and the issues in the litigation.  *Kyocera Corp.*, 2012 WL 4103811, at *8 (quoting *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1094 (N.D. Cal. 2004)); *see Palomar Med. Techs., Inc. v.*

*Tria Beauty, Inc.*, 2012 WL 517532, at *4 (D. Mass. Feb. 15, 2012).  The Court will not disqualify an expert based on general or conclusory assertions that the expert possesses related confidential information.  *Kyocera Corp.*, 2012 WL 4103811, at *8.

In addition to analysis of the risk that confidential information will be disclosed, some courts have considered "the public . . . interest in allowing or not allowing the expert to testify." *Grioli v. Delta Int'l Mach. Corp*., 395 F. Supp. 2d 11, 14 (E.D.N.Y. 2005).  These courts have balanced "the public's interest in preserving judicial integrity and fairness" against "the party's right to the assistance of experts who possess specialized knowledge and the right of such experts to pursue their professional calling."  *Loc. 3621*, 2021 WL 5362256, at *4 (quoting *Auto-Kaps*, 2016 WL 1122037, at *2)  Courts which consider public interest factors, however, often find that these factors are largely accounted for by the preceding analysis.  *See Auto-Kaps*, 2016 WL 1122037, at *3; *Loc. 3621*, 2021 WL 5362256, at *6; *In re Incretin Mimetics Prods. Liab. Litig*., 2015 WL 1499167, at *9 (S.D. Cal. Apr. 1, 2015).  By holding the movant to the burden of satisfying each of the four elements above, the public interest in preserving the parties' expectations of confidentiality is balanced against the public interest in access to expert assistance.  Where the movant has established the existence of each of the four elements, "[t]here is [] 'a substantial public interest in the protection of trade secrets and proprietary information as well as the enforceability of contracts.'"  *Chadha v. Chadha*, 2020 WL 1031385, at *16 (E.D.N.Y. Mar. 2, 2020) (quoting *Aventri, Inc. v. Tenholder*, 2018 WL 7348013, at *1 (D. Conn. Dec. 18, 2018)), *report and recommendation adopted,* WL 5228812 (E.D.N.Y. Sept. 2, 2020).

Defendants argue that Barber's multiple confidentiality agreements with OT LLC and Turquoise Hill covering Rio Tinto's confidential information demonstrate the existence of a confidential relationship between Rio Tinto and Barber.  Dkt. No. 346 at 12–13.  They argue that

disqualification is required because extensive confidential information directly relevant to this litigation was disclosed to Barber under these confidentiality agreements. *Id.* at 17–19. Lead Plaintiff counters that each of the confidentiality agreements was either too long ago or adverse to Rio Tinto and thus could not give rise to an "objectively reasonable expectation of a confidential relationship." Dkt. No. 367 at 19–24. They also argue that disqualification is not warranted if the confidential information obtained by an expert is "discoverable and technical" rather than "strategic information of the kind approaching attorney work product." *Id.* at 25–26. Finally, they state that disqualification should not be required because Defendants have not shown that Barber actually received any confidential information relevant to this case that has not already been produced in discovery. *Id.* at 26–28.

## II.    Confidential Relationship and Disclosure of Information

Defendants have adequately shown that a confidential relationship existed with Barber at various points in time, and that within this relationship they in fact disclosed confidential information to Barber.

A confidential relationship exists when the litigant can "reasonably . . . expect that any communications would be maintained in confidence." *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1093. A court may consider factors such as:

> (i) the existence of a confidentiality agreement between the party and the expert; (ii) the extent to which the expert received a party's confidential information such as attorney work product, or whether the expert had access to the party's confidential information; (iii) the length of the relationship; (iv) evidence of contemporaneous documentation that confidential information had been provided to the expert; and (v) the payment of a fee.

*Breitkopf v. Gentile*, 2014 WL 12843765, at *5 (E.D.N.Y. Mar. 24, 2014). The mere existence of a confidentiality agreement is not decisive. A party cannot shield itself from expert advice being provided to a putative litigation adversary by the mere expedient of blanketing all who

15

could render such advice with non-disclosure agreements. Thus, "there may be situations where, despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification." *Paul*, 123 F.R.D. at 278. However, where an employee or consultant has received extensive confidential information from a party pursuant to a confidentiality agreement governing this information, it is objectively reasonable to expect that the information will be maintained in confidence. *See Hewlett-Packard Co.*, 330 F. Supp. 2d at 1096 (finding that the defendant reasonably believed it had a confidential relationship with consultant who had signed a confidentiality agreement); *Rhodes v. E.I. Du Pont De Nemours & Co.*, 558 F. Supp. 2d 660, 671 (S.D.W. Va. 2008) (same); *Kyocera Corp.*, 2012 WL 4103811, at *8 (finding that confidential relationship existed when expert "agreed to maintain the confidentiality of the Kodak information that he was provided" ).

