# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE TURQUOISE HILL RESOURCES LTD. SECURITIES LITIGATION | ) ) ) ) ) ) |

Civil Action No. 1:20-cv-8585-LJL

**EXPERT REBUTTAL REPORT OF ALLEN FERRELL, PH.D.
April 3, 2025**

# TABLE OF CONTENTS

I.    Qualifications ........................................................................................................ 1

II.   Background ............................................................................................................ 1

III.  Plaintiffs' Allegations and Cain Report ............................................................... 4

      A.   Plaintiffs' Allegations ................................................................................ 4

      B.   Cain Report ................................................................................................. 5

III.  Assignment ........................................................................................................... 5

IV.   Summary of Conclusions ...................................................................................... 6

VI.   Dr. Cain Fails to Establish That His Proposed Damages Methodology Can Reliably
      Measure Artificial Inflation in TRQ Common Stock ........................................... 8

      A.   Dr. Cain Does Not Establish How His Proposed Damages Methodology Would
           Properly Measure Inflation Under Plaintiffs' Theory of Liability .................. 9

      B.   Dr. Cain Does Not Demonstrate How His Methodology Can Parse the Artificial
           Inflation to Specific Alleged Misrepresentations ........................................ 13

      C.   Dr. Cain Does Not Demonstrate How His Damages Methodology Can Account for the
           Changing Nature of the But-For Disclosures Over the Class Period ............ 14

      D.   Dr. Cain Fails to Account for the Importance and Changing Impact of Various Risk
           Factors Affecting TRQ Common Stock Over the Class Period .................... 15

VII.  Dr. Cain's Damages Methodology For TRQ Equity Swaps and Options Is Unreliable....... 19

VIII. Dr. Cain Does Not Mention, Let Alone Propose, a Damages Methodology for Plaintiffs'
      §20(a) Claim ......................................................................................................... 19

## I.    QUALIFICATIONS

1.    I am an economist and the Greenfield Professor of Securities Law at Harvard Law School. I received a Ph.D. in economics from the Massachusetts Institute of Technology with fields in econometrics and finance and a J.D. from Harvard Law School. After law school I clerked for Judge Silberman of the United States Court of Appeals for the D.C. Circuit and Justice Kennedy of the Supreme Court of the United States.

2.    I am also a faculty associate at the Kennedy School of Government at Harvard, a fellow at Columbia University's Program on the Law and Economics of Capital Markets, a research associate at the European Corporate Governance Institute, a research associate at the National Bureau of Economic Research, and a visiting professor at Stanford. I formerly was a member of the Board of Economic Advisors to the Financial Industry Regulatory Authority ("FINRA"), an academic fellow at FINRA, Chairperson of Harvard's Advisory Committee on Shareholder Responsibility (which was responsible for advising the Harvard Corporation on how to vote shares held by its endowment), a member of the American Bar Association Task Force on Corporate Governance and of the American Law Institute Project on the Application of U.S. Financial Regulations to Foreign Firms and Cross-Border Transactions, and an executive member of the American Law School section on securities regulation.

3.    I have testified before the U.S. Senate Subcommittee on Securities, Insurance, and Investment and presented to, among others, the Securities and Exchange Commission ("SEC"), the World Bank, the International Monetary Fund, the U.S. Structured Products Association, and the National Bureau of Economic Research. I have published approximately 30 articles in leading law and finance journals. I have also been an expert witness in a variety of corporate and securities matters, including matters involving mergers & acquisitions and damages. My expert testimony in the last four years, publications in the last ten years, and academic work are summarized on my curriculum vitae, which is attached hereto as **Appendix A**.

## II.    BACKGROUND

4.    Turquoise Hill Resources Ltd. ("Turquoise Hill" or "TRQ", or "the Company") is an "international mining company focused on the operation and further development of the Oyu

Tolgoi copper-gold mine in southern Mongolia."[1] During the Class Period, Rio Tinto plc indirectly held a majority interest in TRQ, and Rio Tinto International Holdings Ltd. was responsible for the day-to-day operational management and development of the Oyu Tolgoi ("OT") mine.[2] The OT mine is held by Oyu Tolgoi LLC, which during the Class Period was, in turn, 66% owned by TRQ and 34% owned by Erdenes, a company owned by the Government of Mongolia.[3] TRQ common shares are traded in Canada on the Toronto Stock Exchange ("TSX") and in the US on the NYSE and NASDAQ Global Select Market.[4]

5.     In 2010, the initial investment decision to construct Phase 1 of OT was made, which consisted of the Oyut open pit mine, a concentrator and supporting infrastructure.[5] Phase 1 commercial production was achieved in September 2013, and the first concentrate exported was in October 2013.[6]

6.     On May 6, 2016, Rio Tinto plc and Rio Tinto Limited (together, "Rio Tinto") announced that with its partners, the Government of Mongolia and TRQ, had approved the next stage in the development of the OT mine and that the "development of the underground mine will start in mid-2016 following the approval of a $5.3 billion investment by the partners and the recent granting of all necessary permits."[7]

7.     On July 16, 2018, TRQ issued a Form 6-K and announced its second quarter 2018 production and completion of Shaft 5.[8] In the press release, TRQ discussed that OT "has achieved an important underground development milestone with the completed commissioning of Shaft 5" and that it continues to "expect the first draw bell in mid-2020 and sustainable first

---

[1] Ex. 99.1 to TRQ Form 40-F for the period ended December 31, 2017 ("2017 TRQ Form 40-F"), at 13. Oyu Tolgoi is Mongolian for Turquoise Hill.

[2] Ex. 99.1 to 2017 TRQ Form 40-F, at 18.

[3] Ex. 99.1 to 2017 TRQ Form 40-F, at 9, 10, 13 & 49.

[4] Ex. 99.1 to 2017 TRQ Form 40-F, at 82.

[5] Ex. 99.1 to 2017 TRQ Form 40-F, at 49.

[6] Ex. 99.1 to 2017 TRQ Form 40-F, at 49.

[7] Rio Tinto Press Release, "Rio Tinto approves development of Oyu Tolgoi underground mine," May 6, 2016.

[8] "Turquoise Hill announces second quarter 2018 production and completion of Shaft 5," *GlobeNewswire*, July 16, 2018; TRQ Form 6-K filed July 16, 2018.

production in 2021."[9] On the following day, July 17, Rio Tinto issued a Form 6-K reporting its second quarter production results. Rio Tinto reported that "the major growth projects remain on track" and the "construction of the first drawbell at Oyu Tolgoi Underground [is] anticipated in mid-2020."[10]

8.      On November 1, 2018, TRQ disclosed that Rio Tinto, "in its role as manager of Oyu Tolgoi, has undertaken its second annual schedule and cost re-forecast" for the OT project and that, following the re-forecast, "construction completion schedule remains on track for 2022 and the project is expected to be completed at the $5.3 billion budget estimate disclosed in the 2016 Oyu Tolgoi Feasibility Study and the 2016 Oyu Tolgoi Technical Report."[11] TRQ also stated that "[d]espite significant progress in the development of the project, Rio Tinto has notified Turquoise Hill, based on preliminary results, of a delay to achievement of sustainable first production which is now expected to occur by the end of Q3'21 instead of Q1'21. This is a result of certain delays including, but not limited to, the completion of Shaft 2, which includes over four months of schedule contingency, and challenging ground conditions. First draw bell remains on track for mid-2020, partly due to a change in the draw bell sequencing strategy."[12]

9.      On February 27, 2019, TRQ announced that "there was an increasingly likely risk of a further delay to sustainable first production beyond Q3'21" and that capital expenditures for 2019 on a cash-basis "are expected to be $150 million to $180 million for open-pit operations and $1.3 billion to $1.4 billion for underground development."[13]

10.      On July 15, 2019, TRQ announced that "sustainable first production could be delayed by 16 to 30 months compared to the original feasibility study guidance in 2016," that "capital spend for the project may increase by $1.2 to $1.9 billion over the $5.3 billion

---

[9] "Turquoise Hill announces second quarter 2018 production and completion of Shaft 5," *GlobeNewswire,* July 16, 2018.

[10] Rio Tinto Form 6-K, "Rio Tinto releases second quarter production results," July 17, 2018, at 2 & 6.

[11] "Turquoise Hill announces financial results and review of operations for the third quarter of 2018," *GlobeNewswire,* November 1, 2018.

[12] "Turquoise Hill announces financial results and review of operations for the third quarter of 2018," *GlobeNewswire,* November 1, 2018.

[13] "Turquoise Hill announces 2019 financial guidance and provides underground development update," *GlobeNewswire,* February 27, 2019.

previously disclosed," and that sustainable first production was "now being expected between May 2022 and June 2023."[14]

11.    On July 31, 2019, TRQ reported its financial results for the second quarter of 2019 and reiterated the same production timeline (of a delay by 16 to 30 months and additional capital spend of $1.2 to $1.9 billion) that it had reported on July 16, 2019.[15] The Company also reported that "[t]aking into consideration the estimated impacts of recently announced increases to underground development capital as well as delays to first sustainable production," it expects to "need incremental financing to sustain its underground development beyond 2020."[16]

## III.    PLAINTIFFS' ALLEGATIONS AND CAIN REPORT

### A.    Plaintiffs' Allegations

12.    The Pentwater Funds ("Plaintiffs") filed this lawsuit on behalf of themselves and all other investors who purchased or otherwise acquired TRQ common stock, swaps, and options (collectively, "TRQ Securities") from July 17, 2018 through July 31, 2019 (the "Class Period") in domestic transactions or on United States exchanges.[17] Plaintiffs allege that Defendants Rio Tinto, Jean-Sébastien Jacques, and Arnaud Soirat engaged in a "scheme to conceal massive cost overruns and delays concerning the most critical aspect of the sole business of Turquoise Hill— the development of the Oyu Tolgoi underground mine in Mongolia."[18] In particular, Plaintiffs allege that Defendants made false and misleading statements during the Class Period that

---

[14] "Turquoise Hill announces second quarter 2019 production results and provides underground development update," *PRNewswire,* July 15, 2019.

[15] "Turquoise Hill announces financial results and review of operations for the second quarter of 2019," *PRNewswire,* July 31, 2019.

[16] "Turquoise Hill announces financial results and review of operations for the second quarter of 2019," *PRNewswire,* July 31, 2019.

[17] Third Amended Consolidated Complaint for Violation of the Federal Securities Laws (As conformed based on the Court's February 26, 2024 Order (ECF No. 328)), *In re Turquoise Hill Resources Ltd. Securities Litigation,* U.S.D.C. (S.D.N.Y.), Civil Action no. 1:20-cv-8585-LJL, filed February 28, 2024 (ECF No. 329) ("Complaint"), ¶¶ 1, 34 & 38. The defendants are Rio Tinto plc, Rio Tinto Ltd., Jean-Sébastien Jacques ("Jacques"), and Arnaud Soirat ("Soirat") (collectively, "Defendants"). Complaint, ¶¶ 48-53. Plaintiffs state that they do not assert claims against dismissed Defendants Rio Tinto International Holdings Limited, Turquoise Hill, Ulf Quellmann, Luke Colton, or Brendan Lane. Complaint, note 1.

[18] Complaint, ¶ 3.

