**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TURQUOISE HILL RESOURCES LTD. SECURITIES LITIGATION | Case No. 1:20-cv-08585-LJL |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR**
**FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iv

PRELIMINARY STATEMENT ..............................................................................1

ARGUMENT ...........................................................................................................3

I.      THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL ..................................3

        A.      Lead Plaintiff and Lead Counsel Have Zealously and Adequately
                Represented the Settlement Class .............................................................5

        B.      The Settlement Was Reached After Arm's-Length Negotiations
                Supervised By an Experienced Mediator, and Following Extensive
                Discovery ..................................................................................................6

        C.      The Proposed Settlement Is Fair, Reasonable, and Adequate in Light of
                the Costs and Risks of Further Litigation and Similar Factors ...............8

                1.      The Risks of Establishing Liability and Damages Support
                        Approval of the Settlement ...........................................................9

                        (a)      Risks to Proving Liability ...............................................10

                        (b)      Risks to Proving Loss Causation and Damages...............11

                        (c)      Conclusion .......................................................................12

                2.      The Settlement Is Also Fair and Reasonable in Light of
                        Realistically Recoverable Damages.............................................13

                3.      The Costs and Delays of Continued Litigation Support Approval of
                        the Settlement...............................................................................14

                4.      All Other Rule 23(e)(2)(C) Factors Also Support Approval ....................14

        D.      The Settlement Treats Class Members Equitably Relative to Each Other ............16

        E.      The Reaction of the Settlement Class to the Settlement .......................................16

II.     THE PLAN OF ALLOCATION IS FAIR AND REASONABLE, AND SHOULD
        BE APPROVED ........................................................................................................17

III.    THE SETTLEMENT CLASS SHOULD BE CERTIFIED...............................................19

IV.     THE NOTICE TO THE SETTLEMENT CLASS SATISFIED THE
        REQUIREMENTS OF RULE 23 AND DUE PROCESS.................................................19

CONCLUSION.................................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
  298 F.R.D. 171 (S.D.N.Y. 2014) ................................................................20

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ...................................................................................5

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ...................................................................5

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012)..............................................16, 17

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
  2021 WL 345790 (E.D.N.Y. Feb. 1, 2021)................................................20

*In re China Sunergy Sec. Litig.*,
  2011 WL 1899715 (S.D.N.Y. May 13, 2011) ..........................................13

*In re Citigroup Inc. Sec. Litig.*,
  2014 WL 2112136 (S.D.N.Y. May 20, 2014) ............................................4

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)...........................................................4, 6, 9

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)...........................................................................7

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)..................................................................................19

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015)....................................6, 12

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  674 F. App'x 37 (2d Cir. 2016) ...................................................................6

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
  2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010).........................7, 9, 16, 17

*In re Gilat Satellite Networks, Ltd.*,
  2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ........................................14

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000)..............................................................................................4

*In re IMAX Sec. Litig.*,
283 F.R.D. 178 (S.D.N.Y. 2012) ...................................................................................17

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
233 F.R.D. 306 (E.D.N.Y. 2006) .....................................................................................9

*In re NASDAQ Market-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) .....................................................................................8

*Okla. Firefighters Pension & Ret. Sys. V. Lexmark Int'l, Inc.*,
2021 WL 76328 (S.D.N.Y. Jan. 7, 2021) ......................................................................13

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
330 F.R.D. 11 (E.D.N.Y. 2019) .......................................................................................5

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
62 F.4th 704 (2d Cir. 2023) ..............................................................................................5

*Pearlstein v. BlackBerry Ltd.*,
2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022)...............................................................13

*In re Qudian Inc. Sec. Litig.*,
2021 WL 2383550 (S.D.N.Y. June 8, 2021) ..................................................................20

*Shapiro v. JPMorgan Chase & Co.*,
2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) .................................................................8

*In re Signet Jewelers Ltd. Sec. Litig.*,
2020 WL 4196468 (S.D.N.Y. July 21, 2020) ...................................................15, 17, 18

*In re Turquoise Hill Res. Ltd.*,
2024 WL 4711185 (S.D.N.Y. Nov. 7, 2024) .................................................................11

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022).............................................................................11

*In re Veeco Instruments Inc. Sec. Litig.*,
2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)...........................................................8, 12, 16

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005).........................................................................................4, 19

*Weinberger v. Kendrick*,
698 F.2d 61 (2d Cir. 1982)...............................................................................................6

