# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TURQUOISE HILL RESOURCES LTD. SECURITIES LITIGATION | Case No. 1:20-cv-08585-LJL |

**DECLARATION OF SALVATORE J. GRAZIANO IN SUPPORT OF
(I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT
AND PLAN OF ALLOCATION, AND (II) LEAD COUNSEL'S
MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    PROSECUTION OF THE ACTION ................................................................... 6

    A.    Background ................................................................................................ 6

    B.    Appointment of Lead Plaintiff and Lead Counsel, Lead Counsel's Extensive Investigation and Filing of the Operative Complaint, and the Court's Motion to Dismiss Decisions ................................................................ 6

        1.    The Appointment of Lead Plaintiff and Lead Counsel ............................... 6

        2.    The Investigation and Filing of the Amended Complaint ......................... 7

    C.    Defendants' Motions to Dismiss .............................................................. 9

    D.    Discovery Following Court's Decision on the SAC ............................... 12

    E.    Defendants' Motion to Dismiss the TAC .............................................. 15

    F.    Discovery Following the Court's Decision on the TAC ........................ 16

        1.    The Pursuit of Extensive Document and Written Discovery from Defendants and Third Parties .................................................... 16

        2.    Lead Plaintiff's Review of Defendants' and Third Parties' Documents and Other Materials ................................................ 18

        3.    Defendants' Written Discovery Requests to Lead Plaintiff ..................... 22

        4.    Analysis of Document Discovery and Preparation of Deposition Plan ................................................................................................ 23

        5.    Expert Discovery ................................................................................ 26

    G.    Lead Plaintiff's Motion for Class Certification and Modification of the Scheduling Order ................................................................................ 27

    H.    Mediation and Settlement ...................................................................... 28

III.    RISKS OF CONTINUED LITIGATION ......................................................... 31

    A.    General Risks in Prosecuting Securities Class Actions ......................... 32

    B.    Specific Risks Concerning this Action .................................................. 35

        1.    Risks Associated with Proving Falsity and Materiality ........................... 35

2. Risks Associated with Proving Scienter ................................................. 37

3. Risks Associated with Proving Loss Causation and Damages ................ 38

4. Risks After Trial .................................................................................... 39

C. The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial ....................................................................... 40

IV. LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ..................................... 42

V. ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ................................. 44

VI. THE FEE AND EXPENSE APPLICATION .................................................... 48

A. The Fee Application ................................................................................ 48

1. Lead Plaintiff Has Authorized and Supports the Fee Application ........................ 49

2. The Work Performed by Lead Counsel .................................................... 49

3. The Experience and Standing of Lead Counsel .................................................... 52

4. Standing and Caliber of Defendants' Counsel ....................................................... 52

5. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases ............................................. 53

6. The Reaction of the Class to the Fee Application .................................................. 54

B. The Expense Application ........................................................................ 54

VII. CONCLUSION ............................................................................................. 58

## TABLE OF EXHIBITS

**Exhibit 1**    Declaration of Layn R. Phillips in Support of Lead Plaintiff's motion for Final Approval of Settlement

**Exhibit 2**    Declaration of Matthew Halbower, in Support of (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 3**    CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS: 2024 YEAR IN REVIEW (2025)

**Exhibit 4**    CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2024 REVIEW AND ANALYSIS (2025)

**Exhibit 5**    Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date

**Exhibit 6**    Summary of Lead Counsel's Hours and Lodestar

**Exhibit 7**    BLB&G's Firm Resume

**Exhibit 8**    Summary of Lead Counsel's Expenses by Category

**Exhibit 9**    Compendium of Unpublished Opinions and Authority Cited in Fee Memorandum

I, SALVATORE J. GRAZIANO, declare as follows:

1.    I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel").  BLB&G is counsel for Lead Plaintiff PWCM Master Fund Ltd., Pentwater Thanksgiving Fund LP, Pentwater Merger Arbitrage Master Fund Ltd., Oceana Master Fund Ltd., LMA SPC for and on behalf of the MAP 98 Segregated Portfolio, Pentwater Equity Opportunities Master Fund Ltd., and Crown Managed Accounts SPC acting for and on behalf of Crown/PW Segregated Portfolio (collectively, "Pentwater Funds," "Pentwater" or "Lead Plaintiff") and Lead Counsel for the Settlement Class in the above-captioned Action (the "Action").  I submit this declaration in support of Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Motion"), and Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Motion").  I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of this action and could and would testify competently thereto.[1]

## I.    INTRODUCTION

2.    The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $138,750,000 for the benefit of the Settlement Class.  The Settlement Amount has been paid into an escrow account and is earning interest.  As detailed below, the Settlement provides a significant benefit to the Settlement Class by conferring a substantial, certain, and immediate recovery while avoiding the risks of continued litigation,

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated June 17, 2025 (ECF No. 469-1) (the "Stipulation"), which was entered into by and among (i) Lead Plaintiff, on behalf of itself and the Settlement Class, and (ii) Defendants Rio Tinto plc and Rio Tinto Limited (together, "Rio Tinto"), and Jean-Sébastien Jacques and Arnaud Soirat (together, the "Individual Defendants" and, with "Rio Tinto," "Defendants").

including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation, appeals, and delay.

3.    The proposed Settlement is the result of extensive efforts by Lead Plaintiff and Lead Counsel, which included, among other things:

(i)    conducting an extensive investigation into the alleged fraud, including interviewing over 70 former employees of Turquoise Hill or Rio Tinto, working with two key whistleblowers to investigate the alleged misconduct, and thoroughly reviewing all publicly available information about Turquoise Hill and Rio Tinto, including filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call transcripts, and news articles;

(ii)   drafting three detailed amended complaints based on Lead Counsel's extensive factual investigation and documents obtained in discovery;

(iii)  opposing two rounds of Defendants' motion to dismiss the Complaint, which included extensive briefing;

(iv)   negotiating a case schedule, joint discovery plan, protective order, and ESI protocol, and preparing and responding to extensive discovery requests, including requests for the production of documents, interrogatories, and serving document subpoenas on four non-parties;

(v)    reviewing and analyzing over 1.7 million pages of documents obtained from Defendants and third parties, preparing numerous memoranda, chronologies, and other work product concerning the relevant evidence to support the claims alleged;

(vi)   developing a deposition plan, taking the depositions in the United Kingdom of two whistleblowers identified in the Complaint, and preparing for depositions of numerous additional fact witnesses;

(vii)  litigating numerous motions to compel discovery, including concerning the scope of Defendants' document productions, the production of text and other messaging documents, Defendants' assertion of privilege, and other discovery; filing and obtaining letters of request and pursuing discovery in foreign jurisdictions through the Hague Convention;

(viii) drafting and filing Lead Plaintiff's motion for class certification, including consulting with financial economics experts who prepared a report concerning the efficient market for Turquoise Hill common stock,

defending the deposition of three representatives of Lead Plaintiff and Lead Plaintiff's two experts and deposing Defendants' expert;

(ix)    working extensively with experts in the areas of the mining industry, financial economics (including loss causation, damages, and market efficiency), and the domesticity of trading in Turquoise Hill securities, as well as litigating a motion to disqualify one of Lead Plaintiff's experts;

(x)    participating in two mediation sessions with Judge Phillips, an experienced mediator, which included the exchange of detailed mediation statements, and engaging in further vigorous settlement negotiations; and

(xi)    drafting and negotiating a Term Sheet, the Stipulation setting out the terms of the Settlement, and related documentation.

4.    As a result of these efforts, Lead Plaintiff and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they achieved the proposed Settlement. Indeed, the $138.75 million settlement represents between 34% to 43% of investors' maximum potentially recoverable damages under Lead Plaintiff's expert's analysis, notwithstanding that Defendants have vigorously denied that they made any false or misleading statements and omissions. In light of the substantial recovery and the significant continuing risks of litigation, Lead Plaintiff and Lead Counsel believe that the proposed $138,750,000 Settlement here is an excellent result for the Settlement Class.

5.    The Settlement was achieved only after arm's-length negotiations between the Parties, including two mediation sessions with former U.S. District Judge, Layn R. Phillips, an experienced mediator. As described further below, the mediation process involved significant disputed issues and hard-fought, arm's-length negotiations. In advance of each mediation session, Lead Plaintiff submitted a detailed mediation statement to Judge Phillips. No agreement was reached at either session. In fact, the Parties only reached an agreement in principle to settle the Action for $138.75 million following vigorous further negotiations after the conclusion of the second mediation session.

6.     Judge Phillips has submitted a declaration in support of the Settlement, which states that "the negotiations between the Parties were vigorous and conducted at arm's-length and in good faith," and "the Settlement represents a recovery and outcome that is reasonable and fair for the Settlement Class and all Parties involved." Declaration of Layn R. Phillips in Support of Lead Plaintiff's motion for Final Approval of Settlement ("Phillips Decl."), attached hereto as Exhibit 1, at ¶¶ 12, 13.

7.     In addition, Lead Plaintiff is a sophisticated institutional investor that directed the prosecution of this Action and closely supervised the work of Lead Counsel, and Pentwater's representatives were actively involved in overseeing the litigation and settlement negotiations. *See* Declaration of Matthew Halbower ("Halbower Decl."), attached hereto as Exhibit 2, at ¶¶ 2-6. Lead Plaintiff fully endorses the approval of the Settlement. *Id.* ¶ 7. Pentwater's close attention to and oversight of this action, as well as its approval of the Settlement, support the reasonableness of the Settlement.  In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to sophisticated investors and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case.  H.R. Conf. Rep. No. 104-369, at *34 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 733.

8.     Lead Plaintiff and Lead Counsel believe that the Settlement is in the best interests of the Settlement Class.  Due to their substantial efforts, Lead Plaintiff and Lead Counsel are well-informed of the strengths and weaknesses of the claims and defenses in the Action, and they believe that the Settlement represents an excellent outcome for the Settlement Class.

9.      As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Lead Plaintiff's damages expert, provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court.  The proposed Plan of Allocation provides for distribution to eligible claimants on a *pro rata* basis, fairly based on losses attributable to the wrongdoing alleged in the Complaint.

10.      Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risk.  Lead Counsel prosecuted this case on a fully contingent basis and advanced all litigation-related expenses, and thus bore substantial risk of an unfavorable result. For its efforts in achieving the Settlement, Lead Counsel is applying for an award of attorneys' fees in the amount of 13% of the Settlement Fund, net of Litigation Expenses.  The requested fee has been endorsed by Lead Plaintiff and is reasonable and well within the range of fees that courts in this Circuit and elsewhere have awarded in securities class actions and other complex class actions with comparable recoveries on a percentage basis.  Moreover, the requested fee is ***less*** than Lead Counsel's lodestar (*i.e.*, the value of Lead Counsel's work based on the amount of hours worked and Lead Counsel's hourly rates as described herein).  Specifically, the 13% fee sought here amounts to approximately 60% of Lead Counsel's lodestar—or, in other words, a "negative" 0.6 multiplier of the lodestar, which is below the range of multipliers typically awarded in class actions like this one with significant contingency risks.

11.      Lead Counsel's Fee and Expense Application also seeks payment of Litigation Expenses incurred by Lead Counsel in connection with the institution, prosecution, and settlement of the Action.

