UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                                             :

IN RE TURQUOISE HILL RESOURCES LTD.     :                                                          
SECURITIES LITIGATION                          :              20-cv-8585 (LJL)
                                             :

------------------------------------------------------------------- X      OPINION AND ORDER

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:**_____
**DATE FILED: 10/23/2025**

LEWIS J. LIMAN, United States District Judge:

Lead Plaintiff PWCM Master Fund Ltd., Pentwater Thanksgiving Fund LP, Pentwater

Merger Arbitrage Master Fund Ltd., Oceana Master Fund Ltd., LMA SPC for and on behalf of

the MPA 98 Segregated Portfolio, Pentwater Equity Opportunities Master Fund Ltd., and Crown

Managed Accounts SPC acting for and on behalf of Crown/PW Segregated Portfolio ("Lead

Plaintiff" or "Pentwater Funds") moves for entry of judgment approving the settlement of this

class action lawsuit as fair, reasonable, and adequate, and entry of an order approving the

proposed Plan of Allocation as fair and reasonable.  Dkt. No. 477.  Lead Counsel Bernstein

Litowitz Berger & Grossman LLP ("Lead Counsel") separately moves this Court for entry of an

order awarding attorneys' fees and litigation expenses.  Dkt. No. 479.  For the following reasons,

both motions are granted.

## BACKGROUND

The Court assumes familiarity with the prior proceedings in this matter and summarizes

only those facts necessary for its decision.

### A.       Allegations of the Complaints and Procedural History

This case arises out of delay in the construction of the Oyu Tolgoi mine (the "Mine")

located in Mongolia, expected to be one of the largest copper mines in the world.  Dkt. No. 329

(the "Third Amended Complaint" or "TAC") ¶ 3.  Defendants Rio Tinto plc and Rio Tinto

Limited (collectively, "Rio Tinto") partially owned and operated Turquoise Hill Resources

Limited ("Turquoise Hill") through a subsidiary. *Id.* ¶¶ 40–41, 49–50. Turquoise Hill, in turn, partially owned nonparty Oyu Tolgoi LLC ("OT"), which owned the Mine. *Id.* ¶ 55. Turquoise Hill common stock is and was listed and traded on the New York Stock Exchange and the NASDAQ. *Id.* ¶ 31. The individual defendants are Jean-Sebastien Jacques ("Jacques") and Arnaud Soirat ("Soirat," and together with Jacques, "Individual Defendants," and collectively with Rio Tinto, "Defendants"). Rio Tinto and Turquoise Hill, through its predecessor, have an investment agreement to develop the Mine. *Id.* ¶ 64.

Turquoise Hill began work on the Mine as early as 2001, but worked ceased in 2013 due to a disagreement between OT and the Government of Mongolia. *Id.* ¶¶ 5, 64. Construction resumed in 2016. *Id.* ¶ 7. From the beginning of the renewal of work in 2016, the project was plagued by significant engineering, procurement, and construction issues. *Id.* ¶ 8. Eventually, in July 2019, Rio Tinto and Turquoise Hill disclosed a delay of sixteen to thirty months for sustainable first production and cost overruns of $1.2–$1.9 billion, resulting in Turquoise Hill's stock price plummeting about 43%. *Id.* ¶¶ 24, 269, 438.

In October 2020, a class action lawsuit was filed in this Court alleging that Rio Tinto and Turquoise Hill made false and misleading statements about the progress of construction on the Mine. Dkt. No. 7. Pentwater Funds purchased Turquoise Hill securities in the period from July 17, 2018, to July 31, 2019 (the "Class Period"). TAC ¶ 1. The Court appointed it as Lead Plaintiff on January 15, 2021, to represent a class defined as those who purchased or otherwise acquired Turquoise Hill securities during the Class Period. Dkt. No. 103. Lead Plaintiff filed an Amended Complaint on March 17, 2021, *see* Dkt. No. 110, and a Second Amended Complaint on September 16, 2021, *see* Dkt. No. 127. On September 2, 2022, the Court dismissed all claims against Turquoise Hill and its executives, as well as those against Rio Tinto International

Holdings Limited, leaving only Rio Tinto and the Individual Defendants.  Dkt. No. 149.  On December 15, 2023, Lead Plaintiff filed the Third Amended Complaint.  Dkt. No. 329.

On December 23, 2024, Lead Plaintiff filed an opposed motion for class certification. Dkt. No. 415; *see also* Dkt. No. 443.

On June 18, 2025, one week before the Court was scheduled to hear oral argument on the motion for class certification, Lead Plaintiff filed an unopposed motion for preliminary approval of settlement of this case.  Dkt. No. 469.  The Court heard oral argument on the motion for preliminary approval on June 25, 2025.  On June 26, 2025, the Court issued an order preliminarily approving the settlement and authorizing dissemination of the notice of settlement (the "June 26, 2025 Order").  Dkt. No. 474.  The Court found that it would likely be able to certify a settlement class (the "Settlement Class") comprised of "all persons and entities who purchased or otherwise acquired Turquoise Hill common stock, call options on Turquoise Hill common stock (or sold put options on Turquoise Hill common stock), or swaps replicating a purchase of Turquoise Hill common stock, in domestic transactions or on U.S. exchanges, during [the Class Period] . . . and were damaged thereby."  *Id.* ¶¶ 2–3.  The Court also found that it would likely be able to certify Lead Plaintiff as class representative of the Settlement Class and Lead Counsel as class counsel for the Settlement Class.  *Id.* ¶ 3.  In addition, the Court found that it would likely be able to finally approve the settlement as fair, reasonable, and adequate, *id.* ¶ 4, and it approved and authorized the issuance of notice to the class, *id.* ¶ 8.