Rio Tinto had an objectively reasonable belief that the confidential information Barber received in connection with AMEC's retention in June 2010, including information provided by Rio Tinto itself, would be maintained in confidence. The confidentiality agreement that AMEC signed in connection with its technical work on feasibility studies in 2012 and 2014 provides that the confidentiality provisions are for the benefit of related entities including Rio Tinto. Dkt. No. 365 ¶ 16; Dkt. No. 347-7 § 40.4. The confidentiality agreement was binding on Barber. Dkt. No. 365 ¶ 16. It is not disputed either that Barber received confidential information pursuant to that engagement or that the feasibility studies he worked on were confidential at the time he was completing them. *Id.*

Barber also signed a confidentiality agreement with Turquoise Hill in 2019 which required him to safeguard the confidential information of "Turquoise Hill's Group," including

Rio Tinto.  Dkt. No. 347-16.  It is undisputed that Barber provided technical advice under this contract for at least two years and that he actually received confidential technical information, for example by attending nonpublic meetings.  Dkt. No. 365 ¶¶ 17–18.  This is sufficient to support a confidential relationship with Rio Tinto.

Finally, Rio Tinto also had an objectively reasonable belief that confidential information provided to Barber in connection with his peer review of the ICG report would be maintained in confidence.  Barber's confidentiality agreement with OT LLC in 2021 states it is intended to protect "any members of the Rio Tinto Group that have any interest in any Confidential Information."  Dkt. No. 347-19 § 8.  Barber engaged in the peer review and received confidential information in doing so.  He had access to a large number of confidential documents from Rio Tinto and others, which he accessed on "a secure interrogatable database."  Dkt. No. 368 at 2.  It is clear that Barber could not simply release this information to competitors or the public.

Lead Plaintiff argues that Rio Tinto has no confidential relationship with Barber as to the 2021 ICG peer review because he was engaged as part of an independent investigation looking into possible mismanagement of the mine by Rio Tinto and others, work which was "adverse" to Rio Tinto.  Dkt. No. 367 at 9–10.  This argument confuses adversity with confidentiality.  It is not unusual that a company or its affiliates will undertake an independent investigation.  They have become commonplace as public and private companies alike seek frank, disinterested, advice in response to well-founded allegations of mismanagement by company executives.  *See* Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on the Relationship of Cooperation to Agency Enforcement Decisions ("Seaboard Report"), Exchange Act Release No. 44969, Accounting and Auditing Enforcement Release No. 1470 (October 23, 2001) (describing the SEC's willingness to consider a company's

internal attempts to rectify misconduct as a mitigating factor in enforcement); Policy Statement

Concerning Cooperation by Individuals in its Investigations and Related Enforcement Actions,

S.E.C. Release No. 34-61340 (January 13, 2010) (codified at 17 C.F.R. pt. 202) (setting out the

"analytical framework [the SEC] uses to evaluate cooperation by individuals"); United States

Department of Justice, Justice Manual § 9.28.700 – The Value of Cooperation (March 2023).  In

conducting such an investigation, a company that engages the independent consultant or that

provides confidential information to it pursuant to a non-disclosure agreement does not lose all

protection in that information.  The ability to conduct a fulsome investigation would be

undermined if the investigator could never provide a promise of confidentiality to the subject of

its investigation.  *Cf. Gillman v. United States*, 53 F.R.D. 316, 318 (S.D.N.Y. 1971) (noting that

purpose of internal hospital investigatory board would be "thwarted if the proceedings were not

accorded the status of confidentiality").  Therefore, the fact that Rio Tinto may not have

welcomed the ICG investigation and may have limited the information it provided to the

investigators does not deprive it of an objectively reasonable belief that the confidential

information it provided would be maintained in confidence.  Lead Plaintiff has proffered no

evidence that the investigators disclaimed any obligation to maintain Rio Tinto's information in

confidence.  The evidence is to the contrary, as the confidentiality agreement Barber signed

explicitly states it is intended to benefit Rio Tinto.  Dkt. No. 347-19 § 8.[6]