"repeatedly assured investors that progress on the development was 'on plan and on budget,'"[19] when, "[i]n reality, from before the start of the Class Period and at the time of Defendants' statements, the underground expansion project was many months behind schedule and hundreds of millions of dollars over budget."[20] Plaintiffs claim that TRQ investors incurred losses as TRQ shares "lost well over 70% of their value when the true extent of the delays and cost overruns at [OT] came to light—and Defendants were ultimately forced to disclose that the [OT] project was $1.2 to $1.9 billion over budget and up to 30 months behind schedule."[21]

### B. Cain Report

13.    On December 23, 2024, Plaintiffs submitted the expert report of Dr. Matthew Cain ("Cain Report").[22] In the Cain Report, Dr. Cain concludes that:[23]

    a. The market for Turquoise Hill's securities was efficient during the Class Period;

    b. The value impact of any alleged misstatements or omissions would be reflected in Turquoise Hill's Swaps and Options prices because their pricing is derivative of and dependent upon Turquoise Hill's Common Stock prices; and

    c. Turquoise Hill's Common Stock, Options, and Swaps damages in this matter can be calculated on a class-wide basis subject to a common methodology.

## III.    ASSIGNMENT

14.    I was asked by Counsel for the Defendants to evaluate whether Dr. Cain has demonstrated that alleged class-wide damages could be calculated subject to a common and reliable methodology consistent with Plaintiffs' claims.

15.    I have been assisted by Compass Lexecon staff in this matter. My analyses, opinions, and conclusions are based solely on the work performed by me, and those under my supervision, through the date of this report. I am being compensated for my work on this matter at an hourly rate of $1,600, including for any testimony I may provide in this matter. I receive other compensation from Compass Lexecon based on a portion of staff billings. My

---

[19] Complaint, ¶ 4.

[20] Complaint, ¶ 4.

[21] Complaint, ¶ 4.

[22] Expert Report of Matthew D. Cain, Ph.D., December 23, 2024.

[23] Cain Report, ¶¶ 10-11.

compensation is not contingent upon my opinions, testimony, or conclusions, nor upon the outcome of this matter.

16.     The materials I have considered in reaching the opinions and conclusions set out in this report are listed in **Appendix B**.

17.     This report is subject to change or modification should additional relevant information become available which bears on the analysis, opinions, or conclusions contained herein. I may also seek to respond to opinions or analyses proffered by other experts. I further reserve the right to amend or supplement this report on instruction of counsel or as a result of any motion or court order that may impact the nature or scope of claims and issues in this litigation. I may also prepare illustrative exhibits based on the contents of this report if I am called upon to testify at trial.

## IV.    SUMMARY OF CONCLUSIONS

18.     Based on my review, analysis, experience, and training. I have reached the following principal conclusions:

      a.  Dr. Cain fails to establish that his proposed damages methodology can reliably measure artificial inflation in TRQ common stock.

          i.  In the Complaint, Plaintiffs claim over 30 alleged misrepresentations by Rio Tinto and TRQ. I understand that certain of these alleged misrepresentations have been dismissed, but several remain at issue. Dr. Cain testified that his understanding was that Plaintiffs were alleging a price maintenance theory – i.e., that the alleged misrepresentations prevented TRQ stock price from falling.[24] If Dr. Cain's understanding was correct, he fails to demonstrate how his proposed damages methodology can account for the lack of connection between the alleged misrepresentations and the alleged corrective disclosures. Moreover, Dr. Cain fails to demonstrate how his proposed methodology can reliably parse the effect of the alleged corrective disclosures on TRQ's stock price from information unrelated to the alleged fraud that was released concurrently (i.e., confounding information).

---

[24] Transcript of the Deposition of Matthew D. Cain, Ph.D., March 7, 2025 ("Cain Dep. Tr."), 76:1-17 ("… my understanding is that in inflation maintenance cases, that alleged false and misleading statements and omissions can maintain artificial inflation in the stock price, because if the truth had been properly disclosed, then the stock price would have dropped when investors learned the relevant truth, and often the way to evaluate or measure that question is by looking at the back end, when corrective disclosures are made, do we see declines in the stock price. Q. Is it your understanding that plaintiffs are alleging an inflation maintenance theory here? … A. That's my general understanding of the – the case, yes.").

ii. In addition, if Plaintiffs claim that the alleged misrepresentations concealed or understated a particular risk (i.e., materialization of an undisclosed or concealed risk), Dr. Cain fails to demonstrate how his proposed methodology would (a) account for the changes in the market's assessment of these risks over the purported Class Period or (b) distinguish between a materialization of a known risk from the materialization of an alleged concealed risk.

iii. However, if Dr. Cain is incorrect about Plaintiffs' theory of liability, he does not establish how his proposed damages methodology would properly measure inflation under different theories of liability.

    1. If Plaintiffs' claim is that the Defendants made affirmative misstatements that led to an artificial inflation in TRQ's stock price, Dr. Cain fails to demonstrate how his proposed methodology would be able to establish that the alleged affirmative misstatements created artificial inflation by virtue of causing a statistically significant price increase.

    2. If Plaintiffs' claim involves a combination of different types of theories (i.e., price maintenance, materialization of a concealed risk, and/or affirmative misstatements), Dr. Cain fails to demonstrate how his proposed methodology will address the complexity of constructing a model to properly measure inflation that would account for these different theories and, hence, damages.

iv. Dr. Cain does not demonstrate how his proposed damages methodology can parse the artificial inflation to specific alleged misrepresentations.

    1. If some of Plaintiffs' alleged misrepresentations are found not to be false and misleading, Dr. Cain does not describe, let alone establish, how his proposed damages methodology could apportion his estimate of purported inflation, which is based on the residual declines in TRQ's common stock price on the alleged corrective disclosure dates, across the various alleged misrepresentations during the purported Class Period.

    2. Some of the alleged corrective dates include purported corrective disclosures related to both the delay and cost overrun claims. If the delay or cost overrun claim is found not to be actionable, Dr. Cain does not describe, let alone establish, how his proposed damages methodology could apportion the residual declines in TRQ's common stock price on alleged corrective disclosure dates in which there are purported corrective disclosures related to both claims.

v. The amount of the delay and cost overrun were changing over time, and Dr. Cain does not demonstrate how his proposed methodology would establish what the appropriate disclosures should have been on each day of the purported Class Period absent the alleged fraud.

    1. Dr. Cain ignores that some of the alleged corrective disclosures could not have been disclosed at the start of the Class Period.

2. Dr. Cain fails to establish that the amount of the delay and cost overruns disclosed on the alleged corrective disclosure dates were the same as the amount of delay and cost overruns at the beginning of the purported Class Period. If the amount of delay and/or cost overrun differed at these two points in time, Dr. Cain does not establish how his proposed methodology could account for the changing amounts of the delay and/or cost overruns on the artificial inflation on each day of the purported Class Period.

vi. Dr. Cain's proposed methodology fails to account for the importance and changing impact of various risk factors affecting TRQ common stock during the Class Period. The changing impact of the various risk factors would have an effect on TRQ's common stock price and, thus, the alleged inflation ribbon.

1. To add to the complexity of accounting for these risk factors, the importance of some of the risk factors changed over time. Dr. Cain fails to demonstrate that his proposed methodology could account for these changes over time in a manner that would accurately estimate the alleged artificial inflation, if any, in TRQ's common stock.

b. Dr. Cain's damages methodology for TRQ's options and equity swaps rely on his measure of artificial inflation in TRQ's common stock, which, as described above, is unreliable. Accordingly, Dr. Cain fails to demonstrate that his proposed damages methodology can reliably measure artificial inflation in TRQ's options and equity swaps.

c. The Cain Report does not mention, let alone propose, a damages methodology for Plaintiffs' §20(a) claim. In deposition, Dr. Cain testified that his damages methodology for §20(a) is subsumed within his proposed §10(b) damages methodology.[25] If this claim is true, then the criticisms I discuss above are applicable to his proposed damages methodology for Plaintiffs' §20(a) claims. Therefore, Dr. Cain has not demonstrated that §20(a) damages in this matter can be reliably calculated on a class-wide basis subject to a common methodology.

19.    I provide more detail and support for my opinions in the sections below.

## VI.    DR. CAIN FAILS TO ESTABLISH THAT HIS PROPOSED DAMAGES METHODOLOGY CAN RELIABLY MEASURE ARTIFICIAL INFLATION IN TRQ COMMON STOCK

20.    Dr. Cain states that the "out-of-pocket" method of calculating damages, which estimates damages as the difference between the artificial inflation at the time of purchase minus

---

[25] Cain Dep. Tr. 119:3-12 ("Q. Do you offer an opinion regarding how to calculate damages in connection with the 20(a) claim? … A. So in my experience, those are the same methodologies, it's subsumed within the Section 10(b) out-of-pocket methodology.").

the artificial inflation at the time of sale, is a standard methodology that is widely accepted for use across §10(b) matters.[26] Dr. Cain states that an event study is widely employed to calculate artificial inflation by measuring the stock price reaction on the alleged corrective disclosure dates.[27] He acknowledges that it is necessary to subtract from such stock price reaction the impact of confounding information.[28] He also acknowledges that, while artificial inflation could be constant over the purported Class Period, it "may [also] have varied on a daily basis and could evolve throughout the Class Period based on the timing of specific information or statements."[29] Dr. Cain testified that he had not made any determination whether artificial inflation varied during the Class Period in this case.[30] Without performing any analysis based on the facts and circumstances of this case, Dr. Cain asserts that TRQ common stock damages in this case can "be calculated using a standard and well-established methodology, and can be applied on a class-wide basis."[31]

21.    As I demonstrate below, Dr. Cain fails to establish that his proposed damages methodology for TRQ common stock can reliably measure the artificial inflation in TRQ common stock.

### A.    Dr. Cain Does Not Establish How His Proposed Damages Methodology Would Properly Measure Inflation Under Plaintiffs' Theory of Liability

22.    In the Complaint, Plaintiffs allege over 30 alleged misrepresentations.[32] Dr. Cain testified that his understanding was that Plaintiffs are alleging a price maintenance theory – i.e., that the alleged misrepresentations prevented TRQ's stock price from falling.[33] If Plaintiffs'

---

[26] Cain Report, ¶ 85.

[27] Cain Report, ¶ 88.

[28] Cain Report, ¶ 88.

[29] Cain Report, ¶ 89.

[30] Cain Dep. Tr. 92:22-93:01 ("Q. Have you made any determination as to whether artificial inflation varied throughout the class period in this action? A. No, I have not evaluated artificial inflation at this point in time in this case.").

[31] Cain Report, ¶ 92.

[32] Complaint, ¶¶ 338-440. I understand that many of these alleged misrepresentations have been dismissed from the case through various motions to dismiss.

[33] Cain Dep. Tr. 76:1-17 ("… my understanding is that in inflation maintenance cases, that alleged false and misleading statements and omissions can maintain artificial inflation in the stock price, because if the truth had been properly disclosed, then the stock price would have dropped when investors learned the relevant truth, and often the way to evaluate or measure that question is by looking at the back end, when

claim is that the alleged misrepresentation maintained the stock price at an inflated price, Dr. Cain fails to establish how his proposed damages methodology can (a) demonstrate a connection between the alleged misrepresentations and the alleged corrective disclosures and (b) reliably parse the effect of the alleged corrective disclosures on TRQ's stock price from information that was released concurrently (i.e., confounding information).

23.    For example, Plaintiffs claim the following with regard to the alleged corrective disclosures on June 12, 2019:

> [O]n June 12, 2019, Rio Tinto disclosed new information concerning its tailing dams following an earlier commitment to improve transparency over safety risks following the catastrophic collapse of rival miner Vale's Brumadinho dam in Brazil in January that year. That report demonstrated that the tailings dam at Oyu Tolgoi received a 'High A' hazard grade, the second most severe category, reflecting the severe consequences if there were to be a failure. On June 12, 2019, TRQ shares declined by nearly 6%, closing at $1.15 per share compared to a close of $1.22 per share on June 11, 2019.[34]

The report, however, states that there were over 40 Rio Tinto tailing dams that have at least a "high" hazard consequence in the event of a failure, including three that were assigned a "very high" rating which were located in Chile, Brazil, and Canada.[35] In other words, there were three that had a higher risk rating than OT and at least 37 other tailing dams that had the same risk rating as OT.