*Yang v. Focus Media Holding Ltd.*,
   2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ........................................................................7

**STATUTES & RULES**

Private Securities Litigation Reform Act of 1995,
   15 U.S.C. § 78u-4 ...............................................................................................3, 8, 18, 19

Fed. R. Civ. P. 23 ................................................................................................... *passim*

In accordance with Fed. R. Civ. P. 23(e), Lead Plaintiff Pentwater, on behalf of itself and the Settlement Class, respectfully submits this memorandum of law in support of its motion for final approval of: (i) the proposed $138,750,000 settlement of this securities class action (the "Action") for the benefit of the Settlement Class (the "Settlement"), and (ii) the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation").[1]

## PRELIMINARY STATEMENT

Lead Plaintiff is pleased to present for the Court's approval its agreement to settle this securities class action in full in exchange for a cash payment of $138,750,000 for the benefit of the Settlement Class. Lead Plaintiff respectfully submits that the proposed Settlement is an excellent result for the Settlement Class that readily satisfies all the standards for final approval under Rule 23(e) of the Federal Rules of Civil Procedure and Second Circuit precedent.

The $138.75 million Settlement is an outstanding result for the Settlement Class given the range of possible outcomes at trial and the risks of continued litigation. The recovery represents a substantial percentage (34% to 43%) of the maximum damages that Lead Plaintiff could prove at trial, which is a very favorable result in light of the significant risks of continued litigation. As discussed below and in the Graziano Declaration,[2] Lead Plaintiff faced a number of significant risks related to proving falsity, scienter, loss causation, and damages in the Action.

---

[1] Unless otherwise noted, capitalized terms have the meanings given them in the Stipulation and Agreement of Settlement dated June 17, 2025 (ECF No. 469-1) (the "Stipulation") or in the Declaration of Salvatore J. Graziano in Support of (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Graziano Declaration" or "Graziano Decl."), filed herewith. Citations herein to "¶ __" and "Ex.__" refer, respectively, to paragraphs in, and exhibits to the Graziano Declaration.

[2] The Graziano Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, among other things: the history of the Action (¶¶ 15-90); the nature of the claims asserted (¶¶ 13-14, 24); the

Absent the Settlement, Lead Plaintiff and the Settlement Class faced the prospect of protracted litigation through resolution of a contested class certification motion; a potential Rule 23(f) appeal; the completion of fact discovery (including numerous remaining fact depositions); costly expert discovery; summary judgment; a complex trial; post-trial motions on both liability and damages; and the inevitable appeals if Lead Plaintiff succeeded at trial. The Settlement eliminates the real risks that protracted litigation might lead to a lesser or no recovery—and instead guarantees a substantial near-term benefit of $138.75 million for the Settlement Class.

This case was hard-fought and the Settlement comes only after significant litigation. The Settlement was achieved after four and a half years of litigation, the filing of three amended complaints, and resolution of two motions to dismiss, both of which the Court partially granted. Discovery disputes were also hard-fought, with the Court granting in part and denying in part certain efforts by Lead Plaintiff to obtain additional discovery. Lead Plaintiff's class certification motion was being briefed when Settlement was reached, and extensive discovery—including production of more than 1.7 million pages of documents, depositions of some of the witnesses identified in the Complaints, four depositions of Lead Plaintiff's representatives, depositions of both of Lead Plaintiff's experts, and the deposition of one of Defendants' experts—had already occurred. Thus, the Parties were fully informed about the issues in the case and the attendant risks of further litigation at the time of Settlement.

To reach the settlement, Pentwater and Defendants engaged in vigorous arm's-length settlement negotiations before the Honorable Layn R. Phillips, a former federal judge and a premier mediator, including at two in-person mediation sessions in February and April 2025. *See*

---

negotiations leading to the Settlement (¶¶ 84-89); the risks and uncertainties of continued litigation (¶¶ 91-120); and the terms of the Plan of Allocation for the Settlement proceeds (¶¶ 127-37).

Declaration of Layn R. Phillips, Ex. 1, at ¶¶ 3-10.  Those mediations did not result in settlement, which was only achieved following further hard-fought negotiations.