12.     For all of the reasons discussed in this Declaration and in the accompanying motions and declarations, including the quality of the result obtained and the numerous significant litigation risks discussed fully below, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are "fair, reasonable, and adequate" in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e).  For similar reasons, and for the additional reasons discussed below, we respectfully submit that Lead Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Background

13.     Lead Plaintiff alleges that, from July 17, 2018 through July 31, 2019, inclusive (the "Class Period"), Defendants made materially false and misleading statements concerning the development of the Oyu Tolgoi mine in Mongolia and related delays and cost overruns.

14.     Lead Plaintiff alleges that the price of Turquoise Hill common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements, and that the price of the stock declined when the truth was revealed through a series of partial corrective disclosures, including on February 27, 2019, July 15, 2019, and July 31, 2019.  *See* Complaint (ECF No. 329), at ¶¶ 255-72.  As a result of these disclosures, Turquoise Hill investors incurred losses as Turquoise Hill shares lost well over 70% of their value.  *Id.* ¶ 4.

### B.     Appointment of Lead Plaintiff and Lead Counsel, Lead Counsel's Extensive Investigation and Filing of the Operative Complaint, and the Court's Motion to Dismiss Decisions

#### 1.     The Appointment of Lead Plaintiff and Lead Counsel

15.     In October 2020, a class action alleging violations of the federal securities laws against Rio Tinto and certain of its officers was filed in the United States District Court for the Southern District of New York (the "Court").  On December 3, 2020, a second action was filed

asserting substantially the same claims under the caption *Lion v. Turquoise Hill Resources Ltd.*, No. 20-cv-10198 (S.D.N.Y. Dec. 3, 2020).  On December 10, 2020, the Court consolidated the cases.  ECF No. 45.

16.    On December 14, 2020, the Pentwater Funds moved for appointment as Lead Plaintiff and approval of its selection of counsel.  ECF Nos. 66-69.

17.    Six other persons or entities filed competing motions seeking to be appointed as lead plaintiff.  ECF Nos. 46, 49, 50, 55, 57, 62, 66.

18.    On January 15, 2021, following briefing and oral argument, the Court appointed the Pentwater Funds as Lead Plaintiff and appointed BLB&G as Lead Counsel.  ECF No. 103.

### 2.    The Investigation and Filing of the Amended Complaint

19.    Lead Counsel undertook an extensive investigation into the alleged fraud and potential claims that could be asserted by Lead Plaintiff in the Action, which began prior to the Court's appointment of Lead Plaintiff.  The investigation included a careful review and analysis of, among other things: (i) documents filed publicly by Turquoise Hill and Rio Tinto with the SEC; (ii) Turquoise Hill and Rio Tinto press releases and other public statements; (iii) transcripts of Turquoise Hill and Rio Tinto investor conference calls; (iv) research reports by financial analysts and news reports concerning Turquoise Hill and Rio Tinto; (v) trading data for Turquoise Hill and related documents; (vi) other publicly available sources; (vii) consultations with relevant experts and consultants; and (viii) Lead Plaintiff's and Lead Counsel's communications with and review of documents from former employees of Turquoise Hill, Rio Tinto, and contractors who worked at the Oyu Tolgoi mine.

20.    In connection with its investigation, Pentwater and Lead Counsel interviewed and were guided in their investigation by two whistleblowers—Richard Bowley and Maurice Duffy—who provided key details concerning the Defendants' alleged wrongdoing.  In addition, Lead

Counsel and its in-house investigators located former employees of Turquoise Hill, Rio Tinto, and contractors who worked at the Oyu Tolgoi mine, who might have relevant information pertaining to the claims asserted in the Action. In total, this included contacting over 447 such individuals who were believed to have potentially relevant information. Lead Counsel and/or its in-house investigators spoke to over 70 of these individuals. Lead Counsel ultimately included detailed information received from 12 of these individuals in the Amended Complaint concerning the delays and cost overruns at Oyu Tolgoi.

21.     In connection with the preparation of the Amended Complaint, Lead Counsel consulted with mining experts from Ammonite Resources, including G. Warfield "Skip" Hobbs and Bruce Genereaux, and later worked with John C. Barber and Malcom Brown, two experts with substantial experience in block cave mining construction and other technical aspects relevant to the underground development of the Oyu Tolgoi mine. Lead Counsel consulted with Messrs. Hobbs, Genereaux, Barber, and Brown about, among other things, technical aspects of the construction and development of Oyu Tolgoi that caused the project to become delayed and over budget.

22.     Lead Counsel also consulted with Matthew Cain, Ph.D, who specializes in the application of economics, finance, statistics and valuation principles to questions that arise in a variety of context, including securities class actions. Lead Counsel consulted with Dr. Cain about, among other things, the impact of Defendants' alleged misstatements on the market price of Turquoise Hill securities and the damages suffered by Turquoise Hill shareholders.

23.     Lead Counsel also consulted with Joshua Mitts, Ph.D, who specializes in financial economics, financial market structure and securities trading. Lead Counsel consulted with Dr. Mitts about, among other things, the evidence and methodology to determine whether class

members' transactions were domestic under the U.S. securities laws, what evidence supported determinations of domesticity, and methodologies for determining domesticity based on evidence common to the class.

24.     On March 17, 2021, Lead Plaintiff filed and served its Amended Consolidated Complaint for Violations of the Federal Securities Laws (the "Amended Complaint") asserting claims against defendants Luke Colton, Jean-Sebastien Jacques, Brendan Lane, Ulf Quellmann, Rio Tinto International Holdings Limited, Rio Tinto Limited, Rio Tinto Plc, Arnaud Soirat, and Turquoise Hill under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against defendants Rio Tinto plc, Rio Tinto Limited, Rio Tinto International Holdings Limited, Jacques, Soirat, Quellmann, Colton, and Lane under Section 20(a) of the Exchange Act.  ECF No. 110.

### C.     Defendants' Motions to Dismiss

25.     On July 19, 2021, Defendants filed motions to dismiss the Amended Complaint. ECF Nos. 111 (Defendants Turquoise Hill, Luke Colton, Brendan Lane, and Ulf Quellmann), 114 (Defendants Rio Tinto plc, Rio Tinto Limited, Rio Tinto International Holdings Limited, Jean-Sébastien Jacques and Arnaud Soirat).  On July 17, 2021, Lead Plaintiff filed its opposition to Defendants' motions to dismiss.  ECF No. 122.  On August 9, 2021, Lead Plaintiff sought permission to file a second amended complaint (ECF Nos. 124-25), which the Court granted on August 11, 2021 (ECF No. 126).

26.     On September 16, 2021, Lead Plaintiff filed the Second Amended Consolidated Complaint for Violations of the Federal Securities Laws (the "SAC").  ECF No. 127.  The SAC incorporated the additional findings of a comprehensive investigation, detailed in a 157-page report prepared by the Independent Consulting Group for the Oyu Tolgoi LLC Board's Special Committee, into the cost overruns and delays at the Oyu Tolgoi mine that corroborated Lead

Plaintiff's allegations that Defendants misrepresented the progress of the underground expansion at the mine.

27.    On October 19, 2021, Defendants filed motions to dismiss the SAC.  ECF Nos. 129, 132. In their motions, Defendants attacked the SAC as inadequate to plead securities fraud and argued they could not be held liable for the claims alleged.  In particular, Defendants argued that:

- Lead Plaintiff failed to allege an actionable misstatement or omission, including because Defendants' disclosures were accurate because they were based on the best information available when made;

- many of the alleged misstatements were non-actionable puffery or corporate optimism, projections of future performance, and statements of opinion that cannot give rise to securities claims;

- Defendants had no affirmative duty to disclose additional information about the delays or overruns prior to October 2018 because the delays were not definitively established until they completed the reforecast project in October 2018;

- Defendants had no fraudulent intent to mislead investors because they disclosed the delays once they were known in October 2018 and disclosed additional delays and the cost overruns as they received new information throughout the alleged Class Period;

- the former employees that Lead Plaintiff relied on to establish falsity and scienter were only low-level, non-management employees who would not have known about Defendants' knowledge or states of mind, and in any event their allegations were insufficient because they, among other things, failed to show that any of the misstatements were knowingly or recklessly false when made;

- Defendants Turquoise Hill and its officers Luke Colton, Brendan Lane, and Ulf Quellmann also argued that they—as opposed to Rio Tinto and its officers—did not receive the information about delays and cost overruns allegedly contrary to their public statements and that none of their statements were actionably false and misleading; and

- the Section 20(a) claims should be dismissed for failure to plead an underlying violation.

28.    On November 16, 2021, Lead Plaintiff filed its opposition to Defendants' motions to dismiss the SAC.  ECF No. 135.  In summary, Lead Plaintiff's opposition argued that:

- the SAC sufficiently alleged that Defendants made materially false and misleading statements, including through contemporaneous evidence of wrongdoing, including internal company emails and witness accounts;

- Defendants' statements were not non-actionable puffery, protected opinions, or protected by the safe harbor, and Defendants' projections of future performance, were actionable;

- the SAC adequately alleged Defendants' scienter, including through witness accounts that Defendants were repeatedly warned by their own consultants and employees that the underground expansion was behind schedule and over-budget by 2017;

- the SAC adequately pleaded that Turquoise Hill and its officers had access to information contrary to their challenged statements, plus motive and opportunity to commit fraud supporting scienter; and

- the SAC pleaded Section 20(a) control person claims as to all of the Individual Defendants.

29.    On December 17, 2021, Defendants filed their replies in further support of their motions to dismiss the SAC.  ECF No. 137-38.  Defendants' reply reiterated the arguments made in their motion to dismiss and responded to the arguments in Lead Plaintiff's opposition brief.

30.    On August 25, 2022, the Court held oral argument on Defendants' motions to dismiss the SAC.  ECF No. 150.

31.    On September 2, 2022, the Court entered its Order granting the motions to dismiss as to Defendants Quellman, Colton, Lane, Turquoise Hill, and Rio Tinto International Holdings Limited, and denied the motions to dismiss, in part, as to Defendants Rio Tinto plc, Rio Tinto Limited, Jacques, and Soirat.  ECF No. 149.  In particular, the Court:

- dismissed all claims against Defendants Turquoise Hill, Colton, Lane, Quellmann, and Rio Tinto International Holdings Limited; and dismissed the Section 10(b) claims against Jacques;

- sustained Section 10(b) claims against Defendants Rio Tinto plc, Rio Tinto Limited, and Soirat based on misstatements regarding Rio Tinto's risk disclosures, the October 2018 re-forecast, statements attributing delays to ground conditions, and a July 2018 statement regarding a Shaft Five ventilation system; and

11

- sustained the Section 20(a) control-person claims against Defendants Soirat and Jacques.

32.     On October 18, 2022, Defendants Rio Tinto Limited, Rio Tinto plc, Jacques, and Soirat filed their answer to the SAC.  ECF No. 179.  Defendants denied all allegations against them, as well as any liability to Lead Plaintiff and the class, and asserted 37 affirmative defenses, including (among other things) that (i) Defendants did not misrepresent any alleged fact or omit any alleged fact that Defendants were under a duty to disclose; (ii) even if such misrepresentations and were made, they were not material to the investment decisions of a reasonable investor; and (iii) there was no loss causation or damages.