On September 10, 2025, Lead Plaintiff filed this motion for final approval of the Settlement, Dkt. No. 477, and Lead Counsel filed a motion for approval of an award of attorneys' fees and litigation expenses, Dkt. No. 479.  Memoranda of law and declarations were filed in support of the motions.  Dkt. Nos. 478, 480–81.  On October 8, 2025, Lead Plaintiff and

Lead Counsel filed a reply memorandum of law in further support of the motions for approval of the settlement and for the award of attorneys' fees and litigation expenses. Dkt. No. 484.

The Court held a hearing on the motions on October 15, 2025.

**B.    The Proposed Settlement**

The settlement is the product of negotiations between the parties over at least two private mediation sessions before former-judge and former United States Attorney Layn R. Phillips. Dkt. No. 469-1 ¶¶ Q, S.  The parties held a first private mediation session before Mr. Phillips on February 5, 2025. *Id.* ¶ Q; Dkt. No. 481-1 ¶ 7.  They exchanged and submitted detailed mediation statements and supporting exhibits in advance of that session but did not reach a resolution.  Dkt. No. 481-1 ¶ 8.  The parties attended a second mediation session with Mr. Phillips on April 25, 2025, which also failed to yield a resolution. *Id.* ¶¶ 10–11; Dkt. No. 469-1 ¶ S.  The participants in the mediation included representatives of Lead Plaintiff.  Dkt. No. 481-1 ¶ 7; Dkt. No. 481-2 ¶ 6.  On May 1, 2025, the parties reached an agreement on the financial terms to settle this case subject to formal documentation and Court approval—terms which were memorialized in a term sheet executed on May 14, 2025.  Dkt. No. 469-1 ¶ U; Dkt. No. 481-1 ¶ 11.

The final settlement is embodied in a Stipulation and Agreement of Settlement (the "Settlement Agreement").  Dkt. No. 469-1.  It provides for the payment by or on behalf of Defendants of $138,750,000 for the benefit of the Settlement Class in exchange for a release by members of the class, including Lead Plaintiff, of all claims against Defendants and Defendants' Releasees. *Id.* ¶ U.  The released claims include:

> [A]ll claims and causes of action of every nature and description, whether arising under federal, state, common, or foreign law, including known claims and unknown claims, that Lead Plaintiff or any other member of the Settlement Class asserted in the TAC or could have asserted in any other forum that (i) arise out of or are based upon the allegations, transactions, facts, matters or occurrences, representations, or

4

> omissions involved, set forth, or referred to in the TAC and (ii) relate to the purchase or acquisition of Turquoise Hill common stock or call options on Turquoise Hill common stock or sales of put options on Turquoise Hill common stock, or swaps replicating a purchase of Turquoise Hill common stock, in domestic transactions or on U.S. exchanges during the Class Period.

*Id.* ¶ 1(mm).  The parties agree that Lead Counsel will apply to the Court for a collective award of attorney' fees and litigation expenses.  *Id.* ¶ 15.

The parties have also agreed upon a proposed Plan of Allocation, but such plan is not a necessary term of the Settlement.  *Id.* ¶ 22; *see id.* at 77–87.[1]  The proposed Plan of Allocation provides for the allocation of the settlement amount based on the purchase and sale of Turquoise Hill securities over the Class Period, whether those purchases or sales were in the form of Turquoise Hill common stock or swaps with respect to Turquoise Hill common stock, or in the form of Turquoise Hill call and put options, and the date that the relevant securities were sold. Only purchases or acquisitions of Turquoise Hill common stock, call options on Turquoise Hill common stock, or swaps replicating a purchase of Turquoise Hill common stock (or sales of put options on Turquoise Hill common stock) made through a U.S. transaction or on a U.S. exchange are eligible for a recognized loss amount.  *Id.* at 81.  A claimant who has market gains as a result of purchases and sales of Turquoise Hill securities during the Class Period is not entitled to any recovery and, in any event, a claimant is not able to recover more than its market loss.  *Id.* at 82–83.

A separate securities class action has been brought in Quebec on behalf of investors who purchased Turquoise Hill securities in the secondary market and held some or all of those securities until after one or both of the corrective disclosures alleged in this case and who are (i) residents of Canada or were residents in Canada at their acquisitions; or (ii) acquired Turquoise

---

[1] Citations to this document use ECF pagination.

Hill securities in the secondary market in Canada or elsewhere, other than in the United States. *Id.* at 64. The Plan of Allocation prohibits double-dipping in both this action and the Canadian class action. Claimants are not eligible to recover in this action for the same purchases, acquisitions, or sales of Turquoise Hill securities for which they submit claims in the Canadian class action, and claimants will have to certify that their claim in this case does not include such purchases or sales. *Id.* at 81.

The proposed Plan of Allocation contains a *cy pres* provision permitting the distribution by Lead Counsel of any funds remaining after the distribution to claimants to "one or more non-sectarian, not-for-profit, 501(c)(3) organizations to be selected by Lead Counsel and approved by the Court." *Id.* at 83.

### C.    Notice and Reaction of the Class

On July 11, 2025, the notice and claims administrator sent notice packets to 4,080 addresses reflected in mailing records of brokerage firms, banks, and other institutions which are the largest and most common nominees that purchase securities on behalf of beneficial owners. Dkt. No. 481-5 ¶ 5. On July 18, 2025, the notice and claims administrator also sent notice packages to 12,310 potential class members as identified from records produced by defense counsel. *Id.* ¶ 4. In total, over 16,000 notice packets were mailed to potential class members and nominees in the initial mailing from July 11, 2025 through July 18, 2025. *Id.* ¶ 7. The notice and claims administrator also followed up with phone calls, emails, and reminder postcards to brokers and nominees to ensure that they provided timely responses to the mailings of the notice packets. *Id.* ¶ 8. On July 10, 2025, the notice and claims administrator also provided a copy of the notice of settlement to the Depository Trust Company ("DTC") for posting on its Legal Notice System. *Id.* ¶ 9. Through September 9, 2025, the notice and claims administrator mailed an additional 2,315 notice packets to potential class members. *Id.* ¶ 10. As of October 8, 2025,

the notice and claims administrator has mailed a total of 30,569 notice packets to potential class members and nominees.  Dkt. No. 484-1 ¶ 2.  In addition, notice and information regarding the settlement were made available through a website, a telephone helpline, and a summary notice published in *The Wall Street Journal* and released by *PR Newswire*, a settlement website.  Dkt. No. 481-5 ¶¶ 12–14; Dkt. No. 484-1 ¶ 3.