---

[6] Lead Plaintiff also argues that Barber's work under his 2019 contract with Turquoise Hill was adverse to Rio Tinto.  Dkt. No. 367 at 9–10.  In addition to the problems with this argument discussed above, Barber's work under the 2019 agreement was not adverse to Rio Tinto.  Lead Plaintiff has strenuously maintained that Barber's 2019 retention was aimed at evaluating prospective plans for Panel 0, not assessing Rio Tinto's past failings.  Dkt. No. 367 at 10; Dkt. No. 365 ¶ 17.  Rio Tinto and Turquoise Hill were aligned in their desire for the mine to succeed going forward.  Plaintiffs assert that Rio Tinto "was actively concealing the facts about the causes of the delays and cost overruns" from Turquoise Hill in 2019.  Dkt. No. 367 at 10.  This

Lead Plaintiff additionally argues that Barber has been released from some of his confidentiality obligations and that some of the information he has received is no longer confidential.  Dkt. No. 367 at 8–10.  These later developments are relevant to the current threat of improper disclosure, discussed further below, but not to the threshold issues of whether Rio Tinto had a confidential relationship with Barber and provided him with confidential information.

### III.    "Discoverable and Technical" Information

Given that Barber received Rio Tinto's confidential information at various points, the issue remains whether any of this information remains confidential and is relevant to this litigation.  If the information has already been disclosed to Lead Plaintiff or is irrelevant, there is no risk of improper disclosure.

On this point, Lead Plaintiff first argues broadly that because the information Barber received is "discoverable and technical," it "is not considered 'confidential' for the purposes of disqualification."  Dkt. No. 367 at 25.  This argument draws a distinction between confidential technical information, which generally is subject to discovery, and privileged litigation strategy or attorney work product, which is not.  *See United States v. Babich*, 2018 WL 4623055, at *3 (D. Mass. Sept. 26, 2018) ("The key distinction to be made . . . is between confidential information that is disclosed to the expert, but that is nevertheless discoverable by the opposing party, and confidential information that is privileged, attorney work product, or otherwise inaccessible to the opposing party." (quoting *Twin City Fire Ins. Co.*, 2006 WL 5164249, at *4)).  It undisputed that Barber was not retained by Rio Tinto in preparation for this litigation and had

---

speaks to whether Barber received material relevant to this litigation as part of his 2019 retention but does not speak to whether Rio Tinto reasonably expected that any information Barber received would remain confidential.

no access to privileged material, attorney work product, or litigation strategy.  Dkt. No. 365 ¶ 15.
The confidential information received by Barber consisted of technical information about the
Oyu Tolgoi project, which is discoverable by Lead Plaintiff in this litigation.  *See* Dkt. No. 346
at 15–18.  According to Lead Plaintiff, this necessarily means there is no cause for
disqualification.

Lead Plaintiff is correct that there is no cause for disqualification when the only
confidential information received by the expert has already been disclosed to the retaining party.
The expert cannot breach any duties of confidentiality by disclosing confidential information the
retaining party already possesses.  And if "outside counsel and [a] hypothetically acceptable
expert witness can have access to . . . confidential technical information in discovery, there is
nothing particularly unfair" about the proposed expert having access to the same information.
*Edwards Vacuum*, 2020 WL 7360682, at *10.  "[I]t makes no difference, as a practical matter,
whether the expert became aware of that information via discovery taken in the litigation or
some other independent route."  *Sarl*, 2013 WL 501783, at *6.

Building on this principle, some courts have stated in general terms that possession of
confidential "technical" information cannot be cause for disqualification.  *See Vineyard*
*Investigations v. E. & J. Gallo Winery*, 2024 WL 4931961, at *3 (E.D. Cal. Dec. 2, 2024);
*Edwards Vacuum*, 2020 WL 7360682, at *7; *In re JDS Uniphase Corp. Sec. Litig.*, 2006 WL
2845212, at *5 (N.D. Cal. Sept. 29, 2006).  As a number of other courts have recognized,
however, "technical" information cannot be equated with information that the retaining party
already possesses through discovery.  *See Tabaian v. Intel Corp.*, 2018 WL 4566257, at *4–5 (D.
Or. Sept. 22, 2018); *Oracle Corp. v. DrugLogic, Inc.*, 2012 WL 2244305, at *7 (N.D. Cal. June
15, 2012); *Auto-Kaps*, 2016 WL 1122037, at *4; *Pellerin*, 2012 WL 112539, at *3.  The fact that

the expert was exposed to only technical information is not grounds for denying a motion for

disqualification and for permitting the expert to continue to work for his former client's current

litigation adversary, particularly if the technical information has not already been discovered.