24.    Dr. Cain fails to establish how his methodology can demonstrate a connection between the risk rating of the OT tailing dam and Plaintiffs' alleged misrepresentations related to the delay and cost overrun claims. In addition, even if a connection could be made between this alleged corrective disclosure and the alleged misrepresentations, Dr. Cain fails to demonstrate how his proposed damages methodology could reliably parse the impact on TRQ's common stock price, if any, of the other 40 tailing dams receiving "very high" or "high" ratings from the impact of the OT tailing dam receiving a "high" rating.

---

corrective disclosures are made, do we see declines in the stock price. Q. Is it your understanding that plaintiffs are alleging an inflation maintenance theory here? … A. That's my general understanding of the – the case, yes.").

[34] Complaint, ¶ 263.

[35] "Dozens of Rio tailing dams would be high hazards if they failed," *The Sydney Morning Herald,* June 12, 2019.

25.     In addition, if Plaintiffs claim that the alleged misrepresentations concealed or understated a particular risk (i.e., a materialization of an undisclosed risk), Dr. Cain fails to demonstrate how his proposed methodology would account for the change in the market's assessment of the risk over time. Moreover, Dr. Cain fails to establish how his proposed damages methodology would distinguish between a materialization of a known risk and a materialization of an alleged concealed risk.

26.     For example, in the TRQ 2017 Form 40-F filed on March 15, 2018 (i.e., prior to the start of the purported Class Period), the Company disclosed that the "actual cost of developing Oyu Tolgoi may differ materially from the Corporation's estimates, and development may involve unexpected problems or delays."[36] The Company also stated that "there is no assurance that the current or future development, construction or expansion activities will be successfully completed within cost estimates, on schedule or at all and, if completed, there is no assurance that such activities will result in profitable mining operations."[37] In other words, the Company disclosed that cost overruns could occur. Thus, to the extent there are alleged corrective disclosures related to cost overruns, Dr. Cain fails to demonstrate how his proposed damages methodology is able to properly account for the impact of cost overruns that are a materialization of a known and disclosed risk from the impact, if any, of cost overruns that are a materialization of an alleged concealed risk.

27.     If Dr. Cain, however, is incorrect about Plaintiffs' theory of liability, he does not establish how his proposed damages methodology would properly measure inflation under different theories of liability. I elaborate on this below.

i.    *Affirmative Misstatements*

28.     If Plaintiffs claim that Defendants' affirmative misstatements led to artificial inflation in TRQ's stock price, Dr. Cain fails to establish how his methodology could reliably demonstrate that the alleged affirmative misstatements created artificial inflation in TRQ common stock by virtue of causing a statistically significant price increase.

---

[36] Ex. 99.1 to 2017 TRQ Form 40-F, at 35.

[37] Ex. 99.1 to 2017 TRQ Form 40-F, at 36.

29.    There are over 30 alleged misrepresentations in the Complaint,[38] which were made over 19 unique trading dates. Dr. Cain's event study *for the TRQ U.S. shares* shows that only 1 out of the 19 dates (i.e., September 26, 2018) had positive and statistically significant residual return, but Dr. Cain's event study *for the TRQ Canadian shares* shows that *none* of the 19 dates had positive and statistically significant residual returns.[39] *See* **Appendix C.** If markets are efficient for TRQ common stock, as Dr. Cain contends,[40] then one would expect that information that is value-relevant to TRQ common stock would elicit a stock price reaction in *both* TRQ's U.S. and Canadian shares. Because this is not the case for the alleged misstatement on September 26, 2018, then there is no reliable economic basis for Dr. Cain to establish that the information disclosed on September 26, 2018 was value-relevant.

30.    Moreover, Plaintiffs state that the alleged misstatement on September 26, 2018 was that Defendant Jacques stated in a conference that the "'$5.3 billion Oyu Tolgoi underground first drawbell production' would take place in 2020."[41] This statement, however, was identical to an earlier statement made by Defendants on August 1, 2018,[42] during which there was no statistically significant and positive stock price reaction in both the TRQ U.S. and Canadian shares. *See* **Appendix C**. Thus, the alleged misstatement on September 26, 2018 was stale information and, if markets are efficient, would not elicit a stock price reaction.

### ii.    Combination of the Above Theories

31.    If Plaintiffs' claim involves a combination of different types of theories (i.e., price maintenance, materialization of a concealed risk, and/or affirmative misstatements), Dr. Cain fails to demonstrate how his proposed methodology will address the complexity of constructing a

---

[38] Complaint, ¶¶ 338-455.

[39] I am not endorsing Dr. Cain's event study and only use it in this report to identify which dates could be statistically significant based on Dr. Cain's proposed damages methodology.

[40] Cain Report, ¶ 10 ("Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the opinion that the market for Turquoise Hill's Securities was efficient during the Class Period.").

[41] Complaint, ¶ 361.

[42] Complaint, ¶ 356 ("On August 1, 2018, Rio Tinto also held an investor conference call to discuss the six-month financial results. A written presentation for the call listed Defendant Jacques' name on the cover and was posted on Rio Tinto's website. The slides stated that the Oyu Tolgoi underground development remained 'on track' (in two places) and on budget with '$5.3 billion Oyu Tolgoi underground first drawbell production in 2020.'").

model to properly measure inflation that would account for these different theories and, hence, damages.

### B.    Dr. Cain Does Not Demonstrate How His Methodology Can Parse the Artificial Inflation to Specific Alleged Misrepresentations

32.    In the Complaint, Plaintiffs claim over 30 alleged misrepresentations.[43] I understand that many of these alleged misrepresentations have been dismissed from the case through various motions to dismiss. Dr. Cain does not describe, let alone establish, how his damages methodology could apportion his estimate of purported artificial inflation, which is based on the residual declines in TRQ's common stock price on the alleged corrective disclosure dates, across the remaining alleged misrepresentations during the Class Period. As discussed above, Dr. Cain fails to demonstrate how his proposed damages methodology can account for the lack of connection between the alleged misrepresentations and the alleged corrective disclosures.

33.    In addition, Plaintiffs allege two types of misrepresentations – one related to delays and another related to cost overruns – and some of the alleged corrective disclosure dates purportedly correct both types of alleged misrepresentations. For example, on July 15, 2019, Plaintiffs allege that Defendants disclosed a "substantial delay for sustainable first production of 16 to 30 months" and that the "capital spend for the project would increase by $1.2 to $1.9 billion over the $5.3 billion previously disclosed."[44] Dr. Cain, however, states that he considers Plaintiffs' theory to fall under "one singular category of misstatements."[45] If the trier of fact finds that only one of the two types of alleged misrepresentations is actionable, Dr. Cain has failed to

---

[43] Complaint, ¶¶ 338-455.

[44] Complaint, ¶ 267.

[45] Cain Dep. Tr. 12:10-13:20 ("Q. Did you evaluate in this case whether any of the motion to dismiss orders dismissed entire categories of misstatements? … A. My recollection is that there is really one theory of liability and one singular category of misstatements, to the best of my recollection. Q. And what is that category of misstatements? … A. It's summarized in Section III of my report starting in paragraph 14. It pertains to alleged false and misleading statements and omissions relating to the development progress of the expansion of the Oyu Tolgoi mine. Q. So if there were allegations about misstatements regarding both the schedule and the budget for the mine, would you consider those to be a single category of misstatements? A. … My understanding is that plaintiffs have one theory of liability that all these false – alleged false and misleading statements fall under.") & 100:17-101:04 ("Q. Do you in your report propose a method of apportioning estimated inflation across those alleged misstatements? … A. I'm not offering any opinions about artificial inflation at this point in time. My understanding is that there is one theory of liability, there is one singular sort of category of alleged misrepresentations, so it's not clear to me that there needs to be any sort of apportionment, but again, really answering that question requires an exhaustive loss causation analysis in order to assess artificial inflation.").

establish how his proposed damages methodology could apportion the residual decline in TRQ's
common stock price on that alleged corrective disclosure date to the remaining type of alleged
misrepresentation.

### C. Dr. Cain Does Not Demonstrate How His Damages Methodology Can Account for the Changing Nature of the But-For Disclosures Over the Class Period

34.     The allegations in the Complaint imply that the amount of the delay and cost
overrun are not static throughout the purported Class Period.[46] Dr. Cain however, does not
establish how his proposed damages methodology can account for what the disclosures of the
delay and cost overrun should have been throughout the purported Class Period absent the
alleged fraud.[47]

35.     Dr. Cain also ignores that some of the alleged corrective disclosures could not
have been disclosed at the start of the purported Class Period.[48] For example, on April 4, 2019,
the alleged corrective disclosure was related to a recommendation by the Parliamentary Working
Group ("PWG") after they completed their investigation.[49] Dr. Cain fails to demonstrate how his
proposed damages methodology could account for the disclosure of a recommendation by the
PWG earlier than the date that the PWG disclosed its recommendation, let alone that such
alleged corrective disclosure could have been made at the start of the purported Class Period.

36.     In addition, the amount of the delay and/or cost overrun at the start of the Class
Period may have been different from the amount of the delay and/or cost overrun on the alleged
corrective disclosure dates. For example, on July 15, 2019, Plaintiffs claim that the alleged
corrective disclosure was that TRQ announced that "sustainable first production could be

---

[46] *See, e.g.,* Complaint, ¶ 16 (showing an email dated July 19, 2018 that states "12 months behind schedule" and "$300mill capital over budget. Expect this to rapidly escalate.") & ¶ 24 ("Ultimately, Defendants disclosed that the expansion project required an additional $1.2 to $1.9 billion in capital and was 16 to 30 months behind schedule ….").

[47] In his deposition, Dr. Cain stated that he could, if it became necessary, use a discounted cash flow analysis at various points in time to see how TRQ's value changed based on changes in projections and those changes could be used to adjust the artificial inflation ribbon. Cain Dep. Tr. 97:13-21. This, however, is speculative because Dr. Cain does not establish that there are available different sets of projections that cover the relevant period to perform such an analysis.

[48] Cain Dep. Tr. 98:1-6 ("Q. Did you evaluate whether that corrective disclosure announced information that would have been accurate to disclose at the beginning of the class period? A. I have not asked that question at this point in time.").

[49] Complaint, ¶ 261.

delayed by 16 to 30 months compared to the original feasibility study guidance in 2016" and that the "developmental capital spend for the project may increase by $1.2 to $1.9 billion over the $5.3 billion previously disclosed."[50] As an initial matter, the above announcement discusses the possibility of a delay (i.e., "could be delayed") and a possibility of a cost overrun (i.e., "may increase"), which means that not only was the amount of the potential delay and/or cost overrun uncertain, the probability of a delay and/or cost overrun could also have changed over time. Dr. Cain does not establish how his proposed damages methodology could account for the changing amounts (and probabilities) of delay and cost overrun in determining the artificial inflation, if any, on each day of the purported Class Period.