The Settlement has the full support of the Court-appointed Lead Plaintiff Pentwater. Pentwater is a highly sophisticated institutional investor of the type Congress favored when it passed the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Pentwater, including its CEO Matthew Halbower, was actively involved throughout the litigation and vigorously directed the litigation strategy and settlement negotiations with a significant financial interest in the outcome of this case.  *See* Declaration of Matthew Halbower, Ex. 2, at ¶¶ 4-6.  Further, although the September 24, 2025 deadline for Settlement Class Members to object or to request exclusion from the Settlement Class has not yet passed, to date no one has objected to the Settlement and just one request for exclusion from the Settlement Class has been received.[3]  Accordingly, and as further discussed below, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate, and merits final approval by the Court.

The Court should also approve the Plan of Allocation, which Lead Counsel developed in consultation with Lead Plaintiff's expert on damages, as it provides a reasonable method for allocating the Net Settlement Fund among eligible Settlement Class Members based on damages they suffered related to the wrongdoing alleged in the Action.

<u>**ARGUMENT**</u>

**I.  THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL**

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims.  *See* Fed. R. Civ. P. 23(e).  A class-action settlement merits approval where the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

---

[3] Lead Plaintiff will address any objections that may be received and all requests for exclusion in its reply papers, due on October 8, 2025.

The Second Circuit has recognized that public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("*Visa*") ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'"). In ruling on final approval of a class settlement, a court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms. *See Visa*, 396 F.3d at 116; *In re Citigroup Inc. Sec. Litig.*, 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014).

Rule 23(e)(2) provides that courts should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Similarly, the Second Circuit has historically held that courts should consider following factors from *City of Detroit v. Grinnell Corp.* in evaluating class settlements:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), *see also Visa*, 396 F.3d at 117.

The Advisory Committee Notes to the 2018 amendments to the Federal Rules note that the four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted

by a Court of Appeals, but "rather [seek] to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Advisory Committee Notes to 2018 Amendments.  Accordingly, Lead Plaintiff addresses below the Settlement's "fairness, reasonableness, and adequacy" principally under the four factors listed in Rule 23(e)(2), while also discussing application of relevant, non-duplicative *Grinnell* factors. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019), *aff'd sub nom.*, 62 F.4th 704 (2d Cir. 2023) ("the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors").  As set forth below, ***all*** of the relevant factors strongly support approval here.

### A.    Lead Plaintiff and Lead Counsel Have Zealously and Adequately Represented the Settlement Class

In weighing approval, a court should consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A); *see also In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) ("the adequacy requirement 'entails inquiry as to whether: (1) plaintiffs' interests are antagonistic to the interest of other members of the class and (2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation'").

Here, there is no antagonism or conflict between Lead Plaintiff and the proposed class. Lead Plaintiff, like the other Settlement Class Members, purchased Turquoise Hill Securities during the Class Period and was injured by the same alleged misstatements.  If Lead Plaintiff were to prove its claims at trial, it would also prove the Settlement Class's claims.  *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions).

Moreover, it is respectfully submitted that Lead Plaintiff and Lead Counsel have more than adequately represented the Settlement Class by vigorously prosecuting the Action in the four and

half years since its inception and by negotiating a highly favorable Settlement. Lead Counsel also notes that BLB&G is well qualified and highly experienced in securities litigation (*see* Lead Counsel's firm resume at Ex. 7), and the successful result that the firm achieved here was reached in the face of opposition from zealous and highly skilled opposing counsel. ¶ 149. Accordingly, Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class.

**B.** **The Settlement Was Reached After Arm's-Length Negotiations Supervised By an Experienced Mediator, and Following Extensive Discovery**

Courts must also consider whether a proposed settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B), and traditionally courts consider certain other related factors in assessing the "procedural" fairness of a settlement. These factors include: (i) whether counsel had an adequate understanding of the case's strengths and weakness based on "the stage of the proceedings and the amount of discovery completed,"[4] (ii) any indicia of collusion;[5] and (iii) the involvement of an independent mediator. Here, all of these factors also strongly support approval of the Settlement.

First, the Settlement was reached only after extensive, vigorous, arm's-length negotiations which included two in-person mediations led by former U.S. District Judge Layn R. Phillips, a highly experienced mediator of securities class actions and other complex actions. *See* Declaration of Layn R. Phillips (Ex. 1), at ¶¶ 3-11. The mediation process involved the exchange of detailed

---

[4] *See Grinnell*, 495 F.2d at 463 (third factor); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *4 (S.D.N.Y. Nov. 9, 2015) ("the question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement"), *aff'd*, 674 F. App'x 37 (2d Cir. 2016).