### D.     Discovery Following Court's Decision on the SAC

33.     Following the Court's decision on the motion to dismiss the SAC, the Court scheduled an initial pre-trial conference and directed the parties to submit a proposed Case Management Plan and Scheduling Order.  ECF No. 152.

34.     The Parties immediately began to negotiate several matters set forth in their proposed Case Management Plan and Scheduling Order and accompanying Addendum, which were filed on January 13, 2023.  ECF Nos. 200, 201.  Following an initial case management conference on January 20, 2023, the Court endorsed the Parties' proposed discovery plan in the Case Management Plan and Scheduling Order and Addendum.  ECF Nos. 202, 203.  Pursuant to the so-ordered discovery plan, the Parties negotiated for each side to serve up to 35 interrogatories and take up to 30 depositions.  ECF No. 203.

35.     The Parties also negotiated a protective order governing the treatment of documents and other information produced in discovery and protocols for the production of electronically stored information ("ESI").  The Parties submitted the proposed protective order to the Court on February 24, 2023 (ECF No. 217), which the Court entered the same day (ECF Nos. 218).  The

Parties submitted the proposed ESI order to the Court on March 24, 2023 (ECF No. 238), which the Court entered on March 27, 2023 (ECF Nos. 239).

36.     Before they had even submitted their proposed discovery schedule to the Court, the Parties conducted substantial document discovery.  On November 11, 2022, the Parties exchanged Initial Disclosures pursuant to Rules 26 and 23 of the Federal Rules of Civil Procedure.  Due in part to Lead Plaintiff's extensive investigation into the claims alleged in the Complaint, at the very outset of discovery, Lead Plaintiff was able to identify 78 current and former Turquoise Hill and/or Rio Tinto employees and agents who Lead Plaintiff believed were likely to have discoverable information concerning the allegations in the Complaint.  By contrast, Defendants did not identify any witnesses beyond the named Defendants, thus requiring Lead Plaintiff to conduct extensive additional discovery to identify relevant individuals and documents.

37.     On November 18, 2022, Lead Plaintiff served its first requests for the production of documents on Defendants. Lead Plaintiff requested that Defendants produce documents concerning, among other things, the delays and cost overruns at Oyu Tolgoi.  On the same day, Lead Plaintiff also served its first set of interrogatories on Defendants.  Lead Plaintiff's initial interrogatories focused on identifying additional custodians and all custodial locations of documents and communications responsive to Lead Plaintiff's first set of requests for production of documents, including email, messaging, chat, shared drives, and other electronic storage locations.  Likewise, Lead Plaintiff's interrogatories requested all "noncustodial" locations of electronic or hard-copy materials that may contain responsive documents.

38.     On January 13, 2023, Defendants served their responses and objections to Lead Plaintiff's first requests for production.  Defendants also served responses and objections to Lead Plaintiff's first set of interrogatories, refusing to provide answers to many of them.

39.     In the months that followed, Lead Counsel engaged in numerous meet-and-confers and extensive negotiations with Defendants' counsel over the scope and adequacy of Defendants' discovery responses, including relating to search terms to be used, custodians whose documents should be searched, the types of documents that should be searched, the applicable timeframe, and other parameters.

40.     In connection with these and other discovery negotiations, the Parties had several significant discovery disputes, including regarding the identity and number of Defendants' document custodians.  Defendants refused to produce documents from the custodial files of several current and former Rio Tinto and Turquoise Hill employees.  Defendants also sought to limit their production of documents and materials to a shorter time period than Lead Plaintiff requested in its discovery requests.  The Parties' disputes concerning the scope of document discovery were discussed in numerous meet-and-confers and letters.

41.     While the Parties were able to reach agreement on certain issues, Lead Plaintiff was required to bring several others to the Court for resolution.  For example, on July 25, 2023, Lead Plaintiff moved to compel Defendants to produce documents for the full relevant time period in Lead Plaintiff's discovery request and add additional document custodians.  ECF No. 275.  On July 28, 2023, the Court granted in part Lead Plaintiff's motion to compel, requiring Defendants to produce documents from several important document custodians and spanning a longer time period than Defendants had previously agreed to produce.  ECF No. 279.

42.     As a result of Lead Plaintiff's discovery efforts, Defendants produced over 355,000 documents in response to Lead Plaintiff's discovery requests as of December 2023.

43.     On December 15, 2023, Lead Plaintiff moved for leave to file a third amended complaint based on the discovery Defendants had produced, and attached that proposed complaint

14

to its motion.  ECF No. 305.  On January 8, 2024, the Court granted Lead Plaintiff's motion for

leave to file a third amended complaint.  ECF No. 314.  On January 22, 2024, Defendants moved

the Court to reconsider this order.  ECF No. 320.  Lead Plaintiff filed its opposition to that

reconsideration motion on February 5, 2024 (ECF No. 323) and Defendants filed their reply on

February 12, 2024 (ECF No. 324).  On February 21, 2024, the Court granted in part and denied in

part Defendants' motion for reconsideration and directed Lead Plaintiff to re-file the third amended

complaint in accordance with its rulings (ECF No. 325), and filed an amended version of that order

on February 26, 2024 (ECF No. 328).

44.    On February 28, 2024, Lead Plaintiff filed the operative Third Amended

Consolidated Complaint ("TAC" or "Complaint") in accordance with the Court's February 26,

2024 order.  ECF No. 329.  The TAC included additional allegations that, among other things,

sought to revive certain claims that the Court had dismissed in its order on Defendants' earlier

motions to dismiss the SAC.

### E.    Defendants' Motion to Dismiss the TAC

45.    On March 22, 2024, Defendants filed their motion to dismiss the TAC.  ECF No.

332.  In particular, Defendants argued:

- the proposed TAC failed to allege that Defendant Jacques intended to defraud
  investors as required to revive Section 10(b) claims against Jacques; and

- the new allegations regarding misstatements of the timing of the first drawbell blast
  were not sufficient to state a Section 10(b) claim.

46.    On April 22, 2024, Lead Plaintiff filed its opposition to that motion.  ECF No. 336.

In particular, Lead Plaintiff's opposition argued:

- the TAC's additional allegations amply pled scienter for Defendant Jacques,
  including through facts showing Jacques was continually informed of the project's
  status by internal Rio Tinto experts well before the Class Period stated in July 2018;
  and

- the TAC included allegations based on documents produced in discovery showing that Defendants' statements regarding the timing of the first drawbell blast were false when made because they were based on a drawbell resequencing strategy that Rio Tinto's Geotechnical Review Board had rejected shortly before the statements were made.

47.     On May 13, 2024, Defendants filed their reply in further support of the motion. ECF No. 341.  Defendants' reply reiterated the arguments made in their motion to dismiss and responded to the arguments in Lead Plaintiff's opposition brief.

48.     On November 7, 2024, the Court entered an order granting in part and denying in part Defendants' motion to dismiss the TAC.  ECF No. 356.  In particular, the Court:

- sustained Section 10(b) claims against Defendant Jacques for a portion of the Class Period; and

- dismissed the new claims to the extent premised on Defendants' misstatements regarding the timing of the first drawbell blast.

49.     Defendants filed their answer to the TAC on December 20, 2024.  ECF No. 411. Defendants again strongly denied all allegations against them, as well as any liability to Lead Plaintiff and the class, and asserted 37 affirmative defenses, including (among other things) that (i) Defendants did not misrepresent any alleged fact or omit any alleged fact that Defendants were under a duty to disclose; (ii) even if such misrepresentations and were made, they were not material to the investment decisions of a reasonable investor; and (iii) there was no loss causation or damages.

**F.     Discovery Following the Court's Decision on the TAC**

**1.     The Pursuit of Extensive Document and Written Discovery from Defendants and Third Parties**

50.     Following the Court's order on the TAC, the Court entered a discovery schedule on November 26, 2024.  ECF No. 374.  Lead Counsel engaged in numerous meet-and-confers and extensive negotiations with Defendants' counsel over the scope of document discovery, including

relating to search terms to be used, the inclusion of text and similar messaging documents in custodial searches, and other parameters.

51.     In connection with these and other discovery negotiations, the Parties had several significant discovery disputes.  For example, Defendants refused to run Lead Plaintiff's requested search terms and to search and produce certain custodians' text and similar messages.  The Parties' disputes on these and other discovery issues were discussed in multiple meet-and-confers and letters following the Court's entry of the November 26, 2024 scheduling order.

52.     On December 2, 2024, Lead Plaintiff filed motions to compel Defendants to run Lead Plaintiff's requested search terms to identify responsive documents (ECF No. 378) and search and produce text and similar messages from additional Defendant document custodians (ECF No. 375).  In response, Defendants agreed to run Lead Plaintiff's search terms, and agreed to search and produce messaging documents from Defendants Jacques and Soirat, while opposing Lead Plaintiff's motion to compel other messaging document custodians.  On January 3, 2025, the Court granted Lead Plaintiff's motion to compel concerning the messaging documents, permitting Lead Plaintiff to select multiple additional document custodians whose messaging documents Defendants were required to search and produce.  ECF No. 421.

53.     Ultimately, after extensive negotiations, numerous meet-and-confers, and, in certain instances, bringing discovery disputes to the Court, Lead Plaintiff succeeded in obtaining a large volume of documentary evidence from Defendants, including important employees of Rio Tinto and Turquoise Hill.  These were significant victories for Lead Plaintiff and a direct result of Lead Plaintiff's diligence in discovery.

54.     However, Lead Plaintiff uncovered that certain text and other messages—including those of Defendants Soirat and Jacques—may have not been preserved.  Lead Plaintiff conducted

17

extensive investigation to uncover this failure to preserve these documents, including through the review of other evidence of Defendants' communications and numerous follow-up requests and meet-and-confer discussions with Defendants.  Lead Plaintiff also served Defendants with a notice to conduct a deposition of a corporate representative to ascertain additional information concerning Defendants' failure to preserve evidence, which Defendants refused.  On April 22, 2025, Lead Plaintiff moved to compel this deposition with the Court, and that motion was pending at the time the Parties reached a settlement.  ECF No. 447.

55.    The Parties also had several discovery disputes related to Defendants' withholding of documents as privileged.  Lead Plaintiff challenged Defendants' privilege logs and assertions of privilege over tens of thousands of documents through numerous meet-and-confer discussions and letters.  On April 23, 2025, Lead Plaintiff moved to compel Defendants to produce many of the documents they withheld on the ground that these materials were not privileged.  That motion also remained pending when the Parties reached a settlement.  ECF No. 450.

56.    In total, Defendants produced a total of 434,112 documents consisting of more than more than 1.7 million pages of documents to Lead Plaintiff.  As Lead Counsel received documents, it reviewed and analyzed those documents through regular team meetings, running targeted searches aimed at locating the most relevant documents, analyzing the document trail on several key issues, and creating timelines of events and memoranda concerning key themes germane to the case. The magnitude and complexity of the documents was substantial, and included, among other things, emails, text messages, presentations, internal financial analyses, and board materials.