To date, only one request for exclusion has been submitted and there have been no objections to the settlement.  Dkt. No. 481-5 ¶ 15; Dkt. No. 484-1 ¶ 4.  As of October 7, 2025, 13,107 claims have been received, of which 6,562 appear to be eligible under the Plan of Allocation.  Dkt. No. 484-1 ¶¶ 6–7.  The eligible claims represent a total of approximately 533,965,096 damaged shares of Turquoise Hill common stock or relevant Turquoise Hill swaps and 182,300 damaged options.  *Id.* ¶ 7.  The total recognized claims for all claims received is approximately 382,471,111.  *Id.*

## DISCUSSION

### A.    Certification of the Settlement Class

The June 26, 2025 Order contained the Court's findings that it would likely be able to approve certification of the Settlement Class defined as "all persons and entities who purchased or otherwise acquired the common stock of Turquoise Hill, call options on Turquoise Hill common stock (or sold put options on Turquoise Hill common stock), or swaps replicating a purchase of Turquoise Hill common stock, in domestic transactions or on U.S. exchanges, during the Class Period, and were damaged thereby."  Dkt. No. 474 ¶¶ 1–2.

The Court confirms and finalizes that conclusion.  The Settlement Class satisfies Federal Rule of Civil Procedure 23(a) because the class is so numerous that joinder of all members would be impracticable, there are questions of law and fact common to the class, the claims of the Pentwater Funds are typical of those of the class, and the Court has concluded that Lead

Plaintiff and Lead Counsel will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  The Settlement Class also satisfies Federal Rule of Civil Procedure 23(b)(3) because at this stage common questions predominate over individualized questions and the class action provides a superior means of resolving the claims of class members to any other method of adjudication.  Fed. R. Civ. P. 23(b)(3); *see In re Petrobras Sec. Litig.*, 317 F. Supp. 3d 858, 867 (S.D.N.Y. 2018) (certifying settlement class in case involving securities traded globally), *aff'd*, 784 F. App'x 10 (2d Cir. 2019) (summary order).

**B.    Approval of the Settlement**

Lead Plaintiff asks that the Court approve the Settlement Agreement as fair, reasonable, and adequate.  Rule 23(e) provides that "[t]he claims . . . of a certified class . . . may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e). Rule 23(e)(2) requires a court to make certain findings in order for a settlement to be binding on class members.  A settlement may be approved only if it "is fair, reasonable, and adequate."  *Id.* The Rule, as amended on December 1, 2018, provides that if a proposed settlement:

> would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> > (A) the class representatives and class counsel have adequately represented the class;
> >
> > (B) the proposal was negotiated at arm's length;
> >
> > (C) the relief provided for the class is adequate, taking into account:
> >
> > > (i) the costs, risks, and delay of trial and appeal;
> > >
> > > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > >
> > > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > >
> > > (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

*Id.* The Advisory Committee's notes on Rule 23(e)(2) state that the goal of the amendment "is not to displace any factor" previously adopted by any United States Court of Appeals, "but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) advisory committee's notes to 2018 amendment. The notes explain that in certain jurisdictions, lengthy, multifactor tests risk distracting courts and parties from focusing on the key issues in a settlement review. *Id.*

Most of the requirements set forth in the amendments to Rule 23(e)(2) have long been incorporated in the nine-factor test adopted by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). To evaluate the substantive fairness of a proposed settlement, *Grinnell* instructs district courts to consider "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013) (alteration in original) (quoting *Grinnell*, 495 F.2d at 463). In conducting the review required by Rule 23(e), the Court has a duty "to make a considered and detailed assessment of the reasonableness of proposed settlements of class actions." *Weinberger v. Kendrick*, 698 F.2d 61, 82 (2d Cir. 1982) (Friendly, J.).

1.    **The Class Representatives and Class Counsel Have Adequately Represented the Class.**

Before the Court approves a class action settlement, it must determine that both the class representatives and class counsel have adequately represented the class.  Fed. R. Civ. P. 23(e)(2)(A).  "The adequacy of the proposed class representative . . . directly implicates the due process rights of absent class members who will be bound by the judgment." *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 198 (S.D.N.Y. 2015) (citation omitted); *see also Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 519 (2d Cir. 2020) ("Rule 23's requirements of adequacy and typicality are intended to protect the due process rights of absent class members."); *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968) ("[C]ourts have expressed particular concern for the adequacy of representation in a class suit because the judgment conclusively determines the rights of absent class members.").  "[T]he adequacy requirement 'entails inquiry as to whether: 1) plaintiffs' interests are antagonistic to the interest of other members of the class and 2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation.'" *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) (quoting *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).

Lead Plaintiff's interests coincide with the interests of the class.  As a result of their purchase of Turquoise Hill securities during the Class Period, and depending on the method of calculation, the Pentwater Funds have incurred losses of between approximately $220 million and $229 million.  Dkt. No. 67 at 2; Dkt. No. 68-2.  Lead Plaintiff thus shares the common goal with members of the class in maximizing recovery for losses as a result of transactions in Turquoise Hill securities during the Class Period.  *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of

maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Before the Pentwater Funds were appointed as Lead Plaintiff, other investors who sought the same position raised the concern (which the Court shared) that Lead Plaintiff's continuing large equity position in Turquoise Hill could create a potential for conflict with members of the class. *See* Dkt. No. 103 at 11–16. The concern was that, if appointed as Lead Plaintiff, the Pentwater Funds could use the threat of a recovery for the class in this lawsuit to leverage benefits for itself in other fora. It could compromise the interests of the class in exchange for assistance from Rio Tinto in disposing of its large and otherwise presumably illiquid position in Turquoise Hill; obtaining a board seat in Turquoise Hill; or obtaining a separate, more lucrative settlement in shareholder and oppression litigation in Canada. *Id.* As a result, the Court took several measures to protect the interests of the class. It secured the commitment of the Pentwater Funds that they would not enter into any agreement relating to their Turquoise Hill holdings with Defendants or their affiliates other than in connection with an agreement for the class subject to class notice and Court approval. *Id.* at 13. The Court further secured a representation that the Pentwater Funds would not pursue simultaneous litigation against Defendants in another forum that would conflict with this case. *Id.* at 16. The Court imposed an affirmative obligation on the Pentwater Funds to report to the Court any litigation that Lead Plaintiff commenced against Defendants or their affiliates, with an explanation as to why such litigation did not create a conflict of interest. *Id.* To address the concern that the Pentwater Funds could use this litigation as leverage for assistance with their position in Turquoise Hill securities, the Court ordered the Pentwater Funds "to report to the Court any arrangements made with any of the Defendants or their affiliates to purchase Pentwater Funds' shares in Turquoise Hill or otherwise find

purchasers for those shares, during the pendency of this litigation, regardless of whether such arrangement is made in connection with settlement."  Dkt. No. 108.[2]

There is no evidence that Lead Plaintiff has done anything other than vigorously represent the interests of the class.  It did not make any agreements with Defendants in connection with its continued stake in Turquoise Hill.  With respect to the Canadian litigation, at oral argument, counsel for Lead Plaintiff explained that there have been two relevant lawsuits, neither of which has had any impact on this case.  The first was resolved approximately six months before settlement negotiations in this case began, and counsel for Lead Plaintiff had no role in that process other than ensuring it did not result in a global settlement.  Thus, at the time of settlement negotiations here, Lead Plaintiff had no continuing interest in that action which could have compromised its representation of the class.  The second Canadian case has not yet been resolved and involves a different time period, different laws, and different damages.  Counsel for Lead Plaintiff has not played a role in that case.  There is therefore likewise no basis for concern that Lead Plaintiff traded away compensation for the class in this case in favor of compensation in the Canadian case. *Cf. Mendell v. Am. Med. Response, Inc.*, 2021 WL 1102423, at *3 (S.D. Cal. Mar. 23, 2021) (declining to find that parallel litigation rendered the lead plaintiff's representation of the class inadequate, as there was no evidence that the lead plaintiff was "likely to advance his own interests at the cost of the interests of the class"); *Trunzo v. Citi Mortg.*, 2018 WL 741422, at *13 (W.D. Pa. Feb. 7, 2018) (noting that the "ironic part" of

---

[2] The Court also noted that, to the extent the Canadian litigation presented the potential for a conflict of interest, that concern was speculative at the stage of appointing Lead Plaintiff, and the Court could better assess it at the class certification stage when the Canadian action was "further along."  Dkt. No. 198 at 16.  The Court assessed the Canadian litigation during the fairness hearing and has determined that it does not undermine the Pentwater Funds' adequacy to serve as class representative here.

arguments regarding the class representative selling out the class for a better individual settlement was that the defendant had not in fact settled with the class representative).  As such, there is no reason to doubt that Lead Plaintiff has adequately represented the class.

As for Lead Counsel, the Court has previously determined that they are qualified, experienced, and well-suited to conduct the litigation.  Dkt. No. 103 at 22–23.  They have demonstrated that capacity, having filed three complaints and successfully litigated numerous motions.

### 2.     The Proposal Was Negotiated at Arm's Length.

From a procedural standpoint, the negotiation of a settlement at arm's length between qualified counsel provides assurance regarding the fairness, reasonableness, and adequacy of a settlement.  *See* Fed. R. Civ. P. 23(e)(2)(B).  "Courts have traditionally considered other related circumstances in determining the 'procedural' fairness of a settlement, including: (i) counsel's understanding of the strengths and weakness of the case based on factors such as the stage of the proceedings and the amount of discovery completed, (ii) the absence of any indication of collusion in the settlement negotiations, and (iii) a mediator's involvement in the negotiations." *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *3 (S.D.N.Y. July 21, 2020) (internal citations and quotations omitted).

Here, the Settlement Agreement was reached only after two mediation sessions held by qualified and experienced counsel on both sides before a highly experienced mediator.  Dkt. No. 481 ¶¶ 84–89; Dkt. No. 481-1 ¶¶ 7-11.  According to the mediator, Mr. Phillips:

> The mediation process was an extremely hard-fought negotiation from beginning to end and was conducted by experienced and able counsel on both sides. Throughout the mediation process, the negotiations between the Parties were vigorous and conducted at arms-length and in good faith. . . . [T]he arguments and positions asserted by all involved were the product of substantial work, were complex and highly adversarial, and reflected a detailed and in-depth understanding of the strengths and weaknesses of the claims and defenses at issue in this case.

13

Dkt. No. 481-1 ¶ 12.

Lead Counsel had an understanding of the strengths and weaknesses of their case, gained through extensive investigation and lengthy litigation.  The case was not settled until after the Court had ruled on two motions to dismiss and on the eve of a hearing on the motion for class certification.  Before agreeing to the settlement, Lead Counsel interviewed two whistleblowers, Dkt. No. 481 ¶ 20; spoke (directly or through investigators) to over seventy other individuals believed to have relevant information pertaining to the claims in the case, *id.*; consulted with four mining experts, *id.* ¶ 21, and two economic or finance experts, *id.* ¶¶ 22–23; reviewed 434,112 documents consisting of more than 1.7 million pages produced in response to discovery requests, *id.* ¶ 56; provided over 371,000 pages of documents to Defendants, *id.* ¶ 66; conducted depositions of the two whistleblowers over the course of four days in the United Kingdom, *id.* ¶ 74; prepared two expert reports in connection with class certification, *id.* ¶ 79; defended the depositions of numerous witnesses including a party representative from the Pentwater Funds, *id.* ¶ 80; and took the deposition of Defendants' market efficiency expert, *id.* ¶ 82.