First, when a consultant or employee working on a project receives confidential business

information, that information may well not take the form of documents, but rather of mental

impressions derived through conversations, meetings, and other experience. *See Thompson, I.G.,*

*L.L.C. v. Edgetech I.G., Inc.*, 2012 WL 3870563, at *6 (E.D. Mich. Sept. 6, 2012); *Tabaian*,

2018 WL 4566257, at *5. Such information is not discoverable. *See In re Incretin Mimetics*,

2015 WL 1499167, at *7 ("Dr. Fleming's mental impressions, the mental impressions of others

who worked for Novo, . . . [and] strategy discussions are incapable of memorialization via

meeting minutes or summaries of events and would not be discoverable information."). This

distinguishes situations in which "an expert was obtained for the purposes of litigation" from

situations in which "the expert was a former employee for reasons other than litigation."

*Thompson, I.G.*, 2012 WL 3870563, at *5. In the former situation, it is more plausible to believe

that any confidential technical information reviewed by the expert as a litigation consultant will

simply be the same confidential documents produced in discovery. In the latter situation, where

an expert is immersed in confidential research or development as an employee, the expert will

not humanly be able to separate the confidential information produced in discovery from that

confidential information gained through meetings, conversations, and direct experience. *Id.* at

*6; *see Pellerin*, 2012 WL 112539, at *3 (expert cannot "parse his knowledge of [a company's]

confidential information to only rely upon what is provided to him in the litigation," ignoring

confidential conversations and impressions); *Auto-Kaps*, 2016 WL 1122037, at *4 ("An expert

cannot build a Chinese wall in his own mind, despite his best efforts to do so."). Therefore, the

retention as an expert on a confidential project of a former employee (and, in some cases, a consultant) who has worked for an extended period on that same project may create a substantial risk that confidentiality will be breached, even if inadvertently. *See Auto-Kaps*, 2016 WL 1122037, at *4; *Space Sys./Loral v. Martin Marietta Corp.,* 1995 WL 686369, at *2 (N.D. Cal. Nov. 15, 1995); *Alien Tech. Corp. v. Intermec, Inc*., 2007 WL 4261972 (D.N.D. Nov. 30, 2007) (rejecting proposed expert who led confidential research and development of relevant product); *Eastman Kodak Co.,* 2003 WL 23101783, at *4 (rejecting proposed expert with access to confidential information due to "extended participation in the research group that generated the tabular grain technology at issue in this action").

Second, confidential technical information may pose a risk of improper disclosure because not all technical or non-privileged information relevant to a litigation is actually produced in discovery. The federal courts have not adopted a policy of full disclosure by each side of every document that could be relevant to a litigation. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) ("[D]iscovery, like all matters of procedure, has ultimate and necessary boundaries.") (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)). "Even when the requested information sought is relevant, 'the court must limit the frequency or extent of discovery' where it is 'unreasonably cumulative or duplicative' or when 'the burden or expense of the proposed discovery outweighs its likely benefit.'" *Chen-Oster v. Goldman, Sachs & Co*., 293 F.R.D. 557 (S.D.N.Y. 2013) (quoting Fed. R. Civ. P. 26(b)(2)(C)(i), (iii)). Moreover, what is produced in discovery generally is a function of what is asked for in discovery. Some non-privileged material relevant to the case may not be produced simply because a party does not know to request it. *See In re JDS Uniphase Corp. Sec. Litig*., 2006 WL 2845212, at *5 (noting that the use of an expert with inside information "would enable Defendant to discover more

effectively information that the Court has ruled that it is entitled to discover"). Consequently, the fact that the confidential information received by a former employee or consultant is not privileged from discovery does not answer the question whether the former employee or consultant may misappropriate that confidential information to the detriment of his former employer to obtain discovery. If the retaining party does not possess the information, and the expert uses it wittingly or unwittingly to help his new employer know what questions to ask and what documents to request, this is a breach of confidentiality. The fact that a confidential document is later, with the benefit of the expert's advice, produced in discovery does not immunize the expert from the violation of confidentiality that led to the production in the first place.

For these reasons, Lead Plaintiff's per se rule that "discoverable and technical" information cannot be cause for disqualification is overbroad. Dkt. No. 367 at 25. When confidential technical documents are produced in discovery, the fact that an expert has previously seen those same documents under a confidentiality agreement is not cause for disqualification. But when an expert possesses confidential technical information which has not been produced in discovery, this may provide cause for disqualification. There is a risk that the expert will use "confidential information that they learned from a party in the course of an earlier engagement against that party in a later lawsuit," the very issue the disqualification doctrine aims to prevent. *Kyocera Corp.*, 2012 WL 4103811, at *8. When, for example, an employee worked for decades under a confidentiality agreement as head of the group responsible for designing a relevant product, it is not proper for him to breach this agreement and testify as an expert about that product simply because the information he received was technical. *See Space Sys.,* 1995

WL 686369, at *2; *Alien Tech.*, 2007 WL 4261972; *Eastman Kodak Co.*, 2003 WL 23101783, at *4.