> ### D.      Dr. Cain Fails to Account for the Importance and Changing Impact of Various Risk Factors Affecting TRQ Common Stock Over the Class Period

37.      The Company publicly disclosed many risk factors that could affect TRQ during the Class Period. For example, TRQ's 2018 annual report devotes 14 pages to the discussion of various risk factors.[51] These risk factors could impact TRQ's common stock price and, consequently, could also impact the artificial inflation. For example, TRQ states that it "generates revenue from the sale of concentrate containing copper, gold and silver" and, "[i]n order to determine the transaction price, revenue from contracts with customers is measured by reference to the forward price for the commodities for the expected quotation period and the company's best estimate of contained metal at the date revenue is recognized."[52] As the Company disclosed, "certain important factors that could cause actual results, performance or achievements to differ materially from those in the forward-looking statements and information include, among others, copper, gold and silver price volatility."[53] In other words, TRQ disclosed that a risk to its performance is the price of copper, gold, and silver. As **Exhibit A** shows, the spot and futures prices of gold increased over the purported Class Period. All else equal, higher

---

[50] "Turquoise Hill announced second quarter 2019 production results and provides underground development update," *PRNewswire,* July 15, 2019.

[51] 2018 TRQ Annual Report, at 24-37.

[52] 2018 TRQ Annual Report, at 63.

[53] Ex. 99.1 to TRQ Form 40-F for period ended December 31, 2018, at 3; "Turquoise Hill announces financial results and review of operations for the third quarter of 2018," *GlobeNewswire,* November 1, 2018; "Turquoise Hill announces financial results and review of operations for 2018," *GlobeNewswire,* March 14, 2019.

gold prices would result in a higher value for TRQ common stock. This implies that, even if TRQ makes the same alleged corrective disclosure, the impact of such disclosure may be less at the start of the purported Class Period than it would be at the end of the purported Class Period. Dr. Cain does not establish how his proposed damages methodology would properly account for the increasing impact of disclosed risk factors on his daily artificial inflation ribbon.[54]

### Exhibit A
### Gold Spot and Futures Prices
### July 17, 2018 – July 31, 2019



**Source**: Bloomberg L.P.

---

[54] In his deposition, Dr. Cain stated that he removes in every case certain types of confounding information, such as movements in commodities prices, through the inclusion of an industry index in his event study. Cain Dep. Tr. 108:18-109-1 ("So in every case the event study removes a certain type of confounding information because it controls for the market and the industry movements. So if there is changes [*sic*] in commodities prices, such as gold or copper, that's actually gonna be controlled for in the industry index of the event study itself. So in every case there is confounding information that's removed from the estimate of artificial inflation."). Dr. Cain, however, does not establish that his industry index in this case appropriately accounts for the impact of gold, silver, and copper given that a majority of the companies in his industry index do not have products or use raw materials in those commodities. *See* **Appendix D**.

38.    In addition, as **Exhibits B & C** show, the spot and futures prices of silver and copper fluctuated throughout the purported Class Period. This implies that the impact of an alleged corrective disclosure on TRQ's common stock price would differ depending on when during the purported Class Period the disclosure was made. Dr. Cain does not establish how his proposed damages methodology would properly account for the oscillating impact of disclosed risk factors on his daily artificial inflation ribbon.

**Exhibit B**
**Silver Spot and Futures Prices**
**July 17, 2018 – July 31, 2019**



**Source:** Bloomberg L.P.

**Exhibit C**
**Copper Spot and Futures Prices**
**July 17, 2018 – July 31, 2019**



**Source:** Bloomberg L.P.

39.     Moreover, it is unclear how Dr. Cain's proposed methodology would quantify the impact of certain risk factors. For example, in the 2017 TRQ Form 40-F, the Company disclosed that "[a]lthough the [Company] expects that the Investment Agreement and the Underground Plan will continue to bring significant stability and clarity to the legal, political and operating environment in which the [Company] will develop and operate Oyu Tolgoi, the [Company] remains subject to legal and political risks in Mongolia."[55] Such risk factors could have an effect on TRQ's common stock price. Dr. Cain, however, does not demonstrate how his proposed damages methodology would quantify such risk factors.

40.     Given the above, Dr. Cain fails to establish how his proposed damages methodology could account for these changes in a manner that the artificial inflation, if any, in the TRQ common stock price could be reliably estimated.

---

[55] Exhibit 99.1 to 2017 TRQ Form 40-F at 31.

18

## VII.    DR. CAIN'S DAMAGES METHODOLOGY FOR TRQ EQUITY SWAPS AND OPTIONS IS UNRELIABLE

41.    Dr. Cain's damages methodology for TRQ equity swaps and options rely on his estimate of artificial inflation based on TRQ's common stock. With respect to his damages methodology for TRQ equity swaps, Dr. Cain states: "As described above equity swaps provide the purchaser with the same economic interest in the underlying stock over a given time period. Thus, damages on Turquoise Hill's equity Swaps can also be calculated in a similar manner using the techniques described above."[56] Similarly, with respect to his damages methodology for TRQ options, Dr. Cain states:

> Damages relating to Turquoise Hill's Options can also be calculated in a similar manner and utilizing the same techniques described above. Once artificial inflation is estimated, the embedded inflation contributing to an option's price can change based on a number of factors. These factors include, but are not limited to, the level of the stock price in relation to the strike price, time to maturity, and volatility. One can employ various options pricing methodologies, such as the widely utilized Black-Scholes pricing model, or the binomial model, to infer the inflation at the time of each Class member's purchase and sale. These models provide a way to value an option as a function of the variables that influence option values: the strike price, time to expiration, risk-free interest rate, volatility of the underlying security, and the current market price of the underlying security. By changing the underlying price of the security in the equation to reflect the removal of the artificial inflation, one can assess how the value of the option would be impacted. Therefore, Options damages in this matter can be calculating using a standard and well-established methodology, and can be applied on a class-wide basis.[57]

42.    As shown in the prior section, Dr. Cain's damages methodology for TRQ common stock is unreliable. Therefore, Dr. Cain's damages methodology for TRQ equity swaps and options is also unreliable.

## VIII.    DR. CAIN DOES NOT MENTION, LET ALONE PROPOSE, A DAMAGES METHODOLOGY FOR PLAINTIFFS' §20(a) CLAIM

43.    Plaintiffs allege that Defendants violated §20(a) of the Exchange Act. Nowhere in the Cain Report does Dr. Cain mention, let alone propose, a methodology for calculating damages under §20(a).

---

[56] Cain Report, ¶ 90.

[57] Cain Report, ¶ 91.

44.     Dr. Cain, however, testified that his damages methodology for §20(a) is "subsumed" within his proposed damages methodology for §10(b).[58] If this claim is true, then the criticisms I discuss above are applicable to Dr. Cain's proposed damages methodology for Plaintiffs' §20(a) claims.

45.     Therefore, Dr. Cain has not demonstrated that §20(a) damages in this matter can be reliably calculated on a class-wide basis subject to a common methodology.

_____

Allen Ferrell

---

[58] Cain Dep. Tr. 119:3-12 ("Q. Do you offer an opinion regarding how to calculate damages in connection with the 20(a) claim? … A. So in my experience, those are the same methodologies, it's subsumed within the Section 10(b) out-of-pocket methodology.").

**Appendix A**

March, 2025

# Allen Ferrell

Harvard Law School
Cambridge, Massachusetts  02138
Telephone: (617) 495-8961
Email: fferrell@law.harvard.edu

## CURRENT POSITIONS

*Greenfield Professor of Securities Law*, Harvard Law School

*Visiting Professor,* Stanford Law School

*National Bureau of Economic Research,* Research Associate

*Fellow*, Columbia University's Program on the Law and Economics of Capital Markets

*Faculty Associate*, Kennedy School of Government

*Research Associate*, European Corporate Governance Institute

## EDUCATION

*Massachusetts Institute of Technology*, Ph.D. in Economics, 2005
Fields in econometrics and finance

*Harvard Law School,* J.D., 1995, *Magna Cum Laude*

- Recipient of the *Sears Prize* (award given to the two students with the highest grades)
- Editor, *Harvard Law Review*

*Brown University,* B.A. and M.A., 1992, *Magna Cum Laude*

## PREVIOUS POSITIONS

*Harvard University Fellow*
Harvard Law School, 1997

*Law Clerk*, Justice Anthony M. Kennedy
Supreme Court of the United States; 1996 Term

*Law Clerk*, Honorable Laurence H. Silberman
United States Court of Appeals for the District of Columbia; 1995 Term


COURSES TAUGHT

*Blockchain & Cryptocurrencies*
*Corporate Finance*
*Law and Finance*
*Securities Litigation & Regulation*
*Contracts*

REFEREE FOR FOLLOWING JOURNALS

*American Law and Economics Review*
*Journal of Corporation Finance*
*Journal of Finance*
*Journal of Financial Perspectives*
*Journal of Law and Economics*
*Journal of Law, Economics and Organization*
*Journal of Legal Studies*
*Quarterly Journal of Economics*

CONSULTING AREAS

Price Impact and Securities Damages, Valuation, Mergers & Acquisitions

## Papers

"Are Star Law Firms Better Law Firms?" with Manconi, Neretina, Powley & Renneboog, revise and resubmit at the *Journal of Accounting Research* (2024)

"Hidden History of Securities Damages", 1 University of Chicago Business Law Review 97 (2022)

"How Accurate are Matrix Bond Prices?" with Drew Roper & Yibai Shu, Working Paper (2018)

"New Special Study of the Securities Markets: Intermediaries" with John Morley in SECURITIES MARKET ISSUES FOR THE 21ST CENTURY (2018) (editors Fox, Glosten, Greene and Patel)

"Socially Responsible Firms," with Hao Liang and Luc Renneboog, 122 *Journal of Financial Economics* 586-606 (2016) (winner of Moskowitz Prize for outstanding quantitative research)

"Price Impact, Materiality, and *Halliburton II*" with Drew Roper, 93 *Washington University Law Review* 553 (2016)

"Introducing the CFGM Corporate Governance Database: Variable Construction and Comparison" with Cremers, Gompers and Andrew Metrick, Working Paper

"The Benefits and Costs of Indices in Empirical Corporate Governance Research," *in* OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (2016)

"Thirty Years of Shareholder Rights and Stock Returns," with Martijn Cremers, *revise and resubmit Journal of Financial Economics*

"Thirty Years of Shareholder Rights and Firm Valuation," with Martijn Cremers, 69 *Journal of Finance* 1167 (2014)

"Rethinking *Basic*," with Lucian Bebchuk, 69 *Business Lawyer* 671 (2014)

"Calculating Damages in ERISA Litigation," with Atanu Saha, 1 *Journal of Financial Perspectives* 93 (2013)

"Forward-casting 10b-5 Damages: A Comparison to other Methods", with Atanu Saha, 37 *Journal of Corporation Law* 365 (2011)

"Event Study Analysis: Correctly Measuring the Dollar Impact of an Event" with Atanu Saha, Working Paper (2011)

"Legal and Economic Issues in Litigation arising from the 2007-2008 Credit Crisis," with Jennifer Bethel and Gang Hu, *in* PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN (2009)

"Securities Litigation and the Housing Market Downturn," with Atanu Saha, 35 *Journal of Corporation Law* 97 (2009)

"The Supreme Court's 2005-2008 Securities Law Trio: *Dura Pharmaceuticals, Tellabs*, and *Stoneridge*," 9 *Engage* 32 (2009)

"What Matters in Corporate Governance?" with Lucian Bebchuk & Alma Cohen, 22 *Review of Financial Studies* 783 (2009)

"Do Exchanges, CCPs, and CSDs have Market Power?," *in* GOVERNANCE OF FINANCIAL MARKET INFRASTRUCTURE INSTITUTIONS (Ruben Lee) (2009)

"An Asymmetric Payoff-Based Explanation of IPO 'Underpricing'," Working Paper, with Atanu Saha (2008)

"The Law and Finance of Broker-Dealer Mark-Ups," commissioned study for NASD using proprietary database (2008)