[5] *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) ("the absence of any indication of collusion, the protracted settlement negotiations, the ability and experience of plaintiffs' counsel, [and] the extensive discovery preceding settlement . . . are important indicia of the propriety of settlement negotiations").

written submissions before each of the two mediations sessions, on February 5, 2025 and April 25, 2025, and months of extensive negotiations. *Id.* ¶¶ 7-11. The settlement negotiations were conducted on an arms'-length basis throughout. *Id.* ¶ 12. These facts powerfully support a finding that the Settlement is procedurally fair and free of collusion. *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (mediator's involvement in settlement negotiations "helps to ensure that the proceedings were free of collusion and undue pressure"); *Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) (participation of highly qualified mediator "strongly supports a finding that negotiations were conducted at arm's length and without collusion."); *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *14 (S.D.N.Y. Nov. 8, 2010) (finding that proposed settlement was fair and reasonable "is strengthened by the fact that [it] was reached in an extended mediation").

Moreover, as noted above, the Parties and their counsel were well informed about the strengths and weaknesses of the case before they agreed to settle. Among other things, Lead Plaintiff and Lead Counsel had (i) conducted an extensive investigation before filing the Amended Complaint, including interviewing more than 70 former Rio Tinto or Turquoise Hill employees, working with whistleblowers, and thoroughly reviewing relevant SEC filings, investor conference calls, press releases, media reports, and other public information; (ii) drafted a detailed Amended Complaint, which was subsequently twice amended as additional information became available; (iii) researched and briefed opposition to two rounds of Defendants' motions to dismiss; (iv) moved for class certification and engaged in related discovery; (v) conducted substantial document discovery, including obtaining more than 1.7 million pages of documents, and litigated numerous discovery and expert matters; (vi) deposed certain witnesses named in the Complaint and spent substantial time preparing for upcoming depositions; (vii) worked extensively with

experts in the mining industry, trading and share domesticity issues, loss causation, and damages; and (viii) engaged in extensive arm's length negotiations. Thus, Lead Plaintiff and Lead Counsel were well informed as to the strengths and weaknesses of the claims and defenses when they negotiated the Settlement.

Lead Plaintiff itself strongly supports the Settlement, which is another factor that weighs in favor of approval. Indeed, Lead Plaintiff is a very sophisticated institutional investor of the exact type envisioned by the PSLRA to lead securities class actions like this one. *See* Ex. 2, at ¶ 2. A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor"—as here—"is 'entitled to an even greater presumption of reasonableness.'" *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007).

Finally, the judgment of Lead Counsel, which is highly experienced in securities class-action litigation, is entitled to "great weight." *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *2 (S.D.N.Y. Mar. 24, 2014); *accord In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts consistently give "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation"). Lead Counsel strongly endorses the Settlement.

### C.    The Proposed Settlement Is Fair, Reasonable, and Adequate in Light of the Costs and Risks of Further Litigation and Similar Factors

In determining whether a class action settlement is "fair, reasonable, and adequate," the Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" and similarly relevant factors. Fed. R. Civ. P.

23(e)(2)(C); *see Grinnell*, 495 F.2d at 455 ("most important factor" is "strength of the case for

plaintiffs on the merits, balanced against the amount offered in settlement.").[6]

As a threshold matter, courts "have long recognized that [securities class action] litigation

is notably difficult and notoriously uncertain." *FLAG Telecom*, 2010 WL 4537550, at *15.

Accordingly, such suits "readily lend themselves to compromise because of the difficulties of

proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica

Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006). This case was no exception.

As detailed in the Graziano Declaration and below, continuing the litigation here through

the resolution of the class certification motion, the completion of fact and expert discovery, trial,

and inevitable appeals would have presented numerous significant risks—and necessarily involved

substantial costs and delays—all without any assurance of obtaining a better (or indeed any)

recovery. ¶¶ 91-116. Moreover, the proposed $138.75 million Settlement represents from 34% to

43% of the maximum damages that could be established at trial, which is well above the norm in

cases like this, and represents a very favorable result given the litigation risks here. ¶¶ 117-19.