### 2.    Lead Plaintiff's Review of Defendants' and Third Parties' Documents and Other Materials

57.    As part of its discovery efforts, Lead Counsel assembled a team of staff attorneys, including many lawyers who have worked with Lead Counsel for years and have substantial

experience on other significant class actions. Their biographies, along with those of all lawyers who worked on this case, are attached hereto in Exhibit 7. As explained below, this team was integral in helping Lead Counsel review and analyze the documentary record, assist expert witnesses, and compile the strongest evidentiary support for Lead Plaintiff's claims.

58.      Throughout this process, Lead Counsel ensured that the review and analysis of documents was conducted efficiently. Lead Counsel eschewed a "linear" review, whereby Lead Plaintiff's review team would attempt to review each and every document Defendants and third parties produced. Instead, Lead Plaintiff constructed a highly focused process by creating searches to identify documents likely to be related to key themes that were relevant to specific claims at issue in the case. Lead Plaintiff developed this process by closely reviewing notes from its investigation and numerous other materials, such as information provided by Defendants in their interrogatory responses and during the course of meet-and-confers and information provided by Lead Plaintiff's experts. Lead Plaintiff further continuously updated the search protocols as it discovered more information throughout the course of discovery. Thus, Lead Plaintiff took significant steps to ensure that its review of materials produced in this litigation was highly focused and efficient and would not waste time or other resources.

59.      As part of this process, Lead Counsel reviewed, analyzed, and categorized the documents in the case's electronic database. Before beginning, Lead Counsel developed a review protocol, issue "tags," and guidelines for identifying "hot" documents, as well as a written manual with guidelines for the review and "coding" of documents. Using these tools, Lead Counsel tasked its attorneys with reviewing documents, with the documents most likely to be "hot" put into prioritized batches for review. Lead Counsel's review and analysis of those documents included substantive analytical determinations as to the importance and relevance of each document—

including whether each document was "hot," "highly relevant," "relevant," or "irrelevant." For important case documents, attorneys documented their substantive analysis of the documents' relevance and import by making notations on the document review system, explaining what portions of the documents were important, how they related to the issues in the case, and why the attorney believed that information to be significant. Attorneys also "tagged" the specific issues that were involved in each document, such as cost-overruns, delays, and documents specific to key individual Rio Tinto employees whom Lead Plaintiff sought to depose in discovery.

60. Throughout its review, Lead Counsel also analyzed the adequacy and scope of the document productions by Defendants and third parties. For example, attorneys reviewed privilege redactions and entries in Defendants' privilege logs to assess whether Defendants redacted or withheld potentially non-privileged information. Lead Counsel also reviewed the productions to determine whether they substantively tracked what had been agreed to be produced in response to document requests. Where Lead Counsel identified deficiencies in a document production, Lead Counsel challenged Defendants or the producing party to set forth the basis for privilege or otherwise address and correct the deficiency.

61. In addition to regular communications that occurred throughout the review process, attorneys who primarily focused on the document review participated in at least weekly meetings with the full litigation team. In advance of these meetings, "hot" documents and documents that raised questions for discussion that had recently been reviewed and analyzed were compiled and circulated to the broader team. At the meetings, Lead Counsel discussed those documents, including the reasons they were identified as "hot," attorneys asked questions and discussed similar documents that had been reviewed, and the team generated ideas for research projects and work product following up on open issues. These efforts ensured that the entire litigation team learned

of and understood the documentary evidence being developed, provided an opportunity for Lead Counsel to further refine its legal and factual theories, focused the document-review team on developing other supporting evidence, and enabled Lead Counsel to ensure that documents were reviewed consistently.  Lead Counsel also often conducted follow-up research and drafted analyses concerning topics of interest that arose at these meetings.  In total, Lead Counsel's team research concerned dozens of discrete issues, including in-depth analyses concerning, among other things, the source of the delays and cost-overruns at Oyu Tolgoi, the timing of Rio Tinto and Turquoise Hill executives' becoming aware of these issues, and their internal discussions concerning the disclosure of these issues.

62.    Further, Lead Counsel prepared chronologies of events, and maintained repositories of key documents organized by issue, which it continually updated and refined as the team's knowledge of issues expanded.  This step enabled attorneys to quickly and efficiently access critical documents necessary to prepare for depositions.

63.    At the outset of Lead Counsel's document review efforts, Lead Counsel determined that it would be most efficient to utilize in-house litigation support resources at BLB&G, which provided a far more cost-effective document review platform than those provided by third-party vendors, as well as an algorithm-based "technology-assisted review" ("TAR") (also known as "predictive coding").  The reviewing team initially used keywords, phrases, and name searches to aid in reviewing the documents that were most likely to be relevant.  As additional productions were received, the coding of these initial documents helped the predictive modeling program to prioritize the order of the documents to be reviewed.  The TAR software enabled Lead Counsel to streamline the review by "learning" the coding of documents as they were reviewed and applying that information to subsequently prioritize further review.  While Lead Counsel could not rely on

this algorithm to identify all of the necessary documents to prosecute this Action, it used the algorithm to further streamline its review and to prioritize the review of documents most likely to be relevant to the claims at issue in the case.

### 3. Defendants' Written Discovery Requests to Lead Plaintiff

64.     Defendants served their first set of document requests to Lead Plaintiff, comprising 28 document requests, on November 18, 2022.  Lead Plaintiff responded and objected to those requests on January 13, 2023.  In connection with Defendants' document requests, Lead Plaintiff engaged in extensive meet-and-confers and exchanged correspondence with Defendants to discuss the scope of Lead Plaintiff's responsive document production.

65.     Despite significant disagreements on the scope of Lead Plaintiff's responsive document production, Lead Plaintiff immediately began gathering potentially relevant and responsive materials in order to meet discovery deadlines, including for the substantial completion of document production.  While negotiating the scope of Lead Plaintiff's document production with Defendants, Lead Counsel worked with Pentwater to gather these potentially relevant and responsive materials and conducted a robust collection.  Lead Counsel then reviewed those documents carefully to ensure the production of responsive, non-privileged materials.  After this review, Lead Counsel subsequently produced the relevant, responsive, nonprivileged documents in Lead Plaintiff's possession.

66.     Lead Plaintiff made 12 productions of documents to Defendants from May 12, 2023 through December 20, 2024.  In total, Lead Plaintiff produced over 371,000 pages of documents to Defendants.

67.     Defendants served their first set of interrogatories to Lead Plaintiff on November 18, 2022.  Lead Plaintiff responded and objected to those interrogatories on January 13, 2023.

68.     On January 14, 2025, Defendants served their second set of interrogatories to Lead Plaintiff.   On February 20, 2025, Lead Plaintiff responded and objected to that set of interrogatories.

69.     On March 28, 2025, Defendants served their third set of interrogatories to Lead Plaintiff.  On April 28, 2025, Lead Plaintiff responded and objected to that set of interrogatories. The Parties met and conferred over the scope of Lead Plaintiff's interrogatory responses throughout discovery.

### 4.     Analysis of Document Discovery and Preparation of Deposition Plan

70.     The Parties reached a settlement in principle shortly after Lead Plaintiff's first fact depositions.  Up to that point, however, Lead Plaintiff had prepared extensively for depositions in the case.  Indeed, Lead Plaintiff had prepared a full deposition program, including an order of deponents and schedule, had secured dates for certain depositions, and were in the process of negotiating dates for others with Defendants.   To build an efficient and effective deposition program, Lead Counsel constructed "key players" lists compiled from various sources, including: (i) its investigation in connection with preparing the complaints; (ii) document searches, including analyses of hot documents; and (iii) Defendants' interrogatory responses.

71.     Once deponents were identified, effectively preparing for depositions required that Lead Counsel devote substantial time, effort, and resources.

72.     One of Lead Counsel's most significant projects in preparation for the depositions—both in terms of time and effort as well as substantive importance—was the preparation of detailed "deposition kits."  These kits typically consisted of dozens of documents with an index summary.  The kits also included a detailed memorandum analyzing those documents and the witness's background, likely areas of knowledge, and role in the events at issue in the case.  In addition, as noted above, the attorney team prepared analyses and chronologies

concerning several key issues in the case, which were used to prepare for the depositions of each witness who was involved with that issue.

73.    Lead Counsel prepared deposition kits for numerous fact witnesses in anticipation of their depositions.  Preparing deposition kits required a comprehensive, deep dive into each witness's associated materials, including their: (i) custodial documents, i.e., documents the deponent drafted, received, or maintained in their files; (ii) role in the events at issue, including with respect to information in relevant documents they may not have personally reviewed; (iii) prior relevant testimony or interviews; and (iv) information gleaned from public searches.  The preparation of each kit required the analysis of myriad documents in the particular context of each witness, as well as the exercise of professional judgment in narrowing down which documents to present to that deponent.  As the kits were prepared and refined, the attorneys preparing to take the depositions worked closely with the attorneys tasked with creating the relevant kits.

74.    In late March and early April 2025, the Parties conducted depositions of two key non-party fact witnesses—whistleblowers Richard Bowley and Maurice Duffy—over the course of four days in the United Kingdom.  In addition, 15 other depositions had been scheduled (or were pending) at the time the Parties reach an agreement to settle, including one that was scheduled for May 2, 2025, the day after the Parties reached their agreement on financial terms.  Specifically, Lead Plaintiff had noticed the depositions of the following witnesses, and had taken or were preparing to take these depositions when the Parties reached their agreement:

      i.    Maurice Duffy (taken March 26-27, 2025)

     ii.    Richard Bowley (taken April 1-2, 2025)

   iii.    Greg Field (scheduled for May 2, 2025)

   iv.    Donna Rathbone (May 13, 2025)

    v.    Rosemary Fagen (May 15, 2025)

    vi.    Chris Aitchison (May 20, 2025)

    vii.    Armando Torres (May 22, 2025)

    viii.    Andrew Stokes (May 27, 2025)

    ix.    Bold Baatar (May 2025)

    x.    Adam Kent (June/July 2025)

    xi.    Craig Kinnell (June/July 2025)

    xii.    Marco Pires (June/July 2025)

    xiii.    Grant Brinkmann (letters rogatory for deposition issued and subject to scheduling based on pending judicial requests in Australia)

    xiv.    Munkhbileg Enkh-Amgalan (letters rogatory for deposition issued and subject to scheduling based on pending judicial requests in Australia)

    xv.    Morgan Aspin (letters rogatory for deposition issued and subject to scheduling based on pending judicial requests in Australia)

    xvi.    Mohammad Khishvand (letters rogatory for deposition issued and subject to scheduling based on pending judicial requests in Australia)

    xvii.    Russell Brenchley (letters rogatory for deposition issued and subject to scheduling based on pending judicial requests in Australia)

75.    Lead Plaintiff had also notified Defendants that it would depose the following 16 individuals, and at the time of the agreement to settle, the Parties were in the process of negotiating dates for their depositions:

    i.    Steven Cox

    ii.    Zane Dempsey

    iii.    Craig Stegman

    iv.    Jo-Anne Dudley

    v.    Ulf Quellmann

    vi.    Simone Niven

    vii.    Peter Cunningham

    viii.    Jay Bastain

    ix.    Andrew Chuk

    x.    Munkhtushig Dul

    xi.    Stephen McIntosh

    xii.    Jakob Stausholm

    xiii.    Arshad Sayed

    xiv.    David Joyce

    xv.    Arnaud Soirat

    xvi.    Jean Sebastian Jacques

**5.    Expert Discovery**

76.    Lead Plaintiff also undertook extensive work with experts in connection with its prosecution of the case.  Lead Counsel worked with its experts closely throughout each step of expert discovery to analyze the strengths and weaknesses of the case.  This process involved careful analysis of the documents produced by Defendants and third parties, as well as critical and strategic thinking about how best to use the evidence gathered throughout discovery to survive summary judgment and prove Lead Plaintiff's claims at trial.