There is no evidence of collusion.

### 3.    The Relief Provided for the Class Is Adequate.

Courts must consider whether "the relief provided for the class is adequate, taking into account," among other things, "the costs, risks, and delay of trial and appeal."  Fed. R. Civ. P. 23(e)(2)(C)(i).  Rule 23 "incorporates the nine-factor test set forth in *Grinnell* for determining whether a settlement is substantively fair, reasonable, and adequate."  *In re Signet Jewelers*, 2020 WL 4196468, at *4.

### a.    Adequacy of the Relief Given the Risks of Trial and Appeal

Lead Plaintiff reached the settlement in the face of numerous litigation risks.  In order to prevail, Lead Plaintiff would have to convince a unanimous jury by a preponderance of the

evidence that (i) Defendants made misstatements; (ii) the misstatements were material; (iii) the misstatements were made with scienter; (iv) investors relied upon the misstatements; and (v) Defendants' alleged fraud caused investors losses.  Dkt. No. 149 at 22.  In addition, to convince the Court that a class should be certified and to proceed as a class action, Lead Plaintiff would have to establish that common issues predominated over individualized issues, that the class was ascertainable, and that a class action was "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Lead Plaintiff faced formidable risks in establishing liability, damages, and a basis for class certification.  Few of Lead Plaintiff's challenged statements survived Defendants' motions to dismiss, *see* Dkt. Nos. 149, 356, and of those that did, Defendants still had arguments available that the statements were not actionable because they were not material, were forward-looking, or were statements of opinion, Dkt. No. 481 ¶¶ 103–04.  The Court dismissed claims against defendant Jacques for failure to adequately plead scienter, 2024 WL 4711185, at *16–17 (S.D.N.Y. Nov. 7, 2024), and at summary judgment or trial, Defendants would be able to make many of the same arguments with respect to defendant Soirat.  Dkt. No. 481 ¶ 107.  There were also risks with respect to loss causation and damages, including whether the alleged corrective disclosures revealed information that was already known to the market.  *Id.* ¶ 111.  As to class certification, the Court would have had to find, among other things, that any individualized questions relating to whether class members purchased Turquoise Hill securities in domestic transactions would not predominate over common questions regarding falsity, materiality, and scienter.  *See In re Petrobras Sec. Litig.*, 862 F.3d at 273–74.

All of these issues would have also presented substantial risks on appeal in the face of a verdict for Lead Plaintiff.

### b.    The Costs and Delay of Trial and Appeal

Were the case not settled, class members would have to await the resolution of a complicated class certification motion, the filing and resolution of motions for summary judgment, and trial.  In addition to all of the litigation risks class members faced, each of those steps would have taken substantial time in this complex case involving conduct in several continents.  Each of those steps additionally would have been costly—with costs taken out of any common fund obtained as a result of a favorable resolution.

By settling now, Lead Plaintiff was able to avoid those costs and delay on behalf of the class, assuring immediate payment to class members for the losses they suffered from the purchase of Turquoise Hill securities.

### c.    The Effectiveness of the Plan of Allocation

Rule 23(e)(2) requires a court to consider the effectiveness of the parties' "proposed method of distributing relief to the class, including the method of processing class-member claims."  Fed. R. Civ. P. 23(e)(2)(C)(ii).  An adequate method is one that can "deter or defeat unjustified claims" without imposing an undue demand on class members.  Fed. R. Civ. P. 23(e)(2)(C) advisory committee's note to 2018 amendment.  A plan for allocating settlement funds "need not be perfect."  *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007).  Rather, the plan "need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."  *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005).

Under the proposed Plan of Allocation, each member of the settlement class would be assigned a pro rata share of the settlement fund, calculated based on the dates on which they bought and sold Turquoise Hill securities, the price they paid, and the loss they suffered.  This

allocation plan appears to be rational and fair, as it treats class members equitably considering the magnitude of their injuries.  Accordingly, this factor weighs in favor of approval.

### d.    The Terms of Any Proposed Award of Attorneys' Fees

Lead Counsel seeks attorneys' fees totaling 13% of the settlement fund and reimbursement of $2,217,327.97 in expenses.  Dkt. No. 481 ¶ 138.  Assuming the litigation expenses are paid in full, the requested fee will come to $17,749,247.  *Id.* ¶ 143.

The Court will describe in greater detail below the appropriateness of the fees request and the performance of counsel.  For purposes of Rule 23(e), the proposed attorneys' fees are not an obstacle to approving the settlement.

### e.    Agreements Required to Be Identified Under Rule 23(e)(3)

Rule 23(e)(3) states that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal."  Fed. R. Civ. P. 23(e)(3).  In addition to the Settlement Agreement, Lead Plaintiff and Rio Tinto have entered into a confidential agreement regarding requests for exclusion from the Settlement Class, setting forth the conditions under which Rio Tinto may terminate the agreement if the opt-outs from the Settlement Class exceed an agreed-upon threshold.  The Court has reviewed the agreement *in camera*.  The agreement "has no negative impact on the fairness of the Settlement."  *Signet*, 2020 WL 4196468, at *13.

### f.    Whether the Proposal Treats Class Members Equitably Relative to Each Other

As explained above, the net settlement fund will be allocated to authorized claimants on a pro rata basis given the relative size of their recognized losses.  The Court finds that the Plan of Allocation both seeks to, and does in fact, compensate members of the class equitably.

g.      **The Reaction of the Class to the Settlement**

The deadline for submitting objections to the settlement was September 24, 2025.  Dkt.
No. 481-5 at 11.  No objections were submitted with respect to the Settlement Agreement, the
Plan of Allocation, or the proposed award of attorneys' fees and expenses.