Therefore, Defendants' motion cannot be denied simply because the information provided to Barber was "technical."  The issue is whether, on the particular facts of this case, Defendants have shown that Barber possesses any confidential technical information which remains confidential and has a relationship to this litigation.

### IV.    Risk of Improper Disclosure in This Litigation

To meet its burden, Defendants must provide "specific and unambiguous evidence to establish the relationship between the information received and the issues in the litigation."  *In re New York City Policing During Summer 2020 Demonstrations*, 2022 WL 656808, at *7 (quoting *Auto-Kaps*, 2016 WL 1122037 at *3); *see Gordon*, 2013 WL 2250506, at *5; *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1094.  Moreover, this relationship to the litigation must be established as to information which is meaningfully confidential, i.e. which is not already publicly available or disclosed in discovery.  *See Edwards Vacuum*, 2020 WL 7360682 at *10; *Sarl*, 2013 WL 501783, at *6.  The movant may not simply state in a general or conclusory fashion that the expert possesses confidential information that may be disclosed to the opposing party.  The movant must supply evidence to permit and survive meaningful inquiry into whether the expert will invariably use on behalf of her client confidential information she obtained from her former employer.  *See Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 190 (S.D.N.Y. 1988).  This requirement is consistent with the principle that "disqualification is a drastic remedy" not casually granted.  *Kyocera Corp.*, 2012 WL 4103811, at *8.

The type of evidence required to establish that an expert cannot separate the confidential information he has received from his work on this litigation is a context-dependent exercise.  For example, when the person later hired as an expert was engaged as an employee over a long

period to do confidential work on a product that is the subject of litigation, this fact alone might support a clear inference that he "will almost certainly use confidential knowledge he gained from his employment" if retained as an expert, and there may be no need to specify the exact documents he received or meetings he attended. *WesternGeco LLC v. Ion Geophysical Corp.*, 2010 WL 2266610, at *2 (S.D. Tex. June 2, 2010); *see Incretin Mimetics Prods. Liab. Litig.*, 2015 WL 1499167, at *7 (granting disqualification despite failure to specify particular disclosures because the movant demonstrated the expert's "role as a key player in key moments" of the relevant product's approval process). There would be no way to determine all of the information to which the employee had access and no way to police an inevitable disclosure. *Auto-Kaps*, 2016 WL 1122037, at *3–4. By contrast, when the person engaged as an expert was previously employed only on a project of limited scope, the parameters of which were clearly defined, it is incumbent on the movant to show that such engagement would have led to the disclosure of confidential information material to a new engagement. *See Bone Care Int'l*, 2009 WL 249386, at *3; *Rexnord Corp.*, 111 F. Supp. 2d at 74–76. It is not sufficient to say that the expert received confidential information in the past if that information had little bearing on the current engagement. *See Lyman v. Pfizer, Inc.*, 2011 WL 3843956, at *3 (D. Vt. Aug. 30, 2011) (denying disqualification of expert who had consulted for the movant in previous litigation because movant did not specify how information received was relevant to the current litigation).

Here, Defendants have not met their burden as to the information Barber received in any of his three engagements.

### A.    AMEC Consultancy

In Barber's first engagement, for AMEC between 2010 and 2014, he acquired confidential technical information related to feasibility studies for "Hugo North Lift 1" of Oyu Tolgoi, Shafts 3 and 4, the material handling system, and the conveyor-to-surface system. This

information has not been produced in discovery because Defendants argued it was not proportional to the needs of the case. Dkt. No. 400 at 13; *see* Dkt. No. 349-19 at 4 n.4. However, Defendants now argue that it is highly confidential and relevant to the litigation because it "concerns" Oyu Tolgoi. Dkt. No. 400 at 12. Lead Plaintiff argues that much of this information is now public or has been "superseded by subsequent updates." Dkt. No. 367 at 8–9.