"Majority Voting" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2008)

"The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," with Atanu Saha, 63 BUSINESS LAWYER 163 (2007)

"Mandated Disclosure and Stock Returns:  Evidence from the Over-the-Counter Market," 36 *Journal of Legal Studies* 1 (June, 2007)

"Policy Issues Raised by Structured Products," with Jennifer Bethel, *in* BROOKINGS –NOMURA PAPERS IN FINANCIAL SERVICES (2007)

"The Case for Mandatory Disclosure in Securities Regulation around the World," 2 *Brooklyn Journal of Business Law* 81 (2007)

"U.S. Securities Regulation in a World of Global Exchanges," with Reena Aggarwal and Jonathan Katz, *in* EXCHANGES: CHALLENGES AND IMPLICATIONS (2007)

"Shareholder Rights" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2007)

"Creditor Rights: A U.S. Perspective," 22 *Angler- und Glaubigerschutz bei Handelsgesellschaften* 49 (2006)

"Measuring the Effects of Mandated Disclosure," 1 *Berkeley Business Law Journal* 369 (2004)

"If We Understand the Mechanisms, Why Don't We Understand the Output?", 37 *Journal of Corporation Law* 503 (2003)

"Why European Takeover Law Matters," *in* REFORMING COMPANY AND TAKEOVER LAW IN EUROPE (2003)

"Does the Evidence Favor State Competition in Corporate Law?", with Alma Cohen & Lucian Bebchuk, 90 *California L. Rev.* 1775 (2002)

"Corporate Charitable Giving," with Victor Brudney, 69 *Univ. Of Chicago Law Review* 1191 (2002)

"A Comment on Electronic versus Floor-Based Securities Trading," *Journal of Institutional and Theoretical Economics* (Spring 2002)

"Much Ado About Order Flow," *Regulation Magazine* (Spring 2002)

"On Takeover Law and Regulatory Competition," with Lucian Bebchuk, 57 *Business Lawyer* 1047 (2002)

 "Federal Intervention to Enhance Shareholder Choice," with Lucian Bebchuk, 87 *Virginia Law Review* 993 (2001)

"A New Approach to Regulatory Competition in Takeover Law," with Lucian Bebchuk, 87 *Virginia Law Review* 111 (2001)

"A Proposal for Solving the 'Payment for Order Flow' Problem," 74 *Southern California Law Review* 1027 (2001)

"Federalism and Takeover Law: The Race to Protect Managers from Takeovers," with Lucian Bebchuk, 99 *Columbia L. Rev.* 1168 (1999)

TESTIMONY LAST FOUR YEARS

*Ramirez v. Exxon Mobil Corporation et al.*, Case No. 3:16-cv-031110K, Expert report and deposition on March 22, 2019, trial testimony June 7, 2022 and deposition on January 27, 2025

*Homyk v. ChemoCentryx*, Case No. 4:21-CV-03343-JST, Expert reports and depositions on January 6, 2024 and December 4, 2024

*Alesco Preferred Funding et al v. ACP re LTD et al,* Index Case No. 655881/2017, Expert reports and deposition on August 9, 2024

*BLST Northstar v. Santander*, Case No. 22-cv-2210, Expert reports and deposition on August 2, 2024

*In re P3 Health Group Holdings, LLC*, Case No. 2021-0518-JTL, Expert reports and depositions on August 26, 2021 and May 29, 2024

*Gelt Trading v. Co-Diagnostics*, Case No. 2:20-CV-00368-CMR, Expert report and deposition on March 1, 2024

*In re Ripple Labs Litigation*, Case No. 4:18-CV-06753-PJH, Expert report and deposition on October 16, 2023

*Chabot v. Walgreens*, Case No. 1:18-CV-02118-CCC-KM, Expert report and deposition on October 6, 2023

*XOG Litigation Trust v. Kelley*, Case No. 01-22-0002-3114, Expert report and deposition on August 31, 2023 and testimony on October 25, 2023

*CRCM v. Getty Images Holdings*, Case No. 1:23-CV-01074-JSR, Expert report and deposition on August 14, 2023

*Halperin & Davis, Co-Trustees of Appvion Liquidating Trust v. Richards et al.*, Case No. 17-12082, Expert report and deposition on August 9, 2023

*IBM v. GlobalFoundries U.S. Inc.*, Case Index No. 653625/2021, Expert report and deposition on June 27, 2023

*In re Anadarko Petroleum Corporation Securities Litigation*, C.A. No. 4:20-CV-00576, Expert report and deposition on March 2, 2023

*In Re Madison Square Garden Entertainment Corp. Stockholders Litigation*, C.A. No. 2021-0468-KSJM, Expert report and deposition on February 22, 2023

*Politan Capital Management v. Masimo Corporation et al*, C.A. No. 2022-0948-NAC, Expert report and deposition on February 5, 2023

*Restanca v. House of Lithium*, C.A. No. 2022-0690-PAF, Expert report and deposition on November 21, 2022 and testimony on December 7, 2022

*Roberts et al. v. Zuora*, Case No. 3:19-cv-03422-SI, Expert report and testimony on October 25, 2022

*United States v. Milton*, 21 Crim. 478, Expert testimony on September 30 & October 3, 2022

*FSG Services v. Flutter*, Ref. No. 1425034540, Expert report and testimony on June 29, 2022

*In re Kraft Heinz Securities Litigation*, Case No. 1:19-cv-01339, Expert report and deposition on June 23, 2022

*SEC v. AT&T Inc. et al,* 21 Civ. 1951, Expert report and deposition on April 15, 2022

*Securitized Asset Funding 2011-2 v. CIBC*, Case Index No. 653911/2015, Expert report and deposition on July 30, 2021 and trial testimony March 18 and 21, 2022

*SEC v. Ripple*, Case No.20-CV-10832, Expert report and deposition on February 23, 2022

*Chabot et al. v. Walgreens*, M.D. Pa 1:18-cv-02118, Expert report and deposition on January 18, 2022

*EIG Energy Fund v. Keppel Offshore & Marine LTD*, Case No.18-cv-01047-PGG, Expert report and deposition on December 9, 2021

*Purple Mountain Trust v. Wells Fargo et al.*, Case No. 3:18-cv-03948-JD, Expert report and deposition on December 3, 2021

*In re Robinhood Litigation,* Case No. Case No. 3:20-cv-01626-JD, Expert reports and deposition on September 30, 2021

**Appendix B**

## Materials Relied Upon

**I.    Case Documents**

1.  Third Amended Consolidated Complaint for Violation of the Federal Securities Laws (As conformed based on the Court's February 26, 2024 Order (ECF No. 328)), *In re Turquoise Hill Resources Ltd. Securities Litigation,* U.S.D.C. (S.D.N.Y.), Civil Action no. 1:20-cv-8585-LJL, filed February 28, 2024 (ECF No. 329)

2.  Expert Report of Matthew D. Cain, Ph.D., December 23, 2024 and Backup files

3.  Transcript of the Deposition of Matthew D. Cain, Ph.D., March 7, 2025

**II.    Rio Tinto and Turquoise Hill Resources Ltd. SEC Filings & Press Releases**

4.  Rio Tinto Press Release, "Rio Tinto approves development of Oyu Tolgoi underground mine," May 6, 2016

5.  Rio Tinto, Form 6-K filed July 17, 2018

6.  Rio Tinto, Form 6-k filed August 1, 2018

7.  Rio Tinto Press Release, "Rio Tinto: 2018 half year results," August 1, 2018

8.  Rio Tinto, Form 6-K filed October 16, 2018

9.  Rio Tinto Press Release, "Rio Tinto: Third quarter 2018 operations review," October 16, 2018

10. Rio Tinto, Form 20-F for the period ending December 31, 2018

11. Rio Tinto, Form 6-K filed January 18, 2019

12. Rio Tinto, Form 6-K filed February 27, 2019

13. Rio Tinto, Form 6-K filed Form 6-K filed April 16, 2019

14. Ex. 99.1 to Turquoise Hill Resources Ltd., Form 40-F for the period ended December 31, 2017

15. Turquoise Hill Resources Ltd., Form 6-K filed July 16, 2018

16. "Turquoise Hill announces financial results and review of operations for the second quarter of 2018," *GlobeNewswire*, July 31, 2018

17. Turquoise Hill Resources Ltd., Form 6-K filed July 31, 2018

18. Turquoise Hill Resources Ltd., Form 6-K filed October 15, 2018

19. Turquoise Hill Resources Ltd., Form 6-K filed November 1, 2018

20. "Turquoise Hill announces financial results and review of operations for the third quarter of 2018," *GlobeNewswire*, November 1, 2018

21. Ex. 99.1 to Turquoise Hill Resources Ltd., Form 40-F for period ended December 31, 2018

22. Turquoise Hill Resources Ltd. 2018 Annual Report

23. Turquoise Hill Resources Ltd., Form 6-K filed February 27, 2019

24. "Turquoise Hill announces 2019financial guidance and provides underground development update," *GlobeNewswire*, February 27, 2019

25. Turquoise Hill Resources Ltd., Form 6-K filed March 14, 2019

26. "Turquoise Hill announces financial results and review of operations for 2018," *GlobeNewswire*, March 14, 2019

27. Turquoise Hill Resources Ltd., Form 6-K filed April 15, 2019

28. Turquoise Hill Resources Ltd., Form 6-K filed May 15, 2019

29. Turquoise Hill Resources Ltd., Form 6-K filed July 15, 2019

30. "Turquoise Hill announces second quarter2019 production results and provides underground development update," *PRNewswire*, July 15, 2019

31. "Turquoise Hill announces financial results and review of operations for the second quarter of 2019," *PRNewswire*, July 31, 2019


### III.    SEC Filings in Appendix D

32. AK Steel Holding Corporation, Form 10-K, for the fiscal year ended December 31, 2017

33. Alcoa Corporation., Form 10-K, for the fiscal year ended December 31, 2017

34. Arch Coal, Inc., Form 10-K, for the fiscal year ended December 31, 2017

35. Allegheny Technologies Incorporated, Form 10-K, for the fiscal year ended December 31, 2017

36. Carpenter Technology Corporation, Form 10-K, for the fiscal year ended June 30, 2018

37. Century Aluminum Company, Form 10-K, for the fiscal year ended December 31, 2017

38. Cleveland-Cliffs Inc., Form 10-K, for the fiscal year ended December 31, 2017

39. Coeur Mining, Inc., Form 10-K, for the fiscal year ended December 31, 2017

40. Commercial Metals Company, Form 10-K for the fiscal year ended August 31, 2018

41. Compass Minerals International, Inc., Form 10-K, for the fiscal year ended December 31, 2017

42. CONSOL Energy Inc., Form 10-K, for the fiscal year ended December 31, 2017

43. Freeport-McMoRan Inc., Form 10-K, for the fiscal year ended December 31, 2017

44. Haynes International Inc., Form 10-K, for the fiscal year ended September 30, 2017

45. Helca Mining Company, Form 10-K, for the fiscal year ended December 31, 2017

46. Kaiser Aluminum Corporation, Form 10-K, for the fiscal year ended December 31, 2017

47. Materion Corporation, Form 10-K, for the fiscal year ended December 31, 2017

48. Mcewen Mining Inc., Form 10-K, for the fiscal year ended December 31, 2017

49. Newmont Mining Corporation, Form 10-K, for the fiscal year ended December 31, 2017

50. Nucor Corporation, Form 10-K, for the fiscal year ended December 31, 2017

51. Peabody Energy Corporation, Form 10-K, for the fiscal year ended December 31, 2017

52. Reliance Steel & Aluminum Co., Form 10-K, for the fiscal year ended December 31, 2017

53. Royal Gold, Inc., Form 10-K, for the fiscal year ended June 30, 2018

54. Schnitzer Steel Industries Inc., Form 10-K, for the fiscal year ended August 31, 2017

55. Steel Dynamics, Inc., Form 10-K, for the fiscal year ended December 31, 2017

56. Suncoke Energy Inc., Form 10-K, for the fiscal year ended December 31, 2017

57. Timkensteel Corporation, Form 10-K, for the fiscal year ended December 31, 2017

58. United States Steel Corporation, Form 10-K, for the fiscal year ended December 31, 2017

59. Warrior Met Coal, Inc., Form 10-K, for the fiscal year ended December 31, 2017

60. Worthington Industries, Form 10-K, for the fiscal year ended May 31, 2018


**IV.    Earning Call Transcripts and Presentations**

61. Rio Tinto, FH1 2018 earnings call transcript dated August 1, 2018

62. Rio Tinto, presentation slides for 2018 half year results dated August 1, 2018

63. Rio Tinto, presentation on Bernstein Pan European Strategic Decisions Conference, "Delivering superior returns," J-S Jacques, September 26, 2018