### 1. The Risks of Establishing Liability and Damages Support Approval of the Settlement

While Lead Plaintiff believes that its claims are meritorious, it recognizes that this Action

presented several substantial risks to establishing both liability and damages. In considering

whether to enter the Settlement, Lead Plaintiff and Lead Counsel weighed the $138.75 million

Settlement Amount against the strength of Lead Plaintiff's claims, taking into consideration the

---

[6] This factor under Rule 23(e)(2)(C) essentially encompasses at least six of the nine factors of the traditional *Grinnell* analysis. *See Grinnell*, 495 F.2d at 463 ("(1) the complexity, expense and likely duration of the litigation; . . . (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; . . . (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation") (citations omitted).

risks inherent in proving liability and recoverable damages, as well as the expense and likely duration of continued litigation.  This Action presented several substantial risks to establishing both liability and damages, which Lead Plaintiff and Lead Counsel fully recognize, while continuing to believe strongly in the merits of the claims.

### (a)    Risks to Proving Liability

The risks of continued litigation and trial concerned each main element of Lead Plaintiff's claims.  Lead Plaintiff would have been required to prove (i) that Defendants' alleged misstatements and omissions were materially false and misleading when made; (ii) that Defendants knew or recklessly disregarded that the statements and related alleged omissions were false when made (i.e., Defendants acted with "scienter"); (iii) that the revelation of Defendants' alleged fraud caused the alleged loss suffered by Lead Plaintiff and the Settlement Class (i.e., loss causation); and (iv) the amount of class-wide damages.  Defendants would have had arguments in defense of each of these issues.

To start, Lead Plaintiff faced challenges in proving that Defendants made allegedly misleading statements or omissions concerning the development of the Oyu Tolgoi mine in Mongolia and related delays and cost overruns.  ¶¶ 102-05.  Lead Plaintiff expected that Defendants would argue that all of their disclosures were accurate because they were based on the best information available when made.  For example, Defendants would likely argue that none of their statements prior to October 2018 could have been false or misleading because the delays were not definitively established until they completed the reforecast project in October 2018. Defendants would argue that after the October 2018 disclosures, investors had current, accurate information on the state of the Oyu Tolgoi development, and that they were acting in good faith to investigate and quantify any delays and cost impacts.  ¶¶ 103, 107.  Defendants would further argue that their misstatements concerning delays—if any—were not material to investors.  ¶ 104.

Defendants would also have argued that their alleged misstatements were not made with "scienter" as required under the Exchange Act. Defendants would have argued that they did not have any fraudulent intent to mislead investors because they disclosed the delays once they were known in October 2018, and they disclosed additional delays and the cost overruns as they received new information throughout the alleged Class Period. ¶¶ 106-09. In fact, the Court had already ruled twice at the motion to dismiss stage that Lead Plaintiff could not adequate allege scienter as to many of the statements it alleged were fraudulent. *See In re Turquoise Hill Res. Ltd. Sec. Litig.,* 625 F. Supp. 3d 164, 234-241 (S.D.N.Y. 2022); *In re Turquoise Hill Res. Ltd.*, 2024 WL 4711185, at *15-17 (S.D.N.Y. Nov. 7, 2024). In addition, Lead Plaintiff did not have any clear evidence of motive in this case, such as unusual sales of Turquoise Hill Securities by the Individual Defendants, to bolster its allegations of scienter. ¶ 108. In fact, despite the fact that the SEC and other regulators initiated investigations into the alleged misconduct in this case, none of those investigations resulted in an enforcement action, let alone finding of wrongdoing, further highlighting the risks Lead Plaintiff faced in proving liability here. Thus, there was a meaningful risk that the Court or jury could find against Lead Plaintiff on these issues on a complete record at summary judgment or trial.

**(b)    Risks to Proving Loss Causation and Damages**

In addition, Defendants would likely raise challenges to loss causation, arguing that certain of the price declines at issue were caused by the disclosure of information that was already known to the market. ¶¶ 110-12. For example, Defendants argued in opposition to Lead Plaintiff's class certification motion that the alleged disclosure on July 31, 2019 that the Oyu Tolgoi project needed additional financing to complete was already known to the market based on the Company's earlier disclosures. ¶ 112. If Defendants had succeeded on these arguments, the recoverable damages could have been substantially less than the amount provided in the Settlement. *Id.*

In addition, Defendants would have argued that, even if liability was found and their defenses rejected, Lead Plaintiff's expert had overestimated recoverable damages, and that such damages were a fraction of that amount.  ¶ 111.