77.    As described above, in connection with investigating the claims asserted in the Complaint, Lead Counsel consulted with numerous experts, including John Barber and Malcolm Brown, who provided expertise in mining relevant to the delays and cost-overruns at Oyu Tolgoi. Lead Counsel also consulted with Matt Cain, who provided analysis on market efficiency, loss causation, and damages and Joshua Mitts, who analyzed the domesticity of trades by Turquoise Hill shareholders.

78.    Following numerous meet and confers and discussions with Defendants, Lead Plaintiff also litigated and successfully opposed a motion filed by Defendants to disqualify Mr.

Barber, who Defendants argued was conflicted because of prior work he had performed in connection with the Oyu Tolgoi mine.  ECF Nos. 345-349, 363-368, 403-404, 425.

### G. Lead Plaintiff's Motion for Class Certification and Modification of the Scheduling Order

79.     On December 23, 2024, Lead Plaintiff filed its motion for class certification and appointment of class representative and class counsel, requesting that the Court certify a class comprising all persons and entities who purchased or otherwise acquired Turquoise Hill securities during the period from July 17, 2018 through July 31, 2019, inclusive and were damaged thereby. ECF Nos. 415-418.  Lead Plaintiff's motion was supported by the expert report of Matt Cain, who opined that the market for Turquoise Hill securities was efficient throughout the Class Period, and that damages for class members could be calculated through a common methodology.  ECF No. 417-1.  Lead Plaintiff also submitted an expert report of Joshua Mitts, who opined that the vast majority of trades of Turquoise Hill stock were domestic for purposes of the United States securities laws, and the domesticity of class members' trades could be determined through a common methodology.  ECF No. 417-2.

80.     In connection with their opposition to Lead Plaintiff's class certification motion, Defendants deposed numerous witnesses from Pentwater, including Matthew Halbower (for two days, including one as a party representative pursuant to Fed. R. Civ. P. 30(b)(6)), Roman Kusnetsov, and Michael O'Connor.  Defendants also deposed Lead Plaintiff's experts Matt Cain and Joshua Mitts.  Lead Counsel reviewed Pentwater's documents, prepared these individuals for their depositions, and defended the depositions, which occurred throughout February and March 2025.

81.     On April 3, 2025, Defendants opposed Lead Plaintiff's motion for class certification, including reports of Dr. Allen Ferrell on market efficiency and damages

methodology, and Brandon Becker on trade domesticity issues.  ECF Nos. 445, 446.  Defendants argued that Pentwater was subject to unique defenses and thus failed to meet the typical and adequacy requirements of Rule 23(a) of the Federal Rules of Civil Procedure.  Among other things, Defendants argued that they had rebutted the *Basic* presumption of reliance because Pentwater was privy to non-public information not possessed by other class members.  Defendants also argued that Lead Plaintiff was not an adequate class representative because, among other things, Pentwater purportedly did not preserve information relating to audio recordings pertaining to its investigation of the Oyu Tolgoi project.  Defendants also argued that the class could not be certified because Lead Plaintiff had not established a method for determining whether class members satisfied the domesticity requirement under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010) on a class-wide basis due to the fact that Turquoise Hill shares traded on both United States and Canadian exchanges.

82.    In preparation for submission of its reply in further support of class certification, Lead Plaintiff devoted considerable time to researching and analyzing Defendants' arguments in opposition to class certification.  Lead Plaintiff also deposed Defendants' market efficiency expert, Dr. Allen Farrell, and had prepared to and were about to begin the deposition of Defendants' trade domesticity expert, Brandon Becker, on the day that the Parties reached the settlement.

83.    In light of the Parties' settlement negotiations, the Parties agreed to an extension of time for Lead Plaintiff to file its reply in further support of class certification, and the Parties ultimately finalized the settlement terms and documentation before the reply was filed.

## H.    Mediation and Settlement

84.    On February 5, 2025, the Parties engaged in a private mediation session before Hon. Layn Phillips (the "Mediator"), a highly experienced mediator.  In advance of that session, the Parties exchanged and submitted detailed mediation statements and supporting exhibits to the

Mediator. Pentwater's representatives, including its founder and CEO Matthew Halbower and Portfolio Manager Michael O'Connor, attended the mediation and participated throughout the mediation process. The Parties did not reach a resolution at that time but agreed to continue settlement discussions.

85.     Following the first mediation session, the Parties continued to engage in discovery, as described above, in which Lead Plaintiff vigorously pursued additional document productions from Defendants, including through motions to compel discovery. ECF Nos. 447, 451. The Parties also conducted several depositions, including Defendants' depositions of Lead Plaintiff's two experts who submitted reports in support of Lead Plaintiff's class certification motion, four depositions of Lead Plaintiff's fact witnesses in connection with the class certification motion. As noted above, the Parties also conducted depositions of two non-party fact witnesses— whistleblowers Richard Bowley and Maurice Duffy—over the course of four days in the U.K.

86.     On April 25, 2025, the Parties attended a second in-person mediation session with Judge Phillips. In advance of that mediation session, Lead Plaintiff submitted a detailed supplemental mediation statement to Defendants and the Mediator, and included supporting exhibits compiled from documents produced in the course of discovery. Lead Plaintiff's representatives, including Matthew Halbower and Michael O'Connor, attended and participated in the negotiations at the mediation session. The negotiations were extremely hard fought, and no agreement was reached during the formal mediation session that day.

87.     In fact, it was only during further settlement discussions, which continued into the following week after the conclusion of the formal mediation session, that the Parties reached an agreement in principle on May 1, 2025 to settle the Action for $138,750,000.

88.     The agreement's terms were memorialized in a term sheet dated May 14, 2025 (the "Term Sheet").  The Term Sheet set forth, among other things, the Parties' agreement to settle and release all claims against Defendants and Defendants' Releasees (defined below) in return for a cash payment of $138,750,000 by or on behalf of Defendants for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers.

89.     Following the execution of the Term Sheet, the Parties negotiated the final terms of the Settlement and drafted the Stipulation and Agreement of Settlement and related settlement papers.  On June 17, 2025, the Parties executed the Stipulation, which embodies the final and binding agreement to settle the Action.  *See* ECF No. 469-1.  On June 18, 2025, Lead Plaintiff submitted the Parties' Stipulation to the Court as part of its motion for preliminary approval of the Settlement.  ECF Nos. 469-471.

90.     On June 26, 2025, the Court entered its Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement (ECF No. 474) ("Preliminary Approval Order"), which, among other things: (1) preliminarily approved the Settlement; (2) approved the form of Notice, Summary Notice, and Claim Form, and authorized notice of the Settlement to be given to potential Settlement Class Members through mailing of the Notice and Claim Form, posting the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *The Wall Street Journal* and over the *PR Newswire*; (3) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the fee and expense application; and (4) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense

Application.  The Preliminary Approval Order also scheduled the Settlement Hearing for October 15, 2025 at 10:30 a.m. to determine, among other things, whether the Settlement should be finally approved.

## III.    RISKS OF CONTINUED LITIGATION

91.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $138,750,000 million cash payment.  Lead Plaintiff and Lead Counsel believe that the proposed Settlement is an excellent result for the Settlement Class.

92.    As explained below, Lead Plaintiff faced significant risks with respect to proving liability and recovering full damages in this case.  To prevail in this case, Lead Plaintiff had the burden to convince a unanimous jury by a preponderance of the evidence of each of the elements of its claims, including that (i) Defendants made misstatements; (ii) the misstatements were material; (iii) the misstatements were made with scienter (i.e., knowingly or with deliberate recklessness); (iv) investors relied upon the misstatements; and (v) Defendants' alleged fraud caused investors' losses.

93.    Moreover, absent a settlement, Lead Plaintiff would still need to prevail at several additional stages of the litigation, including defeating Defendants' opposition to Lead Plaintiff's motion for class certification, Defendants' anticipated motion for summary judgment, at trial, and on appeal.  At each of these stages, Lead Plaintiff would have faced significant risks related to establishing liability and damages, including, among other things, overcoming Defendants' falsity, scienter, and loss causation challenges.  Even after any trial, Lead Plaintiff would have faced post-trial motions, including a potential motion for judgment as a matter of law, as well as further appeals that might have prevented Lead Plaintiff from successfully obtaining a recovery for the Settlement Class.

94.    The Settlement Amount—$138,750,000 million in cash, plus interest—represents a significant recovery for the Settlement Class.  As discussed below, it also represents a significant portion of the recoverable damages in the Action as determined by Lead Plaintiff's damages expert—particularly after considering Defendants' substantial arguments with respect to liability and damages.  These arguments created a significant risk that, after years of protracted litigation, Lead Plaintiff and the Settlement Class would have achieved no recovery at all, or a smaller recovery than the Settlement Amount.

### A.    General Risks in Prosecuting Securities Class Actions

95.    In recent years, securities class actions have become riskier and more difficult to prove given changes in the law, including numerous United States Supreme Court decisions.  For example, data from Cornerstone Research show that more than half of all securities class actions filed in each year from 2015 and 2020 were dismissed.  See CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS: 2024 YEAR IN REVIEW (2025), attached hereto as Exhibit 3, at 16.

96.    Even when they have survived motions to dismiss, securities class actions can be defeated either at the class certification stage, in connection with *Daubert* motions, or at summary judgment.  For example, class certification has been denied in numerous cases in recent years.  *See, e.g.*, *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017), *reconsideration denied*, 2018 WL 3472334 (N.D. Cal. Jan. 18, 2018), *and leave to appeal denied*, *Oklahoma Firefighters Pension & Ret. Sys. v. Finisar Corp.*, 2018 WL 3472714 (9th Cir. July 13, 2018); *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193 (S.D.N.Y. Mar. 19, 2015); *Sicav v. James Jun Wang*, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170 (S.D.N.Y. July 3, 2013); *Colman v. Theranos, Inc.*, 325 F.R.D. 629, 651 (N.D. Cal.

2018); *Smyth v. China Agritech, Inc.*, 2013 WL 12136605 (C.D. Cal. Sept. 26, 2013); *In re STEC Inc. Sec. Litig.*, 2012 WL 6965372 (C.D. Cal. Mar. 7, 2012).