The reaction of the class weighs strongly in favor of the settlement.  *See Wal-Mart
Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 119 (2d Cir. 2005) ("[T]he favorable reaction of the
overwhelming majority of class members to the Settlement is perhaps the most significant factor
in [the] *Grinnell* inquiry.").

h.      **The Size of the Settlement in the Range of Possible Recovery**

Lead Plaintiff's damages expert has estimated that the maximum realistically recoverable
damages in this case would range from approximately $322 million to $407 million.  Thus, the
recovery of $138.75 million represents a recovery of 34% to 43% of investors' maximum
damages.  Dkt. No. 481 ¶ 118.  "There is 'a range of reasonableness with respect to a settlement,'
. . . and the settlement amount's ratio to the maximum potential recovery need not be the sole, or
even the dominant, consideration when assessing the settlement's fairness."  *In re Glob.
Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 460–61 (S.D.N.Y. 2004).  The settlement here as
a percentage of maximum possible recovery falls well within the range that courts have approved
in other largescale securities class actions.  *See, e.g.*, *Christine Asia Co. v. Yun Ma*, 2019 WL
5257534, at *14 (S.D.N.Y. Oct. 16, 2019) (approving settlement of $250 million representing
17–20% of maximum recovery); *In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 157 (S.D.N.Y.
2013) (approving settlement of $730 million representing approximately 24% of maximum
recovery); *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y.
2007) (noting that a settlement of $133 million representing approximately 3–7% of maximum

recovery fell "within the range of reasonableness for recovery in the settlement of large securities class actions").

### i.    The Ability of Defendants to Withstand a Greater Judgment

The ability of Defendants, and in particular Rio Tinto, to withstand a judgment in excess of $138.75 million is clear.  This fact alone, however, "does not suggest that the settlement is unfair."  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001).  For a settlement to be fair and adequate, a "defendant is not required to empty its coffers."  *In re IMAX Secs. Litig.*, 283 F.R.D. 178, 191 (S.D.N.Y. 2012) (cleaned up); *see also In re FLAG Telecom Holdings*, 2010 WL 4537550, at *19 (S.D.N.Y. Nov. 8, 2010) ("[T]he mere ability to withstand a greater judgment does not suggest the settlement is unfair.").

Given these factors, the Court determines that the proposed Settlement Agreement is fair, reasonable, and adequate.

### C.    Approval of the Plan of Allocation

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized—namely, it must be fair and adequate."  *In re WorldCom*, 388 F. Supp. 2d at 344 (quoting *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y.2002)); *see also In re IMAX*, 283 F.R.D. at 192.  As indicated above, the formula established for allocation "need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."  *In re Bear Stearns Cos. Secs., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 270 (S.D.N.Y. 2012) (quoting *In re WorldCom*, 388 F. Supp.2d at 344).  In particular, "courts look primarily to the opinion of counsel" in determining the reasonableness and fairness of a plan of allocation.  *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011); *see also In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 414–15 (S.D.N.Y. 2018), *aff'd sub nom. In re*

*Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020) (summary order); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010).

The Plan of Allocation satisfies these standards.  Lead Plaintiff's Plan of Allocation was prepared by experienced counsel along with a damages expert, both of which are indicia of reasonableness.  Dkt. No. 481 ¶ 128.  The objective of the Plan of Allocation is to distribute the settlement proceeds equitably among those class members who suffered economic losses as a proximate result of the alleged wrongdoing and who have submitted claims.  *Id.* ¶ 129.  In developing the Plan of Allocation, Lead Plaintiff's damages expert calculated the estimated amounts of artificial inflation in the per-share closing prices of Turquoise Hill common stock, Turquoise Hill swaps, and call options on Turquoise Hill common stock which was purportedly proximately caused by Defendants' allegedly materially false and misleading statements.  *Id.* ¶ 130.  Recognized Loss Amounts are based primarily on the difference in the amount of alleged artificial inflation in the respective prices of the Turquoise Hill securities at the time of purchase or acquisition and at the time of sale, or the difference between the actual purchase price and sale price, assuming a settlement class member held the interest through a corrective disclosure.  *Id.* ¶¶ 131, 133.  The net settlement fund (i.e., the settlement fund after payment of the expenses of the notice and claims administrator, attorneys' fees, and litigation expenses) will be allocated to authorized claimants on a pro rata basis given the relative size of their recognized claims.  *Id.* ¶ 134.  And the parties have agreed that Lead Counsel shall submit to the Court, and publish publicly on the settlement website, a report detailing the results of distributions of the net settlement fund.  Dkt. Nos. 490–91.

The Court therefore likewise determines that the proposed Plan of Allocation is fair, reasonable, and adequate.

### D.    Attorneys' Fees and Expenses

Lead Counsel seeks an attorneys' fees award of 13% of the net settlement fund or approximately $17,749,247.  Dkt. No. 481 ¶¶ 138, 143.  Lead Counsel also seeks $2,217,327.97 in costs and expenses.  *Id.* ¶ 138.

"Under controlling law, 'a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'"  *In re Petrobras Sec. Litig.*, 317 F. Supp. 3d at 873 (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).  In reviewing a fee application in the class action context, the "court is 'to act as a fiduciary who must serve as a guardian of the rights of absent class members.'"  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 249 (2d Cir. 2007) (quoting *Grinnell*, 560 F.2d at 1099).  The award "must reflect 'the actual effort made by the attorney to benefit the class.'"  *Id.* (quoting *Grinnell*, 560 F.2d at 1099).