Defendants have not met their burden to show that any information received in Barber's first engagement merits his disqualification here. Barber worked on Oyu Tolgoi in his role at AMEC between approximately 2010 and 2014. Dkt. No. 365 ¶ 16. This litigation concerns alleged mismanagement of Oyu Tolgoi between 2016 and July 2019. TAC ¶¶ 68–267. The construction of Oyu Tolgoi was shut down between 2013 and 2016 due to disputes between OT LLC and the government of Mongolia and was reinitiated in 2016 under a new financing plan. *Id.* ¶¶ 66–68. By the time of the events in this litigation, the 2012 and 2014 feasibility studies Barber worked on had been superseded by a new 2016 feasibility study. Lead Plaintiff's argument that Barber's information is outdated and largely irrelevant to this litigation is supported by Defendants' representations that the burden of providing this information would outweigh its relevance. Dkt. No. 349-19 at 4 n.4. In response, Defendants do not identify any particular manner in which information accessed by Barber up to 2014 would provide meaningful insight into the later construction, engineering, and procurement issues between 2016 and 2019 which are described in the complaint.[7]

---

[7] Lead Plaintiff additionally argues that the 2012 and 2014 feasibility studies Barber worked on are now public. However, Lead Plaintiff's only evidence in support is a single page of a document titled "2016 Oyu Tolgoi Technical Report." Dkt. No. 367 at 8–9; Dkt. No. 368-3. Lead Plaintiff does not explain how this page demonstrates the public availability of the 2012 or 2014 reports on which Barber worked, and in fact seems to concede that the 2014 report is not publicly available. Dkt. No. 367 at 8 n.3. In addition, even assuming the final reports or related

Defendants note that other courts have found confidential information remains relevant even when the employee "ceased to work for movant prior to the relevant period for the primary allegations in a case." Dkt. No. 400 at 12 (citing *Eastman Kodak*, 2003 WL 23101783, at *2; *Wang Lab'ys, Inc. v. CFR Assocs., Inc*., 125 F.R.D. 10, 11 (D. Mass. 1989)). It is true that the previously-acquired information was relevant to the litigation in those cases, but this does nothing to explain why the Court should find Barber's 2014 information is relevant here. Although Defendants compare this case to patent cases involving an "extended process involving a body of [technical] work, with each research step providing a 'building block' for the next," *Eastman Kodak Co*., 2003 WL23101783, at *5, here there was a significant discontinuity between the steps worked on by Barber and the subsequent reopening of the mine in 2016. It cannot simply be assumed that information which was relevant in 2014 still has a meaningful relationship to this litigation.

Moreover, contrary to Defendants' arguments, the fact that "the confidential information disclosed to Barber concerns [Oyu Tolgoi]" is not "more than sufficient to establish relevance." Dkt. No. 400 at 12. Defendants liken this case to cases in which an expert retained in a patent case worked "on the product or project at issue," justifying disqualification. Dkt. No. 400 at 12; *see Eastman Kodak Co*., 2003 WL 23101783, at *5 (in patent infringement case, expert had an 18 year career as a member of a closed research group developing the technology); *Auto-Kaps*,

---

data are publicly available, this would not prevent Rio Tinto from having a reasonable expectation that Barber would retain confidential any information was not reflected in the final reports. *See Auto-Kaps*, 2016 WL 1122037, at *2 (noting confidentiality interest in "goals and priorities" and "feedback and instruction," in addition to the final design of the relevant product); *Tabaian*, 2018 WL 4566257, at *5 (noting confidentiality interest in information received in "conversations . . . and meeting with Defendant's engineers"). The issue is not that all the information provided to Barber is in fact publicly available, but that Defendants have not demonstrated the relationship between any non-public information and this litigation.

2016 WL 1122037, at *3 (in patent infringement case, expert "consulted on the very project that culminated in the bottle design at issue"); *Thompson, I.G.*, 2012 WL 3870563, at *6.  However, the mine Oyu Tolgoi is not equivalent to a specific product, and the subject matter of this litigation cannot be defined broadly as "Oyu Tolgoi."  Management of Oyu Tolgoi constitutes the entire business of OT LLC and Turquoise Hill.  TAC ¶¶ 40, 55.  Certain mine shafts are more than 1.5 kilometers away from others.  Dkt. No. 365 ¶ 17.  The project involved separate mining, construction, and procurement teams, and one of the key issues identified by the ICG was that various teams did not share information and were not coordinated under a master schedule.  *See* Dkt. No. 124-1; TAC ¶¶ 84–133.  Therefore, it cannot be inferred that confidential information about one aspect of the project is equivalent to confidential information about another.  Rather, the mine is more akin to an entire company, with its different aspects analogous to different products.  Courts have regularly held that confidential knowledge of one product created by a company does not imply confidential knowledge of others.  *Bone Care Int'l.*, 2009 WL 249386, at *3; *Palomar*, 2012 WL 517532, at *4; *Rexnord Corp.*, 111 F. Supp. 2d at 74–75.  Similarly here, the mere fact that Barber has confidential knowledge of "Oyu Tolgoi" from one period of time does not establish that he has confidential information related to the purported mismanagement of the mine during a different period of time or to the engineering and construction issues discussed in Lead Plaintiff's complaint.  Defendants must make a more specific showing, which they fail to do.