64. Rio Tinto, presentation on Copper & Diamonds road show, Arnaud Soirat, October 2, 2018

65. "Rio Tinto PLC UBS Australasia conference – presentation," Regulatory News Services, November 12, 2018

66. Rio Tinto, presentation slides on UBS Australasia Conference, "Delivery superior returns," J-S Jacques, November 12, 2018

67. Rio Tinto, FY 2018 earnings call transcript dated February 27, 2019

68. Rio Tinto, Group Shareholder/Analyst call transcript dated April 10, 2019

69. Turquoise Hill Resources Ltd., FQ2 2019 earnings call transcript dated August 1, 2018

70. Turquoise Hill Resources Ltd., FQ3 2019 earnings call transcript dated November 2, 2018

71. Turquoise Hill Resources Ltd., presentation slides for 3Q 2018 financial results dated November 2, 2018

72. Turquoise Hill Resources Ltd., FQ4 2018 earnings call transcript dated March 15, 2019

73. Turquoise Hill Resources Ltd., FQ1 2019 earnings call transcript dated May 16, 2019

74. Turquoise Hill Resources Ltd., FQ2 2019 earnings call transcript dated July 16, 2019

## V.    **News Articles and Other Public Sources**

75. MBN World interview with Soirat dated August 15, 2018. Interview video available at https://www.facebook.com/watch/?v=692435861116980

76. "Turquoise Hill to attend upcoming TD Securities Mining conference," *GlobeNewsire*, January 15, 2019

77. "Dozens of Rio tailing dams would be high hazards if they failed," *The Sydney Morning Herald*, "June 12, 2019

78. "Schnitzer Steel Rebrands as Radius Recycling to Reflect Company's Vision, Purpose, and Impact on Circular Economy," *Business Wire*, July 26, 2023

79. "Worthington Industries Board of Directors Approves Separation of Worthington Steel," *Worthington Steel News Release*, November 9, 2023

80. "TimkenSteel Announces Intent to Change Name to Metallus Inc.," *PRNewswire*, January 10, 2024

81. "Reliance Rebrands, Drops Steel & Aluminum from Name," *Metal Center News*, February 16, 2024

82. "Successful Completion of Merger Creating Core Natural Resources," *PRNewswire*, January 14, 2025

## VI.    **Data Sources**

83. S&P Capital IQ

84. Bloomberg, L.P.

85. worldtimebuddy.com

*All other documents cited in the report, exhibits, and appendices.*

**Appendix C**

**Dr. Cain's Event Study Results on the Alleged Misrepresentation Dates in the Complaint**

| | Date/ Time* | Reaction Date | Event | (Complaint ¶) | Statistics | Cain US | Cain CAN |
|---|---|---|---|---|---|---|---|
| 1 | 07/16/18 5:14 PM<br><br>07/17/18 3:28 PM | 07/17/18 | TRQ filed 6-K announcing 2Q 2018 production result.<br><br>Rio Tinto filed 6-K announcing 2Q 2018 production result. | 338, 339 | Residual %<br>t-Stat<br>Stat Sig and Pos? | 1.68%<br>-0.98<br>No | -1.36%<br>-0.76<br>No |
| 2 | 07/31/18 5:19 PM<br><br>08/01/18 5:00 AM<br><br>08/01/18 9:00 AM | 08/01/18 | TRQ filed 6-K announcing 2Q 2018 financial result.<br><br>Rio Tinto held investor conference call for 1H 2018 financial result with presentation slides.<br><br>TRQ held investor conference call for 2Q 2018 financial result. | 345-347, 351, 353, 356 | Residual %<br>t-Stat<br>Stat Sig and Pos? | -4.13%<br>-2.40<br>No | -4.22%<br>-2.35<br>No |
| 3 | 08/01/2018 4:37 PM | 08/02/18 | Rio Tinto filed 6-K announcing financial result for 1H 2018. | 355 | Residual %<br>t-Stat<br>Stat Sig and Pos? | -0.32%<br>-0.18<br>No | -0.62%<br>-0.35<br>No |
| 4 | 8/15/18 No Timestamp | 08/15/18 | MBN World (a Mongolian News Network) interviewed Soirat and discussed the Oyu Tolgoi underground project. | 360 | Residual %<br>t-Stat<br>Stat Sig and Pos? | 0.75%<br>0.43<br>No | 0.87%<br>0.48<br>No |
| 5 | 9/26/18 4:00 AM – 12:00PM | 09/26/18 | Jean-Sébastien Jacques (Rio Tinto copper division) presented on behalf of Rio Tinto at the Bernstein Pan European strategic Decisions Conference in London. | 361 | Residual %<br>t-Stat<br>Stat Sig and Pos? | 3.15%<br>2.01<br>**Yes** | 2.72%<br>1.73<br>No |
| 6 | 10/02/18 No Timestamp | 10/02/18 | Soirat presented on behalf of Rio Tinto at the Copper & Diamonds roadshow held in the U.S. | 363-364 | Residual %<br>t-Stat<br>Stat Sig and Pos? | 1.42%<br>0.90<br>No | 0.70%<br>0.45<br>No |
| 7 | 10/15/18 5:06 PM | 10/16/18 | TRQ filed 6-K announcing 3Q 2018 production result. | 366-369 | Residual %<br>t-Stat<br>Stat Sig and Pos? | -1.86%<br>-1.23<br>No | -1.83%<br>-1.19<br>No |
| 8 | 10/16/18 4:26 PM | 10/17/18 | Rio Tinto filed 6-K announcing 3Q 2018 production result. | 370 | Residual %<br>t-Stat<br>Stat Sig and Pos? | -2.42%<br>-1.66<br>No | -3.40%<br>-2.32<br>No |

**Dr. Cain's Event Study Results on the Alleged Misrepresentation Dates in the Complaint**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 9 | 11/01/18 5:08 PM  11/02/18 9:00 AM | 11/02/18 | TRQ filed 6-K announcing financial results for 3Q 2018.  TRQ held investor conference call for 3Q 2018 financial result with presentation slides. | 376-377, 379-384, 387-389, 394 | Residual % t-Stat Stat Sig and Pos? | -1.96% -0.91 No | -1.92% -0.84 No |
| 10 | 11/12/18 2:00 AM | 11/12/18 | Jean-Sébastien Jacques presented slides about Oyu Tolgoi at the UBS Australasia Conference in Sydney, Australia. | 397 | Residual % t-Stat Stat Sig and Pos? | -1.24% -0.57 No | -1.11% -0.48 No |
| 11 | 01/17/19 11:50 AM | 01/17/19 | TRQ presented at TD Securities Mining Conference in Toronto, Canada. | 398 | Residual % t-Stat Stat Sig and Pos? | -1.48% -0.61 No | -1.93% -0.73 No |
| 12 | 01/18/19 1:09 PM | 01/18/19 | Rio Tinto filed 6-K announcing production results for 4Q 2018. | 399 | Residual % t-Stat Stat Sig and Pos? | 0.95% 0.40 No | 1.80% 0.69 No |
| 13 | 02/27/19 8:15 AM  02/27/19 1:53 PM  02/27/19 3:30 AM | 02/27/19 | TRQ filed 6-K announcing 2019 financial guidance and provides underground development update.  Rio Tinto filed 6-K announcing 2018 full year results and presentation slides.  Rio Tinto held FY 2018 earnings call. | 401-404, 451-454, 406-409 | Residual % t-Stat Stat Sig and Pos? | -12.28% -4.41 No | -13.17% -4.38 No |
| 14 | 03/04/19 1:48 PM | 03/04/19 | Rio Tinto filed 2018 20-F. | 404, 443, 451-454 | Residual % t-Stat Stat Sig and Pos? | 4.38% 1.54 No | 2.92% 0.94 No |
| 15 | 03/14/19 5:32 PM  03/14/19 5:20 PM  03/15/19 9:00 AM | 03/15/19 | TRQ filed 6-K announcing 2018 full year results.  TRQ filed 2018 Form 40-F.  TRQ held Q4 2018 earnings call. | 411-414, 417, 419-421, 442, 447-448 | Residual % t-Stat Stat Sig and Pos? | 0.50% 0.17 No | 3.26% 1.05 No |

**Dr. Cain's Event Study Results on the Alleged Misrepresentation Dates in the Complaint**

| 16 | 04/10/19 7:00 AM | 04/10/19 | Rio Tinto held annual shareholders meeting. | 423 | Residual % t-Stat Stat Sig and Pos? | -1.61% -0.54 No | -1.34% -0.42 No |
|---|---|---|---|---|---|---|---|
| 17 | 04/15/19 5:16 PM

4/16/19 8:34 AM | 04/16 | TRQ filed 6-K announcing 1Q 2019 production result.

Rio Tinto filed 6-K announcing 1Q 2019 production result. | 425-426 | Residual % t-Stat Stat Sig and Pos? | -1.26% -0.43 No | -2.02% -0.64 No |
| 18 | 05/15/19 5:14 PM

5/16/19 9:00 AM | 05/16/19 | TRQ filed 6-K announcing 1Q 2019 financial result.

TRQ held 1Q 2019 earnings call. | 428-429 430-431 | Residual % t-Stat Stat Sig and Pos? | 3.43% 1.35 No | 1.27% 0.46 No |
| 19 | 07/15/19 7:11 PM

07/16/19 9:00 AM

07/16/19 2:00 AM | 07/16/19 | TRQ filed 6-K announcing 2Q 2019 production result.

TRQ held 2Q 2019 operating results call.

Rio Tinto press release "Update on Oyu Tolgoi underground project". | 434-437 | Residual % t-Stat Stat Sig and Pos? | -45.96% -17.32 No | -44.98% -16.04 No |

\* For SEC Filings, the timestamp is the "Accepted" time as reported on the SEC Edgar database. For earnings calls and shareholders/analyst calls, the reported GMT timestamp on the transcript (downloaded from S&P Capital IQ), is converted using the GMT to ET converter at worldtimebuddy.com. Dr. Cain's event study results per TRQ-CAIN-000068 & -069.