Moreover, these disputed issues regarding negative causation and damages would have presented a prototypical battle of the experts at trial.  There is no way to predict with any degree of certainty which expert's opinions the jury would have accepted.  Had the jury accepted some or all of Defendants' expert's views, damages would been materially reduced, and potentially eliminated altogether.  The Settlement eliminates those risks and provides a certain recovery for the Settlement Class.  *See Facebook*, 2015 WL 6971424, at *5 ("[D]amages would be subject to a battle of the experts, with the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount Plaintiffs' losses.  Under such circumstances, a settlement is generally favored over continued litigation."); *Veeco*, 2007 WL 4115809, at *9 ("a very lengthy and complex battle of the parties' experts likely would have ensued at trial, with unpredictable results.  These risks as to liability strongly militate in favor of the Settlement.").

### (c)     Conclusion

Further, in order to obtain recovery for the Settlement Class, Lead Plaintiff would have to prevail at several stages—on the pending motion for class certification, at summary judgment, and at trial—and, even if it prevailed on those, on the appeals that were likely to follow.  Thus, there were significant risks attendant to the continued prosecution of the Action, and there was no guarantee that further litigation would have resulted in a higher recovery, or any recovery at all.

Given these significant litigation risks, Lead Plaintiff and Lead Counsel believe that the proposed $138.75 million Settlement is an excellent result for the Settlement Class.  The Settlement provides a substantial, near-term benefit to the Settlement Class as compared to the risk that the claims in the Action would produce a smaller recovery, or no recovery at all, after further

proceedings on Lead Plaintiff's motion for class certification and likely summary judgment motions, trial, and appeals, possibly years in the future.

### 2.    The Settlement Is Also Fair and Reasonable in Light of Realistically Recoverable Damages

Lead Plaintiff submits that the $138.75 million Settlement is a particularly favorable result when considered in relation to the maximum damages that could realistically be established at trial and the risks of the litigation. Assuming that Lead Plaintiff prevailed on class certification and all liability issues, including falsity and scienter, at summary judgment and trial (which was far from certain), Lead Plaintiff's damages expert has estimated that the maximum recoverable damages in this case would range between approximately $322 million to $407 million (depending on the use of FIFO or LIFO matching of shares). Accordingly, the recovery of $138.75 million Settlement represents a recovery of 34% to 43% of investors' maximum damages.

This level of recovery is substantially above the typical recovery range seen in comparable cases. *See, e.g.*, *Pearlstein v. BlackBerry Ltd.*, 2022 WL 4554858, at *6 (S.D.N.Y. Sept. 29, 2022) (approving recovery of 13.75% of the estimated maximum damages as "well within the range of reasonableness and, in fact, considerably above the high end of historical averages" and noting that it "substantially exceed[ed]. . . median recovery of 4.2% of damages in 2021"); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 2021 WL 76328, at *3 (S.D.N.Y. Jan. 7, 2021) (approving settlement that was 10% of the estimated damages, noting that the settlement was "within the range previously approved by judges in this District," referencing recoveries ranging from 3% to 11% of estimated damages); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) ("average settlement amounts in securities fraud class actions where investors sustained losses over the past decade . . . have ranged from 3% to 7% of the class members' estimated losses").

13

### 3.    The Costs and Delays of Continued Litigation
###        Support Approval of the Settlement

Further, the time and costs involved in continuing to litigate this case through the completion of fact discovery, including additional depositions and extensive expert discovery, the completion of class certification motion practice, and summary judgment—let alone through a trial and the inevitable post-trial motions and appeals—would have been **very** substantial.  Indeed, it is widely recognized that "[s]ecurities class actions are generally complex and expensive to prosecute."  *In re Gilat Satellite Networks*, *Ltd*., 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007).  Accordingly, this factor also weighs heavily in favor of approving the Settlement.

### 4.    All Other Rule 23(e)(2)(C) Factors Also Support Approval

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)."  Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv).  These factors either further support approving the Settlement or are neutral, and certainly provide no basis for finding the Settlement inadequate.

First, the procedures for processing Settlement Class Members' claims and distributing the Settlement's proceeds to eligible claimants in cases of this type are well-established.  In sum, the net Settlement proceeds will be distributed to eligible class members who submit required Claim Forms and supporting documentation to the Court-appointed Claims Administrator, JND Legal Administration ("JND")—a highly experienced claims administration firm.  JND will (a) review and process submitted claims under the supervision of Lead Counsel, (b) provide claimants with an opportunity to cure any deficiencies and bring any unresolved claims disputes to the Court, and (c) ultimately send claimants their *pro rata* share of the Net Settlement Fund (following entry of a

14

final "Distribution Order" by the Court).[7]  This type of claims processing is standard in securities class actions (as neither Lead Plaintiff nor Defendants possess individual investors' trading data that would otherwise allow the Parties to create a "claims-free" process to distribute Settlement funds).