97.    Multiple securities class actions also recently have been dismissed at the summary judgment stage, and the Court noted the risks to Lead Plaintiff's claims at summary judgment here. *See, e.g.*, *In re Turquoise Hill Res. Ltd.*, 2024 WL 4711185, at *14 & n.11 (S.D.N.Y. Nov. 7, 2024); *see also Homyk v. ChemoCentryx, Inc.*, 2025 WL 2505483, at *1 (N.D. Cal. Aug. 15, 2025) (granting summary judgment after approximately four years of litigation); *Holwill v. AbbVie Inc.*, 2025 WL 1908156, at *23 (N.D. Ill. July 10, 2025) (granting summary judgment after seven years of litigation); *In re Mylan N.V. Sec. Litig.*, 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023) (granting summary judgment after approximately six years of litigation); *In re Allergan PLC Sec. Litig.*, 2022 WL 17584155 (S.D.N.Y. Dec. 12, 2022) (granting summary judgment after approximately four years of litigation); *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *6 (D. Or. May 24, 2021) (granting summary judgment after approximately five years of litigation); *In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690 (D. Minn. 2009) (granting summary judgment on loss causation grounds after seven years of litigation); *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305 (S.D.N.Y. September 13, 2017) (summary judgment granted after eight years of litigation); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) (summary judgment granted after six years of litigation); *see also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448 (D. Conn. 2013), *aff'd*, 766 F.3d 172 (2d Cir. 2014); *Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878 (D. Nev. Jan. 3, 2017), *aff'd sub nom., Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *Perrin v. Sw. Water Co.*, 2014 WL 10979865 (C.D. Cal. July 2, 2014); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1015 (S.D. Cal. 2011); *In re Oracle Corp. Sec.*

*Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010).  Even cases that have survived summary judgment have been dismissed prior to trial in connection with *Daubert* motions.  *See, e.g.*, *Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

98.    Even when securities class action plaintiffs are successful in certifying a class, prevailing at summary judgment, and overcoming *Daubert* motions, there remain significant risks that a jury will not find the defendants liable or award expected damages.  *See, e.g.*, *In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010 (N.D. Cal. June 14, 2023) (jury verdict for defense delivered in securities class action involving Elon Musk's tweets about taking Tesla private even though that court had already found the tweets were false and Musk acted recklessly in issuing them, and the same conduct had resulted in SEC charges and a settlement).  Further, post-trial motions, based on a complete record, also present substantial risks.  For example, in *In re BankAtlantic Bancorp, Inc. Securities Litigation*, a jury rendered a verdict in plaintiffs' favor on liability in 2010.  2011 WL 1585605, at *6 (S.D. Fla. Apr. 25, 2011).  In 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims.  *Id.* at *38.  In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation.  *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012).

99.    In sum, securities class actions face serious risks of dismissal and non-recovery at all stages of the litigation.

### B.  Specific Risks Concerning this Action

100.    While Lead Plaintiff believes that its claims have merit, Lead Plaintiff faced substantial risks that Defendants would succeed in eliminating all or part of the case in connection with summary judgment, pre-trial motions, at trial, or on post-trial appeal.

101.    Although Lead Counsel respectfully submits that, by the time of the mediation, ample discovery had been taken to allow all parties to reasonably assess the fairness of the proposed Settlement, they were also aware that deposition discovery of Defendants still remained to be completed absent the Settlement.  In addition, formal merits expert discovery on hotly contested liability issues had not yet begun, and the Parties faced the further risks and expense of complex summary judgment motions and trial.  Accordingly, although both sides were able to present information that supported their respective claims and defenses, there was clearly substantial risk as to how the further testimony of fact and expert witnesses would ultimately play out.  In light of these risks, the significant, immediate benefit of the $138,750,000 Settlement is a particularly strong result for the Settlement Class.  *See In re StockerYale, Inc. Sec. Litig.*, 2007 WL 4589772, at *3 (D.N.H. Dec. 18, 2007) (fact that "various defenses could result in no liability and zero recovery for the class" favors approval of the settlement).

### 1.  Risks Associated with Proving Falsity and Materiality

102.    With respect to the alleged false and misleading statements remaining in this case after the Court's rulings on Defendants' motions to dismiss (*see supra* at ¶¶ 31, 48), Defendants would have argued that these statements were neither false nor material to investors.  While these misstatements were sustained at the motion to dismiss stage, Defendants would have remained free to relitigate any of their arguments at summary judgment or trial, where the applicable standards would likely have been more challenging for Lead Plaintiff.

103.    To begin, Defendants likely would have argued that Defendant Soirat's August 2018 statement that the underground expansion was "on track and on budget" was protected by cautionary language accompanying Rio Tinto's risk disclosures and thus not actionable—an argument the Court noted Defendants were free to make at summary judgment at trial. *In re Turquoise Hill Res. Ltd.,* 2024 WL 4711185, at *14 n.11.  Defendants also would likely have argued that Soirat's statements and Defendants' other challenged statements were either true at the time they were made, or that Defendants reasonably believed them at the time he made them.  In support of these contentions, Defendants likely would have pointed to certain internal documents showing that the progress of the underground expansion was proceeding close to projected targets, as well as documents suggesting that senior executives such as Defendants Jacques and Soirat may have only learned of definitive delays and cost-overruns just prior to disclosing them.

104.    Further, Defendants likely would have argued that some of the challenged statements were not material, and were statements of opinion and forward-looking statements, and thus were not actionable as a matter of law.  *See, e.g.*, *In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010, at *7-8 (N.D. Cal. June 14, 2023) (sustaining jury verdict for defendants on materiality grounds even though falsity had been established).

105.    While Lead Plaintiff believes it had significant arguments supported by discovery to make in response, there was a significant risk that the Court or a factfinder could have credited them at either summary judgment or trial.  In sum, there was a significant risk that Lead Plaintiff would not be able to establish the material falsity of both challenged statements at trial, and that one or both statements could be dismissed.  Had that happened, recovery for Lead Plaintiff and the Settlement Class would have either been severely reduced or eliminated entirely.

## 2.    Risks Associated with Proving Scienter

106.    Even if Lead Plaintiff had been able to establish falsity and materiality, it would have faced significant risk in establishing Defendants' scienter.

107.    For example, Defendants would argue that they did not have scienter for any statements prior to October 2018 because the delays were not definitively established until Rio Tinto completed the reforecast project in October 2018, and that they disclosed the delays once they were known in October 2018, and also disclosed additional delays and the cost overruns as they received new information throughout the alleged Class Period.  In doing so, Defendants would point to the facts cited in the Court's ruling dismissing Section 10(b) claims against Defendant Jacques for failing to adequately allege scienter, including the details concerning the status of the underground development set forth in the October 2018 TEG report, and argue that these facts similarly fail to prove scienter with respect to Defendant Soirat, the only other individual defendant.  *See, e.g.*, *In re Turquoise Hill Res. Ltd.*, 2024 WL 4711185, at *16-17.

108.    The record also did not contain evidence supporting scienter based on a motive to defraud investors.  For example, there were no allegations that Defendants Jacques and Soirat or other insiders engaged in suspiciously timed insider stock sales or stood to personally receive other financial benefits that, in other cases, have been found to support scienter by incentivizing fraud.  The absence of such motive allegations created a headwind against Lead Plaintiff establishing scienter in this case.

109.    Had Lead Plaintiff failed to create a triable issue regarding scienter at summary judgment, or failed to prevail on establishing scienter at trial, the Settlement Class would not be able to recovery anything in this Action.

### 3.    Risks Associated with Proving Loss Causation and Damages

110.    Even if Lead Plaintiff had successfully established Defendants' material misrepresentations and scienter, it would still have faced meaningful challenges in establishing loss causation and damages in this Action.

111.    While Defendants did not challenge Lead Plaintiff's loss causation allegations at the class certification stage, Defendants could have argued at a later stage in the case that not all of the declines in the price of Turquoise Hill securities following the alleged corrective disclosures were recoverable as damages.  To advance this argument, Defendants could have introduced expert testimony about the level of artificial inflation in the stock that could be attributed to the sustained misrepresentations, and that could have played out in a difficult-to-predict "battle of the experts" at summary judgment or trial.  If accepted, this argument would have reduced damages very substantially, or eliminated them entirely.

112.    Defendants could have further argued that certain of the alleged corrective disclosures were insufficient to support damages because they revealed information already known to the market.  For example, Defendants have argued that because the October 2018 disclosure had revealed that the project was behind schedule, the alleged corrective disclosures in February 2019 and July 2019 revealing additional delays were not sufficiently "corrective" under the securities laws, and could not have caused investors damages.  Similarly, Defendants argued in opposition to Lead Plaintiff's class certification motion that the alleged disclosure on July 31, 2019 that the Oyu Tolgoi project needed additional financing to complete was already known to the market based on the Company's earlier disclosures.  If Defendants had succeeded on these arguments, the recoverable damages could have been substantially less than the amount provided in the Settlement.

38

113.    Lead Plaintiff also faced risks to recovering damages in light of domesticity issues for class members trades.  Given that Turquoise Hill common stock was dual-listed in the U.S. and Canada, a significant portion of the class's trades presented a question of whether the trade was a domestic transaction that could be covered by claims under the U.S. securities laws.  If the Court credited Defendants' expert's arguments that such domesticity questions could not be determined on the basis of class-wide basis, class certification could be denied.  Further, even if such a determination could be made for class certification purposes, Lead Plaintiff still faced significant risks that many trades would be considered foreign transactions and thus not capable of supporting actionable damages for the class.

### 4.    Risks After Trial

114.    Even if Lead Plaintiff overcame all the above risks and prevailed at trial, Defendants would have appealed any judgment in Lead Plaintiff's and the class's favor.  Such an appeal could have taken years, and could have been successful.  For example, in *Glickenhaus & Co. v. Household Int'l Inc.*, 787 F.3d 408 (7th Cir. 2015), a securities fraud class action alleging a massive predatory lending scheme, the plaintiffs won a trial verdict.  Defendants appealed, challenging loss causation, as well as a jury instruction about who legally "made" a statement for liability purposes.  Defendants prevailed, and the Seventh Circuit set aside the judgment that plaintiffs had won.

115.    Moreover, even if a judgment in Lead Plaintiff's favor was affirmed on appeal, Defendants could then have challenged the reliance and damages of each class member, including Lead Plaintiff, in an extended series of individual proceedings.  That process could have taken multiple additional years, and could have severely reduced any recovery to the class as Defendants "picked off" class members.  For example, in *In re Vivendi Universal SA Securities Litigation*, the district court acknowledged that in any post-trial proceedings, "Vivendi is entitled to rebut the

presumption of reliance on an individual basis," and that "any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into the individual circumstances of particular class members."  765 F. Supp. 2d 512, 583-584 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016).  Over the course of several years, Vivendi indeed successfully challenged several class members' damages in individual proceedings.

116.    The Settlement eliminates these significant litigation risks and provides a substantial and certain recovery for the Settlement Class.  *See Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *13 (S.D.N.Y. Oct. 16, 2019) ("The Parties developed and would have presented competing evidence on these issues, including competing expert evidence. While Plaintiffs proceeded as though they had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages[.]").

## C.    The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial

117.    The Settlement Amount—$138,750,000 in cash—represents a significant recovery for the Settlement Class.  The Settlement is roughly 15 times the size of the median securities class-action settlement in the Second Circuit from 2014 to 2023 ($9.3 million).  *See* Cornerstone Research, Securities Class Action Settlements: 2024 Review and Analysis (2025), attached hereto as Exhibit 4, at 20.

118.    The $138,750,000 Settlement is particularly favorable result when it is considered in relation to the maximum amount of damages that could be reasonably established at trial, in the event that Lead Plaintiff prevailed on class certification and liability issues, including falsity and scienter, at summary judgment.  Lead Plaintiff's damages expert has estimated that the maximum realistically recoverable damages in this case—assuming complete success in establishing liability—would range from approximately $322 million to $407 million (depending on the use of

FIFO or LIFO matching of shares). Thus, the recovery of $138.75 million represents a recovery of 34% to 43% of investors' maximum damages.