The Second Circuit provided substantial guidance to district courts on common-fund fee applications in *Goldberger v. Integrated Resources*, Inc., 209 F.3d 43 (2d Cir. 2000).  *Goldberger* makes plain that district courts have discretion to use either the lodestar or percentage methods in setting a fee award.  *Id.* at 45.  The decision lists certain factors that a court should weigh when reviewing an attorneys' fees application: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."  *Id.* at 50 (quoting *In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989)).  *Goldberger* further notes that "the lodestar remains useful as a baseline even if the percentage method is eventually chosen."  *Id.*  The lodestar method serves "as a 'cross-check' on the reasonableness of the requested

percentage." *Id.* "Of course, where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case (as well as encouraged by the strictures of Rule 11)." *Id.* (citation omitted). The Second Circuit's 2007 opinion in *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany* moved analysis of attorneys' fees away from the concept of a "lodestar" in favor of a "presumptively reasonable fee." 522 F.3d 182, 183 (2d Cir. 2007). The reasonable hourly rate is "what a reasonable, paying client would be willing to pay." *Id.* at 184.

Lead Counsel seeks attorneys' fees in the amount of 13% of the settlement fund, net of litigation expenses awarded. That percentage falls well within the range that courts in this Circuit have deemed reasonable for settlements of securities class actions in excess of $100 million. *See Boston Ret. Sys. v. Alexion Pharms., Inc.*, No. 16-cv-2127, Dkt. No. 329 ¶ 5 (D. Conn. Dec. 21, 2023) (awarding 25% of $125 million settlement); *Pearlstein v. Blackberry Ltd.*, 2022 WL 4554858, at *10–11 (S.D.N.Y. Sept. 29, 2022) (awarding 33.3% of $165 million settlement); *In re Luckin Coffee Sec. Litig.*, No. 20-cv-1293, Dkt. No. 338 ¶ 4 (S.D.N.Y. July 22, 2022) (awarding 17.5% of $175 million settlement); *Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2017 WL 3579892, at *6 (S.D.N.Y. Aug. 18, 2017) (awarding 21.24% of $210 million settlement); *Freeman v. Weatherford Int'l Ltd.*, No. 12-cv-2121, Dkt. No. 218 at 5 (S.D.N.Y. Nov. 23, 2015) (awarding 20.9% of $120 million settlement); *In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 148 F. Supp. 3d 303, 305 (S.D.N.Y. 2015) (awarding 25% of $180 million settlement); *In re Fannie Mae 2008 Sec. Litig.*, No. 8-cv-7831, Dkt. No. 552 ¶ 3 (S.D.N.Y. Mar. 3, 2015) (awarding 17.65% of $170 million settlement); *Bd. of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2012 WL 2064907, at *3 (S.D.N.Y. June 7,

2012) (awarding 25% of $150 million settlement); *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) (awarding 25% of $225 million settlement); *In re Deutsche Telekom AG Sec. Litig.*, 2005 WL 7984326, at *4 (S.D.N.Y. June 9, 2005) (awarding 28% of $120 million settlement).

The requested fees are also reasonable under the lodestar method. Lead Counsel spent over 47,000 hours of attorney and other professional support time prosecuting this action for more than four and a half years, excluding time spent on the fee application and on the motion for appointment of Pentwater Funds as Lead Plaintiff. Dkt. No. 481 ¶¶ 143–44. Lead Counsel has calculated a lodestar of $28,616,822.50, which would result in a negative lodestar multiplier of 0.6 (meaning the fees ultimately recovered would be 60% of the calculated lodestar). *Id.* ¶ 143. Even assuming that some of the fees are in excess of those that would be reasonable in a non-contingent case and that not all of the hours billed were reasonable, any lodestar would be well within the range that courts have found to be acceptable. *See Chabak v. Somnia Inc.*, 2025 WL 1275214, at *2 (S.D.N.Y. Apr. 28, 2025) (explaining that a "multiplier of 1.14 . . . falls within the range of multipliers approved by courts in the Second Circuit pursuant to lodestar cross checks of percentage-of-fund awards"); *In re 3D Sys. Sec. Litig.*, 2024 WL 50909, at *15 (E.D.N.Y. Jan. 4, 2024) (noting that "a lodestar multiplier of approximately 1.74 . . . is 'well within the range of multipliers commonly awarded in securities class actions and other complex litigation'" (citation omitted)); *In re Signet Jewelers*, 2020 WL 4196468, at *16 (asserting that a "1.98 multiple . . . is within the range of multipliers commonly awarded in securities class actions and other comparable litigation"); *cf. In re Tremont Sec. L., State L. & Ins. Litig.*, 699 F. App'x 8, 18 (2d Cir. 2017) (summary order) (noting in a case lacking substantial contingency

risk that a "lodestar multiplier of 2.5 would be considered high for a standard common fund case in this Circuit").

Importantly, the requested fee was arrived at only after negotiation with Lead Plaintiff. Dkt. No. 481-2 ¶ 8. At the outset of the litigation, Lead Plaintiff and Lead Counsel agreed on an engagement letter that provided for different levels of percentage fees based on the stage of the litigation at which the settlement was reached. *Id.* Lead Plaintiff agreed that Lead Counsel could apply for a fee of no more than 15% of the settlement fund if a settlement were reached after the completion of motion to dismiss briefing and before the conclusion of fact discovery. *Id.* The fee sought by Lead Counsel falls below that mark and is the product of further negotiation between Lead Counsel and Lead Plaintiff at the conclusion of this case. *Id.*

The other *Goldberger* factors support the reasonableness of the requested fee. Counsel achieved a very good result in an extremely hard-fought litigation against experienced opposing counsel. As noted above, Lead Counsel filed three detailed amended complaints, opposed two rounds of Defendants' motion to dismiss the complaint, successfully litigated numerous discovery issues, reviewed extensive documents, and took depositions abroad. Dkt. No. 481 ¶ 3. The case was extremely complex both factually and legally, involving both technical questions of mining in a foreign continent and legally challenging issues including ones over the extraterritorial application of the United States securities laws. As a result, Lead Counsel assumed significant risk. It was by no means a foregone conclusion that this case would survive a motion to dismiss or a motion for summary judgment or that a class would be certified. Thus, it was also by no means a foregone conclusion that the case would settle. Counsel took a risk that they would recover nothing. The Court was in a position to observe the quality of the representation provided by counsel. It was consistently excellent. Finally, it is worth noting

that, unlike in other cases where counsel might be able to piggyback off a governmental investigation, counsel in this case had to develop their theories of fact and law largely on their own.