### B.    Turquoise Hill Consultancy

Barber's second engagement with Oyu Tolgoi was his Turquoise Hill consultancy beginning in 2019.  In this role, Barber participated in non-public meetings concerning the project's status and technical issues impacting the project.  Dkt. No. 365 ¶ 18.

Lead Plaintiff argues that Barber's 2019 confidentiality agreement with Turquoise Hill was terminated in February 2023. Dkt. No. 368-20 at 20. The letter Barber received from Turquoise Hill cancelled "any agreement or engagement" between Turquoise Hill and Barber, and provided they should have no further force or effect. *Id.* By its terms, the February 2023 letter is not limited to the Consultancy Agreement. It would also apply to the Confidentiality Agreement. Defendants nonetheless argue that Barber has a continuing obligation of confidentiality. It is true that duties of confidentiality do not only arise from contract, and that even in the absence of an explicit agreement "an agent has a duty not to exploit to the former employer's detriment specific information obtained during the employment that was either technically confidential or that was available to the fiduciary only because of the employment," *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013) (quoting *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 914 (2d Cir. 1998)), *on reconsideration*, 2014 WL 13109132 (S.D.N.Y. Apr. 14, 2014); *see* Restatement (Third) of Agency § 8.05; Restatement (Third) of Unfair Competition § 41 (1995); *Rocket Pharms.*, 2024 WL 3835264, at *6 ("[T]he Second Circuit and numerous New York courts have held that an agent has a duty not to use confidential knowledge acquired in his employment in competition with his principal" (citation and brackets omitted)). Because Barber gained access to information which was clearly confidential while working on behalf of Turquoise Hill, even in the absence of contract he would normally have a duty not to misappropriate this information. However, "it is of course possible for an employer and employee to agree by contract to limit this duty." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 48 & n.8 (2d Cir. 1999). Therefore, the issue is whether Barber's Confidentiality Agreement displaced his common-law duties of confidentiality or supplemented them. In the former case, the termination of the Confidentiality Agreement would leave him free to share the

information, while in the latter case it would simply leave him subject to standard common-law duties of confidentiality.  *See Juniper Ent., Inc. v. Calderhead*, 2007 WL 9723385, at *19 (E.D.N.Y. Aug. 17, 2007) (finding no breach of a contractual duty not to disclose trade secrets and proceeding to analyze defendant's obligations "as encompassed by the common law duty of loyalty").

The 2023 agreement, terminating the 2019 Confidentiality Agreement, did not itself relieve Barber of all his obligations of confidentiality.  The 2019 Agreement itself is best read to supplement or "make[] explicit" Barber's implied duties with regards to confidential information he received during his engagement.  *N. Atl. Instruments*, 188 F.3d at 48.  A confidentiality agreement must generally be "explicit" to displace common-law duties, and the Confidentiality Agreement here does not mention such duties.  *Id.* at 48 n.8; *see Juniper Ent.*, 2007 WL 9723385, at *19; *see also* Restatement (Third) of Unfair Competition § 42 (1995) (suggesting that confidentiality agreements are normally expected to "clarify and extend the scope of an employer's rights," not reduce them).  Moreover, Barber's Consultancy Agreement states that Barber will respect the confidentiality of "all information disclosed by or on behalf of the Client to the Consultant during the term of this Agreement . . . [or] *following the termination or expiration of this Agreement*." Dkt. No. 347-15 (emphasis added).  Even if the Consultancy Agreement and Confidentiality Agreement were terminated, then, that would not on its face eliminate any common law duties of Barber not to share confidences with Rio Tinto's adversary.  Indeed, the letter terminating the contract simultaneously requires Barber to return confidential material for destruction, suggesting that Turquoise Hill believed he had continuing confidentiality obligations.  Dkt. No.  No. 368-20 at 20.

However, Defendants have not met their burden to show that Barber actually received confidential information in his 2019 engagement which he would be expected to disclose in this litigation.  Defendants provide no evidence whatsoever regarding Barber's 2019 consultancy other than his contract, which stated that he would attend nonpublic meetings.  Dkt. No. 347-15 Sch. A.  There is no evidence clarifying "the nature of the information [Barber] learned or what, if any of it, was confidential."  *Kyocera Corp.*, 2012 WL 4103811, at *10.  Barber states that his role was evaluating a proposed redesign of Panel 0, an area unrelated to the issues at Shaft 2 that are the subject of this litigation.  Dkt. No. 365 ¶ 17; *see* TAC ¶¶ 8, 75–99.[8]  Panel 0 is 1.5 kilometers away from Shaft 2.  Dkt. No. 365 ¶ 17.  As stated above, it is not sufficient for Defendants to show that Barber attended meetings or received information that somehow concerned Oyu Tolgoi.  Moreover, although issues with the Oyu Tolgoi project were purportedly discussed at meetings Barber attended, there is evidence that at this time Rio Tinto was refusing to disclose information related to the subject-matter of this litigation to Turquoise Hill.  *See* Dkt. No. 367 at 10–11.  This casts doubt on the notion that Barber would have received any relevant confidential information, which is not dispelled by Defendants' minimal evidentiary showing.