[1] Turquoise Hill Resources Ltd. Form 6-K filed July 16, 2018; Rio Tinto Form 6-K filed July 17, 2018.
[2] Turquoise Hill Resources Ltd. Form 6-K filed July 31, 2018; Turquoise Hill Resources Ltd. FQ2 2019 earnings call transcript dated August 1, 2018; Rio Tinto FH1 2018 earnings call transcript dated August 1, 2018; Rio Tinto presentation slides for 2018 half year results dated August 1, 2018.
[3] The Complaint cites to Rio Tinto Form 6-K filed August 1, 2018. The same Rio Tinto press release was available on August 1, 2018 at 2:43 AM ET. The reaction date to this press release would have been on August 1, 2018, which as shown in [2] is not statistically significant and positive.
[4] MBN World interview with Soirat dated August 15, 2018. Interview video available at https://www.facebook.com/watch/?v=692435861116980. Last accessed on April 2, 2025. There is no timestamp on the video. Dr. Cain's event study finds that, on the next trading day August 16, 2018, the residual return (t-statistic) for the US shares is -2.85% (-1.653) and Canadian shares is -2.15% (-1.191).
[5] Rio Tinto presentation on Bernstein Pan European Strategic Decisions Conference, "Delivering superior returns," J-S Jacques, September 26, 2018.
[6] Rio Tinto presentation on Copper & Diamonds road show, Arnaud Soirat, October 2, 2018. No timestamp was found. Dr. Cain's event study finds that, on the next trading day October 3, 2018, the residual return (t-statistic) for the US shares is -1.39% (-0.883) and Canadian shares is -0.62% (-0.403).

[7] Turquoise Hill Resources Ltd. Form 6-K filed October 15, 2018.

[8] The Complaint cites to Rio Tinto Form 6-K filed October 16, 2018. The same Rio Tinto press release was available on October 16, 2018 at 3:37 AM ET. The reaction date to this press release would have been on October 16, 2018, which as shown in [7] is not statistically significant and positive.

[9] Turquoise Hill Resources Ltd. Form 6-K filed November 1, 2018; Turquoise Hill Resources Ltd. FQ3 2019 earnings call transcript dated November 2, 2018; Turquoise Hill presentation slides for 3Q 2018 financial results dated November 2, 2018.

[10] "Rio Tinto PLC UBS Australasia conference – presentation," *Regulatory News Services*, November 12, 2018; Rio Tinto presentation slides on UBS Australasia Conference, "Delivery superior returns," J-S Jacques, November 12, 2018.

[11] "Turquoise Hill to attend upcoming TD Securities Mining conference," *GlobeNewsire*, January 15, 2019. The news articles stated that Turquoise Hill will be presenting at TD Securities Mining Conference in Toronto on January 17, 2019 at 11:50 AM ET; Actual presentation missing.

[12] Rio Tinto Form 6-K filed January 18, 2019.

[13] Turquoise Hill Resources Ltd. Form 6-K filed February 27, 2019; Rio Tinto 6-K filed February 27, 2019; Rio Tinto FY 2018 earnings call transcripts dated February 27, 2019.

[14] Rio Tinto Form 20-F for the period ending December 31, 2018 filed March 4, 2019.

[15] Turquoise Hill Resources Ltd. Form 6-K filed March 14, 2019; Turquoise Hill Resources Ltd. Form 40-F for the period ending December 31, 2018 filed March 14, 2019; Turquoise Hill Resources Ltd. FQ4 2018 earnings call transcript dated March 15, 2019.

[16] Rio Tinto Group shareholder/analyst call transcript dated April 10, 2019.

[17] Turquoise Hill Resources Ltd. Form 6-K filed April 15, 2019; Rio Tinto 6-K filed Form 6-K filed April 16, 2019.

[18] Turquoise Hill Resources Ltd. Form 6-K filed May 15, 2019; Turquoise Hill Resources FQ1 2019 earnings call transcript dated May 16, 2019.

[19] Turquoise Hill Resources Ltd. Form 6-K filed July 15, 2019; Turquoise Hill Resources FQ2 2019 earnings call transcript dated July 16, 2019; Rio Tinto press release, "Update on Oyu Tolgoi underground project," July 16, 2019.

**Appendix D**

**Primary Products and Raw Materials of the Members of the S&P Metal and Mining Select Industry Total Return Index As of July 16, 2018**

| | Company | Comments | Primary Products | Primary Raw Material | Primary Products or Raw Material | Weight in Index As of July 16, 2018 |
|---|---|---|---|---|---|---|
| | | | Include Gold, Silver and/or Copper? | | | |
| 1 | Alcoa Corp | The company is a global industry leader in the production of bauxite, alumina, and aluminum. Raw material for alumnia includes bauxite, caustic soda, electricity, fuel oil and natural gas, and lime. Raw material for aluminum includes alumnia, aluminum fluoride, calcined petroleum coke, cathod blocks, electricity, liquid pitch, and natural gas. | No | No | No | 4.7% |
| 2 | Arch Resources Inc | The company is one of the world's largest coal producers. It sells substantially all of its coal to power plants, steel mills, and industrial facilities. Principal supplies used in their business include petroleum-based fuels, explosives, tires, steel and other raw materials as well as spare parts and other consumables used in the mining process. | No | No | No | 4.2% |
| 3 | ATI Inc | The company is a global manufacturer of technically advanced specialty materials and complex components. The principal raw materials the company uses in the production of its specialty materials are scrap (including iron-, nickel-, chromium-, titanium-, and molybdenum-bearing scrap), nickel, titanium sponge, zirconium sand and sponge, ferrochromium, ferrosilicon, molybdenum and molybdenum alloys, manganese and manganese alloys, cobalt, niobium, vanadium and other alloying materials. | No | No | No | 4.4% |
| 4 | Carpenter Technology Corp | The company is a recognized leader in high-performance specialty alloy-based materials and process solutions for critical applications. It is a pioneer in premium specialty alloys, including titanium, nickel, and cobalt, as well as alloys specifically engineered for additive manufacturing processes and soft magnetics applications. These raw materials include nickel, cobalt, chromium, manganese, molybdenum, titanium, iron and scrap containing iron and nickel. | No | No | No | 3.9% |
| 5 | Century Aluminum Co | The company is a global producer of primary aluminum and operates aluminum reduction facilities, or "smelters," in the United States and Iceland. Alumina, electrical power, calcined petroleum coke and liquid pitch (the key raw materials for carbon anodes), and labor are the principal components of its cost of production. | No | No | No | 4.0% |
| 6 | Cleveland-Cliffs Inc | The company is an independent iron ore mining company in the United States. The key driver of its business is demand for steelmaking raw materials from U.S. steelmakers. | No | No | No | 4.6% |
| 7 | Cleveland-Cliffs Steel Holding Corp | The company is a leading producer of flat-rolled carbon, stainless, and electrical steel products, primarily for the automotive, infrastructure and manufacturing, and electrical power generation and distribution markets. The company's steel manufacturing operations require carbon and stainless steel scrap, coal, coke, chrome, iron ore, nickel and zinc as primary raw materials. | No | No | No | 4.6% |
| 8 | Coeur Mining Inc | The company is a **gold and silver** producer, as well as a zinc and lead producer. The company's operating results are substantially dependent upon the market prices of **silver and gold**, and to a lesser extent zinc and lead. | Yes | No | Yes | 4.9% |

**Primary Products and Raw Materials of the Members of the S&P Metal and Mining Select Industry Total Return Index As of July 16, 2018**

| | Company | Comments | Include Gold, Silver and/or Copper? | | | Weight in Index As of July 16, 2018 |
|---|---|---|---|---|---|---|
| | | | Primary Products | Primary Raw Material | Primary Products or Raw Material | |
| 9 | Commercial Metals Co | The company manufactures, recycles and markets steel and metal products, related materials and services through a network of facilities that includes four electric arc furnace ("EAF") mini mills, two EAF micro mills, a rerolling mill, steel fabrication and processing plants, construction-related product warehouses, and metal recycling facilities in the United States and Poland. The company bases pricing in most of its sales and purchase contracts on metal commodity futures exchange quotes. Due to the volatility of the metal commodity indices, the company enters into metal commodity futures contracts for **copper** and aluminum. Ferrous metal is the primary raw material for EAFs, such as those operated by its Americas Mills and International Mill segments. The primary raw material that its Alabama, Arizona, Oklahoma, South Carolina and Texas mills use is ferrous scrap metal. | Yes | No | Yes | 4.2% |
| 10 | Compass Minerals International Inc | The company is a leading provider of essential minerals, including salt for winter roadway safety and other consumer, industrial and agricultural uses; specialty plant nutrition products that improve the quality and yield of crops; and specialty chemicals for water treatment and other industrial processes. After sodium chloride and potassium-rich salts precipitate from brine, a concentrated magnesium chloride brine solution remains, which becomes the raw material the company uses to produce several magnesium chloride products. | No | No | No | 3.8% |
| 11 | Core Natural Resources Inc | The company is a leading, low-cost producer of high-quality bituminous coal, focused on the extraction and preparation of coal in the Appalachian Basin. Coal mining consumes large quantities of commodities including steel, **copper**, rubber products and liquid fuels and requires the use of capital equipment. | No | Yes | Yes | 2.4% |
| 12 | Freeport-McMoRan Inc | The company operates large, long-lived, geographically diverse assets with significant proven and probable reserves of **copper, gold**, and molybdenum, and is **the world's largest publicly traded copper producer**. | Yes | No | Yes | 4.4% |
| 13 | Haynes International Inc | The company is one of the world's largest producers of high-performance nickel- and cobalt-based alloys in flat product form such as sheet, coil and plate forms. Nickel, a major component of many of the company's products, accounted for approximately 35% of raw material costs, or approximately 13% of total cost of sales in fiscal 2017. Other raw materials include cobalt, chromium, molybdenum and tungsten. Melt materials consist of virgin raw material, purchased scrap and internally produced scrap. | No | No | No | 0.6% |
| 14 | Hecla Mining Co | The company discovers, acquires, develops, and produces **silver, gold**, lead, and zinc. It produces lead, zinc and bulk concentrates, which the company sells to custom smelters and brokers, and unrefined precipitate and bullion bars (doré) containing **gold and silver**, which are further refined before sale to precious metals traders. | Yes | No | Yes | 2.6% |

**Primary Products and Raw Materials of the Members of the S&P Metal and Mining Select Industry Total Return Index As of July 16, 2018**

| | Company | Comments | Include Gold, Silver and/or Copper? | | | Weight in Index As of July 16, 2018 |
|---|---|---|---|---|---|---|
| | | | Primary Products | Primary Raw Material | Primary Products or Raw Material | |
| 15 | Kaiser Aluminum Corp | The company manufactures and sells semi-fabricated specialty aluminum mill products for the following end market applications: aerospace and high strength; automotive; general engineering; and other industrial. The company purchases primary and scrap, or recycled, aluminum, its main raw material, at prices that fluctuate on a monthly basis, and the company's pricing policies generally allow it to pass the underlying cost of metal through to its customers so that the company remains neutral to metal pricing. The company is exposed to the risk of fluctuating prices of certain alloying metals, especially **copper** and zinc, to the extent that changes in their prices do not highly correlate with price changes for aluminum. **Copper,** zinc and certain other metals are used in its remelt operations to cast rolling ingot and extrusion billet with the proper chemistry for its products. From time to time, the company enters into forward contract swaps with third parties to mitigate its risk from fluctuations in the prices of alloying metals, including **copper** and zinc. | No | Yes | Yes | 2.4% |
| 16 | Materion Corp | The company is an integrated producer of high-performance advanced engineered materials used in a variety of electrical, electronic, thermal, and structural applications. The principal raw materials are aluminum, beryllium, cobalt, **copper, gold,** nickel, palladium, platinum, ruthenium, **silver**, and tin. | No | Yes | Yes | 1.2% |
| 17 | McEwen Mining Inc | The company is a mining and minerals production and exploration company focused on precious and base metals in Argentina, Mexico, Canada, and the United States. The end product at its **gold and silver** operations is either in the form of doré or concentrate. | Yes | No | Yes | 0.8% |
| 18 | Metallus Inc | The company manufacture alloy steel, as well as carbon and micro-alloy steel. The principal raw materials that it uses to manufacture steel are recycled scrap metal, chrome, nickel, molybdenum oxide, vanadium and other alloy materials. | No | No | No | 1.0% |
| 19 | Newmont Corp | The company is primarily a **gold producer** with significant operations and/or assets in the United States, Australia, Peru, Ghana and Suriname. Newmont is also **engaged in the production of copper**, principally through Boddington in Australia and Phoenix in the United States. **Silver is produced as a by-product** at certain of its operations and is included as a reduction to Costs applicable to sales in the company's Consolidated Financial Statements. | Yes | No | Yes | 4.5% |