Second, the relief provided the Settlement Class under the Settlement is also adequate when the terms of the proposed attorney's fee award is considered.  As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 13% of the Settlement Fund, to be paid when the Settlement is approved and fee is awarded, are fair and reasonable in light of Lead Counsel's work and the results achieved in the face of substantial litigation risk.  Moreover, nothing in the Settlement is contingent on the approval of attorneys' fees, which are subject to separate approval by the Court.  *See* Stipulation ¶ 16.

Lastly, courts should consider the fairness of a proposed settlement in light of any other agreements required to be identified under Rule 23(e)(3).  *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).  As previously disclosed, the only agreement the Parties have entered into—other than the Stipulation (which supersedes the Parties' initial Term Sheet)—was a confidential Supplemental Agreement, which sets forth the conditions under which Rio Tinto may terminate the Settlement if the Settlement Class Members who request exclusion reach a certain threshold.  *See* Stipulation ¶ 36. This type of agreement is standard in securities class actions and has no negative impact on the fairness of the Settlement.  *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020).

---

[7] The Settlement is not a claims-made settlement.  If the Settlement is approved, Defendants will have no right to the return of any portion of Settlement based on the number or amount of claims submitted.  *See* Stipulation ¶ 13.

### D.    The Settlement Treats Class Members Equitably Relative to Each Other

The Settlement also treats Settlement Class Members equitably relative to one another.  As noted at § II below, under the Plan of Allocation all eligible claimants will receive their *pro rata* share of the recovery based on the amount and timing of their transactions in Turquoise Hill Securities.  Lead Plaintiff will receive precisely the same kind of *pro rata* recovery, calculated under the same Plan of Allocation provisions as all other Settlement Class Members.

### E.    The Reaction of the Settlement Class to the Settlement

One important factor set forth in *Grinnell,* but not included in Rule 23(e)(2), is the reaction of the class to the Settlement.  *See, e.g.*, *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 266 (S.D.N.Y. 2012); *FLAG Telecom*, 2010 WL 4537550, at *16; *Veeco*, 2007 WL 4115809, at *7.

Pursuant to the Preliminary Approval Order, JND began mailing copies of the Notice Packet (consisting of the Notice and Claim Form) to potential Settlement Class Members and their nominees on July 11, 2025.  *See* Declaration of Luiggy Segura (Ex. 5), at ¶¶ 3-7.  As of September 9, 2025, JND had sent a total of 30,568 copies of the Notice Packet to potential Settlement Class Members and nominees.  *See id*. ¶ 11.  In addition, the Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire* on July 23, 2025.  *See id*. ¶ 12.  The Notice set out the essential terms of the Settlement and informed potential Settlement Class Members of, among other things, their right to object to any aspect of the Settlement or to opt out of the Settlement Class, as well as the procedure for submitting Claim Forms.

While the September 24, 2025 deadline set by the Court for Settlement Class Members to object or exclude themselves from the Settlement Class has not yet passed, to date no objections have been received (¶ 126); and only one request for exclusion has been received (Ex. 5, at ¶ 15).  As provided in the Preliminary Approval Order, Lead Plaintiff will address any objections and all

requests of exclusion that may be received in its reply papers (which are due on October 8, 2025). To date, however, the class's reaction—like the other applicable Rule 23(e)(2) factors—strongly supports a finding that the Settlement is fair, reasonable, and adequate.

## II.  THE PLAN OF ALLOCATION IS FAIR AND REASONABLE, AND SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate.  *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012); *Bear Stearns*, 909 F. Supp. 2d at 270.  A plan of allocation is fair and reasonable as long as it has a "rational basis."  *Signet Jewelers*, 2020 WL 4196468, at *13; *FLAG Telecom*, 2010 WL 4537550, at *21.  Generally, a plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable.  *See Signet*, 2020 WL 4196468, at *13. In determining whether a plan of allocation is reasonable, "courts give great weight to the opinion of experienced counsel."  *Id*.

Here, the proposed Plan of Allocation (or "Plan") was developed by Lead Counsel in consultation with Lead Plaintiff's expert consultant on damages, and is set forth in full in the Notice mailed to potential Settlement Class Members.  *See* Ex. 5, Ex. A, at Appendix A.  Lead Counsel respectfully submits that the Plan provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms, based on the damages they suffered as result of the conduct alleged in the Action.