119.    Importantly, this estimated range assumes Lead Plaintiff's complete success in establishing Defendants' liability on the remaining claims, and that the trier of fact would reject Defendants' loss causation and damages arguments. The recovery of 34% to 43% of the maximum recoverable damages, which is many multiples above the median percentage recovery seen in comparable cases. *See, e.g.*, *Pearlstein v. BlackBerry Ltd.*, 2022 WL 4554858, at *6 (S.D.N.Y. Sept. 29, 2022) (approving recovery of 13.75% of the estimated maximum damages as "well within the range of reasonableness and, in fact, considerably above the high end of historical averages" and noting that it "substantially exceed[ed]. . . median recovery of 4.2% of damages in 2021"); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 2021 WL 76328, at *3 (S.D.N.Y. Jan. 7, 2021) (approving settlement that was 10% of the estimated damages, noting that the settlement was "within the range previously approved by judges in this District," referencing recoveries ranging from 3% to 11% of estimated damages); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) ("average settlement amounts in securities fraud class actions where investors sustained losses over the past decade . . . have ranged from 3% to 7% of the class members' estimated losses").

120.    Given the meaningful litigation risks, and the immediacy and amount of the $138,750,000 recovery for the Settlement Class, Lead Plaintiff and Lead Counsel believe that the Settlement is an excellent result; fair, reasonable, and adequate; and in the best interest of the Settlement Class.

## IV.    LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

121.    The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class.  The Preliminary Approval Order also set a September 24, 2025 deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final approval hearing date of October 15, 2025.

122.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed JND Legal Administration ("JND"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 13% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $2,600,000.  To disseminate the Notice, JND obtained information from Rio Tinto and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members.  *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Segura Decl."), attached hereto as Exhibit 4, at ¶¶ 3-11.

123.    JND began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominee owners on July 11, 2025.  *See* Segura Decl. ¶¶ 3-7.  As of September 9, 2025, JND had disseminated a total of 30,568 Notice Packets to potential Settlement Class Members and nominees.  *Id*. ¶ 11.

124.    On July 23, 2025, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the *PR Newswire*.  *Id*. ¶ 12.

125.    Lead Counsel also caused JND to establish a dedicated settlement website, www.TurquoiseHillSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as the Stipulation, Preliminary Approval Order, and Complaint.  *See* Segura Decl. ¶ 13.  That website became operational on July 11, 2025.  *Id*.  Lead Counsel also made copies of the Notice and Claim Form and other documents available on its own website, www.blbglaw.com.

126.    As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, and/or Fee and Expense Application, to request exclusion from the Settlement Class, or submit Claim Forms is September 24, 2025.  To date, one request for exclusion has been received.  *See* Segura Decl. ¶ 15.  In addition, no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application, or the certification of the Settlement Class have been received.  Lead Counsel will file reply papers on or before October 8, 2025 that will address all requests for exclusion and any objections that may be received, and provide preliminary information on the Claims received.

## V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

127.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to be eligible to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed) or submitted online no later than September 24, 2025.  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

128.    Lead Counsel consulted with Lead Plaintiff's damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation").  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action.

129.    The Plan of Allocation is set forth at pages 18 to 28 of the Notice.  *See* Segura Decl., Ex. A at pp. 18-28.  As described in the Notice, the objective of the Plan of Allocation is to distribute the Settlement proceeds equitably among those Settlement Class Members who suffered economic losses as a proximate result of the alleged wrongdoing.  The calculations under the Plan of Allocation are intended as a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.  *See* Notice ¶ 81.

130.    In developing the Plan of Allocation, Lead Plaintiff's damages expert calculated the estimated amounts of artificial inflation in the per-share closing prices of Turquoise Hill common stock, certain Turquoise Hill Swaps ("Relevant Turquoise Hill Swaps"), and call options on Turquoise Hill common stock (and artificial deflation in the price of put options on Turquoise

Hill common stock) which allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions.[2] *See* Notice ¶ 82. In calculating the estimated artificial inflation (or deflation) allegedly caused by those misrepresentations and omissions, Lead Plaintiff's damages expert considered the price change in Turquoise Hill Securities in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and omissions. *Id.* ¶ 83.

131. In order to have recoverable damages, the disclosure of the alleged misrepresentations or omissions must be the cause of the decline in the price of the security. In this case, Lead Plaintiff alleges that Defendants made false statements and omitted material facts from July 17, 2018 through July 31, 2019, inclusive, which had the effect of artificially inflating the prices of Turquoise Hill common stock, Relevant Turquoise Hill Swaps, and Turquoise Hill call options (and artificially deflating the prices of Turquoise Hill put options). Lead Plaintiff further alleges that corrective information was released to the market on: February 27, 2019, July 15, 2019 (after market close), and July 31, 2019 (after market close), which partially removed the artificial inflation or deflation from the prices of Turquoise Hill Securities on: February 27, 2019, February 28, 2019, July 16, 2019, July 17, 2019, and August 1, 2019. Notice ¶ 84. Thus, in order to have a Recognized Loss Amount under the Plan of Allocation, a Settlement Class Member who or which purchased or otherwise acquired Turquoise Hill Securities prior to the first corrective disclosure, which occurred on February 27, 2019, must have held his, her, or its shares of the respective Turquoise Hill Security through at least the opening of trading on February 27, 2019.

---

[2] Turquoise Hill swaps that replicate purchases of Turquoise Hill Common Stock with prices that are within the daily trading range of Turquoise Hill common stock are considered the "relevant" swaps at issue ("Relevant Turquoise Hill Swaps"). Turquoise Hill common stock, Relevant Turquoise Hill Swaps, call options on Turquoise Hill common stock, and put options on Turquoise Hill common stock are collectively referred to as the "Turquoise Hill Securities".

A Settlement Class Member who purchased or otherwise acquired Turquoise Hill Securities from February 27, 2019 through and including the close of trading on July 31, 2019, must have held the respective Turquoise Hill Security through at least one of the later dates where new corrective information was released to the market and partially removed the artificial inflation from the price of the respective Turquoise Hill Security.  Notice ¶ 85.

132.    Recognized Loss Amounts will be calculated under the Plan of Allocation for each purchase or acquisition of Turquoise Hill common stock, Relevant Swap, or call option (or sale of a put option) in a domestic transaction or on a U.S. exchange during the Class Period that is listed on a Claimant's Claim Form and for which adequate documentation is provided.  *See* Notice ¶ 86.

133.    Recognized Loss Amounts are based primarily on the difference in the amount of alleged artificial inflation in the respective prices of the Turquoise Hill Securities at the time of purchase or acquisition and at the time of sale or the difference between the actual purchase price and sale price.  In addition, the Recognized Loss Amount for Turquoise Hill common stock sold in the 90-day period after the end of the Class Period or held until the end of that period, is further capped as provided under the PSLRA.  *See* Notice ¶ 87(c), (d).

134.    The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases of Turquoise Hill Securities during the Class Period is the Claimant's "Recognized Claim."  Notice ¶ 94.  The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  Notice ¶ 107.  If an Authorized Claimant's *pro rata* distribution amount calculates to less than ten dollars, no payment will be made to that Authorized Claimant.  *Id.* ¶ 109.  Those funds will be included in the distribution to the Authorized Claimants whose payments exceed the ten-dollar minimum.

135.    One hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants.  If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted.  Notice ¶ 110.  Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective (for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available), will those funds be donated to one or more non-sectarian, not-for-profit, 501(c)(3) organizations to be selected by Lead Counsel and approved by the Court.  *See id*.

136.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on transactions in Turquoise Hill Securities that were attributable to the misconduct alleged in the Action.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.  To date, no objections to the proposed Plan of Allocation have been received.

137.    In addition, both Lead Counsel and Lead Plaintiff will ensure that the Net Settlement is promptly administered and distributed to Settlement Class Members.  Lead Counsel has lawyers dedicated to overseeing and facilitating the distribution process and will focus on and ensure that the Claims Administrator promptly administers and distributes the Net Settlement Fund.  Moreover, Lead Plaintiff has a significant financial interest in the Net Settlement Fund and is motivated, both on its own behalf, and on behalf of other members of the Settlement Class, to ensure a prompt, efficient, and fair distribution.

## VI.    THE FEE AND EXPENSE APPLICATION

138.    Lead Counsel is applying to the Court for an award of attorneys' fees of 13% of the Settlement Fund, net of Litigation Expenses awarded.  Lead Counsel also requests payment for litigation expenses that it incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $2,217,327.97 (the "Expense Application").  The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum.  The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

139.    For its efforts on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  The percentage method is the standard and appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interests of Lead Plaintiff and the class in achieving the maximum recovery in the shortest amount of time required under the circumstances.  Use of the percentage method has been recognized as appropriate by the Supreme Court and Second Circuit for cases of this nature where an all-cash common fund has been recovered for the class.

140.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 13% fee award is substantially below the range of percentage fees typically awarded in securities class actions in this Circuit, and is fair and reasonable in light of all the circumstances in this case.  In addition, the 13% request

represents a fee award that is substantially below Lead Counsel's lodestar, which further supports the reasonableness of the award.

### 1.    Lead Plaintiff Has Authorized and Supports the Fee Application

141.    Lead Plaintiff Pentwater is a sophisticated institutional investor that closely supervised and monitored the prosecution and settlement of this Action.  *See* Declaration of Matthew Halbower, in Support of (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Halbower Decl."), attached hereto as Exhibit 2, at ¶¶ 2-6.  Lead Plaintiff has evaluated the Fee Application and fully supports the fee requested.  *See* Halbower Decl. ¶ 8.

### 2.    The Work Performed by Lead Counsel

142.    Lead Counsel devoted substantial time to the prosecution of the Action.  The work that Lead Counsel performed in this Action included, among other things: (i) conducting an extensive investigation into the claims asserted, which included a detailed review of public documents, interviews with dozens of former Rio Tinto or Turquoise Hill employees, and consultation with experts; (ii) drafting three detailed complaints; (iii) researching, briefing, and arguing Lead Plaintiff's two rounds of opposition to Defendants' motions to dismiss; (iv) researching and briefing Lead Plaintiff's motion for class certification, including related depositions; (v) undertaking substantial fact discovery in the United States and foreign jurisdictions; (vi) consulting extensively with experts and consultants; and (vii) engaging in extensive arm's-length settlement negotiations to achieve the Settlement, including two formal mediation sessions.

143.    Attached hereto as Exhibit 6 is a schedule summarizing the amount of time spent by the attorneys and professional support staff employees of Lead Counsel BLB&G on the Action from its inception through June 17, 2025 (the date the Stipulation was executed), and a lodestar

calculation for those individuals.  As set forth in Exhibit 6, the number of hours expended by BLB&G on the Action from its inception through June 17, 2025 is 47,740, for a lodestar of $28,616,822.50.  The requested fee of 13% of the Settlement Fund, net of Litigation Expenses will come to $17,749,247, if Litigation Expenses are awarded in the amount requested, plus interest earned on that amount at the same rate as the Settlement fund.  Therefore, the fee requested represents a fractional amount (referred to as a "negative" multiplier) of approximately 0.6 of Lead Counsel's lodestar.  Such a request is well below the positive fee multipliers typically awarded in comparable securities class actions and in other class actions involving contingency fee risk.