Lead Counsel's request for reimbursement of expenses totaling $2,217,327.97 is also reasonable. "It is well-settled that attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were incidental and necessary to the representation of those clients." *In re Facebook*, 343 F. Supp. 3d at 418 (quoting *In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F.Supp.2d 180, 184 (S.D.N.Y. 2003)). Lead Counsel's expenses included, among other things, foreign discovery and witness costs, online legal and factual research, mediation fees, travel, copying expenses, and most prominently, expert fees, which accounted for approximately 43% of all expenses. Dkt. No. 481-8; Dkt. No. 481 ¶ 159. These experts opined on complex issues related to mining, engineering, and project management, as well as economic and domesticity issues relevant to loss causation, damages, and class certification. Dkt. No. 481 ¶ 159.[3] "[C]onsultant and expert fees . . . are customary and necessary expenses for a complex securities action." *In re Forest Lab'ys, Inc. Sec. Litig.*, 2009 WL 10738220, at *9 (S.D.N.Y. May 15, 2009) (citation omitted). Given the complexity of the case stretching over four and a half years and the necessity of these expenses, they are "properly chargeable to the Settlement Fund." *Id.* (citation omitted).

"The timing of the proposed award of attorney's fees is somewhat more controversial." *Mikhlin v. Oasmia Pharm. AB*, 2021 WL 1259559, at *7 (E.D.N.Y. Jan. 6, 2021). Federal Rule

---

[3] "Domesticity" in the securities context refers to the requirement that the relevant "manipulative or deceptive device or contrivance [be used] . . . in connection with the purchase or sale of a security listed on an *American* stock exchange, and the purchase or sale of any other security in the *United States*." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 273 (2010) (emphasis added).

of Civil Procedure 23(e)(2)(C)(iii) requires courts to consider the "timing of payment" for "any proposed award of attorney's fees." Fed. R. Civ. P. 23(e)(2)(C)(iii). The Settlement Agreement provides:

> Any attorneys' fees and Litigation Expenses that are awarded by the Court *shall be paid to Lead Counsel immediately upon award* . . . subject to Plaintiffs' Counsel's obligation to make appropriate refunds or repayments to the Settlement Fund . . . if the Settlement is terminated pursuant to the terms of this Stipulation or if, as a result of any appeal or further proceedings on remand, or successful collateral attack, the award of attorneys' fees and/or Litigation Expenses is reduced or reversed and such order reducing or reversing the award has become Final.

Dkt. No. 469-1 ¶ 16 (emphasis added).

Lead Counsel cites to a number of cases in this Circuit where courts have approved such "quick-pay" provisions allowing for the immediate payment of attorneys' fees upon issuance of the award. These cases recognize that "counsel have spent a great deal of time and money to litigate this case and should not have to continue to shoulder the costs of funding this litigation any longer than necessary." *In re Petrobras Sec. Litig.*, 317 F. Supp. 3d at 877. Such provisions also serve "the socially-useful purpose of deterring serial objectors" who are attracted by the hope that if they level an objection that delays the payment of a settlement they will be paid to drop that objection. *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 2016 WL 5338012, at *21 (N.D. Ohio Sept. 23, 2016). On the other hand, some courts in this District have held that a residual of the attorneys' fees should be held back to provide "an incentive for counsel to monitor the distribution agent and ensure that the settlement funds are distributed expeditiously." *In re Petrobras Sec. Litig.*, 317 F. Supp. 3d at 877; *see Hernandez v. Between the Bread 55th Inc.*, 496 F. Supp. 3d 791, 807–08 (S.D.N.Y. 2020); *Hart v. BHH, LLC*, 334 F.R.D. 74, 77 (S.D.N.Y. 2020).

Lead Counsel has convinced the Court that there need not be any holdback in this case. The principal reason for a holdback would be to ensure that counsel vigilantly monitors the

distribution process to ensure that the full settlement is distributed without undue delay. In the absence of a holdback, there is a risk that counsel would not be incentivized to perform its obligations to consult with the claims administrator as required by the Settlement Agreement. But, in this case, the class is represented by a Lead Plaintiff who is sophisticated and who also has a substantial stake in the settlement fund. Lead Plaintiff has both the interest and the ability to monitor Lead Counsel and to ensure that Lead Counsel performs its functions in connection with the settlement distribution. The Pentwater Funds suffered a significant loss in connection with their purchase of Turquoise Hill shares and stand to be a significant beneficiary of the settlement. Dkt. No. 68-2. They have an interest in ensuring that the settlement fund is quickly distributed. To the extent that distribution of the settlement fund is delayed, Lead Plaintiff would suffer along with, and no less than, members of the class. The Pentwater Funds have prior experience serving as lead plaintiff in a securities class action and overseeing the activities of counsel. Dkt. No. 68-3 ¶ 3. The Pentwater Funds also have a longstanding professional relationship with Lead Counsel. *Id.* ¶ 6. Any delay in the distribution of the settlement would be to the detriment of Lead Counsel, as Lead Counsel both has a current relationship with Lead Plaintiff and a motive to perform so as to continue its relationship with Lead Plaintiff in the future. Thus, in this particular case, it is the position of Lead Plaintiff more than any holdback that will ensure the class is protected. A holdback of compensation to Lead Counsel, which has performed its role on behalf of the class so ably, would inflict harm and undermine the incentives for counsel to undertake risky, complicated cases for sophisticated lead plaintiffs in the future.

## CONCLUSION

The motion for final approval of the Settlement Agreement and Plan of Allocation as fair, reasonable, and adequate is GRANTED. The motion for Lead Counsel's attorneys' fees and expenses is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 477 and 479.

SO ORDERED.

Dated: October 23, 2025
      New York, New York

                                              LEWIS J. LIMAN
                                    United States District Judge