## C.    ICG Peer Review

In his third engagement in 2021, Barber spoke with ICG members and reviewed confidential Rio Tinto documents available to the ICG.  Dkt. No. 368-18 at 2.  The ICG documents were produced in discovery.  Dkt. No. 367 at 28.  There is no evidence that they were

---

[8] Defendants assert that "Barber also received numerous confidential documents including a Panel 0 PFS Design Review Study, complete PFS report, and final draft of OTFS20," and that "[t]he subject matter of his review and the confidential information he received covered most all substantive areas of the OTUP, including: geology and geotechnical issues, production strategy, mine design, ore handling, mine service and support infrastructure, schedule, operations, and equipment and personnel."  Dkt. No. 346 at 6.  This is not supported by any evidence, and the latter portion is arguably contradicted by Barber's declaration that his work focused on Panel 0.

produced as a result of any information provided by Barber to Lead Plaintiff; their existence and relevance would have been independently known to Lead Plaintiff. Defendants have not shown that there exists any category of confidential information available to Barber and the ICG which was not independently produced to Lead Plaintiff prior to Barber's involvement. Importantly, Barber did not obtain any information orally from anyone at Rio Tinto as part of his peer review of the ICG report, nor is there evidence he accessed confidential information through the engagement other than what was contained in the documents. He performed a function analogous to what any expert would perform here—reviewing the documents and evaluating them from the perspective of one knowledgeable in the field. Because the confidential information Barber received in his 2021 engagement was limited to documents produced in discovery, the cases equating technical with discoverable information are on point as applied to this engagement. *See Edwards Vacuum*, 2020 WL 7360682 at *10; *Vineyard Investigations*, 2024 WL 4931961, at *3; *Sarl*, 2013 WL 501783, at *6. "[T]here is nothing particularly unfair" about Barber using his industry knowledge to comment on documents that, once known to him confidentially, have already been made known to Lead Plaintiff, and Barber will not breach any confidentiality obligation by commenting on them. *Edwards Vacuum*, 2020 WL 7360682 at *10. Moreover, Barber's confidentiality agreement with OT LLC related to his ICG peer review explicitly provides that he may disclose the information if it "becomes available to the Recipient from a third party legally entitled to possess the information and provide it to the Recipient, if the use or disclosure accords with the right or permission legally granted to the Recipient by that third person." *Id.* § 3.2. This exception applies to the ICG materials produced in discovery. Therefore, Barber's 2021 peer review of the ICG report provides no cause for disqualification.

*     *     *

Barber was never employed by Rio Tinto or immersed in the management of Oyu Tolgoi during the relevant time period. He consulted on technical aspects of the mine before the relevant time period and was involved as a consultant on an issue unrelated to this litigation after the relevant time period. Dkt. No. 365 ¶¶ 16–18. The Court will not disqualify Barber on Defendants' unsupported assertions that the information Barber learned during those consultancies is necessarily relevant to a time period and set of issues on which he did not consult. Disqualifying an expert on such an equivocal showing would be inconsistent with the principle that disqualification is a "drastic remedy" to be "resorted to rarely." *Kyocera Corp.*, 2012 WL 4103811, at *8. The burden is on Defendants, as the party seeking such a remedy, to demonstrate that the information it disclosed is material to the subject-matter of the litigation. *Id.* That burden has not been satisfied.[9]

## CONCLUSION

The motion to disqualify Lead Plaintiff's expert is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 345.

SO ORDERED.

Dated: February 4, 2025
New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[9] Defendants additionally argue that the public interest weighs against disqualification because of "the prejudice and unfairness to Rio Tinto from having its prior engagements with Barber weaponized against it." Dkt. No. 346 at 20. As discussed above, Defendants have not established that such prejudice and unfairness exist. In the absence of such a showing, the public interest favors permitting the use of experts to clarify the issues raised by challenging technical subject matter, which will then aid the presentation of those issues to the Court. This interest is served even on the assumption that Barber serves only as a consulting expert, not an expert witness. *See* Dkt. No. 346 at 22.