3

**Primary Products and Raw Materials of the Members of the S&P Metal and Mining Select Industry Total Return Index As of July 16, 2018**

| | Company | Comments | Include Gold, Silver and/or Copper? | | | Weight in Index As of July 16, 2018 |
|---|---|---|---|---|---|---|
| | | | Primary Products | Primary Raw Material | Primary Products or Raw Material | |
| 20 | Nucor Corp | The Company and its affiliates manufacture steel and steel products. The Company also produces direct reduced iron ("DRI") for use in its steel mills. The company also processes ferrous and nonferrous metals and brokers ferrous and nonferrous metals, pig iron, hot briquetted iron ("HBI") and direct reduced iron. The company is North America's largest recycler, using scrap steel as the primary raw material in producing steel and steel products. The primary raw materials for its steel mills segment are ferrous scrap and scrap substitutes such as pig iron, DRI and HBI. The primary raw material for its DRI facilities is iron ore. The primary raw material for its steel products segment is steel produced by Nucor's steel mills. The company also periodically uses derivative financial instruments to hedge a portion of its exposure to price risk related to natural gas purchases used in the production process and to hedge a portion of its scrap, aluminum and **copper** purchases and sales. | No | Yes | Yes | 4.6% |
| 21 | Peabody Energy Corp | The company is the world's largest private-sector coal company by volume. It owns interests in 23 coal mining operations located in the United States and Australia. In addition to mining operations, it markets and brokers coal from other coal producers, both as principal and agent, and trade coal and freight-related contracts through trading and business offices in the U.S., Australia, China, and the United Kingdom. | No | No | No | 4.5% |
| 22 | Radius Recycling Inc | The company is one of North America's largest recyclers of ferrous and nonferrous scrap metal, including end-of-life vehicles, and a manufacturer of finished steel products. The nonferrous products by its largest segment include aluminum, **copper,** stainless steel, nickel, brass, titanium, lead, high temperature alloys and joint products such as zorba (primarily mixed aluminum nonferrous material) and zurik (predominantly stainless steel). The company processes recycled metals ranging from iron and steel to aluminum, **copper**, lead, stainless steel and zinc for use in the manufacture of new products. | Yes | Yes | Yes | 2.0% |
| 23 | Reliance Inc | The company is the largest metals service center company in North America. It provides metals processing services, or first-stage processing, and distribute a full line of more than 100,000 metal products, including alloy, aluminum, brass, **copper,** carbon steel, stainless steel, titanium and specialty steel products, to more than 125,000 customers in a broad range of industries. In 2015 to 2017, products classified as "miscellaneous, including brass, **copper**, titanium, manufactured parts and scrap" were **5% of total sales**. | No | No | No | 4.5% |
| 24 | Royal Gold Inc | The company is engaged in the business of acquiring and managing precious metal streams, royalties, and similar interests. Its financial results are primarily tied to the price of **gold** and, to a lesser extent, the price of **silver** and copper, together with the amounts of production from its producing stage stream and royalty interests. | Yes | No | Yes | 4.7% |

**Primary Products and Raw Materials of the Members of the S&P Metal and Mining Select Industry Total Return Index As of July 16, 2018**

| | Company | Comments | Primary Products | Primary Raw Material | Primary Products or Raw Material | Weight in Index As of July 16, 2018 |
|---|---|---|---|---|---|---|
| | | | | Include Gold, Silver and/or Copper? | | |
| 25 | Steel Dynamics Inc | The company is one of the largest domestic steel producers and metal recyclers in the United States. The primary source of the company's revenues are from the manufacture and sale of steel products, processing and sale of recycled ferrous and nonferrous metals, and fabrication and sale of steel joists and deck products. The principal raw material is scrap metal derived primarily from end-of-life automobiles, industrial scrap, railroad cars, railroad track materials, agricultural machinery and demolition scrap from obsolete structures, containers and machines. The company routinely enters into forward exchange traded futures and option contracts to manage the price risk associated with nonferrous metals inventory, as well as purchases and sales of nonferrous metals (primarily aluminum and copper). | No | Yes | Yes | 4.4% |
| 26 | SunCoke Energy Inc | The company is the largest independent producer of high-quality coke in the Americas. Coke is a principal raw material in the blast furnace steelmaking process and is produced by heating metallurgical coal in a refractory oven, which releases certain volatile components from the coal, thus transforming the coal into coke. The company also provides handling and/or mixing services to steel, coke (including some of its domestic cokemaking facilities), electric utility, coal producing and other manufacturing based customers. Metallurgical coal is the principal raw material for the company's cokemaking operations. | No | No | No | 0.9% |
| 27 | United States Steel Corp | The company is an integrated steel producer of flat-rolled and tubular products with major production operations in the United States and Europe. An integrated steel producer uses iron ore and coke as primary raw materials for steel production. | No | No | No | 4.6% |
| 28 | Warrior Met Coal Inc | The company is a large scale, low-cost U.S.-based producer and exporter of premium met coal operating two highly productive underground mines in Alabama. It sells a premium met coal product to leading steel manufacturers in Europe and South America. Met coal mining consumes large quantities of commodities including steel, copper, rubber products and liquid fuels and requires the use of capital equipment. | No | Yes | Yes | 4.2% |
| 29 | Worthington Enterprises Inc | The company is a diversified metals manufacturing company with manufactured metal products that include: pressure cylinders for liquefied petroleum gas, compressed natural gas, oxygen, refrigerant and other industrial gas storage; water well tanks for commercial and residential uses; hand torches and filled hand torch cylinders; propane-filled camping cylinders; helium-filled balloon kits; steel and fiberglass tanks and processing equipment primarily for the oil and gas industry; cryogenic pressure vessels for liquefied natural gas and other gas storage applications; engineered cabs and operator stations and cab components; and, through its joint ventures, complete ceiling grid solutions; laser welded blanks; light gauge steel framing for commercial and residential construction; and current and past model automotive service stampings. The primary raw material purchased by the company is steel. | No | No | No | 2.3% |

**Primary Products and Raw Materials of the Members of the S&P Metal and Mining Select Industry Total Return Index As of July 16, 2018**

| Company | Comments | Include Gold, Silver and/or Copper? | | | Weight in Index As of July 16, 2018 |
|---|---|---|---|---|---|
| | | Primary Products | Primary Raw Material | Primary Products or Raw Material | |
| Companies with primary products that do not include gold, silver, and/or copper | | 21 | | | 71.8% |
| Companies with primary products or raw materials that do not include gold, silver, and/or copper | | | | 15 | 52.7% |

Sources: Index constituents and weights per Bloomberg L.P.; Business descriptions per company Forms 10-K.

1    Alcoa Corporation 10-K for the fiscal year ended December 31, 2017, dated February 26, 2018, at 1 & 23.
2    Arch Resources, Inc. 10-K for the fiscal year ended December 31, 2017, dated February 23, 2018, at 6 & 19.
3    ATI Inc. 10-K for the fiscal year ended December 31, 2017, dated February 20, 2018, at 3 & 7.
4    Carpenter Technology Corporation 10-K for the fiscal year ended June 30, 2018, dated August 14, 2018, at 2.
5    Century Aluminum Company 10-K for the fiscal year ended December 31, 2017, dated February 28, 2018, at 1 & 4.
6    Cleveland-Cliffs Inc. 10-K for the fiscal year ended December 31, 2017, dated February 14, 2018, at 3 & 45.
7    AK Steel Holding Corporation 10-K for the fiscal year ended December 31, 2017, dated February 15, 2018, at 1 & 6.  In March 2020, AK Steel was acquired by Cleveland-Cliffs Inc. and changed its name to Cleveland-Cliff's Steel.
8    Coeur Mining, Inc. 10-K for the fiscal year ended December 31, 2017, dated February 7, 2018, at 4-5.
9    Commercial Metals Company 10-K for the fiscal year ended August 31, 2018, dated October 25, 2018, at 3-5 & 43.
10   Compass Minerals International, Inc. 10-K for the fiscal year ended December 31, 2017, dated February 27, 2018, at 4 & 6.
11   CONSOL Energy Inc. 10-K for the fiscal year ended December 31, 2017, dated February 16, 2018, at 7 & 35. In January 2025, Arch Resources and CONSOL merged to form Core Natural Resources.
12   Freeport-McMoRan Inc. 10-K for the fiscal year ended December 31, 2017, dated February 20, 2018, at 1.
13   Haynes International, Inc.10-K for the fiscal year ended September 30, 2017, dated November 16, 2017, at 3 & 12.
14   Hecla Mining Company 10-K for the fiscal year ended December 31, 2017, dated February 15, 2018, at 1.
15   Kaiser Aluminum Corporation 10-K for the fiscal year ended December 31, 2017, dated February 26, 2018, at 1, 2, & 42.
16   Materion Corporation 10-K for the fiscal year ended December 31, 2017, dated February 15, 2018, at 2 & 4.
17   McEwen Mining Inc. 10-K for the fiscal year ended December 31, 2017, dated February 21, 2018, at 3-4.
18   Timkensteel Corp. 10-K for the fiscal year ended December 31, 2017, dated February 20, 2018, at 3 & 5. In January 2024, Timkensteel announced its intent to change its name to Metallus Inc.
19   Newmont Corporation 10-K for the fiscal year ended December 31, 2017, date February 22, 2018, at 3-5.
20   Nucor Corporation 10-K for the fiscal year ended December 31, 2017, dated February 28, 2018, at 1, 6 & 18.
21   Peabody Energy Corporation 10-K for the fiscal year ended December 31, 2017, dated February 21, 2018, at 2.
22   Radius Recycling, Inc. 10-K for the fiscal year ended August 31, 2017, dated October 24, 2017, at 2, 4 & 28. In July 2023, Schnitzel Steel rebrands as Radius Recycling.
23   Reliance, Inc. 10-K for the fiscal year ended December 31, 2017, dated February 28, 2018, at 1 & 9. In February 2024, Reliance Steel & Aluminum Co. rebrands to Reliance, Inc.
24   Royal Gold, Inc. 10-K for the fiscal year Ended June 30, 2018, dated August 9, 2018, at 1 & 5.
25   Steel Dynamics, Inc. 10-K for the fiscal year ended December 31, 2017, dated February 27, 2018, at 3, 17 & 63.
26   SunCoke Energy, Inc. 10-K for the fiscal year ended December 31, 2017, dated February 15, 2018, at 1 & 5.
27   United States Steel Corporation 10-K for the fiscal year ended December 31, 2017, dated February 21, 2018, at 18.
28   Warrior Met Coal, Inc. 10-K for the fiscal year ended December 31, 2017, dated February 14, 2018, at 7 & 28.
29   Worthington Enterprises Inc. 10-k For the fiscal year ended May 31, 2018, at 1 & 6. In December 2023, Worthington Industries was renamed Worthington Enterprises.