In developing the Plan, Lead Plaintiff's damages expert calculated the estimated amount of artificial inflation (or deflation) in Turquoise Hill Securities during the Class Period that was allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions.  ¶ 130.  In calculating this estimated artificial inflation (or deflation), Lead Plaintiff's damages expert considered the price change in Turquoise Hill common stock in

reaction to the public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and omissions. *Id.*

Recognized Loss Amounts will be calculated under the Plan of Allocation for each purchase or acquisition of Turquoise Hill common stock, Relevant Turquoise Hill Swap, or call option (or sale of a put option) in a domestic transaction or on a U.S. exchange during the Class Period that is listed on a Claimant's Claim Form and for which adequate documentation is provided. ¶ 132. Recognized Loss Amounts are based primarily on the difference in the amount of alleged artificial inflation in the respective prices of the Turquoise Hill Securities at the time of purchase or acquisition and at the time of sale or the difference between the actual purchase price and sale price. In addition, the Recognized Loss Amount for Turquoise Hill common stock sold in the 90-day period after the end of the Class Period or held until the end of that period, is further capped as provided under the PSLRA. ¶ 133.

The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases of Turquoise Hill Securities during the Class Period is the Claimant's "Recognized Claim." ¶ 134. The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. *Id.*

Accordingly, Lead Plaintiff and Lead Counsel believe that the Plan provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members. Moreover, as noted above, as of September 9, 2025, more than 30,000 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the Plan of Allocation, had been sent out, *see* Segura Decl. ¶ 11, and no objections to the proposed Plan have been received to date. Graziano Decl. ¶ 136.

### III.    THE SETTLEMENT CLASS SHOULD BE CERTIFIED

In connection with the Settlement, the Parties have stipulated to the certification of the Settlement Class for purposes of the Settlement.  As detailed in Lead Plaintiff's motion for preliminary approval of the Settlement, the Settlement Class satisfies all the requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.  *See* ECF No. 470, at 16-23.  To date, there has been no objection to certification.  ¶ 126.  Accordingly, Lead Plaintiff respectfully requests that the Court certify the Settlement Class under Rules 23(a) and (b)(3).

### IV.    THE NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice to the Settlement Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974).  The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  *Visa*, 396 F.3d at 114.

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards.  The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4, including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) the amount of the Settlement; (iv) a description of the Plan of Allocation; (v) an explanation of the reasons why the Parties are proposing the Settlement; (vi) a statement indicating the attorneys' fees and costs that will be sought; (vii) a description of Settlement Class Members' right to opt-out of the Settlement Class or to object to the Settlement,

the Plan of Allocation, or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Settlement Class Members.

As noted above, in accordance with the Court's Preliminary Approval Order, the Court-approved Claims Administrator (JND), began mailing copies of the Notice Packet to potential Settlement Class Members on July 11, 2025. *See* Ex. 5, at ¶¶ 3-7. As of September 9, 2025, JND has disseminated 30,568 copies of the Notice Packet to potential Settlement Class Members and nominees. *See id.* ¶ 11. In addition, JND caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over the *PR Newswire* on July 23, 2025. *See id.* ¶ 12. Copies of the Notice, Claim Form, and Stipulation were made available on the settlement website maintained by JND beginning on July 11, 2025. *Id.* ¶ 13. This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, transmitted over the newswire, and set forth on internet websites, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Qudian Inc. Sec. Litig.,* 2021 WL 2383550, at *3 (S.D.N.Y. June 8, 2021); *In re Blue Apron Holdings, Inc. Sec. Litig.,* 2021 WL 345790, at *4 (E.D.N.Y. Feb. 1, 2021); *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 182-83 (S.D.N.Y. 2014).

## **CONCLUSION**

For the reasons stated in this memorandum and in the Graziano Declaration, Lead Plaintiff respectfully requests that the Court grant final approval of the proposed Settlement and approve the Plan of Allocation.

Dated: September 10, 2025

Respectfully submitted,

*/s/ Salvatore J. Graziano*

Salvatore J. Graziano
James A. Harrod
Michael D. Blatchley
Alexander M. Noble
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
jim.harrod@blbglaw.com
michaelb@blbglaw.com
alexander.noble@blbglaw.com

*Counsel for Lead Plaintiff the Pentwater
Funds and Lead Counsel for the Settlement
Class*