144.    The information in this declaration and its exhibits regarding the time spent on the Action by Lead Counsel's attorneys and other professional staff is based on contemporaneous daily time records regularly prepared and maintained by BLB&G, which are available at the request of the Court.  I am one of the partners who oversaw the activities in the litigation, and BLB&G attorneys under my supervision reviewed these time records to prepare this Declaration.  The purpose of this review was to confirm both the accuracy of the time entries and the necessity for, and reasonableness of, the time committed to the litigation.  All time expended in preparing this application for fees and expenses was excluded.  In addition, all time incurred by any timekeeper who spent fewer than ten hours working on the Action has been excluded.  Moreover, Lead Counsel has removed all of the time that Lead Counsel spent moving for appointment of Pentwater as Lead Plaintiff and contesting competing motions of lead plaintiff appointment, or specifically working on "typicality" or "adequacy" issues arising from Pentwater's purchase of certain Turquoise Hills securities, including through block trades or outside normal market purchases, and related *Morrison* issues.  While Lead Counsel believes that this time played an important role in allowing Lead Plaintiff to lead the Action and achieve an excellent result for the class, for the

avoidance of doubt all of this time has been removed from the lodestar.  *Cf.*  Opinion and Order on Lead Plaintiff Motion (ECF No. 103), at 19 n.6.  Certain other timekeepers and time entries were also removed in the exercise of Lead Counsel's billing judgment.

145.    I believe that the time reflected in the firm's lodestar calculation is reasonable in amount and was necessary for the effective and efficient prosecution and resolution of the litigation.

146.    The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 6 are the usual and customary rates set by the firm for each individual.  These hourly rates are the same as, or comparable to, the rates accepted by courts, including courts in this Circuit, in other contingent-fee securities-class-action litigation or shareholder litigation.  The firm's rates are set based on an annual analysis of rates that are charged by firms performing comparable work and that have been approved by courts.  Different timekeepers within the same employment category (*e.g.*, partners, associates, paralegals, etc.) may have different rates based on a variety of factors, including years of practice, years at the firm, year in the current position (*e.g.*, years as a partner), relevant experience, relative expertise, and the rates of similarly experienced peers at our firm or other firms.  For personnel who are no longer employed by my firm, the current rate used for the lodestar calculation is based upon the rate for that person in his or her final year of employment with the firm.

147.    Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that ensured the efficient prosecution of this litigation.  To that end, in addition to partners and associates, Lead Counsel also relied upon its staff attorneys in prosecuting this Action, whose work included (among other things) a review and analysis of the documents produced by Defendants, preparation of substantive memoranda on issues in the case, and assisting in preparation for

51

depositions.  The work these attorneys conducted was substantive and crucial to Lead Plaintiff's successful prosecution of the case.  The attorneys who participated in discovery in this Action had significant credentials and experience, as set forth in their biographies included in BLB&G's firm resume.  *See* Exhibit 7 at 36-39.  The staff attorneys are full-time W-2 employees of the firm, not independent contractors or employees of a staffing firm; they were each supervised by the firm's partners and associates and had access to secretarial and paralegal support; and had firm email addresses, access to the firm's 401(k) program, and eligibility to receive year-end bonuses.

### 3.    The Experience and Standing of Lead Counsel

148.    A copy of Lead Counsel BLB&G's firm resume, which includes information about the standing of the firm and brief biographical summaries for each attorney listed in Exhibit 6, including information about their position, education, and relevant experience, is attached as Exhibit 7 hereto.  As demonstrated by the firm resume, BLB&G is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases.  BLB&G is consistently ranked among the top plaintiffs' firms in the country.  Further, BLB&G has taken complex cases such as this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions.  I believe this willingness and ability added valuable leverage in the settlement negotiations.

### 4.    Standing and Caliber of Defendants' Counsel

149.    Defendants were represented in the Action by a team of extremely able counsel from Quinn Emanuel Urquhart & Sullivan, LLP, who vigorously litigated the Action.  In the face of this skillful and well-financed opposition, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants and their counsel to settle the case on terms that will benefit the Settlement Class.

**5.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases**

150.    The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above.   The risks assumed by Lead Counsel here, and the time and expenses incurred by Lead Counsel without any payment, were extensive.

151.    From the outset, Lead Counsel understood that it was embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that the prosecution of the case would require.   In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands.   Because complex shareholder litigation often proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel has received no compensation during the course of this Action and no reimbursement of out-of-pocket expenses, yet they have incurred over $2 million in expenses in prosecuting this Action for the benefit of Turquoise Hill investors.

152.    Lead Counsel also bore the risk that no recovery would be achieved in the Action. As discussed above, this case presented a number of significant trial risks and uncertainties from the outset, including challenges in proving the materiality and falsity of Defendants' statements, establishing scienter, and establishing loss causation and damages.

153.    The Settlement was reached only after Lead Counsel had engaged in substantial discovery.  Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Class.

### 6.    The Reaction of the Class to the Fee Application

154.    As noted above, as of September 9, 2025, over 30,000 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 13% of the Settlement Fund.  *See* Segura Decl. ¶ 11 and Ex. A (Notice ¶¶ 5, 63).  In addition, the Court-approved Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire* on July 23, 2025.  *See* Segura Decl. ¶ 13.  To date, no objections to the request for attorneys' fees have been received.

### B.    The Expense Application

155.    Lead Counsel also respectfully seeks $2,217,327.97 in litigation expenses from the Settlement Fund that it reasonably incurred in connection with the prosecution of the Action.

156.    From the outset of the Action, Lead Counsel has been cognizant of the fact that it might not recover any of the expenses it incurred, and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years.  Lead Counsel also understood that, even assuming that the case were ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action.  Consequently, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

157.    As set forth in Exhibit 8 hereto, Lead Counsel has paid or incurred a total of $2,217,327.97 in unreimbursed litigation expenses in connection with the prosecution of the Action.  Exhibit 8 identifies each category of expense (*e.g.*, experts and consultants, online legal

and factual research, court fees, telephone charges, and printing and copying) and the amount incurred for each category. These expenses are reflected in the books and records maintained by Lead Counsel, which are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. These expenses are submitted separately by Lead Counsel and are not duplicated by the firms' hourly rates

158. The following is additional information regarding certain of these expenses:

159. **Experts.** Approximately 43% of the total expenses, or $951,725.15, was expended for the retention of Lead Plaintiff's experts or consultants. Given the complexity of the mining, engineering and project management issues in the substantive aspects of the case, as well as the complex economic and domesticity issues relevant to loss causation, damages and class certification, these experts provided critical insight and advice in aid of prosecuting Plaintiffs' claims. The largest expert expenses were for Lead Plaintiffs' experts who provided reports and testimony in connection with Class Certification, totaling approximately $628,000 (or 66% of the total expert expenses), including payments to Matthew Cain, Ph.D. (approximately $143,000), who provided a report and testimony concerning economics and market efficiency, and Joshua Mitts, Ph.D. (approximately $485,000), who provided a report and testimony concerning the domesticity of transactions in Turquoise Hill's dual-listed common stock. Other significant expert expenses were for payments to experts providing consulting services concerning (a) damages and loss causation, totaling approximately $198,000 (or 21% of the total expert expenses), (b) mining, engineering and project management issues, totaling approximately $60,000 (or 6% of the total expert expenses), and (c) foreign legal and ethical issues, totaling approximately $62,500 (or 7% of the total expert expenses).

160. **Online Legal and Factual Research.** The combined costs of on-line legal and factual research were $139,092.51, or approximately 6% of the total expenses. The charges reflected are for out-of-pocket payments to vendors such as Westlaw (Thomson Reuters), Lexis/Nexis, Thomson Reuters, Bureau of National Affairs (Bloomberg), Court Alert, and PACER for online legal and factual research done in connection with this litigation. These resources were used to obtain access to court filings, to conduct legal research and cite-checking of briefs, and to obtain factual information regarding the claims asserted through access to various financial databases and other factual databases. These expenses represent the actual expenses incurred by BLB&G for use of these services in connection with this litigation. There are no administrative charges included in these figures. Online research is billed to each case based on actual usage at a charge set by the vendor. When BLB&G utilizes online services provided by a vendor with a flat-rate contract, access to the service is by a billing code entered for the specific case being litigated. At the end of each billing period, BLB&G's costs for such services are allocated to specific cases based on the percentage of use in connection with that specific case in the billing period.

161. **Document Hosting & Management.** BLB&G seeks $332,932.39 for document management and litigation supports costs, which represent approximately 15% of the overall expenses. This includes $11,402.50 paid to an outside vendor who assisted in gathering Pentwater's documents, and $321,529.89, which represents BLB&G's costs associated with establishing and maintaining the internal document database that BLB&G employed to process and review the substantial number of documents produced to Lead Plaintiff by Defendants and third parties in the Action. BLB&G charges a rate of $4 per gigabyte of data per month and $17 per user to recover the costs associated with maintaining its document database management

56

system, which includes the costs to BLB&G of necessary software licenses and hardware. BLB&G has conducted a review of market rates charged for the similar services performed by third-party document management vendors and found that its rate was at least 80% below the market rates charged by these vendors, resulting in a savings to the class.

162.    **Mediation Costs.**  Lead Plaintiff's share of the mediation fees paid to Phillips ADR Enterprises for the services of Judge Phillips in overseeing two formal mediation sessions and additional ongoing negotiations amounted to $101,372.50.

163.    **Foreign Discovery & Witness Costs**.  Lead Counsel also incurred $571,070.21 in expenses in connection with certain discovery, in particular discovery conducted outside the United States, which included compensation to counsel and witnesses that were subject to such foreign discovery.  These expenses include payments to counsel in foreign jurisdictions to assist in obtaining or managing discovery in those jurisdictions, payments to an examiner for overseeing depositions in the United Kingdom, and payments to counsel and witnesses for certain of the witnesses who were deposed, which were shared with counsel for Defendants.

164.    The other expenses for which Lead Counsel seeks payment are also the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court costs, service of process costs, printing and copying costs, long distance telephone charges, postage and delivery expenses, and travel costs. The costs for internal copying and printing are charged at $0.10 per page.  Airfare for Lead Counsel's travel is at coach rates, hotel charges per night are capped at $350; and travel and other out-of-office meals are capped at $20 per person for breakfast, $25 per person for lunch, and $50 per person for dinner.  In-office working meals are capped at $25 per person for lunch and $40 per person for dinner.

165.    The total amount requested by Lead Counsel for expenses, $2,217,327.97 is substantially below the $2,600,000 that Settlement Class Members were advised could be sought in the Notice.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

## VII.   CONCLUSION

166.    For all the reasons set forth above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submits that the requested fee in the amount of 13% of the Settlement Fund net of expenses should be approved as fair and reasonable, and the request for Lead Counsel's litigation expenses in the amount of $2,217,327.97 should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.  Executed on September 10, 2025.

*/s/ Salvatore J. Graziano*
Salvatore J. Graziano